U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2009 OCT -8  PM 4:49

BY _____
DEPUTY CLERK



UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

ALICE H. ALLEN and LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, )
GARRET SITTS and RALPH SITTS, )
on behalf of themselves )
and all others similarly situated, )
                Plaintiffs )
 )
    v. )      Docket No. 2:09-cv-230
 )
DAIRY FARMERS OF AMERICA, INC., )
DAIRY MARKETING SERVICES, LLC, )
DEAN FOODS COMPANY, and )
HP HOOD LLC, )
          Defendants )

## CLASS ACTION COMPLAINT AND JURY DEMAND

Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts, as

Plaintiffs and Class Representatives, by and through their undersigned attorneys, file this

action both on behalf of themselves and as a Class Action pursuant to Rule 23 of the Federal

Rules of Civil Procedure against Defendants Dairy Farmers of America, Inc. ("DFA"), Dairy

Marketing Services, LLC ("DMS"), Dean Foods Company ("Dean"), and HP Hood LLC

("Hood") (collectively referred to as "Defendants"). Plaintiffs seek treble damages and

injunctive relief for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C.

§§ 1 and 2). Plaintiffs complain and allege as follows:

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

## NATURE OF THE CASE

1.      This complaint arises from a crisis in the dairy industry in the Northeast United States, "the severity and urgency of which," according to recent public statements by Senator Leahy, "cannot be overstated." As a consequence of the conduct alleged herein, as Senator Leahy observed on September 19, 2009, "our bedrock dairy industry is on the brink of collapse . . . with Vermont dairy farmers not getting their fair share of the retail price of milk, while corporate processors appear to be raking in profits as they continue to raise prices to consumers."

2.      This is an antitrust case arising out of DFA's unlawful creation of monopsony and monopoly power in the milk distribution system by tying up access to milk bottling plants in the Northeastern United States through unlawful exclusive supply agreements and then using that monopsony power to force independent farmers to join DFA or to market their raw milk through its marketing affiliate, DMS. Though organized as a cooperative, DFA is not in fact operated solely for the benefit of its farmer members. Instead, DFA, for its own purposes, has utilized its market power, and that of DMS, to reduce fluid raw milk prices paid to its members and other members of the class relative to what would have prevailed in a competitive market. These lowered fluid raw milk prices increased profits for Defendants Dean and Hood, fluid milk processors in the Northeast with whom DFA conspired and contracted to establish and maintain its market power.

3.      The acquisition of Defendants' monopsony power primarily resulted from a series of unlawful contracts, agreements and understandings that defied restrictions that the Department of Justice ("DOJ") and various state Attorneys General imposed on various mergers or other combinations among Defendants. The resulting market structure effectively

secured for DFA and its DMS affiliate monopoly control over the supply of fluid Grade A milk to bottling plants in the Northeast.

4.      First, Defendants engaged in a string of unlawful mergers, acquisitions and closures of bottling plants – many of which violated conditions imposed by the DOJ – to strengthen their control of the market for the sale and purchase of fluid Grade A milk.

5.      Second, defying the explicit instructions of the Department of Justice, DFA entered into unlawful agreements with Dean, which controls approximately 70 percent of the Northeast market for bottling fluid Grade A milk, and with Hood, which controls approximately 20 percent of the Northeast market for bottling fluid Grade A milk and is part owned by DFA, whereby DFA and its affiliate DMS would supply all of the fluid Grade A milk bottled in the Northeast by Dean and a significant share of the fluid Grade A milk bottled by Hood.

6.      Third, Defendants forced independent dairy cooperatives and independent dairy farmers in the Northeast to join DFA or DMS in order to obtain access to bottling plants and balancing plants; access to bottling plants is the only means by which independent cooperative members and independent dairy farmers may qualify to receive minimum monthly payments for the sale of fluid Grade A milk set by the United States Department of Agriculture and to receive over-order premiums from the sale of their fluid Grade A milk.

7.      Fourth, DFA and DMS participated in a conspiracy to suppress milk prices for dairy farmers in the Northeast, which allowed DFA and DMS to avoid competition from the few dairy cooperatives in the Northeast that they did not control.

8.      As a result of Defendants' unlawful conduct, independent dairy farmers and independent dairy cooperatives were forced to choose between ceasing operations altogether or

joining DFA or DMS and paying fees to them in order to continue marketing fluid Grade A milk to their own customers at prices fixed by Defendants. Defendants' scheme increased the profits of Dean and Hood and permitted DFA's management to invest further resources into its monopolization efforts and to divert revenue from processors and joint ventures to themselves and outside business partners.

9.     The key actions taken by Defendants in furtherance of the conspiracy include the following:

- In 1999, DFA created marketing agent DMS with Dairylea, the largest dairy cooperative in the Northeast. DFA formed DMS to market fluid Grade A milk produced by, and to compensate, independent dairy cooperatives and farmers that did not want to join DFA. DFA used DMS to further the anti-competitive scheme by 1) forcing independent dairy farmers and cooperatives to join DMS in order to access bottling plants with whom DFA exclusively contracted; and 2) fixing the over-order premiums paid to independent dairy farmers and cooperatives who joined DMS.

- In 2001, Dean and Suiza merged to create the largest fluid Grade A milk bottler in the Northeast. DFA facilitated the merger by purchasing, through newly formed NDH, 11 of Dean's and Suiza's bottling plants which the DOJ required be divested. DFA then secured full-supply agreements with the newly merged Dean and with NDH that required independent dairy farmers and cooperatives to join DFA or DMS in order to access Dean's or NDH's bottling plants. As a result, in 2003, Dean informed independent dairy farmers and cooperatives that they must join DMS in order to continue to supply Dean with fluid Grade A milk.

- Dean paid supermarket chain Stop & Shop Supermarket Company ("Stop & Shop") to close down its bottling plant in Readville, MA. The closure not only eliminated a competitor of Dean's, but also eventually forced St. Albans Cooperative Creamery ("St. Albans"), which had previously provided Grade A milk to the Readville plant, to join DMS in order to obtain access to sufficient bottling plant capacity.

- In 2003, DFA orchestrated a stock and CEO exchange between NDH and Hood to obtain an ownership interest in, and supply contracts with, Hood. As a result of the transaction, DFA limited the growth of Agri-Mark Dairy Cooperative ("Agri-Mark"), a major supplier to Hood, and ensured

that the bottling plants acquired by Hood from NDH exclusively obtained fluid Grade A milk from DFA and DMS.

- In 2006, DFA and DMS established the Greater Northeast Milk Marketing Association ("GNEMMA"). GNEMMA's purpose was to provide a means for DFA and DMS to fix the prices that were paid to dairy farmers for the sale of fluid Grade A milk throughout the Northeast.

10.    At virtually every stage of the conspiracy, the DOJ or state Attorneys General intervened to place conditions on major transactions in order to preserve competition. The DOJ and state Attorneys General could only impose those conditions if they concluded that they were necessary for the transactions to comply with the Sherman Act and the Clayton Act. Yet, time and again, in furtherance of the conspiracy, Defendants circumvented and thwarted the conditions imposed by the DOJ and state Attorneys General in violation of the Sherman Act and the Clayton Act. Defendants' defiance of the conditions imposed by the DOJ and state Attorneys General include the following activities:

- In 2001, the DOJ required Dean and Suiza to divest 11 of their bottling plans to an independent competitor as a condition of their merger. Instead, they divested the plants to an entity, NDH, that was created and controlled by DFA. DFA had previously entered into full-supply contracts with Suiza and subsequently entered into full-supply contracts with NDH.

- In 2001, when Dean and Suiza merged, DFA was forbidden from entering into long-term exclusive supply contracts by previously existing consent decrees. Nonetheless, DFA entered into a one year full-supply contract with Dean that had to be renewed for 20 successive years to avoid Dean paying tens of millions of dollars in liquidated damages.

- In 2001, state Attorneys General were concerned that Dean's shutting down of Stop & Shop's bottling plant in Readville, MA would eliminate bottling capacity available to independent farmers and cooperatives, particularly St. Albans. As a result, state Attorneys General required Dean to make its bottling capacity "available" to competitors for five years. However, just two years later, DFA forced St. Albans, which had previously supplied fluid Grade A milk to the Readville plant, to join DMS in order to access sufficient bottling plant capacity.

- In 2002, state Attorneys General blocked a proposed merger between Hood and NDH because they were concerned that DFA would enter into full-supply contracts with the merged entity. However, in 2004, DFA engineered a stock and CEO exchange between Hood and NDH, which resulted in the transfer of significant ownership of Hood to DFA and major supply contracts between Hood and DFA.

11.     Having unlawfully obtained control of, and foreclosed access to, Northeast fluid Grade A milk bottlers by other cooperatives and independent dairy farmers, Defendants have used that control to: a) impose membership fees and dues onto Northeast dairy farmers who were forced to join DFA or DMS to obtain access to fluid Grade A milk bottlers; b) ensure that Dean and Hood did not compete with other bottlers in the Northeast to obtain fluid Grade A milk from dairy farmers; c) ensure that DFA and DMS did not compete with other cooperatives in the Northeast to obtain farmer members who produced raw Grade A milk; and d) fix, suppress, and maintain the over-order premiums fluid Grade A milk bottlers in the Northeast pay for fluid Grade A milk purchased from dairy farmers in the Northeast.

12.     Defendants' anticompetitive scheme enables them to enjoy the economic benefits that flow from foreclosing access to fluid Grade A milk bottling plants and balancing plants, and fixing prices for fluid Grade A milk paid to Northeast dairy farmers. Dean, Hood, and DFA each can pay artificially low over-order premium prices to Northeast dairy farmers with the comfort of knowing that their horizontal "competitors" are paying the same price - because DMS and GNEMMA are their common marketing agents and can police compliance with fixed prices. Defendants' actions have left independent dairy farmers and independent cooperative members with a choice between utilizing DFA or DFA-controlled DMS to market their fluid Grade A milk at the cartel's price or going out of business.

13.     Plaintiffs bring a class action pursuant to Rule 23(a) and (b)(2) and (3) of the Federal Rules of Civil Procedure ("Rule 23"), on behalf of themselves and other Northeast

dairy farmers, under Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 & 2, for which Defendants are jointly and severally liable.  This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs and expenses, as well as attorneys' fees and disbursements, along with such additional and further relief as may be deemed just and proper.

<u>JURISDICTION, VENUE, AND INTERSTATE COMMERCE</u>

14.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 - 2.

15.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

16.     This Court has personal jurisdiction over Dean, Hood, DFA and DMS because they systematically and continuously transact substantial business in the United States and in this District.

17.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, reside, are found or have an agent in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

18.     Defendants' business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce. Defendants Dean, and Hood purchase, process and ship fluid Grade A milk across state lines. Defendant DFA markets, processes and ships fluid Grade A milk across state lines. Defendant DMS markets fluid Grade A milk across state lines.  All Defendants receive substantial payments across state lines from the sale of fluid Grade A milk.

## PARTIES

Plaintiffs

19.     Plaintiff Al-lens Farm, a dairy farm located at 210 Bolkum Road, Wells River, VT 05081 was a member of Booth Brothers Dairy, Inc. until 2006 and a member of National Farmers Organization from 2006 until present.  Al-lens Farm milks approximately 30 cows. During the Class Period, Al-lens Farm sold, through DMS, fluid Grade A milk to fluid Grade A milk bottling plants in Order 1.

20.     Plaintiffs Ralph and Garrett Sitts and the unnamed partnership of which they are the general partners reside at 13501 Route 357, Franklin, NY 13775.  The partnership operates a dairy farm.  The dairy farm was a member of DFA from 1998 until 2007, and a member of Elmhurst Dairy, Inc. from 2007 until present.  The farm milks approximately 70 cows.  During the Class Period, Ralph and Garrett Sitts and the unnamed partnership sold, through DMS, fluid Grade A milk to fluid Grade A milk bottling plants in Order 1.

Defendants

21.     Defendant Dean is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201.  Dean is the largest fluid Grade A milk bottler in the Northeast and in the United States.

22.     Defendant Hood is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at Six Kimball Lane, Lynnfield, Massachusetts 01940.  Hood owns at least 14 fluid Grade A milk bottling plants in the Northeast and is the second largest fluid Grade A milk bottler in the Northeast.

23.     Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Northeast Council headquarters located at 5001 Brittonfield Parkway, East Syracuse, New York 13057. DFA is by far the largest dairy cooperative in the United States with over 20,000 member farmers. DFA has approximately 1,900 members farmers in the Northeast. DFA is a vertically integrated cooperative that not only engages in fluid Grade A milk production, but also markets, hauls, processes, bottles and distributes fluid Grade A milk.

24.     Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221. DMS was created by DFA and Dairylea Cooperative Inc., and DFA exercises control over DMS. DMS is a marketing agency that markets milk for 9,000 dairy farmers, including independent dairy farmers and cooperatives, throughout the Northeast. DMS markets approximately 80 percent of fluid Grade A milk marketed to bottling plants in the Northeast.

Co-conspirators

25.     At all relevant times, other milk marketers, milk purchasers, milk processors or other entities, as well as various other persons, companies, and corporations, the identities of which are presently unknown, (collectively "Co-conspirators") have participated as Co-conspirators with the Defendants in the violations alleged herein and have performed acts and made statements in the United States in furtherance thereof.

26.     All averments herein against any Defendant are also averred against these unnamed Co-conspirators as though set forth at length.

27.     The acts alleged herein that were done by each of the Co-conspirators were fully authorized by each of those Co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-conspirator while actively engaged in the management direction or control of its affairs.  The acts charged in this Complaint as having been done by Defendants and their Co-conspirators were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed class is defined under Rule 23(b)(2) and (3) as representatives of the following class:

> All dairy farmers, whether individuals, entities or members of cooperatives, who produced Grade A milk within Order 1 and sold Grade A milk through DMS in Order 1 during any time from October 9, 2005 to the present.  Defendants and Defendants' Co-conspirators are excluded from the Class.

29.     At all times relevant to this Complaint, there have been more than 9,000 members of the proposed class in the Northeast. Members of the proposed class reside in 11 different states. The members of the proposed class are so numerous that the individual joinder of all members is impracticable.

30.     The questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual proposed members. These common questions include, but are not limited to, the following:

a.    Whether Defendants engaged in a conspiracy to fix, stabilize, maintain, and/or artificially lower the over-order premiums paid to Northeast dairy farmers for fluid Grade A milk;

b.    Whether Defendants purchased fluid Grade A milk bottling plants, closed down fluid Grade A milk bottling plants and/or refused to operate fluid Grade A milk bottling plants with the purpose and intent of stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Northeast;

c.    Whether Defendants entered into and implemented long-term supply agreements to foreclose Northeast dairy farmers' access to fluid Grade A milk bottling plants;

d.    Whether Defendants required Northeast dairy farmers to market their fluid Grade A milk through DFA or DFA-controlled DMS to gain access to fluid Grade A milk bottling plants and/or balancing plants;

e.    Whether Defendants foreclosed Northeast dairy farmer access to fluid Grade A milk bottling plants and/or balancing plants in the Northeast;

f.    Whether, in furtherance of the conspiracy, Defendants engaged in group boycott;

g.    Whether DFA, and or DFA, DMS and Co-conspirators collectively, exercise monopoly power in the marketing and sale of fluid Grade A milk to bottling plants in the Northeast United States;

h.    Whether DFA, and or DFA, DMS and Co-conspirators collectively, have abused their monopoly power;

i.    Whether Dean, and/or Dean, DFA and Hood collectively, have a monopsony in the purchase of fluid Grade A milk by bottling plants in the Northeast United States;

j.    Whether Dean, and/or Dean, DFA and Hood collectively, have abused and/or misused their monopsony power;

k.    Whether Defendants conspired to monopolize and/or monopsonize and/or restrain interstate trade of fluid Grade A milk marketed or sold to or purchased by bottling plants in the Northeast;

l.    Whether Defendants conspired to circumvent and thwart conditions and restrictions imposed by the DOJ or state Attorneys General to preserve competition in the market for the sale or purchase of Grade A milk in the Northeast;

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

m.     Whether Defendants' conduct has violated the Sherman Act;

n.     Whether Defendants caused injury to Plaintiffs and proposed class members under the Sherman Act;

o.     Whether Defendants' conduct has violated the Agricultural Fair Practices Act; and

p.     Whether Plaintiffs and proposed class members are entitled to: i) an injunction prohibiting the continuation of Defendants' violations, and ordering such other and further injunctive relief as is necessary to restore competition; ii) a declaration of their eligibility to an award of damages and other monetary relief, including treble damages; iii) interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and iv) attorneys' fees and costs and any other relief the Court deems just and reasonable.

31.     This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

32.     Individual litigation of the facts of hundreds of cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court. Notice of pendency of the action and any resolution thereof can be provided to proposed class members by publication and/or other means.

33.     Plaintiffs' claims are typical of the claims of proposed class members. Plaintiffs and proposed class members are dairy farmers who produce Grade A milk in the Northeast

and, through DMS, sold fluid Grade A milk in the Northeast. All Plaintiffs and proposed class members have been injured by the same wrongful, anticompetitive conduct of Defendants.

34.     Plaintiffs are adequate representatives of the class, and Plaintiffs' interests do not conflict with the interests of the members of the proposed class. Plaintiffs are committed and determined to pursue this litigation and to assist counsel in this matter. Plaintiffs possess considerable knowledge of the dairy business. Plaintiffs have retained competent counsel experienced in the prosecution of complex litigation, class actions, and antitrust litigation.

## RELEVANT MARKETS

35.     The relevant geographic market is the Northeast United States. The Northeast market consists of Federal Milk Market Order 1, which covers areas in Delaware, District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont and Virginia. DFA operates a marketing area specifically designated as the Northeast Council which consists of the same geographic areas as the Northeast.

36.     The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants. The market for the sales or marketing of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants is treated as a distinct market by the industry and by federal regulations.

37.     Under the applicable FMMOs, dairy farmers qualify to participate in the Northeast FMMOs only by selling fluid Grade A milk (Class I) to bottling plants. Processors of non-fluid commodities, such as sour cream (Class II), cheese (Class III) and butter (Class IV) are not viable substitutes for Northeast dairy farmers because they cannot "touch base" by delivering Grade A milk to such commodity processors, and milk delivered directly to these

processors is less valuable than fluid Grade A milk purchased by bottlers because commodity manufacturers traditionally do not pay over-order premiums.

38.     Fluid Grade A milk (Class I) is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities, such as sour cream (Class II), cheese (Class III) and butter (Class IV).

## OVERVIEW OF THE CONSPIRACY

3 9.     In an unrestrained market, fluid Grade A milk bottlers in the Northeast would compete amongst each other to purchase Grade A milk from independent dairy cooperatives and independent dairy farmers, thereby enabling Northeast dairy farmers such as Plaintiffs to obtain a price for their fluid Grade A milk that would reflect actual market conditions and help to sustain efficient fluid Grade A milk production in the Northeast. However, Defendants' illegal conspiracy to monopolize and monopsonize the market for fluid Grade A milk in the Northeast eliminated competition by and between Defendants for the purchase of fluid Grade A milk by fluid Grade A milk bottlers, forced independent dairy farmers and previously independent cooperatives to join DFA or market their fluid Grade A milk through DFA-controlled DMS as a condition of access to fluid Grade A milk bottling plants and balancing plants in the Northeast, and in so doing eliminated and fixed at artificially low levels the over-order premiums that would otherwise exist in a competitive market.

4 0.     Beginning as early as 1999, Defendants began to implement their conspiracy to eliminate competition in the market for the sale of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants in the Northeast by undertaking a series of carefully planned and collaborative steps. Through acquisitions, mergers, closures of competitors' bottling plants, and supply agreements, Defendants assisted each other in securing for DFA monopoly

control over the supply of fluid Grade A milk in the Northeast and securing for Dean

monopsony control over the purchasing of fluid Grade A milk in the Northeast. As part of the

conspiracy, Defendants subsequently entered into agreements with DFA and DFA-controlled

DMS whereby DFA and DMS would provide all of the fluid Grade A milk bottled in the

Northeast by Dean and a significant portion of the fluid Grade A milk bottled by Hood.

Defendants collaboratively used these supply agreements to force previously independent

cooperatives and independent farmers to join DFA or DMS in order to gain access to fluid

Grade A milk bottling plants and balancing plants. As a result of the supply agreements, Dean

and Hood did not compete with other bottlers to obtain fluid Grade A milk from farmers, and

DFA and DMS did not compete with other cooperatives to obtain members. Defendants

exploited their market power to unlawfully reduce the prices paid to farmers for the purchase of

fluid Grade A milk, including but not limited to DFA and DMS conspiring to fix over-order

premiums for farmers in the Northeast.

41.     On September 18, 2000, then-DFA President Gary Hanman previewed the

conspiracy in a speech to the Mideast Council: "We've got some stress going on in New York

and in New England in that one of our joint ventures up there is in the country trying to maintain

a non-member milk supply that they've had. And yet our leadership up there says, 'I thought we

had an understanding that these producers would become DFA members.' ... I think we've

pretty well got the rest of it organized where that milk supply is now coming from DFA

members, but we haven't integrated fully a milk supply function for these affiliates, primarily

Suiza and affiliates there in the Mideast and Northeast Council. But we will get that done, given

time. This fall is probably not the time to put pressure on this membership. But we will get that

done over time."

42.    The DOJ and state Attorneys General raised antitrust concerns about, and formally objected to, several of the major transactions pursued by Defendants in furtherance of the conspiracy.  However, as discussed below, each time the DOJ or state Attorneys General imposed conditions on such a transaction to preserve competition in the market for the purchase or sale of fluid Grade A milk in the Northeast, Defendants devised and implemented strategies to circumvent and thwart those restrictions and eliminated competition in violation of the antitrust laws.

## BACKGROUND ON GRADE A MILK

43.    Grade A milk is highly perishable.  Dairy farmers milk their cows at least twice a day, and the milk must be transported from farms to fluid Grade A milk bottlers nearly every day.  Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to fluid Grade A milk bottling plants.  Fluid Grade A milk bottling plants prepare Grade A milk for human consumption by processing and packaging raw fluid Grade A milk in bottles or cartons for wholesale or retail sale.

44.    Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk.  The highest standards are established for Grade A milk because of safety risks associated with fluid milk products.  There is no substitute for Grade A milk.

45.    Pursuant to the 1937 Agriculture Act, the Secretary of the U.S. Department of Agriculture ("USDA") classifies Grade A milk into four classes for minimum pricing purposes based upon the actual end-use of the milk:

a.    Class I milk is used in beverage milk products for human consumption.

b.     Class II milk is used to manufacture "soft" dairy products, such as sour cream, cottage cheese, ice cream, and custards.

c.     Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products such as cheddar cheese.

d.     Class IV milk is used to produce butter and nonfat dry milk.

46.     Each month, the USDA calculates minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as Federal Milk Market Orders ("FMMO" or "Order"). Currently, there are 10 Orders. This Complaint is concerned with fluid Grade A milk in Order 1, which is commonly referred to as the "Northeast."

47.     USDA regulations mandate that cooperatives or independent dairy farmers participating in the FMMO program receive at least the weighted uniform average or minimum "blend" price for fluid Grade A milk that is "pooled" on an order. Dairy farmers "pool" Grade A milk on an order by delivering specified minimum quantities of fluid Grade A milk to USDA-regulated fluid Grade A milk bottling plants associated with that order. Dairy farmers' delivery of the minimum quantity of fluid Grade A milk to fluid Grade A milk bottling plants is referred to as "touching base." USDA regulations require that dairy farmers touch base each month they are pooled on an order.

48.     The minimum blend price for an order is based upon the end uses of all Grade A milk pooled on that order. Thus, for example, if 60 percent of all Grade A milk pooled on an order was used as Class I milk (fluid milk), and the remaining 40 percent was used as Class III milk (cheese milk), the minimum blend price for all Grade A milk pooled on the order would consist of the Class I price for 60 percent and the Class III price for 40 percent.

49.     USDA minimum prices for Grade A milk represent the minimum prices that fluid Grade A milk bottlers must pay for Grade A milk marketed pursuant to USDA regulation. Cooperatives and independent dairy farmers are free to negotiate for prices in excess of FMMO minimum prices to reflect market conditions. The amounts by which prices for Grade A milk exceed FMMO minimum blend prices are known generically as "over-order premiums." Prior to Defendants' antitrust violations, dairy farmers in the Northeast received over-order premiums for Grade A milk that more accurately reflected competitive market conditions.

50.     The actual price a dairy farmer receives for Grade A milk is referred to as the "mailbox price." The mailbox price received by independent dairy farmers is comprised of the FMMO minimum blend price plus any over-order premium and bonuses for volume or quality, minus marketing costs. The mailbox price received by dairy cooperative members is calculated in the same way except additional charges may be deducted by the cooperative. Prior to Defendants' antitrust violations, dairy farmers in the Northeast received mailbox prices for Grade A milk that included over-order premiums that more accurately reflected competitive market conditions.

51.     Access to fluid Grade A milk bottling plants and balancing plants in the Northeast and receipt of FMMO minimum prices and over-order premiums is necessary and essential to the economic viability of Northeast dairy farmers.

## DAIRY FARMERS OF AMERICA

52.     Dairy cooperatives are associations of dairy farmers who agree to collectively market their Grade A milk. Dairy cooperatives are *supposed* to be owned, operated, and controlled by their member farmers. Cooperatives typically locate buyers for their farmers'

fluid Grade A milk, negotiate sales prices, coordinate the hauling, perform the testing, record and report related data to milk market regulators, and process payments to member farmers for their fluid Grade A milk.

53.    In the mid 1970s, the DOJ filed antitrust actions against three dairy cooperatives for violations of Sections 1 and 2 of the Sherman Act, *United States v. Associated Milk Producers, Inc.*, Civ. A. No. 72-49 (W.D. Tex. Feb. 1, 1972); *United States v. Dairymen, Inc.*, Civ. A. No. 73-7364 (W.D. Ky. Mar. 29, 1973); *United States v. Mid-America Dairymen, Inc.*, Civ. A. No. 73-681 (W.D. Mo. Dec. 27, 1973). The DOJ sought redress for the cooperatives entering into contracts and agreements to monopolize trade and commerce in the raw milk market, requiring processors to contract for a set quantity of raw milk for a 12-month period and penalizing processors failing to do so, and entering into membership agreements which unreasonably restricted the rights of members to withdraw and market their milk in a freely competitive manner. Judgment was entered against each of the cooperatives enjoining them from entering into or enforcing agreements for a term in excess of one year.

54.    In 1977, the United States District Court for the Western District of Missouri entered a consent decree against Mid-America Dairymen, Inc. ("Consent Decree"). The Consent Decree enjoined and restrained Mid-America Dairymen, Inc. from the following:

- Using threats or coercion to induce any producer to execute or refrain from terminating a membership and marketing agreement with defendant or to deliver milk to defendant;

- Qualifying milk for participation in federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing pool in order to force, coerce or induce such producers who are not members of defendant or join defendant or to cease selling milk in competition with defendant;

- Entering into or enforcing any contract or agreement with another cooperative or association of producers to qualify milk for participation in

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing order pool in order to force, coerce or induce such producers who are not members of defendant to join defendant or such other cooperative or association or to cease selling milk in competition with defendant or such other cooperative or association;

• Entering into or enforcing any Milk Sales Agreement containing a term in excess of (1) year;

• Joining, contributing anything of value to, or participating in any organization or association which directly or indirectly engages in or enforces any act which defendant is prohibited by this Final Judgment from engaging in or enforcing, or which is contrary to or inconsistent with any provision of this Final Judgment.

55. On January 1, 1998, DFA was created from the merger of four cooperatives, including two of the cooperatives that had been sued by the DOJ: Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairy Cooperative, Inc. The CEO and CFO of Mid-America Dairymen, Inc., Gary Hanman and Gerald Bos respectively, became the CEO and CFO of DFA.

56. Since its formation, DFA has been bound by the Consent Decree. In the "Dairy Farmers of America, Inc.: Statement of Terms for the Merger of Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing Inc., & Western Dairymen Cooperative, Inc.," written on September 30, 1997, one of the identified "Potential Disadvantages" is: "DFA will be subject to the restrictions of the antitrust consent orders currently applicable to AMPI, Mid-Am, and WDCI."

57. By 2000, DFA had become, and remains, the largest dairy cooperative in the country. DFA has approximately 1,900 member dairy farmers in the Northeast.

58. Some dairy farmers have sought to market their fluid Grade A milk to bottling plants in the Northeast independent of DFA, either by joining other cooperatives or by not

joining any cooperatives. Cooperatives other than DFA are referred to herein as "independent dairy cooperatives," and dairy farmers that are not members of cooperatives are referred to herein as "independent dairy farmers." Independent dairy cooperatives and independent dairy farmers seek to market their fluid Grade A milk to bottling plants by directly contracting with plants or through agents and/or marketing associations. None of the independent dairy cooperatives or independent dairy farmers in the Northeast have sufficient market share to impede the exercise of Defendants' monopoly or monopsony power.

DFA's Acquisition of Processors

59.     In 1998, DFA management began to invest significant amounts of its producer members' monies and equity and incurred significant amounts of debt to acquire stakes in many fluid Grade A milk processing plants. The success of such investments depended upon DFA management's ability to supply these plants with fluid Grade A milk obtained at the lowest possible price, which is directly contrary to the core responsibility that DFA management owes its members to market their fluid Grade A milk at the highest possible price. Processing plants want to buy fluid Grade A milk at the cheapest price from farmers and cooperatives and sell the processed milk product at the highest price to the grocery store.

60.     DFA obtained ownership interests in Southern Belle Dairy Co., LLC; Keller's Creamery, LLC; Rosenberger's Dairies, Inc.; Turner Holdings, LLC; Wilcox Farms, Inc.; National Dairy Holdings LP; Hood; and Melody Farms, LLC, all of which are fluid Grade A milk bottlers. DFA also obtained ownership interests in DairiConcepts L.P.; Dairy.com; Dietrich Milk Products LLC, and Borden, Inc., all of which serve wholesale and retail cheese and dairy markets. In addition, in partnership with other processors, DFA built cheese

processing facilities such as Southwest Cheese Company L.L.C. and Melrose Dairy Proteins LLC.

61.    In January 2000, DFA further expanded its fluid Grade A milk bottling investments by forming Suiza Dairy Group L.P. ("SDG"), a joint venture with Suiza Food Corporation ("Suiza"), then the largest fluid Grade A milk bottler in the United States and the precursor to Dean.  To form the joint venture, Suiza contributed all of its fluid Grade A milk bottling operations to SDG, and DFA contributed Southern Foods Group, LP, a joint venture co-owned by DFA, Peter Schenkel and Allen Meyer.  In connection with the formation of SDG, DFA obtained a 33.8 percent ownership stake in Suiza's fluid Grade A milk bottling operations.  When DFA and Suiza purchased Schenkel's stake in SDG for $100 million, Schenkel was elected to Dean's Board of Directors in January 2000 and subsequently became Dean's Vice Chairman in January 2006.

62.    Robert D. Wellington, Senior Vice President at Agri-Mark, testified before the United States Senate Judiciary Committee that "DFA simply used its economic muscle to buy up market outlets for milk even though it does not have the local milk supply to service that milk."

63.    As DFA's investments in fluid Grade A milk bottling and processing operations expanded, its leadership's interests increasingly were aligned with those of fluid Grade A milk bottlers.  The decision by DFA's leadership to make significant investments in fluid Grade A milk bottling operations created a conflict of interest between the leadership's duty to obtain for DFA's member dairy farmers the highest possible prices for their fluid Grade A milk and DFA's need as a bottler to pay the lowest possible prices for fluid Grade A milk.

64.    On May 9, 2005, Moody's Investors Service downgraded DFA's credit rating, stating, "Historically, DFA's price risk was limited as it served simply as a conduit through

which members' milk was aggregated and delivered to processing plants, with member dairy farmers absorbing price fluctuations. However, as DFA's investment in bottling affiliates and branded dairy foods manufacturers has grown, its earnings have become more sensitive to the overall pressures impacting the dairy foods and bottling businesses."

65.     DFA was not operated for the mutual benefit of its members during the Class Period. Rather, DFA's management engaged in activities that reduced the over-order premiums distributed to DFA members in order to maximize revenue for processing operations and joint ventures. A significant portion of the profits from the processing operations and joint ventures were not distributed to DFA's members, but rather diverted to DFA's management and outside business partners. Whereas the FMMO pricing system ensures that DFA members receive a minimum payment for the sales of their fluid Grade A milk, the USDA does not require DFA to provide a payment to its members from profits obtained from processing operations and joint ventures. In fact, members of DFA are not informed, and cannot obtain information regarding, how profits from DFA's joint ventures and processor investments are distributed.

66.     DFA's expansion into Grade A milk processing enabled its management to engage in a scheme to divert millions of dollars, the details of which DFA management has refused to disclose to DFA member farmers. Gary Hanman, CEO of DFA from its formation until December 31, 2005, and Gerald Bos, CFO of DFA from its formation until December 31, 2005, were assisted in this scheme by Co-conspirators, including businessmen Robert Allen and Allen Meyers. Upon information and belief, the scheme to divert millions of dollars included, among others, the following transactions:

   a.     In 1997, Mid-American Dairymen, Inc., DFA's predecessor directed and controlled by Hanman and Bos, sought to acquire Borden. In order to

remedy the DOJ's antitrust concerns, Allen formed Milk Products LLC, which was financed by a subsidiary of Mid-American Dairymen, Inc. with a guaranteed $30 million loan, to purchase Borden's assets in Texas, Louisiana, and New Mexico. Upon information and belief, in 2001 Allen sold Milk Products LLC to NDH, then controlled by DFA, for a price substantially above fair market value and reaped a multi-million dollar profit from his risk-free venture.

b.   In 2001, DFA and Allen, through his partnership, jointly acquired Southern Belle, a fluid Grade A milk processor, for $18.7 million. DFA contributed $18 million and Allen contributed $1 million to their joint venture, yet DFA granted Allen 100 percent control of management, 100 percent of the voting shares, and 50 percent of the profits, while guaranteeing Allen's $1 million investment in their venture.

c.   In 2001, DFA, Meyer, and two other individuals formed NDH. Meyer and the two individuals each contributed $5 million for the same ownership stakes in NDH. Three years later DFA purchased the other two individuals' ownership stakes in NDH for a total of $41 million, or more than four times their initial investment, which, upon information and belief, was not a fair market value transaction.

d.   In 2001, then-CEO Hanman arranged for the unauthorized transfer of $1 million, to be paid through DFA affiliate NDH, to then DFA Board Chairman Herman Brubaker. The transaction was concealed from, and not approved by, DFA's Board of Directors. On May 8, 2008, DFA's current CEO, Rick Smith, informed DFA members of the "unfortunate" unauthorized transfer and of the appointment of a special committee to investigate the transaction.

e.   From on or about 1998 through 2006, DFA made excessive and advance payments for the purchase of milk to DFA director Lewis Gardner of Galeton, Pennsylvania, who ultimately filed for bankruptcy. Gardner served as chair of DFA's Northeast Council until 2006 and has served on DFA's board of directors since DFA's creation in 1998. Bankruptcy documents filed with the U.S. Bankruptcy Court for the Middle District of Pennsylvania in 2006 demonstrate that Gardner received advance milk check payments from DFA and received significantly more for his milk than market prices dictated.

67.   DFA's management does not disclose the details of its financial transactions to its members, thereby avoiding oversight and accountability. Because DFA is not a publicly traded corporation or a union, it is not legally required to publicly disclose such information.

Efforts by DFA members to obtain such financial information have been met with resistance and retaliation.  For example, in 1996, Carole Knight was elected to the regional board of DFA's predecessor, Mid-American Dairymen, Inc. During board meetings, she repeatedly inquired as to the basis for certain deductions from milk checks received by farmers.  Under the direction of Hanman and Bos, Mid-American Dairymen, Inc. ejected Ms. Knight from the board of directors and removed her farm from the cooperative. She subsequently filed suit and won a $450,000 verdict and  attorneys' fees.

### DAIRY MARKETING SERVICES

68.    DFA greatly strengthened its position in the Northeast in 1999 by forming DMS, a marketing agency, with Dairylea Cooperative Inc. ("Dairylea"), the largest dairy cooperative in the Northeast.

69.    DMS is a milk-marketing organization that assembles, tests and hauls fluid Grade A milk to processors for its members.  DMS determines how much its member farmers and member cooperatives receive for their fluid Grade A milk in addition to the FMMO minimum price, and DMS determines where the fluid Grade A milk produced by its member farmers and member cooperatives is bottled and pooled.  DMS markets approximately 16 billion pounds of milk produced by more than 9,000 farmers in the Northeast and manages a hauling system of 180 contract milk haulers delivering more than 900 loads per day.  DMS is by far the largest marketer of fluid Grade A milk in the Northeast.

70.    DFA owns 50 percent of DMS and controls DMS's operations.  Farmers who market their Grade A fluid milk through DMS are paid milk checks issued from the same bank accounts that issue milk checks to DFA members.  DMS employees are paid from bank

accounts, and have pension programs, controlled by DFA.  Vehicles that transport the testers who test the quality of raw milk for DMS are registered as owned by DFA.

71.     The joint creation of DMS strengthened DFA's control of the Northeast fluid Grade A milk supply in three significant ways.  First, by designating DMS as the exclusive marketer for Dairylea, all of Dairylea's 2,300 members farmers were brought under DFA's control.  Second, the creation of DMS provided a mechanism for DFA to bring independent dairy farmers and cooperatives under its control.  As discussed below, through supply agreements and other anticompetitive transactions, DFA forced thousands of independent dairy farmers and independent cooperatives to join DMS in order to access fluid Grade A milk bottling plants.  Third, by arranging for DMS to function as the exclusive marketing agent for all DFA members in the Northeast and all (or virtually all) independent dairy cooperatives and independent dairy farmers that ship fluid Grade A milk to Dean and Hood's newly acquired bottling plants, DFA established a mechanism through which over-order premiums could be fixed and reduced.

Balancing Plants

72.     Balancing plants are essential due to weekly and seasonal variations in fluid Grade A milk supply and demand.  When supply of fluid Grade A milk exceeds demand, balancing plants store the milk until demand increases.  Fluid Grade A milk balancing plants are particularly critical during weekends and holidays when bottling plants are closed, as they store the fluid Grade A milk until the bottling plants reopen, and convert bulk supplies of surplus fluid Grade A milk into storable, non-fluid commodities such as cheese (Class III) or powdered milk (Class IV).

73.     It would be impossible for an independent dairy farmer or independent dairy cooperative to operate in the Northeast market without access to fluid Grade A milk balancing plants.

74.     DMS controls a significant majority of the balancing plants in the Northeast market.  There are seven balancing plants located in the Northeast, and five of them are owned and controlled by DMS cooperatives.  The two non-DMS balancing plants are located in Maryland and in Vermont, and most farmers in the Northeast cannot use either balancing plant because of their location and limited capacity.  DFA and DMS use DMS's control over a significant majority of balancing plants to coerce independent dairy farmers and independent dairy cooperatives to join DFA and/or DMS.

## PROCESSOR #1: DEAN FOODS

### Suiza Buying Up Competing Processors

7 5.     Suiza, the precursor to Dean, entered the New England market in July 1997 when it purchased Garelick Farms, which had dairy plants in Vermont, Massachusetts and Maine.  In July 1998, Suiza purchased West Lynn Creamery in Massachusetts. In August 1998, Suiza purchased the New York and Massachusetts-based dairy plants of Cumberland Farms, which had a reputation for aggressively competing against Suiza for contracts.  Later that same year, Suiza acquired Nature's Best Dairy in Rhode Island and New England Dairy in Connecticut through a joint venture with DFA.  By 2000, Suiza controlled 70 percent of the fluid milk processing in New England.

76.     Suiza had entered into a comprehensive full-supply agreement with DFA that gave DFA the exclusive right to supply all the fluid Grade A milk to all of Suiza's bottling plants.

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

77.     Suiza subsequently closed several of the bottling plants that it acquired.  In 2000, Suiza issued an annual report that stated that it sought to eliminate capacity.  Among the plants that Suiza eventually closed are the Garelick bottling facility in Bennington, Vermont; Seward's Dairy in Rutland, Vermont; the New England Dairies plant in Newington, Connecticut; and the Cumberland Farms plant in Canton, Massachusetts.  As a result of Suiza's acquisitions and plant closings, there was significantly less bottling capacity in the Northeast and minimal bottling capacity outside of the Suiza plant system.

78.     Senator Patrick Leahy stated that Suiza had achieved its "market dominance by buying up local dairies and then closing them down."

Suiza-Dean Merger

79.     By 2001, following nearly a decade of consolidation and increasing interrelationships between fluid Grade A milk bottlers, Suiza was the largest buyer and bottler of fluid Grade A milk in the United States, and Dean was the second largest buyer and bottler of fluid Grade A milk in the United States.

80.     In 2001, Dean and Suiza announced their plan to merge and thereafter operate the merged company under the name Dean.  Dean, Suiza, and DFA agreed that Dean would buy out DFA's 33.8 percent stake in Suiza for $166 million.  In connection with Dean's agreement to acquire DFA's 33.8 percent stake in Suiza, Dean issued to DFA a $40 million promissory note which becomes due in 2021 in the amount of $96 million.

81.     The DOJ had substantial concern that the Suiza-Dean merger would diminish competition and generate antitrust violations.  After months of negotiations with the companies, the DOJ established conditions on the merger to preserve competition.  First, the DOJ required that the full-supply contract between DFA and Suiza be modified to ensure "that dairies owned

by the merged firm in the areas affected by the divestitures will be free to buy their milk from sources other than DFA." Second, the DOJ required Dean and Suiza to divest 11 of Dean's and Suiza's fluid Grade A milk bottling plants to a third party that would actively compete with the reconstituted Dean. Dean and Suiza accepted the DOJ's conditions.

82.    However, in furtherance of the conspiracy, Dean, Suiza and DFA circumvented and thwarted the two conditions imposed by the DOJ on the merger. As discussed below, DFA and the merged Dean entered into exclusive full-supply agreements, and 11 of Dean's and Suiza's bottling plants were divested to a corporation controlled by DFA.

Dean Full-Supply Contract with DFA

83.    Dean's and Suiza's agreement with the DOJ to modify the supply relationship with DFA did not result in the merged Dean purchasing substantial quantities of milk from sources other than DFA. Rather, in furtherance of the conspiracy, DFA and the merged Dean entered into full-supply agreements that designated DFA and DMS to be the exclusive suppliers of milk to Dean's bottling plants. Despite a 1977 DOJ consent decree entered in the *Mid-America Dairymen* case prohibiting DFA from entering into supply agreements with terms in excess of one year, Dean and DFA ensured that their full-supply agreement would be long-term by: 1) DFA agreeing to forgive the entire balance of the $40 million promissory note provided that Dean renewed a series of 20 successive one-year full-supply agreements; and 2) Dean agreeing to pay DFA liquidated damages of up to $47 million in the event Dean did not renew each of the 20 annual full-supply agreements.

84.    In January 2003, pursuant to the supply agreement with DFA, Dean assigned its marketing agreements with the 2,500 independent dairy farmers who supplied it with fluid Grade A milk to DMS. No Defendant informed these independent dairy farmers that their

fluid Grade A milk would thereafter be marketed, processed, and controlled by DFA, that DFA would process the payments for their fluid Grade A milk, or that prices paid to DMS producers were fixed, suppressed, and stabilized by DFA and Co-conspirators. Thereafter, Dean refused to deal with independent dairy farmers who had traditionally been its direct suppliers.

85.   As a result of the merger, Suiza's former bottling plants in the Northeast continued to have full-supply agreements with DFA, and the independent dairy farmers who provided milk to Dean were forced to join DMS in order to access Dean's bottling plants. Thus, DFA and DMS had, and continue to have, exclusive control over the supply of fluid Grade A milk to Dean, which dominates the bottling market in the Northeast. Farmers in the Northeast who want to sell fluid Grade A milk to one of Dean's 50 brands must join DFA or utilize DMS.

86.   Upon information and belief, despite the full-supply agreement between DFA and Dean, in 2004 and 2005, Dean permitted a handful of independent dairy farmers who were complaining of antitrust violations to deliver fluid Grade A milk directly to Dean's fluid Grade A milk bottling plants. These independent dairy farmers were not permitted to negotiate price, but rather had to accept prices set pursuant to Defendants' conspiracy. Upon information and belief, Dean permitted these independent dairy farmers to deliver milk directly to its bottling plants in part in order to deter the DOJ, which had launched an investigation of Dean's anticompetitive conduct in 2004, from prosecuting Dean.

DFA Control Over and Full-Supply Contract with NDH

87.   Dean and Suiza did not divest 11 fluid Grade A milk bottling plants to an independent third party, but rather to a company owned and controlled by another member of the conspiracy. The 11 bottling plants were sold to National Dairy Holdings LP ("NDH"), a newly formed partnership that was created by DFA and two former Dean executives, and was 50

percent owned and controlled by DFA.  In 2007, DFA increased its ownership stake in NDH to 87 percent.

88.    Upon information and belief, DFA and its subsidiaries provided more than $400 million in financing to NDH, enabling it to acquire the 11 fluid Grade A milk bottling plants divested by Dean and Suiza in 2001.

89.    Upon information and belief, in forming NDH, DFA and its partners agreed that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers.  As a result, NDH did not take any significant action without DFA's express approval or without having been directed to take such action by DFA.

90.    DFA installed Allen Meyer as CEO of NDH.  Meyer had co-founded the Southern Foods Group with DFA and subsequently merged it with DFA into Suiza's bottling operations. The DOJ has accused Meyer of operating as functionary for DFA who colludes with DFA to eliminate competition while claiming to operate NDH as an independent competitor.  The DOJ has specifically alleged that DFA and Meyer have "a long history of friendly and mutually profitable financial dealings," that Meyer "has a substantial incentive to keep DFA happy so that he can continue to receive profitable business opportunities," that "Meyer enjoys a share of the profits and potential appreciation that is far out of proportion to his investment in NDH/Flav-O-Rich, thanks to DFA," and that the "prospect of future ventures with DFA affords Meyer a strong incentive to manage [NDH] in a manner that serves DFA's interests in eliminating competition." In 2004, DFA bought out two of the investors in NDH, leaving Meyer as DFA's sole investment partner in NDH.

91.     After NDH acquired the 11 fluid Grade A milk bottling plants divested by Dean and Suiza, NDH agreed to enter into exclusive, full-supply agreements for Grade A milk with DFA. In the Northeast, NDH's fluid Grade A milk processing plants in Concord, New Hampshire and Albany, New York entered into exclusive supply agreements with DFA.

Effect of the Dean-Suiza Merger

92.     Through the merger, Dean and DFA significantly strengthened each other's control over the milk supply in the Northeast, furthering the aims of the conspiracy.  DFA aided Dean by financing and offering NDH as a vehicle to purchase the 11 milk processing plants whose divestiture was necessary to obtain clearance from the DOJ for the merger and by using its control over NDH to ensure that NDH would not vigorously compete with Dean for the purchase or sale of milk.  Dean, in turn, agreed to cease purchasing raw milk from independent dairy farmers and independent dairy cooperatives and to enter into full-supply agreements with DFA and DMS for its Northeast bottling plants.

93.     As a result of the merger, Dean became the largest fluid milk processor in the Northeast.  Throughout the Class Period, Dean dominated the market for bottling fluid Grade A milk in the Northeast, controlling approximately 80 percent of the market in Massachusetts and Rhode Island, approximately 70 percent in New England and northern New Jersey, and over 60 percent in Connecticut.

94.     As a result of the merger, NDH became the second largest fluid milk processor in the Northeast until it sold its fluid Grade A milk bottling plants to Hood in 2004.

95.     As a result of the merger, and in contravention of the conditions imposed by the DOJ, DFA established ownership of and control over NDH, and entered into full-supply agreements with both Dean and NDH.

Dean Shuts Down Stop & Shop Plant and DFA Captures St. Albans

96.     Prior to February 2000, Stop & Shop, one of the largest supermarket chains in New England, had been processing its own fluid Grade A milk at its Readville, Massachusetts plant with milk provided by St. Albans.  A substantial share of the fluid milk produced by St. Albans was processed at Stop & Shop's plant.

97.     In February 2000, Stop & Shop entered into an agreement with Suiza, then partially owned by DFA and exclusively supplied by DFA.  The agreement required Suiza to pay approximately $50 million to Stop & Shop in return for Stop & Shop closing down its Readville bottling plant, selling the plant's assets to Suiza, and agreeing to purchase and sell fluid milk products exclusively bottled by Suiza for a 15-year period. Because DFA was the exclusive supplier of fluid milk to Suiza, the agreement would greatly expand DFA's dominance in the Northeast and greatly damage St. Albans by eliminating the primary buyer of its milk.

98.     The Attorneys General of Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island were concerned that the Suiza-Stop & Shop transaction would eliminate competition in the Northeast fluid Grade A milk market by expanding DFA's dominance over the supply of fluid Grade A milk at the expense of St. Albans and by reducing the availability of bottling capacity not controlled by Suiza.

99.     To address their antitrust concerns, the Attorneys General entered into a settlement agreement with Suiza and Stop & Shop that contained the following requirements:

- Suiza shall make available to its competitors 30 million gallons of its New England milk processing capacity per year, for a period of five years.

- Suiza and Stop & Shop shall not honor or enter into agreements to restrict Stop & Shop stores from selling competitors' milk.

- Stop & Shop shall not sell the processing assets of the Readville plant to Suiza.

- Suiza shall not sell, close or cease operations of, or purchase an ownership interest in, any New England dairy plants without first notifying the Vermont Attorney General.

100.    Once the agreement was consummated between Stop & Shop and Suiza, Stop & Shop shut down its Readville processing plant and sold its assets.  The closure of the Stop & Shop plant immediately increased Suiza's market share of fluid milk sales to supermarkets to approximately 80-90 percent in Boston and Rhode Island and approximately 65 percent in all of New England.

101.    As a result of the closure of Stop & Shop's Readville plant, St. Albans had little choice but to rely on Suiza's (and later Dean's) processing plants in order to sell its Grade A fluid milk. Yet, under the settlement agreement, Suiza (and later Dean) was only required to offer its processing capacity to St. Albans for five years.

102.    Gary Hanman attended several of St. Albans's annual meetings, and, during those meetings, he said that DFA was interested in "folding" St. Albans into DFA, which, in effect, had long-term exclusive supply contracts with Dean.

103.    In order to ensure long-term access to fluid Grade A milk processing plants, St. Albans was forced to join DMS.  On February 24, 2003, St. Albans issued the following statement: "Over the last several years processing plants in the Northeast have closed or been acquired by major processors.  St. Albans Cooperative Creamery, Inc. experienced a significant change in its Class I account in 2000 with Stop & Shop's decision to close their bottling facility. … The Board of Directors and Management of the St. Albans Cooperative Creamery, Inc. have determined that access to the Class I market, fluid milk for bottling, is essential to the viability of the Cooperative.  The Cooperative needs to maintain at a minimum, 20 percent of its milk volume as Class I to qualify and receive the benefits under the Federal Order System. … After

careful and full analysis, the St. Albans Cooperative Board of Directors has agreed to an annual membership and marketing agreement with DFA. This is not a merger of these two organizations. This is an annual marketing and membership agreement that will assure St. Albans Cooperative access to markets in the Northeast and allow St. Albans to be competitive in returns to its dairy farmer members."

104.    St. Albans subsequently joined DFA, invested in DFA's equity program and gained one seat on the board of DFA, two on DFA's Northeast Council and three on the board of DMS.

105.    After St. Albans joined DFA and DMS, the over-order premiums that were paid to St. Albans member farmers decreased significantly.

<u>PROCESSOR #2: HP HOOD</u>

<u>Hood-NDH Alliance</u>

106.    In November 2002, Hood and NDH, then owned and controlled by DFA, attempted to merge. The merger proposal was prepared by Gary Hanman, then president of DFA, who wanted to further expand DFA's dominance over the Northeast market by establishing supply agreements with Hood. Under the original merger proposal, DFA would have had an exclusive right to supply fluid Grade A milk to all Hood plants, including milk that was being supplied by Agri-Mark. In December 2002, Hanman said of the merger proposal, "What we're really in this for is to gain market share."

107.    Due to strong objections by state Attorneys General, the merger proposal was restructured on May 12, 2003 into an unusual exchange of both stock and CEOs. Under the revised proposal, three transactions would take place: (1) Hood would acquire a 30% interest in

NDH; (2) DFA would acquire a 15% interest in Hood; and (3) Hood and NDH would trade their respective CEOs.

108.   Robert D. Wellington, Senior Vice President at Agri-Mark, provided the following written testimony to the United States Senate Judiciary Committee regarding the restructured transaction: "It is plain that the contemplated three-way federation between and among DFA, NDH and Hood is inherently and inescapably fraught with anti-competitive dangers.  As a result of the transaction, Hood, which is the prize DFA is pursuing, will be 15% owned by DFA.  This will represent a substantial degree of DFA control over Hood.  Moreover, Hood in turn will acquire a 30% interest in NDH, thus becoming a co-venturer with DFA in NDH.  There is no ambiguity as to what is going on here: DFA, NDH and Hood will be fused into a single, coordinated economic unit.  To cement the relationship, Hood's president and chief executive, John Kaneb, will become chairman and chief executive of NDH and NDHs current president, Tracy Noll, will move over to become Hood's president.  In short, the proposed transaction is a 'virtual merger' of DFA, NDH and Hood."

109.   In 2004, following the exchange of stock and CEOs between Hood and NDH, NDH sold all of its Northeast fluid milk bottling plants -- which were located in Binghamton, New York; Albany, NY; Concord, NH; and Lancaster, PA -- to Hood.  As 50 percent owner of NDH and 15 percent owner of Hood, DFA was again on both sides of the transaction.

110.   As a result of the stock and ownership exchange between Hood, NDH and DFA and NDH's sale of Crowley Foods, Hood became the second largest fluid Grade A milk bottler in the Northeast.

Hood Supply Agreements with DFA and DMS

111.   After the stock and ownership exchange between Hood and NDH, Hood designated DMS to be a major supplier of its fluid Grade A milk supply, further consolidating DFA's control of the Northeast milk supply.

112.   Upon information and belief, when Hood purchased Crowley from NDH, DFA continued to be exclusive provider of fluid Grade A milk to the Crowley bottling plants acquired by Hood.

113.   Agri-Mark is the only cooperative that supplies fluid Grade A milk to Hood that is *not* a member of DFA or DMS.  Upon information and belief, DFA used its ownership interests in and supply contracts with Hood to limit the volume of fluid Grade A milk that Hood obtained from Agri-Mark and ensured that bottling plants newly acquired by Hood were supplied by DMS.  DFA also forced Hood to market some of its fluid Grade A milk through DMS in order to access Dean's bottling plants.

## FORCING INDEPENDENT FARMERS TO JOIN

114.   Through acquisitions, mergers, supply agreements and closures of competitors' bottling plants, Defendants secured control of the fluid Grade A milk bottling market in the Northeast.  DMS became the exclusive supplier of fluid Grade A milk to Dean and provided a significant share of the fluid Grade A milk to Hood.  Defendants used their control over the fluid Grade A milk supply market to force independent dairy cooperatives and independent dairy famers to join DFA or DMS.  The effect of these activities has been to eliminate competition between bottlers and between cooperatives and to fix and stabilize prices paid to Northeast dairy farmers for fluid Grade A milk.

115.   Gary Hanman has explicitly acknowledged that DFA has intentionally used acquisition of processing plants as a hammer to force independent dairy farmers and independent dairy cooperatives to join DFA or DMS even when they did not otherwise want to join.  He also acknowledged that, as early as 2000, DFA had to be careful when engaging in such conduct because it was being carefully watched by the DOJ and state Attorneys General.

. 1 1 6 .   Robert D. Wellington, Senior Vice President at Agri-Mark, provided the following written testimony to the United States Senate Judiciary Committee regarding the Northeast market: "[L]ocal farmers quickly recognize that they have no choice but to capitulate to and join DFA in order to have a market for their milk. … Instead of gaining membership through farmer choice as we and most other cooperatives do, DFA gains it by eliminating choice."

117.   For example, in 2003, St. Albans joined DFA and DMS in order to access bottling plants after the Dean-financed closure of Stop & Shop's Readville, Massachusetts plant.

118.   For example, in 2005, Farmland Dairies entered into an exclusive supply agreement with DMS.  About 400 farmers who shipped independently to Farmland Dairies subsequently received a letter stating that Farmland Dairies was no longer buying milk directly from them, but rather obtaining it through a new full-supply contract with DMS.  As a result, the independent farmers who had previously provided milk to Farmland Dairies were required to join DMS in order to access bottling or balancing plants.

<u>DFA FIXED PRICES THROUGH DMS</u>

119.   DMS, which is controlled by DFA, determines the monthly over-order premiums that its members, including independent dairy cooperatives and independent dairy

farmers, will receive.  DFA fixes, depresses and stabilizes the over-order premiums paid to

dairy farmers throughout the Northeast by requiring that dairy farmers market through DMS to

gain access to bottling plants in the Northeast.

120.    Through DMS, DFA fixed over-order premiums for DFA members, independent

dairy cooperatives and independent diary farmers in the Northeast at levels lower than what

would have prevailed in a competitive market. Upon information and belief, DFA's

management sought payment of lower over-order premiums for at least three reasons:  First, by

obtaining fluid Grade A milk at cheaper prices through the payment of lower over-order

premiums, DFA's joint ventures and processors increased their profits, and a portion of such

profits were diverted to benefit DFA management and outside business partners. Second, DFA

was able to invest some of its profits from joint ventures and processors into the continuation and

expansion of DFA's unlawful monopolization of the supply of fluid Grade A milk through the

acquisition of additional processors and the establishment of joint ventures with outside business

partners.  Third, lower-order premiums increased the profits of Dean and Hood, which, in return,

continued to designate DFA and DMS as their exclusive suppliers of milk and thus preserved

and strengthened DFA's monopoly over the supply of fluid Grade A milk throughout the

Northeast.

121.    To further ensure compliance with the conspiracy, DFA received, processed,

and accounted for the monies collected by independent farmers and cooperatives resulting

from the sale of fluid Grade A milk through DMS.  This allowed DFA to monitor fluid Grade

A milk sales by other Northeast cooperatives and independent dairy farmers, and allowed DFA

to confirm that these sales were compliant with Defendants' conspiracy to control and fix the

prices of fluid Grade A milk sold to bottlers in the Northeast. This price monitoring

mechanism ensured that each Defendant could operate with the knowledge that it would not have to compete for fluid Grade A milk.

## DFA AND DMS FIXED PRICES THROUGH GNEMMA

122.   In September 2006, GNEMMA was formed. GNEMMA is comprised of DFA, four cooperatives that are members of DMS (Dairylea, Land O'Lakes, St. Albans, and Maryland & Virginia Milk Producers Cooperative Association, Inc.), one cooperative that markets some of its fluid Grade A milk through DMS (Agri-Mark) and one of the two independent dairy cooperatives in the Northeast operating completely outside of DMS with appreciable market share (Upstate Niagara Cooperative Inc.).

123.   GNEMMA is an over-order pricing agency. GNEMMA's member cooperatives meet regularly to fix and monitor the over-order premiums that they will distribute to their respective member farmers in the Northeast.

124.   GNEMMA's members supply 70 percent of the fluid Grade A milk to bottlers in the Northeast, and they project they will supply 85 percent of the fluid Grade A milk to bottlers in the Northeast by 2018.   Additionally, the owners of DMS – DFA and Dairylea – are members of GNEMMA, and the over-order premiums set by GNEMMA were applied to all DMS members, which include an additional several thousand independent dairy farmers.   Therefore, GNEMMA members fixed over-order premiums for significantly greater than 70 percent of the fluid Grade A milk sold to bottlers in the Northeast.

125.   By establishing and participating in GNEMMA, DFA ensured that two of the three independent dairy cooperatives with appreciable market share operating outside of DMS in the Northeast distributed the same over-order premiums as did DFA and DMS, thereby eliminating competition between cooperatives in the Northeast for members.   Leon Berthiaume,

CEO of St. Albans, described GNEMMA as a "price agreement agency" that was established in part to "reach out and embrace those that are not part of the DMS system into a common decision-making and strategic organization."

## IMPACT ON DAIRY FARMERS

126.   As a direct and proximate result of the antitrust violations alleged herein, Plaintiffs and class members have been injured and have sustained damages in that the prices received for fluid Grade A milk, specifically over-order premiums, have been artificially reduced below levels they would have received but for Defendants' unlawful agreement to refuse to compete for the marketing, sales or purchase of fluid Grade A milk.  As a result of this conspiracy, Defendants have reaped many hundreds of millions of dollars of profits that would have otherwise been paid to Plaintiffs and class members for their Grade A milk.

127.   As a direct and proximate result of the antitrust violations alleged herein, due to the underpayment of over-order premiums to farmers, the proportion of the retail price for fluid Grade A milk in the Northeast that was distributed to Defendant bottlers increased whereas the proportion of the retail price for fluid Grade A milk that was distributed to dairy farmers decreased.  For example, from May 2004 until November 2006, the raw fluid Grade A skim milk price paid to dairy farmers in New England dropped from $1.29/gallon to $0.96/gallon while the processor margin increased from $0.64/gallon to $0.78/gallon.  During that same time period, in New York, the raw fluid Grade A skim milk price paid to dairy farmers dropped from $1.26/gallon to $0.95/gallon while the processor margin increased from $0.70/gallon to $0.76/gallon.  Senator Patrick Leahy stated that as a result of Dean's and DFA's antitrust violations, "our farmers are not getting a fair share of the retail price of milk, while giant,

GRAVEL AND SHEA
A PROFESSIONAL CORPORATION
P. O. BOX 369
BURLINGTON, VERMONT
05402-0369

corporate processors are raking in anti-competitive profits as they simultaneously raise prices to consumers."

128.    In a competitive raw milk market, the mailbox prices in the Northeast would be higher than the mailbox prices in the Midwest because 1) transportation costs are greater in the Northeast than in the Midwest and 2) a greater proportion of the raw milk produced in the Northeast is converted to fluid Class I milk than in the Midwest, where much of the milk is used to manufacture cheese and other dairy products.  However, as a direct and proximate result of the antitrust violations alleged herein, the mailbox prices received by dairy farmers are, on average, greater in the Midwest than the Northeast.  In 2008, for example, the average Class I fluid Grade A milk price in New York was $0.30 per hundredweight less than in Wisconsin, and the average mailbox price in New York was $0.553 per hundredweight less than in Wisconsin. Professor Ron Cotterill, professor of agricultural economics at the University of Connecticut, testified, "So why are mailbox prices less in the Northeast than the Midwest? The answer is that retailers and processors in the northeast are not paying over-order premiums that are as high as those in the Midwest. … Northeast raw milk markets, relatively speaking, are dominated by the milk channel firms at the expense of the region's dairy farmers. Monopsony power in the northeast dairy market is a major force."

129.    In the past, when the market was competitive, dairy cooperatives in the Northeast sometimes paid "competitive credits" to processors to help those processors compete with other processors who were acquiring milk more cheaply from independent dairy farmers. As a direct and proximate result of the antitrust violations alleged herein, dairy farmers in the Northeast that supply fluid Grade A milk to Dean are still required to pay Dean a "competitive credit," even though Dean controls approximately 70 percent of the market for the bottling of

fluid Grade A milk and even though independent dairy farmers must sell their milk to Dean through DMS.

130.    As a direct and proximate result of the antitrust violations alleged herein, Dean does not pay a fuel surcharge to dairy farmers in the Northeast to help cover transportation costs to its bottling plants.  Other processors within the Northeast do pay a fuel surcharge in addition to an over-order premium.

131.    Peter Carstensen, an antitrust professor at the University of Wisconsin Law School, explained, "Where there is a competitive market for buying milk, dairy farmers are paid more.  When DFA comes to dominate a market, then farmers are paid less.  Monopolists behave like monopolies."

132.    Due to the underpayment of over-order premiums to farmers in the Northeast, dairy farmers are going out of business.  In Connecticut alone, more than 50 dairy farms have been closed since 2007, and there are currently fewer than 30 percent of the number of farms as there were in 1990.

133.    Meanwhile, during the Class Period, Defendants' profits greatly increased. During a teleconference with analysts in May, 2009, Dean's CFO bragged that cheap raw milk had created "the perfect sunny day" for the $12 billion corporation.

<u>DOJ INVESTIGATION</u>

134.    In 2004, the Antitrust Division of the DOJ launched an investigation into the anticompetitive conduct of Dean, DFA and NDH for fluid Grade A milk.

135.    In August 2006, as a result of the investigation, career lawyers at the DOJ recommended prosecuting Dean, DFA and NDH for violating the antitrust laws.  Nonetheless, DOJ did not bring suit at that time.

136.    On August 6, 2009, Sen. Bernie Sanders, Sen. Chuck Schumer, and Sen. Russ Feingold sent a written request to Christine Varney, Assistant Attorney General for the Antitrust Division of the DOJ, urging her to continue the antitrust investigation of Dean, DFA and NDH and to re-examine the recommendation to pursue action against them.

137.    On September 19, 2009, the Senate Judiciary Committee held a hearing in Vermont titled "Crisis on the Farm: The State of Competition and Prospects for Sustainability in the Northeast Dairy Industry." During the hearing, Sen. Bernie Sanders and Sen. Patrick Leahy encouraged Christine Varney, the Assistant Attorney General of the Antitrust Division of the DOJ, to prosecute Dean and DFA for antitrust violations. Varney testified that Dean's dominant share of the Northeast bottling market was "disconcerting." At the hearing, various attendees and speakers encouraged private action in light of the current crisis in the diary industry in the Northeast.

## CONCEALMENT AND TOLLING

138.    Throughout the relevant period, Defendants have affirmatively concealed from Plaintiffs and class members the unlawful combinations, conspiracies and agreements among Defendants alleged herein. Defendants and their co-conspirators conducted their conspiracy in secret. Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings, agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiffs and class members that the prices they received for Grade A milk were fair and competitive.

139.    As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiffs and class members has been tolled. Plaintiffs exercised due

diligence to learn of their legal rights, and, despite the exercise of due diligence, did not

discover and could not have discovered the unlawful conduct alleged herein at the time it

occurred.

COUNT I
SHERMAN ACT SECTION 2 VIOLATION
Conspiracy to Monopolize and Monopsonize

140.    Plaintiffs incorporate by reference paragraphs 1 through 139 as if fully alleged

herein.

141.    At all times relevant to this Complaint, Defendants have willfully, knowingly

and intentionally conspired among themselves with the specific intent to monopolize the

market for the marketing or sales of fluid Grade A milk to bottling plants in the Northeast, to

monopsonize the market for the purchase of fluid Grade A milk by bottling plants in the

Northeast, and thereby to depress, fix and stabilize the over-order premiums paid for fluid

Grade A milk produced in the Northeast and to ensure that all dairy farmers of such milk

would be unable to market their fluid Grade A milk except at prices that were fixed and

artificially depressed by Defendants' conspiracy.  This conspiracy has caused and continues to

cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

142.    Through a series of unlawful activities, many of which defied restrictions

imposed by the DOJ and state Attorneys General, Defendants willfully, knowingly and

intentionally conspired among themselves with the specific intent to secure for DFA monopoly

control over the supply of fluid Grade A milk in the Northeast to bottling plants and to secure

for Dean monopsony control over the purchasing of fluid Grade A milk in the Northeast by

bottling plants.

143.    In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts: a) DFA created DMS with Dairylea to bring non-DFA members under DFA's control; b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants, Dean and Suiza merged to form the largest process in the Northeast; c) Dean, DFA and DMS entered into and implemented long-term full-supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants; d) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to join DMS to access fluid Grade milk bottling plants; e) DFA orchestrated a stock and CEO exchange between NDH and Hood in order to transfer bottling plants to, obtain an ownership interest in and enter into supply agreements with Hood; f) Defendants forced Northeast dairy farmers to market their fluid Grade A milk through DFA or DMS to gain access to fluid Grade A milk bottling plants; g) Defendants forced Northeast dairy farmers to market their fluid Grade A milk through DFA or DMS to gain access to fluid Grade A milk balancing plants; h) Defendants purchased fluid Grade A milk bottling plants, closed down fluid Grade A milk bottling plants and/or have refused to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition in the Northeast; i) Defendants cut off Northeast dairy farmer's access to fluid Grade A milk bottling plants in the Northeast; j) Defendants boycotted dairy farmers, cooperatives, and fluid Grade A milk bottlers that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; k) Through DMS, DFA depressed, fixed and stabilized prices for fluid Grade A milk paid to DFA members, independent dairy cooperatives and independent dairy farmers in the Northeast; and l) DFA and DMS established GNEMMA, and through GNEMMA, DFA

depressed, fixed and stabilized prices for fluid Grade A milk paid to DFA members, independent dairy cooperatives and independent dairy farmers in the Northeast.

144.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

145.    The relevant product market consists of the market for the marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants.

146.    Defendants willfully conspired among themselves with the intent to acquire, maintain and exploit monopoly power in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Northeast, and Defendants willfully conspired among themselves with the intent to acquire, maintain and exploit monopsony power in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in the Northeast.

147.    As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

148.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants jointly and severally for these violations.  Such damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged.  Damages may be quantified on a classwide basis.  These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

149.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

COUNT II
SHERMAN ACT SECTION 2 VIOLATION
Attempt to Monopolize

150.    Plaintiffs incorporate by reference paragraphs 1 through 139 as if fully alleged herein.

151.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

152.    The relevant product market consists of the market for the marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants.

153.    DFA, both by itself and in combination with DMS, has attempted to and continues to attempt to possess market power in the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Northeast market and maintains a dominant position in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Northeast.  DFA has acted with the specific intent to monopolize and has used and is using its market dominance in an attempt to eliminate competition from independent dairy farmers and independent dairy cooperatives.

154.    DFA's attempt to monopolize includes, but is not limited to, the following conduct: a) DFA created DMS with Dairylea to bring non-DFA members under DFA's control; b) DFA, assisted the merger between Dean and Suiza by purchasing 11 of Dean and Suiza's divested bottling; c) Dean, DFA and DMS entered into and implemented long-term full-supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants; d)

Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to join DMS to access fluid Grade A milk bottling plants; e) DFA orchestrated a stock and CEO exchange between NDH and Hood in order to transfer bottling plants to, obtain an ownership interest in and enter into supply agreements with Hood; f) DFA forced Northeast dairy farmers to market their fluid Grade A milk through DFA or DMS to gain access to fluid Grade A milk bottling plants; g) DFA forced Northeast dairy farmers to market their fluid Grade A milk through DFA or DMS to gain access to fluid Grade A milk balancing plants; h) DFA purchased fluid Grade A milk bottling plants, closed down fluid Grade A milk bottling plants and/or have refused to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition in the Northeast; i) DFA cut off Northeast dairy farmer's access to fluid Grade A milk bottling plants in the Northeast; j) DFA boycotted dairy farmers, cooperatives, and fluid Grade A milk bottlers that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; k) Through DMS, DFA depressed, fixed and stabilized prices for fluid Grade A milk paid to DFA members, independent dairy cooperatives and independent dairy farmers in the Northeast; and l) DFA and DMS established GNEMMA, and through GNEMMA, DFA depressed, fixed and stabilized prices for fluid Grade A milk paid to DFA members, independent dairy cooperatives and independent dairy farmers in the Northeast.

155.   DFA's scheme to monopolize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of DFA monopolizing these markets.

156.    DFA's scheme and its predatory acts in furtherance of this scheme constitutes attempted monopolization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

157.    As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

158.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from DFA for these violations.  These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of fluid Grade A milk in the absence of the violations alleged.  Damages may be quantified on a class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

159.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

### COUNT III
### SHERMAN ACT SECTION 2 VIOLATION
### Attempt to Monopsonize

160.    Plaintiffs incorporate by reference paragraphs 1 through 139 as if fully alleged herein.

161.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

162.    The relevant product market consists of the market for the marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants.