# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

ALICE H. ALLEN AND LAURENCE E.,  )
ALLEN, d/b/a Al-lens Farm,        )
GARRET SITTS and RALPH SITTS,     )
on behalf of themselves           )
and all others similarly situated, )
                                   )      Docket No. 5:09-cv-00230-cr
        Plaintiffs,   )
                                   )      Judge Christina Reiss
    v.                )
                                   )
DAIRY FARMERS OF AMERICA, INC.,    )
DAIRY MARKETING SERVICES, LLC,     )
DEAN FOODS COMPANY, and            )
HP HOOD LLC,                       )
        Defendants.   )
_____)

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS DAIRY FARMERS OF AMERICA, INC.'S AND DAIRY MARKETING SERVICES, INC.'S, DEAN FOODS COMPANY'S AND HP HOOD LLC'S MOTIONS TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ...................................................................................................... 9

I.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ............................................................................................... 9

     A.     Plaintiffs Allege Overt Acts Occurring Within The Limitations Period ............ 10

     B.     Plaintiffs Properly Allege Fraudulent Concealment Sufficient To Toll The Statute Of Limitations ............................................................ 17

II.    PLAINTIFFS PROPERLY ALLEGE PLAUSIBLE MARKETS .................................. 20

     A.     Plaintiffs Allege Plausible Relevant Product Market: The Marketing Or Sales Of Fluid Grade A Milk To, And The Purchase of Fluid Grade A Milk By, Bottling Plants ............................................................ 21

     B.     The Northeast Is A Plausible Geographic Market ............................... 24

III.   PLAINTIFFS ADEQUATELY ALLEGE THAT DFA AND DEAN EACH POSSESS MONOPOLY POWER ...................................................................... 27

     A.     Plaintiffs Adequately Allege That Dean Possesses Monopsony Power ............. 27

     B.     Plaintiffs Adequately Allege That DFA Possesses Monopoly Power ................. 32

          1.     DMS Is An Agent Of DFA ................................................. 33

          2.     As An Agent Of DFA, DMS Unlawfully Monopolized The Relevant Market ................................................................. 35

          3.     DFA Is Liable For DMS's Antitrust Violations ..................................... 36

IV.   PLAINTIFFS PROPERLY PLEAD THAT DFA AND DMS ENGAGED IN UNLAWFUL PRICE-FIXING IN VIOLATION OF SECTION ONE ......................... 37

     A.     DFA And DMS Are Separate Entities And Can Conspire Under Section 1 Of The Sherman Act ............................................................ 38

     B.     Price-Fixing By GNEMMA Members Is Not Implausible Because DFA, DMS And Dean Control Whether Other GNEMMA Members Can Sell Their Milk ............................................................ 42

     C.     DFA And DMS Engaged In Unlawful Price-Fixing That Is Not Immunized By Capper-Volstead ............................................ 45

          1.     Neither DFA Nor DMS Proves It Qualifies As A Capper-Volstead Entity ................................................................. 46

# TABLE OF CONTENTS
### (continued)

**Page**

2.     Capper-Volstead's Limited Antitrust Immunity Would Not Extend To DFA's or DMS's Anticompetitive Acts Alleged In The Amended Complaint .................................................................................. 48

V.     PLAINTIFFS PROPERLY PLEAD SECTION 1 AND 2 CLAIMS AGAINST HOOD ......................................................................................................... 49

A.     Plaintiffs Allege That Hood Conspired With Defendants To Enable DFA's Monopoly And Receive Artificially Depressed Prices For Milk........................ 49

1.     Plaintiffs' Conspiracy Claims Are Plausible ........................................... 51

2.     Plaintiffs' Allege Sufficiently Detailed Conspiracy Claims Against Hood......................................................................................................... 55

3.     Hood Improperly Divorces Plaintiffs' Conspiracy Allegations Against It From Each Other And From The Allegations Against Other Defendants .................................................................................... 57

B.     Plaintiffs' Claims Do Not Rely On a "Shared Monopoly" Theory .................... 59

C.     Plaintiffs Do Not Allege That Hood Violated Clayton Act Sections 3 or 7 ........ 60

CONCLUSION.................................................................................................................... 62

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*
    881 F. 2d 1396 (7th Cir. 1989) ..............................................................................24

*Albrecht v. Herald Co.,*
    390 U.S. 145 (1968)............................................................................................53

*Alexander v. Nat'l Farmers Org.,*
    687 F.2d 1173 (8th Cir. 1982) ................................................................... passim

*Alternative Electrodes, LLC v. Empi, Inc.,*
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) ..................................................20, 21, 23

*American Soc'y of Mech. Eng'rs v. Hydrolevel Corp.,*
    456 U.S. 556 (1982)......................................................................................32, 34

*American Tobacco Co. v. United States,*
    328 U.S. 781 (1946)............................................................................................59

*Amusement Indus., Inc. v. Stern,*
    No. 07-11586, 2010 U.S. Dist. LEXIS 11816 (S.D.N.Y. Feb. 9, 2010)...............56

*Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.,*
    Nos. 95-7574, 95-7580, 2000 U.S. Dist. LEXIS 18959 (W.D.N.Y. Oct. 3, 2000) .................56

*Arista Records LLC v. Lime Group LLC,*
    532 F. Supp. 2d 556 (S.D.N.Y. 2007).................................................................59

*Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.,*
    677 F. Supp. 1477 (D. Or. 1987) ..................................................................40, 41

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................... passim

*Bergjans Farm Dairy Co. v. Sanitary Milk Producers,*
    241 F. Supp. 476 (E.D. Mo. 1965)..................................................................5, 49

*Berkey Photo, Inc. v. Eastman Kodak Co.,,*
    603 F.2d 263 (2d Cir. 1979)..........................................................................13, 15

*Blount v. Swiderski,*
    No. 03-0023, 2006 U.S. Dist. LEXIS 82889 (E.D.N.Y. Nov. 14, 2006)................56

*Brager & Co., Inc. v. Leumi Sec. Corp.*,
429 F. Supp. 1341 (S.D.N.Y. 1977)........................................................................61

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)..........................................................................................42

*Broadway Delivery Corp. v. United Parcel Serv. Of Am., Inc.*,
651 F.2d 122 (2d Cir. 1981)................................................................................28

*Case-Swayne Co. v. Sunkist Growers*,
389 U.S. 384 (1967)..................................................................................45, 46

*Chapman v. New York Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)................................................................................23

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*,
546 F.2d 570 (4th Cir. 1976) ..............................................................................11

*Citizen Publ'g Co. v. United States*,
394 U.S. 131 (1969)........................................................................................39

*Cleveland v. Caplaw Enters.*,
448 F.3d 518 (2d Cir. 2006)................................................................................33

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
111 F.3d 1427 (9th Cir. 1997) ............................................................................11

*Conergy AG v. MEMC Elec. Materials, Inc.*,
651 F. Supp. 2d 51 (S.D.N.Y. 2009)......................................................................23

*Cont'l Baking  Co. v. United States*,
281 F. 2d 137 (6th Cir. 1960) .............................................................................36

*Cont'l Ore Co. v. Union Carbide and Carbon Corp.*,
370 U.S. 690 (1962)....................................................................................9, 59

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984)..................................................................................37, 40

*Crossword Magazine v. Times Books*,
No. 96-4550, 1997 U.S. Dist. LEXIS 21606 (E.D.N.Y. May 5, 1997) ................................29

*Daniel v. Am. Bd. of Emergency Med.*,
988 F. Supp. 112 (W.D.N.Y. 1997) ..................................................................11, 15

*Davis v. Grusemeyer*,
996 F.2d 617 (3d Cir. 1993)................................................................................10

*Dry Cleaning & Laundry Inst. of Detroit v. Flom's Corp.*,
    841 F. Supp. 212 (E.D. Mich. 1993)...................................................................17

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
    100 F.3d 462 (6th Cir. 1996) ....................................................................11

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*,
    635 F.2d 1037 (2d Cir. 1980)...........................................................4, 47, 49

*Filco v. Amana Refrigeration, Inc.*,
    709 F.2d 1257 (9th Cir. 1983) ..................................................................53

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)................................................................................62

*Global Network Commc'n, Inc. v. City of New York*,
    453 F. 3d 150 (2d Cir. 2006).................................................................31, 32

*Grunewald v. United States*,
    353 U.S. 391 (1957)................................................................................56

*Gulf Coast Shrimpers & Oystermans Ass'n v. United States*,
    236 F.2d 658 (5th Cir. 1956) ...................................................................47

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)................................................................................11

*Harkins Amusement Enter. v. Gen. Cinema Corp.*,
    748 F. Supp. 1389 (D. Ariz. 1990) ...........................................................61

*Heerwagen v. Clear Channel Commc'ns*,
    435 F.3d 219 (2d Cir. 2006)............................................................27, 28, 35

*Hinds County v. Wachovia Bank*,
    620 F. Supp. 2d (S.D.N.Y.2009)...............................................................57

*Hydrolevel Corp. v. American Soc'y of Mech. Eng'rs, Inc.*,
    635 F.2d 118 (2d Cir. 1980).................................................................33, 36

*In re Buspirone Patent Litig.*,
    185 F. Supp. 2d 365 (S.D.N.Y. 2002).......................................................13

*In re Carbon Black Antitrust Litig.*,
    MDL No, 1543, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) ..................12

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) .......................................................16

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*,
No. 00-7804, 2004 U.S. Dist. LEXIS 3892 (S.D.N.Y. Mar. 9, 2004) ..............................17, 19

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ..................................................................................................11

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) .........................................................................................19

*In re Mushroom Direct Purchaser Antitrust Litig.*,
514 F. Supp. 2d 683 (E.D. Pa. 2007) ........................................................................38, 45, 46

*In re Mushroom Direct Purchasers Antitrust Litig.*,
No. 06-0620, 2009 U.S. Dist. LEXIS 26254 (E.D. Pa. Mar. 26, 2009)............................46, 49

*In re NASDAQ Market-Makers Antitrust Litig.*
169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................................................51

*In re Nine West Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000)...................................................................................18, 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
562 F. Supp. 2d 392 (E.D.N.Y. 2008) ................................................................................21, 26

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................................58

*In re Rubber Chems. Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) .....................................................................................18

*In re Shulman Transp. Enters.*,
744 F.2d 293 (2d Cir. 1984)......................................................................................................33

*In re Southeastern Milk Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)........................................................................... passim

*In re Southeastern Milk Litig.*,
No. 08-1000, 2008 U.S. Dist. LEXIS 444541 (E.D. Tenn. June 6, 2008).............................1, 38

*In re Sumitomo Copper Litig.*,
120 F. Supp. 2d 328 (S.D.N.Y. 2000).......................................................................................19

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007).......................................................................................58

*In re Uranium Antitrust Litig.*,
552 F. Supp. 518 (N.D. Ill.1982) ..............................................................................................61

*In re Vitamins Antitrust Litig.*,
   No. 99-197, 2000 U.S. Dist. LEXIS 7397 (D.D.C. May 9, 2000)..........................................19

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
   677 F.2d 1045 (5th Cir. 1982) ...............................................................................................11

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*,
   845 F.2d 404 (2d Cir. 1988)....................................................................................................29

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)................................................................................................................12

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ...................................................................................................4

*Knuth v. Erie-Crawford Dairy Coop. Ass'n*,
   395 F.2d 420 (3d Cir. 1968)....................................................................................................45

*Koury v. Xcellence, Inc.*,
   649 F. Supp. 2d 127 (S.D.N.Y. 2009)....................................................................................58

*Lone Star Milk Producers Inc. v. Dairy Farmers of America, Inc.*,
   No. 00-191, 2001 U.S. Dist. LEXIS 18716 (E.D. Tex. Jan. 22, 2001)...................4, 22, 24, 47

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
   No. 07-8455, 2008 U.S. Dist. LEXIS 80475 (S.D.N.Y. Oct. 10, 2008).................................16

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*,
   334 U.S. 219 (1948)................................................................................................................25

*Maryland & Virginia Milk Producers Assoc., Inc., v. United States*,
   362 U.S. 458 (1960)........................................................................................................ passim

*Massena v. Niagara Mohawk Power Corp.*,
   No. 79-163, 1980 U.S. Dist. LEXIS 9382 (N.D.N.Y. Sept. 8, 1980).....................................24

*Mathias v. Daily News, L.P.*,
   152 F. Supp. 2d 465 (S.D.N.Y. 2001)...............................................................................23, 26

*McCagg v. Marquis Jet Partners, Inc.*,
   No. 05-10607, 2007 U.S. Dist. LEXIS 61020 (S.D.N.Y. Mar. 29, 2007)..............................23

*Meijer, Inc. v. 3M*,
   No. 04-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005)...................................12

*Michigan ex rel. Kelley v. McDonald Dairy Co.*,
   905 F. Supp. 447 (W.D. Mich. 1995) ....................................................................................18

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
 392 F.3d 265 (8th Cir. 2004) ............................................................12

*Mission Hills Condo. Ass'n v. Corley*,
 570 F. Supp. 453 (N.D. Ill. 1983) ......................................................32

*Morton's Mkt. Inc. v. Gustafson Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999) ...............................................12, 13, 17

*Neitzke v. Williams*,
 490 U.S. 319 (1989)............................................................................9

*New York ex rel. Spitzer v. Feldman*,
 No. 01-6691, 2003 U.S. Dist. LEXIS 11759 (S.D.N.Y. July 14, 2003)..................................51

*New York ex rel. Spitzer v. Saint Francis Hosp.*,
 94 F. Supp. 2d 399 (S.D.N.Y. 2000).................................................39

*New York Jets LLC v. Cablevision Sys. Corp.*,
 No. 05-2875, 2005 U.S. Dist. LEXIS 23763 (S.D.N.Y. Oct. 17, 2005)................................20

*New York v. Hendrickson Bros., Inc.*,
 840 F.2d 1065 (2d Cir. 1988)....................................10, 17, 18, 19

*Newcal Industries, Inc. v. Ikon Office Solution*,
 513 F.3d 1038 (9th Cir. 2008) ...........................................................61

*Nilvar v. Mercy Health Sys.*,
 No. 06-3819, 2007 U.S. App. LEXIS 19127 (6th Cir. Aug. 7, 2007) ....................................24

*North Texas Producers Ass'n v. Metzger Dairies, Inc.*,
 348 F.2d 189 (5th Cir. 1965) ..............................................................4

*Otto Milk Co. v. United Dairy Farmers Coop. Ass'n*,
 388 F.2d 789 (3d Cir. 1967)................................................................4

*Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*,
 281 F.3d 2002 (7th Cir. 2002) ...........................................................51

*Redmond v. Missouri Western State College*,
 No. 84-6139, 1988 U.S. Dist. LEXIS 12230 (W.D. Mo. Nov. 2, 1988) ................................23

*Rice v. Kawasaki Heavy Indus., LTD*,
 No. 07-4031, 2008 U.S. Dist. LEXIS 83659 (E.D.N.Y. Oct. 17, 2008)................................32

*Richards v. Mileski*,
 662 F.2d 65 (D.C. Cir. 1981) .............................................................10

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F. 2d 210 (D.C. Cir. 1986) ........................................................................42

*Sheridan v. Marathon Petroleum Co.*,
    530 F.3d 590 (7th Cir. 2008) ..........................................................................43

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
    54 F.3d 1125 (3d Cir. 1995) ............................................................................42

*Smith v. Multi-Flow Dispensers of Ohio, Inc.*,
    No. 96-4185, 1999 U.S. App. LEXIS 9845 (6th Cir. May 14, 1999) .....................24

*Smugglers Notch Homeowners' Assoc., Inc. v. Smugglers' Notch Mgmt. Co.*,
    No. 08-186, 2009 U.S. Dist. LEXIS 46026 (D. Vt. May 29, 2009) ......................23

*Spectators' Commc'n Network, Inc. v. Colonial Country Club*,
    253 F. 3d 215 (5th Cir. 2001) .........................................................................62

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ...............................................................57

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ..................................................................... passim

*Sun Dun, Inc. v. Coca-Cola Co.*,
    740 F. Supp. 381 (D. Md. 1990) .....................................................................59

*Sun Microsys., Inc. v. Versata Enters., Inc.*,
    630 F. Supp. 2d 395 (D. Del. 2009) ................................................................29

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006) ..........................................................................................37

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................... passim

*Tops Market, Inc. v. Quality Meats, Inc.*,
    142 F.3d 90 (2d Cir. 1998) .............................................................................29

*Townshend v. Rockwell Int'l Corp.*,
    No. 99-0400, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000) ................40

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ..........................................................................62

*Truck Drivers' Local No. 421, etc. v. United States*,
    128 F.2d 227, 235 (8th Cir. 1942) ..................................................................36

*United Mine Workers of America v. Coronado Coal Co.*,
  259 U.S. 344 (1922)..........................................................................................36

*United States v. American Radiator & Standard Sanitary Corp.*,
  433 F.2d 174 (3d Cir. 1970)..............................................................................36

*United States v. American Smelting & Ref. Co.*,
  182 F. Supp. 834 (S.D.N.Y. 1960).....................................................................39

*United States v. Borden Co.*,
  308 U.S. 188 (1939).....................................................................................45, 49

*United States. v. Cadillac Overall Supply Co.*,
  568 F.2d 1078 (5th Cir. 1978) ...........................................................................36

*United States. v. Country Lake Foods, Inc.*,
  754 F. Supp. 669 (D. Minn. 1990).....................................................................24

*United States v. Dairy Farmers of America, Inc.*,
  426 F.3d 850 (6th Cir. 2005) ...............................................................................4

*United States v. Dairymen, Inc.*,
  660 F.2d 192 (6th Cir. 1981) .................................................................4, 22, 48

*United States v. Dairymen, Inc.*,
  No. C 7634 A, 1983 U.S. Dist. LEXIS 16355 (W.D. Ky. June 9, 1983) ...........5, 24

*United States v. Dairymen, Inc.*,
  Nos. 84-5003, 84-5039, 1985 U.S. App. LEXIS 14634 (6th Cir. Feb. 26, 1985) ....4

*United States v. General Box Co.*,
  No. 88-716, 1989 U.S. Dist. LEXIS 10922 (N.D. Ohio April 11, 1989) ...............16

*United States v. Hilton Hotels Corp.*,
  467 F.2d 1000 (9th Cir. 1972) ...........................................................................36

*United States v. Hinote*,
  823 F. Supp. 1350 (S.D. Miss. 1993)..................................................................45

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948)...........................................................................................53

*United States v. Parke Davis & Co.*,
  362 U.S. 29 (1960).............................................................................................53

*United States v. Rice Growers Ass'n of California*,
  No. 84-1066, 1986 U.S. Dist. LEXIS 30507 (E.D. Cal. Jan. 31, 1986) ...............22

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)...........................................................................................37

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008)............................................................................16

*Vermont Mobile Home Owners' Ass'n, Inc. v. Lapierre*,
    87 F. Supp. 2d 348 (D. Vt. 1999).....................................................................13

*Virginia Excelsior Mills v. FTC*,
    256 F.2d 538 (4th Cir. 1958) ...........................................................................39

*Vitale v. Marlborough Gallery*,
    No. 93-6276, 1994 U.S. Dist. LEXIS 9006 (S.D.N.Y. July 19, 1994) ...................16

*Vogel v. American Soc'y of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) ...........................................................................37

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)........................................................................................10

*Zschaler v. Claneil Enters.*,
    958 F. Supp. 929 (D. Vt. 1997)........................................................................29

## STATUTES

7 U.S.C. § 291...............................................................................................46, 48

## OTHER AUTHORITIES

*Milk in the New England and Other Marketing Areas*, 63 Fed. Reg. 4802, 4815-16 (Jan.
    30, 1998) ........................................................................................................26

*Restatement (Second) Agency* § 1, 7 .................................................................37

*Restatement (Second) of Agency* § 8 .................................................................37

## INTRODUCTION AND SUMMARY

Plaintiffs respectfully submit this memorandum in opposition to Defendants' Motions To Dismiss ("Defendants' Motions").[1]  For the reasons set forth below, Defendants have not come close to establishing their burden of demonstrating that the Amended Complaint fails to state a claim.  The Amended Complaint alleges, in great detail, a concerted effort by Defendants to monopolize and monopsonize the production, marketing, and processing of fluid Grade A milk in the Northeast United States through a series of anticompetitive acts intended to lower prices paid to Northeast dairy farmers for milk. Defendants' actions establish classic violations of the Sherman Act that entitle Plaintiffs and all others similarly situated to relief.

No doubt cognizant of the above, Defendants re-characterize Plaintiffs' actual allegations, rely selectively upon certain facts while studiously ignoring others, and assert various fact-bound affirmative defenses outside the four corners of the Amended Complaint. Tellingly, Defendants scarcely mentioned in their memoranda that the Court in *In re Southeastern Milk Antitrust Litigation* squarely rejected the principal arguments advanced here. 555 F. Supp. 2d 934 (E.D. Tenn. May 20, 2008); *see also In re Southeastern Milk Antitrust Litig.*, No. 08-1000, 2008 U.S. Dist. LEXIS 444541 (E.D. Tenn. June 6, 2008).  As in *Southeastern Milk*, in which DFA, DMS, and Dean are parties, Defendants repeatedly attempt "to parse and dismember the complaints, contrary to the Supreme Court's admonition that '[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and

---

[1]   Plaintiffs previously filed a motion requesting leave to file a single, consolidated response to Defendants' motions (and requesting a page limitation *smaller* than the page limitation if three separate oppositions were filed).  Because of the overlap in Defendants' arguments – and because a central failing of Defendants' motions is their improper attempt to dismember the conspiracy and break it into separate parts – a consolidated response is the most efficient and appropriate way to address these issues for the Court.  If Plaintiffs' motion is not granted, Plaintiffs respectfully request that they be granted a week to prepare three separate responses to Defendants' motions.

viewing its separate parts.'" 555 F. Supp. 2d at 943-44 (quoting *Cont'l Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690 (1962)).  Also, as in *Southeastern Milk*, Defendants' Motions consistently disregard the well-established rule that, where properly pled, factual issues cannot be resolved on a motion to dismiss and reasonable inferences are drawn *against* the moving party.  *Id.* (denying motion to dismiss based on failure to allege relevant market, statute of limitations, *Twombly* and Capper-Volstead because each involves factual disputes).  Because there is also no basis for Defendants' motions to dismiss here, Plaintiffs respectfully request that they be denied.

## FACTUAL BACKGROUND

Defendants in this case are Dairy Farmers of America ("DFA"), Dairy Marketing Services ("DMS"), Dean Foods Company ("Dean") and HP Hood ("Hood").  DFA is a vertically-integrated company that markets raw fluid Grade A milk ("Grade A milk") to bottling facilities and also has substantial ownership interests in businesses engaged in purchasing and bottling Grade A milk.  (Am. Compl. ¶ 23.) DFA created and owns approximately fifty percent of DMS, which is a limited liability company that assembles, tests, hauls and markets Grade A milk to bottlers for dairy farmers and cooperatives.  (*Id.* ¶ 24.)  Dean and Hood are the two largest Grade A milk purchasers and bottlers in the Northeast, with market shares of approximately seventy percent and twenty percent respectively.  (*Id.* ¶ 5.)

The Amended Complaint alleges a conspiracy among Defendants to refuse to compete for the purchase of Grade A milk produced and marketed in the Northeast United States; to foreclose independent dairy farmers' and independent cooperative members' access to Grade A milk bottling plants; to eliminate and stifle competition from independent dairy cooperatives and independent Grade A milk bottlers; and to engage in other unlawful activities to artificially and

anti-competitively fix and depress the prices paid for Grade A milk purchased from Plaintiffs and other class members at levels substantially below the amount they would receive in a competitive marketplace.  (*Id.* ¶¶ 1-12.)  Through these actions, Dean acquired a monopsony position in the market for purchasing milk.  (*Id.* ¶¶ 5, 93, 186-187.)  Dean and Hood subsequently reached unlawful agreements with DFA and DMS to stop competing for the purchase of milk and to require thousands of dairy farmers to market milk through DMS to gain access to Dean and Hood bottling plants, which account for ninety percent of the market.  (*Id.* ¶¶ 5-6, 11, 83-85, 111-118.)  DMS controls approximately eighty percent of this marketed milk.  (*Id.* ¶ 24.)  Thus, DFA and DMS have been given control over access to the Dean and Hood bottling plants and, as a *quid pro quo,* have fixed and restrained prices paid to dairy farmers.  (*Id.* ¶¶ 123-129.)  This conspiratorial conduct has created a monopoly in the marketing and sale of Grade A milk to bottling plants, and a mirror image monopsony in the purchase of Grade A milk by bottling plants.  (*Id.* ¶ 2.)  These competitive restraints have suppressed prices paid to dairy farmers and allowed officials and allies of Defendants to reap enormous financial windfalls at the expense of Northeast dairy farmers.  (*Id.* ¶¶ 11-12, 66.)

**The Supply and Purchase of Grade A Milk.**  The putative class includes thousands of dairy farmers who produce Grade A milk in the Northeast, a geographic market described by the USDA as "Order 1."  (*Id.* ¶¶ 29, 35.)  Dairy farmers who deliver a sufficient amount of Grade A milk to bottlers in the Northeast (a procedure known as "touching base") become eligible to receive a federal minimum blended price ("the FMMO minimum") calculated by the USDA according to how Grade A milk is utilized by the processors.  (*Id.* ¶ 47.)  Dairy farmers cannot "touch base" by delivering milk to processing plants that manufacture cream, cheese, butter and

other dairy products; only delivering a sufficient quantity of Grade A milk to bottling plants qualifies dairy farmers for the FMMO minimum.  (*Id.* ¶ 37.)

In a competitive market, dairy farmers (and cooperatives of dairy farmers) are free to negotiate with bottlers for prices above the FMMO minimum to reflect market conditions.  (*Id.* ¶ 49.)  The amount by which prices paid by bottlers for Grade A milk exceed the FMMO minimum is known as the "over-order premium."  (*Id.*)  Unlike bottlers, processors of cream, cheese, butter and other dairy products traditionally do not pay over-order premiums.  (*Id*. ¶ 37.)

Prior to Defendants' antitrust violations, dairy farmers in the Northeast received over-order premiums for Grade A milk that more accurately reflected competitive market conditions.  (*Id.* ¶¶ 49-50.)  Dairy farmers who were not provided a fair price by a bottler could supply milk to other bottling competitors to secure a fair and competitive price for their milk or could join a cooperative that negotiated for higher over-order premiums from bottlers.  (*Id.* ¶ 37.)

**Defendants' Unlawful Conduct.**  DFA was created in 1998 and is a successor entity to two dairy cooperatives previously sued by the Department of Justice ("DOJ") for antitrust violations (DFA remains subject to the resulting consent decrees).[2]  (*Id.* ¶¶ 54-56.)  A year later,

---

[2]     The dairy industry is, in fact, infamous for its history of antitrust violations, including price-fixing, bid rigging, boycotting, coercion, exclusive dealing, monopolization, and anticompetitive acquisitions, among other illegal activities.  *See, e.g., United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850, 861-62 (6th Cir. 2005) (Clayton Act violations); *United States v. Dairymen, Inc.*, Nos. 84-5003, 84-5039, 1985 U.S. App. LEXIS 14634, at **10-14 (6th Cir. Feb. 26, 1985) (exclusive hauling contract and full-service agreements violated the Clayton Act); *United States v. Dairymen, Inc.*, 660 F.2d 192, 195 (6th Cir. 1981) (exclusive hauling contracts and full-service agreements); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986-87 (9th Cir. 2000) (price fixing); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1193, 1208 (8th Cir. 1982) (discriminator pricing, disrupted deliveries, and threatening purchasers with litigation); *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (2d Cir. 1980) (remanding to determine whether dairy cooperative's actions were predatory); *Otto Milk Co. v. United Dairy Farmers Coop. Ass'n*, 388 F.2d 789, 797, 799 (3d Cir. 1967) (dairy cooperative coerced stores to boycott competitor); *North Texas Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189, 195-96 (5th Cir. 1965) (coerced purchasers to boycott non-members); *Lone Star Milk Producers Inc. v. Dairy Farmers of America, Inc.*, No. 00-191, 2001 U.S. Dist. LEXIS 18716, at *16, *22, *27 (E.D. Tex. Jan. 22, 2001) (dairy cooperative allegedly coerced processors and entered into exclusive agreements

DFA created DMS (in conjunction with another dairy cooperative) in order to control the marketing of, and compensation for, Grade A milk produced by dairy farmers and cooperatives who did not want to join DFA.  (*Id.* ¶¶ 68-71.)  DFA and DMS subsequently entered agreements with each other and major bottling plants to restrain competition and create monopoly and/or monopsony power in both the market for supplying and marketing Grade A milk to bottlers (sell-side) as well as the market for purchasing and bottling Grade A milk (buy-side).  (*Id.* ¶¶ 1-11.)

Although DFA is supposed to serve as a cooperative that assists dairy farmers in supplying Grade A milk to bottlers, it has instead embarked on a scheme to restrain competition and reap economic rewards in the bottling market for the benefit of individual executives.  While Defendants' Motions repeatedly characterize DFA as a "dairy cooperative" and a "supplier" of milk, this oversimplifies and inaccurately depicts DFA's position and economic interests.  During the class period DFA has been a *vertically integrated* company, with significant financial interests in bottling and processing facilities, including Defendant Hood.  (*Id.* ¶¶ 59-64.)  DFA has used profits from its ownership and joint venture interests in bottling plants to make substantial financial payouts to DFA officers and close business associates.  (*Id.* ¶¶ 8, 65-66.)

In early 2000, DFA entered into an agreement with Suiza (the largest bottler in the United States and a predecessor to Dean) in which DFA acquired a 33.8% stake in Suiza's Grade A milk bottling operations.  (*Id.* ¶ 61.)  A year later, DFA, Suiza and Dean substantially increased concentration among milk bottlers by merging Suiza and Dean to create the largest bottler in the Northeast.  (*Id.* ¶ 80.)  As a condition to this merger, the DOJ required Dean and Suiza to divest

---

with balancing plants); *United States v. Dairymen, Inc.*, No. C 7634 A, 1983 U.S. Dist. LEXIS 16355, at **25-26 (W.D. Ky. June 9, 1983) (dairy's use of full-supply agreements violated the Clayton Act); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476, 482-83, 486, 488 (E.D. Mo. 1965) (dairy cooperative fixed prices, attempted to monopolize, and charged discriminatory prices), *aff'd* 368 F.2d 679 (8th Cir. 1966).

eleven bottling plants.  (*Id.* ¶ 81.)  It also required the existing milk supply contract between DFA and Suiza to be modified to ensure that bottling plants owned by the merged firm would "be free to buy their milk from sources other than DFA."  (*Id.*)   Consequently, DFA and former Dean executives created a new partnership, NDH, to acquire the 11 divested plants.  (*Id.* ¶ 87.) As a result, Dean and NDH became the largest bottlers in the Northeast market.  (*Id.* ¶¶ 93-94.) In 2007, DFA increased its ownership stake in NDH from 50 percent to 87 percent.  (*Id.* ¶ 87.)

Despite a DOJ consent decree that prohibited DFA from entering into milk supply agreements with terms in excess of one year, Dean and DFA entered agreements designed to circumvent DOJ's requirements and to require dairy farmers to join DFA or market their milk through DMS in order to gain access to Dean's bottling plants.  (*Id.* ¶ 83.)  Thus, an agreement was reached that (a) DFA would forgive the entire balance of a $40 million promissory note provided by Dean as part of the transaction if Dean renewed a series of 20 successive one-year full-supply agreements; and (b) Dean would have to pay DFA liquidated damages of up to $47 million in the event Dean did not renew each of the annual full-supply agreements.  (*Id.*)

Pursuant to its agreement with DFA to stop competing for the purchase of milk, Dean informed independent dairy farmers and cooperatives that they had to market their milk through DMS to continue to supply Dean with Grade A milk.  (*Id.* ¶ 84.)  Similarly, an agreement was reached with NDH, requiring that all milk supplied to NDH had to be supplied through DFA or DMS.  (*Id.* ¶ 91.)  Likewise, DFA entered into an agreement with Hood to stop competing for the purchase of milk.  (*Id.* ¶¶ 106-108, 111-113.)  As part of this transaction, Hood acquired a 30% interest in NDH and DFA acquired a 15% interest in Hood.  (*Id.* ¶ 107.)

In 2004, all of NDH's bottling plants in the Northeast were sold to Hood.  (*Id.* ¶ 109.)  As 50% owner of NDH and 15% owner of Hood, DFA was again on both sides of the transaction.

(*Id.*)  DFA subsequently reached an agreement with Hood that made DFA the exclusive supplier of Grade A milk to the bottling plants Hood had acquired from NDH, thereby insuring that Hood would not compete against Dean to purchase raw Grade A milk.  (*Id.* ¶¶ 111-113.)  DFA also entered into an agreement not to compete with Agri-Mark, whereby DFA would allow Agri-Mark to supply milk to some Hood plants in return for Agri-Mark not competing with DFA or DMS for membership and supply contracts.  (*Id.* ¶ 113.)

As a result of these consolidations and agreements not to compete, DFA and DMS gained a dominant position supplying milk to Dean and Hood.  (*Id.* ¶ 114.)  In return for the agreement not to compete, Dean and Hood (along with DFA in its processor capacity) were safe in the knowledge that the dominant companies were no longer competing on the basis of prices for their major input – Grade A milk.  (*Id.* ¶ 12.)  As a result of the conspiracy, DMS now controls approximately *80 percent* of Grade A milk to bottling plants in the Northeast market and Dean and Hood respectively control over seventy percent and twenty percent of the market for bottling Grade A milk in the Northeast.  (*Id.* ¶¶ 5, 24.)

Throughout the class period, DFA and DMS have furthered the aims of this conspiracy by fixing and suppressing the amount of the "over-order" premium that Dean, Hood and other bottlers pay for their milk.  (*Id.* ¶¶ 123-129.)  To prevent any deviation from this price, DFA receives, processes and accounts for the moneys collected from bottlers for milk marketed through DMS.  (*Id.* ¶ 125.)  This allows DFA to ensure all sales are compliant with the conspiracy, and to monitor all payments to dairy farmers.  (*Id.*)

In September 2006, DFA and DMS expanded their power to monitor and control prices by forming the Greater Northeast Milk Marketing Association ("GNEMMA").  (*Id.* ¶ 126.) GNEMMA is comprised of DFA, four cooperatives that market their milk through DMS, one

cooperative that has agreed not to compete with DMS – Agrimark, and one independent dairy cooperative – Upstate Niagara.  (*Id.*)  The members of GNEMMA meet regularly to discuss and fix the over-order premiums paid to dairy farmers.  (*Id.* ¶ 127.)  Because of DFA and DMS's agreements with bottlers and their control of over 80 percent of the milk marketed in the Northeast, they are able to dictate the over-order price set by GNEMMA.  (*Id.* ¶¶ 128-129.)  Thus, GNEMMA provides a mechanism for Defendants to expand the reach of their price-fixing conspiracy to encompass farmers who do not market their milk through DMS and thereby ensure that other cooperatives cannot compete with DFA and DMS.  (*Id.* ¶ 129.)

The agreements between Dean, Hood, DMS and DFA – and the resulting control that DMS and DFA have over access to bottling plants – have empowered DMS and DFA to force independent dairy farmers and cooperatives to join DFA or market their milk through DMS.  (*Id.* ¶¶ 119-122.)  As one cooperative has explained, "local farmers quickly recognize that they have no choice but to capitulate to and join DFA in order to have a market for their milk."  (*Id.* ¶ 116.)

Defendants continue to use this power to maintain and expand the reach of this conspiracy.  For example, when a group of farmers attempted to end their relationship with DMS in 2009, a DMS inspector threatened to impose multiple health code violations on those farmers and, if that did not deter their departure, he threatened to instruct haulers not to transport those farmers' milk to bottlers, and further threatened to void all contracts with haulers that disobeyed this instruction.  (*Id.* ¶ 120.)  Similarly, DMS has terminated its contracts with haulers if they transport milk for dairy farmers who quit DFA and threatened to stop supplying milk to independent bottlers if they accept milk from dairy farmers that quit DFA.  (*Id.* ¶ 121.)  Actions such as this to maintain and expand the reach of the conspiracy, including other actions

concealed from public disclosure by Defendants pursuant to the conspiracy, have been facilitated by and inured to the benefit of all Defendants, to the detriment of dairy farmers. (*Id.* ¶¶ 11-12.)

Accordingly, this action is brought on behalf of a proposed class of Northeast dairy farmers seeking relief from the grievous injury inflicted by Defendants' continuing unlawful anticompetitive conduct.

## ARGUMENT

In considering a Rule 12(b)(6) motion, the Court must accept as true the facts as Plaintiffs have pled them and construe the Amended Complaint in the light most favorable to Plaintiffs. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 317 (2d Cir. 2010). Defendants' Motions must be denied if Plaintiffs plead factual allegations that are "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). There is no heightened pleading standard for an antitrust complaint; it must merely include "enough factual matter (taken as true) to suggest that an agreement was made . . . [I]t simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. In this regard, *Twombly* did not change the long-standing rule that courts must avoid "tightly compartmentalizing the various factual components [of a plaintiff's' claim] and wiping the slate clean after scrutiny of each." *Cont'l Ore*, 370 U.S. at 699.

## II.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Where, as here, antitrust defendants have engaged in a continuing conspiracy over many years, the four-year limitations period commences each time "a defendant commits an act that

injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Additionally, a defendant's fraudulent concealment may toll the statute of limitations. *See New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). The statute of limitations is an affirmative defense and defendants seeking dismissal on this ground as a matter of law bear a heavy burden. *See, e.g.*, *Davis v. Grusemeyer*, 996 F.2d 617, 623 n.10 (3d Cir. 1993); *Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981).

Remarkably, in seeking dismissal of the claims based on statute of limitations grounds, Defendants scarcely even mention that virtually identical arguments were made in motions to dismiss the *Southeastern Milk* litigation and were squarely rejected by the Court:

> Because the Court finds that the plaintiffs have adequately pled a continuing antitrust violation and have alleged overt acts which, if proven, would restart the statute of limitations, the motion of the defendant, at this stage of the proceedings, lacks merit. Plaintiffs in this case allege an agreement to eliminate competition. A conspiracy is presumed continuing where there is an agreement to eliminate competition with no "affirmative showing of the termination of that agreement." *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 275 (8th Cir. 2004), *Morton's Mkt. Inc. v. Gustafson Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).
>
> Plaintiffs in this case have alleged that the continuing conspiracy was implemented by the annual review of full supply agreements and have alleged numerous other overt acts occurring within the limitations. These facts are clearly articulated in plaintiffs' complaint and the Court will not set them out individually in this memorandum opinion. . . . Accepting these allegations as true, as the Court is required to do for the purposes of these motions, the plaintiffs clearly plead a continuing conspiracy with overt acts committed well within the limitations period applicable to this case.

*Southeastern Milk*, 555 F. Supp. 2d at 947. Exactly the same conclusion is appropriate here.

### A.   Plaintiffs Allege A Continuing Conspiracy With Overt Acts Occurring Within The Limitations Period.

"In the context of a continuing conspiracy to violate the antitrust laws . . . the statute of limitations runs from the commission of the act" that injures the plaintiff. *Zenith*, 401 U.S. at

338. Continuing antitrust violations occur when the defendants' actions "repeatedly invade" the plaintiffs' interests. *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996). Because the harm is continuing, a cause of action accrues and the limitations period begins to run anew with each "new and independent act . . . inflict[ing] new and accumulating injury on the plaintiff." *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112, 120 (W.D.N.Y. 1997).

In fact, the "Supreme Court has considered and rejected the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1171 (3d Cir. 1993) (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968)).[3]  To illustrate, in *Hanover Shoe*, the Supreme Court permitted a plaintiff to file suit *forty-three years* after the commencement of the unlawful conspiracy because the conspiracy and the acts of price-fixing in furtherance of that long-running conspiracy constituted "a continuing violation of the Sherman Act [] which inflicted continuing and accumulating harm."  392 U.S. at 502 n.15.  The Court reasoned that a continuing conspiracy need not "occur within some specific and limited time span."  *Id.*

The Amended Complaint alleges that Defendants entered into the conspiracy and committed unlawful acts with the purpose and intent to suppress competition, establish buy-side and supply-side monopolies, and fix prices received by farmers at artificially low levels.  (Am. Compl. ¶ 39.)  Numerous courts have held that in price fixing cases, "each time a customer

---

[3]     *Accord Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 572 (4th Cir. 1976) ("each refusal to deal gives rise to a claim under the antitrust laws"); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982) (recognizing the "continuing violation exception that permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy"); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444-45 (9th Cir. 1997) ("refusal was not a mere reaffirmation of . . . [an agreement] because the . . . [a]greement was not a permanent and final decision that controlled the later act").

purchases [a] product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999); *accord Meijer, Inc. v. 3M*, No. 04-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005); *In re Carbon Black Antitrust Litig.*, MDL No., 1543, 2005 U.S. Dist. LEXIS 660, at *25 (D. Mass. Jan. 18, 2005); *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 275 (8th Cir. 2004) ("continuing violations restart the statute of limitations when there is an ongoing scheme, such as a price-fixing conspiracy"). Thus, "if plaintiffs purchased milk at a fixed price . . . the purchase would constitute an overt act that injured it" and so, each sale restarts the statutory period. *Morton's*, 198 F.3d at 828 (citing *Zenith*, 401 U.S. at 338).

Here, Defendants engaged in a conspiracy designed to fix and suppress the price for raw Grade A milk in the Northeast *every month* at artificially low levels, (Am. Compl. ¶¶ 123-31), and each payment to dairy farmer class members was an overt act that restarted the statutory period. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[E]ach overt act that is part of the violation and that injures the plaintiff, *e.g.,* each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.") (citations and quotations omitted). Defendants' Motions ignore the ongoing nature of the price-fixing conspiracy alleged and, for this reason alone, their Motions should be denied.[4]

---

[4]     Moreover, it is irrelevant whether the Defendants participated in price-fixing conversations during the limitations period because each purchase of milk at a fixed price constituted an overt act that injured the plaintiffs. *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) ("even if there were no price-fixing conversations after 1987 . . . if plaintiffs purchased milk at a fixed price after that date, the purchase would constitute an overt act that injured it") (footnote omitted). As in *Klehr and Morton's*, each time Plaintiffs are required to sell and or market their milk through DMS or DFA, at prices set by the cartel, an overt act is committed and the statutory period begins anew.

The Second Circuit has reached the same conclusion in monopolization cases where anticompetitive prices are being charged within the limitations period based on earlier conduct. In *Berkey Photo, Inc. v. Eastman Kodak Co.*, the Court explained:

> [t]he taint of an impure origin does not dissipate after four years if a monopolist continues to extra excessive prices because of it.  Moreover, it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief. … We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct requisite to recovery by pointing to anticompetitive actions taken before the limitations period.

603 F.2d 263, 296 (2d Cir. 1979); *see also In re Buspirone Patent Litig.*, 185 F. Supp. 2d 365, 378 (S.D.N.Y. 2002) ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge customers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").[5]

Defendants' statute of limitations arguments are also unavailing because a conspiracy is presumed to be continuing where there is "an agreement to eliminate competition" with no "affirmative showing of the termination of that agreement."  *Morton's*, 198 F.3d at 828-29;  *see Southeastern Milk*, 555 F. Supp. 2d at 947; *Vermont Mobile* 87 F. Supp. 2d at 351  (continuing conspiracy exists where anticompetitive agreement continues into period not barred by statute of limitations absent affirmative acts to "call[] off" the agreement).  Defendants do not contend they have terminated the conspiracy at issue in this case.

---

[5]     Defendants' assertion that payment of fixed prices is an "overt act" for only one count of the Amended Complaint, but not others, disregards both the express language in the Amended Complaint incorporating the earlier factual allegations into each count, including specific language pertaining to GNEMMA (*see, e.g.*, Am. Compl. at ¶¶ 47, 158, 164, 175, 179, 183, 193, 196, 204 & 207), and the Supreme Court's well established rule, followed in *Southeastern Milk*, that a complaint must be "taken as a whole" and it is not appropriate for the defendants to "dismember" the conspiracy.  555 F.Supp.2d at 943-44.

Moreover, just as in *Southeastern Milk*, Defendants' statute of limitations arguments are misplaced because, in addition to price fixing, Plaintiffs clearly plead continuing conspiracy and monopolization with other "overt acts committed well within the limitations period applicable to this case." 555 F. Supp. 2d at 947. As in *Southeastern Milk,* Plaintiffs have alleged numerous overt acts occurring within the limitations period that secured and expanded Defendants' respective market powers and furthered the price-fixing and monopolization conspiracies:

- Dean and DFA annually renewed full-supply agreements. (Am. Comp. ¶ 83).[6]

- DFA and DMS created GNEMMA in 2006. (*Id.* ¶¶ 147, 158, 168, 179, 187, 196, 207.)

- Dean required Northeast dairy farmers to pay "competitive credits" at various points throughout the limitations period even though Dean controls approximately 70% of the market for the bottling of raw Grade A milk. (*Id.* ¶ 133)

- Through 2006, DFA made excessive and advance payments for the purchase of milk to DFA director Lewis Gardner. (*Id.* ¶ 66(e))

- Beginning in October 2007, DFA forced its members to share in the losses of joint venture NDH, which amounted to hundreds of millions of dollars, even though profits were not shared with farmer-members. (*Id*. ¶ 66(f))

- Since 2006, DFA and DMS have used threats and retaliation to force dairy farmers and haulers to supply milk through DFA or DMS to bottling facilities controlled by Dean and Hood and otherwise maintain and enforce the conspiracy. (*Id.* ¶¶ 119-122)

- For example, in 2009, a DMS official threatened to impose multiple health code violations on farmers when they attempted to end their relationship with DMS. (*Id*. ¶ 119)

---

[6]     *Southeastern Milk*, 555 F. Supp. 2d at 947 ("Plaintiffs in this case have alleged that the continuing conspiracy was implemented by the annual renewal of full supply agreements."); *Hypertherm*, 2007 U.S. Dist. LEXIS 67579, at **12-14 (each time a sale is made with an anti-competitive warranty, although warranty policy was initiated outside the limitations period, a new overt act occurs.). Moreover, in contrast to the cases cited by Defendants, here DFA was subject to a Consent Decree that prohibited it from entering a full supply agreement that would last more than one year. Thus, it is quite extraordinary for Defendants to argue that their conduct should not be deemed continuing, because – for all practical purposes – they entered a twenty-year agreement (in violation of the Consent Decree) to foreclose competition for the supply and purchase of milk at Dean plants and then took additional steps throughout the limitations period to implement this.

- Similarly, in 2009, DMS threatened that it would instruct haulers not to transport farmers' milk if they discontinued supplying milk through DMS and also threatened to void all contracts with haulers that disobeyed that instruction.  (*Id.*)

- DFA and DMS have, in fact, punished haulers who contracted to transport the milk of former DFA members or former DMS clients.  For example, they terminated all contracts with an independent hauler (who had hauled milk for DFA and DMS for fifteen years) after he agreed to haul milk for a farmer who had quit DFA. (*Id.* at ¶ 121.)

- DFA and DMS have punished dairy farmers who attempt to quit DFA and supply milk to independent bottlers (instead of Dean or Hood), by threatening to halt all DFA sales to independent bottlers that agree to accept the former DFA-members' milk.  (*Id*. at ¶ 122.)

- Hood limited the amount of Grade A milk it acquired from Agri-Mark in order to eliminate competition between Agri-Mark and DFA and strengthen DFA's monopoly over the supply of Grade A milk.  (*Id*. at ¶ 113.)

These allegations constitute overt acts in furtherance of the conspiracy undertaken within the limitations period and include numerous acts that injure all members of the class because they are designed to maintain and strengthen Defendants' unlawful conspiracy, Defendants' monopoly control over the markets at issue, and Defendants' resulting ability to fix and suppress prices paid to all dairy farmers. *See, e.g., Berkey Photo,* 603 F.2d at 295.

It is well established that all overt acts apply to all members of the conspiracy.  Thus, a defendant's assertions that *it* did not engage in an overt act within the conspiracy is immaterial.[7] *Daniel*, 988 F. Supp. at 121 n.8 ("Injurious conduct in furtherance of a conspiracy committed within the limitations period ensures a timely cause of action against *all* members of the

---

[7]     For example, for statute of limitations purposes it is immaterial when Hood acquired NDH's Northeast bottling plants and entered full-supply agreements with DFA and DMS.  (*See* Hood Mot. at 12-14, 24.)  Plaintiffs allege a continuing conspiracy and overt acts within the limitation period.  Hood is a member of the conspiracy, and every overt act in furtherance of the conspiracy applies to it.  *Daniel*, 988 F. Supp. at 121 n.8.

conspiracy.") (emphasis added) (citing *United States v. Fletcher*, 928 F.2d 495, 498 (2d Cir.

1991) (limitations period runs after last overt act in furtherance of conspiracy's main goals).[8]

In asserting that they are nevertheless entitled to dismissal as a matter of law here,

Defendants resort to citing inapposite cases.  *Madison Square Garden, L.P. v. Nat'l Hockey

League* involved the doctrine of laches – as opposed to the statute of limitations – which

"presumptively bar[s] a plaintiff's claims" where "the conduct forming the basis for the

Complaint occurs outside of the analogous statute of limitations period."  No. 07-8455, 2008

U.S. Dist. LEXIS 80475, at *31 (S.D.N.Y. Oct. 10, 2008).  Here, Defendants are due no such

presumption and must argue statute of limitations as an affirmative defense while accepting as

true all facts alleged in the Amended Complaint.  In fact, *Madison Square Garden* actually

supports Plaintiffs' Amended Complaint here because it recognizes that "a price-fixing

conspiracy that brings about a series of unlawfully [low] priced sales over a period of years"

constitutes a continuing conspiracy, and each sale "starts the statutory period running again."  *Id.*

at *32 (quoting *Klehr*, 521 U.S. at 189) (citation and quotations omitted).[9]

---

[8]     *See also U.S. v. Yannotti*, 541 F.3d 112, 123 (2d Cir. 2008) ("Accordingly, even if a defendant engaged in predicate conduct that occurred outside of the statute of limitations, that defendant remains liable for RICO conspiracy unless the evidence shows that the conspiracy concluded or he withdrew from that conspiracy more than five years before the indictment."); *U.S. v. General Box Co.*, No. 88-716, 1989 U.S. Dist. LEXIS 10922, at **6-7 (N.D. Ohio Apr. 11, 1989) ("Even had the government been required to allege an overt act within the limitations period, the Court concludes that the government would have met that burden.  In conspiracy cases, a defendant can 'be convicted of the substantive offense based upon acts committed by a co-conspirator in furtherance of the conspiracy. . . .'") (citing *United States v. Tilton*, 610 F.2d 302, 309 (5th Cir. 1980)).

[9]     Defendants' reliance on *Vitale* and *Ciprofloxacin* is likewise misplaced.  *Vitale v. Marlborough Gallery* involves a plain refusal to deal where – in stark contrast to this case – the plaintiff "fail[ed] to allege a continuing conspiracy."  No. 93-6276, 1994 U.S. Dist. LEXIS 9006, at *18 (S.D.N.Y. July 19, 1994).  In *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, plaintiffs alleged that where the only agreement at issue was entered outside the limitations period; no other overt acts were alleged within the limitations period; and the sole fact that *installment* payments under the original agreement were made within the limitations period did not restart the statute of limitations.  261 F. Supp. 2d 188, 228-29 (E.D.N.Y. 2003) (emphasis added).

This is a conspiracy that has continued in full force throughout the limitations period; it has been enforced and strengthened by the mechanisms put in place by Defendants, further agreements, and threats and retaliation throughout the limitations period; and it causes new injury every time suppressed prices are paid within the limitations period.  The Court correctly reached that conclusion in *Southeastern Milk* and exactly the same result is dictated here.

### B.   Plaintiffs Properly Allege Fraudulent Concealment Sufficient To Toll The Statute Of Limitations.

Although the foregoing analysis is sufficient to dispose of Defendants' statute of limitations arguments, that result is independently justified by the fraudulent concealment doctrine. Fraudulent concealment tolls the limitations period until such time as a plaintiff discovers a defendant's wrongful conduct.  *See Hendrickson*, 840 F.2d at 1083.  When the statute of limitations is so tolled, "plaintiffs may recover damages for all the years during which the conspiracy was fraudulently concealed." *Morton's*, 198 F.3d at 832.  To allege fraudulent concealment, Plaintiffs must plead the following acts: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Hendrickson*, 840 F.2d at 1083.

With respect to the first element, the Second Circuit has adopted a "lenient standard requiring plaintiffs to prove concealment by showing *either* that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing."  *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00-7804, 2004 U.S. Dist. LEXIS 3892, at *14 (S.D.N.Y. Mar. 9, 2004).  "A self-concealing wrong is one in which deception is an essential element for some purpose other than merely covering up the act." *Dry Cleaning & Laundry Inst. of Detroit v. Flom's Corp.*, 841 F. Supp. 212, 217 (E.D.

17

Mich. 1993) (quotations omitted).  Price-fixing conspiracies are self-concealing.  *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("[A] plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct" in price-fixing context.); *see also Hendrickson*, 840 F.2d at 1084.  "Thus, by alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment . . . ."  *Nine West*, 80 F. Supp. 2d at 193.  Plaintiffs allege a price-fixing scheme here; that alone satisfies the first prong of fraudulent concealment.  *See id.*

In addition, Plaintiffs plead that Defendants have affirmatively concealed from Plaintiffs and class members the unlawful combinations, conspiracies and agreements among Defendants by planning and implementing the conspiracy during non-public meetings, monitoring and enforcing the conspiracy in non-public meetings, agreeing not to discuss or disclose the details of their conspiracy, and falsely representing to Plaintiffs and class members that the prices they received for Grade A milk were fair and competitive.  (Am. Compl. ¶ 142.)  Defendants also required independent dairy farmers and cooperatives to use DMS, but failed to disclose the price-fixing arrangement between DFA and DMS.  (*Id.* ¶ 114.)  Plaintiffs' allegations more than sufficiently plead fraudulent concealment. *See Hendrickson*, 840 F.2d at 1084-85 (one conspirator's cover-up activities are attributable to other members of the conspiracy).  Indeed, in the "context of a Rule 12(b)(6) motion filed before discovery . . . [t]he complaint need not paint the lily" to support its allegations of fraudulent concealment.  *Michigan ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 450 (W.D. Mich. 1995); *see also In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) (it is "generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage").

The second and third elements of fraudulent concealment require a plaintiff to plead that it did not know of the potential claims and its ignorance was not the result of a lack of due diligence. *See Hendrickson*, 840 F.2d at 1085. Here, Plaintiffs have alleged ignorance of the potential claims, which was not a result of a lack of due diligence. (Am. Compl. ¶ 143.) Like Defendants attempt to rebut this allegation by claiming that Plaintiffs were on inquiry notice of their injuries before the limitations period, this mere claim in a motion to dismiss, however, is not sufficient to meet defendant's "extraordinary" burden of rebutting allegations of fraudulent concealment. *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 346-47 (S.D.N.Y. 2000).

Plaintiffs also establish the third element of fraudulent concealment – due diligence – by alleging that Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings and agreed not to discuss or disclose the details of their conspiracy. Despite some public facts regarding market structure and contracting practices, much of Defendants' conduct occurred privately and its conspiracy was concealed. Thus, due to Defendants' deception, Plaintiffs "could not have discovered the conspiracy at an earlier date by the exercise of due diligence." *Nine West*, 80 F. Supp. 2d at 193. Furthermore, in the context of a motion to dismiss, the Court must accept Plaintiffs allegations as true, and Plaintiffs allege they "exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred." (Am. Compl. ¶ 143). *See Initial Pub. Offering*, 2004 U.S. Dist. LEXIS 3892, at *18.[10]

---

[10]     *See also In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001) (court held that the issue of whether the plaintiffs' circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy are factual in nature and inappropriate for dismissal of the complaint for failure to state a claim); *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 7397, at *43 (D.D.C. May 9, 2000) ("This court agrees with the many courts which have held that the issues of

III.    **PLAINTIFFS PROPERLY ALLEGE PLAUSIBLE MARKETS.**

Defendants alternatively argue that Plaintiffs have failed to allege adequate product and geographic markets.  Again, Defendants' memoranda do not mention that essentially the same arguments were advanced unsuccessfully in *Southeastern Milk*:

> *Market definition is a highly fact-based analysis that generally requires discovery.*
>
> … Plaintiffs … define two relevant product markets:  (1) the market for the purchase of fluid Grade A milk for bottling in the Southeast and (2) the market for the sale and marketing of fluid Grade A milk for bottling in the Southeast.  They also allege, as defendants concede, that the relevant geographic market is the Southeast, i.e., the area covered by FMMO's 5 and 7.  Because definition of the relevant market is a highly fact based inquiry and because *plaintiffs clearly allege relevant product and geographic markets*, this Court will spend very little time on this issue.  The fact that defendants suggest, at this stage of the litigation, that other relevant markets may likewise exist is of no consequence.  Likewise, plaintiff allege DFA and Dean control over significant portions of both the buy-side and the sale-side of the relevant product markets, allegations which are sufficient to establish a *prima facie* case of monopoly power.  *These issues simply are not appropriate for disposition on a motion to dismiss given the factual allegations contained in plaintiffs' complaints.*

*Southeastern Milk*, 555 F. Supp. 2d at 946 (emphasis added).

In the same manner, the Second Circuit has explained that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).[11]

Accordingly, at this pre-discovery stage Plaintiffs need only "allege a product market that is

---

fraudulent concealment and due diligence are questions of fact that should not be decided on a motion to dismiss.") (citing *Klehr*, 521 U.S. at 196 (due diligence is a "fact-based question").

[11]    *Accord New York Jets LLC v. Cablevision Sys. Corp.,* No. 05-2875, 2005 U.S. Dist. LEXIS 23763 at *17 (S.D.N.Y. Oct. 17, 2005) (ruling that plaintiff's alleged product market is too fact-intensive an inquiry to appropriately resolve at the [motion to dismiss] stage of the proceedings."); *Alternative Electrodes, LLC v. Empi, Inc.,* 597 F. Supp. 2d 322, 334 (E.D.N.Y. 2009) ("Courts are reluctant to dismiss antitrust claims for failure to plead the relevant market because determining the relevant market requires a fact-intensive inquiry that is best served by allowing the parties discovery").

'plausible' and that bears a 'rational relationship' to the analytical framework." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008). "Analytical framework" refers to "the methodology courts prescribe to define a market for antitrust purposes – analysis of interchangeability of use or the cross-elasticity of demand." *Alternative Electrodes*, *LLC v. Empi, Inc.,* 597 F. Supp. 2d 322, 334 (E.D.N.Y. 2009). This means, in cases brought by sellers – *e.g.,* dairy farmers selling Grade A milk – the relevant product is the "buyers seen by sellers as being reasonably good substitutes." *Todd*, 275 F.3d at 202. The Amended Complaint sufficiently pleads plausible relevant product and geographic markets – the marketing or sale of Grade A milk to, or purchase of Grade A milk by, bottling plants in the Northeast – and does not give rise to the rare occasion to dispose of the claims without the benefit of discovery.

DFA/DMS do not dispute Plaintiffs' alleged relevant markets, conceding the issue. (*See* DFA/DMS Mot. at 15-17.) Dean and Hood, however, argue that the Amended Complaint should be dismissed because Plaintiffs did not allege the so-called "factual predicates" for the proposed markets. Not only is this the wrong standard at this stage, Dean and Hood omit material portions of the Amended Complaint and fail to show why the Court should dismiss the Amended Complaint on relevant market grounds.

### A.     Plaintiffs Allege Plausible Relevant Product Market:  The Marketing Or Sales Of Fluid Grade A Milk To, And The Purchase of Fluid Grade A Milk By, Bottling Plants.

Plaintiffs' Amended Complaint alleges in detail that the relevant product market is Grade A milk for bottling because it is not reasonably interchangeable with milk for other uses. (Am. Compl. ¶¶ 35-38, 43-51.) Plaintiffs allege dairy farmer access to milk bottling plants is necessary for the farmers to "touch base" and therefore become eligible to receive the FMMO

minimum blend price and over-order premiums.  (*Id.* ¶ 37.)  Plaintiffs likewise allege milk for sour cream, ice cream, cheese, nonfat dry milk, and butter processing plants are not reasonable substitutes for bottling plants because sales solely to non-bottling plants do not enable dairy farmers to "touch base" or become eligible for the FMMO minimum blend price and over-order premiums.  (*Id.* ¶ 37.)  As such, Plaintiffs allege non-bottling plants are not reasonably interchangeable with access to bottling plants from the perspective of dairy farmers.  *See Todd*, 275 F.3d at 202; *United States v. Rice Growers Ass'n of California,* No. 84-1066, 1986 U.S. Dist. LEXIS 30507, at *11 (E.D. Cal. Jan. 31, 1986) (defining relevant product market as "purchase or acquisition, for milling of paddy rice grown in California," because, among other things, "[n]o alternative outlet for the sale of paddy rice will regularly provide growers with a return that is a good substitute for the return generally paid by the California mills").

Notably omitted from Defendants' motion are relevant court opinions affirmatively recognizing that Grade A milk for bottling is not interchangeable with milk for other uses.  *See, e.g., Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1191 (8th Cir. 1982); *United States v. Dairymen*, *Inc*., 660 F.2d 192, 193 (6th Cir. 1981); *Lone Star Milk Producers Inc. v. Dairy Farmers of America, Inc.*, No. 00-191, 2001 U.S. Dist. LEXIS 18716, at *15 n.1 (E.D. Tex. Jan. 22, 2001).  Defendants also disregard the holding in *Southeastern Milk*, which recently rejected Defendants' similar arguments for dismissing a complaint in a case involving the same alleged product market, an analogous geographic market, three of the same parties, and many of the same factual allegations as here.  *See* 555 F. Supp. 2d at 946 (explaining relevant markets are not appropriate for disposition on a motion to dismiss given the factual allegations contained in plaintiffs' complaint).

Beyond string-citing inapposite cases,[12] Defendants' only argument is that Plaintiffs "impermissibly" define the relevant product by "type of customer," *i.e.*, bottling plants, rather than by differences in the product supplied to the customers.[13]  (Dean Mot. at 15-16.)  This argument ignores the Amended Complaint and simply confuses the issue.  As noted, Grade A milk for bottling is not reasonably interchangeable with milk for other uses because sales solely to non-bottling plants do not enable dairy farmers to "touch base" and become eligible for the minimum FMMO blend price or receive over-order premiums.  (Am. Compl. ¶ 37.)  This is the appropriate analysis.  *See, e.g., Todd*, 275 F.3d at 202 (explaining relevant product defined by "buyers seen by sellers as being reasonably good substitutes.").  Neither of the cases cited by Defendants support their argument for obvious reasons.  *See Redmond v. Missouri Western State College*, No. 84-6139, 1988 U.S. Dist. LEXIS 12230, at *1 (W.D. Mo. Nov. 2, 1988) (granting *summary judgment* when plaintiff offered no explanation for limiting relevant market to

---

[12]    Notably, many of Defendants' cases did not dismiss complaints on relevant product grounds. *See Alternative Electrodes*, 597 F. Supp. 2d at 322 (finding relevant product market adequately pled); *Conergy AG v. MEMC Elec. Materials, Inc.,* 651 F. Supp. 2d 51 (S.D.N.Y. 2009) (denying motion to dismiss, no explanation of relevant markets).  Other Defendant cases dismissed complaints due to extreme market definition deficiencies not present here. *See Chapman v. New York Div. for Youth,* 546 F.3d 230 (2d Cir. 2008) (dismissing complaint when plaintiff admitted the relevant product market to be more broad than the pled market, and plaintiff offered no theoretically reasonable explanation for this discrepancy); *Mathias v. Daily News, L.P.,* 152 F. Supp. 2d 465 (S.D.N.Y. 2001) (finding alleged relevant product – home delivery of the *Daily News* – inadequate because plaintiffs did not explain why *Daily News* is not interchangeable with other delivered newspapers); *McCagg v. Marquis Jet Partners, Inc.,* No. 05-10607, 2007 U.S. Dist. LEXIS 61020, at *1 (S.D.N.Y. Mar. 29, 2007) (finding complaint contained no explanation – and the court could not conjure any – for plaintiff limiting relevant product to "25-Hour Jet Card market" to the exclusion of all other interchangeable types and durations of jet cards); *Smugglers Notch Homeowners' Assoc., Inc. v. Smugglers' Notch Mgmt. Co.*, No. 08-186, 2009 U.S. Dist. LEXIS 46026, at *1 (D. Vt. May 29, 2009) (dismissing complaint limiting relevant geographic market to a single ski resort in Cambridge, Vermont without explanation).

[13]    Defendants attempt to extend their argument in footnote 8, claiming Plaintiffs do not explain why sales to all purchasers of raw Grade A milk are not within the relevant product because dairy farmers can draw the federal minimum blend for all sales.  (Dean Mot. at 16, n.8.)  This is a red herring.  It ignores the allegation that over-order premiums are paid on milk sold for bottling, which distinguishes this type of Grade A milk sale from all others.  (*See* Am. Compl. ¶ 37.)  In addition, it ignores that dairy farmers must "touch base" with bottling plants in order to become eligible to receive the blended price for other sales. (*Id.*)

scholarship students instead of a service or product); *Smith v. Multi-Flow Dispensers of Ohio, Inc.*, No. 96-4185, 1999 U.S. App. LEXIS 9845, at *1 (6th Cir. May 14, 1999) (holding relevant product not adequately defined when complaint provided *no explanation* for limiting relevant product to sales to locally-owned restaurants instead of all restaurants in the geographic market).

      **B.**      **The Northeast Is A Plausible Geographic Market.**

      Plaintiffs allege the Northeast is the relevant geographic area because this is the area to which Northeast dairy farmers can practically turn for alternative buyers of their product.  *See, e.g., Massena v. Niagara Mohawk Power Corp.*, No. 79-163, 1980 U.S. Dist. LEXIS 9382, at **21-22 (N.D.N.Y. Sept. 8, 1980) (explaining relevant geographic market is the area to which consumers can practically turn for alternative sources of product).  It is thus unsurprising that, in prior antitrust cases concerning Grade A milk sales by dairy farmers, courts have upheld multi-state regions as relevant geographic markets.  *See, e.g.*, *Southeastern Milk*, 555 F.Supp.2d 934 (14 states); *Alexander,* 687 F.2d at 1192 (ten states); *Lone Star*, 2001 U.S. Dist. LEXIS 18716, at *15 (seven states); *Dairymen Inc.,* 1983 U.S. Dist. LEXIS 16355, at *3 (five states).

      Defendants argue that the Amended Complaint should be dismissed because it lacks "a sufficient factual predicate" for the alleged geographic market.  (Dean Mot. at 17.)  Defendants cite no Rule 12(b)(6) cases that actually support this standard or argument.[14]  Indeed, this argument incorrectly presumes Plaintiffs must show all facts supporting their markets at a pre-discovery motion, and flat disregards Plaintiffs' allegations explaining why the Northeast is the relevant geographic market.  Plaintiffs allege that DFA, for instance, organizes itself by

---

[14]     None of Defendants' cases involved a motion to dismiss.  *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.* 881 F. 2d 1396 (7th Cir. 1989) (appeal of judgment notwithstanding the verdict); *United States. v. Country Lake Foods, Inc.,* 754 F. Supp. 669 (D. Minn. 1990) (motion for preliminary injunction); *Nilvar v. Mercy Health Sys.,* No. 06-3819, 2007 U.S. App. LEXIS 19127, at *1 (6th Cir. Aug. 7, 2007) (appeal of summary judgment).

geographic marketing areas and operates in a marketing area, the Northeast Council, consisting of the same geographic area as the Northeast.  (Am. Compl. ¶ 35.)  This supports Plaintiffs' market definition because "[i]ndustry recognition is well established as a factor that courts consider in defining a market" as courts assume "'the economic actors usually have accurate perceptions of economic realities.'"  *Todd*, 275 F.3d at 205 (citing *Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) and quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F. 2d 210, 219, n.4 (D.C. Cir. 1986)).  Defendants give no reason for the Court to conclude that Plaintiffs' geographic market is implausible – as a matter of law – when Defendants themselves operate their businesses with the Northeast as a market.

Plaintiffs also allege that the Northeast is the same as the Order 1 marketing area.  (Am. Compl. ¶ 35.)  Defendants dismiss this allegation as irrelevant, omitting that the bounds of Order 1 are based upon economic realities similar to the factors for determining relevant geographic market for antitrust purposes.  *See Milk in the New England and Other Marketing Areas*, 63 Fed. Reg. 4802, 4815-16 (Jan. 30, 1998) (publishing USDA criteria for formulating borders of Order 1, including milk sales patterns, locations of dairy farmers and processors, and natural boundaries).  Defendants give no reason for the Court to disregard the USDA's determination that Order 1 is a contiguous marketing area based on these factors.  *See Todd*, 275 F.3d at 205 (courts can look to industry recognition when assessing relevant market).

In addition, Plaintiffs' allegations indicate that selling Grade A milk outside the Northeast is not a viable option for Northeast farmers because Grade A milk is highly perishable. (Am. Compl. ¶ 43.)  Defendants ignore this allegation even though the Supreme Court recognizes product perishability is a determinative factor for geographic markets for agricultural produce.  *See, e.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219,

222 (1948) (geographic market was limited due to "semi-perishable" nature of agricultural product making it "incapable of being transported over long distances or of being stored cheaply or safely for any extended period").

Finally, Defendants inappropriately cite USDA statistics and data not included within the Amended Complaint and argue that the Northeast cannot be a relevant geographic market because some milk is marketed across the border.  *See, e.g., Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001) (explaining the Court is not at liberty to look beyond factual allegations in the complaint).  The Court need not accept Defendants' invitation to look beyond the Amended Complaint because their argument is unavailing and betrays a fundamental misunderstanding of antitrust and monopsony law.  As explained in *Todd*, "the market is not the market of competing sellers but of competing buyers.  This market is comprised of buyers who are viewed by sellers as being reasonably good substitutes."  275 F.3d at 202.  Thus, it is irrelevant whether bottlers buy raw milk from outside the Northeast or dairy farmers from other markets ship milk into the Northeast.  (Dean Mot. at 17.)

In sum, Plaintiffs' alleged relevant markets are plausible and related to the interchangeability of use of the product; therefore, the allegations are adequate at this stage.  *See In re Payment Card Interchange*, 562 F. Supp. 2d at 399.  That Defendants may proffer different relevant markets, (Dean Mot. at 14-16), is of no moment because on a motion to dismiss the issue is simply whether Plaintiffs have alleged a plausible relevant market – not whether they have proved one.

IV.    **PLAINTIFFS ADEQUATELY ALLEGE THAT DFA AND DEAN EACH POSSESS MONOPOLY POWER.**

Plaintiffs allege that DFA attempted to monopolize, and actually monopolized, the market for the marketing and sale of Grade A milk to bottling plants in Order 1, and that Dean attempted to monopsonize, and actually monopsonized, the market for the purchase of Grade A milk by bottling plants in Order 1.  Plaintiffs' extensive factual allegations both constitute direct evidence of Dean's and DFA's exclusion of competition and describe Dean's and DFA's control of a sufficiently large percentage of the relevant market.

As they did in *Southeastern Milk*, Dean and DFA argue – incorrectly – that the Amended Complaint fails to adequately allege that Defendants possess the requisite monopoly power to sustain such claims.  Rejecting the same argument, the Court in *Southeastern Milk* explained that "plaintiffs allege DFA and Dean control over significant portions of both the buy-side and the sale-side of the relevant product markets, allegations which are sufficient to establish a *prima facie* case of monopoly power.  These issues simply are not appropriate for disposition on a motion to dismiss given the factual allegations contained in plaintiffs' complaint."  *Southeastern Milk*, 555 F. Supp. at 946.  The same conclusion is required here.

A.    **Plaintiffs Adequately Allege That Dean Possesses Monopsony Power**

Monopoly power "may be proven directly by evidence of . . . the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."  *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted).  Plaintiffs allege, in significant detail, that Dean "engaged in improper conduct that has or is likely to have the effect of . . . excluding competition, thus creating or maintaining market power."  *Heerwagen*, 435 F.3d at 226.  The Amended Complaint alleges, among other things, Dean improperly merged with Suiza to form the largest processor and eliminate competition,

(Am. Compl. ¶¶ 79-82); paid Stop & Shop to close down its Readville bottling plant in order to eliminate competition, (*id*. ¶¶ 96-101); entered into unlawful, full-supply agreements with DFA and DMS to exclude competition, (*id*. ¶¶ 83-86, 92, 95); boycotted dairy farmers who failed to market their Grade A milk through DFA or DMS in order to eliminate other cooperatives that would service competing bottlers, (*id*. ¶¶ 81-85); purchased and closed down Grade A milk bottling plants with the purpose of eliminating competition and expanding its monopsony, (*id*. ¶¶ 75-78, 97); and paid over-order premiums fixed by DFA and DMS to dairy farmers in order to eliminate competition between bottlers and between cooperatives, (*id*. ¶¶ 123, 127). Plaintiffs allege that each of those activities carried out by Dean succeeded in excluding or eliminating competition.  (*Id*. ¶¶ 151,169, 188.)

Dean's monopsony power may also be inferred from its "large percentage share of the relevant market."  *Heerwagen*, 435 F.3d at 227.  Plaintiffs have alleged that Dean commands a sufficiently large share of the relevant market to possess monopsony power.  Plaintiffs allege that Dean "controls approximately 70 percent of the Northeast market for bottling fluid Grade A milk," "dominates the bottling market in the Northeast," and "is the largest fluid Grade A milk bottler in the Northeast and in the United States."[15] (Am. Compl. ¶¶ 5, 21.)

The Second Circuit has held that the leading cases "upholding monopolization claims involved defendants who controlled well over half the relevant market, with market shares ranging from 70 to 100%," and "a share above 70% is usually strong evidence of monopoly power."  *Broadway Delivery Corp. v. United Parcel Serv. Of Am., Inc.,* 651 F.2d 122, 127 (2d

---

[15]     Plaintiffs also identify Dean's specific shares in the most significant regions of Order 1, alleging that it has approximately an eighty percent share in Massachusetts and Rhode Island; approximately seventy percent in New England and northern New Jersey, and over 60 percent in Connecticut. (Am. Compl. at ¶¶ 93, 141) (testimony by Assistant Attorney General of the DOJ's Antitrust Division that Dean's dominant share of the Northeast bottling market is "disconcerting").

Cir. 1981); *see also Delaware & H.R. Co. v. Conrail,* 902 F.2d 174 (2d Cir. 1990) (holding that

two-thirds market share precludes summary judgment in favor of defendant on Section 1

monopolization claim).   Moreover, a lower market share is sufficient to sustain a claim of

attempted monopolization.   *See, e.g., Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont,*

*Inc.*, 845 F.2d 404, 409 (2d Cir. 1988) (denying defendants' motion to dismiss attempted

monopolization claim where defendant had market share "above 55%"); *Zschaler v. Claneil*

*Enters*., 958 F. Supp. 929, 943 (D. Vt. 1997) (holding that factual dispute could exist regarding

attempted monopolization when defendants possessed only 35% market share).[16]

Dean argues that Plaintiffs' allegations regarding its market share "do not correspond to

the relevant market plaintiffs propose."  (Dean Mot. at 18.)  This is not accurate.  Twice in the

Amended Complaint, Plaintiffs explicitly allege that Dean controls approximately 70% of the

market for the bottling of Grade A milk in the Northeast market, and the Northeast market is

clearly defined as consisting of Order 1, the relevant geographic market.  (Am. Compl. ¶ 141.)

Dean further argues that "plaintiffs nowhere explain the factual basis for their conclusory

market share assertion."  (Dean Mot. at 19.)  First, Dean misstates the pleading standard, as

Plaintiffs need not provide detailed backup for their allegations of Dean's market share.  Dean

cites to *Sun Microsys., Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395 (D. Del. 2009) and

*Crossword Magazine v. Times Books*, No. 96-4550, 1997 U.S. Dist. LEXIS 21606 (E.D.N.Y.

May 5, 1997), but in both cases, the court dismissed the monopolization claim on the grounds

---

[16]     Dean's reliance on *Tops Market, Inc. v. Quality Meats, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) to
argue that "market shares as high as 70% are insufficient to establish monopoly power" is misplaced.
Therein, the court stated that high market share did not necessarily permit an inference of monopoly
power if there was "no other evidence . . . [which] supports the conclusion that [defendant] can control
prices or exclude competition" at the summary judgment stage.  By contrast, there is substantial evidence
here even before discovery**.**

that plaintiffs had failed to even identify the defendant's market.  By clear contrast, in the instant case, Plaintiffs specifically allege Dean's market share in the relevant market.

Moreover, Plaintiffs do explain, in far greater detail than required to defeat a motion to dismiss, the factual basis for their market share allegation.  Not only does the Amended Complaint describe Dean's position in many of the states and regions that comprise the relevant geographic market,[17] the Amended Complaint also describes precisely how Dean acquired and maintained its 70% market share.  The Amended Complaint documents how Suiza entered the Northeast market and rapidly acquired milk processing plants, (Am. Compl. ¶ 75); both Suiza and Dean acquired and shut down bottling plants in the Northeast to eliminate competitors and expand their respective market shares, (*id.* ¶¶ 75-78, 97); Suiza and Dean, the two largest bottlers of Grade A milk in the United States, merged in a manner that thwarted conditions imposed by the DOJ to preserve competition, (*id.* ¶¶ 79-82); Dean entered into long-term, full-supply agreements that violated a 1977 DOJ consent decree and designated DFA and DMS to be Dean's exclusive suppliers of milk, (*id.* ¶¶ 83-86, 92, 95); Dean forced dairy farmers in the Northeast to contract with DFA or DMS, which funneled milk to Dean and diminished the supply of milk to competing bottlers, (*id.* ¶¶ 81-85); Dean paid Stop & Shop to close down the Readville bottling plant, thereby instantly increasing Dean's market share of Grade A milk sales to supermarkets to 80-90% in Boston and Rhode Island, (*id.* ¶ 100); Dean paid over-order premiums pursuant to the price fixing agreement to maintain its monopoly, (*id.* ¶ 123, 127); and

---

[17]     On the one hand, Dean claims that allegations of its market share in specific states and regions do not directly "correspond to Order 1," and yet, on the other hand, Dean complains that Plaintiffs fail to explain the basis for the assertion that Dean controls approximately 70% of the relevant market in Order 1.  Defendants cannot have their cake and eat it too – they cannot assert that Plaintiffs fail to identify the factual basis for the assertion of market power and yet dismiss allegations regarding subcomponents of that market power as being factually irrelevant.

Dean exercised its monopoly power to avoid paying fuel surcharges to dairy farmers and to force dairy farmers to pay Dean a "competitive credit." (*Id.* ¶¶ 133, 134.)

Dean asserts that Plaintiffs' Amended Complaint should be dismissed because Dean believes its ownership of a purported 18% of Order 1 bottling plants cannot support a monopolization claim. (Dean Mot. at 18-22.) Even assuming that judicial notice of this factual claim were appropriate – which it is not – the *number* of Dean's bottling plants is irrelevant. What matters is not how many bottling plants Dean owned in Order 1, but rather how much production capacity and output those bottling plants possessed, a matter on which Dean's brief is conspicuously silent.

Not only is Dean's factual claim irrelevant, Dean Exhibits 10-13 and 15-18 and its 18% argument relying on these Exhibits (Section III) should be stricken due to Dean's misuse of the "Judicial Notice" rule.[18] In arguing that it owns only 18% of an undisclosed category of facilities in Order 1, Dean relies on over *700* pages of documents from a variety of sources, while ignoring the Amended Complaint allegations that Dean controls approximately 70% share of the market. (Am. Compl. ¶ 5.) None of Dean's Exhibits actually state Dean owns 18% of anything. In fact, the SEC filings and USDA reports Dean attached as exhibits simply list plants in operation during a given year but do not indicate ownership, processing capacity or milk volumes processed – the information needed to determine shares of the milk bottling market. Consideration of Dean's argument based on these exhibits would necessarily require intensive fact finding by the Court – namely, ascertaining Dean's market share as a matter of law. This is not permitted under the Judicial Notice exception to the requirement that motions to dismiss

---

[18]     Rule 201 permits Courts to take judicial notice of the *existence* of certain documents, but not of the *facts* asserted in the documents. Fed. R. Evid. 201; *Global Network Commc'n, Inc. v. City of New York*, 453 F. 3d 150, 157 (2d Cir. 2006).

must be confined to the four corners of the complaint.  *Global Network Commc'n, Inc. v. City of New York*, 453 F. 3d 150, 156-57 (2d Cir. 2006)  (holding district court committed reversible error during motion to dismiss when relying on Judicial Notice documents to engage in findings of fact).  Plaintiffs accordingly request that the Court strike Dean Exhibits 10-13 and 15-18 and Section III of its motion and decline to make findings of fact as to Dean's market share rather than convert Dean's motion into one for summary judgment.[19]

In short, Defendants' argument is not only irrelevant, but obviously presents exactly the kind of factual assertion that cannot be resolved on a motion to dismiss.  Indeed, Dean's argument and misuse of judicial notice simply turns the legal standard governing a motion to dismiss on its head by improperly seeking factual inferences in favor of the moving party.[20]

### B.    Plaintiffs Adequately Allege That DFA Possesses Monopoly Power.

DFA argues that Plaintiffs' claims for attempted and actual monopolization against it must be dismissed because the Amended Complaint fails to provide factual allegations of DFA's monopoly power.  However, Plaintiffs have adequately pled factual allegations that show that DFA directly engaged in improper conduct to exclude competition and that DFA, as a principal, is liable for the monopolization of the relevant market by its agent, DMS, because DMS acted with actual or apparent authority.  *See American Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456

---

[19]    *See Mission Hills Condo. Ass'n v. Corley*, 570 F. Supp. 453 (N.D. Ill. 1983) (refusing to take judicial notice of defendant market share information during motion to dismiss because defendants' possession of market power is a matter of proof, not pleading); *Rice v. Kawasaki Heavy Indus., LTD*, No. 07-4031, 2008 U.S. Dist. LEXIS 83659 at *11 (E.D.N.Y. Oct. 17, 2008) (explaining district court has discretion to either disregard extraneous materials attached to motion to dismiss or convert the motion into one for summary judgment and afford the parties opportunity to take discovery).

[20/]    Relying entirely on its erroneous factual assertion that it has an 18% market share in Order 1, Dean also seeks dismissal of the claim of attempted monopolization and conspiracy to restrain competition.  Because they start from a flawed and disputed factual premise, Dean's conclusions are also specious.

U.S. 556, 572 (1982); *Hydrolevel Corp. v. American Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 125 (2d Cir. 1980).

       1.       **DMS Is An Agent Of DFA.**

Agency is established by the existence of three elements: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006); *see also Restatement (Second) of Agency* § 1 cmt. b (1958). The crucial element of an agency relationship "is that the agent acts subject to the principal's direction and control." *In re Shulman Transp. Enters.*, 744 F.2d 293, 295 (2d Cir. 1984).

The Amended Complaint makes clear that DFA manifested assent that DMS would act for it. Plaintiffs allege that DFA, in conjunction with Dairylea Cooperative Inc., created DMS, (Am. Compl. ¶ 68); that DFA owned 50% of DMS and controlled its operations, (*id.* ¶ 70); that DFA designated DMS to be the exclusive marketing agent for DFA members, (*id.* ¶ 71); that DFA designated DMS to be the marketing agent for independent dairy cooperatives and farmers, so that DFA could exert control over them, (*id.*); that DFA entered into exclusive supply agreements with Dean whereby DMS would became the exclusive marketer of Grade A milk to Dean, (*id.* ¶¶ 5, 9); that DFA fixed over-order premiums and designated DMS to make such payments to independent dairy farmers and cooperatives, (*id.* ¶¶ 123-24); and that DFA designated DMS to threaten and punish farmers who attempted to quit DFA, haulers who attempted to transport the milk of those farmers, and processors who attempted to purchase the milk of those farmers, (*id.* ¶¶ 9, 120-122).

The Amended Complaint also alleges that DMS accepted the undertakings assigned to it by DFA.  The Amended Complaint alleges that DMS held itself out as the exclusive marketing agent for DFA and carried out, on behalf of DFA, each of the activities identified in the previous paragraph. (*Id.* ¶¶ 9, 71).  For example, the Amended Complaint provides that, when DFA designated DMS to punish haulers and processors who attempted to contract with former DFA members, DMS terminated all contracts with independent hauler Tom Bowman after he agreed to transport milk for a former DFA member.  ( *Id.* ¶¶ 121-122.)  Similarly, Plaintiffs allege that when DFA secured long-term, full-supply agreements with Dean, DMS assumed the marketing responsibilities for 2,500 independent dairy farmers that had previously supplied Grade A milk to Dean. (*Id.* ¶¶ 9, 84.)

The Amended Complaint also alleges that DMS is subject to DFA's direction and control.  The Amended Complaint repeatedly refers to "DFA-controlled DMS" and specifically alleges that "DFA owns 50 percent of DMS and controls DMS's operations."  ( *Id.* ¶¶12, 39-40, 70.)  The Amended Complaint explains that "[f]armers who market their Grade A milk through DMS are paid milk checks issued from the same bank accounts that issue milk checks to DFA members"; "DMS employees are paid from bank accounts, and have pension programs, controlled by DFA"; "DFA received, processed, and accounted for the monies collected by independent farmers and cooperatives resulting from the sale of Grade A milk through DMS"; and "[v]ehicles that transport the testers who test the quality of raw milk for DMS are registered as owned by DFA."  (*Id.* ¶¶ 70, 125.)  The Amended Complaint further alleges that the creation of DMS "strengthened DFA's control of the Northeast Grade A milk supply in three significant ways": 1) "all of Dairylea's 2,300 member farmers were brought under DFA's control"; 2) "the creation of DMS provided a mechanism for DFA to bring independent dairy farmers and

cooperatives under its control"; and 3) the creation of DMS provided "a mechanism through which over-order premiums could be fixed and reduced" by DFA.  (*Id.* ¶ 71).  As a result, DMS was an agent of DFA during the proposed class period.

2.     **As An Agent Of DFA, DMS Unlawfully Monopolized The Relevant Market.**

As an agent of DFA, DMS unlawfully attempted to monopolize, and succeeded in monopolizing, the market for the marketing and sale of Grade A milk to bottling plants in Order 1.  The Amended Complaint alleges that "DMS markets approximately 80 percent of fluid Grade A milk marketed to bottling plants in the Northeast" and that "DMS is by far the largest marketer of fluid Grade A milk in the Northeast."  ( *Id.* ¶ 24.)  The Amended Complaint further states that DMS is the exclusive marketer of Grade A milk to Dean, which controls approximately 70% of the market for the purchase of Grade A milk by bottling plants in Order 1.  Moreover, the Amended Complaint alleges that DMS exercises control over "a significant majority of the balancing plants in the Northeast market."  (*Id.* ¶ 58.)

As an agent of DFA, DMS willfully "excluded competition" in the market for the marketing and sale of Grade A milk to bottling plants in Order 1. *See Heerwagen*, 435 F.3d at 227.  The Amended Complaint alleges that DFA used DMS to further the anti-competitive scheme of eliminating competition by (1) requiring independent dairy farmers and cooperatives to market their milk through DMS in order to access bottling plants with whom DFA exclusively contracted and (2) fixing the over-order premiums paid to independent dairy farmers and cooperatives who marketed their milk through DMS.  (Am. Compl. at ¶ 9.)  In so doing, DMS eliminated competition with other marketers and sellers of Grade A milk in Order 1.  Moreover, the Amended Complaint alleges that DMS threatened and punished farmers who attempted to terminate their relationship with DFA or DMS, haulers who attempted to transport

the milk of those farmers, and processors who attempted to purchase the milk of those farmers.
(*Id.* ¶¶ 9, 120-122.)  The Amended Complaint further explains that to protect its monopoly,
DMS conspired to allocate markets and not compete with Agri-Mark.  (*Id.* ¶ 113.)

### 3.   **DFA Is Liable For DMS's Antitrust Violations.**

DFA is liable for DMS's attempted and actual monopolization of the market for the
marketing and sale of Grade A milk to bottling plants in Order 1.  The Supreme Court has held
that principals are liable for the antitrust violations committed by their agents acting both with
"actual authority,"[21] or or "apparent authority."[22]  *See United Mine Workers of America v.
Coronado Coal Co.*, 259 U.S. 344 (1922); *Am. Soc'y of Mech. Eng'rs*, 456 U.S. at 572.[23]   DFA
provided DMS with *actual* authority when, as alleged in the Amended Complaint, it instructed
DMS to market the milk of DFA members; require independent dairy farmers and cooperatives
to market their milk through DMS in order to access bottling and balancing plants; fix the over-
order premiums paid to independent dairy farmers and cooperatives who marketed their milk
through DMS; agree to allocate markets and not compete with Agri-Mark; and threaten and
punish farmers who attempted to terminate their relationship with DFA or DMS, haulers who
attempted to transport the milk of those farmers, and processors who attempted to purchase the

---

[21]     "Actual authority" is defined by the Restatement (Second) of Agency as an agent's power to
affect the legal relationships of the principal "by acts done in accordance with the principal's
manifestations of consent" to the agent.  *Restatement (Second) Agency* § 7 (1958).

[22]     "Apparent authority" is defined by the Restatement (Second) of Agency as an agent's power to
affect the legal relationships of the principal with third persons "arising from and in accordance with the
[principal's] manifestations to such third persons." *Restatement (Second) of Agency* § 8 (1957).

[23]     *See also Hydrolevel Corp. v. American Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 125 (2d Cir.
1980); *Truck Drivers' Local No. 421, etc. v. United States*, 128 F.2d 227, 235 (8th Cir. 1942); *Cont'l
Baking Co. v. United States*, 281 F.2d 137 (6th Cir. 1960); *United States v. American Radiator &
Standard Sanitary Corp.*, 433 F.2d 174 (3d Cir. 1970); *United States v. Hilton Hotels Corp.,* 467 F.2d
1000 (9th Cir. 1972); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978).

milk of those farmers.  (Am. Compl. ¶¶ 114-125.)  Furthermore, DFA provided DMS with

*apparent* authority when, as alleged in the Amended Complaint, DFA communicated to bottling

plants that DMS was the exclusive marketing agent for DFA members; reached full-supply

contracts with Dean that designated DMS as the exclusive marketer of Grade A milk to Dean;

entered agreements with Agri-Mark whereby Agri-Mark and DMS would allocate markets and

not compete; and threatened farmers that DMS would terminate marketing and hauling contracts

if they terminated their membership in DFA.  (*Id.* ¶¶ 71, 113 119-122.)[24]

## V.  PLAINTIFFS PROPERLY PLEAD THAT DFA AND DMS ENGAGED IN UNLAWFUL PRICE-FIXING IN VIOLATION OF SECTION ONE.

Plaintiffs allege that DFA, DMS and other conspirators violated Section 1 of the Sherman

Act by engaging in an unlawful agreement to fix the prices paid to farmers for the sale of their

Grade A milk.  (Am. Compl. ¶¶ 193-203.)[25]  DFA and DMS argue these price-fixing claims fail

for three reasons.  First, DFA and DMS assert that their price fixing is not unlawful under

*Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006), and they lack the capacity to conspire under

*Copperweld*'s "single entity" doctrine. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S.

752, 772 (1984).  Second, DFA and DMS argue that GNEMMA members cannot price-fix

---

[24]     We note also that even *assuming* arguendo that Defendants' market power argument were correct (which it is not), the facts in the Amended Complaint establish a claim of monopolization against DMS (as well as DFA as its principal), and leave to amend would be appropriate based on the well established rule that such relief should be liberally granted at this early stage in the proceedings.

[25]     Plaintiffs properly state a claim under Section 1.  "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 223 (1940).  A "horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers." *Todd v. Exxon Corp.*, 275 F.3d at 201.  Such buying cartels, the "object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal *per se*." *Vogel v. American Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (citing *Mandeville Island Farms, Inc.*, 334 U.S. at 223-24.  Plaintiffs allege that Defendants DFA, DMS and their co-conspirators – buyers of milk – fixed the prices of the milk they bought from Plaintiff dairy farmers – the suppliers of milk.  Such price-fixing by buyers is *per se* unlawful.

because Defendants believe this cannot make economic sense.  Third, DFA and DMS summarily

assert the Capper-Volstead Act and its limited immunity as an affirmative defense.

All three Defendant arguments ultimately rely upon factual assertions that must be

proven, not presumed.  *See Southeastern Milk.*, 2008 U.S. Dist. LEXIS 44541 at \*14 (ruling that

"the affirmative defense of Capper-Volstead immunity cannot be resolved through a Rule

12(b)(6) motion"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 694,

699 (E.D. Pa. 2007) (denying motion to dismiss where both *Copperweld* and Capper-Volstead

affirmative defenses were asserted).   Moreover, as set forth below, Defendants' arguments also

misapply the law.  *Dagher* does *not* permit joint ventures to price-fix with other entities, nor does

it immunize entities operated for anticompetitive purposes.  *Copperweld* does *not* allow separate

corporations that lack a majority interest in one another to fix prices.  The Second Circuit does

*not* require a complaint to explain how a conspiracy serves the economic interest of each

conspirator.  Capper-Volstead immunity does *not* extend to conduct intended to stifle

competition and does *not* immunize cooperatives that fail to operate for the mutual benefit of

their members.

### A.   DFA And DMS Are Separate Entities And Can Conspire Under Section 1 Of The Sherman Act.

Relying on *Dagher*, Defendants argue that DFA and DMS cannot "fix" prices unlawfully

because there is no allegation that DFA and DMS are competitors and DMS is the exclusive

marketing agent for DFA.  (DFA/DMS Mot. at 18-19.)  Contrary to Defendants' claim,

Plaintiffs' allegations are not "analogous" to *Dagher*.  As the Second Circuit recently

recognized, *Dagher* merely held it is not *per se* price fixing for two entities to form a lawful joint

venture through which to conduct all of their business in the market, including determining the

price of the product produced by the venture.  *See Starr*, 592 F.3d at 326.  Plaintiffs' claims are wholly different.

Importantly, Plaintiffs allege that DFA, DMS, "***and their co-conspirators***" unlawfully fixed prices.  (Am. Compl. ¶¶ 194-96.)  This makes Plaintiffs' price fixing allegations entirely different than *Dagher*, where the only two alleged conspirators were the two joint venture partners.[26]  Moreover, the joint venture at issue in *Dagher* was presumed to be lawful because it was reviewed and approved by the DOJ and the plaintiffs did not argue it was operated for sham or unlawful purposes.  *Starr*, 592 F.3d at 326.  This is not the case here.  DMS is not alleged to be a lawful joint venture, and its conduct is not alleged to have been reviewed and approved by government regulators.  In fact, Plaintiffs allege the exact opposite – that Defendants used DMS and GNEMMA as a means for fixing prices illegally.  (Am. Compl. ¶¶ 194-96.)  As explained by the Second Circuit, *Dagher* does not immunize joint ventures (or their owners) from antitrust liability when the joint venture is used for anticompetitive purposes such as unlawful price fixing.  *Starr*, 592 F.3d at 326-27.[27]

As a bootstrap argument, Defendants next argue that DFA and DMS are not separate enough to have the capacity to conspire under *Copperweld*.  (DFA/DMS Mot. at 19-20.)  Again, this argument simply attacks a strawman.  The Amended Complaint alleges that DFA and DMS

---

[26]    In addition, *Dagher* ruled only on the applicability of *per se* liability to a joint venture, finding that dismissal was appropriate when Plaintiffs alleged *per se* claims only.  547 U.S. at 1.  Here, however, Plaintiffs' allegations are not limited to *per se* claims; therefore, *Dagher* does not support a dismissal of Plaintiffs' Amended Complaint, as recognized by *Starr*.  592 F.3d at 326.

[27]    Indeed, there is a long history of anti-competitive behavior among conspirators in similar relationships.  The Supreme Court has expressly recognized that agreements among competitors to fix prices through the use of a common sales agent are *per se* unlawful.  *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-36 (1969); *Virginia Excelsior Mills v. FTC*, 256 F.2d 538, 540 (4th Cir. 1958); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000); *United States v. American Smelting & Ref. Co.*, 182 F. Supp. 834, 857-58 (S.D.N.Y. 1960).

have conspired with other parties (as well as each other), so it is legally irrelevant for this purpose whether they are viewed as a single entity or multiple entities – in either case, they have participated in a conspiracy involving more than one party that is actionable under the antitrust laws.

Aside from that basic flaw in Defendants' argument, they are also incorrect in asserting that DFA cannot conspire with DMS.  This claim is premised upon a misconstruction of the Amended Complaint's allegations, and is contradicted by DFA and DMS themselves. *Copperweld* taught that a parent controlling 100% of a subsidiary may be immune from a claim under Section 1 of the Sherman Act when they comprise a "single entity" which cannot conspire with itself.  467 U.S. at 771-73.

Whether DFA and DMS lack the capacity to conspire due to their corporate relationship is a factual issue and inappropriate for disposition upon a motion to dismiss. *Townshend v. Rockwell Int'l Corp.*, No. 99-0400, 2000 U.S. Dist. LEXIS 5070, at *14 (N.D. Cal. Mar. 28, 2000) ("[T]he nature of an entity and its ability to combine or conspire in violation of § 1 [of the Sherman Act] is a fact question.") (quoting *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1387 (9th Cir. 1984)).  Plaintiffs' allege that DMS and DFA are legally separate entities.  (Am. Compl. ¶¶ 40, 195).  Defendants' conclusory factual assertions to the contrary cannot be accepted as true at this early stage because: (1) DFA does not own 100%, or even a majority share of DMS; (2) DFA and DMS have denied that DFA controls DMS; (3) DFA and DMS do not represent themselves as a single entity; and (4) DFA and DMS cite no relevant cases in support of this argument.

*First*, DFA and DMS cannot be presumed a "single entity" because DFA does not own 100% of DMS.  *See Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1486 (D.

Or. 1987) ("[A] controlling shareholder having less than all shares" is not a single entity "with the controlled corporation.") (citing *Sonitrol of Fresno, Inc. v. AT&T Co.*, No. 83-2324, 1986 U.S. Dist. LEXIS 26034 (D.D.C. Apr. 30, 1986)); *cf. Copperweld*, 467 U.S. at 771-73 (parent owned 100% of subsidiary).  Courts have held a company does not form a single entity with an affiliate when it owns less than a majority.  *See, e.g. Aspen Title*, 677 F. Supp. at 1486 (parent owned 60% of one subsidiary and 75% of another subsidiary, and the subsidiaries were not immunized by *Copperweld*).  Plaintiffs allege DFA has owned 50% of DMS and no more.  (Am. Compl. ¶ 70.)

*Second,* DFA and DMS are not a "single entity" because, as noted, DFA and DMS **denied** in their answers to Plaintiffs' complaint in the Southeast that "DMS is so thoroughly dominated by DFA that commentators have stated:  'DMS is DFA.'"  (Aug. 4, 2008, Consolidated Am. Compl. *In re Southeastern Milk Antitrust Litig.*, 2:08-md-1000, Doc.  No. 111, at ¶ 88); (July 21, 2008, DFA Answer, Doc. No. 102, at ¶ 88); (July 21, 2008, DMS Answer, Doc. No. 103, at ¶ 88).

*Third*, DFA and DMS do not represent themselves as a single entity (Am. Compl. ¶ 71). DFA is a dairy cooperative that farmers can actually join, whereas DMS is a marketing agent that provides testing, hauling and marketing services to farmers, regardless of their membership in a cooperative.  In fact, most farmers in the Northeast marketing their milk through DMS are not members of DFA; the Amended Complaint explains that DFA has 1,900 members in the Northeast, whereas DMS markets milk for 9,000 farmers in the Northeast.  (*Id.* ¶¶ 23-24).

*Fourth*, DFA and DMS's cases are inapposite.  In addition to *Dagher* and *Copperweld,* explained above, *Siegel Transfer* and *Broadcast Music* are also inapplicable.  *Siegel Transfer, Inc. v. Carrier Express, Inc.* found that a corporation and its own freight salespeople, acting as

separate independent agents but with the sole purpose of selling freight for the corporation, could

not conspire with each other.  54 F.3d 1125, 1135 (3d Cir. 1995).  DMS, by contrast to the

salespeople in *Siegel Transfer*, is a large organization, not just one person, and it markets milk

for numerous dairy farmers and milk cooperatives, not just one company.  *Broad. Music, Inc. v.*

*Columbia Broad. Sys., Inc.* is also easily distinguishable because the Court held there that an

organization that licensed musicians' copyrighted works in a blanket fashion was not *per se*

unlawful under Section 1.  441 U.S. 1, 4-6, 9, 24 (1979).  The court found that the organization

allowed a unique product to exist – a blanket license for use of copyrighted music – "where the

agreement on price is necessary to market the product at all."  *Id.* at 10, 24.  Defendants fail to

explain how this relationship between artist licensors and the licensing organization resembles

that of DFA and DMS such that they do not have the capacity to conspire.  Nevertheless,

*Broadcast Music* did not even find that such a relationship was immune to challenge.  *Id.* [28]

> **B.      Price-Fixing by GNEMMA Members Is Not Implausible Because DFA, DMS
>          And Dean Control Whether Other GNEMMA Members Can Sell Their
>          Milk.**

Defendants also take issue with Plaintiffs' allegation that DFA and DMS fixed prices

through GNEMMA, arguing that it is implausible under *Twombly* that each of the cooperative

members of GNEMMA would agree to suppress prices paid to dairy farmers.  (DFA/DMS Mot.

at 18, 21-25 (citing 550 U.S. 544 (2007)).  But Defendants supply the incorrect pleading

standard.  Plaintiffs are not required to plead how each conspirator acted against its own

economic self-interest to state a plausible claim.  Nonetheless, even under that standard,

---

[28]      Nor would the principal-agent relationship between DFA and DMS somehow make it a single
entity under *Copperweld*.  A principal can conspire with his agent under Section 1.  *Rothery Storage &*
*Van Co. v. Atlas Van Lines*, 792 F.2d 210, 214-15 (D.C. Cir. 1986) (holding that the common carrier
principal that provided moving services could conspire with its independent carrier agents to form a
Section 1 group boycott and that the *Copperweld* doctrine did not apply as the principal and agents were
"legally separate entities").

Plaintiffs plead an economically plausible theory because Plaintiffs allege GNEMMA members are forced by DFA and DMS's market power to directly market through DMS or to accept the prices set through GNEMMA in order to have an opportunity to sell their milk to a bottler at all. (Am. Compl. ¶¶ 71, 96-105, 113, 114-118, 126-129, 207.)

In the Second Circuit, a plaintiff need only allege enough factual content that its conspiracy claim is plausible, as *Starr* recently stated: "[f]actual allegations must be enough to raise a right to relief above the speculative level." 592 F.3d at 321 (citing *Twombly*, 550 U.S. at 555). The Second Circuit continued:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

*Id.* (citing *Twombly*, 550 U.S. at 556). Plaintiffs allege sufficient facts that reveal an illegal agreement by stating the GNEMMA members set prices for milk at their regular meetings, a fact Defendants do not dispute. (Am. Compl. ¶¶ 127-28.)[29] This is more than sufficient to meet the standard.[30]

---

[29] Defendants do not challenge this specific factual allegation, but Defendants rather contend that GNEMMA members are protected by the Capper-Volstead Act. (DFA/DMS Mot. at 24.) As GNEMMA and its members are not immune under that act, *see infra*, no more factual allegation is necessary for a price-fixing claim under *Twombly*.

[30] Defendants cite no authority for the proposition that a plaintiff must allege that a conspiracy must be against every conspirator's economic self-interest to survive a motion to dismiss. No case exists. *Sheridan v. Marathon Petroleum Co.,* 530 F.3d 590, 592 (7th Cir. 2008), does not create such a standard and no case in any Circuit cites *Sheridan* for such a proposition. In *Sheridan*, the Seventh Circuit found that plaintiffs failed to allege facts that the Defendant participated in a conspiracy with credit card companies because Plaintiffs failed to allege sufficient facts to suggest an agreement under *Twombly*. *Id.* at 596. ("In any event, the complaint gives no hint of the role that Marathon might be hired to play in a conspiracy of the card companies.") Thus, under *Twombly* and *Starr* (and *Sheridan*), what is required is a factually plausible theory and that is what Plaintiffs allege.

Moreover, while Plaintiffs are not required to plead separately why the price-fixing conspiracy is contrary to the economic self-interest of each and every conspirator, Plaintiffs do so anyway.  Plaintiffs allege that  DFA and DMS exercise their market power, achieved through their conspiracy to obtain and maintain exclusive supply and marketing agreements with Dean and DFA's ownership interest in Hood, to control the prices announced by GNEMMA.  The other cooperative members of GNEMMA,[31] as well as the dairy farmers and cooperatives marketing through DMS, must accede to DFA's and DMS's desired prices set by GNEMMA, or they will be unable to sell their milk to processors at all.  (Am. Compl. ¶¶ 71, 96-105, 113, 114-118, 126-129, 207.)  Plaintiffs specifically allege that Agri-Mark made an anti-competitive agreement with DFA to ensure its ability to supply milk to Hood in return for aiding DFA and DMS in furthering their power over the market.  (*Id.* ¶ 113.)  Similarly, Plaintiffs also specifically allege that St. Albans, a cooperative that is a member of DMS and GNEMMA, was forced by DFA to market milk through DMS in order to access milk processors at all.  (*Id.* ¶¶ 96-105, 117.)

Plaintiffs plead a plausible and indeed compelling theory as to why other members of GNEMMA – Agri-Mark and Upstate Niagara – must accept lower prices for members under pressure from the market power of Defendants.  Whether Defendants have a competing theory to "rationalize" the behavior of GNEMMA members is irrelevant at this pre-discovery stage.

---

[31]     As a preliminary matter, as Defendants note, (DFA/DMS Mot. at 21-22), other than the members of DMS (DFA, Dairylea, Land O'Lakes, St. Albans and Maryland & Virginia Milk Producers Cooperative Association, Inc.), only Agri-Mark and Upstate Niagara are members of GNEMMA.  (Am. Compl. ¶ 126.)  Agri-Mark, however, also markets milk through DMS.  (*Id.* ¶ 113); (DFA/DMS Mot. at 22).  DMS obviously sets the prices for all of its member cooperatives and at least in part for Agri-Mark.  (Am. Compl. ¶¶ 123-26.)  As a result, only Upstate Niagara operates separately from DMS.

### C.  DFA And DMS Engaged In Unlawful Price-Fixing That Is Not Immunized By Capper-Volstead

DFA and DMS claim their price-fixing is immunized by the Capper-Volstead Act.[32] (DFA/DMS Mot. at 21.)  Again, this affirmative defense cannot prevail on a Motion to Dismiss particularly where, as here, Plaintiffs expressly allege facts that, if proven, deprive Defendants of that immunity.  *Southeastern Milk*, 2008 WL 2368212 at *4.[33]  Plaintiffs have alleged a host of anti-competitive and/or predatory practices which place Defendants' conduct outside Capper-Volstead's limited grant of immunity, *see* Am. Compl. ¶ 198, and DFA/DMS's "conclusory" assertion of the immunity is insufficient.  *Southeastern Milk*, 2008 WL 2368212 at *4 ("Resolving such issues necessarily requires a fact intensive inquiry which can be completed by this Court only after proper discovery has been conducted.").  As in *Southeastern Milk*, the Court

---

[32]      The Capper-Volstead Act provides, in relevant part:

Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: Provided, however, That such associations are operated for the mutual benefit of the members thereof. . . .

7 U.S.C. § 291.

[33]      Courts routinely deny or reverse motions to dismiss granted on the basis of Capper-Volstead immunity. *See also Case-Swayne Co. v. Sunkist Growers*, 389 U.S. 384, 396 (1967) (reversing and remanding appeals court's decision to dismiss a charge under § 1 of the Sherman Act); *Maryland & Virginia Milk Producers Assoc., Inc., v. United States*, 362 U.S. 458, 468 (1960) (reversing dismissal of Sherman Act § 2 claim on Capper-Volstead grounds); *United States v. Borden Co.*, 308 U.S. 188, 206 (1939) (reversing dismissal of § 1 claim under the Sherman Act); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184 (8th Cir. 1982) (reversing lower court dismissal of claims under §§ 1 and 2 of the Sherman Act); *Knuth v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420, 428 (3d Cir. 1968) (reversing district court's dismissal of §§ 1 and 2 claims); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) (denying motion to dismiss on Capper-Volstead grounds when material facts were in question); *United States v. Hinote*, 823 F. Supp. 1350, 1360 (S.D. Miss. 1993) (denying motion to dismiss criminal indictment against president of catfish cooperative pursuant to § 1 of Sherman Act).

should deny the affirmative defense on this ground alone.  In addition, Defendants' argument

fails for at least two other reasons.

1.      **Neither DFA Nor DMS Proves It Qualifies As A Capper-Volstead Entity.**

Capper-Volstead immunity is an affirmative defense, and a defendant must prove it meets

the requirements to qualify for the limited immunity.  *See Alexander*, 687 F.2d at 1184.  Here,

DFA and DMS simply *assert,* without offering any proof, that they are qualified Capper-

Volstead organizations.  (DFA/DMS Mot. at 21.)  These conclusory assertions are insufficient.

*Southeastern Milk*, *supra*.  In order to qualify as a Capper-Volstead entity, DFA and DMS must

each prove at least that it: (1) operates for the mutual benefit of its members; and (2) does not

engage in activities outside of the "legitimate objects" of a cooperative.  Neither DFA nor DMS

has proven these requirements, nor can they.[34]

First, neither DFA nor DMS even asserts it is operated for the mutual benefit of its

members, an essential element of Capper-Volstead qualification.  *See* 7 U.S.C. § 291; *Alexander*,

687 F.2d at 1184; *see also Case-Swayne Co. v. Sunkist Growers*, 389 U.S. 384, 393-94 (1967);

*In re Mushroom Direct Purchaser*, 514 F. Supp. 2d at 692-93.  Furthermore, the allegations of

the Amended Complaint belie this possibility.  The Amended Complaint alleges that both DFA

and DMS have been operated to the detriment – not mutual benefit – of their members because

"DFA's management engaged in activities that reduced the over-order premiums distributed to

DFA members in order to maximize revenue for processing operations and joint ventures" the

---

[34]      Additionally, DFA and DMS have not proven other threshold requirements of being a Capper-Volstead entity: "1) all of the members of the cooperative are producers of agricultural products; 2) each member of the cooperative only gets one vote regardless of its size; 3) the cooperative 'does not pay dividends on stock or membership capital in excess of 8 per centum per annum;' and 4) at least 50% of the products dealt with by the cooperative are products of its members." *In re Mushroom Direct Purchasers Antitrust Litig.*, No. 06-0620, 2009 U.S. Dist. LEXIS 26254, at *41, n.8 (E.D. Pa. Mar. 26, 2009) (quoting 7 U.S.C. § 291).

profits of which "were not distributed to DFA's members, but rather improperly distributed to DFA's management and outside business partners." (*Id.* ¶¶ 65, 198.)  Plaintiffs also allege DFA and DMS did not operate for the mutual benefit of its members because they force independent dairy famers to join DFA or DMS (*id.* ¶¶ 8, 11, 84); punish members who attempt to terminate their membership (*id.* ¶ 120); and eliminate competition in order to pay artificially low over-order premium prices to Northeast dairy farmers (*e.g. id.* ¶¶ 11, 12, 123-25).

Second, neither DFA nor DMS offers proof that its activities are within the legitimate objects of a cooperative, a perquisite for claiming Capper-Volstead's limited exemption.  *See Maryland & Virginia Milk Producers Assoc., Inc. v. United States*, 362 U.S. 458, 468 (1960) (explaining Capper-Volstead does not protect conduct "outside the 'legitimate objects' of a cooperative").  The Supreme Court has identified activities outside the legitimate objects of a cooperative to include restraining trade or achieving monopoly power "by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way," *id.* at 467, and "engag[ing] in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative."  *Id.*  "[E]ven lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act."  *Id*. at 472.  Applying this standard, courts have deemed a wide variety of activities – boycotts, coerced membership, foreclosure through supply agreements – as outside the "legitimate objects" of a cooperative and therefore not within Capper-Volstead's protection.[35]

---

[35]     *See, e.g., id.* (acquisition of bottling plant and use of credit); *Fairdale Farms,* 635 F.2d at 1044 (stating that it is predatory conduct to force farmers to join a cooperative), *cert. denied,* 454 U.S. 818 (1981); *N. Tex. Producers Ass'n*, 348 F.2d at 195-96 (boycotts), *cert. denied,* 382 U.S. 977 (1966); *Gulf Coast Shrimpers & Oystermans Ass'n v. United States*, 236 F.2d 658, 665 (5th Cir. 1956) (coerced membership), *cert. denied,* 352 U.S. 927 (1956); *Lone Star*, 2001 U.S. Dist. LEXIS 18716, at *1 (denying DFA's motion to dismiss complaint because allegations of DFA's use of leases, loans and supply agreements to foreclose another cooperative from the market constituted predatory conduct).

2.      **Capper-Volstead's Limited Antitrust Immunity Does Not Extend To DFA's Or DMS's Anticompetitive Acts Alleged In The Amended Complaint.**

Even if both DFA and DMS could establish that they satisfy the prerequisites for invoking Capper-Volstead's limited antitrust immunity, which would be directly contrary to the Amended Complaint's express allegations, both have engaged in conduct that results in forfeiture of Capper-Volstead immunity.  "Capper-Volstead provides only a ***limited*** immunity" for qualified organizations.  *Alexander,* 687 F.2d at 1182 (emphasis added).  Capper-Volstead "does not include a privilege to combine with competitors so as to use a monopoly position as a lever further to suppress competition by and among independent producers and processors." *Maryland & Virginia*, 362 U.S. at 472.  The limited immunity has also been held to mean:

> An anticompetitive practice may have economic justification, but its use may be undertaken with unlawful intent and in the desire to achieve an unlawful goal . . . the most important inquiry is whether these contracts were intended to stifle competition or were intended to meet legitimate business purposes.

*Dairymen,* 660 F.2d at 195.  The anticompetitive or predatory conduct set forth in Plaintiffs' Amended Complaint therefore does not fall within the limited immunity granted by Capper-Volstead.

The Amended Complaint alleges that DFA and DMS have conspired with Dean, Hood and others to fix prices for milk paid to Northeast dairy farmers and eliminate competition for the purchase of Grade A milk in violation of §§ 1 and 2 of the Sherman Act.  (*See, e.g.,* Am. Compl. ¶¶ 40, 111-13, 145.)  DFA and DMS do not dispute, nor can they, that Dean and Hood are non-exempt entities.  Additionally, the Amended Complaint alleges that DFA and DMS have unlawfully fixed and monitored prices through GNEMMA, (*Id*. ¶¶ 126-29), which DFA and DMS do not contest is an over-order pricing agency.  (DFA/DMS Mot. at 21.)  DFA and DMS

48

have not even asserted, let alone proven, that each GNEMMA member is a qualified Capper-Volstead entity.  These price fixing allegations thus place DFA and DMS outside the protection of any Capper-Volstead immunity.[36]

## VI.   PLAINTIFFS PROPERLY PLEAD SECTION 1 AND 2 CLAIMS AGAINST HOOD.

### A.   Plaintiffs Allege That Hood Conspired With Defendants To Enable DFA's Monopoly and Receive Artificially Depressed Prices For Milk

Defendant Hood has played and continues to play a critical role in facilitating and implementing the unlawful conduct at issue.  The central premise of Hood's motion to dismiss – its repeated characterization of DFA as no more than its "supplier" – is contrary to the specific factual allegations in the Amended Complaint and is demonstrably untrue.  As we have explained, DFA is not simply a "supplier."  It is a vertically-integrated company that fails to operate in the interests of dairy farmers – Hood has taken actions to give DFA a direct economic stake in any excess profits Hood's bottling operations secure by suppressing payments to dairy farmers.  By mischaracterizing DFA and dismembering the conspiracy, instead of recognizing the combined effect of the conspirators' actions, Hood simply disregards its significance to the

---

[36]     *See Borden,* 308 U.S. at 204-05 (no Capper-Volstead protection for dairy cooperative that conspired to fix prices with non-exempt entities); *Alexander,* 687 F.2d at 1182 (same); *Bergjans*, 241 F. Supp. at 482-83 (same); *Maryland & Virginia,* 362 U.S. at 471-72.

DFA and DMS also ignore that the Complaint's specific allegations of predatory conduct, taken as true, establish their conduct is not protected by Capper-Volstead.  (Am. Compl. ¶¶ 114-18 (DFA and DMS forced dairy cooperatives and farmers into joining DFA or DMS)); (*Id.* ¶¶ 117-18 (St. Albans forced to join DFA in 2003 and Farmland Dairies forced to market through DMS in 2005)).  *See, e.g., Fairdale Farms,* 635 F.2d at 1040, 1044 (Capper-Volstead's limited antitrust immunity permits cooperative entities to attain and maintain monopoly power only through natural and voluntary growth without "resort to predatory or anticompetitive practices").

DFA and DMS's argument that price-setting through GNEMMA is lawful because one of its members operates outside of DMS with appreciable market share is also unavailing.  (DFA/DMS Mot. at 21-22.)  Whether the GNEMMA price-fixing resulted in *suppressed* prices or not is a factual issue that is properly determined with the benefit of discovery.  The consequential point is that DFA and DMS concede they have engaged in price-fixing through GNEMMA – a non-exempt entity.

challenged conspiracy, including the following conduct:

- Hood provided DFA a substantial ownership stake in Hood's bottling operations (Am. Compl. ¶ 111);

- Hood purchased bottling plants from NDH and subsequently agreed with DFA that it would remain the exclusive supplier of milk to those facilities (*Id.* ¶ 112).

- These agreements and Hood's continuing practices have allowed DMS to maintain a dominant position in the market for supplying fluid Grade A milk to bottling plans, a position that gives DFA and DMS enormous power to require dairy farmers to join DFA or market their milk through DFA.  (*Id.* ¶ 114).

- As a result of its agreement with DFA, Hood has not allowed another cooperative, Agri-Mark, to have access to these bottling plants, thereby enforcing DFA's agreement not to compete with, and restrict the growth of, Agri-Mark.  (*Id.* ¶¶ 117-18).

- By entering major supply agreements with DFA and capping the supply of Agri-Mark's milk, Hood has ensured that it obtains milk from the same price-fixing source as Dean, thereby eliminating competition for the purchase of milk between the two major bottlers in the Northeast, which control 90 percent of the market.

- By helping DMS acquire and maintain power in the marketing of milk to bottlers, and agreeing not to permit any competition for supply of milk to the bottling plants from NDH, Hood has both facilitated the price-fixing activities described in the Amended Complaint and reaped the financial benefits of paying suppressed prices for milk.

- The DOJ has recognized that DFA has a "long history of friendly and mutually profitable financial dealings" with its business partners and an incentive to act "in a manner that serves DFA's interest in eliminating competition."  (Am. Comp. ¶ 90 (discussing DFA's relationship with Allen Meyer)); (*see also id.* ¶ 66(a-f)).

In short, Hood's participation in the conspiracy was important to ensure that (1) DFA secured

market power over the sale of milk to bottlers in the Northeast, and (2) competition was

eliminated between Dean and Hood in the Northeast,[37] as they purchased milk from the same price-fixing supplier.  Absent Hood's anticompetitive agreements and conduct, DFA and DMS would have competed with Agri-Mark and other cooperatives for the sale of milk to Hood, and Dean and Hood would have competed with each other for the purchase of milk, thereby allowing farmers to obtain higher prices.

Hood's role in the conspiracy makes it responsible for the actions of all the conspirators because in a civil antitrust conspiracy case, it is "the norm that every conspirator is responsible for the acts of every other. . . ."  *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 2002, 632 (7th Cir. 2002); *see also In re NASDAQ Market-Makers Antitrust Litig.* 169 F.R.D. 493, 519 (S.D.N.Y. 1996) ("the antitrust law provides for joint and several liability of co-conspirators"); *New York ex rel. Spitzer v. Feldman*, No. 01-6691, 2003 U.S. Dist. LEXIS 11759, at *11 (S.D.N.Y. July 14, 2003) (explaining that "antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy") (citations omitted).  In addition, because Hood has conspired with its partial owner and contracting partner, DFA, it can plainly be held responsible for Defendants' unlawful acts.

> 1.   **Plaintiffs' Conspiracy Claims Are Plausible.**

Proceeding from its flawed factual premise, Hood argues that Plaintiffs' conspiracy allegations are "economically implausible" and asserts that it does not make economic sense for a "supplier" (DFA/DMS) to conspire with a purchaser (Hood) to facilitate a monopoly for that "supplier."  (*See, e.g.*, Hood Mot. at 8.)  But yet, that is precisely what Hood did when it agreed

---

[37]   Hood's argument that it has no incentive to create a monopoly position for Dean is simply a red herring.  The relevant point is that Hood has benefitted substantially from a conspiracy that gives its co-owner DFA – a vertically-integrated operation with a substantial stake in the economic profits of bottling plants and an established track record of diverting these profits to insiders – dominant control over access to bottling plants and the resulting power to fix and suppress prices, through DMS and GNEMMA, paid to dairy farmers for their milk.

to turn over supply to DFA through the conduit of full supply agreements.  The fact that Hood's activities (many of which cannot even be disputed) only make sense when understood as part of a conspiracy to restrain competition and receive milk at fixed and suppressed prices simply provides further corroboration of the conspiracy alleged in the Amended Complaint.

Moreover, while there are, in fact, strong economic motives for Hood's participation in this conspiracy, no court, much less one in the Second Circuit, has even required that a Plaintiff allege that every conspirator act in its own economic interests to arrive at an economically plausible claim.  All that is required is a factually plausible agreement to conspire.  Plaintiffs spell out, and Hood ignores, the economic motivations for the illegal acts of Defendants.  The Amended Complaint explains that the objective of the conspiracy is to eliminate competition with the intent and effect of fixing prices for milk at sub-competitive levels, (*see, e.g.,* Am. Compl. ¶¶ 145-52), an outcome that benefits Hood and Dean acquiring milk at suppressed prices.[38]  Although Hood speculates that it would implausible for it to conspire to give DFA market power because DFA theoretically could then increase prices, (Hood Mot. at 10), this argument is misplaced because it is directly contrary to the Amended Complaint's allegations and what has, in fact, occurred.  The Amended Complaint alleges that DFA does not have an overriding incentive to drive up the price of raw milk paid to dairy farmers, due to its ownership stakes in dairy processors and joint ventures that have allowed it to divert literally millions of dollars of processor profits to DFA insiders and close business allies.  (Am. Compl. ¶¶ 63-67.)  Moreover, the Amended Complaint makes clear that there are atypical incentives at work in this market – a "supplier" *without* an incentive to consistently maximize its own prices has conspired

---

[38]        As explained *supra*, Hood is not entirely independent of DFA, which partially owns it.  (Am. Compl. ¶¶ 106-109.)  Because Hood is a privately-held corporation, Plaintiffs cannot know without discovery precisely how much total ownership DFA currently has of Hood or how much control DFA currently exercises over it.

with a purchaser *that is partially owned by that supplier*. Within this context, the alleged

conspiracy allegations are not only plausible, they logically track precisely what has transpired.

Instead of responding to the substance of the Amended Complaint, Hood dismisses

Plaintiffs' specific allegation that Hood has received from DFA (or its agent DMS) Grade A milk

at artificially depressed rates pursuant to the conspiracy, (*Id.* ¶ 206), by claiming this allegation is

implausible insofar as any such agreement would be "an unwritten and unenforceable promise to

forebear from monopolistic behavior." (Hood Mot. at 11.) Without the benefit of discovery,

Hood's naked speculation that any such agreement in the dairy industry would be unwritten and

unenforceable must be rejected.[39] Furthermore, Hood's claim is contradicted by the Amended

Complaint allegations, which are particularly plausible here given the history of DFA rewarding

loyal business partners like Hood. (*See, e.g.,* Am. Compl. ¶¶ 66(a-f) & 90) (explaining what the

DOJ called "a long history of friendly and mutually profitable financial dealings" with one

partner who "enjoys a share of the profits and potential appreciation that is far out of proportion

to his investment" and that the "prospect of future ventures with DFA affords [that partner with]

a strong incentive to manage [his business] in a manner that serves DFA's interests in

eliminating competition.").

Viewing the Amended Complaint as a whole, Hood's contrasting of basic economic

theory with the specific allegations in the Amended Complaint actually serves to *validate* the

plausibility of the alleged conspiracy. Per Hood's logic, no purchaser in a competitive market

---

[39]     Even if Hood merely acquiesced in the conspiracy without any enforceable guarantee of a *quid pro quo*, it would not escape liability. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948) (no need to distinguish between conspirators who fomented the conspiracy and those who only participated because they were coerced "[f]or acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.") *See also Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1266 (9th Cir. 1983); *see also Albrecht v. Herald Co.*, 390 U.S. 145 (1968) (mere acquiescence in an antitrust conspiracy can establish liability); *United States v. Parke Davis & Co.*, 362 U.S. 29, 46-47 (1960).

would have an incentive to provide exclusive contracts that might entrench a monopolist supplier's market power.  (*See* Hood Mot. at 1, 8-10.)  Yet the Amended Complaint details the exclusive contracts that both Dean and Hood signed with DFA and DMS, which controls approximately 80 percent of Grade A milk marketed to bottling plants in the Northeast.  (Am. Compl. ¶¶ 24, 73-95, 111-13.)  Hood further theorizes that it "would directly suffer the higher prices and restricted output threatened by DFA holding a monopoly."  (Hood Mot. at 9.)  Yet the Amended Complaint explains in great detail how, after Hood delivered DFA the full supply agreements at issue and the resulting market power, Hood's and Dean's proportion of the retail milk price increased whereas dairy farmers' proportion of the retail milk price decreased.  (Am. Compl. ¶¶131-37 (explaining that dairy farmers enjoy higher prices in those regions where DFA and DMS do not dominate the market)).  Thus, the specific and substantiated allegations in the Amended Complaint reveal market behavior that is opposite from the theoretical competitive market Hood imagines and instead closely aligns with Plaintiffs' allegations.  Hood's arguments thus actually support Plaintiffs' allegations because what Hood and Dean *did* by entering into full supply agreements with a monopolist only makes sense in the context of the alleged conspiracy to monopolize and monopsonize.

In *Twombly*, the Court acknowledged that, unlike at summary judgment where a plaintiff must present evidence that tends to exclude the possibility of independent action, a motion to dismiss must be denied where plaintiffs have pled "enough factual matter (taken as true) to suggest that an agreement was made," 550 U.S. at 556; *see also* 2 Areeda & Hovenkamp § 307d1 (3d ed. 2007) ("[T]he Supreme Court did not hold that the same standard applies to a complaint and a discovery record. . . . The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for

summary judgment.").  In arguing that the claims it should be dismissed as a matter of law, Hood has greatly oversimplified the nature of DFA and then offered a factual hypothesis that is contradicted by the allegations in the Amended Complaint and the realities of these markets. Indeed, Hood's implicit request that this Court find, as a matter of law, that DFA is merely a "supplier" with interests no different than any other "supplier," is not only factually incorrect, it shows precisely why dismissal of such claims without the benefit of factual discovery would be wholly unwarranted.

2. **Plaintiffs Allege Sufficiently Detailed Conspiracy Claims Against Hood.**

Hood argues that the Court must dismiss the Amended Complaint because the conspiracy allegations lack sufficient detail regarding specific times, places and persons.  (Hood Mot. at 6-8.)  This argument is premised upon the wrong legal standard.

As the Second Circuit has recognized – even in the context of more speculative "parallel pricing" conspiracy cases – Plaintiffs are not required to mention a specific time, place or person involved in each conspiracy allegation to survive a motion to dismiss, as Hood claims.  *See Starr*, 592 F.3d at 325.

Moreover, the present allegations, taken together, more than satisfy the actual pleading standard, which is to place Defendants' conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 323, citing *Twombly*, 550 U.S. at 557.  The Amended Complaint thoroughly details the alleged conspiracy, including the mutual incentives DFA and Hood had to conspire, Hood's supply contracts during the relevant period, (Am. Compl. ¶¶ 111-13), Hood's contracting practices and cross-ownerships, (*id.* ¶¶ 107-13), and both general and specific anticompetitive conduct of DFA and DMS as a result of their conspiracy with both Dean and Hood.  (*Id.* at ¶¶

114-29.)  For example, contrary to Hood's claims that the Amended Complaint allegations are

"amorphous," (Hood Mot. at 7), the Amended Complaint explains that the DFA-Hood agreement

for the exclusive supply of milk – a central component of the conspiracy – was part of the 2004

stock and ownership exchange between Hood and NDH.  (Am. Compl. ¶¶ 110-12.)  There is

nothing amorphous about this claim – it *identifies* and *describes* the context and terms of one of

Hood's unlawful agreements.  Moreover, Plaintiffs have explicitly pled that certain aspects of the

conspiracy were necessarily conducted outside of public view.  (*Id.*  ¶ 142.)  *Twombly* does not

require the impossible; Plaintiffs need not plead all the details of a secret conspiracy before

discovery. [40]

Although Hood is generally vague as to which additional details would be necessary to

put it on notice of the claims against it, Hood does make one very specific, but misplaced,

argument – that the Amended Complaint allegedly fails to identify what Hood did to

"consciously commit itself" to the alleged conspiracy.  (Hood Mot. at 7.)  However, it is

sufficient that Plaintiffs allege that, in expressly contracting and otherwise cooperating with DFA

and DMS throughout the class period, (Am. Compl. ¶¶ 113, 206), Hood knowingly assisted in

securing for DFA and DMS monopoly control over the supply of milk to bottling plants in return

for the provision of milk priced at artificially depressed rates as explained above.  *See Hinds*

---

[40]     Courts in the Second Circuit and elsewhere have long recognized that *non-public* portions of a conspiracy need not be plead with corresponding detail because they generally cannot be.  *See, e.g., Amusement Indus., Inc. v. Stern,* No. 07-11586, 2010 U.S. Dist. LEXIS 11816, at *71 (S.D.N.Y. Feb. 9, 2010) ("With respect to the conspiracy elements, 'great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading.'") (quoting *Maersk, Inc. v. Neewra, Inc.,* 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008)); *Grunewald v. United States,* 353 U.S. 391, 402 (1957) ("[E]very conspiracy is by its very nature secret" and "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces."); *Blount v. Swiderski*, No. 03-0023, 2006 U.S. Dist. LEXIS 82889, at *55 (E.D.N.Y. Nov. 14, 2006) ("a conspiracy is, by its very nature, a secret enterprise."); *Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.*, Nos. 95-7574, 95-7580, 2000 U.S. Dist. LEXIS 18959, at *14 (W.D.N.Y. Oct. 3, 2000) (rejecting motion to dismiss where plaintiffs alleged in their complaint that the conspiracy "was inherently self-concealing.").

*County v. Wachovia Bank*, 620 F. Supp. 2d at 513 (S.D.N.Y.2009) (Plaintiffs need only make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (the complaint "need not contain detailed 'defendant by defendant' allegations,' it 'must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.'") (quoting *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008)).

Thus, Plaintiffs' Amended Complaint provides clear notice of the claims at issue in this case and there is no basis for Defendants' contention that it should be dismissed for a lack of specificity. *See Southeastern Milk*, 555 F. Supp. 2d at 943 (denying defendants' motion to dismiss in similar case where plaintiffs' "complaint as a whole" effectively "put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist" despite the fact that the complaint did not specifically answer the "who, what, when and where" of the conspiracy).

3.   **Hood Improperly Divorces Plaintiffs' Conspiracy Allegations Against It From Each Other And From The Allegations Against Other Defendants.**

Contrary to the Supreme Court's clear directives in *Continental Ore,* Hood improperly attempts to divide and conquer Plaintiffs' conspiracy allegations.  It ignores its co-conspirators' unlawful actions, even though each member of the conspiracy (including Hood) bears legal responsibility for those actions.  Instead Hood parses the allegations that explicitly reference it, and argues that each allegation cannot, by itself, provide a sufficient basis for its liability.  As explained above, however, the Supreme Court has expressly disallowed this approach in antitrust cases.  *See Cont'l Ore*, 370 U.S. at 698-99 ("It is apparent from the foregoing that the Court of

Appeals approached [the Plaintiff's] claims as if they were five completely separate and unrelated lawsuits.  We think this was improper.  In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Courts in this Circuit have similarly recognized that complaints are entitled to the inferences that result from a holistic reading.  *See Koury v. Xcellence, Inc.*, 649 F. Supp. 2d 127, 133 (S.D.N.Y. 2009) ("The Court, moreover, is required to read the factual allegations in a complaint 'as a whole.'"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) ("Because [i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole, the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder") (citations and quotations omitted); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 418 (S.D.N.Y. 2007) (at the motion to dismiss stage "the court may not 'weigh the evidence that might be presented at trial,' but must instead limit itself to considering all of the facts alleged in the complaint, taken collectively.").

Notwithstanding this well established law, Hood tries to dismember the Amended Complaint by arguing that each of the following allegations, *standing alone*, cannot establish its liability:  (1) the fact that, taken together, Dean and Hood comprise 90% of the market for bottling fluid Grade A milk in FMMO 1; (2) Hood's actions giving DFA a partial ownership stake in its bottling operations; (3) Hood's acquisition of certain processing plants from NDH, an organization created and controlled by DFA; (4) Hood's exclusive contracting with DMS; (5) Hood's awareness of simultaneous exclusive contracting between Dean and DFA; (6) Hood's foreclosure of independent cooperatives from the bottling plants acquired from NDH; (7) DFA management's willingness to use full supply agreements or other variations of exclusive

contracts to require independent farmers and cooperatives to join DFA or market through DMS; and (8) DFA and DMS price-fixing of the amount paid by Hood to farmers for fluid Grade A milk.  However, all of these facts, *taken together*, plainly demonstrate that it is not only plausible that Hood has conspired to restrain competition, this is in fact what has occurred.  Just as the efforts of DFA, DMS and Dean to dice allegations on a motion to dismiss a similar complaint were rejected by the Court in *Southeastern Milk,* 555 F. Supp. 2d at 943-44 ("defendants attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition that [t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.") (quotations omitted), Hood's use of a similar strategy here should also be rejected.

### B.      Plaintiffs' Claims Do Not Rely On A "Shared Monopoly" Theory.

Hood attacks Plaintiffs' monopsony claims that explicitly focus on Dean's conduct and only plead the involvement of Hood "in the alternative."  (*See* Hood Mot. at 2-5 (discussing Counts III and V).)  It incorrectly argues that Plaintiffs' position depends on a "shared monopoly" theory that has been "discredited."[41]  This argument is a mere distraction.  Plaintiffs'

---

[41]      The viability of "shared monopoly" theory, i.e., that competitors' market shares can be aggregated for purposes of a claim under Section 2 of the Sherman Act, is unsettled.  *See Sun Dun, Inc. v. Coca-Cola Co.,* 740 F. Supp. 381, 391 n.9 (D. Md. 1990).  The Second Circuit stands alone among appellate courts in having explicitly rejected the "shared monopoly" theory in the context of a *monopolization* claim.  *See Arista Records LLC v. Lime Group LLC,* 532 F. Supp. 2d 556, 580 n.32 (S.D.N.Y. 2007) (recognizing that no other court of appeal has opined on the issue of "shared monopoly" theory).  It has not, however, rejected it in the context of a conspiracy to monopolize claim and multiple courts acknowledge its viability in that context.  *See id.* at 580 (analyzing this issue without deciding and assuming *arguendo* that such a theory is viable); *Sun Dun,* 740 F. Supp. at 391-92 ("shared monopoly" may be viable for conspiracy to monopolize); *American Tobacco Co. v. United States,* 328 U.S. 781 (1946) (apparently recognizing a "shared monopoly" theory in the context of a conspiracy to monopolize claim).  In any case, the Amended Complaint in this case properly alleges antitrust violations by Hood based on its participation in an unlawful conspiracy to restrain competition – including a conspiracy to fix prices (*see* Count VII) and to monopolize the market for supplying fluid Grade A milk to bottlers (*see* Counts I and VII) – and does not depend on a shared monopoly theory.

case does not rely on "shared monopoly" theory; no conduct, nor any damages at issue in the Amended Complaint depend on Hood's inclusion in the monopsony claims against Dean.

### C.       Plaintiffs Do Not Allege That Hood Violated Clayton Act Sections 3 or 7

Hood also argues that it should not be held liable under Sections 3 or 7 of the Clayton Act, which relate to exclusive dealing and mergers and acquisitions, respectively.  Again, these arguments are distractions.  Plaintiffs do not bring any Counts under those statutes.

In arguing against its liability for "exclusive dealing agreements," Hood mischaracterizes Plaintiffs' factual allegations and the applicable theories of liability.  As explained above, the case against Hood is a conspiracy case under Sections 1 and 2 of the Sherman Act, and Hood's liability is intertwined with DFA's and DMS's anticompetitive acquisition and use of monopoly power.  This is not simply an exclusive dealing fact pattern and thus Hood's elaborate exclusive dealing argument misses the point.

In its misdirected attempt to shoehorn the Complaint allegations into an exclusive dealing context, Hood critically mischaracterizes Plaintiffs' case.  For example, Hood emphasizes Plaintiffs' assertion that DFA and its affiliate DMS only supply a *significant share* of the milk bottled by Hood since DMS is a "major supplier" rather than sole provider to Hood.  (Hood Mot. at 17-18) (emphasis in original).  Hood then argues that there is a "'yawning chasm' between buying 'significant share' of one's milk from a given supplier and buying *exclusively* from that supplier."  (*Id.*) (emphasis in original).  However, Hood ignores the Amended Complaint's allegations, including those of the very paragraph it cites.  (*See id.*) (citing Am. Compl. ¶113.  In that paragraph, Plaintiffs make clear that "Agri-Mark is the only cooperative that supplies fluid Grade A milk to Hood that is not a member of DFA or does not regularly market its milk through DMS."  (Am. Compl. ¶113.)  Plaintiffs further explain in great detail how the conspiracy

between Hood and DFA and DMS serves to eliminate competition with and control the growth of Agri-Mark.  (*Id*.)  Plaintiffs conclude that "DFA and DMS exercise control over *all* of the milk supplied to Hood" (emphasis added).  (*Id*.)  Thus, Hood's conclusion that "Hood has, according to plaintiffs, merely committed to purchase a 'significant share' of its needs from DFA, leaving the remainder open to other suppliers," (Hood Mot. at 20), is misleading at best.[42] As Plaintiffs allege, Hood's contracting practices cede all control of supply to its partial owner, DFA (and DMS) as part of a *quid pro quo* combination.

Hood's argument concerning its market share is also irrelevant, (Hood Mot. at 20-24), because a conspirator in a price fixing or monopolization case under the Sherman Act need not have *any* appreciable market share to be liable for its acts as well as the acts of its co-conspirators.  *See Harkins Amusement Enter. v. Gen. Cinema Corp.*, 748 F. Supp. 1389, 1394-95 (D. Ariz. 1990) (fact that single co-conspirator had negligible market share cannot remove or reduce that co-conspirator's liability for entirety of plaintiffs' claims); *Brager & Co., Inc. v. Leumi Sec. Corp.*, 429 F. Supp. 1341, 1347 n.18 (S.D.N.Y. 1977) (co-conspirator's liability unaffected by the fact that it had no share in the market subject to the conspiracy to monopolize); *In re Uranium Antitrust Litig.*, 552 F. Supp. 518, 522 (N.D. Ill.1982) ("[I]t has long been the law that an antitrust defendant is jointly and severally liable for the acts of its co-conspirators").  Thus, to the extent that Hood conspired unlawfully or committed acts in furtherance of the

---

[42]     To the extent that Hood disputes that it ceded exclusive control of supply to DFA and DMS, this factual issue cannot be resolved on a motion to dismiss.  *See Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, (9th Cir. 2008) (whether competitors entered into exclusive dealing arrangements with their contracts, in violation of the Sherman Act, could not be resolved at motion to dismiss phase because of factual dispute as to whether competitors' contracts contained exclusive dealing provisions).

conspiracy, Hood's market share is irrelevant.[43]  *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether an *arrangement* has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.") (citations omitted, emphasis added).  *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F. 3d 215, 225 (5th Cir. 2001) ("[T]he reason for looking at market power is to determine whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market.").  Thus, the Court should not be distracted by Hood's exclusive dealing arguments.

## CONCLUSION

As in the *Southeastern Milk Antitrust Litigation*, Defendants' various factual defenses and theories provides no basis for dismissal of the Amended Complaint.  Accordingly, Plaintiffs respectfully request that Defendants' Motions be denied.

---

[43]      Moreover, given that Dean and Hood are each alleged to have conspired with DFA (and its agent DMS), it would also be inappropriate to disaggregate their respective 70 and 20 percent market shares to determine the effects of each prong of the conspiracy on the market.  Indeed, if Hood's position were correct, even if the conspirators had collectively foreclosed one hundred percent of the market, this would be legally insufficient.  Instead, the appropriate inquiry – even under a rule of reason analysis – is whether the conduct of the conspiracy at issue (without "dismembering" it) had an actual adverse effect on competition.  *See Todd*, 275 F.3d at 206 ("Market power defined as a percentage market share, however, is not the only way to demonstrate defendants' ability to depress salaries.  If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power.  In fact, this arguably is more direct evidence of market power than calculations of exclusive market share figures."); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (explaining that "the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration").

Respectfully submitted,

/s/ Brent W. Johnson
BENJAMIN D. BROWN
DANIEL A. SMALL
KIT A. PIERSON
BRENT W. JOHNSON
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:     (202) 408-4600
Facsimile:      (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com

ROBERT G. ABRAMS
GREGORY J. COMMINS, JR.
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC   20004
Telephone:     (202) 783-0800
Facsimile:      (202) 383-6610
AbramsR@howrey.com
ComminsG@howrey.com

J. DOUGLAS RICHARDS
GEORGE F. FARAH
COHEN MILSTEIN SELLERS
    & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY   10022
Telephone:     (212) 838-7797
Facsimile:      (212) 838-7745
drichards@cohenmilstein.com
gfarah@cohenmilstein.com

ANDREW D. MANITSKY, ESQ.
GRAVEL AND SHEA, A PROFESSIONAL
CORPORATION
76 St. Paul St., 7th Floor, P.O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
amanitsky@gravelshea.com

*Counsel for Plaintiffs and the Proposed Class*