# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ALICE H. ALLEN and LAURANCE E. ALLEN, )<br>d/b/a Al-lens Farm, )<br>GARRET SITTS and RALPH SITTS, )<br>on behalf of themselves )<br>and all others similarly situated, )<br>             Plaintiffs )<br>             )<br>     v. )<br>             )<br>DAIRY FARMERS OF AMERICA, INC., )<br>DAIRY MARKETING SERVICES, LLC, )<br>DEAN FOODS COMPANY, and )<br>HP HOOD LLC, )<br>         Defendants )  | Docket No. 2:09-cv-00230 |

# REPLY MEMORANDUM IN SUPPORT OF DEFENDANT HP HOOD LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT

Jane Osborne McKnight
LAW OFFICES OF JANE OSBORNE
MCKNIGHT, PLC
207 Webster Road
Shelburne, Vermont 05482
Tel: (802) 985-3800
jane@mcknightlaw.com

Steven J. Rosenbaum
James R. Dean
Jeffrey H. Lerner
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: (202) 662-5568
srosenbaum@cov.com
jdean@cov.com
jlerner@cov.com

*Attorneys for Defendant*
*HP Hood LLC*

April 1, 2010

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      The Conceded Claims. ..................................................................................... 1

II.     The Only Specific Facts Alleged As To Hood Do Not Make Out A Viable Antitrust
        Claim Against The Company ............................................................................. 2

        A.      The Partial Exclusive Supply Contracts. .............................................. 3

        B.      The 2004 Transaction. ........................................................................... 5

        C.      Hood Has Not Improperly Compartmentalized Plaintiffs' Allegations. ............... 6

III.    Plaintiffs Cannot Rely Upon Generalized And Conclusory Allegations Of An
        Overarching Conspiracy. ................................................................................... 7

        A.      The Amended Complaint Fails To Allege Sufficient Facts Of Hood's
                Participation In An Overarching Conspiracy ......................................... 8

        B.      The Facts Alleged Do Not Support A Plausible Inference That Hood Participated
                In A Conspiracy. ................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ad/Sat v. Associated Press*,
181 F.3d 216 (2d Cir. 1999).........................................................................8

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)....................................................................................2

*Arar v. Ashcroft*,
585 F.3d 559 (2d Cir. 2009) (en banc)........................................................9

*Arista Records LLC v. Lime Group LLC*,
532 F. Supp. 2d 556 (S.D.N.Y. 2007)..........................................................2

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ...................................................................... passim

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................... passim

*Commercial Street Express LLC v. Sara Lee Corp.*,
No. 08 C 1179, 2008 WL 5377815 (N.D. Ill. Dec. 18, 2008) ..................14

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ....................................................................5

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)....................................................................................7

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*,
312 F. Supp. 2d 379 (E.D.N.Y. 2004) ......................................................14

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.*,
672 F. Supp. 724 (S.D.N.Y. 1987), *aff'd*, 879 F.2d 1005 (2d Cir. 1989)..................2

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)....................................7, 9, 11

*In re Potash Antitrust Litigation*,
954 F. Supp. 1334 (D. Minn. 1997), *aff'd*, *Blomkest Fertilizer, Inc. v. Potash Corp.*,
203 F.3d 1028 (8th Cir. 2000) ...............................................................6, 7

*Kamholtz v. Yates County*,
350 Fed. Appx. 589 (2d Cir. 2009) .............................................................9

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ...................................4

*MCI Communications Corp. v. American Tel. and Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ...............................................................15

*Midwestern Mach. Co. v. Northwest Airlines, Inc.*,
392 F.3d 265 (8th Cir. 2004) ...............................................................5

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
866 F.2d 525 (1st Cir. 1989).................................................................15

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
507 F.3d 117 (2d Cir. 2007).........................................................13, 14, 15

*Standard Oil v. United States*,
337 U.S. 293 (1949)...........................................................................12

*Starr v. Sony BMG Music Entertainment*,
592 F.3d 314 (2d Cir. 2010)...........................................................10, 11, 12

*Sun Dun, Inc. v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990) ..........................................................2

*Tilli v. Exxon Mobil Corp.*,
346 Fed. Appx. 751 (3d Cir. 2009) (unpublished).................................14

*Tops Markets, Inc. v. Quality Markets, Inc.*,
142 F.3d 90 (2d Cir. 1998)...................................................................5

*Turkman v. Ashcroft*,
589 F.3d 542 (2d Cir. 2009).................................................................8

**STATUTES**

Clayton Act § 3, 15 U.S.C. § 3 ...............................................................3

Sherman Act § 1, 15 U.S.C. § 1...........................................................3, 10

Sherman Act § 2, 15 U.S.C. § 2........................................................1, 2, 3

**TREATISES AND ARTICLES**

XI Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their Application* (2d ed. 2005) ...............................................................................................12

James A. Keyte, *Twombly: How Courts Are Interpreting and Extending Its Principles*, 23 Antitrust 65, 67 (Fall 2008) ...........................................................7, 8

A. Benjamin Spencer, *Plausibility Pleading,* 49 B.C. L. Rev. 431 (Mar. 2008) .........................12

**OTHER CITED MATERIALS**

Reply Brief for Appellants, *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)
(No. 06-3128), 2007 WL 4966910 ........................................................................................7

The only specific facts plaintiffs have alleged regarding HP Hood LLC do not make out a viable antitrust claim against it.  The partial exclusive supply contracts Hood entered with Dairy Farmers of America ("DFA") are *per se* lawful, as was the 2004 transaction by which Hood acquired certain processing plants from National Dairy Holdings ("NDH"), and DFA (a fifty percent owner of NDH) acquired a non-controlling, minority interest in Hood as part of the purchase price.  Furthermore, any claims relating to these events are time-barred.

While plaintiffs make much of the denial of the motion to dismiss in the *Southeastern Milk* litigation, asserting that the court there "squarely rejected the principal arguments advanced here" (Pl. Opp. 1), Hood is not a party to that lawsuit, is not alleged to have participated in the conspiracy alleged there, and no party advanced the "principal arguments" advanced by Hood here.  Similarly, while plaintiffs trace putative antitrust violations in the dairy industry going back to 1965 (Pl. Opp. 4 n. 2), none of these cases involved Hood.

In the absence of any specific facts giving rise to a claim against Hood, plaintiffs are reduced to relying upon generalized and speculative allegations of an overarching conspiracy involving Hood, DFA, DMS and Hood's horizontal competitor, Dean.  But these allegations fall far short of the pleading requirements imposed by the Supreme Court in *Twombly*[1] and *Iqbal*.[2]

## I.      The Conceded Claims.

Hood is not named as a defendant in Counts II, IV and VI.  With respect to Counts III (attempted monopsonization) and V (monopsonization), Hood's share of the alleged market is too low to support a Sherman Act § 2 claim, and as Hood established in its opening brief (at 4-5), and plaintiffs concede (Pl. Opp. 59 n.41), monopsonization and attempted

---

[1]      *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

[2]      *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

monopsonization claims based on a shared monopsony theory are not actionable in the Second Circuit.  Further, plaintiffs do not refute Hood's showing that their claimed conspiracy to establish a joint monopsony fails to state a Sherman Act § 2 violation.[3]

Count III and Count V therefore fail to state a claim against Hood, a deficiency plaintiffs effectively admit by offering no argument in support of these Counts against Hood, conspicuously omitting them from their list of purported antitrust violations by the Company. (*See* Pl. Opp. 59 & n.41).  This leaves only the conspiracy claims alleged in Count I and Count VI, to which we now turn.

## II.  The Only Specific Facts Alleged As To Hood Do Not State A Viable Antitrust Claim Against The Company.

Plaintiffs effectively concede that the only *specific* facts alleged in the Amended Complaint do *not* make out a claim against Hood.  Plaintiffs specifically allege only that: (1) Hood has entered into exclusive supply arrangements with DFA for the supply of some (but not all) of its fluid milk plants; and (2) that when Hood purchased the Crowley fluid milk plants

---

[3]     *See* Hood Mem. 5 & n.2; *see also H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 741-42 (S.D.N.Y. 1987) (noting "considerable discomfort" with the "seemingly antithetical" idea that competitors could conspire to monopolize), *aff'd*, 879 F.2d 1005 (2d Cir. 1989).  Plaintiffs fail to identify a single case in which a court has found a claim of conspiracy to obtain a joint monopsony or monopoly to be actionable, *see* Pl. Opp. 59 n.41.  Plaintiffs only muster *dicta* in two opinions (*see id.*) entertaining the possibility that such a claim might be actionable if the aim of the conspiracy were "to form a single entity" or "two or more competitors seek to allocate a market," *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007).  In both cases, however, the courts dismissed the conspiracy claims under Federal Rule of Civil Procedure 12(b)(6).  Moreover, the Amended Complaint does not allege that Hood, DFA, and Dean sought either to form a single entity or to allocate a market. Plaintiffs also purport to rely on *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), but in that case "the issue whether competitors were capable of conspiring to monopolize was neither presented nor decided," *Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990).  Finally, the conspiracy to monopsony claim is, in any event, subject to the same deficiencies identified *infra* with respect to plaintiffs' other claims.

from NDH in 2004, DFA (a fifty percent owner of NDH) received as part of the purchase price a non-controlling minority interest in Hood.  Neither set of allegations presents a viable claim.

### A.      The Partial Exclusive Supply Contracts.

As Hood demonstrated in its opening brief at 20-24, even if Hood had entered into an exclusive contract for DFA to supply *all* of the raw milk needs at *all* of its fluid milk plants, and even if (as plaintiffs urge) the relevant market is limited to Northeast fluid milk plants, no antitrust violation would be stated because the market foreclosure (twenty percent) would be too small.  Hood cited *sixteen judicial decisions* establishing that: (a) an exclusive supply contract resulting in market foreclosure less than thirty or forty percent is *per se* lawful, and (b) a customer (such as Hood) is responsible only for the foreclosure effect of its *own* exclusive  contracts with a supplier, not those of *other* customers' exclusive contracts.[4]

*Plaintiffs do not contest any of this case law,* other than observing that they are pursuing claims under Sherman Act §§ 1 and 2, not Clayton Act § 3.  (Pl. Opp. 60).  But each of the sixteen decisions cited by Hood arose under Sherman Act §§ 1 and/or 2.  Their additional discussions of Clayton Act § 3 are perfectly relevant given that its standard is the same as or *lower* than the standard under Sherman Act §§ 1 or 2.  (*See* Hood Mem. 18 n.5).

As an independent ground for dismissal, Hood also showed that plaintiffs have no claim against it because the company admittedly has entered into exclusive arrangements for only some, not all, of its supply, *see* Hood Mem. 17-20.  Plaintiffs respond (Pl. Opp. 61):

> Hood's conclusion that "Hood has, according to plaintiffs, merely committed to purchase a 'significant share' of its needs from DFA,

---

[4]      For the reasons advanced by Dean in its opening and reply briefs, Hood also submits that plaintiffs' market definition is too narrow.  But plaintiffs' claims against Hood are defective regardless of how that question is resolved.

leaving the remainder open to other suppliers," (Hood Mot. at 20), is misleading at best.

But in fact, Hood was *quoting* the Amended Complaint, which alleges that "DFA and its affiliate DMS…supply…a *significant share* of the fluid Grade A milk bottled by Hood" and that DMS has been designated a "major supplier" by Hood, *see* Am. Compl. ¶¶ 5, 111 (emphasis added). Plaintiffs now toss in an additional allegation regarding an alleged horizontal agreement reached between DFA and fellow dairy cooperative Agri-Mark, *see* Pl. Opp. 60-61, but that has nothing to do with any alleged agreement by Hood; *see also* p. 6 n.6 *infra*.

This lawsuit is totally anomalous: a putative plaintiff class action, centered on exclusive supply contracts with DFA and/or DMS, being led by a named plaintiff (Al-Len Farms) that until 2006 supplied milk to Hood's Barre, Vermont fluid milk plant through Booth Brothers, *an independent cooperative that is not affiliated with either DFA or DMS*, *see* Am. Compl. ¶ 19. Al-Len Farms voluntarily terminated that arrangement only because it chose to join another cooperative that does not currently supply Hood, *see id*.

Finally, as yet a third independent ground for dismissal, plaintiffs' claims relating to the partial exclusive supply contracts entered into in 2004 are time-barred, *see* Hood Mem. 24.[5]

---

[5]     Plaintiffs challenge as "inapposite" the recent decision finding the continuing violation doctrine inapplicable to the renewal of license agreements originally entered prior to the analogous statute of limitations period, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008); see Pl. Opp. 16. But while plaintiffs assert that laches, which applies to claims for equitable relief, is wholly distinct from the analogous statute of limitations applied to damages claims, the two doctrines are inextricably linked and the *Madison Square Garden* court explicitly applied statute of limitations principles in finding that laches applied to the facts at hand. *See id*.

**B.      The 2004 Transaction.**

Hood similarly demonstrated that its 2004 purchase agreement with NDH cannot give rise to any claims against it.  First, purchases and sales of assets are routine, and plaintiffs in their Amended Complaint and opposition memorandum point to nothing in DFA's acquisition of a non-controlling minority interest in privately-owned Hood that would allow DFA to force Hood to act in ways contrary to the interests of either the Company or those owning a controlling interest in it.  *See* Hood Mem. 14-15.

Second, an antitrust plaintiff must demonstrate that "the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market," *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998), but as alleged in the Amended Complaint (at ¶112), the 2004 Transaction involved plants that were already supplied via full supply contracts with DFA.

Third, any antitrust claim based on the 2004 Transaction is time-barred, because claims based on "the initial acquisition of another company's stocks or assets [accrue] at the time of the merger or acquisition."  *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004); *see* Hood Mem. 12-14.  The applicable four-year limitations period for any claims arising from the 2004 Transaction thus expired in 2008.

Plaintiffs neither dispute that basic fact nor argue that the 2004 Transaction itself constituted a continuing violation that would extend the applicable limitations period, *see* Pl. Opp. 14-15.  Thus, because Hood is "merely holding or using assets in the same manner as at the time of acquisition," the statute of limitations period is not extended, and any claims based on the 2004 Transaction are time-barred.  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000).

In the face of this statute of limitations barrier, plaintiffs attempt to rely on vague allegations of an overarching conspiracy, devoting the bulk of their statute of limitations argument (Pl. Opp. 10-13) to the contention that certain more recent acts by parties *other than Hood* are sufficient.[6]  But as explained in Section III, *infra*, these allegations of an overarching conspiracy fall far short of the pleading requirements imposed by *Twombly* and *Iqbal* and should be dismissed.  Absent a legally sufficient allegation as to the existence of such an ongoing conspiracy, no grounds exist to extend the limitations period with respect to Hood.

Plaintiffs separately argue (Pl. Opp. 17-19) that the fraudulent concealment doctrine tolls the limitations period.  But as shown in Hood's opening brief (at 13), the Amended Complaint fails to plead specific facts of fraudulent concealment as required by Fed. R. Civ. P. 9(b).  Moreover, plaintiffs' discussion of fraudulent concealment (Pl. Opp. 17-19) contains *no* explanation how the 2004 Transaction or supply contracts were ever concealed.

**C.**     **Hood Has Not Improperly Compartmentalized Plaintiffs' Allegations.**

In sum, none of the specific facts alleged state a cognizable claim against Hood. Plaintiffs accuse Hood of improperly addressing their allegations one by one rather than as a totality (Pl. Mem. 57-58), but in the memorable words of one court rejecting allegations of an alleged antitrust conspiracy, "zero plus zero plus zero still equals zero[;] … [i]f no incident has probative value, all incidents taken together have no probative value."  *In re Potash Antitrust*

---

[6]     The only act within the limitations period allegedly related to Hood is a vague and internally inconsistent allegation in paragraph 113 that *DFA* both entered into a market allocation agreement with fellow dairy cooperative Agri-Mark and separately acted anti-competitively to limit Agri-Mark's ability to supply Hood plants.  Regardless of whether Agri-Mark is alleged to be a victim or a co-conspirator, these allegations do not support the statement that "*Hood* limited the amount of Grade A milk it acquired from Agri-Mark in order to eliminate competition between Agri-Mark and DFA."  (Pl. Opp. 15) (emphasis added).  Indeed, as explained in Section III (B), *infra*, Hood has no economic interest in DFA and would have no reason to deny itself potentially lower-cost milk supplies from Agri-Mark or any other cooperative.

*Litigation*, 954 F. Supp. 1334, 1389 (D. Minn. 1997), *aff'd*, *Blomkest Fertilizer, Inc. v. Potash Corp.,* 203 F.3d 1028 (8th Cir. 2000).

Indeed, an allegation by allegation review to determine whether a valid antitrust claim has been stated is *precisely* what the Second Circuit undertook in *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), a post-*Twombly* decision repeatedly cited in Hood's opening brief but, tellingly, not mentioned once in plaintiffs' opposition.  Just as the plaintiffs here (*see* Pl. Mem. 57), the *Elevator Antitrust* plaintiffs argued — citing the very same fifty year old Supreme Court decision (*see id.*) — that "[p]laintiffs are entitled to 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'"[7]  But the Second Circuit, citing *Twombly*, proceeded to review the plaintiffs' allegations one by one and, finding each of these allegations insufficient, dismissed the claims.  502 F.3d at 50-52.

The same approach was followed by *Twombly* itself, *see* 550 U.S. at 564-70; *see generally* James A. Keyte, *Twombly: How Courts Are Interpreting and Extending Its Principles*, 23 Antitrust 65, 67 (Fall 2008) ("[T]he impact of *Twombly* cannot be avoided merely by 'viewing the complaint as a whole' – a sometimes successful pre-*Twombly* invocation.").

## III.   Plaintiffs Cannot Rely Upon Generalized And Conclusory Allegations Of An Overarching Conspiracy.

Given that the partial exclusive supply agreements between Hood and DFA simply do not make out a viable antitrust claim against Hood, plaintiffs attempt to rely upon generalized and conclusory allegations of an overarching conspiracy among Hood, DFA, DMS

---

[7]     Reply Brief for Appellants, *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) (No. 06-3128), 2007 WL 4966910, at * 19, quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).

and Hood's horizontal competitor, Dean, "with respect to the sale of fluid Grade A milk in the Northeast in unreasonable restraint of trade," Am. Compl. ¶ 205, *see, e.g.*, Pl. Opp. 2-3.  As Hood has shown, this allegation falls short on two grounds: it lacks sufficient specific facts, and it is implausible.  Nothing in plaintiffs' opposition rebuts that conclusion.

A.    **The Amended Complaint Fails To Allege Sufficient Facts Of Hood's Participation In An Overarching Conspiracy.**

Plaintiffs cite no specific facts supporting the existence of a global conspiracy or Hood's participation in it— no specific meetings, no individuals involved, not even a description of when the agreement was entered, *see, e.g.*, Am. Compl. ¶ 207, Pl. Opp. 3.  To state a conspiracy claim against Hood, plaintiffs must allege facts showing that *Hood* "consciously committed 'to a common scheme designed to achieve an unlawful objective.'"  (Hood Mem. 5 (quoting *Ad/Sat v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999))).  Yet plaintiffs at most can only speculate that the behavior upon which they rely might be explained by "a conspiracy among Defendants," *e.g.*, Pl. Opp. 2.  This is *precisely* the line of reasoning that the Supreme Court deemed inadequate in *Twombly* and *Iqbal*.  Plaintiffs ignore *Iqbal* entirely, and avoid applying core *Twombly* principles.

*Twombly* and *Iqbal* imposed significantly enhanced pleading requirements, as recognized explicitly by the Second Circuit, *see Turkman v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) ("*Twombly* and *Iqbal* [established] 'a heightened pleading standard'") (citation omitted), and by commentators, *see, e.g.*, Keyte, *Twombly Principles*, 23 Antitrust at 65 ("[M]ost courts . . .have concluded that *Twombly* substantially raised the bar for plaintiffs who fail to plead adequate supporting facts for each element of an antitrust claim.").

In applying *Twombly*, the Second Circuit, sitting *en banc*, has emphasized that "[b]road allegations of conspiracy are insufficient; the plaintiff must provide some factual basis

supporting a meeting of the minds….."  *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) (en

banc); *see also, e.g., Kamholtz v. Yates County*, 350 Fed. Appx. 589, 591 (2d Cir. 2009) ("'mere

conclusory statements' are insufficient, and we need not accept legal conclusions as true")

(applying *Iqbal* and *Twombly*).

        For example, in *Elevator Antitrust* (which as noted, plaintiffs ignore entirely), the

plaintiffs alleged a broad antitrust conspiracy, and in support asserted that: 1) the defendants had

participated in meetings in the United States and Europe to discuss pricing and market divisions;

2) agreed to fix prices for elevators and services; 3) rigged bids for sales; 4) exchanged price

quotes; 5) allocated markets for sales and maintenance; 6) "collusively" required customers to

enter long-term maintenance contracts; 7) collectively took actions to drive independent repair

companies out of business; 8) utilized similar contractual language, pricing, and equipment

design; and 9) had been fined for antitrust violations in Europe.  502 F.3d at 49, 51 & n.6.

        The Second Circuit affirmed the dismissal of the action, holding these allegations

were too general and did not constitute "plausible grounds to infer an agreement" because, while

the alleged conduct is "consistent with conspiracy, [it is] just as much in line with a wide swath

of rational and competitive business strategy unilaterally prompted by common perceptions of

the market."  502 F.3d at 51, quoting *Twombly,* 550 U.S. at 554, 556.

        Similarly, the *Twombly* plaintiffs alleged, as do the plaintiffs here, that the

defendants' behavior was best explained by a conspiratorial agreement, pointing to the fact that

all four of the defendant regional phone companies had admittedly avoided entering each other's

territories, while each had vociferously fought against new entrants.  Furthermore, the president

of one defendant had made public statements that invading territory of others might be a way to

make a "fast buck" but did not make sense.  550 U.S. at 550-51, 564-65.  The *Twombly* plaintiffs

interpreted these facts as showing a conspiracy to allocate territories in violation of Sherman Act § 1, and specifically alleged that the defendants "have agreed not to compete with one another and otherwise allocated customers and markets to one another."  The Supreme Court disagreed and dismissed the complaint, holding that plaintiffs' allegations were insufficient to show that the challenged conduct was the result of a preceding agreement, and not merely parallel conduct that could just as well be independent action.  550 U.S. at 551, 564-66.

Similarly, the conspiracy allegations here merely reflect plaintiffs' conjecture, that Hood's partial exclusive supply contracts, and the 2004 Transaction itself, were pursuant to some overarching agreement with Hood's horizontal competitor, Dean, rather than simply an agreement between a supplier (DFA) and a buyer (Hood), and a seller (NDH/DFA) and a purchaser (Hood), respectively.

The allegations in this case are a far cry from those in *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), upon which plaintiffs heavily rely, *see, e.g.*, Pl. Opp. 55.  *Starr* alleged an unlawful horizontal conspiracy among record companies to increase the price charged for online music, and the factual allegations were specific and detailed, including: 1) the entry by all defendants into written agreements *with horizontal competitors* that established the price that consumers would have to pay; 2) an agreement among defendants to share revenues based on total sales; 3) one defendant's public acknowledgement that the agreements were specifically designed to maintain high prices; 4) the imposition of requirements that licensees not undercut defendants' prices; 5) the inclusion of license provisions that bolstered prices; and 6) the defendants' attempts to conceal the existence of those license provisions because, as one defendant explicitly acknowledged, they created antitrust problems. 592 F.3d at 217-19.

The Second Circuit found that these "specific facts" plausibly suggested an agreement among the defendants. *Id.* at 323. Nothing remotely comparable is found in the Amended Complaint. To the contrary, *Starr* illustrates how meager and conclusory are plaintiffs' allegations as to Hood.

## B. The Facts Alleged Do Not Support A Plausible Inference That Hood Participated In A Conspiracy.

Furthermore, plaintiffs' claim that Hood has conspired for years to enable its supplier, DFA, to monopolize and its largest competitor, Dean, to monopsonize, is bizarre and implausible, *see* Hood Mem. 8-11. As plaintiffs do not dispute, the very danger of monopoly is that the monopolist will *raise prices* and restrict output, and it is Hood that would suffer from the higher prices and reduced output, *see id.* at 8-9. Nor do plaintiffs offer any reasoning to explain why Hood would join a conspiracy to vest monopsony power in its largest competitor, Dean.

Plaintiffs strain to show even the *possibility* that Hood joined the alleged conspiracy. But the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Facts "merely consistent with" a defendant's liability "stop[] short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*; *see Elevator Antitrust*, 502 F.3d at 50 ("[I]t is not enough to make allegations of an antitrust conspiracy that are consistent with unlawful agreement.").

Hood has shown (Hood Mem. 9-10) that extensive and longstanding authority recognizes the implausibility of conspiracies in which a buyer allegedly conspired with a supplier to allow the supplier to monopolize. Courts have found such claims not only "implausible" but "illogical" and "preposterous" for the very reasons such a claim is implausible

here.  ***In their 62-page brief with 42 footnotes, plaintiffs fail to identify even a single case in which such a conspiracy claim was found to be plausible.***

The inference of conspiracy is also implausible because Hood has had valid, unilateral business reasons for purchasing milk from DFA.  *Twombly* holds that where there is an "obvious alternative explanation" for a defendant's conduct, such that it was likely explained by "routine market conduct" and "there was no need for joint encouragement," a plaintiff's claim has not been "nudged . . . across the line from conceivable to plausible" and should be dismissed. *Twombly*, 550 U.S. at 547, 566-67, 570; *see also Starr*, 592 F.3d at 321 (conduct "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" does not suffice to plead conspiracy).  Thus, under *Twombly*, "a plaintiff may no longer survive a motion to dismiss if she pleads facts that are equivocal, meaning the allegations are consistent both with the asserted illegality and with an innocent alternate explanation.  The [*Twombly*] Court made this clear at several points in its opinion."  A. Benjamin Spencer, *Plausibility Pleading,* 49 B.C. L. Rev. 431, 445 (Mar. 2008).

Plaintiffs do not and cannot dispute that "[t]he benefits of exclusive dealing are many" and include "a significant efficiency potential."  Hood Mem. 16-17, *quoting* XI Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their Application* ¶ 1810, at 136 (2d ed. 2005); *id.* ¶ 1820, at 161.  For buyers such as Hood, exclusive supply agreements may, for example, "assure supply, afford protection against rises in price. . . and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand." *Standard Oil v. United States,* 337 U.S. 293, 306 (1949).

Further, the Amended Complaint makes clear that Hood has *not* used DFA as an exclusive milk supplier at all its plants, but also purchases milk from independent dairy cooperatives.  (Am. Compl. ¶¶ 5, 113).  The Amended Complaint, stripped of its unsupported labels and conclusions, reflects that Hood has purchased milk from DFA where it makes sense to do so and has purchased milk from other suppliers where their offerings are more attractive – precisely the behavior the antitrust laws are intended to foster.

The fact that Hood has continually purchased milk from independent dairy cooperatives demonstrates the illogic of plaintiffs' claim that Hood has participated in the alleged conspiracy:  If Hood actually desired DFA to obtain a monopoly, why wouldn't Hood obtain all of its milk from DFA?  Why would Hood purchase milk from non-DFA members, when to do so works counter to DFA "monopolizing" the market?  Because Hood's contracts with DFA are "equally consistent with" (if not better explained by) "a valid business reason, rather than for an anticompetitive one," plaintiffs' conspiracy claims fail to meet the plausibility standard and should be dismissed.  *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 124-25 (2d Cir. 2007).

Lacking plausible grounds to suggest that Hood voluntarily joined a conspiracy, plaintiffs resort to speculating that Hood might have been coerced into joining a conspiracy. (*See* Pl. Opp. 53 n.39).  But plaintiffs have pled no facts whatsoever to suggest such coercion of Hood, and plaintiffs' speculation makes little sense given Hood's acknowledged maintenance of a substantial non-DFA milk supply.

In a further attempt to support their economically implausible conspiracy allegations, plaintiffs characterize DFA as a "vertically-integrated company," as opposed to solely a milk-supplier.  *See* Pl. Opp. 49, 51 n.37.  But with respect to the geographic market at

issue here (the Northeast), following the sale of the Crowley plants to Hood, the sole basis for asserting that DFA is "vertically integrated" rests on its minority interest in Hood.  DFA is not alleged to own any equity interest in Dean, which allegedly controls 70% of the Class I milk processing capacity in the Northeast.  (Am. Compl. ¶ 5).  DFA's minority share of the purported "excess profits" earned by the much, much smaller Hood cannot legitimately be characterized as a plausible allegation of "a substantial stake in the economic profits of bottling plants" (Pl. Opp. 51 n. 37), let alone suffice to replace the lost profits allegedly foregone by DFA in the sale of raw milk.

Further, even were DFA deemed to be vertically-integrated, that fact still would not explain why Hood would support the acquisition of monopsony power by its competitor (Dean) or monopoly power by its major supplier (DFA).  The minority ownership stake in Hood held by DFA provides Hood no reciprocal economic interest in DFA's economic performance.

Plaintiffs also attempt to rely on their assertion that DFA has charged "artificially low" prices pursuant to a conspiracy, but this is precisely the type of conclusory allegation not entitled to be accepted as true.[8]  In any event, the allegation fails to refute Hood's showing that the conspiracy would leave Hood at the whim of DFA to raise prices and reduce output *to Hood* at any time.  *See, e.g.*, *Port Dock*, 507 F.3d at 123 ("The danger to customers from

---

[8]    *See, e.g.*, *Tilli v. Exxon Mobil Corp.*, 346 Fed. Appx. 751, 752 (3d Cir. 2009) (unpublished) ("conclusory allegations of price-fixing" are "insufficient under *Twombly*"); *Commercial Street Express LLC v. Sara Lee Corp.*, No. 08 C 1179, 2008 WL 5377815, at *4 (N.D. Ill. Dec. 18, 2008) (allegation of "a continuing agreement . . . to artificially raise, fix and or stabilize prices of oral, personal and home care products in the United States" is conclusory); *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 389-90 (E.D.N.Y. 2004) (price-fixing allegations were "conclusory" and did "[not] suffice" where plaintiff alleged, *e.g.*, that defendants "acquiesced and/or agreed affirmatively and/or impliedly to fix, control, stabilize, maintain or raise prices," and "Universal (as the seller) and Ingram/VPD (as buyers) agreed to fix, control, stabilize and/or raise the prices at which the buyers will resell Universal's [p]roduct.").

- 14 -

monopolization of the production level is the danger that the monopolist will raise prices and restrict output."); *MCI Communications Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1114 (7th Cir. 1983) ("The ultimate danger of monopoly power is that prices will be too high, not too low"); *Port Dock*, 507 F.3d at 123-24 ("Those who would suffer from the defendant's exercise of monopoly power would be the dealers or consumers who were forced to buy at higher prices (or inferior quality) because the defendant had acquired the market power to charge monopoly prices.").[9]  The fact that Hood would suffer from DFA's exercise of monopoly power renders implausible the allegation that it joined a conspiracy to that end.

Because "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" by Hood here, *Iqbal*, 129 S. Ct. at 1950, the conspiracy claims (Counts I and VII) against Hood should be dismissed.

Respectfully submitted,

/s/Jane Osborne McKnight
Jane Osborne McKnight
LAW OFFICES OF JANE OSBORNE
MCKNIGHT, PLC
207 Webster Road
Shelburne, Vermont 05482
Tel: (802) 985-3800
jane@mcknightlaw.com



April 1, 2010

/s/Steven J. Rosenbaum
Steven J. Rosenbaum
James R. Dean
Jeffrey H. Lerner
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: (202) 662-5568
srosenbaum@cov.com
jdean@cov.com
jlerner@cov.com
Attorneys for Defendant HP Hood LLC

---

[9]    Notably, Plaintiffs do not contend that the prices charged by DFA have been predatory. Their assertion that low, nonpredatory prices violate the Sherman Act is baseless.  "The Sherman Act's very purpose is to help consumers, in part by bringing about low, nonpredatory prices." *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) (Breyer, J.). Courts have been loath to find antitrust violations in nonpredatory price reductions or discounts, recognizing that "[i]f suppliers cannot charge low, nonpredatory prices without the threat of antitrust actions, they will hesitate to cut their prices" to the detriment of consumers.  *Id.*