U.S. DISTRICT COURT
DISTRICT OF VERMON
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2010 AUG 30  PM 12: 07

CLERK

BY _____ *pjl* _____
DEPUTY CLERK

|  |  |  |
|---|---|---|
| ALICE H. ALLEN and LAURANCE E. ALLEN, d/b/a Al-lens Farm, and GARRET SITTS and RALPH SITTS, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Case No. 5:09-cv-230 |
| DAIRY FARMERS OF AMERICA, INC., DAIRY MARKETING SERVICES, LLC, DEAN FOODS COMPANY, and HP HOOD LLC, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS
### (Docs. 23, 24, 25)

This matter came before the court on May 6, 2010 for oral argument on the motions to dismiss filed by Defendants, Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), Dean Foods Company ("Dean"), and HP Hood LLC ("Hood") (collectively, "Defendants"). Defendants seek dismissal of the Amended Complaint filed by Plaintiffs, Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts (collectively, "Plaintiffs") on the following grounds: (1) failure to state a claim; (2) Capper-Volstead Act immunity; (3) failure to satisfy *Iqbal/Twombly*'s pleading and plausibility standards; and (4) statute of limitations.

## I.  Factual and Procedural Background.

Plaintiffs seek permission for their lawsuit to proceed as a class action.  Their sixty-seven page, seven-count Amended Complaint[1] contains 212 paragraphs, many of which contain subparts.  It asserts the following claims:

**Count I:**  Sherman Act § 2 violation (Conspiracy to Monopolize and Monopsonize) (against all Defendants);

**Count II:**  Sherman Act § 2 violation (Attempt to Monopolize) (against DFA and DMS);

**Count III:**  Sherman Act § 2 violation (Attempt to Monopsonize) (against Dean and, in the alternative, against Dean, Hood, and DFA);

**Count IV:**  Sherman Act § 2 violation (Unlawful Monopolization ) (against DFA);

**Count V:**  Sherman Act § 2 violation (Unlawful Monopsony) (against Dean and, in the alternative, against Dean, Hood, and DFA);

**Count VI:**  Sherman Act § 1 price-fixing violation (against DFA and DMS); and

**Count VII:**  Sherman Act § 1 conspiracy violation (against all Defendants).

All Defendants have filed timely motions to dismiss.  The following factual allegations set forth in the Amended Complaint provide a context for analyzing those motions.

The Allens operate a dairy farm in Wells River, Vermont and the Sitts brothers operate a dairy farm in Franklin, New York.  The Sitts brothers' farm was a member of DFA from 1998-2007.  During the class period (Oct. 9, 2005-Oct. 8, 2009), both groups of Plaintiffs sold, through DMS, raw fluid Grade A milk to bottling plants.

---

[1]  On October 8, 2009, Plaintiffs filed their initial Class Action Complaint.  On January 21, 2010, before any of the Defendants had answered, Plaintiffs filed their Amended Class Action Complaint.

DFA, a not-for-profit corporation, is the largest dairy cooperative in the United States.  As a vertically-integrated cooperative with 1,900 members in the Northeast, DFA engages in milk production and markets, hauls, processes, bottles, and distributes milk. DMS is a limited liability company created by DFA and Dairylea Cooperative, Inc. ("Dairylea").  Acting as DFA's marketing agent, DMS markets approximately 80% of the milk marketed to bottling plants in the Northeast (on behalf of 9,000 Northeast dairy farmers) and manages a system of 180 contract milk haulers.  Dean is alleged to be the largest milk bottler, with Hood the second largest milk bottler, in the Northeast.

Plaintiffs' antitrust claims arise out of DFA's alleged unlawful creation of monopsony and monopoly power in the milk distribution system by tying up access to milk bottling plants in the Northeastern United States through unlawful exclusive supply agreements and then using that monopsony power to force independent farmers to join DFA or to market their raw milk through its marketing affiliate, DMS.  DFA allegedly utilized its and DMS's market power "to reduce fluid raw milk prices paid to its members and other class members relative to what would have prevailed in a competitive market. These lowered fluid raw milk prices allegedly increased profits for Defendants Dean and Hood with whom DFA allegedly conspired and contracted to establish and maintain its market power." (Doc. 16 ¶ 2.)  Plaintiffs allege that through "carefully planned and collaborative steps," the monopolization/monopsonization conspiracy has "eliminated competition by and between Defendants" and "fixed at artificially low levels" the fluid raw milk prices that farmers would otherwise receive in a competitive market.  (Doc. 16 ¶¶ 39-40.)

The Amended Complaint alleges that the relevant geographic market is the Northeast United States, consisting of Federal Milk Market Order 1 ("FMMO 1"), "cover[ing] areas in Delaware, [the] District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia." (Doc. 16 ¶ 35.)  It alleges that the relevant product market

"consists of the market for the sales or marketing of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants." (Doc. 16 ¶ 36.)

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

When assessing a motion to dismiss pursuant to Rule 12(b)(6), the court takes the complaint's "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The court need not credit "legal conclusions" in the complaint or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 72 (quoting *Ashcroft v. Iqbal*, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks and alteration omitted). In its analysis under Rule 12(b)(6), the court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (citation omitted).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950 (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

### B. Whether Plaintiffs Have Adequately Pled Claims Against Hood.

In their Amended Complaint, Plaintiffs allege four claims against Hood. In Count I, they allege that Hood, as part of a conspiracy with all other defendants, violated Section 2 of the Sherman Act by monopolizing the relevant market. In Count III, Plaintiffs

4

assert claims against Dean, and allege an attempt to monopsonize in violation of Section 2 of the Sherman Act. They allege, "[i]n the alternative" that "Defendants Dean, Hood and DFA collectively have attempted to and continue to attempt to obtain market power in the market for the purchase of fluid Grade A milk by fluid Grade A bottling plants in the Northeast market." (Doc. 16 ¶ 171.) In Count V, Plaintiffs charge Dean with unlawful monopsony in violation of Section 2 of the Sherman Act. They allege, "[i]n the alternative," that Dean, Hood and DFA collectively have "abused their monopsony power to maintain and enhance their market dominance . . . ." (Doc. 16 ¶ 189.) In Count VII, Plaintiffs allege a Sherman Act Section 1 conspiracy claim against all Defendants. Accordingly, all of Plaintiffs' claims against Hood depend upon evidence that Hood has agreed to participate in a conspiracy.

Hood seeks dismissal of Plaintiffs' claims because the Amended Complaint lacks the requisite specificity in that it fails to answer the "basic questions" of "who, did what, to whom (or with whom), where, and when?" (Doc. 23-1 at 11 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)). Were the court to deem the Amended Complaint's conspiracy allegations against Hood adequately pled, Hood seeks dismissal on the further ground that the Amended Complaint does not support an economically plausible inference that Hood violated any provision of the antitrust laws. Because the court agrees that the Amended Complaint is facially deficient insofar as it pertains to Hood, the court does not reach the issue of economic plausibility.

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege: "(1) concerted action, (2) by two or more persons that (3) unreasonably restrains trade." *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 190 (S.D.N.Y. 2000). A successful conspiracy claim under Section 2 of the Sherman Act requires: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999) (quotation omitted).

5

In order to survive a motion to dismiss, "it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 556); *see also Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009) (en banc) ("Broad allegations of conspiracy are insufficient; the plaintiff must provide some factual basis supporting a meeting of the minds . . .") (citation and internal quotation marks omitted). In *Kendall*, the Ninth Circuit accurately summarized the degree of specificity required:

> "[T]erms like 'conspiracy' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint." [*Twombly*, 550 U.S. at 557] (quoting *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)). The Court also suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a "specific time, place, or person involved in the alleged conspiracies" to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin. *Id.* at 1970 n.10. A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily.

*Kendall*, 518 F.3d at 1047.[2]

---

[2] Plaintiffs' reliance on *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) for a contrary standard is misplaced. *Starr* merely stands for the proposition that, in allegations of parallel conduct, a specific time, place, or person involved in the alleged conspiracy need not be repeated for each conspiracy allegation. *Id.* at 325. As the *Starr* court observed:

> Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect. The *Twombly* court noted, in dicta, that had the claim of agreement in that case *not rested* on the parallel [price fixing] conduct described in the complaint, "we doubt that the . . . references to an agreement among the [Baby Bells] *would have given the notice required by Rule 8 . . . [because] the pleadings mentioned no specific time, place, or person involved in the alleged*

As the United States Supreme Court observed in *Twombly*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (citation omitted). "[A] few stray statements speak[ing] directly of agreement . . . are merely legal conclusions resting on . . . prior allegations," and cannot be accepted as true. *Id.* at 564; *see also Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("'[A]verments of agreements made at some unidentified place and time' are 'insufficient to establish a plausible inference of agreement, and therefore to state a claim.'") (quoting *In re Elevator Litig.*, 502 F.3d at 50). Although it is true that "antitrust conspiracies 'are rarely evidenced by explicit agreements, but must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators,'" *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989) (citations and internal quotations marks omitted), "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of a line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

Here, the alleged facts regarding Hood's agreement to enter into a conspiracy consist of: (1) an allegation that DFA has acquired a 15% interest in Hood and that Hood has designated DMS as one of its major suppliers; (2) an allegation that, with no evidence of an agreement between them, Dean and Hood comprise 90% of the market for bottling fluid Grade A milk in the relevant geographic market, and are both members of DMS; (3) an allegation that DFA and DMS "exercise control over all of the milk supplied to Hood, either by directly supplying the milk to Hood or by eliminating competition with and controlling the growth of Agri-Mark" (Doc. 16 ¶ 113); and (4) an allegation, wholly

---

conspiracies." 550 [U.S.] at 565 n.10. In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.

*Id.* (emphasis supplied).

7

devoid of facts, that Hood's participation in the conspiracy was "in return for [DFA] providing fluid Grade A milk priced at artificially depressed rates for . . . Hood." (Doc. 16 ¶ 206.) The Amended Complaint provides no greater detail regarding Hood and Dean's concerted action other than a generalized allegation that Dean received the same *quid pro quo* from DFA and DMS as Hood. (Doc. 16 ¶ 206.)

Perhaps in recognition of the deficiencies of the Amended Complaint, in opposing dismissal of their claims against Hood, Plaintiffs' arguments range far afield of the more generalized allegations of their pleading. *See* Doc. 42 at 62 (outlining facts alleged against Hood, several of which do not appear in the Amended Complaint). A complaint that fails to state a claim because of the insufficiency of its allegations cannot be "cured" in this manner. *See Chauvet v. Local 1199, Drug, Hosp. & Health Care Employees Union, RWDSU, AFL-CIO*, 1996 WL 665610, *6 (S.D.N.Y. Nov. 18, 1996) ("The confusing array of cases, statutes, and factual allegations that plaintiffs have offered in their motion papers and at oral argument does not cure the problems with the pleading, nor do they add up to a legally sufficient complaint.") (citation omitted).

In the alternative, Plaintiffs urge the court to examine the Amended Complaint as a whole and to attribute to Hood the acts of its alleged co-conspirators. *See* Doc. 42 at 63 ("In addition, because Hood has conspired with its partial owner and contracting partner, DFA, it can plainly be held responsible for Defendants' unlawful acts."). The problem with this approach is that it remains true that the Amended Complaint contains no "direct or circumstantial evidence that reasonably tends to prove that [Hood] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 233 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "Only after an agreement is established will a court consider whether the agreement constitutes a restraint of trade." *Id.* at 232.

8

In summary, Plaintiffs' allegations against Hood do not allege any *facts* regarding Hood's alleged agreement to conspire.   Accordingly, the Amended Complaint, even when viewed in the light most favorable to the Plaintiffs, remains wholly conclusory and fails to state antitrust conspiracy claims against Hood. *See Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  Pursuant to Fed. R. Civ. P. 12(b)(6), Hood's motion to dismiss is hereby GRANTED, and Plaintiffs'claims against Hood are hereby DISMISSED WITHOUT PREJUDICE.

### C. Whether Plaintiffs Have Alleged a Relevant Product and Geographic Market.

Dean seeks dismissal of the Amended Complaint on the grounds that Plaintiffs have failed to adequately plead a relevant product and geographic market.  Hood asserts that it agrees with Dean's conclusion that Plaintiffs' "market definition is too narrow." (Doc. 52 at 8 n.4)  DFA and DMS do not, at this time, join in Dean's motion.

"Evaluating market power begins with defining the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Thus, in order to assert an antitrust claim, a plaintiff must allege which "trade or commerce," 15 U.S.C. §§ 1, 2, has been restrained. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (to determine whether there is a viable claim of monopolization or attempted monopolization, a court must inquire "into the relevant product and geographic market.")

### 1. Product Market.

To determine the relevant product market, "no more definite rule can be declared than that the commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). "Products will be considered to be reasonably interchangeable if consumers treat them as acceptable substitutes." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quotation marks omitted).

9

The Second Circuit has held:

> The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level. Reasonable interchangeability sketches the boundaries of a market, but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis. Defining a submarket requires a fact-intensive inquiry that includes consideration of such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. The term submarket is somewhat of a misnomer, since the submarket analysis simply clarifies whether two products are in fact reasonable substitutes and are therefore part of the same market. The emphasis always is on the actual dynamics of the market rather than rote application of any formula.

*Geneva Pharms.*, 386 F.3d at 496 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) and *E.I. du Pont*, 351 U.S. at 395).

The Amended Complaint alleges that fluid raw Grade A milk for bottling is the relevant product market. (Doc. 16 ¶¶ 36-38, 43-51.) It alleges that this product is not reasonably interchangeable with milk for other uses because milk for non-bottling purposes does not enable producers to "touch base"[3] and therefore become eligible to receive the FMMO minimum blend price and over-order premiums. (Doc. 16 ¶ 37.) In other words, Plaintiffs define the market not only by the product it uses, but by the price it fetches, for which they allege there is no reasonable substitute. Industry preferences are relevant in defining a relevant product market as the court "assume[s] that the economic actors usually have accurate perceptions of economic realities." *Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986)). Finally, the Amended Complaint alleges that milk for other purposes is subject to different sanitization

---

[3] Plaintiffs allege that the delivery of the minimum quantity of fluid Grade A milk to bottling plants is referred to as "touching base." (Doc. 16 ¶ 47.)

standards and has a greater shelf life and thus is not a reasonable substitute.  (Doc. 16 ¶¶ 37, 43-44.)

The Amended Complaint addresses some of the factors--price, product qualities, and preferences of market participants--necessary to determine whether Grade A fluid raw milk for bottling is a relevant product market.  *See Alt. Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 334 (E.D.N.Y. 2009) ("A relevant market consists of products reasonably interchangeable 'for the purposes for which they are produced—price, use and qualities considered.'") (quoting *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383-84 (S.D.N.Y. 2007)).  As Plaintiffs point out, a number of courts have recognized Grade A milk as a relevant product; however, contrary to Plaintiffs' further assertion, these courts have *not recognized* a product market for Grade A fluid raw milk *for bottling.  See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1191 (8th Cir. 1982) ("In our view, NFO clearly established that raw Grade A milk is a relevant product market."); *United States v. Dairymen, Inc.*, 660 F.2d 192, 193 (6th Cir. 1981) (per curiam) (recognizing product market alleged was Grade A milk, but not addressing whether this constituted a relevant product market and not mentioning milk for bottling); *Lone Star Milk Producers, Inc. v. Dairy Farmers of America, Inc.*, 2001 WL 1701532, *5 n.1 (E.D. Tex. Jan. 22, 2001) ("DFA does not challenge Lone Star's assertion that the relevant product market is raw grade A milk.").

In seeking dismissal, Dean argues that it is undisputed that Grade A milk is purchased by Class II, III, and IV plants, which also offer a blend price.  In addition, Grade A milk may be used for cheese, ice cream, sour cream, butter, powdered milk, etc. Its use is thus not confined to Class I bottling plants for fluid drinking milk.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430, 437 (3d Cir. 1997) ("Interchangeability implies that one product is roughly equivalent to another for the use to which it is put . . .") (citation omitted).  Dean further contends that Plaintiffs are simply incorrect in describing industry recognition of the product market and producers' preferences.  (Doc. 53 at 7-10) (citing *Schepps Dairy, Inc. v. Bergland*, 628 F.2d 11, 15

(D.C. Cir. 1979) ("Producers are largely indifferent to whether their milk is used for class I or II purposes, for they receive a blend price.")).  Dean points out that by narrowing the relevant product market to milk Grade A raw milk sold to *bottlers* and by focusing on the financial incentives attached to selling to this market, Plaintiffs have limited the market by customer traits, rather than by differences between the product and its acceptable substitutes.  Several courts have rejected an alleged product market on this basis.  As the Sixth Circuit observed:

> In the end, we are most persuaded by the handful of cases that have held that an antitrust plaintiff may not narrow a relevant product market to a select group of customers without identifying a difference in the *product* supplied to that group of customers.  *See, e.g., T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 824 (11th Cir. 1991) ("While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the product sold to those customers"); *Re-Alco Indus., Inc. v. National Center for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) ("If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products . . . , a court may grant a Rule 12(b)(6) motion"); *Redmond v. Missouri Western State College*, 1988 WL 142119 [*2] (W.D. Mo. 1988) ("Classes of prospective purchasers are not separated, and it seems unprecedented to allow a claim that a defendant has monopolized a class of customers as distinguished from a product or service").

*Smith v. Multi-Flow Dispensers of Ohio, Inc.*, 1999 WL 357784, *5 (6th Cir. May 14, 1999) (emphasis in original).

The *Smith* Court further observed, however, that "pretrial dismissal of an antitrust complaint on the ground urged by the defendant is uncommon, determination of the relevant product market often being a factual inquiry." *Id.*  In *Smith*, the dismissal occurred only after discovery, a ruling on a motion for summary judgment, and the filing of an amended complaint followed by a motion to dismiss.  Similarly, in each of the cases cited by the *Smith* court as supporting dismissal of the complaints based on product markets defined by customer traits, only one involved a pre-discovery dismissal based upon the complaint's failure to allege facts regarding substitute products. *See Re-Alco*

12

*Indus., Inc.*, 812 F. Supp. at 391.  Accordingly, although there is not a "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market," *Queen City Pizza*, 124 F.3d at 436, it remains the exception not the rule.  *See Todd*, 275 F.3d at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *Alt. Electrodes*, 597 F. Supp. 2d at 333 ("Courts are reluctant to dismiss antitrust claims for failure to plead the relevant market because determining the relevant market requires a fact-intensive inquiry that is best served by allowing the parties discovery."); *see also In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 946 (E.D. Tenn. 2008) ("Because definition of the relevant market is a highly fact based inquiry and because plaintiffs clearly allege [a] relevant product . . . market[] . . . [t]he fact that defendants suggest, at this stage of the litigation, that other relevant markets may likewise exist is of no consequence.").

On balance, although the court is concerned that Plaintiffs have artificially narrowed the relevant product market to Grade A fluid raw milk for *bottling*, before the court may make this determination it must examine industry recognition of the market, the commercial realities of, among other things, production, transportation, accessibility of plants, pricing, and consumer preferences, as well as "the actual dynamics of the market." *Geneva Pharms.*, 386 F.3d at 496.  This level of detailed information is simply not required at the pleading stage.  *See Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 402 (D. Del. 2009).  Plaintiffs are thus entitled to discovery and a factual inquiry before their alleged product market may be dismissed as impermissibly narrow.  *See Crossword Magazine, Inc. v. Times Books*, 1997 WL 227998, *1, *2 (E.D.N.Y. May 5, 1997) (noting that when faced with a Rule 12(b)(6) motion, court's function "is not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient," and thus plaintiffs' allegations "although sparse, sufficiently aver the relevant market[s]"); *Alt. Electrodes,*

13

597 F. Supp. 2d at 335 (for purposes of surviving Rule 12(b)(6) dismissal, allegation of a
relevant product market consisting of replacement parts for a single brand was
"reasonably alleged" at "this early stage" of the litigation).  As a result, Dean's request
for dismissal of the Amended Complaint for failure to plead a relevant product market
must be DENIED.

### 2.  Geographic Market.

In their Amended Complaint, Plaintiffs allege that the Northeast, which Plaintiffs
claim is the same as FMMO 1, is the relevant geographic market.  (Doc. 16 ¶ 35.)
Plaintiffs allege that selling Grade A raw milk outside the Northeast is not a viable
substitute because fluid Grade A raw milk is highly perishable.  (Doc. 16 ¶ 43); *see also
Schepps Dairy, Inc.*, 628 F.2d at 14 ("As everybody knows, raw milk is a highly
perishable commodity.").  Plaintiffs further allege that the milk industry, and Defendants
themselves, recognize the Northeast as a relevant geographic market, as DFA "operates a
marketing area specifically designated as the Northeast Council" in the same geographic
area.  (Doc. 16 ¶ 35.)  The United States Supreme Court has held that:

> The criteria to be used in determining the appropriate geographic
> market are essentially similar to those used to determine the relevant
> product market.  Moreover, just as a product submarket may have . . .
> significance as the proper line of commerce, so may a geographic
> submarket be considered the appropriate section of the country.  Congress
> prescribed a pragmatic, factual approach to the definition of the relevant
> market and not a formal, legalistic one.  The geographic market selected
> must, therefore, both correspond to the commercial realities of the industry
> and be economically significant.

*Brown Shoe Co.*, 370 U.S. at 336-37 (internal quotation marks, footnotes, and citations
omitted).[4]

---

[4] In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), the Court simply
described the relevant geographic market as "the area of effective competition" and "the market
area in which the seller operates, and to which the purchaser can practicably turn for supplies."

In seeking dismissal, Dean objects to the use of Federal Milk Marketing Orders, which it characterizes as "creatures of federal regulation," to define a geographic market for antitrust purposes. (Doc. 25 at 25.) It asks the court to consider U.S. Department of Agriculture ("USDA") reports and USDA maps in evaluating whether the geographic boundaries Plaintiffs rely on are related to competition and whether they are sufficiently precise. Dean further contends that perishability of the product does not support the alleged geographic market because FMMO 1 excludes Maine and includes areas in Virginia and Maryland. Dean contends that no discovery or factual inquiry need precede dismissal. However, the cases upon which Dean relies generally do not support this approach.

For example, in *United States v. Country Lake Foods, Inc.,* 754 F. Supp. 669 (D. Minn. 1990), before rejecting the government's proposed geographic market of an area within fifty miles of Minneapolis, the court engaged in a careful factual analysis of the area of competition based upon evidence presented to the court through declarations, exhibits, and testimony. The court examined, among other things, the market's and producers' sensitivity to product price fluctuations, relative labor costs, developments in the industry including the increase in economies of scale in processing, and faster, safer and less expensive transportation costs, prices charged by the competition and the ability to match reductions in price, and competitors' willingness to enter the market in response to price advantages. *Id.* at 672-73. Dean's arguments for a contrary approach ignore the reality that dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market, *see, e.g., Sun Microsystems, Inc.*, 630 F. Supp. 2d at 403 (dismissal warranted because, *inter alia,* "[s]pecifically, the Court concludes that Versata has not adequately alleged the boundaries of the relevant market . . ."); (2) defines a geographic market in an unreasonably and implausibly narrow manner, *see, e.g, Smugglers Notch Homeowners'*

15

*Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 2009 WL 1545829, *3 (D. Vt. May 29, 2009) (granting motion to dismiss where, among other things, plaintiffs' proposed geographic market was a single village); or (3) alleges a "contradictory" and "vague delineation of the relevant geographic market." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001).   Here, none of those glaring deficiencies are present in the Amended Complaint.  As a result, "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)); *see also Bansavich v. McLane Co., Inc.*, 2008 WL 4821320, *3 (D. Conn. Oct. 31, 2008) ("An antitrust plaintiff fails to state a claim only where a proposed market definition is patently implausible on the basis of the four corners of the complaint.").

     Although the court is not convinced that FMMO 1 is "the area of effective competition," *Tampa Electric Co v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), the test at the motion to dismiss stage is one of plausibility, not probability. *See Twombly*, 550 U.S. at 556 (heightened pleading standards do "not impose a probability requirement at the pleading stage . . . [a]nd, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."). The Amended Complaint contains sufficient facts to support its proposed geographic market which, when accepted as true and regarded in the light most favorable to Plaintiffs, render dismissal inappropriate at this time. Dean's motion to dismiss the Amended Complaint for failure to plead a relevant geographic market is therefore DENIED.

### D.  Whether Plaintiffs Have Sufficiently Alleged Dean's Market Power.

     Dean seeks dismissal of Counts III (Attempt to Monopolize) and V (Unlawful Monopsony) of the Amended Complaint on the further ground that Plaintiffs allegedly "have failed to supply any factual predicate for their conclusory allegations that Dean had

the requisite market power to support their claims." (Doc. 25 at 27.)[5] Dean characterizes Plaintiffs' claims regarding its market share as similarly conclusory and contends that they do not withstand *Iqbal/Twombly* scrutiny. In particular, Dean points out that while Plaintiffs purport to calculate its market share in New England, Plaintiffs also allege a relevant market of FMMO 1, which is not commensurate with New England. Moreover, Dean asserts that publicly available documents[6] reveal that it owned fewer than 20% of the bottling plants in FMMO 1 during Plaintiffs' proposed class period. By focusing solely on the *number* of plants it owns in FMMO 1, Dean calculates its own market share as approximately 18% and seeks dismissal on this basis.

Plaintiffs, in turn, rely on *In re Southeastern Milk*'s conclusion that Dean's monopoly power was adequately pled in *that* case. In the absence of a side-by-side comparison of the two complaints, this argument is unavailing. More persuasive is Plaintiffs' citations of allegations in the Amended Complaint that Dean "controls approximately 70 percent of the Northeast market for bottling fluid Grade A milk," "dominate[s] the market for bottling fluid Grade A milk in the Northeast," and "is the largest fluid Grade A milk bottler in the Northeast and in the United States." (Doc. 16 ¶¶ 5, 21, 93.) Although these allegations are themselves conclusory, the Amended Complaint alleges other facts indicative of Dean's market power, including the ways in

---

[5] "The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'" *PepsiCo, Inc.*, 315 F.3d at 107-08 (quoting II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 501, at 85 (2002)). The Second Circuit has held that market power may be shown by "direct measurements of a defendant's ability to control prices or exclude competition" or, once a relevant market is determined, using the defendant's market share "as a proxy for market power." *Id.* at 108. In the absence of proof of either, dismissal is appropriate. *Id.*

[6] Dean requests the court to take judicial notice of numerous documents attached to its motion to dismiss and to thereafter use those documents to calculate Dean's market share. Although the existence of the documents may be the proper subject of judicial notice, their contents, which Dean seeks to offer for their truth (without demonstrating the contents are not subject to reasonable dispute) are not. *See* Fed. R. Evid. 201; *see also Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

which Dean has allegedly unlawfully used or attempted to unlawfully use its market power to exert an adverse impact on proposed class members and competition. (Doc. 16 ¶¶ 75-86, 92, 95-101, 123, 127.)

Dismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory. *See, e.g., Crossword Magazine, Inc.,* 1997 WL 227998, \*2 ("Plaintiffs nowhere set forth any facts as to [defendant's] market share, and have pleaded no facts indicating that [defendant] has the power to fix prices or exclude competition in the alleged relevant market."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F. Supp. 832, 838 (S.D.N.Y. 1988) ("Here . . . Medtronic has alleged neither monopoly power, nor even significant market share on Telectronics' part. Instead, it simply avers that: '[t]he Telectronics[] entities have monopolized and continue to monopolize' the relevant markets.").

Similarly, although there is precedent for rejecting a certain market share as presumptively inadequate, "[t]he trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence." *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 99 (2d Cir. 1998) (quoting *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.,* 651 F.2d 122, 128 (2d Cir. 1981)). Indeed, "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd,* 275 F.3d at 206. "In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures." *Id.*

Certainly there is no authority for dismissing a complaint at the pleading stage based upon Dean's approach of simply adding up the bottling plants in the relevant geographic market, determining what percentage of the number of plants are owned by Dean, and dismissing the case if that number is less than 30%. *Cf Commercial Data*

18

*Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (concluding that summary judgment should be granted in favor of defendant that established, through expert evidence, that its market share declined from 23% to 14% and noting that "[c]ourts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power."). Indeed, even after a defendant's market share is properly calculated, the courts "will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Markets, Inc.*, 142 F.3d at 98. "These characteristics include the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Id.* (citations omitted).

Application of the foregoing standards to the Amended Complaint reveals that, under *Iqbal/Twombly*, it adequately pleads Dean's market share in the alleged relevant market. The actual determination of both Dean's market share and market power must await a "full consideration of the relationship between market share and other relevant market characteristics." *Tops Markets, Inc.*, 142 F.3d at 98. The court thus DENIES Dean's request for dismissal of Counts III and V for failure to plead sufficient market power.

**E.  Whether Monopolization Claims Against DFA-DMS Must be Dismissed.**

DFA and DMS seek dismissal of Count II (Attempt to Monopolize)[7] and Count IV (Unlawful Monopolization)[8] of the Amended Complaint for failure to state a claim. They

---

[7] In order to properly plead a claim of attempted monopolization, a plaintiff must allege sufficient facts to establish: (1) the defendant's intent to monopolize the relevant market; (2) the defendant's anticompetitive conduct was designed to carry out that intent; and (3) a "dangerous probability" of success. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990) (quoting *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953)).

[8] To properly plead a claim of monopolization, a plaintiff must allege sufficient facts to show that: (1) the defendant possesses monopoly power in the relevant market; and (2) the defendant

assert that Counts II and IV contain no factual allegations that DFA possesses monopoly power, or that there is a dangerous probability that it will acquire monopoly power. Defendants are correct that "'[a] threshold showing for a successful attempted monopolization claim is sufficient market share by the defendant' because a defendant's market share is 'the primary indicator of the existence of a dangerous probability of success.'" *AD/SAT*, 181 F.3d at 226 (citations omitted).

DFA and DMS ask the court to dismiss the Amended Complaint without any discovery based upon their further contention that DFA's 1,900 members in the Northeast represent "a market share of approximately 17%." (Doc. 24-1 at 20) (emphasis in the original).

Finally, DFA challenges what it characterizes as Plaintiffs' "shared monopoly" theory, noting that the Second Circuit has rejected Sherman Act Section 2 claims on this basis. *See H.L. Hayden Co. of N.Y., Inc.*, 879 F.2d at 1018 (ruling that "the district court correctly concluded that the market shares of [defendants] could not be aggregated to establish an attempt to monopolize in violation of Sherman Act [§ 2]."); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 2009 WL 3111728, *14 (E.D.N.Y. Sept. 24, 2009) ("The Second Circuit has specifically rejected monopolization claims under Section 2 based on a shared monopoly theory of liability.").

In their Opposition, Plaintiffs argue that DFA's market share must be considered in conjunction with the market share of DMS, as the two act as one. In so arguing, they disavow any reliance on a shared monopoly theory. They allege, instead, that their theory is one of agency and that they seek to hold DFA responsible for its own antitrust violations, as well as for those of its alleged agent, DMS.

---

willfully acquired or maintained this monopoly power by anticompetitive conduct rather than by way "of a superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570-71.

A claim of agency requires facts establishing: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; *and* (3) the understanding of the parties that the principal is to be in control of the undertaking." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (emphasis in original) (internal quotation marks and citation omitted); *see also In re Shulman Transp. Enters., Inc. (Pan American World Airways, Inc. v. Shulman Transp. Enters., Inc.)*, 744 F.2d 293, 295 (2d Cir. 1984) ("An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control."). "The burden is on the party alleging the existence of a principal-agent . . . relationship to assert facts sufficient to withstand a motion to dismiss based on the agency relationship." *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, 1999 WL 307642, *6 (S.D.N.Y. May 17, 1999). If Plaintiffs sustain this burden, they may properly base their attempted monopolization and monopolization claims on an agency theory. *See American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982) (the antitrust laws permit the imposition of liability based upon a principal-agent relationship); *see also Hydrolevel Corp. v. American Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 127 (2d Cir. 1980) (recognizing agency liability and observing that "we see no reason why the treble damage provision . . . should compel a restricted view of agency law.").

In its reply, DFA and DMS accuse Plaintiffs of attempting to re-write the Amended Complaint through their Opposition. They further challenge the sufficiency of the Amended Complaint's agency allegations, and it is true that the terms "agency" and "principal-agent" are not contained within that pleading. However, "[t]he existence of an agency relationship need only be pled in compliance with Fed. R. Civ. P. 8." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 825 (S.D.N.Y. 2006); *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005) (finding general allegations that company and other member firms conducted audit as agents or otherwise under the control of other firms were sufficient); *DGM Invs., Inc. v. New York Futures*

21

*Exch., Inc.*, 265 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (finding allegations that individual was a chairman acting within the scope of his duties and position sufficient to allege an agency relationship); *Cromer Fin. Ltd. v. Berger*, 2002 WL 826847, *3, *4 (S.D.N.Y. May 2, 2002) (general allegations and the inferences that could fairly be drawn from them held sufficient to "adequately allege[] that Jack had actual authority to act as Deloitte's agent when performing audit work.").

The Amended Complaint clearly satisfies Rule 8's standards. It alleges that DFA, as principal, acted in concert with DMS, as agent, in an attempt to monopolize and to monopolize in violation of Section 2 of the Sherman Act. Specifically, the Amended Complaint alleges that DMS is subject to DFA's direction and control;[9] that DMS was formed by DFA to act as DFA's exclusive marketing agent;[10] that through DMS, DFA exercises control over more farmers;[11] that DFA and DMS together have punished farmers, haulers, and independent processors who operate outside of their sphere of influence;[12] and that DFA and DMS together have harmed competition.[13]

---

[9] *See, e.g.,* Doc. 16 ¶ 70: "DFA owns 50 percent of DMS and controls DMS's operations."

[10] *See, e.g.,* Doc. 16 ¶ 68: "DFA greatly strengthened its position in the Northeast in 1999 by forming DMS, a marketing agency, with Dairylea Cooperative, Inc. ("Dairylea"), the largest dairy cooperative in the Northeast."

[11] *See, e.g.,* Doc. 16 ¶ 71: "[B]y designating DMS as the exclusive marketer for Dairylea, all of Dairylea's 2,300 member farmers were brought under DFA's control."; Doc. 16 ¶ 71: "[T]he creation of DMS provided a mechanism for DFA to bring independent dairy farmers and cooperatives under its control."; Doc. 16 ¶ 74: "DFA and DMS use DMS's control over a significant majority of balancing plants to force independent dairy farmers and independent dairy cooperatives to join DFA and/or market their milk through DMS."

[12] *See, e.g.,* Doc. 16 ¶ 120: "DFA and DMS have punished farmers who attempted to terminate their relationships with DFA or DMS, thereby often forcing them to renew their membership with DFA or contract with DMS."; Doc. 16 ¶ 121: "DFA and DMS have punished haulers who contracted to transport the milk of former DFA members or former DMS clients."; Doc. 16 ¶ 122: "DFA and DMS have punished independent processors who attempted to purchase milk from existing or former DFA members and DMS clients."

Because the Amended Complaint sufficiently alleges claims of attempted monopolization and monopolization based upon an agency theory, DFA's motion to dismiss Counts II and IV of the Amended Complaint for failure to state a claim is hereby DENIED.

## F.   Whether Plaintiffs' Price-Fixing Claims Fail to State a Claim.

Defendants DFA and DMS seek dismissal of Count VI of the Amended Complaint which alleges price-fixing against them in violation of Section 1 of the Sherman Act.[14] Plaintiffs' price-fixing claims contain two distinct components. First, Plaintiffs allege that DFA fixed prices through DMS (Doc. 16 ¶¶ 123-25), and second, Plaintiffs allege that DFA and DMS fixed prices through GNEMMA. (Doc. 16 ¶¶ 126-129.) DFA and DMS contend that both theories fail as a matter of law because Plaintiffs have alleged that DFA and DMS are a single entity, because the Capper-Volstead Act provides them with statutory immunity, and because Plaintiffs' price-fixing allegations do not survive *Iqbal/Twombly* scrutiny as they fail to make economic sense.

### 1.   DFA-DMS Price-Fixing.

DFA's and DMS's first challenge to Plaintiffs' price-fixing claims is that "[t]he relationship between DFA and DMS, as alleged, is fatal to Plaintiffs' claim that DFA and DMS have, in any sense forbidden by the antitrust laws, 'fixed prices.'" (Doc. 24-1 at 23.) They cite *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), for the proposition that there can be no price-fixing between entities that set prices as part of a joint venture.

---

[13] *See, e.g.*, Doc. 16 ¶¶ 113, 124.

[14] "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 223 (1940). Price-fixing is "a *per se* violation regardless of whether the restraint is vertical or horizontal." *PepsiCo, Inc.*, 315 F.3d at 110.

Pursuant to Section 1 of the Sherman Act, more than one actor is required to establish a "contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. The Sherman Act thus recognizes a "basic distinction between concerted and independent action," and does not "reach conduct that is wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 768 (1984) (internal quotation marks and citations omitted). Accordingly, "[w]hen two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979).

Although whether two entities have acted as one is generally a question of fact, *Madison Square Garden L.P. v. Nat'l Hockey League*, 2008 WL 4547518, *13 (S.D.N.Y. Oct. 10, 2008), in this case, the Amended Complaint is replete with allegations regarding how DFA and DMS have acted as one. Indeed, this is the essence of Plaintiffs' agency claim: that DFA, as principal, created, directs, and dominates DMS, as agent, which, in turn, carries out DFA's directives and objectives. The Amended Complaint contains no allegations that would support a claim that DMS acts independently of DFA. When separate legal entities act as "one organization," *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29 (1962), when they have a "complete unity of interest," *Copperweld*, 467 U.S. at 771, where their "objectives are common, not disparate," and where "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one" as alleged in the Amended Complaint, "[t]hey are not unlike a multiple team of horses drawing a vehicle under the control of a single driver." *Id.* Plaintiffs point to nothing in the Amended Complaint that would sustain a contrary interpretation of the relationship between DFA and its agent DMS.[15]

---

[15] Plaintiffs gain nothing by arguing that DFA and DMS dispute this characterization.

Because the Amended Complaint alleges that DFA-DMS, acting as a single entity, conspired with itself to fix prices, it fails to state a DFA-DMS price-fixing claim as a matter of law. *See Copperweld*, 467 U.S. at 767 (Section 1 of the Sherman Act does not reach the "conduct of a single firm" which is "governed by § 2 alone"); *Dagher*, 547 U.S. at 6 (agreement as to prices by parties to a joint venture "is not price fixing in the antitrust sense").[16] DFA's and DMS's motion to dismiss the DFA-DMS price-fixing allegations if therefore GRANTED.

### 2. GNEMMA Price-Fixing.

DFA's and DMS's argument in favor of dismissal of Plaintiffs' GNEMMA price-fixing claim on the basis of Capper-Volstead immunity is considerably less persuasive. According to the Amended Complaint, GNEMMA is an over-order pricing agency comprised of DFA, four cooperatives that market their milk through DMS (Dairylea, Land O'Lakes, St. Albans, and Maryland & Virginia Milk Producers Cooperative Association, Inc.), Agri-Mark, and Upstate Niagara Cooperative, Inc. (Doc. 16 ¶¶ 126-27.) The Amended Complaint alleges that "GNEMMA's member cooperatives . . . fix and monitor the over-order premiums that they will distribute to their respective member farmers in the Northeast." (Doc. 16 ¶ 127.) It further asserts that by establishing and participating in GNEMMA, DFA eliminated competition between cooperatives in the Northeast for members and sought to bring cooperatives that did not participate in DMS into a common decision-making and strategic organization. (Doc. 16 ¶ 129.) Plaintiffs

---

[16] The court declines Plaintiffs' invitation to find their conclusory allegations that DFA, DMS, and *their co-conspirators* unlawfully fixed prices sufficient to allege a price-fixing conspiracy involving other defendants. In Count VI, neither Dean nor Hood is even mentioned and the count, itself, states that it is "Against DFA and DMS." (Doc. 16 at 61.) Stray statements alleging price-fixing between "co-conspirators" are not only conclusory, but also fail to place those alleged co-conspirators on notice that a claim has been asserted against them. Even prior to *Iqbal/Twombly*'s "heightened pleading standard," *Turkman v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009), these vague statements would be deemed insufficient to state a claim against any entity other than DFA and DMS. *See Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

allege that they and class members have been injured by these activities through their receipt of artificially depressed milk prices. (Doc. 16 ¶¶ 130-32.)

In response, DFA and DMS argue that the Capper-Volstead Act immunizes the GNEMMA price-fixing alleged by Plaintiffs and that it is Plaintiffs' burden to demonstrate otherwise. DFA and DMS cite no authority for this allocation of the burden of proof. As price-fixing is otherwise a *per se* violation under Section 1 of the Sherman Act, and as a cooperative is generally in the best position to establish whether its members are farmer-producers, the court finds more rational the approach taken by those courts that interpret Capper-Volstead immunity as an affirmative defense to be established by a defendant seeking its protection.[17] The court thus examines whether DFA and DMS have conclusively demonstrated that Capper-Volstead immunity requires dismissal of Plaintiffs' GNEMMA price-fixing claims.

"The Capper-Volstead Act removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978). It thus grants dairy cooperatives antitrust immunity with respect to price-fixing agreements with other dairy cooperatives, "[p]rovided, however, [t]hat such associations are operated for the mutual benefit of the members thereof . . ." 7 U.S.C. § 291. The Act does not, however, extend immunity for conduct "outside the 'legitimate objects' of a cooperative," including restraining or

---

[17] *See Alexander*, 687 F.2d at 1184 ("The exemption is an affirmative defense and [defendant] introduced sufficient evidence to establish prima facie entitlement to the exemption."); *In re Southeastern Milk Antitrust Litig.*, 2008 WL 2368212, *4 ("[T]he affirmative defense of Capper-Volstead immunity cannot be resolved through a Rule 12(b)(6) motion . . ."); *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 692-94 (E.D. Pa. 2007) (requiring defendants to establish facts demonstrating that the "limited exemption from antitrust laws" offered by Capper-Volstead Act applies); *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1039 (2d Cir. 1980) (referring to defendants' allegation of Capper-Volstead Act immunity as an "affirmative defense"); *Northern Cal. Supermarkets, Inc. v. Central Cal. Lettuce Prods. Coop.*, 413 F. Supp. 984, 987 (N.D. Cal. 1976) (referencing defendants' affirmative defense under the Capper-Volstead Act).

monopolizing trade, or suppressing competition. *Maryland & Virginia Milk Producers Ass'n, Inc. v United States*, 362 U.S. 458, 468 (1960) (internal quotation marks omitted); *see Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1044 (2d Cir. 1980) ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as . . . harassment . . . coerced membership, and discriminatory pricing.") (citations omitted). Moreover, not every agricultural cooperative is a Capper-Volstead entity. 7 U.S.C. § 291; *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 823 (N.D.N.Y. 1996) (Capper-Volstead immunity extends only to organizations or cooperatives whose members are producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members); *see also Nat'l Broiler Mktg. Ass'n*, 436 U.S. at 827-29 (Capper-Volstead requires that all members of the cooperative be farmers and even one middleman is sufficient to destroy the Capper-Volstead immunity shield).

Here, Plaintiffs have pled their way around Capper-Volstead immunity sufficient to survive a motion to dismiss. They allege that DFA does not qualify as a Capper-Volstead entity (Doc. 16 ¶ 198), and that the members of GNEMMA have not acted for their dairy farmer members' benefit but rather have "agreed to fix, reduce, stabilize or maintain at artificially depressed values the over-order premiums paid to dairy farmers in the Northeast." (Doc. 16 ¶ 196.) They have alleged conduct through GNEMMA, in addition to price-fixing, that is clearly outside Capper-Volstead's safe harbor, including that DFA used GNEMMA to suppress competition and to pressure entities outside DMS to join that organization. (Doc. 16 ¶ 129.) At this juncture, the court cannot find, as a matter of law, that the Capper-Volstead Act bars Plaintiffs' GNEMMA price-fixing claim.

DFA's and DMS's *Iqbal/Twombly* challenge to Plaintiffs' GNEMMA price-fixing claim fares no better. They ask the court to dismiss the Amended Complaint, pre-

discovery, because it does not make economic sense that Agri-Mark in particular, which
they characterize as "no friend to DFA" would engage in a price-fixing scheme with DFA
and DMS. (Doc. 24-1 at 29 n.7.)  Price-fixing agreements between parties with opposing
interests often make economic sense because each party to the agreement gains through
the suppression or control of competition on price.  In this case, Plaintiffs contend that
GNEMMA's members benefit from price-fixing in order to have an opportunity to sell
their milk to bottling plants in the relevant geographic market.  Access to bottling plants
is thus allegedly the incentive for Agri-Mark to price-fix and engage in anticompetitive
conduct with DFA and DMS.  This, in turn, "allow[s] DFA and DMS to avoid
competition from the few remaining dairy cooperatives in the Northeast [such as Agri-
Mark] that they d[o] not control."  (Doc. 16 ¶ 7.)  Although Plaintiffs do not need to
plead each GNEMMA member's motive to engage in the alleged price-fixing and
anticompetitive conduct, the Amended Complaint sets forth in sufficient detail how and
why the alleged price-fixing conspiracy operates and how and why it benefits the alleged
conspirators. (Doc. 16 ¶¶ 123-32.)  This conclusion is underscored by the courts'
recognition that, pre-discovery, antitrust allegations often lack a plethora of detail
because "relevant information regarding the conduct of particular defendants is 'largely
in the hands of the alleged conspirators.'"  *In re Nine West Shoes Antitrust Litig.*, 80 F.
Supp. 2d at 191 (quoting *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)).

Applying the *Iqbal/Twombly* standard to the Amended Complaint, the court
determines that it contains sufficient plausible factual allegations regarding a price-fixing
conspiracy through GNEMMA to withstand pre-discovery dismissal.  Accordingly,
DFA's and DMS's motion to dismiss Count VI is GRANTED IN PART and DENIED IN
PART.  Plaintiffs' claims directed at a DFA-DMS's alleged price-fixing agreement are
hereby DISMISSED WITHOUT PREJUDICE.

28

## G. Whether Counts I-V & VII Must be Dismissed as Time Barred.

Defendants challenge all but Count VI of the Amended Complaint, which alleges price-fixing, as barred by the applicable statute of limitations. Defendants assert that Counts I -V and VII allege claims that are dependent upon acts that took place more than four years before the filing of Plaintiffs' initial Complaint. They also assert that Plaintiffs have not adequately pled fraudulent concealment and cannot establish a continuing violation.

"The basic rule is that damages are recoverable under the federal antitrust acts only if the suit therefor is 'commenced within four years after the cause of action accrued,' 15 U.S.C. § 15b, plus any additional number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). A cause of action accrues "when a defendant commits an act that injures [the] plaintiff's business." *Id.* In other words, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* at 339.

In analyzing the statute of limitations issues raised by Defendants, the court first briefly addresses Plaintiffs' claim of fraudulent concealment.

### 1.  Fraudulent Concealment.

As Plaintiffs correctly assert, "a defendant's fraudulent concealment may toll the statute of limitations." (Doc. 42 at 22, citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)). In order to establish fraudulent concealment, a plaintiff must show:

> (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part.

*Id.* Courts have described the burden of establishing fraudulent concealment as a "heavy one." *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979); *see also*

29

*Grynberg v. ENI S.p.A.*, 2009 WL 2482181, \*5 (S.D.N.Y. Aug. 13, 2009) (citing *Buccino v. Cont'l Assurance Co.*, 578 F. Supp. 1518, 1523 (S.D.N.Y. 1983)).

Fed. R. Civ. P. 9(b) requires that, "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." Plaintiffs conceded at oral argument that the Amended Complaint does not plead fraudulent concealment with particularity: "I think in general it's probably fair to say that the Second Circuit requires particularized allegations for a fraudulent concealment argument. And the allegations in paragraphs 143 and 144[18] aren't particularized; they don't get you there." (Doc. 76, Transcript of Oral Argument at 89, *Allen v. Dairy Farmers of America*, Case No. 5:09-cv-230.) Even a cursory review of the Amended Complaint reveals that this concession is warranted.

Not only are Plaintiffs' allegations of fraudulent concealment not particularized, they do not contain the essential elements of a fraudulent concealment claim. Indeed, it is somewhat unlikely that Plaintiffs *could* satisfy the *Hendrickson Bros.* standard based upon Plaintiffs' acknowledgement of the public nature of the information upon which they base their claims. The Amended Complaint recites in some detail the 2003 Senate Judiciary Committee testimony of Robert D. Wellington, Senior Vice-President of Agri-Mark, Inc., which outlines the majority of Plaintiffs' claims. It is thus difficult to discern how a colorable fraudulent concealment claim could be made. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1051 (8th Cir. 2000) (statute of limitations not tolled for allegations that "were public information at the time . . . and were well known throughout the . . . industry."); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) (no fraudulent concealment claim exists where antitrust claims based on settlement could have been discovered with diligent examination of public records); *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 509 (S.D.N.Y. 1989) (in the context of a fraudulent concealment analysis, "facts that should arouse suspicion . . . are equated with

---

[18] Plaintiffs' counsel misspoke when referring to the pertinent paragraphs of the Amended Complaint alleging fraudulent concealment. The correct paragraphs are 142 and 143.

actual knowledge of the claim.") (internal quotation marks omitted)); *see also* Areeda &
Hovenkamp, ¶ 320c1, at 288-89 (3d ed. 2004 & 2007 Supp.) (observing that "the more
recent decisions have paid increased attention to what the plaintiff knew or should have
known when the initial act constituting the violation occurred.").

As currently pled, the Amended Complaint fails to set forth a fraudulent
concealment claim that would toll the applicable statute of limitations.

### 2.   Continuing Violation.

It is beyond dispute that many of the acts that Plaintiffs allege caused them injury
took place more than four years prior to the filing of Plaintiffs' initial Complaint.  In the
absence of a continuing violation, these acts cannot form the basis of Plaintiffs' antitrust
claims. *See Vitale v. Marlborough Gallery*, 1994 WL 654494, *4 (S.D.N.Y. July 5,
1994) ("When the anticompetitive act causing the injury and giving rise to the cause of
action occurs outside of the statutory period, the claim is time barred.").

For example, Plaintiffs rely in part on 1997-1998 purchases of New England
bottling plants by "Suiza, the precursor to Dean," Suiza's control over 70% of the fluid
milk processing in New England in 2000, and Suiza's alleged "full-supply agreement"
with DFA and the subsequent closure of bottling plants by Suiza.  (Doc. 16 ¶¶ 75-77.)
All allegations relating to Suiza predate the Suiza-Dean merger in 2001 and are thus
outside the limitations period, as is the 2001 Dean-Suiza merger itself.

Plaintiffs further rely on the 2000 closure of the Stop & Shop bottling plant in
Readville, Massachusetts, National Dairy Holding's ("NDH") 2001 acquisition of eleven
milk bottling plants from Dean and Suiza, NDH's alleged full-supply agreement with
DFA, and Dean's 2003 alleged announcement to independent dairy farmers and
cooperatives that they must market their milk through DMS in order to continue to supply
Dean.  (Doc. 16 ¶¶ 9, 79-88, 91-92, 96-97, 103.)  Each of these claims appears to allege
an injury initially suffered outside the limitations period.

Similarly, Defendants challenge the 1999 formation of DMS (Doc. 16 ¶ 9), the
alleged forcing of the Saint Albans Cooperative Creamery to join DMS in 2003 (Doc. 16

¶¶ 9-10, 101-103), the 2003-2004 alleged stock and CEO exchange between NDH and Hood (Doc. 16 ¶¶ 9-10, 107), and DFA's 2003 alleged agreement not to compete with Agri-Mark. (Doc. 16 ¶¶ 9, 113.)  Again, all events and alleged concomitant initial injuries took place outside the limitations period.

In an effort to resurrect their claims, Plaintiffs adopt a two-pronged approach. First, they assert that, in a conspiracy, it is enough to allege an anticompetitive act by one conspirator within the limitations period which may then be imputed to all co-conspirators and which will, in turn, bring all claims that are part of the conspiracy within the limitations period.  Second, they rely heavily on the "continuing violation" theory, which "is based on an initial action that violates the antitrust laws followed by injuries caused by illegal actions *designed to implement and effectuate* the initial violation." *Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 275 (8th Cir. 2004) (emphasis in original).  "A continuing violation is one in which the plaintiff's interests are repeatedly violated, and, in these circumstances, a new cause of action accrues each time the plaintiff is injured by an act of the defendant." *Buspirone Patent Litig.*, 185 F. Supp. 2d at 378.

With regard to their first argument, Plaintiffs rely to a great extent on horizontal price-fixing cases.  They ask this court to find that every time Defendants purchased fluid raw milk at allegedly artificially depressed prices, a new antitrust injury occurred, restarting the statute of limitations period.  Plaintiffs contend: "Numerous courts have held that in price-fixing cases, 'each time a customer purchases [a] product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues.'") (Doc. 42 at 23-24, quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999)).  Although the every-purchase-equals-a-new-violation-theory is applicable to Plaintiffs' price-fixing claims in Count VI, it has no independent application to Plaintiffs' remaining claims which allege illegal acts and agreements in a vertical conspiracy to restrain trade.  Those claims require either incorporation by reference of Plaintiffs' price-fixing claims or independent, overt injuries within the limitations period;

32

otherwise, they are time-barred. *See Daniel v. American Bd. of Emergency Med.*, 988 F. Supp. 112, 120 (W.D.N.Y. 1997) ("[W]here all damages complained of necessarily result from a pre-limitations act by the defendants, the cause of action does not 'continually accrue' into the limitations period.") (citation omitted). "To hold otherwise would effectively abrogate the statute of limitations . . . because each sale of a product pursuant to the underlying agreement would start the statute of limitations running anew." *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 2008 WL 4104534, *3 (E.D. Mo. Aug. 27, 2008); Areeda & Hovenkamp ¶ 320c1 at 286 ("If the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization.").

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) is not inapposite. There, in reviewing a jury verdict and post-trial judgment, the Second Circuit held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Id.* at 296. The Second Circuit cautioned that:

> It should not be inferred that this ruling grants antitrust plaintiffs a license to embark on a search for Ichthyosauria that is, on a time-warped fishing expedition. A trial court in its discretion may always set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it. Moreover, the trial court might not be without flexibility to limit the proof where delay in bringing suit may have caused injustice to the defendants.

*Id.* (internal citations and quotation marks omitted). The court concluded by noting that "[i]t may, of course, be difficult for a purchaser to demonstrate that conduct occurring many years before the commencement of suit contributed to an overcharge that it paid within the limitations period. That however, is no reason for denying it the opportunity to do so." *Id.* at 298. No reasonable reading of *Berkey Photo* would allow it to stand for the proposition that, at the pleading stage, an allegation of an anti-competitive, artificially depressed price paid to the producers of a product within the limitations period

33

automatically brings within the limitations period any pre-limitations conduct that contributed to a purchaser's ability to extract that low price. While *Berkey Photo* demonstrates that pre-limitations conduct may, in some circumstances, be allowed as evidence, it does not cure any deficiencies in the Amended Complaint. Accordingly, the mere fact that Plaintiffs have alleged a price-fixing claim within the limitations period does not resolve the statute of limitations question.

The second prong of Plaintiffs' argument is that Counts I-V and VII are not time barred because of the continuing violation theory. As Plaintiffs note, "'[i]n the context of a continuing conspiracy to violate the antitrust laws, . . . the statute of limitations runs from the commission of the act' that injures the plaintiff." (Doc. 42 at 22) (quoting *Zenith*, 401 U.S. at 338). In other words, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citation and internal quotation marks omitted). The continuing violation doctrine is not, however, without limitation and "[a]s a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) (quotation and citation omitted); *accord Vitale*, 1994 WL 654494, *5.

"[T]o restart the statute of limitations plaintiff must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act'; and (2) 'inflict[s] new and accumulating injury on the plaintiff.'" *Vitale*, 1994 WL 654494, *5 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). In addition to their price-fixing claims in Count VI, Plaintiffs identify seven[19] overt acts that

---

[19]  Plaintiffs identify the overt acts in eleven "bullet points," some of which are either redundant or different parts of the same claim. *See* Doc. 42 at 26-27.

they allege occurred during the limitations period as part of a "continuing violation."
The court addresses Plaintiffs' alleged overt acts seriatim.

First, Plaintiffs allege that since 2001, Dean and DFA have annually renewed full-
supply agreements which, in turn, must be renewed for twenty successive years in order
for Dean to avoid paying a financial penalty. (Doc. 16 ¶¶ 10, 83, 147(c).)  In making this
argument, Plaintiffs seek to characterize each annual renewal of the existing agreement as
a new violation.  The weight of authority rejects this approach, holding that renewal of an
existing agreement falls squarely within the "reaffirmation" exception to the continuing
violation doctrine.  *See Madison Square Garden*, 2008 WL 4547518, *10 (employing
statute of limitations case law to laches defense and finding that renewal of licensing
agreement without any substantive change in the parties' rights insufficient to restart
limitations period as "[u]nder any meaningful definition of 'reaffirmation,' . . . a
'renewal' of policies in existence [prior to the limitations period] qualifies"); *In re
Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003)
(Because "the focus is on the timing of the causes of action, *i.e.*, the defendant's overt
acts, as opposed to the effects of the overt acts," any payments received as a result of a
pre-limitations period contract are insufficient to restart the period because "the
performance of an allegedly anticompetitive, pre-existing contract is not a new predicate
act") (citation omitted); *United States Philips Corp. v. Princo Corp.*, 2005 U.S. Dist.
LEXIS 6820, *22 (S.D.N.Y. Jan. 24, 2005) ("continued existence of the contractual
arrangement is insufficient to toll the statute of limitations . . ."). Plaintiffs "do not
plausibly allege any new and independent acts that inflicted new and accumulating injury
on [the Plaintiffs]," *Madison Square Garden*, 2008 WL 4547518, *10 (quotation marks
omitted), they cannot rely on the annual renewal of the Dean-DFA supply agreement as
an overt act within the limitations period.

Second, Plaintiffs allege that DFA and DMS created GNEMMA in 2006.
Plaintiffs allege that "GNEMMA's purpose was to provide a means for DFA and DMS to
fix the prices that were paid to dairy farmers for the sale of fluid Grade A milk

35

throughout the Northeast." (Doc. 16 ¶ 9.) The creation of GNEMMA and the injuries it allegedly inflicted upon Plaintiffs took place within the limitations period and thus may be considered an overt act.

Third, Plaintiffs allege that Dean required Northeast dairy farmers to pay "competitive credits" at various unspecified points through the limitations period. Plaintiffs do not, however, allege that they were required to do so, nor do they allege when payment of these competitive credits was required. In order to restart the limitations period, a plaintiff must allege, within the limitations period, a "new and accumulating injury" on the plaintiff. *Midwestern Machinery*, 392 F.3d at 271. Here, Plaintiffs' generalized, undated allegations are insufficient to meet this pleading requirement.

Fourth, Plaintiffs allege that through 2006, DFA made excessive and advance payments for the purchase of milk to DFA director Lewis Gardner. It is not clear how this alleged act injured Plaintiffs. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). It is also not clear how this furthered any conspiracy, as DFA cannot conspire with itself or its directors. *See* 1 Louis Altman and Malla Pollack, Callmann on Unfair Competition, Trademarks and Monopolies, § 4:23 (4th ed. Supp. 2010) ("[A] conspiracy cannot exist between a company and its directors, officers, employees, or outside agents, nor between the directors, officers, employees or agents themselves when they are acting on the company's behalf.") (footnotes omitted). Accordingly, DFA's alleged excessive payments to one of its directors do not constitute an overt act within the limitations period. *See Vitale*, 1994 WL 654494, *4 (it is not enough to allege bad acts within the limitations period because such "assertions fail to cure the time barred nature of this action, because plaintiff fails to allege an injury resulting from these acts.").

Fifth, Plaintiffs allege that beginning in October of 2007, DFA forced its members to share in the significant losses of its joint venture with NDH, even though profits were not shared with farmer-members. Plaintiffs neither allege that they were members of

36

DFA at the time,[20] nor do they allege that they bore the burdens of these losses. *See Madison Square Garden*, 2008 WL 4547518, *11 (antitrust injury begins with plaintiff establishing that it suffered an injury-in-fact as a predicate to the court's inquiry into whether plaintiff has also shown anticompetitive effect). In the absence of such facts, Plaintiffs have not established that this is an overt act within the limitations period.

Sixth, Plaintiffs allege that since 2006, DFA and DMS have used threats and retaliation to force dairy farmers and haulers to join DFA and to supply milk DMS to bottling facilities controlled by Dean and Hood. (Doc. 16 ¶¶ 119-122.) For example, Plaintiffs allege that in 2009, a DMS official threatened to impose multiple heath code violations on farmers when they attempted to end their relationship with DMS. Similarly, they allege that in 2009, DMS threatened that it would instruct haulers not to transport farmers' milk if they discontinued supplying milk through DMS and also threatened to void all contracts with haulers that disobeyed that instruction. Finally, Plaintiffs allege that DFA and DMS punished dairy farmers who attempted to quit DFA and supply milk to independent bottlers (instead of Dean or Hood), by threatening to halt all DFA sales to independent bottlers that agreed to accept the former DFA-member's milk. Although there is no evidence that any of the named Plaintiffs were subjected to the alleged threats or retaliation, Plaintiffs assert that these coercive acts perpetuated the monopoly and monopsony, disciplined those that sought to challenge it, cowed those who might venture a similar challenge, and produced the allegedly artificially depressed fluid raw milk prices that Plaintiffs received and which allegedly caused them injury. Because Plaintiffs have alleged sufficient facts to place them in the "target area" of Defendants' allegedly anticompetitive conduct, they have alleged overt acts within the limitations period. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1168 ("Only those within the 'target area' of an alleged antitrust conspiracy have standing to sue.") (citation omitted);

---

[20]   The Amended Complaint asserts that the Sitts farm was a member of DFA from 1998 to 2007. (Doc. 16 ¶ 20.) It does not further assert that the Sitts farm was required to bear the 2007 losses in question.

*Glaberson v. Comcast Corp.*, 2006 WL 2559479, *7 (E.D. Pa. Aug. 31, 2006)
("Plaintiffs' injury is thus directly traceable to [Defendants' alleged] anticompetitive
behavior . . . . [O]ther direct victims exist, but their presence does not diminish the
directness of the [Plaintiffs'] injury.") (citation and internal quotation marks omitted); *In
re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168-70 (3d Cir. 1993)
(concluding that plaintiff steel companies alleged antitrust injury from inflated dock
handling charges resulting from defendant railroads' conspiracy even though dock
companies were also victims).

Finally, Plaintiffs allege that Hood limited the amount of fluid raw milk it acquired
from Agri-Mark in order to eliminate competition between Agri-Mark and DFA and
strengthen DFA's monopoly over the supply. The Amended Complaint alleges no time
period for this act, however, it claims the allegedly anticompetitive agreement was
entered into in 2003. (Doc. 16 ¶¶ 9, 113.) In the absence of some evidence that this act
occurred within the limitations period, the court cannot consider it an overt act for
purposes of a continuing violation analysis.

In sum, Plaintiffs have alleged price-fixing claims, which include the formation of
GNEMMA, and threats, retaliation and punishment of dairy farmers, as overt acts within
the limitations period that, as part of an overarching conspiracy, have caused Plaintiffs
injury. These factual allegations, although not *de minimus*, are markedly weaker than
those at issue in *In re Southeastern Milk*, 555 F. Supp. 2d at 947 (finding that plaintiffs
alleged "numerous" overt acts within the limitations period). However, at this juncture,
"[t]he court's function . . . is not to weigh the evidence that might be presented at a trial
but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local
3 Int'l Bhd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990).

Defendants' challenges to Plaintiffs' overt acts do not mandate a different
approach and have their own deficiencies. In essence, Defendants ask the court to ignore
Count VI in its statute of limitations continuing violation analysis because: (a) they have
not challenged it on statute of limitations grounds; and (b) the alleged price-fixing claims

38

do not involve all of the Defendants and are independent of Plaintiffs' other claims. Defendants' approach misses the mark for several reasons.

First, the fact that a party has not challenged a claim on statute of limitations grounds does not thereby exclude it from a statute of limitations analysis where an overarching conspiracy encompassing the claim is alleged. *See* Callmann, § 4.23 ("In considering the evidence, the court must assess the conspiracy in its entirety; none of its parts, including even the unobjectionable elements, should be weeded out and separately explored; conspiracy can properly be inferred only from the whole 'panorama' of all the acts and circumstances."); *see also Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 654 F. Supp. 1195, 1204 (N.D.N.Y. 1987) (refusing to dismiss portion of defendant's claims on statute of limitations grounds because "[s]uch a piecemeal approach to an antitrust claim is improper."); *Mishkin v. Ageloff*, 1998 WL 651065, *26 (S.D.N.Y. Sept. 23, 1998) (complaint must be read "as a whole, not in the piecemeal fashion that [defendant] adopts."). DFA's approach is also inconsistent with the appropriate standard of review. *See H.L. Hayden Co. of N.Y., Inc.*, 879 F.2d at 1012 (noting that in deciding whether to dismiss one claim among many, "we must accord plaintiffs 'the full benefit of their proof without tightly compartmentalizing the various components and wiping the slate clean after scrutiny of each.'") (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Second, Counts I-V and VII incorporate Plaintiffs' GNEMMA price-fixing allegations by reference. *See* Doc. 16 ¶¶ 144, 154, 164, 175, 183, 204. "Incorporation by reference is proper pleading." *Fla. Dep't Ins. v. Debenture Guar.*, 921 F. Supp. 750, 754 (M.D. Fla. 1996). *Accord* Charles Alan Wright, Arthur R. Miller, 5A *Fed. Prac. & Proc. Civ.* § 1326 (3d ed.) ("As the courts have made clear, adoption by reference within a single pleading has generated relatively few problems and is an extremely common practice. Facts alleged in connection with one count, defense, or paragraph may be incorporated by reference in a different count, defense or paragraph of the same pleading."). As a result, Plaintiffs have at least, for pleading purposes, integrated their

GNEMMA price-fixing allegations into each count of the Amended Complaint which, in turn, provides a factual basis for a continuing violation. *See Midwestern Mach. Co., Inc.*, 392 F.3d at 275 ("[C]ontinuing violations restart the statute of limitations when there is an ongoing scheme, such as a price-fixing conspiracy or an attempt to monopolize.").

Finally, at the motion to dismiss stage, the court must "draw all reasonable inferences in favor of the [P]laintiff[s]." *Kassner v. 2ⁿᵈ Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A statute of limitations analysis is generally riddled with questions of fact[21] which *the Defendants* must establish in order to bar Plaintiffs' claims. Because of this fact-intensive burden, "[a]ffirmative defenses such as the statute of limitations are generally not resolved with a motion to dismiss under Rule 12(b)(6)." *In re Evanston Northwestern Healthcare*, 2008 WL 2229488, *1 (N.D. Ill. May 29, 2008) (citing *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006)). Accordingly, "[u]nless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development." *Foss v. Bear, Stearns & Co., Inc.*, 394 F.3d 540, 542 (7th Cir. 2005); *see also Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*, 2009 WL 3496115, *2 (S.D.N.Y. Oct. 23, 2009) ("[G]enerally '[because] defendants have the burden of raising [an affirmative defense] in their answer and establishing [it] at trial or on a motion for summary judgment, a plaintiff, in order to state a claim . . . need not plead facts showing the absence of such a defense.'") (quoting *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996)).

---

[21] *See Morton's Market, Inc.*, 198 F.3d at 828 ("The commencement of the statute of limitations is a question of fact."); *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1170 ("[T]he question of when the statute of limitations began to run on the plaintiffs' cause of action is a factual one."); *Bice v. Robb*, 324 F. App'x 79, 81 (2d Cir. 2009) (reversing and remanding because question of whether statute of limitations had run "turns on a number of unresolved issues of fact that would benefit from discovery."); *Allen v. Egan*, 303 F. Supp. 2d 71, 79 (D. Conn. 2004) ("Determining whether the events comprising the basis for [plaintiff's] claim are part of a single, continuing course of conduct is fact-intensive, and therefore inappropriate [to resolve] at this stage of the proceedings.").

Plaintiffs have alleged overt anticompetitive acts within the limitations period with regard to each count of the Amended Complaint and Defendants have failed to sustain their burden to prove otherwise.  Defendants' motions to dismiss on statute of limitations grounds are therefore hereby DENIED.

**III.        Conclusion.**

For the foregoing reasons, Defendants' motions to dismiss are hereby GRANTED IN PART and DENIED IN PART.  All claims against Defendant Hood are DISMISSED WITHOUT PREJUDICE, as are all claims alleging a price-fixing conspiracy between DFA-DMS.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this *30*ᵗʰ day of August, 2010.

Christina Reiss
United States District Court Judge