UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| ALICE H. ALLEN AND LAURENCE E. ALLEN, d/b/a Al-lens Farm, VINCE NEVILLE, GARRET SITTS and RALPH SITTS, JONATHAN AND CLAUDIA HAAR, and DONNA HALL on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 5:09-cv-00230-cr |
| DAIRY FARMERS OF AMERICA, INC., DAIRY MARKETING SERVICES, LLC, and DEAN FOODS COMPANY. | ) ) ) ) | Judge Christina Reiss |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
APPROVAL OF PROPOSED SETTLEMENT WITH
<u>DEAN FOODS COMPANY</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 2

    A.  The Litigation ................................................................................................ 2

    B.  The Settlement ............................................................................................. 3

        1.  The Settlement Class .......................................................................... 4

        2.  The Settlement Amount ...................................................................... 4

        3.  Injunctive Relief .................................................................................. 4

        4.  Release ................................................................................................. 5

    C.  The Timeline ................................................................................................. 6

III.  THE COURT SHOULD GRANT PRELIMINARY APPROVAL ........................ 6

    A.  Standard for Granting Preliminary Approval ........................................... 6

    B.  The Proposed Settlement Results from Arm's-Length Negotiations between Experienced, Capable Counsel ................................................... 9

    C.  The Proposed Settlement is in the Range of Possible Approval as Fair, Reasonable and Adequate ........................................................................ 10

    D.  The Proposed Settlement Achieves an Excellent Result for the Class, Particularly Given the Expense, Duration and Uncertainty of Continued Litigation ..................................................................................................... 12

IV.  CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS IS WARRANTED ................................................................................................... 14

    A.  The Settlement Class Satisfies Rule 23(a) ............................................. 14

        1.  Fed. R. Civ. P. 23(a)(1): The Class Meets the Numerosity Requirement and Is Ascertainable .......................................... 15

        2.  Fed. R. Civ. P. 23(a)(2): There Are Questions of Law  and Fact Common to Members of the Class ..................................................... 16

        3.  Fed. R. Civ. P. 23(a)(3): The Representative Plaintiffs' Claims Are Typical of the Class's Claims ................................................... 20

        4.  Fed. R. Civ. P. 23(a)(4): The Representative Plaintiffs will Fairly and Adequately Protect the Interests of the Class ................................... 21

    B.  The Requirements of Rule 23(b)(3) are Satisfied ................................... 25

        1.  Common Questions of Law and Fact Predominate in this Action ........... 26

            a.  Violation of the Antitrust Laws .................................................. 27

            b.  The Impact of the Unlawful Activity ........................................... 28

   c. Damages.........................................................................................31

  2. A Class Action Is Superior to Other Available Methods.........................32

V. THE FORM OF NOTICE SHOULD BE APPROVED AND NOTICE OF THE PROPOSED SETTLEMENT SHOULD BE GIVEN TO CLASS MEMBERS .............35

VI. CONCLUSION.............................................................................................................36

## TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................26, 34

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 419 (S.D.N.Y. 2001)..............................................................................9

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001)..............................................................................................6

*Barone v. Safway Steel Prods., Inc.*,
    No. 03-4258, 2005 U.S. Dist. LEXIS 17645 (E.D.N.Y. Aug. 23, 2005)................................25

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    MDL No. 997, 1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994)...............................23

*In re Bulk (Extruded) Graphite Prod. Antitrust Litig.*,
    No. 02-6030, 2006 U.S. Dist. LEXIS 16619 (D.N.J. Apr. 4, 2006).......................................18

*In re Carbon Black Antitrust Litig.*,
    MDL No. 1543, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) ................................22

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001) ..............................................................................26, 29

*Chatelain v. Prudential-Bache Sec. Litig.*,
    805 F. Supp. 209 (S.D.N.Y. 1992)..................................................................................10

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)..............................................................................................8

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)..............................................................................................15

*Cordes & Co. Fin. Serv., Inc v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)....................................................................................... passim

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ..................................................................................12

*In re Currency Conversion Fee Antitrust Litig.*,
    264 F.R.D. 100 (S.D.N.Y. 2010) ..........................................................................20, 22, 34

*In re Currency Conversion Fee Antitrust Litig.*,
    MDL No. 1409, 2006 U.S. Dist. LEXIS 81440 (S.D.N.Y. Nov. 8, 2006) ...............................7

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)................................................................................7

*Daniel v. Am. Bd. of Emergency Med.*,
   269 F. Supp. 2d 159 (W.D.N.Y. 2003)...........................................................28

*DeMarco v. Nat'l Collector's Mint, Inc.*,
   229 F.R.D. 73 (S.D.N.Y. 2005)......................................................................17

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)...........................................................................22

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006)............17, 31

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009)............................................................... passim

*Fears v. Wilhelmina Model Agency, Inc.*,
   No. 02-4911, 2003 U.S. Dist. LEXIS 11897 (S.D.N.Y. July 15, 2003).................20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)...............................................................20, 21, 22

*Fogarazzo v. Lehman Bros., Inc.*,
   232 F.R.D. 176 (S.D.N.Y. 2005).....................................................................14

*Fogarazzo v. Lehman Bros., Inc.*,
   263 F.R.D. 90 (S.D.N.Y. 2009).................................................................15, 16

*In re Foundry Resins Antitrust Litig.*,
   242 F.R.D. 393 (S.D. Ohio 2007)...............................................................15, 28

*Hall v. Children's Place Retail Stores, Inc.*,
   669 F. Supp. 2d 399 (S.D.N.Y. 2009).............................................................12

*Harris v. Initial Sec., Inc.*,
   No. 05-3873, 2007 U.S. Dist. LEXIS 18397 (S.D.N.Y. Mar. 7, 2007).................16

*In re Host Am. Corp. Sec. Litig.*,
   No. 05-1250, 2007 U.S. Dist. LEXIS 77418 (D. Conn. Oct. 18, 2007).................14

*In re Polyester Staple Antitrust Litig.*,
   No. 03-1516, 2007 U.S. Dist. LEXIS 52525 (W.D.N.C. Jul. 19, 2007)................27

*In re Initial Pub. Offering Sec. Litig.*,
   260 F.R.D. 81 (S.D.N.Y. 2009).......................................................................26

*In re Initial Pub. Offering Sec. Litig,*
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)...................................................................11

*In re Initial Public Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006)...............................................................................16

*In re Joint E. & S. Dists. Asbestos Litig.,*
    878 F. Supp. 473 (E.D.N.Y. 1995) ................................................................8, 10

*Kennedy v. Tallant,*
    710 F.2d 711 (11th Cir. 1983) ..........................................................................33

*Lane v. Facebook, Inc.,*
    No. 08-3845, 2010 U.S. Dist. LEXIS 24762 (N.D. Cal. Mar. 17, 2010)................21

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    No. 99-0790, 2003 WL 22037741 (D.D.C. June 16, 2003)...................................24

*In re Luxottica Group S.p.A. Sec. Litig.,*
    233 F.R.D. 306 (E.D.N.Y. 2006) .........................................................................6

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997)...............................................................................15

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
    No. 04-8144, 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) ...............26

*McReynolds v. Richards-Cantave,*
    588 F.3d 790 (2d Cir. 2009)..........................................................................8, 35

*Menkes v. Stolt-Nielsen S.A.,*
    No. 03-409, 2010 U.S. Dist. LEXIS 94184 (D. Conn. Sept. 10, 2010).......... passim

*In re Mercedes-Benz Antitrust Litig.,*
    213 F.R.D. 180 (D.N.J. 2003)............................................................................18

*In re Michael Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 57 (S.D.N.Y. 1993) .........................................................................13

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) ("NASDAQ III") ....................................... passim

*In re NASDAQ Market-Makers Antitrust Litig.,*
    176 F.R.D. 99 (S.D.N.Y. 1997) ........................................................................7, 9

*In re NASDAQ Market-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................13

*In re Natural Gas Commodities Litig.*,
   231 F.R.D. 171 (S.D.N.Y. 2005) ........................................................17

*Newman v. Stein,*
   464 F.2d 689 (2d Cir. 1972)...............................................................11

*Norflet v. John Hancock Life Ins. Co.*,
   No. 04-1099, 2007 WL 2668936 (D. Conn. Sept. 6, 2007)....................34

*In re Painewebber Ltd. P'ship Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................10

*Pecere v. Empire Blue Cross and Blue Shield,*
   194 F.R.D. 66 (E.D.N.Y. 2000) ..........................................................14

*Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*,
   43 F.R.D. 452 (E.D. Pa. 1968)............................................................19

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)...........................................................................34

*In re Plastic Cutlery Antitrust Litig.*,
   No. 96-728, 1998 U.S. Dist. LEXIS 3628 (E.D. Pa. March 20, 1998)...................................15

*In re Prudential Sec. Inc. Lt'd P'ship Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) .....................................................7, 11

*In re Prudential Sec. Ltd. P'ships Litig.*,
   1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995)......................12

*In re Ready Mix Concrete Antitrust Litig.*,
   261 F.R.D. 154 (S.D. Ind. 2009)........................................................21

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)...............................................................20

*Ross v. A.H. Robins Co.*,
   700 F. Supp. 682 (S.D.N.Y. 1988).......................................................10

*In re Salomon Inc. Sec. Litig.*,
   No. 91-5442, 1994 U.S. Dist. LEXIS 8038 (S.D.N.Y. June 15, 1994) ..................................10

*Sebo v. Rubenstein*,
   188 F.R.D. 310 (N.D. Ill. 1999)..........................................................17

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ..........................................................16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) .......................................................................21

*In re Sterling Foster & Co. Sec. Litig.*,
  238 F. Supp. 2d 480 (E.D.N.Y. 2002) ...................................................................8

*In re Sumitomo Copper Litig.*,
  182 F.R.D. 85 (S.D.N.Y. 1998) ..........................................................................32

*In re Sumitomo Copper Litig.*,
  189 F.R.D. 274 (S.D.N.Y. 1999) ...................................................................28, 29

*In re Telectronics Pacing Systems, Inc.*,
  172 F.R.D. 271 (S.D. Ohio 1997) ........................................................................33

*In re Twinlab Corp. Sec. Litig.*,
  187 F. Supp. 2d 80 (E.D.N.Y. 2002) ....................................................................8

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008)............................................................................22

*In re Visa Check/MasterMoney Antitrust Litig.*,
  192 F.R.D. 68 (E.D.N.Y. 2000) ..........................................................................34

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)...........................................................................27, 33

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)...................................................................................8

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)................................................................................17

*Weseley v. Spear, Leeds & Kellogg*,
  711 F. Supp. 713 (E.D.N.Y. 1989) ......................................................................12

### STATUTES

Fed. R. Civ. P. 23 .................................................................................... passim

### OTHER AUTHORITIES

6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1522 (2d
  ed. 1990) ............................................................................................................7

Alba Conte & Herbert Newberg, *Newberg on Class Actions* (4th ed. 2002) ...............35

Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure*
  (3d ed. 2005) ....................................................................................................26

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiff class representatives[1] (collectively "Plaintiffs") submit this Memorandum in Support of their Motion for Preliminary Approval of a proposed settlement between Plaintiffs and Defendant Dean Foods Company ("Dean").[2]  The December 7, 2010 Settlement Agreement achieves an excellent result for the Plaintiffs in this action and is attached as Exhibit A hereto.  All defined terms herein have the same meaning as set forth in the Settlement Agreement.

## I.    <u>INTRODUCTION</u>

After hard fought, arm's-length negotiation by highly experienced counsel, Dean and Plaintiffs reached a Settlement Agreement resolving the claims of a proposed class of dairy farmers who produced raw Grade A milk in the Northeast (the "Settlement Class" as defined in II.B.1 below).  The Settlement Agreement reached between the Plaintiffs and Dean secures a $30,000,000 cash payment for the Settlement Class, as well as injunctive relief that will enhance the choices available to dairy farmers and thereby benefit the Settlement Class.

Accordingly, Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the settlement and finding that the proposed settlement is sufficiently fair, reasonable and adequate to allow dissemination of notice of the settlement to the proposed Settlement Class; (2) certifying the Settlement Class, as defined below; (3) appointing Cohen Milstein Sellers & Toll PLLC and Howrey LLP as Class Counsel for the Settlement Class; (4) appointing Alice H. Allen and Laurence E. Allen, Vince Neville, Garret Sitts and Ralph Sitts, Jonathan Haar and Claudia Haar, and Donna Hall as Class Representatives; (5) approving the

---

[1] The Plaintiff class representatives are Alice H. Allen and Laurence E. Allen, Vince Neville, Garret Sitts and Ralph Sitts, Jonathan Haar and Claudia Haar, and Donna Hall.

[2] The remaining Non-Settling Defendants are Dairy Farmers of America Inc. ("DFA") and Dairy Marketing Services LLC ("DMS").

form of the Class Notice and Summary Notice; (6) approving the Notice Plan and directing that Notice be mailed and published; (7) establishing a deadline for filing papers in support of final approval of the proposed settlement; (8) establishing a deadline for the filing of objections by Settlement Class members; (9) establishing a deadline for Settlement Class members to exclude themselves from the proposed Settlement Class; (10) establishing a date for a hearing on final approval of the proposed settlement; (11) ordering a stay of all proceedings against Dean except those proceedings provided for or required by the Settlement Agreement; and (12) authorizing Class Counsel to pay the cost of providing notice to the Settlement Class, taxes, tax expenses and charges of the escrow agent from the Settlement Fund as they are incurred.  The proposed order is attached as Exhibit B hereto.

## II.    **BACKGROUND**

### A.    **The Litigation**

Plaintiffs have brought a class action pursuant to Rule 23(a) and (b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of themselves and other Northeast dairy farmers who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present ("Class Period").  Plaintiffs contend that the conduct at issue violates Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 & 2.  This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs and expenses, as well as attorneys' fees and disbursements, along with significant injunctive relief.

The operative Consolidated Amended Complaint, Dkt. No. 100 (October 15, 2010) ("Complaint"), alleges a combination and conspiracy among Defendants DFA, DMS and Dean to refuse to compete for the purchase of raw Grade A milk produced, marketed, and processed in the Northeast United States; to restrict farmers' access to raw Grade A milk bottling plants; to

eliminate and stifle competition from cooperatives and Grade A milk bottlers; and other unlawful activities designed to artificially and anti-competitively fix, stabilize, and depress the prices paid for raw Grade A milk purchased from Plaintiffs and other members of the class at levels substantially below the amount they would receive in a competitive marketplace.  As a result of the challenged conduct, DFA and DMS gained significant control over access to bottling plants and, as a *quid pro quo,* fixed and restrained milk prices paid to dairy farmers in the Northeast. This conspiratorial conduct created a monopsony in the purchase of Grade A milk from dairy farmers in the Northeast, with DMS controlling the majority of this marketed milk.  These restraints on competition suppressed prices paid to Northeast dairy farmers, provided significant profits to the Defendants, and allowed officials and allies of Defendants to reap enormous financial windfalls at the expense of Northeast dairy farmers.

Plaintiffs filed their first complaint on October 8, 2009 and amended complaints on January 21, 2010 and October 15, 2010.  (Dkt. Nos. 1, 16 and 100.)  Plaintiffs propounded their first set of document requests on April 26, 2010.  On May 6, 2010, the Court issued its Discovery Scheduling Order, which stayed fact discovery until after issuance of the decision on the motion to dismiss.  (Dkt. No. 68.)  On August 30, 2010, the court denied in part Defendants' motion to dismiss, preserving most of Plaintiffs' claims against DFA, DMS and Dean.  (Dkt. No. 81.) Over the ensuing months, Plaintiffs' have reviewed voluminous records produced by the Defendants and third parties in the *Southeastern Milk* antitrust litigation, deposition testimony from that litigation, and documents produced by the Defendants and third parties in this litigation.

## B.    The Settlement

After extensive negotiations, during which the merits of each party's positions were thoroughly discussed, evaluated and negotiated, a settlement was reached between the Plaintiffs

and Dean.   The discussions were founded on a full understanding of the strengths and weaknesses of the case, based, *inter alia*, on information gleaned from pre-filing investigations and discovery as well as an extensive review of documents and deposition testimony.   The basic terms of the Settlement Agreement include:

### 1.    The Settlement Class

The Settlement Agreement defines a Settlement Class as follows:

> All dairy farmers, whether individuals, entities or members of cooperatives, who produced raw Grade A milk in Order 1 and pooled raw Grade A milk on Order 1 during any time from January 1, 2002 to the Notice Date.   Defendants' current officers and directors, and Defendants' alleged co-conspirators are excluded from the Settlement Class.

Settlement Agreement ¶ 2.2.

### 2.    The Settlement Amount

The proposed Settlement Agreement with Dean provides that Dean will pay thirty million United States dollars ($30,000,000) for the benefit of the Settlement Class.   This amount will be deposited in the Escrow Account by Dean within 15 calendar days after entry of the preliminary approval order.   Settlement Agreement ¶ 9.1.   The Settlement Agreement allows Dean to reduce the Settlement Amount based on the percentage of the Settlement Class that elects to opt out from the Settlement Agreement; the reduction would be calculated based on the percentage of opt outs' raw Grade A milk sales in Order 1 relative to total sales by the Settlement Class in Order 1.   Settlement Agreement ¶ 11.1.

### 3.    Injunctive Relief

In addition to the payment of the Settlement Amount, Dean has agreed to modify its purchasing policy in order to enhance competition in the market for the sale and purchase of raw Grade A milk.   Specifically, Dean has agreed to purchase, at a price that reflects a competitive

market price, from dairy farmer marketers other than DFA or DMS, raw grade A milk that meets or exceeds Dean's quality specifications in an aggregate quantity of at least 10% and up to 20% of Dean's monthly raw grade A milk purchases for its processing plants in Order 1 (such quantity not to exceed 60,000,000 pounds per month) for delivery at Dean's processing plants in East Greenbush, NY; Franklin, MA; and West Lynn, MA.  Settlement Agreement ¶ 9.2.  These obligations will stay in place for a minimum of 30 months from the first purchase pursuant to this program.  Dean must be prepared to receive milk from such other suppliers within six months of the Effective Date of the Settlement.

### 4.    Release

In exchange for the above consideration from Dean, Plaintiffs have agreed for themselves and on behalf of the putative Settlement Class to release and discharge Dean from any and all claims against Dean arising out of, or related to, the facts or circumstances occurring from January 1, 1995 through and including the Effective Date of the Settlement that were alleged in Plaintiffs' Amended Class Action Complaint filed on January 21, 2010, in Plaintiffs' Consolidated Amended Class Action Complaint filed on September 29, 2010, or in Plaintiffs' Revised Consolidated Amended Class Action Complaint filed on October 15, 2010, including, but not limited to, Dean's purchase of, or failure or refusal to purchase, raw Grade A milk that was produced in and pooled on Federal Milk Marketing Order 1.  Settlement Agreement ¶ 8.1. The release shall cover both claims that were asserted and claims that could have been asserted.

The Settlement Agreement, however, does nothing to abrogate the rights of any member of the putative Litigation Class or Settlement Class to recover from any other Defendant for the alleged participation by Dean in a conspiracy to depress the prices of raw Grade A milk during the relevant time period.  In addition, this Settlement Agreement does not release any claims

brought on behalf of the Southeast dairy farmer class certified by Judge J. Ronnie Greer in *In re Southeastern Milk Antitrust Litigation,* MDL 2:08-MD-1000.

### C.     The Timeline

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, a hearing on the final approval of the settlement should take place after class members have received notice and have had the opportunity to evaluate the settlement.  Plaintiffs propose the following schedule:

1.     Notice to be mailed no later than thirty (30) days following the date on which the preliminary approval order is entered by the Court ("Notice Date");

2.     Summary Notice to be published as soon as feasible after the Notice Date;

3.     Plaintiffs' motion for final approval of the settlement to be filed no later than fourteen (14) days prior to the date the Court sets for a hearing on final approval;

4.     Requests for exclusion from the proposed settlement must be mailed to the Claims Administrator, postmarked no later than twenty-one (21) days prior to the date the Court sets for a hearing on final approval;

5.     Any objections to the settlement must be filed with the Court no later than twenty-one (21) days prior to the date the Court sets for a hearing on final approval;

6.     Class Counsel may respond to any objections no later than fourteen (14) days prior to the date the Court sets for a hearing on final approval; and

7.     A hearing before the Court on final approval of the settlement to be scheduled subject to the Court's convenience.

## III.     THE COURT SHOULD GRANT PRELIMINARY APPROVAL

### A.     Standard for Granting Preliminary Approval

The Second Circuit has endorsed as an overriding public interest the settling of litigation, particularly class actions.  *See Bano v. Union Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001); *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) ("There is a strong public interest in quieting any litigation; this is 'particularly true in class actions.'").  In fact, "settlement should be facilitated at as early a stage of the litigation as possible."  6A Charles

Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* 2d § 1522, at 225-26 (citing 1983 Advisory Committee Notes).

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise of claims brought on a class basis. Once a proposed settlement is reached, "a court must determine whether the terms of the proposed settlement warrant preliminary approval . . . [i]n other words, the court must make 'a preliminary evaluation' as to whether the settlement is fair, reasonable and adequate." *In re Currency Conversion Fee Antitrust Litig.*, MDL No. 1409, 2006 U.S. Dist. LEXIS 81440, at *13 (S.D.N.Y. Nov. 8, 2006). Courts have wide discretion to determine what information to consider at the preliminary stage. *Manual for Complex Litigation*, Fourth § 21.162 (2004).

At the preliminary approval stage, the Court does not make a final determination of the merits of the proposed settlement. *In re Prudential Sec. Inc. Lt'd P'ship Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995). Full evaluation is made at the final approval stage, after notice of the settlement has been given to the members of the class and class members have had an opportunity to voice their views of the settlement. *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("NASDAQ").

In considering whether to grant preliminary approval to a class action settlement, courts make a preliminary evaluation of the fairness of the settlement. *Id.* Determining whether a settlement is fair, reasonable, and adequate requires consideration of the negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). With respect to procedural fairness, the reviewing court must "ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the [necessary]

experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (citation and quotation marks omitted).   Under such circumstances, the Second Circuit has recognized a presumption of correctness attached to a class settlement reached in arm's-length negotiations between experienced, capable counsel.  *See id.* at 803; *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2d Cir. 2005); *In re Sterling Foster & Co. Sec. Litig.*, 238 F. Supp. 2d 480, 484 (E.D.N.Y. 2002); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 83 (E.D.N.Y. 2002); *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F. Supp. 473, 567 (E.D.N.Y. 1995).

With respect to substantive fairness, the reviewing court may consider nine factors, namely: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[3]  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted).  *See also McReynolds*, 588 F.3d at 804; *Wal-Mart Stores*, 396 F.3d at 117.

Ultimately, "[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant

---

[3] Because the Court is only being asked to preliminarily approve the settlement at this stage, some of these factors, such as reaction of the class to the settlement, do not yet fully come into play.  *See Bourlas v. Davis Law Assocs.*, 237 F.R.D. 345, 355 n.7 (E.D.N.Y. 2006).

preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *NASDAQ,* 176 F.R.D. at 102. *See also In re Medical X-Ray Film Antitrust Litig.*, No. 93-5904, 1997 WL 33320580, at *6 (E.D.N.Y. Dec. 26, 1997) ("preliminary approval should be granted and notice of the proposed settlement given to the class if there are no obvious deficiencies in the proposed settlement[]").

Here, the settlement falls well within the range warranting preliminary approval and there are no grounds to doubt the fairness of the proposed settlement.

### B.    The Proposed Settlement Results from Arm's-Length Negotiations between Experienced, Capable Counsel

Vigorous arm's-length negotiations between seasoned counsel protect against collusion and advance the fairness considerations of Rule 23(e), and settlements resulting from such negotiations are entitled to deference from the court. *See, e.g., In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 419, 430 (S.D.N.Y. 2001) (noting that "the opinion of experienced and informed counsel is entitled to considerable weight" in deciding whether to approve a settlement). Courts recognize that the opinion of experienced and informed counsel supporting settlement is entitled to considerable weight. *See Joint E. & S. Dists. Asbestos Litig.*, 878 F. Supp. at 567 (stating that "[a] substantial factor in determining the fairness of a settlement is the opinion of counsel involved in the settlement") (citation omitted); *In re Painewebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation); *In re Salomon Inc. Sec. Litig.*, 91 Civ. 5442, 1994 U.S. Dist. LEXIS 8038, at *42 (S.D.N.Y. June 15, 1994) (the judgment of experienced counsel "weighs strongly in favor [of] the proposed settlement"); *Chatelain v. Prudential-Bache Sec. Litig.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992); *Ross v. A.H. Robins Co.*, 700 F. Supp. 682, 683 (S.D.N.Y. 1988).

Here, the proposed settlement was reached after vigorous, arm's-length and hard-fought negotiations between highly experienced counsel. Plaintiffs were represented by counsel with extensive experience litigating complex antitrust class actions and thorough familiarity with the factual and legal issues of the case, and Defendant was represented by similarly experienced and knowledgeable counsel. Plaintiffs' counsel and defense counsel also have particularly extensive experience litigating class actions involving dairy and other agricultural issues, including years of experience litigating similar claims against several of the same defendants in *In re Southeastern Milk Price Fixing Antitrust Litig.*, No. 08-md-1000 (E.D. Tenn.).

In preparation for such negotiations, Plaintiffs' counsel undertook a diligent and thorough investigation of the legal and factual issues posed by this litigation. Plaintiffs' counsel conducted a comprehensive examination of the facts, reviewed voluminous documents produced by Defendants and third parties, and briefed and argued opposition to Defendants' motion to dismiss, all of which assisted in identifying the material issues in this case and the strengths and weaknesses of the claims asserted.

The arm's-length nature of the negotiations and the participation of experienced counsel throughout the process strongly supports the conclusion that the proposed settlement is fair, reasonable and adequate. Nothing in the course of the negotiations or in the substance of the proposed settlement presents any reason to doubt its fairness.

### C. The Proposed Settlement is in the Range of Possible Approval as Fair, Reasonable and Adequate

"[I]n any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972). This settlement falls well "within the range of possible

approval," warranting the issuance of notice to the Settlement Class.  *See Prudential*, 163 F.R.D. at 210.

A recovery of $30 million from Dean is an excellent result for the Settlement Class.  It would be premature for Plaintiffs to identify the precise percentage of the total damages in this case that the $30 million settlement represents, because Plaintiffs' damages calculation is not finalized (and expert reports on the merits issues are not due until May 2011).  However, Plaintiffs' analysis of the potential damages in this case, based on the voluminous milk marketing data produced by Defendants and third parties, indicates that the $30 million settlement amount is consistent, as calculated as a percentage of total damages, with the percentage thresholds typically approved by courts in the Second Circuit.[4]  *See, e.g, Menkes v. Stolt-Nielsen S.A.*, No. 03-409, 2010 U.S. Dist. LEXIS 94184, at *63-66 (D. Conn. Sept. 10, 2010) (preliminarily approving settlement that represents approximately eight percent of the maximum recoverable damages for all Class Members); *In re Initial Pub. Offering Sec. Litig,* 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009) (approving settlement which provided only two percent of defendants' maximum possible liability, observing that "the Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate"); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 n.30 (S.D.N.Y. 2009) (approving a settlement that amounted to 5-12 percent of provable damages); *In re Prudential Sec. Ltd. P'ships Litig.*, MDL No. 1005, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6 percent and 5 percent of

---

[4] Indeed, even if the settlement were a smaller percentage of total damages, "courts have determined that a settlement can be approved even if the benefits amount to a small percentage of the recovery sought . . . And, 'there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'" *Lazy Oil, Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (quoting *Grinnell*, 495 F.2d at 455 n.2).

claimed damages); *In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that awarded class members between six cents and ten cents for every $1.00 lost).

The injunctive provisions of the Settlement Agreement constitute additional fair and adequate consideration that provides substantial value to the Settlement Class.  The Settlement Agreement requires Dean to alter its purchasing policy in order to enhance competition in the market for the sale and purchase of raw Grade A milk.  Specifically, Dean has agreed to purchase from dairy farmer marketers other than and in addition to the Non-Settling Defendants, at a price that reflects a competitive market price, qualified raw Grade A milk in an aggregate quantity of at least 10% and up to 20% of Dean's total monthly raw grade A milk purchases for its processing plants in Order 1.  This substantial purchase commitment, which will last at least 30 months, will introduce greater choice for Northeast dairy farmers and competition into the market for the purchase of raw Grade A milk produced by dairy farmers in the Northeast.

A settlement providing a $30 million recovery and injunctive relief is fair, reasonable and adequate when balanced against the expense and risk that Plaintiffs and the Settlement Class would face in litigating this case through trial and appeal against Dean.

> **D.    The Proposed Settlement Achieves an Excellent Result for the Class, Particularly Given the Expense, Duration and Uncertainty of Continued Litigation**

Antitrust class actions are "notoriously complex, protracted, and bitterly fought." *Weseley v. Spear, Leeds & Kellogg,* 711 F. Supp. 713, 719 (E.D.N.Y. 1989).  Continuing this litigation against Dean would entail a lengthy and expensive legal battle, involving complex

legal and factual issues.[5]   Motions would continue to be vigorously contested, and the merits discovery process would be comprehensive and costly.  Additionally, Dean would assert various defenses, and a jury trial might well turn on close questions of proof, many of which would be the subject of complicated expert testimony, making the outcome of such trial uncertain for both parties.  *See, e.g., In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("NASDAQ II") ("Antitrust litigation in general, and class action litigation in particular, is unpredictable").  Moreover, even after trial is concluded, there would very likely be one or more lengthy appeals.  *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 65 (S.D.N.Y. 1993).

Against this background, the settlement represents an excellent result for the members of the Settlement Class.  Dean's $30 million payment provides for significant compensation to the Settlement Class that will be available much earlier than if litigation against Dean continued through trial and appeal.  In addition to a significant cash payment, the Settlement Agreement also provides swift benefits to the putative Settlement Class by obtaining, within just six months of the execution of the Settlement Agreement, modification of Dean's purchasing policies that enhances choice and competition for the sale and purchase of raw Grade A milk.

Therefore, in light of the risks and duration of the litigation and the monetary and non-monetary benefits achieved by the Settlement, the Settlement is well within the range of being fair, reasonable and adequate and should be preliminarily approved.

---

[5] Because Plaintiffs' Counsel may have to litigate against the Non-Settling Defendants through trial and appeal, their duties to the putative Litigation Class preclude a more detailed discussion of their potential litigation risks.

## IV.    CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS IS WARRANTED

As part of approving the settlement, the Court must also approve and certify the proposed Settlement Class.  Rule 23 of the Federal Rules of Civil Procedure delineates the prerequisites to certifications.[6]  Courts in the Second Circuit favor "the liberal construction of Rule 23" and exercise "broad discretion when they determine whether to certify a class."  *Thompson v. Linvatec Corp.*, No. 06-404, 2007 U.S. Dist. LEXIS 37711, at *12 (N.D.N.Y May 22, 2007) (citations omitted); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176 (S.D.N.Y.  2005).  Courts are to resolve any doubts in favor of certifying the class.  *Id.*

This Court should certify the proposed Settlement Class because it satisfies each of the Rule 23 class certification requirements.  Indeed, the United States District Court for the Eastern District of Tennessee has certified a class for litigation purposes comprised of dairy farmers who produced and sold raw Grade A milk in the Southeast.[7]  *In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000.

### A.    The Settlement Class Satisfies Rule 23(a)

Rule 23(a) provides that four prerequisites must be satisfied before a case may proceed as a class action:

(a)    The class is so numerous that joinder of all members is impracticable ("numerosity");

(b)    There are questions of law or fact common to the class ("commonality");

---

[6] "Although the rule is silent as to certifying a class 'for settlement purposes only,' the Second Circuit Court of Appeals and the United States Supreme Court have recognized this judicial invention."  *In re Host Am. Corp. Sec. Litig.*, No. 05-1250, 2007 U.S. Dist. LEXIS 77418, at *2 (D. Conn. Oct. 18, 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)).

[7]  The certification decision of the Eastern District of Tennessee is presently subject of a Rule 23(f) petition before the Sixth Circuit Court of Appeals.

(c)     The claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and

(d)     The representative parties will fairly and adequately protect the interests of the class ("adequacy").

The proposed Settlement Class satisfies the four requirements of Rule 23(a) for purposes of settlement.

## 1.     Fed. R. Civ. P. 23(a)(1): The Class Meets the Numerosity Requirement and Is Ascertainable

Under Rule 23(a)(1), the class must be so numerous that joinder of all members is "impracticable." "There is no magic number which satisfies [Rule 23(a)(1)'s] numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members." *In re Plastic Cutlery Antitrust Litig.,* No. 96-728, 1998 U.S. Dist. LEXIS 3628, at *7 (E.D. Pa. March 20, 1998).  Generally, though, joinder is "presumed to be impracticable when a putative class exceeds 40 members." *Menkes*, 2010 U.S. Dist. LEXIS 94184.  *See also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Fogarazzo*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009). Numerosity is met here because, at all times during the Class Period, there have been many thousands of dairy farmers within the Class.  Under the circumstances, joinder of each member of the proposed class is impracticable.

In addition to the sheer number of class members, the geographic dispersion of class members across multiple states and judicial districts makes joinder impracticable.  *See, e.g.*, *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393, 404 (S.D. Ohio 2007).  Members of the proposed Class are spread throughout the 11 states making up Federal Order 1 and reside in numerous United States District Court districts, making joinder of all class members in a single action manifestly impracticable.

Additionally, a distinct "implied requirement of ascertainability" must be satisfied for certification of class actions. *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 30, 44-45 (2d Cir. 2006). *See also Menkes,* 2010 U.S. Dist. LEXIS 94184, at *33-34; *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010); *Fogarazzo*, 263 F.R.D. at 97.  Class membership "must be ascertainable 'at some point in the case,' but not necessarily prior to class certification." *IPO*, 471 F.3d at 45 (quoting *In re Methyl Tertiary Butyl Ether "MTBE" Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).  Class membership is readily identifiable where it "can be ascertained by reference to objective criteria." *Spagnola*, 264 F.R.D. at 97 (citation and quotation marks omitted).  *Cf. Harris v. Initial Sec., Inc.*, No. 05-3873, 2007 U.S. Dist. LEXIS 18397 (S.D.N.Y. Mar. 7, 2007) (class defined as "dark-skinned" employees deemed unascertainable "because there is no objective criteria to which the Court could refer to determine whether someone is sufficiently 'dark-skinned' to be a class member.").

Here, the ascertainability requirement is met.  The proposed Settlement Class is comprised of all dairy farmers, whether individuals, entities or members of cooperatives, who produced raw Grade A milk in Order 1 and pooled raw Grade A milk on Order 1 during any time from January 1, 2002 to the Notice Date.  This is a finite class defined with sufficiently precise criteria.  Plaintiffs can obtain the identities of Settlement Class members from cooperatives and marketing agencies that pool raw Grade A milk in Order 1 and can provide notice to such Settlement Class members by using a specific list maintained by the market administrator of Order 1.

## 2.    Fed. R. Civ. P. 23(a)(2): There Are Questions of Law and Fact Common to Members of the Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  This is "not a demanding standard," as it "is established so long as the plaintiffs can identify some

unifying thread among the [class] members' claims." *Menkes*, 2010 U.S. Dist. LEXIS 94184, at

*23 (quoting *Haddock v. Nationwide Fin. Serv., Inc.*, 262 F.R.D. 97, 116 (D. Conn. 2009).)

Commonality does not require a showing that all the questions raised by the class claims are

identical; it is sufficient if a single common issue is shared by the class.  *DeMarco v. Nat'l*

*Collector's Mint, Inc.*, 229 F.R.D. 73, 80 (S.D.N.Y. 2005).  *See also In re Natural Gas*

*Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y. 2005) (noting that "common question"

requirement has been characterized as a "low hurdle") (quoting *In re Sumitomo Copper Litig.*,

194 F.R.D. 480, 482 (S.D.N.Y. 2000)).

　　　Courts recognize that antitrust price-fixing cases inherently present common legal and

factual questions concerning the existence, terms, scope, and effect of the alleged conspiracy.

"Where an antitrust conspiracy has been alleged, courts have consistently held that 'the very

nature of a conspiracy antitrust action compels a finding that common questions of law and fact

exist.'"  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-1486, 2006

U.S. Dist. LEXIS 39841, at *29 (N.D. Cal. June 5, 2006) (citations omitted).  "The weight of

authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint

of trade is one that is common to all potential plaintiffs, and the importance of this question

usually warrants treating them as a class." *Sebo v. Rubenstein*, 188 F.R.D. 310, 314 (N.D. Ill.

1999) (citation omitted). *See also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D.

493, 509 (S.D.N.Y. 1996) ("NASDAQ III") ("numerous courts have held that allegations

concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important

common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)"); *In re*

*Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528-29 (3d Cir. 2004) (where defendant

"engaged in a broad-based campaign, in violation of federal and state consumer fraud and

antitrust laws . . . allegations naturally raise several questions of law and fact common to the

entire class"); *In re Bulk (Extruded) Graphite Prod. Antitrust Litig.*, No. 02-6030, 2006 U.S. Dist. LEXIS 16619, at *15 (D.N.J. Apr. 4, 2006) ("[T]he existence, scope and efficacy of the conspiracy to fix or stabilize prices of bulk extruded graphite sold in the United States are common questions that satisfy the requirements of Fed. R. Civ. P. 23(a)(2)."); *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. 180, 184 (D.N.J. 2003) ("common questions exist[] concerning the existence of the alleged conspiracy and how it worked.").

Here, Plaintiffs allege an overarching anti-competitive scheme to monopsonize the purchase of raw Grade A milk for the purpose of depressing and fixing prices at below competitive levels. These issues present a "common core of questions" that go to the gravamen of this case – the existence of the alleged anti-competitive scheme, the relevant product and geographic market, whether Defendants possessed market power, and the estimation of what the prices should have been. The numerous questions of law and fact common to the members of the proposed Settlement Class include:

- Whether Defendants engaged in a conspiracy to fix, stabilize, maintain, and/or artificially lower the over-order premiums paid to Northeast dairy farmers for raw Grade A milk;

- Whether Defendants entered into and implemented long-term supply agreements to foreclose Northeast dairy farmers' access to raw Grade A milk bottling and processing plants;

- Whether Defendants required Northeast dairy farmers to market their raw Grade A milk through DFA or DFA-controlled DMS in order to gain access to raw Grade A milk bottling and processing plants and/or balancing plants;

- Whether Defendants entered into agreements not to compete and to allocate markets, such as an agreement not to compete for the purchase of raw Grade A milk from Northeast dairy farmers and an agreement not to compete on over-order premiums paid by processors for raw Grade A milk in the Northeast;

- Whether Defendants threatened and punished farmers who attempted to terminate their relationship with DFA or DMS and join other cooperatives or operate independently, and/or threatened and punished the haulers and processors that attempted to transport and purchase the raw Grade A milk of those farmers and whether those actions enhanced their market power;

- Whether Defendants conspired to monopsonize raw Grade A milk marketed or sold to, or purchase by, processing plants or purchased from dairy farmers in the Northeast;

- Whether DMS, controlled by its principal DFA, exercises and has abused its monopsony power in the raw Grade A milk market;

- Whether Defendants conspired to circumvent and thwart conditions and restrictions imposed by the DOJ or state Attorneys General to preserve competition in the raw Grade A milk market in the Northeast;

- Whether Defendants purchased raw Grade A milk bottling and processing plants, closed down raw Grade A milk bottling and processing plants and/or refused to operate raw Grade A milk bottling and processing plants with the purpose and intent of stifling competition from independent dairy farmers, cooperatives, and raw Grade A milk processors in the Northeast;

- Whether, in furtherance of the conspiracy, Defendants engaged in group boycott;

- Whether Defendants' conduct has violated the Sherman Act;

- Whether Defendants caused injury to Plaintiffs and proposed Class members under the Sherman Act;

- Whether Plaintiffs and proposed Class members are entitled to: i) an injunction prohibiting the continuation of Defendants' violations, and ordering such other and further injunctive relief as is necessary to restore competition; ii) a declaration of their eligibility to an award of damages and other monetary relief, including treble damages; iii) interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and iv) attorneys' fees and costs and any other relief the Court deems just and reasonable.

These issues present a common thread, focusing on the central issue of the "existence of the alleged conspiracy and establishment of what the price should have been" in a free and open market. *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 458 (E.D. Pa. 1968). Thus, "[c]ommonality exists because identical questions of both law and fact would be raised by the claims of each class member if these were to be asserted individually." *Menkes*, 2010 U.S. Dist. LEXIS 94184, at *23-24.

### 3.    Fed. R. Civ. P. 23(a)(3): The Representative Plaintiffs' Claims Are Typical of the Class's Claims

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class."  The typicality requirement is intended to ensure that the representative plaintiffs' interests are aligned with those of the proposed class and that, in pursuing their own claims, the representative plaintiffs will also advance the interests of the class members.  1 Newberg, *supra*, § 3-13, at 3-76.

 "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation and quotation marks omitted).  By its terms, the rule only requires that the named plaintiff's *claims* be typical of the class; typicality "does not require 'that the factual background of each named plaintiff's claim be identical to that of all class members.'"  *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D 265, 272-73 (S.D.N.Y. 2007) (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999)) (other citations omitted); *see Fears v. Wilhelmina Model Agency, Inc.,* No. 02-4911, 2003 U.S. Dist. LEXIS 11897, at *12 (S.D.N.Y. July 15, 2003), ("Personal traits or variables . . . are irrelevant to the typicality criterion."). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

"[C]laims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement," and "typicality in the antitrust context will be established by Plaintiffs and all class members alleging the same antitrust violations by the defendants."  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998).  *See, e.g., In re Currency Conversion Fee*

*Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) ("Plaintiffs' claims are typical because Plaintiffs must prove a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, (N.D. Cal. 2009) (finding overarching price fixing scheme satisfied typicality); *In re Ready Mix Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) ("Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation as the defendants.") (citation omitted).

Here, the Representative Plaintiffs' claims are typical of the claims of the entire Settlement Class. Each Representative Plaintiff produced raw Grade A milk in Order 1 and pooled raw Grade A milk on Order 1 during the Class Period. Each Representative Plaintiff claims that he/she was injured by Defendants' abuse of market power and conspiracy to depress the price of milk, and by conduct in furtherance of these illegal acts. Each alleges a common course of conduct by Defendants directed against all Settlement Class members and each asserts the same theory of antitrust liability. Even though the size of a given farm may differ, all Plaintiffs have supplied the same product during the class period, raw Grade A milk, thereby suffering the same types of harms as the other members of the Settlement Class. S*ee Lane v. Facebook, Inc.*, No. 08-3845, 2010 U.S. Dist. LEXIS 24762, at *11 (N.D. Cal. Mar. 17, 2010) (typicality was met where "all of the named Plaintiffs' and Settlement Class Members' claims arise from . . . a common course of conduct resulting in the same or similar alleged injuries").

### 4.      Fed. R. Civ. P. 23(a)(4): The Representative Plaintiffs will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)'s fourth requirement is that "[t]he representative parties will fairly and adequately protect the interests of the class." *Flag*, 574 F.3d at 34. The adequacy requirement is satisfied where (1) "the proposed class representative's interests are to vigorously pursue the claims of the class and are not antagonistic to the interests of other class members," and (2) the

proposed class counsel "are qualified, experienced and able to conduct the litigation."  *Menkes,* 2010 U.S. Dist. LEXIS 94184, at *29; *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).  The inquiry focuses "on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Flag*, 574 F.3d at 35 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, (1997)).  To defeat a motion for certification, any such conflicts "must be fundamental." *Flag*, 574 F.3d at 35 (citation omitted); *Menkes*, 2010 U.S. Dist. LEXIS 94184 at *29.

"[T]he great weight of authority in price-fixing conspiracy cases, absent special circumstances such as arbitration, holds that the victim of one alleged co-conspirator is adequate to prove liability for victims of all co-conspirators." *Currency*, 264 F.R.D. at 113.  *See NASDAQ III*, 169 F.R.D. at 519 (Because antitrust law "provides for joint and several liability of co-conspirators, each Plaintiff will have an equal incentive to generally prove the Defendants' participation in the alleged conspiracy."); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 644 (D. Kan. 2008) (named plaintiffs had the "same interests as the other class members in proving they were all damaged by defendants alleged price-fixing conspiracy"); *In re Carbon Black Antitrust Litig.*, MDL No. 1543, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) ("The overarching question here is the conduct of the defendants, not the specific damage calculation or relevant bargaining power among the plaintiffs. Therefore, the named plaintiffs and their counsel have the same core objectives as would absent class members.").

Here, the Representative Plaintiffs are representative of the putative class and unhindered by conflicts with each other or members of the putative class.  They vary in size and are dispersed throughout several states.  Each Representative Plaintiff, like each class member, produced and pooled raw Grade A milk in Order 1 during the Class Period.  The Representative Plaintiffs will vigorously prosecute the interests of the class.  Each has an interest

in establishing Defendants' liability, recovering damages resulting from Defendants' antitrust violations that artificially depressed raw Grade A milk prices, and restoring a competitive market for the purchase of grade A milk, because they generally make most or all of their livelihood selling raw Grade A milk and have strong ties with and interest in the community and well-being of dairy farmers.

Nor are there any disqualifying conflicts of interest between the Representative Plaintiffs or with other class members, let alone the kind of conflict that conceivably might be an obstacle to class certification.  As shown above, nearly all the raw Grade A milk produced in the Northeast is sold by GNEMMA cooperatives or DMS at the same anti-competitively fixed prices.[8]  Defendants' conspiracy to depress prices lowered payments to all farmers in the proposed Settlement Class.  In proving their own claims, Representative Plaintiffs will be proving the claims of fellow Settlement Class members.

The fact that some representative Plaintiffs are members of DFA, and some are independent, does *not* establish a conflict among them or with other class members; the intent and effect of Defendants' Sherman Act violations has been to stymie competition and lower prices paid to Northeast dairy farmers regardless of whether they are members of DFA, members of another cooperative, or independent producers.  Therefore, regardless of whether Representative Plaintiffs are members of DFA, they were similarly injured by Defendants' antitrust violations and share an interest in recovery.  Courts reject efforts to defeat certification "by raising the possibility of hypothetical conflicts or antagonisms among class members," unless they are "apparent, imminent, and on an issue at the very heart of the suit." *NASDAQ III*, 169 F.R.D. at 514 (citation and quotation marks omitted).  *See In re Brand Name Prescription*

---

[8]  The minority of Northeast farmers who sell raw Grade A milk without the involvement of DMS or GNEMMA cooperatives are similarly injured by Defendants' conspiracy, as those farmers are unable to bargain for over-order premiums higher than the fixed price without risking access to bottling plants.

*Drugs Antitrust Litig.*, MDL No. 997, 1994 U.S. Dist. LEXIS 16658, at *10 (N.D. Ill. Nov. 15, 1994) (rejecting conflict raised by Defendants as assuming a conspiracy with different contours than that alleged by Plaintiffs).

As to the second requirement, Plaintiffs are represented by experienced counsel -- Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Howrey LLP ("Howrey") -- that are thoroughly familiar with class action and antitrust litigation and have particular experience litigating class actions involving dairy and other agricultural issues.  Cohen Milstein, with more than fifty attorneys and offices in Washington, D.C., New York, Philadelphia and Chicago, is nationally renowned for its decades of experience representing plaintiffs in antitrust and other class and complex actions.  Cohen Milstein has successfully litigated complex class actions involving the mispricing of agricultural products, including recovering $110 million for corn farmers who sued a biotechnology corporation for driving down corn prices, and obtaining a judgment of nearly $60 million for blueberry farmers who sued berry processors for price fixing. Chief Judge Hogan of the District of Columbia District Court, referring to Cohen Milstein attorneys, among others, stated: "counsel for the parties here are some of the most experienced and best antitrust counsel in the country . . ."  Transcript of Fairness Hearing at 10, *In re Lorazepam & Clorazepate Antitrust Litig.,* No. 99-0790, 2003 WL 22037741 (D.D.C. June 16, 2003).

Howrey is one of the largest antitrust firms in the United States -- in the last five years its attorneys have worked on more than 500 antitrust litigation matters and represented parties in one-third of pending MDL proceedings.  Howrey also has experience representing farmers in antitrust class action litigation.  In addition to *Southeastern Milk*, where Howrey is lead counsel representing dairy farmers alleging similar antitrust claims against several of the same Defendants, Howrey was lead counsel for a class of 170,000 tobacco farmers alleging a conspiracy to fix prices for tobacco leaf.  At the hearings approving the settlement (one of the

largest in class action history), Judge Osteen of the Middle District of North Carolina, stated, in reference to Howrey, that he had "never seen a group of plaintiffs' lawyers be more professional in what you have done and what you have accomplished for your clients," Transcript of 10/1/03 Fairness Hearing at 34, *DeLoach v. Philip Morris Cos*., No. 1:00CV01235 (M.D.N.C.), and that this was "some of the best lawyering" he had ever witnessed, *id.*, Transcript of 5/16/03 Preliminary Settlement Approval Hearing at 4.

Proposed Class Counsel have already demonstrated vigorous and efficient prosecution on behalf of the putative class by, among other activities, conducting a comprehensive pre-filing investigation, preparing and filing detailed amended complaints, retaining experts to demonstrate and calculate class-wide damages, opposing and largely defeating Defendants' motion to dismiss and conducting fact-intensive merits discovery. Both firms have shown through their expenditures of time and money to date that they are willing and able to commit the resources necessary to litigate the claims vigorously, and both firms have a successful history of funding large scale litigation.

Accordingly, the Representative Plaintiffs and Class Counsel are adequate representatives of the Settlement Class under Rule 23(a)(4).

### B. The Requirements of Rule 23(b)(3) are Satisfied

Under the two prongs of Rule 23(b)(3), Plaintiff must first show that "questions of law or fact common to the class predominate over questions affecting individual members." *Barone v. Safway Steel Prods., Inc*., No. 03-4258, 2005 U.S. Dist. LEXIS 17645, at *14 (E.D.N.Y. Aug. 23, 2005) (quoting Rule 23(b)(3)). Second, Plaintiff must show that a "class action is 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* The predominance and superiority requirements are satisfied in this action and certification of the Settlement Class is appropriate.

### 1.   Common Questions of Law and Fact Predominate in this Action

Generally, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Menkes*, 2010 U.S. Dist. LEXIS 94184; *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 92 (S.D.N.Y. 2009). "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-8144, 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) (quoting *Prudential*, 163 F.R.D. at 206.) "A claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individualized position." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001). Therefore, "when one or more of the central issues in the action are common to the class and can be said to predominate, the [class] will be considered proper." 7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure: Civil* 3d § 1778 at 121-23. "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *NASDAQ III*, 169 F.R.D. at 517.

The Supreme Court has stated that "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Cordes & Co. Fin. Serv., Inc v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007); *Currency*, 264 F.R.D. at 113. In a similar case involving similar antitrust claims against several of the same defendants, *In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000, the Eastern District of Tennessee held that common questions of law and fact predominate and

thus certified a class comprised of dairy farmers who produced and sold raw Grade A milk in the Southeast.  Specifically, the Court found:

> Plaintiffs' allegations of a per se violation of the antitrust laws are exactly the kind of allegations which may be proven on a class wide basis through common proof. Whether plaintiffs will be able to actually prove the existence of such an agreement remains to be seen. The same is true with respect to plaintiffs' monopolization/monopsonization claims. … [W]ith respect to the antitrust issues raised by the plaintiffs' complaint, common issues do in fact predominate as to the defendants' liability- *i.e.*, the existence, scope and extent of the alleged conspiracy, and the predominance requirement is met.

*Id.* The same is true in this action.  Indeed, the numerous common questions of law and fact discussed above easily predominate over any individual issues that may exist.

The "narrow issue" at this juncture is "whether the elements of an antitrust cause of action are demonstrable across the class on the basis of common proof."  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 94 (D. Conn. 2009).  As discussed below, the Plaintiffs could use common evidence to prove each of the elements of their antitrust claims on behalf of the Settlement Class.  To prevail in an antitrust case, Plaintiffs must prove three elements: (1) a violation of the antitrust laws; (2) the impact of the unlawful activity; and (3) damages.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).

### a.    Violation of the Antitrust Laws

Courts have found that the existence and scope of a price-fixing conspiracy are predominant common issues in the case.  *See*, *e.g.*, *Cordes*, 502 F.3d at 105 ("allegations of the existence of a price-fixing conspiracy are susceptible to common proof and, if proven true, would satisfy the first element of the plaintiffs' antitrust cause of action."); *EPDM*, 256 F.R.D. at 87 ("[T]he plaintiffs here have alleged that EPDM producers engaged in an illegal price-fixing

agreement to raise, maintain, and/or stabilize the price of EPDM in the United States. That issue is common to the class, and if proven true, would satisfy the first element of an antitrust cause of action, namely, a violation of antitrust law."); *Foundry Resins*, 242 F.R.D. at 408 ("courts have consistently found that common issues regarding the existence and scope of the conspiracy predominate over questions affecting only individual members"); *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 192 (W.D.N.Y. 2003) (allegation of single antitrust conspiracy satisfies both commonality and predominance requisites).   Common issues also predominate in cases alleging monopolization (monopsonization) and conspiracy to monopolize (conspiracy to monopsonize). *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.26, at 18-83 to 18-86 (4th ed. 2002) ("in antitrust [cases], the issues of conspiracy, monopolization, and conspiracy to monopolize have been viewed as central issues which satisfy the predominance requirement").

Proof of Defendants' violation of antitrust law would involve evidence common to all Settlement Class members.   Critically, Plaintiffs' allegations of price-fixing and monopsony focus on the actions of the Defendants, rather than the actions of individual class members, so that common issues regarding Defendants' liability predominate.   Plaintiffs will offer common class-wide proof to establish the creation, scope, terms, participants, and enforcement of an overarching conspiracy, as well as acts in furtherance of the conspiracy.   Accordingly, proof of these issues "will not vary among class members." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 279 (S.D.N.Y. 1999).   In short, proof of Defendants' antitrust violations is a common issue of sufficient magnitude that it alone causes common issues to predominate in this case.

### b.   The Impact of the Unlawful Activity

Plaintiffs would need to prove that Defendants' conspiracy injured the class. *See Cordes*, 502 F.3d at 106.   This element of an antitrust claim has two components: (1) a legal question,

which asks "whether such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" and (2) a factual question, which asks whether injury was in fact suffered.  *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The classwide nature of the legal question is clear.  All class members are seeking the same relief:  damages equal to the amount that they were underpaid as a result of the antitrust conspiracy.  Whether this injury satisfies the legal definition of antitrust injury, therefore, is common to the class.  *See id.* at 107 ("legal question raised by the antitrust injury element of [plaintiffs'] case is common to the class"); *EPDM*, 256 F.R.D. at 88 (finding predominance for legal prong of antitrust injury met in an antitrust price fixing conspiracy).

Proof of injury in fact is also common to the class.  Plaintiffs do not have to prove actual impact at the certification stage; rather, they only "must show that injury-in-fact, or impact, can be proven by evidence common to the class."  *Id*. "If generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' individual circumstance . . ." *Cardizem*, 200 F.R.D. at 307.  "Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes*, 502 F.3d at 108.

The common, predominating evidence of how raw Grade A milk prices are fixed shows that Defendants' conspiracy to depress milk prices alleged here affects *all* dairy farmers.  There are no individual price negotiations between individual farmers and milk processors for the

prices farmers will be paid for their milk.[9]  All prices are fixed by Defendants.  As discussed above, DFA and DMS entered into full-supply agreements with Dean and other processors, many of which contain Most Favored Nations clauses that guarantee each processor's price will be the same as other processors.  DFA and DMS thereafter fixed raw Grade A milk prices and over-order premiums with Dean and other processors.  DMS subsequently charged those fixed milk prices and paid fixed over-order premiums to thousands of dairy cooperative members and independent farmers.  DFA and DMS also required GNEMMA member cooperatives, including those who do not contract with DMS, to charge those fixed prices and pay the fixed over-order premiums to their member farmers.  Through this coordinated effort, Defendants fixed the over-order premiums to be paid by processors at artificially low levels to the injury of the entire Settlement Class.[10]

The characteristics of the market for milk in the Northeast confirm that the impact of the alleged conspiracy is subject to class-wide proof.  Raw Grade A milk is a homogenous product for which there are no close substitutes.  Accordingly, price is the critical factor in sales and purchase, and the impact of the alleged conspiracy can be shown by proof that the free market raw Grade A milk price would have been higher than the fixed price.  *See In re Polyester Staple*

---

[9] In price-fixing cases, even where the allegations involve individual negotiations and varied purchase methods, courts repeatedly have found that common questions regarding proof of impact predominate over individual issues.  *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002).

[10] The fact that the specific amount in a farmer's mailbox check may differ (based on volume of milk sold, for example) does not preclude common proof of impact because all raw Grade A milk prices would have been higher but for Defendants' illegal conspiracy.  *See EPDM*, 256 F.R.D. at 89 ("Defendants argue that, because the plaintiffs have not conclusively demonstrated how those price increases raised prices for each transaction with each plaintiff, they cannot serve as common proof of impact, pointing to individual discounts, price rebates, and contract terms that would have lowered the price of EPDM below the list price for certain plaintiffs. The defendants misconstrue the plaintiffs' burden at the class certification stage. The plaintiffs need not demonstrate to an absolute certainty that all EPDM purchasers ultimately suffered damages as a result of inflated list prices.")

*Antitrust Litig.*, MDL No. 03-1516, 2007 U.S. Dist. LEXIS 52525, at *82 (W.D.N.C. July 19, 2007) ("with undifferentiated commodities, a rise in prices to one set of customers necessarily implies a price increase to all customers generally.")   Furthermore, Defendants control a significant majority of all milk marketed and bottled in the Northeast, which limits the possibility of competition and makes it easier for Defendants to assert collusive power over milk prices and for that collusive power to lower prices across the Settlement Class.  *EPDM*, 256 F.R.D. at 92. Through GNEMMA, DFA and DMS fix the prices of, and determine access to bottling plants for, approximately 80 percent of the raw Grade A milk in the Northeast.  Additionally, due to the high cost of transporting milk, a perishable product, farmers cannot easily find other outlets for their milk, and there are substantial barriers to entry in the Northeast market.  As a result, when they conspired, Defendants were insulated from the risk of non-conspiring competitors entering the market and offering higher prices. *Id.*

### c.    Damages

No precise damage formula is needed at the class certification stage.  *See DRAM*, 2006 U.S. Dist. LEXIS 39841, at *48-50.  Rather, the Court's inquiry is limited to assessing whether methods are available to prove damages on a class-wide basis.  *See NASDAQ III*, 169 F.R.D. at 522 ("The Court need not decide at [the class certification] juncture what [economic methodologies are] best suited to the particularities of this case. It is sufficient to note at this stage that there are methodologies and that Rules 23(c)(1) and (d) allow ample flexibility to deal with these issues.").  Multiple methodologies are available to prove damages in this case on a class-wide basis.  For example, damages can be calculated using a geographic benchmark model, which is an approach commonly employed in antitrust cases of this type.  The over-order premiums paid in certain regions outside the Northeast are applied as a yardstick to estimate the over-order premiums that Class members in the Northeast would have received were it not for

the conspiracy.  This is done using standard regression techniques that control for differences between the regions that would be likely to influence over-order premiums paid in each location.

In this Circuit, it is well-settled that even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure.  *See, e.g., McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) ("[T]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."); *Menkes,* 2010 U.S. Dist. LEXIS 94184, at *36 ("The need to prove actual losses individually incurred by each class member does not defeat predominance because differences in the amount and recoverability of individual damages do not necessarily make class actions unmanageable."); *EPDM*, 256 F.R.D. at 103 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damages issues."); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y. 1996) ("Courts have routinely held, however, that the need for individualized determinations of the putative class members' damages does not, without more, preclude certification of a class under Rule 23(b)(3)."); Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18:27 (4th ed. 2002) ("A particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class.")

## 2.    A Class Action Is Superior to Other Available Methods

In addition to the predominance of common questions, Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Factors relevant to the superiority of a class action under Rule 23(b)(3) include: "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." *Visa Check*, 280 F.3d at 133.   The Court should balance, "in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271, 290 (S.D. Ohio 1997) (quoting *Georgine v. Amchem Prods.*, 83 F.3d 610, 632 (3d Cir. 1996)).

In this case, a class action is certainly superior.   The interests of Settlement Class members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.   There are no other pending actions raising the same allegations in the Northeast against these Defendants.   Thus, the first three factors listed above are easily addressed:   No class member has demonstrated any interest in litigating individually; the claims in this case are not being litigated anywhere else; and it would be enormously inefficient – for both the Court and the parties – to engage in multiple trials of the same claims asserted in multiple individual actions.   *See, e.g., NASDAQ III*, 169 F.R.D. at 527 ("Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor 'an adjudication' of their claims . . . ."). Given the common legal and factual issues, any suggestion by Defendants that Northeast dairy farmers should file thousands of individual suits would defy logic.   Even if such a course of action were possible, it would not be desirable, as it would consume substantial judicial and private resources.   *See Playmobil*, 35 F. Supp. 2d at 249; *Catfish*, 826 F. Supp. at 1034.   Thus, a class action is the *only* efficient method for Plaintiffs and class members to litigate the claims at issue against these Defendants.   *Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir. 1983).

Further, proceeding as a class action, rather than a host of separate individual trials, would provide significant economies in time, effort and expense and permit class members to seek damages that would otherwise be too costly to pursue.  It would be prohibitively expensive for class members to litigate their claims individually.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class actions . . . may permit the plaintiffs to pool claims which would be uneconomical to litigate individually."); *Currency*, 264 F.R.D. at 117 ("A class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action."); *Menkes*, 2010 U.S. Dist. LEXIS 94184, at *59-60 ("The claims of each individual class member are likely too small to warrant the costs of litigating individually, and it is therefore in the interest of all class members to proceed as a class."); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 88 (E.D.N.Y. 2000) ("Without class certification," it is highly likely that a lot of plaintiffs "will lose any practical means of obtaining damages for [a] defendants' allegedly illegal conduct.").  Because it would be economically unreasonable for the class members to adjudicate their separate claims individually, the superiority of a class action is evident.  Additionally, "a class action is considered a superior mode of adjudication where it would increase the public's awareness of the suit and thereby increase[ ]the number of individuals able to vindicate their rights.'"  *Norflet v. John Hancock Life Ins. Co.*, No. 04-1099, 2007 WL 2668936, at *10 (D. Conn. Sept. 6, 2007).

Finally, the Supreme Court has found that when certifying a settlement class "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial."  *Amchem Prods.*, 521 U.S. at 620.  Such is the case here.  The settlement between Plaintiffs and Dean

obviates the need for a trial against Dean, and thus questions concerning the manageability of litigating Plaintiffs' claims on a class-wide basis are irrelevant for purposes of certifying the proposed Settlement Class.  Thus, irrespective of whether this case would be maintainable as a trial class as Plaintiffs contend, it can be certified as a settlement class because all of the requirements of Rule 23(a) and all of the relevant requirements of Rule 23(b)(3) have been met in the settlement context.  Accordingly, the Court should certify the Settlement Class proposed by the parties.

## V.   THE FORM OF NOTICE SHOULD BE APPROVED AND NOTICE OF THE PROPOSED SETTLEMENT SHOULD BE GIVEN TO CLASS MEMBERS

Rule 23 requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23 (c)(2)(B); *see* 4 *Newberg* § 8.2 at 162-65.  The notice "must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance." *McReynolds*, 588 F.3d at 804.

Plaintiffs' Counsel propose that notice of the settlement with Dean be provided to the Settlement Class in two ways:  First, a Notice will be mailed to each member of the Settlement Class who can be identified with reasonable effort by the administrator of Federal Milk Marketing Order 1, as well as to anyone who requests such notice.  The form of the Notice to be mailed is attached to the proposed Order as Exhibit 1.  Second, a Summary Notice of the proposed settlement will be published in the following four publications: *American Agriculturalist*; *Country Folks* (Eastern Edition); *Farming: The Journal of Northeast Agriculture*; and *Progressive Dairyman* (Northeast Edition).  The form of the Summary Notice to be published is attached to the proposed Order as Exhibit 2.

The Notice provides details regarding the certification of the Settlement Class, the terms of the settlement and the rights of Settlement Class members to share in the recovery.   In addition, the Notice and the Summary Notice will provide the date and time of the fairness hearing to consider final approval of the proposed settlement and approval of a petition for attorneys' fees, as well as information about the right of Settlement Class members to attend and object at the fairness hearing.   Both notices also provide contact information for Class Counsel and a website and toll-free number where potential Settlement Class members can obtain additional information.

The form and manner of notice proposed here fulfill all of the requirements of Rule 23, and due process, and Class Counsel request that the Court direct that such notice be given to Settlement Class members.

## VI.    <u>CONCLUSION</u>

Based upon the foregoing, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Approval of Proposed Settlement with Dean Foods Company and enter the proposed order filed concurrently herewith.

Dated: December 23, 2010                     Respectfully submitted,

                                             __/s/ Kit A. Pierson_____

ANDREW D. MANITSKY, ESQ.                 KIT A. PIERSON
GRAVEL AND SHEA, A                       DANIEL A. SMALL
PROFESSIONAL CORPORATION                 BENJAMIN D. BROWN
76 St. Paul St., 7th Floor, P.O. Box 369     BRENT W. JOHNSON
Burlington, VT 05402-0369                COHEN MILSTEIN SELLERS
(802) 658-0220                           & TOLL PLLC
amanitsky@gravelshea.com                 1100 New York Avenue, N.W.
                                         Suite 500, West Tower
ROBERT G. ABRAMS                         Washington, DC  20005
GREGORY J. COMMINS, JR.                  Telephone:    (202) 408-4600
HOWREY LLP                               Facsimile:    (202) 408-4699
1299 Pennsylvania Avenue, NW             bbrown@cohenmilstein.com
Washington, DC  20004                    dsmall@cohenmilstein.com
Telephone:    (202) 783-0800             kpierson@cohenmilstein.com
Facsimile:    (202) 383-6610             bjohnson@cohenmilstein.com
AbramsR@howrey.com
ComminsG@howrey.com                      GEORGE F. FARAH
                                         COHEN MILSTEIN SELLERS
                                         & TOLL, PLLC
CHARLES E. TOMPKINS, ESQ.                88 Pine Street, 14th Floor
TODD S. HEYMAN, ESQ.                     New York, NY  10005
SHAPIRO HABER & URMY LLP                 Telephone:    (212) 838-7797
53 State Street                          Facsimile:    (212) 838-7745
Boston, MA 02109-2802                    gfarah@cohenmilstein.com
(617) 439-3939
ctompkins@shulaw.com
theyman@shulaw.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify, this 23rd day of December, 2010, that notice of the filing of the

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT WITH DEAN FOODS COMPANY

was served via operation of the electronic filing system of the U.S. District Court for the District

of Vermont on December 23, 2010, or via other means on December 23, 2010, on the following

attorneys:

JOHN T. SARTORE
PAUL FRANK COLLINS PC
1 Church Street
P.O. Box 1307
Burlington, VT 05402-1307
(802) 658-2311
Fax: (802) 658-0042
jsartore@pfclaw.com

PAUL T. DENIS
PAUL H. FRIEDMAN
PAUL D. FRANGIE
DECHERT LLP
1775 I Street, N.W.
Washington, DC, 20006
Tel: (202) 261-3300
Paul.denis@dechert.com
Paul.friedman@dechert.com
Paul.frangie@dechert.com

CAROLYN H. FEENEY
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-4000
Carolyn.feeney@dechert.com

STEVEN R. KUNEY
KEVIN HARDY
WILLIAMS & CONNOLLY LLP
725 Twelth Street, N.W.
Washington, D.C. 20005

ANDREW D. MANITSKY, ESQ.
GRAVEL AND SHEA, A PROFESSIONAL
    CORPORATION
76 St. Paul St., 7th Floor, P.O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
amanitsky@gravelshea.com

ROBERT G. ABRAMS
GREGORY J. COMMINS, JR.
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC   20004
Telephone:      (202) 783-0800
Facsimile:      (202) 383-6610
AbramsR@howrey.com
ComminsG@howrey.com

BENJAMIN D. BROWN
DANIEL A. SMALL
KIT A. PIERSON
BRENT W. JOHNSON
COHEN MILSTEIN SELLERS
    & TOLL, PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:      (202) 408-4600
Facsimile:      (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com

(202) 434-5000
Fax: (202) 434-5029
skuney@wc.com
khardy@wc.com

W. TODD MILLER
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20037
(202) 663-7820
Fax: (202) 663-7849
tmiller@bakerandmiller.com

STEVEN J. ROSENBAUM , ESQ.
JAMES R. DEAN , JR.
JEFFREY H. LERNER , ESQ.
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-6000
Fax: (202) 778-5651
srosenbaum@cov.com
jdean@cov.com
jlerner@cov.com

JANE OSBORNE MCKNIGHT
JANE OSBORNE MCKNIGHT, PLC
207 Webster Road
Shelburne, VT 05482
(802) 985-3800
Fax: (802) 985-3828
jane@mcknightlaw.com

ELIZABETH HAWKINS MILLER, ESQ.
SPINK AND MILLER
One Lawson Lane
Burlington, VT 05401
emiller@spinkmiller.com

J. DOUGLAS RICHARDS
GEORGE F. FARAH
COHEN MILSTEIN SELLERS
  & TOLL PLLC
88 Pine Street, 14th floor
New York, NY   10005
Telephone:     (212) 838-7797
Facsimile:     (212) 838-7745
drichards@cohenmilstein.com
gfarah@cohenmilstein.com

CHARLES E. TOMPKINS, ESQ.
TODD S. HEYMAN, ESQ.
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109-2802
(617) 439-3939
ctompkins@shulaw.com
theyman@shulaw.com

/s/ George F. Farah_____