U.S. DISTRICT COU-
DISTRICT OF VERM...
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2011 JAN 18 PM 4:53

BY_____
DEPUTY CLERK

ALice H. ALLEN, et al.,            )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )   Civil Action No. 5:09-CV-00230
                                   )
DAIRY FARMERS OF AMERICA, INC.,    )
DAIRY MARKETING SERVICES, LLC,     )
and DEAN FOODS COMPANY,            )
                                   )
          Defendants.              )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF OBJECTING TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Federal Rules of Civil Procedure 23(d)(1)(B), 24(a)(2), and/or (b)(1)(B), Bryan Davis, Reg Chaput, Rendell Tullar, John Gorton, Harold Howrigan, Jr., Louis Aragi, Jr., Clark Hinsdale III, Thomas Quint, and Clement Gervais (collectively "Intervening Farmers"), by and through their undersigned counsel, submit this Memorandum in Support of their Motion to Intervene for the Limited Purpose of Objecting to Preliminary Approval of Class Action Settlement.

### INTRODUCTION AND SUMMARY

The terms of the proposed settlement negotiated by Plaintiffs with Dean Foods Company ("Proposed Settlement") pose substantial risks to the economic interests of Intervening Farmers and demonstrate that Plaintiffs and their counsel do not adequately represent the interests of the Intervening Farmers. Primarily, the proposal includes injunctive relief requiring Dean to divert up to 60 million pounds of its milk purchases per month to non-DFA/DMS producers for a minimum of 30 months. This modification to Dean's milk purchases will disrupt the markets for

the Intervening Farmers and poses a significant risk of lost revenue that would not be off-set by the proposed settlement payment, regardless of whether the Intervening Farmers participate in the settlement or opt out. In fact, the Proposed Settlement attacks the strength and integrity of the cooperatives and common marketing agencies like DMS upon which the Intervening Farmers so heavily rely.

Intervention now is important because the Proposed Settlement raises complex issues relating to the market for raw milk and the roles of cooperatives and common marketing agencies to provide security to individual farmers, all of which should be considered by the Court from the perspective of those most affected as the Court begins to formulate its opinions on the issues of fairness and adequate representation. As the Intervening Farmers will demonstrate, the Proposed Settlement is harmful and Plaintiffs and their counsel have not fully considered its implications, or worse, are purposefully acting against the interests of a very large segment of the putative class.

### The Intervening Farmers

The Intervening Farmers are a group of farmers, partnerships, and other entities that own and operate farms in Vermont, New Hampshire, Maine and Massachusetts. *See generally* Declarations of Intervening Farmers attached hereto as Exhibits 1-9. The farms vary substantially in size and location – some being large farms on main roads, others being small on hard to access dirt roads. *See id.* All market and sell Grade A raw milk through a relationship with DMS. *See id.* All but one are members of dairy cooperatives and all pool some, if not all, of their milk on Federal Order 1. *See id.*

The people who own and operate these farms are mostly multigenerational farmers who have extensive experience in farming and the market for raw milk. *See id.* Some are actively

involved in the governance of their cooperatives and participate in other industry organizations such as the Vermont and American Farm Bureaus. *See e.g.,* Howrigan Decl., ¶ 7; Gervais Decl., ¶ 4; Hinsdale Decl., ¶ 7. Collectively, these 9 farmers represent multiple generations and hundreds of years of farming experience in four states. The Intervening Farmers have been monitoring this litigation and are now compelled to act in response to the significant risks posed by the terms of the Proposed Settlement and the alarming prospect of being represented by Plaintiffs and their counsel whose actions appear adverse to the Intervening Farmers' interests.

### The Raw Milk Market and Cooperatives

Dairy farmers produce milk daily, a highly perishable product that must be sold and shipped on a daily or near daily basis.

Milk is sold in 4 classifications, 1 through 4, with one being the highest (for fluid milk) and 4 being the lowest (for powdered milk). *See e.g.,* Gorton Decl., ¶ 6. The minimum required price for milk is established by the market administrator for the Federal Milk Marketing Order. This price is often below cost and farmers must negotiate what are known as over-order premiums – premiums over and above the minimum Federal Order price. *See id.,* ¶ 9. Premiums may depend on the class of milk (Class I commanding the highest premium), quality, quantity and whether for example it is growth hormone free. *See e.g.,* Quint Decl., ¶ 10. Individual farmers have little leverage to negotiate over-order premiums.

A complicating factor in this market is the variations in supply and demand. For example, farmers produce surplus milk in the "spring flush" and plants may close for the holidays, yet the milk still needs to be processed to be of any value. *See e.g.,* Quint Decl., ¶ 11; Davis Decl., ¶ 11. Additionally, certain farmers may have limited access to markets that may have other supply options.

Also, there are significant cost considerations in transporting milk to market that depend on the location of a farm, how much of a truck load is produced, and where the milk processor is located. *See e.g.,* Quint Decl., ¶ 6. Another cost is testing to ensure the quality of the milk and to determine premiums. *See e.g.,* Howrigan Decl., ¶ 10; Aragi Decl., ¶ 5.

Cooperatives offer essential protection and stability to farmers in this challenging and complex market. For nearly 100 years, farmers have joined forces to form cooperatives in order to meet these challenges.[1] The overall function of cooperatives is to do collectively what individual farmers cannot do alone. First, the cooperatives provide a reliable and stable outlet for their members by contracting with many purchasers, distributing the milk where it is needed to ensure that it is not wasted. This function is known as "balancing." *See e.g.,* Davis Decl., ¶ 9 ("This balancing service is important because there are times of the year, particularly in the spring, when milk is in over supply and we need to find a home for it."); Tullar Decl., ¶ 5 ("being part of a coop ensures that there is a market for my milk even when there is a surplus of milk at certain times of the year.").

The inherent risk in this situation is self evident: If the buyer does not need milk on a particular day, the farmer may be unable to sell his milk. Further, the farmer risks that the buyer will no longer be in existence. For example, one of the Intervening Farmers, Clark Hinsdale III, once considered whether he could do better by leaving his cooperative and selling directly to a local cheese plant. *See* Hinsdale Decl., ¶ 9. When the cheese plant was destroyed by fire, Mr. Hinsdale was reminded of the value in being a cooperative member. *See id.*

Second, cooperatives have significantly more bargaining power than individual farmers and are able to negotiate prices that are higher than the Federal Order minimums ("over-order

---

[1] The Federal government recognized the need for farm cooperatives and enacted the Capper-Volstead Act, 7 U.S.C. § 291 in 1922 to provide certain antirust exemptions in order to allow farmers to work together.

premium"). *See e.g.*, Gorton Decl., ¶ 9 ("Coops exist in part to negotiate a premium above the established minimum") and Hinsdale Decl., ¶ 8 ("Coops exist to negotiate premiums above the minimum required price established by the Federal Market Order.").

Third, cooperatives allow farmers to pool resources and share in the costs of marketing and hauling their milk, thereby significantly lowering costs. Indeed, for many smaller farms in more remote locations, being a cooperative member is the only way in which they can remain in business. *See e.g.*, Quint Decl., ¶ 6.

Finally, cooperatives provide a number of other valuable services such as field services and testing to help improve the quality of the milk, insurance and financial services, group buying options, and government relations. *See* Declarations generally.

All of the Intervening Farmers belong to cooperatives that market their milk through DMS, or are independent farmers who market their milk through DMS.[2] *See id.* DMS provides value to these farmers by further expanding the market for their milk, and providing further hauling efficiencies. *See e.g.,* Quint Decl., ¶ 6; Gorton Decl., ¶ 7; Davis Decl., ¶ 10; Gervais Decl., ¶ 7.

Dairy farmers pay a price to belong to cooperatives and DMS, for example dues. Additionally, they often do not receive the full premium paid to the cooperative for their milk as the premiums may include "balancing costs" associated with finding a home for milk. Thus, there may be a difference in price between what the farmer is paid from the cooperative or DMS and the price that the processor pays to the cooperative. *See e.g.,* Gorton Decl., ¶ 14. In the view of the Intervening Farmers, these costs are well worth paying in exchange for the certainty that their milk will always find a home and be sold at the highest price possible. *See* Hinsdale Decl., ¶ 8 ("Dairy farmers have worked hard to create the coops and partnership with [DMS] to

---

[2] DMS may also provide cooperative services to independent farmers.

negotiate better prices for farmers and work together to reduce the costs of hauling and marketing milk, all of which I believe as resulted in more money for dairy farmers.").

**The Proposed Settlement**

The Intervening Farmers are members of the putative settlement class, which includes "all dairy farmers . . . who produced raw Grade A milk in Order 1 and pooled raw Grade A milk in Order 1 during any time frame from January 1, 2002 to the Notice Date." Proposed Settlement, ¶ 2.2. The primary consideration for the Proposed Settlement is payment by Dean of $30 million (see id., ¶ 9.1) and an injunctive component whereby, for a period of at least 30 months, Dean agrees to offer to purchase between 10% and 20% of its raw milk in Order 1, not to exceed 60 million pounds per month, from farmers other than those who belong to Defendant Dairy Farmers of America ("DFA") or who market their milk through DMS. See id., ¶ 9.2. This provision allows Dean, in its "sole discretion" to determine what the "competitive market price" is for the milk that it offers to buy. See id. Finally, it provides Dean with the option to continue this practice at the end of the 30 month period as it sees fit.

With respect to the monetary payment, it is not clear how much each farmer will receive, but Plaintiffs suggest that the average will be $2,500. Proposed Notice, ¶ 12. This figure appears to contemplate that Plaintiffs' counsel will be paid $10 million and the remaining money will be distributed to the Settlement Class. As defined, the proposed class may in fact be larger than what Plaintiffs are estimating and thus the settlement average may be lower for each farmer. Regardless of what the exact figure works out to, the Intervening Farmers believe that this payment would not offset the significant harm resulting from the injunctive relief, harm that could not be avoided by opting out of the Proposed Settlement. See e.g., Chaput Decl., ¶ 12; Tullar Decl., ¶ 10; Gorton Decl., ¶ 22; Aragi Decl., ¶ 11; and Howrigan Decl., ¶ 12.

## ARGUMENT

### I. THE LEGAL STANDARDS FOR INTERVENTION IN A CLASS ACTION.

Federal Rule of Civil Procedure 23 gives the Court broad discretion in the conduct of class actions, including the authority to "protect class members and fairly conduct the action" by, *inter alia*, giving members the opportunity "to intervene and present claims or defenses, or to otherwise come into the action." Rule 23(d)(1)(B)(iii).

Here, the Intervening Farmers are not seeking to assert a substantive claim or defense. Rather, they seek to intervene for the limited purpose of protecting their interests as it relates to the Proposed Settlement. While Rule 24 states that intervention is appropriate for the purposes of asserting a claim or defense by requiring that a motion be accompanied by a "pleading", *see* Rule 24(c), the Rule should be read more liberally in this context.

First, Rule 23 expressly broadens the right of intervention insofar as it permits a party to submit a claim or defense, "or otherwise come into the action." Rule 23(d)(1)(B)(iii). Where intervention is sought in a class action, Rules 23 and 24 "should be construed harmoniously. . . ." *Diduck v. Kaszycki & Sons Contractors, Inc.*, et al, 149 F.R.D. 55, 58 (S.D.N.Y. 1993). Thus, courts apply a more relaxed application of Rule 24 in a class action. *See e.g., In re Discovery Zone Securities Litigation*, 181 F.R.D. 582, 589 (N.D. Ill. 1998) ("In the class action context, absent (or unnamed) class members can intervene if the class representatives are no longer adequately representing their interests – although the absent class member must technically meet either Rule 24(a)'s or (b)'s requirements as well."). Indeed, other courts have permitted intervention for the purpose of objecting to proposed settlements. *See Cohen v. Viray*, 622 F.3d 188, 191 (2nd Cir. 2010) (noting that district court allowed intervention for the purpose of objecting to preliminary approval of the proposed settlement.); *see also Ligas v. Maram*, 2010

U.S. Dist. LEXIS 34122 *25 (N.D. Ill.) (allowing putative class members to intervene and "participat[e] in the court's consideration of the 'Joint Motion for Settlement Class Certification, Preliminary Approval of Consent Decree, and Approval of Notice Plan.'").

Second, Rule 24 must be interpreted broadly to serve its purposes in atypical situations. *See United States of America, et al. v. Hooker Chemicals & Plastics Corp.*, et al., 749 F.2d 968, 983 (2nd Cir. 1984) ( "courts should 'not make a fortress of the dictionary' but rather should 'apply the rule with thoughtful consideration of the objectives it is intended to serve.'") (quoting 7A Wright & Miller, Federal Practice and Procedure § 1904 at 474 (1972)). Thus, the Rule favors "'practical considerations' to allow courts to reach pragmatic solutions to intervention problems. . . [and] is a nontechnical directive to courts that provides the flexibility necessary 'to cover the multitude of possible intervention situations' and that requires consideration of all of the competing and relevant interests raised by an application for intervention. . . ." *Id.* (citation omitted).

Accordingly, courts "have expressed a willingness to adopt flexible interpretations of Rule 24 in special circumstances." *EEOC v. National Children's Center, Inc.*, 146 F.3d 1042, 1045-1046 (D.C. Cir. 1998). As stated by the Court in *National Children's Center*, "[i]n particular, we have eschewed strict readings of the phrase 'claim or defense,' allowing intervention even in 'situations where the existence of any nominate 'claim' or 'defense' is difficult to find.'" *Id.* (quoting *Nuesse v. Camp*, 128 U.S. App. D.C. 172, 385 F.2d 694, 704 (D.C. Cir. 1967)). Because Rule 24 is "[o]bviously tailored to fit ordinary civil litigation, these provisions require other than literal application in atypical cases." *Textile Workers Union of America, CIO v. Allendale Co.*, 96 U.S. App. D.C. 401, 226 F.2d 765, 767 (D.C. Cir. 1955) (en

banc). "Failure to come within the precise bounds of Rule 24's provisions does not necessarily bar intervention if there is a sound reason to allow it." *Id.,* at 768.[3]

For the reasons discussed below, the Court should grant the Intervening Farmers' motion to intervene as of right, or in the alternative to allow permissive intervention for the limited purpose of objecting to the preliminary approval of the class settlement.

## II. THE INTERVENING FARMERS ARE PERMITTED TO INTERVENE AS OF RIGHT.

A timely motion to intervene must be granted where a party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Intervening Farmers meet these requirements.

### A. The Motion Is Timely.

The determination of the timeliness of a motion to intervene is committed to the sound discretion of the Court and subject only to review for abuse of that discretion. *See Farmland Dairies v. Commissioner of New York State Dep't of Agriculture & Markets,* 847 F.2d 1038, 1043-1044 (2d Cir. N.Y. 1988) (citations omitted). Timeliness must be measured against the totality of the circumstances. *See id.,* at 1044. "While not necessarily an exhaustive enumeration, the following factors should guide the district court's determination: (1) the length of time the applicant knew or should have known of his interest before making the motion; (2)

---

[3] *See also United States v. Peters,* 2008 U.S. Dist. LEXIS 100589, 6-7 (D. Minn. Dec. 12, 2008) ("Rather than attempting to force the factual allegations presented by LGE's, Acorn's, and Zenith's motions into the analytical framework of Rule 24, a practical, commonsense application of Rule 24 suggests intervention for the limited purpose sought by LGE, Acorn, and Zenith is appropriate here."); *see also Inmates of the Rhode Island Training School v. Martinez,* 465 F. Supp. 2d 131, 136-37 (D. R.I. 2006) (declining to "engag[e] in a convoluted analysis in order to fit the facts of [the] Motion's square peg into the Rule's round hole," and relying instead on "the reasonable measure of latitude" afforded to the district court in the "practical application of Rule 24(a)(2)") (quotation omitted).

prejudice to existing parties resulting from the applicant's delay; (3) prejudice to the applicant if the motion is denied; and (4) the presence of unusual circumstances militating for or against a finding of timeliness." *Id.* "Among the most important factors in a timeliness decision is 'the length of time the applicant knew or should have known of his interest before making the motion.'" *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) (vacated on other grounds)(quoting *Farmland Dairies v. Commissioner of New York State Dep't of Agriculture & Markets*, 847 F.2d 1038, 1044 (2d Cir. 1988)).

In the context of a class action, the timeliness clock does not begin to run until the party seeking to intervene becomes aware that the class representative will not represent their interest. *See e.g., In re Lease Oil Antitrust Litigation*, 570 F. 3d 244, 248 (5th Cir. 2009). The Intervening Farmers first became aware of the need to bring this motion shortly after the Plaintiffs filed their motion for preliminary approval of the Proposed Settlement on December 23, 2010. This Motion to Intervene was filed only 25 days later. Prior to this time, the Intervening Farmers could not have known that the Plaintiffs were seeking injunctive relief which would cause them financial harm and thus there is no undue delay and no prejudice to any party. Conversely, for reasons discussed in more detail below, there would be prejudice to the Intervening Famers if their Motion were denied. Accordingly, the Motion is timely.

### B. The Intervening Farmers Have A Significant Interest In This Litigation.

As absent putative class members directly and adversely affected by the Proposed Settlement regardless of whether they participate or opt out, the Intervening Farmers have an interest in this litigation. *See In re Discovery Zone Securities Litigation*, 181 F.R.D. at 589 ("an absent class member would have little difficulty showing an interest in the action" under Rule 24(a)). Indeed, the Proposed Settlement will disrupt the business relationships between Dean,

DFA and DMS, in which the Intervening Farmers have a real and direct interest. Specifically, the Intervening Farmers are all members of DFA or market their milk through DMS and they directly benefit from and depend on the supply arrangements that DFA and DMS have entered into with Dean. This economic interest is direct, substantial and legally protectable. *See New York Pub. Research Group, Inc., v. The Regents of the University of The State of New York*, 516 F.2d 350, 351-352 (2nd Cir. 1975) (holding that economic interest of members of the pharmacy profession is sufficient interest to permit intervention); *see also Commack Self-Service Kosher Meats, Inc., v. Rubin*, 170 F.R.D. 93, 101 (E.D. N.Y. 1996) (observing that the "Second Circuit has held that an economic interest relating to the conduct of the movants' business constitutes sufficient legal interest for granting intervention.") (citing *New York Pub. Research Group*).

The proposal that Dean divert up to 60 million pounds per month of its milk purchases to non-DFA/DMS producers will directly impact the Intervening Farmers in three important respects. First, DMS will have to find alternative buyers for this milk, which will be difficult if not impossible to do without out lowering milk revenues. Either the price of the milk will have to be lowered or the milk will be sold at lower classes (for which DMS charges lower premiums), or at further distances with increased costs, or all of the above. Lower revenues for the cooperatives translate to smaller milk checks for the farmers.

The second impact is the negative effect that this agreement will have on the overall price of milk, not just the 60 million pounds that need to be sold elsewhere. When Dean goes into the market to purchase this milk, it will certainly offer prices that are less than what it currently pays to DMS because to do otherwise would be counter to its interest. Indeed, the terms of the Proposed Settlement appear calculated to ensure that Dean does not pay more than it currently does because it specifically provides that it must only "offer" to purchase this milk at a price that

in its "sole discretion, reflects a competitive market price. . ." Proposed Settlement, ¶ 9.2. This language virtually assures Dean that it will not be forced to pay prices higher than it wants to.

For example, if Dean is purchasing milk outside of the cooperatives, it will avoid having to pay balancing costs. Therefore, it could offer an individual farmer a slightly higher price directly that is still lower than it pays a cooperative. That price could force cooperatives to match. Further, Dean would have increased leverage over individual farmers to reduce premiums, for example, on what it now pays for growth hormone free milk, again lowering the market price for milk. Dean, and other processors, may use these lower market prices to drive down the overall market.

Finally, the Proposed Settlement may undermine the strength of the cooperatives by making it harder for the cooperatives to market and sell their milk and possibly inducing some members to leave the cooperatives and sell directly to Dean, thus increasing the costs of the cooperatives for the remaining members.

### C. Moving Forward Without The Intervening Farmers Will Impair Their Ability To Protect Their Interest.

Because the Intervening Farmers sell their milk in the market that is impacted by the Proposed Settlement, they will be negatively affected regardless of whether they choose to participate or not. The Intervening Farms cannot simply opt out any negative impact on the market for raw milk caused by the terms of the Proposed Settlement. *Cf. Shore v. Parklane Hosiery Company, Inc.,* 606 F.2d 354, 357 (2nd Cir. 1976) (upholding trial court's conclusion that "[b]ecause appellants might elect to be excluded from the challenged settlement 'in which event they remain free to pursue their full remedies . . .'" their interests were not impaired.). In order to protect their interests, it is imperative that the Intervening Farmers be permitted to intervene.

### D. The Named Plaintiffs Will Not Adequately Protect The Interests Of The Intervening Farmers.

An intervener need only show that its interests may not be adequately represented. *See Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (citations omitted). The burden of making this showing is minimal. *Id.; United States Postal Service, et al. v. Brennan*, 579 F.2d 188, 191 (2nd. Cir. 1978) (same).

Based on the terms of the Proposed Settlement that the named Plaintiffs negotiated with Dean, it is evident that they will not adequately protect the interest of the Intervening Farmers because the settlement will actually hurt the Intervening Farmers (and likely all farmers). Accordingly, the Intervening Farmers do not believe that the Plaintiffs or their counsel are looking out for their interests. *See e.g.,* Chaput Decl., ¶ ("it seems that [Plaintiffs] would not have agreed to this settlement if they understood the negative impacts that it will cause"); Gorton Decl., ¶ 15 ("I certainly do not believe that this deal was negotiated by anyone who represents my interests, or the interests of any farmer that I know of."). As already noted, the Intervening Farmers can not protect their interest by opting out of the settlement. *Cf. Shore v. Parklane Hosiery Copany, Inc.*, 606 F.2d 354, 357 (2nd Cir. 1976) (upholding trial court's conclusion "that appellants' right to opt-out of the proposed settlement protected their interests from the allegedly inadequate representation.").

In sum, the Intervening Farmers meet all of the requirements for intervention as of right and the Court should grant this Motion.

13

III. **THE COURT SHOULD EXERCISE ITS DISCRETION AND PERMIT THE INTERVENING FARMERS TO INTERVENE.**

Should the Court conclude that the Intervening Farmers are not entitled to intervene as of right, it should nonetheless permit intervention pursuant to Rule 24(b)(1)(B) which provides that "[o]n timely motion, the court may permit anyone to intervene who: . . . has a claim or defense that shares with the main action a common question of law or fact." The Court should also consider "whether the intervention will [] significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal question presented." *H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 797 F.2d 85, 88 (2d Cir. 1986). Here, the Intervening Farmers meet the requirements of the Rule and the Court should exercise its discretion and allow intervention.

For the reasons discussed above, the Intervening Famer's motion is timely. Further, as absent class members, the Intervening Farmers "have little difficulty in showing an interest in the action (Rule 24(a)) or a common question of law or fact with the class (Rule 24(b))." *In re Discovery Zone Securities Litigation*, 181 F.R.D. at 589. While the Intervening Farmers are not seeking to raise any substantive claim or defense in this litigation, their interest in participating in the litigation to preserve their own economic interest satisfies the Rule. For the reasons set forth at the outset, under Rule 23(d)(1)(B)(iii), parties are expressly permitted to intervene to "present claims or defenses, *or otherwise to come into the* action." *Id.* (emphasis added). Moreover, Rule 24 Rule must be interpreted broadly to meet its purpose and this circumstance warrants the Court's exercise of discretion to allow intervention here. *See* supra at 7-9.

The terms of the Proposed Settlement raise serious concerns with regard to the adequacy of representation in this case and permitting the Intervening Farmers to come into the action at this point will ensure that all aspects of the Proposed Settlement are adequately considered by the

14

Court. While the Intervening Farmers should be entitled to voice their objections prior to a final fairness hearing, more robust participation is justified given the unique circumstances of this case. Otherwise, the Court may not be in a position to determine whether the Proposed Settlement is fair – even at the preliminary stage. *See German, et al. v. Federal Home Loan Mortgage Corp., et al.*, 899 F. Supp. 1155, 1166 (S.D.N.Y. 1995) ("Varying facts and circumstances may actually add to the understanding of the scope and breadth of the claims and therefore support an intervention motion").

## CONCLUSION

For all of the foregoing reasons, the Court should grant the Intervening Farmers' motion to intervene as of right, or in the alternative, for permissive intervention so that the Intervening Farmers may adequate protect their substantial interest in this case.

Dated at Burlington, Vermont this 18th day of January, 2011.

Gary L. Franklin
Kevin M. Henry
Primmer, Piper, Eggleston, Cramer PC
150 S. Champlain Street
P.O. Box 1489
Burlington, VT 05402-1489
Tel: (802) 864-0880

Attorneys for Bryan Davis, Reg Chaput, Rendell Tullar, John Gorton, Harold Howrigan, Jr., Louis Aragi, Jr., Clark Hinsdale III, Thomas Quint, and Clement Gervais.

B04102-00001\Doc #: 26