UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

ALICE H. ALLEN AND LAURENCE E. )
ALLEN, d/b/a Al-lens Farm, )
VINCE NEVILLE, GARRET SITTS )
and RALPH SITTS, JONATHAN AND )
CLAUDIA HAAR, and DONNA HALL on )
behalf of themselves and all others similarly )
situated, )
             )
      Plaintiffs, )  Docket No. 5:09-cv-00230-cr
             )
 v.          )  Judge Christina Reiss
             )
DAIRY FARMERS OF AMERICA, INC., )
DAIRY MARKETING SERVICES, LLC, )
and DEAN FOODS COMPANY, )
             )
      Defendants. )

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF BEING HEARD ON THE PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

    Pursuant to Federal Rule of Civil Procedure 23(d)(1)(B), 24(a)(2) or, in the alternative 24(b)(2), Donald Risser and Lee Ramsburg (collectively "Intervener Dairy Farmers") submit this memorandum in support of their motion to intervene for the limited purpose of objecting to and raising concerns regarding preliminary approval of proposed settlement with Dean Foods Company ("Dean").

**I.  Introduction**

    Despite the assertions of plaintiffs Alice H. and Laurence E. Allen, Vince Neville, Garret and Ralph Sitts, Jonathan and Claudia Haar, and Donna Hall (collectively, "Plaintiffs") that they represent the interests of all dairy farmers, the proposed settlement that they negotiated creates substantial risks for intervening dairy farmers, and those risks far outweigh the benefits

of the estimated settlement payment. Moreover, the proposed settlement demonstrates that the Plaintiffs have sacrificed the interests of farmers – like Intervener Dairy Farmers - who sell their milk through Dairy Marketing Services ("DMS"). Specifically section 9.2 of the proposed agreement requires Dean to purchase up to 60 million pounds of milk from marketers other than DMS or Dairy Farmers of America ("DFA") and it grants Dean, the largest Grade A milk processor in the Northeast, the power to determine unilaterally the "competitive market price" for the milk it purchases from the non-DFA/DMS farmers.

Based on Intervener Dairy Farmers' long experience in the milk business in this region, the injunctive relief requested will disrupt the market and could undermine cooperatives through which Intervener Dairy Farmers access substantial and valuable benefits. Further, Intervener Dairy Farmers anticipate any settlement distribution will be more than offset by the financial harm caused by the proposed agreement.

It is important that the Court hear from Intervener Dairy Farmers before making its preliminary approval decision because the perspective of dairy farmers that rely on DFA and DMS and achieve substantial benefit through their coop membership is essential to understanding fundamental market dynamics, particularly when the Court must make its determination on the appropriateness of section 9.2 before providing adequate and meaningful notice to the putative class. Plaintiffs are clearly inadequate to represent such farmers. Intervener Dairy Farmers respectfully request that the Court permit them to intervene for the limited purpose of being heard on the substantial hardships raised by the proposed settlement agreement.

## II. Procedural History and Background

### A. Intervener Dairy Farmers

Messrs. Risser and Ramsburg are both dairy farmers in central Pennsylvania. Although their farms differ in size and type, both sell virtually all of their milk production through Defendants DFA/DMS. Intervener Dairy Farmers' families have pooled and sold their raw milk under Federal Marketing Order 1 ("Marketing Order 1") for many years, including during the proposed class period. *See* Affidavit of Donald Risser ("Risser Aff."), attached hereto as Exhibit 1, at ¶ 3; Affidavit of Lee Ramsburg, Jr. ("Ramsburg Aff."), attached hereto as Exhibit 2, at ¶¶ 1-2; Northeast Marketing Area Federal Order 1 at § 1001.2. Mr. Risser's family farm, Meadow-Vista, has been a member of the Mt. Joy cooperative, which, in turn, is a member of DMS. *See* Risser Aff. at ¶¶ 3, 10. Mr. Ramsburg's family farm, Rock Creek, has been a member of DFA for many years, but was previously a member of other dairy cooperatives. *See* Ramsburg Aff. at ¶¶ 2-3.

Marketing Order 1, *inter alia,* establishes and defines the scope of certain Classes of Utilization, *id.* at § 1000.40, and sets the method and formula for calculating the minimum price for milk, *id.* at § 1000.50. Under Marketing Order 1, the market administrator has a number of duties, including calculating and publishing the minimum price for milk. *Id.* at § 1000.25. The price for the milk is based on a number of factors, including the Class of Utilization. Class 1 includes fluid skim milk and butterfat. Class II includes fluid skim milk and butterfat used to produce, *inter alia*, cottage cheese, ricotta cheese, milkshake mixes, frozen desserts, sour cream, custards, infant formula, candy, and soup. Class III includes fluid skim milk and butterfat used to produce, *inter alia,* cream cheese and hard cheeses that may be shredded, grated or crumbled. Class IV includes fluid skim milk and butterfat used to produce, *inter alia,* butter, evaporated or condensed milk, and any dried form of milk. *Id.* at § 1000.40.

Because the price set often does not cover the costs of operating the farm, transporting, storing and testing the milk, dairy farmers must negotiate premiums over and above the price established by the market administrator.

Cooperatives, like Mt. Joy and DFA (and common marketing agencies like DMS), provide a variety of valuable services to farms, including health and workers compensation insurance, transportation and testing services. Risser Aff. at ¶¶ 6-10. These services allow the farmers to reduce their expenses, improve the quality and the characteristics of their fluid milk, and enhance their efficiency and maximize their margins. Dairy farming can be difficult and many dairy farms do not succeed. Risser Aff. at ¶ 2. Individual farmers have no power when trying to negotiate premiums with dairy processors. Risser Aff. at ¶¶ 4, 6. So, the ability of a cooperative or its marketing agency to negotiate with processors, some of which are national in scope, is also valuable. Risser Aff. at ¶¶ 4, 6.

The cows produce milk each and every day that must be managed. Risser Aff. ¶ 7. The cooperative's trucks pick up the milk every day or almost every day and transport the product to either the dairy processor or a balancing plant. Risser Aff. ¶ 3, 7. Without this service, farms would require more substantial milk storage facilities or the milk would perish. The raw milk transported to the balancing plants is used to make the lower margin products contemplated under Classes III and IV. Risser Aff. ¶ 7. Thus, the cooperative not only provides the dairy farmers the security of a guaranteed purchaser for their very perishable product, but it also provides an important tool for the management of the production, particularly in times of lower demand. Risser Aff. ¶ 5, 7.

By spreading the costs of the various services provided, the cooperatives allow dairy farmers to achieve efficiencies that that they could not achieve individually. Moreover, the

resources provided, such as the field staff involved in grazing management and the analysis of individual farmer's product to detect problems and identify solutions, simply would not be readily and cost-effectively available to any dairy farmer without the cooperatives. Risser Aff. ¶ 10.

Mr. Risser and Mr. Ramsburg have substantial experience and expertise regarding the production and marketing of milk, and both farmers are very concerned about the terms of the proposed settlement agreement. After receiving a copy of the Revised Consolidated Amended Class Action Complaint and Jury Demand and the proposed settlement agreement, both men concluded that the settlement would increase the risks to and threaten their businesses and that it was important for them to be heard regarding their concerns. *See* Risser Aff. ¶¶ 11-15; Ramsburg Aff. at ¶¶ 6, 18-22.

### B. Proposed Settlement Agreement

On December 23, 2010, Plaintiffs moved the Court for preliminary approval of their proposed settlement with Dean. Doc. 160. The putative settlement class includes "[a]ll farmers who produced raw Grade A milk in Order 1 and pooled raw Grade A milk on Order 1 during any time from January, 1 2002 to the notice date." Doc. 160-1 at 12; Doc. 160-2 ¶ 2.2.

Section 9.2 provides that Dean "will offer to purchase, at a price that, in [Dean's] sole discretion, reflects a competitive market price, from marketers other than Dairy Farmers of America ('DFA') or Dairy Marketing Services ('DMS'), . . .in an aggregate quantity of at least 10% and up to 20% of Settling Defendant's monthly raw Grade A milk purchases for its plants in Order 1, such quantity not to exceed 60,000,000 (600,000 cwt) per month . . . ." Doc. 160-2 ¶ 9.2.

The agreement provides that "Dean will pay thirty million United States dollars ($30,000,000) for the benefit of the Settlement Class." Doc. 160-1 at 12. For attorneys' fees,

Plaintiffs' counsel will seek 33 1/3 %, which would reduce the settlement fund to approximately $20,000,000. Doc. 160-2 ¶ 12.1. Plaintiffs calculate each farmer will receive approximately $2,500. Doc. 160-4 ¶ 12.

## III.   Argument

### A. Intervention is Important to Allow Intervener Dairy Farmers to Protect Their Interests and Explain the Effect of the Settlement on those Interests

Rule 24 governs when a non-party can intervene. Because Intervener Dairy Farmers are members of the putative class under Rule 23, the Court has the authority to protect them and to permit them to be heard as to "whether they consider the representation fair and adequate," and to "present claims or defenses, or to otherwise come into the action." Fed. R. Civ. P. 23(d)(1)(B). Moreover, it is clear that "[to] the extent that Rule 23 deals with intervention, it should be construed harmoniously with Rule 24." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55, 57-58 (S.D.N.Y. 1993). Intervener Dairy Farmers do not seek to assert their own claims or defenses. Instead, they intervene for the purpose of ensuring that the proposed settlement is analyzed with complete information regarding the way in which the dairy market works and in order to explain the negative effects that Section 9.2 will have on their farms and their families.

### 1. The Court Must Permit Intervener Dairy Farmers to Intervene Under Rule 24(a)

Under Rule 24(a), "[o]n timely motion, the court must permit anyone to intervene who ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

Fed. R. Civ. P. 24(a)(2).[1] The Second Circuit has established the framework by which courts analyze motions to intervene as of right: "a movant must: '(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action.'" *Brennan v. N.Y. City Bd. of Educ.*, 260 F.3d 123, 128-29 (2d. Cir. 2001) (quoting *N.Y. News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992)). Intervener Dairy Farmers readily satisfy each of these four factors.

### a. Intervener Dairy Farmers Motion is Timely

The Intervener Dairy Farmers moved to intervene promptly after learning that the proposed settlement agreement seeks injunctive relief likely injurious to their business and their family farms. "Timeliness is a flexible determination made in the discretion of the Court." *Cohen v. Republic of Philippines*, 146 F.R.D. 90, 91 (S.D.N.Y. 1993). Indeed, ["t]he determination of timeliness is in large part an equitable one, to be made based upon the totality of the circumstances." *Hnot v. Willis Group Holdings*, 234 Fed. App'x 13, 14 (2d Cir. 2007). There are four factors that the courts review when assessing the timeliness of a motion to intervene: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-cv-8781, 2010 U.S. Dist. LEXIS 135261, at *9 (S.D.N.Y. Dec. 22, 2010) (quoting *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003)). In light of the procedural posture of the case, the fact

---

[1] Rule 24(a)(2)'s underlying purpose is to permit "an absentee, purportedly represented by a party, to intervene in the action if he [can] establish with fair probability that the representation [is] inadequate." Fed. R. Civ. P. 24 Advisory Com. Notes 1966 Amend.

that Plaintiffs have been claiming to represent the interests of all farmers selling or pooling their raw milk under Marketing Order 1 (except for officers or directors of DFA or DMS), and the recent disclosure of the settlement agreement containing Section 9.2, Intervener Dairy Farmers' motion is timely.

Indeed, in a putative class action, the timeliness clock is not triggered until the intervener becomes aware that the class representative will not represent its interest. *See e.g., In re Lease Oil Antitrust Litigation*, 570 F. 3d 244, 248 (5th Cir. 2009). Here, Intervener Dairy Farmers should be heard because they moved promptly to intervene as soon as they learned that the proposed settlement threatened their interests.

Courts have recognized expressly that motions to intervene for the specific purpose of objecting to and raising concerns regarding a settlement are timely when filed after the parties reach a proposed settlement. *U.S. v. Carpenter*, 298 F.3d 1122, 1125 (9th Cir. 2002) (reversing denial of intervention motion because lower court incorrectly determined motion was untimely since it "would likely derail the parties' settlement"); *U.S. v. Hooker Chemicals & Plastics Corp.*, 540 F. Supp. 1067, 1080, 1083 (W.D.N.Y. 1982) (granting motion to intervene over party's objection that it was untimely); *see also E.E.O.C. v. Local 638*, 71-civ-2877, 2003 U.S. Dist. LEXIS 13190, at *3 (S.D.N.Y. July 30, 2003) (granting motion to intervene filed nearly five months after court granted preliminarily approval of the proposed consent order); *Cohen v. Philippines*, 146 F.R.D. 90, 92 n.2 (S.D.N.Y. 1993) (granting motion to intervene over party's argument that intervention would "destroy the parties' joint tentative settlement of this case").

Further, because Intervener Dairy Farmers acted promptly after Plaintiffs filed their motion for preliminary approval, there has been no delay that could prejudice Plaintiffs,

Dean, DMS, or DFA. *See Capoccia v. Boone*, No. 1:07-cv-12, 2007 U.S. Dist. LEXIS 40707, at *8 (D. Vt. June 5, 2007) (finding no need to consider prejudice where proposed-intervener acted within deadline set by court). Intervener Dairy Farmers do not seek to add new claims or defenses to the litigation, and, therefore, their participation here does not prejudice the parties. *See N.J. Carpenters Health Fund*, 2010 US. Dist. LEXIS 135261, at *12 (finding no prejudice to existing parties because they were "on notice of the claims that would be added since the beginning of the action").

In contrast, denial of intervention will prejudice Intervener Dairy Farmers and harm their interests. As described in the affidavits submitted by Messrs. Risser and Ramsburg and section III(2-3), *infra*, Intervener Dairy Farmers anticipate that Section 9.2 of the proposed settlement will damage the multi-faceted economic interest they have in selling their milk through DMS and cause them financial hardship. To the extent unusual circumstances exist here, they militate in favor of finding timeliness. In light of the likely effects of Section 9.2 on their farms, Intervener Dairy Farmers had no reason to think that anyone purporting to act on their behalf and representing their interests would ever agree to anything like that provision. Risser Aff. at ¶ 16.

Where, as here, the applicants moved to intervene for the purpose of being heard on aspects of the settlement that could not have been known to them prior to the disclosure of the proposed agreement, the timeliness factor is satisfied.

### 2. Intervener Dairy Farmers Have a Cognizable Interest in the Action

"[F]or an interest to be cognizable under *Rule 24(a)(2)*, it must be 'direct, substantial, and legally protectable.'" *Brennan*, 260 F.3d at 129 (quoting *Washington Elec.*

*Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990)).[2] Further, a proper intervener "need not have an independent cause of action to be considered to have an interest within the scope of Rule 24(a)." *Willis v. Firestone Bldg. Prods. Co.*, 231 F.R.D. 447, 449 (D. Conn. Oct. 19, 2005). Where, as here, the interveners' interest is economic, the Second Circuit recognizes that it is cognizable under Rule 24(a)(2). *N.Y. Pub. Interest Research Group, Inc. v. Regents of the Univ. of the State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975); *Commack Self-Service Kosher Meats, Inc., v. Rubin*, 170 F.R.D. 93, 101 (E.D.N.Y. 1996) ("Second Circuit has held that an economic interest relating to the conduct of the movants' business constitutes sufficient legal interest for granting intervention.").

      Here, Intervener Dairy Farmers have an economic interest in their relationships with DMS and DFA. Interveners are both members of cooperatives that market their milk through DMS. The cooperatives provide a guaranteed market for the milk the Intervener Dairy Farmers produce, and allow them to obtain a fair price for their milk. *See* Risser Aff. at ¶ 5; Ramsburg Aff. at ¶ 11. The cooperatives also provide services that are crucial to the long-term viability of the Interveners' farms, including balancing plants, transportation, and sampling and testing services. *See* Risser Aff. at ¶¶ 6-10; Ramsburg Aff. at ¶¶ 7-16. Insofar as the Proposed Settlement will adversely affect DMS and the farmers associated with it, for all of the reasons set forth in the attached Affidavits, the Intervener Dairy Farmers have an interest in the Proposed Settlement that is cognizable under Rule 24(a)(2).

---

[2] Rule 24 however, "does not require that the intervener prove a property right, whether in the constitutional or any other sense." *Brennan*, 260 F.3d at 130.

### 3. Intervener Dairy Farmers Have Shown an Impairment of that Interest Arising from an Unfavorable Disposition

Section 9.2 of the proposed agreement will impair the Intervener Dairy Farmers' interests. Based on their long experience in the Northeast milk business and their knowledge of the extensive benefits that they receive through their membership in cooperatives and through DMS, Intervener Dairy Farmers anticipate that requiring Dean to purchase up to 60 million pounds of milk per month from sources other than DFA or DMS will lower their revenues and likely raise their costs. More of the Intervener Dairy Famers' milk is likely to end up in the balancing plants or not needed by Dean, meaning more product will be classified as something other than Class I milk, and which will result in lower premiums. *See* Risser Aff. at ¶¶ 7, 13; Ramsburg Aff. at ¶¶ 12-13. It will also likely increase transportation costs, which will further cut into the Intervener Dairy Farmers' margins. *See* Risser Aff. at ¶ 14; Ramsburg Aff. at ¶¶ 14, 16.

Dean will use the opening provided by Section 9.2's requirement that it purchase milk from non-DFA/DMS sources to push prices down, not only for non-DFA/DMS milk, but also for milk from Intervener Dairy Farmers and their cooperative. If Dean demands a lower purchase price under Section 9.2, its competitors will demand to pay similar prices. The unilateral authority granted Dean to determine the "competitive market price" for the milk it purchases from marketers other than DFA/DMS can only lead to substantial pressure on milk premiums. *See* Risser Aff. at ¶¶ 12-15; Ramsburg Aff. at ¶¶ 20-21.

Intervener Dairy Farmers are also concerned that the settlement will weaken their cooperatives, upon which they depend for a variety of valuable services. If their cooperatives lose members, the remaining members will be responsible for a larger share of the cooperatives' expenses, which once again will harm their farms.

### 4. Intervener Dairy Farmers' Interests Are Not Adequately Protected

"[R]epresentation by an existing party is determined to be adequate only if the party's 'interests are so similar to those of the intervener that adequacy of representation is assured.'" *Willis*, 231 F.R.D. at 450 (quoting *Brennan*, 260 F.3d at 133) (alterations in *Willis* omitted). The burden of showing inadequacy is "minimal." *Town of N. Hempstead v. Village of N. Hills*, 80 F.R.D. 714, 716 (E.D.N.Y. 1978).

As discussed above, Plaintiffs sacrificed the interests of farmers who continue to sell their milk through DFA/DMS. Besides the estimated $2,500 payment to each farmer who presents a valid claim, the benefits of the agreement flow only to farmers who do not market their milk through DFA/DMS. Furthermore, Interveners estimate that even the $2,500 payment will fail to offset the reduction in their margins that the settlement will cause. Accordingly, it is evident that Plaintiffs are not adequate to protect the interests of Intervener Dairy Farmers. Indeed, Intervener Dairy Farmers could not imagine how someone claiming to represent their interests would ever agree to the inclusion of Section 9.2. Risser Aff. ¶ 16.

Additionally, Intervener Dairy Farmers cannot protect their interests by opting out of the proposed settlement class. The proposed settlement will disrupt the market for milk. Even if Intervener Dairy Farmers opt-out, such opting-out would not prevent the negative effects on their farms or lessen the market disruption that the settlement causes.

### B. Alternatively, the Court Should Permit Intervening Diary Farmers to Intervene Under Rule 24(b)

"Regardless of whether he may intervene as of right, Rule 24(b)(1)(B) allows for permissive intervention by anyone who 'has a claim or defense that shares with the main action a common question of law or fact.'" *Brown v. Barre*, 5:10-cv-81, 2010 U.S. Dist. LEXIS 131709, at *32 (D. VT. Dec. 13, 2010) (Reiss, J.) (quoting Fed. R. Civ. P. 24(b)(1)(B)). "'Additional

relevant factors include the nature and extent of the interveners' interests, the degree to which those interests are adequately represented by other parties, and ***whether parties seeking intervention will significantly contribute to the full development of the underlying factual issues in the suit*** and to the just and equitable adjudication of the legal questions presented.'" *Lovely H. v. Eggleston*, No. 05-civ-6920, 2006 U.S. Dist. LEXIS 83424, at *8 (S.D.N.Y. Nov. 15, 2006) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986) (emphasis added)).

As explained above, Intervener Dairy Farmers' motion is timely and they have economic interests that are threatened by the proposed settlement. Moreover, there is no doubt that Intervener Dairy Farmers' positions shares common questions of law and fact with those of the members of the putative class, particularly those that market their milk through DFA/DMS. The contemplated intervention would better protect the interests of farmers who continue to sell their milk through DMS and will contribute significantly to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented. Thus, intervention under Rule 24(b) should be permitted.

## IV. Conclusion

For the foregoing reasons, Mr. Risser and Mr. Ramsburg respectfully request that this Court grant its motion to intervene under Rule 24(a)(2) or, alternatively, under Rule 24(b), for the purpose of being heard with respect to the proposed settlement.

Respectfully submitted,

Dated January 18, 2011

Jacqueline A. Hughes
Kimbell Storrow Buckley Hughes LLP

26 State Street, Suite 8
Montpelier, VT 05602
Phone: (802) 229-2900, ext. 114
Fax: (802) 229-5110
Email: jhughes@kimbell-storrow.com

- and -

_____

Brian P. Downey
PEPPER HAMILTON LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108-1181
Phone: (717) 255-1155
Fax:        (717) 238-0575
Email: downeyb@pepperlaw.com
*Pro Hac Vice Motion Being Filed*

*Counsel for Donald Risser and Lee Ramsburg*