UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| ALICE H. ALLEN AND LAURENCE E. ALLEN, d/b/a Al-lens Farm, VINCE NEVILLE, GARRET SITTS and RALPH SITTS, JONATHAN AND CLAUDIA HAAR, and DONNA HALL on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 5:09-cv- 00230-cr |
| DAIRY FARMERS OF AMERICA, INC., DAIRY MARKETING SERVICES, LLC, and DEAN FOODS COMPANY. | ) ) ) ) | Judge Christina Reiss |
| Defendants. | ) ) | |

## REVISED CONSOLIDATED AMENDED
## CLASS ACTION COMPLAINT AND JURY DEMAND

Alice H. Allen and Laurence E. Allen doing business as Al-lens Farm, Vince Neville, Garret Sitts and Ralph Sitts, Jonathan and Claudia Haar and Donna Hall, as Plaintiffs and Class Representatives, by and through counsel, file this action both on behalf of themselves and as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS") and Dean Foods Company ("Dean") (collectively referred to as "Defendants"). Plaintiffs seek treble damages and injunctive relief for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Plaintiffs complain and allege as follows:

**Public Version - Redacted Pursuant to Protective Order**

## NATURE OF THE CASE

1.      This complaint arises from a crisis in the dairy industry in the Northeastern United States, "the severity and urgency of which," according to recent public statements by Senator Patrick Leahy, "cannot be overstated."  As a consequence of the conduct alleged herein, Senator Leahy observed on September 19, 2009, "our bedrock dairy industry is on the brink of collapse . . . with Vermont dairy farmers not getting their fair share of the retail price of milk, while corporate processors appear to be raking in profits as they continue to raise prices to consumers."

2.      As set forth below, Defendants have made concerted, persistent and successful efforts to restrain competition in the supply and purchase of raw Grade A milk in the Northeast and to fix and suppress the price paid for raw Grade A milk.  Defendants Dean, DFA and DMS have taken numerous steps to effectuate this conspiracy and these efforts have been joined and facilitated by other dairy processors, such as HP Hood LLC ("Hood"), National Dairy Holdings ("NDH") and Farmland Dairies ("Farmland"), suppliers who sell their milk through DMS and other members of the Greater Northeast Milk Marketing Agency ("GNEMMA") and various business cronies of Dean, DFA and DMS.  These activities have restricted the alternatives available to all dairy farmers in the Northeast and, in particular, their ability to sell milk at a price that has not been fixed and suppressed as a result of the conspiratorial and price-fixing activities described herein.

3.      This unlawful conspiracy commenced more than a decade ago and continue today.  Defendants' successful efforts to suppress competition include, for example, the following activities:

**Public Version - Redacted Pursuant to Protective Order**

A.      Defendant DFA enabled Dean to gain significant market power, not only in the Northeast but in other markets, by facilitating a merger between two of the largest milk processors in the United States, Suiza Foods Corporation ("Suiza") and "old" Dean (a predecessor to the merged entity).  DFA and Suiza planned this merger as a way to reduce competition; DFA facilitated it by helping Dean implement the merger and comply with competitive safeguards required by the Justice Department for certain plants at locations outside the Northeast; and DFA, DMS and Dean surreptitiously entered agreements that were designed to and in fact did circumvent these competitive safeguards.  Throughout the conspiracy, DFA (and DMS) have been rewarded for their collaboration through actions by Dean that have allowed DFA/DMS to gain a dominant market position in the Northeast (as well as other locations).

B.      For example, the Justice Department required the merged entity, the "new" Dean, to divest 11 of these processing plants to an independent competitor as a condition of the merger.  Instead, Dean and Suiza divested the plants to an entity – NDH – that was controlled and financed by DFA.  Contrary to assurances made to the Justice Department, DFA and its business allies controlled the management of NDH and prevented it from acting as an independent competitor.

C.      DFA was forbidden by prior consent decrees from entering into long-term exclusive supply contracts with Dean.  DFA and Dean circumvented this requirement by entering into a one year full supply contract and then agreeing that Dean would have to pay tens of millions of dollars if it did not do business with DFA on the same terms each year for the next twenty years.

**Public Version - Redacted Pursuant to Protective Order**

D.      Although Dean had historically competed directly with DFA and DMS by procuring milk directly from dairy farmers, Dean agreed to stop doing so for thousands of dairy farmers and instead only purchase its milk through DMS and turn over its previously independent farmers to DFA's control.  Because DFA and Dean understood that independent dairy farmers did not want to join or be controlled by DFA, they agreed to use DMS as a front organization to conceal DFA's control of DMS from Northeast dairy farmers.  Nor did Dean or DFA inform these farmers – who had not joined DFA – that the price for their milk was actually being negotiated and set by DFA in cooperation with its coconspirators.  DFA reached similar market allocation agreements with other processors.  It has also reached an "unwritten agreement" with other dairy cooperatives not to solicit business from each other's farmer members which has been enforced even during the pendency of this lawsuit.

E.      Dean, DFA and DMS have conspired with other processors as well as the members of GNEMMA to coordinate, fix and suppress the prices paid by processors for milk.  As described below, DFA and DMS communicate with other members of GNEMMA, as well as Dean, Hood and other processors to set a uniform price for payments by processors.  Pursuant to this conspiracy, prices ordinarily will not be increased unless a consensus is reached between DFA, DMS, other GNEMMA members, Dean and other processors.  This coordination and fixing of prices has the effect of substantially reducing prices paid for raw Grade A milk in the Northeast.

F.      In furtherance of the conspiracy, DFA and DMS have made substantial payments and provided "credits" to Dean that are neither justified, nor disclosed to

4

dairy farmers. As described below, Dean, DFA and DMS have engaged in these practices both before and after October 2005, *i.e.* four years before this action was filed.

G.      By facilitating DMS's acquisition of monopoly/monopsony power in the purchase and supply of raw Grade A milk, Dean and other processors have also given DFA and DMS enormous power to maintain and strengthen their grip on the market through threats and retaliation directed at farmers who consider or take steps not to do business through DFA and DMS. Because of their market position, DFA and DMS need not direct these threats or engage in retaliation against all farmers to maintain its monopoly/monopsony. The fact that DFA and DMS have the ability to do so – and have demonstrated their willingness to exercise this power – gives them significant power in the marketplace and strengthens their position to restrain competition and suppress the prices paid to all farmers.

H.      In furtherance of its conspiracy with Dean and other coconspirators, DFA and DMS have also engaged in threats and retaliation directed at truckers and independent processors. For example, DFA has punished haulers who contract to transport the milk of former DFA and DMS farmers and, in fact, has terminated them for doing so. DFA has threatened to withhold milk supplies from independent processors who accept milk from independent dairy farmers. DMS milk inspectors have threatened to impose health code violations on farmers who end their relationship with DMS. Similarly, inspectors have found higher bacterial counts – and then reduced payments to farmers – after those farmers publicly criticize DFA or DMS practices. These actions further the conspiracy, strengthen DFA's and DMS's market power, and thereby injure all dairy farmers in the Class.

**Public Version - Redacted Pursuant to Protective Order**

4.      The conspiratorial activities described herein have suppressed prices paid to Northeast dairy farmers and eliminated competition among cooperatives and processors for the purchase of raw Grade A milk in the Northeast.  The conspiracy allowed Dean to coordinate surreptitiously with DFA and DMS to circumvent the Justice Department's competitive safeguards.  Moreover, because of the conspiratorial pricing activities with DFA, DMS and other members of GNEMMA described below, Dean, Hood and other processors have avoided price competition and benefited from fixed and suppressed prices for raw Grade A milk.

5.      At the same time, DFA and DMS have steadily expanded their control over access to milk processing plants and their corresponding market power, and have ultimately secured monopoly/monopsony power over the purchase and supply of raw Grade A milk. Moreover, DFA is not simply a milk supplier; it owns processing plants in the Northeast.  Thus its suppression of milk prices has reaped financial benefits for its processing interests.  At the same time, its participation in the conspiracy has yielded financial payoffs and benefits to certain officers and business cronies of DFA and DMS that have been worth tens of millions of dollars.

6.      Plaintiffs bring this class action pursuant to Rule 23(a) and (b)(2) and (3) of the Federal Rules of Civil Procedure ("Rule 23"), on behalf of themselves and other Northeast dairy farmers, and under Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 & 2, for which Defendants are jointly and severally liable.  This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs and expenses, as well as attorneys' fees and disbursements, along with such additional and further relief as may be deemed just and proper.

**Public Version - Redacted Pursuant to Protective Order**

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

7.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

8.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

9.     This Court has personal jurisdiction over Dean, DFA and DMS because they systematically and continuously transact substantial business in the United States and in this District.

10.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, reside, are found, or have an agent in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

11.    Defendants' business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.  Defendant Dean purchases, processes and ships raw Grade A milk across state lines.  Defendant DFA markets, processes and ships raw Grade A milk across state lines.  Defendant DMS markets raw Grade A milk across state lines. All Defendants send and receive substantial payments across state lines from the sale of raw Grade A milk.

## PARTIES

### Plaintiffs

12.    Plaintiffs Alice H. Allen and Laurence E. Allen do business as the Al-lens Farm, a dairy farm located at 210 Bolkum Road, Wells River, VT 05081.  The farm was a member of Booth Brothers Dairy, Inc. until 2006 and a member of National Farmers Organization from

7

2006 until present.  During the Class Period, Al-lens Farm sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

13.     Plaintiffs Ralph and Garrett Sitts and the unnamed partnership of which they are the general partners reside at 13501 Route 357, Franklin, NY 13775.  The partnership operates a dairy farm.  The dairy farm was a member of DFA from 1998 until 2007, and a member of Elmhurst Dairy, Inc. from 2007 until present.  During the Class Period, Ralph and Garrett Sitts and the unnamed partnership sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

14.     Plaintiffs Jonathan and Claudia Haar reside at 1495 Paddock Road, West Edmeston, NY 13485 and they jointly operate a dairy farm.  The dairy farm has been a member of DFA from 2000 to the present.  During the Class Period, Jonathan and Claudia Haar sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

15.     Plaintiff Vince Neville, is a dairy farmer located at Rural Route 1, Box 1372, Little Meadows, PA 18830.  During the Class Period, Vince Neville, as a member of the Empire Keystone Cooperative, a New York cooperative, sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

16.     Plaintiff Donna Hall resides at 566 Halls Way, Muncy, PA 17756 and operates a dairy farm.  The dairy farm was an independent farm and sold its milk directly to Farmland Dairies before it was required to market its milk through DMS in 2005.  During the Class Period, Donna Hall sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

Public Version - Redacted Pursuant to Protective Order

**Defendants**

17.     Defendant Dean is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201.  Dean is the largest raw Grade A milk processor in the Northeast and in the United States.

18.     Defendant DFA is ostensibly a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Northeast Council headquarters located at 5001 Brittonfield Parkway, East Syracuse, New York 13057.  DFA is by far the largest dairy cooperative in the United States with over 20,000 member farmers.  DFA has approximately 1,900 member farmers in the Northeast.  DFA is a vertically integrated cooperative that not only engages in the production of raw Grade A milk, but also markets, hauls, processes, bottles and distributes raw Grade A milk.

19.     Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221.  DMS was created by DFA and Dairylea Cooperative Inc., and DFA exercises control over DMS.  DMS is currently owned by DFA, Dairylea Cooperative, Inc. and St. Albans Cooperative.  DMS is a marketing agency that markets milk for 9,000 dairy farmers, including independent dairy farmers and cooperatives, throughout the Northeast even though DMS received no authorization from independent dairy farmers to do so.  DMS markets approximately 60 percent of raw Grade A milk marketed to processing plants in the Northeast.

**Public Version - Redacted Pursuant to Protective Order**

**Coconspirators**

20.     Defendants have conspired with Dairylea Cooperative Inc., other members of the Greater Northeast Milk Marketing Agency ("GNEMMA"), Farmland Dairies LLC, National Dairy Holdings LLC, HP Hood LLC and other processors, certain individuals named below and other entities and persons, the identities of which are presently unknown, (collectively "Coconspirators").

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed Class is defined under Rule 23(b)(2) and (3) as:

> All dairy farmers, whether individuals, entities or members of cooperatives, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present.  Defendants and Defendants' Coconspirators are excluded from the Class.

22.     At all times relevant to this Complaint, there have been more than 9,000 members of the proposed Class in the Northeast.  Members of the proposed Class reside in 11 different states.  The members of the proposed Class are so numerous that the individual joinder of all members is impracticable.

23.     The questions of law or fact common to the members of the proposed Class predominate over any questions affecting only individual proposed members.  These common questions include, but are not limited to, the following:

a.  Whether Defendants engaged in a conspiracy to fix, stabilize, maintain, and/or artificially lower the over-order premiums paid to Northeast dairy farmers for raw Grade A milk;

b.  Whether Defendants entered into and implemented long-term supply agreements to foreclose Northeast dairy farmers' access to raw Grade A milk bottling and processing plants;

10

**Public Version - Redacted Pursuant to Protective Order**

c. Whether Defendants required Northeast dairy farmers to market their raw Grade A milk through DFA or DFA-controlled DMS to gain access to raw Grade A milk bottling and processing plants and/or balancing plants;

d. Whether Defendants foreclosed Northeast dairy farmers' access to raw Grade A milk bottling and processing plants and/or balancing plants in the Northeast;

e. Whether Defendants entered into agreements not to compete and to allocate markets, such as an agreement not to compete for the purchase of raw Grade A milk from Northeast dairy farmers and an agreement not to compete on over-order premiums paid by processors for raw Grade A milk in the Northeast;

f. Whether Defendants threatened and punished farmers who attempted to terminate their relationship with DFA or DMS and join other cooperatives or operate independently, and/or threatened and punished the haulers and processors that attempted to transport and purchase the raw Grade A milk of those farmers and whether those actions enhanced their market power;

g. Whether, in furtherance of the conspiracy, Defendants engaged in group boycott;

h. Whether DMS, controlled by its principal DFA, exercises monopoly/monopsony power in the raw Grade A milk market;

i. Whether DMS, controlled by its principal DFA, has abused its monopoly/monopsony power;

j. Whether Defendants conspired to monopolize/monopsonize and/or restrain interstate trade of raw Grade A milk marketed or sold to, or purchase by, processing plants or purchased from dairy farmers in the Northeast;

k. Whether Defendants conspired to circumvent and thwart conditions and restrictions imposed by the DOJ or state Attorneys General to preserve competition in the raw Grade A milk market in the Northeast;

l. Whether Defendants purchased raw Grade A milk bottling and processing plants, closed down raw Grade A milk bottling and processing plants and/or refused to operate raw Grade A milk bottling and processing plants with the purpose and intent of stifling competition from independent dairy farmers, cooperatives, and raw Grade A milk processors in the Northeast;

m. Whether Defendants' conduct has violated the Sherman Act;

n. Whether Defendants caused injury to Plaintiffs and proposed Class members under the Sherman Act;

**Public Version - Redacted Pursuant to Protective Order**

o.  Whether Plaintiffs and proposed Class members are entitled to: i) an injunction prohibiting the continuation of Defendants' violations, and ordering such other and further injunctive relief as is necessary to restore competition; ii) a declaration of their eligibility to an award of damages and other monetary relief, including treble damages; iii) interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and iv) attorneys' fees and costs and any other relief the Court deems just and reasonable.

24.     This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

25.     Individual litigation of the facts of hundreds of cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court.  Notice of pendency of the action and any resolution thereof can be provided to proposed Class members by publication and/or other means.

26.     Plaintiffs' claims are typical of the claims of proposed Class members. Plaintiffs and proposed Class members are dairy farmers who produce raw Grade A milk in the Northeast and sold raw Grade A milk in the Northeast. All Plaintiffs and proposed Class members have been injured by the same wrongful, anticompetitive conduct of Defendants.

27.     Plaintiffs are adequate representatives of the Class, and Plaintiffs' interests do not conflict with the interests of the members of the proposed Class.  Plaintiffs are committed and determined to pursue this litigation and to assist counsel in this matter.  Plaintiffs possess

12

**Public Version - Redacted Pursuant to Protective Order**

considerable knowledge of the dairy business.  Plaintiffs have retained competent counsel experienced in the prosecution of complex litigation, class actions, and antitrust litigation.

## RELEVANT MARKETS

28.     The relevant geographic market is the Northeast United States.  The Northeast market consists of Federal Milk Market Order 1, which covers areas in Delaware, District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont and Virginia.  DFA's Northeast Council manages DFA's operations specifically in the same geographic areas as the Northeast.  DFA and DMS evaluate and treat the Northeast as a separate market in their business activities and internal documents. Greg Wickham, who heads DFA's operations in the Northeast and has served as the CEO of DMS, refers to the Northeast as a distinct market in connection with DFA's and DMS's milk sales, production and marketing activities.

29.     The relevant product market consists of the market for raw Grade A milk.  This "raw Grade A milk market" is treated as a distinct market by the Defendants, the industry and by federal regulations and has been recognized as a relevant product market by federal courts. Raw Grade A milk is a homogenous product such that one farmer's production of it is undifferentiated from another farmer's.  Dairy farmers do not have substitute markets available for their raw Grade A milk.  The distinct nature of the raw Grade A milk market is recognized by the Defendants in their internal documents and treated as such by the Defendants in connection with their business activities.

## OVERVIEW OF THE CONSPIRACY

30.     In an unrestrained market, raw Grade A milk processors and cooperatives in the Northeast would compete amongst each other to purchase and market raw Grade A milk from

**Public Version - Redacted Pursuant to Protective Order**

independent dairy cooperatives and independent dairy farmers, thereby enabling Northeast dairy farmers such as Plaintiffs to obtain a price for their raw Grade A milk that would reflect actual market conditions.   However, Defendants have engaged in an illegal conspiracy to restrain competition, fix and suppress prices paid to farmers and monopolize/monopsonize the raw Grade A milk market in the Northeast.  This has suppressed at artificially low levels the over-order premiums that would otherwise exist in a competitive market.

31.     Beginning as early as 1998, Defendants began to implement their conspiracy to eliminate competition in the raw Grade A milk market in the Northeast by undertaking a series of carefully planned and collaborative steps.   Dean, DFA and DMS conspired to put DFA/DMS in a dominant position in the Northeast and circumvent restrictions that had been imposed by the Department of Justice to limit Dean's market power, protect independent farmers' access to milk processing plants, and prevent collusion and suppression of prices paid for raw Grade A milk.  In exchange for DFA's and DMS's assistance in circumventing the Justice Department's requirements, increasing Dean's dominance, and suppressing raw Grade A milk prices, Dean agreed to restrict competition with DFA and DMS as a direct purchaser of milk from independent farmers, give DFA and DMS control over access to Dean's processing facilities, and help DMS acquire a monopoly/monopsony position in raw Grade A milk market in the Northeast.  DFA, DMS and Dean, with other coconspirators, have acted and continued to act to achieve the goals of the conspiracy, including the fixing and suppression of prices paid for raw Grade A milk.

32.     The DOJ and state Attorneys General raised antitrust concerns about, and formally objected to, several of the major transactions pursued by Defendants in furtherance of the conspiracy.   As discussed below, when the DOJ or state Attorneys General imposed

Public Version - Redacted Pursuant to Protective Order

conditions on such a transaction to preserve competition in the market, Defendants devised and covertly implemented schemes to circumvent those restrictions and eliminate competition in violation of the antitrust laws.

## BACKGROUND ON RAW GRADE A MILK

33.     Raw Grade A milk is highly perishable.  Dairy farmers milk their cows at least twice a day, and the milk must be transported from farms to raw Grade A milk processors nearly every day.  Raw Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to raw Grade A milk processing plants.  *Fluid Grade A milk bottling plants* prepare fluid raw Grade A milk for human consumption as beverages by processing and packaging it into bottles or cartons for wholesale or retail sale.  As used in this complaint, a *raw Grade A Milk processing plant* prepares raw Grade A milk for human consumption and processes it into either beverage milk products or other dairy products, such as sour cream, cottage cheese, ice cream, cheese, butter or dry milk.  As used in this complaint, a bottling plant is a processing plant, but not all processing plants are bottling plants.

34.     Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk.  The highest standards are established for Grade A milk because of safety risks associated with fluid milk products.  There is no substitute for raw Grade A milk.

35.     Pursuant to the 1937 Agriculture Act, the USDA classifies raw Grade A milk into four classes for minimum pricing purposes based upon the actual end-use of the milk:

        a.      Class I milk is used in beverage milk products for human consumption.

**Public Version - Redacted Pursuant to Protective Order**

       b.      Class II milk is used to manufacture "soft" dairy products, such as sour cream, cottage cheese, ice cream, and custards.

       c.      Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products such as cheddar cheese.

       d.      Class IV milk is used to produce butter and nonfat dry milk.

36.     Each month, the USDA calculates minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as Federal Milk Market Orders ("FMMO" or "Order").  Currently, there are 10 Orders. This Complaint is concerned with raw Grade A milk in Order 1, which is commonly referred to as the "Northeast."

37.     USDA regulations mandate that cooperatives and independent dairy farmers participating in the FMMO program receive at least the weighted uniform average or minimum "blend" price for raw Grade A milk that is "pooled" on an Order.  Dairy farmers "pool" raw Grade A milk on an Order by delivering specified minimum quantities of raw Grade A milk to USDA-regulated fluid Grade A milk bottling plants associated with that Order.  Dairy farmers' delivery of the minimum quantity of raw Grade A milk to fluid Grade A milk bottling plants is referred to as "touching base."  USDA regulations require that dairy farmers touch base each month they are pooled on an Order.  Dairy farmers cannot qualify or touch base by delivering raw Grade A milk to processing plants of non-fluid products, such as sour cream (Class II), cheese (Class III) and butter (Class IV).

38.     The minimum blend price for an Order is based upon the end uses of all Grade A milk pooled on that Order.  Thus, for example, if 60 percent of all raw Grade A milk pooled on an Order was used as Class I milk (beverage milk), and the remaining 40 percent was used as Class III milk (cheese milk), the minimum blend price for all raw Grade A milk pooled on

**Public Version - Redacted Pursuant to Protective Order**

the Order would consist of the Class I price for 60 percent and the Class III price for 40 percent.

39.     USDA minimum prices for raw Grade A milk represent the minimum prices that raw Grade A milk processors must pay for raw Grade A milk marketed pursuant to USDA regulation. Cooperatives and independent dairy farmers are free to negotiate for prices in excess of FMMO minimum prices to reflect market conditions.  The amounts by which prices paid for raw Grade A milk exceed FMMO minimum prices are known generically as "over-order premiums."  Prior to Defendants' antitrust violations, dairy farmers in the Northeast received over-order premiums for raw Grade A milk that more accurately reflected competitive market conditions.

40.     The actual price a dairy farmer receives for raw Grade A milk is referred to as the "mailbox price."  The mailbox price for an independent dairy farmers is comprised of the FMMO minimum blend price plus any over-order premium in excess of the federal minimum blend price and bonuses for volume or quality, minus marketing costs.  The mailbox price received by dairy cooperative members is calculated in the same way except additional charges may be deducted by the cooperative. Prior to Defendants' antitrust violations, dairy farmers in the Northeast received mailbox prices for raw Grade A milk that included over-order premiums that more accurately reflected competitive market conditions.

41.     Access to fluid Grade A milk bottling, processing and balancing plants in the Northeast and receipt of FMMO minimum prices and over-order premiums is necessary and essential to the economic viability of Northeast dairy farmers.

**Public Version - Redacted Pursuant to Protective Order**

## THE FORMATION AND EXPANSION OF DAIRY FARMERS OF AMERICA

42.     Dairy cooperatives are associations of dairy farmers who agree to collectively market their raw Grade A milk.  Dairy cooperatives are *supposed* to be owned, operated, and controlled by their member farmers.  Cooperatives typically locate buyers for their farmers' raw Grade A milk, negotiate sales prices, coordinate the hauling, perform the testing, record and report related data to milk market regulators, and process payments to member farmers for their raw Grade A milk.

43.     In the mid 1970s, the DOJ filed antitrust actions against three dairy cooperatives – Associated Milk Producers, Inc.; Dairymen, Inc.; Mid-America Dairymen, Inc. – for violations of Sections 1 and 2 of the Sherman Act.  *See United States v. Associated Milk Producers, Inc.*, Civ. A. No. 72-49 (W.D. Tex. Feb. 1, 1972); *United States v. Dairymen, Inc.*, Civ. A. No. 73-7364 (W.D. Ky. Mar. 29, 1973); *United States v. Mid-America Dairymen, Inc.*, Civ. A. No. 73-681 (W.D. Mo. Dec. 27, 1973).  The DOJ charged the cooperatives with entering into contracts and agreements to monopolize trade in the raw milk market, requiring processors to contract for a set quantity of raw milk for a 12-month period and penalizing processors failing to do so, and entering into membership agreements that unreasonably restricted the rights of members to withdraw and market their milk in a freely competitive manner.  Judgment was entered against each of the cooperatives enjoining them from entering into or enforcing agreements for a term in excess of one year.

44.     In 1977, the U.S. District Court for the Western District of Missouri entered a consent decree against Mid-America Dairymen, Inc. ("Consent Decree").  The Consent Decree enjoined and restrained Mid-America Dairymen, Inc. from the following:

Public Version - Redacted Pursuant to Protective Order

- Using threats or coercion to induce any producer to execute or refrain from terminating a membership and marketing agreement with defendant or to deliver milk to defendant;

- Qualifying milk for participation in federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing pool in order to force, coerce or induce such producers who are not members of defendant or join defendant or to cease selling milk in competition with defendant;

- Entering into or enforcing any contract or agreement with another cooperative or association of producers to qualify milk for participation in federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing order pool in order to force, coerce or induce such producers who are not members of defendant to join defendant or such other cooperative or association or to cease selling milk in competition with defendant or such other cooperative or association;

- Entering into or enforcing any Milk Sales Agreement containing a term in excess of (1) year;

- Joining, contributing anything of value to, or participating in any organization or association which directly or indirectly engages in or enforces any act which defendant is prohibited by this Final Judgment from engaging in or enforcing, or which is contrary to or inconsistent with any provision of this Final Judgment.

45.    On January 1, 1998, DFA was created from the merger of four cooperatives, including two of the cooperatives that had been sued by the DOJ: Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairy Cooperative, Inc. The CEO and CFO of Mid-America Dairymen, Inc., Gary Hanman and Gerald Bos respectively, became the CEO and CFO of DFA.

46.    Since its formation, DFA has been bound by the Consent Decree.  The document "Dairy Farmers of America, Inc.: Statement of Terms for the Merger of Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing Inc., & Western Dairymen Cooperative, Inc.," dated September 30, 1997, identifies one of the "Potential Disadvantages" of

Public Version - Redacted Pursuant to Protective Order

the merger to be: "DFA will be subject to the restrictions of the antitrust consent orders currently applicable to AMPI, Mid-Am, and WDCI."

47.     By 2000, DFA had become, and remains, the largest dairy cooperative in the country.  DFA has approximately 1,900 member dairy farmers in the Northeast.  Its Northeast Area Council, operated out of Syracuse, NY, would be the second largest cooperative in the Northeast if it were a stand alone business.

48.     Some dairy farmers market their raw Grade A milk to processing plants in the Northeast without engaging DFA, either by joining other cooperatives or by not joining a cooperative.   Cooperatives other than DFA are referred to herein as "independent dairy cooperatives," even though some of them have very close ties to DFA.  Dairy farmers that are not members of cooperatives are referred to herein as "independent dairy farmers." Independent dairy cooperatives and independent dairy farmers seek to market their raw Grade A milk to processing plants by directly contracting with plants or through agents and/or marketing associations.   None of the independent dairy cooperatives or independent dairy farmers in the Northeast have sufficient market share to impede the exercise of the monopoly/monopsony power of DMS, which is controlled by DFA.

## DAIRY MARKETING SERVICES

49.     DFA greatly strengthened its position in the Northeast in 1999 by forming Dairy Marketing Services or DMS, a marketing agency, with Dairylea, the largest dairy cooperative in the Northeast.

50.      DMS is a milk-marketing organization that assembles, tests and hauls raw Grade A milk to processors for farmers and cooperatives.  DMS controls how much farmers and cooperatives who market their milk through DMS receive for their raw Grade A milk above the

Public Version - Redacted Pursuant to Protective Order

FMMO minimum price.  DMS also determines where the raw Grade A milk produced by farmers who market through DMS is bottled and pooled.  DMS markets approximately 17 billion pounds of milk produced by more than 9,000 farmers in the Northeast including the milk of 24 dairy cooperatives and more than 2,800 independent dairy farms.  DMS manages a hauling system of 180 contract haulers delivering more than 900 loads per day.  DMS is by far the largest marketer of raw Grade A milk in the Northeast.

51.     DFA and DMS describes DMS as a joint venture milk marketing agency that markets milk and provides member services to independent producers.  Its current member-owners are Dairylea Cooperative, Dairy Farmers of America and St. Albans Cooperative Creamery.  Land O'Lakes is a joint venture partner of DMS.  DMS is the largest stand-alone milk marketing business in the U.S.  DFA also states that DMS allows DFA to retain the milk supply with the ultimate goal of converting the independent producer to a cooperative member.

52.     The creation of DMS strengthened DFA's control of the Northeast raw Grade A milk market in three significant ways.  First, by designating DMS as the exclusive marketer for Dairylea, all of Dairylea's 2,300 member farmers were brought under DFA's control.  Second, the creation of DMS provided a mechanism for DFA to bring independent dairy farmers and cooperatives under its control.  As discussed below, through full supply and outsourcing agreements and other anticompetitive acts, DFA forced thousands of independent dairy farmers and independent cooperatives to market their milk through DMS in order to access fluid Grade A milk bottling plants.  Third, DFA also did not reveal to those farmers that DFA controlled DMS, including the prices that it set.  Third, by arranging for DMS to function as the exclusive marketing agent for all DFA members in the Northeast and all independent dairy cooperatives and independent dairy farmers that ship raw Grade A milk to Dean's Northeast processing

Public Version - Redacted Pursuant to Protective Order

plants, DFA established a mechanism through which over-order premiums could be fixed, suppressed and monitored.

53.    DFA and DMS have a principal-agent relationship.  DFA owns 50 percent of DMS and controls DMS's operations.  DMS's Limited Liability Company Operating Agreement formally provides DFA with great power over DMS, especially due to the super-majority voting structure that gives DFA veto power over almost any significant action of DMS.

54.    For example, DMS acts as DFA's agent in the handling of payments from processors and to dairy farmers.  Farmers who market their Grade A fluid milk through DMS are paid milk checks issued from the same bank accounts that issue milk checks to DFA members. DFA documents describe the intertwined structure of the DFA and DMS relationship and how DMS acts as DFA's agent.  DMS invoices processors and coordinates payment of dairy farmers. According to DFA, "all proceeds from customers are deposited in DMS bank accounts." "All checks for milk payments are drawn on DMS bank accounts." "Each day, DFA sweeps the DMS depository accounts and funds all DMS check clearings."  "DMS does not borrow or invest cash - DFA provides all treasury services."

55.    DFA executives also hold executive positions at DMS to facilitate DFA's control over DMS as its principal.  For example, Rick Smith was the President and Chief Executive Officer of DMS at the same time that he served as DFA's President of Council Operations and President of the DFA Northeast Area Council.  Greg Wickham was DMS's Chief Operating Officer of the Northeast at the same time that he served as the DFA's Vice-President and Chief Operating Officer of the DFA Northeast Area Council.

22

**Public Version - Redacted Pursuant to Protective Order**

56.    DMS employees are paid from bank accounts and have pension programs – both controlled by DFA.  Vehicles that transport the testers who test the quality of raw milk for DMS are registered as owned by DFA.

## THE FORMATION AND EXPANSION OF DEAN FOODS

### Suiza Enters the Northeast Market

57.    In the late 1990's, Suiza undertook a series of steps to expand its processing facilities in the Northeast as well as other markets.  In July 1997, Suiza purchased Garelick farms, which had dairy plants in Bennington, Vermont, Franklin, Massachusetts and Bangor, Maine.  In July 1998, Suiza purchased West Lynn Creamery in Lynn, Massachusetts.  In August 1998, Suiza purchased the East Greenbush, New York and Florence, New Jersey dairy plants of Cumberland Farms, which had a reputation for aggressively competing against Suiza for contracts.  Suiza acquired Nature's Best Dairy in Rhode Island and had closed it by 2001.

58.    By 1998, Suiza's CEO, Gregg Engles, reached an agreement with DFA's CEO, Gary Hanman, designed to restrain competition and secure dominant positions in the Northeast for Suiza and DFA.  During meetings in 1997 and 1998, Engles and Hanman negotiated and then agreed that each would stop competing or compete less aggressively with each other at both the raw milk marketing and milk processing levels of the industry.  Through Engles and Hanman, Suiza (later renamed Dean) and DFA agreed not to compete for  purchase of raw Grade A milk from dairy farmers and to assist each other in gaining control over raw Grade A milk marketing and processing in the Northeast and other markets.  Engles and Hanman agreed that Suiza would help DFA gain control of raw Grade A milk marketing by giving it exclusive access to Suiza processing plants and requiring non-DFA cooperatives and independent dairy farmers to sell milk through DFA to secure access to those plants.  Engles and Hanman also agreed that DFA

23

Public Version - Redacted Pursuant to Protective Order

would help Suiza gain control of milk processing by assisting it in acquiring more processing plants, including transferring control of DFA-owned processing facilities to Suiza. Engles had also agreed by December 1998 that Suiza, with DFA, would turn their efforts to conversion of independent dairy farmers to DFA membership. The Engles-Hanman agreement is documented and implemented in notes and letters in 1998, the full-supply agreements they entered shortly thereafter, and other actions described below. It has been implemented in the Northeast as well as other markets.

59.     Suiza entered into what became a comprehensive full supply agreement with DFA that gave DFA the exclusive right to supply all the raw Grade A milk to all of Suiza's processing plants. On February 20, 1998, Engles communicated to Hanman that as Suiza continued to acquire additional processing facilities, DFA could supply all the milk to those plants, and if DFA expanded to new geographic areas where Suiza had plants, Suiza would establish supply agreements with DFA for those plants.

60.     In furtherance of their agreement, Suiza and DFA formed a joint venture called Suiza GTL in 1998. Suiza contributed its six Garelick, Cumberland and West Lynn plants and DFA added the four plants of Tuscan Dairy Farms and Lehigh Valley Dairies in Frasier, NY, Union, NJ, Lansdale, PA and Schuylkill Haven, PA as well as New England Dairies in Hartford, Connecticut that it owned. (Earlier in 1998, DFA had purchased the Tuscan/Lehigh plants, along with a partner whose interest it later bought out. DFA took over the marketing of the milk supplied by independent dairy farmers to those plants.) DFA and Suiza GTL signed a full supply agreement in 1998 to have DFA supply all of the milk to those plants. DFA's dealings with Suiza resulted in DFA holding a 33.8% ownership in Suiza in 2000.

**Public Version - Redacted Pursuant to Protective Order**

61.     Suiza and DFA planned in 1998 to jointly convert to DMS over 1,000 independent farmers who supplied the Suiza GTL plants in the Northeast and therefore refuse to deal with them unless they sold their milk through DFA. This conversion was facilitated by DFA and Dairylea. In 2001, Suiza then turned over the independent farmers that supplied its Garelick, Cumberland and West Lynn plants to DMS without seeking their consent to be outsourced. Although Suiza and DFA sought to hide their agreement with claims that no independent farmer would be forced to join DFA and any decision to convert to DFA membership or market milk through DFA would be made by independent farmers, in reality Suiza and DFA were aware that farmers were being given no choice other than – as Engles later testified – to "join DFA, market their milk through DFA and not join DFA or supply their milk to some other party other than" Suiza.

62.     DFA's investment in joint venture ownership of processing plants with Suiza and other investors created a conflict of interest between DFA's duty to market its members' milk at the highest possible price and DFA's obligation to its non-farmer co-investors who want to maximize their profits by paying the lowest possible prices for raw Grade A milk.

63.     Thus, as Engles and Hanman agreed, Suiza helped DFA gain control of milk marketing by requiring non-DFA cooperatives and dairy farmers to sell milk through DFA in order to access plants controlled by Suiza. Engles and Hanman accomplished this by requiring independent farmers to join DFA and "converting" to DMS those farmers who did not want to join DFA.

**With DFA's Help, Suiza and Dean Merge and Circumvent DOJ's Requirements Designed to Preserve Competition**

64.     By 2001, Suiza was the largest buyer and processor of raw Grade A milk in the United States, and "Old" Dean was the second largest buyer and processor of raw Grade A

**Public Version - Redacted Pursuant to Protective Order**

milk in the United States. "Old" Dean was the largest competitor of Suiza and DFA-owned processing plants.  Dean purchased milk from a variety of cooperatives and directly from independent dairy farmers.

65.     Prior to the conspiracy, Suiza and Dean competed to purchase raw Grade A milk directly from dairy farmers against each other, other milk processors and cooperatives like DFA. For example, Dean believed that having multiple sources of milk supply, including independent farmers and multiple cooperatives, provided competitive advantages.

66.     Then Suiza and DFA orchestrated a scheme to eliminate their chief rival, Dean. Suiza would purchase Dean. Accordingly, in 2000, DFA's Hanman hosted a hunting trip at Hanman's private reserve on December 1-2, 2000 to bring together Engles from Suiza and Howard Dean from Dean as well as Pete Schenkel of Suiza and DFA's CFO, Gerald Bos. During this trip, Engles commenced serious negotiations with Howard Dean regarding Suiza's acquisition of Dean.   Hanman and Bos became deeply involved in the effort to combine Suiza and Dean.   Suiza and Dean agreed to a deal and, in 2001, Suiza announced its plan to acquire Dean and create the "new" Dean.  As the *quid pro quo* for DFA facilitating and financing the merger between Dean and Suiza by selling its 33% share in Suiza and circumventing DOJ's requirements designed to preserve competition, Engles agreed not to compete with DFA for the purchase of milk from dairy farmers, including those in the Northeast.   In short, DFA facilitated a merger that allowed Suiza to continue to expand its position in the Northeast and other markets, and DFA was rewarded by "new" Dean's continuing efforts to limit competition with DFA (and its agent DMS) and substantially increase DFA/DMS's market power.

67.     In light of the concentration and anticompetitive results likely to occur because of the proposed merger, DOJ expressed concerns. To preserve competition, DOJ required Dean and

**Public Version - Redacted Pursuant to Protective Order**

Suiza to: (1) modify the full supply agreements by "carving out" 16 plants that could be sourced by non-DFA suppliers; and (2) divest 11 processing plants to a supposedly independent entity – NDH, which was formed at that time by DFA to acquire the divested plants, with the collateral agreement that DFA would not control the newly created NDH.   Defendants Suiza (now known as Dean), DFA and NDH agreed to these conditions.  Absent these requirements, which applied to plants at various locations outside the Northeast, the Suiza-Dean merger likely would not have been approved.  Privately, however, DFA conspired with Suiza to violate these requirements.

68.    First, although Defendants ostensibly agreed to carve out from the full supply agreements 16 plants that were to be open to competition by independent farmers and cooperatives, Defendants deliberately and collaboratively undermined DOJ's goal to preserve competition.  In light of DOJ's insistence that these plants be open to competition, Dean paid DFA ███████ to purportedly reflect a reduction in value of the full supply agreements.  But DFA secretly agreed to return the payment to Dean if, in fact, the new Dean purchased only from DFA controlled sources.  Defendants never notified the Department of Justice of the ███ ███ payments.   Less than two years later, DFA returned the ███████, because as agreed, Dean in fact had not purchased milk for the carve-out plants from a source other than DFA or its controlled entities and thus  deliberately flouted the requirements established by the Justice Department to preserve competition.  Notably,  Defendants did not document the ███ ███ payment at the time it was made.

69.    Second, to secure approval of the merger, the Justice Department imposed a "requirement that the ███████████████ in DFA's milk supply agreement with the merged entity (new Dean) be removed.  As the Justice Department recognized, such provisions reduce price competition and facilitate the coordination of pricing among processors.

Public Version - Redacted Pursuant to Protective Order

Notwithstanding DOJ's requirement, new Dean and DFA nevertheless agreed to a ███████ ███ provision in Amendment No. 5 to their full supply agreement, effective January 1, 2002. This was not disclosed to the Department of Justice

70.     In short, DFA and DMS reached secret agreements with Suiza and Engles that enabled Suiza's merger with Dean to go forward and circumvented protections insisted upon by the Department of Justice.  DFA and DMS helped the new Dean gain a more dominant position as a milk processor and, in exchange, Suiza and Engles privately agreed to a scheme that facilitated DFA's and DMS's efforts to restrain competition and gain a monopoly/monopsony position in the raw Grade A milk market in the Northeast.

71.     In 2001, Dean and Suiza announced the merger, but not the private agreements with DFA and DMS to circumvent the DOJ protections.  The post-merger company operated under the name Dean.  Dean, Suiza, and DFA agreed that Dean would buy out DFA's 33.8 percent stake in Suiza for $166 million and issue to DFA a $40 million promissory note which becomes due in 2021 in the amount of $96 million.

72.     In a memo to their Board of Directors, DFA described the deal above as follows: "Prior to the acquisition of Dean Foods by Suiza, DFA had a full supply contract with Suiza.  DFA also had an equity interest in the Suiza bottling operations.  To facilitate the acquisition of Dean by Suiza, DFA sold its equity interest in Suiza back to Suiza.  In exchange for that interest, DFA received a combination of cash and processing plants that were required to be sold by Suiza/Dean for antitrust reasons. In addition, DFA's exclusive supply obligations and rights were extended to *all* newly acquired Dean plants." (emphasis added)

**Public Version - Redacted Pursuant to Protective Order**

**Dean's Full Supply Agreements with DFA**

73.     The events described above did not result in the new Dean purchasing substantial quantities of milk from sources other than DFA.  Rather, in furtherance of the conspiracy, DFA and the new Dean entered into and/or continued to implement full supply agreements and outsourcing agreements that designated DFA and DMS to be the exclusive suppliers of milk to Dean's processing plants.  Dean, DFA and DMS also structured the full supply agreements to circumvent a binding 1977 Consent Decree entered in the *Mid-America Dairymen* case that bars DFA from entering milk supply agreements with terms in excess of one year.  Dean and DFA ensured that their full supply agreement would be long-term by:  1) DFA agreeing to forgive the entire balance of the $40 million promissory note provided that Dean renewed one-year full supply agreements until 2021; and 2) Dean agreeing to pay DFA liquidated damages of up to $47 million in the event Dean did not turn over their independent farms to DFA/DMS.

74.     Defendants structured the DFA full supply agreement with Dean to appear as a one-year agreement, but, in fact, Suiza executed a promissory note in the amount of $40 million which would become payable in full, together with accrued interest, if and when Dean terminated or failed to renew any of its full supply/full-requirements agreements with DFA prior to December 21, 2021.   At the end of the 20 years, the $40 million note, plus interest, would be extinguished if Dean entered full supply agreements with DFA throughout this time period. Payment of the promissory note, which approaches $100 million including accrued interest, would require a significant amount of money from Dean if it did not carry forward Defendants' scheme.   The entire note balance plus interest is due upon cancellation of the agreement as to any of those nine plants.

**Public Version - Redacted Pursuant to Protective Order**

75.     Dean has agreed to pay DFA ▮▮▮▮▮ in liquidated damages if Dean fails to turn over its independent farmers to DFA in accordance with its full supply agreements with DFA.

76.     Dean described the agreement regarding the $40 million promissory note as follows in an internal document: "On December 21, 2001, in connection with our acquisition of Dean Holding Company, we issued a contingent, subordinated promissory note to Dairy Farmers of America ("DFA") in the original principal amount of $40 million. DFA is our primary supplier of raw milk, and the promissory note is designed to ensure that DFA has the opportunity to continue to supply raw milk to certain of our facilities until 2021, or be paid for the loss of that business. The promissory note has a 20-year term and bears interest based on the consumer price index. Interest will not be paid in cash, but will be added to the principal amount of the note annually, up to a maximum principal amount of $96 million. We may prepay the note in whole or in part at any time, without penalty. The note will only become payable if we ever materially breach or terminate one of our milk supply agreements with DFA without renewal or replacement. Otherwise, the note will expire at the end of 20 years, without any obligation to pay any portion of the principal or interest. Payments we make under this note, if any, will be expensed as incurred. We have not breached or terminated any of our milk supply agreements with DFA."

**DFA Control Over and Full Supply Contract with NDH**

77.     Dean, DFA and DMS also schemed to circumvent DOJ's condition on the Dean-Suiza merger that eleven plants be divested to an independent third party.  DFA's Hanman and Bos helped Suiza circumvent this requirement by establishing a straw entity, NDH, to acquire the divested plants.  In 2001, DFA and three individual investors, coconspirators Tracy Noll, Cletes

Public Version - Redacted Pursuant to Protective Order

Beshears and Allen Meyer, created NDH.  In 2001, NDH acquired all of the Crowley plants and became a large processor in the Northeast.  Relying on hundreds of millions of dollars of financial backing from DFA and only minor contributions by these coconspirators, NDH also acquired the 11 divested plants described above in 2002, enabling Suiza to complete its merger with Dean.  Upon information and belief, DFA and its subsidiaries provided more than ███ million in financing to NDH for the acquisition of these bottling facilities.

78.    The Department of Justice had insisted that NDH be run independently. Although DFA and NDH told the Justice Department that DFA would not control NDH or be involved in its day-to-day operations, DFA installed the three DFA-insider investors as NDH's officers.  DFA also acquired a 50 percent ownership stake in NDH, which was subsequently increased to 87 percent.  With its insiders entrenched, DFA participated in NDH's management from NDH's inception, ensuring that NDH would not be an effective competitor in the Northeast.

79.    Additionally, Bos and Hanman were appointed to NDH's management committee and provided DFA a veto over NDH's operational decisions.  DFA and its partners agreed that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers.  As a result, NDH did not take any significant action without DFA's express approval or without having been directed to take such action by DFA.

80.    DFA installed Allen Meyer as CEO of NDH.  Meyer had co-founded the Southern Foods Group and subsequently merged it with DFA into Suiza's bottling operations. DOJ has accused Meyer of operating as functionary for DFA who colludes with DFA to eliminate competition while claiming to operate NDH as an independent competitor.  The DOJ has

Public Version - Redacted Pursuant to Protective Order

specifically alleged that DFA and Meyer have "a long history of friendly and mutually profitable financial dealings," Meyer "has a substantial incentive to keep DFA happy so that he can continue to receive profitable business opportunities," "Meyer enjoys a share of the profits and potential appreciation that is far out of proportion to his investment in NDH/Flav-O-Rich, thanks to DFA," and the "prospect of future ventures with DFA affords Meyer a strong incentive to manage [NDH] in a manner that serves DFA's interests in eliminating competition." In 2004, DFA bought out two of the investors in NDH, leaving Meyer as DFA's sole investment partner in NDH.

81.     NDH was a wounded competitor from the start because it had acquired the poorly performing processing plants cast aside by Suiza and Dean, and they continued to perform poorly.  DFA greatly overpaid for the NDH plants, but its agreement to do so allowed the Suiza-Dean merger to go forward and foreclosed the independent operation of these plants that the Justice Department had required.

82.     These actions to facilitate the merger and circumvent the Justice Department's efforts to protect competition also furthered the conspiracy for DFA to monopolize the market for raw Grade A milk in the Northeast.  NDH – now controlled by DFA cronies – adopted full supply agreements with DFA at its plants that foreclosed access to those plants by other cooperatives and independents.    In short, DFA's actions enabled Suiza to proceed with its merger and avoid competitive protections insisted upon by the Justice Department; in return, Suiza (and new Dean) continued to conspire and take actions to help DFA/DMS gain monopoly/monopsony power in the Northeast (as well as other markets).

Public Version - Redacted Pursuant to Protective Order

**Effect of the Dean-Suiza Merger**

83.     Through the merger and their circumventing of Department of Justice safeguards, Dean and DFA significantly strengthened each other's market positions and furthered the aims of the conspiracy.  DFA aided Dean by financing and offering NDH as a vehicle to purchase the divested 11 milk processing plants and by using its control over NDH to ensure that NDH would not vigorously compete with Dean for the purchase or sale of milk. Dean, in turn, did not purchase raw milk from independent dairy farmers and independent dairy cooperatives in the Northeast and instead purchased raw milk through full supply agreements with DFA and DMS for its Northeast processing plants.  As a result of the merger, "new" Dean became the largest fluid milk processor in the Northeast. The Dean-Suiza merger has been successful financially.  For example, Dean had a gross profit of $2.7 billion on $10 billion in sales in 2006 with 85% of its business coming from its Dairy Group.

### DEFENDANTS FORCE INDEPENDENT FARMERS TO JOIN DFA OR MARKET THEIR MILK THROUGH DMS

84.     Through acquisitions, mergers, supply agreements and closures of competitors' processing plants, Defendants secured control of the raw Grade A milk processing market in the Northeast.  DMS became the exclusive supplier of raw Grade A milk to Dean.  Defendants used their control over the raw Grade A milk supply market to force independent dairy cooperatives and independent dairy famers to join DFA or market their milk through DMS. Defendants have acted to eliminate competition between processors and cooperatives.  These actions have injured all Class members by allowing DMS, controlled by DFA, to acquire and maintain a monopoly/monopsony power to suppress the price paid to them for raw Grade A milk.

**Public Version - Redacted Pursuant to Protective Order**

85.     Gary Hanman has explicitly acknowledged that DFA has intentionally used acquisition of processing plants as a hammer to force independent dairy farmers and independent dairy cooperatives to join DFA or market their milk through DMS even when these farmers and cooperatives did not otherwise want to join.  He also acknowledged that, as early as 2000, DFA had to be careful when engaging in such conduct because the DOJ and state Attorneys General were carefully watching it.

## DFA/DMS's Agreement with Dean Forces Dean's Independent Dairy Farmers to Market Their Milk Through DMS

86.     As explained above, from the outset of the Suiza-Dean discussions, Dean (Engles) and DFA (Hanman) agreed that Suiza's independent farmers would be turned over to DFA.  Dean and DFA proceeded to implement that agreement with respect to the Suiza and Old Dean independent farmers.  At the start of the Suiza/DFA negotiations with Old Dean, internal documentation at Dean affirmed this agreement between Engles and Hanman.

87.     This agreement to stop competing for milk procurement from independent producers and instead agreed to turn those "independents" over to DFA/DMS, constitutes a per se violation of the Sherman Act.  DFA acquired full supply agreements with the old Dean plants and thus forced the independent dairy farmers who provided milk to Dean to market their milk through DMS in order to access Dean's bottling plants. (Suiza's processing and bottling plants in the Northeast, now part of the new Dean, continued to have full supply agreements with DFA.) This enabled DFA/DMS to gain greater control over dairy farmers.

88.     Consistent with their agreement, Defendants worked to consolidate non-DFA cooperatives and independent dairy farmers under a single entity that DFA could control. At a Dean board meeting on May 4, 2001, only weeks after the announcement of the proposed Dean-

**Public Version - Redacted Pursuant to Protective Order**

Suiza merger, Engles explained the agreement that DFA would supply new Dean's processing plants, either with DFA's milk or from a DFA-controlled entity.

89.    Martin Devine of Dean noted the "side letter" agreement between DFA and Dean in a January 29, 2001 memo: "We have a general understanding with DFA that over some period of time our independent producers will convert to be members of DFA.  (There is a side letter signed by Gregg Engles and Gary Hanman, and was also agreed to by one or two of you in the field)."  He noted the agreement to turn over Dean's independent farms to DFA (and then also to DMS) and that there was a ▮▮▮▮▮▮ penalty for failing to do so.

90.    DFA described the full supply arrangement between Dean and DFA as being "'thrust' upon both organizations by agreement among Gary, Jerry, Pete and Gregg" and also stated that "Dean operating personnel had 'their farms' and 'their control' given away."   In accordance with their agreement, Dean agreed not to compete with DFA and DMS in the solicitation and purchase of raw Grade A milk from dairy farmers.

91.    In 2001, Suiza (through Garelick Farms, which was owned by Suiza) sent a letter to dairy farmers in the Northeast misleadingly informing them of its decision "to outsource our raw milk procurement functions to Dairy Marketing Services ("DMS")."   Farmers were told that Garelick Farms "operate[s] in a very competitive market and we believe that we can best serve our shareholders, our customers and our industry by allocating more of our resources toward growing retail dairy sales."  Farmers were also told that "effective July 1, DMS will assume responsibility for fieldwork, milk assembly and transportation, and all other producers related activities" while Garelick "will continue to do the lab testing of the milk."  Farmers were not told that DFA, in fact, controlled DMS, much less was DFA even mentioned.  Farmers were instead misleadingly assured that "you will not be forced or pressured in any way to join a cooperative."

**Public Version - Redacted Pursuant to Protective Order**

92.     Dean and DMS executed a formal agreement on January 1, 2003 that DMS would, on Dean's behalf, assume all of Dean's responsibilities for the assembly, collection and delivery of raw Grade A milk.  The agreement included the Dean plants in the Northeast – the Garelick, Cumberland, West Lynn, Tuscan and Lehigh Valley plants.  (As described above, the independent dairy farmers that previously supplied these Northeast plants directly had already been outsourced.)  This agreement confirmed Dean's already severely restricted role as a direct competitor of DFA and DMS in the solicitation of milk from dairy farmers.

93.     Under this arrangement, DMS purportedly would manage, collect and deliver independent producer's milk supply to 22 Dean processing plants across the country.  In reality, however, DFA controls and manages all aspects of the DMS operations in the Northeast and elsewhere.  DFA also sets the prices paid to the Northeast independent farmers that Dean/Suiza turned over to DMS.

94.     Dean had told its independent dairy farmers in different regions quite the opposite about DFA's role and goals, as noted above in the 2001 letter from Suiza to independent dairy farmers that supplied its Garelick plants. Similarly, Martin Devine of Dean wrote a letter to dairy farmers dated December 4, 2001 to address rumors following the closing of the Dean-Suiza merger.  He misled dairy farmers supplying Dean by representing that their milk supply agreements would be honored and that they would not be "[r]equired, forced, pressured or coerced to join a cooperative."

95.     After assigning the agreements to DMS, however, Dean refused to deal with independent dairy farmers who had traditionally been its direct suppliers.  Those independent farmers had no choice but to sell their milk through DMS at prices and terms that unbeknownst

Public Version - Redacted Pursuant to Protective Order

to farmers, were controlled by DFA..  In short, DMS was set up as a front to trick independent dairy farmers into marketing their milk through an organization secretly controlled by DFA.

96.     Thus, although Dean used to compete for independent farmer milk, the Defendants agreed that it would stop competing and would instead turn over control of the independent supply, including pricing, to DFA.  In this way, Dean aided and abetted DFA's ability to control price not only of its own members, but also of thousands of farmers who do not belong to DFA.

**Dean Receives Credits, Rebates and Other Benefits from DFA/DMS**

97.     In return for "outsourcing" its independent dairy farmers and unlawfully allocating the market, Dean received suppressed prices for milk from DFA and DMS.  The over-order premiums paid by Dean were repeatedly reduced by "competitive credits."  Dean also sometimes received "silent credits."  These silent credits are not disclosed to dairy farmers.  Hanman and Engles agreed that Dean would receive credits as far back as their meetings in 1998 when they agreed to help each other.  Since 2001, Dean has received millions of dollars of silent credits not disclosed to Northeast dairy farmers.  Dean was also rewarded with secret rebates not reflected on any invoices or disclosed to dairy farmers.  As a result of these secret credits and rebates, prices for raw Grade A milk are not actually received and passed on to Northeast dairy farmers.

98.     DFA also agreed to pay Dean end-of-year rebates that effectively lowered the cost of Dean's milk (and the revenue collected for Northeast dairy farmers).  Under the outsourcing agreement, DMS agreed to pay a rebate of ███████ to Dean.  This rebate, ostensibly, was to reflect Dean's share of the "efficiencies" that would result from the outsourcing of Dean's independent supply to DMS.  However, the parties did not conduct any analysis to justify this

**Public Version - Redacted Pursuant to Protective Order**

██████ rebate because, in fact, the rebate was not based on any efficiencies; it was simply "negotiated" between Engles and/or Schenkel and Hanman.    Another DMS/Dean agreement provided for a ██████ per month rebate from July through December 2004, which amounted to ██████.    The purported purpose of these rebates was to "lower Dean's overall costs of acquiring raw milk" and they were not reflected on any invoices.    DFA termed the $3,750,000 payments in 2005 and 2006 "competitive price adjustments."

99.    Thus DFA/DMS agreed to pay Dean an ██████ in rebates as follows between 2003 and 2007: ██████ in 2005; ██████ in 2006; ██████ in 2007; and ██████ in 2008.  The credits and rebates given to Dean are significant since they amount to a significant percentage of the over-order premiums during 2000-07.

100.    In addition, Dean would sometimes receive credits from DFA after turning over its independent producers to DFA.  An internal Dean document dated April 24, 2001 lists "long term advantages" of "turning over all independents to DFA" in the Northeast as: 1) 100% supply credit, and 2) volume credit.  DFA in turn would pay the formerly independent dairy farmers a less than competitive price.

101.    A November 18, 2003 email from Martin Devine discusses rebates from DFA/DMS: "This would give us a credit of ██████. We call this a silent rebate because we did not want everyone in the field or our competitors to know we received this rebate."

102.    Dean did not disclose these credits and rebates to the public concerning the outsourcing of its independent farmers, but instead stated that it could best serve its shareholders, customers and dairy farmers by focusing retail sales and developing new products and packaging.

38

**Public Version - Redacted Pursuant to Protective Order**

**DFA/DMS's Other Deals That Forced Independent Farmers To Market Their Milk Through DMS**

103.    DFA employed this anticompetitive strategy – entering into full supply agreements and converting independent dairy farmers – with processors other than Dean.  DFA has admitted that its outsourcing agreement with Dean to outsource Dean's independent dairy farmers to DMS "served as a predicate for subsequent outsourcing projects with NDH and Kraft, and others (most recently Hood-Rosenberger)."  These outsourcing agreements are separate from the full supply agreements and force independent farmers into DMS, an anticompetitive and indeed predatory act that is a per se violation of the Sherman Act.  Thus, DFA and DMS entered into similar agreements with other processors in order to restrain competition, increase DFA's and DMS's power over dairy farmers and secure a monopoly/monopsony position for DMS controlled by DFA in the raw Grade A milk market.  For example, DFA and DMS have employed this strategy with Dean, NDH, Hood and Kraft as well as with Farmland Dairies and the formerly Suiza dairies, the Tuscan and Lehigh Valley dairies.

104.    DFA had implemented this strategy even before the Dean-Suiza deal when the Tuscan and Lehigh Valley plants outsourced their independent producers to DFA.

105.    DMS signed a full supply agreement with Kraft in 2003 for its New York plant.  Kraft then "assigned" its independent dairy farmers to DMS, including the independent cooperative, Konhochton Milk Producers' Cooperative in Arkport, NY.

106.    In July 2005, Farmland Dairies entered into a full supply agreement with DMS.  DMS assumed the milk marketing responsibilities for about 400 farms and two small cooperatives.  About 400 farmers, including named plaintiff Donna Hall, who had shipped independently to Farmland Dairies subsequently received a letter stating that Farmland Dairies would no longer buying milk directly from them, but rather obtain it through a new full supply

39

contract with DMS.  As a result, the independent farmers who had previously provided milk to Farmland Dairies were required to market their milk through DMS in order to access Farmland's processing plants.

107.    DFA and DMS have also used these tactics to force independent dairy cooperatives to market their milk through DMS.  The Jefferson Bulk Milk Cooperative ("Jeff Bulk"), an independent cooperative of approximately 40 farmers in upstate New York, previously provided its milk directly to Great Lakes Cheese Company ("Great Lakes"), a private processor in upstate New York.  However, in 2004, DMS entered into a supply contract with Great Lakes, whereby DMS would provide 80% of the milk needed by Great Lakes.  As a result, Jeff Bulk was forced to sell its seven million pounds of milk to Great Lakes through DMS.

**Dean Shuts Down Stop & Shop Plant and DFA Captures St. Albans**

108.    Prior to February 2000, Stop & Shop, one of the largest supermarket chains in New England, had been processing its own raw Grade A milk at its Readville, Massachusetts plant with milk provided by St. Albans dairy cooperative.  The Stop & Shop plant processed a substantial share of the raw Grade A milk produced by St. Albans' dairy farmers.

109.    In February 2000, Stop & Shop entered into an agreement with Suiza, then partially owned by DFA and exclusively supplied by DFA.  The agreement required Suiza to pay $56 million to Stop & Shop in return for Stop & Shop closing down its Readville processing plant, selling the plant's assets to Suiza, and agreeing to purchase and sell milk products exclusively processed by Suiza for a 15-year period.  As DFA was the exclusive supplier of raw Grade A milk to Suiza, the agreement greatly expanded DFA's dominance in the Northeast and greatly damaged St. Albans by eliminating the primary buyer of its milk.

**Public Version - Redacted Pursuant to Protective Order**

110.    At their February 14, 2000 meeting, DMS's board of directors discussed Suiza's purchase of the Stop & Shop plant and how Suiza planned to close the plant to move the volume to other Suiza plants.

111.    The Attorneys General of Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island were concerned that the Suiza-Stop & Shop transaction would eliminate competition in the Northeast raw Grade A milk market by expanding DFA's dominance over the supply of raw Grade A milk at the expense of St. Albans and by reducing the availability of bottling capacity not controlled by Suiza.

112.    To address their antitrust concerns, the Attorneys General entered into a settlement agreement with Suiza and Stop & Shop that contained the following requirements:

- Suiza shall make available to its competitors 30 million gallons of its New England milk processing capacity per year, for a period of five years.

- Suiza and Stop & Shop shall not honor or enter into agreements to restrict Stop & Shop stores from selling competitors' milk.

- Stop & Shop shall not sell the processing assets of the Readville plant to Suiza.

- Suiza shall not sell, close or cease operations of, or purchase an ownership interest in, any New England dairy plants without first notifying the Vermont Attorney General.

113.    Once the agreement was consummated between Stop & Shop and Suiza, Stop & Shop shut down its Readville processing plant and sold its assets.  The closure of the Stop & Shop plant immediately increased Suiza's and DFA's market power in the Northeast.

114.    As a result of the closure of Stop & Shop's Readville plant, St. Albans had little choice but to rely on Suiza's (and later Dean's) processing plants to sell its raw Grade A milk.

**Public Version - Redacted Pursuant to Protective Order**

Yet, even under the State Attorneys Generals' settlement agreement, Suiza (and later Dean) was only required to offer its processing capacity to St. Albans for five years.

115.    In order to ensure long-term access to fluid Grade A milk bottling plants, St. Albans was forced to market its milk through DMS.  Gary Hanman attended several of St. Albans's annual meetings, and, during those meetings, he said that DFA was interested in folding St. Albans into DFA, which had a long-term full supply agreement with Dean.

116.    On February 24, 2003, St. Albans concluded that: "Over the last several years processing plants in the Northeast have closed or been acquired by major processors.  St. Albans Cooperative Creamery, Inc. experienced a significant change in its Class I account in 2000 with Stop & Shop's decision to close their bottling facility. … The Board of Directors and Management of the St. Albans Cooperative Creamery, Inc. have determined that access to the Class I market, fluid milk for bottling, is essential to the viability of the Cooperative.  The Cooperative needs to maintain at a minimum, 20 percent of its milk volume as Class I to qualify and receive the benefits under the Federal Order System. … After careful and full analysis, the St. Albans Cooperative Board of Directors has agreed to an annual membership and marketing agreement with DFA. This is not a merger of these two organizations.  This is an annual marketing and membership agreement that will assure St. Albans Cooperative access to markets in the Northeast and allow St. Albans to be competitive in returns to its dairy farmer members."

117.    In a March 1, 2003 agreement, St. Albans joined DFA and invested in DFA's equity program.  It gained one seat on DFA's board, two seats on DFA's Northeast Council and three seats on DMS's board.  After St. Albans joined DFA, it marketed its milk through DMS even though it had marketed its own milk in the past.  After its started doing so, the over-order premiums paid to its member farmers decreased significantly.

Public Version - Redacted Pursuant to Protective Order

**Dean Buys and Shuts Down Northeast Dairies**

118.    Dean has also effectuated the conspiracy and weakened the ability of dairy farmers to secure a competitive price for their milk by taking steps to acquire and then shut down milk plants in the Northeast.  In 2004 and 2005, Dean's facility closing costs were ███████ and ███████, respectively.  Dean acquired and then closed the processing plant of Marcus Dairy, an independent dairy in Danbury, Connecticut, in October 2005.  Dean spent ███████ in 2006 shutting down three Dairy Group facilities, including one in Union, NJ.  It also closed plants in Hartford, CT (New England Dairies), Cranston, RI (Nature's Best) and Fairdale, Vt.

119.    Senator Patrick Leahy stated that Suiza (now Dean) had achieved "market dominance by buying up local dairies and then closing them down."

## DFA CONSPIRES WITH NDH AND HP HOOD TO STRENGTHEN ITS GRIP ON THE NORTHEAST MARKET

**The Hood/NDH Proposed Merger**

120.    In furtherance of the conspiracy, DFA and DMS have also entered agreements and taken actions to secure a financial stake in HP Hood LLC, a significant processor in the Northeast, and restrain the ability of dairy farmers to gain access to its processing and bottling plants.  In November 2002, NDH, then owned and controlled by DFA, and Hood attempted to merge.  Once again, DFA played a central role.  The merger proposal was prepared by DFA's Hanman, who wanted to further expand DFA's dominance over the Northeast market by establishing supply agreements with Hood.  Under the original merger proposal, DFA would have had an exclusive right to supply raw Grade A milk to all Hood plants, including displacing milk that was being supplied by Agri-Mark.  In December 2002, Hanman said of the merger proposal, "what we're really in this for is to gain market share."

**Public Version - Redacted Pursuant to Protective Order**

121.    In 2002, Hood and NDH signed a letter of intent confirming the consolidation of the two companies and describing the transaction.  DFA executed the document for the purpose of acknowledging and accepting the terms of the document.

122.    Due to strong objections by state Attorneys General, the merger proposal was restructured into an unusual exchange of both stock and CEOs.  Under the revised proposal, three transactions would take place: (1) Hood would acquire a 30% interest in NDH; (2) DFA would acquire a 15% interest in Hood; and (3) Hood and NDH would trade their respective CEOs.

123.    DFA proposed an ownership structure where Hood and DFA's ownership interests were ███ and ███ respectively with the remaining ███ ownership interest going to a "Partner Group."  The "Partner Group" was comprised of Tracy Noll, Cletes Beshears and Allen Meyer, providing each with a ███ interest.   The new entity's corporate structure would give DFA veto power over all major decisions.  In addition, Hood's plants would be added to a full supply agreement that gave DFA control and veto power over any amendment to that agreement.  Furthermore, if Hood decided to sell NDH, DFA would have to buy Hood's interest in NDH.

**Hood's Acquisition of Processing Plants from DFA & NDH**

124.    After antitrust concerns scuttled this transaction, DFA purchased eight bottling plans from NDH,  including four in the Northeast, and sold them to Hood.   As a result of this transaction, Hood became the second largest processor in the Northeast and DFA acquired a huge economic stake in Hood's processing operations.  After Hood's acquisition of these processing plants, DFA's acquired a ███ stake in Hood that was valued in the range of ███ to ███ million as well as a ███████ note owed to DFA by Hood

44

**Public Version - Redacted Pursuant to Protective Order**

125.     Before the transfer to Hood, DFA entered into full supply agreements with the processors being sold to Hood.

**DFA's and Hood's Ongoing Efforts to Restrain Competition**

126.     According to a 2010 USDA report, Hood currently owns eleven processing plants in the Northeast.  In December 2006, DFA valued its ▮▮ interest in Hood at ▮▮▮▮▮.  DFA considered partnering with Hood in the division of Hood that owns four processing plants previously owned by NDH, and increasing its stake in that business from ▮▮ to ▮▮ .  As of October 2008, Hood also still owed DFA ▮▮▮▮ as a result of the previously executed promissory note.  Hood had made substantial principal payments to DFA in 2005 and 2006.  By virtue of both its equity stake – and Hood's continuing and substantial obligations pursuant to the promissory note – DFA has a substantial financial interest in the profitability of Hood's milk bottling business.

127.     DFA shares pricing information with Hood because it considers itself a partner in Hood's bottling operations.  In 2004, John Wilson of DFA instructed Amy Clapper of DFA to share pricing information with a Hood official, Cal Vanhoff.  At least through the  end of 2006, Hood's treasurer sent to DFA its top-level financial statements and information on a monthly basis, including its net income.

128.     DFA and DMS executives also discuss important decisions with officials from Hood.  For example, Greg Wickham, Sharud Mathur and Brad Keating of DMS met with Mike Suever of Hood in 2005 to advise him on the consolidation of Hood's plants and possible elimination of certain plants.  DFA continues to have an ownership and other financial interests in Hood today that give it the power to exercise significant control over Hood's actions.

**DFA's and DMS's Agreements with Hood to Strengthen Their Control Over the Market and Restrain Competition**

**Public Version - Redacted Pursuant to Protective Order**

129.    After the sale of processing plants from NDH to Hood, Hood designated DMS to be the major supplier of its raw Grade A milk, further consolidating DFA's control of the Northeast milk supply.

130.    In April 2004, after Hood's acquisition of the processing plants previously owned by NDH, Hood either continued or agreed to full supply agreements with DFA for all the plants it acquired from NDH.  DFA and Hood have reached similar agreements at other Hood plants. Thus, in a similar fashion to Dean, Hood "converted" or "outsourced" its independent dairy farmers to DMS controlled by DFA.  At least for many of its plants, Hood used to compete with DFA, Dean and other processors and cooperatives for the purchase of raw Grade A milk from independent dairy farmers, but by virtue of these agreements decided to cease competing.

131.    Hood's full supply agreements with DMS contain ████████████████████████ provisions similar to those condemned by the Department of Justice in connection with the Dean-Suiza merger, but then secretly implemented by Dean, DFA and DMS anyway.  For example, in 2004, DFA and Hood entered into a one year Full Milk Supply Agreement for Hood's milk processing plant located in Winchester, Virginia.  DFA included a ████████ ████████ provision that stated: ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

132.    Hood has enforced its full supply agreements with DMS.  For example, twenty large independent producers were forced to market their raw Grade A milk through DMS after Hood converted them.   These producers asked Mike Suever of Hood whether Hood would be interested by buying milk from them directly.  He told them that he buys 100 percent of his milk from DMS.  In addition, when Westco Cooperative, an independent cooperative, sought to sell

**Public Version - Redacted Pursuant to Protective Order**

its raw Grade A milk to Hood, Hood refused to buy from an independent cooperative due to its fully supply agreement with DMS.

**DFA & Agri-Mark Agree Not to Compete Over Access to Hood's Plants**

133.    Agri-Mark is the only cooperative that supplies raw Grade A milk to Hood that is *not* a member of DFA and does *not* regularly market its milk through DMS.  However, upon information and belief, DFA engaged in the following activities to eliminate competition with and limit the growth of Agri-Mark: (1) entered into an agreement to allocate markets and not compete with Agri-Mark, whereby DFA would continue to allow Agri-Mark to supply milk to Hood in return for Agri-Mark's agreement not to compete with DFA or DMS for farmer membership or supply contracts; (2) used its ownership interests in and supply contracts with Hood to limit the volume of raw Grade A milk that Hood procured from Agri-Mark; (3) ensured that Hood's newly acquired processing plants were fully supplied by DMS, not Agri-Mark; and (4) forced Agri-Mark to market some of its raw Grade A milk through DMS.  Thus, DFA and DMS exercise control over all of the milk supplied to Hood, either by directly supplying the milk to Hood or by eliminating competition with and controlling the growth of Agri-Mark.

134.    Agri-Mark has described its market position with Hood to the USDA: "Hood is currently Agri-Mark's largest Class I customer.  If Agri-Mark could not sell milk to those facilities or the facilities of the Dean Company for which DFA also has a full supply contract, we would not have had sufficient Class I sales to meet the 20% Class I shipping provision requirements necessary to remain pooled in the Northeast Order during the fall months of the year.  We could be depooled despite all the money our members have invested to balance the Class I market!"

**Public Version - Redacted Pursuant to Protective Order**

135.     Agri-Mark continued: "When one organization has such a overwhelmingly high percentage of Class I sales, we are concerned that the 'call' provision can be manipulated to specifically exclude another cooperative, despite that cooperative's desire, history and facilities dedicated to serving the Class I market."

**DEFENDANTS FIXED AND SUPPRESSED PRICES FOR RAW GRADE A MILK**

136.     The aims of Dean's participation in the conspiracy have included limiting competition among purchasers of milk from dairy farmers and the fixing and suppressing of prices for raw Grade A milk.  Dean's activities – including price coordination – have allowed DMS controlled by DFA to steadily expand its control over the supply of milk and ultimately acquire a monopoly/monopsony position.  As detailed below, DFA and DMS have used their market dominance to prevent price competition among milk suppliers, set uniform prices for the supply of milk and maintain their market position.  In limited circumstances, DFA and DMS have allowed milk suppliers to maintain their own market position and gain access to processors as long as they cooperate with DFA and DMS in setting prices and restraining competition.

137.     Defendants, led by DFA and DMS, fix and suppress prices paid for raw Grade A milk through a number of mechanisms.  First, DMS sets and suppresses the price paid to the dairy farmers who market their milk through DMS, either as members of cooperatives or as independent dairy farmers.  DMS sets and pays the monthly over-order premiums that farmers who market their milk through DMS receive.  Second,  DFA and DMS, along with the cooperatives that market through DMS, have conspired and agreed with other cooperative members of GNEMMA to fix and suppress prices for raw Grade A milk.  Third, DFA and DMS coordinate agreement among those cooperatives and processors, such as Dean, NDH, Hood and Farmland Dairies, to fix and suppress prices paid for milk.

**Public Version - Redacted Pursuant to Protective Order**

138.    In September 2006, DFA and DMS formed a common marketing agency called Greater Northeast Milk Marketing Agency.  GNEMMA is comprised of DFA; three cooperatives that market their milk through DMS (Dairylea, Land O'Lakes and St. Albans); a cooperative with strong ties to DFA (Maryland & Virginia); a cooperative that markets some of its raw Grade A milk through DMS, depends on DFA and DMS for access to bottling facilities, and has agreed to restrict its competition with DFA/DMS (Agri-Mark); and a cooperative that shares business interests and ownership in other entities with DFA (Upstate Niagara Cooperative, Inc.).

139.    According to DFA and DMS, GNEMMA is an over-order pricing agency.  GNEMMA announces the over-order premiums that all its Northeast dairy cooperative members are supposed to charge Northeast processing plants.  GNEMMA is operated like a business by cooperative executives.  These individuals make the pricing decisions for the agency.  Thus GNEMMA's member cooperatives meet regularly to fix and monitor the over-order premiums that they will charge to Northeast processors.

140.    According to DFA, Dairylea and Greg Wickham, GNEMMA members produce between 76% and 81.3% of the raw Grade A milk in the Northeast.   In June 2007, Greg Wickham, who has served as a senior executive at DFA, DMS and Dairylea, indicated  that GNEMMA produces 81.3% of the raw Grade A milk in the Northeast.  GNEMMA has projected that GNEMMA will supply 85% of the raw Grade A milk to processors in the Northeast by 2018.

141.    The owners of DMS – DFA, Dairylea and St. Albans – are members of GNEMMA, and the over-order premiums set by GNEMMA are applied to farmers who market their milk through DMS, including the cooperatives noted above as well as additional several thousand independent dairy farmers.   Therefore, GNEMMA members fixed over-order

Public Version - Redacted Pursuant to Protective Order

premiums for approximately eighty percent of raw Grade A milk sold to processors in the Northeast.  Moreover, because of this market power, GNEMMA effectively sets the market price received by all dairy farmers in the Northeast.

142.    By establishing and participating in GNEMMA, DFA ensured that two of the largest independent dairy cooperatives  operating outside of DMS in the Northeast charged the same over-order premiums as did DFA and DMS, thereby eliminating competition between cooperatives in the Northeast for the purchase of raw Grade A milk from dairy farmers, including the members of those two cooperatives.  Leon Berthiaume, CEO of St. Albans, has described GNEMMA as a "price agreement agency" that was established in part to "reach out and embrace those that are not part of the DMS system into a common decision-making and strategic organization."

**Defendants, Led by DFA and DMS, Fixed Prices Among Processors and Cooperatives**

143.    DFA and DMS have coordinated agreement among the members of GNEMMA and processors, such as Dean, Hood, NDH and Farmland Dairies, to fix prices paid to dairy farmers in the Northeast.

144.    DFA and DMS have used their market power to charge substantially the same prices to processors, suppress payments to dairy farmers and avoid increases in the payments to farmers unless a consensus was reached among all GNEMMA members and the processors to raise prices.   By effectuating this agreement, DFA and DMS have been able to maintain their dominant share of the market and avoid price competition.  By cooperating in these efforts, GNEMMA's other members avoid price competition with the dominant supplier in the market and are able to maintain access to the processing and balancing plants upon which their businesses depend.

**Public Version - Redacted Pursuant to Protective Order**

145.    DFA and DMS will only change the prices of their raw Grade A milk if they can agree with all the significant Northeast processors and then set the *same* price for all of the processors.  DFA's CEO, Gary Hanman, has acknowledged that DFA is "in a position to assure our customers they are going to get the same price."  Thus, DFA reduces or eliminates competition among processors by assuring that all of its purchasers – and, indeed, all purchasers from GNEMMA's members – get the same or virtually the same price.

146.    DFA/DMS and GNEMMA's members insist upon getting the agreement of the largest processors in the Northeast, in particular Dean, Hood and Farmland Dairies, before they institute any change in prices. For example, in the Spring of 2007, Greg Wickham indicated that

147.    Rick Smith, who is now the CEO of DFA, has stated that "[i]t's pretty basic that we cannot adjust prices without ***everybody in the marketplace agreeing***, whether it be NDH, whether it be Kroger and certainly Dean would have to agree."  Smith continued that "[t]he way it tends to work is you need everybody to agree and anyone not agreeing can defeat a price change."  Jim Collins, a DFA official stated that the processors, including Dean and NDH, had to agree to any price before the cooperatives led by DFA could implement a price increase.  He stated that there had to be a consensus before the cooperatives set the price.  Similarly, Frank

Public Version - Redacted Pursuant to Protective Order

Johns, DFA's Director of Customer Relations, testified that Dean and NDH are "deal breakers," meaning that DFA must get their agreement on a proposed price before it is implemented. NDH's president, Allen Meyer, has testified that NDH talked to its DFA representatives "every day" to ensure *that it was getting the same price a*s Dean and other processors.   NDH agreed that every processor must agree on a price or that price would not be honored.  NDH's president testified if any of NDH's competitors refused to pay an over-order premium, no one would pay it: "If Dean wouldn't accept a premium, I wouldn't accept the premium."

148.    Moreover, notwithstanding the Justice Department's objections to use of ███ ████████████████████ (and Dean and DFA's agreement to remove such a provision from certain supply agreements), Defendants have in fact employed them in full supply agreements to enforce a uniform price contractually.  DFA's network of full supply agreements with Dean, Hood, Farmland Dairies and other processors ensure these processors ██████████████ ████████████████████████████████████████████████ ████████████████████████████████.

149.    In a January 29, 2001 internal memorandum from Martin Devine, Dean summarized the agreement between DFA/DMS and Suiza (and then new Dean) that implemented this ████████ strategy: "DFA will keep Suiza [now Dean] competitive with all creditable raw milk suppliers competing with each of our plants."

150.    These agreements, in addition to the Defendants' other anticompetitive activity, resulted in dairy farmers in the Northeast receiving uniformly below market payments for their milk.

151.    To further ensure compliance with the conspiracies, DFA receives, processes, and accounts for the monies collected by independent farmers and cooperatives resulting from

**Public Version - Redacted Pursuant to Protective Order**

the sale of raw Grade A milk through DMS.  This allows DFA to monitor raw Grade A milk sales by other Northeast cooperatives and independent dairy farmers, and allows DFA to confirm that these sales were compliant with Defendants' conspiracy to control and fix the prices of raw Grade A milk sold to processors in the Northeast.  This price monitoring mechanism ensured that each Defendant could operate with the knowledge that it would not have to compete for raw Grade A milk.

152.    Although not disclosed in its public statements or communications with dairy farmers, DFA, through its control of DMS, sets the prices paid to independent producers turned over to DMS.  These prices are set by DFA with input from the price-fixing scheme which includes processors Dean and Hood.

153.    Defendants thus effectively fix, depress and stabilize the over-order premiums paid for raw Grade A milk throughout the Northeast at levels lower than what would have prevailed in a competitive market.

154.    These market allocation and price fixing activities are not only per se unlawful in and of themselves, they are also help perpetuate Dean's efforts to secure a monopoly/monopsony position for DMS.  Dean is incentivized to facilitate and maintain DMS's control over the supply market by DFA and DMS's agreement to coordinate and suppress prices for milk, and their ability to ensure that Dean's competitors will receive the same prices.  Thus, by engaging in price fixing, coordination and suppression, DFA and DMS are able to ensure the participation of Dean, Hood and other processors in the conspiracy.

### DEFENDANTS AGREED NOT TO COMPETE FOR
### THE PURCHASE OF DAIRY FARMERS' GRADE A MILK

155.    DFA and DMS have also reached market allocation agreements with processors such as Dean, Hood and Farmland and certain cooperatives in the Northeast, including Dairylea,

**Public Version - Redacted Pursuant to Protective Order**

Land O'Lakes, St. Albans and Agri-Mark, to restrict competition for the purchase of raw Grade A milk from individual dairy farmers in the Northeast.  Historically, DFA competed against processors such as Dean, Hood and Farmland – as well as other cooperatives – by contacting dairy farmers and soliciting their business directly.  As described above, many of the Northeast processors, including Dean and Hood, agreed to not to compete for the purchase of raw Grade A milk from dairy farmers.

156.    Similarly, DFA has agreed with other cooperatives to restrict competition and solicitations to dairy farmers for their milk.  For example, within the past year, an Agri-Mark official was told by management at Agri-Mark that it had an unwritten agreement with other cooperatives not to approach dairy farmers for business if they were in other cooperatives.  After the official met with another farmer to discuss the possibility of selling milk to Agri-Mark, he was told to cease this competitive activity because of Agri-Mark's agreement with other cooperatives not to solicit each other's farmers.  The official has complained to management at Agri-Mark about its "collusion" to suppress competition for purchases from dairy farmers.

157.    Similarly, when plaintiff Jonathan Haar explored selling milk to Agri-Mark in the past year, he was told by Agri-Mark's field representative that Agri-Mark had an unwritten agreement with DFA that Agri-Mark and DFA would not approach each other's farmers to solicit business.  He was also told that as part of the unwritten agreement, if a farmer who was a member of a cooperative approached a second cooperative, the second cooperative would alert the original cooperative to the farmer's effort to explore alternatives.  Dave Wilbur of Agri-Mark told Mr. Haar that Agri-Mark will not solicit or "knock on the doors" of DFA farmers.

Public Version - Redacted Pursuant to Protective Order

158.    Peter Barrett, a dairy farmer in Vermont, stated that prior to being coerced into joining Dairylea, Agri-Mark would regularly suggest that he join their cooperative.  Agri-Mark stopped reaching out to him once he joined Dairylea.

159.    Jeffery Marcus, the owner of Marcus Dairy, stated that Marcus Dairy would not solicit DFA farmers to sell milk directly to Marcus Dairy and would only talk to new farmers if they approach Marcus Dairy first.

160.    These agreements among DFA and DMS, Dean and other processors and cooperatives have had the effect of suppressing competition and lowering the price that dairy farmers in the Northeast can obtain for their milk.  Without dairy cooperatives and processors seeking their supply of raw Grade A milk, and with prices being fixed and suppressed by DMS and GNEMMA members for the entire market, dairy farmers had no effective alternative that would allow them to receive a competitive price for their milk.  These concerted activities have severely reduced competition in the market for the purchase of raw Grade A milk from dairy farmers in the Northeast.   Absent the conspiracy and their illegal agreement not to compete, Northeast raw Grade A milk processors would compete with cooperatives for the purchase of raw Grade A milk from dairy farmers.

### DEFENDANTS HAVE ADVANCED THE CONSPIRACY BY THREATENING AND RETALIATING AGAINST DAIRY FARMERS

161.    Because of their market power, DFA and DMS also have the ability to take retaliatory actions against farmers who decline to join DFA or sell their milk through DMS (or choose to pursue alternatives).   It is not necessary that DFA and DMS exercise this power against all or even most farmers.  This power, and DFA's and DMS's exercise of it, deters farmers who might choose to other alternatives.  Its exercise strengthens the conspiracy as well

Public Version - Redacted Pursuant to Protective Order

as DMS's market position resulting ability to suppress competition and prices paid to all farmers.

162.   Defendants have used their market power to punishing farmers that attempted to leave DFA or DMS and sell their milk independently or through competing cooperatives or milk marketing agencies.  They have also punished haulers that attempted to transport those farmers' milk and processors that attempted to purchase those farmers' milk.  For example, when a group of farmers in Central Pennsylvania attempted to end their relationship with DMS in 2009, DMS inspector Joe Hauk threatened to impose multiple bogus health code violations on those farmers, and if that failed to deter their departure, he further threatened to instruct haulers not to transport those farmers' milk and to void all contracts with haulers that disobeyed his instruction.

163.   In the Fall of 2005, plaintiff Donna Hall and several other farmers were interviewed by Lou Dobbs about problems they had encountered with DFA and DMS.  Shortly after these interviews, Hall and the other farmers were told by DFA's inspector that their milk had a high bacteria count which reduced the amount of their milk payments from DFA.  On further investigation, Hall and the other farmers learned that the normal test results obtained by DFA did not show a high bacteria count, but that the DFA inspector had used a manual override and determined that their bacterial counts were purportedly excessive.

164.   Vince Neville was an independent dairy farmer and sold to the Crowley plant in Binghamton.  In approximately 2007, DMS tripled the trucking costs in the area.  DMS then informed Mr. Nevelle and other dairy farmers that they would have to join DFA or Dairylea if they wanted more reasonable hauling charges.

**Public Version - Redacted Pursuant to Protective Order**

165.    Peter Barrett, a dairy farmer in Vermont, was an independent farmer until approximately 2007, when Hood bought up a plant in Concord, NH to which he had shipped milk for many years.  As a result of Hood's acquisition of the Concord plant, and as a result of suggestions from DMS, DFA and Dairylea that his hauling costs would rise if he remained independent (in comparison to cooperative members), he reluctantly joined Dairylea, which now hauls his milk through DMS.

166.    In approximately 2007, Pete Southway, a dairy farmer in New Jersey, began selling part of his fluid milk to a local cheese-maker.  Immediately thereafter, two officials from DMS, John Rockefeller and Brent Bunce, drove from Syracuse, NY, and told Mr. Southway that he was not permitted to sell milk to anyone other than DMS.  Six months later, they returned and threatened to impose a $100 trucking charge if Mr. Southway refused to sell all of his fluid milk through DMS.  Mr. Southway demanded that the DMS employees put their ultimatum in writing and threatened to sue DMS, and as a result, the DMS employees relented and left.

167.    Pat Grimshaw has been a dairy farmer since 1991 and is a member of the board of Jefferson Bulk Milk Cooperative ("Jeff Bulk"), an independent cooperative of approximately 40 farmers in upstate New York.  Dairylea subsequently used its leverage over Jeff Bulk to prevent farmers from leaving Dairylea.  In 2009, when two or three former Dairylea members attempted to join Jeff Bulk, Dairylea informed Jeff Bulk, via one or more phone conversations, that it would assess Jeff Bulk a $2-3 surcharge on milk purchases if Jeff Bulk accepted the applications of those former Dairylea members.  As a result, Jeff Bulk denied admission to those farmers and cannot readily expand.

168.    DFA and DMS have also acted in furtherance of the conspiracy by punishing haulers who contracted to transport milk for former DFA members or dairy farmers who

Public Version - Redacted Pursuant to Protective Order

marketed their milk through DMS.  For example, when Tom Bowman, an independent hauler who had hauled milk for DFA and DMS for approximately 15 years, agreed to transport milk for a farmer who had quit DFA, DMS terminated all its contracts with Mr. Bowman.

169.    Similarly, DFA has used its control over "balancing plants" to force dairy farmers to sell milk through DMS.  Access to balancing plants is essential to dairy farmers due to weekly and seasonal variations in raw Grade A milk supply and demand.  When supply of raw Grade A milk exceeds demand, balancing plants store the milk until demand increases.  Raw Grade A milk balancing plants are particularly critical during weekends and holidays when processing plants are closed, as they store the raw Grade A milk until the processing plants reopen, and convert bulk supplies of surplus raw Grade A milk into storable, non-fluid commodities such as cheese (Class III) or powdered milk (Class IV).

170.    It would be impossible for an independent dairy farmer or independent dairy cooperative to operate in the Northeast market without access to raw Grade A milk balancing plants.

171.    DMS controls a significant majority of the balancing plants in the Northeast market.  There are eight balancing plants located in the Northeast – St. Albans, two Dietrich plants, Leprino, Carlisle, O-AT-KA, Agri-Mark and MDVA – and five of them are owned and controlled by DMS cooperatives.  Two others are owned by GNEMMA cooperatives.  DFA and DMS use DMS's control over a significant majority of balancing plants to force independent dairy farmers and independent dairy cooperatives to join DFA and/or market their milk through DMS.  In internal documents, DFA has stated that it will deal with competition by "mak[ing] it harder for" dairy farmers "to balance milk."

**Public Version - Redacted Pursuant to Protective Order**

172.    Defendant Dean and other coconspirators have substantially facilitated these activities by giving DFA and DMS control over access to Dean's bottling facilities and agreements not to compete for independent dairy farmers' milk supply.  In short, by taking steps to increase DFA and DMS's market power – and ultimately give DMS monopoly/monopsony power – Dean has significantly enhanced DFA's and DMS's ability to threaten or retaliate against farmers, haulers or other entities that do not adhere to demands or threats from DFA and DMS.

### MOTIVES FOR ENGAGING IN THESE UNLAWFUL ACTIVITIES

173.    As set forth above, it is now clear that the Defendants have engaged in unlawful, conspiratorial activity.  Much of the conspiratorial activity described above has either been documented and/or otherwise admitted by the Defendants or their representatives.  Thus, even if their motives were opaque, the existence of these unlawful agreements is not.  Beyond this, however, there are in fact significant financial motivations for this unlawful conduct.

**<u>Dean and Other Processors</u>**

174.    Dean's participation in the agreements and activities described herein has reaped benefits for both Dean and its executives.  As explained above, its agreements with DFA and DMS were instrumental in facilitating Dean's ability to engage in a significant merger – and substantially increase its market power in the Northeast – while circumventing the safeguards that had led the Justice Department to conclude, and assure the public, that such a merger would not have adverse competitive consequences.  DFA and DMS were partners with Dean in this and other transactions since the early days of the conspiracy and all three of these entities have reaped significant benefits.

**Public Version - Redacted Pursuant to Protective Order**

175.    Defendant Dean as well as Hood and other processor coconspirators are motivated to participate in the conspiracy to keep their milk costs low and to eliminate competition among the processors.  Raw Grade A milk is the most critical, and costly, ingredient for processors.  In fact, raw milk accounts for approximately 60-70% of the cost of total cost of bottled milk.  A large processor such as Dean buys billions of dollars of raw milk each year and thus any change in the price of raw Grade A milk can quickly amount to a large sum to Dean. Moreover, since Dean and the processor coconspirators all insist on receiving substantially the same price for raw Grade A milk, the conspiracy allows them to not compete on price and maintain their market share and control.  Thus, Dean and the other processor coconspirators have sufficient motive to participate in a conspiracy to suppress raw grade a milk prices and lower their milk procurement costs as well as to maintain market share.

176.    It is not surprising that Dean and other processors would be seek lower prices and have success doing so anticompetitively in this raw Grade A milk market.  Markets with few sellers of a standardized product that lacks close substitutes, such as milk, are ripe for collusive conduct. As explained above, raw Grade A milk is a commodity product so dairy farmers and cooperatives compete for its marketing and sale to processors primarily on price.  The raw Grade A milk market is also highly concentrated.  Defendant Dean, Hood and the processors owned by cooperative members of GNEMMA control more than 50% of the raw Grade A milk processing capacity in the Northeast.  Upon information and belief, DFA holds full supply or near full supply agreements with Dean, Hood, Farmland and other Northeast processors that total approximately 60% of the processing capacity in the Northeast.  Thus the Northeast market for milk is susceptible to collusive activity.  Since Dean has to compete on price, it is incentivized to

**Public Version - Redacted Pursuant to Protective Order**

lower its milk procurement costs and the highly concentrated nature of the market gives it and its coconspirators an opportunity to do so.

177.    Dean/Suiza executives and other coconspirators also benefited handsomely from their participation in the conspiracy.  For example, Engles has drawn more than ███████ of compensation from Dean during the time he was working with Hanman and DFA (not including his ownership of more than ██████ of Dean stock).   Moreover, two years after paying a total of ████████████ in a DFA processing plant investment, and keeping DFA as the supplier to the bottling plants he managed, Pete Schenkel sold his stake to Suiza and DFA for ████████ that resulted in a windfall of ██████████ in earnings in two years.

178.    Dean also received significant secret credits and rebates from DFA/DMS that furthered the conspiracy as described above.

179.    Other milk processors, such as Hood, had similar reasons to participate in the conspiracy.  Like Dean, they benefitted financially by purchasing raw Grade A milk at suppressed prices.  Moreover, as a result of the conduct at issue here, they did not have to compete on price with their competitors for their most significant input, but were assured that they would be able to secure it at the same, or virtually the same, price as their competitors.  In Hood's case, it also has also received an enormous financial investment from DFA and/or DMS.  Moreover, as the market power of DFA and DMS has grown, smaller processors that do not do business with it now run the risk of the type of retaliatory conduct described herein.

**DFA and DMS**

180.    DFA and DMS also had motives to participate in the conspiracy.  In a competitive market, DFA would compete to sell its members' milk as well as compete with other cooperatives and processors to attract dairy farmer members. By entering the full supply

61

**Public Version - Redacted Pursuant to Protective Order**

agreements, foreclosing other cooperatives' and independents' access to plants and threatening and retaliating against farmers who attempt to leave DFA or DMS, DFA and DMS eliminated competition among cooperatives and processors for the purchase of raw Grade A milk from dairy farmers. Moreover, the lower over-order premiums that resulted from the conspiracy increased the profits of Dean and Hood. They, in turn, continued to designate DFA and DMS as their exclusive suppliers of milk and thus preserved and strengthened DMS's, as controlled by DFA, monopoly/monopsony over the market for raw Grade A milk throughout the Northeast. Thus DFA and DMS increased and maintained their own monopoly/monopsony power through the conspiracy.

181.    DFA and DMS also participated in the conspiracy because it made their controlling officers rich. CEO Hanman made millions of dollars while insuring that DFA and Dean follow the plan he hatched with Engles.    Hanman pulled in over ██████████ in compensation from DFA during the nine years he ran DFA.    Bos was also enriched while helping Engles and Hanman. DFA insiders initially helped Dean and Suiza avoid the DOJ's restrictions on their merger by forming NDH to acquire the 11 plants that DOJ required them to divest. As a sample of the money Defendants lavished on DFA's insiders through their dealings with NDH:

a.    <u>Coconspirator Cletes Beshears</u>. In approximately three years time, Beshears reaped profits of ██████████ on an investment of slightly more than ██████████.

b.    <u>Coconspirator Tracy Noll</u>. Noll realized profits of ██████████ on an investment of slightly more than ██████████.

c.    <u>Coconspirator Allen Meyer</u>. In total, Meyer invested in four ventures with DFA (or its predecessor), and bore no financial risk in any of them. In one venture he made a

**Public Version - Redacted Pursuant to Protective Order**

$70 million profit without any out-of-pocket investment, and in his NDH investment, DFA paid ████████ for Meyer's shares even though they were worthless.

182.    DFA's compensation scheme incentivizes its management to participate in the conspiracy. CEO Hanman's bonuses were based, variously, on the valuation of DFA's processing operations and the volume of milk handled – not based on increased milk prices received by the farmer members. The valuation of DFA's processing operations would be enhanced by lower, not higher, prices for raw milk.  Similarly, the volume of milk handled provided an incentive to provide lower prices for processors.  Moreover, in 2004, DFA's senior management compensation plan proposed paying bonuses based on DFA and DMS managements' success at paying DFA and DMS producers the same price.  Instead of DFA and DMS competing to pay their respective producers higher prices, DFA sought to incentivize paying DFA and DMS producers the same, *lower,* fixed price.

**DFA Owns and Controls Processors**

183.    In addition, DFA retains milk processing interests which, like other processors, benefit from lower prices for raw milk.  By obtaining raw Grade A milk at cheaper prices through the payment of lower over-order premiums, DFA's joint ventures and processors increased their own valuations and benefitted DFA management and outside business partners. DFA uses those joint ventures and processors to continue and expand DMS's, as controlled by DFA, unlawful monopolization/monopsonization of the raw Grade A milk market.

184.    In the late 1990s, DFA management began to invest significant amounts of its producer members' monies and equity and incurred significant amounts of debt to acquire stakes in many raw Grade A milk processing plants.  The success of such investments depended upon DFA management's ability to supply these plants with raw Grade A milk obtained at the lowest possible price, which is directly contrary to the core responsibility that

**Public Version - Redacted Pursuant to Protective Order**

DFA management owes its members to market their raw Grade A milk at the highest possible price. Absent a conspiracy, processing plants want to buy raw Grade A milk at the cheapest price from farmers and cooperatives and sell the processed milk product at the highest price to the grocery store.

185.    DFA entered into joint ventures with a number of milk processors.  In 2000, DFA formed a joint venture with Suiza Dairy Group (which owned more than 70 bottling plants) in which DFA had a 33.8% ownership interest.  In 2001, DFA formed a joint venture with NDH. In 2004, DFA formed a joint venture with Hood.

186.    DFA describes itself as the dominant dairy cooperative in the United States and the largest milk marketer in the world.  It states that DFA and its affiliates are in the business of procuring, processing and distributing fluid milk and other dairy products.  DFA further describes its business as investing in processors as making equity investments in affiliates.  It receives in return the right to be the processor's preferred supplier.  DFA has noted that the strategy of increasing the volume milk produced or marketed by DFA and DMS has been a success.  For example, as a result of this strategy, DFA's total revenue was $7 billion including $122 million in profit in 2003.

187.    On May 9, 2005, Moody's Investors Service downgraded DFA's credit rating, stating, "Historically, DFA's price risk was limited as it served simply as a conduit through which members' milk was aggregated and delivered to processing plants, with member dairy farmers absorbing price fluctuations.  However, as DFA's investment in bottling affiliates and branded dairy foods manufacturers has grown, its earnings have become more sensitive to the overall pressures impacting the dairy foods and bottling businesses."

Public Version - Redacted Pursuant to Protective Order

188.    As DFA's investments in raw Grade A milk bottling and processing operations expanded, its leadership's interests increasingly were aligned with those of raw Grade A milk processors.  The decision by DFA's leadership to make significant investments in raw Grade A milk processing operations created a conflict of interest between the leadership's duty to obtain for DFA's member dairy farmers the highest possible prices for their raw Grade A milk and DFA's need as a processor to pay the lowest possible prices for raw Grade A milk.

189.    DFA was not operated for the mutual benefit of its members during the Class Period.   Rather, DFA's management engaged in activities that reduced the over-order premiums distributed to DFA members in order to maximize revenue for processing operations and joint ventures.   The processing operations and joint ventures did not benefit DFA's members, but rather DFA's management and outside business partners.  Whereas the FMMO pricing system ensures that DFA members receive a minimum payment for the sales of their raw Grade A milk, the USDA does not require DFA to provide a payment to its members from processing operations and joint ventures.   In fact, members of DFA are not informed, and cannot obtain information regarding, DFA's joint ventures and processor investments.

190.    DFA's management does not disclose the details of its financial transactions to its members, thereby avoiding oversight and accountability.  Because DFA is not a publicly traded corporation or a union, it is not legally required to publicly disclose such information. Efforts by DFA members to obtain such financial information have been met with resistance and retaliation.  For example, in 1996, Carole Knight was elected to the regional board of DFA's predecessor, Mid-American Dairymen, Inc.   During board meetings, she repeatedly inquired as to the basis for certain deductions from milk checks received by farmers.  Under the direction of Hanman and Bos, Mid-American Dairymen, Inc. ejected Ms. Knight from the board

Public Version - Redacted Pursuant to Protective Order

of directors and removed her farm from the cooperative.  She subsequently filed suit and won a $356,000 verdict and  attorneys' fees.  In awarding the verdict, Washington Parish Judge Patricia Hedges found that "the members of the coop were deliberately kept ignorant of facts.  The farmers were expected to produce milk, accept whatever mailbox price was given them, and not question management."

191.    Other cooperatives that own significant processing facilities also had the same incentives to keep prices paid for raw Grade A milk low.  For example, DFA believed that Agri-Mark wanted to keep milk prices low to serve its processors' interests.  Moreover, as the discussion of Defendants' price-fixing activities above indicates, given the market power of DFA and DMS, no other cooperative is in a position to demand higher prices from a processor customer if DFA and DMS are unwilling to do so.   Moreover, by accepting consensus pricing – in which all of the GNEMMA members adhere to virtually identical prices – the GNEMMA members avoid competition and risks to their market position.  This is, in fact, exactly what has occurred as a result of the agreement by DFA, DMS and other GNEMMA not to increases prices for dairy farmers unless a consensus involving the GNEMMA members, Dean, Hood and other processors is formed.  Similarly, as set forth above, DFA, Agri-Mark and other cooperatives have an "unwritten agreement" not to solicit farmers from each other.

## IMPACT ON DAIRY FARMERS

192.    As a direct and proximate result of the antitrust violations alleged herein, Plaintiffs and Class members have been injured and have sustained damages in that the prices received for raw Grade A milk, specifically over-order premiums, have been artificially reduced below levels they would have received but for Defendants' unlawful agreement not to compete in the raw Grade A milk market in the Northeast.  As a result of this conspiracy,

Public Version - Redacted Pursuant to Protective Order

Defendants have reaped hundreds of millions of dollars of profits that would have otherwise been paid to Plaintiffs and Class members for their raw Grade A milk.

193.    As a direct and proximate result of the antitrust violations alleged herein, due to the underpayment of over-order premiums to farmers, the proportion of the retail price for raw Grade A milk in the Northeast that was distributed to Defendant processors increased whereas the proportion of the retail price for raw Grade A milk that was distributed to dairy farmers decreased.  For example, from May 2004 until November 2006, the raw Grade A skim milk price paid to dairy farmers in New England dropped from $1.29/gallon to $0.96/gallon while the processor margin increased from $0.64/gallon to $0.78/gallon.  During that same time period, in New York, the raw Grade A skim milk price paid to dairy farmers dropped from $1.26/gallon to $0.95/gallon while the processor margin increased from $0.70/gallon to $0.76/gallon.  Senator Patrick Leahy stated that as a result of Dean's and DFA's antitrust violations, "our farmers are not getting a fair share of the retail price of milk, while giant, corporate processors are raking in anticompetitive profits as they simultaneously raise prices to consumers."

194.    In a competitive raw milk market, the mailbox prices in the Northeast would be higher than the mailbox prices in the Midwest because (1) transportation costs are greater in the Northeast than in the Midwest and (2) a greater proportion of the raw milk produced in the Northeast is converted to fluid Class I milk than in the Midwest, where much of the milk is used to manufacture cheese and other dairy products.  However, as a direct and proximate result of the antitrust violations alleged herein, the mailbox prices received by dairy farmers are, on average, greater in the Midwest than the Northeast.  In 2008, for example, the average Class I raw Grade A milk price in New York was $0.30 per hundredweight less than in Wisconsin, and the average mailbox price in New York was $0.553 per hundredweight less than in Wisconsin.

Public Version - Redacted Pursuant to Protective Order

Professor Ron Cotterill, professor of agricultural economics at the University of Connecticut, testified, "So why are mailbox prices less in the Northeast than the Midwest?  The answer is that retailers and processors in the northeast are not paying over-order premiums that are as high as those in the Midwest. … Northeast raw milk markets, relatively speaking, are dominated by the milk channel firms at the expense of the region's dairy farmers.  Monopsony power in the northeast dairy market is a major force."

195.    Peter Carstensen, an antitrust professor at the University of Wisconsin Law School, explained, "Where there is a competitive market for buying milk, dairy farmers are paid more.  When DFA comes to dominate a market, then farmers are paid less.  Monopolists behave like monopolies."

196.    During the Class Period, Defendants' profits greatly increased.   During a teleconference with analysts in May 2009, Dean's CFO bragged that cheap raw milk had created "the perfect sunny day" for the $12 billion corporation.

197.    On June 26, 2008, 25 civic organizations advocating for the welfare of farmers, including the National Family Farm Coalition and the American Agricultural Movement, sent a letter to Senator Patrick Leahy calling for the Senate Judiciary Committee to launch an investigation into the "corruption" and "anti-market" behavior of DFA.  In the letter, the civic organizations expressed concern that "DFA has continued to violate consent decree agreements beginning with their predecessor organization Mid-America Dairymen" and that DFA's "full supply contracts reduce farm milk prices."

**Public Version - Redacted Pursuant to Protective Order**

## DOJ INVESTIGATION

198.    In August 2006, as a result of an investigation, career lawyers at the DOJ recommended prosecuting Dean, DFA and NDH for violating the antitrust laws.  Nonetheless, DOJ did not bring suit at that time.

199.    On August 6, 2009, Sen. Bernie Sanders, Sen. Chuck Schumer, and Sen. Russ Feingold sent a written request to Christine Varney, Assistant Attorney General for the Antitrust Division of the DOJ, urging her to continue the antitrust investigation of Dean, DFA and NDH and to re-examine the recommendation to pursue action against them.

200.    On September 19, 2009, the Senate Judiciary Committee held a hearing in Vermont titled "Crisis on the Farm: The State of Competition and Prospects for Sustainability in the Northeast Dairy Industry."  During the hearing, Sen. Bernie Sanders and Sen. Patrick Leahy encouraged Christine Varney, the Assistant Attorney General of the Antitrust Division of the DOJ, to prosecute Dean and DFA for antitrust violations.  Varney testified that Dean's dominant share of the Northeast bottling market was "disconcerting."  At the hearing, various attendees and speakers encouraged private action in light of the current crisis in the diary industry in the Northeast.

## EXCESSIVE POOLING

201.    Due to seasonal and other variations in Grade A milk production and demand and uneven distribution of dairy farmers throughout the United States, the utilization of raw Grade A milk for Class I purposes varies between orders.  On some orders, such as Order 1, where demand for fluid Class I dairy products often exceeds raw Grade A milk production, Class I utilization has traditionally been higher than in other areas, such as the Southwest, where demand for fluid Class I dairy products does not exceed raw Grade A milk production.  Consequently,

Public Version - Redacted Pursuant to Protective Order

Orders with high Class I utilization generally have higher FMMO minimum blend prices than Orders with lower Class I utilization. Shifting substantial quantities of Grade A milk from one order to another is referred to as "diluting" or "flooding" a pool because the "outside" raw Grade A milk increases the total volume of raw Grade A milk pooled to the point that it decreases the Order's Class I utilization, and hence reduces the minimum blend prices. Because DFA has the capacity to flood pools and to move money arbitrarily among its members, it can use that power, as well as other means, to stifle competition in the Northeast market.

## CONCEALMENT AND TOLLING

202.    As set forth below, during the relevant period, Defendants have affirmatively concealed from Plaintiffs and Class members the unlawful combinations, conspiracies and agreements among Defendants alleged herein.

203.    For example, by their very nature, the price-fixing activities described herein, and the efforts to fix and suppress milk prices, were secret and, in fact, self-concealing activities. Defendants did not disclose the coordinated pricing activities described herein and those activities were conducted in communications involving Defendants, GNEMMA member cooperatives and processors that were not publicly disclosed and were not open to plaintiffs. Defendants thus hid from dairy farmers, among other things, the existence of "silent rebates" and "competitive credits" agreed to among Defendants, which depressed the prices farmers actually received for milk.  Nor was there any disclosure, or public information, of the fact that such activities and agreements were being reached outside the parameters of the Capper-Volstead Act.

204.    Moreover, Defendants went to considerable length to conceal the true nature, and illegal consequences, of their concerted activity.  Indeed, as explained above, Defendants

Public Version - Redacted Pursuant to Protective Order

gained approval of their activities – and determinations that the activities were lawful and would not have anticompetitive consequences – by misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to the Department of Justice. Thus, Defendants publicly trumpeted the Justice Department's review and approval of their activities. In light of these public statements that the nation's leading antitrust enforcer had reviewed and approved their actions as lawful and not anticompetitive, it was entirely reasonable for Plaintiffs and the Class to accept those conclusions. In fact, Defendants issued press releases and/or made other public statements highlighting the Justice Department's approval of their activities for the precise purpose of communicating to the public, and participants in the industry such as the Plaintiffs, that their activities had been carefully reviewed and were lawful.

205.    This is illustrated by the conspirators' public statements relating to the Dean – Suiza merger, the Justice Department's review of the merger and the safeguards that were purportedly in place to protect competition. On April 9, 2001, Suiza and Dean issued a press release touting the competitive benefits of their proposed merger. Suiza's CEO, Engles, stated that "[b]y combining with Dean Foods, we will also generate greater efficiencies and scale to invest in innovation and growth. This opportunity should translate into increased consumption – a benefit for the entire industry, from dairy farmers to consumers."

206.    On May 10, 2001, Dean issued a press release stating that relevant materials relating to the Dean-Suiza merger were being submitted to the Department of Justice and steps were being taken to address any potential competitive concerns. According to Dean's statement "[t]he companies have carefully analyzed the transaction for areas of overlap and based on their analysis have identified the operations of six plants in five states that will be

71

sold *to resolve potential antitrust problems and to facilitate approval for this pro-competitive transaction*. The company expects the merger to be approved in the third or fourth quarter of calendar 2001 and believes that *the merger plan preserves competition, while providing benefits to dairy farmers, consumers and the entire industry.*"  (Emphasis added).

207.    On May 8, 2001, Dean prepared a "Merger News Bulletin" and filed this with the Securities and Exchange Commission.  Dean stated that "[t]he new company will be committed to increasing fluid milk consumption, which will benefit producers, processors and the entire industry."  Dean further stated that the merger was going to receive a "comprehensive" review by the federal government and "we are confident that the transaction will be approved.  We believe our decision to divest the four Dean Foods and two Suiza Foods facilities will resolve any regulatory issues related to the merger.  *The dairy industry is and will remain highly competitive at both local and regional levels.*  This transaction creates a company that benefits consumers and retailers by providing a broader range of products. … We believe that regulators will see the merits of this transaction and endorse it."

208.    Dean's public submission of May 8, 2001 further stated that "[t]here will continue to be vigorous competition from other well-known local and regional rivals in every market where the new Dean Foods will operate.  The formation of National Dairy Holdings, L.P., will create an additional large-scale dairy competitor.   We believe this transaction is a very positive one for the dairy industry in this country.  The merger will create a more efficient player in the foods industry capable of increasing funding for marketing and product innovation.   The company will also be committed to reversing declining fluid milk consumption – something that will benefit the entire industry."

**Public Version - Redacted Pursuant to Protective Order**

209.    As set forth above, however, Dean and Suiza did not disclose to the Department of Justice – or the public – actions that were being taken to circumvent the competitive safeguards required by the Justice Department.  Thus, the DOJ erroneously believed – and, based on Dean and Suiza's assurances, so informed the public on December 18, 2001 – that the parties to the merger had "agreed to modify Suiza's supply contract with DFA to ensure that dairies owned by the merged firm in the areas affected by the divestitures will be free to buy their milk from sources other than DFA."  Thus, unaware of the secret steps taken by Dean, Suiza and DFA to undermine the Justice Department's safeguards, the  Department assured the public that the safeguards in place "ensure that consumers of milk … continue to get the benefits of competition – increased choices for consumers resulting in lower prices and better service.  Maintaining competition in the dairy industry is important for American consumers."

210.    Similarly, in connection with the NDH-Hood transaction described above, the proposed merger was expressly modified for the purported purpose of addressing all regulatory and anticompetitive concerns.   On June 1, 2003, the press reported that "[f]aced with government opposition to a planned merger, Dairy Farmers of America, Inc. (DFA), National Dairy Holdings, L.P. (NDH) and HP Hood Inc. have restructured the proposed consolidation of NDH and Hood" and under the restructured proposal Hood and DFA would only make "minority investment[s]" in each other.   The revised transaction would be "subject to government review."  Tracy Noll, NDH's President, announced in June 2001 that "[a]s a result of our discussions, we believe the proposed new transaction will allow us to accomplish our original goals of expanding product lines and distribution."

211.    By highlighting the Government's review of their activities, even where the Government had received misleading or incomplete information about their schemes, the

Public Version - Redacted Pursuant to Protective Order

conspirators assured the public – including the Plaintiffs and the Class – that the Nation's chief antitrust enforcement body had reviewed their conduct and determined it to be lawful and pro-competitive.  For example, on August 12, 2004, DFA's General Counsel, David Geisler, publicly stated (and the press reported) that "[i]n the six years since DFA was formed, the DOJ has frequently reviewed the cooperative's various acquisitions and mergers."  Geisler publicly denied "that the cooperative was trying to monopolize the raw milk market, and he noted that *the government has repeatedly reviewed the cooperative's actions and not charged it with any violations*."  (emphasis added).

212.    It was entirely reasonable for farmers, including the Plaintiff Class, to rely on the conclusions of antitrust regulators (who have expertise, significant resources and the power to secure and review the conspirators' internal records) as well as the conspirators' express public statements that their actions were "frequently reviewed," had been modified when appropriate, and had received the imprimatur of antitrust enforcement authorities.  Moreover, while from time to time concerns were raised by private parties, the fact that the Government has purportedly been fully informed of defendants' activities, had "frequently reviewed" them and had allegedly approved them, provided a reasonable basis to conclude that they were lawful.  Indeed, that is precisely the impression defendants' sought to create when they issued press releases or otherwise made public statements that their conduct had been carefully reviewed and approved by the Government.

213.    Moreover, Defendants have consistently and repeatedly made very public statements designed to lead the public, as well as farmers and others in the industry, to believe that prices of milk are a function of market and regulatory dynamics, rather than unlawful price-fixing activities and other anticompetitive conduct.  Defendants have repeatedly made

74

**Public Version - Redacted Pursuant to Protective Order**

public statements about the variability of milk pricing and attempts to explain it without disclosing their unlawful price-fixing activities.

214.     On March 25, 2003, Herman Brubaker, chairman of DFA, made a presentation at DFA's annual delegate meeting in which he acknowledged the low prices farmers were being paid for milk but said that solving this was a matter of bringing supply and demand into better balance.

215.     In a 2004 newsletter sent to farmers, DMS told farmers in  "A Newsletter for Independent Producers" that "[f]arm milk prices are projected to increase in steady steps from their current levels and could surpass $20 per hundredweight this summer."  DMS again claimed that price levels were a function of underlying market conditions rather than any conspiratorial or price-fixing activities:  "Milk prices will reach record high levels based on worldwide tightness in supply and demand.  Here in the U.S., milk production declined by 2.2 percent in February, compared to a year earlier.  At the same time, demand for dairy products has been strong.   Factors contributing to the positive supply/demand situation include: Monsanto's 50 percent allocation of Posilac is not expected to change in the future.  This is reducing production per cow …;" "the U.S. dairy herd has 153,000 fewer cows than a year ago …;" "There are fewer dairy heifer replacements than in past years"; and numerous other market factors.  DMS concluded that "2004 looks like it will be a phenomenal milk price year. If supply and demand dynamics cause butter and cheese prices to retreat later in the year [this] will moderate the farm milk price decline for a few months."  Similarly, Greg Engles of Dean made public statements in or about July of 2004 that dairy prices had risen "to historic highs, as did many other agricultural inputs and energy prices" but "[t]he raw milk environment is showing signs of returning to more normal levels in the third quarter."

Public Version - Redacted Pursuant to Protective Order

216.    On or about March 1, 2006, Gary Hanman of DFA told approximately 250 farmers and political leaders at the annual meeting of the St. Albans' Cooperative that they could anticipate a short-term problem with a drop in Class I milk prices, but they also faced a longer term problem because there were 49 replacement heifers for every cow being milked in the United States.  Hanman indicates that the result would be a "tsunami" of surplus milk and declining prices.

217.    In August 2006, DMS publicly stated that "there are signs indicating an increase in milk prices in the future … The low prices resulted from strong milk production growth and inventory buildup."

218.    On or about October 2, 2007, Engles of DFA publicly announced that "[r]apidly increasing and record high dairy commodity costs have created a very challenging operating environment  … The third quarter has been particularly challenging as dairy commodity costs have risen sharply, hitting all time highs.   This is by far the most difficult operating environment in the history of the company …"  Dean's CFO, Jack Callahan, again pointed to market conditions as the explanation for milk prices, stating that "[w]hile we had expected strong growth in milk supply to lead to lower conventional dairy commodity prices toward the end of the year, it now appears that prices will likely remain high … due in part to continued strong export demand for non-fat dry milk powder.  However, we expect more favorable price movements as we get farther into 2008."

219.    In 2009, DFA, DMS and Dean continued to tell farmers and the public that prices were being dictated similarly by market conditions and regulatory issues, without any mention of their price-fixing activities and other anticompetitive conduct described herein. For example, in March 2009, DFA's President and CEO Rick Smith publicly stated at the

Public Version - Redacted Pursuant to Protective Order

DFA's annual meeting that low milk prices were a result of "world supply and demand. We were expanding production into a growing export market." He stated that "U.S. supply/demand balance is already coming back into alignment."

220.    On or about July 17, 2009, Dean Foods publicly stated that milk prices are generally set by the United States Department of Agriculture, and that low prices to farmers were a result of current supply and demand levels. Marguerite Copel, Dean's Vice President of Corporate Communications, stated that "[a]t Dean Foods, we work hard to create demand for our products which in turn creates additional demand for milk and additional markets for farmers."

221.    In August 2009, Dean's Copel publicly stated that it is a "free market" place, there are lots of milk buyers besides Dean, and the price of raw milk is set by the marketplace, not by one company. Similarly, on or about August 28, 2009, Rick Smith of DFA publicly stated that DFA had not engaged in collusion with Dean Foods and, to the contrary, Dean had been a good customer for DFA's members.

222.    In September 2009, Dean issued a public statement saying that "[t]o suggest that we control the raw-milk market, or that we are the cause of low milk prices, makes no sense. For most of the milk we buy, we pay a price that is regulated by USDA, plus premiums."

223.    In short, throughout all or most of this conspiracy, Defendants repeatedly communicated to farmers and the general public that milk prices were a function of market conditions and, in some cases, regulatory activities (rather than price-fixing or other collusive activities). Indeed, as explained above, they went one step further by indicating that their business activities had frequently been reviewed and approved by Government officials.

**Public Version - Redacted Pursuant to Protective Order**

224.    After this lawsuit was filed, Defendants have continued to make public statements that they have not engaged in any form of price suppression or other anticompetitive or unlawful activity.   For example, on or about October 14, 2010, DFA publicly stated that "[w]e are continuously looking for additional ways to increase dairy farmer pay price and net returns, not suppress them, and have been successful in doing so."

225.    Likewise, Defendants did not disclose to the public (or dairy farmers) that DFA manages and controls DMS pursuant to an operating agreement.   Nor did Defendants disclose that DFA sets the prices for DMS independent farmers pursuant to the operating agreement, with input from other Defendants.   To the contrary, Defendants claimed just the opposite in their concerted communications campaign.   Dean's Martin Devine, in a December 4, 2001 letter, told independent farmers converted to DMS that they would not be members of a cooperative, but did not disclose that these farmers marketing through DMS would receive prices and terms controlled by DFA.   In publically-filed answers in a high-profile litigation, both DFA and DMS denied that DFA controls DMS.   Similarly, Defendants have kept secret the terms and conditions of their supply agreements.   Not even DFA's dairy farmer board members have reviewed these agreements.

226.    The named plaintiffs were not aware of Defendants' unlawful price-fixing activities and other unlawful conduct described herein nor, given the nature of those activities, could they have learned of them through due diligence.   Indeed, the fact that the nation's chief antitrust enforcement authorities had "frequently reviewed" Defendants' actions but had not discovered secret agreements and other steps to circumvent competitive safeguards, demonstrates that Plaintiffs and other dairy farmers could not reasonably have been expected

Public Version - Redacted Pursuant to Protective Order

to discover either defendants' unlawful price-fixing agreements or other anticompetitive activities challenged herein.

227.    Each of the Plaintiffs has been through the time period covered by this case actively engaged in dairy farming, an occupation which is, by its nature, extremely time-demanding.  Notwithstanding this, each of the Plaintiffs makes reasonable effort to stay abreast of public information that is available to them through the media.  The exercise of this reasonable diligence did not, however, give Plaintiffs reason to know that Defendants were engaged in unlawful anticompetitive conduct before or after October 2005.  Indeed, Defendants' public statements were directly to the contrary.

228.    In the alternative, even if Plaintiffs could have discovered that Defendants' conduct was unlawful in some respects (a factual conclusion that Plaintiffs dispute) prior to October 2005, Plaintiffs did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in unlawful, concerted efforts to fix and suppress prices.

229.    In the fall of 2009, Defendants' anticompetitive activities began to receive widespread attention, both nationally and in the Northeast.  Milk prices to farmers had declined precipitously, and this free-fall in prices prompted concerns and/or allegations of collusion and anticompetitive conduct by the Department of Justice, Congress and other public officials.  The DOJ, Congress and various state officials all commenced investigations and/or hearings relating to these activities.  (Moreover, this litigation was commenced in October 2009, further publicizing these unlawful activities).  This information provided a basis for each of the Plaintiffs to investigate and proceed with claims against the Defendants in this action.

**Public Version - Redacted Pursuant to Protective Order**

230.   As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiffs and Class members has been tolled.  Plaintiffs exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein more than four years before commencing this action.

## COUNT ONE (ALL DEFENDANTS)

## SHERMAN ACT SECTION 2 VIOLATION:  CONSPIRACY TO

## MONOPOLIZE/MONOPSONIZE

231.   Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

232.   At all times relevant to this Complaint, Defendants have willfully, knowingly and intentionally conspired among themselves with the specific intent to monopolize/monopsonize the raw Grade A milk market in the Northeast and thereby to depress, fix and stabilize the over-order premiums paid for raw Grade A milk produced in the Northeast and to ensure that all dairy farmers of such milk would be unable to market their raw Grade A milk except at prices that were fixed and artificially depressed by Defendants' conspiracy.  This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

233.   Through a series of unlawful activities, including activities that defied restrictions imposed by the DOJ and state Attorneys General, Defendants willfully, knowingly and intentionally conspired among themselves with the specific intent to secure for DMS, as controlled by DFA, (or, to the extent that they are alter egos, DMS and DFA) monopoly/monopsony control over the raw Grade A milk market in the Northeast.

Public Version - Redacted Pursuant to Protective Order

234.    In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice concerning full supply agreements and pricing provision and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA bought processing plants from NDH and then sold them to Hood; DFA then obtained a ███ ownership interest, a ████████ note and full supply agreements all with Hood; (h) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other coconspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those

81

farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA and DMS established GNEMMA, and through GNEMMA, depressed, fixed and stabilized prices for raw Grade A milk paid to the dairy farmer members of the GNEMMA cooperatives, independent dairy cooperatives and independent dairy farmers in the Northeast; and (p) Defendants engaged in price-fixing and price suppression with each other, members of GNEMMA and other coconspirators and thereby furthered the conspiracy to monopolize/monopsonize by providing incentives for Dean to conspire.

235.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

236.    The relevant product market consists of the raw Grade A milk market.

237.    Defendants willfully conspired among themselves with the intent that DMS, as controlled by DFA, (or, to the extent they are alter egos, DMS and DFA) would acquire, maintain and exploit monopoly/monopsony power in the raw Grade A milk market in the Northeast.

Public Version - Redacted Pursuant to Protective Order

238.    As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and Class members have suffered injury and damages in an amount to be proven at trial.

239.    The foregoing conduct is a *per se* violation of Section 2 of the Sherman Act.  In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

240.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants who are jointly and severally for these violations.  Such damages represent the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged.  Damages may be quantified on a Classwide basis.  These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

241.    Plaintiffs, on behalf of themselves and other members of the Class, also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT TWO (DFA AND DMS)

## SHERMAN ACT SECTION 2 VIOLATION:  ATTEMPT TO

## MONOPOLIZE/MONOPSONIZE

242.    Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

243.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

244.    The relevant product market consists of the market for the marketing or sale of raw Grade A milk to processing plants.

**Public Version - Redacted Pursuant to Protective Order**

245.    DMS has attempted, and continues to attempt, to possess market power in the raw Grade A milk market in the Northeast and maintains a dominant position in the raw Grade A milk market in the Northeast.    DMS has acted with the specific intent to monopolize/monopsonize and has used, and is using, its market dominance in an attempt to eliminate competition from independent dairy farmers and independent dairy cooperatives.

246.    DFA is also liable for DMS's attempt to monopolize/monopsonize by virtue of its principal-agent relationship with DMS.  As set forth above, DFA has manifested that DMS shall act for it; DMS has accepted that undertaking; and the parties understand that DFA is in control of this undertaking.  Moreover, based on the facts alleged above, DMS is subject to DFA's direction and control; DMS was formed by DFA to act as DFA's exclusive marketing agent; through DMS, DFA exercises control over more dairy farmers; DFA and DMS together have punished farmers, haulers, and independent processors who operate outside of their sphere of influence; and DFA and DMS together have harmed competition.

247.    In the alternative, DFA and DMS are alter egos by virtue of the interrelationships set forth above and thus are both liable for the attempt to monopolize/monopsonize.

248.    This attempt to monopolize/monopsonize includes, but is not limited to, the following conduct:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice concerning full supply agreements and pricing provision and, in exchange for DFA's and DMS's cooperation, assisted DMS, as

Public Version - Redacted Pursuant to Protective Order

controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA bought processing plants from NDH and then sold them to Hood; DFA then obtained a ▇▇▇ ownership interest, a ▇▇▇▇▇▇ note and full supply agreements all with Hood; (h) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other coconspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw

**Public Version - Redacted Pursuant to Protective Order**

Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA and DMS established GNEMMA, and through GNEMMA, depressed, fixed and stabilized prices for raw Grade A milk paid to the dairy farmer members of the GNEMMA cooperatives, independent dairy cooperatives and independent dairy farmers in the Northeast; and (p) Defendants engaged in price-fixing and price suppression with each other, members of GNEMMA and other coconspirators and thereby furthered the conspiracy to monopolize/monopsonize by providing incentives for Dean to conspire.

249.   This scheme to monopolize/monopsonize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of DMS monopolizing these markets.

250.   This scheme, and the predatory acts in furtherance of this scheme, constitute attempted monopolization/monopsonization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

251.   As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and Class members have suffered injury and damages in an amount to be proven at trial.

252.   Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from DMS and DFA for these violations.  These damages represent the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged.  Damages may be quantified on a Class-wide

**Public Version - Redacted Pursuant to Protective Order**

basis.  These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

253.    Plaintiffs, on behalf of themselves and other members of the Class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT THREE (DMS AND DFA)**

**SHERMAN ACT SECTION 2 VIOLATION:**

**UNLAWFUL MONOPOLIZATION/MONOPSONIZATION**

254.    Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

255.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

256.    The relevant product market consists of the raw Grade A milk market.

257.    DMS possesses monopoly/monopsony power in the raw Grade A milk market in the Northeast and has abused and continues to abuse that power to maintain and enhance its market dominance in the raw Grade A milk market by unreasonably restraining trade, artificially and anticompetitively reducing the price of raw Grade A milk sold by from Plaintiffs and members of the Class, eliminating competition from rival cooperatives and independent dairy farmers, and foreclosing and excluding competitors from access to raw Grade A milk bottling plants by engaging in predatory and unlawful conduct.

258.    DFA is also liable for DMS's monopolization/monopsonization by virtue of its principal-agent relationship with DMS as set forth above.

**Public Version - Redacted Pursuant to Protective Order**

259.    In the alternative, DFA and DMS are alter egos by virtue of the interrelationships set forth above and thus are both liable for unlawful monopolization/monopsonization.

260.    This unlawful monopolization/monopsonization includes, but is not limited to, the following conduct:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice concerning full supply agreements and pricing provision and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA bought processing plants from NDH and then sold them to Hood; DFA then obtained a ▮▮▮▮ ownership interest, a ▮▮▮▮▮▮▮▮ note and full supply agreements all with Hood; (h) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other coconspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through

Public Version - Redacted Pursuant to Protective Order

DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA and DMS established GNEMMA, and through GNEMMA, depressed, fixed and stabilized prices for raw Grade A milk paid to the dairy farmer members of the GNEMMA cooperatives, independent dairy cooperatives and independent dairy farmers in the Northeast; and (p) Defendants engaged in price-fixing and price suppression with each other, members of GNEMMA and other coconspirators and thereby furthered the conspiracy to monopolize/monopsonize by providing incentives for Dean to conspire.

261.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs and Class members have suffered injury and damages in an amount to be proven at trial.

262.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from DMS and DFA for these violations. These damages represent the additional

Public Version - Redacted Pursuant to Protective Order

amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged.  Damages may be quantified on a Class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

263.    Plaintiffs, on behalf of themselves and other members of the Class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT FOUR (ALL DEFENDANTS)

## SHERMAN ACT SECTION 1 VIOLATION:  PRICE FIXING

264.    Plaintiffs incorporate by reference all preceding and ensuing paragraphs as if fully alleged herein.

265.    During the Class Period, Defendants and their coconspirators engaged in a continuing contract, combination or conspiracy with respect to the raw Grade A milk market in the Northeast in unreasonable restraint of trade and commerce.

266.    The contract, combination or conspiracy consisted of an agreement between Defendants and their coconspirators to unlawfully allocate the market, refuse to compete and to fix, reduce, stabilize or maintain at artificially depressed values the over-order premiums paid by processors and paid for raw Grade A milk in the Northeast during the Class Period.

267.    In formulating and effectuating this conspiracy, Defendants conducted meetings between themselves and their dairy cooperative and dairy processor coconspirators, including members of DMS and members of GNEMMA, and during those meetings, they engaged in conversations in which they agreed to unlawfully allocate the market, refuse to compete and to fix, reduce, stabilize or maintain at artificially depressed values the over-order premiums paid by

Public Version - Redacted Pursuant to Protective Order

processors in the Northeast for raw Grade A milk during the Class Period.  This conduct has depressed the prices of all raw Grade A milk paid to dairy farmers in the Northeast.

268.    As a result of these agreements, Plaintiffs and Class members have been forced to accept suppressed prices for their raw Grade A milk.  But for the conspiracy alleged herein, raw Grade A milk prices obtained by Plaintiffs and Class members in the Northeast market would have been significantly higher.

269.    The Capper-Volstead Act grants dairy cooperatives limited antitrust immunity with respect to price-fixing agreements with other dairy cooperatives "provided, however, that such associations are operated for the mutual benefit of the members thereof." 7 U.S.C. 291. During the Class Period, DFA and DMS were not operated for the mutual benefit of their members and was, therefore, outside the scope of Capper-Volstead's grant of antitrust immunity. DFA's and DMS's management engaged in activities that reduced the over-order premiums distributed to their members in order to maximize their market share and their revenue for processing operations and joint ventures.   Upon information and belief, the processing operations and joint ventures benefitted not DFA's members, but rather DFA's management and outside business partners. Additionally, upon information and belief, during the Class Period, DFA and DMS pursued other illegitimate ends and operated with structural deficiencies that both rendered Capper-Volstead's grant of antitrust immunity inapplicable, including, but not limited to, conspiring to fix and suppress prices with Dean and other processors and coconspirators and foreclosing competition through full supply agreements and the conversion of independent dairy farmers.

270.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

**Public Version - Redacted Pursuant to Protective Order**

271.     The relevant product market consists of the raw Grade A milk market.

272.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

273.     The conduct described herein constitutes a per se violation of Section 1 of the Sherman Act.  In the alternative, the conduct violates Section 1 of the Sherman Act by virtue of the rule of reason.

274.     Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants for these violations.  These damages represent the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged.  Damages may be quantified on a Class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

275.     Plaintiffs, on behalf of themselves and other members of the Class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT FIVE (ALL DEFENDANTS)

## SHERMAN ACT SECTION 1 VIOLATION

## CONSPIRACY TO RESTRAIN TRADE

276.     Plaintiffs incorporate by reference all preceding and ensuing paragraphs as if fully alleged herein.

277.     During the Class Period, Defendants and coconspirators engaged in a continuing contract, combination or conspiracy with respect to the raw Grade A milk market in the Northeast in unreasonable restraint of trade and commerce.

**Public Version - Redacted Pursuant to Protective Order**

278.    The contract, combination or conspiracy consisted of an agreement between Defendants to restrain trade in the raw Grade A milk market in the Northeast in return for assisting Dean in securing greater market share and market power and obtaining raw Grade A milk priced at artificially depressed rates.

279.    In furtherance of the contract, combination or conspiracy, Defendants have committed one or more of the following overt acts:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice concerning full supply agreements and pricing provision and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA bought processing plants from NDH and then sold them to Hood; DFA then obtained a ▮▮▮ ownership interest, a ▮▮▮▮▮▮ note and full supply agreements all with Hood; (h) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other coconspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to

93

Public Version - Redacted Pursuant to Protective Order

gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA and DMS established GNEMMA, and through GNEMMA, depressed, fixed and stabilized prices for raw Grade A milk paid to the dairy farmer members of the GNEMMA cooperatives, independent dairy cooperatives and independent dairy farmers in the Northeast; and (p) Defendants engaged in price-fixing and price suppression with each other, members of GNEMMA and other coconspirators and thereby furthered the conspiracy to monopolize/monopsonize by providing incentives for Dean to conspire.

280.   The agreement that Defendants have entered, maintained, renewed, and enforced with one another have had the purpose and effect of eliminating or restraining competition in the raw Grade A milk market.  As a result of this agreement, Plaintiffs have

Public Version - Redacted Pursuant to Protective Order

been forced to accept suppressed prices for their raw Grade A milk, and otherwise have been damaged as described in this Complaint. But for the conspiracy alleged herein, raw Grade A milk prices obtained by Plaintiffs and Class members in the Northeast market would have been significantly higher.

281.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

282.    The relevant product market consists of the raw Grade A milk market.

283.    The conduct described herein constitutes a per se violation of Section 1 of the Sherman Act.  In the alternative, the conduct violations Section 1 of the Sherman Act by virtue of the rule of reason.

284.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

285.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants jointly and severally for these violations. These damages represent the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged. Damages may be quantified on a Class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

286.    Plaintiffs, on behalf of themselves and other members of the Class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**Public Version - Redacted Pursuant to Protective Order**

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. Pro. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a. Declare this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare Plaintiffs Alice Allen and Laurence Allen dba Al-lens Farm, Garret Sitts and Ralph Sitts, Vince Neville, Jonathan and Claudia Haar and Donna Hall to be Class Representatives for the Class.

b. Adjudge and declare that Dean, DFA and DMS have engaged in unlawful conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 12;

c. Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

d. Declare null and void the full supply agreements by and between Dean, DFA and DMS as described herein;

e. Preliminarily and permanently enjoin Dean, DFA and DMS and/or any entity controlled by any of them from entering into full supply agreements as described herein;

f. Preliminarily and permanently enjoin Dean, DFA and DMS and/or any entity controlled by any of them from agreeing not to compete for the purchase of raw Grade A milk from dairy farmers;

g. Order Dean, DMS and DFA as well as their subsidiaries and/or joint ventures to divest raw Grade A milk processing plants necessary to restore competition in the Northeast;

h. Order Dean, DMS and DFA, their subsidiaries or joint ventures to divest raw Grade A milk balancing plants necessary to restore competition in the Northeast;

i. Order DFA and DMS to submit to an independent accounting of its books, including all revenues, profits, expenses, assets and liabilities incurred, received, paid, or otherwise recorded during the entirety of the Class Period;

j. Declare that DFA's and DMS's activities described above are outside the scope of the Capper-Volstead Act's grant of antitrust immunity;

**Public Version - Redacted Pursuant to Protective Order**

k.  Against all Defendants, jointly and severally, award Plaintiffs and the proposed Class damages in an amount to proven at trial, to be trebled with interest and the costs of this suit, including attorneys' fees; and

l.  Award such further relief, including structural remedies, as the Court deems just and proper.

Dated:  October 15, 2010         Respectfully submitted,

ANDREW D. MANITSKY, ESQ.
GRAVEL AND SHEA, A PROFESSIONAL
CORPORATION
76 St. Paul St., 7th Floor, P.O. Box 369
Burlington, VT 05402-0369
(802) 658-0220
amanitsky@gravelshea.com

BENJAMIN D. BROWN
KIT A. PIERSON
BRENT W. JOHNSON
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:     (202) 408-4600
Facsimile:     (202) 408-4699
bbrown@cohenmilstein.com
dsmall@cohenmilstein.com
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com

ROBERT G. ABRAMS
GREGORY J. COMMINS, JR.
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:     (202) 783-0800
Facsimile:     (202) 383-6610
AbramsR@howrey.com
ComminsG@howrey.com

J. DOUGLAS RICHARDS
GEORGE F. FARAH
COHEN MILSTEIN SELLERS
   & TOLL PLLC
88 Pine Street
Fourteenth Floor
New York, NY   10005

97

Public Version - Redacted Pursuant to Protective Order

Telephone:    (212) 838-7797
Facsimile:    (212) 838-7745
drichards@cohenmilstein.com
gfarah@cohenmilstein.com

Charles E. Tompkins, Esq.
Todd S. Heyman, Esq.
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109-2802
(617) 439-3939
ctompkins@shulaw.com
theyman@shulaw.com

*Counsel for Plaintiffs and the Proposed Class*

**Public Version - Redacted Pursuant to Protective Order**