UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

ALICE H. ALLEN, ET AL            )

          VS                     )   CASE NO: 5:09-CV-230

DAIRY FARMERS OF AMERICA, INC,)
DAIRY MARKETING SERVICES,
LLC, DEAN FOODS COMPANY AND   )
HP HOOD,LLC
_____ )      FINAL FAIRNESS HEARING


BEFORE:   HONORABLE CHRISTINA REISS
          CHIEF JUDGE


APPEARANCES:  KIT A. PIERSON, ESQUIRE
                   Cohen Milstein
                   1100 New York Avenue, NW
                   Suite 500, West Tower
                   Washington, DC   20005
                   Representing The Plaintiffs


              ANDREW D. MANITSKY, ESQUIRE
                   Gravel & Shea
                   76 St. Paul Street
                   P.O. Box 369
                   Burlington, Vermont  05402
                   Representing The Plaintiffs


                   (APPEARANCES CONTINUED:)


DATE:        July 18, 2011


              TRANSCRIBED BY:  Anne Marie Henry, RPR
                        P.O. Box 1932
                        Brattleboro, Vermont   05302

APPEARANCES CONTINUED:


KEVIN HARDY, ESQUIRE
        Williams & Connolly, LLP
        725 Twelfth Street, NW
        Washington, DC   20005
        Representing Dairy Farmers of Vermont, Inc.


W. TODD MILLER, ESQUIRE
        Baker & Miller, PLLC
        2401 Pennsylvania Avenue, NW
        Suite 300
        Washington, DC   20037
        Representing Dairy Farmers of Vermont, Inc.


JOHN T. SARTORE, ESQUIRE
        Paul, Frank & Collins, PC
        1 Church Street
        P.O. Box 1307
        Burlington, Vermont   05402
        Representing Dean Foods Company


PAUL H. FRIEDMAN, ESQUIRE
        Delchert LLP
        1775 I Street, NW
        Washington, DC   20006
        Representing Dean Foods Company

```
 1                 (The Court opened at 9:20 a.m.)

 2                 THE CLERK:  Your Honor, the matter before the

 3    Court is civil case number 09-230, Alice Allen, et al versus

 4    Dairy Farmers of America, Incorporated, et al.  The

 5    plaintiffs are present through Attorneys Andrew Manitsky and

 6    Kit Pierson.  The defendants are present through attorneys

 7    W. Todd Miller, Kevin Hardy, John Sartore and Paul Friedman.

 8    The matter before the Court is a Final Fairness Hearing.

 9                 THE COURT:  Good morning.

10                 MR. FRIEDMAN:  Good morning, Your Honor.

11                 MR. PIERSON:  Good morning, Your Honor.

12                 MR. MILLER:  Good morning, Your Honor.

13                 MR. HARDY:  Good morning, Your Honor.

14                 MR. MANITSKY:  Good morning, Your Honor.

15                 MR. SARTORE:  Good morning, Your Honor.

16                 THE COURT:  My understanding, based on the filing,

17    I believe from Sunday night, is that you are not going

18    forward on the class certification hearing today.  I granted

19    that unopposed motion and I will talk to you at the end of

20    this hearing about rescheduling.

21                 I'm sorry for whatever medical unfortunate event

22    caused that to happen, but it's good that you could all

23    reach an agreement on that.

24                 With regard to today's hearing you know that we're

25    here to discuss the Dean settlement and in terms of whether
```

```
 1   it is fair, reasonable and adequate and whether the Court
 2   should grant a final approval.  As usual I have some
 3   questions that I would like answered.  I have read what you
 4   have filed.  I have received the Vermont Attorney General's
 5   most recent filing, I would call it a corrective letter, and
 6   have read that.
 7           The order I would like to proceed in is I want to
 8   hear from any individuals who came who want to speak about
 9   the settlement.  And then I would hear arguments from
10   counsel for Dean, for the plaintiff.  I have ruled that the
11   defendants do not have standing to object to the settlement
12   as revised.  If anybody wants to call any witnesses I'll ask
13   that you bring that to my attention.
14           A couple of the questions I had in looking over
15   what you have filed was whether or not the class, or
16   proposed class I should say, was advised of the change of
17   location to Rutland.  I did notice that it was Elmwood
18   Avenue, Burlington with a notice to go to the website for a
19   change in location.  And obviously we're here in Rutland.
20   So I want to make sure that people were re-directed here if
21   necessary.
22           I looked at the number of notices that were
23   returned and saw the process by which they were sent out
24   again.  I'm not so sure I'm very clear to the final tally of
25   how many notices did not reach prospective class members.
```

1          With regard to incentive awards for class

2     representatives that was not something that I granted

3     preliminary approval.  And I don't recall that coming into

4     the class notice.  I looked for it this morning again.  I'm

5     not so sure that the class got notice of that.  And so I

6     want you to address whether they got notice, what the form

7     was and, and whether or not it would be fair to add that

8     into the settlement at this time in the event notice was not

9     given.

10         So those were some of the questions I had.  And

11    let me start with asking if there are any individuals here,

12    we had at least one written request who wished to speak with

13    regard to the issue of the settlement.  Yes?

14         MR. GORTON:  Yes, Your Honor.  My name is Grant

15    John Gorton.  I submitted the written request.

16         THE COURT:  Does either counsel for Dean or for

17    the plaintiffs have any objection to taking Mr. Gortman

18    first?

19         MR. PIERSON:  Excuse me, Your Honor, I'm sorry?

20         THE COURT:  Do you have any objection to taking

21    Mr. Gortman first?

22         MR. PIERSON:  No, not at all.

23         MR. FRIEDMAN:  No, Your Honor.

24         THE COURT:  Is anybody asking that Mr. Gortman be

25    sworn in?  We typically don't do it in this, we just allow

1    you to voice your opinion.  You do it right from the podium.

2    And any request for that from counsel?

3              MR. FRIEDMAN:  No, Your Honor.

4              MR. PIERSON:  No, Your Honor.

5              MR. GORTON:  Your Honor, I requested to speak

6    because although I have accepted the settlement I have

7    several very strong concerns.

8              One of the first concerns is the fact that my

9    acceptance of the settlement would be considered approval of

10   what has happened.  I've accepted the settlement only

11   because it was the best alternative.  The only other

12   alternative was to continue litigation of my biggest and

13   most important and most critical client and customer against

14   me, a litigation which I did not want to happen in the first

15   place.

16             The reason I didn't want that litigation to happen

17   is because what's most important to me is to have a

18   long-term relationship with this customer.

19             THE COURT:  Are you talking about Dean?

20             MR. GORTON:  Dean Foods.

21             THE COURT:  Dean, okay.

22             MR. GORTON:  Yes, Dean Foods.  To put long-term

23   relationship in perspective I have been married for 40

24   years, I live in a house that was built in the 1850's, I

25   milk in a barn that was built in the 1850's.  I have four

1    neighbors who are farmers.  They've been friends and

2    neighbors for 30 years spanning at least three generations.

3    I worship in a church that I attended as a toddler and have

4    many friends in the community whose friendships spans as

5    many as five generations.  That's long-term relationship to

6    me.

7            I've been farming for 30 years.  I expect my son,

8    whose farming with me now, to farm for another 40 years.

9    And it's important to him to have a long-term relationship

10   with Dean Foods.

11           And my understanding of long-term relationship and

12   the potential damage that this lawsuit comes to long-term

13   relationships is based on my non-farm experience.  I'm a

14   program manager.  I have almost 20 years of experience as a

15   program manager and working in business development for

16   Defense Department contractors.  I'm a 1971 graduate of the

17   Naval Academy, spent nine years on active duty in the

18   military, 12 years in the Reserves.

19           And my business in the program management for

20   multi-million dollar government contracts and business

21   development with both national and international customers

22   has given me a very strong understanding of what business,

23   how business relationships are developed, how important they

24   are and what kind of damage can be done.

25           Dean Foods is a for profit company.  Clearly, the

cost of milk is one of their most -- probably their biggest

if not the biggest expense that they incur.  So clearly it's

in their business interests to buy milk at the lowest price

that they can buy milk.

          Dairy farmers, our most important income, our

biggest income in fact is the price of milk.  So Dean Foods

wants to buy milk at a price that's maybe way down here if

you would ask them.  Dairy farmers want to get a price of

milk that's way up here.  And there has to be some agreement

reached that is sustainable.

          Dean Foods needs dairy farmers just as badly as we

need Dean Foods.  Without dairy farmers they don't have any

milk to process.  And what makes this problem worse is there

is no definitive answer for what price should be a fair

price.

          I spent about four hours on the phone with

Mr. Benjamin Brown of Cohen-Milstein.  And his response was,

well, this lawsuit, the effects of this lawsuit will not

affect the business relationship between dairy farmers, it

will not affect the price of milk that Dean -- the price

that Dean Foods might be willing to pay for milk.  And I

could agree with that if there was some way to say Dean

Foods and dairy farmers could say, okay, $22.10 is the price

of milk, it's the least price that we can pay and it's the

price that's going to satisfy farmers so that's what we'll

1    pay and that number wouldn't necessarily change if there

2    were issues or as a result of the business relationship.

3    But that doesn't occur.  There is no -- there is no price

4    discovery mechanism that allows either dairy farmers or Dean

5    Foods to accurately determine that price of milk in between

6    what they want to pay and what dairy farmers want to

7    receive.

8            So it's a negotiated price, a negotiated price

9    based on also, not just price, but quality and service.  And

10   as a negotiation the resulting price that comes out of that

11   negotiation has, the business relationship has an important

12   effect, potential effect on that price; an effect that far

13   outweighs any benefit that dairy farmers will receive from

14   this settlement.

15           One way that people might say, well, to determine

16   the -- to determine a price discovery mechanism would be to

17   have the purchase of independent milk supplies.  And the

18   problem with that is it represents a price discovery

19   mechanism but it represents an inaccurate price discovery

20   mechanism because it does not accurately reflect the true

21   cost of bringing milk to the market.

22           The fact that one individual farmer, who might

23   live only a few miles say from a Dean plant, and lives on a

24   main road, and is a large farmer, and could ship a lot of

25   milk very easily to a Dean plant, therefore, Dean could pay

1    him less, he could get more money does not adequately

2    reflect the cost of serving the market in the northeast.

3              Every day a thousand, probably something on the

4    order of a couple thousand milk trucks travel to five or six

5    thousand or eight thousand farms, pick up milk and deliver

6    that milk to something on the order of I think it's a, over

7    a hundred plants.

8              The cost of doing that and making sure that each

9    plant gets as much milk as they want and that all the

10   farmers who produce milk have their milk picked up and

11   delivered to a plant, which it has to be, is called

12   balancing.  In addition to balancing costs there are other,

13   there are other associated costs besides, besides balancing.

14   You have issues of Legislative action, you have issues of

15   regulatory action, you have product development and you have

16   marketing.  And all of those are expenses which represent

17   the common good of the industry.  If there's Legislative

18   action that could seriously impact dairy farmers that needs

19   to be addressed.  If there are regulatory issues such as

20   clean water, clean air, those issues have to be addressed

21   and it costs money to do that.

22             And so though all of those costs come in between

23   the cost that Dean Foods pays for milk and the cost that

24   dairy farmers receive.  And if all farmers share in that

25   cost all farmers share in the benefit so all farmers should

1    be sharing in all of those costs equally.  And that's very

2    difficult to do.

3              The other problem that we have very seriously is

4    that in our industry what's good for any single one of us as

5    an individual is bad for the common good.  What's good for

6    every single dairy farmer is to produce as much milk as that

7    dairy farmer can produce.  When we all do that it produces

8    too much milk.  Also what's good for the industry is to make

9    sure every customer, not just Dean Foods, but every customer

10   we have receives as much milk as they need for their plant

11   because the end goal is to ensure that every one of us as a

12   consumer whenever you want to walk into any store anywhere

13   and buy any dairy product, milk, cheese, butter, whatever,

14   that product is available in the store for you to buy.

15             And in order for me to do that, in order for me to

16   make sure my customers and my customers move enough food,

17   enough milk to get dairy products to consumers I basically

18   have to over produce.  There is no way that I can figure out

19   exactly how much milk needs to be produced every day,

20   exactly how much milk needs to go to consumers.

21             The trouble is the current system as soon as I

22   over produce milk or the industry over produces milk the

23   current policy of pricing in the current pricing mechanisms

24   force my price of my milk down.

25             If you put the current mechanism for pricing milk

1  into an Excel spreadsheet you would get what Excel calls a

2  circular reference error.  It would not allow you to put the

3  formula in the spreadsheet.

4         It is an undamped positive feedback system.  And

5  in addition to my business, my development and my technical

6  expertise in the Department of the Defense is in the area of

7  controls and monitoring.  And a undamped positive feedback

8  system is the most unstable control system that you can

9  possibly devise.

10        What we really truly need is a system that will

11  allow me, allow dairy farmers to receive a fair price, a

12  price that's fair to consumers, a price that's fair to the

13  people in the, in the middle, the processers and the

14  retailers in the middle.  That's what we -- that's what we

15  really truly need.  And then the excess milk that's produced

16  could be used to help those in need.

17        I, if I could get a fair price for 95 percent of

18  the milk that I produce I could afford to give away five

19  percent of the milk I produce to help those in need.  When

20  producing that 100 percent of my milk drives my price down

21  to an unacceptable price, a price that's below cost of

22  production, I can't help other people.

23        So each one of us and this is, this issue of doing

24  something for yourself as opposed to doing something for the

25  common good that's not just for dairy farmers.  Every single

1    one of us every day we get up and have to ask ourselves how

2    much today do we do that helps us and our families versus

3    how much we do that helps the common good or helps those in

4    need.  And that can be a very difficult -- it can be a very

5    difficult position when doing things to help the common good

6    hurts you because every single one of us, we have to take

7    care of ourselves, we have to take care of our families, we

8    have to take care of our businesses, whatever it is that we

9    do.

10              And so my problem with this lawsuit and my problem

11   with this settlement is that it does nothing to help me

12   solve the real issues that my industry faces.  And, in fact,

13   it exacerbates those problems and promotes the potential for

14   those problems to increase and those problems to reduce my

15   price of milk.  And that's why I do not support a 33 and a

16   third percent fee to the lawyers.

17              Basically the lawyers are asking for this.  I

18   would like to pay them this.  And you kind of get -- in this

19   case you get to decide what's in the middle.  And we

20   certainly will abide by your decision.  And if that's not a

21   politically correct statement I don't know what is.  But I

22   don't envy your job, Your Honor.  Thank you.

23              THE COURT:  Well, thank you.  It's obvious to me

24   that you gave that a lot of thought.  And I'm glad you came

25   here to tell us your thoughts.  And I'm going to ask counsel

 1   to address some of those comments in your presentation.

 2          MR. GORTON:  You want me to stay here?

 3          THE COURT:  No, you are free to sit down.

 4          Anybody else who wanted to speak including any

 5   attorney generals for order number one, including our amicus

 6   curie Vermont Attorney General?

 7          All right.  We will start with plaintiffs.  And

 8   Mr. Pierson I didn't know or Mr. Manitsky if you are going

 9   to call witnesses or if you're going to make an oral

10   presentation.  You've obviously filed a lot of documents.

11          MR. PIERSON:  Thank you, Your Honor.  We're simply

12   inclined to make an oral presentation.  It's my

13   understanding from conversations -- I think -- I think

14   that's how all parties are proceeding.

15          THE COURT:  All right.  And in addition, let me

16   know what, if anything, I know Dean Foods gave notice of

17   this, the preliminary approval and the proposed settlement

18   to all of the attorney generals in order number one.  We

19   have only heard from the Vermont Attorney General.  Please

20   confirm for me that that is all that we've heard from.

21   Mr. Friedman?

22          MR. FRIEDMAN:  That's correct, Your Honor.

23          THE COURT:  All right.

24          MR. FRIEDMAN:  Correct.

25          MR. PIERSON:  Correct, Your Honor.  We have spoken

```
 1   to some other attorney general's offices, but we have not

 2   received any objections.

 3              THE COURT:  All right.  Mr. Pierson?

 4              MR. PIERSON:  Good to see you, Your Honor.  It's

 5   nice to be here in Rutland.

 6              THE COURT:  Yes.

 7              MR. PIERSON:  I think the last time I was here was

 8   some 20 years ago when I was here with a bicycle.  And it's

 9   a wonderful area to bicycle in.

10              Before I start I would just like to make a couple

11   introductions, if I may.  Perhaps and most importantly I

12   would like to introduce the Sitts, the two Sitts plaintiffs.

13              THE COURT:  Good morning.

14              MR. PIERSON:  Ralph and Garret.  I also have with

15   me Mr. Manitsky, who you know.  And I should mention

16   Mr. Commins who is here from the Baker-Hostetler firm.

17              THE COURT:  Good morning.

18              MR. PIERSON:  Mr. Cummins is here.

19              THE COURT:  One of your clients has his hand up.

20              MR. SITTS:  There's something I would like to

21   address the Court.

22              THE COURT:  At some point certainly.  Absolutely.

23

24              MR. PIERSON:  First, I guess I would like to -- I

25   will comment on Mr. Gorton's comments during the course of
```

```
 1    my presentation.  I would like to thank him for being here.

 2    He's obviously an articulate and, frankly, impressive

 3    gentleman.  And his comments were well considered and

 4    thought out.

 5            I would comment at the outset that I think the

 6    Court should know, to get some sense of the process, my

 7    partner, Mr. Brown, did actually spend several hours on the

 8    phone over the course of three conversations with

 9    Mr. Gorton.  And I don't recall if those conversations were

10    initiated by Mr. Brown or Mr. Gorton.  But they spent a lot

11    of time talking.

12            And the point of those, as you no doubt gather

13    from Mr. Gorton's comments, he's got strong opinions.  And

14    they are, they are not opinions that were lightly reached.

15    He's an impressive guy.  And the point of our conversations

16    with him was not to persuade him that he was wrong, but it

17    was to hear his perspective and to try to understand his

18    perspective and to help him understand our perspective.  So

19    I just want the Court to know we took that very seriously.

20    And even though he obviously disagrees with us in some

21    respects I'm glad he's here today.

22            With regard to the preliminary approval I'm

23    getting actually answers to some of the Court's questions,

24    but I'll try to answer those in the context of my remarks.

25    I'll be, I'll try to be relatively succinct here.  As you
```

1    know on May 4, 2011 you granted preliminary approval of the

2    Dean settlement.  Since that time, in my view, nothing has

3    happened that changes my view of the settlement or I think

4    should change the Court's view of whether final approval is

5    appropriate.

6            Notice was sent to more than nine thousand

7    farmers.  Notice was also published in agricultural

8    publications directed to the farming community consistent

9    with the Court's order.  And information about the case has

10   also been published on the website for the claims

11   administrator.

12           To answer one of your questions of the nine

13   thousand notices 201 were returned, the claims -- because of

14   incorrect addresses.  My understanding is that 10 of those

15   were returned with a follow-up address by the postal service

16   and the notice was then re-mailed to the corrected address.

17           Of the remainder Rust, whose the claims

18   administrator, which is probably, you know, if not the

19   leading claims admin -- they may be the leading claims

20   administrator in the country.  It's certainly on a very

21   short list.  They were able to locate, through a service

22   they use for locating people, another 149 of the people that

23   did not receive notice.  So they've received notice.

24           So in terms of what the identifiable class notice

25   here is actually I think very, very good.  Probably, I

1    didn't exactly do the math, but it's probably 98,

2    99 percent.  And, of course, the additional notice is

3    provided by the publications and the internet.

4            So I think it is fair to say that we've pretty

5    much done pretty much all you can humanly do with what I

6    would say considerable success.

7            Of the nine thousand notices there were only two

8    objections.  There were only four opt outs, which is really

9    extremely low by any measure.  And to some extent the Court,

10   when we discussed this a couple months ago the Court, and

11   I'm paraphrasing a little bit, but you essentially made the

12   observation that one of the benefits of the notice process

13   was it provided some reality testing because it's pretty

14   easy for lawyers or parties to gather up people that are

15   going to support their position, but the notice provides a

16   way to sort of test the realities of the situation.  And I

17   think the fact that there have been only two objections out

18   of more than nine thousand notices I think it tells you a

19   lot.  I think it says a lot.  I don't want to overstate what

20   it says, but it's a significant factor in evaluating the

21   settlement.  And I think the Second Circuit, the Second

22   Circuit makes that, makes that clear.

23           The one other interesting thing that I'll just

24   comment on briefly that I think the Court should be aware of

25   is since I was last in front of the Court I actually had the

```
1    opportunity to oppose, to maybe oppose, but certainly depose
2    the head of DMS, Greg Whitcomb.  And one of the interesting
3    things in Mr. Whitcomb's deposition was, and I'm
4    paraphrasing him as well, but I think it's a fair
5    paraphrase, he basically said he had no problem with the 30
6    million dollar settlement, that they weren't -- he had never
7    opposed that aspect of it.  That um, that that, that that
8    was Dean's business and I thought it was --
9              THE COURT:  Well, weren't the defendants up front
10   from the start is that they never weighed in on the monetary
11   portion of the settlement?
12             MR. PIERSON:  I don't really -- I disagree with
13   that in one respect, Your Honor.  They had argued there was
14   a conflict relating to that and it was this whole argument
15   about counsel can't make a choice between which defendant to
16   settle with.  So they had certainly -- I think -- I think it
17   is true, I mean all the affidavits that came in talked about
18   Section 9.2 of the -- none of them complained about the
19   monetary relief.  And I'm going to say this -- I'm going to
20   try to answer the Court honestly.  And this is not really
21   meant as a criticism of anyone at all.  There was sort of a
22   lawyer created argument about a conflict, about the
23   financial position.  I think it was a lawyer argument.
24             THE COURT:  Well, you opened the door so I will
25   now walk through it.  And I took the defendant's argument to
```

1    be by the sheer virtue of negotiating an injunctive

2    provision that favored, in their opinion, one portion of the

3    class over the other, the class counsel and representatives

4    displayed a conflict of interest which made them ill-suited

5    to represent the whole class.  So that's what the argument

6    was.

7         And when the injunctive relief went away in terms

8    of this particular settlement and this class I believe that

9    those arguments are mute.  And what happens when we get to

10   class certification I would expect that argument to be

11   resurrected.

12         MR. PIERSON:  Yeah, sure.  And I actually think --

13   I may have a little bit different -- I don't disagree that

14   they made that argument.  What I think they actually argued

15   more than that.  I think the lawyers were sort of arguing

16   there was a conflict with regard to the financial component

17   too.  But what was -- what was I think significant, and I

18   think Mr. Whitcomb's comments about it are significant, is

19   that when you look at the underlying materials, and the

20   Court picked this up I think very quickly at the last

21   hearing, none of the underlying materials suggested that

22   there was any real opposition to the 30 million dollar

23   settlement.  Put aside 9.2.  Obviously that was at issue.

24         And all I'm saying about Mr. Whitcomb's testimony,

25   and I don't mean to dwell on it because I don't think it's

1    much of an issue, it was significant to me when I deposed

2    him he sort of reiterated that that was not problematic from

3    his point of view.  I don't want to overstate his testimony,

4    but I think -- but I think that's fair.

5              THE COURT:  Well, let me, as long as we're talking

6    about the amount of settlement, and I agree that this case

7    is one in which there are very few objections if you

8    compared them against the size of the class, the Vermont

9    Attorney General has raised the issue of the amount of the

10   settlement in comparison to the amount of the settlement in

11   Southeastern Milk.  They conceded that they haven't analyzed

12   the strength of the claims.  They conceded that that

13   settlement was on the eve of trial and is paid out over four

14   years.

15             I have some at least thoughts of my own about the

16   statute of limitations in that case versus this case, but

17   they have raised that issue about is it enough without

18   saying isn't it enough.  So how about addressing some of

19   their comments.

20             MR. PIERSON:  Yeah, let me address that, Your

21   Honor.  And it's a fair question for them to raise.  You

22   know, frankly, if they hadn't raised it I was going to raise

23   it myself.  And I wouldn't have raised it as a question, but

24   the Dean settlement in the Southeast I think became -- I

25   think the Court was notified of it Tuesday or Wednesday of

1    last week.  So as an officer of the Court I would have

2    discussed it with the Court whether they raised it or not.

3            I think there are a few things to be said about

4    the Vermont A.G.'s letter.  First, and without sounding like

5    we invite too many objections, we do -- I'm glad to have

6    them weigh in.  I think it's good.  It's good for the

7    process.  It's good for the Court.  So we welcome that.  And

8    we've tried to -- I think we have a cooperative relationship

9    with them.  I think the defendants have been cooperative

10   with them.

11           One thing that is important, and then I'll kind of

12   get to the merits of the answer of the question, and I want

13   to say that tactfully.  They have a very limited

14   understanding -- in fact they have no understanding of what

15   the litigation in the Southeast is about.  And that's not a

16   criticism of them because they are not in the Southeast,

17   it's not their jurisdiction.  You wouldn't expect them --

18   you wouldn't expect them to, but, you know, the letter sort

19   of reflects that.  I mean the first letter they sent was

20   based on the assumption that there was one order at issue.

21   There were, in fact, two orders that are at issue.  And I

22   think the relevance of that, and they are frank about this

23   in their letter, the relevance of that is they really have

24   no -- they are really kind of just raising the question.

25   And it's a legitimate question.  And I'll answer it.

1              I think a second point that I want to make about

2    their letter, and the Court alludes to it, is it's important

3    to look at what the letter says and what the letter doesn't

4    say.  The letter does not object to the settlement.  It does

5    not object to the attorney fee.  And, of course, and, in

6    fact, they distinguish it from cases.  They make a point

7    that they do go into cases where those are problems and, you

8    know, they are not shy about expressing their opinion, and

9    they shouldn't be.  And it's quite clear they have not

10   raised an objection here.  What they've done is they have,

11   they have raised a question.

12             There's one other assumption in their letter,

13   which I think is, it really requires comment, which is the

14   assumption that the Dean settlement was a, was a

15   pre-discovery settlement.  And I do want to say a couple

16   things about that, Your Honor, because it's, you know,

17   frankly, it's important to me and um, and it's important to

18   my team.  You know, we were put on a discovery schedule in

19   this case which, with the benefit of it being done, I will

20   now thank the Court for, because it, you know, at the end of

21   the day it serves the litigation well.  And we've got issues

22   that should move towards resolution.  But I will also tell

23   Your Honor that in almost 30 years of practice this is the

24   toughest schedule I've had in an antitrust case in my career

25   by some measure.

1           And what that -- the relevance of that to the Dean

2    settlement is that by the time the Dean case -- by the time

3    the settlement was negotiated in December we were on the

4    verge of about 50, 60 depositions.  And I think the cut off

5    at that point, I don't know if it was the end of January or

6    it was some time in February, but by the time we negotiated

7    the settlement with Dean we had reviewed literally millions

8    of pages of documents that had been produced in the

9    Southeast.  You know, a lot of them pertained to the

10   Northeast and had never been reviewed for that purpose.

11          So we had done a massive amount of work, Your

12   Honor.  And that it, you know, one thing that has been I

13   think actually highly beneficial about the case, and I give

14   the defense counsel credit for this, I give us some credit

15   for this too, is there's been an enormous amount of work

16   here that has sort of gone on behind the curtain and it's

17   because counsel has been able to litigate this case without

18   flooding Your Honor with motions.  And that, that hasn't

19   been as a result -- it certainly hasn't been a result of

20   capitulation from them.  It hasn't been like capitulation

21   for us either.  It's reflected in, you know, dozens and

22   dozens of hours of trying to negotiate out issues and

23   ultimately compromising and trying to reach middle grounds.

24   But I -- but -- but -- but the important point is that by

25   the time we sat down, and Mr. Friedman and I sat down to see

1   if we could reach a resolution of this we had done -- we had

2   done an extraordinary amount of work.

3           There's one other comment I want to make, Your

4   Honor, and it's sort of a personal comment, but I think it's

5   important because I really want you to understand our

6   perspective of the settlement.  And then I'm going to get to

7   the merits of what they have to say.

8           You know, I spent about 25 years of my career on

9   the defense side of these cases, primarily on the defense

10  side of these cases.  And um, and it was a great

11  professional experience in a lot of ways, but I realigned

12  myself at the end of that on the plaintiff's side of these

13  cases and it was because, frankly, Your Honor, to be just

14  brutally honest with you, it was because that was where my

15  heart was.  That was who I really wanted to be representing.

16  But when I made what was a very fundamental career decision

17  for me one of the concerns I had about the plaintiff's bar,

18  frankly, was that I had seen too many cases where they were

19  too quick to settle and I didn't think it served their

20  clients well.

21          And when I was speaking to my old firm and making

22  a personal decision about making that career choice one of

23  the questions I really wanted talked out and did talk out

24  was that was not the way I litigate cases.  I like going to

25  trial.  And I think I'm good at it.  And I think there are

cases where it should be done.  And I had made clear to my

firm and made a commitment myself that whatever kind of

plaintiff's lawyer I was going to be when I was representing

victims, people that are really hurt, it was going to be a

lawyer that was prepared to take cases to trial.  But, but

what a good lawyer does, Your Honor, is a good lawyer is

prepared to take cases to trial, but a good lawyer also is

prepared to settle cases when they should be settled.  And

that's what happened here.

So let me talk for a moment about the merits of

their argument and in particular their comments about -- the

questions about the Southeast.

The first comment I would like to make is that,

you know, basically the question they posed is there's -- I

mean, and in essence they are saying there's more milk in

the northeast than the southeast so why the difference.  And

the first response I would make is the volume of milk is

really not a metric for anything in terms of the strengths

or weaknesses of the antitrust cases in these two regions.

Let me give you an example.  I mean in Order 30,

which is the area around Chicago and the midwest, they

produce more milk, significantly more milk than they do in

the northeast.  That tells you nothing about whether there's

an antitrust case there.  It tells you nothing about the

strength of an antitrust case.  In fact, it's not -- in

fact, it's not even a relevant metric of the strength of the
case.  So that's kind of my first answer to them is that the
question you're posing is really not the relevant question.
I mean the relevant question is compare the actual substance
of the cases.  And that's something they really haven't
done.  They're simply asking the question.

So there are a couple differences that are
relevant here.  And they certainly were relevant to us.  One
difference is the difference in the market share.  Dean, my
understanding, and Mr. Cummins is here and um, who is about
to go to trial in the Southeast, so he could answer this in
more detail if it's helpful to the Court, Mr. Friedman is
obviously familiar with it, but the plaintiff's allegation
in the Southeast is that Dean -- DFA also owns a lot of
processing plants in the northeast or they owned or
controlled.  And the allegation is through surrogates like
NDH in the Southeast.  And that so the market share of
defendant owned and controlled, principally by Dean
processing plants in the Southeast, is about 75 percent.
That's the plaintiff's allegation.  They will probably
dispute it at trial, but that's an allegation in the
Southeast.  And that's magnitudes -- orders of magnitude
higher than it is in the northeast.

Now, we think we got a real case in the northeast.
We actually think we have a good case against DFA.  But

1    Dean's situation in the two regions is different in a

2    respect that is of significance.

3              THE COURT:  And it was one of the issues Dean

4    raised in moving to dismiss, inadequate market share to base

5    a claim.

6              MR. PIERSON:  Absolutely.  So that's an issue.

7    The second issue, and um, again, I'm happy to go into it in

8    as much detail as the Court wants, but let me give you a

9    high level.  There is conduct by Dean at issue in the, in

10   the Southeast that is of less significance in the northeast.

11   For example, I can just give you two examples. I mean, in

12   other words, the conduct is not -- the allegations of

13   wrongdoing by Dean are not the same.  Frankly, there are

14   some facts by DFA in the northeast that I think are worse in

15   the northeast than they are in the southeast.  But with

16   regard to Dean two examples are there is a big issue down

17   there about the spin off of the certain, of 11 processing

18   plants to NDH.  And um, the allegation in the Southeast, as

19   I understand it, is that that was basically done and

20   orchestrated in a way that was designed to circumvent the

21   DOJ -- to allow the DOJ to approve other activity,

22   acquisition activity that were going on down there.  But

23   those plants, those plants were located in the southeast.

24   There are some issues relating to NDH in the northeast, but

25   they are relatively modest compared to the issues in the

1    southeast.

2          Another major issue of conduct in the southeast

3    concerns an organization called the Southern Marketing

4    Organization, which is -- it's a little bit like DMS in the

5    south, but it just exists in the south.

6          And the allegation down there is that Dean forced

7    some of the competing co-ops, basically said you want to

8    access Dean you got to go through SMA, which was a DFA

9    controlled entity.

10          So the allegation in the southeast is basically

11    that the DFA and Dean were like that and really had a lock

12    on a very, very substantial portion of that market.  And

13    many of those allegations, and some of the sort of crony

14    allegation, the outflow from that, involved facts that are

15    going on in the Southeast --

16          Now, there are other attorneys here that can

17    explain it better than I can, but I think the one point that

18    there's not really a dispute about it is that there is

19    significant conduct that is at issue down there that isn't

20    at issue in the northeast.  It's just not -- in that sense

21    it's not an apples to apples comparison.

22          Your Honor alluded to the statute of limitations.

23    And, you know, this is an issue which I have no doubt we're

24    going to have a dialogue about down the road.  And it's, as

25    you know, Your Honor's wrestled with it.  It's a, it's a

1    complicated issue.  I think you'd probably agree with me

2    about that.  I've read a lot of the same stuff that you've

3    read and it's a complicated issue.  The case law is a little

4    bit muddled.  And, and I really think that we're right on

5    the issue.  Frankly, I think we're right vis-a-vis Dean, and

6    the Court's earlier ruling let some of -- raised questions

7    about the statute of limitations versus Dean.  Said some

8    stuff for the purposes of a motion to dismiss.  It could go

9    forward against Dean.  It left a little bit up in the air.

10   So we'll have time to argue about it, time to talk about

11   that, but I think it is significant in terms of these two

12   cases.  I mean the case in the southeast was brought a

13   couple years earlier.  And the defendants have not contended

14   there, as I understand it, and Mr. Friedman will correct me

15   if I'm wrong, but as I understand it the defendants have not

16   disputed that the issue of fraudulent concealment is a fact

17   issue for the jury.  So it's not that the statute of

18   limitations issue may not be raised down there, it may or

19   may not.  It wasn't raised, as I understand it, it wasn't

20   raised summary judgment motions in the southeast, it wasn't

21   raised on the motion -- I don't believe it was raised on --

22          THE COURT:  I believe it was raised on the motion

23   to dismiss.

24          MR. PIERSON:  I could be wrong about that, Your

25   Honor.  My understanding is that it has been a -- it's a,

1    and Mr. Cummins will correct me if I'm wrong, but I don't

2    believe that the defendants argued in the summary judgment

3    motions in the southeast, and they argued a lot, as you can

4    imagine they argued a lot of things.  There was a mountain

5    of motions filed there.  I don't believe that they contended

6    that the fraudulent concealment issue could be resolved as a

7    matter of law.  I think they implicitly sort of accepted

8    that that was a fact issue for the jury.  But it's -- but

9    it's an issue that we got to confront in the northeast.

10   And, frankly, it was a bigger issue with regard to Dean in

11   the northeast than I think it is with regard to DFA.  So

12   that's a difference.  And not a, not a small one.

13          There are a couple other factors, Your Honor,

14   about the -- I mean I think those factors by themselves I

15   would say are the primary factors.  There are a couple other

16   things that are relevant to me and one of them may not

17   differentiate the situation in the southeast, but it was --

18   it was -- it was a factor in our thinking about the

19   settlement.

20          As we -- as we were discussing settlement with

21   Dean there were issues about Dean's financial wherewithal.

22   There were issues to me.  And I don't know that all counsel

23   agreed, but there were issues that I was concerned about.

24   There was -- there were trade press reports that listed Dean

25   on the short list of the companies that might not be around

1    in another year.  And so there was an issue that if you

2    tried to play out this case for two or three years and took

3    the risk of appeals there might be nothing to collect at the

4    end of the day.  So that, that, that was a factor.

5             I think the other factor that was significant,

6    Your Honor, is that one thing the A.G.'s Office letter

7    doesn't point out, and they may have been unaware of it, the

8    Dean settlement, and I applaud the counsel, I mean

9    Baker-Hostetlet has done a great job down there.  And they

10   should be congratulated for the settlement.  But it's paid

11   out over a four year period.

12            So, you know, what that means in the Southeast is

13   that from the date of filing, which was 1999 or 2007, until

14   the date of the final payment, it's an eight year period

15   for, for payment from the date the case was filed, four

16   years of very intense litigation, and then payments right

17   out, some payments right away.  I think it's 60, 20, 20, 20

18   over a four year period is the way I think it works.  But

19   there's a time break from day one till the final payment of

20   eight years.  You know, in this case, this case has just

21   been on a really different track.  I mean you put our feet

22   to the fire on the case.  And um, you know, and, you know,

23   I've said this to you before, and I'll just reiterate it,

24   I've never been prouder of the group of colleagues that I've

25   worked -- of the team of colleagues that I've worked with in

1    this case.  People have -- I've been in the office all night

2    on several occasions in which case, which I don't know

3    about.  Some of my colleagues are more youthful.  I feel

4    like I'm getting a little old for that.  My kids think I'm

5    too old for it.  But, you know, we've been -- we've been in

6    a dead sprint.

7            And the result of that in the case of the Dean

8    settlement is that absent an appeal the payout from this

9    case -- the date -- from the day this case was filed to

10   that, till the payments are made is probably about a two, is

11   about a two year period compared to eight years.  And, you

12   know, in a situation, Your Honor, where um, where farmers

13   are experiencing what they are experiencing in Vermont, and

14   a lot of them going out of business, I -- it has always been

15   my view of the case, even someone who loves to try cases, it

16   has always been my view that the best result for farmers in

17   this case is to reach a good settlement.  The sooner you

18   reach a good settlement I think it's a better outcome for

19   farmers than letting the process run its course forever up

20   here.

21           I want to be very clear, I mean, in some respects

22   I think one of the strongest indications of how well counsel

23   -- on how well the class is represented here is that, you

24   know, we are absolutely prepared to go to trial in this

25   case.  In fact, frankly, at this point, at this point we're

1    basically prepared to go to trial with DFA -- the soonest

2    trial date we can get.  And I understand there are other

3    obstacles -- there are other hurdles that have to be

4    crossed.  And there's a schedule, a schedule -- but we're at

5    the point where we're going to start pushing for the

6    earliest trial date you'll give us.

7              So, you know, what you've got in terms of

8    representation of this class, and it is relevant to the Dean

9    settlement, is you have counsel that is absolutely prepared

10   to do whatever they need to do to get this case ready to

11   trial and to go to trial against defendants that are -- have

12   vastly greater, vastly greater resources.  And you see that

13   in the work that we've done in connection with DFA.  We've

14   reviewed millions of documents.  We've taken 70 depositions.

15   We just gave them 300 pages of interrogatory responses.  Our

16   expert work is on track.  I think the expert work is

17   exceptionally good.  You know, we are absolutely good to go.

18   But at the same time -- and what that tells Your Honor is

19   that this is not a class that is represented by people that

20   are eager to settle this case at all.  It's a class that's

21   represented by people that are absolutely ready to go to

22   trial and firmly believe that DFA has, in fact, violated the

23   law.  But that doesn't mean that -- but our responsibility

24   to the class is that if there's an opportunity for a good

25   settlement that's the best resolution of the case.

 1          So it's -- at some respects I think if you look at

 2     our work in a broader context what you see is class counsel

 3     who are prepared to settle the case on reasonable terms, but

 4     are also prepared absolutely to go to the distance and have

 5     been sprinting for two years to accomplish that.

 6          THE COURT:  Well, as you know, the case law favors

 7     settlement.  And we don't expect people to go to trial as a

 8     matter of rubato.  So I understand your point, but it really

 9     isn't an either or situation for the Court.  The law favors

10     settled, settlements over litigation.  But I take your point

11     to be that if I set you a prompt trial date you would be

12     ready to press the case forward.

13          MR. PIERSON:  We absolutely would, Your Honor.

14     And, and the other point I'm making, Your Honor, and it's

15     really not to be an expression of rubato, but I think, you

16     know, the implicit question that the Vermont A.G.'s letter

17     raises, and it's just a question is, you know, do we need to

18     be concerned here that counsel, you know, was in a race to

19     settle the case and settle it for too small amount.  I mean

20     that's kind of the implicit underlying -- maybe it is, maybe

21     it isn't.  That's kind of how I read it.  And that's really

22     the point I'm making is that, you know, this is a situation

23     where you got real litigators who are doing what real

24     litigators do and are absolutely ready to go to trial

25     whenever we can get a trial date.  And the settlement with

Dean was negotiated in that context by that kind of counsel.
We thought it was a good settlement.

Today I think it's, you know it's really easy to
judge these things for the benefit of hindsight or 20-20
vision.  It's really easy to attack them.  I think it's a
great settlement.  I think it's a really good settlement.

THE COURT:  I think you may be reading too much
into the letter.  We can hear from the Vermont Attorney
General as to what was implied.  I took that to mean a
realistic assessment that a case that settles on the eve of
trial is likely to have a higher settlement having crossed
the threshold of class certification, motion for summary
judgment than a settlement in say three quarters of the way
through discovery without having passed through the fire of
summary judgment and not knowing what claims are going to
make it to trial.

So I, I thought that was a realistic assessment
that we're talking about apples and oranges in terms of when
these cases settled.

MR. PIERSON:  You know, Your Honor, I think that
is exactly right.  I mean the reality -- I mean, you know,
you've been in the profession for a long time too.  The
reality there's a premium if you get over all those
obstacles and you're on the eve of trial.  And that premium
can come at a cost, it comes at considerable risk, but there

1    is a premium.

2          But what the Second Circuit has said -- the Second

3    Circuit has said that with regard to class actions the

4    preference is that they settle so you don't actually get all

5    the way down the road.  That's the preference.  And

6    sometimes it plays out that way.  But the preference is to

7    try to reach a negotiated settlement of these things.

8          And so it, you know, implicit in that is, you

9    know, I think is the view that, you know, you can't then say

10   that a case that settles before all those hurdles are

11   crossed, you know, that people should be penalized for that

12   in some way or the settlement should be disparaged or

13   criticized.  I mean, you know, it's implicit in saying we

14   hope for the judiciary and the parties that when we settle

15   cases there's a recognition that that means that that

16   premium from surviving all those risks may not be real.

17   It's just a better outcome.  I mean that may be another way

18   of sort of stating what the Court's stating.

19         Let me comment a little bit so, on Mr. Gorton's

20   comments.  And I don't have a lot to say about him.  I mean

21   I think he's, you know, as I've said twice, he's really

22   impressive and he is really impressive.  And, you know, I

23   hope if we've convinced the Court of anything in this case

24   is that we're really trying to get this right.  And the

25   issues are complicated.  We're just working really hard to

1    get it right.  And so in that context I'm glad to hear what
2    Mr. Gorton has to say.
3              In terms of his, you know, he kind of makes I
4    guess a couple points um, that I would like to comment on.
5    You know, one point is the notion of sort of long-term
6    relationships and gee is Dean going to retaliate against
7    farmers and lower the price.  I guess that may be a fair
8    crystallization of it.  And, you know, what I would say
9    about that is that -- I guess I would say a couple things
10   about this.  Number one, you know, this is the view of one,
11   of one objector.  And, frankly, in terms of -- I want to
12   answer another question Your Honor raised, which is the
13   change in um, in location.  And I know what we did in
14   connection with that was that we contacted Mr. Gorton
15   because he was the one -- and I can't tell you whether we,
16   whether we contacted the other objector who just wrote a
17   sentence or two.  I just don't know the answer to that.  But
18   I do know that I told our co-counsel, and I notice, and
19   Mr. Gorton I hope will correct me if I'm wrong, but I
20   specifically told my colleagues call Mr. Gorton, make sure
21   he understands the hearing's down here because I want to,
22   you know, he was entitled to express his view.  And I wanted
23   to make sure that he knew where it was.  I also told my
24   colleagues where it was because I also wanted to make sure
25   they would be here.

1            On the merits though he basically says a couple

2      things.  Um, one is this concern that, that um, that I guess

3      that Dean will sort of retaliate and lower their prices

4      further because they are going to be unhappy with the

5      farmers.  And what I would say about that are a couple of

6      things.  Number one, I mean Dean and DFA have been pretty

7      tight in these cases.  I mean they are all sitting at the

8      same counsel table.  I know this is not a criticism, but

9      there's no indication -- there has been no indication of

10     antagonism resulting from the litigation or their relative

11     postures in all of this case.

12            You know, we have looked at millions of pages of

13     Dean and DFA documents.  And whatever they tell you I can

14     represent to the Court there has been no indication of any,

15     anywhere of Dean saying a bunch of these farmers are suing

16     us that's the reason to try to drive the price lower nor

17     have there been any suggestion in any of the DFA documents

18     over the four years of litigation in the southeast or the

19     litigation in the northeast that that is happening.

20            The position they've taken in their documents and

21     in the litigation is, DFA is trying to drive down or that

22     Dean wants to negotiate a low price.  And if Mr. Gorton is

23     suggesting that now they are going to be mad and we'll

24     negotiate a lower price I just don't think -- I just don't

25     think the evidence really --

1          THE COURT:  I think you may be reading too much

2    into that because I think he said that we have a very

3    complicated issue and the way farmers survive is by over

4    producing and that's not necessarily the way to go and what

5    I need to do is be paid a fair price.  And my only regret is

6    the Court has only so much power to affect those kinds of

7    changes.  But I didn't actually even hear him object to the

8    amount of the settlement.  His criticism was to the amount

9    of the attorney's fees.

10          So I would direct that -- and I actually noted

11   Mr. Gorton to say Dean was a valued customer and no

12   suggestion that he was concerned that Dean would retaliate

13   against.

14          MR. PIERSON:  Well, I may not be doing justice to

15   him.  I mean he spoke quite a while and he spoke

16   articulately and he expressed some complex ideas.  And I

17   don't mean to oversimplify and I certainly didn't mean to

18   inaccurately state it.  So, but I would like to address his

19   point about fees because I think it's -- I think it's really

20   a significant one as a matter of public policy.  And um, let

21   me say a couple things about that.

22          I mean, number one, I think it is significant that

23   there have been no other objections.

24          THE COURT:  But we had a sliding scale.

25          MR. PIERSON:  We did have a sliding scale, but the

1    fee petition explained -- the fee petition lays out what the

2    fee, what the fees that we sought are.  And there have been

3    no objections to that.  That's not an accurate statement.

4    Mr. Gorton has objected to it.  But the Attorney Generals

5    haven't.  It's an issue I've discussed with the Vermont

6    Attorney General.  I've explained our perspective, our

7    perspective on it.  And they certainly haven't weighed in

8    against the fees.

9            The Second Circuit law is, I would say, has a

10   vault in a pretty clear direction.  And I think it's a

11   sensible direction.  And I know how careful Your Honor reads

12   the briefs so I'm not going to belabor that.  The Second

13   Circuit has made it I think pretty clear that the percentage

14   method is, it's not the required method, but it's the right

15   method in the Second Circuit.  And District Courts have

16   really evolved in that direction, not just in the Second

17   Circuit, but I think -- but I think nationally.  And there's

18   some -- and there's some pretty compelling policy reasons

19   for that.  And they are explained in the briefs.  It

20   probably isn't worth belaboring it.

21           THE COURT:  Let me ask you about one thing that

22   I'm thinking about is that 33 and a third is what plaintiffs

23   could expect to recover for attorney's fees should they

24   prevail at trial.  And should it be something less than that

25   if the settlement is in, well in advance of trial and before

1    some of those hurdles had crossed and so is there any

2    thought in terms of adjusting it for the stage of the

3    litigation just as we adjust the amount of the settlement

4    for the stage of the litigation?

5            MR. PIERSON:  Well, Your Honor, my sense of that

6    is if you looked at it from a market point of view, you

7    know, the typically, you know, boy the contingency fee

8    arrangements, if you looked at it like an individual, and

9    it's not an unfair way to look at it, and, in fact, there's

10   some support in the Second Circuit that you really -- to

11   view it this way the way the market would deal with

12   contingency fee cases.  But, you know, in a contingency fee

13   case I think of this complexity in an antitrust case, you

14   know, it would be a very normal contingency fee arrangement

15   to provide for, you know, probably a 30 percent fee, plus

16   expenses at the outset, you know, and maybe if the case was

17   resolved in a month or two.  But for a case that really got

18   litigated and the percentage, you know, if to the extent --

19   I mean often, you know, many of the contingency fee

20   arrangements I've seen don't differentiate for the situation

21   whether a case goes to trial or if it doesn't.

22           THE COURT:  Some of them do.

23           MR. PIERSON:  Some of them absolutely do.  But,

24   but I can tell you as someone, you know, who has now been

25   doing this long enough and has seen it from the other side

there is no possibility in the market that, that plaintiff's
attorneys would take this case on without an agreement that
if you were going to litigate this case as hard as we've
litigated it, we've invested $13 million of time and fees in
the case so far, and it continues to accumulate.  And um,
nobody in the marketplace would take that case on without
being assured of a return of at least 30 percent regardless
of whether it went to trial; 30 percent plus fees.

        And, and that's not just my speculation, Your
Honor.  There is evidence of that.  I mean, I think, you
know, one of the important ways to view our work is, you
know, Your Honor alludes to the statute of limitations issue
and certainly some of the conduct we've been challenging has
been going on for a while.

        You know, there are no individuals who have been
able to pursue these claims on an individual basis.  There
are no other class action lawyers that stepped up.  There
are no law enforcement agencies that were prepared to take
this on.  And, frankly, most law enforcement agencies,
particularly State A.G.'s Offices don't nearly have the
resources to take them on.

        So at one level, Your Honor, with regard to these
claims, you know, the market has sort of spoken.  No one
else was prepared to do this, Your Honor.  And, and, and,
frankly, Your Honor, it's a case that absolutely should have

 1    been brought.

 2            And I, I mean you've seen a lot of evidence now

 3    and this is not the time or place to speak of it.  The

 4    evidence is compelling.  It is a case that should have been

 5    brought.  And the private market was not bringing it.  And

 6    I, you know, I think -- so there are a couple of points in

 7    connection with that that I would like to make about fees.

 8            First, I think it is important -- so in terms of

 9    the percentage method, you know, there is a great deal of

10    case law, and I'm not suggesting it's every case, but there

11    are many cases within the Second Circuit that have said

12    30 percent, 33 and a third percent and expenses is

13    reasonable.  One case describes it as eminently reasonable.

14    I think we cite nine or 10 cases for that proposition.  And,

15    again, I'm not claiming that it's universal, but there is

16    ample support for that proposition.

17            Secondly, what the cases say -- the way load star

18    is primarily used now, Your Honor, as you know, this is a

19    check, this is a double check to make sure it's not out of

20    proportion.  I mean here, you know, if the load star tells

21    you anything it tells you that we're stupid.  I mean in the

22    sense that, you know, I mean our load star exceeds,

23    substantially exceeds the fee that we're requesting.  So,

24    you know, not only does it -- does it not reflect a risk

25    premium in the case where the risks and burdens are

```
 1   enormous, you know, we're not even -- we're seeking an
 2   amount that's below our load star.
 3          The other obser -- I guess there are two other
 4   observations I would like to make about the fees, Your
 5   Honor.  One is that, you know, I can tell you as an officer
 6   of the Court and as somebody who has been doing this for a
 7   long, long time on, on both sides of the equation, while the
 8   fee may seem like a lot, and it is a lot, given the
 9   complexity of this litigation, this case has actually been
10   done in an extremely efficient way.  I mean it's just, this
11   is what it takes to litigate a case like this.
12          My view as a litigator, and it was, you know, my
13   partners used to get mad at me about this when I was at a
14   big firm, I'd do big leverage cases and get big staffs
15   together.  I've always believed cases are most effectively
16   litigated with the smallest team you can bring that's
17   consistent with getting the work done.  And that's what
18   we've tried to do here.
19          So Your Honor gave us directions I think about a
20   year ago, which was, you know, you basically -- you didn't
21   want more than two people showing up at depositions.  I
22   think that was one.  There were a number of ground rules.
23   And I will tell you Your Honor -- I mean I took about 10
24   depositions in this case in the last couple of months.  And
25   I mean it was almost a full-time job.  There were a lot of
```

 1   senior witnesses.  It was more than a full-time job.  You

 2   know, rarely was there a second attorney there on our side.

 3   Never was there a paralegal there.  You know, I went out

 4   there and did them alone, carried my own boxes and did what

 5   a real litigator ought to do.  And that is what everyone on

 6   our team did.  That's what Mr. Manitsky did.  So not only

 7   did we not overstaff it in the way Your Honor was

 8   legitimately concerned about, we were erring in the other

 9   direction.  And there was a compelling reason for that.

10   There was a lot of work to be done and a limited amount of

11   bodies to do it.

12          The other observation I want to make about this,

13   Your Honor, and I really think this is fundamental and um,

14   this is really a benefit, I think in my perspective from

15   being on the other side of these cases, you know, I can

16   virtually guarantee you that -- in fact, there's no doubt in

17   my mind that whatever resources we've devoted to prosecuting

18   these cases the other side has devoted significantly more.

19   Where we bring one attorney they bring two attorneys, they

20   bring three attorneys.

21          Where we carved out the Dean preliminary

22   settlement there are, you know, there's the counsel for DFA,

23   there are three other lawyer firms DFA has paid for.

24   There's a huge dissimilarity in resources.  And that's fine.

25   I'm not criticizing the defendants for that.  I did the same

1    thing when I was on the defense side.  But it has a real

2    implication, Your Honor, which is these cases cannot be

3    brought and litigated successfully if plaintiff's counsel

4    has to tie their hands behind their back.  You know, if, if,

5    if the way the system worked was that they can devote

6    enormous financial resources to expert work and bringing

7    attorneys etcetera, etcetera, and we have to devote one

8    sixth of the resources of that the cases can't be won.

9         So, you know, what we've done, Your Honor, and I

10   say this as someone whose been doing it a long, long time,

11   is we've tried to litigate the case really, really

12   efficiently, but we've also tried to litigate it extremely

13   well and not get crushed by the other side's resources.

14        Your Honor, our fee petition is an expression of

15   that, Your Honor.  That's, I mean, it's simply what it

16   takes, Your Honor.  And if we want cases like this to be

17   brought, if we want firms to be able to bring cases like

18   this the attorneys have to be able to litigate it with some

19   level of comparable resources to the resources the

20   defendants bring to the table and the defendants have to be

21   compensated for that -- the plaintiffs to have compensated

22   for that.

23        And, you know, at one level, I mean, you know, I'm

24   very sympathetic and supportive of these farmers.  And, you

25   know, it's, it's simply a practical necessity that attorneys

1    get well compensated for their work in a case like this.

2           And I think, you know, and so I think the short

3    order is the case has been litigated really efficiently,

4    people have been working really, really hard in a dedicated

5    way.  This is what, just what it costs.  I think more

6    resources have been expended on the other side.  The fee

7    requests we're making is consistent with Second Circuit law

8    and it really rewards nothing for risk in a case where the

9    risk was very high.  And that's -- I'm not complaining about

10   that.  That's just the way it is.  But I think, Your Honor,

11   that the fee request is eminently releasable and is really,

12   you know, if we can't fully compensate attorneys for doing

13   this kind of work these cases won't be brought.  And that,

14   that would really undermine a strong policy in the Second

15   Circuit and elsewhere for private enforcement of the

16   antitrust laws.

17          THE COURT:  What about the incentive fees for

18   class representatives?

19          MR. PIERSON:  You know, I want to check on that.

20   Can I just ask my co-counsel?  I asked him to check on that.

21          THE COURT:  Sure.

22          MR. PIERSON:  Yeah, Your Honor, what the answer to

23   is that um, on the website -- so what the notice -- and I

24   can -- I'm kind of doing this from the advice I've gotten

25   and my understanding.  So if I've got it wrong I'll correct

1    it later.  But here is what my understanding is, the notice

2    tells everybody in the class that they can get -- to get

3    information about the case when it's posted on the website.

4    It's on the claims administrator's website.  So on the

5    claims administrator's website we posted the fee petition

6    including the request for the incentive fees.

7           The request for incentive fees is quite standard.

8    You know, I would say neither high nor low.  It's just it is

9    what it is.  But all of that information is posted on the

10   website.  None of the Attorney Generals have objected to the

11   incentive fee or the fee request.  And none of -- and

12   there's been -- there's been the one objection from

13   Mr. Gorton.  Does that answer?

14          THE COURT:  Well, my question was prefaced by

15   didn't come at preliminary approval, the Court did not pass

16   on it.  My concern is how can you object to something that

17   you don't know about?  You've said, well, it's on the

18   website.  One of the reasons why I got involved in what the

19   notice should say is I found some ambiguities.  I thought

20   the class should know that it wasn't a lock, that it was

21   going to be 33 and a third, that they should be able to

22   evaluate the range and understand it was the Court's

23   responsibility.  I don't recall even addressing the issue of

24   incentive fees.

25          MR. PIERSON:  I mean that's a fair question, Your

Honor.  And, and it is a fair question.  And I -- I'll, you

know, the Court will have to, you know, the Court will

obviously make a decision, but all I can tell you is that it

is -- that it's standard.  I mean it's well within the norm.

And, you know, frankly, in a case where, you know, there's

an argument for a higher incentive fee, there's a real

argument.  In the Southeast -- in the Southeast I believe

the preliminary approval I think it's a $10,000 incentive

fee.

And, you know, it's a really reasonable request,

particularly in a case like this where, you know, these guys

stepped up and um, you know, took a risk in, you know, in

suing what is a major portion of the market.  I mean you

want to talk about fear of retaliation or fear of the

concerns for their livelihood.  These guys really took a

risk.  So I think, you know, it's quite -- it's quite a

standard and justified request.  It is on the website.  I

understand the Court's point, but I do think that the

information is out there.  And I just think it's fully

appropriate in this case.

And in terms of, you know, what we're talking

about here, you know, it's, you know, a very modest amount

in terms of -- in terms of the amount at issue.

THE COURT:  All right.  And I believe your client

wanted to speak?

1           MR. PIERSON:  Can I just speak with them for a

2    moment?

3           THE COURT:  Yes.

4           MR. PIERSON:  Your Honor, can we have a brief

5    recess?

6           THE COURT:  Pardon me?

7           MR. PIERSON:  With your indulgence can we ask for

8    a brief recess?

9           THE COURT:  Sure.  We will take, it's about time

10   for our mid-morning recess anyway.  We'll take approximately

11   10 minutes.  You have all day, but at 11:45 we are going to

12   exceed the courtroom to Judge Hall who is going to use it

13   for ceremonial purposes over the noon hour.  If you need

14   time in the afternoon we'll have it as well.

15          MR. PIERSON:  Thank you, Your Honor.

16          (The Court recessed at 10:40 a.m. and resumed at

17   10:50 a.m.)

18          THE COURT:  We're back on the record in Allen et

19   al versus Dairy Farmers of America, Inc., et al.  And, Mr.

20   Pierson, we were in your presentation.

21          MR. PIERSON:  And I appreciate your indulgence,

22   Your Honor.  And there are a couple things I want to share

23   with you.  And I'll try to be as quick as I can.

24          The most fundamental one is this, is that the

25   clients are really not in it for the money.  I mean they --

1    the damages are real and they think people should be

2    compensated but, but what they -- the reason they stepped up

3    and participated in this lawsuit was out of real concern for

4    what's happening with competition in this industry and

5    practices that they regard as illegal and we regard as

6    illegal.

7            And, you know, what they hope to see in the -- at

8    the end of the day in the litigation, and as we go forward

9    against DFA, they really want changes in the industry that

10   will improve the situation for everybody and help farmers

11   get a fair deal and help farmers stay in business and help

12   farmers get the benefit of fair competition.  And that is

13   extremely important to them.  And that's what we'll be

14   pursuing in terms of injunctive relief against DFA.  And

15   we're committed to doing that.

16           The other thing that I know from talking with them

17   that I wanted to reiterate to the Court, it's something

18   we've spoken about before, but it's also really important to

19   them, is one of their goals in this litigation is to shed

20   light on what's been going on in the northeast.  And so a

21   frustration that, a frustration that they've had, and it's

22   an issue we've discussed before, is the volume of stuff that

23   is under seal and how hard it is to sort of get all the

24   stuff out to light.

25           And what, what I've communicated and committed to

```
 1   them is that, you know -- and I think the Court has some
 2   sense of this, is that we're working pretty hard to try to
 3   get -- I mean there's some stuff, and we talked about it
 4   before, pricing information in the last year or two that
 5   stays under seal until the case goes to trial.
 6           But, but our view is that the overwhelming
 7   majority of facts in this case should be part of the public
 8   record and should be brought to light.  The Vermont Attorney
 9   General has started to post some of this on the website,
10   but, but, you know, there's a lot of talk in this case about
11   farmers versus farmers.  And I think, you know, the starting
12   point, from our perspective, and I think the clients agree
13   with this, is, is let people find out what the real facts
14   are and then you may see a lot less division than is
15   professed by the defendants.
16           So I just -- I hope I've communicated what you
17   wanted me to communicate.  But the point is they want to see
18   the industry change in a way that's better for everyone.
19   That's extremely important for them.  They want the real
20   facts to come out.  And we're going to do what we need to do
21   in this case to make sure that happens.
22           THE COURT:  Did you want to say something
23   yourselves?  You are free to do so.
24           PLAINTIFF:  No, Your Honor.  Counsel said it.
25   Thank you.
```

1          THE COURT:  How about you, sir?  Are you together

2    then?  Yes.  Yes, okay.  And neither of you want to say

3    anything.  You don't have to.  I just wanted to make sure

4    you have an opportunity if you want to.  I know Mr. Gorton

5    would like to respond to counsel's remarks after they've

6    been concluded.  And I think that's fine as well.  That's

7    what we're doing in a fairness hearing.

8          Let's turn to you Mr. Friedman.

9          MR. FRIEDMAN:  Thank you, Your Honor.  Hopefully I

10   can be reasonably brief.  I want to first comment on

11   Mr. Gortman's remarks and what I understood him to be

12   saying.  And during the break I did have an opportunity to

13   chat with him briefly as well.  And I think, first of all,

14   he is a very eloquent and passionate person about his

15   concerns about the dairy industry.

16         The fundamental take away that I understood from

17   him is that the mechanism for determining, discovering,

18   establishing prices for raw milk in the dairy industry isn't

19   working.  Fundamentally, however, that pricing mechanism is

20   a creature of federal regulation because 90 percent of the

21   pricing is established every month by the United States

22   Department of Agriculture using national metrics that

23   Mr. Gortman believes, I think, don't set an appropriate fair

24   proxy, don't have any real relationship to cost or market

25   prices.

1            THE COURT:  I think you've accurately summarized

2    what I took him to be saying.  My regret is over promising

3    what the Court can do because it -- not all of this is

4    within the Court's power.

5            MR. FRIEDMAN:  And, and I think that's exactly

6    right, Your Honor.  Litigation is a relatively blunt

7    instrument when it comes to addressing policy issues such as

8    those expressed by Mr. Gortman.  So I think that's where we

9    find ourselves with respect to his valid concerns.

10           Let me speak to the settlement and the fairness of

11   the settlement itself.  And I think it is important to

12   underscore that the issue before the Court is whether this

13   settlement is fair and reasonable to the class.

14           And I will tell you that from my perspective and

15   my client's perspective it's a lot of money.  And it is a

16   lot of money particularly in a case where Dean Foods

17   continues to maintain that it has not violated the law.  And

18   there's no admission of liability here.  There's no

19   admission of liability in the Tennessee settlement.  And I

20   will talk about the differences between the two cases in a

21   moment.

22           One of the things that I think bears highlighting

23   in terms of the Court's assessment of the fairness of this

24   resolution is in the plaintiff's memorandum in support at

25   Page 11.  And they note that the 30 million dollar payment

equals about 20 percent of the total amount of over order

premiums that Dean paid to the settlement class during the

class period.  By any measure -- and that over order premium

is the only portion of the price that is set by the parties

in this lawsuit.

So, a 20 percent recovery in effect is a

sur-charge that Dean is being assessed or a tax that Dean is

being assessed on the prices that it paid to class members

for the milk that it bought over the course of the class

dispute.  That's a very substantial recovery by class action

standards, by antitrust jurisprudence standards.  And the

plaintiffs have cited a number of cases talking about

recoveries that are much, much smaller.  So if we just take

an objective examination of what's the recovery here as a

percentage of the prices that were paid it's substantial.

With respect to what went into the settlement, and

it certainly is correct that there was an arm's length

negotiation between the parties and both parties were fully

informed.  To be sure I started at a much lower number than

we ended up.  And they demanded a higher number than we

ended up.  And that's the nature of compromise.

In terms of where this case was, discovery of Dean

in depositions in this case had not been taken when we

settled.  But, as Your Honor knows, extensive deposition

discovery of Dean had been taken in the Tennessee

1    litigation, all of which was available to the lawyers in

2    this case.

3            So the negotiations occurred in the context I

4    think of a fully revealed record.  Since the settlement

5    there were only four additional depositions of Dean, current

6    or former Dean employees, taken.  And those, I think it's

7    fair to say, didn't add or subtract to the knowledge that

8    informed the decision to settle.

9            THE COURT:  And nothing about the settlement

10   precluded them from taking more should they have decided it

11   was necessary?

12           MR. FRIEDMAN:  Well, we, we had agreed that we,

13   that they could take -- they would treat us as a third party

14   to take up to four.

15           THE COURT:  Right.

16           MR. FRIEDMAN:  I don't think they would have been

17   permitted to take more than four depositions.

18           It is, it is the case that the statute of

19   limitations issue in my mind played a significant role in

20   valuing the case.  And it was a point of disagreement,

21   frankly, between counsel as we negotiated it.  But I can

22   tell you quite frankly that my position was if you try this

23   case against us you're going to get damages for four years,

24   period, full stop.  It's not going to go back beyond four

25   years from when the complaint was filed.  And they take a

1    different view, but in terms of looking at the risk in the

2    case that was very clearly our position.

3            In contrast -- and the reason for that is, and you

4    may remember, in their complaint there are no acts in

5    furtherance of the conspiracy that are identified committed

6    by my client that occurred within four years of the

7    limitations period.  So if they wanted to take advantage of

8    fraudulent concealment and continuing conspiracy theory they

9    needed to have identified something like that.

10           So our position, as part of negotiation, as part

11   of an evaluation of the case was it was a four year damage

12   period was our risk.  All right.  So that's one point.

13           The second point is that this is a case that came

14   to a settlement negotiation and a conclusion with a fully

15   formed or almost fully formed record from, from my client's

16   perspective.  And so we knew, and the plaintiffs knew, that

17   the fundamental theory in the case, and it's in their

18   interrogatory answers, their theory is that a conspiracy was

19   hatched in 1998.  That's their theory.  We disagree.  We

20   don't think they can prove it, but that's their theory.

21           And what their expert Gordon Rausser said, and

22   he's their expert in Tennessee, and he's their expert here,

23   he said the conspiracy was formed in 1998, but it couldn't

24   be implemented until the end of 2001 when Suiza and Dean

25   merged.  Rausser says that's the overt act that enabled the

1    parties to engage in any competitive behavior.  Again, we

2    don't agree with that, but that's his position.

3           Well what's significant about that in terms of

4    evaluating the exposure in this case is that the merger

5    between Suiza and Dean had virtually or no impact in order

6    one.  And the reason I say that is this, Legacy Dean, which

7    was a party to the merger, had one plant in order one.

8    That's it.  So Suiza and Dean didn't increase their

9    concentration in order one by reason of the merger.

10          Second point is what Professor Rausser says

11   happened as a result of the merger is the merged entity

12   divested 11 plants throughout the United States to this

13   newly formed entity, NDH, National Dairy.  None of the

14   divestiture plants was in order one, not one of them.  Most

15   of them were in the southeast, not all of them, but most of

16   them.

17          And according to the plaintiffs the divested

18   plants in the hands of NDH really operated as a tool, a

19   puppet, an entity under the control of DFA.  And so the

20   theory, according to Rausser and the plaintiffs in the

21   southeast is that DFA controlled the processing plants that

22   NDH owned and had a full supply agreement with Dean for its

23   processing plants.  And so the combination of those gave the

24   so-called conspiracy control of 70 to 80 percent of bottling

25   plant demand.

1          It wasn't all in Dean's hands.  The experts, the

2     plaintiff's experts say Dean, after the merger, had about,

3     somewhere between 40 and 43 percent of the class one

4     bottling capacity.

5          So let's compare that to what we have here.  You

6     heard Your Honor I think in April Mr. Pierson acknowledged

7     that when they alleged Dean's market share in order one in

8     their complaint they were off a bit and their best estimate

9     now is somewhere in the mid 20 percent share.

10          Okay.  Now, what about the rest of the processing

11     world?  Well, NDH is not a factor in the northeast.  It's

12     essentially not present as a processor.  Hood has the second

13     largest share.  And it, just making sure my phone was off,

14     Your Honor.  I heard a ring in the background.

15          Your Honor dismissed Hood on the motion to dismiss

16     because the plaintiffs were not able to allege facts

17     sufficient to withstand a 12 (B) 6 standard.  So there's

18     really, from my perspective, evaluating the risk, no

19     evidence of a processor conspiracy that is wrapping up

20     control or access to processing plants in order one.  It

21     makes a huge difference in terms of our assessment of the

22     risk, likelihood of plaintiff's success, likelihood of a bad

23     outcome.  So those, those facts make a huge difference in

24     our assessment.

25          And then let me just turn to the procedural

1    posture of the case because clearly it makes, it makes a big

2    difference.  And I will preface what I'm about to say, I'll

3    say it once so I don't have to keep repeating it.  Judge

4    Grear in Tennessee has made a substantial number of rulings

5    and moved the case forward.  And we disagree with many of

6    his rulings, but they are the rulings of the Court.  And

7    they put us in the posture we found ourselves last week.

8            So the hurdles that the plaintiffs in Tennessee

9    passed, that have not been even crossed yet by the

10   plaintiffs here, include class certification.  And in

11   Tennessee we petitioned for interlocutory appeal.  The Sixth

12   Circuit turned it down so they survived that.  There are two

13   pending motions to decertify the class.  The Court hasn't

14   ruled on those yet.  Motions for Summary Judgment briefed,

15   argued, decided.  Three counts were dismissed, from my

16   perspective that was great, but two counts survived.  And

17   those two counts, conspiracy in restraint of trade under

18   Section 1 and conspiracy to monopolize in violation of

19   Section 2, frankly, are sufficiently large to encompass

20   everything that the plaintiffs in Tennessee were complaining

21   about.

22           There were 70, don't blanch, but 70 motions in

23   limine that were filed.  The Court held argument on those

24   over the course of two days and delivered oral rulings on

25   many of them.  So we knew -- the, the written rulings were

still coming out.  But we knew that the case was going to
survive with some whittling back, but largely in tact.

So we reached an agreement with the plaintiffs in
Tennessee days before the final pre-trial conference knowing
that they had survived all of the milestones and it was a
virtual certainty that if we didn't resolve the case it was
going to go to the jury with a very large damage number with
substantial risk and exposure.  And under those
circumstances were the plaintiffs able to extract from us a
larger settlement?  Yes, they were.  It is the nature of
litigation.

So we have a situation where the risk profile of
this case to my client is much lower than the risk profile
of the Tennessee case.  And procedurally the plaintiffs had,
had crossed every milestone short of going to a jury and
hear all of those milestones lay before them.

So given that I think that really addresses the
question that I took the Attorney General to be asking,
which is we think $30 million seems like a fair and
reasonable settlement, but we understand that there's a
larger settlement in Tennessee and we'd like somebody to
explain whether that causes anybody to question whether the
settlement in the northeast litigation is fair.  So
hopefully I've answered that.  If Your Honor has questions
I'm happy to take them.

 1              THE COURT:  No.  You have addressed it.  Thank

 2   you.

 3              MR. FRIEDMAN:  Thank you, Your Honor.

 4              THE COURT:  And Mr. Gorton did you want to say

 5   something further?  You may do so.  And then we'll let Mr.

 6   Pierson as the moving party have the last word.

 7              MR. GORTON:  Thank you, Your Honor, for the

 8   opportunity to speak again.  I would like to address two or

 9   three things that were said.  First off, I would like to

10   confirm that Mr. Brown did, in fact, contact me and make

11   sure that I knew that the venue had changed.  And in all of

12   our discussions Mr. Brown clearly was trying to understand

13   my position and my perspective of things.  He was clearly

14   trying to articulate his perspective.  And he obviously was

15   trying to convince me of his perspective, but he made it

16   very clear that in no way, shape or manner was he trying to

17   prevent me or was he even encouraging me not to present my

18   perspective.  And I appreciate that very much.  And I

19   enjoyed very much the conversations with him.

20              A couple of other things that I would like to

21   address.  First, the issue of representation.  I'm up here

22   as a single voice.  To be very honest with you when I talked

23   to Mr. Brown, Mr. Brown actually initiated contact.  He

24   called me when he got my letter.  And when I asked him and

25   he told me that I was the only farmer who requested to speak

```
1    that was sort of a combination of scaring, daunting.  And I
2    was, I was -- in some ways I was disappointed.  I really
3    thought that maybe more farmers would be interested and
4    willing to share their thoughts.
5             I think one, one big issue here is this is the
6    busiest time of year for dairy farmers.  And um, I think a
7    lot of farmers, number one, didn't have the time and, number
8    two, wouldn't necessarily be comfortable, while they might
9    be happy to discuss this issue at a dairy farmer meeting or
10   among friends and family, would feel very uncomfortable
11   standing up here at this podium and speaking.  And I am not.
12   I give technical presentations at engineering symposiums
13   national and international.
14            I would like to address a couple other things.  As
15   these lawyers said the federal -- there's this issue with
16   the federal minimum price.  And unfortunately, particularly
17   for class one milk, the federal minimum price, in fact,
18   bears no relationship whatsoever to what Dean Foods can sell
19   milk for and it has no relationship whatsoever to what dairy
20   farmers can produce milk for.
21            So as an indicator of what the price of milk,
22   particularly fluid milk, should be, it is like totally
23   worthless to all of us.  And that is in good part, you know,
24   what caused the problem.  And we recognize that you as the
25   Court can't change that.  But that -- and I say that because
```

1  that's the exact emphasis of the issue of long-term

2  relationship.

3          I already, I already have convinced Dean Foods to

4  pay me an over order premium.  They pay me more than they

5  absolutely have to pay me already.  And any change in that

6  negotiation position, which could be imperceptible, I

7  absolutely agree, you know, I'd have no thought whatsoever

8  that Dean Foods is going to stand up tomorrow and say you

9  dairy farmers sued me so you are not going to get an over

10 order premium.  They are not going to say that, absolutely

11 not.  They need us.  We need them.

12         But, once again, my expertise in control and

13 monitoring, for example, if you have a thermometer that can

14 measure plus or minus five degrees you can't detect a change

15 of a tenth of a degree.  And a change in negotiating

16 position that would be imperceptible even to the Dean Foods

17 people and the DFA people who are negotiating, could more

18 than offset the benefit of this settlement.  And for me

19 personally my share of the settlement will not even, will

20 not even compensate me for the amount of time I have spent.

21 I attended the preliminary hearing.  I wrote a letter.  I

22 wrote this letter.  I have thought long and hard about what

23 to say at this meeting.  Several times this week my wife has

24 taken her to do list and said, John, why are you doing this?

25 And I said, well, honey, I think it's important to my

1    industry so I'm doing it.

2            And then I would like to address the issue of

3    representation of, representation of farmers.  So I haven't

4    had any opportunity, due to time and resources, to do any

5    kind of like survey or anything that I could claim that has

6    any illegitimacy.  I have spoken to lots of dairy farmers.

7    I would like to say two things.

8            First off, I believe in my heart that my position

9    represents somewhere between a majority and a vast majority

10   of dairy farmers in the northeast.  And the other thing I

11   will say that for the dairy farmers who support the idea of

12   competition, and that would be my last remark, talk about

13   competition, those who support that concept, the concept

14   that this lawsuit is promoting when that drives the price of

15   milk below cost of production, like it did in 2009, 2006 and

16   several other times, those farmers are the first farmers to

17   cry and shout the loudest and hardest that this system needs

18   to be changed.  And the reason for that is that competition

19   as the single driving force is in itself destructive.  I

20   already talked about in order to really satisfy things,

21   dairy farmers, our industry needs to over produce.  When we

22   over produce that competition forces our price down.

23           And the competition -- and even if it's the other

24   way, if something happens and milk turns short, competition

25   forces the price up.  That's good for dairy farmers, but it

1    forces the price up, as it did in 2008, to a price that's

2    not sustainable for them.  That doesn't do me any good and

3    it doesn't do them any good.

4          Just as in 2009 when it forced the price down to a

5    level that was unsustainable for dairy farmers, yeah,

6    instantly it was great for Dean Foods, but it's not in the

7    long-term interest to either of us.

8          And the problem with competition is that

9    competition in and of itself is a root, is a ruthless and

10   relentless driver that moves prices one way or the other

11   without regard to what is right.  If there's a little bit of

12   over supply it pushes prices up indiscriminate of what

13   really should happen.  If there's a little bit too much milk

14   it pushes prices down indiscriminate of what prices should

15   be.  And that is the reason -- those are the reasons that I

16   have the concerns that I have is that, once again, this

17   lawsuit, this settlement does not help me in any way, shape

18   or form to solve the real problems in my industry.

19         We've already heard, we've spent almost

20   $20 million in legal fees to get $30 million.

21         I'd also like to just mention Russ Consulting.

22   When I got notice I had a lot of questions.  I called Russ

23   Consulting.  I got several wrong answers.  I got several

24   nonanswers.  I discussed that issue with Mr. Brown at

25   length.  Basically if Russ Consulting were working for me on

1    one of my defense contracts as a program manager I would

2    have fired them.

3              THE COURT:  All right.  Thank you.  Mr. Pierson?

4              MR. PIERSON:  Your Honor, I think I can be very

5    brief.  Again, I appreciate Mr. Gorton's remarks, but I do

6    want to comment on, on one thing he said, which is, and it's

7    really to reiterate the client's point about the importance

8    of changes in behavior.

9              Mr. Gorton, I think his words were basically

10   competition is disruptive.  And, of course, he's entitled to

11   his opinion.  But DFA's antitrust complaint guidelines say

12   they will compete fairly and prescribe certain activities,

13   many activities that they say they will not do because they

14   are strictly prohibited.  And it's a black list of

15   activities.

16             And the record in this case I think overwhelmingly

17   shows that, in fact, that's exactly what DFA has been doing.

18   DFA is subject to a consent decree with the United States

19   Department of Justice in which it has both agreed and is

20   required to compete fairly.  We're going to hold them to

21   that standard.  It's a standard they've imposed for

22   themselves.  And we are going to seek relief in this case

23   from that defendant to achieve those goals.

24             THE COURT:  Thank you.  All right.  I will take

25   this matter under advisement.  I am setting myself a

```
 1    deadline of approximately 30 days.  The Court sets its own
 2    deadlines.  It also has the power to modify them.  But I'm
 3    going to try to get you a prompt response.
 4          I want to talk to counsel for all defendants,
 5    except for Dean now, about the motion for class
 6    certification and rescheduling it.  And my, my first remark
 7    is I agree that I set you a, I'll call it ambitious, and you
 8    might call it something else, discovery schedule in this
 9    case.  And for the most part all deadlines have been met.
10    If you need to extend a deadline you worked together and
11    modified it.
12          There's been very limited judicial intervention in
13    the case.  I told you I would not let this become the most
14    expensive case in the District of Vermont's history.  It has
15    not been from my perspective.  And it's been well managed.
16    Something has happened with the class certification where
17    people are filing 273 page exhibits to this Friday
18    afternoon.  Another one is pending approval now.  You
19    should -- it's always good to think of the decision maker in
20    what is that decision maker going to be able to digest and
21    pursue.  And nothing merits that kind of paper.
22          If you cannot present what you need me to know in
23    a succinct fashion then maybe it needs to go back to the
24    drawing board.  It's literally stacks and stacks of paper.
25    And you know my practice is to read every single thing you
```

1    submit.  But particularly lately it hasn't been a realistic

2    view of what the judge is going to be reading Sunday night.

3           So I want you to be cautious about that because I

4    want to give everything that you file my complete attention

5    and if you are being overly inconclusive and repetitive

6    that's not going to accomplish that.

7           Counsel has proposed certain dates for the hearing

8    in rescheduling the hearing in this case.  Unfortunately the

9    Court is going through its final renovations at that point

10   in time.  I know counsel has a trial coming up in the

11   Southeast milk case.  A couple thoughts as to how to handle

12   this.  We could do it on the papers.  And there certainly is

13   a lot of them.  We could reschedule the hearing and try to

14   give you some dates in late July, knowing that everybody's

15   probably got the summer booked, or we can do it after your

16   trial.  And I don't know when that's expected to end, but I

17   think you chose some August, perhaps 8th and 9th were days

18   that everybody was available.  It did not really appear to

19   work.  So let's hear, let's hear first from DFA and DMS

20   because we've made them stay silent during the case.

21          MR. SARTORE:  Your Honor, may my group be excused?

22          THE COURT:  Sure.

23          MR. SARTORE:  Thank you.

24          MR. HARDY:  Good morning, Your Honor.  Kevin Hardy

25   on behalf of DFA and DMS.  And I do just want to start by

 1    thanking counsel for the plaintiffs and the Court.  I know I
 2    speak on behalf of Mr. Kuney, we very much regret and
 3    understand the inconvenience and appreciates everyone's
 4    consideration.
 5            THE COURT:  We just hope he's well.
 6            MR. HARDY:  With respect to scheduling I have a
 7    couple thoughts.  The Court in Tennessee has advised the
 8    parties that in light of its criminal docket
 9    responsibilities it won't be -- we won't be in trial on
10    Mondays in that case.  So one possibility is to schedule it
11    for a Monday.
12            Another possibility is that Judge Grear in
13    Tennessee has indicated that for him the week of August 29th
14    he has his own scheduling issues that week.  So that might
15    actually -- I don't know -- I haven't -- I don't know what
16    plaintiff's counsel's availability is then, but I know he is
17    not available at the end of July.
18            MR. PIERSON:  Any of that is fine with us.
19            MR. HARDY:  So that would avoid a Monday hearing
20    which has some travel logistics, but that might be one
21    candidate option.  If we push it to the end of the Southeast
22    trial I regret, I think that ends up being late October,
23    which is a pretty lengthy, lengthy delay.  So perhaps a
24    Monday or the week of the 29th if that would work with the
25    Court's schedule.

1          THE COURT:  Does that work with you as well,

2    Mr. Pierson?

3          MR. PIERSON:  It does.  July really doesn't look

4    good for me, Your Honor.  I apologize for that.  But pretty

5    much any time in August that's convenient for them and I'll

6    make myself available.

7          THE COURT:  Well, my judicial assistant will work

8    with the two of you, we will get a date and we will reset it

9    promptly.  And that gives us enough time to work with.  I

10   don't see why we shouldn't be able to do it.

11         MR. PIERSON:  If I could make one other comment,

12   Your Honor, I don't think we would be opposed to having it

13   decided on the papers either.

14         THE COURT:  All right.  Well, you can talk between

15   the two of you if that's what you want to do.  My practice

16   is if a party asks for oral argument we generally grant that

17   request.  But I offered that as a possibility because

18   certainly it has been well briefed.

19         MR. PIERSON:  We'll certainly discuss that.

20         THE COURT:  Anything further on this matter?

21         MR. FRIEDMAN:  Nothing from us, Your Honor.

22         MR. PIERSON:  No, Your Honor.

23         THE COURT:  Thank you.

24         MR. PIERSON:  Thank you.

25         (The Court recessed at 1125 a.m.)

```
 1                     C E R T I F I C A T E

 2

 3           I, certify that the foregoing is a correct

 4   transcript, to the best of my ability, of the record of

 5   proceedings in the above entitled matter dated July 18,

 6   2011.

 7

 8                         _____

 9                              Anne Marie Henry, RPR
                               Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```