UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 AUG -3 PM 4:07

CLERK
BY ᵖᴹ
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, GARRET SITTS, )
RALPH SITTS, JONATHAN HAAR and )
CLAUDIA HAAR, on behalf of themselves )
and all others similarly situated, )
 )
 Plaintiffs, )
 )
v. ) Case No. 5:09-cv-230
 )
DAIRY FARMERS OF AMERICA, INC., )
DAIRY MARKETING SERVICES, LLC, )
and DEAN FOODS COMPANY, )
 )
 Defendants. )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
FINAL APPROVAL OF DEAN SETTLEMENT**
(Docs. 310, 327)

This matter came before the court on July 18, 2011 for a hearing on Plaintiffs' motion for an order granting final approval of the settlement Plaintiffs reached with Defendant Dean Foods Company ("Dean") on December 7, 2010 (the "Dean Settlement"). (Doc. 327.) Plaintiffs also request: (1) approval of class counsel's application for an award of $8.5 million in attorney's fees, as well as accrued interest, plus $1.5 million in costs and expenses; and (2) a $7,500 incentive award to each of the six class representatives. (Doc. 310.) At issue before the court is whether the Dean Settlement is fair, reasonable and adequate. *See* Fed. R. Civ. P. 23(e). With certain modifications, the court concludes that it is, and therefore grants final approval.

Plaintiffs are represented by Kit A. Pierson, Esq., and Andrew D. Manitsky, Esq. Dean is represented by Paul H. Friedman, Esq. and John T. Sartore, Esq. Mr. Grant John Gorton requested, and was granted, an opportunity to address his concerns regarding the Dean Settlement.

### A. Factual and Procedural Background.

In this lawsuit, Plaintiffs, on behalf of themselves and other dairy farmers who produced and pooled raw Grade A milk in Federal Milk Marketing Order 1 ("Order 1"), allege that Defendants Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), and Dean engaged in anticompetitive conduct in the dairy industry. In their 98-page, seven-count Revised Consolidated Amended Class Action Complaint, Plaintiffs allege, *inter alia*, that Defendants conspired to fix prices and monopolize and monopsonize the raw Grade A milk market in Order 1. Defendants deny Plaintiffs' claims.

In August 2010, the court granted in part and denied in part the motions to dismiss filed by each of the Defendants.[1] (Doc. 81.) The court set an expedited discovery schedule. Discovery in this case closed on May 20, 2011. In December 2010, Plaintiffs and Dean filed a motion for preliminary approval of the Dean Settlement. (Doc. 160.)

In March 2011, the court granted the Vermont Attorney General ("VTAG") permission to file an amicus brief in this action. Dean notified each attorney general whose state is located within Order 1 of the Dean Settlement. VTAG has submitted several letters to the court regarding the Dean Settlement.

On May 4, 2011, the court granted preliminary approval of the Dean Settlement, as revised. The revisions included the deletion of the injunctive relief provision in the Dean Settlement, clarification of the definition of the proposed settlement class, and inclusion of additional financial information.

   1.   *The Dean Settlement Agreement.*

As revised, the Dean Settlement Agreement identifies the proposed settlement class as follows:

> All dairy farmers, whether individuals, entities or members of cooperatives, who produced raw Grade A milk in Order 1 and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the Notice Date.

---

[1] Defendant H.P. Hood, LLC was dismissed at that time.

> Defendants' current officers and directors are excluded from the Settlement Class.

(Doc. 294-1 at 8-9.) Paragraph 9.1 of the Dean Settlement Agreement sets forth the amount of the Settlement Fund:

> Within fifteen calendar days after the entry of the Preliminary Approval Order, the Settling Defendant [Dean] will deposit a sum of thirty million United States dollars ($30,000,000) into an escrow account (the "Settlement Fund"), held and administered by Eagle Bancorp, Inc.

(Doc. 294-1 at 17.) Pursuant to the settlement, Dean admits no wrongdoing and Plaintiffs agree, on behalf of the proposed settlement class, that once the Dean Settlement Agreement becomes final, their claims against Dean will be released. Until such release, Dean has agreed to respond to reasonable discovery requests in the status of a non-party. To date, it has submitted to four depositions.

   2.   *Notice of the Dean Settlement.*

The Preliminary Approval Order required class counsel to, *inter alia*: (1) send notice of the Dean Settlement to members of the settlement class, via first class mail, within thirty days after the order was signed; and (2) publish a summary notice of the Dean Settlement in four agricultural publications widely circulated in the Northeast.

The Affidavit of Charlene Young (the "Young Affidavit"), Senior Project Administrator for the Dean Settlement Claims Administrator, Rust Consulting ("Rust"), details Plaintiffs' dissemination of the Dean Settlement notices. According to the Young Affidavit, Rust mailed to 9,067 prospective Dean Settlement class members a packet containing the Settlement Notice (the "Notice"), a claim form, cover letter, and envelope which contained information required by the court in its preliminary approval order.[2] The

---

[2] The Notice is an eight-page document which describes in plain, easily understood language the nature of the litigation, the terms of the Dean Settlement, the definition of the settlement class, how to request a claim form, how to submit a claim, how to obtain exclusion from the lawsuit, how to object, how to attend the court's fairness hearing, and what happens if a class member does nothing. It divides these topics into twenty-seven discrete questions that explain the Dean Settlement in even greater detail. The Notice also advises each class member of the right to be represented by his or her own lawyer, and the binding effect of the Dean Settlement if exclusion is not requested. The Notice directs settlement class members to the website established

United States Postal Service ("USPS") returned 201 of these mailings as undeliverable without a forwarding address. Rust obtained new addresses for 149 of these undeliverable packets and promptly re-mailed them. The USPS also returned ten notice packets that contained forwarding addresses; Rust re-mailed those packets as well. At the fairness hearing, Plaintiffs estimated that they sent individualized notices to 98% to 99% of the settlement class.

Through Rust, and pursuant to the Preliminary Approval Order, Plaintiffs also created a case-dedicated settlement website, www.NEDairySettlement.com, which became available on May 14, 2011 and includes links to the Notice, Claim Form, Dean Settlement Agreement, and other court documents. The website's opening paragraph states in bold:

> **IF YOU ARE A DAIRY FARMER WHETHER AN INDIVIDUAL, ENTITY OR MEMBER OF A COOPERATIVE, WHO PRODUCED RAW GRADE A MILK IN ORDER 1 AND POOLED RAW GRADE A MILK ON ORDER 1 DURING ANY TIME FROM JANUARY 1, 2002 TO MAY 23, 2011, A PROPOSED CLASS ACTION SETTLEMENT MAY AFFECT YOUR LEGAL RIGHTS**

(Doc. 327-3 at 22.) The website answers the following questions: "What is the lawsuit about? Who is included in the Dean Settlement Class? What are the terms of the settlement? What are my rights? What if I have questions?" (Doc. 327-3 at 22.) As of July 8, 2011, Plaintiffs estimate that this website had been viewed by approximately 1,456 visitors. In her Affidavit, Ms. Young noted that Rust established a toll-free telephone number, which went 'live' on May 13, 2011, and which provided a recorded message and access to a live representative to answer any additional questions. The toll-free number logged approximately 354 calls by July 8, 2011. (Doc 327-3 at 4.)

Rust, on behalf of Plaintiffs, also created a one page "Summary Notice" regarding the Dean Settlement which they published in four trade publications: *Country Folks*;

---

specifically for the Dean Settlement, and to Rust, for further information. Contact information for class counsel is also provided.

4

*Farming: The Journal of Northeast Agriculture*; *Farmshine*; and *Progressive Dairymen* (Northeast edition). The Summary Notice begins with the following statement: "**If Your Farm Produced Grade A Milk In the Northeast Since 2002[,] You Could Get Money from a Class Action Settlement.**" (Doc. 327-3 at 7.) The Summary Notice describes the Dean Settlement and briefly answers the following questions: "What is the Case About? Who is Included in the Class? What Does the Settlement Provide? How to Get a Payment?" (Doc. 327-3 at 7.) The final paragraph, entitled "Your Other Rights," sets forth the following information:

> If you do nothing, you will be legally bound by the Settlement, your rights will be affected and you will not be able to sue Dean for any claim relating to the lawsuit. If you do not want to be legally bound by the Settlement, you may exclude yourself from it by **June 27, 2011**. If you stay in the Settlement, you may object to it by **June 27, 2011**. The Court will hold a hearing on **July 18, 2011** to consider whether to approve the Settlement and a request by the Class lawyers for up to one-third of the settlement amount ($10 million) in attorneys' fees, plus costs, expenses, and incentive fees for the dairy farmers who brought the lawsuit. You do not need to attend the hearing. If you wish, you or your own lawyer may ask to appear and speak at the hearing at your own cost.

(Doc. 327-3 at 7.) The Summary Notice provides the Settlement toll free number and web address if class members wanted more information and a claim form.

The court finds that the Notice of the Dean Settlement fairly and reasonably apprised settlement class members of the nature of the lawsuit, the nature of the Dean Settlement, their right to object and to request exclusion from the settlement class, the time and manner for requesting exclusion, and the consequences for failing to do so. The Notice also provided settlement class members with clear directions as to how, when, and where to present any objections to the Dean Settlement, and of their right to be represented by their own attorneys. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (observing that notice must be reasonably calculated to apprise the class of the pending action and to afford class members an opportunity to object). The Notice was supplemented by the Summary Notice, the Dean Settlement

website, and toll-free number. As a result, the court finds that Plaintiffs have provided the best practicable notice under the circumstances. *See* Fed. R. Civ. P. 23(c)(2).

### 3. *Objections to the Dean Settlement.*

Rust received four requests for exclusion from the Dean Settlement. Two class members objected to the Dean Settlement, including Mr. Gorton. At the July 18th hearing, Mr. Gorton expressed: (1) a concern that this lawsuit will do little to change the conditions in the dairy industry which are causing price instability, overproduction, and underpayments to farmers; (2) a desire to preserve a relationship with Dean which Mr. Gorton described as his "best customer;" (3) a concern that unregulated competition is destructive for the dairy industry and that what benefits an individual may not benefit the industry as a whole; and (4) a belief that the attorney's fees proposed for Plaintiffs' counsel are too high. Ranson Mead of Mead Farms, LLC in Newport Center, Vermont, the other objector, opposed the settlement because not enough money is being paid back to the farmers, and because an example should be set for the big milk companies who are not following the rules while farmers are required to do so. (Doc. 320.)

VTAG advised the court, by letter, that it had received criticism that the Dean Settlement amount was too low. It noted that this was a common criticism in class action litigation and that, although it had objected to settlements in the past on this basis, it would not interpose an objection to the Dean Settlement. VTAG questioned, however, why the $144 million settlement amount that Dean agreed to pay in the *In re Southeastern Milk Litigation* ("*Southeastern Milk*")[3] was considerably greater than the settlement amount offered by Dean in this case.

---

[3] *In Southeastern Milk*, litigated in the Eastern District of Tennessee, the plaintiffs alleged that the defendants (including Dean and Dairy Farmers of America) violated sections 1 and 2 of the Sherman Act through conspiracy to monopolize and monopsonize; unlawful monopsony and unlawful monopolization; attempt to monopolize and monopsonize; and conspiracy to price-fix. While the plaintiffs' litigation theories in *Southeastern Milk* are similar to those in this case, the factual allegations and the structure of the Grade A milk market are quite different. The posture of the two cases is also markedly different. The plaintiffs in *Southeastern Milk* have survived a motion to dismiss and a motion for summary judgment. Class certification has been granted (although a motion is currently pending to decertify the class). *Southeastern Milk* is on the eve of a jury trial; in this case, the parties just completed discovery.

Plaintiffs respond to the objections as follows. First, they point out that the number of objections and requests for exclusion is extremely low when compared to a class that exceeds 9,000 class members. Second, they argue that they did not reach settlement with Dean until they had completed over seventy depositions and had engaged in extensive written discovery, and thus were in a position to adequately assess the strengths and weaknesses of their case against Dean. Third, they assert that they have some questions regarding Dean's continuing financial viability, which renders a settlement advisable at this time. Fourth, they note that any argument by VTAG that the settlement amount should be based upon the volume of milk processed in Order 1 as opposed to the volume of milk processed in Orders 5 and 7 (the federal milk orders involved in the *Southeastern Milk* litigation), is irrational and not supported by either evidence or expert opinion. Plaintiffs further posit that VTAG is not sufficiently familiar with *Southeastern Milk* to make a proper comparison between the two settlements. For example, they point out that VTAG was initially unaware that *Southeastern Milk* involved both Orders 5 and 7, that Dean's market share in that geographic market approximated 70% (compared to a much smaller market share in Order 1), and that the *Southeastern Milk* settlement was payable over four years, as opposed to the Dean Settlement which is payable within six months.

Plaintiffs further contend that the attorney's fees and expenses they request are fair and reasonable, and fall well within what courts typically approve in litigation of this complexity and magnitude. They assert that devoting time and resources to this case involved significant risk, and that without a fee and expense award in the requested amount, attorneys would not bring these types of cases. Plaintiffs also contend that either the percentage or lodestar method are appropriate to calculate the attorney's fees award, and that a 28% recovery from the Dean Settlement Fund ($8.5 million), plus $1.5 million in expenses—which is "$500,000 less than the total expenditures of settlement class counsel on the instant litigation during this time period" (Doc. 310-1 at 18)—is reasonable.

For its part, Dean advised the court that it believes its damages in this lawsuit would have been confined to a four year period due to the statute of limitations. Dean also stated that it had strong defenses based upon its limited market share in the Northeast; that the facts at issue (insofar as they pertain to Dean) are very different in the two cases; and that, unlike the plaintiffs in that litigation, Plaintiffs here still have many hurdles to overcome before their claims against Dean proceed to trial. Dean asserted that the settlement amount is sizable in light of its smaller litigation risk and potential exposure should Plaintiffs prevail on their claims against it.

**B. The Standard for Granting Approval of the Dean Settlement.**

As the court has previously acknowledged, "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citations omitted). Settlements generally advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation.

The claims of a certified class may be settled "only with the court's approval." Fed. R. Civ. P. 23(e). In deciding whether to approve a settlement, the court must determine, after a hearing, whether it is "fair, reasonable and adequate," Fed. R. Civ. P. 23(e)(2), and is not the product of collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "This analysis requires the court to consider both 'the settlement's terms and the negotiating process leading to settlement.'" *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 674 (S.D.N.Y. 2011) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)). The Second Circuit has identified nine factors to be considered in making this determination:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in

8

light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted) (abrogated on other grounds by *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)). Application of the *Grinnell* factors to the Dean Settlement reveals that it should be approved.

                1.      *Complexity, Expense, and Likely Duration of the Litigation; Stage of the Proceedings.*

This is a complex and expensive lawsuit that has already required a sizable time and monetary investment by Plaintiffs' counsel, totaling 31,429.6 hours from the time the lawsuit was filed on October 8, 2009 until April 30, 2011. Extensive written discovery, motion practice, and depositions took place before the Dean Settlement was reached.[4] Plaintiffs' counsel is experienced in antitrust and class action litigation and negotiated the Dean Settlement at arm's length, in a vigorous and non-collusive manner, with equally competent and experienced counsel for Dean. By settling before the completion of discovery, both Plaintiffs and Dean have saved themselves, and the prospective class, the time and expense of further discovery, class certification proceedings, motions for summary judgment, and the often exorbitant costs of trial. On the other hand, this is not a case which was settled prior to an adequate testing of the strength of Plaintiffs' allegations against Dean. *See Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *1 (S.D.N.Y. May 14, 2004) ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable, and adequate if . . . it was the product of arm's length negotiations conducted by capable counsel experienced in class action litigation . . . , and if it occurred after meaningful discovery.") (citations omitted).

Courts have held that "it is enough for the parties to have engaged in sufficient investigation of the facts to enable the [c]ourt to 'intelligently make . . . an appraisal' of the Settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164,

---

[4] In addition to the discovery conducted in this case, Plaintiffs are privy to all of the discovery involving Dean in *Southeastern Milk*.

176 (S.D.N.Y. 2000) (quoting *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982)). The court has some opportunity to consider the strength of Plaintiffs' claims against Dean in deciding the motions to dismiss. It concludes that the Dean Settlement neither grossly overvalues nor undervalues those claims.

        2.    *Reaction of the Class to the Dean Settlement.*

"It is well settled that 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.'" *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (quoting *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989)); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 118 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal quotation marks and citation omitted); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785, 812 (3d Cir. 1995) (the number and vociferousness of the objectors is a factor to consider in weighing reasonableness of proposed settlement); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement") (citation omitted).

In this case, notwithstanding broadly disseminated individualized and published notice of the Dean Settlement, only two objections to the revised settlement were filed, together with four requests for exclusion. By any measure, this is an exceedingly small number of objections and exclusions. The court thus concludes that the class reaction to the Dean Settlement has been largely favorable.

        3.    *Risks of Establishing Liability and Damages, and of Maintaining Class Action.*

The court next examines the risks of establishing liability and damages, and of maintaining the class action through trial. In seeking dismissal of this action over a year

ago, Dean challenged Plaintiffs' definition of both the product and geographic markets, and argued that based upon publicly available documents, it owned fewer than 20% of the bottling plants in Order 1, and possessed only 18% of the market share, during Plaintiffs' proposed class period. "The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (quoting 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 501, at 85 (2002)).[5] Dean argued that its own market power in Order 1 was simply too insignificant to form a factual and legal basis for Plaintiffs' antitrust claims.

In its Opinion and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, this court denied Dean's request for dismissal, observing that "[d]ismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." *Allen v. Dairy Farmers of Am. Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010) (citations omitted). The court nonetheless acknowledged that "[c]ourts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power." *Id.* (quoting *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003)). Dean's limited market share in Order 1 thus posed a sizable risk that Plaintiffs would be unable to establish Dean's liability for antitrust violations.

This court further recognized that Plaintiffs faced similar challenges with regard to Dean's statute of limitations defense as "[i]t is beyond dispute that many of the acts that Plaintiffs allege caused them injury took place more than four years prior to the filing of Plaintiffs' initial Complaint [and in] the absence of a continuing violation, these acts cannot form the basis of Plaintiffs' antitrust claims." *Id.* at 348 (citation omitted). The court further noted that "'[a]s a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a

---

[5] The Second Circuit has held that once a relevant market has been established, a defendant's market share may be used "as a proxy for market power." *PepsiCo*, 315 F.3d at 108.

11

showing of compelling circumstances.'" *Id.* at 350 (quoting *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010)). If the statute of limitations were found to bar all or most of Plaintiffs' claims against Dean, there would be no recovery for the class.

With regard to the risks of maintaining the class action through trial, it bears noting that the court has certified the class for purposes of the Dean Settlement only. The court has not adjudicated Plaintiffs' motion for class certification, which has been vigorously opposed by DFA and DMS, who have standing to oppose it.[6] Accordingly, there is a risk that this lawsuit will not be certified as a class action and will proceed to trial, if at all, as a lawsuit brought by the individual Plaintiffs against DFA and DMS. In such an event, there will obviously be no class recovery.

In light of the cited risks and obstacles, the court need not address whether Plaintiffs would face similar challenges in establishing damages[7] other than to note that, in antitrust class action suits, the task is rarely a simple one and is usually heavily dependent upon competing, complex, expensive, and extensive expert witness testimony. Plaintiffs therefore could be expected to incur additional time, labor, and expense in an effort to establish class members' damages against Dean. *See Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class action litigation is "notoriously complex, protracted, and bitterly fought"). Granting final approval to the Dean Settlement would thus "grant relief to all class members without subjecting them to the risks, complexity, duration, and expense of continuing litigation [against Dean.]" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456-57 (S.D.N.Y. 2004). Accordingly, the fourth, fifth, and sixth *Grinnell* factors also favor approval.

---

[6] Consistent with controlling precedent, the court ruled that DFA and DMS, as non-settling Defendants, lacked standing to oppose the Dean Settlement. *See Allen v. Dairy Farmers of America, Inc.*, 2011 WL 1706778, at *4 (D.Vt. May 4, 2011) (citing *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993) and 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.55 (4th ed. 2002)).

[7] The court has not been provided with damages estimates from either Plaintiffs or Dean.

### 4. The Ability of Dean to Withstand a Greater Judgment; Reasonableness of Settlement Fund.

The court must also consider whether Dean could have withstood a greater settlement amount, the reasonableness of the settlement fund in light of the best possible recovery, and the range of the reasonableness of the settlement fund to a possible recovery in light of all of the attendant risks of litigation.

Plaintiffs have expressed concern regarding Dean's continued financial viability, citing a news article discussing Dean's large debt. They note that "the fact that a defendant is able to pay more than it offers in a settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997). Instead, this factor "must be weighed in conjunction with all of the *Grinnell* factors, most notably the risk of the class prevailing and the reasonableness of the settlement fund." *In re AOL Time Warner ERISA Litig.*, 2006 WL 2789862, at *8 (S.D.N.Y. Sept. 27, 2006). Here, the court cannot determine whether Dean *could have* paid more, it can only conclude that there is no evidence that Dean *should have* paid more in light of its statute of limitations defense and its limited market share in Order 1.

As far as the reasonableness of the settlement fund, VTAG has questioned whether the $30 million settlement here is reasonable in light of the $140 million settlement in *Southeastern Milk*. However, because of the factual and procedural differences between the two cases, the court agrees with Plaintiffs and Dean that the *Southeastern Milk* settlement is not a proper benchmark for evaluating the Dean Settlement. The plaintiffs in *Southeastern Milk* are on the eve of trial. Because of Dean's approximately 70% market share in the Southeast, and more numerous allegations of Dean's wrongdoing (which Dean disputes), Dean's financial exposure in that litigation appears greater than its financial exposure in this case. Moreover, Plaintiffs here risk the possibility that their claims against Dean will be dismissed long before trial, but after they have incurred the time, expense, and inconvenience of further litigation. The unpredictability of the likelihood and amount of a potential recovery against Dean in this case thus weighs in

favor of finding the Dean Settlement within the range of reasonable outcomes. *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable").

In summary, the Dean Settlement was the result of arm's length negotiations between competent, experienced counsel, fully familiar with an extensive factual record, who have litigated the case in a vigorous and professional manner. Although the best outcome for Plaintiffs is impossible to determine in this case, the court finds the Dean Settlement adequate in light of the risks of no recovery, the possibility that the class will not be certified, and the stage of the litigation at which the settlement was reached. Based upon all of the foregoing factors, the court concludes that the monetary amount and other terms (with the exception of attorney's fees and costs) of the Dean Settlement is "fair, reasonable and adequate." *See* Fed. R. Civ. P. 23(e).

### C. Attorney's Fees and Expenses.

Plaintiffs' counsel request an attorney's fees award in the amount of $8,500,000, as well as accrued interest, plus $1,500,000 as partial reimbursement for costs and expenses. The total award would thus represent approximately one third of the Dean Settlement. For the reasons set forth below, the court concludes that an award of $1,500,000 to cover costs and expenses is appropriate, and that an attorney's fees award comprising 15% of the total settlement ($4,500,000), without accrued interest, is fair and reasonable.

It is beyond dispute that settlement class counsel have created a benefit for the settlement class through the Dean Settlement that might not otherwise exist. Courts recognize that when a common fund is created, the party who creates it is generally entitled to a reasonable attorney's fee. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (holding "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.") (citations omitted). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its

cost." *Goldberger*, 209 F.3d at 47. Courts further acknowledge the reality that "a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988) (citations omitted). Here, the only dispute is the amount of the fee.

"Courts have used two distinct methods to determine what is a reasonable attorneys' fee." *Goldberger*, 209 F.3d at 47. "The first is the lodestar, under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Id.* "Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* (citation omitted). "The second method is simpler. The court sets some percentage of the recovery as a fee." *Id.* "In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.* (citation omitted).

As Plaintiffs correctly point out, "[t]he trend in the Second Circuit has been to express the attorneys' fees as a percentage of the total settlement[.]" *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2007 WL 4526593, at *13 (S.D.N.Y. Dec. 20, 2007). In determining the proper percentage, the Second Circuit has identified six factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation[ ]; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

1. *Counsel's Time and Labor.*

Plaintiffs' counsel has expended substantial time and labor on this lawsuit. Plaintiffs estimate that, using the lodestar method of calculation, their attorney's fees exceed $11 million and their costs and expenses exceed $2 million. However, only a portion of these amounts gave rise to the Dean Settlement which in turn gave rise to the common fund from which any attorney's fee must be derived. Plaintiffs do not segregate the fees they incurred in pursuing the Dean Settlement from, for example, the time they spent in litigating the motions to dismiss, the discovery disputes, and the motion to certify the class. Indeed, they acknowledge that much of the discovery they would have otherwise pursued from Dean remains to be completed. The court thus does not find Plaintiffs' lodestar a reliable proxy for a reasonable attorney's fees award with regard to the Dean Settlement. Correspondingly, by awarding Plaintiffs the full amount of their costs and expenses incurred to date, the court arguably may overcompensate them for costs and expenses not incurred in creating the common fund. The court factors these considerations into its overall determination of a reasonable attorney's fees award.

2. *Litigation Complexity, Magnitude, Risk, and Quality of Representation.*

The court has already acknowledged that this litigation is complex, time consuming, and laden with risk regarding its potential outcome. Plaintiffs' counsel is experienced in antitrust litigation and vigorously negotiated the Dean Settlement. To date, Plaintiffs' attorneys have been competent, professional, and cooperative in this lawsuit and have not unnecessarily driven up the cost of litigation through either meritless motion practice, discovery subterfuges, or oppositional tactics. Indeed, counsel for all parties have litigated this case in a professional and courteous manner, on an expedited schedule that would have rendered it difficult for lead counsel to take on and pursue other work. The attorney's fee award in this case should compensate Plaintiffs' counsel's efforts and recognize both the quality of their representation, and the risks they accepted when they decided to pursue claims against Dean.

### 3. *The Relationship of the Fee to the Settlement.*

The relationship of the fee request to the Dean Settlement is grounds for concern. It leaves a relatively small recovery for each class member with no suggestion by either Plaintiffs or Dean that the Dean Settlement is expected to make class members "whole" insofar as their claims against Dean are concerned. In addition, Plaintiffs' ten million dollar fee request was based in part on the injunctive relief originally contained in the Dean Settlement which Plaintiffs lauded as a major victory for settlement class members. When that provision of the Dean Settlement proved divisive, it was excised. A corresponding reduction in the attorney's fee award properly reflects that the nature of the Dean Settlement has changed.

At the preliminary approval hearing, Plaintiffs candidly admitted that one third of the Dean Settlement fund was the most that they could reasonably expect the court to award as attorney's fees in this case. Although they now point to other attorney's fees awards in excess of this amount (that have been approved by other courts), they concede that it is not uncommon for parties to negotiate a lesser fee award when litigation does not require a trial to produce a common fund. Moreover, the Second Circuit has rejected the notion of a "benchmark" for common fund cases. *See Goldberger*, 209 F.3d at 51 (rejecting counsel's argument that 25% is a proper benchmark for a percentage fee in a common fund case while acknowledging that other jurisdictions have taken this approach). It has also tasked the district courts to act "as a fiduciary who must serve as a guardian of the rights of absent class members[.]" *Id.* (citation omitted). Accordingly, the court must take a hard look at Plaintiffs' fee request because "awards [in common fund] cases are proper only 'if made with *moderation*.'" *Id.* (citation omitted).

Here, the litigation has not reached its conclusion. If Plaintiffs are successful in pursuing their claims against DFA and/or DMS, additional attorney's fees may be awarded. According to Plaintiffs' own calculations, the Dean Settlement is thus only a partial recovery for settlement class members. In light of this fact, the attorney's fees award should be a partial recovery as well.

4.      *Public Policy Considerations.*

The merits of this litigation have not been decided, and no injunctive relief has been granted. Dean admits no wrongdoing. In such circumstances, public policy does not play an important role in the attorney's fee award for the Dean Settlement.[8]

Examining all of the foregoing factors and the totality of the circumstances, the court concludes that an attorney's fee award of $4.5 million, or 15% of the total Dean Settlement, without accrued interest, and an additional $1.5 million award for expenses and costs incurred to date is a reasonable and fair award.

### D.      Incentives for Class Representatives.

"An incentive award is meant to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001) (internal citations omitted). Plaintiffs seek an incentive award of $7,500 per class representative (a total of $22,500) for class representatives' provision of documents and information essential to the litigation. They identify no personal risk undertaken by any of the class representatives in pursuing this lawsuit.

At the preliminary approval hearing, Plaintiffs did not ask the court to grant incentive awards to the class representatives, and the order granting preliminary approval is silent on that issue. The Dean Settlement Agreement makes passing references to incentive awards, but does not explicitly call for such awards.[9] The possibility of

---

[8] Public policy weighs in favor of awarding substantial attorney's fees for incurring the risks of meritorious litigation that redresses antitrust violations. At this juncture, no antitrust violations have been found.

[9] Section 10.5 of the Settlement Agreement provides that "In no event shall Settling Defendant be obligated to pay anything in addition to the Settlement Fund described in paragraph 9.1 hereto, including without limitation class notice costs, attorneys' fees, *payments to named Plaintiffs for their efforts on behalf of the Settlement Class* . . . Except as provided in paragraph 10.6 hereto, no payment shall be made out of the Settlement Fund prior to the Effective Date, and then, only as approved by the Court." (Doc. 301) (emphasis supplied). Section 10.6 provides: "Except as otherwise provided in this paragraph, any disbursement from the Settlement Fund, including disbursements for attorneys' fees, costs and expenses, *and incentive fees to named Plaintiffs*, shall be made only upon approval and order of the Court, and only after

incentives for class representatives is disclosed in the Notice and the Summary Notice but only in the most general terms and without any accompanying monetary amount.[10]

Plaintiffs' motion seeking incentive awards was filed on June 3, 2011 (Doc. 310), a month after the court granted preliminary approval of the Dean Settlement as revised. In the absence of full disclosure of the amount and nature of these incentive awards, the court concludes that it is not appropriate to now include them as part of the Dean Settlement. Class representatives will share in the Dean Settlement *pro rata* payment. Additional compensation for their efforts must await further developments in this case, and must be accompanied by full and accurate notice of any deduction from the class's recovery. In so ruling, the court does not intend to suggest that class representatives have been anything less than vigorous in their pursuit of this lawsuit.

## CONCLUSION

For the foregoing reasons, the court:

1. GRANTS Final Approval of the Dean Settlement Agreement, as revised;

2. AWARDS compensation of Plaintiffs' costs and expenses in the amount of $1.5 million and attorney's fees in the amount of $4.5 million;

3. DENIES Plaintiffs' request for an award of accrued interest on the Settlement Fund;

4. STAYS all proceedings against Dean; and

---

the Effective Date." (Doc. 301) (emphasis supplied).

[10] In a section entitled "How will the lawyers be paid?" the Notice states "Class Counsel may also request a payment from the Settlement Fund for Class Representatives who sued on behalf of the whole Class." (Doc. 327-3 at 15). The Summary Notice states that class counsel will be requesting "up to one third of the settlement amount ($10 million) in attorneys' fees, plus costs, expenses, and incentive fees for the dairy farmers who brought the lawsuit." (Doc. 327-3 at 7.)

5. DENIES Plaintiffs' request for incentive awards to class representatives.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of August, 2011.

Christina Reiss, Chief Judge
United States District Court