UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

ALICE H. ALLEN, ET AL            )

          VS                     )   CASE NO: 5:09-CV-230

DAIRY FARMERS OF AMERICA, INC,)
ET AL
_____ )         MOTION HEARING


BEFORE:   HONORABLE CHRISTINA REISS
          CHIEF JUDGE


APPEARANCES:   KIT A. PIERSON, ESQUIRE
               BRENT W. JOHNSON, ESQUIRE
               GEORGE F. FARAH, ESQUIRE
                    Cohen Milstein
                    1100 New York Avenue, NW
                    Suite 500, West Tower
                    Washington, DC   20005
                    Representing The Plaintiffs


               ANDREW D. MANITSKY, ESQUIRE
                    Gravel & Shea
                    76 St. Paul Street
                    P.O. Box 369
                    Burlington, Vermont  05402
                    Representing The Plaintiffs


                    (APPEARANCES CONTINUED:)


DATE:        September 26, 2011


TRANSCRIBED BY:  Anne Marie Henry, RPR
                    P.O. Box 1932
                 Brattleboro, Vermont   05302

APPEARANCES CONTINUED:

GREGORY J. COMMINS, JR.
    Baker & Hostetler, LLP
    1050 Connecticut Ave., NW, Suite 1100
    Washington, DC    20036
    Representing the Plaintiffs


STEVEN R. KUNEY, ESQUIRE
KEVIN HARDY, ESQUIRE
    Williams & Connolly, LLP
    725 Twelfth Street, NW
    Washington, DC    20005
    Representing Dairy Farmers of Vermont, Inc.


W. TODD MILLER, ESQUIRE
    Baker & Miller, PLLC
    2401 Pennsylvania Avenue, NW
    Suite 300
    Washington, DC    20037
    Representing Dairy Farmers of Vermont, Inc.

```
 1                  (The Court opened at 9:25 a.m.)

 2            THE CLERK:  Your Honor, the matter before the

 3    Court is civil number 9-230, Alice H. Allen, et al versus

 4    Dairy Farmers of America, et al.  Present on behalf of the

 5    plaintiffs are Andrew Manitsky, Brent Johnson, George Farah,

 6    Gregory Commins and Kit Pierson.  Present on behalf of the

 7    defendants is Kevin Hardy, Steven Kuney and W. Todd Miller.

 8    And we are here for a hearing on the motion to certify

 9    class, motion to appoint counsel and motion to appoint

10    custodian.

11            THE COURT:  Good morning.  Let me just first get

12    an idea as to how people want to proceed, whether or not

13    people want to put on evidence, and if so, who are going to

14    be the witnesses and how much time will be necessary or if

15    you are contemplating pure oral argument.  So let's start

16    with that question.  And let's start with the plaintiffs.

17    Mr. Pierson?

18            MR. PIERSON:  Thank you, Your Honor.  This is a

19    subject I've discussed a couple times with Mr. Kuney.  I

20    think we're in agreement neither side is proceeding by

21    presenting live testimony.  I know that Mr. Haar has asked

22    with the Court's leave if at the end of my presentation that

23    he could make a brief statement about class certification,

24    just to offer his perspective as a farmer.  That, of course,

25    is a matter within the Court's discretion.
```

1          I understand Mr. Gorton, who the Court heard from

2     earlier, may wish to do the same.  If he wishes to I have no

3     objection to that.  But I don't think either side is

4     planning to present witnesses.

5          THE COURT:  And there's no opposition to the

6     admission of anybody's declaration as evidence in this case

7     from the plaintiff's perspective?

8          MR. PIERSON:  Correct.

9          THE COURT:  Let's hear from you, Mr. Kuney.  You

10    are speaking today?

11         MR. KUNEY:  Yes, Your Honor, I am.  Thank you.

12    And Mr. Pierson is correct we are also not planning to have

13    live witnesses.  And we have obviously no objection to Mr.

14    Haar speaking if he wishes to speak.  And I think Your Honor

15    has Mr. Gorton's letter with his request to speak, but we're

16    not expecting to introduce testimony just oral argument.

17         THE COURT:  No opposition to Mr. Gorton speaking?

18         MR. KUNEY:  No, not from us, Your Honor.

19         THE COURT:  And no opposition to the Court's

20    admissions of anybody's declarations as evidence in this

21    case?

22         MR. KUNEY:  Not from this side, Your Honor.

23         THE COURT:  So as is my habit I have come up with

24    some things that I am wondering about.  And I'm going to

25    tell you what they are in hopes that you can either address

1    them in your oral argument or point to me where in your

2    voluminous filings I may find them because this is a case in

3    which the filings kind of spun out of control.  And it will

4    help me if you can direct me, judge, we covered that at

5    Page 183 and doctor or Professor Rausser's supplemental

6    declaration and that will help me focus my inquiry.

7         A couple of things that I think are not contested,

8    and you can correct me if I'm wrong, is I don't get the

9    sense that product market is contested.  It seems to me that

10   both parties agree that raw Grade A. Milk is the relevant

11   product.  There hasn't been many arguments about that point.

12   If there has I have missed them.

13        There also does not seem to be a great deal of

14   argument about numerosity, that this is a class in which

15   there are many members, if it is a class, and that's not an

16   issue.

17        I am sensing that there is an agreement that the

18   focus on price, which was very heavily briefed, is not on

19   the regulated price, but is on the over order premium price.

20   I don't know if you're in agreement about that.  My cursory

21   view is if the blend price or the regulated price is set by

22   the federal government why would we be looking to that in

23   terms of whether it's, there's something anticompetitive

24   about it, it has to be that over order premium that we're

25   looking at and I'm wondering if everybody agrees to that.

1          I'm looking at commonality and typicality and

2     adequacy for Rule 23 certification are the thrusts of the

3     party's debate.  And I'm questioning whether there's enough

4     of a uniform impact about across Order 1 to use it as a

5     geographic market.  And it seems to me that plaintiffs are

6     talking about Order 1 and defendants are focusing on what's

7     going on in counties.  There are some efforts to impute the

8     facts in Southeastern Milk here, but I do recall in

9     approving the Dean settlement that I was told that what is

10    happening in those markets is markedly different from what's

11    happening here.  The defendants have significantly greater

12    market power.  The allegations are different.  This is not

13    nearly the same lawsuit, although there are similarities in

14    the Northeast that is now pending in the Southeast.

15         I'm interested in the issue of access to

16    non-conspirator processing plants and how that affects the

17    allegations.  There is some suggestion by the defendants,

18    not just a suggestion, but a statement that approximately 65

19    percent of the milk produced in and pooled in Order 1 was

20    produced by farmers in zip codes that were within 50 miles

21    of at least two plants that were not fully supplied by DMS

22    and that the proposed class member farmers in Order 1 are

23    commonly within 50 miles of multiple non-conspirator

24    processors and what does that do to both the allegations and

25    the market definition.

1          I thought about the issue of sub-classes.  I don't

2    actually think we are in a sub-class situation.  I think if

3    we have a problem it would be solved by having issue

4    certification as opposed to sub-classes.  I look at

5    sub-classes where parties have similar allegations against

6    the defendant but different interests.

7          And in reading the declarations supplied by the

8    defendants my take would be that those dairy farmers who

9    oppose this lawsuit oppose it completely.  They are not

10   asking to pursue the same allegations but with different

11   class representatives.  They are asking that there be no

12   lawsuit on this basis.  So I don't really see this as

13   farmers with different interests.  It's either farmers who

14   are in support of the lawsuit and farmers who are not.  And

15   you can correct me if I'm wrong in looking at that.

16         I did think about issue certification.  And I

17   don't think that either party has really proposed or briefed

18   that.  But it seems to be a response to one of defendant's

19   primary arguments that there are significant variations

20   across Order 1 and that we have at least two groups of

21   potential class members; those who belong to the allegedly

22   conspiring co-ops and those who don't and those parties have

23   different interests in different issues.  So one is I

24   decided not to go with a co-op, I don't like how they do

25   business, that has left me with the following damages.  And

1    the other one is I was forced to go with the co-op, I didn't

2    want to do it.   I'm assuming these are people who want to be

3    in the class in the first place.   I didn't want to do it,

4    but I had to, and these are my damages.   And how do we have

5    typicality and commonality among those two groups.

6            I'm wondering about the extent to which you agree

7    that maybe it isn't just looking over the order, over order

8    premium price, but the component pricing system which is

9    allegedly used in Orders 1, 30, 32, 33, 12, 126 and 135.

10   And what got me thinking about that is that there was some

11   suggestion, and I believe it was from defendants, that, you

12   know, we have to also look at the varying quality of milk

13   that the defendants are -- that the farmers are producing.

14           And I didn't get the fact that quality was

15   determining price.   And the only way I could think is

16   because milk being fungible, and I didn't see anything that

17   would support that, I might have missed it, but it makes

18   sense to me that if you were going to do pricing based on

19   components of butter fat, protein, other solids, and that is

20   how price is being set, that has a quality aspect to it and

21   it might have some play in it.   But I wasn't quite sure

22   where the parties were going with that.

23           The defendants characterize the motives of the

24   cooperatives that are engaging in this conspiracy as

25   managerial corruption and sloth.   And I'm wondering to what

1    extent the plaintiffs agree with that or reject it entirely.

2    And if so, if they agree with it, how would we have a common

3    proof with regard to who is corrupt and who is slothful and

4    what would that look like.

5              I'm wondering with regard to the issue of damages

6    at the most simplistic would there be at least two formulas,

7    those for people inside a co-op, those for people outside a

8    co-op.  Or maybe more formulas, one for people who are

9    members of the DMS and DFA versus non-members, how would we

10   deal with that.

11             In this case we have not had yet a lot of

12   discussion about co-conspirators.  And there's a lot of

13   material about co-conspirators in both expert's opinions.

14   And if you ask me here today to identify who those

15   co-conspirators are I'd have difficulty doing so.

16             And I will call this the Hood problem.  I'm not

17   sure that I would have any ability to pinpoint when they

18   joined the conspiracy, how they joined the conspiracy, how

19   they benefited from it.  So I call this the Hood Milk

20   problem. It, it isn't certainly in the complaint as it sits

21   here today.  And I'm not sure I have a good view of what

22   they have done to join the conspiracy and how we can add

23   them in there.  And, and I guess that, that's troubling

24   because at this point in the case I should be able to pretty

25   clearly identify who is doing what to whom and why and who

1    the players are.

2              With regard to the geographic market that seems to

3    be a fairly hotly disputed issue.  And the plaintiffs have

4    chosen Order 1 as a geographic market.  And I think in doing

5    so they concede that Order 1 originally came into being as a

6    regulatory definition.

7              In looking at it geographically I want to hear

8    some pretty compelling reasons why people in Order 1 would

9    not, you know, walk over the boundary to the next county to

10   use a processing plant there.  Defendants have pointed to

11   some evidence that people pool in more than one order, that

12   there are really no regulatory barriers that can say you can

13   only pool in Order 1 or in Order 33.

14             They claim that people are pooling in multiple

15   orders.  Professor Rausser says it is possible that the

16   unregulated areas adjoining Order 1 are part of the relevant

17   market.  Where does that take us?

18             So obviously these are issues more directed to the

19   plaintiffs than the defendants, but it's the plaintiff's

20   motion and they have to come forward with the proof.

21   Preliminary thoughts, lots of things to correct in there.

22   So let's get started.  Mr. Pierson?

23             MR. PIERSON:  Many hard questions and good

24   questions.  Your Honor, I'd hike to proceed if I may,

25   Mr. Kuney may be more an electronic wizard.  I'm a little

1    more comfortable with hard copies.  So what I've done,

2    instead of making electronic demonstratives, I've just

3    prepared some notebooks with a hard copy.  I'll give

4    essentially my presentation, you know, the issues are

5    complex.  I thought it would be helpful to sort of have it

6    laid out in writing a little bit.

7              THE COURT:  Sure.

8              MR. PIERSON:  So if I can approach?

9              THE COURT:  Sure.  You can.  This is fine.  But

10   our electronic system is easy enough for a judge to use.  So

11   next time you are in beautiful Rutland do not hesitate and

12   we will give you a 15 minute tutorial on it and you'll be

13   able to use it.

14             MR. PIERSON:  That's fine, Your Honor.  The three

15   notebooks are all duplicative.  It's really one notebook,

16   but I included two for your law clerks or other staff.  That

17   might help them follow the presentation.

18             THE COURT:  All right.

19             MR. PIERSON:  Your Honor, if I could begin by

20   briefly, what I suppose I could housekeeping matter, but

21   it's a little more significant than that.  I want to give

22   you an up-date on just where we are with the Dean

23   settlement.  It will take 30 seconds or a minute.

24             The claims administration process has essentially

25   been completed this week.  And we anticipate filing with you

1    next week really a final paper relating to that settlement

2    which simply says this is the way the money's being

3    allocated to farmers for your final approval.

4              What is significant to note about that is that --

5    is that more than 7,000 claims have been, have been filed.

6    And I think I -- I know I can represent to the Court that

7    that is, that is an extraordinary figure.  I don't -- our

8    law firm has handled many class actions.  I don't know if

9    we've ever had a higher claims rate, but it's about as high

10   as you'll ever see and it may be the highest.  So, so that,

11   that is extraordinary.  And I think it's something we should

12   all feel good about.

13             And it's probably inappropriate jumping in point

14   to this class certification hearing because the fact of the

15   matter is that certification of a class against Dean allowed

16   $24 million to be distributed to 7,000 farmers.  And absent

17   class certification none of that would have happened.  It's

18   not viable for people to proceed individually.  And I don't

19   think there's any real dispute about that.

20             THE COURT:  Let me just say that that does sound

21   like a good claims rate.  In looking at that particular

22   issue I found it much more straightforward than what is

23   facing the Court now.  So that was not a difficult class to

24   certify.  There wasn't anybody who said, you know, we had

25   very few opt outs.  We're in a very different territory.  So

1    I think that went well, but we've got a much different

2    motion ahead of us.

3              MR. PIERSON:  And, and I understand that.  I

4    understand that, Your Honor.  It is probably -- the starting

5    point probably is that history, which is that for purposes

6    of the Dean settlement the Court did make findings about

7    numerosity, commonality, typicality, predominance and

8    adequacy and superiority.  I understand the issues here are

9    different or at least different in some respects.

10             I think the Court's observation regarding

11   superiority though is worth noting.  It's important.  The

12   Court said class action litigation in this case avoids

13   multiple trials on the same claims in multiple forums with

14   the possibility of inconsistent results literally thousands

15   of such actions.  Conservation of judicial resources favors

16   class action litigation both on the question of liability

17   and damages.  That is equally true here.  I appreciate it is

18   not the end of the story.  But it is true here and it is

19   important.

20             The defendant's view here is that, and it's

21   important to understand this, even if they engaged in an

22   unlawful conspiracy a class cannot be certified here.  In

23   fact, Dr. Kalt, on Page 17 of his initial report says,

24   quote, in undertaking my analysis I have been asked to

25   assume that the conduct alleged by the plaintiffs actually

1    occurred.

2          So, the essence of their position is that even if

3    there was an illegal conspiracy, even if thousands and

4    thousands of farmers were injured you cannot, you cannot

5    certify a class here.  And he basically argues that that is

6    true no matter how far you break it down; in the county

7    level, within co-op, he argues there's what he calls

8    dispersion churning that would prevent a class really from

9    being certified at any level.

10          So in essence what you are being asked to choose

11    between here is whether it is viable to cert. a class or

12    potentially sub-classes or instead put farmers in a position

13    where the only way they can get relief is to bring

14    individual actions and the only way to get full relief would

15    be to bring literally thousands of individual actions.

16    That, at the end of the day, --

17          THE COURT:  Well, what if I disagree with

18    Professor Kalt that it's an either or proposition and we

19    look at issue certification.  My understanding is that

20    Professor Kalt says causation not subject to a single

21    formula, damages not subject to a single formula.  You've

22    got a problem with the market.  But the proof -- if he's

23    going to assume that the proof with regard to the

24    allegations that you're bringing in common the answer would

25    be to certify a class on those issues only.

1          I know that you want to go further than that and

2     that will not bring this case to a resolution.

3          MR. PIERSON:  Yeah, my basic reaction to that,

4     Your Honor, and I'll try to walk through this slowly.  And

5     I'm not a statistical expert myself, but I've learned a lot

6     through this.

7          Dr. Kalt's analysis is wrong at so many levels

8     that, that his conclusions are wrong.  And I mean it's

9     probably worth observing in response to your question that

10    in his testimony Dr. Kalt -- Dr. Kalt has submitted expert

11    reports I believe in over 200 different matters.  Not all on

12    class certification, but many on class certification.  I

13    believe he's paid $1,000, $1,200 an hour for his work.

14    Nothing wrong with that.  But there's an incredible history

15    here.

16         Dr. Kalt's testimony was that in no case has he

17    ever testified that impact can be proved by common proof.

18    Never.  So when we get to Dr. Kalt's testimony I will walk

19    you through why I believe it is just fundamentally flawed.

20         I would also point out, and this is reflected on

21    Slide 1 in the notebook, that the position defendants are

22    taking today directly contradicts the position that they

23    took with regard to the Dean settlement.  There, when they

24    talked about the various challenges of class certification,

25    they very explicitly said, this is Mr. Kuney, are we saying

1    that there can't be a class against us?  No.  We're not

2    saying there can't be any class.

3              That was their position several months ago.  Their

4    position today is the opposite.  Their position today is you

5    cannot certify a class at all.  Mr. Kuney can correct me if

6    he thinks that's wrong.  But it is a flip in their position.

7    Several months ago they were acknowledging that a class

8    could be certified.

9              Turning to Slide 2.  I thought I should comment

10   on, on the status of what, of what's happened in the

11   Southeast Milk.  And I can describe it briefly.  I have

12   Mr. Commins here from the Baker Law Firm, which is the lead

13   counsel there.  Of course, defendants will have their own

14   perspective.

15             Point one is not -- is a self-evident proposition.

16   The Court's going to make an independent determination here.

17             Point two is important though.  It's important to

18   understand that in the Southeast the Court has certified a

19   class.  It's a class that includes all non-DFA members.  And

20   the case will presumably proceed to trial on at least that

21   basis.  And it's a litigation class, not a settlement class.

22             That class includes farmers that sell through the

23   Southern Marketing Association, which is essentially, I

24   don't want to oversimplify it, but you can think of it as an

25   analogue to DMS.  It's a marketing agency down there.  So

1    the class that's been certified includes that.

2         Now, SMA's situation is a little more complicated

3    because SMA has settled their claims, has settled the claims

4    in the Southeast.  So whether the Court thought it was, it

5    was certifying a settlement class vis a vis SMA or a

6    litigation class against SMA I don't want to read the

7    Court's mind on that.  But I just wanted to acknowledge that

8    there's a little more ambiguity with regard to SMA.

9         THE COURT:  And that case is currently in trial?

10        MR. PIERSON:  It's not in trial.  In fact, the

11   trial has been postponed indefinitely.  What happened down

12   there, Your Honor, was that the Court -- so let me take a

13   step back.  What the Court basically said in the Southeast

14   is, and we disagree with this conclusion, but it's what the

15   Court said, it said with regard to the DFA members and

16   everybody else it thought there was an interclass conflict.

17   And it made that ruling and upheld it on a motion for

18   reconsideration.

19        And then Dean went into court and said, well, if

20   there's a conflict in the class that was certified for

21   purposes of our settlement we want out of our settlement.

22   So Dean is trying to, I don't want to be pejorative about

23   this, Dean is trying to get out from out of the settlement

24   or re-negotiate the settlement based on the Court's ruling

25   after the Dean settlement about what to do with the class.

1   It's basically trying to get out from the settlement or

2   re-negotiate it.

3            So what the Court has done is said, is

4   basically -- so the Court's taken that under advisement.

5   And it said with regard to the, to the, to everyone that

6   wasn't in DFA that case can go forward and we'll go forward

7   to trial, but the trial isn't -- there's no date on the

8   trial now.

9            And I think, for reasons I'll explain I think the

10  expectation is it will be postponed into some time next year

11  down there.

12           The complication that's arisen down there is with

13  regard to what to do about the DFA farmers there.  Because

14  the Court has said, and this is the quote at the bottom of

15  the slide, the Court has said I didn't find that there's any

16  intra-class conflict within DFA.  I just found a conflict

17  between these two groups.

18           So with regard to the DFA group of farmers what

19  the Court has done is um, has basically invited the parties

20  to address the issue of whether, for purposes of the Dean

21  settlement, a sub-class can be created for the DFA farmers.

22  That's -- so that's what the Court's doing for purposes of

23  the Dean settlement.

24           It has not addressed the issue yet can, well, can

25  you have a sub-class of DFA farmers for litigation purposes.

1    So what's fair to say, Your Honor, is that things have been

2    moving back and forth in the Southeast quite a bit.  It's

3    pretty hard to follow the bidding.  But the short answer is

4    that, that that's what the Court ruled.  The Court has

5    postponed the trial indefinitely.  The status of the Dean

6    settlement is a little bit unclear.  And the Court will tell

7    us what it thinks down there.

8            Frankly, our view, as I go through on the merits

9    is that either the Court just has it wrong in some important

10   respects or there are issues here that really haven't been

11   -- I'm going to focus on some of the issues about conflict

12   here, but I think really were not pursued by either side,

13   particularly in the Southeast, that warrants a different

14   conclusion here.

15           The one other point though I think is significant

16   about what happened in the Southeast is that in certifying a

17   litigation class, and that is the starting point down there,

18   the Court did certify a class it just didn't certify

19   everyone in the class.  The Court made all the predicate

20   findings about commonality, typicality, predominance of

21   common issues, so these issues, the sort of second half of

22   the defendant's arguments here about commonality and

23   predominance I think it is fair to say have been rejected in

24   the south.

25           THE COURT:  Well, I looked at that opinion.  And

```
1    it was not, certainly it was not the analysis that meeting

2    all of what has been filed here would produce.  So I can say

3    without any analysis we have common issues.  When we get to

4    causation and damages a searching inquiry I don't think

5    that, I don't recall an in-depth analysis of what the

6    experts said and, you know, could you move to a different

7    order and what would happen if there was a fluctuation in

8    price.  I thought that was a fairly cursory analysis under

9    Rule 23. And you both are asking the Court for far more than

10   that here it appears.

11             MR. PIERSON:  And I, you know, Your Honor,

12   frankly, I don't really want to characterize -- I'm not

13   going to characterize the judge's opinion either way.  I

14   mean there's some respects in which we agree with it.

15   There's some respects in which we disagree with it.  It's

16   under Sixth Circuit law.  You're operating in the Second

17   Circuit.  You know, I know that the Court, you know, has

18   reflected by both your history and the questions you've

19   asked at the start you're going to take a hard look at this.

20   And, and, you know, what happened in the Southeast we agree

21   with them in some respects and disagree in others.  You'll

22   obviously reach an independent decision and you should.

23             I'm basically going to divide the defendant's

24   arguments into, into two categories.  The conflicts argument

25   and what I would really categorize as a predominance
```

1    argument because I don't think there's really any dispute

2    that -- I don't think there's a serious basis to dispute

3    that there are some common issues in this case.  The issue

4    really I think is what are common issues predominate over

5    individualized issues.  And, you know, maybe how one

6    characterizes that it doesn't matter a lot.  I think that

7    analytically that's probably the best way to think about it

8    that it's a predominance issue.  In any event, that's,

9    that's the way that I'm going to walk through the issues.

10          And I want to start with the conflict issue.  And

11   I want to talk about it carefully because um, it's an issue

12   that um, we've talked about before.  It's an issue the Court

13   has had, I think it's fair to say, concerns about.  Or you

14   certainly wrestled with the issue.  And I want to make clear

15   what our position is.  And this is reflected in Slide 3.

16          Our position is that there is no cognizable

17   conflict in this case.  Now, to be clear, our position in

18   this case is that the practices that we're challenging don't

19   benefit any farmers.  And there's only been one damages

20   study that's been conducted in this case.  It's a damages

21   study done by our expert which concluded that, that over

22   order premiums have been suppressed by about 50 percent in

23   the northeast and that lowers the tide for all farmers.

24          THE COURT:  So let me stop you there.  Agreed that

25   that's all we're looking at in terms of price is the

1    order --

2              MR. PIERSON:  No.  I um, no.  But, but can I put a

3    place holder on that question?

4              THE COURT:  Yes.  Sure.

5              MR. PIERSON:  Because we actually, I actually

6    think, and we'll explain it in some detail because it's

7    important in looking at the total prices is critical and

8    it's statistically appropriate.  But let me get there if I

9    can.

10             The first point in the slide is what we intend to

11   show in this case is that the conduct at issue is illegal.

12   That the conduct at issue violates a core policy of DFA.

13   That the conduct at issue violates specific requirements in

14   DFA's antitrust compliance guidelines and that the conduct

15   at issue violates a consent decree that DFA has agreed to

16   comply with and also inform all members -- when DFA was a

17   merger of several different co-ops in the late 1990's.  And

18   at the time of the merger DFA told farmers that in

19   considering whether to support this merger they should

20   consider the fact that the new entity was going to be

21   subject to this consent decree.

22             So in essence what defendant -- and the evidence

23   in this case will support all of these propositions.  It

24   does support all those propositions.  In essence the

25   defendant's position on the conflict issue is that if a DFA,

1   if a DFA member says, well, the conduct is illegal, it

2   violates a core policy of DFA to comply with the law, it

3   violates our antitrust guidelines and it violates a consent

4   decree that the association has agreed to -- that the

5   organization has agreed to comply with, nevertheless I think

6   it's good for me, I think all those things are good for me.

7   And that creates a conflict.  Not only does it create a

8   conflict, it essentially allows me to veto the ability of

9   other DFA members to seek meaningful relief in this case.

10          And that is not a conflict, Your Honor.  Saying I

11  benefit by violating -- if DFA violates its own policies,

12  violates its core policies, violates a consent decree and

13  violates a law that's a benefit to me that's not a

14  cognizable conflict.  And I'll discuss that more as we

15  proceed.  But I want to walk through the predicates for

16  that.

17          THE COURT:  So let me stop you there.  I saw this

18  in your supplemental filing, and I read the consent decrees

19  and I saw some overlap of allegations in the amended

20  complaint, but I did not see that this was a thrust of the

21  amended complaint.  So I would have not characterized this

22  as a lawsuit in which you were alleging that DFA was

23  violating its own antitrust compliance guidelines, violating

24  consent decrees, when it merged it told members that C.V.

25  consent decrees in these four cases, or however many there

1   was, we'll be adhering to it.  I would not have said that

2   that was the thrust of this lawsuit.

3          MR. PIERSON:  Well, let me walk through that, Your

4   Honor.  But let me deal with it at a high level and then

5   I'll drill into the details.  At a high level we allege

6   certain conduct.  Now, the complaint doesn't say that

7   violates the consent decree and this violated the internal

8   guidelines.  Frankly, at the time we didn't have all of the

9   documentation.  But um, the complaint alleges certain

10  conduct.

11          And the point is that that conduct, the conduct

12  that is at issue in the complaint is illegal, it does

13  violate the core policy, it does violate the guidelines and

14  it does violate the consent decree.  And let me show you how

15  that is true.  If you would turn to Slide 4.  And let me,

16  Your Honor, if I may, I'm going to give you a copy of DFA's

17  antitrust compliance guidelines.  This is Exhibit B. that we

18  filed earlier.

19          And you'll note, Your Honor, that on the very

20  first page of this, the very first thing they say is that

21  DFA's policy is to conduct its operations in strict

22  compliance with all applicable federal, state and local

23  laws.  And I should note this is a document that was

24  circulated to DFA members by Rick Smith.  And we'll hear

25  more about Rick Smith later, but he is the president and CEO

1    of DFA.

2          And then Mr. Smith says in this antitrust

3    compliance guidelines that compliance, strict compliance

4    with all applicable federal laws is quote a core policy of

5    the company and it is critical that each and every one of us

6    abide by it.

7          So, Your Honor, that is sort of the starting

8    point.  It is our view that given that DFA's core policy, a

9    core policy of the organization purports to be to comply

10   with the law, that an individual member cannot say, well

11   gee, I'd rather you ignore this policy.  I've joined DFA,

12   but I'd rather you ignore this core policy and I think a

13   violation of that core policy benefits me and that creates

14   some sort of cognizable conflict that prevents other people

15   from getting relief.  We just think that's wrong.

16         The second point that is emphasized here, Your

17   Honor, is that in the second paragraph, where it says that

18   in this regard antitrust laws have been adopted by the

19   federal and most state governments to preserve our free

20   enterprise system.  The antitrust laws were designed to

21   assure competition on the merits among companies without

22   artificial restraints through improper agreements or

23   otherwise.

24         So the point is, Your Honor, that what DFA

25   expresses as its core policy is fair competition.  And for

1   anyone to assert that DFA should be doing something else

2   contradicts its own professed policy.

3          Let me talk about the relevant specific provisions

4   in this.  And, Your Honor, if you would turn to the second

5   page of this document it provides some context for this.  In

6   the middle where it talks about the guidelines being divided

7   into three categories.  And it describes a black list under

8   the first bullet.  And it says, these items, the items on

9   the black list are matters that are strictly prohibited.  So

10  there's a black list of conduct that the organization is not

11  supposed to engage in.

12         And then if you turn to the third page, which at

13  the bottom the Bate's Stamp Number, the last two digits are

14  21, there is a black list of prohibited conduct.  Items 1

15  and 2 deal with coercing or threatening people.  Basically

16  forcing people to market their milk through the association.

17  Item 4 under the black listed items is, do not enter into

18  any discussion or agreement with another cooperative not to

19  solicit.

20         There is such an agreement here, Your Honor.  It's

21  both -- there was an unwritten agreement.  And, in fact,

22  there are now written agreements not to solicit each other's

23  business.  That is a direct -- and that's a central

24  allegation in the complaint, in the case as the case has

25  evolved and very strongly supported by the evidence.  And it

1    is also, I would add, a per se violation of the antitrust

2    laws, which means that you can't get up and say, oh, we

3    think it benefits us to do that.  It is a per se

4    impermissible violation of the antitrust law.

5            Item A5, do not enter into any discussions or

6    agreements with other cooperatives relating to payments to

7    members or other producers.

8            On the next page, Your Honor, under Item C, Item

9    1, do not enter into any contract with a fluid milk bottler

10   or other processor that requires the processor to purchase

11   milk from DFA for a period greater than one year.  So

12   there's a one year limit on my milk agreement you can reach

13   with another processor.  And I will comment in a moment

14   about how they have violated that.

15           On Page 3-1 of this document the document states

16   that quote, any conduct that may permit an inference that

17   DFA and another cooperative had agreed on matters affecting

18   that competition, such as pay prices, should be avoided.

19   This is on Page 3-1.  And the basic point that it's making

20   is we can't enter agreements that restrict competition among

21   ourselves for farmers, such as agreeing on the prices, such

22   as price fixing at that level or agreeing on prices.

23           And the last point noted on point, on Page 3-7 is,

24   do not require as a condition of receiving a discount that

25   the customer purchase a full supply from DFA or an agency to

1    which DFA is a member.  And, Your Honor, that, in fact, is

2    exactly what has happened here.

3           So the point is that there are a number of very

4    specific prohibitions in antitrust guidelines.  It's

5    essentially this is what the organization commits to adhere

6    to and it's what they haven't done.

7           THE COURT:  So let's get back to my point.  That

8    would be a much neater, more concise case than the Court has

9    before it.  And I'm looking at the amended complaint.  And

10   some of those allegations are there.  And maybe the

11   responses, we didn't have discovery when we framed the

12   amended complaint so we didn't know this was out there.  But

13   there's a lot in that amended complaint that could create a

14   conflict.

15          So I might agree with the proposition that nobody

16   could agree that it's good for them to violate the antitrust

17   laws, but the complaint as framed has got the GNEMMA price

18   fixing, it's got the monopsony, it's got allegations that

19   could be tied into this, but this is not the complaint.

20          MR. PIERSON:  Your Honor, every central allegation

21   that we're relying on in this case, I think this is a fair

22   statement, violates either what DFA has said it is doing,

23   violates its internal policies or violates the consent

24   decree or more generally violates their statement that it is

25   a core policy to violate the antitrust laws.  Let me give

1    you specific examples.

2         THE COURT:  Okay.  And that's not what I'm saying.

3    I'm saying that the consent decree, as you've acknowledged,

4    none of the consent decrees are mentioned in the amended

5    complaint.  Certainly these antitrust violations or

6    guideline is not mentioned in the amended complaint.

7         The amended complaint ranges beyond that.  I

8    believe that's where the defendants are alleging the

9    conflicts arises.  So either we're talking about a different

10   complaint or you're asking me to agree to propositions which

11   may be very easy to agree to, but I'm looking at certifying

12   a class based on an amended complaint that contains the

13   allegations of conduct, but there isn't a cause of action

14   for violating their antitrust policies or violating consent

15   decrees.  That might be the conclusions.  There's a lot of

16   other allegations in there.  And I believe that's where the

17   allegation of the conflict arises.

18        So for me it's not, it's not particularly helpful

19   to focus on things that we might all agree to, but to focus

20   on areas where defendants say you've got one group of dairy

21   farmers that wants to be part of these co-operatives and

22   another group of dairy farmers that does not.

23        MR. PIERSON:  Well, Your Honor, let's talk about

24   the specific allegations because certainly, you know, the

25   issue in this case is whether pursuing the allegations in

1    the complaint creates a conflict.  And, you know, whether

2    the words consent decree or, you know, the underlying

3    rational for why it doesn't create a conflict, I mean the

4    focus is the conduct and whether that creates -- whether

5    that creates a conflict.

6            And, you know, whether the words consent decree

7    are invoked or internal antitrust guidelines are invoked in

8    the complaint, we can amend the complaint to address any of

9    that.  The issue here is really a substantive one, is

10   whether the conduct that has been challenged in this case

11   creates a conflict.

12           I mean if we need to amend the complaint to add

13   the additional facts that have been produced in discovery we

14   can do that.  And it's not unusual to amended a complaint to

15   conform with discovery.  But I think the focus here needs to

16   be on substance.  What is the conduct being challenged and

17   does it create a conflict.

18           THE COURT:  And so let me stop you.  I agree that

19   some of this conduct is in the amended complaint.

20   Absolutely it is in there.  The non-solicitation, you know,

21   all, everything that you have pointed out I could probably

22   find in the amended complaint.

23           You've got allegations about GNEMMA, you've got

24   other allegations.  And so let's -- tell me how that is not

25   the basis of a conflict.

1          MR. PIERSON:  Well, for example, I mean so the

2     central allegations is basically non-solicitation, exclusive

3     dealing agreements that last more than one year and include

4     most favored nations provisions or include restrictions on

5     whether someone solicits, etcetera.

6          With regard to GNEMMA what we believe the evidence

7     with regard to GNEMMA will show that it is being used to

8     suppress prices.  That is, you know, exactly the opposite of

9     what DFA has said that, that the purpose -- has assured its

10    members that it, that it would do.  And it has publicly

11    stated that the purpose of GNEMMA is to raise prices.

12         What we've indicated is that it suppresses prices.

13    And that by doing that what it's doing is in effect an

14    agreement that suppresses pay prices to farmers, which is

15    what in, for example, in the guidelines that I just referred

16    to, you know, they were -- the guidelines are clear that

17    they shouldn't be discussing prices with other members to

18    hold down prices or to prevent competition between, between

19    themselves for farmers.

20         With regard to the other allegations in the case,

21    I mean you commented on the unwritten, the agreements to

22    restrict solicitation of farmers.  The evidence in the case

23    is extraordinary.  You've -- you have, I hope taken note, I

24    can provide it if you want, the document from Rick Smith in

25    which essentially another co-op, and major co-op, St.

 1   Albans, has said let's agree to restrictions on

 2   solicitation.  And Rick Smith in marginalia sent to the

 3   senior officials of DFA writes, obviously, obviously we're

 4   going to do this.  Do we want this in writing?  I think not.

 5          You know, that is a remarkable document from the,

 6   from a CEO of a company because not only does it show -- not

 7   only does it reflect the agreement, it reflects his

 8   knowledge that he better not write it down in a

 9   communication to that affect among senior officials.

10          There are agreements that processors will not

11   solicit business from independent farmers in connection with

12   the full supply agreements and the outsourcing.  And that is

13   both a violation of their internal guidelines and it's a

14   violation -- and it's a clear violation of the consent

15   decree.  Your Honor, I would like to hand you what is

16   Exhibit BB, which is, is a truly, I think, remarkable

17   document.

18          This is about as close to a core violation of the

19   antitrust laws as you can get.  This is a payment between

20   the most senior officials at DMS acting on behalf of DFA

21   through Mr. Wickham who, along with a couple others,

22   basically runs these organizations.  And it's reflecting a

23   payment that's going to be made to Dean.  And the key

24   language here is in the paragraph that says, these payments

25   are the ones you and Gerry agreed to funds from Kansas City,

1    that's DFA headquarters, we consider them payments for

2    non-compete on the independent supply.

3            And what is going on here, Your Honor, is

4    essentially, and it's in an internal e-mail between the most

5    senior officials at DFA, they are memorializing the fact

6    that a check for a million dollars is going to be Federal

7    Expressed to senior officials at DFA -- at Dean.  And it's a

8    payment, and it's a payment non to compete.  And it was then

9    followed by four similar payments for $250,000.  And that --

10   and there has been conduct of that nature, Your Honor,

11   continuing in 2007, continuing in 2008.  And what is more

12   remarkable about some of those payments is the documentation

13   in this case also reflects that it wasn't even documented

14   internally.  They were making payments of millions of

15   dollars not to compete without even reflecting them on their

16   internal books.

17           With regard to false supply agreements, Your

18   Honor, the record in the case shows that they have entered

19   exclusive dealing arrangements, which are more than one

20   year, which is prohibited in the consent decree and

21   prohibited in their internal policies that include an

22   understanding that there will be no solicitations by the

23   processors involved, which is a violation of the consent

24   decree that include most favored nations provisions which

25   contradicts what they told the Department of Justice and

1    contradicts what they told all its members, all their

2    members, which was the MFN provisions had been removed.  And

3    they've done that at the same time that they, through

4    non-solicitation positions, have restricted competitive

5    alternatives.

6          So the full supply agreements that are challenged

7    in this case, again, go to conduct that is clearly contrary

8    to their own articulated policies and the requirements of

9    the consent decrees.

10         They've taken actions to fix and suppress farmer's

11   prices, which are described in our brief at Pages 4 and 6.

12   And they've entered into agreements to restrict pricing

13   through MFN clauses.

14         So really getting to your point, Your Honor, is,

15   you know, all of the central conduct that's been challenged

16   in this case does violate, it violates their core policy

17   because it's illegal.  And that in itself is a violation of

18   their core policy.  It violates specific policies, it

19   violates consent decrees.  And I, you know, I think the

20   premise, frankly, of Your Honor's question that there is

21   other conduct that's sort of, you know, is it all central to

22   this case where one of those things isn't true.  I think

23   that's really not correct, Your Honor.  We could take any of

24   the conduct that is really at the heart of this case and

25   point to ways in which it violates their internal policies,

1    violates consent decrees and violates the law.

2              THE COURT:  All right.  Well, I, I guess I'm not

3    making my point.  My point is those allegations are not in

4    the amended complaint.  So I could deduce them, but an

5    allegation that these are per se violations of the antitrust

6    laws, that they violate their internal policies, that they

7    violate various consent decrees, those allegations, those

8    particular allegations are not in the amended complaint.

9              And so how far can the Court go with them on class

10   action certification?  I agree that this conduct

11   allegations, some of them, and maybe even most of them, are

12   in the amended complaint.  But you are making a very

13   forceful argument.  Look, Judge, this is per se violations,

14   they violate the consent decrees, they promised they weren't

15   going to do this to the Justice Department and I don't see

16   those allegations in the amended complaint.

17             MR. PIERSON:  The key response, Your Honor, I

18   think that the case does not freeze at the complaint.  You

19   have a record for class certification -- and I think it goes

20   -- you know this business about a rigorous examination of

21   the record, that cuts both ways.  It means, it means not

22   only do you put us to our proof, but it means you look at

23   the whole record.  And the record in this case does not

24   freeze at the time of the complaint.  Obviously it doesn't.

25   There's a tremendous amount of discovery after the

1    complaint.

2            So you need to evaluation -- you need to decide

3    whether there's a conflict in this case based on the entire

4    record in front of you not just the complaint.  Now, the

5    complaint identifies certain conduct.  But the entire record

6    in front of you, which requires rigorous examination,

7    includes the consent decree, it includes their commitment to

8    comply to the consent decree and telling members that they

9    were voting to form the organization on that basis, it

10   includes their antitrust compliance guidelines and it

11   includes the public representations they have made to

12   members.  That's what a rigorous analysis requires that you

13   look at the whole record.

14           So they are really -- at the end of the day here

15   there are two questions you have to ask; what's the conduct

16   at issue and what, based on a rigorous examination of the

17   entire record as the case is developed, does that present a

18   conflict or doesn't it present a conflict.  And the reason

19   it doesn't present a conflict is because the conduct that we

20   are challenging, the central conduct in this case it is

21   illegal, which violates a core policy of the company, it

22   violates specific guidelines and it violates the consent

23   decree.  And all of that is in the record before you, Your

24   Honor.

25           Now, Your Honor, I would -- the other issue that

probably makes sense for me to address is the issue of
sub-classing, which is addressed in, in paragraph, in Slide
9.  And I want to be clear about this.  We don't think
there's a conflict here.  We don't think sub-classing is
required.  And, and the reason we think that is for the
reason that I just explained is that the conduct, the
conduct that's been challenged, not only does it hurt people
that are outside DFA, it violates DFA's own policies, it
violates the consent decree, it violates the law, etcetera,
etcetera.

So we think, you know, our basic position, and
it's reflected, for example, in the Jacobi case, in the
Southern District of New York, is that, is that, you know,
is that people in an organization can't get up and say,
well, I know the organization has made it, it's core policy
not to do X., Y. and Z. but I think X., Y. and Z. is good
for me and that creates a conflict.  They may feel that way,
but that's not a cognizable conflict.

But let's assume for the sake of argument that the
Court disagreed.  What would be the way to -- what would be
the way to approach this or if the Court just wanted to be
prudent.  And the case I wanted to bring to the Court's
attention, which the defendants are aware of, they briefed
it in the Southeast.  And, frankly, you know, I gave some
thought as to whether we should file a supplement -- I mean

```
1    I'm going to refer to two cases in my argument which were

2    not in the prior briefing.  And the message I kind of had

3    gotten from the Court was enough is enough.

4            So in that spirit I will refer you to the literary

5    works in Electronic Data Bases Copyright Litigation.  The

6    citation's here.  It's a decision just really about a month,

7    a month ago.

8            And the issue that was dealt with in that case you

9    had various writers who were arguing that they had not been

10   properly reimbursed for their, for their copyrights and

11   basically the writers potentially fell into three different

12   groups essentially depending on how um, how strong their

13   statutory claims were essentially; Group A., Group B. and

14   Group C..  And an additional complication in the case was

15   that some of the writers fell within Groups A., B. and C.,

16   some fell within A., B., some fell within B., C..  So the

17   Court wrestled with how to deal with that.

18           And it started from the premise that, that there's

19   always going to be tensions within class actions.  That's

20   almost inherent to the exercise.  And the question is

21   whether there's a fundamental conflict.

22           In that case two of the judges felt that there

23   was.  And they said how do we deal with that.  And that's

24   the quote that's reflected in Slide 9 where we say not every

25   conflict among sub-groups of a class will prevent class
```

1    certification.  The conflict must be fundamental to violate

2    Rule 23(A)4.  Where such a conflict does exist it can be

3    cured by dividing the class into separate homogeneous

4    sub-classes with separate representation to eliminate

5    conflicting interests of counsel.

6            If the Court were concerned that there was a

7    conflict in this case I think the appropriate approach would

8    be essentially create a sub-class of people that sell

9    through DMS and people that don't, which is not terribly

10   different than what may be happening in the Southeast.

11           I actually don't think it's the right approach

12   because -- basically because we don't believe there's a

13   cognizable conflict for people to get up and say we think

14   it's good for DFA to violate the consent decree that they

15   agreed to.  We don't think there's a conflict.  But if the

16   Court was concerned that there was a conflict, you know,

17   what the Second Circuit has made clear, and it made this

18   clear in the Visa case, is that there are, and the Court I

19   think -- I don't want to overstate it, but it sort of made

20   this for me, there are compelling reasons.  You know, given

21   a choice between certifying a class in a case where, where

22   we're assuming that there has been illegality where your

23   choice is we'll certify class and let people proceed and put

24   them to their proof versus a world in which, as a practical

25   matter, no one's going to be able to proceed.  There are

1    compelling reasons to choose this option.

2              And what the Second Circuit -- the Second Circuit

3    has said that.  And what it's essentially saying is if there

4    are tensions, if there are conflicts and you can create

5    sub-classes you should create sub-classes.

6              The other thing that is interesting about Literary

7    Works is it sort of acknowledges the sub-classes don't have

8    to be -- they don't have to be perfect.  In fact, in that

9    case they talked about the possibility, well, we can create

10   -- because of all of the permutations we can create seven

11   sub-classes.  But that doesn't really make sense.  What we

12   think probably makes sense is let's create three in that

13   case and we'll send it back to the District Court to

14   exercise their sound discretion.  So, you know, that's

15   basically where we are on the conflict.

16             THE COURT:  But let me ask you, because in

17   simplistic terms, I think that, especially reading the

18   declarations supplied by DFA and DMS, what I am hearing is

19   people saying I joined a cooperative because I decided that

20   was the best way to bring my milk to market, I have a

21   problem being both a member of that cooperative and being

22   sued by plaintiffs.  So single I don't get it.  If my

23   cooperative, DMS or some other, gets a, it would have to be

24   a defendant to get a judgment against them, that's going to

25   somehow come out of my pocket.  And that's my conflict is I

1    don't want to be both a plaintiff and a defendant.  And it's

2    different if we had a non-cooperative defendant, but the

3    argument is a cooperative is owned by its members, it's

4    managed by its members, you are suing us on behalf of us.

5    That's in simplistic terms what I believe they are saying

6    the conflict is.

7           MR. PIERSON:  Well, I agree with that

8    characterization, Your Honor, but I think the key point is

9    that no member of a co-op is entitled to say I -- we're not

10   telling people they can't join DFA or they can't join a

11   co-op or co-ops can't organize.  We're not saying that.

12   Co-ops can do all sorts of things.  And they can, you know,

13   that's a given.

14          What we're saying is that no member in a co-op can

15   say, boy, even if the evidence shows that we're -- our

16   practices violate the law, violate our core policy, violate

17   a consent decree and violated our anti-trust compliance

18   guidelines, nevertheless, I should be able to veto the

19   ability of other co-op members to try to enforce those

20   requirements and get antitrust relief because I think they

21   are good for me.

22          THE COURT:  I think that their allegation goes to

23   the conspiracy allegations.  We are in on the conduct for

24   which you are seeking recovery.  That's, what you presented

25   today is a different set of facts, which I haven't heard any

1    dairy farmer member address.  And it's about things that

2    maybe reasonable minds could not differ like the consent

3    decree, do you have to follow it or not.  You have a

4    conspiracy allegation in which they are, it may be in their

5    view, de-facto members of the conspiracy and also plaintiffs

6    alleging a conspiracy.

7              And so, yes, I might agree with you that nobody

8    can agree and do a waiver and say that we all want to

9    violate the antitrust laws.  Your core allegations are

10   conspiracy ones at this point.

11             MR. PIERSON:  But, Your Honor, the conspiracy

12   allegations violate every one of those things that I just

13   listed.  And if it was correct that a co-op could -- co-ops

14   which are, you know, consist of management that does include

15   farmers.  If co-ops could prevent a class action and thereby

16   prevent meaningful relief by saying, well, you know, we

17   decided we want to conspire, we decided we want to violate

18   the law, we decided we want to violate the consent decree, I

19   think that's good for me.  If a co-op could circumvent a

20   class action by doing that, you know, there will be no class

21   action, there could be no class action relief in this case.

22             THE COURT:  But what about their point, okay, but

23   you are not representing my interests then because my

24   interest is to remain a member of this co-op and avoid a

25   damage award.  That, that's what, even if, even if the

1    position you are either taking you disagree with I want to

2    get to where the conflict lies and how would, does it exist

3    and how would it be addressed.  I don't actually see the

4    same conflict with what you presented today versus

5    conspiring to monopsonize and the other allegations in the

6    amended complaint.

7              MR. PIERSON:  Well, Your Honor, I mean the

8    conspiracy to monopsonize, I mean all the conduct that I

9    described that is the conduct that, you know, the

10   monopolization is the big overarching label, but it consists

11   of this conduct that violates their policy.  And what, what,

12   you know, the essence of our argument, I mean I think there

13   are two points I want to make.  One is sort of technical

14   point, but the other I think is the larger point.

15             The technical point is this notion that this law

16   -- that the class action harms the financial interests of

17   some of it in DFA is just factually incorrect.  And it's

18   discussed in our reply brief.  And the reason it's factually

19   incorrect is because, remember DFA is a national

20   conglomerate and basically in which DFA members in the

21   Northeast constitute essentially five percent of the milk

22   that's used by the conglomerate.  So their equity interest

23   is essentially five percent in the organization.

24             This is a technical point.  I want to get to the

25   Court's larger point.  But the point is for every dollar

 1    recovered against DFA in this case 17 cents of that dollar

 2    is going to go to DFA class members because they constitute

 3    17 percent of the class in the northeast.  And their

 4    argument is well, gee, they are going to have to pay out

 5    money too.  But because they only constitute five percent of

 6    the national organization basically at worst for a DFA

 7    member every dollar they recovered they are going to get

 8    17 cents and their equity might be diminished by five cents.

 9            But I think the Court though I think is raising

10    sort of a larger point about, which goes to -- I mean the

11    central issue, just to phrase it as clean as I can, and I

12    don't think apply the label conspiracy or monopolization or

13    you break it into the individual conduct.  The central issue

14    is the conduct we have identified violates their policy, it

15    violates a consent decree and it violates the law.  And our

16    fundamental position is that for a DFA member -- I mean it's

17    just like a DFA member getting up and saying I think we

18    could make more money for me and the organization if we sold

19    drugs.  I mean that would not create a cognizable conflict

20    even if it benefited that member, even if we could do that

21    we'd rake success.  And that's really our point here.  A DFA

22    member -- where essentially the record is I think largely,

23    maybe undisputable would be to overstate it, but certainly

24    there is, you know, compelling evidence to put to a jury

25    that they are violating their own policies, they are

1    violating a consent degree and they are violating the law.

2    And for a DFA member to say, well, I know we're doing that,

3    but I think it's good and, and not only do I think it's good

4    I can prevent any other member of the organization from

5    challenging those things to getting meaningful relief using

6    the only mechanism that's available to them, that's just,

7    that can't be the law.  It --

8              THE COURT:  Yeah, I don't think that's the

9    argument though.  And I won't circle around too much again,

10   but we have class actions pending here.  And for some reason

11   many right now.  And if I drew a line between defendants and

12   plaintiffs that line would stick.  There are people crossing

13   over on either side.

14             And the argument here is people who are in the

15   defendant's category are also in the plaintiff's category.

16   And that, in the most simplistic terms, is the challenge of

17   people being both defendants and plaintiffs.  And I can tell

18   you that is a little novel and it has to be addressed head

19   on because it is not typical in antitrust cases.  Maybe

20   against co-operatives it's typical, but it's not typical in

21   an antitrust case to have that, people on both lines.  And

22   that wasn't a conflict I was presented with the Dean

23   settlement.  Dean was on one side, the plaintiffs were on

24   the other, I didn't see a conflict between the two of them.

25             MR. PIERSON:  Yeah, I understand.  Fair enough.

1    But I think -- I guess there are two points I'd want to

2    emphasize, Your Honor.  You know, number one, you know,

3    taken to its logical conclusion, you know, if, if one bought

4    into that notion that, gee, you can't be a, a member of a --

5    that members of a co-op can't sue the co-op because they are

6    suing themselves.  If, if that were the law, you know,

7    basically co-ops would have de-facto immunity from class

8    actions by their own members because you'd always have that

9    kind of a conflict.

10           Now, whether that proposition is true in some

11   cases -- here you've got the additional factors that it

12   violates -- that the conduct that's been challenged violates

13   what the organization describes as its core policy and it

14   violates a consent decree and it violates the law.  And so,

15   you know, this isn't even the most extreme case with a

16   co-op.  This is a case where we're basically saying, you

17   know, no member of the co-op has a right to say it's good

18   for us to violate our policy, it's good for us to violate

19   the consent decree and it's good for us to violate the law.

20   And that's in essence what their conflict position is.

21           Now, there's an issue ultimately to be, you know,

22   the jury will decide whether we're right or whether we're

23   wrong, but there is abundant evidence in this case that all

24   of those things are true.  That they are violating core

25   policy, they are violating the consent decree, they are

1    violating the law.  And, you know, our fundamental position

2    is that, is that that doesn't, you know, a member saying,

3    gee, that's good, we want the co-op to sell drugs, I'm

4    making money from selling drugs, that's not a cognizable

5    conflict, Your Honor.

6              And anyway, that's -- I don't mean to belabor the

7    point.  That's my fundamental point.  And I, you know, the

8    point I would emphasize in connection with that is, is, you

9    know, if that were the law co-ops have de-facto immunity

10   even where they do violate the law, and they do violate a

11   consent decree and that would seriously undermine

12   enforcement of the anti -- it would make meaningful

13   enforcement of the anti-trust laws in this context virtually

14   impossible.  I mean, you know, there's a reality that

15   overrides this proceeding.  I mean they can say Mr. Haar,

16   and I mentioned Mr. Haar and his family, are sort of

17   scattered throughout the courtroom I guess in white shirts

18   um, um, you know, they could say, well, Mr. Haar can just

19   sue them individually.  But we all know that that's

20   impossible.  They have spent, you know, millions of dollars

21   on the defense of this case.  Their experts alone.  It is

22   impossible for anyone to proceed individually.

23             And that's why, you know, in the last 10 years,

24   you know, in the Southeast and the Northeast, no individual

25   farmer has been able to do this.  No individual farmer has

1    tried to do that.  So the stark reality is if their theory

2    is right then co-ops have de-facto immunity even where they

3    violate a consent decree, even when --

4          THE COURT:  That's going too far.  You're saying

5    de-facto immunity from class action certification means

6    de-facto immunity from the antitrust laws.  And I don't

7    think you can go that far.  Individuals and companies do sue

8    other companies for antitrust violations.  Not all antitrust

9    cases are brought as class action certifications.  And it

10   gets us too far away from our point which is is there a

11   conflict.

12         MR. PIERSON:  Well, let me just comment on that

13   briefly, Your Honor, because I do think it is fundamental.

14   I think the reality is that individual farmers cannot do

15   that.  That the reality is confirmed by the history here.

16   Even when you have Dean paying, you know, ultimately in

17   excess of $100 million, if you include both settlements, to

18   resolve antitrust claims, I mean these claims are real.

19   Dean doesn't pay that kind of money over stuff that is

20   fabricated.  They may disagree with it, but there are

21   substantial claims here.  And if you look at the last 10

22   years no individual has been able to pursue a claim like

23   that.

24         So I don't want to overstate it.  It's not

25   theoretically impossible, but the Court should have no doubt

1   about it.  As a practical matter the alternatives here are

2   class relief or no private relief.  That's just the reality.

3           Now, if I may, shall I turn to the predominance

4   analysis?

5           THE COURT:  Sure.

6           MR. PIERSON:  All right.  And I would start, Your

7   Honor, on Slide 10 and make a number of overarching points.

8   First, as the Court is aware, the Supreme Court has said the

9   predominance test is readily met in cases involving

10  allegations of violation of the antitrust laws.

11          And we cite some more sort of, I would say sort of

12  generalized law to start.  I don't think it's necessary to

13  repeat it here because it's reflected in the briefs.  But it

14  was also finding in this Court's earlier ruling -- and I

15  understand that the issues are more complicated here, but

16  the Court did analyze the predominance issue earlier.  And

17  one of the points the Court made, which is of central

18  importance here, is that in cases involving a conspiracy

19  where, where issues such as was the conspiracy formed, who

20  are the participants, what's, what was its duration, what

21  are the activities it did, did people drop, those are, those

22  are common issues.

23          And I know the last time the Court was here, I was

24  here in front of the Court, the Court, I would say gently,

25  criticized us for submitting these voluminous papers.  We

1    submitted interrogatory responses that were about I think
2    200 pages long, outlining what we think is the illegal
3    conduct that we think the conspiracy has engaged in.  And I
4    mean this is the reason why the Supreme Court has said the
5    common issues -- that common issues typically do predominate
6    in antitrust cases because you look at the volume of proof
7    of the conspiracy and its activities and the complexity of
8    it, which the Court is well aware of.  The notion that that,
9    that that proof is going to be presented in any one of these
10   cases, if you have to proceed, and there are obvious
11   enormous efficiencies for the judiciary and for reporting
12   inconsistent decisions in having that presented in a single
13   proceeding rather than having it done hundreds or
14   potentially thousands of times.
15          So that's sort of -- that's sort of a core
16   starting point.  Is that, you know, the conspiracy is the
17   pink elephant in the room.  And that is very much a common
18   issue.  And I'm not saying it's the only issue, but it is a
19   common issue.  And that's why the prominence finding is
20   typically found to be met in antitrust cases, not always,
21   but as the Supreme Court said ordinarily.
22          In Slide 10 there is some reference, some
23   discussion to whether this is a horizontal conspiracy -- I'm
24   on Slide 10.  On the second page there's some reference to
25   whether this is a horizontal conspiracy or a vertical

1    conspiracy.

2         I think it's, it's kind of a debate, much ado

3    about nothing.  It's not -- for class certification purposes

4    the conspiracy is what it is.  It will be proved by common

5    proof.  And whether one characterizes it as horizontal or

6    vertical it doesn't really, I don't think it matters legally

7    much at the end of the day, which is a ruling that was

8    reached in the Southeast.  Again, you can take it for

9    whatever you think that it's worth.

10        The other point I would make, to make in

11   connection with this though that even though I don't think

12   it's terribly legally relevant whether it's horizontal or

13   vertical, in fact, a great deal of the core conduct here is

14   absolutely horizontal; price fixing, competition with

15   processers when you're both competing for farmers that's

16   competing in a horizontal way.

17        Agreements between co-ops not to solicit their

18   members is a horizontal agreement.  There's a lot of

19   horizontal conduct that's at issue in this case.  Again, I

20   don't think it's a matter of particular significance.

21        Turning to Slide 11 this is sort of the overview

22   of essentially how we're trying to prove our case.  I

23   observe in Bullet 1 here that the existence, scope,

24   activities, participants and duration of the conspiracy are

25   all going to be demonstrated by common proof.  The impact of

1    the conspiracy in this case will be demonstrated by common

2    proof.  And I'm going to -- and since that's been their

3    major point of contention I'll walk the Court through some

4    of the detail on that.

5              THE COURT:  Before you get started let me ask you,

6    have you given any thought to whether this is a bifurcated

7    case with a class certification and determination of

8    liability and then an analysis of causation and damages?  If

9    we've got an expert on the other side, assuming the

10   allegations are true for the sake of its analysis, and

11   putting all of his fire power challenging common impact and

12   damages, wouldn't almost or a good portion of that go away

13   if we had a liability determination and then the Court took

14   up the extent to which we would have at that point a more

15   narrow focus as to what the allegations were for which

16   liability was found, if it was found, and then we would have

17   a much more streamlined damages and causation analysis?

18             MR. PIERSON:  I think that's a really, really good

19   question.  Here's my reaction to it.  I think it's an issue

20   to be decided as the matter gets closer to trial because

21   you're going to get summary judgment briefs, you're going to

22   get Daubert briefs, you'll drill down on the expert reports,

23   you'll have a better sense of sort of what the evidence is

24   and the interplay of it.

25             I know in the Southeast the defendants argued that

1    the issue of geographic market should be, should be

2    bifurcated and tried first and then you should try

3    everything else.  The judge down there, Judge Greer, you

4    know, say -- putting aside your views about his particular

5    opinion, he's a very experienced trial judge.

6            THE COURT:  You should definitely not cast

7    aspersions on my behalf on his opinion.  I just said that

8    there was not a great deal of analysis on the proof needed

9    for causation in that opinion.

10           MR. PIERSON:  Fair enough.

11           THE COURT:  If it was there I didn't see it.

12           MR. PIERSON:  Fair enough.  And really the point

13   I'm trying to make is he is a very experienced trial judge.

14   And he examined this question about whether it made sense to

15   break these issues down in their geographic market versus

16   everything else and decided that was not the best way to

17   proceed with trial.

18           I think it's an interesting question.  I think

19   it's a question that you can think about as the case

20   actually gets to trial.  And in connection with class

21   certification the way I would suggest to deal with it is to

22   just say -- and the Second Circuit says this in a number of

23   its opinions, says, you know, that it's within the trial

24   court's discretion.  There are a variety of approaches the

25   Court can use.  Sub-classing, breaking it into issues,

etcetera, etcetera.  And the Court should exercise its sound
discretion about those things.  But I think the time to do
that is as we're really getting close to trial.  And what I
would urge the Court to do is sort of withhold judgment on
that until, until you've got sort of more of the evidence in
front of you.

          The other thing that occurs to me in which in a
sense the case is sort of logically bifurcated is issues of
injunctive relief will not be decided by the jury.  They'll
be decided by the Court.  And that's an important point to
bare in mind in the sense that there will be no injunctive
relief in this case, none, unless the Court finds that it's
appropriate.  And the Court, of course, can only find that
it's appropriate if, if the conduct that requires that
relief is deemed to be illegal.

          If the Court finds that conduct is illegal then it
violates a core policy of DFA.  So the one thing you know as
a given, Your Honor, is that no injunctive relief will be
entered in this Court, in this case, unless, unless it's
illegal and violates a core policy of the company.  That's
one of the reasons why we don't think there's a conflict.

          Now, we're going to argue that that kind of relief
is appropriate, but ultimately the Court will decide that.
So in that sense I don't know if bifurcation is technically
the right word for that, but I think it's important to bare

1    in mind, you know, the jury will decide the liability and

2    the damages issues, but the -- it's bifurcated in the sense

3    of the injunctive relief is all decided by the Court.

4              Returning to Slide 11.  With regard to impact I

5    will drill down in this.  But I think what one of the points

6    that I want to emphasize is that, you know, we can have a

7    battle of the experts here, and we do have a battle of the

8    experts here, but a lot of the problem with the defendant's

9    position is that it's really rejected by their own internal

10   arguments, their own internal documents and testimony.  And

11   I'll give you examples of that later.  But one of the core

12   ones is a document referred to in the papers in which a vice

13   president of DMS says that their conduct is lowering the

14   price for the entire market.  And that is the -- that's the

15   essence of our position, Your Honor, here.  And it's

16   important to emphasize this, that for purposes of antitrust

17   impact we don't have to show that everybody was impacted in

18   the same way.  We don't even have to show everybody was

19   impacted.  What we need to show is that there was, you know,

20   essentially a drop in prices that affected the entire

21   market, not necessarily every tiny piece of it, but in

22   general can be said to have affected the entire market.  And

23   that's acknowledged in their own documents.  Not by a

24   low-level guy, but by one of the vice presidents of DMS.

25             With regard to damages we're proceeding in, we're

1    proceeding here, and the Court's familiar with the

2    methodology, we're basically using a combination of a

3    benchmark and multiple regression analysis.  And I think

4    that the point to emphasize here is that there's nothing

5    novel about the approach Dr. Rausser's using here.  I mean

6    this is kind of antitrust 101.  You know, we're using basic

7    methodologies that are very commonly accepted in these case.

8           There is one difference which is reflected in the

9    next, in the next bullet where I reference the fact that the

10   data in this case is unusually robust.  Here, Your Honor,

11   Dr. Rausser's analysis is based on -- I mean there's been,

12   as you know, there's been a lot of discovery in this case.

13   We've worked very, very hard at it.  His analysis is based

14   on 500,000 price points, price transactions during the

15   relevant period.

16          And it's unusual in the sense that -- not only is

17   it unusual to have that level of transactional data, but the

18   detail that underlies it.  I mean not only do you have the

19   total price, but you have the various component prices and

20   premiums, etcetera.  So there's an extraordinary amount of

21   data.  And also the ability to undertake what is quite a

22   sophisticated multiple aggression analysis.  I mean

23   controlling for 19 variables.  That is a substantial, that

24   is a substantial undertaking.

25          The other point that I want to emphasize before

1    getting into the details a little bit is um, that um, this

2    is not a case like many antitrust cases are where you've got

3    an expert who sort of theorizes and says I think I can do

4    this, here's my theory for how I'll be able to do it.

5    Rausser's actually done this.  He's actually prepared a

6    damages report now.  It's referenced in the interrogatories

7    that we've submitted.  It was filed or served on the other

8    side afterwards.  It certainly is referenced in the

9    underlying materials.  But this is not an expert

10   theoretically saying I think I can do it.  He's actually

11   done it.  And at the Daubert stage they can debate whether

12   or not he's done it right.  But the key point is, unlike a

13   lot of antitrust cases, this is not an expert theoretically

14   saying they can do it.  It's an expert whose actually

15   performed the analysis and is prepared to defend it.

16           THE COURT:  Well, let me ask you about that

17   because it was my perception that the opinion changed over

18   time, maybe in response to the defendant's challenges to it,

19   but that there were alterations in it.  And that's why I

20   believe I received two or three supplements to the opinion.

21           MR. PIERSON:  Yeah.  Well, that's a fair question.

22   Um, you know, it's a complicated case.  We can stipulate to

23   that.  And um, and I think it is fair to say that both

24   experts have evolved the way they've done their analysis.

25   Dr. Rausser started -- there was an -- this goes a little

1   bit to this issue of total price versus just looking at the

2   premium.

3          It's important to bare in mind that there's a

4   price that starts at the processor level, how much the

5   processors pay into the federal marketing system.  And it

6   works its way down to farmers who are ultimately getting a

7   suppressed price.

8          The component price at the processor level is

9   regulated and standardized in that sense.  But when co-ops

10  um, eventually pay their farmers out at the bottom there is

11  some ability to manipulate the component price.  My

12  understanding is that it's not strictly regulated at that

13  level.  And, in fact, I think what, what we, what the

14  evidence showed in the Southeast and the way price is being

15  analyzed in the Southeast is a lot of the price manipulation

16  and suppression in the Southeast is actually found in the

17  components that the co-ops paid to their farmers.

18         So if we had ignored that piece of the total

19  price, the components, what the defendants would have said

20  is that we were gaming the analysis and that we weren't

21  doing what we did in the Southeast.

22         Now -- and that's why Rausser started by looking

23  for uniformity in the component price because that's where

24  the suppression was found in the Southeast.

25         Now what he found during that analysis was that

1    the component prices in the Northeast -- and, in fact,

2    that's not where the suppression was.  The suppression was

3    in the total price, and in particular, in the premiums.  But

4    it was, it was a, it was a reasonable place to start.

5         Kalt, on the other hand, started by analyzing what

6    he called a competitive premium.  And this is one of many

7    respects in which his analysis is, let me just say, it is

8    incorrect because there is no such thing as a quote

9    competitive premium.  And what Kalt did was he went to um,

10   the premium that different co-ops charged and they labeled

11   different components in different ways.  And he sort of

12   picked and choosed which parts of the premium he was going

13   to count for purposes of his analysis.

14        So surprise, surprise he found that in, you know,

15   when you pick certain parts of someone's premium and

16   different parts of someone else's premium and you exclude

17   some things you add variability.  So he was criticized for

18   his use of a competitive premium by Rausser.  And he then

19   responded by creating a new premium in his next level of

20   analysis which we also think is flawed.  It's a premium that

21   now excludes both the PPD, which is a location differential

22   which is paid, and excludes the blend price, but Kalt

23   changed his methodology.

24        And so what -- I think the fair thing to say, Your

25   Honor, is -- and, you know, one of the -- one of the really

1    hard things in this case, it's a hard thing for attorneys

2    and experts and, you know, you're probably getting, you

3    know, of the challenges.  You know, one of the issues we

4    struggled with in this case was when should the class

5    certification report be filed.  And we, you know, I think

6    the original order had them very early and they got pushed

7    back later on, but they were filed while discovery was

8    mid-stream.  And that's, I'm not being critical of that.

9    It's not -- it was not unusual, but that's what happened.

10   And so Rausser in his initial report said that, look,

11   discovery is ongoing, here's what I know based on what I

12   know now, but I may need to revise my analysis as more and

13   more information becomes available.  And that's what

14   happened.  Rausser did it.  Kalt did it.  We don't criticize

15   Kalt for that in particular.

16           The point is whether the analysis is ultimately

17   right.  And that's -- that raises another point that is a

18   really important point to think about in connection with

19   these -- how you think about these expert reports, Your

20   Honor.

21           And an issue, as you know that the Courts have

22   struggled with, and in which the laws evolved is how much of

23   this do you get into at the class certification stage.  And

24   I think it's fair to say that the law is still evolving on

25   that issue.  What is clear is that the Court has to

1   undertake a rigorous analysis and that that requires some

2   examination of this stuff.  But, but in doing that what you

3   need to focus on is what is the question that you are

4   ultimately deciding.

5           And the question that you are ultimately deciding

6   is not, is not whose right in terms of was there a -- was

7   there an underpayment here or an overpayment.  What you're

8   deciding is whether the proof in this case is susceptible to

9   common proof.

10          Now, that doesn't mean that Dr. Kalt couldn't get

11  on the stand and say I don't like Rausser's methodology and

12  I think there's a better way to do it.  But the fundamental

13  question is is it susceptible to common proof.  And that

14  means that allows some error in what the expert does along

15  the way.  So that if you go through a progression of expert

16  reports and let's -- and I don't think this happened here,

17  but let's say you have a case where the expert does make

18  some errors, but in the final analysis the expert says, I've

19  heard the criticisms, here's how I would address it having

20  considered all this the matter is susceptible to common

21  proof.  I can do it in a credible, Daubert proof way at the

22  end of the game.  That's sufficient for class certification

23  purposes because the question you have to answer is whether,

24  based on all the evidence, not, you know, disagreements

25  about what happened in the original report, but based on the

1    full record rigorously analyzed do I think this is

2    susceptible to common proof, not can experts disagree, but

3    is it susceptible.  And um, that, I just emphasize that

4    because that's the context in which --

5            THE COURT:  Well, and as you know, some courts

6    look like they are doing Daubert analysis under Iqball,

7    Twombly, probability analysis in terms of the quality of the

8    expert's proof.  In this case when we don't even have an

9    agreement on the geographic market it's pretty hard to reach

10   a conclusion that this is susceptible to common proof.

11   There might be common issues, but without the market being

12   fixed and using that as a component of the causation and the

13   damages analysis it's very, it's more complicated.

14           MR. PIERSON:  It is complicated, Your Honor.  Now,

15   the market issue I have to say I don't think has really been

16   fully -- I wouldn't say it's been extensively briefed by

17   either party.  It is discussed in the expert reports, but I

18   don't think -- I don't really take that as a major part of

19   what, of what their argument was.  I mean I, I mean at the

20   end of the day --

21           THE COURT:  I took it to be a very major part of

22   it.

23           MR. PIERSON:  Well, at the end of the day, I mean

24   the geographic market in this case, and I'll get into some

25   of the details about the proof throughout the market, but

1    um, is a completely defensible market.

2              I mean, in fact, in fact, it's repeatedly a market

3    that is used, you know, it's how they organize -- they

4    organize their business by Order 1.  There are numerous

5    documents in which they describe that market as, you know,

6    as a matter, as the market in which they are doing business.

7    I mean this is all over their internal documents.  And it's

8    reflected in some of their testimony.

9              And, you know, I'll get into actually the economic

10   analysis, but at the end of the day I think there's just no

11   question at all that there, you know, what the proper market

12   is on the issue is at a minimum -- I think we're right.  But

13   at a minimum it's going to be an issue -- it's going to be a

14   fact issue for the jury.

15             But let me walk through some of the common impact

16   analysis to show --

17             THE COURT:  Would this be a logical breaking

18   point?  I want to make sure that the court reporter has some

19   time this morning.  Or should you finish that line of

20   thought?  Does it make any difference?

21             MR. PIERSON:  It doesn't make any difference.

22   That is fine, Your Honor.

23             THE COURT:  We'll take approximately 15 minutes

24   and then we'll come back.

25             (The Court recessed at 10:51 a.m. and resumed at

1   11:10 a.m.)

2         THE COURT:  We're back in the case of Alice H.

3   Allen, et al versus Dairy Farmers of America Inc., et al.

4   We are in Mr. Pierson's argument.  Go ahead.

5         MR. PIERSON:  First, let me say I appreciate the

6   Court's patience with this.  I know we're both working

7   really hard at this.  This stuff is not easy.

8         I want to comment a little bit on this issue of a

9   geographic market since that's one of the issues you

10  indicated is important to you.  And there are a couple of

11  points to make in connection with this.  I mean ultimately,

12  ultimately this is an issue for the jury.  It's going to be

13  a fact issue, but there are a couple of points to point out.

14        You know, the question with a geographic market in

15  a monopsony is basically whether farmers are located in what

16  we've described as the market what alternatives do they

17  have, meaningful alternatives if there's price suppression

18  and in particular if price, the way it's often tested if

19  price drops by a certain amount can they meaningfully escape

20  the conspiracy by going outside the market.  That's sort of

21  how you look at analyzing the market.

22        Now, one way to look at this is by what's called a

23  Snip Test.  And I don't think I can explain all the math

24  about that, although, it's discussed in Rausser's report.

25  And at a first level it's a test that basically asks that

1    question at a theoretical level, would people be able to

2    ship out.

3              And what Rausser finds is that the Snip Test --

4    that the other markets that are out there, the other orders

5    really are not viable for farmers in the Northeast.  In the

6    Southeast, of course, you've got the problem that those

7    markets are constrained by the allegations of the conspiracy

8    down there to begin with.  So it wouldn't be appropriate to

9    include them as part of the market.

10             But the one, the one market where there was some

11   question was, was Order 33.  And, you know, Order 33 you

12   actually have an ability to drill down in Order 33 because

13   there have been instances where the prices in Order 33 went

14   up relative to what they are in Order 1.  So Rausser had the

15   ability to look, not just at a theoretical model under the

16   Snip Test, but in terms of actual history, do you actually

17   see farmers moving their milk to Order 33 when the prices

18   change in order -- when a gap develops in the prices.

19             And what he found was that, that, in fact, the

20   movement into Order 33 is, is negligible when prices raise.

21   So as a real world matter that's, that's not a viable

22   market.  And so what we know about the ability of farmers to

23   sell outside Order 1 is a couple things.  Historically

24   Rausser says, in fact, very little milk moves from Order 1

25   outside Order 1.  Very limited amounts.  There are ample

1    reasons in the record why we could expect that to be true.

2    It is not easy for farmers to switch.  And, in fact, farmers

3    have very little control over where their milk goes.  It's a

4    decision that's made by DMS.  And for individual farmers to

5    say I want to get out of DMS and I'll sell milk

6    independently and I'll try to do it outside Order 1 is

7    something that, at a common sense level and in terms of the

8    factual record in the case, is a very hard thing to do.  And

9    as a historical matter, in fact, is not -- it is being done

10   at a very negligible level.

11        So that's what -- that's what the data shows

12   essentially the movement -- the ability of people to move

13   outside Order 1 and that as a practical alternative is very

14   limited almost to the point of being de-mittimus.

15        The other thing --

16        THE COURT:  What about milk coming into Order 1?

17   I understand he says approximately 30 percent of the milk

18   pooled on Order 1 is produced in geographic areas outside of

19   it.

20        MR. PIERSON:  Well, there are two points about

21   that, Your Honor.  And it's -- one of the reasons why I

22   think that um, you know, maybe the parties under briefed the

23   issue of what the proper geographic market is because there

24   are really -- it raises really complicated legal issues that

25   I don't think either party really addressed in their briefs

1    on how you measure geographic market.

2         But the relevant question in the monopsony case is

3    not what are the alternatives for a farmer that's outside

4    Order 1.  The relevant question is what are the alternatives

5    for a farmer that is within Order 1, what are their

6    alternatives to move out.  So that the relevant inquiry

7    really here is milk moving out, not milk moving in.

8         I think that is a legal proposition.  And I think

9    the judge -- well, it's briefed and argued extensively.

10   That is in fact the law.  If we need to brief it we can.

11        THE COURT:  We talked about this in a motion to

12   dismiss.  And I don't think there's any argument about how

13   you define a relevant market.  My concern is there's lots of

14   talk about price, and is the price being suppressed, and

15   what portion of the price do we look at.  And in this

16   particular case I am having a hard time looking at price

17   without a fixed geographic market because I don't, I think

18   they go hand in hand.  I might be wrong about that.

19        So when I have arguments about geographic market,

20   similar if I had arguments about product market, it's hard

21   to argue price if we're talking about both raw milk and

22   cottage cheese or 15 other different products.  I don't see

23   how far we can get in price if we don't have a designated

24   geographic market.

25        MR. PIERSON:  Well, the, you know, we've been

1    quite clear about what we think the graphic market is.

2              THE COURT:  Yes.

3              MR. PIERSON:  Now, Rausser makes another point so

4    we know what we're talking about.  And I guess the question

5    is whether the evidence supports, reasonably supports the

6    use of that as a geographic market.

7              I guess there are two other points I would like to

8    make in that connection.  One is Rausser makes the point

9    that even if at the end of the day we decided to define the

10   market more broadly so that it included, for example, the

11   unregulated areas, that that would not change the price

12   analysis because DMS's control over milk -- it's actually

13   the percentage of milk from those unregulated areas that

14   comes into Order 1 DMS's control over that is even higher as

15   a percentage than it is within Order 1.  And that's what

16   Rausser I think is saying when he says it really wouldn't

17   change the analysis.

18             The other important point that I think is worth

19   emphasizing, Your Honor, is that, is the point that I made

20   earlier that, I mean you've got this debate between the

21   experts about Snip Tests and what the historical evidence

22   shows, etcetera.  And Rausser I think has rendered an

23   opinion which is, you know, it's clearly sufficient for

24   purposes of Daubert and sending the issue to the jury that

25   this is what the market is and this is why I think it is and

1    this is what it is based on sound economic principles.  So

2    that's all in there.

3            But it's further corroborated by the way the

4    defendants organize their business.  I mean, you know, bare

5    in mind that, you know, DMS -- that, you know, DFA organizes

6    its business so that it has a Northeast council.  You know,

7    DMS in the Northeast is owned by St. Albans and Dairylea and

8    DFA.

9            DMS Northeast is a separate entity.  This is the

10   way they've chosen to organize their business.  And that's a

11   factor the Courts also consider in considering what the

12   relevant market is.  How do the industry participants deal

13   with it.

14           I mean this is the way they organize their

15   business.  So, you know, we can debate a little bit at the

16   margins about this.  And I think ultimately that will be an

17   issue for the jury or maybe we play it out on Daubert, but

18   for these purposes what you have is an expert who based on.

19   you know, on evidence that quite clearly has been explained

20   in the report, has explained why using the Northeast Order

21   as a market makes economic sense, it's consistent with the

22   empirical evidence, it's consistent with historical

23   experience, it's consistent with the fact there are very

24   limited outflows of market from Order 1 and that that's the

25   proper focus.

1              So I appreciate the question.  It's a complex

2     issue, but I think the, the bottom line is that for these

3     purposes you've got a very -- a market that has been very

4     clearly and explicitly defined.  There is no question about

5     we're saying it is.  I mean, we're saying if you drew it

6     differently it wouldn't change the results.  But we laid out

7     a very clear position and it's an economically defensible

8     position that is consistent with historical data and the way

9     they draw their own boundaries.

10             THE COURT:  Well, how much can you say they drew

11    the boundaries when it's the federal government that chose

12    Order 1?  And if you look at Order 1 and you look at your

13    proposition that most people send their milk to processing

14    within 50 miles of where it's produced, you know, Order 1

15    does not make a lot of sense.  It isn't the Northeast.  It

16    goes into, I believe, Maryland.

17             So it's a creation of federal regulation.  And

18    they have to comply with those federal regulations.  So how

19    far can we go, well, this is the way they've organized their

20    business and, you know, it's a little bit different than

21    widgets.

22             MR. PIERSON:  That's a good point.  I think my

23    reaction to that is that um, that the way the federal

24    government defines and creates certain market realities, so

25    even if it wasn't the market -- I mean the federal

1    government obviously took their best shot at what they

2    thought the proper boundary was.  And maybe they were right,

3    maybe they were wrong.  But once they are right, and they

4    establish a pooling system, and particular prices, you know,

5    blended prices for that region, that creates certain market

6    realities.  And, and that's, Your Honor, why we see that

7    there's, you know, of the farmers that are producing milk

8    here in Order 1, you know, there's, there's very little

9    outflow from it.

10        So I think Your Honor's point is a good one, but I

11   think it's created market realities, that those have been

12   confirmed by both theoretical testing and the history.  And

13   that at the end of the day that's an issue for the jury or

14   at worse an issue to resolve or, you know, to think about in

15   Daubert.

16        So if I may, I'm going to return to Slide 12 just

17   briefly because I think it's, it's helpful.  Slide 12 is

18   basically an effort to sort of explain what the law is on

19   this issue of impact.

20        Point 2 is the point that I mentioned earlier

21   which is that, is that for there to be impact -- obviously

22   there can be variability in how much people are impacted.

23   The question for antitrust purposes is whether they are

24   impacted at all.

25        And what the, what the case law we cite there, the

1    point that it's making is that not, not every -- not every

2    member of the class has to be adversely impacted.  If that

3    was the standard you'd probably never get a class certified.

4    But what you want is a widespread impact, is a widespread

5    impact within the class.

6            The third bullet, the third point just refers to

7    their internal documents.  And I think it is important to

8    take a step back here for a minute, Your Honor, in terms of

9    the plausibility of what's being presented to you.

10           You know, we can debate at enormous levels of

11   detail what these experts think and the details of their

12   analysis, but at a very high level you've got internal

13   documents here that basically support the theory of

14   plaintiff's case.  You've got a vice president at DMS saying

15   that the conduct has lowered the entire market, his words,

16   not mine.  And you've got an analysis by Dairylea that looks

17   at prices in the Midwest where benchmarks are being used

18   here and looks at prices in the Northeast and says, well,

19   you know, the difference between these two places is that

20   prices in the Northeast are lower because there's not,

21   there's less competition in the Northeast.

22           So the premise that we're trying to prove here is,

23   in fact, consistent with internal documents at a very high

24   level.  And I think, I think that's significant because it's

25   easy to get lost in the details here.

1          The last point on this slide, Point 4, deals with

2     this issue that the Court has, you know, is going to have to

3     work through about how far do you drill into the expert

4     reports here.  And the, the case, the one case I referenced

5     that was not referenced in the briefs is this recent

6     decision mentioned at the very bottom of the case, Baron

7     versus Comcast Corporation.

8          And, you know, what it basically says is -- it's a

9     Court of Appeals decision dealing with this whole issue of

10    how rigorously do you have to go into this.  One of the

11    central points it makes is the District Court has

12    significant discretion.  And when it gets reviewed at the

13    Court of Appeals level it's, you know, whatever

14    determinations you make about the expert reports are going

15    to be reviewed on a clearly erroneous standard.

16         And I think what the Court of Appeals is basically

17    saying is we really want District Courts to wrestle with

18    these issues, they want them to think hard about it, but at

19    the end of the day we are going be pretty deferential in how

20    we review it.

21         The, Baron is not in the Second Circuit.  The

22    reason I thought it was appropriate to call it to the

23    Court's attention was, number one, it was decided in the

24    last month.  And, secondly, this whole evolution of the case

25    law, you know, there used to be when I was on the defense

1    side you could never win class certification.  The

2    defendants always lost class certification fights.  And it

3    is fair to say that the law has evolved to require a more

4    rigorous analysis, become a little harder for the

5    plaintiffs.  It's, you know, that's, that's clear.

6            Where that really started was in the Hydrogen

7    Peroxide decision in the Third Circuit.  It's one of the

8    leaders in this area of sort of where should the pendulum

9    be.  And Baron is their latest word on that.  So I don't

10   want to belabor it, but I think that's a decision that will

11   be instructive to the Court.

12           The two other cases, because they are in the

13   Second Circuit cited on the next page, are the Amaranth

14   decision and the EPDM decision in which courts basically

15   say, look, we're going to wrestle with this question, is it

16   susceptible to common proof.  But, you know, whether the

17   expert had every last variable right we're only going to

18   drill down so far.  I think that's basically what they are

19   saying.

20           So let me drill down then on the issue of common

21   impact.  And in Slide 13 I start with a point about why

22   there are a number of factors that are arguably peculiar to

23   this case which, which would lead one to believe you're

24   probably going to find common impact here.  In other words,

25   you're going to find that where price is being suppressed it

1    is a tide lowering phenomenon that's going to have -- that's

2    going to affect the entire market and as defendant's

3    document says it does.

4           And I list five different factors.  One is the

5    market characteristics.  You know, milk at some level, I

6    don't want to oversimplify it, there are differences in

7    milk, but in terms of, you know, there are differences in

8    beer too, but in terms of products that are out on the

9    marketplace there's a significant element of homogeneity

10   here.

11          You asked the question about quality, are there

12   quality difference in milk.  Yes, there are quality

13   differences in milk.  To some extent, you know, the Court

14   makes a good point that that's taken into account in sort of

15   the component pricing when you break it down into butter fat

16   or whatever.  But I think for these purposes the key point

17   is that one of the things Rausser's analysis does in the

18   multiple aggression analysis is, and this is one of the

19   fundamental problems with Kalt's analysis.  Kalt's analysis

20   is almost invariably univaried analysis which means he looks

21   at price and compares price between two different people,

22   there are exceptions to this, but this is his fundamental

23   analysis, without comparing it, you know, why is A.

24   different than B., what other factors might explain this.

25          And what Rausser does in his multi-variable

1  progression is identify the factors that we know to be

2  systematically identified with price and take those into

3  account in a multiple progression analysis.  And that would

4  include quality, taking that into account.  So if there are

5  quality differences, and there are some quality difference,

6  it's taken into account in the analysis.

7          Pooling is a fundamental aspect of this market.

8  Now, pooling does not ensure uniformity, but the whole

9  nature of the pooling system where the money from processors

10  is put into a common pool and then distributed to different

11  co-ops based on volume and then they sort of distribute it

12  from down there, there is a -- there is a core aspect of

13  this market pooling which is designed to create uniformity.

14  It's designed not to penalize farmers whose milk is

15  ultimately used for cheese instead of used for fluid milk or

16  it's used for ice cream.  It's designed to introduce an

17  element of uniformity here.  It's not a guarantee of

18  uniformity, I don't want to overstate it, but it's an aspect

19  of this matter which makes it more -- makes it more likely

20  that you're going to find uniform impacts from price

21  suppression.

22          The conspirator in GNEMMA's dominant role in the

23  market.  It is I think undisputed in this case that GNEMMA

24  pricing decisions impact 75 percent of the market.  They

25  start with 75 percent of the market.  So there is, in fact,

```
 1   a high degree of concentration here.  And, you know, I don't
 2   want to belabor the debate about GNEMMA because I think if
 3   you look at our reply report, if you look at the Rausser
 4   report, I mean it was interesting that the defendants sort
 5   of downplayed the role of GNEMMA and, gee, we don't formally
 6   announce over-order prices.  But the evidence just -- it
 7   hasn't stood up to close examination.  I mean it's clear
 8   what's going on at these meetings.  They are discussing
 9   price and they are making decisions about not to pursue
10   price increases.
11          Most favored nation clauses.  That has been a
12   central part of a lot of the agreements that have been
13   challenged in this case, which is essentially if I give you
14   this -- if someone else gives you a lower price I will match
15   that price, I will give you the lowest price I'm giving
16   everyone else.  Again, these are all factors that would lead
17   one to expect a relatively high degree of uniformity and
18   common impact because everything is sort of tied together.
19          THE COURT:  Are there any allegations in the
20   amended complaint about most favored nation clauses?
21          MR. PIERSON:  You know, I'd have to look to answer
22   that.  Um, what I know we've -- I think there are.  But,
23   but, but I want to be overcareful because I'm not sure.
24   What I know we have learned, and it is reflected in the
25   record that's in front of the Court, it's reflected in
```

1   Mr. Hanman's testimony, which was submitted with our reply

2   brief.

3          What we've learned is that what DFA did was they

4   told the Department of Justice that they were going to

5   remove most favored nation clauses.  And they told their

6   members that that was what they had done.  They said this

7   publicly to all DFA members, we have removed most favored

8   nation provisions from the contracts.  And what they did was

9   -- and after that they put them back in without providing

10  any notice to the members.  And --

11         THE COURT:  But I know that allegation is not in

12  the complaint.

13         MR. PIERSON:  You know, Your Honor, some of this

14  stuff, I mean, I didn't know -- whether -- it's a 98 page

15  complaint.  I just -- I don't want to make -- I want to be

16  very careful in my representations to the Court.  I don't

17  know if it's in there or not.  What I know is the things

18  we've learned over -- as the discovery process proceeded.

19         And, again, the point I want to emphasize is that

20  a rigorous analysis, you know, has to go beyond the

21  complaint.  You know, it has to look at the whole record.

22         And um, and, you know, the key point is they

23  represented to members that they were out, they represented

24  to the DOJ they were out.  They put them back in.  And their

25  own evidence says that the affect of those is to lower the

1     price for the quote entire market, they are lowering the

2     tide.

3             If you would turn, Your Honor, please, to Slide

4     14.  I think this is a really key slide because it really

5     goes into a substantial amount of the evidence in the record

6     put, put aside the expert reports for a minute, about

7     whether there is, in fact, common impact here.  Because,

8     Your Honor, I mean, I think, you know, one of the limits of

9     the judicial system in some ways is, you know, experts say a

10    lot of things.  And, and you can really get into a battle of

11    the experts, but there's some significant reality testing

12    here in terms of what the evidence is about common impact.

13    And I think it's overwhelming.

14            The first bullet simply makes the point that all

15    these different co-ops that operate within DMS, how money is

16    going to be distributed, those decisions are made, how DMS

17    is going to distribute money, which accounts for, you know,

18    depending on -- there is a debate about whether it's

19    50 percent of the market or 60 percent of the market, but

20    it's a lot.  Those decisions are made basically by three or

21    four people at DMS.  They are made for Dairylea.  They are

22    made for DFA.  And there are further decisions down the

23    line, which I'll talk about.  But the starting point for

24    allocation of DMS revenues is made by a very small group of

25    people for all these companies.

1          On the second bullet is that DMS has a management

2     directive to eliminate unexplained differences between all

3     the farms that we manage with regard to what the business

4     comes from.  And this is a point that is, it's really worth

5     emphasizing.  I mean what they say and what other co-ops say

6     is that they have policies in place that eliminate

7     unexplained differences so that two similarly situated

8     people will be treated essentially identically.  And this

9     is, this is one of the fundamental problems with Kalt's

10    analysis.

11         Kalt says there are price differences between what

12    different farmers get for their milk.  And of course there

13    are.  There's differences in quality, there's differences in

14    volume.  There are a variety of differences.  And what

15    Rausser says is when you analyze those you find that -- you

16    find that the differences are explainable here to a degree

17    that's very consistent with what you would find in

18    industries with homogeneous products.

19         And that notion, that notion is consistent with a

20    what -- with what -- with what their internal policy is

21    which is eliminate unexplained differences that aren't

22    related to quality or whatever.

23         The third bullet is basically making the same

24    point.  This is Mr. Wickham, who I think is the senior

25    official now at DMS, saying that if there was more than a 10

1   cent price difference between farmers that were similarly

2   situated our policy was to eliminate that over time.

3           The fourth bullet is making the point that this is

4   a -- this is -- this is basically a fundamental aspect of

5   what co-ops are about.  I mean co-ops in their bylaws often

6   provide that we're going to treat similarly situated people

7   the same.  And, in fact, so if you look at DFA's articles of

8   incorporation, and it cites the central purposes of DFA, one

9   of its purposes is to distribute quote, on a uniform basis

10  the marketing proceeds after paying expenses and matured

11  liability.  So this is at the very core of this co-op.  It's

12  saying one of its central purposes is to make sure that

13  money is distributed in a uniform way to people who are

14  similarly situated.

15          The fifth bullet down is also I think a

16  significant one because it comes from Stephen Pynes.  And I

17  think this is going to tell you something that is

18  significant in the -- this is one of the problems in the

19  Kalt report which is that it essentially disregards evidence

20  that contradicts his conclusion.

21          So what Kalt says in his report is he uses

22  examples of where there's competition for particular

23  farmers.  And half the examples he uses come from situations

24  involving Steve Pynes, who is one of the, one of the

25  marketing people for DFA-DMS.

1            So he uses anecdotes to say, gee, there's very

2    little, we're competing in different ways.  But what

3    Mr. Pynes said in his testimony is that 99 percent of the

4    time people that are similarly situated get the same price.

5    That's his testimony.  And Kalt's report just ignores it.

6    Just disregards it.

7            On the next page of the slide you have, you have,

8    you have similar testimony from both Mr. Pynes and

9    Mr. Cella, who, again, basically say do we ever negotiate

10   special deals.  The Cella testimony is I believe one or two

11   --  I believe two times this has happened.  Pynes again says

12   it happens less than one percent of the time.  So Kalt's

13   report is talking about anecdotes, this is what the witness

14   says in terms of what's the overriding practice.

15           Brad Keating is also one of the senior officials

16   of DMS.  He works for Mr. Wickham.  And he makes the point

17   in the second bullet on this slide that essentially what

18   happens with milk prices gets spread down through people

19   evenly.

20           So when I deposed Mr. Keating I asked him about a

21   specific example, which we were talking about a situation in

22   which DMS had decided they needed to reduce prices in the

23   Northeast.  And in Mr. Wickham's deposition -- in his

24   declaration he had said, gee, I complate that the systems

25   were complicated, I complate in different ways.  So that was

1    creating examples.  Prices had dropped.  And I said -- I

2    asked Mr. Keating, okay, when you drop your prices how many

3    people instead of experiencing a drop of the actual farmers

4    how many people actually experienced an increase, how many

5    people did it move the opposite direction for so it didn't

6    flow to them.  He said one or two out of 1,400.  And he said

7    the same thing for Dairylea.

8              So this is the reality of what is happening, Your

9    Honor.  And it is overwhelmingly supported by their

10   testimony in this case.  Not what they write in a

11   declaration, but when you put them on the stand and you ask

12   them the question the evidence is overwhelming that you've

13   got a tide lowering phenomenon here and that it affects

14   virtually everyone.  They talk about 99, 100 percent.

15             It is further supported by the document I referred

16   to earlier Exhibit FF, that talks about the conduct having

17   quote, that was having the affect of lowering the entire

18   market.  This will continue to be a problem with pricing in

19   the future.  Lowering the entire market.  That's what common

20   impact is all about.

21             Keating's testimony I won't belabor here.  He

22   basically says the same thing.  What Keating says is, gee,

23   the problem -- I was asking about the Grave's document and

24   he says, you know, what, what does this mean you can lower

25   the entire market.  He said well, the problem with these --

1          THE COURT:  MFN.

2          MR. PIERSON:  I was asking about the affect of

3     MFN's.  And what Keating said, he sort of theorized, and

4     said, well, the problem -- the issue with these MFN's is

5     because there are all sort of -- you got a lot of them and

6     they are all sort of interconnected to different processors

7     that, you know, you lower the price for one person you got

8     to lower the price for the next person and lower the price

9     for the next person and pretty soon you have all the

10    dominoes falling and you've lowered the price for the entire

11    market. He says that's what Mr. Graves was talking about.

12    That's the essence of his testimony.

13          Now, Mr. Keating didn't acknowledge that that is

14    what occurred, although Mr. Graves said that is what's

15    occurring.  And that is basically our proposition in the

16    case about MFN's is that they have a domino affect that

17    lowers prices throughout the market, which is exactly what

18    Mr. Graves says.

19          The last reference here is to the Dairylea audit

20    committee which is the point that I made earlier.  So that

21    is an important step to this question about, to this battle

22    of the experts.  The battle of the experts gets very

23    complicated.  And, you know, Your Honor, for me one of

24    the -- well, of course, there was some serious

25    circumstances, dire circumstances that resulted in this

being the third iteration of this scheduled hearing, but for

me one of the challenges has been I've had to relearn the

statistical stuff three times and every time it's pretty

hard to learn.  But I think the preceding slide is very,

very important in the sense that, you know, the experts can

debate the minutia of their reports.  And it's important.

And we will get into it.  But at a fundamental level the

evidence in this case, the documents from the defendants,

their own testimony, overwhelmingly supports the proposition

Rausser's making.

          So Slide 15.  Rausser's analysis.  I won't belabor

the point about his qualifications.  I outline them here.

He's extraordinarily well qualified.  This is not a higher,

you know, this is not a for hire expert.  This is one of

the -- this is one of the leaders in this field.  He's a

Fulbright Scholar, he's a dean at the University of

Berkeley, Chief Economist to Agency of International

Development.  Published 250 articles.  He's an

extraordinarily qualified person, as is Dr. Kalt.  But

there's no question that Rausser is.

          They have challenged Rausser's conclusions in the

Southeast on Daubert grounds and made many arguments such as

the same geographic argument, the variance of the geographic

arguments that they are making here.  You should know that

their Daubert arguments against Rausser have been rejected

1   in the Southeast.  Again, it's just a point of information

2   you should be aware of.

3          Dr. Rausser conducted what is called a uniformity

4   analysis to determine the variability in prices that are

5   paid to farmers.  And what he did, he started with data that

6   was robust.  He had 500,000 data points.  He originally

7   examined content pricing as for the reasons that I discussed

8   earlier because that's where price suppression had been

9   found in the Southeast.  He then examined gross price, the

10  total price that includes that, it includes PPD, it includes

11  premiums that are paid on top of that.

12         Now, one of the points that Rausser made which is

13  important to understand, to understand is that dispersion

14  and variability in pricing is a fact of life because there's

15  imperfect information.  So if you, to stay fixated on my

16  beer example, if you went to get, you know, a six pack of

17  Millers at, at, at one store in Rutland and you went to the

18  other side of the city to buy the same six pack, not even

19  different product, same branded product, you're going to get

20  differences in prices.  There's a certain amount of

21  variability that just -- it's just the nature of it.

22         And a lot of that tends to be random.  It's not

23  stuff that changes in the but for world.  So what you're

24  trying to do in this analysis is see, you know, is it

25  unusually high here and can we explain it, can we explain

1   the variability that we're seeing.  It's not that no

2   variability exists.

3          And what Rausser found is that, and this is

4   explained in greater detail in the, in the bullets in the

5   slide, is that, in fact, what we find here is that the level

6   of variability relating not to just all products but to

7   other products which have a high degree of homogeneity like

8   gasoline, liquor, cigarettes, etcetera, that the degree of

9   price dispersal here is relatively small actually to most

10  products.  There's more consistency than you would

11  ordinarily, than you would ordinarily find.

12         Now, they've argued, they've argued, and this is

13  one of the questions, Your Honor, raised earlier, and I want

14  to see if I can explain this as well as I can.  They've

15  argued the focus should be just on the, on the premium not

16  on the total price.  And that -- you asked if we agreed with

17  that.  We don't agree with that.  It's fundamentally wrong

18  just as a matter of statistics and it is for a couple of

19  reasons.  Number one, because there is the potential to find

20  suppression in any element of the price.

21         THE COURT:  Even the regulated price?

22         MR. PIERSON:  Yes.  At the -- and this is the

23  distinction I made earlier that the component pricing is

24  regulated and uniform at the processor level, but the price

25  that we're looking at here to see the variability is the

1    check the farmer actually gets.  And so they -- so a co-op

2    can put a component price -- it can put a component price

3    into the paycheck and can have price suppression in there

4    because it's not regulated at that level.

5            So that's, that's what you're looking for.  And

6    that's what they found in the Southeast.  So it's important

7    to examine for that here.

8            The second point, Your Honor, and I think the

9    literature in the case is undisputed about that, I don't

10   think they cite any literature in which someone says you can

11   take a price for a product and you can just study a portion

12   of it to see if you find dispersions -- to find dispersion.

13           What the literature does is it looks at the total

14   price for products.  And often some of that price is

15   regulated and often some of it isn't.  And the reason you

16   are doing that is because you want to be able to make --

17   when you're asking, well, how much dispersion is there here

18   relative to other industries.  And you want to be able to

19   compare it.  And if you start breaking a price into its

20   components it's very difficult to make that comparison.

21           So, for example, I used the example of cigarettes

22   earlier or liquor.  Those products have -- for cigarettes

23   and liquor there's a very high percentage of those product

24   prices that are taxes.  They are regulated.  They are

25   standardized.  But when people measure dispersion in those

1    products, they don't just look at the part that excludes

2    taxes, they look at the total price and they do that so this

3    can --

4              THE COURT:  Well, isn't the tax based on the total

5    price?  I mean there's a relationship there.

6              MR. PIERSON:  There may be -- I guess it is a

7    percentage.  It is a percentage of the total price, but it's

8    uniform.  There's going to be no variability as to the

9    percentage.  I am no expert in this stuff, but what I can

10   tell you is that when people study prices in order to make

11   comparisons between industries they look at total price.

12   And that's -- it's reflected in citations in the slide, it's

13   reflected in Rausser's analysis.  And Kalt has not cited a

14   single study, a single peer review paper, any research that

15   says you can disregard that, you can just look at this piece

16   of the price and we'll ignore, and we'll ignore other parts

17   of the price.

18            The other key point here, and it really relates to

19   the use of the multiple regression analysis, Your Honor, is

20   you might ask why are we doing this, you know, what's, you

21   know, what's the inquiry about dispersion, why do we care.

22   And the critical inquiry that's being made here, and this is

23   what is, is explained in Rausser's expert report, is what

24   you're trying to find out is can we understand these prices

25   well enough so that, so that we're confident that when, you

1    know, at the end of the day what we're going to do is we're

2    going to look at various explanatory variables and we come

3    up with one variable which is the impact that we are

4    associating with the conspiracy.

5          Let's call it variable A.  And what you, what you

6    basically want to make sure that you don't do is ignore a

7    variable B., which is very closely correlated with variable

8    A., but call it a shadow variable.  Because if you, if you

9    ignore -- if such a variable exists and you're measuring A.,

10   but it's got the shadow other variables that you've ignored,

11   what you may be finding may not be A. at all it may be B..

12         Can I explain that?

13         THE COURT:  Yes.

14         MR. PIERSON:  So that's the central purpose of

15   this inquiry is, is there a B., is there a shadow variable

16   out there that, that would explain what we think that we're

17   finding.  And that's why Rausser conducted this multiple

18   regression analysis.  And he looked at, at 19 different

19   factors.  He basically looked at all of the factors that in

20   the literature or in logic you would assume could

21   systematically influence what the price of milk would be,

22   the quality would be, the quality would be something like

23   that.  But he looked at 19 of them based on sort of what the

24   literature suggested were the things you ought to look at.

25         Now, in addition to explanatory variables you have

```
 1    a certain degree of just randomness in prices.  And that's

 2    the point I made earlier about the same beer, different

 3    locations, it's a market with imperfect information.  You

 4    always have randomness.  And randomness is the same in the

 5    but for world as it is in the actual world.  And this is the

 6    point, that it's made in some of the footnotes of Rausser's

 7    reports.  What it basically says is that our concern is we

 8    want to make sure there isn't a variable B. that is

 9    systematically biasing the results.  So you think you're

10    measuring A and, in fact, you're getting B..

11          Randomness we're not so worried about because

12    randomness -- there's always price dispersion in a random

13    way.  And you're going to have that in any market.  And

14    that's not our concern.  And so that's what, that's what

15    Rausser tested for.

16          And what Rausser found is that if you look at the

17    total price you can explain virtually all of the total price

18    based on the explanatory variables he's used.

19          Now, Kalt says that, well, if you look at -- if

20    you look at only the premium, then the amount of

21    variability -- then the -- then the explanation goes down I

22    think to 54 to 56 percent.  And, number one, it's the wrong

23    way to do it because you should look -- there are basically

24    three responses to that.  Number one, it's the wrong way to

25    examine it.  Number two, that level of explanatory power in
```

1    a multiple regression is -- if it was 56 percent is entirely

2    consistent with academic research and industry standards.

3    And we cite Dan Rubenfeld's.  And I've used Dan Rubenfeld as

4    an expert.  And he is one of the leading experts on the use

5    of regressions.  And he cites a study that I think as an

6    example of regression working, which I think had 54 percent

7    explanatory factor or explanatory power.  And conversely

8    Kalt has cited no research that indicates that that is not

9    scientifically accepted.

10            Now, the third key point to make about the

11   regression analysis is that -- so Rausser then asked the

12   question, which is the fundamental question about is there

13   some variable that I'm missing, it's not random, just random

14   noise that exists in either world, but is there a some

15   variable -- is there a B. where I think I'm measuring A. and

16   in fact I'm getting B.?  And the only thing that had been

17   hypothesized by Dr. Kalt, he hadn't proved it, he had just

18   hypothesized that you might have differences between

19   localities, and this goes to a question the Court raised

20   earlier about um, where there are more non-conspirator

21   processors in a particular county, where there's less

22   concentration of the conspiracy in a county.  And Rausser

23   thinks that -- that that's what the whole spacial

24   integration debate is about with Rausser saying, you know,

25   the fact that you don't -- because the counties -- you just

1   can't draw the market that way.  It's not what this spacial

2   integration data indicates.  But what Rausser does in his

3   multiple regression is he specifically tests what is only a

4   hypothesis of this variable B. by Kalt.  And he looks at

5   whether you get different prices -- whether people are able

6   to get higher prices if they live in a county without as

7   many of the conspirators.  And the data does not support

8   that hypothesis.

9          So the key point here, and it's explained in

10  Rausser's, in Rausser's last report, because everyone keeps

11  drilling down here.  And he's responding to new analysis

12  from Dr. Kalt about where he is saying, well, the regression

13  should be 50 percent and it only explains 50 percent it

14  should explain 20 percent.  Rausser responds to that by

15  saying, okay, I'm going to look at the one variable that

16  Kalt hypothesized as being potentially systematically

17  biasing the results, which is the level of concentration of

18  non-conspirator processors.  And it's not supported by the

19  data.  So that's basically Rausser's uniformity analysis and

20  his use of multiple regression.

21         Now, let's talk a little bit about Dr. Kalt.  The

22  first point I made about Dr. Kalt, and it is a context in

23  which to consider his remarks, is that he has acknowledged

24  that he has never, never testified that common impact can be

25  proven.  He's never reached that opinion in any of his

1     testimony over 200 cases, although, I'm not suggesting they

2     all raise that issue.  And this is Slide 16 where I really

3     start drilling into Dr. Kalt and what Dr. Kalt has to say.

4              Secondly, Kalt basically ignores the evidence that

5     contradicts his conclusion.  And I provided a couple

6     examples here, but let me just discuss briefly the first one

7     which is that, you know, one of Kalt's hypotheses is that

8     some farmers benefit -- are better off with low prices.

9     That testimony contradicts the testimony of every farmer in

10    this case.  It contradicts the declarations that were

11    submitted to you, where you're getting all these

12    declarations saying, gee, we love DFA-DMS because we think

13    they are providing higher prices to us.  It contradicts what

14    DFA has, you know, repeatedly said in public statements,

15    which is we're doing everything we can to raise your prices.

16    And here's their expert coming in and saying, actually

17    farmers are better off with low prices or some farmers are

18    better off with low prices.  It is just one pretty naked

19    example of Kalt picking and choosing the evidence he likes.

20             The third point is that the methodologies used by

21    Dr. Kalt are unsupported or they are unsupported, I use the

22    word in the slide misleading.  I, you know, maybe that's

23    stronger language than I want, but the fact is there are

24    real problems with them.  And let me explain what a few of

25    them are.

1            I discussed the problem of Kalt's use of a

2    competitive premium earlier.  I mean in order to measure

3    dispersion and measure how much variance there is Dr. Kalt

4    has to come up with a premium.  The premium he creates, a

5    competitive premium, is based on picking and choosing

6    different things.  It's not really supported by any of the

7    testimony in the case.  It's contradicted by testimony in

8    the case.  And that's cited in Rausser's report.

9            And that's sort of -- that was Kalt's starting

10   point.  So then he creates a new premium which excludes,

11   excludes PPD, which is the differential in paying.  This is

12   where we're starting to really drill down, but it's not

13   something that should be excluded from his analysis of the

14   premium.  And the reason for that is because there's

15   testimony in the case, I believe there's testimony from

16   Agri-Mark in their internal documents that sometimes people

17   use, some co-ops use PPD to disguise price drops to farmers.

18   So the basic point is the Kalt starting point, what he's,

19   what he's using as his measurement for his analysis is

20   flawed to begin with.

21           He uses scatter plots.  And the scatter plots are

22   great visually.  You look at them, gee, these dots are all

23   over the point, are all over the place, but it's not really

24   serious science.  And you may see some in their

25   presentation.  The problem with scatter plots is that they

draw the eye to the range, but what they don't tell you --
you see all these points on them.  You can't tell whether
one of those points represents 50 farmers or two farmers or
one farmer.  They don't tell you anything about averages
which is essentially the coefficient of variability.  So
it's just, it's not a sound methodology.

You have the same problem with emphasizing range
which Kalt does repeatedly in his analysis.  He'll pick the
extreme points where the range is between this and that
without talking about the coefficient of variability which
is really, is more telling you, you know, what is, what is
really happening in this marketplace, not just what is
happening in its various extremes.

The biggest problem or one of the biggest problems
with Kalt's analysis is his use of univariate analysis.  And
that is something that is probably true 90 percent of the,
and I use the figure loosely, but it is overwhelmingly true
of the information Kalt submits, not all of it, but it is
overwhelmingly true.  The problem with univariate analysis I
think, I mean -- Rausser is quite harsh in his report.  He
basically says this is an area that, you know, you would
find in an undergraduate statistics test that, statistics
course that, you know, to say farmer A. got paid more than
farmer B., where there's a big gap between A. and B.,
without considering the quality of their milk --

1              THE COURT:  Well, tell me where quality comes in.

2     Because we talked about -- you said, well, it's a part of

3     component pricing.  Where does the farmer get the premium

4     for quality, who does it come from, is it at the processing

5     plant, is it from the co-op?  Because I didn't really see

6     anything that factored in for quality.

7              MR. PIERSON:  Yeah, there are a couple of ways in

8     which -- it's a good question.  There are a couple ways in

9     which it's factored in.  I mean, one is -- one is it's

10    reflected in the breakdown for prices for components.

11             THE COURT:  Okay.  But assume, we've already dealt

12    with that, and where else does it come in?

13             MR. PIERSON:  Another example would be the use of

14    rbST-free milk.

15             THE COURT:  Right.  But I thought we had fluid

16    Grade A. milk and I don't know that we had something rBST --

17             MR. PIERSON:  Grade A. milk does include -- in

18    fact, most of the milk is rbST-free.

19             THE COURT:  That's what I thought.

20             MR. PIERSON:  And there is an rBST premium.  So

21    farmers get paid more if they don't -- if they don't use

22    this.

23             THE COURT:  So we can easily segregate that out.

24             MR. PIERSON:  You can factor that in, but that's a

25    good example, Your Honor, because that's -- when Kalt makes

price comparisons between farmer A. and farmer B. he doesn't

do that.  So if farmer A. -- remember, now there's a price

associated to a farmer with using -- with providing

rBST-free milk.  People use this growth hormone because it

allows them to produce milk more efficiently.

So what Kalt does is if you have farmer A. that,

that is supplying rBST-free milk and farmer B. that is not

incurring -- that is not getting the benefits of rBST-free

milk or is not getting the benefits of using rBST and um,

and provides --

THE COURT:  I know what you're saying.  You're

saying he doesn't --

MR. PIERSON:  He doesn't -- he can't take it into

account.

THE COURT:  But you've said he doesn't take into

account the quality of the milk.  So that's one example that

we haven't talked about.  We already talked about component

pricing.  What other component related to quality is true

but not considered by Professor Kalt?

MR. PIERSON:  Well, you know, Your Honor, to be

honest, to answer as honest as I can, maybe I can get more

-- I probably can get more information at the break, there

are 19 variables that Kalt -- that Rausser takes into

account that explain differences in the price of milk.

You know, one is the location which takes into

1    account the price, the PPD, the price differential.  There

2    are 19 different variables that sort of systematically

3    explain price.  Kalt's univaried analysis doesn't take into

4    account any of them.

5              THE COURT:  Well, that's my point is you say,

6    well, you can't rely on that, he's not even taking into

7    consideration quality.  And I'm asking you where is the

8    quality determined, by whom, where is that factored into the

9    analysis?

10             MR. PIERSON:  Yeah.  And I, you know, I'll maybe

11   need to get you a better answer at the break.  But it's -- I

12   want to emphasize the fundamental point which is that, you

13   know, as, as their internal documents say, you know, what

14   they tried to do is treat likes the same.  And, you know,

15   what Kalt is saying is, is gee, if you take two people that

16   aren't similarly situated, based on any of these 19

17   variables, they are getting a different price.

18             And our answer is surprise, surprise.  That's not,

19   that's not the point.  There are a variety of variables that

20   explain the pricing.  And the whole reason why you use a

21   multiple regression analysis is to make sure that you've

22   taken those into account so that when you're looking at the

23   price differences between A. and B., and how much the

24   conspiracy is affected, you've taken into account other

25   variables, whether they are quality or their location or

1    whether they are one of those other 19 variables.  I mean

2    that is basic.  That is why multiple regression analysis is

3    so standardly used and so standardly accepted in antitrust

4    analysis.

5           And the key point -- I mean we can drill down into

6    the particulars of variables.  But the key point about

7    Kalt's analysis is that he does very, very little of that.

8    And that's just -- that is really antitrust 101 to be using

9    multiple regression analysis.  And we can debate the details

10   of what, you know, Kalt sort of tries to catch up, you know,

11   at the back end of this.  But, but the important thing to

12   look at in his data is when he's comparing differences they

13   typically do not take into account for any of these

14   variables.

15          Chapter or Slide 17 deals with the, what he calls

16   the churning analysis, which is basically people moving from

17   one percentile in price or one portile or one quantile into

18   another one.  And the -- I think the key point about this is

19   that there is no demonstration that this is an accepted

20   methodology that's ever been used or accepted by courts or

21   accepted in the literature as a way to think about price

22   fixing.

23          My brother is a political scientist so I know how

24   he uses this kind of analysis.  This analysis is used, Your

25   Honor, when you are asking -- like a classic example for

this kind of quote churning analysis would be when you're

asking does a citizen in the United States -- what does

someone who starts in the bottom 20 percent of the

population, starts in poverty, what is their chance of

rising to the top quintile.  And how does that compare to

England.  Is there more social mobility in this country

than, than in countries in Europe.

          That's what this -- that's what this analysis --

and that's the studies he cites.  That's what they are

talking about.  They are talking about income mobility.

They are not talking about antitrust price fixing cases.

Nor does he cite any literature that suggests that it is an

appropriate methodology.  Not any literature that suggests

it's an appropriate methodology in this situation.

          I think the slides on the, on this Slide Number 17

on the churning analysis probably gives you about as much as

you will need for this.  The, his churning analysis is

univariant.  So it's saying farmer A. is moving in a

different direction relative to farmer B..  He makes no

effort at all to explain that.  Is that because farmer A.

decided in this year to produce rBST-free milk.  Is it

because farmer A.'s volume increased.  He makes no effort at

all to describe it -- to explain it.

          The other key point about the churning analysis is

it's based on changes in sort of what percentile you're at.

1   The differences in terms of the actual amount of money

2   involved typically in these charts are actually very, very

3   small.  So you could -- you could get three cents more for

4   milk in a given year than you got before.  In his analysis

5   that might move you up significantly or move you in a

6   different direction from another farmer.  But in terms of

7   the actual amount involved, because he uses percentages

8   there instead of the actual amounts involved, it disguises

9   changes that are, in fact, very, very small.

10          The next slide, and I do appreciate your patience,

11  and I'm, I'm, I am getting pretty near the back end here,

12  goes to the question about their claim that there are

13  different levels of concentration among non-conspiring

14  processors in different counties.  And I'll move through

15  this relatively quickly, but I think there are a couple

16  points that I want to emphasize.

17          One is that, the starting point is that milk in

18  Order 1 is overwhelming -- most of the milk in Order 1 comes

19  from the conspirators.  That's the starting point.  So --

20          THE COURT:  Tell me whose in the conspiracy.

21          MR. PIERSON:  Excuse me?

22          THE COURT:  Tell me whose in the conspiracy.

23          MR. PIERSON:  At the, at the processor level it

24  is -- it is Dean, Hood, NDH, Farmland and Kraft have all

25  agreed to full supply agreements, I think most favored

nation clauses, etcetera.  And in many of the cases there's
evidence suggesting that they've -- that certainly DMS's
understanding, DFA's understanding was that implicit in that
was an agreement that they wouldn't be out soliciting
farmers themselves independently similar to what we've
talked about earlier.  At the co-op level it is Dairylea,
DFA, DMS, St. Albans, Agri-Mark, Maryland, Virginia and Land
O'Lakes.

        We describe -- and it probably is beyond the scope
of what makes sense to do at this hearing, but um, in the,
in the interrogatories we provided to the Court in one of
our supplemental filings that are, you know, 170, 200 pages
long, whatever, we walked through the evidence that relates
to, you know, we walked through in considerable detail what
the evidence is.

        I should mention just so -- you have the -- just
so you have the full record, they asked us to supplement the
interrogatories to say when various people joined the
conspiracy, etcetera, which we have done.  It's not in the
supplemental -- I, I thought I would take a risk with the
Court's good graces if I filed another set of --

        THE COURT:  Well, you, certainly as you know, you
don't file discovery with the Court.  So I don't need to see
all of the discovery.  But whose in the conspiracy, when
they joined and how they joined is fairly key.  So I would

1    be interested in that.

2         MR. PIERSON:  Right.  Okay.  Well, we'll file --

3    we'll file our supplemental.  You know what, probably what

4    we ought to do, because I think this would be the easiest

5    thing because the interrogatory responses, and we directed

6    them to file them seriously.  They are huge.  What we'll do

7    is just file the supplemental set, but we'll call the

8    Court's attention to the pages are new because they, you

9    know, because they largely --

10        THE COURT:  I wouldn't, I would actually file the

11   pages that you want to direct our attention to.  It's, it's

12   a problem for the Clerk' Office and the record if every page

13   is scanned in.  And we don't typically take discovery.  So

14   some of it is something the Court might be interested in,

15   but going through 270 pages to find out what it might be is

16   not.

17        MR. PIERSON:  Yeah.  Fair enough.  I mean we'll,

18   we'll figure out a way to do that.  I just want to warn you

19   in honesty, I mean, they do describe in quite a bit of

20   detail, you know, they are long, and they are long with

21   respect to the various conspirators.

22        THE COURT:  We're at the noon hour.  And I know

23   you're getting towards an end.  So here's your two options.

24   You can finish up and we'll go into the noon hour or we can

25   take a break now and we can come back and you can finish

```
 1    your presentation.  We're going to hear from Mr. Haar and
 2    then we'll turn to the defendants and Mr. Gorton.
 3              MR. PIERSON:  Your Honor, if it's fine with you
 4    why don't we take a break now and try to be, I'll look
 5    through my notes and I'll try to be as succinct as I can.
 6              THE COURT:  Okay.  I'll tell you, you did a nice
 7    job answering my questions.  I wrote down things that I
 8    hadn't heard.  And one was for the co-conspirators where can
 9    I find them and how can I find when and how they joined the
10    conspiracy and is that something I would find in the amended
11    complaint.
12              So, the other one is the competing allegations
13    about a comfortable world versus managerial cooperation and
14    sloth.
15              MR. PIERSON:  Right.
16              THE COURT:  And I guess I would characterize that
17    as the question of motive and is that susceptible to common
18    proof when we're talking about individuals, is it uniform
19    enough so that we could all agree that all reasonable
20    individuals react in a certain way to a certain benefit.
21    Anyway, I'm interested in that.
22              And you've answered my question about what are we
23    looking at in terms of the price.  And I was going to ask
24    you if we could look at everything other than the regulated
25    component, but I'm hearing no.
```

1              MR. PIERSON:  Well, no.  What I said, what I -- to

2     be clear, Your Honor, what I've said are based upon -- let

3     me just deal with that question.  I said three things.

4     Number one, the appropriate way to look as to what the total

5     price is.  That's what's methodologically appropriate.

6     That's what's done in the literature.

7              Number two, even if you look just at the portion

8     above regulated price, number one, Kalt does it the wrong

9     way because he excludes PPD.  But even if you look at that,

10    you limit the regression to that, you still get a,

11    explanatory power that is consistent with the Rubenfeld

12    citation.  It's still a reasonable explanatory factor.  Even

13    if you focus on that you have sufficient explanatory power.

14             And the third key point about that is that the

15    question you really want to ask is when you undertake that

16    analysis -- the question is how much explanatory power is

17    enough.  And the question you want to ask is there some

18    unexamined variable that is going to bias the results.  Is

19    there something shadowing behind A. that's following it that

20    you are not observing.  And the only thing Kalt has

21    hypothesized is this business about concentration of

22    non-conspirator processers and the regression analysis.

23             So what you don't have explained is just random

24    variation that exists in every market, it's not unusual in

25    this market, and it doesn't create any methodological

1   problems.

2          THE COURT:  I guess where you haven't persuaded me

3   is why are we looking at the regulated component price at

4   all other than say the literature always looks at total

5   price and maybe it wouldn't be simpler, but if the regulated

6   price is fixed, we got into the cigarettes example, and it

7   isn't going to be something subject to market manipulation

8   why aren't we talking about everything else but?

9          MR. PIERSON:  And I'll stay focused on -- I

10  appreciate your patience.  There really are two points.

11  Number one, you got to look at the total price because

12  remember we're looking at variability at the farmer level

13  price.  And these various components can be manipulated at

14  the farmer level.  So they are not -- and that's what's

15  happened in the Southeast.  So if you didn't look -- so

16  there's the regulated price at the processor level and

17  there's the -- and there's the price that the farmer

18  ultimate gets.  And you got to look at every component of

19  that price because there is the potential for suppression in

20  every level of that price.

21          So, number one, that's the right way to look at

22  it.  But, number two, even if you don't look at it that way,

23  even if you limit yourself to the premium properly measured,

24  which Kalt hasn't done, but even if you looked at the

25  premium the level of explanatory power here is entirely

1    consistent with scientific norms.

2              THE COURT:  All right.  We'll come back in

3    approximately an hour.

4              MR. PIERSON:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              (The Court recessed at 12:05 p.m. and resumed at

7    1:12 p.m.)

8              THE COURT:  We're back on the record in the case

9    of Allen, et al versus Dairy Farmers of America.  We are in

10   Mr. Pierson's presentation.

11             MR. PIERSON:  Thank you, Your Honor.  Let me begin

12   by quickly addressing two points that you raised near the

13   end.  One was you asked a couple questions about what was in

14   the amended complaint.  And, again, emphasizing that our

15   view is the rigorous analysis requires the totality of the

16   record not just the complaint.  But I do want to answer the

17   questions you posed.  The MFN's are apparently referred to

18   repeatedly -- frequently in the amended complaint, which was

19   my recollection.

20             THE COURT:  Was the allegation that DFA or DMS

21   told the Justice Department they took them out and then put

22   them back in?  That's what I didn't recall from the amended

23   complaint.

24             MR. PIERSON:  I don't know.  I don't know if we

25   were aware of that or focused on it.  I don't know what at

1     that level of detail.

2               THE COURT:  All right.

3               MR. PIERSON:  The consent decree is also

4     referenced I think five times.

5               THE COURT:  All right.  Can you give me the

6     paragraphs?  And it's all of the consent decrees?

7               MR. PIERSON:  It's the um, there's really sort of

8     a central consent decree.  There are a variety of consent

9     decrees.  I did not look at the complaint myself so I can't

10    -- we can get you that information.

11              THE COURT:  All right.  No, I'll look at it

12    myself.

13              MR. PIERSON:  All right.  I wanted to answer your

14    question about motives and give you basically my view about

15    that.  I mean my basic view is that in and conspiracy the

16    conspirators have -- there are going to be a variety of

17    motives on why people join a conspiracy.  Like a classic

18    example would be where there are suppliers and there are

19    buyers.  You know, suppliers and buyers are looking at the

20    opposite side of the coin from different angles but may come

21    to the same coin.

22              So I think that's typical.  So it's not essential

23    to our position that every, that everyone here -- you asked

24    about sloth that isn't really essential as being one of the

25    motives.

1           You know, I'll give you my view of what the facts

2    are, having been pretty emersed in it.  DFA and Dairylea I

3    think, you know, emerged very early in this conspiracy to

4    get a dominant position in the market and basically to

5    prevent competition between the two of them.  So they

6    emerged in a dominant position.  A variety of other co-ops

7    joined because in a number of cases they had no choice

8    because DFA and Dairylea, DFA and DMS in particular, had

9    locked up so much of the processing capacity.  So, for

10   example, for St. Albans it became very precarious not to

11   just sort of join this cabal.

12          In other cases there was concern about

13   retaliation, evidence of retaliation against Agri-Mark and

14   basically threatening, basically telling Agri-Mark that they

15   were going to go to war with them if they didn't knock off

16   the competition.  The evidence of that is very strong.

17          So there's retaliation.  There is a desire to sort

18   of avoid the cost of competition which is that, you know,

19   one of the, you know, competition has both threats and

20   rewards.  And one of the threats of competition is that you

21   can lose market share and joining DFA-DMS was a way to

22   basically avoid, avoid the power that this juggernaut had

23   accumulated to avoid the risk of competition and the risk of

24   retaliation.  And there's considerable evidence of all of

25   that in the record.

1          For processors, you know, on the buyer's side or,

2    you know, this is basically a quid pro quo.  You know, they

3    agreed to -- the quid pro quo is they get lower prices, they

4    get suppressed prices in exchange for agreeing to restrict

5    the competitive playing field.

6          You know, a classic example of this is the

7    document that I handed up to you earlier which is, you know,

8    literally a check for a million dollars being sent Federal

9    Express from one corporate executive to another executive in

10   exchange for a non-compete for the independents.  So that's

11   a form of lower price.  They are getting a rebate, credit,

12   pay off, kickback, whatever you want to call it, they are

13   getting a million bucks not to compete.

14         So different motives, Your Honor, or some range of

15   motives.  But that's going to be, that's going to be true

16   of, of any conspiracy.  And the key point is that when you,

17   when you think about how it makes sense to prove a

18   conspiracy like this in a case do you really want, you know,

19   a thousand different plaintiffs to have to come in here and

20   prove one by one this is why the conspirators joined or does

21   it make sense to do this all in the context of class action.

22   And that's why it's not a universal principle, but it's why

23   the Supreme Court says that the antitrust cases are sort of

24   particularly appropriate for class certification.  And

25   that's why that's generally true, not always true, but

1   generally true for conspiracy cases because you got this
2   big, you know, the elephant in the room is the conspiracy
3   and you don't want to have to force individuals to prove
4   that over and over and over.  It just doesn't make sense.
5           THE COURT:  Well, I think the motive issues,
6   again, in my view, more basic and it is why would farmer
7   owned co-ops managed by farmers conspire to hurt their own
8   managers because you can have policy set at a higher level
9   but in the end the allegations are that these co-ops acted
10  adverse to their member's interests.
11          MR. PIERSON:  Well, let's start with DFA.  DFA was
12  run by Gary Hanman.  Gary Hanman was paid more than
13  $30 million from his co-op for running that organization.
14  And part of his compensation was based on expanding market
15  share.  It was one of the factors that determined his
16  compensation.  The amount that he was paid was not disclosed
17  to DFA's members.  There may have been a core kernel of
18  people that knew it, but it was not disclosed to the
19  membership.  So Gary Hanman got paid an awful lot of money
20  for creating this juggernaut.
21          I think in the case of other people, you know,
22  because of what DFA was doing competitively, and DMS was
23  doing, and because of the agreements that DFA and Dean had
24  reached I think a lot of other people joined because at the
25  end of the day they felt they didn't, they didn't have a lot

1    of choice.  It was do this or take the risks that were

2    involved.

3            Now some of these people have been very well

4    compensated.  But I think our basic view of it is that the

5    actors that really precipitated this whole thing, which I

6    would describe I think as DFA, Dairylea, DMS, which is sort

7    of a conglomeration of the two, and Dean, had reasons, you

8    know, in terms of sort of acquiring market share, acquiring

9    dominance and an ability to restrain competition that led

10   them to create this thing.  And other people came on because

11   there wasn't a lot -- because the competitive risks to them

12   for not doing so I think were quite high.

13           Agri-Mark is a classic example of that.

14   Agri-Mark, you know, a smaller co-op, not a small co-op, but

15   a smaller co-op, the documents make very clear that

16   Agri-Mark -- that Agri-Mark was competing.  It was competing

17   by soliciting farmers and that that was starting to drive up

18   prices.  And I think we've submitted a lot of this evidence

19   in the record of the Court.  And the response of DFA-DMS was

20   essentially -- I mean among other things they, they

21   threatened to essentially cut them off.  They would

22   co-mingle milk on some of their trucks.  And DFA and DMS

23   basically said you guys got to knock this off, you know,

24   we're cutting you out and actually formulated plans to start

25   doing this.

1          I mean this is, this is extreme anti-competitive

2     behavior.  That's what happened.  And at the end of the day

3     Agri-Mark essentially said, you know, no mas, we'll stop

4     soliciting your members, you stop soliciting our members,

5     etcetera.  I mean -- so there's an element of some actors

6     trying to gain a dominant share and others coming along

7     because there wasn't a lot of choice at the end of the day.

8          You know, for, for Gary Hanman and DFA, you know,

9     why did they sort of accept a regime that involved lower

10    prices, why did they accept MFN's, for example, which we're

11    going to hold down the lower price, you know, it really was

12    basically a quid pro quo.  I mean that was the, you know,

13    the price of making an agreement with Dean in which Dean

14    would give them exclusive access to those facilities.

15         I think, frankly, when DFA and Dairylea got in

16    that position they didn't even have the milk to supply

17    Dean's needs.  They had to go out and scramble to get the

18    milk.  But they had achieved this market share that they

19    wanted.  And, like I said, Gary Hanman was paid very richly

20    for that.

21         Your Honor, turning back to the question of common

22    impact, and I'm on Slide 18, this issue of variability about

23    processors in different counties.  I mean there are a number

24    of points to be made about that.

25         First, Dr. Rausser makes the point that there's

1    nothing unusual about that, you know, in a -- you wouldn't

2    expect to ordinarily find a conspiracy or the power of the

3    conspirators to be evenly allocated throughout every

4    geographic area, particular areas as small as counties.

5    There's nothing unusual about that at all.

6            The fact of the matter is that the level of

7    concentration here is quite high.  And that's reflected on

8    the slide where, in the second bullet where we described the

9    fact that the conspirators are the predominant suppliers,

10   the dominant suppliers for plants that have over 80 percent

11   of the capacity in Order 1.

12           I mean it's not mentioned in the slide.  But I

13   should point out that where, where there are other plants

14   out there, there is an analysis in Rausser's report about

15   well, whether a non-conspirator processing plant what, what

16   excess capacity do they have, what ability do they have to

17   expand.  And, in fact, the Rausser analysis, I think it's in

18   his second report, is that their excess capacity is quite

19   low.

20           The fourth bullet makes the point that in most of

21   these counties, in most counties there are only zero or one

22   processing facility that is not owned or supplied

23   predominately or exclusively by the conspirators.  So there

24   is a high degree of concentration.  But I think there is a

25   more fundamental point, Your Honor, which is that this sort

1    of notion that because there are one or two, there may be

2    one or two processors in a particular area that maybe has

3    extra capacity, maybe, but it typically doesn't have extra

4    capacity, that that somehow creates competitive conditions.

5    It's just empirically -- it's not what you would expect with

6    a market like this with a product like this which can be

7    transported, which is relatively homogenous, it's not what

8    you would expect and it's not what the evidence shows.

9         What the evidence shows -- what Rausser says is

10   what you would expect to have happen at this point in this

11   sort of a market is for processors to take advantage of the

12   low prices that the conspirator has achieved, largely market

13   wide, and take advantage by demanding similarly low prices.

14   That's what you would expect.

15        And, in fact, that's, that's what you find.  And

16   that's, that's what's demonstrated in the last bullet on

17   Slide 18, which Rausser analyzed this in a variety of ways.

18   And these are pretty standard methodologies.  He looked at

19   what's called spacial integration.  You know, do you find,

20   you know, do you -- is each county standing alone or are you

21   finding that what happened to one county that there's a

22   strong correlation with the next county.  And he -- that's

23   sort of a basic way that you study this.  And he finds that

24   the answer is yes.

25        As, as they, as they sort of -- as the experts

continue to go back and forth on this issue Rausser actually
expanded his multiple regression analysis, his common
factors analysis to specifically wrestle with this issue and
see, okay, let's do a multiple regression analysis that asks
the question, you know, in counties where you have quote
non-conspiring processors available are you finding that
that makes higher prices available to farmers or are you
finding that sort of everyone's taking advantage of the
suppression of the conspiracy.

          And what he found, using multiple regression
analysis is that, is essentially the presence of more
non-conspiracy non-conspirators, non-conspiring processors
in a particular county, it didn't result in higher prices
for farmers.  And the reason for that is because prices are
suppressed for the entire market.

          And bare in mind -- it's one of the more important
documents on this common impact issue.  And that's the words
of the defendant's own vice president that the prices have
dropped for the entire market.

          So the fact that you have some variability within
a particular county it's just not changing the underlying
dynamic or most importantly the fact that prices are
declining for quote the entire market.

          Your Honor, turning to Slide 19 we addressed the
issue of whether the defendants claim that some farmers

1    benefit from low milk prices, whether there's, whether that

2    creates any issue for class purposes.  They basically argue

3    that for people that are in vertically integrated co-ops

4    that have some interest in processing plants that maybe low

5    milk prices helps them.

6            The first three points here are really the point

7    that I made earlier is that this whole notion that low

8    prices -- that there are some people in this class that are

9    going to be benefited by low prices basically contradicts

10   everything that DFA has said, you know, contradicts

11   essentially all the evidence in this case, including their

12   own declarations which repeatedly say, gee, we love DFA

13   because they are driving up our price, we want higher

14   prices.

15           You know, there is not a single person who has

16   testified in this case to this proposition that Kalt is

17   hypothesizing about that low prices is good for any of these

18   farmers.  No one believes that other than Professor Kalt's

19   hypothesis.

20           The fifth point in this slide simply -- is simply

21   kind of an analysis of the empirical question.  And it's

22   probably not necessary unless the Court wants me to kind of

23   go through it in detail.  It's covered in Rausser's report.

24   But Rausser basically makes the point that because, because

25   the, the actual price that farmers get paid is so

1    fundamental to how much money they are making that, you

2    know, whatever interest they have in a processing plant it's

3    so small relative to the check they actually get paid for by

4    virtue of their -- by virtue of their milk supply that

5    there's just -- there just isn't -- there is not a plausible

6    circumstance in which a reduction in milk prices is going to

7    help -- is going to help any farmer.  And that's what the

8    empirical evidence indicates.

9          The last point I think that should be emphasized

10   for this purpose is the sixth point is that sort of a more

11   complicated legal point, and I don't want to dwell on it

12   because I just don't think there's anything to this

13   argument, but it's an important legal point, which is that

14   in, in over-charge or under-charge cases, and this is sort

15   of what Illinois Brick and Hanover Shoe sort of one of the

16   premises of those cases is that, is that the question in

17   those cases is, is, you know, damages are measured by, if

18   it's an over-charge case, the amount of the over-charge.  If

19   there's an under-charge the amount of the under-charge.

20         You don't ask the next question for a particular

21   plaintiff, well, did they profit from this in some respect.

22   It's just not a legal -- it's an inference that is not

23   permitted.  So even if they were right factually, which they

24   are not, it's a legally impermissible direction to go.

25         In Slide 20 we address the issue, their claim that

1     basically farmers who don't sell through DMS, who may have

2     been targeted by the conspiracy were in fact targeted by the

3     conspiracy but didn't chose to sell through one of the

4     conspirators.  They argue that they, that they have no

5     standing to recover in this case which, you know,

6     interestingly is not an argument they've ever raised.  It's

7     a legal argument they've never raised on a motion to dismiss

8     or otherwise, but apparently are now asserting for class

9     purposes.

10            First I want to be clear about what the facts are.

11     There's no question that the conspiracy here targeted and

12     impacted the very farmers that they are talking about right

13     now.  You know, a central purpose of this conspiracy was to

14     force -- was to force conspiracy -- was to force farmers to

15     sell through the conspiracy by essentially restricting the

16     alternatives that were available to them, restricting,

17     restricting attractive alternatives, suppressing the price,

18     the price everywhere.

19            So, you know, a classic example of how these

20     people were targeted is the document I handed to the Court

21     earlier which says -- which talks about this million dollar

22     payment which was followed by multi-million dollar payments

23     in more recent years and where they described this as we

24     consider them payment for non-compete on the independent

25     supply.

1          So these are the exact farmers we're talking

2     about.  And DFA is paying the major processor in the area

3     not to compete for milk purchased by those farmers.  So you

4     could hardly have a more explicit document making clear that

5     these people were targeted by the conspiracy.

6          In that respect this is not a case at all like the

7     umbrella pricing type cases that they are talking about

8     where someone simply says, gee, there was a conspiracy and

9     it seemed to have -- it appeared in a -- in a high price

10    case, that it seemed to raise prices on everybody and so

11    everybody should be able to recover, recover damages.

12         This is a case where exclusive dealing agreements

13    were entered that specifically said, in effect said if you

14    don't sell through DMS these other -- these other farmers

15    cannot get access to those plants or it paid people not to

16    compete with them.  And, and that damaged competition that

17    was directed to these people where they were, in effect,

18    almost named by name.  That's what we're talking about.

19    That's very different than the kind of umbrella pricing

20    cases they are talking about.

21         So, for example, the two cases they rely on from

22    the Southern District of New York, one is a case involving

23    New Balance Shoes that's talking about -- it's just a

24    typical -- it's an actually extreme umbrella pricing case

25    involving thousands of retailers across the country and

every purchaser of New Balance Shoes.  There's no allegation
that the conduct was directed at the various people who were
victims, etcetera.  It's fundamentally different than this
case.

       The other case that they rely on from the Southern
District of New York is the case, it's a case in which the
plaintiff in that case was not even a participant in the
relevant market.  So not only is this very different than
umbrella pricing cases in general, and actually much more
like Associated General Contractors, which is a case where
the Supreme Court found standing for people who said that --
the defendants in that case had conspired and had coerced
third parties not to deal with the plaintiffs, which were
unions, not to deal with unionized work.  So, you know, that
was a targeting case for accurately -- where activities were
directed against third parties who then targeted the
plaintiffs.

       So all of this, without belaboring the point, is
consistent with the Court's analysis on the motion to
dismiss where you may recall they talked about -- there were
issues about what overt acts should be counted for purposes
of the conspiracy in a continuing conspiracy.  And the Court
talked about the coercion.  And the argument they made, that
the defendants made was, well, this coercion wasn't directed
at the plaintiffs themselves, it involved the coercion of

1    other people.  And the point that the Court made, correctly

2    I think, was, well, it had market-wide, it had market-wide

3    affect, it sort of sent out a message to the marketplace

4    that you play ball or this is what you may be subject to and

5    that everyone within that market was a target of this

6    activity.  And you cite cases like the Ionor case which I

7    was actually involved in the original trial of that.  The

8    Henry Beef Industries case.  These are cases, again, where

9    you've got people that were targeted and are found to have

10   standing.

11          The last point I would like to make in connection

12   with that is, you know, the lynchpin for all the standing

13   analysis is that Associated General Contractor, the five

14   factors that they identify in that case for standing.  And

15   if you look at the five factors there, every one of the

16   factors, not just one of the factors, but every one of the

17   factors supports standing for people in this situation,

18   farmers that were, among others, I'm not saying they were

19   the only targets, but they were clearly targets of the

20   conspiracy.  The injuries are the type the antitrust laws

21   are designed to address, payments for non-compete.  You

22   couldn't get more at the heart of the antitrust laws.

23          The farmers, who would not supply through DMS,

24   were direct targets.  The harm isn't speculative.  It's

25   acknowledged in their own document when they talked about

1    dropping the price for the entire market.  There's no risk

2    of duplicative recovery.  These farmers, the injury they

3    incurred was injury they incurred.  There's no one else that

4    can recover and if they couldn't recover no one recovers for

5    that injury.  And there's no need to apportion the damages.

6    These are the only people that can recover for it.  So,

7    anyway, that's -- that is that argument.

8              The last point I want to address, which I think I

9    can address briefly here, is just the damages analysis,

10   which is addressed in Slide 21.  The point I want to make

11   about damages -- a couple points I want to make about

12   damages.  One bedrock principle the Court should bare in

13   mind is that in regard to damages plaintiffs were given a

14   fairly wide latitude for the way they think about damages.

15   And the reason for that -- and it's a principle that I think

16   it's more generally applicable to some of the arguments that

17   are being raised.  A lot of the uncertainties that are

18   created about what would have happened in a different world

19   are a result of -- a result of unlawful conduct.  And what

20   the courts have said in Zenith and other cases is that, is

21   that, you know, having created uncertainties about what

22   would have happened in a competitive world the defendants

23   kind of bare responsibility for that and plaintiffs are

24   given a reasonable amount of latitude.  It's got to be

25   reasonable.  A reasonable amount of latitude to come up with

1    a damages estimate.

2         THE COURT:  How can a non-DMS dairy farmer have

3    the same damages as a DMS member dairy farm?

4         MR. PIERSON:  For exactly the reason indicated in

5    the document of Mr. Graves because what we're measuring is

6    whether there has been a suppression in price.  And remember

7    the document talks about a suppression of price for the

8    entire market.

9         THE COURT:  So, but in one category of damages;

10   right?  So you're only saying loss of price is the only

11   damages that you're looking for?

12        MR. PIERSON:  That's the only damages here we are

13   seeking.  We are not seeking lost profit.

14        And to be clear, Your Honor, because this goes to

15   sort of the question you raised earlier, when we measure

16   damages -- when we do the uniformity analysis to see if

17   there's unusual dispersion in this market, or whatever, we

18   studied the total price, we study -- and we also looked at

19   the sub-components of the price and said, you know, we

20   looked at it both in a narrow sense and in a broad sense.

21   But for damages, damages purposes we're not trying to

22   recover damages based on a regulated price or anything like

23   that.  The only damages -- the only suppression that we're

24   trying to recover for in the final analysis is the

25   suppression of the over-order premium, which Dr. Rausser's

1    damage model shows it's gone down about 50 percent less than

2    you would find in a competitive marketplace.

3              THE COURT:  And there's no offset for the monitary

4    benefit that a DMS member receives from belonging to the

5    co-op?  So they aren't a member of the co-op for no reason,

6    they derive some benefits from it, how is that factored into

7    damages?

8              MR. PIERSON:  In an over-charge case, Your Honor,

9    in an over-charge case it not only doesn't need to be it

10   really shouldn't be because it's the distinction between

11   kind of using the term of over-charge and under-charge

12   interchangeably here.  But the measure of damages here in an

13   over-charge case -- let me use it more properly.  In a

14   under-payment case the measure of damages is the reduction

15   in price.  You can't get into issues of did we lose profits

16   here or conversely the defendant can't argue, well, it was

17   profitable to you in some sense.  That's not the measure of

18   damages.  And that flows from Illinois Brick and Hanover

19   Shoe.

20             So I think that's a very well established

21   proposition that they -- so, for example, someone whose

22   overcharged in a price fixing conspiracy they can't, they

23   can't say, well, that person not only passed along the

24   higher price they got they got, they passed along even more

25   than they got.  So actually the fact that they were

1   overcharging in the price fixing conspiracy actually helped

2   them because they were able to profit from it.  That's off

3   ground in an antitrust case and it's just --

4         THE COURT:  Well, I mean you have a price fixing

5   category of allegations, but you have other allegations of

6   anti-competitive conduct and anti-competitive harm that go

7   beyond just pricing.  I guess you're telling me that you are

8   not going to seek any kind of recovery for that harm?

9         MR. PIERSON:  That's right.  Well, let me be

10  clear.  The damage that we're claiming was caused is a

11  suppression of the prices.  And that was caused by a variety

12  of conduct.  But the only damages we're seeking are for

13  suppression of the prices.  We are not seeking damages for

14  lost profits for farmers.

15        THE COURT:  Or any other form of anti-competitive

16  harm?

17        MR. PIERSON:  Or any harm.  It's a single measure

18  of damages.  Very standard in a case like this.  It's, it's,

19  it's purely from the suppression of prices caused by various

20  conduct.

21        You know, I think the only thing I -- I do

22  appreciate, I'm sure Mr. Kuney's chomping at the bit to

23  speak, and so I appreciate your patience with me.

24        I think probably the only other thing, unless you

25  have questions about the damages, I should say is the

1    methodology that's been applied here is not novel.  This is

2    standard to use a benchmark in a comparable market.

3              I mean here, you know, I've been involved on both

4    sides in a lot of antitrust cases and seen different

5    benchmarks, different markets used.  Here the benchmark is

6    particularly strong because, you know, you are not talking

7    about a different product line, you are not talking about a

8    different -- you're talking about the same time period, very

9    similar products, an awful lot of data available and not a

10   theoretical model but a model that's actually been done.

11             So, so, you know, we did a lot of work on this.

12   We did a lot of work on this.  And the -- for present

13   purposes the relevant point is that the way our expert is

14   approaching these issues is to prove them by common proof.

15             So where I would end this, Your Honor, is simply

16   sort of where I started.  You know, the Court recognized

17   early on, as has the Second Circuit, that there are

18   tremendous advantages to using a class action in a case like

19   this.  There may be no alternative.  Obviously there are

20   challenges in proving the case.  This is hard.  It's the

21   result of a complex conspiracy.  And it makes our job hard.

22   But we've done the work.  The case is susceptible to common

23   proof and I would respectfully request that the class be

24   certified.

25             THE COURT:  All right.  Let's turn to Mr. Kuney.

1          MR. PIERSON:  Oh, did you want to hear from Mr.

2     Haar?

3          THE COURT:  I was thinking we could go to Mr.

4     Haar, but then I was thinking we would take both individuals

5     at the end.  What's your preference?

6          MR. PIERSON:  That's fine with me, Your Honor.

7          MR. KUNEY:  Thank you, Your Honor.  Steve Kuney

8     for the defendants.

9          Your Honor, just a question if I may so I can try

10    to use my time in a way that would be most helpful.  We

11    understood Your Honor has something at 3:30.

12         THE COURT:  I have a change of plea for a trial

13    starting tomorrow.  So that will go forward.  And if you

14    need time at the end of that, that's fine.  I think it will

15    take about a half an hour.

16         MR. KUNEY:  Okay.  Thank you, Your Honor.  I'll

17    try to be consistent.

18         I do have a set of slides that I would like to

19    hand up.  And I can probably make this thing work.

20         Your Honor, I'm going to try to address the issues

21    in front of us in the order suggested here, which is to deal

22    with the predominance questions and then to deal with the

23    conflicts issues and I hope along the way to pick up the

24    various questions that you have raised.  Probably not, I'll

25    cycle through them at the tail end.  And I trust you'll

1   remind me if I skip too many of them.  But there's obviously

2   been an awful lot written and an awful lot said today to

3   which there might need to be some response.

4          I want to start with the predominance issue.  I

5   know that's kind of where Mr. Pierson ended, but I think I

6   would like to start there with the Court's permission and

7   then work back to the conflicts because I think the

8   predominance issue really can resolve everything in front of

9   you.  I think correctly understood the predominance issue,

10  and this is as to liability and impact, really can take care

11  of all of the seemingly thorny questions that are in front

12  of the Court at this point.

13         And the -- there's a multiple of sub-points that I

14  want to talk about.  The one I'm going to spend most of my

15  time on actually is the second bullet here, which is the

16  data, the data on pricing shows why you can't use common

17  evidence of impact.

18         And I think there are number of Second Circuit

19  cases and other cases that suggest that if the common -- if

20  impact is an issue that's not susceptible to common proof

21  then we're really in a position where certification is not

22  appropriate, that that issue in and of itself, which is a

23  liability issue, it's injury in fact, it's not a damages

24  question.  That if that requires individual proof then we're

25  in a situation where we simply, the plaintiffs can't meet

1  the predominance requirement.

2           THE COURT:  Will you take the position that it

3  precludes issue certification?

4           MR. KUNEY:  I'm going to address that, Your Honor.

5  I can't say as a blanket technical matter, does it preclude

6  that?  No, I couldn't tell you that.  I think in this case,

7  thinking about what might be susceptible to issue

8  certification, I will try to explain when we get there why I

9  don't think that's a workable answer here.  Because I think

10  even as that -- if one's thinking that perhaps the existence

11  of the conspiracy is a, is an issue that could be dealt with

12  in common, I don't believe, given the facts of this case,

13  that it can be.  But with the Court's permission I'll sort

14  of work my way up to that.

15           THE COURT:  Yes, do what you feel is appropriate.

16           MR. KUNEY:  And then we'll talk about these two

17  groups that Mr. Pierson mentioned at the end, which is the

18  dairy farmers and the vertically integrated co-ops and the

19  dairy farmers who basically don't deal with the, with the

20  defendants.

21           I think part of the reason that you've seen what

22  our, apologetically, these mountains from the experts are

23  because we actually do agree about something, which is that

24  price dispersion is really important with respect to the

25  feasibility of the common proof.  You've got a mountain of

1    stuff about pricing.  You've heard a fair amount about it

2    this morning, although, most like anecdotal.  But the reason

3    that you were swamped with these expert reports, there were

4    hundreds of pages, and then page after page of tables, is

5    because everyone agrees that price dispersion is really,

6    really fundamental to the feasibility of common proof.  And

7    the quote that I have there in red is from Dr. Rausser in

8    his opening report, where he said it really better than I

9    can, that a wide distribution of prices suggests the

10   conspiracy may have been difficult to effectuate and casts

11   doubt that the impact of the conspirator's coordinated

12   action was common across individual class members.

13        I'm going to stop right there with his

14   formulation.  I think we, we agree with that.  And that's

15   the reason for all of the focus on pricing.

16        Before I start flipping up charts with numbers and

17   data and all that let me just give a verbal description for

18   a couple of minutes about why the setting seems to us to not

19   lead one to expect commonality of pricing experience or

20   commonality of impact for purposes of the issues that the,

21   that are in front of the Court.

22        So we know, we've heard said multiple times we

23   have about, more or less 9,000 putative class members.  Only

24   half of them, about half of them are dairy farmers that

25   deal, that market their milk through DMS.  We have the

1    primary focus in the discussion, in the conversation, in the

2    allegation and the accusations, if I can say that, are

3    always about DMS.  But we have a situation where, in spite

4    of the kind of continual reference to domineering market

5    share, etcetera, DMS markets just shade over half the milk

6    in the Northeast.  And maybe dominance is in the eye of the

7    beholder, but in terms of expecting commonality, we have an

8    awful lot of talk about in the briefing and in the expert

9    reports about how does DMS do pools and how does it divide

10   up its milk.  And it's important not to forget that that

11   whole conversation is only about slightly over half the

12   farmers in the proposed class.

13        And, and what we -- what we have here is a

14   situation, you know, you've pressed repeatedly about the

15   conspirators and when did they supposedly join.  So we have

16   a -- we have a sequence of activity in the creation and

17   expansion of DMS, which doesn't happen all at once, which

18   doesn't happen before the class period begins.  During the

19   class period dairy farmers and the co-ops and independents

20   are joining DMS in spite of the discussion you just heard

21   about, about as soon as DMS was created Dairylea and DFA had

22   some dominant position in the market.  The position they had

23   in the market at that point was somewhat in the neighborhood

24   of a 30 percent market share.

25        I, I don't think in today's antitrust parlance

```
1    that's a market share that people will talk of as

2    overwhelmingly dominant and great enough to coerce everybody

3    else in the marketplace to bend to their will.

4            I probably should register a brief kind of

5    disclaimer in advance.  It's, it's difficult to listen to

6    hours worth of accusations and not want to take on the

7    merits.  I understand that's not the issue in front of us.

8    I know that you know it's not the issue in front of us.  I'm

9    going to try just to talk about it as it relates to the Rule

10   23 requirements.

11           THE COURT:  Well, here's something that I didn't

12   hear in the plaintiff's presentation, but I do recall from

13   our motion to dismiss, was lots of talk about market share

14   and market power.  And that's why I'm interested in whose

15   market power are we talking about.

16           MR. KUNEY:  Well, there are -- there are still

17   monopolization counts in the complaint.

18           THE COURT:  Right.

19           MR. KUNEY:  And we would assume that that would be

20   an important part of the Court's analysis in weighing

21   predominating.  There is the tendency to talk about it as if

22   it's just a conspiracy case.  But it's not just a conspiracy

23   case.  There's monopolization and attempted monopolization

24   counts directed at DFA and DMS.  So, so Your Honor is quite

25   right.
```

1          And then we have this -- we have this, this, this

2    issue you've raised about can you assess commonality without

3    knowing what the market is which, which is a question that I

4    think Mr. Pierson correctly said did not receive a great

5    deal of attention in the briefing by the parties or even in

6    the expert reports.

7          Dr. Rausser talks about the market.  What Dr. Kalt

8    says is that there's some obvious reasons to think that the

9    market definition the plaintiffs have posited and,

10   therefore, the area within which they are looking for price

11   dispersion is not the right area.  And the most obvious

12   reason I think is one that you pointed out earlier today,

13   which is that 30 percent of the milk that's going to these

14   processing plants in the geographic boundaries of Federal

15   Order 1 are coming from outside the geographic boundary of

16   Federal Order 1.

17         Mr. Pierson said we all know the only issue is

18   where can the plaintiffs go to escape in the face of this

19   alleged price suppression.  We actually don't know that at

20   all because if the issue is do the defendants in Order 1

21   have market power and there is, 30 percent of their milk is

22   coming from outside, and if that 30 percent of the milk

23   could readily go, for example, to Order 33, because an awful

24   lot of those farmers are in Western New York and Western

25   Pennsylvania, and just as close to processing plants in

1    Order 33 as they are to Order 1, they could defeat any

2    attempted exercise of monopsony power.

3              So as the case unfolds you're going to hear from

4    us that the appropriate geographic market at least includes

5    those unregulated areas in Pennsylvania and New York and

6    Maine and almost surely more than that.

7              And with respect to the suggestion that one of the

8    reasons the plaintiffs are right about market definition is

9    because of how we do our business.  Well, yes, DFA has a

10   Northeast Area Council.  DMS relates to the Northeast, but

11   the Northeast, by those organizations, is not defined to be

12   limited to the boundaries of Federal Order 1.  It includes

13   those farmers in Pennsylvania, Maine, Western New York who

14   are outside the boundaries.

15             One of the complications we've had in the case is

16   they'll pluck a document out and say, oh look, DMS has X.

17   market share.  And we'll say, no, that's not your market.

18   That's a market share developed for business purposes in the

19   territory that the business considers to be the scope of

20   where it operates.  But that's not limited to Federal Order

21   1, absolutely not limited.  There's nothing in DFA or DMS

22   that draws any organizational distinction between the

23   farmers in the nearby, unregulated areas and the farmers who

24   are inside the geographic boundaries of Order 1.

25             And, and I think the way the regulations work

1    there are plants that are physically outside the geographic

2    boundaries of Order 1 that are regulated by Order 1 because

3    that's just the way the system operates.

4              So we do have a bigger market than suggested which

5    only gives us greater reason to expect that there's going to

6    be variability of conditions, variability of pricing,

7    something that will cast doubt upon the ability to use

8    common impact.

9              We also know that the various co-ops that we've

10   heard talked about are not disbursed evenly across this

11   whole territory.  And Agri-Mark is in Vermont and Northern

12   New York.  St. Albans is in Vermont.  Maryland and Virginia

13   is in the southern part of the territory.  Land O'Lakes

14   tends to be in Pennsylvania.

15             These -- there's -- if we had a pet -- we have a

16   lot of maps.  I'm going to put up a lot of maps with the

17   Court's indulgence.  But it's a patchwork.  There's nothing

18   unform about it that would lead one to expect a consistency

19   of outcomes all the way across Order 1.

20             We have different co-ops operating in different

21   territories.  We have different state regulatory schemes.

22   We have the Pennsylvania Milk Marketing Board overlapping

23   part of Order 1 and covering part of Western Pennsylvania

24   that we think is going to prove to be in the relative -- the

25   relevant market.

1          We have the Maine Milk Commission.  We have all of

2     these non-DMS farmers.  We have the fact that as the DMS

3     documents and witnesses have told the plaintiffs DMS really

4     doesn't treat the Northeast as a single whole.  They pretty

5     consistently talk about four distinct sub-regions; New

6     England, Central and Northern New York, Eastern New York,

7     excuse me, Western New York, and Western Pennsylvania and

8     then the Southern territory, which is kind of the little

9     corner of Pennsylvania and Maryland and New Jersey.

10         They don't deal with it as a whole.  They don't

11    think about it that way.  Up until a year ago they didn't

12    handle the money that way.  They had distinctive pools in

13    different parts of the territory all of which were

14    acknowledgments of the fundamental differences.

15         And the affidavit from Mr. Wickham and Mr. Mather

16    and Mr. Keating talks, for instance, about -- one of the

17    most fundamental is the area in, sort of across the Northern

18    tier almost on the Canadian border.  There's an enormous

19    amount of dairy farmers up there, really the part that

20    extends from Northern Vermont across to New York.

21    Especially as you get into New York and begin to move west

22    there are virtually no fluid milk plants up there.  It's all

23    a cheese market.  It's all a manufacturing market.

24         And as a result those dairy farmers tend to get

25    lower premiums than the dairy farmers, for example, in

1    Central New York, Massachusetts and Connecticut that have

2    access to the fluid markets in Boston and New York.  It's

3    just different.

4          THE COURT:  So let me stop you there.  And do you

5    agree that the product market has been properly defined?

6          MR. KUNEY:  We agree, but we were surprised to

7    find that organic milk is not part of the market.  We had

8    not understood that when the case began.  We're not planning

9    to pick a fight about that, but we now understand that

10   organic milk is not part of the market and that what we're

11   dealing with is basically I guess we'll call it conventional

12   milk being and rBST-free milk.  We're not -- we're not

13   taking issue with that.

14         THE COURT:  What do you say to Mr. Pierson's

15   argument that geographic market is a question for the jury,

16   it's fact intensive, you don't need to decide it in this

17   case to decide our class certification motion?

18         MR. KUNEY:  Totally agree you don't need to decide

19   it.  We really haven't given you enough to decide it.  The

20   question that, as I understood your question was, doesn't it

21   have something to do with commonality.

22         And I think the answer to that is, yes, I think it

23   does have something to do with commonality and has something

24   to do with whether the plaintiffs have met their burden of

25   demonstrating the feasibility of common proof.

1          And Dr. Rausser's one liner that, golly gee whiz,

2    it wouldn't make any difference if we folded those

3    unregulated territories and all the dairy farmers in, it

4    seems to us is well short of the mark of meeting the burden

5    of proof that they have to show they have meet the

6    requirements of Rule 23.

7          But we're certainly not asking you to rule as part

8    of this motion or suggesting that you need to on whose right

9    or whose not right about the market.

10          I think what the plaintiffs have done, it seems to

11   us, is they've, they've come up short in a number of ways.

12   One of the ways that they've come up short on commonality is

13   they have no allowance for these people in the surrounding

14   territories because they have no information about them.

15   Let me be more careful.  Very limited information about

16   them.

17          One of the problems in the whole case is this

18   whole discussion that we're about to get into about the

19   numbers and what do they show and all of that it's based on

20   the payroll data which is overwhelmingly DMS data.

21          So the plaintiffs are claiming commonality across

22   the approximately 9,000 putative class members.  And for

23   somewhere in the neighborhood of 3,000 of them we basically

24   have virtually no information.

25          There isn't -- there's a couple of co-ops that

people got some limited information about, but there's a
whole range of people out there and, and this, this is an
issue that I -- this discussion that you -- Mr. Pierson was
having with you at the tail end of the targeting of people
who were not in DMS, the people that we're talking about is
the outsiders to this alleged conspiracy are, for example,
independent dairy farmers who sold their milk to Elmhurst.
They have nothing to do with us.  They have nothing to do
with any of the defendants.

There's essentially a complete absence of
information.  The plaintiffs didn't develop any information
that would enable them to show commonality as to what is
almost a third of their group, a third of the group that
they are seeking to have included in the certified class.
We have, except for a few anecdotes, a total absence of
information.

We have a significant absence of information about
the farmers in Maine and Western New York and Western
Pennsylvania unless they happen to be in our payroll data.
Again, there's some information from the DMS payroll data.
But we just, we -- going back to the point that they have to
convince you by a preponderance of the evidence that they've
met their requirement of, all the requirements of Rule 23,
and I guess they were talking about B., for purposes of
proof common impact.  One of the very fundamental questions

1    we raise is we don't see how they can do that without

2    information, without having sought information about those

3    people who we shorthand as outsiders, how can they simply

4    assert that, well, trust us, it ought to be the same because

5    we have a theory of spacial integration about prices.  Or

6    Dr. Rausser saying it, really in a single, short paragraph,

7    oh, don't worry about those unregulated areas, it wouldn't

8    make any difference.  Well, respectfully, the information

9    that, that -- there's no -- there's not much record

10   information about that.  But I don't think it would come as

11   a surprise to anybody if the issue is the likelihood of milk

12   shifting from Order 1 to Order 33 is likely to be

13   significantly greater in Western New York when you are right

14   on the edge of Order 33 than it is in Vermont.

15           So is it credible that those people about whom

16   we're missing information are just the same as the people

17   about whom we have data?  It's really not.  It's really not

18   credible.

19           We have -- we have a significant gap in the

20   plaintiff's story about commonality.  That I think all

21   they've offered is theory.  And to his credit when Dr.

22   Rausser and Dr. Kalt did this back and forth about these

23   farmers who are like the independents who sell to Elmhurst,

24   we call them outsiders, at the end of the sort of

25   theoretical back and forth between the two PhD economists,

1    Dr. Rausser said in his, in his reply report at the end of

2    the day it's an empirical question.  That's true.  At the

3    end of the day it an empirical question.  And where is the

4    empirical verification that would give you a basis to make a

5    finding that there's commonality as to those people.

6            Let me turn to an issue that occupied a fair

7    amount of attention while Mr. Pierson was talking.  And it's

8    this question of what prices are we talking about here.

9            And I hope I heard him correctly at the tail end

10   when he said the damages that we're seeking have to do with

11   the suppression of over-order premiums.  We're not trying to

12   collect for the regulated price.  I hope I got that close to

13   right at the tail end of his remarks.  So --

14           THE COURT:  Only damages seeking is suppression of

15   prices.  So no other anti-competitive harm.

16           MR. KUNEY:  But I think he said more than that,

17   Your Honor.  I think he said, and as to the price

18   suppression it relates to over-order premiums and not the

19   regulated part of the price the dairy farmers receive.

20           Now, Mr. Pierson kind of reminded us that one of

21   the reasons that milk pricing confounds those of us who are

22   new to it is that regulatory scheme and the terminology that

23   applies to the price from the plant is similar to, but not

24   always identical, to the price that applies from co-op to

25   dairy farmer.  So we really have two sets of prices, plant

1  prices, pay prices for farmers, a lot of similar talk, a lot

2  of use of the world premium, but they are not exactly the

3  same.

4         But here's what, here's what we all seem to know

5  that this regulated piece of the price is by far the biggest

6  part.  Dr. Kalt went through the payroll data and calculated

7  that the regulated component payment, by far the largest

8  part of what the farmer gets, is, in fact, over 87 percent

9  of the total pay price.

10         This item called the producer price differential,

11  which is essentially a location payment, is another almost

12  eight percent.  And the premiums, premiums defined to

13  include anything else or a little bit under five percent of

14  the total price that the dairy farmers get.  So the case is

15  about the alleged suppression of over-order premiums.  We --

16  Dr. Rausser in the report he just submitted on the merits,

17  which I know we were told he's not just speculating, he's

18  actually done it, he defined the farmer premiums that he was

19  studying as the gross price minus the regulated part with

20  respect to, at that end it's usually called blend.  Again,

21  consistent with the notion that the plaintiffs are not

22  claiming that the regulated price is part of what they are

23  seeking damages for.

24         We actually, we actually fought through this issue

25  in the Southeast case because Dr. Rausser's original damages

1    model in that case did include a claim for the regulated

2    price.  And the Court ruled under the filed rate action you

3    can't collect in a private damage action for a price set by

4    a federal regulator.

5           So I think they, I think they took that to heart.

6    And here it's gross price less the regulated piece.  Well,

7    the regulated piece is by far the lion's share of the gross

8    price that the dairy farmer is getting.

9           So, back to -- we agree with Dr. Rausser that

10   studying price dispersion is kind of the key to

11   understanding the feasibility of common proof on this fact

12   of injury.

13          What are, what are -- what can we say about what

14   Dr. Rausser did and what he didn't do?  Whoops.  Sorry. Dr.

15   Rausser, as Mr. Pierson said, the first time through he

16   analyzed just component pricing.  That's all he did.  He did

17   that 87 percent piece, which surprise, surprise was similar

18   across farmers because it's supposed to be.  And when I

19   asked him during his deposition whether those prices would

20   have been affected by the conspiracy he said no.

21          I asked him a couple different ways whether he was

22   claiming that the regulated price, which to dairy farmers

23   sometimes that regulated piece is called blend.  Dr.

24   Rausser, this is question, is it your opinion that the

25   alleged price suppressing conspiracy had any affect on the

1    blend price in Federal Order 1?  That's the regulated piece.

2    Answer, no.  No.

3           So Dr. Rausser starts off saying, well, I'm just

4    going to do the component prices.  He understands that

5    that's not being conspired against.  And then, as you heard

6    in his second try, he goes to total price.  But did he ever,

7    ever evaluate the dispersion or variability in the premiums

8    that they say are suppressed?  No.  He never did.

9           Now, they have the burden of proof.  They have

10   lots of reasons they say why it's okay to do that.  I would

11   say, Your Honor, for all of the ink that's been spilt you

12   could conclude your evaluation of whether they've met their

13   burden of proof on a common impact right there.  Dr. Rausser

14   presents no evaluation of the dispersion or variability of

15   the premiums alleged suppressed by the conspiracy.  Period.

16   End of story.  None.

17          Now, let me just, because of course I don't want

18   to stop there.  But let me just take a couple minutes and

19   tell you what happens when you do look at premiums.  This is

20   Slide 10 in what I handed up.  And this is a figure from Dr.

21   Kalt's reply report.

22          The co-ops pay the same premiums.  And really the

23   issue here is not are the, are they identical.  We're not

24   assuming Dr. Rausser said they were identical.  But just

25   look at the issue of whether they either all go up or all go

down.  Because if there's one thing, I mean Mr. Pierson kept

talking about the tide, when the tide sinks everybody sinks.

Presumably what that must entail, if nothing else, is that

people's prices are moving in the same direction.  So you

can just look all over this chart and see that that's not

correct.  You can look at 2003 to 2004 and see Dairylea

prices going up and DFA prices going down.

You can look at 2004 to 2005, see Dairylea and DFA

going down.  DMS, Land O'Lakes, Maryland and Virginia all

going up.  You can look at '06 to '07.  See Dairylea, DFA

going up, DMS, Land O'Lakes going down.

It's not just that the premiums are not the same

is that they are not even moving in the same direction if

measured across a co-op, which, of course, there's a lot of

averaging when you put a co-op together.

Mr. Pierson correctly anticipated that we would

see at least one chart showing just what the premiums look

like.  These are the counties.  This provides a dot, not

multiple dots, not we have to guess how many dots.  It

provides a dot for each dairy farmer in the counties where

the Maine plaintiffs live.

And what you can see is that the premiums, there's

a line showing the average, there's is a little clustering

around the average, but if you look at the left-hand scale

you'll see that the area that goes between zero and a dollar

1    encompasses -- it's obviously an exceptionally broad range,

2    and these people are spread out all across that.  The

3    average premium earned in the Northeast is somewhere in the

4    neighborhood of 65 cents.  I'm sure there will be slight

5    variations in how people define it, but looking at Dr.

6    Rausser's merits report and Dr. Kalt's report on class

7    certification they are both using a total premium earned by

8    dairy farmers on average of around 65 or 66 cents.  And

9    that's very important, Your Honor, because one of the

10   debates we have here is how big is big.

11          So we look at a chart like this which shows that

12   the dispersion goes from zero to a buck 30 and you say,

13   well, I can understand where the 65 cent average comes from

14   but look how wildly spread out are these people are.  Is

15   that going to be consisted with the notion that you can do

16   common proof.

17          Well, let's go back to the issue about whether

18   people are moving in the same direction.  This is, again,

19   this is Figure 311 from Dr. Kalt's reply report.

20          There's about 55 to 5,600 dairy farmers in the

21   payroll database.  Okay.  That's where all these figures are

22   drawn from the payroll database.  It's not great.  We all

23   wish we had more information, but we don't.

24          Okay.  5,500.  Dr. Kalt asked the question, how

25   many dairy farmer's prices are going up when the majority is

1    going down?  And conversely.  How many of them are moving in

2    the opposite direction.  Mr. Pierson gave you some, some

3    snippets from testimony where people said, gosh, I think

4    about everybody is going the same.  I think 99 percent of

5    the people are all going the same.

6           Well, it turns out that's wrong.  Dr. Kalt didn't

7    collect snippets on that point.  He didn't interview people.

8    He said, I'm going to take the payroll data and take a look.

9    And what he found is that on average 2,000 out of the 5,500

10   farmers are moving in the opposite direction from the

11   majority.  So that something on the neighborhood of

12   40 percent are going down and everybody else is going up.

13   That's not one percent.  That's not one out of a hundred.

14   That's not one or two out of 1,400.  And it's not based on

15   memory or an anecdote.  It's based on analyzing the data on

16   the premiums that are at issue in this case.

17          So with respect to the allegedly depressed

18   premiums that Dr. Rausser failed to analyze what do we see,

19   a real, simple fundamental point.  Almost half of them are

20   going in the opposite direction, on average opposite

21   direction from the majority.  How will the plaintiffs be

22   able to establish common proof of impact if almost half of

23   the would be class is moving up while the other half is

24   moving down.

25          They, I suspect they are going to say, well, the

1    whole tide still is lowered, but the suggestion of the tide

2    being lowered is that we should see evidence of the dairy

3    farmer's prices, even though some will be higher and some

4    will be lower, we should see evidence of them kind of moving

5    more or less in sync.

6           And what the data show is on the contrary.  They

7    don't come close to moving in sync.  It's not simply that

8    there's a cloud.  There is a cloud because they are so

9    different, but they are not even coming close to moving in

10   the same direction.

11          Now, because there's been some suggestion that,

12   you know, sometimes Dr. Kalt doesn't use the appropriate

13   statistical techniques he translated that concept of dairy

14   farmer's premiums moving in different directions into what

15   econometricians and statisticians do which is something

16   called correlation analysis.  And it -- if it were the case

17   that all of the boats went up and down together then when

18   you went to correlate changes in premiums across dairy

19   farmers what you would find is that correlations were all

20   positive, were all highly statistically significant and that

21   the, this number they cap that they called the correlation

22   coefficient, which more or less shows how closely two

23   numbers move together, the correlation coefficients would be

24   crowding around up near the number one.

25          So what does Dr. Kalt find when he takes all of

1   these premiums and says statistically do they move together.

2   He finds only half of them, excuse me, 40 percent of them

3   are positive and significantly correlated.  He finds almost

4   30 percent of them are negatively correlated.  That's a,

5   perhaps a fancier way of saying what he showed in the last

6   chart, which is, there's an awful lot of prices going down

7   while other guy's prices are going up.  They are not moving

8   in the same direction.  There's no lock step here with

9   respect to the allegedly suppressed premium.

10          We don't find anything approaching the level of

11  similarity and movement of premiums that would have been

12  necessary for the plaintiffs to meet their burden of being

13  able to show impact of common proof.  So Dr. Rausser's first

14  mistake and, again, respectfully the only one the Court

15  needs to consider, is that he never did anything that deals

16  directly with the premiums like the charts we've just been

17  looking at.

18          The second thing Dr. Rausser does, which I think

19  is, is hopefully helped sort through some of the statistical

20  econometric chaos Dr. Rausser has a way of minimizing price

21  variations. This is why I said a few moments ago that the,

22  the fact that the average premium is 65 cents is important.

23          Dr. Rausser takes a look at the analysis that Dr.

24  Kalt did which he called churning.  You know, for better or

25  worse that was Dr. Kalt's term.  It means that if you have

everybody in rank order people are kind of changing places.
And where they stand in the rank order, which is to me just
a different way of saying they are not moving in lock step.
If they are moving in lock step the correlations would be
high and they wouldn't be changing place in order, in the
order very much.  But what Dr. Kalt did, and there's a lot
of charts, for better or worse in his reports about this, he
analyzes the extent to which farmers trade places.

        And Dr. Rausser says, you know, besides that being
a technique that I haven't seen used before the price
changes that Dr. Kalt's findings are quite modest.  And it
turns out that the price changes that Dr. Kalt is talking
about are in the neighborhood of 45 to 50 cents.

        So what is Dr. Rausser telling us?  In a, in a
situation where the average premium is only 65 cents Dr.
Rausser is declaring that 44 to 55 cents is no big deal.  So
the second key reason why Dr. Rausser doesn't see much price
variation here is because he's got his lense looking for
variations that are impossibly big.  And part of that is
because of his focus on total price.  Gee, 44 cents out of
$18 doesn't seem like very much.  That's true.  But 87. --
actually 95 percent of that $18 is a regulated price not
subject to the claimed price suppression, not part of the
damages claim here.  If you compare those price variations
to the allegedly suppressed premium they are enormous.

1          There's a second example of that.  Dr. Rausser

2    talks about Middlebury co-op.  He makes one stab at trying

3    to get some data on these processors about whom he generally

4    lacks information.  And Dr. Rausser has a chart in his reply

5    declaration.  It's around -- the text is around Paragraph 51

6    where he talks about Middlebury co-op and what they are

7    paying farmers.  And he says they track, they tracked DMS

8    pay prices and the differences are small.  Well, if you turn

9    the page and look at the footnote happily he does the math

10   and he says small means 92 cents.  In other words, the

11   difference in what they are paying is greater than the

12   average premium earned by dairy farmers across Order 1.

13         Now, Dr. Rausser can call that small, he can use

14   the word similar throughout his declaration as many times as

15   he wants, but we now have two, what I believe, are fatal

16   problems.  He's not talking about the suppressed premium and

17   his metric for small is totally disconnected from the size

18   of the premium that he's talking about.

19         Well, I don't want to get too far into the weeds

20   here but, Dr. Rausser, again, if you take his own data and

21   you, and you do want to sort of play with the statisticians

22   and you get into this business about the standard

23   deviations, you know, what does he show.  And I know this

24   one's a little hard to read.  I apologize.  The standard

25   deviation across Order 1, and standard deviation is kind of

1    a statistician's measure as they kind of plot these

2    distributions of what people make.  And one standard

3    deviation will usually capture about a third of the people.

4            The standard deviation is a dollar 15.  So the

5    standard deviation in premiums is almost twice the average

6    premium.  What does that tell us?  That reinforces the point

7    that once we focus our lens where we should on the premiums

8    there's extraordinary variability.

9            And that how does Dr. Rausser make that small?  He

10   flips from premium to total price.  He calculates this

11   coefficient of variation and he gives us a percentage

12   coefficient variation based on the total price.  But since

13   what they are suing over are the premiums, what they are

14   alleging is suppressed are the premiums, what, what can he

15   tell us about the variability on the premiums?  Well, as I

16   said, he hasn't told us anything.  And when we look what we

17   see is that it's a completely different picture than he's

18   led us to expect.

19           The plaintiffs kind of say, we've got this thing

20   called multi-variant regression analysis.  It makes it come

21   out fine, not to worry.

22           So one of the things that Dr. Kalt does in his

23   reply report is he says, well, one of the things you're

24   supposed to be able to do with muti-variant regression

25   analysis is you can plug in all of the numbers for all of

1    the variables and come up with a prediction of what the

2    person's pay price would have been.  And then you can

3    compare that prediction to the actual price and see how well

4    the model did.  I mean there's other ways to do it, but

5    that's kind of a way that has a certain sort of intuitive

6    appeal.

7         And so Dr. Kalt presents the results for a number.

8    I'm not going to take the Court's time to go through a

9    number of them, but I'll just take a minute on this one.

10   This is Figure 4.3B.  This is Orange County, Vermont.  This

11   is where the Allens live.  And if you look at the size of

12   the area by which the estimate misses in coming up with a

13   farmer's pay price what you see is that for two out of the

14   three months, and for parts of three out of the three

15   months, the, the error term is greater than the average

16   premium earned by dairy farmers.

17        So the error term is greater than the number that

18   he should be able to predict and project so that he can

19   supposedly use common proof to evaluate the impact of the

20   conspiracy.

21        The other thing is, and we heard, we heard some

22   talk about, well, you know, that regression is really good,

23   it meets professional standards, it shows all the things we

24   need to know.  Well, what does it show us?  And this is a,

25   this is a Rausser exhibit.  This is Exhibit 20 from his

1    reply report.  So he evidently wanted to sponsor this as

2    affirmatively helpful to him.  What, what I, what I believe

3    the statisticians would tell us is when you use a number of

4    different variables in this estimation equation one of the

5    things that the computer can tell you at the end is how much

6    each of those variables helped you predict the changes in

7    the variable that you are studying.

8             So this is, this is Dr. Rausser studying gross

9    mailbox price, not premiums.  And he's -- he's got his

10   variables down the side and it says, well, gee, look I

11   explained almost 95 percent.  Total variation explained by

12   observable characteristics, 94.79 percent.  That sounds

13   really good.  It sounds like Dr. Rausser has an equation

14   that's really dynamite at explaining mailbox prices.  But

15   when you look at the, at the chart what do you see?  You see

16   that almost all the explaining is done by this thing called

17   standardized components rate.

18            In other words, by putting in the regulated part

19   of the price, which we know accounts for about 87.5 percent

20   of the price, we're able to explain 87 percent of the

21   variation.  Well, respectfully, Dr. Rausser, is that telling

22   us anything about what we care about with respect to the

23   feasibility of common proof?  It's telling us if we put in a

24   plug number, which is said to be identical by the regulatory

25   process, that happens to account for the biggest part of

1    total price, we can sort of explain itself back to us.

2            That, that doesn't, that doesn't help at all with

3    whether the plaintiffs have a feasible method of common

4    proof to show the suppressed, the suppressed premiums that

5    they are claiming is the common impact across the class.  It

6    doesn't do us any good at all.  That 94.79 percent number is

7    almost as if we have the price regressed upon the components

8    that by definition account for most of the price.  And if

9    you look at the other numbers --

10           THE COURT:  Let me ask you, are these all the

11   variables used by Dr. Rausser?

12           MR. KUNEY:  Yes, this is Dr. Rausser.

13           THE COURT:  So I asked plaintiff's counsel about

14   where does quality come in.  And I suggested it was in the

15   component pricing and then we got into the rBST discussion.

16   Where else is it?

17           MR. KUNEY:  Well, he's got -- if you think butter

18   fat and protein, some do, some people say quality and what

19   they mean is like somatic cell count, you know, is there --

20   the bacteria count too high in the milk.  Others include

21   things like the protein and the solids and the butter fat.

22           THE COURT:  I'm not talking about the components.

23   And I'm not talking about whether it's rBST or not.

24           MR. KUNEY:  Okay.

25           THE COURT:  Where else would I find, from your

1    perspective, a quality component to the price?  I couldn't

2    find one so I --

3         MR. KUNEY:  The way -- the way we understand it is

4    if you -- if you take the total price and you were to net

5    out the regulated part and you're left with something that

6    you think of as a total premium, if the particular

7    cooperative that the farmer belongs to, for example, pays

8    extra if you have low somatic cell counts that number will

9    be part of what the farmer's gotten as his total premium.

10         And part of what, as I understand it, what Dr.

11    Rausser has said is, well, different co-ops make different

12    choices about that and I really don't care, I just care

13    about the total premium.  So as I understand what he's done

14    if the particular co-op happens to pay then that will be a

15    piece of the premium, but he -- it's not that he uses like

16    somatic cell count as a variable in the regression.

17         THE COURT:  Then looking at these components tell

18    me which ones defendants claim are part of the regulated

19    price.

20         MR. KUNEY:  The standard components rate, the

21    86.38 percent, would be all something that we think has

22    nothing to do with the alleged suppression of the

23    non-regulated part of the price.  So most of the explanation

24    here is of the regulated -- is really the regulated piece of

25    the price is driving the explanation which, Your Honor, is

1    what you'd expect because the regulated piece is by far the

2    biggest part of the total price.

3             And so -- and this is, you know, Dr. Rausser, in

4    his merits report, which I know is sort of officially not

5    really in front of us, but sort of half is, in his merits

6    report he does look at farmer premiums.  He actually

7    deviated a tad from his own prediction about how he was

8    going to do it.  He substracts out the regulated portion.

9    But what that tells us is this kind of evidence of the

10   commonality is really no evidence at all because it --

11   because he doesn't have the variable being explained the

12   right thing.  He's got mailbox price.  He should have

13   premium.

14            The last point about this is that, that where we

15   think, and the reason we're using Dr. Rausser's own exhibit,

16   you'll notice that the other variable that has the highest

17   percent of variation explained is the co-op.  Co-op

18   affiliation.

19            Well, okay.  That -- it's true, he can assign that

20   for everyone, but -- so, so it is a variable to which you

21   can put in data.  But if one of the issues is whether

22   there's a conspiracy involving certain co-ops and you say,

23   well, my explanatory variable is were you in Dairylea.

24   That, that also seeks to really just kind of get us running

25   around in a circle.  Where what we'd expect Dr. Rausser to

do at the end of the day is to say I've got these massive
variables, I really can't explain premiums and then I'm
going to introduce another kind of a plug factor called
class member and show that if you are a class member you
got, in his words, less than you would have expected.

At that point how co-op affiliation can be a
separate, independent explanatory variable, he argues for
commonality.  For us it makes our point.  It makes the point
of an absence of commonality.  The variables that stand out
here are cooperative affiliation and location, geographic
variability across Federal Order 1.

So we, we frankly found Dr. Rausser's explanation
of where his -- Dr. Rausser's summary table of where the
explanatory power in his model came from very helpful to our
point, which is that the model really circles back on itself
and doesn't, and doesn't help him at all.

Very briefly on the, on the other price series,
the prices the plants pay.  This is from Dr. Kalt's reply
report.  It's also part of his executive summary, I'm sorry,
this is his opening report.  One of the things Dr. Kalt did
try to do, perhaps understanding that the hundreds of pages
and hundreds of charts were going to be a little
overwhelming, he does have a summary which I think is very
helpful.  He included this for important reasons, which is
that the, the conspiracy as described to us begins with

1    suppressing the prices paid by the plants which sort of

2    brings less money in the door and therefore helps result in

3    lower prices being paid to dairy farmers.

4            So Dr. Kalt just took a quick look and said, gee,

5    are the class one plants, the fluid milk plants across the

6    northeast, all paying the same price.  And the heights of

7    the bars here show no.  And the color code shows what kind

8    of plant it is; defendant plant, alleged co-conspirator,

9    non-conspirator.  You can see where the class one plants

10   are, you can kind of see off of here loosely the point I was

11   making before about this area in Western New York --

12   Northern and Western New York being an area where you don't

13   see a lot of bars because there's not many fluid plants up

14   there.

15           You see an enormous number of fluid plants in

16   Pennsylvania, in part we believe, as a result of that PMNB

17   and the Pennsylvania regulations and how they create what is

18   really a unique and quite distinctive marketing area as part

19   of this region.

20           So is the kind of input, the farmer pay prices, is

21   that really uniform across the Northeast in a way that would

22   lend itself to common proof?  No, it's not.

23           Here's, here's another one of Dr. Rausser's

24   charts.  And this is also on plant prices, but it hopefully

25   will help underscore a point I was trying to make before.

1    This is a situation where the two red lines represent two,

2    what Dr. Rausser calls fringe.  We call that -- two

3    processers who are not supposed to be part of the alleged

4    conspiracy.  And Dr. Rausser presents this chart and says,

5    see they are kind of all the same.

6            Well, our reaction to that is, well, Dr. Rausser,

7    here we go again in terms of what does it mean to say all

8    the same.  The scale on the left-hand side, of course,

9    almost all the data points fall between 15 and $20.  In

10   other words, the gap between the lowest price paid by a

11   plant on this chart and the highest is something in excess

12   of $3.

13           I don't think anybody in the case would claim that

14   a variation across processing plants of $3 is a triviality,

15   triviality to be ignored.  So Dr. Rausser -- but he presents

16   this, and if you read the accompanying text, you'll see him

17   saying, this is Exhibit 8, his reply report, this shows that

18   they are more or less all the same.  Very similar prices is

19   what Dr. Rausser says at Paragraph 45.

20           It confirms, in his view, that those two red bars

21   are just like everyone else.  Well, the two red bars are

22   dollars different from each other.  If you -- if you start

23   picking points on here, and Dr. Kalt talks about some of

24   this in his reply report, that theory you heard mentioned

25   earlier today, Your Honor, about spacial arbitrage, it's

supposed to -- I believe it's supposed to say that within

the contours of a market prices should more or less even out

with the exception of an allowance for transportation costs.

So we wouldn't expect prices to be the same

everywhere, but we'd expect the variability in pricing to

more or less reflect the cost of moving the goods from Point

A. to Point B..

So Dr. Kalt took a look.  He took a couple of the

data points on this chart and says, gee, how does the

pricing variability that Dr. Rausser himself has shown us

compare with what we know about the transportation costs?

Answer, the transportation costs don't explain the

variability at all.  Not at all.

So, so we have -- we have significant variations

in the plants for whom we have data.  We have this

collection of independent processors for whom we don't have

data.  We have a lot of business documents.  And Dr. Kalt

talks about this.  A lot of the DMS business documents talk

about Elmhurst, Byrne Dairy, Midland Farms, Queensboro, the

people that we typically call independent processors because

they have one or two plants and how important competitively

they are and how episodically they appear and how what they

are willing to pay is not in lock step with what everybody

else is willing to pay, which is part of the reason that

they create competitive issues when they show up in the

1    marketplace.

2         So, so do we have -- are the plaintiffs even

3    within shouting distance, Your Honor, of making a showing

4    that with respect to impact, the impact of the alleged

5    conspiracy, injury in fact, that there's enough commonality

6    or explainable variation in pricing, whether from the plant

7    or to the dairy farmer that you can find that common proof

8    is feasible?  Absolutely not.  It's, it's not -- it's not a

9    close call.  It's not a close call.  And it's, it's really

10   simplified, it's really simplified by Dr. Rausser's

11   insistence that he never had to look at the variability of

12   the price that's at issue, the non-regulated portion of the

13   price.

14        Now, Your Honor, I mentioned up front that we

15   think the lack of commonality goes to liability issues as

16   well as to impact.  And let me just talk about that for a

17   bit.  And this goes to one of the questions you raised about

18   this presence of non-conspirator milk and what difference

19   does it make.

20        Mr. Pierson mentioned that we shouldn't spend too

21   much time worrying about whether this is horizontal or

22   vertical.  It's not really the issue.  I partly agree with

23   that.  The question that will matter to the kind of proof

24   that's presented to the Court is whether this is a per se

25   offense or not.  That's what will matter.  Judge Greer, and

1   I think Your Honor has very correctly noticed that Judge

2   Greer's opinions sometimes provide multiple pages of a lot

3   of reasoning that you can grapple with and decide you agree

4   or disagree.  And then on occasion there's an opinion from

5   Judge Greer that's just kind of a conclusion stated and you

6   are not given a lot of guidance.  And, I mean, I'm not

7   critical, it's just that's the reality, and you've observed

8   that yourself.

9         In his -- in his memorandum opinion on our motion

10  for summary judgment in the Southeast case he provides about

11  six pages of explanation as to why he does not see a per se

12  offense.  It's not cavalier.  It's not weak.  It was the

13  subject of --

14        THE COURT:  I saw those claims were dismissed.  I

15  saw those claims were dismissed.  Let me just ask you if you

16  agree with Mr. Pierson's recitation of where Southeast Milk

17  is at this point?  Trial not in sight, Dean trying to get

18  out of a settlement, seems like all bets are off.

19        MR. KUNEY:  Well, I've, out of respect for Dean, I

20  will say their version is that they are trying to get an

21  enforceable settlement.  And they are concerned that the

22  decertification has left them with an unenforceable

23  settlement against the DFA members.

24        And so they have -- their public position has been

25  they are not trying to get out of it, they are trying to get

1    it rendered enforceable.  And as a result of that there is

2    no trial scheduled.  That's absolutely correct.  And we're

3    currently waiting on an order from Judge Greer as to what

4    process he intends to follow with respect to what is

5    apparently going to be the appointment of new counsel for

6    the DFA members for purposes of seeing that there's a way to

7    save the Dean settlement.

8            THE COURT:  So was there a decertification of a

9    portion of the settlement class?

10           MR. KUNEY:  There was a decertification that was

11   directed at the ongoing litigation.  The, the Dean

12   settlement had, had been submitted to the Court for partial

13   approval.  Then thereafter in the ongoing litigation against

14   DFA-DMS, and a couple other independents, the judge issued a

15   decertification order.

16           When he, when he did that Dean filed a motion

17   saying, wait a minute, we've read AMCAM, the Supreme Court

18   has said in large measure the criteria for settlement

19   classes and litigation classes are the same.  If that class

20   is no good for ongoing litigation we're concerned that we're

21   not going to be able to enforce releases against these

22   people so we're not get what we bargained for.

23           THE COURT:  Okay.  Thank you.

24           MR. KUNEY:  And the judge has had a couple of

25   events about that.  And its led to two postponements of the

1    trial.  And at this point the second postponement did not

2    result in him giving us a trial date.  And our, our

3    expectation is that whatever process he puts in place he's

4    not going to think about or he's not going to -- we're not

5    going to have a trial until he at least gets through the

6    preliminary approval process if it can be gotten through.

7    What he has said is that he, he recognizes that if he does

8    go the route of appointing a new counsel and that new

9    counsel decides the Dean settlement is a good deal that that

10   new counsel will have to again present a motion for

11   preliminary approval including for certification of the

12   settlement class.  And then he'll have to grapple with the

13   issue of whether that is a legitimate settlement class or

14   not.

15          The parties, it probably won't shock you, have

16   taken different views of that.  And there's been I think

17   little clarity about whether he thinks that new counsel

18   would have anything to do with the ongoing litigation

19   against the remaining defendants.  I think that's -- he said

20   a few things about that.  He hasn't said a great deal about

21   that.  I honestly don't think we know.

22          THE COURT:  Thank you.

23          MR. KUNEY:  So let's, if we -- if there's enough

24   similarity between the claims here and the Southeast that

25   Judge Greer's grappling with that issue of whether it's a

per se offense or not is at least informative.  What, what
he -- what he saw was two things.  Number one, there were
obviously multiple levels of the distribution chain involved
so it looked kind of vertical.  And even if it didn't it, it
was not the constellation of conduct that was complained
about that was alleged to have resulted in a suppression of
prices, did not seem to him to fit any of the known
categories of obviously anti-competitive conduct that
warrant that.

One of the things that Judge Greer politely
listened to me say, I don't know, half a dozen times at
least in the various hearings that we had in the case, is
this is a case where, with respect to the specific acts
alleged to be in furtherance of the conspiracy, such as the
full supply agreements, or those alleged to be in the
Southeast case, they are perhaps even sharper that those are
acts alleged to be in furtherance of a price suppressing
conspiracy.

There's no denial from us that we entered into
full supply agreements.  The whole debate is about whether
they are good or bad for dairy farmers.  And my reading of
his opinion is that he heard us on that and that struck him
as part of the reason why we didn't have conduct that was in
the so obviously anti-competitive category that it would
have been appropriate for per se treatment.  But you'll look

```
 1   and see --
 2           THE COURT:  Well, I don't want to go too far down
 3   the Southeastern path, but I don't recall, in looking at the
 4   motion to dismiss, and I didn't look hard at the motion for
 5   summary judgment, that there was any discussion about
 6   violations of consent decrees and violation of internal
 7   anti-competitive policies.  I might have missed that.  I
 8   certainly didn't look for that in the summary judgment
 9   decision.  But I recall it was not in the motion to dismiss.
10           MR. KUNEY:  You're talking about in the Southeast
11   case?
12           THE COURT:  Yes.
13           MR. KUNEY:  Yes.  Here's what has happened.
14   You're right.  You didn't miss it.  It's not there.  The,
15   and I don't want to meander too much into the conflicts
16   issue, but let me, the -- there was an extensive in limine
17   debate about whether evidence of consent decree violations
18   would even be admissible in the trial that we thought we
19   were about to start in August.
20           And at the end of the day the judge said, no, they
21   weren't because they are not actionable by private parties.
22   And what was the point of introducing evidence of a, of an
23   alleged consent decree violation other than to say they did
24   something wrong before, therefore, they may have done
25   something wrong again.
```

1          And if I remember this correctly Judge Greer said

2    this was a 404 B. problem basically.  So there was not going

3    to be, not going to be evidence on that.

4          On the, on the internal policy we, we did not have

5    extensive discussion about internal policy.  We did have a

6    discussion about the illegality.  In other words, we did

7    hear in the context of the, of the arguments, multiple

8    arguments about whether there was a conflict in the

9    Southeast.

10         The plaintiffs did argue that there couldn't be a

11   conflict if what our people were saying is they wanted to

12   continue breaking the law.  And I'll sort of reserve on that

13   until that point.

14         So, so if it's not, if it's not a per se case then

15   the plaintiffs have a lot of work to do in terms of

16   commonality of proving liability that goes, that goes beyond

17   simply injury in fact.  Injury in fact is an element of the

18   claim.  Per se not.  Per se rule of reasons doesn't matter.

19   That's what I've been talking about kind of up until now.

20   But now what else do they have to do if it's a rule of

21   reason case.  Well, they have to show harm to competition in

22   some appropriately defined market.

23         THE COURT:  Well, that's where I started off and

24   wondered why I was not hearing anything about it and

25   wondering how I thought that you have to have a market to

 1    calculate market power and harm to competition.  But

 2    plaintiffs re-directed me and said that's not what we're

 3    seeking here.  This is about price suppression.  That's it.

 4          MR. KUNEY:  Well, Your Honor, from our side of

 5    this if, if we are right and Judge Greer was right that this

 6    is a rule of reason claim for a whole variety of conduct

 7    that the plaintiffs believe has resulted in price

 8    suppression, they still have to prove harm to competition in

 9    a properly defined relevant market.

10          The reason, as Mr. Pierson mentioned that we

11    almost -- that we sought a mini-trial on market definition

12    is because Judge Greer told us multiple times that he

13    thought we were probably right that the plaintiff's market

14    definition was off and that they would have a very difficult

15    time proving that.  And I think he would agree that he came

16    within a whisker of granting our motion for summary judgment

17    because he said every one of their claims required proof of

18    irrelevant market and I'm highly skeptical that the

19    plaintiff's theory is correct about the relevant market.

20          So I think for -- so I guess we're just kind of

21    back to close to where we began this afternoon, which is, I

22    think your instinct about that is absolutely right that in

23    thinking through the things that need to be amenable to

24    common proof that does include market definition and harm to

25    competition.

1             And in the contours of this case where, you know,

2     Mr. Pierson talks about the targets are the outsiders, the

3     point is to force people into the family.  They don't really

4     want to be part of DMS, but we somehow make them become part

5     of DMS, to me that, it's kind of a foreclosure argument that

6     we've left people with no options, that the reason they are

7     in DMS is not because they want to be, but because they have

8     to be.

9             And that's where, from our perspective, we get to

10    those funny maps that talk about conspirator share.  Because

11    is it a, is it a common question across all of Order 1

12    whether people were forced to be part of the DMS family.

13    And the answer we give is, you know -- and this is, this is

14    lifted from Dr. Kalt's report, but this is using Dr.

15    Rausser's definitions.  Okay.  Dr. Rausser didn't like --

16    for whatever reason the economists called this heat maps.  I

17    don't know why.  I guess it's the colors.  So he didn't like

18    Dr. Kalt's heat map because he thought it had too many

19    bright colors and so he put in his own definition of what

20    was a conspirator and what was not a conspirator.

21            And Dr. Kalt, for purposes of a reply report,

22    said, fine I'll take his maps.  It doesn't matter to me

23    because the point right now is not who wins or loses the

24    ultimate claim on whether they can show market power

25    sufficient to, for harm to competition and foreclosure for

this alleged monopsony cartel, but just is it the same
across the whole area.  And even Dr. Rausser's heat maps,
this is 2004.  Dr. Kalt also presented 2009.

And what you see up in the little box is that a
very substantial portion of the milk in Federal Order 1,
within the boundaries that the plaintiff's claims the
market, is being produced in areas where there's a very
significant share of milk that's not part of this alleged
conspiracy.

And from our perspective in a way that will make
it -- it makes foreclosure and harm to competition not
amenable to common proof across all of Order 1.  So impact
issues not amenable to common proof.  Liability issues not
amenable to common proof.

The other one of those funky maps that we think
relates to this question is this access to non-conspirators.
Remembering again that the, the allegations that they have
to prove involve being forced to deal with a conspirator.
And this is one that -- this is one where the, the reason
conspirators is in quotation marks is in part because we're
using Dr. Rausser's definition of a conspirator plant.  And
a conspirator plant for this purpose is any plant that gets
most of its milk from DMS.

So for this purpose, and I will keep emphasizing
that, just for this purpose, we'll use that definition even

1    though candidly we think that's completely implausible.  And

2    when you asked Mr. Pierson today to go through the list of

3    conspirators I know he named quite a few processors, but for

4    Dr. Rausser's purposes it's anybody that gets most of their

5    milk from DMS.  They are a conspirator for this purpose.

6            So, again, thinking about foreclosure, market

7    power, ability to harm competition, does it, does it

8    facially present that it is sufficiently similar across all

9    the face of Order 1 that it's going to be amenable to common

10   proof?  Answer, even using Dr. Rausser's definitions of

11   conspirator, no.  The issues of foreclosure, harm to

12   competition, feasibility of this monopsony cartel are not

13   going to be amenable to common proof.

14           Now, Dr. Kalt tried one other way to help us

15   demonstrate this.  He said, you know, what we have here is

16   this is a class action, would be class action with, sorry,

17   three class reps.  And he said let's look at the class reps.

18   Let's look at where they are, where they market their milk

19   and, again, maybe we can avoid some of the statistical

20   complications and mumbo-jumbo and different maps about

21   coefficient this and coefficient that and just say, gee,

22   part of the idea of a class case if there's common proof is

23   the proof that goes with the named plaintiffs out to kind of

24   count for everybody and what would happen if we did that on

25   these issues of foreclosure, being forced into DMS, being

1    subject to monopsony power and actual harm to competition.

2            So he looks at one county in Orange County,

3    Vermont and two counties in New York to cover each of the

4    named plaintiff farms.  So we have of the Allens who are up

5    here in Orange County, Vermont.  And what we see, a couple

6    things kind of jump off the page there, including that 91

7    percent of the milk where they operate is non-DMS milk.

8    Ninety-one percent.  And that even though this is a period

9    when there's supposed to be suppression of output as part of

10   the consequence of this conspiracy what we see is that milk

11   production has basically been unchanged where the Allens

12   live.

13           The other thing about the Allens is that the

14   Allens began the class period as independent shipping to

15   Booth Dairies.  And then in 2006 they went organic which, as

16   we were discussing earlier, means they essentially left the

17   market, the product market as defined for purposes of this

18   case.  And as far as we know, according to anyone's

19   allegations, they left the control of this alleged

20   conspiracy because they are now out there marketing organic

21   milk.

22           So they began as independents selling to Booth

23   Dairies.  In other words, they would have been called an

24   outsider because they weren't marketing through DMS.  And

25   then they went organic.  Okay.

1           The second plaintiff family, we have the Sitts

2    from Delaware County, New York.  Again, 59 percent of the

3    milk where they are is non-DMS milk.  There are five

4    non-conspirator -- excuse me, three non-conspirator plants

5    within 50 miles of where they operate.  There's been a

6    massive drop in milk production in Delaware County, New York

7    over the course of the class period.  Almost -- over

8    28 percent.  The Sitts were DFA members until 2007.  In 2007

9    they switched and started selling as independents to

10   Elmhurst Dairies.  No one has alleged that Elmhurst Dairies

11   is a conspirator.  No one has said the Sitts were prevented

12   from moving.  They weren't prevented from moving.  As far as

13   we know they have been and continue to be supplying Elmhurst

14   Dairies since 2007.

15           The third of the named plaintiff families are the

16   people who are here with us today, the Haars.  Okay.  They

17   are in Delaware County, excuse me, Maddison County, New

18   York.  Fifty-nine percent share non-DMS milk, 55 percent

19   non-GNEMMA milk.

20           Now the Haars have said that they were unable to

21   change, to leave DFA when they wanted to.  They talked to

22   Queensboro, Queensboro won't take them.  My understanding of

23   the record is Queensboro said their farming operation was

24   too small and they weren't interested.

25           There are five non-conspirator plants within

1    50 miles.  I don't know, as I stand here this afternoon,

2    what the reasons are that the Haars have been unable to find

3    another, another acceptable market to them.  But they are

4    still in DFA.  And as we understand it they are, they would

5    qualify as evidently somewhat unhappily in DFA.

6            So we have three stories by individuals who are in

7    front of the Court to represent the class.

8            The first one was an independent and then now

9    organic out of the market not foreclosed, not constrained by

10   this alleged conspiracy.  The second one was in DFA and then

11   happily changed over to Elmhurst Dairy, a non-conspirator,

12   not foreclosed, not constrained.

13           So if we did, if we actually took the plaintiffs

14   at their word and said, okay, you know what, let's use the

15   three named plaintiffs as the proof on this foreclosure

16   exercise of market power.  I think they would stand up and

17   say, no, no, wait a minute, you can't do that, that's just

18   three stories.

19           Okay.  That's, I think, kind of the point.  That

20   every one of these people has a very different story with

21   respect to whether they've been foreclosed from having other

22   options they have a completely unique and individual story

23   based on where they are, whose around them.  And as the

24   Haar's case may indicate, and I say may respectfully, it may

25   have something to do with the size of their farm.  It may be

 1    that small farmers have fewer choices because at least some

 2    plants or some co-ops are not interested in taking on small

 3    farms.  That just further individualizes the inquiry as to

 4    whether they would have been potentially or actually subject

 5    to market power for purposes of making out the violation

 6    because even though the damage claim is price suppression

 7    it's, it's a rule of reason claim where that harm to

 8    competition, as well as injury, in fact, is all going to

 9    have to be part of the proof.  And it seems to me that the

10    variations in stories of the three people who have come

11    forward to represent this class just underscore how

12    individualized the inquiry would have to be.

13            The, the, the flip side of monopsony there is less

14    milk being produced.  It's, you know, monopsonists

15    supposedly pushed down the price and the result is there's

16    less output.

17            So one of the things that you might look for if

18    you're looking for commonality, looking for the feasibility

19    of using common proof to prove that this monopsony hurt

20    competition all across Order 1, alleged monopsony, is, well,

21    what's happened to output.

22            Now, this is from Dr. Kalt's initial report.  This

23    is Figure 5.13 A..  This is kind of the summary that goes

24    over the whole time period.  But he's got a chart in there

25    for every year.  And that's actually important because this

1    chart simply shows that across Order 1 we have everything

2    from very substantial growth in milk production to quite

3    substantial decline in milk production.

4            So the, if what you're looking for is evidence of

5    monopsony suppression do you see it order wide.  Well, maybe

6    someone will say that's just one picture, maybe every year

7    certain prices are higher and certain lower.  If you take

8    all of that series of Figure 5.13's of Dr. Kalt's and look

9    at them year after year after year what you're going to see

10   is there's not only variation across the geography, which is

11   what you would expect because of the different competitive

12   conditions in different parts of Order 1, but there's also

13   variations over time because it's not always true that the

14   same place is gaining more milk and the same places lose

15   more milk.

16           So if there, if there were a monopsony cartel

17   forcing down common, to some common degree the circumstances

18   for dairy farmers you would expect this other monopsony

19   outcome to show more commonality than it does.  Okay.  So

20   that's, that's the, that's the, that's the predominance

21   issue, lack of commonality issue across the group as a

22   whole.

23           Now, with the Court's indulgence, just a few

24   minutes on the two special sub-groups that we think are part

25   of this.

1            THE COURT:  When you do that I want you to also

2    focus on whether or not if -- you have argued that causation

3    is part of liability and injury.  In fact, is an essential

4    element of the claim.  And you've argued that these are not

5    per se violations.  If the Court had issued certification it

6    would know at the end of that phase what kind of case this

7    was.  Then we would know what kind of proof of causation was

8    necessary and what the measure of damages is.

9            So if I had a jury find what the allegations are

10   with regard to is this a price fixing case, is it something

11   else, that would dictate whether or not we have a rule of

12   reason case versus a per se case and still there is lots of

13   commonality across those allegations.  And the plaintiffs

14   says, you know, Professor Kalt acknowledged -- he starts

15   from the premise let's assume all those allegations are

16   true.  So there's more, although the parties' focus has been

17   on causation and common impact, there's more before the

18   Court than that.

19           MR. KUNEY:  The, Your Honor, I think at the end of

20   the day, and I guess we'll see if, as the case proceeds.  I

21   think what we'll argue to you is that the issue of whether

22   it's a per se offense or a rule of reason offense is a

23   question of law for the Court.

24           Now, I'm not suggesting, I don't think I have

25   suggested that you have to decide that today as part of

```
 1   this.  I don't think you do.  But I don't think that's going
 2   to be a jury question.
 3          THE COURT:  I'm not saying it is, but it's based
 4   on underlying facts.  So sometimes we have jurors as fact
 5   finders and we don't have -- so it would be one thing if
 6   everybody agreed what the relevant geographic market was and
 7   there was no factual inquiry as to that.  But I'm at least
 8   thinking about ways of slicing the baby.  So you should be
 9   thinking of that too.  Okay.
10          MR. KUNEY:  Okay.  Very well.  Should I?
11          THE COURT:  Keep going.
12          MR. KUNEY:  All right.  Thank you.
13          So we have this, this two special groups that also
14   from our perspective have a lot to do with commonality and
15   I've talked a bit about both of them.
16          Now, Mr. Pierson suggested that this issue about
17   the farmers who own processing plants involved some massive
18   contradiction by us of everything we've ever said before
19   because now all of a sudden we're saying low prices are good
20   for dairy farmers.  Well, we're not saying that.  We're not
21   saying that at all.  What we're saying is the putative class
22   includes the dairy farmers who belong to co-ops that are
23   very heavily vertical.  In other words, a very substantial
24   portion of their milk goes into plants that they own.
25          We're not saying for DFA we like low prices.
```

```
 1   We're not saying we want low prices for our members.  We're
 2   saying part of the proposed class includes some co-ops.  And
 3   I'll give a couple examples of examples as we go forward.
 4   But Upstate Niagara, Agri-Mark are two that come to mind.
 5   And Upstate Niagara I'll pause on for just a minute because
 6   what do we know about them?  And we have some evidence about
 7   them in the record because DMS is a kind of investor profit
 8   participant so we get information about Upstate Niagara and
 9   some of it's in Mr. Wickham's declaration.  And we also sell
10   them some milk.
11          And what we've learned in dealing with Upstate
12   Niagara is that they do like low prices because they are so
13   heavily into owning their own processing plants.  And their
14   patronage payment, which is a phrase people usually use for
15   this kind of profit return at the end of the year, their
16   patronage payment in 2010 was a $1.12.  In other words, they
17   gave back more in profits to their members at year end than
18   as the average premium across the Northeast.
19          So what we're saying is this is not a suggestion
20   that all farmers like that.  On the contrary, it's a
21   suggestion that we have a couple of other groups,
22   identifiable groups within the would be class that, that
23   really render impossible the argument that proof is common.
24          THE COURT:  Well, Mr. Pierson says we don't -- if
25   we're looking at price suppression, we don't look at any
```

1   other factors and we don't look at any return of investment.

2   And I raised the issue of, you know, some of these co-op

3   members might be getting other financial benefits and do we

4   do an offset and he said absolutely not.

5           MR. KUNEY:  Right.  And what he's pointing to are

6   cases that talk about I paid the overcharge, if it's a

7   normal monopsony case, but then somehow I was able to find

8   somebody else down the road and make them -- maybe I've got

9   like kind of contract where I get paid a percentage, you

10  know, I mark up the milk six percent.  So when the price is

11  higher to me it's fine because then my six percent is on a

12  bigger base.

13          The Court said that's not a defense.  Understand

14  that. That's not what we're talking about.  Because the

15  first sale from the -- in this vertically integrated

16  situation from the Upstate Niagara member to his plant is

17  not in any commercial sense that we would ordinarily

18  recognize a sale at all.  It's a transfer to himself because

19  the co-op members are the only owners of the plant.  They

20  could, they could write down in their books for accounting

21  purposes any price they wanted because they are selling it

22  entirely to themselves.

23          So it's not a question of you were price fixed by

24  somebody else, but you somehow mitigated damage in a way

25  that you didn't lose any money.  No.  In none of the cases

1    that he cited to you is the first transfer a transfer to

2    self.  And that's what we have here in this context of these

3    vertically integrated plants.  It's a fundamentally

4    different situation.  And I'm unaware of any case suggesting

5    that it doesn't make a difference if the transaction is a

6    transaction to yourself.

7              I'm not going to tell Your Honor that there have

8    been a lot of cases that I've read in, that grapple with

9    this problem.  But I, I believe it's conceptually

10   analytically a very different problem than the standard

11   Illinois Brick cases.

12             So we have a conspiracy here where what Dr.

13   Rausser is telling us is that the point of the conspiracy is

14   for plants to pay less.  So we say, well, if these people

15   who really self deal all the time maybe they want to do that

16   because that first sale is totally inside the family and

17   they are not hurt by it at all and they end up getting

18   perhaps a cheaper raw material that they can benefit in the

19   open market.  I don't know.  But they are simply in a

20   fundamentally different posture because the first sale was

21   not between them and a stranger.  It's between them and

22   them.

23             And there are two co-ops we know of where the

24   amount of money that they return to their members at the end

25   of the year is either greater, as in the Upstate Niagara

1    case, or in the Agri-Mark case, really quite close to the

2    alleged -- well, the average premiums that dairy farmers

3    earn over the course of the Northeast.

4            Dr. Kalt's got Figure 3.24 in his original report

5    where he summarizes these so-called patronage returns.  And

6    he's got some quotations from documents where you realize

7    that some of the money's kept in the co-op, some of the

8    money's handed back to farmers.  And when you look at the

9    Agri-Mark numbers they are not quite at the level of the

10   average premium, but they are in the ballpark.

11           And so what does that say to us and what do we

12   believe it says to you with respect to, to commonality?

13   Commonality of impact it seems to us has to stop at the door

14   of the vertically integrated plants.  They may be -- excuse

15   me, vertically integrated co-ops.  They may be able to prove

16   that there was an adverse impact, but there's no reason to

17   believe it's the same.  And in the Upstate Niagara case

18   where the amount of money that they have returned is almost

19   double the average premium there's every reason to think

20   it's not the same.  So that, those, those vertically

21   integrated folks are in a totally different world.

22           The other group that is in a totally different

23   world, and I may have said most of what I need to say about

24   these people already, but people called the outsiders.  And

25   I, I think we just -- we have a, we have in part a legal

1     dispute here in terms of how one reads the cases.

2              And I do want to go back and try to be sure we're

3     clear about who we're talking about.  Because I thought when

4     Mr. Pierson was talking about these people he mentioned the

5     dairy farmers who were part of the outsourcing.  He said --

6     the way he put it was the people who were victimized by that

7     payment not to compete.  And this is an area where I, I'm

8     going to resist the temptation to take on the substance of

9     the allegation.  I'm sure Your Honor appreciates we don't

10    agree that the outsourcing is an agreement not to compete.

11    We don't think it's some kind of a secret payment so that

12    they would stop seeking independent milk.  They've sought

13    independent milk in the years since those agreements have

14    been in place, but that's about the merits.

15             Is that who we're talking about as outsiders?  The

16    independent dairy farmers who used to provide Dean plants or

17    Suiza plants and then post outsourcing now service those

18    plants through DMS?  No.  That's not who we're talking

19    about.

20             Outsiders are those independents that have never

21    been part of a co-op that was in DMS that sell their milk to

22    Midland and Queensboro and Elmhurst and those people.

23    That's the outsiders that we're talking about.  They are

24    not -- they are not, you know, they are not part of a co-op

25    that in a conspiracy, that is alleged to be in the

1    conspiracy.  They don't sell to a plant that's alleged to be

2    in the conspiracy.  If, if, if the plaintiff's claim is

3    someone tried to muscle them to be in DMS they have

4    evidently happily successfully resisted that all these years

5    because they out there as independents supplying processors

6    who are not accused of being part of the conspiracy.  That's

7    who we're talking about.

8            And those people, we believe, the legal analysis

9    is what is set forth in those cases that reject the

10   so-called umbrella theory because the argument as to them is

11   that somehow, according to the plaintiffs theory, we

12   suppressed the market price level and that drove down the

13   market price.  And the cases since Associated General

14   Contractors that have dealt with this umbrella theory

15   understood that, including cases, District Court cases to be

16   sure, but cases in this, in this circuit.

17           And Dr. Kalt has an explanation as to how he

18   thinks these people who have done better as a result, that

19   if you take the plaintiff's theory at their word, you know,

20   what would have happened is that the conspirators would have

21   pushed down the price and the conspirators would have

22   produced less, processed less milk and that would have left

23   open market opportunities.

24           As I mentioned earlier after the, after the

25   dueling theories between the economists, you know, Dr.

1   Rausser kind of said well, you know, it's an empirical

2   question.  And, and what do we know about the empirical

3   question?  What we know is we don't know much at all because

4   the data that we have about pay prices, and this is doctor,

5   this is an Exhibit 25 from Dr. Rausser's original report

6   where he's explaining what, what milk we had in the payroll

7   database relative to what he considers the potential class

8   milk, the milk produced in Order Number 1.

9          And what you can see is almost all the payroll

10  data, with the exception of Maryland and Virginia, is coming

11  from people who are part of the marketing their milk through

12  DMS.  Subsequent to this he also got, and we got Agri-Mark

13  data that was more usable, that accounted for about another

14  10 percent.  But a good 30 percent, as I mentioned earlier,

15  are, are really outside the ambit for which we have any

16  information.

17         So, so we have a, we have these people who are not

18  facially touched by the conspiracy who, if they've been

19  targeted, have resisted.  And we have the economists going

20  back and forth on what you would expect and everyone kind of

21  saying it's an empirical question and then the plaintiffs

22  having no data to present, to show to the Court that that

23  30 percent of the people who are seemingly operating totally

24  beyond the reach of the conspirators have somehow been

25  impacted.

1          And so to us that's a second group where there is

2   a clear failure of proof even if we don't get into all of

3   the issues about the data and the numbers and the impact and

4   harm to competition and all of that.

5          And just one kind of related point on that, Your

6   Honor, which is, this is Dr. Kalt's initial report.  It's

7   about the DMS share of milk.  And there is -- there has been

8   a lot of talk about, you know, dominant share and forcing

9   this and forcing that.  And I just mention this for two

10  reasons.  The, the problem of that group outside the

11  conspiracy, the alleged conspiracy, is not shrinking over

12  time.  In other words, it's another way of saying the DMS

13  share is not getting any bigger.  You might think, well,

14  that problem about the outsiders it's unfortunate, we don't

15  have data, that's too bad, it would be better if we did, but

16  shucks it's 30 percent and it's probably going away.  And

17  the answer is, well, no, it's not going away.

18         And why is that significant?  Because I think it

19  suggests that those dairy farmers and processors who are

20  operating outside the DMS family have been stably operating

21  outside the DMS family during, during the bulk of the class

22  period.  So that once the DMS organization as it currently

23  exists was assembled the market share was a shade over

24  50 percent and it hasn't budged a whole lot.

25         So that this targeted group, this we should

1    include them even though we don't know much about them,

2    really seems to be managing very well indeed thank you very

3    much.

4              Now, I'm not, I'm not going to get too far into

5    the weeds on this.  There's a lot of pages in the brief

6    about whether the institutions that exist here can somehow

7    make common proof feasible notwithstanding all the problems

8    that the data revealed.  And we've had a debate, you've seen

9    in the briefs, with the plaintiffs about how DMS pooling

10   works.  We've had this big debate about GNEMMA.  We'll

11   continue to have a debate about whether GNEMMA leads to

12   prices higher or lower.  We've had a debate about the

13   difference between discussing and agreeing.  I think, Your

14   Honor, for your purposes, our suggestion would be that the

15   commonality issue and the feasibility of common proof can,

16   can be and should be dealt with based on what the data

17   shows.  Does the data show that it's feasible to do common

18   proof.  Does the -- you are not going to, even though you

19   could if need be, reach into a merits issue as to whether

20   GNEMMA makes prices go up or down.  Frankly, I don't think

21   there's any reason why you have to do that.

22             And if you, if you credit the plaintiff's

23   interrogatory answers, which they were talking about before,

24   I don't know that it would matter anyway because presumably

25   all these people except for Upstate Niagara were in the

1    conspiracy long before GNEMMA was formed.

2            And that is the -- that's the, pretty much the

3    last problem that I want to bring to the Court's attention

4    about commonality.  We, we don't have a single big meeting

5    or a single event or a single year or a single time period

6    when this conspiracy allegedly formed.  We have, we have DMS

7    with a very low market share during the beginning of this

8    period.  I talked about that at some length already in terms

9    of the significance of that for the harm to competition

10   prong.

11           We have these questions about what Maryland and

12   Virginia and Upstate did and what Agri-Mark did in the years

13   before GNEMMA was created.  We have a suggestion from the

14   plaintiffs in their interrogatory answers that Maryland,

15   Virginia and Land O'Lakes joined the conspiracy because they

16   were part of this other price announcing organization that

17   was created I think about the Federal Order Reform in 2000

18   or actually before that because it operated in what used to

19   be Order 4.  It's basically Maryland, Southern New Jersey

20   and part of Pennsylvania.  That because they were announcing

21   prices there in 2000 and 2001 that presumably is a

22   justification for saying they joined this Order 1 wide

23   conspiracy back at a time when there's no other evidence

24   linking them to DMS or GNEMMA or anything else at all.

25           So that -- so when you -- when you say to yourself

1   the plaintiffs are supposed to be able to show injury in

2   fact and liability by common proof across the entire class

3   period when you go back toward the earlier half of the class

4   period the commonality problems multiply expedientially

5   because of the roles of these various alleged conspirators

6   in those earlier parts of the time period.  It just gets

7   more and more difficult.

8           And, frankly, this is an issue about which Dr.

9   Rausser and the plaintiff's lawyers don't consistently speak

10  with one mind.  Dr. Rausser, at his deposition, told me that

11  Maryland and Virginia was not in the, and even Agri-Mark

12  were not in the conspiracy pre-GNEMMA.  And since that time

13  there's been a different view.  Um, and I think that the --

14  I think, like I said, the problems really get phenomenal

15  when you go back to the beginning of the time period.

16          THE COURT:  All right.  Is this a logical breaking

17  point?

18          MR. KUNEY:  It is.

19          THE COURT:  So we are going to take a court

20  reporter's break.  And then we'll have our change of plea

21  and we will come back.

22          (The Court recessed at 3:15 p.m.)

23

24

25

1           (The Court resumed at 4:10 p.m.)

2           THE COURT:  We're back on the record in the case

3   of Alice H. Allen versus Dairy Farmers of America.  And

4   we're in Mr. Kuney's presentation.

5           MR. KUNEY:  Thank you, Your Honor.  Your Honor, I

6   would like to turn to the conflicts issue at this point if I

7   may.

8           I think the Court has really already made the

9   first point, although we had some discussion of this, in

10  connection with the Dean settlement.  Once the injunctive

11  provision was out of that settlement as far as Your Honor

12  was concerned there was really no grievance on DMS's part

13  and really no conflict issue because the members of the

14  class all were similarly interested in getting the benefits

15  of that settlement.

16          What we now have is the issue of whether the

17  lawsuit can proceed with the dairy farmer organizations.

18  DFA and DMS as the only remaining defendants.  Where we have

19  very substantial injunctive relief being sought to try to

20  curtail, in significant ways, the practices of DFA and DMS,

21  and a claim for very, very substantial monetary relief

22  accepting both the allegations of the complaint and we now

23  have Dr. Rausser's merits report in hand.  And you see just

24  how big that proposed monetary relief really is.

25          What I thought I heard earlier today was while

1   there's not a conflict because we're just trying to stop DFA

2   from violating its internal policies, its own antitrust

3   compliance guide, prior consent decrees and the law.  There

4   can't be a conflict because we're just trying to stop them

5   from doing all those bad things.

6          And let me, let me deal with a couple of those,

7   Your Honor, if I can.  First of all the, with respect to

8   the -- with respect to the putative class members who are

9   not part of DFA if they had put in the complaint a claim

10  based on a violation of DFA's internal policies I think we

11  would have had a motion to dismiss and I think the Court

12  would have granted it because I don't understand how those

13  people who are not part of the co-op could complain about an

14  internal policy that somehow DFA had not followed.

15         I mentioned earlier that, that no one has private

16  standing to enforce a consent decree.  And I mentioned that

17  in the companion litigation in the Southeast the Court's

18  essential ruling about consent decree violations, past

19  consent decree violations is that they weren't even going to

20  be admissible.

21         But let me just take on one of the alleged consent

22  decree violations because I think its illustrious.  And it's

23  the suggestion that DFA is subject to consent decrees that

24  prohibit contracts that are longer than a year, contracts

25  with processors that are longer than a year.  And that's one

1    of the violations that I thought I heard enumerated earlier

2    and Mr. Pierson --

3            THE COURT:  I thought that was the black list

4    within the internal policies.  I looked, I looked at the

5    consent decrees and I, I certainly don't have them

6    memorized, but I recall no threatening, you know, people who

7    won't join, that kind of thing.

8            So I remember that coming out of the black list in

9    the internal guidelines, but it may also be a provision of

10   the consent decree.

11           MR. KUNEY:  So what's the -- let me just give a

12   little background on that one if I could.  Mr. Pierson's

13   view is that because of a promissory note and a liquidated

14   damages provision that could, under certain circumstances,

15   require Dean to pay money if it ceases to renew full supply

16   agreements, that therefore that's not really a contract for

17   a year and it's in violation of that term of whatever it is,

18   the consent decree and or the internal compliance

19   guidelines.

20           Well, the history of that provision is that in

21   connection with the Suiza-Dean merger the Justice Department

22   required modification in which plants were covered by the

23   promissory note and the liquidated damages provision.  In

24   other words, the government was absolutely aware of the

25   existence of those provisions and did not find it

1   inconsistent with, I believe there's a past consent degree

2   that limits our contracting.

3           So here's the situation that we have, we have the

4   cooperative, its current leaders and a substantial number of

5   its members who think that the supply agreements, including

6   the attendant provisions, are consistent with their

7   guidelines, their consent decree obligations and everybody

8   else.  And Mr. Pierson and his -- comes along and says, no,

9   no, I want to bring a lawsuit showing you that you are wrong

10  and, in fact, what you are doing is improper under these

11  consent decrees and your own internal guidelines and it's

12  not a conflict because I'm right that you shouldn't be doing

13  those things.

14          Well, I think the issue that the dairy farmers

15  have tried to raise in their affidavits, and Your Honor

16  pointed out today quite correctly, they don't go

17  specifically to this consent decree violation, internal

18  guidelines violation because we hadn't heard that.

19          THE COURT:  Do you recall seeing that in the

20  amended complaint, those allegations?  I could have missed

21  it.

22          MR. KUNEY:  I certainly don't recall the internal

23  guidelines violation as being articulated nor is, I mean

24  most company's compliance programs are set up to create a

25  bit of a buffer zone between what they tell their employees

1    they want them to do and what the law absolutely prohibits.

2         It's, I hope not any disrespect to the clients

3    I've represented over the years, that I've represented a

4    number of people improving that conduct that may have been a

5    violation of their internal guidelines was nonetheless

6    lawful because it's a compliance program.  It's built to

7    have a margin of safety.

8         Now, Mr. Pierson will say, well, the company's

9    internal compliance said we want to obey the law, we want to

10   obey the antitrust laws.  Well, the fact of the matter is

11   the current and former leadership of the cooperative, and I

12   mean dairy farmer leadership of the cooperative, has

13   endorsed these policies.  And someone wants to come along

14   and say, I, as your lawyer, want to show you that you can't

15   do that.  And what they are saying is we don't want any part

16   of that.  We don't understand how you are representing us

17   and telling us that you are helping us by showing that we're

18   doing something that's improper and against policy that we

19   think is perfectly fine.

20        So if, if I understand Mr. Pierson's position it's

21   there can't be a conflict about a violation of law because

22   no one can ever say I want to continue violating the law.

23   Of course not.  The dairy farmer affidavits do not say we

24   want to continue the illicit trade in drugs because we think

25   it's profitable to the co-op.  What they say is that we know

about the, we know what the co-op is doing and we find it
helpful and beneficial or even essential.  And if asked, did
you think it was lawful, the answer would be, of course.

So the lawyer says I'm -- imagine me going to one
of my other clients and say that I represented for 20 years
and I file a lawsuit against them and they say, well, you
can't do that, this is inconsistent with your past
representations and your ongoing obligations to us as a
client.  And I say, no, no, you don't understand, I found a
director who now thinks what the company is doing is
improper, is illegal.  And so it's okay for me to represent
them in suing you.  There's no conflict of interest here
because what you are doing is wrong.

Of course no one has decided yet, no one's close
to deciding that any of the things that they've talked about
are a violation of anything.  The issue is whether
consistent with the DMS dairy farmers having someone whose
loyal to their interests.  They don't see having someone
whose loyal to their interest designed to say, surprise
folks, you've been law breakers all these years.  They can
understand why someone outside could make that claim and
they'll fight that claim and they'll do everything they can
and need to do to show that that claim is not well-founded,
that there's been no violation, that the organization's
activities are lawful and proper.

1          Mr. Pierson says it will create some de-facto

2    immunity if you find a conflict.  Not so.  His class is

3    half -- his proposed class is half people who are outside

4    the co-op, the co-op families that market through DMS.  If

5    they want to come forward and bring a challenge on an

6    appropriate basis, in other words, not a consent decree that

7    they have no standing to raise, not an internal policy that

8    they have no standing to raise.  If they want to try to show

9    that DMS has violated the antitrust laws, a class of just

10   outsiders, I wouldn't be here arguing with you about a

11   conflict of interest.

12        THE COURT:  Well, how about he says we'll solve

13   that problem, you can have a sub-class of farmers who market

14   through DMS, understanding you can have separate counsel,

15   and they can proceed on their own path and that's the way to

16   handle that issue.

17        MR. KUNEY:  Well, I think if I, if I heard Your

18   Honor's opening remarks correctly I thought you said you

19   didn't see this as a situation where sub-classing was a

20   solution given the fundamental objections that have been set

21   forth in those 45 affidavits.  Because what they are saying

22   is, what the complaint attacks we don't want attacked.  So

23   there would have to be a lawyer who would essentially start

24   over --

25        THE COURT:  Well, --

1          MR. KUNEY:  -- and see if on behalf of -- with his

2    only loyalty to DMS farmers he thought there was a lawsuit

3    that ought to be brought and he could find class

4    representatives who would be prepared to go forward and they

5    could meet all the other requirements.  Because I -- part of

6    the reason I started with the predominance issues is,

7    frankly, if you agree with us on the predominance issues we

8    don't even have to get to this point because all that

9    variability that I talked about for the first whatever it

10   was, hour plus that I talked, almost all of that is

11   variability within the farmers who are marketing through

12   DMS.

13          THE COURT:  So let me tell you what I was

14   thinking.  I read your declarations and I noticed a common

15   denominator in that most of the people submitting

16   declarations were in management positions in the co-op.  And

17   so you have those people who say I certainly don't want to

18   be in a lawsuit where I'm getting sued and I'm, you know,

19   the entity that I am managing and directing is being accused

20   of violating the law.  But isn't there another group of

21   people who are in a co-op, don't want to be, but according

22   to plaintiff's theory were forced to go along with it

23   reluctantly and, in fact, we have a plaintiff family that

24   says that's why we're in it because we didn't have enough

25   options, we didn't have choices, they engaged in a range of

1   illegal conduct to get us to join and to keep us in.  So

2   what about those people?

3          MR. KUNEY:  Well, what we have here right now is,

4   let me just go back to the terminology he used.  And I'm

5   not -- I don't know how Your Honor intended it, but um, in

6   the co-op world management often means the kind of hired

7   people who are full-time employed by the co-op.

8          THE COURT:  No, I didn't mean that.  I mean

9   directors.

10          MR. KUNEY:  You said the directors.  And I mention

11   that, in part, because they are in the positions they are in

12   because they've been chosen by their fellow dairy farmers to

13   occupy those positions of leadership.  And many of them

14   mentioned at some length in their affidavits the time they

15   spend keeping in touch with the people who chose them, care

16   about and think and want to have done.  They are not simply

17   out there as free agents.  They are elected representatives

18   in what is really quite a fundamental ground roots

19   democracy.

20          So, so can one person, let's just say, let's take

21   Dairylea, so right now we don't, of course, have any

22   Dairylea proposed or actual class representatives.  So we

23   have the 1,400 Dairylea farmers really speaking to the Court

24   only through the number of Dairylea directors who provided

25   you affidavits who said we think DMS is really important to

1    Dairylea, we think it's done tremendous things for Dairylea,

2    we think it's made the Dairylea farmers better off, we don't

3    have anybody saying on the contrary.  So it's almost with

4    respect to Dairylea I don't -- I'm not sure that issue's

5    even raised in front of you.

6            We have a, we have a blank slate really on the

7    plaintiff's side.  We don't have any St. Albans people on

8    the plaintiff's side saying golly gee whiz I didn't really

9    want to be here.  We only have the dairy farmers who have

10   been chosen by their fellows to have leadership positions in

11   St. Albans saying that what we are doing is everything we

12   can to make life better for dairy farmers and we think we're

13   doing a good job of it and we think we're -- we don't want

14   someone really kind of highjacking the process, the class

15   action process and continuing to impose these costs upon the

16   co-op to defend ourselves.  So there is a DFA person.  You

17   do have one of those in front of you.

18           And I guess the, the question for Your Honor is if

19   you got over all the other hurdles about predominance,

20   etcetera, is one person who says I'm unhappy being in DFA

21   and I wish I could go elsewhere in the face of what you have

22   on the other side of the scale enough for you to conclude

23   that there's a class of DFA members with sufficient

24   commonality of interest to move forward represented not only

25   by that one named plaintiff whose been kind of allied with

the current group, but are you -- I guess was your question

with new lawyers?

THE COURT:  Well, I'm saying that it's not -- I

divided it between -- I didn't see it as -- sub-classes I

think are appropriate when parties have common allegations

and common interests, but there's some divergence in terms

of proof or other things going on or difference in status.

What I saw in your declarations were from people

who were opposed to the lawsuit completely, and they were

also affiliated with director positions in the co-op.  So it

doesn't really to me make sense to carve out that group

because they aren't what I would call a traditional

sub-class.

MR. KUNEY:  Right.

THE COURT:  But I'm wondering if there is not a

group of dairy farmers who are, for lack of a better word,

against their will participating in co-ops and it's as a

result of the anti-competitive conduct alleged by

plaintiffs.

MR. KUNEY:  I think here's the problem that we

have on that issue.  There are a decent number of cases that

say that the criteria for defining a class need to be

objective not subjective and it needs to be something less

than a marriage determination.  I mean there was a point in

time when people would file tort cases and they'd say a

1  class of all the people injured by such and such.  And the

2  Court said, no, no, you can't do that because that would

3  mean we'd have to have the individual determination of

4  whether Mr. X. was injured before we knew if he was a class

5  member.

6          So I don't think you could -- I don't think you

7  could appropriately under Rule 23 certify a class of DFA

8  members who don't like X..  I just -- I don't think -- I

9  think the law is -- and like we can, it's not briefed, but

10 we can get you a series of citations on that.  I just don't

11 think you can do that.

12         I think you have to look at the group and say do

13 you see enough cohesiveness that you can allow the group to

14 go forward as a group.  And I think we have two monumental

15 problems here.  Number one, as you said, the declarations

16 not only -- it's not just that they are against being sued

17 it's that they are against the core of what this particular

18 lawsuit is challenging because they value those things and

19 think that they've been good for dairy farmers.

20         So it would have to be a fundamentally different

21 lawsuit.  Do we, do we do it in the middle of this lawsuit?

22 Do we start and bring someone new in to start over now at

23 this point with reformulating a complaint and then could we,

24 could one ever come up with a class definition that didn't

25 involve some sort of subjective voting as to whether you

like it or not.  I don't think you could.  I think if the

lawsuit bore any resemblance to this one when, when the --

when and if a new complaint was filed I think we'd be back

here with the same problem which is that you are not going

to have the necessary cohesiveness or objective criteria

that would enable you to define that kind of class when the

record in front of you says the fundamentals that have been

raised by this lawsuit, and any other one that we can

conjure up that's close to it, goes to the core of what

these people believe is good and important and very

beneficial to them and their fellow dairy farmers.  So I

don't think there is an answer down that path.  I just

don't.

          Let me just mention the Picket case because it's

an important case for us.  And I think it comes perhaps the

closest on illegality issue.  Picket was a case that

involved the Packers and Stockyards Act, which is something

that I'm not going to pretend to know any more about than

the next person.  But the reason the case is important is

because the allegations were that all of the people selling

to the stockyards were injured by a particular form of

future contracting that some of the producers had entered

into.

          And the conflicts issue was much like, in at least

a piece of it, was much like the one that you have in front

1    of you, which is, you had people saying, I like those

2    contracts, I think they are beneficial, I think they're

3    really important and really helpful and positive.  And then

4    you had people saying we want to stop those contracts, they

5    are negative, they are hurting people.  And they even

6    introduced expert testimony claiming that the contracts

7    resulted in everybody doing worse.  I mean the record was

8    really, was in a lot of ways very much in sync with the kind

9    of record you have.

10           Affidavits from people saying, I like those things

11   and I want to continue doing them.  And a claim that somehow

12   there was no conflict because even those, though those

13   people had entered into those contracts they didn't quite

14   understand that those contracts made everyone worse off.

15           And the Court, the Court case went to the Eighth

16   Circuit if I remember correctly.  The certification was, was

17   deemed improper because that, you couldn't have a class

18   where class members said they were benefited by the

19   challenged conduct.  Now, if there was a legality kicker, in

20   other words, unless it's illegal, well, of course, they

21   claimed it was a violation of the Packers and Stockyards

22   Act.  That was the allegation.

23           The allegation was that the contracts led to a

24   violation of the law.  And no where in the Court's analysis

25   does it say, oh, okay, there's really not a conflict here

1    because what the people who liked the behavior were asking

2    permission to do was continue breaking the law.

3           The issue is -- obviously you have the, I

4    shouldn't say obviously, you step back before there's been a

5    determination of whether there's a violation and say is the

6    bringing of the action a conflict.

7           We have a bringing of an action here where they

8    are claiming that a variety of things that have been done by

9    these organizations are against internal policy, consent

10   decrees and the law.  And the reality is none of those

11   allegations, even if they gave rise to causes of action,

12   which at least the first two don't, and, and, like I said,

13   I'll resist the factual temptation, but there's enormous

14   problems with each of those accusations on the merits,

15   whether it's the consent decree, whether it's the

16   solicitation of dairy farmers, whatever it is.  There's

17   tremendous problems with the factual record and with the

18   commonality issues.  But just kind of done the commonality

19   discussion can you eliminate a conflict by saying to a

20   person who, that you're trying to stop them from breaking

21   the law.  I don't think there's a case that says that.  I

22   don't think there's a case that says when we have a

23   situation where the organizational leaders -- when the Court

24   has in front of it a record from people who have been chosen

25   for leadership positions by their fellow dairy farmers that

1    these policies and practices are important to them, critical

2    to them in the preservation of what their, of their economic

3    well-being and their way of life I don't think someone can

4    come in and say no conflict in me claiming on behalf of you

5    to attack you because I figured out, even though you didn't

6    know it yet, that you've been breaking the law by what

7    you've been doing.  I don't think there's a single case that

8    does say that or that will say that or should say that.

9          THE COURT:  Well, isn't the bigger problem the

10   plaintiffs want to show that the defendants have broken the

11   law and the defendants don't want plaintiffs to accomplish

12   that burden of proof because that's going to create

13   liability on behalf of the defendants?

14         MR. KUNEY:  Right.  And they particularly don't

15   want them to do it in their name.  That's really the

16   conflict issue --

17         THE COURT:  Yes.

18         MR. KUNEY:  -- is about doing it in their name.

19   Can other people try to prove that the co-op's conduct is

20   illegal?  Sure.  If we -- you know, we had, in the Southeast

21   case once upon a time we had a breach of contract claim by

22   the DFA members against DFA.  The Court didn't certify that

23   for class treatment.  It's still -- I guess it's parked in

24   line behind all the other things that seem to be momentarily

25   stalled in the Southeast case.  But these people want to say

1    on behalf -- I want to bring an antitrust action claiming a

2    violation of law on behalf of insiders and outsiders.  The

3    co-op will certainly defend itself against the outsiders.

4    That -- it's not that it's -- it's not getting a free pass

5    to break the law.  There's no implied immunity for

6    cooperatives here.

7              THE COURT:  But doesn't their proposed class

8    exclude directors of the conspirators and directors, and we

9    had this issue in, in the Dean settlement.  It's one thing

10   to say the directors of DFA and DMS, but then we've got to

11   have the directors of all the co-conspirators.

12             MR. KUNEY:  Right.  Those, the, the affidavits

13   from the directors are not expressing concern about personal

14   liability.  The concern, the financial concern they are

15   expressing is as members of the co-ops.  It's not, it's not,

16   oh, we can solve the problem by carving these people off

17   saying they don't have personal liability.  I don't believe

18   that's what's going on here.

19             I think what the dairy farmer affidavits are

20   saying is in our representative capacity as dairy farmers

21   who know something about -- who are here because our

22   colleagues have chosen us, because we keep in touch with

23   them, we know what they think, we know what they care about,

24   we have a tremendous problem with someone claiming in our

25   own name to tell us we are law breakers in our known name.

1    That's the problem.

2            And I think Your Honor has correctly said a couple

3    of times we're not going to solve this problem by doing the

4    sub-class thing so how do we solve the problem.  We have

5    the -- we have a conflict of interest within the proposed

6    class that is not reconcilable with the complaint that you

7    have in front of you.  Is there in some other life, some

8    other antitrust complaint that someone could bring on behalf

9    of insiders?  I don't know.

10            THE COURT:  What about Judge Greer's alleged

11    finding that there's no intra-class conflict?

12            MR. KUNEY:  Well, what Judge Greer said is that

13    there was a conflict because the -- and the focus there was

14    really on the full supply agreements.  That he was -- that

15    full supply agreements and the investment in downstream

16    processing.  Okay.

17            That he now had in front of him a record that made

18    it clear that DFA members found those policies helpful and

19    beneficial and important and so -- and what -- Judge Greer

20    understood the plaintiffs to be again alleging that those

21    were not independently unlawful acts, but rather, acts in

22    furtherance of the conspiracy.  And so the question really

23    was that independent behavior, could they continue having

24    those, those contracts.

25            And he said, well, no, I see a conflict between

1  the outsiders who may want to stop those contracts and the

2  DFA members who want to continue them.  Okay.

3          The motion that Dean then filed, Dean said, well,

4  Your Honor, the implication of that is that that same

5  conflict might well exist inside DFA.  And what Judge Greer

6  said is I haven't said that.  And as I mentioned to you

7  before --

8          THE COURT:  Inside DFA or inside the class?

9          MR. KUNEY:  Inside the DFA class.  In other words,

10 Dean said the DFA group cannot be certified because, really

11 following up on the point you raised earlier, what if there

12 is a DFA person that hates those contracts and wants to sue

13 about them then there would be a conflict with all those

14 other DFA members.  So it could be outsiders.  Just like the

15 contracts want to prove they are illegal, insiders fight

16 them.  There could be, now, what if there's an insider who

17 wants to fight about the contracts.

18         What Dean argued is that the logic of the judge's

19 opinion suggested there would also be an intra-DFA member

20 conflict.  And what Judge Greer said is, I haven't said

21 that, I don't remember anybody making that argument to me

22 before and I haven't said that.

23         As I, as I mentioned earlier where we are in the

24 Southeast is if there is a new lawyer appointed, and if the

25 new lawyer either endorses the prior settlement or enters

1    into a new settlement, that lawyer presumably will file a
2    motion for preliminary approval and for certification of the
3    settlement class.  And then I have a strong suspicion we're
4    going to have this fight again about whether the logic of
5    what the Court has already found really prevents the
6    certification of the DFA class because that same conflict
7    exists inside.

8        So I, I know that the plaintiffs think that our
9    issue's over.  I know Dean thinks the issue is not over.
10    We're somewhat bystanders but not totally bystanders as we
11    watch that issue play out.  Our view is the judge certainly
12    hasn't said there is a cohesive DFA class to pursue
13    litigation because what he's ruled, just along the lines you
14    and I were just talking about, is that a significant number
15    of DFA members are opposed to the core of what that lawsuit
16    is seeking.  So we've been kind of saying the settlement is
17    sort of a separate issue.

18        But I think the language that the plaintiffs
19    quoted you here is correct, but I think Judge Greer was
20    saying no one made that argument to me before about an
21    intra-DFA class conflict.  I have not made such a finding.
22    And he may never.  I'm not predicting that he will.  What
23    I'm really predicting is that at least some parties in the
24    Southeast case think that argument hasn't even been had yet
25    and will occur at sort of the next go around.

1          THE COURT:  Well, he must have made findings

2     because the class did get certified.  And it got certified

3     with plaintiff's counsel in place for the class.  And I

4     believe there might have been a sub-class, but there had to

5     be a finding as to adequacy of representation.

6          MR. KUNEY:  There was, but that's when he changed

7     with the decertification order.  That's the whole reason.

8     In other words, yes, there was originally a certification

9     then there was a subsequent decertification where he

10    essentially said based on the record I now have I'm reaching

11    a different conclusion about whether there's a conflict and

12    as a result whether the class can be certified.

13          And, you know, I don't know if it matters, but

14    what he said from the bench is that he now, given the

15    procedural conundrum that it put us in with the trial date

16    and the settlement and all that he was somewhat lamenting

17    that he hadn't been able to reach that conclusion or had the

18    record that he then had when he issued the original

19    certification ruling.

20          But I think, I think the suggestion here that

21    there's some novel and unique answer to this conflict

22    because they want to tell the co-op that the co-op broke its

23    own rules is, is not only not actionable but is absolutely

24    not an answer to the conflict issue.

25          Let me, let me try to kind of summarize and then

1    see if I can come back to the question that you raised for

2    me before the break.  The, the big picture here is that we

3    think there's really two paths open to the Court to deal

4    with this, with the proposed class certification.  The one

5    that kind of answers all questions from our perspective is

6    the lack of predominance of common issues.  That because of

7    the need for individual proof of both injury and fact and

8    other liability elements such as market definition, market

9    power, harm to competition, foreclosure there's simply --

10   the Court -- the plaintiffs have failed to meet their burden

11   of showing that common issues predominate, end of story,

12   class can't be certified, case closed.

13          The other arguments that I've been talking about

14   this afternoon really deal with pieces, pieces of the

15   puzzle.  The first -- the biggest piece is the one we were

16   just talking about which is the conflict.  As a result of

17   the conflict we believe strongly that the class can't be

18   certified in a way that includes the dairy farmers who

19   market through DMS.

20          I also raised arguments about what we called the

21   outsiders, the people from whom there's no data and no

22   information, and we believe no showing that they've been

23   impacted in any way, shape or form, let alone any common

24   proof.  And then I mentioned the cooperative members who are

25   in the cooperatives who are heavily vertically integrated.

1          The, the reality is when you -- if you take the

2    bite approach, the chunks, the DMS members, the outsiders,

3    the 30 percent outsiders as to whom there's no information,

4    the dairy farmers who are in the heavily vertically

5    integrated co-ops, I'm actually not sure there's anybody

6    left because the, because the alleged conspirator group, the

7    GNEMMA group that's outside DMS, is Upstate Niagara and

8    Agri-Mark and Maryland and Virginia.

9          Now, Upstate Niagara and Agri-Mark were the two

10   co-ops that I used as sort of the, if I may, the poster

11   children for the argument as to why the vertical integrated

12   co-ops can be subject to common impact.  I think the -- I

13   guess technically the Maryland and Virginia folks would be

14   still out there.  But I think if you, if you do not agree

15   with us on the predominance issue and go into the individual

16   arguments I think what's left is a very small slice, if

17   anything, of the case as proposed because DMS is more than

18   50 percent, the outsiders are more than 30 percent and those

19   highly vertically integrated co-ops happen to be essentially

20   the rest.

21         So there are alternative approaches to the

22   problem.  Our, our belief, Your Honor, is that the

23   predominance issue is strong and clean in the sense that for

24   all of the reasons that we talked about before the

25   plaintiffs haven't and can't make a showing that common

 1    issues predominate that the, that these hurdles are simply

 2    too great.

 3              And I think if I understood the question that you

 4    suggest that I come back to before we took the break which

 5    is, can you certify some common issues here in a way that is

 6    consistent with Rule 23.  And I'm now adding to your

 7    question, sort of advance the purposes of the litigation.  I

 8    think, I think, Your Honor, respectfully the answer is no.

 9    I think there's no -- and Cordes is the case that I think

10    we've looked at.  It's a Second Circuit case but it's -- but

11    it's consistent with a number of cases that say the injury

12    in fact issue alone is so fundamental to these cases that

13    even if it were -- I mean what you see is cases where it's a

14    lay down per se offense and the Court declines to certify

15    because of the absence of feasibility of common proof as to

16    injury and fact.

17              So I think the -- I mean because we're already

18    inside the liability tent.  We're carving out liability

19    pieces.  I think when you've carved out injury and fact

20    alone you don't have enough common issues that you could

21    certify that would make the lawsuit useful to anyone.

22              It's, it's reminiscent of some cases that --

23    personal injury cases.  There was a time in the sort of

24    early days of people suffering environmental exposures to

25    what they thought were toxic chemicals.  These cases were

1    brought as class actions.  And the suggestion was well,

2    let's litigate whether chemical X. -- let's litigate whether

3    Dioxin is dangerous.  And we understand we can't litigate

4    whether anybody, a particular person was hurt by that Dioxin

5    or whether their disease was caused or whether they a got

6    big enough dose those things are all so individualized that

7    you can't possibly put together a class.  Let's just do kind

8    of an abstract trial about whether Dioxin is bad for you.

9    And the courts after a little while overwhelmingly rejected

10   that as having enough core of commonality that it made sense

11   that it was superior, that it advanced the ball because

12   they, because for one thing it was an abstraction and it

13   left every single individual supposedly benefited by that

14   still having to show that this alleged thing had some affect

15   on them.  And that's what injury in fact after all is all

16   about.

17          So even if Your Honor was inclined, which

18   respectfully we don't think you should be, to think that

19   there was some per se ness in this case, that if every

20   person is left having to show that whatever the thing is,

21   the solicitation agreement.  Well, the solicitation

22   agreement is actually a great example.  The co-ops that

23   we've heard repeatedly mention in the solicitation agreement

24   do not, for the most part, have members all across Order 1.

25   It's primarily Agri-Mark and DFA and St. Albans who are kind

```
 1    of collected in Vermont and Northern New York.  They are not
 2    -- it wouldn't even be a common issue -- I'm not sure I
 3    could even comprehend how the existence of that agreement
 4    could be a common issue as to all 9,000 of the people
 5    because it's essentially inconceivable that it affected
 6    them.  And when, when impact on the person -- when injury in
 7    fact is such, such a monumentally important part of what has
 8    to be done before anybody is in a position to actually
 9    recover, forget the amount of damages, before anybody has
10    actually demonstrated that they, they can collect on an
11    antitrust claim they have to show violation and they have to
12    show injury in fact.  Injury in fact is, cannot be a common
13    issue here.  And for all of the reasons we've already
14    discussed violation really can't be a common issue here
15    either.
16              So I have thought about your question.  I always
17    like to see if I can find answers that, that help.  I
18    appreciate where the question's coming from and I honestly
19    just don't see it.  I just don't see a way to meaningfully
20    carve out something that would advance the litigation
21    process and not simply be kind of an abstract referendum on
22    a point that would leave 5,000 or 6,000 or 9,000 people
23    still having to prove everything important before they
24    could --
25              THE COURT:  Well, it's kind of a concept on which
```

1    our MDL is based.  So that's exactly what happens and

2    there's some efficiencies associated with that, but I can

3    see your point as well.

4              MR. KUNEY:  All right.  Thank you, Your Honor.

5              THE COURT:  All right.  Let's have the two

6    individuals come forward.  Mr. Haar?

7              MR. HAAR:  Thank you, Your Honor.  I want to thank

8    you for the opportunity to address this Court and, excuse

9    me, and you personally.

10             My wife Claudia and I are named plaintiffs in this

11   case.  Dairy farmers from West Edmeston, New York and also

12   DFA members.

13             The reason I felt compelled to speak at this

14   juncture was a couple of them actually.  First, the conduct

15   by DFA challenged in this case I would argue doesn't benefit

16   the farmers in the Northeast.  When DFA breaks the law it

17   doesn't benefit any farmer.  And obviously I, you know, I'm

18   coming -- I'm speaking after tough acts to follow so I'm

19   just --

20             THE COURT:  You are doing fine.

21             MR. HAAR:  Thank you.  DFA should compete fairly

22   and follow antitrust laws and live to its own guidelines and

23   to comply with what other courts have ordered them to do.

24             I don't believe its done this and its actions have

25   harmed the farmers and kept their prices too low.  And the

1    same is true for other cooperatives.  My next door neighbor

2    is looking at changing co-ops.  My own field rep., a DFA

3    employee, told me he couldn't offer them any better than

4    what they were getting.

5              As I stated I believe the truth will bare out and

6    whatever benefits are alleged are far outweighed by the

7    damage done by anti-competitive pricing behaviors.

8              Second, I would argue that the affidavits and

9    dairy farmer declarations do not represent or indicate the

10   views of a much larger group of farmers.

11             I have no malice toward my fellow farmers.  I

12   probably would have rather picked a stone up than hit

13   anybody.  That I believe them to be ill-informed and they

14   don't have the benefit of the facts which are still under

15   seal.

16             The relationship between those farmers and DFA

17   headquarters is tainted at best.  These people write your

18   paycheck, they inspect your farm, they test your milk.  What

19   are you supposed to say.  Furthermore, the closer these

20   folks get to the ivory tower in Kansas City the more

21   blinding is their reflection.  Those who would enjoy peace

22   with DFA I believe enjoy a pax romana.  When the facts are

23   known I think it will be clear to them as well as everyone

24   else that the antitrust violations have not benefited

25   anybody.

1          Your Honor, if not for my concern for my fellow

2    farmers both DFA and that I would not have asked for the

3    opportunity to come and make comments at this proceeding.

4          When I considered my neighbors, the ones who

5    thanked us for taking the risk we have in investing the

6    time, many of them holding on to farms for three and four

7    generations, all of them well aware they are making a lot of

8    people wealthy while they ponder how to pay for feed or

9    fuel.  I spoke to one of my neighbors about coming here, who

10   also happens to be a DFA member, who had just had a minor

11   stroke.  He thankfully is back to work.  But his father

12   farmed that same place for over 90 years before he passed

13   away this spring.  I told him I was feeling compelled to

14   come here.  He opened his wallet and emptied it out to me.

15   He said I only have 50 bucks, take it for gas, I would like

16   you to go.

17          I came to make a case that only one of us can

18   make.  I do respect the counsel.  They cannot say that dairy

19   farming, dairy farmer concerning this class that we are one.

20   I am them and they are me.  We are soilers of the soil.  We

21   fight against all odds to create a living off the land.  We

22   know what it is to be covered in mud and blood and muck and

23   manure and cobble a chimney back and frozen fields darkness

24   falls.  Our hardships are the same and our joys are the

25   same.  We are one class.  We suffer in mass, I believe,

1   because laws have been broken, rules have been rigged

2   against and they've been rigged against us.

3            The attempts of DFA executives to divide this

4   class of coverall clad workers against themselves is false

5   and hollow.  There is no schism among the farmers.  The only

6   schism is between the executive suits in Kansas City, sweats

7   in Kansas City and the dusty country lanes where the work is

8   done and the money originates.

9            To sum up, Your Honor, I invoke this message with

10  all my breathe, all my days, it will go on that long, it

11  will be worth every effort for my fellow farmers.  I beseech

12  you to allow this class to go forward.  And I'm asking you

13  to not allow us to be disenfranchised for unless the class

14  is certified my fellow farmers in the northeast have no

15  meaningful way to challenge DFA or obtain compensation for

16  the harm it's caused us.  Without a class action accepting

17  divine providence we have no relief.  So, again, I would

18  like to thank you for your time.

19           THE COURT:  All right.  Well, thank you, Mr. Haar.

20  And Mr. Gorton you wanted to say something?

21           MR. GORTON:  I have a few notes.  I don't have

22  anything written.  Thank you, Your Honor, for the

23  opportunity to address the Court.  I've addressed the Court

24  before.

25           One of the requirements that I understand for

 1    certification of class is that -- well, I guess first of all
 2    let me state I am not a director of DFA.  I am a delegate to
 3    the annual meeting.  My only leadership position.  I talk to
 4    all sorts of farmers, both non-DFA farmers, DFA farmers in
 5    my area.  And I don't find an awful lot of people who agree
 6    with Mr. Haar's position.  I find multiple farmers who agree
 7    with my position.
 8            I certainly won't argue that you can't find a
 9    single farmer who doesn't wish he got more money for milk.
10    No argument there whatsoever.  But I would like to address
11    -- it's my understanding that one of the requirements for
12    class certification is that the representative class, the
13    class council adequately protects the interests of all
14    members of the class.  And based on several things that was
15    said today, as well as several things that were told to me
16    in my discussions with Mr. Brown prior to the fairness
17    hearing, I don't feel that the class council protects my
18    interests.
19            And I'll take those off on, on several notes.
20    First off the issue -- let's talk about the issue of supply
21    agreements.  As I mentioned in the fairness hearing a very
22    important part of belonging to a co-op is ensuring the
23    market for your milk.  One of the advantages of belonging to
24    a co-op is that the co-op guarantees you that they will
25    market every pound of milk that you make, every farmer who

1    belongs to the co-op.  And in so doing one of the reasons

2    that you belong to a co-op is the co-op takes a whole bunch

3    of farmers and rather than each farmer trying to figure out

4    every day where his milk goes the co-op says I will collect

5    all this milk, I will go and secure the markets that we need

6    to send that milk to and that will -- and I will do that in

7    the most efficient way.

8            And they spread the cost of doing that equitably

9    to all farmers.  And as a part of doing that, as has been

10   mentioned today, some co-ops actually invest in

11   manufacturing plants or processing plants because every

12   pound of milk has to be processed.

13           Some co-ops or some handlers don't do that.  They

14   simply say I'll collect farmer's milk and I'll go -- and go

15   there.  Or a farmer can say I want to be an independent

16   farmer and so I'll go find a place to take my milk to.

17           As a cooperative farmer operating in a competitive

18   environment as long as the there is lots of plants available

19   and there are lots of avenues available for a farmer to send

20   his milk that's my only requirement.  I am not required to

21   make sure that there's a plant within a few miles of Mr.

22   Haar just because he might want to be an independent.  I'm

23   not required to do that.  As long as there's a plant

24   available to him I'm not required to make sure that the

25   plant is close to him.  That's one of the advantages of

1   belonging to the co-op.

2           And, in fact, when we talked about, all the

3   discussion about well, you know, what is the dollar value.

4   There's a lot more dollar value to me than simply the price

5   of milk that I get in my milk check.  And I was very

6   confused about all the discussion we had today about, well,

7   are we talking about just over-order premium or are you

8   talking about the whole price of milk.

9           Well, Mr. Kit indicated, well, there's, there's

10  the opportunity for, for manipulating the price within

11  component pricing.  That's not true.  That's an indication

12  of how he doesn't understand the system.  I get a milk check

13  every week.  Every month I get a milk check.  That milk

14  check shows my component values.  I get a report from the

15  milk market administrator that tells me what the standard

16  uniform price was and what that price was based on and what

17  the class utilizations were for that month.  I can tell, if

18  I want to do the calculation I can tell whether my component

19  prices were manipulated or not.  It's there.

20          He also obviously doesn't understand about quality

21  of milk.  Quality of milk, very important.  Somatic cell

22  count affects that.  If you are a farmer who produces low

23  quality milk a cheese plant doesn't want your milk or won't

24  want to pay as much for your milk because they can't get as

25  much cheese out of your milk.

1              PI count allegedly, and there's been some question

2    about whether it's really true or not, but PI count, and

3    most processors believe, fluid processors believe that PI

4    count affects the shelf life of fluid milk.  So they want

5    milk with low PI count.

6              And those things result in quality premium.  For

7    DFA right now there's a quality premium available of

8    anywhere from minus, I think they just changed it, I think

9    it's now minus 75 to plus 60 cents.  So your milk check can

10   change by as much as a dollar and 15 cents just based on the

11   quality of milk that you produce.  And that's important.

12   And those things are important to me.

13             So the creation of supply agreements, long-term

14   supply agreements and long-term business relationships, and

15   I understand the issue of contract claims, it might alter

16   life.  I do business for the DOD working for the Navy under

17   DOD contracts.  And, yeah, those contracts are, sometimes

18   they are one year, sometimes they are two years, sometimes

19   they are three years.  And then the concrete are

20   re-competed.  And I have no problem operating in a

21   competitive environment, but one of the key aspects of

22   offering a competitive environment, if you're selling,

23   whether it's services or goods, milk, one of the key aspects

24   of that is to make yourself a supplier of choice.  So that

25   when you come to re-compete in milk supply for your plant

```
 1    you want to come to me and take my milk.  And I, I have put

 2    the effort to make you, to have you believe and understand

 3    that I'm your supplier of choice.  And that's important to

 4    me that my co-op has the ability to make themselves the

 5    supplier of choice to companies, to the companies that we

 6    send our milk to because that is then when the contract

 7    comes up for renegotiation in the competitive environment,

 8    and there are other farms, there are other organizations

 9    that can bring that milk to you, you're going to come to me,

10    my organization and say, no, I want your milk.  Because if I

11    don't have a market for my milk I got nothing.  I got

12    nothing.  I have to dump it down the drain.  So long-term

13    business relationships and supply agreements are critical to

14    the way I do business.

15            One of the other comments I guess from my

16    standpoint the, the -- all the discussion about how we can't

17    seem to differentiate any way between all the milk that was

18    conspirators and milk that was non-conspirators and plants

19    we can't seem to differentiate that there was any difference

20    in price and we, therefore -- we, therefore, conclude that

21    that means there was a serious conspiracy.  I say, well,

22    wait a minute, how does that -- you can make the same

23    argument that that means there was no conspiracy.  If a

24    conspiracy didn't have any affect, you know, how can you say

25    it existed?  Just a side comment.
```

1          And I thought it was very interesting that he

2     talked about his discussions about how the DMS management,

3     they treat similarly situated people the same way.  They

4     distribute the, the proceeds from the co-op in an equitable,

5     in an equitable manner to everybody in the co-op.

6          And on the other hand, part of what they want to

7     do is they want to say, well, listen, the co-op should be

8     going out and trying to solicit members and trying to,

9     trying to drag members away from other co-ops.  Well, how

10    are they going to do that?  If the pay price is the same how

11    are you going to solicit a member?  The only way you're

12    going to solicit a member from the co-op is say, well, I'll

13    pay you more.  And if you pay a single farmer more if you

14    don't get that money from the customer then you have to take

15    that money from other farmers in the co-op and you're,

16    therefore, not treating members of the co-op equally.

17         The only way, and it was a stated goal, a stated

18    goal by Kit Pierson in this Court at the fairness hearing

19    through or through him by one of the plaintiffs that the

20    goal of this lawsuit was that all farmers should get that,

21    all farmers.  And there is no way that advantaging one

22    farmer over another farmer will make all farmers better.

23    The only way all farmers get more money for milk is if the

24    customer pays more money for milk or dairy farmers get a

25    bigger share of the customer dollars.  That is the only way

 1    that all farmers get more money for milk.  The only way all

 2    farmers can benefit.

 3              And even just the price, you know, the pure price

 4    for milk is not the only advantage, it's not the only

 5    benefit to me of being part of the co-op.  And so even

 6    simply saying to me, gee whiz, your co-op might pay just a

 7    few cents less than another co-op might pay, that doesn't

 8    mean that, wow, I should just jump to the other co-op

 9    necessarily.  It's what is the total benefit along with the

10    co-op, what does that mean to me.

11              THE COURT:  All right.  Thank you very much.  We

12    are at --

13              MR. GORTON:  So based on that I don't believe they

14    accurately represent my interests.  Thank you, Your Honor.

15              THE COURT:  All right.  Thank you.  We are out of

16    time and so we'll conclude at this point.  And the Court

17    will take the matter under advisement.  The only thing that

18    I thought would be helpful for supplementation or the

19    allegations or a direction to where I can find the

20    allegations of when the co-conspirators joined the

21    conspiracy and how because I, I do find that that is going

22    to be helpful.  And both parties have argued about that, in

23    particular defendants saying that that varies the

24    commonality of proof because we have alleged co-conspirators

25    joining at different times, doing different things.

1          So the Court will take this under advisement.

2     Anything further from either party?

3          MR. PIERSON:  Your Honor, the one thing that I

4     would say, I appreciate the Court's patience, I mean there

5     is a lot to say about what Mr. Kuney said.  And I, I don't

6     know how to deal with that as a matter of rebuttal.

7          THE COURT:  Well, you had the lion's share of the

8     time, but if you asked for post hearing memorandum that you

9     wanted to file, and I could confine you to a reasonable

10    length, I don't have a problem with that.

11         MR. PIERSON:  Well, I suppose that would be the

12    appropriate way to do it, Your Honor.

13         THE COURT:  We have a trial starting tomorrow and

14    the staff has been here since bright and early.  So it is

15    time for court to close for the day.  Do you want to submit

16    something post hearing?

17         MR. PIERSON:  Why don't we take that under

18    advisement.  And I suspect, I suspect we will, Your Honor.

19    We'll try to focus on what seemed to be points of confusion

20    or we'll try to look at it as an, as high level as we can.

21         THE COURT:  All right.  Anything further from you,

22    Mr. Kuney?

23         MR. KUNEY:  No, Your Honor.  Thank you very much.

24         THE COURT:  All right.  Thank you.

25         (The Court recessed at 5:05 p.m.)

1                    C E R T I F I C A T E

2

3          I, certify that the foregoing is a correct

4    transcript, to the best of my ability, of the record of

5    proceedings in the above entitled matter dated September 26,

6    2011.

7

8    _____

9                    Anne Marie Henry, RPR
                    Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25