U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2011 DEC -9  AM 11: 36

CLERK

BY_____
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN,       )
d/b/a Al-lens Farm, GARRET SITTS,        )
RALPH SITTS, JONATHAN HAAR and           )
CLAUDIA HAAR, on behalf of themselves    )
and all others similarly situated,       )
                                         )
            Plaintiffs,                  )
                                         )
    v.                                   )    Case No. 5:09-cv-230
                                         )
DAIRY FARMERS OF AMERICA, INC., and      )
DAIRY MARKETING SERVICES, LLC,           )
                                         )
            Defendants.                  )

## OPINION AND ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
(Doc. 206)

This matter came before the court on September 26, 2011 for a hearing on Plaintiffs' Motion for Class Certification (Doc. 206). The parties completed their post-hearing filings on October 12, 2011.

Plaintiffs, Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts, and Jonathan and Claudia Haar (collectively, "Plaintiffs") ask the court to certify a class to pursue the allegations contained in Plaintiffs' Amended Complaint on a class action basis. They contend that they have met all of the requirements of Fed. R. Civ. P. 23, and that a class action is the most appropriate mechanism for resolving this lawsuit.

Defendants, Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (collectively, "Defendants"), oppose class certification on three principal grounds. First, they claim this lawsuit lacks common questions of fact and law and that, to the extent there are some common questions, they do not predominate over

questions affecting only individual members of the class. Second, they contend the claims of Plaintiffs' proposed class representatives are not typical of the class. And third, they assert that neither Plaintiffs' proposed class representatives nor proposed class counsel can adequately represent the diverse and conflicting interests of the proposed class.

## I.    The Amended Complaint.

Plaintiffs' Amended Complaint alleges five causes of action: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act;[1] (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act;[2] and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act. In support of these claims, the Amended Complaint contains 286 paragraphs of allegations that assert a vast array of anticompetitive acts by Defendants including that from at least as early as 2001, DFA and DMS and their coconspirators engaged in a wide-ranging conspiracy at both the processor and cooperative levels to fix,

---

[1] Section 2 of the Sherman Act makes it an offense to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2. Section 2 "forbids both monopolization and attempted monopolization." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). In order to establish a § 2 violation for completed monopolization, a plaintiff must show that the defendant: "(1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power." *Id.* (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71(1966)). "[A]n action under section 2 of the Sherman Act for attempting to monopolize a market will lie only where there is anticompetitive conduct, a specific intent to monopolize *and* a dangerous probability that monopoly will be achieved." *Int'l Distrib. Ctrs., Inc., v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 791 (2d Cir. 1987).

[2] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" 15 U.S.C. § 1. To establish a claim under § 1, a plaintiff must show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade[.]" *Tops Mkts., Inc.*, 142 F.3d at 95-96.

stabilize, and artificially depress prices for raw Grade A milk and to allocate markets
within Federal Milk Market Order 1 ("Order 1") among the coconspirators.

Plaintiffs seek monetary damages in an amount which "represent[s] the additional
amount Plaintiffs and other members of the Class would have received from the sale of
raw Grade A milk in the absence of the violations alleged." (Doc. 117 at 83.)  Plaintiffs
further seek treble damages under Section 4 of the Clayton Act. 15 U.S.C. § 15.

In addition to their request for monetary relief, Plaintiffs seek multi-faceted
injunctive relief that includes a request for an order: (1) enjoining Defendants from
entering into full supply agreements; (2) enjoining Defendants from entering into
agreements not to compete for the purchase of raw Grade A milk; (3) enjoining
Defendants from forcing dairy farmers in Order 1 to market their milk through DMS in
order to gain access to processing plants; (4) enjoining Defendants from continuing their
conspiracy to engage in price-fixing and price suppression, and (5) requiring Defendants
to divest their processing plants in order to restore competition. (*Id.* at 80-83, 96.)

With less specificity, Plaintiffs also seek injunctive relief that will prevent
Defendants from continuing to conspire and/or contract to "unlawfully allocate the
market, refuse to compete and to fix, reduce, stabilize or maintain at artificially depressed
values the over-order premiums paid by processors in the Northeast for raw Grade A
milk[.]" (*Id.* at 90-91.)

## II.    Plaintiffs' Proposed Class Action.

Plaintiffs' proposed product market is raw Grade A milk. Their proposed
geographic market is Order 1 covering areas in Connecticut, Delaware, the District of
Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York,
Pennsylvania, Rhode Island, Vermont, and Virginia. Plaintiffs define the proposed class
as follows:

> All dairy farmers, whether individuals, entities or members of cooperatives,
> who produced and pooled raw Grade A milk in Order 1 during any time
> from January 1, 2002 to the present. Defendants and Defendants'
> Coconspirators are excluded from the Class.

3

(Doc. 206 at 16.)  They identify "Defendants' Coconspirators [who] are excluded from the Class" as: Dean Foods ("Dean"), HP Hood LLC ("Hood"), National Dairy Holdings ("NDH"), Farmland Dairies LLC ("Farmland"), Kraft, Dairylea Cooperative, Inc. (Dairylea"), St. Albans Cooperative Creamery, Inc. ("St. Albans"), Agri-Mark, Inc. ("Agri-Mark"), Land O'Lakes, Inc. ("LOL"), and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA").

Plaintiffs propose that the following individuals be named class representatives: (1) Plaintiffs Alice H. Allen and Laurance E. Allen who do business as the Al-lens Farm, which is located in Wells River, Vermont.  From January 1, 2002 to present, Al-lens Farm sold, through DMS, raw grade A milk to raw Grade A milk processing plants in Order 1.  They now sell organic milk, which Plaintiffs concede is not included in the definition of the proposed product market; (2) Plaintiffs Ralph Sitts and Garret Sitts who, as part of a partnership, operate a dairy farm in Franklin, New York.  Their dairy farm was a member of DFA from 1998 until 2007.  From January 1, 2002 to present, their partnership sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1; (3) Plaintiffs Jonathan Haar and Claudia Haar, who operate a dairy farm in West Edmeston, New York.  Their dairy farm has been a member of DFA from 2000 to the present.  From January 1, 2002 to present, their dairy farm sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

### III.    The Nature of Plaintiffs' Claims.

Before embarking on an analysis of Plaintiffs' class certification motion, the court briefly sets forth the legal framework for Plaintiffs' claims against DFA and DMS. Under the Sherman Act, Plaintiffs have alleged both horizontal and vertical restraints of trade as well as a combination of the two.[3]  They allege a conspiracy of dairy

---

[3] "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).

4

cooperatives and milk processors to fix, stabilize, and suppress the prices for raw Grade A milk that dairy farmers receive from both their cooperatives and their processors. In other words, Plaintiffs allege a dual level of price fixing and price suppression for dairy farmers who produce and pool their milk in Order 1.[4]

Despite its broad language, the Sherman Act only prohibits conduct that *"unreasonably* restrain[s] trade." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (emphasis in original). Courts thus analyze the legality of contracts or agreements that allegedly restrain trade using one of two frameworks: either a *per se* approach or the "rule of reason." *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001).

Courts apply the *per se* rule in limited circumstances where the agreement at issue is of the sort that has proven so "manifestly anticompetitive" in the past that, "because of [its] pernicious effect on competition and lack of any redeeming value [it is] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977) (internal quotation omitted). Generally, there is a presumption against applying the *per se* rule. *See Bus. Elecs. Corp. v. Sharps Elecs. Corp.*, 485 U.S. 717, 726 (1988); *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999).

All other contracts and agreements are subject to a rule of reason analysis. A court conducting a rule of reason analysis should consider "all of the circumstances of [the] case," including the nature of the market and market participants involved, in order to determine whether the agreement at issue has an actual adverse effect on competition. *GTE Sylvania*, 433 U.S. at 49.

---

[4] The court in *In re Se. Milk Antitrust Litig.* concluded a similar list of acts "are not manifestly anti-competitive, do not always or almost always tend to restrict competition or decrease output, do not always have an adverse impact on the market and are not, in and of themselves, illegal." *Se. Milk*, 2011 WL 2749587, at *10 (E.D. Tenn. July 14, 2011). Thus, "[t]he essence of plaintiffs' argument . . . is that defendants have used a series of legal, potentially competitive practices to accomplish an unlawful effect on prices and markets." *Id.*

5

Although Plaintiffs characterize some of the conspirators' agreements as *per se* violations of the antitrust laws, their proof in support of this conclusion is decidedly scant.[5] For example, although Plaintiffs allege an unlawful conspiracy to engage in price fixing through Greater Northeast Milk Marketing Association ("GNEMMA")[6] and its predecessors, they do not establish that all price fixing by GNEMMA is unlawful *per se*. This distinction is important because in the absence of *per se* violations, Plaintiffs' claims are subject to a rule of reason analysis:

> Under this test plaintiff bears the initial burden of showing that the challenged conduct has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice. Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.

*Capital Imaging Assocs.*, 996 F.2d at 543. Accordingly, in a rule of reason analysis, Plaintiffs must demonstrate that DFA's and DMS's alleged violations of the Sherman Act had an actual adverse effect on competition as a whole in Order 1.

## IV.   Class Certification Standards.

Plaintiffs, as the parties seeking certification, "bear[] the burden of establishing the existence of all four Rule 23(a) requirements, often referred to as the criteria of 'numerosity, commonality, typicality, and adequacy.'" *Bourlas v. Davis Law Assocs.*,

---

[5] At oral argument, Plaintiffs emphasized that if established, their allegations will demonstrate that DFA and DMS have violated consent decrees, their "core" policies, and their own antitrust guidelines. However, none of these claims is actionable by Plaintiffs, and Plaintiffs do not claim otherwise.

[6] GNEMMA is a common marketing agency formed under the Capper-Volstead Act, 7 U.S.C. § 291 (2006). "The Capper-Volstead Act removed from the proscription of antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978). Accordingly, it grants dairy cooperatives antitrust immunity with regard to price-fixing agreements with other dairy farmers provided the agreement meet certain requirements.

237 F.R.D. 345, 350 (E.D.N.Y. 2006) (citations omitted); *see also* Fed. R. Civ. P. 23(a).[7] If Plaintiffs satisfy this burden, they must also establish that their proposed class action is one of the three types of class action suits identified in Rule 23(b).

A district court must undertake a "rigorous analysis" and "assess all of the relevant evidence admitted at the class certification stage [to] determine whether each Rule 23 requirement has been met[.]" *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 33, 42 (2d Cir. 2006) ("*IPO*"). Class certification requires "significant proof" in support of generalized claims. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). As a result, "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)). Where "significant proof" is lacking, class certification should be denied. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1269 (11th Cir. 2009) (prohibiting courts from being "generous or forgiving" of failures of proof when performing rigorous analysis).

In *IPO*, the Second Circuit held that in order to satisfy the "rigorous analysis" standard, "the district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *IPO*, 471 F.3d at 32-42. It recently summarized the task as follows:

---

[7] Fed. R. Civ. P. 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable [numerosity];
> (2) there are questions of law or fact common to the class [commonality];
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
> (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (quoting *IPO*, 471 F.3d at 41).

The court thus examines each Rule 23(a) requirement to determine whether Plaintiffs have sustained their burden of proof. Only then may it turn to whether Rule 23(b) and (c) have been satisfied.

## V.    Whether Plaintiffs Satisfy Fed. R. Civ. P. 23(a)'s Requirements.

### *Numerosity*

Although there is no rigid test for numerosity, in determining whether a class is so numerous that joinder of all class members is impracticable, joinder is "generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("When class size reaches substantial proportions . . . the impracticability requirement is usually satisfied by numbers alone.").

Here, the proposed settlement class consists of approximately 9,000 dairy farmers, dispersed throughout several states and judicial districts. The court finds that joinder of each of these dairy farmers as a party to this case would be difficult, inconvenient, and expensive, and would unduly complicate and delay the resolution of

this lawsuit. Joinder is thus impracticable, and the numerosity requirement has been satisfied. DFA and DMS do not argue to the contrary.

## *Commonality*

Rule 23(a)(2) requires a party seeking class certification to establish that there are questions of law and fact common to the class. Plaintiffs allege that the commonality requirement is satisfied by common proof of the existence, scope, activities, participants and duration of the alleged conspiracy. As acts in furtherance of the conspiracy, Plaintiffs allege (a) an agreement between DFA and Dairylea to create DMS in order to bring non-DFA members under its control; (b) DFA's purchase of eleven divested bottling plants previously owned by Dean and Suiza, thereby allowing Dean and Suiza to merge; (c) Dean's agreements with DMS and DFA to allow Dean to circumvent Department of Justice safeguards in exchange for Dean's assistance in helping DMS acquire monopoly/monopsony power; (d) market allocation agreements between Agri-Mark, Dean, DFA, and DMS; (e) long-term supply agreements between Dean, DFA, and DMS; (f) actions to force Plaintiffs to market their product through DMS in order to gain access to bottling plants; (g) threatening haulers who worked with independent farmers; (h) cutting off access to bottling plants and boycotting independent dairy farmers; and (j) conspiring to engage in price-fixing and price suppression. (Doc. 117 at 84-86.) They contend that each of these allegedly anticompetitive acts will be established through common proof and that each putative class member "has a common interest in proving the existence, scope, effectiveness and impact of [those] conspirac[ies], as well as the appropriate injunctive and monetary relief to remedy the injury caused by the conspirac[ies]." (Doc. 206 at 20) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996)).

In support of their theory of liability, Plaintiffs rely upon the opinions of their expert witness Gordon Rausser, Ph.D.[8] In his Initial Declaration dated February 1, 2011,

---

[8] Dr. Rausser has a doctorate in the field of Agricultural Economics from the University of California at Davis and has completed post-doctorate studies at the University of Chicago's

Dr. Rausser advanced opinions supported by facts that: (1) Grade A raw milk is the relevant product market and Order 1 is the relevant geographic market; (2) the structure and characteristics of Order 1 are conducive to the conspiracy alleged; (3) there is common evidence that collusion has occurred; and (4) DFA, DMS, and their co-conspirators' actions which are against their own interests may be explained by reference to common proof.

In response, DFA and DMS do not dispute that Plaintiffs can identify some common issues of fact and law with regard to their claims set forth in the Amended Complaint. They nonetheless contend that class certification must be denied on commonality grounds for two reasons.

First, they argue that competitive conditions, milk production, presence of non-conspirator processing plants, and DMS's market share vary so widely across Order 1 that the existence and exercise of monopsony power cannot be established across the entire region by common proof. In support of these arguments, they rely on the April 5, 2011 Expert Report of Joseph P. Kalt, Ph.D.[9] In his report, Dr. Kalt opined, among other

---

Department of Economics and Statistics. He is currently employed at the University of California at Berkeley where he teaches and advises graduate students in the Department of Agriculture and Resource Economics. He has received many awards and professional distinctions, has co-authored numerous publications, and has authored and edited others. He has given trial testimony in thirteen cases in the previous four years and deposition testimony in many others. The court deems him qualified to provide an expert witness declaration in this case, and DFA and DMS do not argue otherwise. Dr. Rausser is also an expert witness for the plaintiffs in the *Southeastern Milk*. The class action in *Southeastern Milk* was recently decertified to the extent it includes current or former members of DFA. *See In re Se. Milk Antitrust Litig.*, 2011 WL 3205798, at *8-9 (E.D. Tenn. July 28, 2011)

[9] Dr. Kalt is a professor of international political economy at the John F. Kennedy School of Government at Harvard University. He is also a senior economist with Compass Lexecon, an economics consulting firm with offices across the United States. His experience includes researching and teaching positions, numerous publications, and trial testimony in state, federal and international courts. He has also provided expert testimony on behalf of the defendants in two ongoing dairy industry antitrust cases. The court finds that for purposes of class certification, Dr. Kalt is qualified to provide an expert opinion. Plaintiffs do not challenge Dr. Kalt's qualifications but point out that he has never opined that a common adverse impact may be shown.

things, that a plausible claim of common class-wide monopolization cannot be established by common proof because: (1) monopsonization is not feasible in unconcentrated markets and the presence of DFA, DMS, and their alleged coconspirators is highly uneven and unstable across Order 1; (2) proposed class members in Order 1 have access to non-conspirators' processing plants; and (3) an anti-farmer conspiracy by farmer owned and operated cooperatives is not plausible. With regard to implausibility, Dr. Kalt points out that Plaintiffs allege:

> [a] complex and novel theory of monopsonization (i.e. buyer monopolization) in which unlawful unilateral and conspiratorial conduct by up to three dozen or more farmer-owned and run dairy cooperatives has been suppressing the prices farmers in the northeastern United States receive for their raw milk for most of the last decade. The complexity and novelty here lies in the claim that so many cooperatives owned and run by farmers have acted to harm the very farmers who own and run those cooperatives.

(Doc. 281-1 at 25).

Although Dr. Kalt may be correct in some of his observations, they do not negate the existence of common facts to establish (or not establish) DFA's and DMS's alleged antitrust violations. Notwithstanding the complexities of a particular market, "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *See NASDAQ*, 169 F.R.D. at 509 (citing cases); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (affirming district court's determination that common proof could be used to prove antitrust violations); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("[w]here an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'"); 7A CHARLES A. WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1781, at 228 (3d ed. 2005) (noting that "whether a conspiracy

exists is a common question"); 6 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON
CLASS ACTIONS § 18.28, at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing
conspiracy is sufficient to establish predominance of common questions.").

Here, Plaintiffs have established that their factual claims against Defendants
alleging antitrust violations, and Defendants' denial of those allegations, will be
determined by reference to the same body of proof. Plaintiffs have thus satisfied the
commonality requirement with regard to establishing the formation, duration and
implementation of the alleged conspiracy.

DFA's and DMS's second challenge to commonality—that Plaintiffs cannot and
have not shown common adverse impact—has greater traction. An essential element of
Plaintiffs' antitrust claims is that the proposed class suffered a common adverse impact
from the alleged antitrust violations. *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629,
634 (D. Kan. 2008) (holding that plaintiffs must establish "that the proposed class
suffered injury from the alleged antitrust violation—an element commonly called
'impact.'"). This element can be "likened to the causation element in a negligence cause
of action. The term means simply that the antitrust violation caused injury to the antitrust
plaintiff." *Alabama v. Blue Bird Body Co. Inc.,* 573 F.2d 309, 317 (5th Cir. 1978).

In support of their theory of common adverse impact, Plaintiffs rely heavily upon
a handful of documents and witnesses that they claim establish that the conspiracy has
lowered milk prices for the entire market and established a uniform milk price for
virtually all dairy farmers in Order 1. The stray statements Plaintiffs cite repeatedly in
support of these claims are less compelling than Plaintiffs claim and are not an adequate
substitute for a cogent theory of common adverse impact. DMS and DMA accurately
identify some of the deficiencies in this proof in Defendants' Response to Plaintiffs'
Post-Argument Supplemental Memorandum on Class Certification (Doc. 355 at 6-8).[10]

---

[10] For example, Plaintiffs assert that Stephen Pyne, a former mid-level DMS executive, testified
that "99% of the members of DFA, Dairylea, and St. Albans receive the same price for their milk
as other members of the same cooperative." (Doc. 355 at 6). However, Mr. Pyne's actual

Plaintiffs more significantly rely upon an analysis of common adverse impact performed by their expert witness Dr. Rausser. Dr. Rausser's common adverse impact opinions in this case elude a simple explanation and have evolved significantly in the course of class certification briefing.[11] The court addresses Dr. Rausser's opinions in accordance with the four iterations Plaintiffs have proffered.

In his Initial Declaration dated February 1, 2011, Dr. Rausser opined that there is common impact on all members of the proposed class, and there is a workable methodology for computing class-wide damages. To support these opinions, he advanced a hypothetical "yardstick" for calculating damages using a regional bench mark "likely consisting of Federal Orders 32 and 33." (Doc. 206-1 at 135). He identified certain variables (which could be found in payroll data or data which is publicly available) that must be considered in determining whether raw Grade A milk prices had been fixed, stabilized or suppressed.[12] "[F]or the purpose of assessing price consistency, [Dr. Rausser] computed the milk price received by individual producers *based only on the reported butterfat, protein, and other solids component prices* available in the payroll database." (Doc. 206-1 at ¶ 222) (emphasis supplied). Dr. Rausser specifically removed "over order premiums" as part of his price comparison, opining that "[t]he

testimony was that only 1% of farmers in Dairylea receive "special deals" or preferential treatment when there is no reason to distinguish them from other dairy farmer members.

[11] Dr. Rausser's Initial Declaration filed February 1, 2011 spanned 131 pages and was supported by 115 pages of exhibits. On June 13, 2011, Dr. Rausser submitted a ninety-five page Rebuttal Declaration, with over 700 pages of exhibits. He has since supplemented his Declaration with a sixteen page Supplemental Declaration dated July 15, 2011 with 273 pages of exhibits.

[12] Some of these variables were identified by Dr. Rausser and include the passage of time and geographic location (to account for structural changes in the relevant market), the regional population under the age of nineteen, the pounds of milk pooled in Order 1, the butterfat percentage of milk, the volume produced per farmer, and Class I utilization rates. At the time of his Initial Declaration, Dr. Rausser's model did "not take into account the potential effect of patronage refunds [which] represent annual credits that cooperatives provide to their members as a means of distributing the cooperative's profits." (Doc. 206-1 at ¶ 242). Dr. Rausser conceded that "[w]hether these 'refunds' can be deemed an additional payment for milk (and thus a potential offset against damages) depends upon the specifics of the program." *Id.*

13

formulaic premiums and deductions that are made available to Northeast farmers . . . are an extremely small part of the overall price and I have seen no evidence to suggest that they are subject to suppression or are in any way different than they would be in the but-for world." (*Id.* at ¶ 236). Dr. Rausser observed that "the announced over order premiums throughout Order 1 were implemented monthly by GNEMMA,"[13] and that although, to date, there was no evidence that this occurred by common agreement in Order 1, there was "clear evidence" of a "unanimous agreement by all processors" in the Southeast region. (Doc. 206-1 at ¶ 219). At the time of his Initial Declaration, Dr. Rausser's theory of common adverse impact remained largely hypothetical. *See id.* at ¶ 241 ("Although this data is not yet complete, it is sufficient to establish that a workable methodology can, in fact, be implemented to measure price suppression and calculate class-wide damages.").

The court cannot rely on the evidence of common adverse impact set forth in Dr. Rausser's Initial Declaration for three reasons. First, as Plaintiffs concede, Dr. Rausser erroneously examined the regulated component prices of raw Grade A milk as the proper unit of price comparison to determine adverse impact. Plaintiffs now claim that the *total price* of raw Grade A milk is the proper unit of comparison and concede that the regulated components pricing *was not impacted* by the alleged conspiracy. *See* Doc. 332-3 at 180; *see also* Doc. 281-6 (Rausser Dep. at 66-67, 78-80, 206). Second, although Dr. Rausser did not examine the impact of the alleged conspiracy on "over order premiums" other than to note that they appeared to have been artificially reduced by GNEMMA, Plaintiffs allege suppression of "over order premiums" as part of their damages. *See* Doc. 332-3 at 180 ("Plaintiffs do, however, contend that the over-order premiums they and all other members of the Class received during the class period were suppressed by virtue of defendants' wrongful conduct[.]"). And third, as acknowledged by Dr. Rausser in his

---

[13] DFA and DMS contend that Plaintiffs and Dr. Rausser misunderstands GNEMMA and that the only premium that GNEMMA as a whole sets is the premium to charge customers for rbST-free raw milk. They contend that GNEMMA does not set "over order" premiums across Order 1. (Doc. 281-8 at 12.)

Initial Declaration, his theory of common adverse impact was merely in the development stage and was not fully articulated.

The court thus turns to whether Dr. Rausser's opinions as set forth in his Rebuttal Declaration, his Supplemental Declaration, or as described in the class certification hearing advance a theory of common adverse impact that can withstand a "rigorous analysis."

In his June 13, 2011 Rebuttal Declaration, Dr. Rausser responded to Dr. Kalt's opinion that there are too many differences in cooperatives' structures, organization, management, degree of vertical integration, and local conditions to conclude that common proof could establish class-wide victimization of proposed class members in Order 1. He asserted that Dr. Kalt ignores real world facts, exaggerates the individualized nature of the industry, and overemphasizes differences in price. However, because DFA and DMS have no obligation to proffer a theory of common adverse impact, the court is more concerned with Dr. Rausser's theory of common adverse impact than Dr. Kalt's. Although Dr. Rausser does not concede that he analyzed the wrong component of price, he states:

> Dr. Kalt criticized the uniformity analysis presented in my Initial Declaration for focusing on the component prices (butterfat, protein and other solids) that comprise the largest portion of the total payment received by proposed Class members. However, when the entire price is analyzed, rather than merely the components, the conclusion remains the same: prices are highly uniform.

(Doc. 312-1 at 79) (footnote omitted).

Similarly, without disclaiming his previous opinion that premiums paid to farmers did not appear to have been significantly impacted by the alleged conspiracy, Dr. Rausser opined that the suppression of over order premiums was a "facilitating mechanism" that results in common impact. (*Id*. at 72). Finally, Dr. Rausser stated that "[i]n response to Dr. Kalt's report, I have performed a regression analysis on the farmer payroll data that has been produced in this case in order to demonstrate that these common factors

15

predominate in the pricing of milk in Order 1." (*Id.* at 92). Dr. Rausser describes his
analysis as follows:

> Covering the time period from 2002 to 2010 and using around 530,000 data
> points, each one corresponding to a farmer's monthly milk deliveries, I
> have separately investigated the common factor regressions for four
> different price variables. The four variables are (i) the gross price; (ii) the
> mailbox price (which is the gross price minus deductions made by the
> cooperative for haulage and so on); (iii) the standardized gross price (which
> standardizes farmer's milk to the same percentage of butterfat, protein and
> other solids); and (iv) the standardized mailbox price (which again
> standardizes farmer's milk to the same percentage of butterfat, protein and
> other solids). . . . I have applied the same multivariate economic model to
> attempt to explain individual variation for each of these four prices, except
> that, when dealing with the two standardized prices, the model disregards
> the farmer's component percentages, since this adjustment has already been
> made. The common factors included in the model for non-standardized
> prices include:

> - Indicators of farm size in terms of total production (to capture the volume
>   incentives in milk pricing);
> - Input costs due to alfalfa hay and diesel;
> - Butterfat, protein and other solids percentages of the farmer's milk;
> - Demand variables, such as State population, proportion of that population
>   under the age of 19 (as more milk is consumed by children) and State per
>   capita income:
> - The Class I Utilization Rate;
> - Indications of whether or not the farmer produces organic or rBST-free
>   milk;
> - The Natural Agricultural Statistics Services reported prices for butter,
>   cheese, dry whey and non-fat dry milk prices, which are used to set Class
>   milk prices;
> - Cooperative and location indicator variables;
> - Seasonality.

(*Id.* at 92-93).

In testing the reliability of his multivariate analysis, Dr. Rausser pointed out that
"[a]n important determinant of the success of the model is its 'explanatory power' as
measured by the R-squared." (*Id.* at 93). R-squared "is a statistical representation of how
much of the variation in prices is accounted for (or 'explained') by the common factors."

*Id.* Dr. Rausser claimed that the "R-squared values for the regressions I have performed range from 89% to 94%." (*Id.* at 94).

On July 8, 2011, DFA and DMS filed the Reply Report of Dr. Kalt. Dr. Kalt noted that Dr. Rausser had offered a series of new opinions in his Rebuttal Declaration, several of which conflicted with his Initial Declaration. In addition, Dr. Kalt pointed out that Dr. Rausser's analysis now focused on the *total price* paid to farmers (including the regulated components). Dr. Kalt opined that the proper unit of comparison was the "market driven premiums," which Dr. Kalt characterized as that portion of the price for raw Grade A milk that was actually responsive to competition and thus susceptible to suppression. Dr. Kalt stressed the fundamental need to focus on the correct unit of comparison and to accurately reflect whether variations in that unit evidenced a common trend.

In response, Dr. Rausser filed a third "Supplemental Declaration" just days before the originally scheduled class certification hearing.[14] In his July 15, 2011 Supplemental Declaration, Dr. Rausser denied that he had offered any new opinions in his Rebuttal Declaration and claimed that he was instead merely correcting Dr. Kalt.[15] Dr. Rausser then proceeded to critique Dr. Kalt's criticism, concluding "Dr. Kalt's approach (relying on univariate analysis, eschewing all price variation as 'too much', and demanding perfection of a price prediction model) would not survive any market or any commodity." (Doc. 332-2 at 17). Dr. Rausser's disclaimer of any new opinions of adverse common impact in his Rebuttal Declaration is problematic because, taken at face value, this would leave the court with the flawed and partially formed opinions in his Initial Declaration.

---

[14] At the parties' request, the class certification hearing was postponed twice.

[15] *See* Doc. 332-2 at 3 ("In his latest report, Dr. Kalt purports to be responding to 'new' analyses appearing four weeks earlier in my rebuttal declaration. This characterization is incorrect. Each and every one of the analyses in my rebuttal was a direct response to a critique advanced by Dr. Kalt in his initial report, and the large majority of them were devoted to correcting Dr. Kalt's own analyses and demonstrating that those analyses (once corrected) do not support his conclusions.").

17

The court thus addresses whether Plaintiffs were able to clarify and reconcile Dr.
Rausser's divergent opinions at the class certification hearing.

At the September 26th class certification hearing, Plaintiffs claimed that Dr.
Rausser's common impact damages theory had become established proof. Indeed,
Plaintffs asserted that "[d]amage results are statistically significant with a 99%
confidence level." *See* Plaintiff's Exhibit 21 (citing Rausser 7/15/11 Supp. Decl. at ¶ 10).
Plaintiffs nonetheless acknowledged that Dr. Rausser had started with the wrong unit of
comparison and that he had initially opined that suppression would be found in the wrong
component of price. *See* Sept. 26, 2011 Tr.; Doc. 358 at 58-59 ("[Dr.] Rausser started by
looking for uniformity in the component price because that's where the suppression was
found in the Southeast. Now what he found during that analysis was that the component
prices in the Northeast—and, in fact, that's not where the suppression was. The
suppression was in the total price, and in particular, in the premiums.").

Moreover, it became clear that Plaintiffs *do* rely upon the opinions offered by Dr.
Rausser in his Rebuttal Declaration as the basis for their theory of common adverse
impact. They argue that Dr. Rausser examined over 500,000 data points (data which Dr.
Rausser characterizes as "unusually robust"), controlled for the approximately nineteen
variables identified in his Rebuttal Declaration, and conducted a "uniformity analysis" to
determine variability in prices paid to farmers. They rely on Dr. Rausser's conclusion
that although some variability in pricing is inevitable, prices paid to farmers exhibit a
high degree of uniformity, and that the coefficient of variation here is "extremely small"
relative to "typical price variation found in the academic literature." In doing so,
Plaintiffs did not attempt to explain why Dr. Rausser's opinions had changed so
significantly, or why he nonetheless maintained that they had not.

At the class certification hearing, DFA and DMS challenged Plaintiffs' theory of
common adverse impact on a number of grounds. First, they questioned the reliability of
an analysis that initially focused on the wrong unit of comparison. Second, they asserted
that because it is undisputed that approximately 85% of milk prices are the product of

regulation that ensures uniformity, it is improper to credit this uniformity to the unlawful conspiracy without targeting that portion of the price that at least could be subject to manipulation. If the analysis examines the competitive premiums earned by dairy farmers, they contend that Dr. Rausser's alleged price uniformity disappears. For example, DFA and DMS point out that from 2002 to 2009, dairy cooperatives operating in Order 1 did not pay uniform premiums to their member dairy farmers, and that not only are premiums not uniform among the alleged coconspirators, they do not even reflect a uniform trend or high correlation. They also argue that there is obvious and substantial geographical dispersion in premiums earned by dairy farmers as evidenced by the counties in which each of the named Plaintiffs are located. They challenge Dr. Rausser's opinion that a 42 cent per cwt difference in premiums is "quite modest" when there is evidence that a 15 cent pay price difference is enough to cause a cooperative to lose or gain members.

With regard to processing plant prices, DFA and DMS argue that Dr. Rausser's data shows variability, not uniformity. Examining prices paid by DMS's plants with those owned by alleged coconspirators and other "fringe" processors, they assert that there are variations as much as $3.00 per cwt.

Finally, DFA and DMS pointed out that any analysis of price suppression is further complicated by the fact that DMS had a significantly lower market share in 2002 and 2003 before St. Albans and Land O'Lakes became affiliated with it, GNEMMA was not created until 2006, and, according to Plaintiffs' own responses to discovery, the members of the alleged conspiracy changed significantly over time which, if Plaintiffs are correct in their allegations, should have had a corresponding impact on prices which Plaintiffs have failed to demonstrate.

Plaintiffs sought to rebut Defendants' challenges by arguing: (1) the vast majority of the raw Grade A milk in Order 1 is supplied through the conspiracy (assuming one accepts Plaintiffs' definition of the multi-membered conspiracy); (2) 80% of processing plant capacity is primarily supplied by conspirators (again, same caveat); (3) 82% of non-

19

pool capacity is primarily supplied by conspirators (same caveat); (4) it is very common in conspiracies for the operations of coconspirators to be unevenly distributed in the relevant market; (5) in most counties, there are zero or one processing facility that is not owned or supplied predominately or exclusively by the coconspirators (same caveat); and (6) the fact that there are county-by-county differences in processors is legally and factually irrelevant, even though Plaintiffs concede that one of their claims is that the conspiracy controlled dairy farmers' access to processing plants.

The parties' competing arguments arguably require the court to delve into the merits of many of Plaintiffs' complex and multi-dimensional allegations regarding how, when, and where the alleged conspiracy operated because Plaintiffs depend upon these allegations in claiming a common adverse impact. Here, the court need not engage in this arduous task because it is confronted with a clear failure of proof.

The Second Circuit has cautioned that Rule 23(a)'s requirements cannot be satisfied by "some showing" based upon an expert report that is not "fundamentally flawed." *See IPO*, 471 F.3d at 40 ("[W]e can no longer continue to advise district courts that 'some showing' of meeting Rule 23 requirements will suffice . . . or that an expert's report will sustain a plaintiff's burden so long as it is not 'fatally flawed[.]'"). Instead, Plaintiffs must adduce "significant proof" of common impact that will withstand a "rigorous analysis." *Id.* at 33, 42; *Falcon*, 457 U.S. at 160. For the following reasons, Plaintiffs have not sustained this burden.[16]

First, although Plaintiffs concede that their expert focused on the wrong component of price, erroneously opined that the impact of the alleged conspiracy would be found in the component pricing, and disclaimed any significant impact of the conspiracy on premiums paid to farmers, Dr. Rausser has repeatedly stated that he has not abandoned the opinions he articulated in his Initial Declaration. Accordingly, Plaintiffs and their expert either have a significant difference of opinion regarding critical

---

[16] The court does not regard this observation as a conclusive determination of the merits of Plaintiffs' causation and damages theory. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

components of Plaintiffs' theory of common adverse impact or the court must rely on Dr. Rausser's fundamentally flawed Initial Declaration. *See IPO*, 471 F.3d at 36 (noting that the Second Circuit has upheld denial of class certification where the expert's opinion was "fundamentally flawed"). If there is a third alternative, Plaintiffs have not identified it.

Second, the court remains unconvinced that the *total* price of milk is what must be examined to determine whether prices have been adversely impacted by the alleged conspiracy.[17] As Dr. Rausser concedes, prices for raw Grade A milk in Order 1 exhibit a high degree of uniformity for reasons that have nothing to do with the alleged conspiracy. *See* Doc. 312-1 at 98 ("In conclusion, milk pricing in Order 1 is highly uniform due to both the homogeneous nature of the product and the regulated structure of the industry."). To focus solely on total price may thus reflect a uniformity that is largely the product of regulation, and not necessarily the product of a conspiracy to suppress prices. Dr. Kalt opines that Dr. Rausser has examined the wrong component of price and that any analysis of common adverse impact must focus on the market driven premiums. In response to this criticism, Plaintiffs assert that "[a]s Dr. Rausser has made clear, even when the regression analysis focuses on the 'total price paid *minus* the Federal Order Uniform Price,' its explanatory power 'is still extremely high by professional standards.'" (Doc. 357 at 7 (citing Rausser July 15, 2011 Supplemental Decl. ¶ 9 and n.14; Plaintiffs' Reply Memorandum at 10 (citing *Reference Manual on Scientific Evidence* (2d ed.) (Federal Judicial Center, 2000)). However, this is yet another opinion by Dr. Rausser that leaves in question the proper unit of comparison.

Third, because one of the central tenets of Plaintiffs' claims is that the alleged conspiracy controlled dairy farmers' access to processing plants, forcing them to join cooperatives against their will in order to gain access to those plants, Plaintiffs should be expected to set forth a theory of common adverse impact that takes into consideration the existence or non-existence of non-conspirator processing plants. Dr. Rausser's Initial

---

[17] The court acknowledges that Plaintiffs need not prove their entire case to the court in order to obtain class certification, however, they must show that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established[.]" *IPO*, 471 F.3d at 41.

Declaration did not address this variable and Plaintiffs, themselves, appear to address it only as an afterthought. *See* Doc. 354 at 10 ("Moreover, the only factor even hypothesized by Defendants as potentially biasing the result (the presence of non-conspirator processors in a county) can easily be accounted for in the regression and has no relevant impact on the results.") (citing Rausser July 15, 2011 Supplemental Decl. at ¶¶ 5, 12 & n.19).

Finally, neither Plaintiffs nor Dr. Rausser adequately address whether the final iteration of their theory of common adverse impact reflects the return on investment some dairy farmers may experience through joining cooperatives that own their own processing plants and return profits to their members based upon processing activities. DFA and DMS characterize this variable as dairy farmers who "benefited . . . or broken even" (Doc. 281-8 at 8) from the alleged price suppression.[18]

In response, Plaintiffs argue that they need only demonstrate that *a* common injury occurred, not the amount of injury suffered by each class member. *See In re Urethane Antitrust Litig.*, 251 F.R.D. at 638 (in deciding class certification motion, "the issue in the common impact analysis is the *fact*, not the amount of, injury.") (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995)). They further argue that whether

---

[18] DFA and DMS more specifically describe the issue as follows:

> Moreover, the very economic theory of Plaintiffs' case precludes any claim of commonality. Plaintiffs insist that the suppression of farmers' prices resulted in supra-competitive profits for conspiring milk processors—by paying less for raw milk, processors were able to increase their margins and profits. But there are thousands of putative class members—e.g., the farmers who belong to the Agri-Mark coop in Vermont, and to the Upstate/Niagara coop in New York—whose cooperatives own their own milk processing plants, such that whatever profits those plants generate are returned to the coops' dairy farmer members. Depending on the extent to which their coops are vertically integrated into owning plants, these farmers would have *benefited* from the price suppression alleged by Plaintiffs (e.g., if their coops are net buyers of raw milk), or *broken even* (e.g., if their coops simply processed the milk produced by their farmers). Only by examining these farmers' individual circumstances can the impact of alleged antitrust violations, *if any*, be determined.

(Doc. 281-8 at 8).

22

some members of the proposed class may have received some benefit from a particular anticompetitive activity is factually and legally irrelevant. However, the court's concern is more subtle. A central tenet of Plaintiffs' Amended Complaint is that "[t]hrough acquisitions, mergers, supply agreements and closures of competitors' processing plants, Defendants secured control of the raw Grade A milk processing market in the Northeast" in order to "force independent dairy cooperatives and independent dairy farmers to join DFA or market their milk through DMS." (Doc. 117 at ¶ 84). Through Dr. Rausser, Plaintiffs proffer a regression analysis which they claim controls for all of the variables that may affect price. They further assert that they have gone beyond theory to established proof, and that "[d]amage results are statistically significant with a 99% confidence level." *See* Plaintiff's Exhibit 21. Dr. Rausser's formula, however, does not appear to account for any difference in the impact the alleged conspiracy may have had on dairy farmers whose cooperatives own their own processing plants versus dairy farmers whose cooperatives do not. In his Initial Declaration, Dr. Rausser recognized that profits distributed to cooperative members may be important in analyzing "price" but noted that his model did not take this into consideration. *See* Doc. 206-1 at ¶ 242. His subsequent opinions also do not appear to adequately reflect this variable. It thus seems premature to declare Plaintiffs' theory of common adverse impact not only finalized but conclusively proven.

In summary, although Dr. Rausser's multivariate regression analysis may ultimately prove to be an acceptable means of analyzing causation and damages in this case, the court cannot find it is presently sufficient to perform this task because too many uncertainties remain regarding what component of price is being analyzed and how. For purposes of class certification, the court thus finds that under Rule 23(a)(2), Plaintiffs have not sustained their burden of proffering "significant proof" that causation and damages may be established by common proof. *See Falcon*, 457 U.S. at 160 (class certification requires "significant proof" in support of generalized claims).

Whether, at this stage of the proceedings, Plaintiffs can ultimately prove common impact through Dr. Rausser's regression analysis does not end the court's class certification inquiry. The court has previously found that Plaintiffs' allegations regarding the conspiracy's formation, participants, duration and implementation are likely to be demonstrated by common proof. *See NASDAQ*, 169 F.R.D. at 509. Rule 23(a)(2) requires only that there be "questions of law or fact common to the class." "This requirement is not quantitative in nature; that is, it is possible to satisfy Rule 23(a)(2) where only a single issue is common to the members of the proposed class, as long as resolution of that issue will advance the litigation." *Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 624-25 (S.D.N.Y. 2010). Here, there are sufficient common questions of fact and law to satisfy the requirements of Rules 23(a)(2).

The court, *sua sponte*, noted the possibility of certifying some, but not all issues, for resolution on a class action basis. *See Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (holding a district court may certify a class as to specific issues even if it cannot do so with regard to the entire claim); *see also* MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.24 (issue classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action."). Both parties, however, ask the court not to certify the class only as to certain issues as this may create more issues than it resolves. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) ("[I]n this case, given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy.") (internal quotations and citation omitted), *abrogated in part by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The court is thus left with the conclusion that while Plaintiffs have satisfied the commonality requirement with regard to the conspiracy's formation, duration and implementation, class certification on those issues is not requested.

In the event Plaintiffs seek to re-file their motion for class certification at a later date and to facilitate appellate review, the court addresses the remaining Rule 23(a) requirements.

***Typicality***

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class. This requirement is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation and quotation marks omitted).

"[C]laims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement" because typicality "in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (citation and internal quotation marks omitted). Accordingly, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

Here, Plaintiffs' proposed class representatives are all dairy farmers who have produced and pooled raw Grade A milk in Order 1 at some point during the alleged conspiracy. For purposes of typicality, the named Plaintiffs and the proposed class share a common interest in establishing that DFA and DMS committed the alleged antitrust violations, even if some members of the proposed class do not object to those activities. *See Eisen v. Carlisle & Jacquelin*, 391 F.2d at 562 (lack of opposition to defendant's

practices from some class members is irrelevant to class certification); *Jacobi v. Bache & Co., Inc.* 1972 WL 560, at \*2 (S.D.N.Y. Feb. 8, 1972) (because the "object of an anti-trust action is the restoration of competition to the industry involved: the fact that some members of the class may differ as to the desirability of a particular remedy for the anti-trust violation, or even desire the maintenance of the status quo" does not prevent class certification); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 127, 141 n.49 (D. Me. 2006) (instructing court to certify class despite "disapproval of the action by some class members"). It is thus well-established that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

Plaintiffs' claims in this case thus meet the typicality requirement of Rule 23(a)(3) to the extent they address the formation, duration, and implementation of the alleged conspiracy. The court does not, at this time, find that Plaintiffs' causation and damages claims meet the typicality requirement as it has found insufficient proof of a theory of common adverse impact.

### *Adequacy*

Rule 23(a)'s adequacy requirement asks whether the class representatives will fairly and adequately protect the interests of the class. "Two factors generally inform whether class representatives satisfy the Rule 23(a)(4) requirement: "(1) absence of conflict and (2) assurance of vigorous prosecution." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.22, at 3-126 (3d ed. 1992)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). This inquiry focuses on "uncovering 'conflicts of interest between named

parties and the class they seek to represent.'" *Flag*, 574 F.3d at 35 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

A conflict must be "fundamental" to violate Rule 23(a)(4). *See Flag*, 574 F.3d at 35; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1768 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."). In instances when a fundamental conflict does exist, the court may cure the conflict by dividing the class into separate "homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011) (same).

DFA and DMS characterize the potential subclasses in this case as follows:

> [F]armers who belong to cooperatives associated with [DMS]; the farmers who have joined cooperatives with no association with DMS (such as Lanco, Fingerlakes Cooperative, and Producers Cooperative); the farmers who have chosen not to join *any* cooperative, but who market their milk independently to plants that have no connection to DMS; the farmers who have chosen to join cooperatives (such as Agri-Mark and Upstate Niagara) that have invested heavily in milk processing plants (the beneficiaries of any allegedly lower prices for raw milk); and the farmers who have chosen to join cooperatives (such as Dairylea) that have minimal, if any, investment in plants.

(Doc. 281-8 at 6). Although DFA and DMS correctly assert that these subgroups of dairy farmers do not share identical interests in the litigation, the only *conflict* they identify is between farmers who are part of DMS and farmers who are not. *See* Doc. 281-8 at 7 ("It could not be clearer that the farmers who ultimately own, fund and support DMS have fundamentally different interests than those outside of DMS who would like to take opportunities, customers, and dollars away from them.").

As they further point out, however, because Plaintiffs seek not only a significant damages award against DFA and DMS, but ask the court to grant injunctive relief that

would fundamentally alter how those entities do business, there is also a potential conflict between those who support and benefit from the activities of DFA and DMS, and those who do not.[19] In support of this claim, DFA and DMS have filed sworn declarations from nearly two dozen dairy farmers who assert that because they use DMS to bring their milk to market and seek to continue to do so, their interests are not aligned with dairy farmers who do not. These dairy farmers oppose both this lawsuit and the relief that it requests.[20] DFA and DMS cite *Pickett* as instructive of how this conflict must be resolved.

In *Pickett*, the trial court certified a class which included all cattle producers who sold feed cattle to the defendants on the spot market, as well as all cattle producers who have or previously had contracts and marketing agreements with the defendants. The plaintiffs in *Pickett* alleged that the contracts and marketing agreements allowed defendants to "depress the market at strategic times in order to force producers to accept artificially low prices[.]" *Id.* at 1278. In reversing the certification decision, the Eleventh Circuit concluded that the adequacy requirement of Rule 23(a)(4) was not satisfied because of a conflict within the class. *See id.* at 1280 ("Thus, a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."). The Eleventh Circuit further observed that the plaintiffs sought injunctive relief which would have prohibited defendants from using purchasing arrangements in the future, thereby imposing a restriction on the way defendants conducted business. *Id.* The court

---

[19] Plaintiffs assert that the facts before the court are no different than those considered by the court when it certified a settlement class for the purposes of the Dean Settlement. However, no member of the Dean Settlement Class could be said to occupy the status of both plaintiff and quasi-defendant. Here, individual dairy farmers including dairy farmer members of DMS would be pursuing relief against dairy farmer-owned DMS.

[20] With regard to the Dean Settlement, only a few dairy farmers opposed Dean's proposal to pay $30 million in order to settle all claims against it in this lawsuit.

concluded that "under these circumstances, the [p]laintiffs could not possibly provide adequate representation" to the class as whole. *Id.*[21]

In this case, Plaintiffs seek monetary relief which, if awarded, must be paid by DFA and DMS and, in turn, paid to some extent by their members. Plaintiffs further seek injunctive relief that will materially transform the manner in which DFA and DMS do business.[22] As a result, DFA's and DMS's members may suffer harm which will not be shared by each of the proposed class representatives.

Contrary to Plaintiffs' assertions, it is not enough to assume that all members of the class will ultimately benefit if the practices in Order 1 are materially altered. Certainly those members of DFA and DMS who contend that their organizations engage in lawful and beneficial activities on their behalf cannot be said to have their interests adequately represented by parties that seek to financially recover from, punish, and prohibit those very same activities.

Pursuant to Rule 23(a)(4), the named plaintiffs must "possess the same interest[s] and suffer the same injur[ies] as the class members." *Amchem,* 521 U.S. at 625-26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Here, the interests of the class clearly diverge, and the proposed class representatives cannot adequately represent all members of the class. There is thus a fundamental conflict within the proposed class created by Plaintiffs' request for injunctive and monetary relief

---

[21] As Plaintiffs point out, on remand in *Pickett*, the District Court certified a narrower class than that proposed by the plaintiffs to address the conflict. *Pickett v. IBP, Inc.*, 2001 WL 34886460 at, *10-11 (M.D. Ala. Dec. 26, 2001). A similar result is warranted here.

[22] As the court in *Southeastern Milk* found, Plaintiffs' challenges to DFA's full supply agreements pose a clear conflict because "injunctive relief preventing DFA and other Defendants from entering into full supply agreements is something at the very heart of plaintiffs' claims," and yet some DFA farmers claim "[t]he DFA supply agreements at issue in this case have guaranteed farmers a stable, secure and needed market for their raw milk, something especially essential to staying in business, especially for farmers in surplus areas and small farmers." *Se. Milk*, 2011 WL 3205798, at *3-4.

which will adversely impact members of DFA and DMS while benefitting other members of the proposed class.[23]

Finding a fundamental conflict with regard to both the monetary and injunctive relief sought, the court must determine whether any conflict may be addressed by certifying subclasses as opposed to denying class certification entirely. In this case, adequacy of representation may be accomplished by certifying subclasses that consist of dairy farmers: (1) who belong to DFA and DMS; and (2) those who do not, with "separate representation [for each subclass] to eliminate conflicting interests of counsel." *Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 249-50; *see also Se. Milk*, 2011 WL 3876531, at *4. As the Amended Complaint does not seek monetary or injunctive relief against alleged coconspirators who are not defendants in this lawsuit, no further subclasses appear to be warranted.

Having determined that a condition precedent to class certification is the creation of a subclass with separate counsel, the court proceeds no further in analyzing whether Rule 23(a)(4)'s remaining requirements have been satisfied.

The court also does not determine whether Rule 23(b)'s requirement that common questions of law and fact predominate over individual questions have been met. Such an analysis would be premature in light of the court's denial of class certification on Rule 23(a)(2) grounds.

---

[23] The court in *Southeastern Milk* properly framed (and answered) the dispositive question as follows:

> Is there proof that the interests of the nominal plaintiffs are in conflict with, or antagonistic to, the interests of the DFA members of the class? In other words, are DFA members of the class entitled to class representatives who share their interests when making decisions about whether to invalidate business practices and seek a money judgment from the cooperative? On the current state of the record, the Court concludes that the answer to both question is "yes."

*Se. Milk*, 2011 WL 3205798, at * 7.

30

## CONCLUSION

For the foregoing reasons, the court DENIES WITHOUT PREJUDICE Plaintiffs'
motion for class certification (Doc. 206).

Dated at Rutland, in the District of Vermont, this 9th day of December, 2011.

Christina Reiss, Chief Judge
United States District Court