UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV 19   AM 9: 46

CLERK
BY_____
DEPUTY CLERK

| | |
|---|---|
| ALICE H. ALLEN, LAURANCE E. ALLEN, <br> d/b/a Al-lens Farm, GARRET SITTS, <br> RALPH SITTS, JONATHAN HAAR and <br> CLAUDIA HAAR, on behalf of themselves <br> and all others similarly situated, <br><br>         Plaintiffs, <br><br>        v. <br><br> DAIRY FARMERS OF AMERICA, INC., and <br> DAIRY MARKETING SERVICES, LLC, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  Case No. 5:09-cv-230 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION AND ORDER GRANTING PLAINTIFFS' RENEWED
## MOTION FOR CLASS CERTIFICATION
(Doc. 388)

This matter came before the court on July 12, 2012 for a hearing on Plaintiffs'
Renewed Motion for Class Certification (Doc. 388). Plaintiffs Alice H. Allen and
Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts, and Jonathan and
Claudia Haar (collectively, "Plaintiffs") ask the court to certify a class and subclasses to
pursue the allegations contained in Plaintiffs' Amended Complaint on a class action
basis. They contend that they have met all of the requirements of Fed. R. Civ. P. 23, and
that a class action is the most appropriate and desirable vehicle for resolving this lawsuit.

Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing
Services, LLC ("DMS") (collectively, "Defendants"), contend that Plaintiffs have failed
to address the issues identified by the court in its previous denial of class certification
and, in particular, contend that Plaintiffs' proposed subclasses do not resolve the
identified conflict and Plaintiffs remain unable to establish that putative class members

and subclass members suffered the same antitrust injury through a common body of proof.

The parties have advised the court that their pending motions to exclude and to strike need not be resolved prior to the court's addressing Plaintiffs' renewed class certification motion.

## I.      The Amended Complaint.

Plaintiffs' Amended Complaint alleges five causes of action: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act;[1] (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act;[2] and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act.  Plaintiffs allege that Defendants engaged in a wide-ranging conspiracy at both the processor and cooperative levels to fix, stabilize, and artificially depress prices for raw Grade A milk and to allocate markets within Federal Milk Market Order 1 ("Order 1") among the co-conspirators.

---

[1] Section 2 of the Sherman Act makes it an offense to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States[.]" 15 U.S.C. § 2.  Section 2 "forbids both monopolization and attempted monopolization." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998).  In order to establish a § 2 violation for completed monopolization, a plaintiff must show that the defendant: "(1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power." *Id.* (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71(1966)).  "[A]n action under section 2 of the Sherman Act for attempting to monopolize a market will lie only where there is anticompetitive conduct, a specific intent to monopolize *and* a dangerous probability that monopoly will be achieved." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 791 (2d Cir. 1987).

[2] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" 15 U.S.C. § 1.  To establish a claim under § 1, a plaintiff must show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade[.]" *Tops Mkts., Inc.*, 142 F.3d at 95-96.

Plaintiffs seek monetary damages in an amount which "represent[s] the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged." (Doc. 117-1 at 83.) Plaintiffs further seek treble damages under Section 4 of the Clayton Act. 15 U.S.C. § 15.

In addition to their request for monetary relief, Plaintiffs seek injunctive relief. Through the course of discovery, they have modified their request for relief to focus on conduct found by the court or a jury to be illegal. This materially alters their previous claims for injunctive relief which were significantly broader and prompted some dairy farmers' opposition to this lawsuit.

## II.    Plaintiffs' Proposed Class Action.

Plaintiffs' proposed product market is raw Grade A milk. Their proposed geographic market is Order 1 covering areas in Connecticut, Delaware, the District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia. Plaintiffs define the proposed class as follows:

> All dairy farmers, whether individuals, entities or members of cooperatives, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present. Defendants and Defendants' Coconspirators are excluded from the Class.

(Doc. 206 at 16.) They identify Defendants' co-conspirators as: Dean Foods ("Dean"), HP Hood LLC ("Hood"), National Dairy Holdings ("NDH"), Farmland Dairies LLC ("Farmland"), Kraft, Dairylea Cooperative, Inc. ("Dairylea"), St. Albans Cooperative Creamery, Inc. ("St. Albans"), Agri-Mark, Inc. ("Agri-Mark"), Land O'Lakes, Inc. ("LOL"), and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA").

In their renewed motion for class certification, Plaintiffs ask the court to certify the following subclasses:

1.   All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who

3

are members of DFA or otherwise sell milk through DMS ("DFA/DMS subclass"); and

2. All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who are not members of DFA and do not otherwise sell milk through DMS ("non-DFA/DMS subclass").

Each of the proposed subclasses excludes officers and directors of the Defendants and their alleged co-conspirators.

Plaintiffs request that the following individuals be named class representatives:

(1) Plaintiffs Alice H. Allen and Laurance E. Allen who do business as the Al-lens Farm, which is located in Wells River, Vermont. From January 1, 2002 to present, Al-lens Farm sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1;

(2) Plaintiffs Ralph Sitts and Garret Sitts who, as part of a partnership, operate a dairy farm in Franklin, New York. Their dairy farm was a member of DFA from 1998 until 2007. From January 1, 2002 to present, their partnership sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1; and

(3) Plaintiffs Jonathan Haar and Claudia Haar, who operate a dairy farm in West Edmeston, New York. Their dairy farm has been a member of DFA from 2000 to the present. From January 1, 2002 to present, their dairy farm sold, through DMS, raw Grade A milk to raw Grade A milk processing plants in Order 1.

Plaintiffs request that Jonathan and Claudia Haar and Richard Swantak, an independent dairy farmer who markets his milk in Order 1 through DMS, be named class representatives of the proposed DFA/DMS subclass, and that Alice and Laurance Allen and Ralph and Garrett Sitts, be named class representatives of the proposed non-DFA/DMS subclass.

## III.   Class Certification Standards.

Plaintiffs, as the parties seeking certification, "bear[] the burden of establishing the existence of all four Rule 23(a) requirements, often referred to as the criteria of 'numerosity, commonality, typicality, and adequacy.'" *Bourlas v. Davis Law Assocs.*,

237 F.R.D. 345, 350 (E.D.N.Y. 2006) (citations omitted); *see also* Fed. R. Civ. P. 23(a).[3] "When appropriate, a class may be divided into subclasses that are each treated as a class under [Fed. R. Civ. P. 23]. Fed. R. Civ. P. 23(c)(5). If Plaintiffs satisfy the requirements of Rule 23(a), they must also establish that their proposed class action is one of the three types of class action suits identified in Rule 23(b).

A district court must undertake a "rigorous analysis" and "assess all of the relevant evidence admitted at the class certification stage [to] determine whether each Rule 23 requirement has been met[.]" *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 33, 42 (2d Cir. 2006) ("*IPO*"). Class certification requires "significant proof" in support of generalized claims. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 159 (1982). As a result, "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)). Where "significant proof" is lacking, class certification should be denied. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1269 (11th Cir. 2009) (prohibiting courts from being "generous or forgiving" of failures of proof when performing rigorous analysis).

In *IPO*, the Second Circuit held that in order to satisfy the "rigorous analysis" standard, "the district judge must receive enough evidence, by affidavits, documents, or

---

[3] Fed. R. Civ. P. 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable [numerosity];
> > (2) there are questions of law or fact common to the class [commonality];
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
> > (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

testimony, to be satisfied that each Rule 23 requirement has been met." *IPO*, 471 F.3d at 41. The court thus examines each Rule 23 requirement to determine whether Plaintiffs have sustained their burden of proof.

### A.    Fed. R. Civ. P. 23(a) Requirements.

#### Numerosity

Although there is no rigid test for numerosity, in determining whether a class is so numerous that joinder of all class members is impracticable, joinder is "generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("When class size reaches substantial proportions . . . the impracticability requirement is usually satisfied by the numbers alone.").

Here, the proposed settlement class consists of approximately 9,000 dairy farmers, dispersed throughout several states and judicial districts. The court finds that joinder of each of these dairy farmers as a party to this case would be difficult, inconvenient, and expensive, and would unduly complicate and delay the resolution of this lawsuit. Joinder is thus impracticable, and the numerosity requirement has been satisfied. This remains true with regard to the proposed subclasses which are anticipated to encompass over one thousand dairy farmers each. Defendants do not argue to the contrary.

#### Commonality & Typicality

Rule 23(a)(2) requires a party seeking class certification to establish that there are questions of law and fact common to the class and subclasses. Rule 23(a)(3) requires Plaintiffs' claims to be typical of the class.

"Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996); *In re Dynamic Random*

*Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006) ("[w]here an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'").

Typicality is satisfied when class members' claims arise from the same course of events and reflect the same legal theories. *See In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) ("In this case, the named Plaintiffs' claims are typical because Plaintiffs must prove a conspiracy, its effectuation, and damages therefrom -- precisely what the absent class members must prove to recover.").

In denying Plaintiffs' initial request for class certification, the court found that Plaintiffs could establish commonality and typicality with regard to their allegations regarding the existence of antitrust violations, but concluded they had not established commonality and typicality with regard to antitrust injury because there were too many uncertainties and inconsistencies in their expert witness's analyses of the alleged price suppression, including an inconsistent unit of comparison.[4]

In renewing their class certification motion, Plaintiffs contend that the unit of comparison for determining the alleged conspiracy's price suppression is "farmer premiums" which they calculate by subtracting the USDA uniform price from the total price received by each farmer for each month for 568,367 paychecks of Order 1 dairy

---

[4] *See Allen v. Dairy Farmers of America, Inc.*, 2011 WL 6148678, at *13 (D. Vt. Dec. 9, 2011) (concluding that "although Dr. Rausser's multivariate regression analysis may ultimately prove to be an acceptable means of analyzing causation and damages in this case, the court cannot find it is presently sufficient to perform this task because too many uncertainties remain regarding what component of price is being analyzed and how.").

farmers. They contend that premiums are generally not separately identified in farmers' paychecks and thus the total price must also be considered. They point out that processors must pay either a USDA minimum class price plus any premiums to cooperatives or a uniform blend price plus any premiums to independent farmers.

Plaintiffs further seek to prove that during the relevant time period, Defendants and their alleged co-conspirators controlled most of the milk transactions in Order 1 and that Order 1's market structure enhanced the conspiracy's ability to achieve price suppression. They point out that milk is a fungible product for which the supply is inelastic meaning that it responds slowly and insubstantially to fluctuations in price. Because raw Grade A fluid milk is brought to market through the practice of "pooling," price uniformity is further increased. They contend these market factors contributed to Defendants' ability to exercise monopsony power. Through the analyses of their expert Gordon Rausser, Ph.D., they contend that they can establish that the presence of non-conspiring processing plants in the market and cooperatives with their own processing plants were not material obstacles to the alleged conspiracy's price suppression.

Plaintiffs further seek to establish that Defendants and their alleged co-conspirators exercised market control through the use of, among other things, price monitoring and controls and most-favored nations pricing.[5] They contend that Dr. Rausser's multivariate analyses will be able to establish price suppression using common proof for all members of the class and subclasses.

Proof at trial of these allegations will be derived from a common body of evidence and will present common and typical issues of fact and law. For purposes of class certification, Plaintiffs have established "commonality" and "typicality" for their class and proposed subclasses. The more demanding standard of "predominance" must be satisfied under Rule 23(b).

---

[5] Plaintiffs allege the most favored nation pricing consisted of DFA/DMS supply and outsourcing agreements that require that prices paid to milk processors not exceed the lowest price charged to any other processor in the area.

### *Adequacy*

Rule 23(a)(4)'s adequacy requirement asks whether the class representatives will fairly and adequately protect the interests of the class. "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *Falcon*, 457 U.S. at 157, n.13).

In *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir. 1968), the Second Circuit framed the issue as follows:

> What are the ingredients that enable one to be termed "an adequate representative of the class?" To be sure, an essential concomitant of adequate representation is that the party's attorney be qualified, experienced and generally able to conduct the proposed litigation. Additionally, it is necessary to eliminate so far as possible the likelihood that the litigants are involved in a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the class.

*Eisen*, 391 F.2d at 562. The *Eisen* court explained that "adequacy" must be evaluated consistent with recognition of the fact that "one of the primary functions of the class suit is to provide 'a device for vindicating claims which, taken individually, are too small to justify legal action but which are significant size if taken as a group.'" *Eisen*, 391 F.2d at 563 (quoting *Escott v. Barchris Construction Corp.*, 340 F.2d 731, 733 (2d Cir. 1965)). "Individual claimants who may initially be reluctant to commence legal proceedings may later join in a class suit, once they are assured that a forum has been provided for the litigation of their claims." *Id.* The Second Circuit found that it would work an injustice to apply the requirement of "adequacy" in too limited a manner: "But to dismiss a class suit in its incipiency before claimants have been given an effective opportunity to join would be a disservice to the class action as envisioned in the new rule. Indeed, we hold that the new rule should be given a liberal rather than a restrictive interpretation." *Id.*

Two factors generally inform whether class representatives satisfy the Rule 23(a)(4) requirement: (1) absence of conflict and (2) assurance of vigorous prosecution. 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.22, at 3-126 (3d ed. 1992)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). This inquiry focuses on "uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Flag*, 574 F.3d at 35 (quoting *Amchem Products*, 521 U.S. at 625. In other words, the named plaintiffs must "possess the same interest[s] and suffer the same injur[ies] as the class members." *Amchem Products, Inc.*, 521 U.S. at 625-26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

A conflict must be "fundamental" to violate Rule 23(a)(4). *See Flag*, 574 F.3d at 35; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1768 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.").

When a fundamental conflict exists, the court may often cure the conflict by dividing the class into separate "homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011) (same).

In opposing Plaintiffs' initial request for class certification, Defendants argued that there was a conflict between dairy farmers who are part of DMS and dairy farmers who are not. *See* Doc. 281-8 at 7 ("It could not be clearer that the farmers who ultimately own, fund and support DMS have fundamentally different interests than those outside of DMS who would like to take opportunities, customers, and dollars away from them."). In

light of the sweeping nature of the injunctive relief requested in Plaintiffs' Amended Complaint, the court agreed. *See Allen*, 2011 WL 6148678, at *16 (finding that Plaintiffs "seek injunctive relief that will materially transform the manner in which DFA and DMS do business" and concluding that "DFA's and DMS's members may suffer harm" from the proposed relief). The court noted that, in particular, Plaintiffs' request for injunctive relief initially included a request that the court prevent Defendants from entering into full supply agreements which some dairy farmers found beneficial. *Id.* at *16 n.22.

In renewing their request for class certification, Plaintiffs have addressed the court's concerns in two ways. First, they have amended and limited their request for injunctive relief to a request that the court enjoin only that conduct which the court or a jury finds illegal. Second, they propose two subclasses with independent counsel so that class members have class representatives and class counsel that represent any divergent interests.[6] Plaintiffs contend that there is now no intra-class conflict with their requested relief because if they establish antitrust violations in Order 1 that resulted in price suppression for dairy farmers, all class members will benefit from such a finding and from any monetary judgment awarded as compensation for those antitrust violations.

Despite Plaintiffs' proposed subclasses, Defendants oppose Plaintiffs' renewed request for class certification for several reasons. First, they contend that the proposed subclasses cannot cure the conflict, but merely ignore it, because a "substantial" number of DFA and DMS members still oppose the lawsuit. They proffer affidavits from fifteen dairy farmers (which overlap to some extent with the twenty affidavits proffered in their initial opposition) who market their milk through DMS and who find the conduct challenged in this lawsuit beneficial to them and to the market. These dairy farmers oppose class certification and object to their proposed class representatives.

"A class action should not be denied merely because every member of the class might not be enthusiastic about enforcing his rights." *Eisen*, 391 F.2d at 563 n.7.

---

[6] Plaintiffs point out that the court in *In re Se. Milk Antitrust Litig.*, 2012 WL 1981511 (E.D. Tenn. June 1, 2012) has designated similar subclasses.

11

Moreover, Plaintiffs' modification of their request for injunctive relief to focus on conduct which either the court or a jury finds illegal itself negates some dairy farmers' objections because these putative class members should not be heard to complain that the court has ordered the discontinuation of illegal conduct even if they find such conduct beneficial and would like to preserve the status quo. *See Jacobi v. Bache & Co.*, 1972 WL 560, at *2 (S.D.N.Y. Feb. 8, 1972) ("The object of an anti-trust action is the restoration of competition to the industry involved: the fact that some members of the class may differ as to the desirability of a particular remedy for the anti-trust violation, or even desire the maintenance of the status quo, does not preclude their being included within the class bringing the action.").

The remaining conflict Defendants identify is not between dairy farmers who may have divergent interests in this lawsuit but between DFA/DMS members who want to pursue this litigation and DFA/DMS members who do not.  Those who do not want to participate in this lawsuit would presumably agree that *no* class representative is suitable to pursue this litigation on their behalf.  If that objection were permitted to preclude class certification "any class representative would be inadequate simply because there may be some class members who do not wish to participate in this case or assert claims against the Defendants." *French v. Essentially Yours Indus., Inc.*, 2008 WL 2788511, at *6 (W.D. Mich. July 16, 2008).

To the extent dairy farmers do not wish to participate in this lawsuit, they will not be forced to do so. *See* Fed. R. Civ. P. 23(c)(2) (upon certification of a class action, the notice to class members must "clearly and concisely state in plain, easily understood language . . . that the court will exclude from the class any member who requests exclusion [and] the time and manner for requesting exclusion[.]"); *see also Eisen*, 391 F.2d at 563 ("Absent class members will be able to share in the recovery resulting in the event of a favorable judgment, and, if they wish to avoid the binding effect of an adverse judgment they may . . . disassociate themselves from the case.").

The court previously determined that the conflict in this case may be addressed by certifying subclasses that consist of dairy farmers: (1) who belong to DFA/DMS; and (2) those who do not, with "separate representation [for each subclass] to eliminate conflicting interests of counsel." (Doc. 361 at 30) (citing *Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 249-50; *Se. Milk*, 2011 WL 3876531, at *4 (E.D. Tenn. Aug. 31, 2011)). In this respect, DFA/DMS dairy farmers who choose to remain members of the class will have their own class representatives and class counsel. *See Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1239 (9th Cir. 1998) (ruling that "the addition of new and impartial counsel can cure a conflict of interest even where previous counsel continues to be involved in the case.").

Proposed class representatives, Jonathan and Claudia Haar, are familiar with this lawsuit and have demonstrated a consistent level of vigorous and competent participation in it. Although Defendants point to several DMS dairy farmers who disagree with Mr. Haar's views, they constitute a small fraction of the proposed class. Under *Eisen*, it would be improper to deny the vast remainder of the class the opportunity to decide whether to participate in this lawsuit because some putative class members object to his representation. *See Eisen*, 391 F.2d at 563 (observing that "the representative party cannot be said to have an affirmative duty to demonstrate that the whole or a majority of the class considers his representation adequate.").

Proposed class representative Richard Swantak is an independent farmer who markets his milk through DMS. Although he has not previously participated in this lawsuit, he is ready, willing, and able to do so and has a general understanding of his proposed role, the allegations in the lawsuit, and the nature of the relief sought. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61-62 (2d Cir. 2000) (proposed class representative who was only eighteen years old and who was alleged to have demonstrated a vague and incomplete recall of the issues held proper class representative because he had sufficient knowledge to "protect the interests of the class" and "he understood the nature of his proposed role in the litigation and demonstrated his

willingness to carry it forward."). Mr. Swantak's alleged lack of familiarity with the full scope of Plaintiffs' allegations and requested relief may be rectified by conferring with the experienced counsel Plaintiffs propose be appointed to represent the DFA/DMS subclass. *See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 356 (S.D.N.Y. 2002) (observing that "the Second Circuit has made it clear that the standard for representation does not require a high level of understanding of the action."); *see also Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) (class representatives can "rely on attorneys to be their strategists" and need not "demonstrate mastery of the intricate details.").

As for the non-DFA/DMS subclass, Plaintiffs Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm and Garret Sitts and Ralph Sitts, and their present counsel, have aggressively, competently, and effectively pursued this litigation since its inception. Plaintiffs have further demonstrated an understanding of the nature of the litigation, the relief sought, and their role in pursuing it. They have demonstrated a consistent willingness and ability to act as class representatives. Their attorneys are experienced, competent, and have demonstrated a willingness to vigorously pursue this litigation in the face of considerable obstacles and Defendants' attorneys' equally competent, experienced, and vigorous opposition. In finding both the proposed class representatives and their proposed counsel "adequate" for purposes of class certification, the court incorporates by reference its findings regarding the adequacy of their representation which the court made in approving the Dean Settlement.

For the foregoing reasons, the court concludes that the requirements of "adequacy" have been satisfied.

### B.     Fed. R. Civ. P. 23(b) Predominance Requirement.

In addition to satisfying the requirements of Rule 23(a), Plaintiffs bear the burden of establishing that the requirements of Rule 23(b) are met. *See* Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if: [one of the requirements of Rule 23(b)(1)-(3) are met]."). In this case, Plaintiffs contend that they have

established "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23(b)'s "predominance" requirement is intended to ensure the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623 (1997). This is a "far more demanding" standard than the "commonality" requirement of Rule 23(a). *Id.* at 624.

Common questions predominate if a "common nucleus of operative facts and issues" underpins the proposed class's claims. *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (citation omitted); *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) ("Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.") (citation omitted). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

Here, Plaintiffs' claims regarding Defendants' alleged antitrust violations are based upon a common nucleus of operative facts and will be derived from a common body of proof that will not vary for proposed members of the class. *In re Nassau County Strip Search Cases*, 461 F.3d at 228. They present common questions regarding the existence of a conspiracy, its implementation, duration, and the nature of its activities. These common questions clearly predominate over any individualized issues and Defendants do not contend otherwise. On this basis alone, class certification would be

appropriate to establish whether the alleged antitrust violations occurred. *See Messner*, 669 F.3d at 815 ("Rule 23(b)(3)'s predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of a class in a single adjudication.") (citation and internal quotations omitted). However, the parties urge the court to refrain from issue-certification and determine whether the entire case is appropriate for resolution as a class action. This requires the court to find that common issues of law or fact regarding class members' injuries also predominate.

The determination of whether Plaintiffs can prove that class members suffered the same antitrust injury commonly referred to as "antitrust impact" presents a decidedly more complicated task. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 101 (2d Cir. 2007) (ruling that, among other things, putative class representative "must possess the same interest and suffer the same injury shared by all members of the class he represents.") (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)); *see also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 634 (D. Kan. 2008) (holding that plaintiffs must establish "that the proposed class suffered injury from the alleged antitrust violation -- an element commonly called 'impact.'").

Some courts have held that the burden imposed at the class certification stage, while rigorous, is not insurmountable:

> Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so. Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is *capable of proof at trial* through evidence that is common to the class rather than individual to its members.

*Behrend v. Comcast Corp.*, 655 F.3d 182, 197 (3d Cir. 2011) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008)); *see also Messner*, 669 F.3d at 818 ("Under the proper standard, plaintiffs' 'burden at the class certification stage [was] not to prove the element of antitrust,' but only to 'demonstrate that the element of

16

antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members.'") (quoting *Behrend*, 655 F.3d at 197); *Schleicher v. Wendt*, 618 F.3d 679, 685-86 (7th Cir. 2010) (observing that "Defendants have approached this case as if class certification is proper only when the class is sure to prevail on the merits . . . Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").[7]

In *IPO*, the Second Circuit rejected prior case law indicating that "some showing" and an expert opinion that was not "fatally flawed" were sufficient to meet Rule 23's requirements. *IPO*, 471 F.3d at 37, 40.  It, however, stopped short of holding that plaintiffs must *prove* their case at the class certification stage and cautioned that an appropriate merits inquiry should not "extend into a protracted mini-trial of substantial portions of the underlying litigation[.]" *Id.* at 41.  Adopting a preponderance of the evidence standard, the Second Circuit held that:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge

---

[7] Since the parties' briefing on class certification, the United States Supreme Court has granted certiorari to consider "[w]hether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." *Comcast Corp. v. Behrend*, 2012 WL 113090 (U.S. June 25, 2012).  The Supreme Court is therefore likely to examine whether the Third Circuit was correct in concluding that a district court need not delve into the merits at the class certification stage. *See Behrend*, 655 F.3d at 197 (noting "[m]any of Comcast's contentions ask us to reach into the record and determine whether Plaintiffs actually have proven antitrust impact. This we will not do.  Instead, we inquire whether the District Court exceeded its discretion by finding that Plaintiffs had demonstrated by a preponderance of the evidence that they *could* prove antitrust impact through common evidence at trial.").

> should not assess any aspect of the merits unrelated to a Rule 23
> requirement; and (5) a district judge has ample discretion to
> circumscribe both the extent of discovery concerning Rule 23
> requirements and the extent of a hearing to determine whether such
> requirements are met in order to assure that a class certification
> motion does not become a pretext for a partial trial of the merits.

*IPO*, 471 F.3d at 41.

As a threshold matter, Defendants have advised the court that it need not rule on their pending motions challenging the admissibility of Dr. Rausser's opinions as a predicate to class certification.[8] Instead, Defendants contend that, assuming arguendo the admissibility of Dr. Rausser's opinions, the court should nonetheless find that Plaintiffs' theory of antitrust impact through common proof is neither plausible nor provable. As no court has apparently required that the case be actually *proven* at the class certification stage, the court need only determine whether Plaintiffs have adduced sufficient admissible evidence which, if deemed credible, would establish by a preponderance of the evidence antitrust injury based upon evidence common to the class. Such an approach is consistent with that taken by other courts in the Second Circuit seeking to perform the analysis required by *IPO*. *See, e.g., In re Ethylene Propylene Diene Monomer [EPDM] Antitrust Litig.*, 256 F.R.D. 82, 94, 101 (D. Conn. 2009) (applying *IPO* and concluding that "[a]t this stage of the proceedings, however, the issue for the court is not whether the conspiracy actually occurred -- that is the ultimate issue in the case and one for the factfinder to decide at the merits stage. The narrow issue at this juncture is whether the elements of an antitrust cause of action are demonstrable across the class on the basis of common proof, or whether individual questions predominate" and noting that "[e]ven *In re IPO*, however, does not require plaintiffs to prove the merits of their case-in-chief at the class certification stage.").

---

[8] The parties did not present live testimony at the court's class certification hearing but rather relied on their competing and voluminous submissions and oral argument. Accordingly, neither party has subjected the opposing expert to cross-examination before the court.

Antitrust injury requires a two-pronged inquiry: "One is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact.' The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Cordes*, 502 F.3d at 106 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The need for individualized damages determinations will not preclude class certification.[9]

In this case, Plaintiffs have adduced admissible evidence that, if believed, would tend to establish that Defendants and their co-conspirators unlawfully suppressed milk prices for all dairy farmers in Order 1 during the relevant time period. This is sufficient to satisfy one requisite prong of antitrust injury for class certification purposes. *Id.* at 107 (quoting *Brunswick*, 429 U.S. at 489) ("Because each class member allegedly suffered the same type of injury, the legal question of whether such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' is a common one.").

Whether Plaintiffs can establish antitrust injury-in-fact or "antitrust impact" for the entire class, including the subclasses, is where Plaintiffs and Defendants differ. In initially denying class certification, the court found that the various iterations of Dr. Rausser's reports were inherently conflicting and did not adequately address Plaintiffs' theory of antitrust impact.[10] In particular, the court concluded that antitrust impact could

---

[9] "It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) (deeming it "clear that individualized monetary claims belong in Rule 23(b)(3)")); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) (recognizing that "the need for individual damages determinations does not, in and of itself, require denial of [a] motion for certification" under Rule 23(b)(3)); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate").

[10] The court remains concerned that Dr. Rausser's damages theory has changed so appreciably in the course of class certification, especially when Dr. Rausser claimed that prior units of

not be measured without settling upon a consistent unit of comparison, without adopting a consistent multiple regression analysis,[11] and without adequately addressing the presence of processing plants in the market which the alleged conspiracy did not control.

In their renewed motion for class certification, Plaintiffs directly address the court's concerns. First, they identify the unit of comparison as "farmer premiums." Second, their expert has revised his multivariate regression model to use a consistent dependent variable and consistent independent variables and has used this model to opine that the alleged conspiracy suppressed farmer premiums and total prices across the class. Finally, Plaintiffs have addressed the presence of non-conspirator processing plants and vertically integrated cooperatives in two ways: first, they argue that in light of the alleged conspiracy's control of milk transactions in Order 1 during the relevant time period, the

---

comparison and regression models possessed the same forceful explanatory power as the theory he currently espouses. The court is equally concerned with relying upon the analysis of Dr. Kalt who has purportedly *never* found common antitrust impact when it undisputedly has been found in scores of cases that have been upheld on appeal. These concerns, however, implicate credibility determinations that are not required for purposes of class certification.

[11] The District of Connecticut has provided a cogent definition of a multiple regression analysis:

> Multiple regression analysis is "a statistical tool for understanding the relationship between two or more variables." Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* 181 (Federal Judicial Center, 2d ed. 2000). The "dependent variable" is the variable to be explained . . . and the "independent variables" are factors that are thought to influence the dependent variable. Using multiple regression analysis allows economists to estimate whether a certain market factor has an effect on the dependent variable and to what degree. By determining whether a particular variable in the equation influences the dependent variable, the economist can accept or reject that variable as having an influence on the dependent variable. . . . In a multiple regression analysis, the model must be correctly set up for the results to be valid. The expert's choices are crucial for the success of the analysis and the ultimate fact-finder should consider the following when evaluating the efficacy of the expert's analysis: has the expert correctly identified the dependent variable; has he or she chosen the correct explanatory variable that is relevant to the question at issue; are the additional variables chosen all correct or are some missing and/or irrelevant; is the form of analysis correct? Rubinfeld, *Reference Guide on Multiple Regression*, at 186-88.

*EPDM Antitrust Litig.*, 256 F.R.D. at 95-96.

presence of non-conspirator plants did not materially impact competition. And second, they point out that Dr. Rausser's revised regression analysis purports to account for this factor by including a variable for "proximity to non-conspirator plants."

To support their claim that they can demonstrate at trial antitrust impact through common proof, Plaintiffs rely on Dr. Rausser's revised multiple regression model with twenty explanatory variables which "explain" variations in farmer premiums and total prices that cannot be attributed to the alleged conspiracy. Dr. Rausser then "backed out" these variables to determine whether he could find antitrust impact. He concludes that when non-conspiracy related variables are accounted for, a common adverse impact on price can be shown to a highly persuasive degree across the class. Dr. Rausser also estimated putative class members' damages by comparing Order 1 premiums with premiums in Orders 32 and 33 (where the alleged conspiracy was not active) and concludes that dairy farmers in Order 1 were paid substantially lower premiums and were "underpaid" by $.69/cwt. Plaintiffs contend that Dr. Rausser will rely on market-wide milk price data to demonstrate antitrust impact with common proof through the analysis of total prices paid to dairy farmers as well as "farmer premiums," and through an estimation of class damages.

To demonstrate that their theory of antitrust impact is consistent with other evidence in the case, Plaintiffs point to various statements made by representatives of the alleged co-conspirators, including statements attributed to Gary Hanman, DFA's former President and CEO, that: "We assured Dean that everybody that was selling milk in the market where they competed was paying the same price for milk" and "We have to be in a position to know all customers are treated the same, all pay the same price." (Doc. 206-55 at 2, 4.)

Defendants challenge Plaintiffs' revised antitrust impact theory on a number of grounds each of which primarily relates to its *persuasiveness*. They challenge whether

Dr. Rausser's regression model correctly identifies the unit of comparison, includes and excludes appropriate variables, and proves what Dr. Rausser claims it proves.[12]

For example, Defendants challenge Plaintiffs' new unit of comparison, "farmer premiums," as an invented concept that mixes in elements of a regulated price based upon artificially standardized milk components and thus shows uniformity that is the product of an artificial benchmark and regulation, not antitrust violations. Defendants argue that the only proper unit of comparison is market-driven over-order-premiums because Dr. Rausser opines that "the suppression of over-order-premiums paid by processors was the facilitating mechanism that results in common impact by directly and proportionally lowering premiums and prices paid to farmers." (Doc. 388-2 at 14, ¶ 21.) With over-order-premiums as the proper focus, Defendants contend that Dr. Rausser's model fails to demonstrate that premiums paid by *processors* were uniformly suppressed. They contend that their expert witness, Joseph Kalt, Ph.D., has demonstrated that processors' premiums during the relevant time period in Order 1 were neither uniform nor suppressed below competitive levels. In addition, Dr. Kalt used a multivariate analyses to determine if the variation in over-order-premiums paid to farmers could be explained with common factors and concluded they could not.

Defendants further contend that Dr. Rausser's regression model loses its explanatory power when the alleged proper unit of comparison, over-order-premiums, is used. And even when "farmer premiums" are used, when independent variables related to the regulated components of milk prices are "backed out" of Dr. Rausser's regression model, Defendants contends uniformity disappears.

Finally, Defendants assert that Dr. Rausser does not adequately account for the presence of non-conspirator processing plants and fails to separately address the independent subclasses for which Plaintiffs' data is allegedly markedly deficient.

---

[12] According to at least one authority, these are all questions reserved for the finder of fact. *See* Rubinfeld, *Reference Guide on Multiple Regression*, at 186-88.

Faced with competing expert opinions, Defendants essentially ask the court to make a determination as to which expert opinion is the most persuasive. Post-*IPO*, the district courts in the Second Circuit have rejected this as the proper test:

> The defendants . . . have misconstrued the extent of the 'merits' inquiry that a court must make under the class certification analysis required by *In re IPO*. The defendants and their experts have focused their opposition to the motion for class certification primarily on the *merits* of the plaintiffs' antitrust claims. Although characterized as a dispute over the very feasibility of plaintiffs' analysis, defendants are actually arguing that plaintiffs' multiple regression analysis, done a slightly different way (i.e. the "right" or "better" way), does not prove what they claim it proves, class wide damages. The defendants claim the model, done slightly differently, demonstrates that at least half the class suffered no damages and thus plaintiffs have not presented a feasible method for proving classwide damages. In essence, the defendants are asking the court to determine which regression model is *most* accurate, which is ultimately a merits decision.

*EPDM Antitrust Litig.*, 256 F.R.D. at 100; *see also Hnot v. Willis Group Holdings, Ltd.*, 241 F.R.D. 204, 210 (S.D.N.Y. 2007) (rejecting request to decide whose experts' statistical findings were more persuasive and ruling that "[b]y asking the Court to decide which expert report is more credible, defendants are requesting that the Court look beyond the Rule 23 requirements and decide the issue on the merits, a practice *In re IPO* specifically cautions against."). Instead, "[t]he real question before this court is whether the plaintiffs have established a *workable* multiple regression equation, not whether plaintiffs' model actually *works*, because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof." *EPDM Antitrust Litig.*, 256 F.R.D. at 100.

Here, the court may make certain factual findings necessary for class certification with relative ease. First, the court no longer identifies fundamental flaws in Plaintiffs' theory of antitrust impact because, based upon admissible evidence, Plaintiffs have specifically identified for the court their proposed unit of comparison, how the alleged

conspiracy engaged in price suppression with regard to it, and how they propose to demonstrate to the court and a jury that the alleged antitrust impact has occurred through a common body of evidence.

Second, Defendants have failed to convince the court that Dr. Rausser *must* focus on over-order-premiums in order to properly analyze price suppression and that his invention of "farmer premiums" must be rejected because, among other things, it mixes in portions of the regulated price and assumes that every farmer's milk contains the same percentage of butterfat, protein, and other solids and is shipped to Boston. The court's initial concern was that Dr. Rausser had not settled upon a consistent unit of comparison for analyzing the impact of the alleged conspiracy. He has now done so. He explains why the unit of comparison must reflect both total prices as well as market-driven premiums as follows:

> Over-order premiums (OOPs) paid by processors to the sellers of milk such as cooperatives directly affect the amount of premium, if any, given to farmers (which I refer to as "Farmer Premiums"). These amounts are referred to as 'over-order' because they are paid on top of the federally regulated minimum price established monthly for each Federal Milk Marketing Order (FMMO). The revenue from processor over-order-premiums is pooled by cooperatives or marketing agents that receive them and in turn distributed evenly across their farmer members. Because revenue from raw milk sales is pooled and distributed ratably to farmers based on their production, it follows that a suppression of OOPs paid by processors will necessarily translate into reduction in total prices paid to individual farms, as well as their Farmer Premiums. My study of price uniformity therefore investigates total prices, as well as the Farmer Premium.

(Doc. 388-2 at 3, ¶ 3.)

Dr. Rausser also explains why he used standardized milk components as a bench mark and then "backs out" those variables because they are unrelated to the alleged conspiracy's activities. He acknowledges that many factors unrelated to the conspiracy contribute to price uniformity. He therefore examined more than 500,000 payments made to farmers during the relevant time period and "evaluated uniformity by conducting

a multivariate regression to account for variation attributable to identifiable factors observable in the data (such as difference in the volume or quantity of milk being sold by the farmer)." *Id.* at 5, ¶ 6. Finding a "high degree of consistency in prices across the cooperatives and processing plants," *id.* at ¶ 7, he then "backed out" through the use of twenty non-conspiracy variables, the uniformity found in milk prices that cannot be attributed to the conspiracy in order to isolate that component of price that is. Plaintiffs contend that the systematic factors backed out by Dr. Rausser's regression model account for 76% of any "farmer premium" variation and thus the explanatory value of his model is high.

In contrast, because Defendants' expert, Dr. Kalt, differs as to the proper unit of comparison, he focuses extensively on over-order-premiums, contending that "without a direct link between changes in OOPs [over-order premiums] and changes in farmer premiums, Professor Rausser's theory that suppression of OOPs 'necessarily' leads to common suppression of farmer premiums (and, thus, common impact) falls apart." (Doc. 406-1 at 11.) Dr. Kalt opines that *his* unit of comparison does not display either uniformity, nor does it establish a uniform reaction to Dr. Rausser's "common market factors." It also does not reflect suppression below competitive levels. In this respect, Defendants seek to alter Plaintiffs' theory of price suppression and then seek to disprove it. This approach is not particularly helpful as it offers the court the quintessential comparison between apples and oranges. Moreover, the court is far from convinced that over-order-premiums are as random and individualized as Dr. Kalt claims[13] in light of the

---

[13] *See* Doc. 406-1 at 17 ("Uniformity of premiums received by farmers matters because when different farmers have different prices, their prices are changing relative to one another, and some farmers' prices are going up while other farmers' prices are going down. Thus, there is no reason to believe that the class members have experienced common impact of the asserted conspiracy. Indeed, . . . reliably isolating the fact and magnitude of any such impact is not feasible absent the kind of individualized inquiry into why and how much various farmers' premiums and prices have varied over time that class certification would presume unnecessary.").

admissions Defendants have made and Plaintiffs' evidence to the contrary.[14]  Indeed, dairy farmer cooperatives by their very nature seek to achieve a level of uniformity and reliability in price and premiums which, as Defendants repeatedly point out, many of their members find beneficial.

Third, although Defendants challenge the adequacy of Plaintiffs' proof on a number of grounds including the alleged paucity of data regarding the independent subclass and Dr. Rausser's alleged failure to separately analyze the DFA/DMS subclass, Plaintiffs' theory of antitrust impact provides a ready response.  Plaintiffs intend to establish price suppression for all dairy farmers in Order 1 using generalized proof and the same regression model, regardless of the dairy farmers' cooperative affiliation or independent status, the time period involved, or the changes in the alleged conspiracy's activities.  Dr. Rausser points out that "if there were some set of facts or circumstances that allowed a subset of the Class to escape or reduce the effects of price suppression, one would expect to see larger amounts of unexplained price variation in Order 1 than in other Orders not affected by the conspiracy." (Doc. 388-2 at 8.)  His analysis found far less price variation in Order 1 than in the other Orders and Plaintiffs point to statements made by Defendants' representatives that purport to acknowledge this.  *See* Doc. 206-58 at 26 (statement attributed to Dairylea management: "Competition for milk among plants in Midwest is greater than Northeast, causing over-order-premiums to remain higher.").

Finally, Defendants argue that Dr. Rausser has failed to adequately assess the existence of non-conspirator processing plants and vertically integrated cooperatives that own their own processing plants in the market.  They assert that the tool he has chosen to measure "proximity to non-conspirator plants" is inappropriate and assumes the existence

---

[14] Plaintiffs cite, among other things, the following statements: Greg Wickham, DMS/DFA/Dairylea executive: "[T]here's been a general management directive that we don't want an – we prefer not to have an unexplainable difference between all the various farms that we manage without regard to what business they come from." (Doc. 388-10 at 18); and Brad Keating, DFA/Dairylea executive:  "[T]he proceeds from the milk marketing venture of DMS affect each unit about the same.  Meaning if all the milk goes into DMS, DMS markets the milk and the price comes down.  Effect is roughly approximate to each. . . . The effect from the milk marketing change up or down comes back and affects each equally." (Doc. 312-76 at 3-4.)

and adverse impact of the conspiracy while his conclusion that the sole benefits dairy farmers in a vertically integrated cooperative receive are cash patronage payments is simply inaccurate. Defendants may well be correct on both points. This does not, however, render Dr. Rausser's regression model unusable. As the Supreme Court has observed, the failure to include certain variables in a multiple regression analysis "will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (accepting the use of a multiple regression analysis in an employment discrimination suit and pointing out that a model that "accounts for the major factors" should not be considered "unacceptable as evidence" because it fails to include a particular variable). Conversely, using an independent variable for a market factor that is difficult to reduce to a number should not negate the use of the model, only its persuasiveness. In any event, Plaintiffs do not address the presence of non-conspirator processing plants and vertically integrated cooperatives in Order 1 solely through Dr. Rausser's regression analysis. They also cite a common body of proof which they contend will demonstrate the alleged conspiracy's dominant control over milk transactions in Order 1 during the relevant time period which, in turn, rendered the presence of non-conspirator processing plants and vertically integrated cooperatives only a minor obstacle to the alleged conspiracy's success.

Examining the totality of Plaintiffs' evidence presented regarding antitrust impact, the court concludes that Plaintiffs have established by a preponderance of the evidence a means of establishing antitrust impact through a common body of admissible proof and through common questions of law and fact which clearly predominate over individualized questions. "Whether the plaintiffs' multiple regression analysis incorporates the necessary variables/factors to reach the correct economic conclusion is an issue to be reserved for the merits, because it has no bearing on whether the plaintiffs can meet the predominance prong [of] Rule 23(b)(3) by establishing that common proof of impact is available in this case." *In re EPDM Antitrust Litig.*, 256 F.R.D. at 102. For

the foregoing reasons, the court finds that the requirement of "predominance" has been met.

### C.    Rule 23(b)'s Other Requirements.

In addition to finding "predominance," the court must also find that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement mandates that the court consider a number of pragmatic concerns to determine whether this lawsuit proceeds as a class action, including:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). These requirements "ensure [] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes*, 502 F.3d at 104. Each of these inquiries supports a conclusion that a class action is superior to all other available methods for adjudicating this lawsuit.

First, there is no evidence that any putative class member would prefer to pursue his or her own separate lawsuit against Defendants (which is likely to be cost-prohibitive) or that separate lawsuits in far flung forums would be desirable in terms of litigants' preferences, judicial economy, and the possibility of varying and inconsistent adjudications.

Second, this litigation has proceeded since its inception as a putative class action and a settlement with Dean Foods was achieved on a class-wide basis without substantial

difficulties or opposition.  It is thus unlikely that this case will prove difficult to manage on a class action basis.

Finally, a class action is the most fair, efficient, and effective vehicle for the presentation of Plaintiffs' claims and Defendants' defenses to them in light of (1) the complex nature of the case; (2) the breadth of Plaintiffs' allegations and Defendants' defenses; (3) the considerable volume of evidence and number of witnesses; (4) the need for expert testimony in specialized areas; and (5) the sheer number of participants. Plaintiffs have thus established "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**D.     Incorporation by Reference of Proposed Order.**

The court attaches hereto and incorporates herein Plaintiffs' proposed order for class certification.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' renewed motion for class certification (Doc. 388).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 19th day of November, 2012.

Christina Reiss, Chief Judge
United States District Court