UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 DEC 31   PM 12: 23

CLERK

BY _____
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN,                )
d/b/a Al-lens Farm, GARRET SITTS, RALPH           )
SITTS, JONATHAN HAAR, CLAUDIA HAAR,               )
and RICHARD SWANTAK, on behalf of                 )
themselves and all others similarly situated,     )
                                                  )
          Plaintiffs,                             )
                                                  )
     v.                                           )     Case No. 5:09-cv-230
                                                  )
DAIRY FARMERS OF AMERICA, INC., and               )
DAIRY MARKETING SERVICES, LLC,                    )
                                                  )
          Defendants.                             )

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE
VARIOUS OPINIONS OF PLAINTIFFS' MERITS EXPERT
DR. GORDON RAUSSER**
(Doc. 372)

Plaintiffs Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts, Jonathan and Claudia Haar, and Richard Swantak (collectively, "Plaintiffs") have brought this lawsuit against Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (collectively, "Defendants"), alleging five violations of the Sherman Act, 15 U.S.C. §§ 1-2: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act; (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act; and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act.

This matter came before the court on Defendants' motion to exclude various opinions of Plaintiffs' expert witness Gordon Rausser, Ph.D.  (Doc. 372.)  Defendants

argue that, in several respects, Dr. Rausser's testimony is unreliable and inadmissible under Fed. R. Evid. 702 and under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.  Defendants have, however, withdrawn their challenge to Dr. Rausser's application of the Herfindahl-Hirschman Index.

Plaintiffs oppose the motion, arguing that any weaknesses in the opinions and methodologies offered by Dr. Rausser are appropriately addressed not by exclusion before trial, but by vigorous cross-examination during trial.  Plaintiffs have filed their own motion to exclude certain opinions of Defendants' expert witness, Joseph Kalt, Ph.D., which will be addressed in a separate opinion.

The court heard oral argument on both pending motions on August 1 and 5, 2013. The parties completed their post-hearing filings on August 21, 2013.

I.     **Factual and Procedural Background.**

Plaintiffs allege that Defendants engaged in a wide-ranging conspiracy at both the processor and cooperative levels to fix, stabilize, and artificially depress prices for fluid Grade A milk and to allocate markets within Federal Milk Market Order 1 ("Order 1") among the co-conspirators.

Plaintiffs' proposed product market is fluid Grade A milk.  Their proposed geographic market is Order 1 covering areas in Connecticut, Delaware, the District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia.

The court has certified a class consisting of all dairy farmers, whether individuals, entities, or members of cooperatives, who produced and pooled fluid Grade A milk in Order 1 during any time from January 1, 2002 to the present.[1]  Defendants and Defendants' co-conspirators are excluded from the class.  Plaintiffs identify Defendants' co-conspirators as Dean Foods ("Dean"), HP Hood LLC ("Hood"), National Dairy

---

[1] The court has also certified two subclasses, consisting of those dairy farmers "who are members of DFA or otherwise sell milk through DMS ('DFA/DMS subclass')" and those dairy farmers "who are not members of DFA and do not otherwise sell milk through DMS ('non-DFA/DMS subclass')."  Subclass plaintiffs also oppose Defendants' motion.

Holdings ("NDH"), Farmland Dairies LLC ("Farmland"), Kraft, Dairylea Cooperative, Inc. ("Dairylea"), St. Albans Cooperative Creamery, Inc. ("St. Albans"), Agri-Mark, Inc. ("Agri-Mark"), Land O'Lakes, Inc. ("LOL"), and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA").

Plaintiffs seek monetary damages in an amount which represents the additional amount Plaintiffs and other class members would have received for sales of fluid Grade A milk in the absence of the antitrust violations alleged, and treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. In addition to their request for monetary relief, Plaintiffs seek an injunction prohibiting conduct found by the court or a jury to be illegal.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Rule 702 of the Federal Rules of Evidence provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence[,]" but a judge does have the responsibility of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597. "Under *Daubert*[,] the district court functions as the gatekeeper for expert testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citation omitted).

In evaluating expert testimony, the "court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). An expert's opinion should be excluded if it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Id*. Nothing requires the court to admit expert opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### B.    Defendants' Motion to Exclude.

Defendants seek to exclude the opinions of Dr. Rausser with respect to: (1) the relevant geographic market; (2) his SSNIP tests; (3) the alleged role and economic motivation of certain non-party processors and cooperatives to participate in the alleged conspiracy; and (4) the calculation of damages. Defendants assert that the problem is not with the reliability of the analytical models that Dr. Rausser used, but rather that Dr. Rausser "consistently failed to follow the established methodologies for these techniques, and instead altered and misapplied them in order to reach opinions that are scientific in name only." (Doc. 372-1 at 8.) Plaintiffs counter that Defendants fail to identify a bar to admissibility for any of Dr. Rausser's opinions and that in light of the lenient standards for admissibility of expert testimony, the court should permit Dr. Rausser's opinions to be presented to the jury subject to cross-examination and impeachment.

### 1.    Geographic Market.

For antitrust purposes, "the relevant geographic market is defined as the 'area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). "These factors are *reversed* in the context of a buyer-side conspiracy." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001). This makes the relevant geographic market the area in which a monopsonist can profitably exercise power over price.

Market definition is not necessary for *per se* unlawful conduct and may not be necessary where actual power to control price can be shown. In other contexts, however, "[m]arket definition is often the most critical step in evaluating market power and determining whether business conduct has or likely will have anticompetitive effects." Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129, 129 (2007). Indeed, "[b]ecause market power is often inferred from market share, market definition generally determines the result of the case." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992).

Markets are identified with a "pragmatic, factual approach" and not a "formal legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). As a result, a market definition is only an approximation of the area of competition and "need not—indeed cannot—be defined with scientific precision." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974). At the same time, a plaintiff cannot eschew its obligation to prove a relevant geographic market by offering a fluid market definition which changes in response to a defendant's challenges.

As Defendants point out, in this case, Dr. Rausser and Plaintiffs appear to have a difference of opinion regarding the relevant geographic market.[2] Plaintiffs allege that the relevant geographic market is Order 1, and does not include dairy farmers who are

---

[2] In initially denying class certification, the court confronted a similar issue, observing that:

> [A]lthough Plaintiffs concede that their expert focused on the wrong component of price, erroneously opined that the impact of the alleged conspiracy would be found in the component pricing, and disclaimed any significant impact of the conspiracy on premiums paid to farmers, Dr. Rausser has repeatedly stated that he has not abandoned the opinions he articulated in his Initial Declaration. Accordingly, Plaintiffs and their expert either have a significant difference of opinion regarding critical components of Plaintiffs' theory of common adverse impact or the court must rely on Dr. Rausser's fundamentally flawed Initial Declaration. If there is a third alternative, Plaintiffs have not identified it.

*Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 269-70 (D. Vt. 2011) (internal citation omitted).

located outside Order 1 but who supply milk to Order 1 processing plants.  Indeed, Plaintiffs have staunchly opposed inclusion of dairy farmers outside of Order 1 as class members.  This point was made clear when dairy farmers located outside of Order 1 who nonetheless pooled their milk on Order 1 sought to intervene in Plaintiffs' settlement with Dean.  *See Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 1706778, at *4-5, *7 (D. Vt. May 4, 2011).

In contrast, although Dr. Rausser opined in his 2011 report: "I have concluded that the relevant geographic market is the market for the sale and purchase of fluid Grade A milk sourced with dairy farmers located in Order 1" (Doc. 372-2 at 19; 7/22/11 Rausser Initial Report at 17), he has repeatedly acknowledged that the relevant geographic market is actually broader than Order 1 and may include dairy farmers who supply fluid Grade A milk to Order 1 processing plants.  For example, in his 2011 report, Dr. Rausser opined that because approximately 30% of the milk pooled on Order 1 comes from adjoining areas consisting of Maine and portions of New York, Pennsylvania, and Virginia, it was "possible that these areas could also be considered part of the relevant market."  (Doc. 372-3 at 19; 7/22/11 Rausser Initial Report at 63.)  Similarly, in his 2011 deposition, Dr. Rausser testified that:

> [A]t a minimum, my opinion is that the relevant market includes all of those producers and the pricing determination that they receive, that they capture in Order 1, the geographic boundaries.  In addition, the surrounding areas in terms of the geographic scope of the relevant market are in that relevant market as well.

(Doc. 458-7 at 6; 11/3/11 Rausser Dep. at 48:6-12.)  In his 2013 deposition, he testified: "[M]y rebuttal report . . . shows that the actual scope -- geographic scope expands beyond the boundaries of Order 1."  (Doc. 458-1 at 7; 6/26/13 Rausser Dep. at 244:6-12.)

Plaintiffs have neither moved to amend their complaint to allege a revised geographic market beyond the confines of Order 1, nor sought to expand the class members who allegedly suffered common adverse impact to dairy farmers outside of Order 1.  Rather, they seek to defuse any conflict with their expert in three ways.

6

First, Plaintiffs point out that Dr. Rausser repeatedly states that his opinions remain unchanged even if areas beyond Order 1 are included as part of the relevant geographic market.  They further characterize Dr. Rausser's opinions as "conservative" because Dr. Rausser ultimately concludes that it is irrelevant whether milk produced outside Order 1 but processed therein is considered part of the market because the outcome of his analysis remains unchanged.

Second, Plaintiffs assert that it is permissible to have markets within markets.  In other words, there may be a larger geographic area which surrounds the area in which a significant anticompetitive impact takes place.  However, at least in their Amended Complaint, Plaintiffs do not allege that Order 1 is a submarket of a larger geographic market.  To the contrary, Plaintiffs have consistently maintained that Order 1 is itself the geographic market and that dairy farmers within it have nowhere else to reasonably turn when faced with price suppression from Defendants and their co-conspirators.

Finally and perhaps most strenuously, Plaintiffs urge the court to find that any conflict between Plaintiffs' alleged geographic market and the opinions of their expert may be addressed through appropriate cross-examination and impeachment, and do not necessitate exclusion of their expert's opinions.  They cite the Second Circuit's admonition that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'"  (Doc. 381 at 9) (quoting *Amorgianos*, 303 F.3d at 267.)

The court disagrees with Plaintiffs' assumption that any difference of opinion between the geographic market they allege and the one their expert believes exists is of no import in this case.  An expert opinion that differs from Plaintiffs' proposed geographic market inexorably has less relevance than one that fully supports it.  *See* Fed. R. Evid. 401 (evidence is relevant if it has any tendency to make a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence); *see also United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981) ("Implicit in that definition [of relevant evidence] are two distinct requirements: (1) [t]he

evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action."). Even if the conflict may be satisfactorily explained, a difference in opinion regarding the relevant geographic market may have a chain effect because the definition of a geographic market assists in defining the market participants which, in turn, may be critical to determining anticompetitive effects. *See* Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. at 130 n.6 ("The identification of market participants—a task that generally requires market definition—may be important to the analysis of the competitive effects of firm conduct even when market shares are not important.").

However, before the court may exclude Dr. Rausser's opinions regarding the relevant geographic market altogether, it must assure itself that the conflict is of such a fundamental nature that Dr. Rausser's opinions will be unhelpful, confusing, or misleading to the jury. Here, the conflict does not pose those dangers as Dr. Rausser's opinion dovetails with Plaintiffs' proposed geographic market. Dr. Rausser opines that Order 1 is the geographic market because of Order-wide regulations, pooling, price uniformity, transportation costs, and alleged anticompetitive effects and that it is irrelevant whether the market is expanded beyond Order 1's regulatory boundaries to include certain imports into Order 1. Defendants may explore and expose any fallacies with that opinion through vigorous cross-examination. Ultimately, the jury must decide whether the conflict makes a difference because "[t]he determination of the relevant market is generally a question of fact." *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n.4 (10th Cir. 1984) (collecting cases).

Because "[t]he proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers," *Eastman Kodak Co.*, 504 U.S. at 482 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)), Dr. Rausser may testify regarding those commercial realities and explain whether it makes any difference if the geographic market is broadened to include areas outside of Order 1.

This does not mandate admissibility of every aspect of Dr. Rausser's geographic market opinions. Rather, it means only that Dr. Rausser may offer opinions regarding the relevant geographic market even if those opinions conflict in part with the geographic market Plaintiffs have alleged. The court thus DENIES Defendants' motion to exclude Dr. Rausser's definitions of the relevant geographic market.

### 2.     Dr. Rausser's SSNIP Tests.

In defining the relevant geographic market, Dr. Rausser allegedly performed a test to measure a small but significant non-transitory increase in price ("SSNIP" test). In a SSNIP test, "one asks whether a hypothetical monopolist controlling all suppliers in the proposed market could profit from a small price increase." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008). "If buyers would respond to the SSNIP by shifting to products produced *outside* the proposed geographic market, and this shift were sufficient to render the SSNIP unprofitable, then the proposed geographic market would be too narrow." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004). The "critical loss" threshold is the point at which a price increase or price suppression is no longer profitable. *See Whole Foods Mkt., Inc.*, 548 F.3d at 1047-48 (Tatel, J., concurring) (explaining "critical loss" is "the point at which the revenue gained from raising prices equals the revenue lost from reduced sales" and concluding that an entity "would be unable to impose a statistically significant non-transitory increase in price [when] the 'actual loss' from such an increase would exceed the 'critical loss'"); *see also* Daniel P. O'Brien & Abraham L. Wickelgren, *A Critical Analysis of Critical Loss Analysis*, 71 Antitrust L.J. 161, 161 (2003) ("Critical loss analysis is a widely-used technique in antitrust practice. The basic idea is simple. One asks: 'given a price increase of X percent, what would the percentage loss in unit sales have to be to make the price increase unprofitable?' . . . If the actual loss is less than the critical loss, the price increase would pay. Otherwise it would not.") (footnotes omitted).

Dr. Rausser describes his initial SSNIP test as an economic analysis to determine which, if any, processing plants outside Order 1 might yield class members a higher net

price in the face of a hypothetical price suppression of 5% over and above the price suppression Plaintiffs allege existed during the years of the conspiracy. His initial SSNIP test assumed that transportation costs were the only impediment to dairy farmers selling their milk outside Order 1, even though Plaintiffs contend "the record in this case clearly indicat[es] that there are other significant barriers to such movement." (Doc. 381 at 14 n.8.) His analyses assumed dairy farmers direct the shipment of their own milk, that processing plants have unlimited capacity, that farmers could always access the closest processing plant in another Order, and that farmers would shift their supply of milk to another Order to obtain an additional increase of $.01 per cwt for their milk. He concluded that it would never be economically feasible for dairy farmers in Order 1 to sell into Orders 30, 32, or 126 to escape a hypothetical price suppression of an additional 5%. He opined that Orders 5, 6, 7, and adjacent state-regulated areas would not be a viable economic alternative for dairy farmers in Order 1 because of "market realities" such as historical supply patterns, supply agreements, and regulatory requirements. He conceded that it *was feasible* for dairy farmers in Order 1 to turn to Order 33 in response to a hypothetical price suppression of 5%, but concluded that they would not in fact do so.

   Dr. Rausser conducted his initial SSNIP test only with respect to class members and thus did not include dairy farmers who supplied approximately 30% of the milk to processing plants in Order 1, but who are located outside Order 1, even though he has acknowledged that these dairy farmers may be included in the relevant geographic market.[3] He opines that he does not need to include these imports because they do not represent an *outlet* for class members' supply of fluid Grade A milk. However, this misses the point which is that any SSNIP analysis which omits a significant portion of the

_____

[3] Plaintiffs claim that Dr. Rausser originally conducted a SSNIP test with the supply of milk imported into Order 1, but did not include it in his Initial Report. *See* Doc. 458 at 8 ("Dr. Rausser conducted (but did not include in his initial report) a SSNIP analysis of imported milk[.]"). If this is true, it did not make its way into Dr. Rausser's Rebuttal Report which contains an entirely different SSNIP analysis.

supply that it is analyzing is of questionable validity. *See In Re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 723 (E.D. Tenn. 2011) (acknowledging Dr. Rausser's failure to include imports into the market but leaving the issue for the jury, noting, "[a]lthough significant questions have been raised about Professor Rausser's approach, especially the possible, and maybe total, lack of consideration by him of the fluid milk flowing into Orders 5 and 7 from elsewhere, genuine questions of material fact do exist requiring the question of the relevant market to be submitted to the jury"). Whether dairy farmers who supply 30% of the milk pooled on Order 1 would turn to Order 33 in the face of price suppression in Order 1 is a relevant inquiry if a true SSNIP test is performed. Such a test would show whether, to what extent, and where a significant percentage of the milk supply in Order 1 may go in the face of a hypothetical price suppression. *See* Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. at 133 n.26 (explaining "the 'hypothetical monopsonist' issue in market definition in such cases is whether the collective exercise of market power by the buyers of a group of products within a region, which depresses prices paid to sellers . . . would be made unprofitable by seller decisions to deal instead with other buyers or to cease participation in the market."). As Defendants point out, dairy farmers located in Western Pennsylvania and Western New York who pool on Order 1 may have a greater incentive and ability to access Order 33 in the face of price suppression than would a dairy farmer in Vermont. This is reflected in the present sizable shipments of milk from those unregulated areas to Order 33. Accordingly, by failing to analyze where a significant percentage of the supply of milk in Order 1 would flow to in the face of the hypothetical price suppression, Dr. Rausser's initial SSNIP test is incomplete.

More importantly, in his initial SSNIP test, Dr. Rausser neither determined a critical loss threshold, nor explained his decision not to do so, although he did conclude that theoretically some milk would flow to Order 33 where milk prices are higher. In performing his initial SSNIP test, Dr. Rausser acknowledges that it is his opinion that class members had and have no ability to supply milk outside of Order 1 because "[c]lass

members rarely make any decisions about who purchases milk or at what price. Instead, those decisions are made by DMS or, in its absence, the cooperative to which the farmer belongs." (Doc. 372-3 at 4; 7/22/11 Rausser Initial Report at 48.)  It is therefore not surprising that Dr. Rausser did not determine the point at which dairy farmers in Order 1 would shift their supply of milk in response to price suppression.

In an effort to explain Dr. Rausser's initial failure to calculate a critical loss threshold, Plaintiffs point out that the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") Horizontal Merger Guidelines (2010) (the "Guidelines") do not *require* a critical loss threshold.  (Doc. 381 at 19) (citing Guidelines at ¶ 4.1.3 ("the Agencies also may consider a 'critical loss analysis'")).  The Guidelines, however, introduced the SSNIP test as an aid to market definition by identifying the point at which a price suppression or increase would become unprofitable.  *See Whole Food Mkt., Inc.*, 548 F.3d at 1038 (noting that DOJ and FTC "developed a technique called the SSNIP" to assist in market definition and which asks whether "a hypothetical monopolist controlling all supplies in the proposed market could profit from a small price increase").  A SSNIP test that fails to determine a critical loss threshold, but which seeks to confirm an opinion that no milk would flow from the candidate market to another Order regardless of the amount of price suppression, is of no assistance in determining the relevant geographic market or the effects of hypothetical price suppression.  *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918-19 (6th Cir. 2009) (holding district court properly excluded expert's SSNIP test because it did not analyze "whether a price increase at a particular point in time would result in consumer substitution of an alternative product" but instead consisted of expert's "own version of the SSNIP test," which failed to satisfy any of *Daubert*'s indicia of reliability and "was produced solely for this litigation.") (internal quotation marks omitted).

In his rebuttal report, Dr. Rausser conducted a markedly different SSNIP analysis. He analyzed a "complete SNNIP test (including imports)" to account for milk supplied by farmers outside of Order 1, and he shifted his focus from where farmers would turn to

12

sell their milk in response to a hypothetical price suppression of 5% to whether and to what extent farmers would respond to a 5% price suppression by producing less milk.  He called this "Volume Reduction" and relied upon two arguably dated academic studies regarding elasticity estimates for New England farmers.[4]  (Doc. 381-1 at 23-25, 32-33; 3/16/12 Rausser Rebuttal at 22-23, 30-31.)  Dr. Rausser explained that he chose to examine elasticities in his SSNIP plus imports test primarily because he lacked the data to duplicate his initial SSNIP test with the imports included.  (Doc. 458-1 at 4; 6/26/13 Rausser Dep. at 224:18-22) ("I have a lot more data with regard to looking at the actual incentives focusing on spatial arbitrage and transport cost for milk leaving Order 1 than I do in the opposite direction.").

     In his revised SSNIP test, Dr. Rausser concluded that both class members and dairy farmers importing milk into Order 1 would not reduce production of milk in response to additional price decreases in sufficient quantities to make a price decrease unprofitable.  Plaintiffs seek to defend Dr. Rausser's revised SSNIP test by pointing out, "[w]here milk would be sold is not the only conceptual approach to analyzing a relevant geographic market as Defendants presume" (Doc. 458 at 10) and a decrease or cessation of participation in the market in response to price suppression may also be considered. While this may be true, it does not negate the conclusion that once again, and for the first time in a rebuttal opinion, Dr. Rausser has fundamentally changed a key aspect of his opinion.  *See Pride v. BIC Corp.*, 218 F.3d 566, 578-79 (6th Cir. 2000) (concluding trial court properly refused to allow rebuttal reports that constituted a "transparent attempt" to redress weaknesses identified in original expert report) (internal quotation marks omitted); *Jorgenson Forge Corp. v. Consarc Corp.*, 2002 WL 34363668, at *1 (W.D. Wash. Jan. 9, 2002) (excluding rebuttal opinions that went "well beyond the scope of the

---

[4] Dr. Rausser relied on the elasticities analyzed and published in: Adesojio Adelaja, *Price Changes, Supply Elasticities, Industry Organization, and Dairy Output Distribution*, 73 Am. J. of Ag. Econ. No. 1 (Feb. 1991); and J.P. Chavas et al., *A Regional Analysis of Milk Supply Response in the United States*, 12 N. Central J. of Ag. Econ. No. 2 (July 1990).

Plaintiff's expert reports and introduce[d] new opinions"). There are, however, even greater concerns regarding the reliability of Dr. Rausser's revised SSNIP test.

Dr. Rausser has testified that a loss of 20% to 30% of the fluid Grade A milk supplied to Order 1 plants would be enough to render a 5% price suppression unprofitable. (Doc. 372-13 at 4; 11/13/11 Rausser Dep. at 16:11-21.) In his rebuttal report, he calculated the critical loss threshold to be 13.1% of the existing supply. *See* Doc. 381-1 at 32 n.48 & 33; 3/16/12 Rausser Rebuttal at 30 n.48 & 31.) It would thus be economically advantageous for farmers in Order 1 to export more than 20% to 30% of their milk to Order 33 in response to the hypothetical price suppression.[5] In other words, in four of the seven years analyzed, at least 14.1% of the milk produced in and pooled on Order 1 (more than the critical loss threshold of 13.1%) would benefit from a shift to Order 33 even with increased transportation costs. Dr. Rausser discounts this outcome by analyzing historical trends (which he calls a "natural experiment") and by explaining that, "given the extremely conservative nature of the assumptions embedded in the model, it is clear that the actual increase in shipments would be minimal, if any." (Doc. 372-3 at 16; 7/22/11 Rausser Report at 60.) Accordingly, while Dr. Rausser finds that a significant number of farmers would benefit economically from a shift to Order 33 in the face of a hypothetical price suppression of 5%, because milk flow from Order 1 to Order 33 historically has been relatively meager and because "commercial realities" such as price limitations, capacity restraints, and long-term supply contracts render the export of milk unlikely, the actual flow of milk from Order 1 to Order 33 would not likely change simply because of price suppression in Order 1, regardless of the magnitude of the price suppression.

As Defendants point out, "[i]f the results of Dr. Rausser's SSNIP analysis as to Order 33 are rightly ignored, as he claims, then Plaintiffs provide no reason why his

---

[5] Dr. Rausser's Initial Report indicates that 14.1%, 30.4%, 66.5%, and 53.7% of the milk produced by Order 1 farmers would benefit economically by leaving in favor of Order 33 in the years 2004, 2007, 2008, and 2009 respectively. (Doc. 372-7 at 12; 7/22/11 Rausser Initial Report, Ex. 11.)

SSNIP has any utility at all for defining the market and should not simply be excluded altogether." (Doc. 405 at 9 n.6.)  In attempting to explain Dr. Rausser's decision to discount his own results, Plaintiffs argue that the court should not require "blind reliance on the results of the *hypothetical* SSNIP test." (Doc. 458 at 11.)  However, Dr. Rausser was not forced to perform a SSNIP test; he *chose* to do so and he *chose* to mix his methodologies in the process.

In essence, Plaintiffs seek to present the jury with two very different versions of an analysis purporting to be a SSNIP test.  The SSNIP tests in Dr. Rausser's initial report and his rebuttal report analyze different market participants, different geographic markets, and different market responses to a hypothetical 5% price suppression.  They will thus offer the jury a quintessential apples to oranges comparison and will serve no purpose beyond suggesting to the jury that Dr. Rausser has conducted a series of sophisticated economic experiments that support his opinions.  This would be misleading. Dr. Rausser will actually opine that regardless what the SSNIP tests reveal, class members have *no* ability to shift their flow of milk outside Order 1 in the face of a hypothetical price suppression because class members do not decide where to market their milk, to whom, or at what price.  Rather, Defendants and their co-conspirators allegedly made and continue to make those decisions for them.  Dr. Rausser's versions of the SSNIP test will therefore not assist in defining the relevant geographic market, but will offer the jury confusing and contradictory opinions that appear "scientific" but yield no reliable conclusions.

A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing [or] misleading the jury[.]" Fed. R. Evid. 403. This is particularly important with respect to expert witnesses "given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over

experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks omitted). "According to *Daubert*, a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Ky. Speedway, LLC*, 588 F.3d at 915 (quoting *Daubert*, 509 U.S. at 597). Here, Dr. Rausser's SSNIP tests fail to satisfy that standard. The court therefore GRANTS Defendants' motion to exclude Dr. Rausser's opinions regarding his SSNIP tests.

### C. Whether Dr. Rausser's Opinions Regarding Certain Alleged Non-Party Participants in the Conspiracy Are Admissible.

Dr. Rausser offers a number of opinions regarding the economic incentives for certain non-party cooperatives and their management, as well as processors, to participate in the conspiracy.[6] Defendants seek exclusion of these opinions, arguing that Dr. Rausser's opinions do not rely on factual or economic analyses; suggest motives contrary to the alleged participants' self-interest; and rely upon full supply contracts that are not anti-competitive. They urge the court to find that Dr. Rausser has failed to adequately connect his opinions to the facts of this case.

Defendants further assert that Dr. Rausser's characterization of the behavior of certain processors as "peripherally involved and passively accepting" (Doc. 372-13 at 16; 11/3/11 Rausser Dep. at 167:14-168:6.) participants in the conspiracy has no legal meaning and cannot be helpful to a jury because, as a matter of law, participation in an antitrust conspiracy requires "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted). They reject Dr. Rausser's discussion of the "competitive fringe," arguing that the processors Dr. Rausser opines fit this description are not part of the conspiracy and that Dr. Rausser must identify whether

---

[6] Defendants have clarified that "the issue is **not** whether Plaintiffs . . . or Dr. Rausser have evidence or opinions regarding participation in the conspiracy by DFA, DMS or Dean. It is Dr. Rausser's views as to the other alleged co-conspirators that [are] the object of the Motion." (Doc. 405 at 13.)

processors fall within the group of conspirators or non-conspirators in order for his opinions to have any relevance.

Finally, Defendants argue that Dr. Rausser's rebuttal opinions regarding whether, why, and how Dairylea was allegedly coerced by DFA to form DMS as part of an anti-farmer conspiracy conflict with his deposition testimony that he has seen no evidence that Dairylea was concerned about punishment from DFA in 1999 when DMS was formed. When asked what Dairylea sought to accomplish by joining with DFA to form DMS, Dr. Rausser responded: "Quite frankly, I'm not prepared to answer the question. You're asking me to put myself in the mind of Dairylea at the time in 1999 and what they thought? I'm sorry, I don't have enough evidence to do that." (Doc. 449-2 at 29; 6/26/13 Rausser Dep. at 161:4-13.) Dr. Rausser agreed, however, that he could not cite any peer-reviewed economic literature that would support a conclusion that DFA had the market power to coerce Dairylea at the inception of the alleged conspiracy. Without overtly abandoning his coercion opinion, in his rebuttal report, Dr. Rausser sets forth, for the first time, a table of alleged sales Dairylea purportedly had lost or could lose due to DFA's supply relationships with Suiza (which later merged with Dean) coupled with a conclusion that Dairylea had no other option but to join DFA. When confronted with this table at his deposition, Dr. Rausser testified that Dairylea's past lost sales were not relevant and he struggled to identify any actual lost future sales, conceding there was no record evidence regarding Dairylea's expected sales.

As a threshold issue, Dr. Rausser's opinions regarding the economic incentives of the various participants fall within his area of expertise and are, in large part, based on the facts of this case. His opinions draw from the contractual relationships between the participants, Defendants' internal documents, the payments made and pricing structure for fluid Grade A milk, typical economic incentives to engage in anti-competitive conduct (such as compensation, empire building, and warding off competitive threats), cooperatives' management's incentives, and the testimony of agents of the alleged conspirators. As even Dr. Kalt acknowledges, Dr. Rausser's opinions on these issues are

within the proper scope of an expert's testimony. (Doc. 381-3 at 3-4; 2/4/12 Kalt Dep. at 53:11-54:2). Accordingly, Dr. Rausser may opine regarding the identity of co-conspirators, their economic incentives to participate in the conspiracy (including the incentives of their management), and whether "the 'climate' of a specific market was consistent with a conspiracy." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 240 (quoting *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000)); *see also U.S. Info. Sys., Inc. v. Int'l Bhd. Of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 240-41 (S.D.N.Y. 2004) (permitting an expert to testify "that the market was 'not competitive'" and to "factors that would tend to show anticompetitive conduct in a market" and noting an expert can "hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way") (citation omitted); *see also In re Se. Milk Antitrust Litig.*, 2010 WL 8228836, at *2 (E.D. Tenn. Dec. 8, 2010) ("There is no doubt that expert testimony [regarding the dairy industry] based upon solid economic principles, research and experience would not only be helpful to the jury, but is an absolute necessity.").

The permissible scope of Dr. Rausser's testimony on these issues is not, however, unlimited. To the extent he intends to opine about "passive conspirators" in an apparent attempt to expand the participants in the conspiracy at both the processor and cooperative level without actually testifying regarding whether, when, why, and how certain entities actually agreed to conspire, he has exceeded the bounds of acceptable expert testimony. For example, he has testified that there are three types of participants: one group that is actively engaged in illegal coordination; a second group that is peripherally involved and passively accepting the mechanisms for the coordination; and a third group that is the competitive fringe. He has further opined that it does not matter to his analysis whether certain processors, which appear to include Kraft, Farmland, and Hood, actually joined the conspiracy or fall within group two or three because "[a]s long as they are either a passive party or in the competitive fringe, it doesn't matter to my economic analysis. I get the same outcome." (Doc. 372-13 at 24; 11/3/11 Rausser Dep. at 198:22-199:2.)

18

Dr. Rausser's initial opinions regarding six Northeast cooperatives (St. Albans, Dairylea, Agri-Mark, MVDA, Land O'Lakes, and Upstate/Niagara) as alleged co-conspirators at the cooperative level follow this same vein. He has testified he is not offering an opinion regarding whether Agri-Mark and MVDA joined the alleged conspiracy because "quite frankly . . . it doesn't matter to me when they joined." (Doc. 372-13 at 16-18; 11/3/11 Rausser Dep. at 198:20-199:2.) With regard to the other cooperatives, he has opined: "What matters is that they followed the dominant players. That's what they did. And that's what all the data shows. And that's what every bit of economic analysis I've done demonstrates." (Doc. 372-13 at 24; 11/3/11 Rausser Dep. at 199: 4-11; *see also* Doc. 372-13 at 15-16; 11/3/11 Rausser Dep. at 165:12-21, 169:7-12.)

In his rebuttal report, Dr. Rausser attempts to retreat from these opinions, but he cites no new evidence for doing so. Plaintiffs attempt to explain Dr. Rausser's approach as follows: "Dr. Rausser explains it from an economic point of view. From an economic point of view it doesn't matter if these other processors [and cooperatives] are considered active participants [in the conspiracy] or were simply followers. In either case there's nothing they were doing to undercut the fundamentals or the effectiveness of the conspiracy that DFA, DMS and Dean put into place." (Doc. 467 at 12; Tr. 9/17/13 at 12.)

Dr. Rausser's testimony regarding "passive participants" if allowed, will not be helpful to the jury, is contrary to the law, and would allow Plaintiffs to proceed on the assumption that an entity is a co-conspirator without any proof of that status. *See Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("Simply put, an expert does not assist the trier of fact . . . if he starts his analysis based upon [an] assumption" that is "the very question that he was called upon to resolve."); *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (ruling "a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly"). In this case, the jury must decide the "crucial question . . . whether the challenged anticompetitive conduct stems from [an] independent decision or from an agreement, tacit or express," which is prohibited as an unreasonable restraint on trade. *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 553-54 (2007) (internal citations, alterations, and quotation marks omitted).

Expert testimony that equivocates regarding whether an entity actually joined the

conspiracy or merely engaged in lawful activity in the conspiracy's wake will not assist

the jury in this important task.  As the Eleventh Circuit explained:

> [The expert] defined "collusion" to include conscious parallelism.  Put
> differently, he did not differentiate between legal and illegal pricing
> behavior, and instead simply grouped both of these phenomena under the
> umbrella of illegal, collusive price fixing.  This testimony could not have
> aided a finder of fact to determine whether appellees' behavior was or was
> not legal, and the district court properly excluded it.

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003); *see also*

*Twombly*, 550 U.S. at 554 (observing that conscious parallelism "is not in itself unlawful"

and holding antitrust plaintiff does not plead a plausible violation of antitrust law on this

factual basis alone).  Therefore, although Dr. Rausser may opine that other market

participants benefitted from the alleged restraints created by DFA, DMS, and Dean, he

may not do so by describing them as *participants* in the conspiracy without factual

evidence to support that opinion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 588 (1986) (explaining that conduct that is "as consistent with permissible

[activity] as with illegal conspiracy does not, standing alone, support an inference of

antitrust conspiracy."); *see also Blomkest Fertilizer*, 203 F.3d at 1038 (holding district

court properly excluded Dr. Rausser's testimony because it "relies almost exclusively on

evidence . . . that is not probative of collusion as a matter of law").

     To the extent Dr. Rausser maintains his opinion that the alleged conspiracy began

with DFA coercing Dairylea to form DMS, he must tie that alleged coercion to actual

evidence of coercion and to a market share that is reasonably relied upon by experts in his

field as sufficient to render coercion successful.  *See* Fed. R. Evid. 703 (requiring expert

witness to testify regarding facts within his or her personal knowledge; facts presented at

trial; and facts presented to the expert outside of court if they are the type of facts

reasonably relied upon by experts).  To the extent he now seeks to opine that the

expectation of lost sales forced Dairylea to join the conspiracy, he must be able to identify and quantify those lost sales.

Consistent with the rulings set forth herein, Defendants' motion to exclude Dr. Rausser's opinions regarding the economic incentives and status of certain non-party cooperatives and processors is GRANTED IN PART AND DENIED IN PART.

### D.     Whether Dr. Rausser Used Improper Methodology for Calculating Damages.

#### 1.     Calculation of Farmer Premiums.

To measure damages arising from the alleged conspiracy, Dr. Rausser has created his own measure of comparison which he calls a "Farmer Premium." The term "Farmer Premium" is not used in the dairy industry, but is nonetheless based upon actual components of the price received by suppliers of fluid Grade A milk. Dr. Rausser's creation and Plaintiffs' use of a Farmer Premium is not impermissible if it accurately isolates a component of price which the conspiracy allegedly suppressed. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (ruling that credit terms are "an inseparable part of price" which if unlawfully fixed may give rise to a violation of the Sherman Act). Here, Dr. Rausser has cited sufficient evidence that dairy farmers' premiums are neither calculated by a universal method, nor reflected in a standardized manner in dairy farmers' milk checks, thereby necessitating the creation of a "Farmer Premium" to isolate a component of price Plaintiffs allege the conspiracy suppressed.

To determine a Farmer Premium, Dr. Rausser starts with a dairy farmer's gross pay price (also referred to by Dr. Rausser as "the gross mailbox price") and subtracts the blend price announced by the USDA Market Administrator for Order 1 for milk delivered to Boston. By using the Boston base blend price, Dr. Rausser opines that it is not necessary to perform a location adjustment even though he concedes that location adjustments exist in the dairy industry and that prices within Order 1 vary by location. Plaintiffs defend this approach by arguing that to adjust Farmer Premiums to account for location adjustments tied to the processing plant location would be inconsistent with what dairy farmers actually receive because DMS and the cooperatives receive the location

21

adjustments and have no obligation to pass them on to farmers.  Plaintiffs further defend
Dr. Rausser's use of the Boston blend price as a baseline, pointing out that Dr. Rausser
also used the Market Administrator's base blend price for his benchmarks, Orders 32 and
33 and this "ensures consistency in the damages model by uniformly attributing the
'base' location adjustment in each Order to all farmers in each Order."  (Doc. 381 at 40.)

   Defendants seek exclusion of Dr. Rausser's use of Farmer Premiums in his
damages model, pointing out that, among other things, the Boston base blend price in
Order 1 is the highest blend price in the Order, while the base blend prices in both Orders
32 and 33 are very close to the average blend prices paid to farmers in those Orders.  As
Defendants observe, there is an approximate $1.15 spread in blend prices across the
fifteen locations within Order 1 and, as a result, the Boston blend price is not
representative of over 82% of the milk shipped in Order 1 to locations other than Boston.
Accordingly, by using the Boston base blend price, Dr. Rausser's damages model
artificially inflates the damages calculation by using a baseline that is not representative
of actual prices in Order 1, but rather is representative of the highest price in Order 1.
When the highest price in Order 1 is compared to the average prices in Orders 32 and 33,
a disparity in price is revealed that does not actually exist across Order 1.

   Plaintiffs seek to counter this criticism by pointing out the USDA Milk
Administrators for Federal Milk Market Orders use the base blend price to compare
prices across Orders which ensures their reliability for that purpose.  The problem with
this approach is that Milk Administrators are not attempting to calculate class members'
antitrust damages; instead, they have merely selected one location in their respective
Orders as a base blend price (Order 1: Boston; Order 32: Kansas City; Order 33:
Cleveland).  In doing so, they make no representation that the base blend price is the
average price, the median price, or even a representative price of the prices found in their
respective Orders.  A USDA Market Administrator's base blend price thus has no
relevance to an antitrust damages calculation if it is not a reasonable proxy for actual
prices received by dairy farmers.  Here, the Boston blend price is not a reasonable proxy.

22

Plaintiffs further defend Dr. Rausser's use of the Boston base blend price by claiming that he does not have sufficient actual delivery data to make an actual price comparison with a location adjustment. They claim that if they attempt to use actual delivery data, they would need to eliminate 440,665 (47%) of the delivery points for which location information is not present. They note that Defendants' expert, Dr. Kalt, used the location of the farm to calculate location adjustments when it is actually the processor location where the milk is received or the plant to which the milk is diverted which governs the location adjustment. *See* 7 C.F.R. § 1001.13(a) & (d)(3). In his rebuttal report, Dr. Rausser asserts that he corrected this error and substituted an adjustment for processor location for which there is adequate information. Using this revised calculation, he opined that there is still statistically significant price suppression. If so, his claim that the Boston base blend price is the only feasible baseline price for Order 1 evaporates.

Because there is no factual or economic reason to use the Milk Administrator's Boston base blend price in order to calculate a Farmers Premium for all dairy farmers in Order 1,[7] and because this approach is virtually certain to artificially inflate Plaintiffs' damages, Defendants' motion in limine to exclude use of the Boston base blend price for Order 1 in Dr. Rausser's damages model is GRANTED.

### 2.    Dr. Rausser's Selection of Orders 32 and 33 as Benchmarks.

Defendants seek exclusion of Dr. Rausser's use of Orders 32 and 33 as benchmarks for his regression analysis to determine the amount of alleged suppression of Farmer Premiums in Order 1. They contend that, as evidenced by his deposition testimony, Dr. Rausser has scant knowledge or information regarding market conditions in Orders 32 and 33 and thus cannot credibly opine that they are competitive and therefore appropriate benchmarks for comparison with Order 1.

---

[7] Dr. Rausser has suggested that a Boston reference zone may also be used to measure the capacity of milk plants by location adjustment. This approach appears to be tainted by the same bias as his use of the Boston base blend price.

Plaintiffs respond that Dr. Rausser used Orders 32 and 33 as benchmarks in his regression analysis in the *In re Southeastern Milk* without objection and Defendants did not originally challenge Dr. Rausser's use of Orders 32 and 33 as benchmarks in this case.  They further observe that Defendants fall far short of claiming that Orders 32 and 33 are either non-competitive or dominated by the alleged conspiracy; nor would Defendants have any incentive to make such claims.  Rather, Defendants merely challenge Dr. Rausser's ability to establish that the converse is true.

Dr. Rausser's lack of familiarity with market conditions in Orders 32 and 33 at his deposition is grist for impeachment and cross-examination.  Plaintiffs nonetheless muster sufficient reasons for using Orders 32 and 33 as benchmarks to render the issue one of weight rather than admissibility.  As they point out, only the unregulated areas separate Order 33 from Order 1, Orders 32 and 33 share certain common characteristics with Order 1, and those Orders also have full supply contracts and cooperative marketing agencies.  There is sufficient price data for Orders 32 and 33 at the dairy farmer level to make reliable comparisons.  In the event that it is determined that Orders 32 and 33 are not wholly competitive, this fact would merely render Dr. Rausser's calculation of damages more conservative.  *See In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675, 683-84 (E.D. Pa. 2007) ("[A]ssuming that the benchmark period was not perfectly competitive, [the] damages calculation actually becomes a more conservative estimate."). If Dr. Rausser's "proposed benchmarks are not perfect" when coupled with an appropriate regression analysis, they will nonetheless assist in "'a reasonable estimate' of damages.  And nothing more is required." *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 491 (E.D. Pa. 2009) (internal quotation marks and citations omitted); *see also In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 928-29 (E.D. Mich. 2002) (denying motion in limine to exclude benchmarks under *Daubert*, noting that benchmarks need only be "somewhat comparable," not "wholly identical" because "certainty generally is unattainable"); *Cason-Merenda v. Detroit Med. Ctr.*, 2013 WL 1721651, at *6-12 (E.D. Mich. Apr. 22, 2013) (denying *Daubert* challenge to expert witness's

selection of benchmark because the issue is one of weight not admissibility and cross-examination is available to identify any benchmark deficiencies); *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *6 (D. Kan. Dec. 21, 2012) (concluding claims of "possible taint" in benchmark chosen by expert "go to the weight of [expert's] opinions and not their admissibility").

For the foregoing reasons, Defendants' motion to exclude Dr. Rausser's use of Orders 32 and 33 as benchmarks in his regression analysis is DENIED.

### 3.   Admissibility of Dr. Rausser's Multivariate Regression Analysis.

Dr. Rausser's calculation of damages uses a regression model with twenty-two variables in an attempt to control for the impact of non-conspiracy related factors on Farmer Premiums.  As they have done with the prior iterations of Dr. Rausser's regression model, Plaintiffs urge the court to find Dr. Rausser's model "robust" producing a "confidence" level of 99% with approximately 64% of price variations between Order 1 and the benchmarks Orders 32 and 33 explained by the model.  (Doc. 381 at 43-44.)

Dr. Rausser's regression model follows an accepted methodology: "[t]he usual way to measure damages in such a case would be to compare the prices . . . inside and outside the region covered by the conspiracy . . . correcting by various statistical techniques for any nonconspiratorial factors that might have caused the prices that are being compared to be different from each other."  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998).  Dr. Rausser also properly uses a yardstick approach when he compares the prices in the proposed geographic market, Order 1, to the prices in a market that is alleged to be unaffected by the antitrust violations, Orders 32 and 33.  *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) ("The 'yardstick' approach compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation[.]"); *see also Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (explaining that "regression analyses" and "a yardstick test

. . . are generally accepted methods for proving antitrust damages") (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1238 (3d Cir. 1993) (explaining that if performed properly multiple regression analysis is a reliable means by which economists may prove antitrust damages); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000) (noting that the two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits)).

The next step takes into account "[a]ny nonconspiratorial factors . . . in order to make a responsible estimate of the prices . . . had it not been for the conspiracy." *Blue Cross & Blue Shield United of Wis.*, 152 F.3d at 593. Dr. Rausser attempted to correct "for any nonconspiratorial factors that might have caused the prices [within the Orders] to be different from each other," *id.* at 592, by accounting for 22 variables. There is no evidence that his use of these 22 variables was so "incomplete or inaccurate such that an economist would not" have relied on them. *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1238. To the extent that Defendants argue that Dr. Rausser has not accounted for certain nonconspiratorial factors, like the degree of cooperative concentration, buyer side concentration, and the extent of vertical integration,[8] his failure to account for those factors goes to weight, not admissibility. *See Conwood Co., L.P.*, 290 F.3d at 794 (rejecting challenge that analysis "ignored other market variables" because expert need not account for every variable and affirming district court's decision to allow expert to testify "subject to vigorous cross examination and an opportunity for [d]efendant to introduce countervailing evidence of its own"). As a result, the deficiencies in his

---

[8] Defendants note that this court previously criticized Dr. Rausser's proposed damages model for failing to account for "the return on investment some dairy farmers may experience through joining cooperatives that own their own processing plants and return profits to their members based upon processing activities." *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 270 (D. Vt. 2011). According to Defendants, in some instances, cooperatives made patronage payments that exceeded the amount of Dr. Rausser's claimed damages. This court, however, previously found that the failure of Dr. Rausser's regression model to reflect the payments for vertically integrated cooperatives "does not . . . render Dr. Rausser's regression model unusable." *Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at *15 (D. Vt. Nov. 19, 2012).

regression model "will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986).

The remaining unexplained price differences between Farmer Premiums in Order 1 and those in Orders 32 and 33 represent Dr. Rausser's calculation of class members' damages. Defendants counter that Dr. Kalt's analysis reveals otherwise. In Dr. Kalt's analysis, he applied Dr. Rausser's model to compare Orders 32 and 33, opining that if the explanatory variables used by Dr. Rausser were sufficient and if the remaining difference was a result of price suppression, there should be no remaining "unexplained" difference when comparing two competitive markets. (Doc. 372-1 at 43.) Instead, Dr. Kalt purportedly found that there are "unexplained" differences between Orders 32 and 33 equal to $1.85 per cwt, (Doc. 408-3 at 196, 264; 12/16/11 Kalt Report at 192, Figure VII. 14), which is over twice the "unexplained" difference identified by Dr. Rausser as existing between Order 1 and Orders 32 and 33. Thus, Defendants assert Dr. Rausser does not know, and should not be permitted to testify regarding, the cause of the differences in Farmer Premiums in Order 1 as opposed to the benchmark Orders 32 and 33.[9] However, "[i]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of injury." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000). Dr. Rausser's conclusion that price suppression caused the unexplained variation in prices between Orders 1 and Orders 32 and 33 is thus not inadmissible simply because it fails to account for all other possibilities.

---

[9] Post-hearing, Defendants submitted the opinion in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013), in which the D.C. Circuit vacated the district court's class certification decision, and directed the district court on remand to take a "hard look" at Dr. Rausser's damages model because it "purport[ed] to quantify the injury in fact to all class members" but the model also yielded "similar results" for certain legacy shippers that were clearly not impacted by the conspiracy. *Id.* at 252-55. The D.C. Circuit concluded that Dr. Rausser's regression model generated "false positives" and "detect[ed] injury where none could exist." *Id.* While recent criticism of this magnitude is concerning, in that case, the D.C. Circuit could identify a group of shippers that were indisputably unaffected by the conspiracy, and apply the regression model to them. Here, the task is considerably more complex, and the court cannot as easily conclude that Dr. Rausser's regression model fails to produce reliable results.

Defendants' final basis for the exclusion of Dr. Rausser's damages model is that it measures the average suppression of Farmer Premiums, but it does not show whether any individual farmer suffered damages. Defendants identify certain farmers for whom Dr. Rausser's model under-predicts prices, such that the farmers were actually paid more than Dr. Rausser predicted they should have been. This, according to Dr. Kalt, begs the question, "did the alleged conspiracy in fact benefit them?" (Doc. 408-3 at 194; 12/16/11 Kalt Report at 190.) Defendants assert that Dr. Rausser's model's alleged failure to show whether individual farmers were harmed precludes its admissibility. *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 591 (N.D. Ill. 2009) ("Measuring average base wage suppression does not indicate whether each putative class member suffered harm from the alleged conspiracy. In other words, it is not a methodology common to the class that can determine impact with respect to each class member.").

Dr. Rausser responds "that [variation showing under-predicted prices] is to be expected based on well understood statistical concepts and is of no concern." (Doc. 372-6 at 10 n.475; 7/22/11 Rausser Initial Report at 184 n.475.) Plaintiffs, in turn, assert that the alleged conspiracy has affected all class members in the same manner and to the same degree, so that the average suppression of Farmer Premiums is an appropriate measure of individual damages. By calculating, as Dr. Rausser does, annual price suppression for each year of the class period, and using such annual suppression rates in conjunction with individual farmer volume during the specific year, it is possible to calculate individual damages for each class member. While this may not be a precise measure of each farmer's damages, it is a reasonable estimate and is not inadmissible. *McDonough*, 638 F. Supp. 2d at 491.

Plaintiffs are required to make a "reasonable estimate" of damages. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969) (internal quotation marks omitted). Dr. Rausser's regression analysis follows accepted methodologies, and will assist the jury in determining whether Plaintiffs have satisfied this burden of proof. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (holding expert testimony is

admissible when it "rests on a reliable foundation and is relevant to the task at hand") (internal quotation marks omitted). The weight to be accorded Dr. Rausser's regression model should also be decided by the jury. *See In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (noting that "[t]rial courts should not arrogate jury's role in evaluating the evidence and the credibility of expert witnesses" where the issue is essentially the weight to be ascribed to competing expert testimony) (internal quotation marks omitted). Cross-examination and impeachment at trial, and the conflicting of opinions of Dr. Kalt, are sufficient to expose any weaknesses in Dr. Rausser's regression analysis. *See Daubert*, 509 U.S. at 596 (holding that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (citation omitted). Defendants' motion to exclude Dr. Rausser's regression analysis is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' motion to exclude the testimony of Dr. Rausser (Doc. 372).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _31st_ day of December, 2013.

Christina Reiss, Chief Judge
United States District Court