U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2014 JAN 23 PM 4:06

CLERK
BY _____
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, GARRET SITTS, RALPH )
SITTS, JONATHAN HAAR, CLAUDIA HAAR, )
and RICHARD SWANTAK, on behalf of )
themselves and all others similarly situated, )
)
Plaintiffs, )
)
v. ) Case No. 5:09-cv-230
)
DAIRY FARMERS OF AMERICA, INC., and )
DAIRY MARKETING SERVICES, LLC, )
)
Defendants. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PROF. JOSEPH KALT
(Doc. 417)

Plaintiffs Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts and Ralph Sitts, Jonathan and Claudia Haar, and Richard Swantak (collectively, "Plaintiffs") have brought this lawsuit against Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (collectively, "Defendants"), alleging five violations of the Sherman Act, 15 U.S.C. §§ 1-2: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act; (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act; and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act.

This matter came before the court on Plaintiffs' motion to exclude certain opinions and testimony of Defendants' expert witness, Joseph Kalt, Ph.D. (Doc. 417.) Plaintiffs

assert that Dr. Kalt's opinions are both unreliable and irrelevant and therefore fail to satisfy the admissibility standards for expert testimony as required by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. (Doc. 417 at 8.) Plaintiffs also challenge Dr. Kalt's qualifications to testify about what Plaintiffs characterize as "cooperative governance." *Id.* at 22.

Defendants oppose the motion, arguing: "While the grounds for [Plaintiffs'] arguments are varied, each is built on a mischaracterization of the opinion in question, the method by which it was reached, and/or the issue to which it pertains. Once Plaintiffs' rhetoric is replaced with the actual substance of Dr. Kalt's opinions . . . , [Plaintiffs'] criticisms are quickly shown to be baseless." (Doc. 427 at 5.) Defendants filed their own motion to exclude certain opinions and testimony of Plaintiffs' expert witness, Dr. Gordon Rausser, Ph.D., which has been addressed in a separate Opinion and Order.

The court heard oral argument on both pending motions on August 1 and 5, 2013.

I. **Factual and Procedural Background.**

Plaintiffs allege that Defendants engaged in a wide-ranging conspiracy at both the processor and cooperative levels to fix, stabilize, and artificially depress prices for fluid Grade A milk and to allocate markets within Federal Milk Market Order 1 ("Order 1") among the co-conspirators.

Plaintiffs' proposed product market is fluid Grade A milk. Their proposed geographic market is Order 1 covering areas in Connecticut, Delaware, the District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia.

The court has certified a class consisting of all dairy farmers, whether individuals, entities, or members of cooperatives, who produced and pooled fluid Grade A milk on Order 1 during any time from January 1, 2002 to the present.[1] Defendants and Defendants' co-conspirators are excluded from the class. Plaintiffs identify Defendants'

---

[1] The court has also certified two subclasses, consisting of those dairy farmers who are members of DFA or otherwise sell milk through DMS ("DFA/DMS subclass") and those dairy farmers who are not members of DFA and do not otherwise sell milk through DMS ("non-DFA/DMS subclass").

2

co-conspirators as Dean Foods ("Dean"), HP Hood LLC ("Hood"), National Dairy Holdings ("NDH"), Farmland Dairies LLC ("Farmland"), Kraft, Dairylea Cooperative, Inc. ("Dairylea"), St. Albans Cooperative Creamery, Inc. ("St. Albans"), Agri-Mark, Inc. ("Agri-Mark"), Land O'Lakes, Inc. ("LOL"), and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA").

Plaintiffs seek monetary damages in an amount which represents the additional amount Plaintiffs and other class members would have received for sales of fluid Grade A milk in the absence of the antitrust violations alleged, and treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. In addition to their request for monetary relief, Plaintiffs seek an injunction prohibiting conduct found by the court or a jury to be illegal.

## II.   Conclusions of Law and Analysis.

Plaintiffs seek to exclude Dr. Kalt from testifying regarding the following topics: (1) his analyses and opinions concerning the relevant geographic market; (2) his opinions that are based on his univariate analysis regarding farmer prices and premiums; (3) his opinions that rely on United States Department of Agriculture ("USDA") survey data of announced prices that Plaintiffs argue are not representative of the actual prices paid by fluid milk processors; and (4) his opinions on "cooperative governance" matters, including specifically his opinions regarding the governance of dairy cooperatives.

### A.   Standard of Review.

"A district court's discretion to admit expert testimony is controlled by Rules 702, 703, and 403 of the Federal Rules of Evidence." *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2002). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;

3

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court "functions as the gatekeeper for expert testimony," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), and is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597; *see also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) ("[T]he district court must consider both the reliability and relevance of the proffered [expert] testimony.").

The district court's task "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

### B.   Whether to Exclude Dr. Kalt's Opinions Regarding the Relevant Geographic Market.

Plaintiffs argue that Dr. Kalt's opinions regarding the relevant geographic market should be excluded because they fail to fit the facts of this case, are not based upon the appropriate analyses, and are erroneous as a matter of law. Because each of Plaintiffs' challenges is based upon an inaccurate characterization of Dr. Kalt's opinions, the court addresses them in a summary manner.

Dr. Kalt has not rendered an opinion regarding his definition of the relevant geographic market; rather he has criticized as too narrow Plaintiffs' proposed geographic market which includes only class members or, in other words, only those dairy farmers both located within Order 1's regulatory boundaries and who pooled fluid Grade A milk

4

on Order 1 during the years of the alleged conspiracy. Dr. Kalt has opined that the relevant geographic market "is at least as large as Order 1 plus the surrounding unregulated areas that supply about one third of the milk pooled on Order 1." (Doc. 408-3 at 217; 12/16/11 Kalt Report, App. A, at 10.) Plaintiffs' expert, Dr. Rausser, tacitly endorsed Dr. Kalt's opinion regarding the potential breadth of the relevant geographic market when he acknowledged that approximately 30% of the milk pooled on Order 1 comes from adjoining unregulated areas consisting of Maine and portions of New York, Pennsylvania, and Virginia, and that it was "possible that these areas could also be considered part of the relevant market." (Doc. 372-3 at 19; 7/22/11 Rausser Initial Report at 63.) Dr. Kalt may thus also opine at trial that the relevant geographic market is broader than Order 1, and he may testify how he reached that conclusion. He does not need to propose his own relevant geographic market in order to do so. *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.").

In challenging Plaintiffs' definition of the relevant geographic market and Dr. Rausser's initial opinion that it included only class members, Dr. Kalt performed a test to measure a small but significant non-transitory increase in price (the "SSNIP" test). A SSNIP test analyzes the impact of anti-competitive behavior in the proposed market by asking whether a hypothetical price increase or suppression would remain profitable or whether sellers would take their product outside the proposed market to obtain a better price. *See In re Se. Milk Antitrust Litig.*, 2010 WL 8228839, at *2 (E.D. Tenn. Dec. 8, 2010) ("[T]he SSNIP Test is just plain common sense: If a monopsonist buyer within the proposed geographic area artificially suppresses the price he pays for the sellers' product, will that action result in a substantial number of those sellers taking their products outside that proposed geographic area to sell them? If the answer is yes, it follows that the monopsonist buyer cannot *profitably* maintain his suppression of prices paid for the sellers' products. In that event, the proposed geographic area must be enlarged and the

5

SSNIP analysis repeated until it is determined that the buyer can profitably maintain his suppression of prices.").

Plaintiffs argue that Dr. Kalt ignored class members in his SSNIP test. This is inaccurate. Dr. Kalt's SSNIP test considered "all milk pooled on Order 1" from 2002 to 2009 to calculate the "pounds shipped to Order 33 given [a] 5% price suppression" within Order 1. (Doc. 427-1 at 18; 12/16/11 Kalt Report, Figure A.1.) His SSNIP test thus considered the effect of price suppression on *all suppliers* to Order 1 processing plants. This approach is consistent with applicable law and is relevant to Plaintiffs' claim that Defendants and their alleged co-conspirators suppressed the price of fluid Grade A milk pooled on Order 1. *Cf. FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (explaining that in a SSNIP test "one asks whether a hypothetical monopolist controlling all suppliers in the proposed market could profit from a small price increase"). He did not perform a "reverse SSNIP test" as Plaintiffs claim.

Moreover, nothing requires Dr. Kalt to analyze only the options available to class members in his SSNIP test. Indeed, such an approach is suspect because in a monopsony case, the "'market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991)). To artificially limit the sellers to class members and the buyers to only Order 1 processing plants misses the point.

Correspondingly, it is neither unreasonable nor impermissible for Dr. Kalt to opine that some suppliers of fluid Grade A milk to Order 1 processing plants have a greater ability and incentive to access plants outside Order 1 than others—primarily because of their geographic proximity to processing plants outside Order 1. If the alleged monopsonist lacks the ability to foreclose options for *all sellers* in the market, the ability to maintain price suppression becomes more untenable. Because Dr. Kalt's SSNIP test is the "product of reliable principles and methods" and was applied "reliably to the facts of the case," his opinions regarding it as well as his opinion that it includes imports into

6

Order 1 are admissible. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

Plaintiffs next assert that Dr. Kalt has "ignored and misapplied well-established market definition concepts" (Doc. 431 at 8) in his market definition testimony because Plaintiffs contend Dr. Kalt has offered testimony that the relevant geographic market could include states such as Colorado, Idaho, New Mexico, Utah, and Washington. This misconstrues Dr. Kalt's testimony. When Plaintiffs' counsel repeatedly questioned Dr. Kalt at his deposition whether it was *possible* that the relevant geographic market included states from Florida to California, Dr. Kalt conceded that it was "theoretically possible" but that he saw no evidence to support it. (Doc. 417-2 at 9; 2/14/12 Kalt Dep. at 178:14-15 ("It's possible as a matter of theory. I don't see a lot of evidence one way or the other."); Doc. 417-2 at 9; 2/14/12 Kalt Dep. at 181:21-22 ("I haven't seen evidence of that, but it's possible as a matter of economic theory."); Doc. 417-2 at 10; 2/14/12 Kalt Dep. at 183:2-3 ("As a matter of theory, it's possible, but I don't see any evidence of it."). Plaintiffs' argument that Dr. Kalt's testimony on this issue must be excluded thus creates an issue where none exists. Defendants do not seek to offer an expert opinion from Dr. Kalt that the relevant geographic market includes the twenty-five states in question. He has made it clear that he was testifying only regarding in theoretical possibilities and not based on the facts of this case.

Finally, to the extent that Plaintiffs disagree with Dr. Kalt's opinions regarding the potential breadth and composition of the relevant geographical market and claim they fail to account for the commercial realities, Plaintiffs may challenge those opinions at trial through vigorous cross-examination. *See In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir. 1995) (noting that "[o]nce certain pieces of scientific evidence pass the admissibility threshold," then *Daubert* provides that "'traditional' devices" like "'[v]igorous cross-examination'" and the "'presentation of contrary evidence'" are available to test shaky scientific evidence) (quoting *Daubert*, 509 U.S. at 596). Ultimately, the scope of the relevant geographic market is a question of fact. *See Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n.4 (10th Cir. 1984)

7

(collecting cases concluding that "determination of the relevant market is generally a question of fact"). Plaintiffs have failed to identify a flaw in Dr. Kalt's geographic market opinions that would require their exclusion under Rule 702.

For the reasons stated above, the court DENIES Plaintiffs' motion to exclude Dr. Kalt's opinions and testimony concerning the relevant geographic market.

### C. Whether to Exclude Dr. Kalt's Opinions Based on a Univariate Analysis.

Plaintiffs' expert witness Dr. Rausser has opined that "[t]he unique nature of milk pooling . . . assures that all Class members will have received the same basic price for their milk sold in the same month and pooled on the same Order." (Doc. 372-2 at 27; 7/22/11 Rausser Initial Report at 25.) Dr. Rausser has also opined that "farmer premiums" in Order 1 are "extremely uniform" and that Order 1 reflects "uniform pricing." (Doc. 372-2 at 27; Rausser Initial Report at 25, 175.)

In order to challenge Dr. Rausser's opinions regarding the alleged uniformity of premiums and pricing across Order 1, Dr. Kalt performed a univariate analysis, which is a statistical analysis of a single variable frequently referred to as a "descriptive statistic." *See Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 295 (N.D. Cal. 1992) ("Descriptive statistics simply report or summarize counts, percentages, or averages based upon a given data set."); *see also EEOC v. Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1297 (N.D. Ill. 1986) (explaining univariate analysis "measures the impact of any one characteristic"). Dr. Kalt examined changes in the farmers' standardized mailbox prices and premiums over time to purportedly find that "in an average month many hundreds, even thousands, of farmers' standardized mailbox prices and premiums move in an opposite direction to that of the majority" and that "in any given month, many hundreds of farmers' prices commonly fall at the same time that most other farmers' prices are rising, and vice versa." (Doc. 408-3 at 95-96; 12/16/11 Kalt Report at 91-92.) This univariate analysis is the basis of his opinion that in Order 1 there is "dispersion" and that "the average premiums paid out by different farmer cooperatives" are "anything but uniform" and are "markedly dispersed" at any specific point in time. (Doc. 408-3 at 95; 12/16/11 Kalt

8

Report at 91.) They further support his opinion regarding "churning" which he defines as occurring when "one farmer cooperative's average premium will be increasing, while another farmer cooperative's average premium will be decreasing." *Id.*

Plaintiffs seek to exclude Dr. Kalt's opinions based on his univariate analysis, noting that this sort of analysis omits explanatory variables, invents and exaggerates variance in the prices analyzed, and, if admitted, will mislead and confuse rather than assist the jury. As Plaintiffs observe, even Dr. Kalt acknowledges a host of variables that can affect farmer prices and premiums, such as incentive payments for meeting quality standards, shipping in excess of volume thresholds, or refraining from using rBST.

A "simplistic" scientific analysis that fails to consider "all independent variables" can be excluded under Rule 702, *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999), because the failure to account for various factors affecting statistical results "indicates a failure to exercise the degree of care that a statistician would use in his scientific work" and is thus "entitled to zero weight." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (precluding expert testimony when expert failed "to make any adjustment for variables bearing on the decision whether to discharge or retain a person on the list other than age" and thus equated "a simple statistical correlation to a causal relation"). However, Dr. Kalt has not offered a univariate analysis to challenge Plaintiffs' claim of price suppression. Instead, he uses it to establish "*the fact of* variation in milk pricing and premiums" and to respond to Dr. Rausser's assertion that no such variation exists. (Doc. 427 at 18.) Dr. Kalt concludes that there was no "purported 'uniformity' of prices paid to farmers[] that is asserted [by Plaintiffs] to have been direct indication of claimed monopsonistic control of the industry." (Doc. 408-3 at 100; 12/16/11 Kalt Report at 96.)

A univariate analysis offered for the limited purpose of challenging a claim of uniformity in prices or premiums is not inadmissible. *See, e.g., Ambrose v. Booker*, 684 F.3d 638, 642 (6th Cir. 2012) (observing that expert employed "descriptive statistics" to identify the existence of a disparity between the number of African Americans in the jury pool in comparison to the number eligible to serve within the county); *Eli Lilly & Co. v.*

9

*Zenith Goldline Pharm., Inc.*, 364 F. Supp. 2d 820, 885 (S.D. Ind. 2005), *aff'd*, 471 F.3d 1369 (Fed. Cir. 2006) (explaining that "scientists conventionally look at *groups* of subjects and calculate descriptive statistics that characterize each group" and that "[t]he *mean*, or average, of a group is a generally accepted and widely used number for comparing differences between groups for both statistical analysis and graphical depiction"); *Stender,* 803 F. Supp. at 295-96 (sanctioning use of inferential statistics that were "calculated from descriptive statistics" and used "to measure" disparities in payroll for certain positions and employees); *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 108 n.30 (D.D.C. 2010) (noting the limitation of descriptive statistics: "Raw numbers are valuable, but additional information . . . tends to help put them in context"). Accordingly, to the extent Dr. Kalt's univariate analysis is offered for the sole purpose of challenging Dr. Rausser's assertions that prices and premiums in Order 1 are uniform, it is admissible.

Dr. Kalt may not, however, rely on his univariate analysis for any opinion regarding the *cause* of the alleged lack of uniformity in prices and premiums. Courts uniformly exclude univariate analyses on this basis. *See, e.g., Raskin*, 125 F.3d at 67-68 (excluding testimony on statistical disparities tending to show age discrimination because, while generally admissible, expert had failed in that case to "attempt to account for other possible causes"); *Blue Dane Simmental Corp.*, 178 F.3d at 1040-41 (excluding testimony based on before-and-after modeling, although it was "a method of analysis typical within the field," because it failed to consider "independent variables" that could affect causation); *Wills*, 379 F.3d at 50 (concluding failure to account for variables expert conceded would impact causation meant expert's conclusions on causation "was not grounded in reliable scientific methods" and was inadmissible); *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 155-56 (N.D. Cal. 2004) (noting reliance "on an extensive array of . . . payroll and personnel data" for "descriptive statistics" to show pay disparities among gender and positions but requiring "inferential statistical evidence . . . to demonstrate that . . . disparities can be explained only by gender discrimination and not

by chance or other neutral variables," since "[e]vidence that certain disparities exist . . . does not, by itself, explain *why* they exist").

For the forgoing reasons, the court DENIES Plaintiffs' motion to exclude Dr. Kalt's univariate analysis for the purpose of establishing lack of uniformity in prices and premiums and precludes the use of that analysis for any other purpose. The court does not hereby address Dr. Kalt's multivariate analysis (which is not independently challenged) and does not preclude Plaintiffs from challenging Dr. Kalt's graphs, scatterplots, and other exhibits in support of his univariate analysis on the grounds that they have the potential to confuse or mislead the jury.

### D. Whether to Exclude Dr. Kalt's Analyses and Opinions That Rely on Announced Prices from USDA Survey Data.

Plaintiffs seek to exclude those portions of Dr. Kalt's opinions that rely on prices reported in USDA surveys, arguing that there is no reliable evidence that the survey prices are representative of the actual prices paid by processors. Plaintiffs further contend that the prices on which Dr. Kalt relies reflect only a small fraction of processors in the area,[2] but that he impermissibly uses these prices to draw conclusions regarding the prices all processors paid in Orders 1, 32, and 33. The portions of Dr. Kalt's testimony that Plaintiffs challenge on this basis include his opinions that: (1) the "prices paid by processors across Order 1 are not uniform";[3] (2) the "prices paid by Order 1 processors were not less than prices paid by processors in Orders 32 and 33"; and (3) the "prices paid by Order 1 processors are not suppressed . . . and are relatively high." (Doc. 417 at 19.)

---

[2] The analysis relies on five cities in Order 1, eight cities in Order 32, and five cities in Order 33. (Doc. 417-12 at 3; 4/5/11 Kalt Report at 73.) Plaintiffs represent that in 2007 "there were more than 140 cities in Orders 1, [32,] and 33 with processors." (Doc. 417 at 21.)

[3] With regard to price uniformity, Defendants accurately note that Dr. Kalt did not rely on USDA surveys of the prices offered to be paid by processors in forming this opinion (Doc. 427 at 19-20) but instead relied upon the prices paid by processors as set forth in "DMS Monthly Invoice Summaries." (Doc. 417-1 at 87-90 & Doc. 408-3 at 99; 12/16/11 Kalt Report at 95, Figures IV 32 A-D.)

11

Defendants respond that there is no actual evidence showing that the USDA survey data is not representative of prices paid by processors and that USDA announced prices are widely utilized and relied on, including by Plaintiffs' own expert. They contend that any challenge to the degree to which the survey prices fairly represent the prices in a particular Order goes to the weight of the evidence and not its admissibility.

In ruling on a motion to exclude expert testimony, a district court must consider "the facts on which the expert relies." *Amorgianos*, 303 F.3d at 267; *see also Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 327 (N.D.N.Y. 2000) (rejecting expert testimony "because of the manner in which he applied his chosen methodology . . . and the questionable reliability of his underlying sales data"); *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding expert testimony because underlying data lacked reliability).

In this case, Dr. Kalt relies on data from the "Announced Cooperative Class I Prices Report," which "is one of the data series of over-order price information collected by Dairy Programs via the administration of the Federal milk order (FMO) program" and which "serves as an early indication of the level and trend of Class I over-order charges." (Doc. 417-8 at 2.) Dr. Kalt acknowledges the nature of this data, explaining in his report it was "based on a survey of cooperatives at a number of different cities around the United States," but he contends that "is the only available price data . . . for plants in both Order 1 and other regions." (Doc. 408-3 at 202-03 n.675; 12/16/11 Kalt Report at 198-99 n.675.) Dr. Kalt uses this data to analyze Dr. Rausser's "benchmark approach" and to "compare[] USDA survey report prices paid by Class I plants in various cities in Order 1 to those reportedly paid by such plants in Orders 32 and 33, while controlling for a number of the same economic factors unrelated to the alleged conspiracy that Plaintiffs' expert . . . included in his own model of prices paid for raw milk." (Doc. 408-3 at 202-03; 12/16/11 Kalt Report at 198-99) (footnotes omitted).

It is undisputed the USDA survey is based on prices that have not been verified as having actually been paid by processors. Accordingly, at a minimum, Dr. Kalt may not refer to this data as the "prices paid" because such a reference is both incorrect and

misleading. However, because USDA price announcements offered to fluid milk processors "may include additional charges for services or milk deliveries beyond contract specifications, credits that processors can earn per contract criteria, or credits that may be given to meet competition" (Doc. 417-8 at 2), they may include the credits that Plaintiffs claim are omitted from the survey prices. As a result, provided Dr. Kalt accurately characterizes the prices as "announced prices" or "survey data" and accurately reflects both the source of this data and its limitations, the data is neither meaningless nor inherently unreliable.

Experts may rely on a wide range of information in forming their opinions provided it is the kind of information upon which "experts in the particular field would reasonably rely." Fed. R. Evid. 703. In this case, both experts relied on USDA survey data in attempting to construct a means of comparing prices among Orders and, in fact, Dr. Rausser's use of this data was extensive. *See, e.g.,* Doc. 372-3 at 15-21; 7/22/11 Rausser Initial Report at 59-65 & Doc. 372-7 at 12, 15-16; 7/22/11 Rausser Report, Exs. 11, 14, 15); Doc. 372-3 at 15 & n.102; 7/22/11 Rausser Initial Report at 59 & n.102. Plaintiffs thus cannot be heard to complain that the data is unreliable.[4]

Most "challenge[s] to the facts or data relied upon by [an expert do] not go to the admissibility of his testimony, but only to the weight of his testimony." *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005); *see also Green*

---

[4] In *SE Milk Antitrust Litig.*, the district court rejected plaintiffs' argument "that neither of [the defendants'] experts utilized actual prices paid by any bottler, but rather used 'asking prices' reported in a USDA survey which may, or may not, reflect actual prices paid." *In re Se. Milk Antitrust Litig.*, 2010 WL 8228839, at *6 (E.D. Tenn. Dec. 8, 2010). As the court explained:

> [The defendants' experts] explained the USDA data which they utilized in formulating their opinions. Involved in the question of the appropriateness of utilizing this USDA data is an issue of fact, *viz.*, whether the data correlate to the actual prices paid by bottlers. That issue of fact ultimately must be resolved by the jury, and the opinions of [the defendants' experts] will collapse if the jury finds that the USDA data do not reasonably correlate to the actual prices paid by bottlers. Resolving that factual issue at the pretrial stage in the guise of a *Daubert* motion however, is highly inappropriate.

*Id.*

*Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 325 (D. Vt. 2007) ("[L]imitations in some of the data on which [an expert] relied goes to the weight of [the expert's] testimony . . ., not its admissibility."). Here, the issue is not whether both experts may use the challenged data, but the manner in which they use it and refer to it before the jury. Dr. Kalt must accurately explain the source and limitations of the data in question, and Plaintiffs may challenge its use on cross-examination. The court therefore GRANTS Plaintiffs' motion to exclude Dr. Kalt's references to "prices paid" when using USDA survey data and DENIES Plaintiffs' motion to exclude Dr. Kalt's analyses and opinions that stem from his use of this data.

E. **Whether Dr. Kalt Has Adequate Qualifications to Opine on Issues of "Cooperative Governance" Concerning Dairy Cooperatives.**

Plaintiffs seek exclusion of Dr. Kalt's opinions regarding "cooperative governance," pointing out that Dr. Kalt has not published on cooperative governance and holds no recognition or accreditation from any relevant professional associations that would render him an expert on that topic. Plaintiffs further assert that Dr. Kalt lacks any expertise specific to dairy farmer cooperatives and, as a result, his testimony could only serve as a "mouthpiece" for Defendants under the guise of offering "expert" opinion, which is not permitted. *See Rotman v. Progressive Ins. Co.*, 2013 WL 3293531, at *8 (D. Vt. June 28, 2013) (concluding that expert who merely repeated testimony of a lay witness was "not testifying as an expert witness based upon specialized knowledge, but rather [was] acting as a conduit for another witness's testimony in the guise of an expert's opinion"); *see also King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.").

Defendants respond that Dr. Kalt is "eminently qualified" to render the opinions in question and that Plaintiffs "ignore the fact that economists on both sides of this case have sought to apply the tools of economics, including the economic behaviors of organizations, to the issues in this case involving the actions of dairy cooperatives." (Doc. 427 at 22.) Dr. Kalt's opinions regarding the incentives of cooperative managers

14

are thus offered in response to Dr. Rausser's opinions regarding the potential incentives for managers to betray the interests of their members. Dr. Rausser has opined that managers may have been incentivized by a desire to increase their own compensation, and to pursue stability, by avoiding competition and maintaining market share. (Doc. 372-4 at 13-14; 7/22/11 Rausser Initial Report at 100-01.) Dr. Kalt challenges Dr. Rausser's hypotheses, arguing that, based on the facts in the record indicating the processes by which the cooperatives conduct business, managers have economic incentives to benefit, not harm, the members of the cooperative. (Doc. 408-3 at 110-24; 12/16/11 Kalt Report at 106-20.) These opinions fall within Dr. Kalt's field of expertise, do not require special expertise in the dairy industry, and are not opinions regarding "cooperative governance."[5] Instead, they are the same type of opinions Dr. Rausser has rendered regarding the economic incentives of the participants in the alleged conspiracy.

Dr. Kalt may not, however, venture beyond the economic incentives of the alleged participants and testify regarding the legal and regulatory framework governing the production and marketing of milk and the dairy cooperatives' role within that complicated framework or regarding the legal, ethical, or regulatory restrictions on the manner in which a dairy cooperative's management does business. Accordingly, to the extent he seeks to opine regarding true "cooperative governance," Defendants fail to demonstrate that he is qualified to do so. *See McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir. 1992) (affirming the exclusion of an electrical and industrial engineer from testifying as to the adequacy of warning labels about the exhaust emitted from hot-melt glue because "he lack[ed] training or experience in chemical engineering, toxicology, environmental engineering, or the design of warning labels"); *see also*

---

[5] *See* Barron's Dictionary of Finance & Investment Terms 145 (7th ed. 2006) (defining "corporate governance" as the "management of a corporation for the benefit of its shareholders in compliance with laws and ethical standards"); 1 Publicly Traded Corporations: Governance & Reg. § 2:1 (2013 ed.) ("Given that the typical modern legal structure of the corporation divides corporate control and accountability between the corporation's (i) shareholders, (ii) board of directors, and (iii) officers/agents, at its most basic level, the term 'corporate governance' embodies the allocation of power and responsibility between these three corporate organs.").

*Eagleston v. Guido*, 41 F.3d 865, 874 (2d Cir. 1994) (affirming the exclusion of an expert who, despite having a doctorate, was "unfamiliar" with the topics party intended the expert to testify about); *cf. Pereira v. Cogan*, 281 B.R. 194, 200 (S.D.N.Y. 2002) (permitting expert to testify about "examples of what he believes good corporate practices require according to industry and custom" because expert had "thirty years of experience in the corporate governance field," including "his observations of 'good corporate practices'").

The court thus GRANTS Plaintiffs' motion to exclude Dr. Kalt's opinions regarding cooperative governance, and DENIES the remainder of Plaintiffs' motion to exclude on this issue.

## CONCLUSION

Consistent with the rulings set forth above, the court GRANTS IN PART and DENIES IN PART Plaintiffs' *Daubert* motion to exclude certain opinions and testimony of Prof. Joseph Kalt. (Doc. 417.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 23rd day of January, 2014.

Christina Reiss, Chief Judge
United States District Court