UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 JUN 11  PM 3: 17

CLERK

BY_____
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN,      )
d/b/a Al-lens Farm, GARRET SITTS, RALPH  )
SITTS, JONATHAN HAAR, CLAUDIA HAAR,      )
and RICHARD SWANTAK, on behalf of        )
themselves and all others similarly situated,  )
                                         )
          Plaintiffs,                    )
                                         )
     v.                                  )      Case No. 5:09-cv-230
                                         )
DAIRY FARMERS OF AMERICA, INC., and      )
DAIRY MARKETING SERVICES, LLC,           )
                                         )
          Defendants.                    )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 479)

This matter came before the court on the motion for summary judgment filed by Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (Doc. 479.) Plaintiffs Alice H. Allen and Laurance E. Allen, d/b/a Al-lens Farm, Garret Sitts, Ralph Sitts, Jonathan Haar, Claudia Haar, and Richard Swantak oppose that motion. The court heard oral argument on May 8, 2014.

**I.     Procedural Background.**

Plaintiffs allege antitrust claims against Defendants DFA and DMS arising out of Defendants' alleged control of the raw Grade A milk supply in the Northeast. Defendant DFA is a dairy cooperative that produces, processes, and distributes raw Grade A milk. DMS is a milk marketing agency which was formed in 1999 by DFA and DairyLea Cooperative, Inc. ("Dairylea") and is currently owned by DFA, Dairylea, and St. Albans Cooperative Creamery, Inc. ("St. Albans"). Plaintiffs are dairy farmers who sold raw

Grade A milk through DMS during the time period between January 1, 2002 to the present.

In their Revised Consolidated Amended Class Action Complaint ("CAC") (Doc. 117), Plaintiffs allege a relevant product market consisting of raw Grade A milk.[1] They allege that the relevant geographic market is Federal Milk Market Order 1 ("Order 1") covering areas in Connecticut, Delaware, the District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia.

Plaintiffs allege that Defendants engaged and are presently engaging in five violations of the Sherman Act, 15 U.S.C. §§ 1-2: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act; (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act; and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act. In support of these claims, Plaintiffs seek to present to the jury evidence that Defendants engaged in a wide-ranging fifteen-year conspiracy at both the processor and cooperative levels to fix, stabilize, and artificially depress prices for raw Grade A milk and to allocate markets within Order 1 among the co-conspirators.

Plaintiffs contend that the conspiracy's mechanism for suppressing milk prices was the co-conspirators' agreement to suppress the premiums Order 1 processors pay for raw Grade A milk:

> Court: Tell me in plain language [your expert's] theory as to how this conspiracy suppressed milk prices, how did that work, what was the mechanism?
>
> Plaintiff's Attorney: The mechanism is reduction in over[-]order premiums that the processors pay.

Tr. 7/12/12 at 27:5-10.

---

[1] At times, Plaintiffs' pleadings have referred to the relevant product market as "fluid Grade A milk." *See, e.g.*, Doc. 1 at 13; Doc. 16 at 14. This term has been used interchangeably in this case with "raw Grade A milk," which is the term used in the CAC. Doc. 117 at 13; ¶ 29.

Plaintiffs' expert witness, Gordon Rausser, Ph.D., contends that the component of milk prices the conspiracy suppressed is "Farmer Premiums"[2]—a term not used in the dairy industry, but which nonetheless identifies that portion of price which he opines was adversely impacted by the conspiracy. In Plaintiffs' opposition to summary judgment, the term "Farmer Premiums" does not appear and Plaintiffs refer to suppressed prices. Because the CAC alleges the suppression of over-order premiums, the court will use that term.

The court has certified a class consisting of all dairy farmers, whether individuals, entities, or members of cooperatives, who produced and pooled raw Grade A milk on Order 1 during any time from January 1, 2002 to the present.[3] Accordingly, in order to be a class member, a dairy farmer must be physically located within Order 1 in addition to pooling milk there. Defendants and Defendants' alleged co-conspirators (at both the processor and cooperative levels) are excluded from the class.

Plaintiffs seek monetary damages in an amount which represents the additional amount Plaintiffs and other class members would have received for sales of raw Grade A milk in the absence of the antitrust violations alleged, and treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. In addition to their request for monetary relief, Plaintiffs seek an injunction prohibiting conduct found by the court or a jury to be illegal.

Defendants contend that they are entitled to judgment as a matter of law in their favor because: (1) Plaintiffs cannot establish a relevant geographic market and that,

---

[2] According to Dr. Rausser, a "Farmer Premium" is the amount received by each class member after subtracting "from their gross pay price the federally regulated blend minimum" price for each month. Doc. 381-1 at 12; 3/16/12 Rausser Rebuttal at 10. Dr. Rausser defines the "federally regulated blend minimum price" as the amount "set each month for each Order by the Market Administrator for that Order." Doc. 381-1 at 100-01; 3/16/12 Rausser Rebuttal at 98-99. By subtracting this price from the "total price" paid to farmers, Dr. Rausser asserts that the resulting "Farmer Premium" exposes the extent of price suppression in Order 1 relevant to the benchmark orders. *Id.*

[3] The court has also certified two subclasses, consisting of those dairy farmers who are members of DFA or otherwise sell milk through DMS ("DFA/DMS subclass") and those dairy farmers who are not members of DFA and do not otherwise sell milk through DMS ("non-DFA/DMS subclass").

absent proof of a relevant geographic market, Plaintiffs' antitrust claims fail; (2) Plaintiffs' monopsonization and attempted monopsonization claims against Defendants (Counts Two and Three) fail because Plaintiffs cannot establish monopsony power or a dangerous probability of achieving monopsony power; (3) Plaintiffs' monopsony conspiracy claims (Counts One through Five) fail as a matter of law because no reasonable jury could find in Plaintiffs' favor on these claims; (4) Plaintiffs cannot establish dairy cooperatives were coerced into joining DFA-DMS or that their management received excessive compensation, was corrupt, or was threatened in order to secure the cooperative's participation in the conspiracy: (5) Plaintiffs cannot establish that HP Hood LLC ("Hood"), Farmland Dairies LLC ("Farmland"), Kraft, and certain other processors participated in the conspiracy; (6) Plaintiffs' price-fixing claim (Count Four) fails as a matter of law because there is no evidence that the Greater Northeast Milk Marketing Agency ("GNEMMA") engaged in price-fixing in a manner that is relevant to this case; and (7) Plaintiffs' claims are time-barred or, in the alternative, their damages are limited to a four-year period from the filing of the Complaint and do not include damages for sales that involve non-conspirators.

Plaintiffs argue that each of the issues identified by Defendants must be decided by the finder of fact and cannot be resolved as a matter of law by the court. They assert that they have proffered sufficient admissible evidence to present each of their claims to a jury.

## II.     The Factual Record on Summary Judgment.

In this case, isolating the undisputed facts is no easy task. Defendants have identified 130 paragraphs of facts, with numerous subparagraphs, which they contend are undisputed. Plaintiffs agree that only a handful of Defendants' facts are undisputed. With regard to the remainder, Plaintiffs either dispute the fact with a proper citation to evidence; contend that an undisputed fact is not reflected in Defendants' memorandum and thus must be disregarded; ask that an undisputed fact be disregarded because it is not relevant; agree that certain facts exist or that a particular statement was made, but assert that this fact or statement cannot be considered in isolation and instead must be

considered with other facts which Plaintiffs at times supply; or respond in a variety of other ways that fall short of either agreeing a fact is undisputed or disputing a fact with admissible evidence.[4]  Defendants have responded to Plaintiffs' statement of disputed facts with a 120-page chart comparing Defendants' statement of undisputed facts, Plaintiffs' responses, and suggesting a proposed resolution of the alleged factual dispute.

Plaintiffs, in turn, have submitted their own "concise" additional statement of disputed material facts which consists of 336 paragraphs of additional facts which they contend the court must consider in ruling on summary judgment.  Defendants have submitted an eighteen-page summary table, identifying assertions in Plaintiffs' additional statement of disputed facts which they contend are either unsupported or inadmissible.  Plaintiffs complain that Defendants have failed to respond to 286 of their 336 disputed material facts.  Plaintiffs cite no authority for the proposition that Defendants are required to respond to this additional statement of disputed facts, and the court has found none.

In light of the voluminous factual record before the court, and the absence of any discernible effort by the parties to narrow the factual or legal issues before the court, the court will not attempt to set forth all of the undisputed facts but will instead only consider those facts necessary to address the issues of law raised by Defendants' motion.  *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (joining "with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on the district court to perform an independent review of the record to find proof of a factual dispute"); *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989) ("A vast array of factual contentions have been advanced by the parties.  In considering a motion for summary judgment, however, the substantive law will identify which facts are material.") (internal quotation marks omitted); *see also Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528-29 (7th Cir. 2000) (concluding that a trial

---

[4] A party disputing a fact must either cite admissible evidence to establish that dispute or demonstrate the moving party's fact is unsupported by the evidence. *See* Fed. R. Civ. P. 56(c). "If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion; . . . (4) or issue any other appropriate order." *See* Fed. R. Civ. P. 56(e).

court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact").

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

### B.    Whether Plaintiffs Have Established a Relevant Geographic Market.

In their CAC, Plaintiffs allege that the relevant geographic market is Order 1, "which covers areas in Delaware, District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont and Virginia." Doc. 117 at 13; ¶ 28. In response to both Defendants' motion to exclude their expert witness's opinions and in response to Defendants' pending motion for summary judgment, Plaintiffs assert that in order to be considered a supplier to Order 1 and part of the relevant geographic market, a dairy farmer must be physically located within Order 1's geographic boundaries. *See* Doc. 488 at 26 ("[T]he relevant market is the area in which the plaintiff sellers can turn to escape dominant buyers."); Doc. 488 at 25 ("It is entirely appropriate to consider Order 1 as a relevant market from the

standpoint of the class of thousands of dairy farmers located in the multi-state area comprising Order 1."). In other words, Plaintiffs contend that the relevant geographic market includes only class members and excludes dairy farmers who pool milk on Order 1, but are physically located outside its geographic boundaries.

Plaintiffs' proposed approach to market definition would exclude approximately 30% of the raw Grade A milk pooled on Order 1, even though Plaintiffs concede that, in a monopsony case, the relevant geographic market is where sellers in the candidate market may turn to avoid unlawful price suppression by buyers. By artificially limiting the definition of "sellers" to only dairy farmers located in Order 1, Plaintiffs apparently seek to correspondingly limit the options available to sellers of milk to Order 1 processors. This inevitably will heighten the alleged adverse impact of the conspiracy, while ignoring a sizable percentage of the milk supply purportedly affected by it. Defendants seek summary judgment regarding whether Plaintiffs can "limit the relevant 'suppliers' to the farmers who happen to be plaintiffs in this case." Doc. 487 at 11.

Plaintiffs defend their definition of the relevant geographic market by first arguing that they do not need to establish a relevant geographic market because "[t]he essence of Plaintiffs' claim is a *per se* unlawful agreement among horizontal competitors not to compete for the purchase of raw milk from dairy farmers." Doc. 488 at 29 (footnote omitted); *see also* Doc. 488 at 29-30 ("Plaintiffs are not required to define a geographic market in this case . . . [because] [t]he record in this case is overwhelming that DFA, DMS, other cooperatives, and processors previously *competed directly* against each other to purchase raw milk. There also is abundant evidence that they agreed to restrict this direct competition beginning in 1998.") (footnote and citations omitted); Doc. 488 at 31 ("[M]arket definition is not required in this case because there is significant proof of actual market power and anti-competitive effects," and "[b]oth the law and antitrust scholarship indicate that market definition is unnecessary where there is direct evidence of the power to control prices or exclude competition.") (footnote and citations omitted).

Plaintiffs' contention that they need not define a relevant geographic market because they allege *per se* violations of the antitrust laws or have such compelling direct

7

evidence of antitrust violations that only a "quick look" approach[5] is required is based upon contested evidence and the competing inferences that may be drawn from that evidence. "This genuine and material factual dispute prevents summary judgment as to whether a *per se* violation occurred." *In re Wholesale Grocery Prods. Antitrust Litig.*, 2014 WL 2109122, at *6 (8th Cir. May 21, 2014). Moreover, it is undisputed that Plaintiffs contend that Defendants have engaged in both horizontal and vertical restraints of trade, many of which are not *per se* violations of the antitrust laws. *See Meredith Corp. v. SESAC LLC*, 2014 WL 812795, at *20 (S.D.N.Y. Mar. 3, 2014) ("[T]he presence of even [a] significant horizontal dimension, alongside a vertical one, does not trigger *per se* review.").

Assuming *arguendo* that Plaintiffs must establish a relevant geographic market for at least some of their claims,[6] Plaintiffs have proffered no evidence that the relevant geographic market includes only class members—*i.e.*, only dairy farmers located within Order 1's geographic boundaries. Plaintiffs' expert witness Dr. Rausser has specifically and repeatedly testified that Order 1, as a relevant geographic market, *does not* require a dairy farmer supplier to be located within its geographic boundaries. *See* Doc. 458-7 at 6; 11/3/11 Rausser Dep. at 48:6-12 ("[A]t a minimum, my opinion is that the relevant market includes all of those producers and the pricing determination that they receive, that they capture in Order 1, the geographic boundaries. In addition, the surrounding areas in terms of the geographic scope of the relevant market are in that relevant market as well."); Doc. 458-1 at 7; 6/26/13 Rausser Dep. at 244:6-12 ("[M]y rebuttal report . . .

---

[5] *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (reserving "quick look" approach to cases in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets").

[6] "Evaluating market power begins with defining the relevant market." *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Thus, in order to assert an antitrust claim, a plaintiff must allege which "trade or commerce," 15 U.S.C. §§ 1, 2, has been restrained. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (explaining that to determine whether there is a viable claim of monopolization or attempted monopolization, a court must inquire "into the relevant product and geographic market").

shows that the actual scope—geographic scope expands beyond the boundaries of Order 1."); Doc. 372-13 at 7; 11/3/11 Rausser Dep. at 43:21-45:12 (testifying that a hypothetical dairy farmer that resides in Maine but sells milk to a processing plant inside Order 1 is part of that relevant market).

In ruling certain of Dr. Rausser's opinions regarding the relevant geographic market admissible, the court did not foreclose the possibility that Plaintiffs could adduce admissible evidence in support of a different geographic market.[7] *See Allen v. Dairy Mktg. Servs.*, 2013 WL 6909953, at *4-5 (D. Vt. Dec. 31, 2013). The court did not, however, suggest that Plaintiffs could withstand summary judgment without this evidence. To the contrary, courts recognize that antitrust plaintiffs often cannot survive summary judgment without the benefit of an expert witness who supports their market definition. *See, e.g., City of New York v. Grp. Health Inc.*, 2010 WL 2132246, at *5 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011) (granting summary judgment in defendant's favor because plaintiff's expert opined that geographic market was broader than plaintiff alleged and thus plaintiff's market definition was "inadequate as a matter of law"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 (D. Md. 2002) (ruling "plaintiffs bear the difficult, if not impossible, burden of proving the outer boundaries of a relevant market and market power without the aid of an economic expert"); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 582 (W.D. Va. 2000) (granting summary judgment in defendant's favor because "the jury would have no reasonable basis for defining the proposed geographic market in the manner the plaintiffs propose" because plaintiff had no expert witness to rebut defendant's expert testimony regarding the relevant geographic market).

---

[7] Plaintiffs do not acknowledge that Dr. Rausser's opinion differs from their own definition of the relevant geographic market. They point to Dr. Rausser's explanation that: "The purpose of this testimony [that the relevant geographic market extends beyond Order 1 to include dairy farmers who supply milk to Order 1] was to point out that my conclusion [that] Order 1 is a relevant geographic market would not change even if my analysis were broadened to include farmers in nearby unregulated areas who sell their milk into Order 1." Doc. 381-1 at 22; 3/16/12 Rausser Rebuttal at 20. However, at no time did Dr. Rausser opine that in order to be considered part of Order 1, a dairy farmer must be physically located within its confines.

Plaintiffs accurately point out that "pooling" on Order 1 is not the equivalent of supplying milk there, however, it is undisputed that both parties' expert witnesses use pooling data in their analyses. Far more important is the complete absence of any evidence that supports Plaintiffs' contention that a dairy farmer must be physically located within Order 1 in order to be considered a supplier to that geographic market. Certainly, Order 1 imposes no such requirement, market participants do not recognize this distinction, and Plaintiffs point to no commercial realities that support it. Moreover, the law applicable to defining a relevant geographic market imposes no requirement that the market be co-extensive with the definition of the class.

Although it is true that "[t]he determination of the relevant market is generally a question of fact," *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n.4 (10th Cir. 1984), this does not dispense with the requirement that the party opposing summary judgment must come forward with admissible evidence to support a claim that it seeks to present at trial. *See Celotex Corp.*, 477 U.S. at 323 (concluding that a moving party is entitled to a judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"); *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) ("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.").

Plaintiffs cite no evidence that would allow them to define the geographic market so that only dairy farmers located within Order 1's geographic boundaries are considered suppliers to that market. Defendants' motion for summary judgment with regard to this portion of Plaintiffs' geographic market definition is therefore GRANTED.

Defendants further ask the court to conclude that even Dr. Rausser's definition of the relevant geographic market does not survive summary judgment. They cite to the analysis of their expert witness, Joseph Kalt, Ph.D., in support of this request and ask the court to find that Dr. Kalt's SSNIP test, which the court ruled admissible, demonstrates that Order 1 cannot be deemed a relevant geographic market. Defendants point out that

Order 1 was established for regulatory and administrative purposes, not for drawing a relevant geographic market in an antitrust case. In addition, they note that the milk regulations in Order 1 do not control where dairy farmers can sell their milk; they merely regulate certain aspects of milk prices for milk pooled on that Order.

In *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), the Court observed that "Congress neither adopted nor rejected specifically any particular tests for measuring the relevant markets, either as defined in terms of product or in terms of geographic locus of competition." *Id.* at 320. Accordingly, it held that:

> [t]he criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. . . . Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both correspond to the commercial realities of the industry and be economically significant.

*Id.* at 336-37 (internal quotation marks, footnotes, and citations omitted); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (defining the relevant geographic market as "the area of effective competition" and "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies"); *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (explaining that in a monopsony, or buyer-side conspiracy, "the market is not the market of competing sellers but of competing buyers" and that therefore the "market is comprised of buyers who are seen by sellers as being reasonably good substitutes") (internal quotation marks omitted).

In the event Plaintiffs seek to present their expert witness's definition of the relevant geographic market at trial, they have adduced sufficient evidence to support it. Plaintiffs cite the low volume of milk leaving Order 1, Order 1 pricing regulations which are controlled by an Order 1 "Market Administrator," market participants' perception that Order 1 is a relevant market, and certain "commercial realities," such as transportation costs, the perishable nature of milk, shipping patterns, the capacity of processing plants, and dairy farmers' inability to fully control where they sell their milk which further reduces their options to shift their milk supply to another market. Defendants contest this

evidence and the inferences that can be drawn from it, however, the weight of the evidence, the credibility of the competing expert witnesses, and the persuasiveness of their opinions are all questions for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"); *see also Pope v. County of Albany*, 687 F.3d 565, 581 (2d Cir. 2012) ("The question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder[.]"); *Michalowski v. CSX Transp., Inc.*, 387 F. Supp. 2d 215, 217 (W.D.N.Y. 2005) ("The question of which expert opinion is more persuasive is not a matter appropriately resolved at the summary judgment stage.").

In this case, there is sufficient admissible evidence to support Order 1 as the relevant geographic market to render that market definition a question for the jury. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 2014 WL 2109122, at *6 (holding "summary judgment was not warranted because [plaintiff] submitted enough evidence to create a genuine factual dispute about . . . the relevant market"). Defendants' motion for summary judgment with regard to Plaintiffs' relevant geographic market is thus GRANTED IN PART and DENIED IN PART. Plaintiffs may present evidence to the jury in support of Order 1 as a relevant geographic market. They may not, however, present to the jury a market definition of Order 1 that requires a dairy farmer to be physically located within Order 1's geographic boundaries in order to be considered a supplier of milk to that market.

### C.   Whether Plaintiffs Can Establish Monopsony Power or a Dangerous Probability of Achieving Monopsony Power (Counts Two & Three).

In Count Two of the CAC, Plaintiffs allege Defendants have violated § 2 of the Sherman Act by engaging in an attempted monopsony of raw Grade A milk in Order 1. In Count Three of the CAC, Plaintiffs allege Defendants possess monopsony power in the raw Grade A milk market in Order 1.

A monopsony may exist when buyers exert unlawful control over where suppliers may sell their products or the prices at which they can sell them. *See Weyerhaeuser Co.*

12

*v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("[A] monopsony is to the buy side of the market what a monopoly is to the sell side," and this "[m]onopsony power is market power on the buy side of the market."); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184 (D. Conn. 2001) (explaining that a monopsony is "an arrangement where a buyer uses its market share power to reduce the purchase price of goods" from a seller or sellers). "The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization." *Weyerhaeuser Co.*, 549 U.S. at 322.

"To establish a claim for attempted [monopsonization], a plaintiff must prove: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to [monopsonize] and (3) a dangerous probability of achieving [monopsony] power.'" *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99-100 (2d Cir. 1998) (quoting *Spectrum Sports, Inc.*, 506 U.S. at 456). "[I]n order to state a claim for [monopsonization] under Section 2 of the Sherman Act, a plaintiff must establish '(1) the possession of [monopsony] power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

The thrust of Defendants' motion for summary judgment with regard to Plaintiffs' monopsony claims in Counts Two and Three is that those claims do not survive summary judgment in the absence of a relevant geographic market. Because the court has determined that Plaintiffs have proffered admissible evidence in support of Order 1 as a relevant geographic market provided it encompasses all suppliers to that market, summary judgment on this basis is not warranted.

Defendants further argue that even if Order 1 is defined as a relevant geographic market, Plaintiffs' monopsony claims must fail because Plaintiffs cannot establish monopsony power or a dangerous probability of achieving monopsony power during the class period. Defendants contend that between 2000 and 2009, DFA's share of milk

produced in and pooled on Order 1 never exceeded 10.6% and DMS's market share was never greater than 58.6%. Defendants further point out that since 2004, the first year in which DMS included all of the cooperatives it currently includes, DMS's market share has been relatively flat with no appreciable increase in market share. Defendants contend that no court has deemed market power of this magnitude, absent direct evidence of monopsony power, sufficient.

In response, Plaintiffs' dispute Dr. Kalt's calculation of DFA's market share, dispute whether DMS's market share has remained relatively flat, and argue that DFA's market share cannot be isolated from DMS's market share because DFA controls DMS, acts as its alter ego, and markets all of its milk through DMS. According to Dr. Rausser, the share of milk produced and pooled on Order 1 by Defendants DFA and DMS ranged from 40.2% to 58.6% during the 2002 to 2009 time period and DMS marketed over 60% of the milk pooled on Order 1 during the 2007-2009 time frame. In addition, Plaintiffs contend that they have established direct evidence of monopsony power and actual adverse effects on competition, even if that evidence is contested.

"'The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence.'" *Tops Mkts., Inc.*, 142 F.3d at 99 (quoting *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981)). Indeed, "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd*, 275 F.3d at 206. "In fact, this arguably is more direct evidence of market power than calculations of elusive market share figures." *Id.* The Second Circuit has opined that "a party may have [monopsony] power in a particular market, even though its market share is less than 50%." *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984). Here, the evidence of Defendants' market share is clearly contested.

Moreover, even after a defendant's market share is properly calculated, the courts "will draw an inference of [monopsony] power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Mkts.,*

*Inc.*, 142 F.3d at 98. "These characteristics include the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct[,] and the elasticity of . . . demand." *Id.* (internal quotation marks omitted). In this case, many, if not all, of these issues are contested questions of fact or the subject of competing expert opinions. Summary judgment is therefore inappropriate. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (reversing summary judgment and holding that "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial'") (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

Because there are genuine issues of material facts regarding Defendants' monopsony power during the relevant time period and because Defendants have failed to establish that they are entitled to judgment as a matter of law in their favor, the court DENIES Defendants' motion for summary judgment with regard to Counts Two and Three.

**D.    Whether Plaintiffs' Alleged Monopsony Conspiracy Claims Fail as a Matter of Law Because No Reasonable Jury Could Find in Plaintiffs' Favor on These Claims.**

Defendants argue that no rational jury could find in Plaintiffs' favor on Plaintiffs' monopsony conspiracy claims (Counts One and Five) because Plaintiffs cannot demonstrate that an inference of a conspiracy is reasonable in light of the competing inferences. As Defendants point out, Plaintiffs' conspiracy claims are complex, expansive, and evolving.

In general terms, Plaintiffs allege an approximately fifteen-year conspiracy that eventually involved most of the major fluid milk processors and dairy cooperatives in Order 1. Prior to the alleged conspiracy, Plaintiffs contend that DFA competed directly for the supply of milk in Order 1. Through the alleged conspiracy, DFA and its marketing agent DMS allegedly gained control of the supply of milk to Order 1

15

processors and thereby suppressed the over-order premiums paid by Order 1 processors to dairy farmers. Plaintiffs allege that the conspiracy restrained competition by restricting the ability of Order 1 processors to solicit suppliers of milk outside the DFA-DMS supply chain and by eliminating competition between dairy cooperatives for members. The participants of the alleged conspiracy varied over time as processors joined the conspiracy to gain access to the DFA-DMS controlled milk supply and as dairy cooperatives allegedly joined the conspiracy for a variety of reasons including, according to Plaintiffs' allegations, in response to threats, coercion, and manager malfeasance or with the intent to act in contravention to their members' best interests.

Defendants contend that Plaintiffs' conspiracy theories are not plausible and that the factual record does not support them. They argue that Plaintiffs will be unable to establish any harm to competition during the class period because: premiums to dairy farmers increased by $0.30/cwt; production decreased more slowly than it had in previous decades; from 2000 to 2010, the number of independent farmers remained steady but the share of milk from independent farmers increased by 20%; and non-conspiring processors either entered the market or expanded their capacity, thereby presenting new and additional options for dairy farmers seeking to escape the alleged conspiracy. Defendants contend that the undisputed evidence establishes that the sole purpose for the creation of DMS was to increase savings on milk assembly, hauling, and transportation costs, to improve service to consolidated customers, to optimize hauling routes and achieve efficiencies, and to yield a better return for the supply of milk.

Defendants further argue that Plaintiffs place undue weight upon evidence that certain cooperatives agreed to refrain from soliciting other cooperatives' members. Although Defendants concede that the court may not examine Plaintiffs' alleged conspiracy in a piecemeal manner,[8] they point out that even Plaintiffs' expert witness Dr. Rausser has not opined that there is a relationship between this alleged conduct and the

---

[8] *See H.L. Hayden Co.*, 879 F.2d at 1012 (directing that courts "must accord plaintiffs 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

16

Farmer Premiums he claims have been suppressed. Defendants ask the court to find that Plaintiffs "cannot create a reasonable inference of the broad conspiracy they allege by simply repeating their version of the facts" regarding the alleged non-solicitation agreements. Doc. 487 at 15.

In response, Plaintiffs provide hundreds of paragraphs of disputed facts which they contend the court must also consider in evaluating Defendants' summary judgment arguments. With regard to certain critical pieces of evidence, Plaintiffs affix anti-competitive labels and descriptions to activities and evidence that are considerably more nuanced than Plaintiffs acknowledge. In this respect, several of Plaintiffs' representations regarding the factual record are either problematic or unreliable.

For example, Plaintiffs allege the conspiracy began in 1998 when DFA, the successor to four merged dairy cooperatives, allegedly conspired with Suiza, a major milk processor in the Northeast, to control the flow of milk to Order 1 processing plants. Plaintiffs allege that DFA and Suiza "agree[d] not to compete," Doc. 488 at 34, and contend that the following contemporaneous statements evidence this non-competition agreement: (1) a November 3, 1997 letter explaining that Suiza and DFA "share common interests in the evolution of [the] dairy industry," "can do an enormous amount of business together," and can build "a broad and mutually profitable relationship in the dairy industry," Doc. 488-1 at 13; PSOF 87; and (2) a February 20, 1998 letter in which Suiza states the following: Suiza views "DFA as a preferred supplier" and "DFA views Suiza as a preferred partner in the acquisition of additional joint ventures [and] operations;" Suiza looks "forward to a more extensive relationship" and "[a]s DFA develops or could develop new supplies of milk in geographic areas where we have or could have plants, we also expect to establish milk supply arrangements with DFA at those facilities;" and "DFA and Suiza will have many other opportunities to expand their strategic partnership." *Id.* It is hard to discern how the cited statements could constitute direct evidence of an agreement not to compete. Rather, they support only a reasonable inference that DFA and Suiza found it mutually beneficial to work together.

In a similar vein, Plaintiffs allege that, in 1998, DFA and Suiza entered a milk supply agreement with a "most favored nations" clause which permitted Suiza to purchase from DFA all the raw Grade A milk Suiza needed for certain of its processing plants. Doc. 488-1 at 14; PSOF 89. They also formed an entity in the Northeast to implement their milk supply agreement (the "Suiza GTL" or the "Venture"). Plaintiffs cite a December 17, 1998 letter from Suiza to DFA as evidence of the alleged agreement to "conver[t]" independent milk producers in Order 1 to DFA members and force them to use DFA's marketing services. Doc. 488-1 at 14-15; PSOF 90(c). This letter, however, is considerably more benign than Plaintiffs' characterization of it.[9] Moreover, contrary to Plaintiffs' representation, Gary Hanman, DFA's then CEO, *did not* testify that he understood the letter to mean Suiza would assist DFA in "*forcing* [independent producers] to utilize a marketing service controlled by DFA." Doc. 488-1 at 15; PSOF 90(d) (citing Pls. Ex. 32, 5/13/11 Hanman Dep. at 41:10-42:18) (emphasis supplied). Instead, he merely agreed to the letter's contents.

---

[9] The December 17, 1998 letter states:

> We look forward to our expanding relationship with DFA as DFA begins to provide milk to the Venture, pursuant to the Milk Supply Agreement executed today.

> After DFA successfully assumes responsibility for the co-op milk supply as contemplated by the Milk Supply Agreement, we would expect that DFA would gradually expand its milk supply responsibilities to include other milk supply needs of the Venture, including those which may be provided by independent producers.

> Pursuant to our discussions we would work closely with and provide support and assistance to DFA in accomplishing this result. After DFA has successfully performed its obligations under the Milk Supply Agreement, we, with DFA, would turn our efforts to the conversion of independent producers to DFA membership, (or in lieu thereof, to nonmembers utilizing the marketing services of DFA) first, around the East Greenbush, New York plant. Thereafter, as DFA's milk supplying capabilities increase, we would support and join your efforts to represent other producers so as to increase the percent of DFA controlled milk supplied to the Venture in the future, subject to the Venture's milk requirements.

Doc. 488-1 at 14-15, PSOF 90(c).

Plaintiffs assert that "DFA took further steps to limit competition for farmer milk by entering into an agreement with Dairylea (DFA's major cooperative competitor in the Northeast), to create DMS in 1999," Doc. 488 at 35, and that this agreement allegedly furthered "DFA's plan to control the milk supply by 'bring[ing] dairy cooperatives in under DFA's umbrella,' 'into the fold,' and 'under [the] DFA[] tent;'" that "cooperatives would have to face some 'risk of going forward as is;'" and that DFA, Dairylea, and DMS "'should put the maximum amount of pressure on other cooperatives.'" Doc. 488 at 36 (citing Doc. 488-1 at 17; PSOF ¶¶ 103-104). Although these sentence fragments, which are repeatedly cited by Plaintiffs, may be found in the factual record, they are taken out of context.[10] Rather than setting forth a clear-cut plan to control the supply of

---

[10] The cited statements were made in the following context:

> I think it will take one of two things to bring dairy cooperatives in **under DFA's umbrella**. No dairy cooperative in the United States is going to change its current course of action unless (1) it has or senses, **"risk" going forward "as is,"** (2) has a politically viable alternative that is saleable to the masses, and (3) addresses the personal expectations and/or requirements of the management and farmer leaders. Pretty basic stuff, huh? Even if these conditions are met, you still need one of two things: 1) either DFA hits home runs every year - year after year - on a substantial basis (something that will take time to achieve if it isn't impossible to begin with) or 2) DFA **is flexible with respect to how cooperatives come into the fold** (certainly DFA has shown flexibility, and class and grace, with respect to Dairylea).

> I believe that instead of trying to be everybody's friend and having nice lunches and meetings with everyone, we should act like the competitors that we are. We can still be cordial, but **we should put the maximum amount of pressure on other cooperatives** so that they comprehend that DFA is not going to give them a free ride until everyone associated with that cooperative retires or dies. On the other hand, there still needs to be a politically attractive alternative for these cooperatives. In some cases, straight up merger will work. In other cases, however, I believe having an alternative structure will be necessary.

> Cooperatives operating facilities have debt load, equity, and milk check competitiveness issues facing them. With increasingly large proprietary competitors squeezing these cooperatives, merger may be an effective way to bring about unification because of the flexibility merger provides with respect to handling member equity. In the East, cooperatives like St. Albans and Maryland-Virginia, with minimal manufacturing operations and thus fewer problems, have

milk in Order 1 through DFA-DMS market power and coercion, the statements are contained in a rambling memorandum in which the author also states that he "came away from DFA's staff and board meetings two weeks ago concerned that the organization is approaching some state of disarray," that he "find[s] DFA's management group scary thin," that they needed to "[t]ell the Board, the membership, and other important constituencies that we are going to miss our year-end profit targets," and that he "think[s] there needs to be a renewed focus on communications within the cooperative, but different than what is going on at the present time. We need less 'rah-rah' and more real talk with, and listening to, our members." Pls. Ex. 66 at 1, 2, 4.

With regard to Plaintiffs' claim that "[i]n agreeing to create DMS as a vehicle to bring dairy cooperatives 'under [the] DFA[] tent,' DFA and Dairylea acted with a shared goal of restricting competition for farmer milk," Doc. 488 at 36, Plaintiffs rely on a document in which the author states that he "would be reluctant to promote DMS, the entity and/or name, except to the independent farmers who will want to associate with it, and/or, possibly, a customer or two in selected areas that for one reason or another might be leary of DFA." Pls. Ex. 68 at 1. It is in this context that he states: "We are using DMS by necessity, not necessarily by choice, although I think it will be with us for a long time." *Id.*

Plaintiffs further argue that DFA "*secretly negotiated* terms that made the ostensible one-year agreement into [a] de facto *twenty year agreement* by imposing draconian financial penalties on Dean [Foods Company ("Dean")] if it terminated the agreements before the year 2023." Doc. 488 at 41. In support of this allegation, Plaintiffs cite a January 24, 2005 memorandum from David Meyer to Brooke Beyer, DFA's Corporate Finance Manager, describing the transaction as follows:

---

> less need for DFA's help with respect to debt load, equity, and keeping members competitive on a month-to-month basis. These cooperatives might be convinced to come **under the DFA tent**, but they won't merge. Basically, putting it in the worst light possible, they don't have to merge, so they won't.

Pls. Ex. 66 at 3 (emphasis supplied).

> DFA has [a] 20 year contract to supply 100% of Dean Foods milk (other
> than plants currently under contract with another milk supplier). We
> currently supply roughly 2/3's of their milk need. Although it's a 20 year
> agreement, by consent decree, it is cancel[l]able by Dean with one year
> notice BUT there is a significant payment due from them to us should they
> cancel.

Pls. Ex. 110 at 1. Plaintiffs also cite deposition testimony from Gary Hanman
acknowledging that there was a financial penalty for cancelling the contract which was
supported by a promissory note and that the agreement covered only certain Dean plants
in the Northeast. There is no evidence that the consent decree prohibited a renewal of the
one-year term in the manner agreed to by Defendants and Dean.

Perhaps most surprising is Plaintiffs' repeated and excessive reliance upon DMS
manager Leon Graves's October 19, 2008 response to a DMS internal questionnaire in
which he observes that the requirement to keep Dean competitive is "lowering the entire
market."[11] Doc. 488 at 47, 71-72. The questionnaire clearly solicits Mr. Graves's
personal opinions. It requests that he follow DMS's "final piece of advice as you fill this
out—don't worry about offending other areas within DMS—tell us what you really
think," and asks him to "[n]ame three problems or issues in the entire DMS business."
Pls. Ex. 25 at 1, 2. Mr. Graves's response includes his observation that one problem or
issue in DMS's business is:

> The Dean Foods contract. We need to begin to operate in a more
> independent manner relative to Dean. The full supply relationship is a
> problem for us and is starting to be ignored by Dean. The requirement
> to keep them competitive is **lowering the entire market**. This will
> continue to be a problem with pricing in the future. Dean Foods should
> not be able to ignore our contract agreements and pay what they feel
> like paying without any consequences.

---

[11] Defendants have compiled their own list of Plaintiffs' use of this phrase, Doc. 487 at 8 n.2, and
point out that the court has already found that this document is "less compelling than Plaintiffs
claim" for the reasons Defendants have asserted. *See Allen v. Dairy Farmers of Am., Inc.*, 279
F.R.D. 257, 265 (D. Vt. 2011). Since the court's observation, Plaintiffs' use of this phrase has
increased, and it could aptly be described as a cornerstone of their damages theory. The cited
sentence fragment is not remotely able to bear that weight.

*Id.* at 1 (emphasis supplied). Far from evidencing how Defendants and Dean have conspired, Mr. Graves describes an antagonistic relationship with Dean.

More importantly, Plaintiffs make no attempt to establish how Mr. Graves's response to an internal inquiry for a candid personal opinion is an admission by a party opponent attributable to both Defendants under Fed. R. Evid. 801(d)(2) or is otherwise admissible hearsay. Nonetheless, Plaintiffs cite this *questionnaire response from a single DMS employee* as the evidentiary basis for the following factual representations to the court:

- "The effect of this conspiracy has been a substantial reduction in the premiums that would be paid to farmers in a competitive market—in Defendants' words, lower prices across 'the entire market.'" Doc. 488 at 13.

- "Defendants' documents also recognize that their actions have had the effect of reducing prices for 'the entire market.'" *Id.* at 32.

- "As DFA recognized, the MFNs requirement that processors pay the same price was 'lowering' prices for 'the entire market.'" *Id.* at 47.

- "Indeed, as explained, Defendants' own executives realized their conduct was having a price suppression effect 'on the entire market' and this is confirmed by Defendants' internal documents and the expert analysis in this case." *Id.* at 55.

- "The Defendants' recognition that their conduct was causing suppressed prices for 'the entire market'—and voluminous additional evidence demonstrating their market power—makes this case fundamentally different [from a cited case]." *Id.* at 55 n.46.

- "There is substantial evidence directly contradicting Defendants' factual position, such as their own acknowledgment of price suppression throughout 'the entire market.'" *Id.* at 58.

- "As a DMS executive recognized, '[t]he requirement to keep [Dean] competitive is *lowering the entire market.*'" *Id.* at 71-72.

The foregoing is by no means the only evidence cited by Plaintiffs in support of their conspiracy claims and is by no means the only evidence that would have to be individually scrutinized to determine whether that evidence supports a reasonable inference of conspiratorial conduct. The cited examples merely reveal the difficulty of accepting Plaintiffs' characterizations of the conspiracy's alleged anticompetitive conduct at face value and determining whether a conspiratorial inference is reasonable in light of competing inferences. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.

Defendants present the court with no less daunting of a task as they ask the court to examine each of the claimed facts, test the reasonableness of the inferences Plaintiffs draw from them, rule whether Plaintiffs' dispute regarding a particular fact is valid, and determine whether each such act either independently or collectively gives rise to a reasonable inference of conspiratorial conduct. This task is also inappropriate for summary judgment. *See Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (internal quotation marks omitted); *Allen v. City of New York*, 480 F. Supp. 2d 689, 702 (S.D.N.Y. 2007) (explaining that on summary judgment, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried'") (quoting *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967)).

Without delving into the details, Plaintiffs have cited sufficient evidence of the alleged conspiracy's anticompetitive activities to survive summary judgment. This evidence includes the use of full supply agreements and most favored nations clauses, sizable payments for non-competition for certain independent suppliers, evidence of uniformity of prices, evidence that over-order premiums were higher in other markets, the sharing of pricing data among competitors, and evidence that dairy farmers did not readily shift their cooperative or processor affiliations, which Plaintiffs contend is evidence that there were no more competitive options available. Although this and other evidence may not support the full breadth of Plaintiffs' extensive conspiracy claims, it

plausibly supports Plaintiffs' allegation that Defendants conspired to control the supply of raw Grade A milk to Order 1 processors during at least portions of the class period.

In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the Court held that:

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. . . . To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. [The plaintiffs] in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiffs].

*Id.* at 588 (internal quotation marks and citations omitted). Post-*Matsushita*, courts have explained that "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468 (1992). Accordingly, "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff. Rather, if a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the *sole* inference." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63. On the other hand, "where a plaintiff's theory of recovery is implausible, it takes strong direct or circumstantial evidence to satisfy *Matsushita*'s tends to exclude standard." *Id.* at 62-63 (internal quotation marks and citations omitted).

Because there are genuine issues of material fact that must be resolved before it can be determined whether an inference of conspiracy is reasonable and plausible in light of competing inferences, Defendants' motion for summary judgment with regard to Plaintiffs' monopsony claims (Count One and Count Five) is hereby DENIED.

### E.   Whether Plaintiffs Can Present Certain Dairy Cooperative's Conspiratorial Motivations to the Jury.

Plaintiffs and their expert witness have proposed an array of possible motivations for dairy cooperatives to conspire against their own members. At the same time,

Plaintiffs correctly point out that they are not required to identify each co-conspirator's motive to join and participate in the conspiracy.

In light of the court's prior ruling that Dr. Rausser could opine regarding dairy cooperatives' motivations to participate in an alleged conspiracy that harmed their own members provided his opinions are tied to admissible evidence,[12] Defendants now ask the court to find that: (1) Plaintiffs have adduced no admissible evidence of how any dairy cooperative other than DFA-DMS and GNEMMA was managed; (2) Plaintiffs have adduced no admissible evidence of any excessive compensation paid to any dairy cooperative's management other than DFA-DMS; (3) Plaintiffs have adduced no admissible evidence of corrupt management of any dairy cooperative other than DFA-DMS; and (4) Plaintiffs have adduced no admissible evidence that any dairy cooperative was actually threatened into joining DFA-DMS or GNEMMA, as opposed to joining because the dairy cooperative felt "at risk."

Although Plaintiffs contend Defendants' facts are disputed because they either lack support, are argumentative, or mischaracterize Plaintiffs' evidence, they do not cite any evidence to demonstrate that these motivations actually existed. *See BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (explaining party opposing summary judgment cannot "assert a conclusion without supplying supporting arguments or facts" and must instead "set forth concrete particulars" regarding the party's claim) (internal quotation marks and citations omitted); *see also Anderson*, 477 U.S. at 249-50, 252 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Accordingly, neither Plaintiffs nor Dr. Rausser may present to the jury speculations that dairy cooperatives' management (other than DFA-DMS) received excessive compensation, was corrupt, or was threatened. *See Virgin Atl. Airways Ltd. v.*

---

[12] *See Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *10-13 (D. Vt. Dec. 31, 2013).

*British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (noting that an expert may be "useful in interpreting market facts affecting [the] litigation" but ruling that "expert testimony rooted in hypothetical assumptions cannot substitute for actual market data"). They also may not present to the jury allegations about how these dairy cooperatives were managed. Defendants' motion for summary judgment on this issue is thus GRANTED IN PART.

Defendants' broader request that the court conclude that, as a matter of law, no dairy cooperative, including Dairylea, was "coerced" into joining the alleged conspiracy is based upon contested evidence that must be examined in the context of the alleged conspiracy as a whole, as well as prevailing market conditions. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1367-68 (2d Cir. 1988) (concluding it was "entirely proper" to allow the jury to consider whether certain businesses refrained from contracting with the plaintiff and chose instead to contract with the defendant because of the defendant's "coercion" or because the businesses "were satisfied with the [defendant's] product"); *see also Apex Oil Co.*, 822 F.2d at 255 (concluding that in an antitrust case the evidence must be "viewed in context with all the circumstances surrounding" the alleged unlawful conduct). Defendants' motion for summary judgment on the issue of dairy cooperative coercion is therefore DENIED.

### F.   Whether Plaintiffs Can Establish that Hood, Farmland, Kraft, and Certain Other Processors Participated in the Conspiracy.

Defendants argue that, as matter of law, Plaintiffs cannot establish that Hood, Farmland, Kraft, and certain other processors participated in the alleged conspiracy. They cite evidence that these processors acted independently of Defendants and had ample access to milk supplies in the Northeast that Defendants did not control. They cite testimony from representatives of certain of these processors that they considered the Northeast to be a competitive market with a multitude of suppliers, including both independent farmers and members of dairy cooperatives, competing to supply milk to Northeast processors. Defendants further point to evidence that these processors competed with Defendants for the supply of milk. Finally, Defendants point out that

26

seven new processing plants regulated by Order 1 and dozens of non-pool processing plants in the Northeast commenced operation during the class period.

Plaintiffs respond that "the record indicates that Hood, Farmland, and Kraft all participated in the conspiracy." Doc. 488 at 53. Plaintiffs' ability to provide factual evidence in support of that contention varies based upon the processor involved. With regard to each processor, however, Plaintiffs have cited at least some evidence of an agreement between the processor and Defendants which Plaintiffs contend restrains trade. *See United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant."). Plaintiffs' efforts to affix conclusory labels to these agreements such as "non-compete," "exclusive access," or "anti-competitive restraints" is both unhelpful and unavailing. *See Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 244 (1918) ("But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence."). However, by the same token, the court cannot examine each agreement in isolation, determine its alleged impact on competition, rule whether it is or is not an unlawful restraint of trade, and thereafter designate the parties to its conspirators or non-conspirators. Instead, the agreements in question need to be examined in the context of the alleged conspiracy. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) (observing that "acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme"); *Md. & Va. Milk Producers Ass'n, v. United States*, 362 U.S. 458, 472 (1960) (ruling that "even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act") (footnote omitted); *see also In re Se. Milk Antitrust Litig.*, 2011 WL 2749579, at *8 (E.D. Tenn. July 14, 2011) (explaining that actions, such as full supply agreements, that are legal "in and of themselves" may "constitute acts in furtherance of an illegal conspiracy").

27

Here, genuine issues of material fact pervade the conspiracy's existence, its contours and participants, and the impact, if any, it has and had on competition. This, in turn, precludes the court from concluding, as a matter of law, whether Hood, Farmland, Kraft, and certain other processors participated in the conspiracy. *See Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) (in ruling on summary judgment, the court "should not consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence," but rather should "view the evidence as a whole"). For this reason, Defendants' motion for summary judgment regarding whether certain processors participated in the conspiracy is DENIED. However, the court's ruling that Dr. Rausser may not opine at trial that certain processors are "passive conspirators" remains unchanged. *See Allen*, 2013 WL 6909953, at *11. Plaintiffs must establish that each of the identified processors actually joined the conspiracy before they may be labelled co-conspirators. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) ("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred. A plaintiff must prove the defendants illegally conspired. . . . The plaintiff's evidence must prove the actors had an intent to adhere to an agreement that was designed to achieve an unlawful objective[.]").

## G.  Whether Defendants are Entitled to Judgment as a Matter of Law on Plaintiffs' Price-Fixing Claim (Count Four of the CAC).

Defendants seek summary judgment with regard to what remains of Plaintiffs' price-fixing claim in Count Four. Count Four of the CAC alleges that "Defendants conducted meetings between themselves and their dairy cooperative and dairy processor coconspirators, including members of DMS and members of GNEMMA, and during those meetings, they engaged in conversations in which they agreed to unlawfully . . . fix . . . the over-order premiums paid by processors in the Northeast for raw Grade A milk during the Class Period." Doc. 117 at 90-91; ¶ 267. The CAC alleges that "[t]his conduct has depressed the prices of all raw Grade A milk paid to dairy farmers in the Northeast." *Id.* at 91; ¶ 267.

The CAC acknowledges that "[t]he Capper-Volstead Act grants dairy cooperatives limited antitrust immunity with respect to price-fixing agreements with other dairy cooperatives 'provided, however, that such associations are operated for the mutual benefit of the members thereof.'" *Id.* at 91; ¶ 269 (quoting 7 U.S.C. § 291).[13]   Although the CAC alleges that, during the class period, DFA and DMS were not operated for the mutual benefit of their members, it makes no such claim with regard to GNEMMA.  It thus appears that Plaintiffs concede GNEMMA is entitled to Capper-Volstead immunity unless Plaintiffs can establish the members of GNEMMA violated the antitrust laws.

The facts regarding GNEMMA are relatively simple and are generally undisputed. GNEMMA was formed in September of 2006 in response to consumer demand for rBST-free milk.  rBST is a growth hormone given to dairy herds to increase milk production. DFA, Dairylea, Land O'Lakes, Inc., Agri-Mark, Inc., St. Albans, and Upstate Niagara Cooperative, Inc. are GNEMMA's members.  There is no evidence that GNEMMA's members were forced to join it.

GNEMMA's members discussed pricing for processor customers, including over-order premiums for different classes of milk in the Northeast, and whether customers would be willing to pay a premium for rBST-free milk.  Price increases were not sought unless all of the members of GNEMMA agreed.  As evidence of actual pricing fixing, Plaintiffs cite the following evidence which they contend "shows GNEMMA members discussed specific prices for milk in Order 1 and reached consensus on those prices:"

> Ex. 22, 5/20/11 Wickham Dep. 147:15-18 ("Q.  So you were going to keep talking about it among the GNEMMA members before reaching a final decision?  A. Yes."); *id.*, 154:1-7 ("Q.  But you reached at – you basically

---

[13] "The Capper-Volstead Act removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978).  The Act does not extend immunity for conduct "outside the 'legitimate objects' of a cooperative," including restraining or monopolizing trade, or suppressing competition. *Md. & Va. Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 468 (1960) (internal quotation marks omitted); *see also Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1044 (2d Cir. 1980) ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as . . . harassment, . . . coerced membership, and discriminatory pricing.") (citations omitted).

> reached a consensus, based on your respective conversations with your customers about the willingness of processors to accept a limited price increase? A. Yes.") (objection omitted).

Doc. 488-2 at 67-68; ¶ 98 (citations omitted). Plaintiffs further point out that GNEMMA members agreed not to seek certain price increases on certain classes of milk unless Dean, Hood, and Farmland each agreed to pay those increases, which they did not. Plaintiffs do not explain how this evidence constitutes an agreement to fix prices. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) ("On a claim of concerted price-fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement.").

Defendants concede "that the cooperatives in GNEMMA discussed prices to be charged to processors—that is their purpose and that is why Congress more than 90 years ago gave them antitrust immunity for such discussions." Doc. 479-1 at 40. Such discussions do not, in and of themselves, constitute price-fixing. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294 n.30 (5th Cir. 1988) (noting that the "mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy" under § 1); *Apex Oil Co.*, 822 F.2d at 257-58 (holding that "evidence of the mere exchange of information by competitors cannot establish a conspiracy"); *see also Todd*, 275 F.3d at 198-99 (drawing a distinction between an agreement to fix prices and the sharing of pricing information, which involves "a closely related but analytically distinct type of claim . . . where the violation lies in the information exchange itself").

"[A]greements among competitors to fix prices on their individual goods or services are among those concerted activities that the [Supreme] Court has held to be within the *per se* category" of agreements or practices illegal under § 1 of the Sherman Act. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979); *see also In*

*re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61 ("An agreement between competitors to fix prices . . . categorically constitutes an unreasonable restraint, and, accordingly, is unlawful *per se*."); *Todd*, 275 F.3d at 198 ("Traditional 'hard core' price fixing remains *per se* unlawful under the seminal case of *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 212-24 [] (1940) and its progeny."). Under § 1 of the Sherman Act, "the three required elements of an antitrust claim [are] (1) a violation of antitrust law; (2) injury and causation; and (3) damages." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (internal quotation marks omitted) (concluding existence of price-fixing conspiracy satisfied first element). The second element requires that "a plaintiff 'must prove [that it has suffered] antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

In this case, it is undisputed that, during the class period, GNEMMA sought to obtain a competitive premium for rBST-free milk to offset the increased cost of producing this type of milk. It succeeded in establishing rBST-free premiums of between $0.90/cwt, $0.75/cwt, and $0.40/cwt in different areas depending upon local competitive conditions. However, the eventual premium for this new category of milk was less than the premium GNEMMA initially tried to establish and did not always offset the costs of producing this type of milk.

Plaintiffs' expert Dr. Rausser has opined as follows with regard to the impact of GNEMMA on prices:

> Q. Did in your view, the formation of GNEMMA make any difference to the effectiveness of the coordinated efforts that you believe resulted in lower pay prices for dairy farmers?
>
> A. Did it make any difference?
>
> Q. Yes.

A. It lowered the transaction cost with regard to the ultimate consequences of lowering prices to class members. But as near as I can determine, that's the only difference it made.

Doc. 488-1 at 47; PSOF 292 (citing Pls. Ex. 20, 11/3/11 Rausser Dep. at 200:3-12). Plaintiffs urge the court to focus on that portion of Dr. Rausser's testimony where he noted that the lowered transaction cost was "with regard to the ultimate consequences of lowering prices to class members" and his further statement that the rBST-free premium resulted in lower pay prices to dairy farmers because the announced premium and the actual premiums that were paid were below the incremental cost of generating rBST-free milk. However, when specifically asked if, "but for GNEMMA, dairy farmers in Order 1 would have been paid a higher premium for producing rBST-free milk," Dr. Rausser responded, "No, I have no opinion in that regard." Pls. Ex. 20; 11/3/11 Rausser Dep. at 201:6-9.

In the light most favorable to Plaintiffs, the evidence demonstrates that GNEMMA was formed to obtain increased prices for rBST-free milk which was more costly to produce but which customers in the Northeast were demanding. The members of GNEMMA discussed pricing information, including whether certain of their customers would pay certain increases in premiums. They attempted to achieve this increase in premiums for rBST-free milk, in order to offset the cost of producing this type of milk, but were not particularly successful in doing so. According to Plaintiffs' own expert, the effect of GNEMMA's activities was to lower transaction costs, but there is no evidence that over-order premiums in Order 1 would have been higher absent GNEMMA. Plaintiffs thus adduce no evidence that GNEMMA members entered into an agreement to fix prices that caused antitrust injury to Plaintiffs. *See Cordes & Co. Fin. Servs., Inc.*, 502 F.3d at 105.

On summary judgment, "the burden on the moving party may be discharged by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc.*, 315 F.3d at 105 (internal quotation marks and citation omitted). "When the moving party meets this burden, the burden

shifts to the nonmoving party to come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). In this case, Plaintiffs have failed to satisfy this burden. Accordingly, Defendants' motion to dismiss Plaintiffs' price-fixing claim in Count Four is hereby GRANTED.

### H.    Whether Plaintiffs' Claims are Time-barred, or, in the Alternative, Whether their Damages are Limited to a Four-Year Period.

"The basic rule is that damages are recoverable under the federal antitrust acts only if [the] suit therefor is 'commenced within four years after the cause of action accrued,' 15 U.S.C. § 15b, plus any additional number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). A cause of action accrues "when a defendant commits an act that injures [the] plaintiff's business." *Id.* In other words, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* at 339.

It is undisputed that a significant portion of the anti-competitive conduct alleged in this case took place before October 8, 2005 (four years prior to the filing date) and thus is outside the applicable statute of limitations. Defendants contend that Plaintiffs have failed to establish that they are entitled to collect damages beyond this period. *See Vitale v. Marlborough Gallery*, 1994 WL 654494, *4 (S.D.N.Y. July 5, 1994) ("When the anticompetitive act causing the injury and giving rise to the cause of action occurs outside of the statutory period, the claim is time barred."). In response, Plaintiffs assert a number of theories that they contend will permit them to recover damages beyond the limitations period. In addition, they contend that they are entitled to collect damages for sales to non-conspirators. Defendants seek summary judgment on this damage theory as well.

### 1.    Fraudulent Concealment.

Plaintiffs assert that they are entitled to recover damages for pre-limitations conduct because Defendants fraudulently concealed the facts giving rise to Plaintiffs' claims. They claim that Defendants: (1) falsely assured dairy farmers that DFA was

complying with DOJ requirements and the requirements of a consent decree arising out of the Dean-Suiza merger; (2) falsely advised dairy farmers that the most favored nations provisions had been removed in supply agreements to ensure Dean's processing plants could purchase milk from sources other than DFA; (3) made payments on an agreement not to compete for the independent supply of milk without disclosing those payments to dairy farmers; (4) entered into unwritten agreements to restrict solicitation of dairy farmers by competing cooperatives without disclosing those practices to dairy farmers; (5) falsely assured dairy farmers that the farmers could continue to supply certain processing plants and retain their independent status and would not be forced to join DMS when Defendants allegedly sought to control the supply of milk to these plants through DFA-DMS; and (6) falsely advised dairy farmers that Defendants and their alleged co-conspirators were working on behalf of dairy farmers and that low prices were attributable to other factors when Defendants were, in fact, acting for their own benefit. *See* Doc. 488 at 61-62. Plaintiffs cite at least some evidence in support of these claims and argue the relationship between dairy cooperatives and their members is fiduciary in nature and gave rise to an affirmative duty to disclose the true facts and to correct any material factual misstatements. Doc. 488 at 63 n.60 (citing, in part, *Land O'Lakes v. Gonsalves*, 281 F.R.D. 444, 454 (E.D. Cal. 2012) ("[T]he relationship between a cooperative marketing association and its members is fiduciary in nature.")).

In response and as part of their affirmative request for summary judgment, Defendants point to evidence that certain Plaintiffs complained about Defendants' allegedly anti-competitive activities as early as 2001. They observe that Plaintiff Alice Allen met with congressional members and Hood's attorneys in 2001 to express her concerns regarding DFA and the Dean-Suiza merger and the use of DMS for outsourcing. Also, in 2004, former Plaintiff Donna Hall met with DOJ attorneys and attorneys from New York's Attorney General's office about the lack of competition and antitrust concerns and appeared on a 2005 television segment entitled "Milk Monopoly." They point out that, on July 23, 2003, Robert Wellington, a Senior Vice President of Agri-Mark, testified before the United States Senate Judiciary Committee "Regarding the

Competitive Environment for Dairy and Livestock Producers," and, in doing so, challenged much of the activities that now comprise Plaintiffs' claims. In the face of such evidence, Defendants argue that no claim of fraudulent concealment can be asserted. *See Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970) ("[T]he statutory period . . . [does] not await [plaintiffs'] leisurely discovery of the full details of the alleged scheme."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1051 (8th Cir. 2000) (concluding statute of limitations not tolled for allegations that "were public information at the time . . . and were well known throughout the . . . industry"); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) (finding no fraudulent concealment claim exists when antitrust claims were based on settlement that could have been discovered with diligent examination of public records); *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 509 (S.D.N.Y. 1989) (explaining that in the context of a fraudulent concealment analysis, "facts that should arouse suspicion . . . are equated with actual knowledge of the claim") (internal quotation marks omitted); *see also* Areeda & Hovenkamp, ¶ 320c1, at 288-89 (3d ed. 2004 & 2007 Supp.) (observing that "the more recent decisions have paid increased attention to what the plaintiff knew or should have known when the initial act constituting the violation occurred").

Plaintiffs counter that Plaintiff Alice Allen's and former Plaintiff Donna Hall's early concerns regarding Defendants' alleged activities, while prescient, do not substitute for knowledge of the causes of action the Plaintiffs asserted in October of 2009. In addition, they point out that after those concerns were expressed, Defendants continued to assure dairy farmers that they were acting in the dairy farmers' best interests and in a pro-competitive manner. The Plaintiffs note that even Mr. Wellington's statements regarding anti-competitive conditions in the dairy industry, which they originally quoted at length in their Complaint, were followed by his subsequent statement that, because the transaction in which National Dairy Holdings ("NDH") sold certain processing plants to Hood had been modified, he was no longer concerned about the deal's impact on the competitive environment for milk producers.

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). In order to establish fraudulent concealment, a plaintiff must show:

> (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part.

*Id.* Courts have described the burden of establishing fraudulent concealment as a "heavy one." *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979); *see also Grynberg v. ENI S.P.A.*, 2009 WL 2482181, at *5 (S.D.N.Y. Aug. 13, 2009) (citing *Buccino v. Cont'l Assurance Co.*, 578 F. Supp. 1518, 1523 (S.D.N.Y. 1983)). Nonetheless, whether a plaintiff has shown fraudulent concealment is generally a question of fact for the jury. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 592-93 (2d Cir. 1979) (reversing summary judgment and ruling that whether plaintiff "exercised due diligence, and thus is not precluded by the statute of limitations from maintaining this action, is a question of fact that should be determined by the jury as the trier of facts"); *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171 (reversing summary judgment because fraudulent concealment involved "factual issues" for the trier of fact); *Grynberg*, 2009 WL 2482181, at *7 (recognizing "[t]he inherent difficulty of determining who knew or should have know[n] what when, and what each individual should have concluded from what he knew or should have known, precludes the court from determining when the Plaintiffs discovered the fraudulent concealment").

As the Eleventh Circuit observed in *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823 (11th Cir. 1999), Defendants "ha[ve] the burden, as the moving parties, to demonstrate conclusively that the [P]laintiffs, through the exercise of reasonable diligence, would have discovered adequate ground[s] for filing suit." *Id.* at 834 (internal quotation marks omitted). For this reason, the Eleventh Circuit "ha[s] held, along with a majority of the circuits, that the issue of when a plaintiff is on 'notice' of his claim is a

question of fact for the jury." *Id.* at 832 (collecting cases). It has also "held on numerous occasions that, as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment." *Id.*

In this case, Defendants dispute the facts giving rise to Plaintiffs' fraudulent concealment claims. In turn, they do not establish, as a matter of law, that Plaintiffs had knowledge of their claims prior to the limitations period or, with due diligence, could have acquired that knowledge. There is thus neither a factual basis nor a legal basis upon which the court could grant summary judgment in Defendants' favor. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 792 (7th Cir. 2006) (reversing grant of summary judgment when "material facts are in dispute as to whether plaintiffs can benefit from tolling under fraudulent concealment"). Accordingly, Defendants' motion for summary judgment with regard to Plaintiffs' fraudulent concealment claim is DENIED.

## 2.    Continuing Violation.

In ruling on Defendants' motion to dismiss, the court determined that Plaintiffs had alleged two categories of acts that had taken place during the limitations period on which a continuing violation theory could be premised: Plaintiffs' GNEMMA price-fixing claim (the 2006 formation and use of GNEMMA to suppress prices) and allegations that in 2006 and 2009 Defendants retaliated against dairy farmers who refused to participate in DFA-DMS. *See Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 352-53 (D. Vt. 2010). Defendants seek summary judgment with regard to these remaining aspects of Plaintiffs' continuing violation theory.[14]

---

[14] Defendants note that Plaintiffs' opposition to their motion for summary judgment on Plaintiffs' continuing violation theory is contained in a footnote. *See* Doc. 488 at 68 n.66. In the footnote, Plaintiffs contend that "the conspirators engaged in numerous acts to implement, effectuate, and extend the unlawful conspiracy within the four years before this case was filed." *Id.* To identify these "numerous acts," Plaintiffs refer the court to another section of their brief which addresses the acts in question only in general terms. Plaintiffs, however, have responded to Defendants' Statement of Undisputed Facts regarding their continuing violation theory in a sufficiently detailed manner to preserve this issue for trial. *See* Doc. 488-1 at 48-50; PSOF 294-312.

The "continuing violation theory is based on an initial action that violates the antitrust laws followed by injuries caused by illegal actions *designed to implement and effectuate* the initial violation." *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 275 (8th Cir. 2004). "A continuing violation is one in which the plaintiff's interests are repeatedly violated, and, in these circumstances, a new cause of action accrues each time the plaintiff is injured by an act of the defendant." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d at 378 (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir. 1988)). In other words, "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citation and internal quotation marks omitted).

"[T]o restart the statute of limitations [the] plaintiff must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act'; and (2) 'inflict[s] new and accumulating injury on the plaintiff.'" *Vitale*, 1994 WL 654494, at *5 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). "This distinction between 'new and independent acts that inflict new and accumulating injury on the plaintiff' (which restart the statute of limitations), and unabated inertial consequences of previous acts (which do not) allows the statute of limitations to have effect and discourages private parties from sleeping on their rights." *Midwestern Mach. Co.*, 392 F.3d at 271 (quoting *Pace Indus., Inc.*, 813 F.2d at 238) (alterations omitted). "To hold otherwise would effectively abrogate the statute of limitations . . . because each sale of a product pursuant to the underlying agreement would start the statute of limitations running anew." *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 2008 WL 4104534, at *3 (E.D. Mo. Aug. 27, 2008).

"As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) (internal quotation marks and citation omitted); *accord Vitale*, 1994 WL 654494, at *5. For much of the conduct Plaintiffs cite in favor of their substantive

claims, the continuing violation theory does not apply. *See United States Philips Corp. v. Princo Corp.*, 2005 U.S. Dist. LEXIS 6820, at *22 (S.D.N.Y. Jan. 24, 2005) ("[The] continued existence of the contractual arrangement is insufficient to toll the statute of limitations . . ."); *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct.10, 2008) (finding that renewal of licensing agreement without any substantive change in the parties' rights insufficient to restart limitations period because "[u]nder any meaningful definition of 'reaffirmation,' . . . a 'renewal' of policies in existence [prior to the limitations period] qualifies"); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003) (noting that "the focus is on the timing of the causes of action, *i.e.*, the defendant's overt acts, as opposed to the effects of the overt acts," and finding that any payments received as a result of a pre-limitations period contract are insufficient to restart the period because "the performance of an allegedly anti-competitive, pre-existing contract is not a new predicate act") (internal quotation marks omitted).

At the summary judgment stage, Plaintiffs fail to adduce a factual basis for the continuing violation theory as it pertains to GNEMMA. When asked whether "but for GNEMMA, dairy farmers in Order 1 would have been paid a higher premium for producing rBST-free milk," Dr. Rausser responded that he had "no opinion in that regard." Pls. Ex. 20; 11/3/11 Rausser Dep. at 201:6-9. Plaintiffs thus fail to establish that GNEMMA's activities caused them to suffer an injury in the limitations period. *See Vitale*, 1994 WL 654494, at *4 (concluding it is not enough to allege bad acts within the limitations period because such "assertions fail to cure the time barred nature of this action, because plaintiff fails to allege an injury resulting from these acts"); *Madison Square Garden, L. P.*, 2008 WL 4547518, at *11 (explaining that antitrust injury begins with plaintiff establishing that it suffered an injury-in-fact as a predicate to the court's inquiry of whether plaintiff has also shown anti-competitive effect). The formation and use of GNEMMA therefore cannot be the basis of Plaintiffs' continuing violation theory.

Plaintiffs further allege that, during the limitations period, dairy farmers were exposed to new acts of intimidation which were intended to force them to supply milk

through the alleged conspiracy and which limited their options to avoid the alleged conspiracy. Defendants ask the court to find that the alleged acts do not preclude summary judgment in their favor on Plaintiffs' continuing violation theory. However, virtually all of the deposition testimony which Defendants cite on this issue is disputed, and when considered with other evidence which Plaintiffs supply, supports a conclusion that certain dairy farmers were pressured into using the DFA-DMS supply network or into using the services of some members of the alleged conspiracy. *See* Doc. 479-2 at 28-29; DSOF ¶¶ 119-26; *see also* Doc. 487-1 at 113-18 (acknowledging Plaintiffs' competing evidence as an accurate reflection of additional deposition testimony of same witnesses identified by Defendants). Plaintiffs' competing evidence is therefore sufficient to render summary judgment inappropriate. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997) (directing that if "there . . . is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment") (internal quotation marks omitted).

As an alternative argument, Defendants ask the court to ignore Plaintiffs' additional evidence because it is not cited in Plaintiffs' Opposition and because Plaintiffs do not explain why this evidence gives rise to a continuing violation. As the court previously observed with regard to Plaintiffs' use of this same argument, there is no requirement that a disputed fact be cited in a memorandum in order for it to be considered in ruling on summary judgment. *Cf.* Fed. R. Civ. P. 56 (imposing no requirement that an undisputed or disputed fact be cited in party's memorandum of law in order to render it material); *see also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (noting district court's discretion to look beyond the party's statement of facts to the record so that the court can "weigh the propriety of granting a summary judgment motion") (internal quotation marks omitted).

Threats and retaliation against dairy farmers during the limitations period in order to monopsonize, attempt to monopsonize, or in a conspiracy to monopsonize may be the basis for a continuing violation theory. *See Midwestern Mach. Co.*, 392 F.3d at 275

("[C]ontinuing violations restart the statute of limitations when there is an ongoing scheme, such as . . . an attempt to monop[sonize]."). Summary judgment on this aspect of Plaintiffs' continuing violation theory must therefore be DENIED.

For the reasons stated above, Defendants' motion for summary judgment with regard to Plaintiffs' continuing violation theory is hereby GRANTED IN PART and DENIED IN PART. Plaintiffs may not rely on the formation and use of GNEMMA as the factual basis for their continuing violation theory. They may, however, rely on evidence of threats, intimidation, and retaliation against dairy farmers during the limitations period.

### 3. Speculative Damages Rule.

Plaintiffs assert that the speculative damages rule entitles them to recover for all post-October 8, 2005 damages caused by earlier conduct because these damages were speculative and not calculable at the time the alleged conduct occurred. They point out that even Defendants' expert Dr. Kalt has opined that a damages calculation requires examination of "all dimensions of farmers' compensation for their milk." Doc. 281-1 at 190; 4/5/11 Kalt Report at 166.

"[A] plaintiff in an antitrust action may recover damages occurring within the statutory limitations period" if those damages "are the result of conduct occurring prior to that period if, at the time of the conduct, those damages were speculative, uncertain, or otherwise incapable of proof." *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 884 (2d Cir. 1971) (citing *Zenith Radio Corp.*, 401 U.S. at 339) (observing that "it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable").

The speculative damages rule does not apply where damages have "always been specific and calculable" but plaintiffs merely delayed in filing suit. *Klehr*, 521 U.S. at 191; *see also Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 266 (E.D.N.Y. 2010) ("*Zenith*'s speculative damages exception applies in this circuit

41

if the fact of damage is uncertain or if the nature and amount of damages cannot be reasonably estimated.").

Here, Plaintiffs have proffered no evidence that their damages prior to October 8, 2005 were neither specific nor calculable. To the contrary, their expert witness has calculated those damages with relative ease by referencing pricing data which existed during the time in question. A plaintiff seeking damages beyond the limitations period based upon a speculative damages theory must establish that the future damages "could not be proved with reasonable certainty" at the time of the earlier conduct. *Ansul Co.*, 448 F.2d at 885. Because Plaintiffs have not sustained this burden, Defendants' motion for summary judgment with regard to Plaintiffs' speculative damages theory is hereby GRANTED.

### 4.    Plaintiffs' *Berkey Photo* Theory of Damages.

Plaintiffs assert that independent of the speculative damages rule, the Second Circuit's decision in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), allows them to recover for suppressed over-order premiums within four years of when their Complaint was filed based on conduct that occurred outside the limitations period. In *Berkey Photo*, the Second Circuit held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anti-competitive actions taken before the limitations period." *Id.* at 296. The court explained that "it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anti-competitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief." *Id.* The court cautioned that:

> It should not be inferred that this ruling grants antitrust plaintiffs a license to embark on a search for Ichthyosauria that is, on a time-warped fishing expedition. A trial court in its discretion may always set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it. Moreover, the trial court might not be without flexibility to limit the proof where delay in bringing suit may have caused injustice to the defendants.

*Id.* (internal citations and quotation marks omitted).

In this case, Plaintiffs are not seeking to recover suppressed premiums for more than four years after Defendants' last alleged anti-competitive act. There is thus no fear that Defendants will escape liability because they ceased their anti-competitive activity more than four years ago, but are still reaping the benefit of that activity because of their illicit market control. Plaintiffs have not demonstrated how the exception in *Berkey Photo* extends to the facts and circumstances of this case. Defendants' motion for summary judgment on Plaintiffs' *Berkey Photo* theory of damages is therefore GRANTED.

### 5.    Recovery of Damages Attributable to Non-Conspirators.

Plaintiffs claim that they are entitled to recover damages attributable to non-conspirators on the theory that milk sold to non-conspiring plants was nonetheless affected by the conspiracy. To their credit, Plaintiffs acknowledge that the "courts are split on whether damages for sales to non-conspirators are recoverable," Doc. 488 at 68-69, and they cite no court in the Second Circuit which has recognized this theory of recovery or explained how it advances the implementation of the antitrust laws. *See Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp. 876, 885-88 (S.D.N.Y. 1995) (granting summary judgment with respect to certain categories of antitrust damages when plaintiff proffered no case law to support a particular theory of damages and when plaintiff failed to otherwise offer "adequate proof" to support the remainder of damages sought). Plaintiffs again rely heavily on DMS manager Leon Graves's October 19, 2008 response to a DMS questionnaire in which he expressed his opinion that the need to keep Dean competitive was "lowering the entire market." Pls. Ex. 25 at 1. On this slender reed, Plaintiffs place an even more tenuous damages analysis. *See* Doc. 488 at 72 ("Dr. Rausser examined the invoice data from two independent processors and confirmed that those processors paid prices comparable to conspiring competitors.").

Defendants seek summary judgment in their favor on Plaintiffs' "umbrella theory of recovery." Doc. 479-1 at 54-57. They argue that Plaintiffs lack standing to collect such damages and further argue that the "umbrella theory" of damages has generally been

discredited by the courts. *See, e.g.*, *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997) (rejecting umbrella theory with regard to standing because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors (*i.e.*, independent pricing decisions of non-conspiring retailers)"); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 38-39 (D.D.C. 1999) (explaining the "main difficulty with the umbrella theory is that, even in the context of a single level of distribution, ascertaining the appropriate measure of damages is a highly speculative endeavor" because "[t]here are numerous pricing variables . . . to approximate the correct measure of damages, including the cost of production, marketing strategy, elasticity of demand, and the price of comparable items").

In addition, they point out that Dr. Rausser used the pricing data for two independent processing plants in Order 1, used the total price paid (which differed by $1.45/cwt because of premiums), and made the assumption that prices paid by these two plants, as well as others, were roughly equivalent to the prices paid in the conspiracy. Defendants argue that antitrust damages cannot be calculated in this manner. The court agrees. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1166 (holding that if "a specific price formula, or . . . other details of a transaction . . . are not available, then the plaintiff cannot recover damages as to that sale") (footnote omitted); Areeda & Hovencamp, Antitrust Law §395d (in seeking antitrust damages, the plaintiff must "[p]rov[e] the price that it actually paid . . . [and] the price that it would have paid 'but for' the conspiracy").

Because Plaintiffs have not established that they are entitled to collect damages attributable to non-conspirators under an umbrella theory of damages, Defendants' motion for summary judgment on this issue is GRANTED. *See BellSouth Telecomms., Inc.*, 77 F.3d at 615 (directing that plaintiff opposing summary judgment must submit the "supporting arguments or facts" in favor of damages claim and that "conclusory" assertions of fact and law "are insufficient to raise a triable issue").

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (Doc. 479).

SO ORDERED.

Dated at Rutland, in the District of Vermont, this ___11th___ day of June, 2014.

*/s/ Christina Reiss*

_____
Christina Reiss, Chief Judge
United States District Court