# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ALICE H. ALLEN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 5:09–CV–00230–cr |
| | ) |
| DAIRY FARMERS OF AMERICA, INC., and | ) |
| DAIRY MARKETING SERVICES, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DAIRY FARMER SUBCLASSES' RENEWED MOTION FOR PRELIMINARY
## APPROVAL OF PROPOSED SETTLEMENT WITH DEFENDANTS DAIRY
## FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 4

    The Parties' Vigorous Litigation. ......................................................................... 4

    Settlement Negotiations and Involvement of Class Representatives...................... 5

    Terms of Proposed Settlement. ............................................................................ 8

ARGUMENT ........................................................................................................... 10

  I.  SUBCLASS COUNSEL WERE AUTHORIZED TO ENGAGE IN SETTLEMENT DISCUSSIONS WITH DFA/DMS.................................................... 10

  II.  THE PROPOSED SETTLEMENT SATISFIES THE CRITERIA FOR PRELIMINARY APPROVAL ........................................................................... 15

    A.  The Proposed Settlement Resulted from Serious, Informed, Non-Collusive Negotiations between Experienced and Capable Counsel ......................................... 16

    B.  The Proposed Settlement Falls Within the Range of Possible Approval by the Court as Fair, Reasonable, and Adequate.............................................. 17

    C.  The Proposed Settlement Has No Obvious Deficiencies ......................................... 20

  III.  THE SUBCLASS REPRESENTATIVES' ISSUES DO NOT PRECLUDE PRELIMINARY APPROVAL AND PRESENTATION OF THE PROPOSED SETTLEMENT TO THE SUBCLASSES.................................................. 22

    A.  Positions of the Subclass Representatives.............................................. 22

    B.  Financial Terms.................................................................................. 22

    C.  Scope of the Settlement Subclasses...................................................... 24

    D.  Equitable Relief.................................................................................. 25

    E.  Role of Objections in the Class Settlement Process............................... 27

    F.  Disclosure of Defendants' Documents.................................................. 27

    G.  Notice to the Subclasses Regarding Potential Attorneys' Fees................ 28

  IV.  THE PROPOSED NOTICES AND NOTICE PLAN SATISFY RULE 23 ..................... 28

  V.  PROPOSED DATES FOR NOTICES, SETTLEMENT ADMINISTRATION, AND FAIRNESS HEARING.................................................................... 29

CONCLUSION........................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Airline Ticket Com'n Antitrust Litig.*,
  953 F. Supp. 280 (D. Minn. 1997) ........................................................................21

*In re BankAmerica Corp. Sec. Litig.*,
  210 F.R.D. 694 (E.D. Mo. 2002) .........................................................................12

*Banyai v. Mazur*,
  2007 U.S. Dist. LEXIS 22343 (S.D.N.Y. Mar. 27, 2007) ......................................17

*Blanchard v. Edgemark Fin. Corp.*,
  175 F.R.D. 293 (N.D. Ill. 1997) ...........................................................................13

*Blessing v. Sirius XM Radio Inc.*,
  2011 WL 3739024 (S.D.N.Y., August 24, 2011) ...................................................18

*Blessing v. Sirius Xm Radio, Inc.*,
  507 F.App'x 1 (2d Cir. 2012) ...............................................................................17

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ............................................................................................28

*Bourlas v. Davis Law Assocs.*,
  237 F.R.D. 345 (E.D.N.Y. 2006) ..........................................................................16

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) .......................................................................21

*Charron v. Wiener*,
  731 F.3d 241 (2d Cir. 2013) ........................................................................2, 12, 14

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ...........................................................................16, 18

*Commissioner of Internal Revenue v. Banks*,
  543 U.S. 426 (2005) ............................................................................................12

*County of Suffolk v. Long Island Lighting*,
  907 F.2d 1295 (2d Cir. 1990) ...............................................................................18

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ..........................................................................18

*Hall v. Children's Place Retail Stores, Inc.*,
   669 F. Supp. 2d 399 (S.D.N.Y. 2009)..................................................................19

*Heit v. Van Ochten*,
   126 F. Supp. 2d 487 (W.D. Mich. 2001) ............................................................13

*Hicks v. Morgan Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ....................................................19

*In re High-Tech Employee Antitrust Litig.*,
   2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ......................................................19

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................18

*In re Ivan F. Boesky Sec. Litig.*,
   948 F.2d 1358 (2d Cir. 1991)........................................................................2, 11

*Kincade v. Gen. Tire & Rubber Co.*,
   635 F.2d 501 (5th Cir. 1981) ..................................................................2, 11, 12

*Lazy Oil Co. v. Witco Corp.*,
   166 F.3d 581 (3d Cir. 1999)..............................................................................13

*Lowery v. City of Albuquerque*,
   2013 U.S. Dist. LEXIS 35626 (D.N.M. Feb. 27, 2013) ....................................12

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. 1995)..............................................................................12

*Maywalt v. Parker & Parsley Petroleum Co.*,
   864 F. Supp. 1422 (S.D.N.Y. 1994)..................................................................13

*In re Med. X-Ray Film Antitrust Litig.*,
   No. 9805904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998)..................................18

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010)..........................................................................18

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ......................................................................19

*In re Michael Milken & Assoc. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) ........................................................................17

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)..............................................................................17

*Parker v. Anderson*,
   667 F.2d 1204 (5th Cir. 1982) ................................................................11, 13

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*,
   2014 U.S. LEXIS 3351 (E.D.N.Y. Jan. 10, 2014) ...........................................28

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) .............................................................18

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ...........................................................................13

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ...........................................................20

*Vazquez v. Lamont Fruit Farm, Inc.*,
   2011 U.S. Dist. LEXIS 144167 (W.D.N.Y. Dec. 12, 2011) ............................21

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................20

*In re W. Union Money Transfer Litig.*,
   2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) ..................................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...............................................................................16

*Walse v. Great Atl. & Pac. Tea Co.*,
   726 F.2d 956 (3d Cir. 1983) .............................................................................13

*White v. NFL*,
   836 F. Supp. 1458 (D. Minn. 1993) .................................................................20

**Statutes**

Fed. R. Civ. P. 23 ...................................................3, 4, 14, 15, 22, 27, 28, 29

**Other Authorities**

Fed. R. Civ. P. 23 Advisory Committee Notes................................................2, 12,13

Alba Conte & Herbert Newberg, *Newberg on Class Actions* at § 3:52 (5th ed.
   2014) .................................................................................................................12

*Manual for Complex Litig.*, Fourth, at § 13.14 ...............................................17

*Manual for Complex Litig.*, Fourth, at § 21.642 .............................................11

## INTRODUCTION

After five years of hard-fought litigation, over a year of intense negotiations, and at least 160 in-person and telephone conferences with Subclass Representatives, the DFA/DMS and Non-DFA/DMS Subclasses reached a proposed settlement with the remaining Defendants, DFA and DMS, for $50 million plus substantial injunctive relief. *See* Ex. A, Agreement.   The proposed settlement goes far beyond what any law enforcement agency has pursued or achieved in the past decade and constitutes the largest antitrust settlement in the history of Vermont.

The Court previously declined to grant an expedited motion for preliminary approval of the proposed settlement due to certain issues with the draft class notice and because the Court desired information "regarding the basis for the Subclass Representatives' objections."[1]  The class notice issues were addressed in a July 23, 2014 submission,[2] and the Subclass Representatives' objections were addressed in detail in a July 23, 2014 *in camera* submission[3] and in general in a July 29, 2014 submission.[4]  A status conference followed on September 9, 2014, where the Court requested additional information about the settlement, particularly Subclass Counsel's authorization to settle, and invited a new motion for preliminary approval.

In response to the Court's September 9 request for information and a new motion,[5] Subclass Counsel, in this Memorandum, (1) address the Court's questions raised during the conference, (2) outline the authorities that support preliminary approval of the proposed

---

[1] Order Denying Without Prejudice Expedited Motion for Preliminary Approval of Settlement Between Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, and Dairy Farmer Subclasses [Dkt. No. 569].

[2] *See* Subclasses' Response to Court's Order Regarding Motion for Preliminary Approval of Proposed Settlement with Defendants DFA and DMS [Dkt. No. 570].

[3] *See* Motion to Submit Materials for *In Camera* Review [Dkt. No. 571].  The Court denied this motion and has not reviewed the materials submitted for *in camera* review.

[4] *See* Dairy Farmer Subclasses' Supplemental Filing Regarding Motion for Preliminary Approval of Settlement [Dkt. No. 572].

[5] *See* Minute Entry for September 9, 2014 Status Conference [Dkt. No. 577].

settlement, and (3) submit points regarding the Subclass Representatives' objections.

*First*, Subclass Counsel were authorized to engage in settlement discussions and present the proposed settlement to the Court. Subclass Representatives were apprised of settlement negotiations throughout the course of this litigation and did not object to the negotiations or suggest that Subclass Counsel were not authorized to negotiate toward the proposed settlement, as reflected in the attached attorney declarations. *See* Exs. E-I. Moreover, the law in both the Second Circuit and other jurisdictions is quite clear that Subclass Counsel do not need authorization from Subclass Representatives prior to negotiating or presenting a settlement to the Court. This is because "the 'client' in a class action consists of numerous unnamed class members as well as the class representatives" and, due to "the unique nature of the attorney-client relationship in a class action, *the cases [] holding that an attorney cannot settle his individual client's case without the authorization of the client are simply inapplicable*." *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981) (emphasis added) (cited with approval by *Charron v. Wiener*, 731 F.3d 241, 254 (2d Cir. 2013)). Indeed, it is class counsel's *duty* to negotiate and present a settlement determined to be in the best interest of a class, even if class representatives are opposed. *See* Fed. R. Civ. P. 23(g)(1)(B) Advisory Committee Notes; *see also In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1365 (2d Cir. 1991).

*Second*, the proposed class settlement satisfies the requirements for preliminary approval – which are "meaningfully lower" than the threshold for final approval. July 9 Order at 7. The proposed settlement is the result of serious, informed, non-collusive negotiations. The settlement was reached after completion of discovery, years of litigation and negotiations between experienced attorneys, and on the eve of trial. Settlements reached in this context are presumptively fair. This fairness is corroborated by the fact that counsel with the five law firms

that represent the Subclasses – including attorneys with a thorough understanding of the voluminous record and complex legal issues presented by the case; lead counsel from *Southeastern Milk*; counsel with experience trying antitrust class actions; and counsel with experience litigating antitrust matters for the Department of Justice and the Federal Trade Commission – support the proposed settlement after careful consideration of its benefits and compromises weighed against the risks and benefits of trying the case to a jury. *See* Exs. E- L.

The proposed settlement also falls with the range of possible approval by the Court as fair, reasonable, and adequate.  With this settlement, the recovery to the Subclasses will total $80 million – the largest antitrust recovery in Vermont history.  The $50 million proposed settlement is almost 20 times greater than the largest jury verdict in this district since 2001 and will result in average payments to farmers of $4,000, in addition to important industry changes that were unlikely to be obtained even if the Subclasses prevailed at trial.

In addition, the proposed settlement has no obvious deficiencies.  A settlement of this magnitude is not obviously deficient, particularly when it was reached through arm's length negotiations.  Also, the proposed settlement grants no preferential treatment to the Subclass Representatives or Subclass members.  Nor would the proceeds be distributed unevenly to them.

*Three*, none of the issues in the Subclass Representatives' Opposition to Proposed Settlement ("Statement"), submitted *in camera* on July 16, 2014, precludes preliminary approval when, as here, the Rule 23 requirements are met.  Indeed, the issues raised in the Statement are legally and factually mistaken and are, in any event, irrelevant at the preliminary approval stage. As this Court noted, preliminary approval "is merely the first step in a multi-step process" that allows all the Subclass members an opportunity "to consider whether the settlement is fair,

reasonable, and adequate."[6] Opinion and Order Granting Preliminary Approval of Revised Dean Settlement and Denying Motions to Intervene ("Dean Preliminary Order") at 5-6 [Dkt. No. 297]. Subclass Representatives will have an opportunity to express their views at the final approval hearing. Their views should not, however, veto a proposed settlement or foreclose the thousands of absent Subclass members from being allowed to consider the proposed settlement.

Accordingly, for the reasons set forth below, the Subclasses respectfully request that the Court enter the attached Proposed Order (see Ex. B) granting preliminary approval of the proposed settlement so that it may be considered by all Subclass members and the Court can ultimately determine, in a final approval hearing pursuant to Federal Rule 23, whether the settlement is fair, reasonable, and adequate.

## BACKGROUND

***The Parties' Vigorous Litigation.*** This is not a case in which a settlement is reached shortly after a case is filed. To the contrary, as the Court is well aware, this case has been vigorously litigated for five years, generating a discovery record with millions of pages of documents, over 70 depositions, and extensive expert reports. There were multiple *Daubert* motions and Defendants filed an expansive motion for summary judgment, which Plaintiffs opposed with equally extensive briefing, statements of fact, and exhibits. The intensity of the litigation increased as the parties prepared for a trial expected to last much of two months, with the parties filing over 20 motions *in limine* and preparing and exchanging trial exhibit lists

---

[6] In connection with the Dean settlement, DFA/DMS argued that because of the issues raised in affidavits they presented from a number of dairy farmers, the Court should deny preliminary approval and not notify the putative class of the proposed settlement. *See* Opposition to Motion for Preliminary Approval [Dkt. No. 188]. The Court's response was to grant preliminary approval so that the entire group of potentially affected by the settlement could speak to it. *See, e.g.*, April 15, 2011 Tr. at 62 (Court: "So why not let the process play out as opposed to let's consider the worst possible scenario right now and not let these class members even consider a $30 million settlement?").

4

totaling more than 2,500 exhibits, witness lists with 120 witnesses, and designations of over 80 depositions (including *Southeastern Milk* depositions).

Throughout this time, Subclass Counsel kept Subclass Representatives informed of the progress of the litigation.  For example, since 2012, BakerHostetler attorneys alone had over **90** in-person and telephone conferences regarding the litigation[7] and Counsel for the DFA/DMS Subclasses have had at least **70** in-person and telephone conferences.[8]

***Settlement Negotiations and Involvement of Class Representatives.***  As the litigation continued, the parties participated in Court-ordered mediation with Michael Marks, a highly-respected mediator.  Current Subclass Representative Jonathan Haar attended the mediation on behalf of the Plaintiff dairy farmers (mediation preceded the certification of Subclasses).  The mediation was unsuccessful.[9]  In addition, in early 2013, counsel from BakerHostetler and for DFA/DMS began to discuss their views about the case in the context of possible settlement.[10] These discussions continued for several months without success.  These discussions resumed in early 2014, but with no success.  The Subclass Representatives were aware of these discussions, including the fact that little-to-no progress had been made toward settlement and that it appeared the case likely would proceed to trial.[11]  At no time in this process did the Subclass Representatives suggest that settlement discussions should not continue or that Subclass Counsel lacked "authority" to conduct or to continue to conduct such discussions.[12]

---

[7] *See* Declaration of Terry L. Sullivan at ¶ 3, attached as Exhibit E; Declaration of Danyll W. Foix at ¶4, attached as Exhibit F.

[8] *See* Declaration of Benjamin D. Brown at ¶ 6, attached as Exhibit G; Declaration of Kit A Pierson at ¶ 5, attached as Exhibit H.

[9] *See id*. at ¶¶ 3-4.

[10] *See* Declaration of Robert G. Abrams at ¶ 3, attached as Exhibit I.

[11] *See, e.g.,* Ex. E at ¶ 3; Ex. F at ¶ 4; Ex. G at ¶ 6.

[12] *See, e.g.,* Ex. E at ¶ 6; Ex. F at ¶ 6-7; Ex. G at ¶ 6; Ex. I at ¶ 7.

As often happens, the imminence of trial crystalized the risks confronted by both sides. In the months before trial, the Court ruled on Defendants' summary judgment motion and the parties filed many motions *in limine*, which the Court had not yet ruled on but which could alter the nature and scope of the trial and the evidence the parties were entitled to present. Although the Court denied much of Defendants' summary judgment motion, it granted parts of it and:

- Expressed concerns about the case theories and the inferences that could be drawn from the factual record;

- Limited certain evidence that could be offered based on the statute of limitations;

- Limited certain types of evidence relating to relevant market definition, including definition that did not consider milk supplied by farmers located outside Order 1; and

- Restricted certain types of damages claimed by class members.

The Court's *Daubert* rulings similarly impacted the scope of testimony permitted by Plaintiffs' expert – and supporting materials that could be presented – on damages and other issues. Defendants also raised many other factual and legal issues and defenses that had to be considered carefully by Subclass Counsel in evaluating whether the Subclasses were best served by settlement or proceeding to trial.

With both sides recognizing their respective risks associated with trial, at the end of May 2014, counsel from BakerHostetler and for DFA/DMS again discussed their views about the case, but remained far apart in terms of settlement.[13] Shortly before the scheduled final pretrial conference, counsel for DFA/DMS indicated they were prepared to resume negotiations.[14] After further negotiations on June 20, DFA/DMS – for the first time – were willing to settle for a financial amount that Subclass Counsel considered reasonable and an appropriate basis for a

---

[13] *See* Ex. I at ¶ 4.
[14] *See id.* at ¶ 5.

settlement if other terms could be negotiated and resolved.[15]

The same day, June 20, 2014, Subclass Counsel advised the Court and the Subclass Representatives of these developments.[16] Counsel agreed in principle on the financial amount and agreed to engage in good faith negotiations on non-financial terms, subject to consultation and approvals as needed. The Court postponed the scheduled June 23, 2014 pretrial conference (until July 1, 2014), to give the parties time to determine if a final settlement could be negotiated. The initial reaction of the Subclass Representatives was positive and/or receptive subject to further discussion and negotiation of the non-financial terms of a settlement.[17] The matter remained on the Court's trial calendar as negotiations proceeded.

Over the ensuing 11 days, there were extensive discussions between Subclass Representatives and Counsel about the pros and cons of a possible settlement and potential terms that should be included. This included lengthy conference calls with the Subclass Representatives (subject to their availability) on June 23, 24, 27, 30, and July 1, 2014.[18] Settlement was discussed for approximately five hours during these calls. In addition, Subclass Counsel had many lengthy calls with individual Representatives.[19]

During the discussions between Subclass Representatives and Counsel, Subclass Counsel continued to negotiate with DFA/DMS to determine whether a settlement agreement could be reached. As in any settlement negotiation, proposals were presented, some were accepted (in

---

[15] *See id.*; Ex. H at ¶ 6.

[16] A final pretrial conference was scheduled for the following Monday, June 23, 2014, at which the Court was to consider numerous pending motions. Recognizing the ongoing work this presented for the Court, counsel for both sides agreed it was important to advise the Court's clerk promptly of these developments. *See, e.g., id.*

[17] *See* Ex. E at ¶ 4; Ex. F at ¶ 5; Ex. G at ¶¶ 8-9.

[18] *See* Ex. E at ¶ 5; Ex. F at ¶ 6; Ex. G at ¶ 10; Ex. H at ¶ 8; Ex. I at ¶ 6; Declaration of David A. Balto at ¶ 4, attached as Exhibit J; Declaration of Andrew D. Manitsky at ¶ 4, attached as Exhibit K; Declaration of Emily J. Joselson at ¶ 4, attached as Exhibit L.

[19] *See* Ex. E at ¶ 4; Ex. F at ¶ 5; Ex. G at ¶¶ 8-9.

whole or in part) and some were rejected.   During this process, Subclass Counsel held conference calls with Subclass Representatives to keep them informed of the negotiation status and they never objected to the continuation of negotiation toward a possible settlement.[20]

**Terms of Proposed Settlement**.   The negotiations ultimately led to a settlement that Subclass Counsel believe is in the interest of the Subclasses.[21]   Under the proposed settlement, DFA/DMS agree to make settlement payments totaling $50 million, payable in two installments of $25 million, the first in 2014 and the second prior to April 15, 2015. *See* Ex. A, Agreement at ¶ 7.1.   DFA/DMS also agree to make numerous changes in how they conduct their business in the Northeast, including:

- Settling Defendants will not, during the next 30 months, enter into any new full-supply agreements ("FSAs") for the supply or sale of raw Grade A milk in Order 1 (although existing agreements may be renewed per a specified procedure). *See id*. at ¶ 7.3(a).

- Settling Defendants are prohibited from entering any agreement to restrict solicitation of milk from farmers during this period, including any agreement that would limit the ability of any cooperative to approach farmers and offer them more favorable prices, services, or other terms. *See id*. at ¶ 7.3(j).

- Settling Defendants agree that any new agreements for the supply or sale of raw Grade A milk in Order 1, or any renewal of existing agreements for the supply or sale of raw Grade A milk in Order 1, shall be presented, reviewed, and approved by Settling Defendants' Boards of Directors prior to entering into or renewing the agreements. *See id*. at ¶ 7.3(b).

- Settling Defendants agree they will, upon written request by any of their respective members who are located in Order 1, disclose to that member a summary of the terms of any DFA or DMS agreement for the supply or sale of raw Grade A milk customers in Order 1, to the extent such disclosure is consistent with their contract obligations. *See id*. at ¶ 7.3(c).

- Settling Defendants agree that any cooperative member, affiliate, or associate of DFA or OMS in Order 1 may, during the next 30 months, terminate its relationship with DFA or OMS upon no more than ninety (90) days written notice without penalty. *See id*. at ¶

---

[20] *See, e.g.,* Ex. E at ¶ 6; Ex. F at ¶ 7; Ex. G at ¶ 6; Ex. I at ¶ 7.
[21] *See* Ex. E at ¶ 6; Ex. F at ¶ 7; Ex. G at ¶ 13; Ex. H at ¶ 10; Ex. I at ¶ 8; Ex. J at ¶ 5; Ex. K at ¶ 5; Ex. L at ¶ 5.

7.3(d).

- DFA financial reports will be prepared in accordance with generally accepted accounting principles, *see id*. at ¶ 7.3(g), and DFA will be audited by a nationally-recognized accounting firm, *see id*. at ¶ 7.3(g)(v).

- DFA senior management and Audit Committee members will affirmatively represent they are responsible for the preparation, integrity and accuracy of DFA's annual financial report. *See id*. at ¶ 7.3(g)(vi).

- DFA will post on its member-only website an annual disclosure of all material related-party transactions, specifically broken out and identified by transaction. *See id*. at ¶ 7.3(g)(ii).

- At its annual meeting, DFA will disclose to its delegates all material related-party transactions (see above) as well as DFA's financial results from its participation in joint ventures and off-balance sheet transactions, specifically broken out and identified by transaction. *See id*. at ¶ 7.3(g)(iv).

- DFA will disclose the identity of the members of its Board of Directors and its committees and their generally applicable per diem payment rate compensation. *See id*. at ¶ 7.3(g)(i).

- DFA senior executive management and Board members will execute annual conflict of interest certifications, which will be subject to review by DFA's Audit Committee and a report by the Committee at DFA's annual meeting. *See id*. at ¶ 7.3(g)(iii).

- DFA's Northeast Area Council ("NEAC") will undertake a careful review of:  (1) members' milk checks, with respect to clarity, transparency, and any other matters, including an opportunity for members' input, in order to determine whether changes in the milk checks are warranted and (2) whether changes are warranted in the election procedure by which Area Council members and delegates are chosen,  including specifically whether the membership should be able to cast ballots by mail, in addition to casting votes in person at meetings.  Changes recommended by the NEAC will be implemented. *See id*. at ¶ 7.3(f) and (j).

- Compliance with the Agreement will be monitored by DFA's Audit Committee, and the Committee will report its views to the delegates at DFA's annual meeting. *See id*. at ¶ 7.3(h).

The settlement agreement also establishes a mechanism for public disclosure of much of the

relevant record in this case.  Settling Defendants agree not to oppose a request by Subclass

Counsel to unseal and release materials submitted to the Court, including briefs and supporting

exhibits filed in connection with Plaintiffs' motion for certification of subclasses (Dkt. No. 388) and Defendants' motion for summary judgment (Dkt. No. 479), consistent with the confidentiality interests of third parties. *See id.* at ¶ 7.3(e).  This disclosure will make available to all Subclass members (and the public) information that will allow them to assess and consider Defendants' conduct, as they deem appropriate.

In exchange for the monetary relief, conduct, and disclosure terms, Subclass members will release Settling Defendants of any claims that have been asserted, or could have been asserted, arising out of or relating in any way to any conduct alleged in the Complaint. *See id*. at ¶ 6.1.  In order to resolve the greatest number of potential claims, the agreement permits Subclass members who previously opted out of the class to apply to the Court for reinstatement to the class. *See id*. at ¶ 4.3.  Furthermore, in light of the fact that Subclass members have already been given an opportunity to opt out, the parties propose that no additional opt-out period is necessary or required.[22]

## **ARGUMENT**

## I.    **SUBCLASS COUNSEL WERE AUTHORIZED TO ENGAGE IN SETTLEMENT DISCUSSIONS WITH DFA/DMS**

During the September 9 status conference, the Court asked whether Subclass Counsel could settle a class case without authorization of the Subclass Representatives.  To begin with, Subclass Counsel had authorization to negotiate the proposed settlement.  As reviewed above, Subclass Representatives were aware of the ongoing effort toward settlement through the numerous communications about the litigation and settlement efforts during the past two years. At no point prior to entering the proposed settlement did Subclass Representatives object to the

---

[22] The rationale for the "no opt-out" provision was previously addressed, *see* Dairy Farmer Subclasses' Expedited Motion for Preliminary Approval of the Settlement at 19 [Dkt. No. 568], but Subclass Counsel will respond further to any specific concerns of the Court.

negotiations, much less tell Subclass Counsel that they were not "authorized" to conduct settlement discussions. To the contrary, Subclass Representatives' early reaction to the proposed settlement was positive and/or receptive to continued negotiations and they participated in the negotiations by providing and responding to proposed non-monetary settlement terms. As a result, the Subclass Representatives explicitly, or at the very least implicitly, authorized Subclass Counsel to engage in settlement negotiations. *See, e.g., Boesky*, 948 F.2d at 1367 (holding objector could not claim lack of authority to settle when "their knowledge and extended silence might easily support a finding of implied consent or estoppel").

Even if, contrary to fact, Subclass Counsel had not had the Subclass Representatives' "authorization" to pursue a settlement, this would not be an impediment to preliminary approval, as class representatives do not "authorize" class action settlement negotiations or settlements.[23] This was directly addressed in *Kincade*, where five of the six class representatives objected to a proposed settlement, arguing class counsel lacked authority to negotiate and enter a class settlement. *Id.* at 635 F.2d at 503-04, 508. The Fifth Circuit rejected this lack of authority argument as misplaced in the class action context:

> Appellants' argument that the settlement cannot be applied to them because they did not authorize their attorney, Walker, to settle the case or otherwise consent to the settlement is also easily disposed of. Because the "client" in a class action consists of numerous unnamed class members as well as the class representatives, and because '[t]he class itself often speaks in several voices ..., it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole ....' *Pettway v.*

---

[23] If settlement negotiations had to have the "authorization" of Subclass Representatives, it would effectively provide Subclass Representatives with absolute veto power over settlement, even though the law is clear that "a court may approve a settlement over class representatives' objections." July 9 Order at 8; *accord Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) ("the named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands"); *Manual for Complex Litig.*, Fourth, at § 21.642 ("a class representative cannot alone veto a settlement, especially one that has been presented to and approved by the court").

> *American Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978). ***Because of the unique nature of the attorney-client relationship in a class action, the cases cited by appellants holding that an attorney cannot settle his individual client's case without the authorization of the client are simply inapplicable***.

*Id*. at 508 (emphasis added).   As *Kincade* recognized, unlike in a traditional attorney-client relationship, in the class context, counsel's obligation in settlement turns on *counsel's* determination of the best interests of the *class*, not on the desires of the *class representatives*.[24] The Second Circuit recently endorsed *Kincade*. *See Charron*, 731 F.3d at 254 ("We believe those cases correctly state the law.").   Every known federal court to address this issue has taken the same approach,[25] consistent with the Second Circuit's explanation that:   "The attorneys themselves have an obligation to all the class members, and 'when a conflict arises between the named plaintiffs and the rest of the class, the class attorney must not allow decisions on behalf of the class to rest exclusively with the named plaintiffs.'" *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995) (quoting *Pettway*, 576 F.2d at 1176).

Class counsel's obligation to the class and authorization to act on the class's behalf in settlement, as opposed to only the class representatives, also is reflected in the Rule 23 Advisory

---

[24] For these reasons, the obligations of counsel to clients in a class context are quite different than the situation where counsel represents an individual client.  The Supreme Court's comment on settlement authority in *Commissioner of Internal Revenue v. Banks*, 543 U.S. 426, 436 (2005), thus arose in a materially different context – it was not a class action, did not address the ethical principles for class actions, and did not consider the settlement obligations of class counsel.

[25] *See, e.g., Lowery v. City of Albuquerque*, 2013 U.S. Dist. LEXIS 35626, at *1 (D.N.M. Feb. 27, 2013) (approving settlement over objection of class representative who claimed class counsel failed to get authorization to settle); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) (approving settlement over objection of the class representatives and explaining "courts have rejected the argument that a settlement cannot be applied to certain class members or representatives because they did not authorize their attorney to settle or otherwise consent to the settlement.  Because the client in a class action consists of numerous unnamed class members as well as the representatives," and because the "class itself often speaks in several voices," it "may be impossible for the class attorney to do more than act in what he believes to be the best interest of the class as a whole") (internal citations and quotation marks removed); *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions*, at § 3:52 (5th ed. 2014) (explaining class representatives do not serve same role as a client in the traditional attorney-client relationship).

Committee Notes, which explain:

> [T]he primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class.  The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.  Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it.  The class representatives do not have an unfettered right to "fire" class counsel.  In the same vein, *the class representatives cannot command class counsel to accept or reject a settlement proposal.  To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.*

Fed. R. Civ. P. 23(g)(1)(B) Advisory Committee Notes (emphasis added).[26]  Class counsel responsibilities are further explained in the appended declaration of Prof. Geoffrey Hazard, who has advised the Federal Rules Committee and is widely recognized as a leading expert on legal ethics in the United States. *See* Exhibit M.  As Prof. Hazard states, consistent with Rule 23's recognition of the unique relationship between class counsel, class representatives, and the class as a whole, where class counsel believes the class would benefit from acceptance of a settlement

---

[26] There are many other cases holding, in a broad range of circumstances, that the overriding obligation of class counsel is to advance the best interests of the class in its entirety. *See, e.g.*, *Staton v. Boeing Co.,* 327 F.3d 938, 960 (9th Cir. 2003) ("class counsel ultimately owe their fiduciary responsibility to the class as a whole and are therefore not bound by the views of the named plaintiffs regarding any settlement"); *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 590-91 (3d Cir. 1999) (class counsel's duty is to the class as a whole); *Walse v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors."); *Parker,* 667 F.2d at 1211 ("The courts have recognized that the duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs."); *Heit v. Van Ochten,* 126 F. Supp. 2d 487, 494 (W.D. Mich. 2001) (duty is to the class as a whole); *Blanchard v. Edgemark Fin. Corp.*, 175 F.R.D. 293, 307 (N.D. Ill. 1997) ("One of the factors unique to class litigation is the existence of a class, rather than individual, client.  Stated another way, in a class suit, class counsel's client is the group which comprises the class, rather than any individual class member … [A]ll that can be expected of class counsel is that he seek to protect the best interests of the class as a whole.  This duty may require class counsel to take actions which are in derogation of the express desires and contrary to the best interest of the class representatives in order to protect the interests of the plaintiff class."); *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422, 1430 (S.D.N.Y. 1994) ("[T]he duty owed by class counsel is to the entire class and not dependent on the special desires of the named plaintiffs.").

offer and the representatives disagree, the settlement should be presented to the court so that a fairness hearing may be held where dissenting class members may be heard. *See id*. at ¶ 10.

Subclass Counsel took these responsibilities with the utmost seriousness and acted in accordance with them.  As explained above, Subclass Representatives were informed of both the mediation and the failure to make progress in subsequent discussions involving counsel with BakerHostetler and for DFA/DMS.  As soon as DFA/DMS indicated willingness to settle on financial terms in an amount that Subclass Counsel believed appropriate, this was communicated to all Subclass Representatives, and Subclass Counsel and Representatives had extensive discussions about the wisdom of negotiating a final settlement (or proceeding to trial), the terms on which DFA/DMS would settle the case, and other potential terms that could be considered. There was continued discussion of these issues, as well as the progress of the ongoing settlement negotiations, until a settlement was reached that Subclass Counsel determined to be in the best interests of the Subclasses as a whole.  Having reached that point, it was entirely appropriate – and, in fact, required – that Subclass Counsel present the proposed settlement to the Court.

Likewise, as the Court recognized, both preliminary and final approval of a settlement can be granted when the standards for approval are met, even if class representatives oppose settlement. *See* July 9 Order at 8.  As the Second Circuit recently affirmed, "the assent of the class representatives is not essential to the settlement, as long as the Rule 23 requirements are met." *Charron*, 731 F.3d at 254 (affirming settlement approval over unanimous objections of named plaintiffs when "district court thoroughly and carefully reviewed the settlement and concluded that it was a fair and sensible way to resolve the[] claims").

Both Subclass Representatives and Counsel have a strong interest in securing as much relief as is reasonably achievable for the Subclasses.  Subclass Representatives should be

commended for their steadfast commitment to that end – they have acted zealously to advance those interests. Despite the disagreements that have emerged in connection with the proposed settlement, Subclass Counsel have the same objective and have tirelessly devoted many thousands of hours toward that same end over the past five years of litigation. After evaluating the proposed settlement, mindful of the "overriding public interest in settling and quieting litigation,"[27] lengthy discussion with Subclass Representatives about the pros and cons of settlement or trial, Subclass Counsel concluded that the proposed settlement is in the best interests of the Subclasses as a whole, and presented the proposed settlement to the Court in accordance with Rule 23.

## II.    THE PROPOSED SETTLEMENT SATISFIES THE CRITERIA FOR PRELIMINARY APPROVAL

Preliminary approval "is merely the first step in a multi-step process in which the Proposed Settlement will be scrutinized by both the [C]ourt and the Dairy Farmer Subclasses." July 9 Order at 8. "Preliminary approval of a class action settlement, in contrast to final approval, 'is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness.'" *Id.* at 7 (quoting *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010); *In re Traffic Exec Ass'n-E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980)). Accordingly, "the threshold for preliminary approval of a proposed class action settlement is meaningfully lower than the threshold for final approval." *Id.* (quoting *In re Payment Card Interchange Fee & Mech. Disc. Antitrust Litig.*, 2012 WL 5989763, at *1 (E.D.N.Y. Oct. 24, 2012)). At this stage, the Court's role is to evaluate whether the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to

---

[27] Dean Final Order at 8 (quoting *Prudential Sec.*, 163 F.R.D. at 209).

class representatives or segments of the class, and falls within the range of possible approval." *Id*. at 8 (quoting *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157 (E.D.N.Y. 2009)).[28]

### A.    The Proposed Settlement Resulted from Serious, Informed, Non-Collusive Negotiations between Experienced and Capable Counsel

The Second Circuit has explained that "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted).

The proposed settlement indisputably is a product of arm's length negotiations after extensive discovery and there is no basis for any suggestion to the contrary.  As set forth above, at every stage of this litigation, the parties zealously advanced their positions.  The matter did not settle during mediation before a very skilled mediator and, despite numerous attempts, no material progress on settlement was made during the ensuing years.  It was only after extensive discovery, after a year of discussions, critical pretrial rulings, and the parties were on the eve of trial, that a reasonable settlement for the first time became a possibility.  Indeed, the fact that it took five years to reach that point is an indication both of the complexity of the issues presented, the arm's length negotiations, and the devotion of both sides to accepting a settlement *only* if it

---

[28] During the final approval stage, courts examine whether the settlement is fair, reasonable and adequate by considering the following factors:  "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted).  Because the Court is only considering preliminary approval, some of these factors do not yet fully come into play. *See Bourlas v. Davis Law Assocs.*, 237 F.R.D. 345, 355 n.7 (E.D.N.Y. 2006).

was reasonable and appropriate in light of the risks and potential benefits of proceeding to trial. In this situation, the proposed settlement presumptively should be preliminarily approved.[29]

In addition, the fact that experienced antitrust and class action counsel[30] with the law firms representing the Subclasses unanimously determined that the proposed settlement is in the best interest of the Subclasses further supports preliminary approval of the proposed settlement.[31]

### B. The Proposed Settlement Falls Within the Range of Possible Approval by the Court as Fair, Reasonable, and Adequate

In deciding whether to grant preliminary approval, the Court also considers whether the settlement is within the range of what might be fair, reasonable and adequate.[32] The determination of a "reasonable" settlement is "not susceptible of a mathematical equation yielding a particularized sum." *Michael Milken,* 150 F.R.D. at 66. Rather, "in any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

---

[29] *See Blessing v. Sirius Xm Radio, Inc.*, 507 F.App'x 1, 3 (2d Cir. 2012) (settlement presumptively fair when "settled on the eve of trial, after nearly three years of litigation, including extensive fact and expert discovery"); *Banyai v. Mazur*, 2007 U.S. Dist. LEXIS 22343, at **22-24 (S.D.N.Y. Mar. 27, 2007) (settlement reached by "experienced, capable counsel after meaningful discovery" presumptively fair, adequate and reasonable).

[30] For example, lead counsel for the non-DFA/DMS Subclass, Mr. Abrams, is a Fellow in the American College of Trial Lawyers. Lead counsel at Cohen Milstein for the DFA/DMS Subclass successfully proceeded to trial (and verdict) in a lengthy antitrust class action trial last year and has served as trial counsel in other major antitrust class action trials.

[31] *See In re Michael Milken & Assoc. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) ("view of experience counsel favoring the settlement is 'entitled to great weight'"); *NASDAQ Market,* 187 F.R.D. at 474 ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

[32] *See Manual for Complex Litig.*, Fourth, at § 13.14 ("First, the [court] reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. If so, the final decision on approval is made after the hearing"). The determination of a "reasonable" settlement is "not susceptible of a mathematical equation yielding a particularized sum."); *Michael Milken*, 150 F.R.D. at 66.

The proposed $50 million settlement with DFA/DMS substantially exceeds (66.6% larger) the Dean settlement ($30 million) that the Court determined to be "fair, reasonable, and adequate" in this case.  Opinion and Order Granting in Part and Denying in Part Final Approval of Dean Settlement at 14 ("Dean Final Order") [Dkt. No. 341].  The proposed settlement is an excellent result because it is far larger than any jury verdict in this district[33] and recovers a significant portion of the total estimated damages in this case.[34]  Prof. Gordon Rausser's damage estimate ($.41/cwt) yielded total damages of $341 million; Defendants challenge that claim and their expert opines there are no damages.  The proposed Settlement, when combined with the 2011 settlement with Dean, yields a total settlement of $80 million dollars, or nearly 25% of the total damages that could potentially be claimed at trial on behalf of the Subclasses.  (Notably, if the matter proceeded to trial, any jury verdict would be subject to an offset of the Dean settlement).  Under any metric, the proposed settlement provides significant compensation that is certain and will be available years earlier than if the case were to go successfully through trial and the appeals that would almost certainly follow.  Such a recovery is well within the range approved by courts for preliminary approval.[35]

---

[33] *See* Ex. N, U.S. District Court for the District of Vermont's Civil Jury Verdicts.

[34] In evaluating the settlement terms, Second Circuit courts evaluate the settlement in the context of actual, not trebled, damages. *See County of Suffolk v. Long Island Lighting*, 907 F.2d 1295, 1324 (2d Cir. 1990); *City of Detroit*, 495 F.2d at 452; *Blessing v. Sirius XM Radio Inc.*, 2011 WL 3739024, at *3, n.4 (S.D.N.Y., August 24, 2011); *In re W. Union Money Transfer Litig.*, 2004 WL 3709932, at *11, n.11 (E.D.N.Y. Oct. 19, 2004).

[35] *See, e.g.*, *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 229-30 (E.D.N.Y. 2013) (approving antitrust settlement representing 2.5% of maximum damages calculation); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approving settlement representing approximately 9% of potential damages); *Menkes*, 270 F.R.D. at 101 (preliminarily approving settlement representing approximately 8% of the maximum recoverable class damages); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483-84 (S.D.N.Y. 2009) ("[T]he Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate."); *In re Med. X-Ray Film Antitrust Litig.*, No. 9805904, 1998 WL 661515,

The proposed settlement is in stark contrast to *In re High-Tech Employee Antitrust Litigation*, 2014 WL 3917126, at *1 (N.D. Cal. Aug. 8, 2014).   It involved conduct that the Justice Department had earlier determined to be a naked and illegal restraint on competition resulting in entries of consent decrees involving the defendants.   In private litigation that followed, Judge Koh denied preliminary approval of a second settlement in which class members "recover[ed] *less* on a proportional basis" than in a prior settlement, even though intervening court rulings had unambiguously strengthened plaintiffs' position in the case. *Id.* at *4 (emphasis added).   Here, there is no issue of the later settlement achieving less than an earlier one:   The proposed settlement is a significantly *greater* sum (66.6% greater) than was approved in the Dean settlement plus there is substantial equitable relief not previously obtained.

In addition to a significant and immediate financial payment, the proposed agreement provides meaningful non-monetary benefits to Subclass members.   Under the agreement, Settling Defendants agree to:   Increase marketing competition and options for Northeast farmers by prohibiting Settling Defendants from agreeing with other cooperatives to restrict solicitation or limit the ability of any cooperative to approach farmers and offer them more favorable prices, services, or other terms; prohibiting Settling Defendants from entering into new FSAs during the Settlement's term; permitting cooperatives affiliated with Settling Defendants to end their relationship without penalty; boosting transparency through auditing and disclosure commitments; and facilitating further internal review of additional meaningful changes to

---

at *5 (E.D.N.Y. Aug. 7, 1998) (approving settlement representing 17% of "best possible" recovery); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 n. 30 (S.D.N.Y. 2009) (approving settlement amounting to 5-12% of maximum provable damages); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 134-35 (S.D.N.Y. 2008) (holding settlement representing 3% of estimated damages to be within range of reasonableness); *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (approving settlement representing 3.8% of estimated damages as within range of reasonableness).

conduct. *See* Ex. A, Agreement at ¶ 7.1.  These conduct terms, combined with the significant monetary payment, heavily weigh in favor of preliminarily approving the proposed settlement.[36]

### C.    The Proposed Settlement Has No Obvious Deficiencies

The proposed settlement should be preliminarily approved because it has no "obvious deficiencies," such as "unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys…." Dean Preliminary Order at 4-5 (quoting *In re Prudential Sec.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995)).

The proposed settlement terms are not obviously deficient.  To the contrary, all Subclass Counsel determined that the settlement – the largest antitrust settlement (or judgment) ever in this district – is in the interest of the Subclasses.  As this Court observed, and counsels' experience confirms, antitrust class actions are "'notoriously complex, protracted, and bitterly fought.'" Dean Final Order at 12 (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).  This case would be no less complex or risky to try.  Even if the Subclasses were to prevail at trial – and a verdict upheld after lengthy appeals – it is possible a jury, this Court, or the Second Circuit would not award more than the $50 million obtained through the proposed settlement, and it is virtually certain that Subclass members could not obtain the conduct terms available in the proposed settlement.  Given these risks, balanced against the valuable benefits, the proposed settlement certainly is not obviously deficient.[37]

---

[36] *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 510-11, 520 (E.D.N.Y. 2003) (approving settlement, in part, based on injunctive relief regarding credit card issuers' practices); *White v. NFL*, 836 F. Supp. 1458, 1479 (D. Minn. 1993) (approving antitrust settlement with changes to NFL rules which benefitted players).

[37] *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) ("Based on this risk and the anticipated expense and complexity of further litigation, the court cannot say that the proposed settlement is obviously deficient…").

In addition, the proposed settlement grants no preferential treatment to Subclass Representatives or segments of the Subclasses.[38] The proposed settlement's compensatory damages would be distributed to all Subclass members according to each member's volume of milk production and sales – the same *pro rata* distribution approved by the Court for the Dean settlement. Likewise, the compensatory damages would be distributed to all members of the Subclasses according to the same *pro rata* formula. This distribution of funds on the same basis to all Subclass members is "fundamentally fair,"[39] consistent with Prof. Rausser's opinion that members of both Subclasses were equally harmed. *See* 3/19/12 Rausser Decl. at ¶ 32.[40]

Finally, the proposed settlement does not grant excessive compensation for attorneys. In fact, the proposed settlement does not set aside, or require any particular amount of compensation for attorneys (the scenario in which this concern may arise). Instead, the settlement explicitly acknowledges that the Court will determine attorney compensation. *See* Ex. A, Agreement at ¶ 8.5. This process for attorneys' fees is well-established and is not an obvious deficiency. *See* Dean Final Order at 14-15 (collecting authorities).

In sum, the proposed settlement meets the low threshold for preliminary approval. The proposed settlement meets the standard the Court has stated: It "is the result of serious, informed, non-collusive ('arm's length') negotiations, [] there are no grounds to doubt its fairness, and no other obvious deficiencies…." July 9 Order at 8 (quoting *Cohen*, 262 F.R.D. at

---

[38] *See NASDAQ Market*, 176 F.R.D. at 102; *see also Vazquez v. Lamont Fruit Farm, Inc.*, 2011 U.S. Dist. LEXIS 144167, at *12 (W.D.N.Y. Dec. 12, 2011) (preliminarily approving proposed settlement in part because "this Court finds no 'obvious deficiencies' with respect to the agreement's treatment of the class members, named Plaintiffs, or class counsel").

[39] *In re Airline Ticket Com'n Antitrust Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (approving *pro rata* distribution of settlement fund based on number of alleged fixed-price product as "cost-effective, simple and fundamentally fair").

[40] *See, e.g., In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving allocation of settlement funds consistent with expert damages calculation).

157).  Accordingly, the proposed settlement should be preliminarily approved so that it can be presented to all Subclass members and the fairness and reasonableness of the settlement ultimately can be determined by this Court after a Rule 23 fairness hearing.  *See* Dean Preliminary Order at 4-5 (explaining preliminary approval should be granted so absent class members can consider the settlement).

### III. THE SUBCLASS REPRESENTATIVES' ISSUES DO NOT PRECLUDE PRELIMINARY APPROVAL AND PRESENTATION OF THE PROPOSED SETTLEMENT TO THE SUBCLASSES

The Subclass Representatives' Statement, submitted *in camera*, provides no reason to deny preliminary approval when, as here, the Rule 23 requirements are met.  Subclass Counsel submit the following points on the Statement for the Court's consideration; however, as a preliminary matter, the Statement is most noteworthy for what it does *not* say.  At no point is there any recognition of the risks the Subclasses face in going to trial or the risks, even if successful, of delay and possible reversal on appeal.  But these are factors critical in evaluating any settlement – indeed, they are the reason why parties settle cases.

#### A. Positions of the Subclass Representatives

The Statement suggests unanimous opposition to the proposed settlement and dissatisfaction with Class Counsel.  But, although Subclass Representative Alice Allen appreciates the other Representatives' concerns with the proposed settlement terms, after further consideration, she does not agree with all of the conclusions in the Statement.  Mrs. Allen does not agree with the criticisms of Subclass Counsel.  She believes they have acted in the best interests of the Subclasses and she does not believe that justice can be achieved only by proceeding to trial.  Thus, the Statement does not represent the views of all Representatives.

#### B. Financial Terms

In the Statement, Subclass Representatives object to the $50 million payment from

DFA/DMS as insufficient.[41]  Several points bear emphasis here.

First, the amount of the payment cannot be evaluated in a vacuum, without consideration of both the risks of proceeding to trial with the inherent complexity of the legal issues presented in this case and the material prospect that an appeal of a successful verdict might result in another trial and potentially years of delay before farmers received any monetary relief.  The Court is familiar with these risks based on the five-year history of this litigation, which Subclass Counsel were in a position to evaluate based on a record that includes literally millions of pages of documents, extensive testimony, voluminous expert reports, extensive briefing of the factual and legal issues in the case, and this Court's prior rulings.  The Statement, however, makes no mention of the risks of proceeding to trial.

Second, it was the judgment of Subclass Counsel that the $50 million settlement was the maximum financial settlement that could reasonably be accomplished.  The alternative here was not a larger financial settlement, but trial of this matter to verdict, with the risks and potential for substantial delay, including inevitable appeals.

Third, the proposed settlement for $50 million resolves claims against DFA/DMS for substantially more than the amount ($30 million) that the Court approved as a fair and reasonable settlement of the claims against Dean Foods.  That settlement resulted in unusually high claims rate, evidencing the significance of this monetary relief to the Subclass.

Fourth, together with the prior Dean settlement, a $50 million settlement with DFA/DMS

---

[41] Subclass Representatives calculate that $50 million is about "1/600[th]" of the value of milk pooled on Order 1 during the class period.  While this calculation appears inaccurate, the relevant issue is not the relation of the amount of the settlement to the underlying price of the product or commodity, but the relation of the amount of the settlement to the damages claimed and the risks of proceeding to trial.

means the total settlement of the claims in this case will now amount to $80 million[42] or, as noted above, about 25% of the single damages that could be claimed by the Subclasses at a trial.

These are, of course, issues for evaluation by the Court in connection with a fairness hearing.  For present purposes, however, the financial terms of this settlement clearly meets the test of "fall[ing] within the range of possible approval," July 9, 2014 Order at 8; *see also* Dean Preliminary Order at 4, and support preliminary approval and notice of the proposed settlement to the Subclasses.

### C.    Scope of the Settlement Subclasses

Subclass Representatives object that the proceeds of the settlement should be distributed to farmers who produce milk outside Order 1 but pool milk with Order 1.  As the Court is aware, the Subclasses certified by the Court do not include farmers outside Order 1.  Subclass Counsel negotiated the proposed settlement on behalf of the members of the Subclasses actually certified by the Court and represented by counsel  Moreover, expanding the Subclasses would dilute the recovery for the members represented by Subclass counsel.  It is often the case that a class could be more broadly defined or parties outside a defined class could claim damages – indeed, the Court already considered and rejected claims by farmers outside Order 1 (Maine farmers) that they should be allowed to participate in the Dean settlement.[43]  The proposed settlement was negotiated on behalf of the Subclasses certified by the Court and that was the appropriate way to proceed (and it should be noted that if this matter proceeded to trial, farmers outside Order 1 would not be entitled to any recovery).

---

[42]  The largest reported jury verdict in this district since 2001 (the time reported) is $2,522,193. *See* Ex. N.

[43]  *See* Dean Preliminary Order at 8-9.  In its Order, the Court noted that farmers outside Order 1 could pursue their own claims, which remains the case.

D.        **Equitable Relief**

Subclass Representatives object to various aspects of the equitable relief.  The fact that they would prefer even more equitable relief does not mean the proposed settlement is inadequate, or that any additional relief could be obtained even if the matter proceeded to trial. In this regard, it is noteworthy that the proposed settlement achieves results – both financial and equitable – that no state or federal authority has sought or accomplished.

Among other things, the proposed settlement prohibits Settling Defendants from entering or maintaining "any agreement, or understanding, written or unwritten, with any cooperative that limits or restricts any form of solicitation of milk supplies from dairy farmers, including but not limited to any agreement that restricts contacting or approaching dairy farms to offer more favorable financial terms, services or other terms or conditions." Ex. A, Agreement at ¶ 7.3(j). This provision specifically addresses conduct that the Court identified as a principal concern.

Subclass Representatives object that this provision merely prohibits conduct that is already unlawful.  Although Defendants likely would dispute that position at trial (and argued such conduct should be judged under the Rule of Reason), even if the Subclasses were to prevail at trial, it is uncertain whether the Court would impose injunctive remedies dealing with this business conduct by Defendants, monitor that conduct, and enforce the remedies over time.

While Subclass Representatives are critical of the time period of the conduct remedies, the period extends through December 31, 2016, *see id*. at ¶ 1.22, and was a negotiated term, reflecting a compromise by the respective sides.  As discussed above, the proposed agreement also provides substantial disclosure of the record developed in this case – including facts relating to non-solicitation – enabling state and federal antitrust authorities to take additional enforcement action, now or in the future, if they consider that warranted.

Additionally, the settlement agreement provides that DFA and DMS cannot enter any new

25

FSAs during the term of the settlement, but preserves the right to renew existing agreements (there was a dispute among the parties during the litigation regarding the percentage of the market encompassed by existing agreements; this agreement prevents Defendants from adding to its market share by precluding new agreements during the time period covered by the settlement). This is a compromise on an issue that was disputed by the parties, with DFA/DMS taking the position that these agreements are lawful. A consequence of the settlement will also be substantial disclosure of the existence of these agreements, both to DFA's Board of Directors (as requested by the Subclass Representatives) and farmer members upon request, and also to the public and state and federal law enforcement authorities pursuant to the disclosure provisions discussed below.

Subclass Representatives also object that the provision allowing DFA cooperatives and affiliates to terminate their relationships with DFA or DMS upon no more than ninety days' notice without penalty expires at the end of the settlement term (December 31, 2016). But that provides ample time for any such cooperative or affiliate to exercise this option.

The proposed settlement agreement imposes certain disclosure requirements to increase the transparency of DFA's financial transactions to its members and ensure that DFA financial reports are subject to reasonable and independent auditing requirements. *See id.* at ¶ 7.3(g). This goal could almost certainly be accomplished *only* through the proposed settlement.

The same is true of provisions addressing whether DFA/DMS operate in a sufficiently democratic manner (*i.e.*, provisions relating to DFA voting procedures). There is little prospect that such relief could be ordered even at the conclusion of a successful antitrust trial. Thus, while the Subclass Representatives might prefer stronger corporate governance provisions, the proposed settlement's requirements that DFA's Northeast Area Council undertake a review of

these issues and any changed recommended by the NEAC will be implemented by DFA, is more than could be accomplished at trial.  In short, the settlement represents the best, and in all likelihood the only, way to further the goals conveyed by the Subclass Representatives.

Finally, the proposed settlement agreement provides a non-retaliation provision, requested by Subclass Representatives, that prohibits any form of retribution by DFA/DMS.

Aside from their issues with a few of the many forms of structural relief offered by the proposed settlement, Subclass Representatives' objections do not state other equitable terms that should have been imposed.  During the course of the litigation, Subclass Counsel solicited potential forms of equitable relief from Subclass Representatives and negotiated those terms with DFA/DMS to the maximum extent possible.  DFA/DMS also vigorously opposed any further relief.  The alternative to the negotiated terms would be no settlement at all.  In short, the settlement represents the best, and in all likelihood the only, way to further the conduct goals of the Subclass Representatives.

### E.    Role of Objections in the Class Settlement Process

Subclass Representatives object that Subclass members have "the burden of objection" to the proposed settlement.  That is, however, the normal process contemplated by Rule 23 and is consistent with the process this Court approved for the Dean settlement.

### F.    Disclosure of Defendants' Documents

Subclass Representatives object that the issue of disclosure of documents in the litigation is left to the whim of DFA.  That is incorrect.  Paragraph 7.3(e) of the proposed settlement provides:

> Settling Defendants agree not to oppose a request by Subclass Counsel to unseal and release materials submitted to the Court, including briefs and the documents that provided the source for supporting exhibits, filed with the Court in connection with Plaintiffs' motion for certification of subclasses (Court Docket No 388) and Defendants' motion for summary judgment (Court Docket No. 479),

to the extent the disclosure of such documents is not prohibited by Settling Defendants' obligations to third parties.

Thus, Settling Defendants relinquish the right to object to public disclosure of any of these materials, other than documents they are prohibited from disclosing due to obligations to third parties. With respect to those documents, Settling Defendants simply preserve the right to object, leaving Subclass Counsel free to urge that all or most of those materials should also be disclosed (a matter within this Court's discretion).

### G. Notice to the Subclasses Regarding Potential Attorneys' Fees

Subclass Representatives take issue with the attorneys' fees that counsel indicated they would seek. But that has nothing to do with the reasonability of the proposed settlement, which includes no agreement on the amount of attorneys' fees. The amount of attorneys' fees actually awarded will be determined by this Court based on established legal standards.[44]

### IV. THE PROPOSED NOTICES AND NOTICE PLAN SATISFY RULE 23

The proposed notice and summary notice have been revised to address issues previously raised by the Court, as explained in the Subclasses' Response to Court's Order Regarding Motion for Preliminary Approval (July 23, 2014) at 3-7 [Dkt. No. 570]. The proposed notices as revised (*see* Exs. C and D) therefore satisfy Rule 23 for the reasons previously explained and incorporated by reference. *See id*. Likewise, the notice plan proposed on July 1, 2014 satisfies Rule 23 for the reasons previously explained and incorporated herein by reference. *See*

---

[44] Because the Court will determine attorneys' fees, any suggestion to the contrary is without merit and disproven by the five years of vigorous litigation and negotiation leading to the proposed settlement. Moreover, courts regularly compute fees to ensure that counsel's interests are aligned with those of the class through settlement and after trials. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980) (class counsel properly awarded a percentage of the fund created from a judgment obtained after trial); *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig*., 2014 U.S. LEXIS 3351 (E.D.N.Y. Jan. 10, 2014) (providing a graduated fee scale and explaining that multiples of lodestar are customary and appropriate where large recoveries are created in class actions). In any event, this factor played no role in evaluation of the proposed settlement terms.

Subclasses' Expedited Motion for Preliminary Approval of Settlement Between Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, and Dairy Farmer Subclasses at 17-19 (July 1, 2014) [Dkt. No. 566-1].[45]

## V. PROPOSED DATES FOR NOTICES, SETTLEMENT ADMINISTRATION, AND FAIRNESS HEARING

Subclass Counsel propose that the Court set deadlines for dissemination of notice, settlement administration, and the fairness hearing as follows:

| | |
|---|---|
| Notice to Subclasses by U.S. Mail | As soon as practicable after entry of the Order granting preliminary approval |
| Summary Notice published | As soon as practicable given publication deadlines |
| Last day for potential Subclass members to request permission to opt back in to the class | 14 days before Fairness Hearing |
| Last day for Subclass members to object to the Settlement | 14 days before Fairness Hearing |
| Last day for Subclass members to return claims forms (including those potential members seeking permission to opt back in) | 14 days before Fairness Hearing |
| Class Counsel file motion for final approval and response to any objections filed | 7 business days before Fairness Hearing |
| Fairness Hearing | December 16, 2014 (or earliest date thereafter convenient for the Court) |

## CONCLUSION

The proposed settlement accomplishes financial relief unprecedented in antitrust litigation in this district and important equitable relief that likely could never be secured at trial. There is more than "probable cause" for preliminary approval. Dean Preliminary Order at 4. While Subclass Counsel respect the right of Subclass Representatives to take a different view, their concerns provide no reason to deny preliminary approval when, as here, the Rule 23

---

[45] Subclass Counsel are available to discuss any remaining issues with the notices or notice plan at the Court's convenience, including whether the Court desires that the notices state the amount of expenses Subclass Counsel request.

requirements are met.  Subclass Counsel, therefore, encourage the Court to grant preliminarily approval of the proposed settlement because it is sufficiently fair, reasonable, and in the best interests of the Subclasses and those members should be afforded the opportunity to consider the settlement and voice their views, along with the Class Representatives, at a fairness hearing.

Dated:  October 3, 2014                                      Respectfully submitted,

*/s/ Robert G. Abrams*                              */s/ Kit A. Pierson*
Robert G. Abrams, Esq.                              Kit A. Pierson, Esq.
Robert J. Brookhiser, Esq.                          Benjamin D. Brown, Esq.
Gregory J. Commins, Jr., Esq.                       Brent W. Johnson, Esq.
Terry L. Sullivan, Esq.                             Emmy L. Levens, Esq.
Danyll W. Foix, Esq.                                Cohen Milstein Sellers & Toll, PLLC
Baker & Hostetler LLP                               1100 New York Ave., N.W.
Washington Square, Suite 1100                       Suite 500, West Tower
1050 Connecticut Ave., N.W.                         Washington, DC  20005
Washington, DC  20036                               (202) 408-4600
202-862-1500                                        kpierson@cohenmilstein.com
rabrams@bakerlaw.com                                bbrown@cohenmilstein.com
rbrookhiser@bakerlaw.com                            bjohnson@cohenmilstein.com
gcommins@bakerlaw.com                               elevens@cohenmilstein.com
tsullivan@bakerlaw.com
dfoix@bakerlaw.com                                  David A. Balto, Esq.
                                                    The Law Offices of David A. Balto
Emily J. Joselson, Esq.                             1350 I St,, N.W., Suite 850
Lisa B. Shelkrot, Esq.                              Washington, DC 20005
Langrock Sperry & Wool, LLP                         (202) 789-5424
210 College St.                                     david.balto@yahoo.com
P.O. Box 721
Burlington, VT 05402-0721                           Andrew D. Manitsky, Esq.
(802) 864-0217                                      Gravel and Shea PC
ejoselson@langrock.com                              76 St. Paul St., 7th Floor,
lshelkrot@langrock.com                              P.O. Box 369
                                                    Burlington, VT  05402
*Counsel for Alice E. and Laurence*                 (802) 658-0220
*E. Allen, Garret and Ralph Sitts,*                 amanitsky@gravelshea.com
*and the non-DFA/DMS Subclass*
                                                    *Counsel for Jonathan and Claudia*
                                                    *Haar, Richard Swantak, and the*
                                                    *DFA/DMS Subclass*