# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **ALICE H. ALLEN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 5:09–CV–00230–cr** |
| ) | |
| **DAIRY FARMERS OF AMERICA, INC., and** ) | |
| **DAIRY MARKETING SERVICES, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DAIRY FARMER SUBCLASSES' MOTION FOR FINAL APPROVAL OF
## PROPOSED SETTLEMENT WITH DEFENDANTS DAIRY
## FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ...................................................................................................................... 8
    I.       The Standards for Final Approval ............................................................. 8
    II.     The Settlement Meets the Standard for Final Approval. ....................... 8
        A.       The Settlement is Procedurally Fair. .......................................... 8
        B.       The Settlement is Fair, Reasonable, and Adequate ..................... 9
                1.      Complexity, Expense, and Likely Duration of the Litigation ............................................................................ 10
                2.      Reaction of the Class to the Settlement. ......................... 11
                3.      Stage of the Proceedings and Amount of Discovery Completed. ....................................................................... 16
                4.      Risk of Establishing Conspiracy, Impact and Damages, and Maintaining a Class Action Through Trial. ................. 18
                5.      Ability of the Defendant to Withstand Greater Judgment. ........... 24
                6.      Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation. ................................................................. 25
                7.      Additional Factor. ........................................................... 29
    III.    The Plan of Allocation Should be Approved ......................................... 30
        A.       Method of Calculation. ............................................................... 31
        B.       Time of Distribution of Net Settlement Funds. ......................... 31
        C.       The Plan of Allocation is Fair, Reasonable, and Adequate. .................... 32

CONCLUSION ................................................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)........................................................................29

*In re Am. Int'l Group, Inc. Sec. Litig.*,
    916 F. Supp. 2d 454 (S.D.N.Y. 2013).......................................................................13

*In re AOL Time Warner ERISA Litig.*,
    No. 02 Civ. 8853, 2006 WL 2789862 (S.D.N.Y. Sept. 27, 2006) ...........................24

*In re Austrian and German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000)........................................................................17

*In re Auto. Refinishing Paint Antitrust Litig.*,
    MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) .................................27

*Blessing v. Sirius XM Radio, Inc.*,
    No. 09 CV 10035, 2011 WL 3739024 (S.D.N.Y. Aug. 24, 2011) ...........................26

*Cavalieri v. General Elec. Co.*,
    No. 06cv315, 2009 WL 2426001 (N.D.N.Y. Aug. 6, 2009)....................................24

*Chatelain v. Prudential-Bache Sec., Inc.*,
    805 F. Supp. 209 (S.D.N.Y. 1992)...........................................................................29

*City of Detroit v. Grinnell Corp.*,
    356 F. Supp. 1380 (S.D.N.Y. 1972).........................................................................27

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974).............................................................................. *passim*

*County of Suffolk v. Long Island Lighting*,
    907 F.2d 1295 (2d Cir. 1990)...................................................................................25

*Cronas v. Willis Grp. Holdings Ltd.*,
    No. 06 Civ. 15295, 2011 U.S. Dist. LEXIS 147171 (S.D.N.Y. Dec. 19, 2011)......................9

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)................................................................................8, 15

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005) ...............................................................................8

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) .....................................................................15

*Ebbert v. Nassau County*,
  No. CV 05-5445, 2011 U.S. Dist. LEXIS 150080 (E.D.N.Y. Dec. 22, 2011) ........................8

*Fisher Bros., Inc. v. Mueller Brass Co.*,
  630 F. Supp. 493 (E.D. Pa. 1985) ........................................................................................27

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................................10, 11

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) ..................................................................................................26

*Guardians Ass'n of N.Y.C. Police Dept. v. Civil Serv. Comm'n of N.Y.*,
  527 F. Supp. 751 (S.D.N.Y. 1981) ......................................................................................17

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ..................................................................................27

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000) ..................................................................................................8

*Klein v. PDG Remediation, Inc.*,
  No. 95 CIV 4954, 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999) ..............................................11

*Lane v. Lombardi*,
  No. 12-4219-CV-C, 2014 U.S. Dist. LEXIS 149823 (W.D. Mo. Oct. 22, 2014)...................13

*Lazy Oil Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997) ..............................................................................24, 27

*In re Linerboard Antitrust Litig.*,
  296 F. Supp. 2d 568 (E.D. Pa. 2003) ..................................................................................18

*In re Lloyd's Am. Trust Fund Litig.*,
  No. 96-cv-1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)..........................................32

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002).............................................................................................26

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)............................................................................11, 32

*McReynolds v. Richards-Cantave*,
  588 F.3d 790 (2d Cir. 2009).................................................................................................9

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) .........................................................................................27

*In re Motorsports Merch. Antitrust Litig.*,
    112 F. Supp. 2d 1329 (N.D. Ga. 2000) ...................................................................18

*Munsey Trust v. Sycor, Inc.*,
    457 F. Supp. 924 (S.D.N.Y. 1978) .........................................................................17

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ............................................................................10

*New York v. Reebok Int'l Ltd.*,
    903 F. Supp. 532 (S.D.N.Y. 1995) ...........................................................................9

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972) ....................................................................................25

*In re Nissan Radiator/Transmission Cooler Litig.*,
    No. 10 CV 7493, 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013) .........10

*In re Painewebber Ltd. P'ship Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................................29

*Park v. Thomson Corp.*,
    No. 05 Civ. 2931, 2008 U.S. Dist. LEXIS 84551 (S.D.N.Y. Oct. 22, 2008) .........10

*Perry v. FleetBoston Fin. Corp.*,
    229 F.R.D. 105 (E.D. Pa. 2005) ..............................................................................24

*In re Philips/Magnavox TV Litig.*,
    No. 09-3072, 2012 U.S. Dist. LEXIS 67287 (D.N.J. May 14, 2012) ......................13

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ..........................................................................1, 8

*In re Remeron Direct Purchaser Antitrust Litig.*,
    No. Civ.03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ..................................26

*Roberts v. Electrolux Home Prods.*,
    Nos. SACV12-1644-CAS, CV13-2339-CAS, 2014 U.S. Dist. LEXIS 130163 (C.D.
    Cal. Sept. 11, 2014) ................................................................................................13

*In re Salomon Inc. Sec. Litig.*,
    No. 91 Civ. 5442, 1994 U.S. Dist. LEXIS 8038 (S.D.N.Y. June 15, 1994) .....16, 29

*Schwartz v. Novo Industri A/S*,
    119 F.R.D. 359 (S.D.N.Y. 1988) ............................................................................17

*In re Shopping Carts Antitrust Litig.*,
    M.D.L. No. 451, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ..................................18

*Taft v. Ackermans*,
   No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007) ............................32

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01-CV-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) .........................9, 17, 18, 24

*Thompson v. Metro. Life Ins. Co.*,
   216 F.R.D. 55 (S.D.N.Y. 2003) .................................................................................................10

*In re Top Tankers, Inc. Sec. Litig.*,
   No. 06-cv-13761, 2008 U.S. Dist. LEXIS 58106 (S.D.N.Y. July 31, 2008) .........................32

*United States v. State*,
   Nos. 88-5087, 88-4080, 87-2331, 1995 U.S. Dist. LEXIS 22645 (D.N.J. Mar. 14,
   1995) .........................................................................................................................................13

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................................15

*In re Vitamins Antitrust Litig.*,
   No. 99-197, 2000 WL 1737867 (D.D.C. Mar. 31, 2000) .........................................................32

*In re W. Union Money Transfer Litig.*,
   No. CV-01-0335, 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) .............................................26

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ............................................................................................8, 9, 10

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002) .................................................................................................26

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) ...........................................................................................23

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982) .........................................................................................................8

*Wixon v. Wyndham Resort Dev. Corp.*,
   No. C 07-02361, 2011 U.S. Dist. LEXIS 87249 (N.D. Cal. Aug. 8, 2011) .............................13

## STATUTES

7 C.F.R. § 1001.2 ...............................................................................................................................12

Fed. R. Civ. P. 23 ......................................................................................................................8, 12, 13

**OTHER AUTHORITIES**

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)........................15

*Manual For Complex Litigation* (Third) (2003).........................................................................15

3 Herbert B. Newberg, *Newberg on Class Actions* (3rd ed. 1992)...............................................32

## <u>INTRODUCTION</u>

This case was commenced on October 8, 2009.  During more than five years of litigation that has followed, both the parties and the Court have devoted enormous effort – including tens of thousands of hours by counsel on each side – to the evaluation and resolution of the complex factual and legal issues presented by the case.  On the eve of trial, the parties were finally able to agree on settlement terms to present to the Court.  These terms include financial payment by Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") in the amount of $50 million (in addition to $30 million previously paid by Defendant Dean), and equitable relief that "is broader than the scope of the equitable relief that may have been ordered by the [C]ourt."[1]  We believe this represents the largest antitrust settlement in the history of this jurisdiction, and it greatly exceeds the largest civil jury verdict since at least January 2001.  *See* Ex. 1 (listing of civil jury verdicts in the District of Vermont since January 2001).[2]  The settlement further provides equitable relief that no state or federal antitrust authority has secured for farmers during the lengthy time period at issue in this case.

In reviewing the final settlement with Defendant Dean Foods Company earlier in this litigation, this Court explained that "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."  Opinion and Order Granting in Part and Den. in Part Final Approval of Dean Settlement 8, Aug. 3, 2011, ECF No. 341 (hereafter

---

[1] Opinion and Order Granting in Part Renewed Mot. for Prelim. Approval of Settlement Between Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, and Dairy Farmer Subclasses and Setting a Fairness Hr'g  7, Nov. 25, 2014, ECF No. 582 (hereafter "11/25/2014 Opinion & Order").

[2] The $50 million settlement is more than twenty times greater than the largest jury verdict listed in the District of Vermont between January 2001 and the present.  To be clear, this is not an exact comparison because the cases that went to trial presumably were not class actions. In evaluating the amount of the settlement, however, counsel had to take into account that this is a very substantial sum to expect a jury to award and one without historical precedent in this jurisdiction.

"8/3/2011 Opinion & Order") quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (citation omitted).   The Court also explained that, "[s]ettlements generally advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation."  8/3/2011 Opinion & Order 8.  The same conclusion is warranted here.  For the reasons set forth below, the Dairy Farmer Subclasses respectfully request that the Court grant final approval to the settlement with DFA and DMS (collectively "Defendants").

## **BACKGROUND**

This case has been vigorously litigated by both sides for the past five years.  Over that time period, the Dairy Farmer Subclasses have secured and analyzed millions of pages of documents; taken or defended sixty-six depositions; filed and/or responded to hundreds of pages of expert reports and extensive contention interrogatories; and extensively briefed the many complex factual, economic, and legal issues presented by the case.  The matter was contested with the same vigor by DFA/DMS.  Counsel for both sides also had substantial experience (and knowledge acquired) during the course of the *Southeastern Milk Antitrust Litigation*.  Thus, as this matter came to the eve of trial, counsel prepared for trial with a deep understanding of the complex factual, economic, and legal issues presented by the case.

**Settlement Negotiations.**  At various points during this five year effort, the Dairy Farmer Subclasses and DFA/DMS explored whether the parties could resolve the pending litigation.  For many years, those efforts were unsuccessful.  The parties participated in Court-ordered mediation with Michael Marks, a highly-respected mediator, but the parties made no material progress toward resolving the case and DFA/DMS expressed no interest in returning to mediation.   In

early 2013, counsel for the non-DFA/DMS Subclass at BakerHostetler and counsel for DFA/DMS began to discuss their views about the case to determine if there was any prospect for settlement.  Those discussions were again unsuccessful.  The discussions resumed in early 2014, but with no success.[3]

As is often the case, the imminence of trial crystalized the risks confronted by both sides. Both sides briefed the factual and legal issues extensively in connection with *Daubert* and summary judgment motions.  The Court conducted a lengthy hearing and then issued extensive opinions on those motions, resolving some issues in favor of the Subclasses and others in favor of the Defendants.  The parties also filed dozens of motions *in limine* prior to trial, which had the potential to further alter the nature and scope of the trial and the evidence the parties were entitled to present.  As these legal issues were being presented and resolved, the parties were also immersed in preparation of the factual record for trial – identifying thousands of trial exhibits (and preparing objections to the other side's exhibits), reviewing the voluminous deposition testimony to designate (and cross-designate) trial testimony, preparing live witnesses to testify, and otherwise preparing vigorously for trial.

While this was ongoing, counsel from BakerHostetler and for DFA/DMS again exchanged their views in May 2014 about the case and any potential for settlement.  Those efforts were unsuccessful.  As trial became imminent, on June 19, DFA/DMS indicated – for the first time – that it was prepared to agree to financial terms that counsel for both Subclasses believed constituted an excellent result if non-financial terms could also be negotiated.  On June 20, Counsel for the Subclasses and Defendants notified the Court's clerk of the situation and,

---

[3] As described in the prior declarations submitted to the Court, counsel for the DFA/DMS Subclass as well as the Subclass Representatives, were aware that there were discussions, but little or no progress had been made.

consistent with the instructions received, worked diligently to determine whether a final settlement was achievable.  The matter remained on the Court's trial calendar as negotiations proceeded.

Over the ensuing week and a half, there were extensive discussions between Subclass Representatives and Subclass Counsel about the pros and cons of a possible settlement and potential terms that should be included.   During the discussions between Subclass Representatives and Subclass Counsel, Subclass Counsel continued to negotiate with DFA/DMS to determine whether a settlement agreement could be reached.  Counsel for the parties executed a final settlement agreement on July 1, 2014.  *See* Ex. 2 ("Agreement").

**The Settlement Terms.**  The Settlement presented to the Court resolves the claims of all Subclass members, as defined by the Court's Memorandum Opinion and Order dated November 19, 2012 (ECF No. 435), who did not exclude themselves by the required date.[4]  Agreement ¶¶ 1.3, 1.5.  Under the proposed settlement, DFA/DMS agree to make settlement payments totaling $50,000,000, payable in two installments of $25,000,000 each, the first in 2014 and the second prior to April 15, 2015.  *See id*. ¶ 7.1.  (DFA/DMS has made the first payment and it is being held in escrow pending resolution of the final approval motion).  DFA/DMS also agree to make the following changes regarding their business practices in the Northeast:

- Settling Defendants will not, for 30 months, enter into any new full-supply agreements ("FSAs") for the supply or sale of raw Grade A milk in Order 1 (although existing agreements may be renewed per a specified procedure).  *See id*. ¶ 7.3(a).

- Settling Defendants are prohibited from entering any agreement to restrict solicitation of milk from farmers during this period, including any agreement that would limit the ability of any cooperative to approach farmers and offer them more favorable prices, services, or other terms.  *See id*. ¶ 7.3(j).

---

[4] The Settlement provides a mechanism for those Subclass members who excluded themselves to opt back into the Subclass in order to participate in the Settlement.

- Settling Defendants agree that any new agreements for the supply or sale of raw Grade A milk in Order 1, or any renewal of existing agreements for the supply or sale of raw Grade A milk in Order 1, shall be presented, reviewed, and approved by Settling Defendants' Boards of Directors prior to entering into or renewing the agreements. *See id*. ¶ 7.3(b).

- Settling Defendants agree they will, upon written request by any of their respective members who are located in Order 1, disclose to that member a summary of the terms of any DFA or DMS agreement for the supply or sale of raw Grade A milk customers in Order 1, to the extent such disclosure is consistent with their contract obligations. *See id*. ¶ 7.3(c).

- Settling Defendants agree that any cooperative member, affiliate, or associate of DFA or DMS in Order 1 may, for 30 months, terminate its relationship with DFA or DMS upon no more than ninety (90) days written notice without penalty. *See id*. ¶ 7.3(d).

- DFA financial reports will be prepared in accordance with generally accepted accounting principles*, see id*. ¶ 7.3(g), and DFA will be audited by a nationally-recognized accounting firm. *See id*. ¶ 7.3(g)(v).

- DFA senior management and Audit Committee members will affirmatively represent that they are responsible for the preparation, integrity and accuracy of DFA's annual financial report. *See id*. ¶ 7.3(g)(vi).

- DFA will post on its members-only website an annual disclosure of all material related-party transactions, specifically broken out and identified by transaction. *See id*. ¶ 7.3(g)(ii).

- At its annual meeting, DFA will disclose to its delegates all material related-party transactions (see above) as well as DFA's financial results from its participation in joint ventures and off-balance sheet transactions, specifically broken out and identified by transaction. *See id*. ¶ 7.3(g)(iv).

- DFA will disclose the identity of the members of its Board of Directors and its committees and their generally applicable per diem payment rate compensation. *See id*. ¶ 7.3(g)(i).

- DFA senior executive management and Board members will execute annual conflict of interest certifications, which will be subject to review by DFA's Audit Committee and a report by the Committee at DFA's annual meeting. *See id*. ¶ 7.3(g)(iii).

- DFA's Northeast Area Council ("NEAC") will undertake a careful review of: (1) members' milk checks, with respect to clarity, transparency, and any other matters, including an opportunity for members' input, in order to determine whether changes in the milk checks are warranted and (2) whether changes are warranted in the election procedure by which Area Council members and delegates are chosen, including

specifically whether the membership should be able to cast ballots by mail, in addition to casting votes in person at meetings.  Changes recommended by the NEAC will be implemented.  *See id*. ¶¶ 7.3(f), 7.3(j).

- Compliance with the Agreement will be monitored by DFA's Audit Committee, and the Committee will report its views to the delegates at DFA's annual meeting.  *See id*. ¶ 7.3(h).

The Settlement Agreement also establishes a mechanism for disclosure of much of the relevant record in this case to the public and dairy farmers.  Settling Defendants agree not to oppose a request by Subclass Counsel to unseal and release materials submitted to the Court, including briefs and the source materials used in supporting exhibits filed with the Court in connection with Plaintiffs' motion for certification of subclasses (ECF No. 388) and Defendants' motion for summary judgment (ECF No. 479), consistent with the confidentiality interests of third parties.  *See* Agreement ¶ 7.3(e).  This disclosure will make available to all Subclass members (and the public) information that will allow them to assess and consider Defendants' conduct, as they deem appropriate, in evaluating the corporate governance of DFA and DMS.

In exchange for the above consideration, Subclass Members agree to give up the right to continue this lawsuit against DFA or DMS.  Subclass Members also release the right to sue DFA and DMS, as well as their members and partners and certain related entities, for legal claims that are related to the facts or circumstances of this case including any lawsuit against DFA, DMS, or their related entities regarding the sale, marketing, or purchase of raw Grade A Milk produced in and pooled on Federal Milk Marketing Order 1.  *Id*. ¶ 1.16.

**Preliminary Approval and Notice.**  On November 25, 2014, the Court preliminarily approved the Settlement and ordered that notice be disseminated to the Subclasses.  11/25/2014 Opinion & Order.[5]  In accordance with the Court's Order, Subclass Counsel caused Notice to be

---

[5] The Court ruled on the Subclasses' original motion for preliminary approval, and instructed Subclass Counsel to address issues relating to the form of notice and the objections

disseminated to the Subclasses on or about December 12, 2014.  The Notice has been sent by

direct mail to 8,859 farmers.  Additionally, Subclass Counsel caused notice of the Settlement to

be published in the periodicals approved by the Court and directed the Claims Administrator to

create and maintain a website and call center that provides information to the Subclasses

regarding the Settlement.

After notice was initially disseminated to the Subclasses, it became apparent that certain

data necessary for the completion of Dairy Farmer's claim forms would not be available from the

Federal Milk Market Administrator for many months.  To allow the Subclasses sufficient time to

procure the information required to submitting a claim, Subclass Counsel moved to extend the

deadline for submitting claims to May 30, 2015[6] and disseminated an amended notice alerting

Subclass members of this change.  *See* Expedited, Unopposed Mot. to Disseminate an Am.

Notice and Adjust Certain Deadlines Related to Settlement, Dec. 22, 2014, ECF No. 584.  That

motion was granted the same day and amended notices were disseminated to the Subclasses the

week of January 5, 2015.

---

raised by Subclass Representatives.  See Order Den. Without Prejudice Expedited Mot. for
Prelim. Approval of Settlement Between Dairy Farmers of America, Inc., Dairy Marketing
Services, LLC, and Dairy Farmer Subclasses, July 9, 2014, ECF No. 569.  These issues were
addressed in the Dairy Farmer Subclasses' Supplemental Filing Regarding Expedited Motion for
Preliminary Approval of Proposed Settlement dated July 29, 2014 (ECF No. 572).  The Court
granted preliminary approval on November 25, 2014.

[6] In addition to the deadline for filing claims, the time period for calculating Subclass
Members' share of the Settlement was changed to allow farmers to submit a claim based on the
amount of raw Grade A milk produced in and pooled on Order 1 from January 1, 2002 to
December 31, 2014 (rather than January 1, 2002 through December 12, 2014).  This change was
made because data related to raw milk production is generally only available on a monthly basis.
All other deadlines associated with the Settlement and outlined in the Court's Order granting
Preliminary Approval of the Settlement remained the same including the deadline for Subclass
Counsel the submit their request for attorneys' fees and expenses, the deadlines for Subclass
Members to submit objections or notify the Court of their intent to appear at the Fairness Hearing
(January 15, 2015).

**ARGUMENT**

**I.      The Standards for Final Approval.**

"There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation . . . ." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (citation omitted).  This is especially true for class action litigation and other complex matters.  *See* 8/3/11 Opinion & Order at 8 (ECF No. 341); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995);  *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 329 (S.D.N.Y. 2005), *aff'd in part, vacated in part on other grounds*, 443 F.3d 253 (2d Cir. 2006).  Class action settlements require final approval by the Court and are reviewed pursuant to Federal Rule of Civil Procedure 23(e).  The standard for this approval is well-established.  The settlement should be approved if it is "fair, reasonable, and adequate." 8/3/11 Opinion  & Order at 8; *see also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  In determining whether the settlement meets these criteria, courts often consider both "the settlement's terms and the negotiating process leading to settlement."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citation omitted).

For the reasons explained below, the Dairy Farmer Subclasses respectfully submit that the proposed settlement should be approved as fair, reasonable, and adequate.

**II.     The Settlement Meets the Standard for Final Approval.**

**A.      The Settlement is Procedurally Fair.**

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself.  *Ebbert v. Nassau County*, No. CV 05-5445, 2011 U.S. Dist. LEXIS 150080, at *20 (E.D.N.Y. Dec. 22, 2011) (citation omitted).  "'A presumption of fairness,

adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery.'" *Cronas v. Willis Grp. Holdings Ltd.*, No. 06 Civ. 15295, 2011 U.S. Dist. LEXIS 147171, at *6-7 (S.D.N.Y. Dec. 19, 2011) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 116); *see also Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,  No. 01-CV-11814, 2004 WL 1087261, at *1 (S.D.N.Y. May 14, 2004); *New York v. Reebok Int'l Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd*, 96 F.3d 44 (2d Cir. 1996); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009).

The settlement negotiations in this case were explained in considerable detail in the Dairy Farmer Subclasses' earlier submission and supporting materials which are incorporated here. *See* Supplemental Filing Regarding Mot. for Prelim. Approval of Proposed Settlement, July 29, 2014, ECF No. 572.  The Court's November 25, 2014 Opinion and Order found that, "the Proposed Settlement resulted from arms-length, non-collusive negotiations on the eve of trial between experienced and fully-informed counsel.  The Proposed Settlement was preceded by years of discovery and motion practice, including motions that addressed the merits of the parties' claims and defenses and the admissibility of evidence at trial."  11/25/2014 Opinion & Order 5.  That conclusion applies with equal force here.

**B.    The Settlement is Fair, Reasonable, and Adequate.**

The Second Circuit, and this Court's earlier opinion regarding the Dean settlement, identify nine factors to guide courts in determining whether to approve the settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the

range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

8/3/2011 Opinion & Order 8-9; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted); *see also Wal-Mart*, 396 F.3d at 117 (approving the use of the *Grinnell* factors to determine the fairness of a class action settlement); *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493, 2013 U.S. Dist. LEXIS 116720, at *14-15 (S.D.N.Y. May 30, 2013) (applying the *Grinnell* factors to determine whether a settlement should be approved).

"In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). Here, the totality of these factors weigh in favor of approving the settlement.

### 1.    Complexity, Expense, and Likely Duration of the Litigation.

"'[A]ntitrust cases, by their nature, are highly complex.'" *Park v. Thomson Corp.*, No. 05 Civ. 2931, 2008 U.S. Dist. LEXIS 84551, at *7 (S.D.N.Y. Oct. 22, 2008) (quoting *Wal-Mart Stores, Inc.*, 396 F.3d at 122); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable.").

As the Court explained in approving the Dean settlement, this case is no exception. *See* 8/3/2011 Opinion & Order 9-10. Both the parties and the Court have worked through many complex factual, economic, and legal issues during this case's five year history. The case presents an especially complex antitrust case involving both Section 1 and 2 claims, intricate and vigorously contested damages models, and vertical and horizontal agreements involving

10

numerous alleged conspirators.  It cannot be disputed that, absent this settlement, there would be significant additional resources and costs expended to prosecute the claims through trial, post-trial motions, the appeal that would very likely have ensued after any jury verdict because of the complex and disputed factual and legal issues presented by the case, and a possible retrial if an appeal was successful.  *See, e.g.*, *Global Crossing*, 225 F.R.D. at 456-57 (granting final approval where "the proposed partial settlement would grant relief to all class members without subjecting them to the risks, complexity, duration, and expense of continuing litigation"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed [s]ettlement."); *Klein v. PDG Remediation, Inc.*, No. 95 CIV 4954, 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (complexity, expense, and likely duration of litigation favored settlement that "offer[ed] Class members the benefit of immediate recovery as opposed to an uncertain award several years from now").

### 2. Reaction of the Class to the Settlement.

As described above, notice of the settlement was sent by direct mail to 8,859 farmers who were identified as potential members of the Subclasses.  Additional notice was provided through publications as approved by the Court.  The objections that have been filed to date constitute a very small fraction of the farmers notified of the settlement.   (In accordance with the preliminary approval order, objections to the settlement were required to be postmarked by January 15, 2015.)

A few observations about the objections that have been filed are appropriate.

\* As the Court is aware, Subclass Representatives for three of the farms represented in this case object to the settlement (and urged any other farmers who had objections to do so).[7] (Multiple letters were submitted for two of those farms).  Those objections have been addressed in earlier pleadings.  *See* ECF Nos. 572 & 580.[8]  A letter regarding the settlement also has been submitted by Subclass Representative Alice Allen.  Letter from Alice H. Allen, Jan. 16, 2015, ECF No. 592.

\* Nine of the objection letters are from individuals who do not appear to be located in Order 1 and therefore are not in the Subclasses.[9]  The Court has previously ruled that farmers outside Order 1 do not have standing to object to the settlement.  (Farms outside Order 1 have never been included in the Class – and subsequent Subclass – definitions and would not be entitled to relief at a trial of this matter.).  *See* Opinion & Order Granting Prelim. Approval of Revised Dean Settlement and Den. Mot. to Intervene 8-9, May 4, 2011, ECF No. 297; *see also* Fed. R. Civ. P. 23(e)(5)("Any class member may object to the proposal if it requires court

---

[7] The basis for these Subclass Representatives' objections has previously been submitted to the Court.  These Representatives subsequently placed an editorial in one of the publications in which settlement notice was provided setting forth their position and requesting that any other farmers who objected to the settlement submit those objections to the Court.

[8] *See* Letter from Jonathan & Claudia Haar, Jan. 21, 2015, ECF No. 621; Letter from Jooshua Haar, Jan. 21, 2015, ECF No. 622.  Similarly, the Sitts have submitted two letters.  *See* Letter from Ralph Sitts, Jan. 21, 2015, ECF No. 620; Letter from Garrett Sitts, Jan. 21, 2015, ECF No. 619.

[9] Subclass Counsel concluded that certain farms likely were not within the Subclasses by identifying their counties based on the addresses in their letters and then verifying whether the counties are part of Order 1 according to the USDA regulations.  *See* 7 C.F.R. § 1001.2 (2014). The following objectors do not have standing because their farms likely are outside Order 1: Letter from Troester Dairy, Jan. 20, 2015, ECF No. 598; Letter from Donna Hall, Jan. 20, 2015, ECF No. 599; Letter from Gerald Carlin, Jan. 20, 2015, ECF No. 606; Letter from Mary Ann Miller, Jan. 20, 2015, ECF No. 607; Letter from Arden Tewksbury, Jan. 20, 2015, ECF No. 608; Letter from Joe Davitt, Jan. 20, 2015, ECF No. 610; Letter from Eric Place, Jan. 20, 2015, ECF No. 612; Letter from Brenda & Joe Cochran, Jan. 20, 2015, ECF No 616; Letter from Anthony Bulinski (Bulinski Farms), Jan. 21, 2015, ECF No. 618.

approval."); *see also In re Am. Int'l Group, Inc. Sec. Litig.*, 916 F. Supp. 2d 454, 459 (S.D.N.Y. 2013) (only class members have standing to object under Rule 23(e)(5)).  That ruling applies for the same reason here.

\*         Three letters fail to articulate a specific basis for objecting to the proposed settlement,[10] which is a requirement set by the Court and stated in the settlement notice.[11]  *See* Settlement Notice 8, ECF No. 580-4 (requiring that objector letters state "specific reasons" for objections).  Conclusory objections are not weighted against a proposed settlement.

\*         Three additional letters are based, in full or in part, on issues that are irrelevant or outside the scope of the litigation.[12]  Courts routinely give such objections little credit when assessing the merits of a proposed settlement.[13]

---

[10] The letters from Fritz Aeschlimann (Fish Hill Farm) (ECF No. 596), Christian Riehl (ECF No. 604), and David Robinson (ECF No. 603), state no reasons for objecting.

[11] *See Wixon v. Wyndham Resort Dev. Corp.*, No. C 07-02361, 2011 U.S. Dist. LEXIS 87249, at \*9 (N.D. Cal. Aug. 8, 2011) (rejecting objections that merely make conclusory statements that "the Settlement Agreement is not in the best interests of the class, reduces owner benefits, or changes the terms of the contract, without further elaboration, or the objections express general dissatisfaction . . . ."); *United States v. State*, Nos. 88-5087, 88-4080, 87-2331, 1995 U.S. Dist. LEXIS 22645, at \*76-78 (D.N.J. Mar. 14, 1995) (rejecting objections to consent decree that did not articulate a basis for objecting).

[12] *See* Letter from Elmer King, Jan. 20, 2015, ECF No. 600 (raising unfair "market adjustment") and Letter from Ronald & Landa Palmer, Jan. 12, 2015, ECF No. 589 (raising need to fix broken milk market); Abner Stoltfus letter (ECF No. 590) (raising DFA import policy, conspiracies with foreign interests, quality bonuses, plant ownership, and pay practices outside Order 1).

[13] *See, e.g., Lane v. Lombardi*, No. 12-4219-CV-C, 2014 U.S. Dist. LEXIS 149823, at \*4 (W.D. Mo. Oct. 22, 2014) (rejecting objections relating to matters that are outside the scope of the litigation); *In re Philips/Magnavox TV Litig.*, No. 09-3072, 2012 U.S. Dist. LEXIS 67287, at \*26-27 (D.N.J. May 14, 2012) (same); *Roberts v. Electrolux Home Prods.*, Nos. SACV12-1644-CAS, CV13-2339-CAS, 2014 U.S. Dist. LEXIS 130163, at \*30-31 (C.D. Cal. Sept. 11, 2014) (rejecting objections relating to matters that are outside the scope of the litigation and explaining the "objector" may "seek relief concerning those other events . . .  pursuant to another lawsuit . . . .").

\*        The few letters that do state a basis for objecting, for the most part, only express a combination of dissatisfaction because the proposed settlement is less than the settlements in *Southeastern Milk*,[14] a desire for a trial to recover more money,[15] and/or ensure evidence concerning Defendants will be released to the public.[16]  Simply comparing the proposed settlement with *Southeastern Milk* does not demonstrate this settlement is inadequate or unfair since the cases are different, as this Court previously recognized.  8/3/2011 Opinion & Order at 6 (ECF No. 341).  Also, the desire for a larger amount must be balanced against the very legitimate risk that a trial would result in no recovery for the Subclasses as well as the likelihood of substantial delays that would attend any appeal.  The reasonableness of the settlement amount is discussed *infra*.  And, the desire for the release of evidence overlooks the fact that the proposed settlement would accomplish exactly that through Defendants' agreement not to oppose the release of hundreds of case documents, including the key documents that would be introduced at trial.

---

[14] *See* Letter from Mike Eby, Jan. 20, 2015, ECF No. 611 (comparing proposed settlement to Southeast case).

[15] *See* Letter from Elam Lapp, Jan 20, 2015, ECF No. 601 ("the financial relief is by far not enough"); Letter from Daryl Walker, M.T.F., Jan. 16, 2015, ECF No. 594 ("The settlement amount would not allow any producer to recoup anywhere near the amount of revenue lost due to the actions of DFA-DMS over many years."); Letter from Mike Eby, Jan. 20, 2015, ECF No. 611 (arguing proposed settlement is too little).

[16] *See, e.g.*, Letter from Daryl Walker, M.T.F., Jan. 16, 2015, ECF No. 594 (stating he "would also prefer the case to go to trial as the actions of the management personel [sic] of DFA and DMS would then become a matter of public record."); Letter from Ronald & Landa Palmer, Jan. 12, 2015, ECF No. 589 ("We also believe that it is important to have the issues, brought forth by the plaintiffs, have transparency and be subjected to a trial procedure."); Letter from Abner P. Stoltzfus, Jan. 15, 2015, ECF No. 590 ("I am writing this letter to oppose the settlement of this case so the case goes on trial . . . ."); Letter from Paul and Gwen Deysenroth, Jan 20, 2015, ECF No. 614 ("[T]his should go to trial and be made public knowledge."); Letter from Mike Eby, Jan. 20, 2015, ECF No. 611 (arguing for trial).

A limited number of objections may itself be taken as evidence of the fairness of a settlement.[17]  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002).  While Subclass Counsel fully understand that all objections (as well as supporting statements) represent strongly held views, it is significant that of the 8,859 farms in the Subclasses that were notified of the terms of the settlement, approximately l/8th of 1% have expressed any objection.  *See D'Amato*, 236 F.3d at 86-87 (holding that the district court properly concluded that 18 objections and 72 exclusions from a class of 27,883 weighed in favor of settlement); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239-40 (E.D.N.Y. 2010) ("Of the 11,800,514 class members, only 127 opted out and 24 objected. Such a small number of class members seeking exclusion or objecting indicates an overwhelmingly positive reaction of the class.") (citations omitted); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) ("'[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members.  If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'") (citation omitted).

Moreover, the arguments raised by those objections filed must be balanced against those raised in letters filed in support of the settlement.  As one class member, Clement Gervais noted, "a settlement would pay dairy farmers a sum of money and end this litigation.  This lawsuit has

---

[17] As the Court is aware, three Subclass Representatives have opposed the settlement (and subsequently placed an editorial in one of the publications in which settlement notice was provided requesting that other farmers object to the settlement).  The issues raised by the Subclass Representatives have been addressed fully in prior submissions and we will not repeat that discussion here.  *See* Supplemental Filing Regarding Expedited Mot. for Prelim. Approval of Proposed Settlement; Renewed Mot. for Prelim. Approval of Proposed Settlement.

dragged on for quite some time, and forcing it to go to trial would only prolong that process. Any money provided to farms will be a nice benefit and a good step to getting this lengthy litigation behind us." Letter from Clement Gervais, Jan. 16, 2015, ECF No. 595. Likewise, Subclass Representative Alice Allen has submitted a letter to the Court summarizing her view of the settlement and concluding that while the settlement (like any settlement) represents a compromise, "it is a major step in the right direction." Letter of Alice H. Allen, Jan. 16, 2015, ECF No. 592.

Further, although claims need not be submitted until May, claims have already been submitted by more than 500 farmers, which is a strong indication that large numbers of Subclass intend to participate in the Settlement. This is consistent with the experience with the Dean settlement, which involved smaller payment to farmers but nevertheless resulted in a very high number of claims. *See* Mot. for Order Authorizing Distrib. of Dean Settlement Fund 4-5, Oct. 7, 2011, ECF No. 356. Given the claims experience to date, and the very small percentage of the notified farmers who have submitted any objection, the overall reaction of the Subclasses supports approval of the Settlement. *See* Ex. 3 (Decl. of Kimberly K. Ness Regarding Noticing Statistics); *see supra* notes 8-10, 12, 14-16 and accompanying text.

### 3. Stage of the Proceedings and Amount of Discovery Completed.

This *Grinnell* factor is designed to assure the Court "that the counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them and the risks of maintaining the class action through trial." *In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442, 1994 U.S. Dist. LEXIS 8038, at *40 (S.D.N.Y. June 15, 1994). In reviewing the Dean settlement, the Court explained that "'it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the

Settlement.'"  8/03/2011 Opinion & Order 9 (quoting *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (citations omitted)).

The Court concluded that this standard was met in connection with the Dean settlement and it follows *a fortiori* that it is also met here, where the record is much further developed, the parties have analyzed that record in pretrial submissions to the Court, and the Court has had the opportunity to evaluate the factual, economic, and legal issues presented in connection with the summary judgment motion and other pleadings.  The extensive discovery record in this case, the Court's resolution of many of the issues presented, and the parties' significant efforts to prepare for trial have greatly assisted both sides in identifying the strengths and weaknesses of the claims and defenses in this case.  In light of this voluminous record and the five year history of this litigation, both Subclass Counsel and the Court are well-positioned to determine that the settlement is fair, reasonable, adequate, and in the best interest of the Dairy Farmer Subclass.

Additionally, when a settlement has been the subject of arms-length bargaining, with class counsel in a position to evaluate accurately the chances of the class prevailing if the case went to trial, there is a "strong presumption" in favor of the settlement.  8/03/2011 Opinion & Order 9 (quoting *Teachers' Ret. Sys.*, 2004 WL 1087261, at *1 ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable, and adequate if . . . it was the product of arm's length negotiations conducted by capable counsel experienced in class action litigation . . . and if it occurred after meaningful discovery.").  *See Guardians Ass'n of N.Y.C. Police Dept. v. Civil Serv. Comm'n of N.Y.*, 527 F. Supp. 751, 757 (S.D.N.Y. 1981); *Munsey Trust v. Sycor, Inc.*, 457 F. Supp. 924, 926 (S.D.N.Y. 1978); *Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 362 (S.D.N.Y. 1988) (Where counsel "has had sufficient information to act intelligently on behalf of the class," this factor is satisfied.).  Given the extensive record

developed in this case, and the tens of thousands of hours that counsel on both sides have

devoted to understanding and analyzing the factual, economic and legal issues presented, this

"strong presumption" applies with particular force here.

           **4.**    **Risk of Establishing Conspiracy, Impact and Damages, and
Maintaining a Class Action Through Trial.**

Courts within this Circuit have noted that "[l]ittle about litigation is risk-free, and class

actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys.*,

2004 WL 1087261, at *3.  Antitrust class actions in particular present significant challenges with

respect to establishing conspiracy, causation, and damages.  These risks were compounded here

by the statute of limitations issues discussed below.  *See In re Linerboard Antitrust Litig.*, 296

F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quoting *In re Motorsports Merch. Antitrust Litig.*, 112

F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)) ("'[a]n antitrust class action is arguably the most

complex action to prosecute. . . . [t]he legal and factual issues involved are always numerous and

uncertain in outcome"); *see also In re Shopping Carts Antitrust Litig.*, M.D.L. No. 451, 1983 WL

1950, at *7 (S.D.N.Y. Nov. 18, 1983) ("antitrust price fixing actions are generally complex,

expensive and lengthy").

Some of these risks were examined by the Court in some detail in approving the Dean

settlement.  8/3/2011 Opinion & Order 10-12.  In evaluating the complex factual, economic, and

legal issues presented by this case, Subclass Counsel needed to assess very carefully risks that

can be described in four categories.

**Statute of Limitations Issues.**  Since the outset of this litigation, the Court has expressed

concerns about the fact that these claims were first brought by farmers more than four years after

much of the challenged conduct occurred, which raised potential statute of limitations issues.  In

extensive briefing, the Dairy Farmer Subclasses have set forth their views on those issues, as

have the Defendants.  In evaluating the settlement, Subclass Counsel had to carefully consider the Court's discussion of the state of limitations issues in the case and, in particular, the significance of the legal rulings on those issues.

The Dairy Farmer Subclasses' claim for damages was $341 million, before any downward adjustment in response to the Court's pre-trial rulings  Of that amount, $130,553,453 incurred outside the four-year limitations period.   The claim for those damages requires a finding of fraudulent concealment.  In ruling on the motions to dismiss early in this case, the Court stated that a plaintiff's burden in establishing fraudulent concealment is a "'heavy one'" and that it was "somewhat unlikely that Plaintiffs" could satisfy this burden because of the "public nature of the information upon which they base their claims."   The Court ruled that "[a]s currently pled, the Amended Complaint fails to set forth a fraudulent concealment claim that would toll the applicable statute of limitation."  Opinion and Order Granting in Part and Den. in Part Defs.' Mots. to Dismiss 29-31, Aug. 30, 2010, ECF No. 81 (citation omitted).

The risks presented by this issue were again discussed in the Court's analysis of the risks that made the $30 million Dean settlement "'fair, reasonable and adequate.'"  8/3/2011 Opinion & Order 14 (citation omitted).  There, the Court explained:

> This court further recognized [in its decision on Dean's motion to dismiss] that Plaintiffs faced similar challenges with regard to Dean's statute of limitations defense as "[i]t is beyond dispute that may of the acts that Plaintiffs allege caused them injury took place more than four years prior to the filing of Plaintiffs' initial Complaint [and in] the absence of a continuing violation, these acts cannot form the basis of Plaintiffs' antitrust claims."  The court further noted that "'[a]s a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances.'"  If the statute of limitations were found to bar all or most of Plaintiffs' claims against Dean, there would be no recovery for the class.

8/03/2011 Opinion & Order 11-12 (citations omitted).

The Court also expressed these concerns at the hearing on Defendants' summary judgment motion.  In its ruling on the motion, the Court explained that "[i]t is undisputed that a significant portion of the anti-competitive conduct alleged in this case took place before October 8, 2005 (four years prior to the filing date) and thus is outside the applicable statute of limitations."   Opinion and Order Granting in Part and Den. in Part Defs.' Mot. for Summ. J. 33, June 11, 2014, ECF No. 525 ("6/11/2014 Opinion & Order").   The Court permitted Plaintiffs to raise the fraudulent concealment claim at trial, while again stating that Plaintiffs' burden of establishing fraudulent concealment was a "'heavy one.'"  *Id.* at 36 (citation omitted).

In evaluating trial risks, Subclass Counsel had to consider carefully the record, the instructions the jury would receive on this issue, and the risk that a jury would conclude that this "heavy" burden was not met.  These risks were discussed in the Court's recent ruling on preliminary approval of the DFA/DMS settlement:

> Finally, as some of the alleged conspiracy's conduct took place outside the statute of limitations period, class members' ability to present this conduct to the jury faced almost certain challenged from Defendant at trial and required a strong factual record before a jury could impose liability and award damages for conduct beyond the limitations period.

11/25/2014 Opinion & Order 6 (referencing 6/11/2014 Opinion & Order).

For damage claims within the four year limitations period (which accounted for $211,323,280 of the potential damages, before any downward adjustment necessitated by the Court's pre-trial rulings), the statute of limitations risks also had to be carefully evaluated. Plaintiffs contended that damages within the four year period could be recovered based on three theories:  the speculative damages rule; the *Berkey Photo* rule; and the continuing violation doctrine.  The first two theories were rejected in the summary judgment ruling.  6/11/2014 Opinion & Order 41-43.  The Court's ruling discussed the limitations of the continuing violation

doctrine and stated that "'[a]s a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances.'" *Id.* at 38 (citation omitted).  The Court's rulings limited the conduct that was subject to the doctrine in this case.  *See* 8/30/2010 Opinion & Order 34-38 (discussing this issue in connection with motion to dismiss) and 6/11/2014 Opinion & Order 41 (ruling that Plaintiffs "may not rely on the formation and use of GNEMMA as the factual basis for their continuing violation theory," but could rely on evidence of threats, intimidation, and retaliation . . . during the limitations period).   These limitations created very material risks even for claimed damages incurred within the four year period.

**Additional Risks Based on Prior Rulings.**  As the Court is aware, this case has presented many other factual and legal issues that have been vigorously litigated by both sides. The Court is familiar with these issues and they need not be addressed in detail here.  Several points, however, are germane to the risks presented by the case.  First, at several stages, the Court has raised questions, and expressed concerns, about the theories of the case, the difficulties they may present for a jury, and the strengths of some aspects of the evidence (and inferences that can be drawn).  Although these are issues on which Subclass Counsel had to make an independent assessment, the Court's observations and views on these matters had to be, and were, carefully considered in evaluating the trial risks.  Second, the Court's rulings on market definition (and the relevance of milk produced outside Order 1 and shipped into Order 1) and the implications for the expert testimony and other issues had to be taken into account.  6/11/2014 Opinion & Order at 6-12.  Third, the Court ruled that "certain aspects of Dr. Rausser's testimony were inadmissible," and excluded some of the expert's damages analysis.  *See* 11/25/2014

Opinion & Order 6r.  Finally, the Court ruled that damages could not be recovered on sales to non-conspiring processors.  6/11/2014 Opinion & Order 43-44.

**Other Defenses Presented by DFA/DMS and Their Experts.**   In addition to the issues raised by the Court's rulings, Subclass Counsel had to consider many other factual, economic, and legal defenses that would be presented by the Defendants at trial.  These included Defendants' arguments about the legality of their conduct; issues relating to specific participants in the conspiracy; the Defendants' own expert analysis about whether options were available to farmers; and the Defendants' claim that there were no damages and related challenges to the analysis of the Subclasses' expert.  The Court is familiar with these issues.  The defenses DFA/DMS intended to raise are described at length in both their summary judgment pleadings and the merits reports by DFA/DMS's two experts.  These issues were complex and vigorously contested, but in evaluating the risks at trial, Subclass Counsel needed to take into account the numerous factual, economic, and legal defenses that DFA/DMS and their experts would present at trial, as well as anticipated testimony from the many farmers and other declarants previously relied upon by Defendants.  Defendants also made clear, in their motions *in limine*, that in connection with trial they would again raise challenges to certification of the Subclasses, an additional risk that had to be considered by Subclass Counsel.

**The Risk of Significant Delay.**  During the five year history of this case, this Court has had to rule on many disputed factual and legal issues and many additional rulings would have been required both at trial and on post-trial motions.  These issues were vigorously contested by experienced counsel on both sides and many of the issues presented necessarily involve legal issues on which there are reasonable grounds for disagreement.  In evaluating the risks presented by this case, Subclass Counsel understood that a jury verdict for either side would undoubtedly

be followed by post-trial motions and, almost inevitably, an appeal.  If the Dairy Farmer Subclasses prevailed on some or all of their claims, it was virtually certain that the Defendants would vigorously pursue appeal options.  If the jury reached a defense verdict, or rejected some but not all of Plaintiffs' claims (for example, on statute of limitations grounds), the Subclasses would also have been obligated to explore all appellate options.

As a practical matter, this meant that any jury verdict in favor of the Dairy Farmer Subclasses would very likely results in years of delay before any payment or other relief was provided. Counsels' own experience is that the appellate process – which could include proceedings before a panel of the Second Circuit, followed by a request for *en banc* review and, if that is unsuccessful, a petition for certiorari to the United States Supreme Court – can take years to complete.[18]  If an appeal was successful – as many antitrust appeals are – the necessity of a retrial would significantly increase this delay.  Settlement avoids this delay and the attendant risks, and instead provides for definite and immediate benefits.  *See*, *e.g.*, *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985).  This is one of the points made by farmers who have submitted statements supporting the settlement and emphasize the value of immediate payments to farmers and resolving this matter after many years of intense litigation.

The Court's November 25, 2014 Opinion and Order discusses many of the risks presented by this case, as does the Court's earlier August 3, 2011 Order approving the Dean

---

[18] This is consistent with counsels' own experience and it is not unusual in antitrust litigation of this complexity.  To cite one example, MCI's antitrust litigation against AT&T based on illegal monopolization was commenced in 1974 and was tried before a jury in 1980.  The jury returned a large verdict in favor of the plaintiff MCI.   After the appellate process ran its course (resulting in reversal of the jury award), and expert analysis and renewed pretrial activities were completed, a second jury trial was conducted in 1985.  This resulted in a new jury verdict awarding MCI substantially less than 1% of the damages it was seeking.   Because of both the number of issues presented, and the complexity of those issues, when antitrust cases proceed to trial, it is not unusual that extended appeals (and often reversals) ensue.

settlement.  These risks were carefully and appropriately evaluated by Subclass Counsel in deciding whether the settlement was in the best interest of both Subclasses, and these risk factors support final approval of the settlement.

**5.      Ability of the Defendant to Withstand Greater Judgment.**

This factor directs courts to consider the extent to which a settling defendant has the ability to pay more than the settlement amount if the case were litigated to conclusion and a larger judgment was obtained.  *See*, *e.g.*, *Teachers' Ret. Sys.*, 2004 WL 1087261, at *4.  Even assuming that DFA and DMS theoretically could withstand a greater judgment, courts in the Second Circuit have given limited importance to this consideration relative to the risk factors described above.  For example, in approving the Dean settlement, this Court explained that "this factor 'must be weighed in conjunction with all of the *Grinnell* factors, most notably the risk of the class prevailing and the reasonableness of the settlement fund.'"  8/3/2011 Opinion & Order 13 (quoting *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853, 2006 WL 2789862, at *8 (S.D.N.Y. Sept. 27, 2006)); *see also Cavalieri v. General Elec. Co.*, No. 06cv315, 2009 WL 2426001, at *2 (N.D.N.Y. Aug. 6, 2009); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997) ("The Court presumes that Defendants have the financial resources to pay a larger judgment.  However, in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ("Fleet could certainly withstand a much larger judgment as it has considerable assets.  While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages.").

6.      **Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.**

The determination of a "reasonable" settlement is not susceptible to a simple mathematical equation yielding a particular sum.  Rather, "in any case there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

This Settlement Agreement, which provides $50 million in addition to substantial injunctive relief, falls well within the range of reasonableness and thus warrants final approval. The proposed $50,000,000 settlement with DFA/DMS substantially exceeds (67% larger) the Dean settlement ($30,000,000) that the Court determined to be "'fair, reasonable, and adequate'" in this case.  8/3/2011 Opinion & Order 14 (citation omitted).

In its preliminary approval decision, the Court addressed the reasonableness of the financial terms in this settlement.  The Court ruled that "[o]n balance, a total monetary payment of $50 million falls within a reasonable range of potential outcomes when considered in the context of a legitimate risk of a defense verdict."  11/25/2014 Opinion & Order 7.  That conclusion is strongly supported by Second Circuit law and the record in this case.

First, the law is clear that in considering that in determining the adequacy and reasonableness of a class settlement, Second Circuit courts evaluate the settlement in the context of actual, not trebled, damages.  *See County of Suffolk v. Long Island Lighting*, 907 F.2d 1295, 1324 (2d Cir. 1990) (holding that in deciding final approval "it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure") (citation omitted); *Grinnell*, 495 F.2d at 458 ("there are strong reasons why trebling is improper when computing a base recovery figure which will be used to measure the adequacy of a

settlement offer.") *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *Blessing v. Sirius XM Radio, Inc.*, No. 09 CV 10035, 2011 WL 3739024, at *3 n.4 (S.D.N.Y. Aug. 24, 2011) (holding that "[i]n antitrust cases, although plaintiffs would be entitled to treble damages, courts assess the value of the settlement as it compares to single, not treble, damages"); *In re W. Union Money Transfer Litig.*, No. CV-01-0335, 2004 WL 3709932, at *11 n.11 (E.D.N.Y. Oct. 19, 2004) (holding that "[i]n accordance with established law" the Court would "not take into account the possibility of treble damages under RICO when considering the reasonableness of a proposed class action settlement.").[19]  The *maximum* single damages claimed in this case were $341,856,833 – even before any downward adjustment necessitated by the Court's pre-trial rulings such as agreeing with Defendants' argument that approximately one-third of the damages should be removed as "umbrella."  *See* 6/11/2014 Opinion & Order 44.  In contrast, the Defendants would have presented expert testimony at trial contending that damages were zero.

Second, only a portion of those damages ($211,323,280) occurred within the four-year limitations period.  As explained above, on damages outside that period, the Dairy Farmer Subclasses bore a heavy burden at trial.  Even within the four-year limitations period, there were significant statute of limitations risks.

---

[19] This is the prevailing perspective outside the Second Circuit as well.  *See, e.g.*, *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ.03-0085, 2005 WL 3008808, at *9 (D.N.J. Nov. 9, 2005) (holding that "to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement recovery to the estimated single damages."); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257 (D. Del. 2002) aff'd, 391 F.3d 516 (3d Cir. 2004) (holding that recovery of treble damages "is purely speculative, however, and need not be taken into account when calculating the reasonable range of recovery" in approving a class action settlement); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 n.12 (D.D.C. 2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages," not treble damages) (citation omitted).

Third, the claimed damages at trial would also have been further reduced by the summary judgment ruling that damages could not be recovered on sales to non-conspiring processors.

Fourth, the claim for these reduced damages would also, of course, have been entirely dependent on overcoming the other factual and legal defenses and risks described above and securing a jury verdict for the plaintiffs.

Fifth, any recovery in the case would (after trebling) have been subject to an offset for the full amount of the earlier Dean settlement.

Finally, any recovery of these damages would then very likely have been subject to extended delay before any payment.

Given these challenges, the fact that the farmer subclasses have been able to secure the largest antitrust settlement in the history of this jurisdiction, in a case presenting the statute of limitations and other complex factual issues familiar to the Court, represents a very significant achievement. The recovery of $50 million in this settlement (and a total of $80 million including the Dean settlement) is clearly within the range of settlements that have been approved in the Second Circuit and elsewhere as fair, reasonable and adequate.[20]   *See* 8/3/2011 Opinion & Order

---

[20] *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009) (approving settlement which provided only two percent of defendants' maximum possible liability, observing that "the Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate"); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) ("estimated recovery of three percent of the total damages estimated by the plaintiffs, does not meaningfully diverge from the range of reasonableness"); *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (3.2% to 3.7% of the potential recovery "well within the ball park"), aff'd in part, rev'd on other grounds, 495 F.2d 448 (2d Cir. 1974); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (approving settlement represented approximately two percent of sales during the Class Period); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 318-19, 39 (W.D. Pa. 1997) (court approved settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the damages falling within the limitations period); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving a settlement representing 0.2 percent of the defendant's sales, and noting that

27

13-14 (finding $30 million Dean settlement "'fair, reasonable and adequate'") (citation omitted); 11/25/2014 Opinion & Order 7 ("a total monetary payment of $50 million falls within a reasonable range of potential outcomes . . .").

Moreover, in addition to a significant and immediate financial payment, the settlement provides meaningful non-monetary benefits to Subclass members.  Under the agreement, Defendants agree to:  Increase marketing competition and options for Northeast farmers by prohibiting Defendants from agreeing with other cooperatives to restrict solicitation or limit the ability of any cooperative to approach farmers and offer them more favorable prices, services, or other terms; prohibiting Settling Defendants from entering into new FSAs during the Settlement's term; permitting cooperatives affiliated with Settling Defendants to end their relationship without penalty; boosting transparency through auditing and disclosure commitments; and facilitating further internal review of additional meaningful changes to conduct.  *See* Agreement ¶ 7.1.  The settlement also includes provisions that are designed to make the relevant factual record available to farmers, the public and relevant law enforcement agencies.  (We note in this regard that the Vermont Attorney General's office has followed a practice of posting relevant materials which are unsealed in this case on its website so they will be available to farmers and the public).

We have previously addressed the appropriateness of this equitable relief and that discussion is incorporated here.  Mem. in Supp. of Renewed Mot. for Prelim. Approval of Proposed Settlement  with Defs. DFA and DMS 22-28, Oct. 3, 2014, ECF No. 580-1.  This relief goes substantially beyond the terms of the Dean settlement, which was determined to be fair, reasonable, and adequate.  The Court's preliminary approval order relating to settlement of the

---

earlier settlements approved in the case represented 2.4 percent, 0.88 percent, 0.65 percent, 0.3 percent, 0.2 percent, and 0.1 percent of other settling defendants' sales).

claims against DFA/DMS points out that "because class members have limited their request for injunctive relief to only 'conduct found by the Court or jury to be illegal,' the equitable relief in the Proposed Settlement is broader than the scope of the equitable relief that may have been ordered by the court." 11/25/2014 Opinion & Order 7. That conclusion is fully supported by the record – indeed, the settlement takes steps to improve cooperative democracy and accountability that very likely could never have been achieved in a trial based on antitrust claims. This relief provides an additional reason for final approval of the settlement as fair, reasonable, and adequate.

### 7.    Additional Factor.

"A substantial factor in determining the fairness of the settlement is the opinion of counsel involved in the settlement." *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992). Courts have noted that "the opinion of experienced and informed counsel is entitled to considerable weight" in deciding whether to approve a settlement. *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001); *see also In re Painewebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation) (internal quotation marks and citation omitted); *In re Salomon*, 1994 U.S. Dist. LEXIS 8038, at *42 (the judgment of experienced counsel "weighs strongly in favor [of] the proposed settlement").

In this case, the Dairy Farmer Subclasses are represented by counsel with extensive experience litigating complex antitrust class actions and thorough familiarity with the factual and legal issues of the case, and Defendants were represented by similarly experienced and knowledgeable counsel. Subclass counsel include some of the most experienced class action

attorneys in the United States and, in particular, have a demonstrated history of proceeding to trial when that is in the best interest of a class and a reasonable settlement cannot be accomplished.  Cohen Milstein, which represents the DFA/DMS Subclass has been involved in two major antitrust class action jury trials in the past two years, each of which went to verdict after several weeks of trial.  The lead counsel at BakerHostetler – representing the non-DFA/DMS Subclass – is a fellow in the American College of Trial Lawyers and has extensive trial experience.  Thus, in evaluating this matter, counsel was fully prepared to proceed to trial if that was in the best interest of the Subclasses and, with the benefit of an extensive factual record that had been carefully analyzed by both sides, was well positioned to evaluate the risks and benefits of doing so and the appropriateness of a possible settlement.

There are two other considerations that made Subclass Counsel especially well-positioned to evaluate these risks and benefits.  First, Subclass Counsel have been assisted in this litigation by highly-capable co-counsel who have practiced for many years and have significant jury trial experience in this jurisdiction.  Second, Subclass Counsel also have many years of experience litigating claims against several of the defendants in *In re Southeastern Milk Price Fixing Antitrust Litigation*, No. 2:08-MD-1000 (E.D. Tenn.).  Accordingly, Subclass Counsel's recommendation that the Court approve the settlement, in light of their extensive knowledge and experience, is an additional factor favoring the granting of approval.

## III.   The Plan of Allocation Should be Approved.

The Dairy Farmer Subclasses respectfully submit for the Court's approval this Proposed Plan of Allocation of the Settlement Funds.  Under the proposed Plan of Allocation, Subclass Members must timely file a claim form with the Claims Administrator to obtain a share of settlement proceeds.

**A.     Method of Calculation.**

The Settlement Funds and the interest earned thereon will be distributed to approved claimants, less any amounts approved by the Court for payment of attorneys' fees, reimbursement of litigation expenses, and incentive awards to class representatives ("Net Settlement Funds").   The Net Settlement Funds will be distributed on a pro rata basis to approved claimants.  An approved claimant's pro rata share of the settlement will be determined by dividing (a) the dollar value of the claimant's total amount of raw Grade A milk produced and pooled from January 1, 2002 to December 31, 2014 by (b) the total dollar value of all claims made by members of the Subclasses.

The Claims Administrator will review all claim forms received and is authorized to investigate any claims and require additional documentation or proof as the Claims Administrator deems necessary to verify the claims.

**B.     Time of Distribution of Net Settlement Funds.**

The Dairy Farmer Subclasses propose that the Net Settlement Funds be distributed, according to the Plan of Allocation, as soon as practicable after all of the following have occurred: a) the Court has granted final approval to the proposed settlement; b) the Court has ruled on Subclass Counsel's requests for an award of attorneys' fees, for reimbursement of litigation expenses, and for incentive awards to class representatives; c) the Claims Administrator has reviewed all Claim Forms and determined the amounts recommended to be paid to Claimants; d) a motion to distribute has been filed and granted; and e) the time for appeal of the final approval has passed or the approval is affirmed on appeal.

C.      **The Plan of Allocation is Fair, Reasonable, and Adequate.**

The standard for "approval of a plan of allocation is the same as the standard for approving a settlement: 'namely, it must be fair and adequate.'"  *In re Top Tankers, Inc. Sec. Litig.*, No. 06-cv-13761, 2008 U.S. Dist. LEXIS 58106, at *34 (S.D.N.Y. July 31, 2008) (citing *Maley*, 186 F. Supp. 2d at 367).  Further, if the plan of allocation is "formulated by 'competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'" *Taft v. Ackermans*, No. 02 Civ. 7951, 2007 U.S. Dist. LEXIS 9144, at *27 (S.D.N.Y. Jan. 31, 2007) (citation omitted).

Settlement distributions, such as this one, that apportion available settlements funds on a pro rata basis to approved claimants, without favoring any class member over another, have consistently been deemed fair, reasonable, and adequate by numerous courts.  *See*, *e.g.*, *In re Lloyd's Am. Trust Fund Litig.*, No. 96-cv-1262, 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) ("*prorata* [sic] allocations . . . are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits."); *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.").  *See also* Herbert B. Newberg, *Newberg on Class Actions* § 12.10 (3rd ed. 1992) (noting that settlement agreements may provide for *pro rata* distributions based on the fraction of a claimant's loss to the total aggregate recognized loss); *Manual For Complex Litigation (Third)* § 30.47 (2003).

Accordingly, for all the foregoing reasons, the Dairy Farmer Subclasses respectfully request that this Court grant approval of this Plan of Allocation.

## CONCLUSION

For the foregoing reasons, the Dairy Farmer Subclasses respectfully request that the

Court grant their Motion for Final Approval of Settlement and enter the proposed Judgment and

Final Order appended to this motion as Exhibit 4.


Dated:  January 22, 2015                              Respectfully Submitted,


/s/ *Robert G. Abrams*                                /s/ *Kit A. Pierson*
Robert G. Abrams, Esq.                                Kit A. Pierson, Esq.
Robert J. Brookhiser, Esq.                            Benjamin D. Brown, Esq.
Gregory J. Commins, Jr., Esq.                         Brent W. Johnson, Esq.
Terry L. Sullivan, Esq.                               Emmy L. Levens, Esq.
Danyll W. Foix, Esq.                                  Cohen Milstein Sellers & Toll, PLLC
Baker & Hostetler LLP                                 1100 New York Ave., N.W.
Washington Square, Suite 1100                         Suite 500, West Tower
1050 Connecticut Ave., N.W.                           Washington, DC  20005
Washington, DC  20036                                 (202) 408-4600
202-862-1500                                          kpierson@cohenmilstein.com
rabrams@bakerlaw.com                                  bbrown@cohenmilstein.com
rbrookhiser@bakerlaw.com                              bjohnson@cohenmilstein.com
gcommins@bakerlaw.com                                 elevens@cohenmilstein.com
tsullivan@bakerlaw.com
dfoix@bakerlaw.com                                    David A. Balto, Esq.
                                                      The Law Offices of David A. Balto
Emily J. Joselson, Esq.                               1350 I St,, N.W., Suite 850
Lisa B. Shelkrot, Esq.                                Washington, DC 20005
Langrock Sperry & Wool, LLP                           (202) 789-5424
210 College St.                                       david.balto@yahoo.com
P.O. Box 721
Burlington, VT 05402-0721                             Andrew D. Manitsky, Esq.
(802) 864-0217                                        Gravel and Shea PC
ejoselson@langrock.com                                76 St. Paul St., 7th Floor,
lshelkrot@langrock.com                                P.O. Box 369
                                                      Burlington, VT  05402
*Counsel for the non-DFA/DMS*                         (802) 658-0220
*Subclass*                                            amanitsky@gravelshea.com

                                                      *Counsel for the DFA/DMS Subclass*