UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


ALICE H. ALLEN, et al.        *
                              *
            V                 *
                              *
DAIRY FARMERS OF AMERICA,     *
INC., et al.                  *   CIVIL FILE NO. 09-230


FAIRNESS HEARING
Thursday, January 29, 2015
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA R. REISS
        Chief District Judge


APPEARANCES:

      EMMY L. LEVENS, ESQ. and KIT A. PIERSON, ESQ.,
        Cohen Milstein Sellers & Toll PLLC, 1100 New
        York Avenue, N.W., Washington, D.C.; Attorneys
        for the Plaintiffs

      ROBERT G. ABRAMS, ESQ., Baker & Hostetler LLP,
        Washington Square, Suite 1100, 1050 Connecticut
        Avenue, NW, Washington, D.C.; Attorney for the
        Plaintiffs

      STEVEN R. KUNEY, ESQ. and CARL R. METZ, ESQ.,
        Williams & Connolly LLP, 725 Twelfth Street,
        N.W., Washington, D.C.; Attorneys for Defendant
        Dairy Farmers of America, Inc.

      IAN P. CARLETON, ESQ., Sheehey, Furlong & Behm,
        P.C., 30 Main Street, Burlington, Vermont;
        Attorney for the Defendant


ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# I N D E X

| STATEMENT BY: | PAGE | LINE |
|---|---|---|
| JOSHUA HAAR | 5 | 17 |
| RALPH SITTS | 22 | 15 |
| RICHARD SWANTAK | 31 | 21 |
| GARRET SITTS | 37 | 15 |
| MIKE EBY | 47 | 5 |
| ALICE ALLEN | 49 | 8 |
| JONATHAN HAAR | 55 | 4 |
| CLAUDIA HAAR | 98 | 2 |
| KENNETH DIBBELL | 142 | 14 |
| LARRY BAILEY | 146 | 20 |
| PAUL BOURBEAU | 150 | 1 |
| REG CHAPUT | 159 | 24 |
| BILL ROWELL | 161 | 19 |
| MICHAEL SWANTAK | 164 | 13 |

```
1    THURSDAY, JANUARY 29, 2015

2    (The following was held in open court at 9:37 a.m.)

3              THE CLERK:  Your Honor, the matter before the

4    Court is civil case number 9-230, Alice Allen, et al.,

5    versus the Dairy Farmers of America, et al.

6    Representing the plaintiffs are attorneys Kit Pierson,

7    Emmy Levens, and Robert Abrams.  Representing the

8    defendants are attorneys Steven Kuney, Carl Metz, and

9    Ian Carleton.  And we are here for a fairness hearing.

10             THE COURT:  Good morning.

11             MR. PIERSON:  Morning, your Honor.

12             MR. KUNEY:  Morning, your Honor.

13             THE COURT:  As a housekeeping matter, I am

14   going to deny as moot without prejudice to renew all

15   pending motions in limine if we -- for both sides.  If

16   we have a trial, you can refile them, and I may decide

17   to winnow down the number of them, but they have been on

18   our docket forever, and if we have a trial, it's not

19   going to be this month or next month, in any event.

20        I am planning on hearing from class members first.

21   I have already read everything that class members have

22   submitted.  I have read the attorneys' papers.  I do

23   have questions for the attorneys, but this is really a

24   hearing in which we hear from the class and the class

25   representatives, if they want to, about whether they
```

1    agree with the settlement, oppose the settlement, have

2    some thoughts that they want to convey to the Court

3    about whether the settlement is fair, reasonable, and

4    adequate.  And in granting preliminary approval, that

5    does not mean the settlement is approved.  That's how we

6    get to a fairness hearing, and hear from the class.

7        So what I am going to ask is that you come forward

8    if you want to speak, you identify yourself for the

9    court reporter and spell your name.  She's going to be

10   taking down everything that you say, both with her

11   machine but also with an audio recording.  And keep in

12   mind that she -- it's hard to keep up with people

13   speaking.  I speak notoriously fast, and she is probably

14   one of our best court reporters in the state of Vermont.

15   So slow down when you speak, and we will try to get

16   everything that you want to say.

17       If we have time left over, we will talk to the

18   attorneys about their thoughts about settlement, but I

19   have read their submissions.

20       So let me ask if there are any class members or

21   class representatives who want to speak.  I have a list

22   of people who have notified us, but if you are not on

23   the list, I plan on being flexible about that.  And

24   right now the list consists of Bill Rowell, Paul

25   Burbeau, Reg Chaput, Larry Bailey, Richard Swantak,

```
1    Garret Sitts, Ralph Sitts, Jonathan and Claudia Haar,
2    and Ken Dibbell.
3         So why don't we start with -- I will get you
4    started.  How about Jonathan and Claudia Haar, because
5    they are class representatives as well as class members?
6              JONATHAN HAAR:  Excuse me.
7              THE COURT:  So come on up, and you are going
8    to come to the podium if you are ready.
9              JONATHAN HAAR:  Thank you, your Honor.
10        I was going to ask if -- thank you, your Honor.
11        I was going to ask if we could have Joshua Haar
12   speak first, if that would be possible.
13             THE COURT:  Sure.  Absolutely.  I had to pick
14   somebody out of the class, and your name came up, so
15   that's fine.
16             JONATHAN HAAR:  Well, thank you.
17             JOSHUA HAAR:  All right.  Thank you very
18   much for the opportunity to address the Court.  Joshua
19   Haar.  Last name -- well, you folks have that last name
20   down very well, I'm sure.
21             THE COURT:  It's H-a-a-r, so we have to do it
22   for the court reporter.
23             JOSHUA HAAR:  That's correct.  Yes.  Yes.
24        I'd like to address the Court today regarding the
25   injunctive relief.  I believe for the farmers, both in
```

1    support of the settlement and against the settlement,

2    that injunctive relief has been at the center of the

3    issues that they have sought.  I wanted to take a look

4    at the specific provisions laid out in the settlement

5    here.  So I guess I will just start right into it.

6        The settling defendants, during the term of this

7    agreement, aren't going to enter into any full-supply

8    agreements, but the existing full-supply agreements are

9    untouched.  This lawsuit was not brought on the basis of

10   full-supply agreements which defendants might bring into

11   existence at some future date, but rather for the ones

12   which are currently strangling the market.  The fact

13   that this term here does nothing to touch those means

14   that it is not going to result in any market change.

15       The next one, that any agreements for the supply or

16   sale of raw Grade A milk to customers will be brought

17   before the DFA board of directors, or the DMS board of

18   directors, depending on which entity is creating

19   those -- oh, incidentally, they have the same address

20   and the same bank account number.  There's -- there's a

21   great consolidation of power there.

22       But I actually went to look at the DFA board of

23   directors on their website, because I noticed further on

24   in the injunctive relief there's a requirement that DFA

25   will disclose the identity of their board of directors.

1    They already do so.  A quick look at the website would
2    have resolved that.
3         What is not on their website, and which actually --
4    I've taken a look at the Dean Foods website, just as an
5    example of a similar -- similar corporate body.  Things
6    like principles, director responsibilities, board
7    leadership structure, director qualifications, voting
8    for directors, committees and compensation, these things
9    are not addressed in the injunctive relief.
10        And additionally, and perhaps the main point on
11   bringing these agreements before the board of directors,
12   because our counsel negotiated away third-party vote
13   counting from us, we have little or no means of
14   influencing the board of directors, as members.  So
15   these two provisions are not going to result in any
16   market change.
17        Moving to the next -- the next page of the
18   settlement:  The settling defendants agree that they
19   will, upon written request by any of their respective
20   members located in Order 1, disclose to that member
21   summary of the terms of any of their agreements for the
22   supply or sale of raw milk.  This disclosure needs only
23   to state whether it's a full-supply agreement, the
24   duration, and any other material provision, provided
25   this disclosure is permitted by the terms of the said

1    agreement.

2        Currently, if DFA, DMS wants to hide something,

3    they put in a clause and hide it.  After this agreement,

4    if they want to hide something, they hide it.  This does

5    not result in any change whatsoever.

6        We'll try (d).  Settling defendants agree that any

7    cooperative member, affiliate, or associate of DFA, DMS

8    in Order 1 may, during the term of this agreement,

9    terminate its relationship with DFA or DMS upon no more

10   than 90 days without -- written notice without penalty.

11       This -- this is impossible for a cooperative member

12   to do.  If they leave DFA, DMS, they know very well that

13   upon completion of the settlement term, they're out of

14   business.  The only way to get the processors is by

15   going through DFA, DMS.

16       Looking down at the next section, we have the

17   disclosure that Settling defendants agree not to oppose

18   the request of subclass counsel to unseal and release

19   materials, including briefs and documents, regarding

20   plaintiffs' motion for certification subclasses and

21   defendants' motion for summary judgment.

22       This only touches a tiny portion of the docket.

23   And worse, back in section 6, we were told all claims

24   that were asserted or that could have been asserted as

25   part of this litigation are released.  So it does no

1    good for us farmers to know about these things if we

2    can't do anything about them.

3         There are other terms which involve DFA's internal

4    considerations, things like having the Northeast Area

5    Council look over our milk checks or the delegate

6    election process.  But to ask DFA to consider activities

7    and policies which it has already considered, it has

8    already established, and it has already maintained is

9    pointless.  This will not result in any change.

10        We are told that their financial reports need to be

11   prepared in accordance with GAAP, general accounting --

12   accepted accounting principles, and audited by a

13   national accepted accounting firm.  In fact, they

14   already are.  We have here a report from Ernst & Young,

15   DFA's 2012 audit.

16        But the point which I would like to address

17   regarding this requirement is that essentially they're

18   trying to weld a wooden hay wagon.  You can't fix an

19   antitrust violation with an audit of financial

20   statements.  In fact, I'm sure you are familiar with the

21   audit opinion, but I would like to read a couple

22   sentences to emphasize this point:  "These financial

23   statements are the responsibility of the company's

24   management.  Our responsibility is to express an opinion

25   on these financial statements based on our audits.  We

1    were not engaged to perform an audit of the company's

2    internal control over financial reporting.  Our audits

3    included consideration of internal control as a basis

4    for designing audit procedures appropriate, not for the

5    purpose of expressing an opinion on the effectiveness of

6    the company's internal control or financial reporting.

7    Accordingly, we express no such opinion."

8         Because -- because this internal control provision

9    is not currently done and was left out of the injunctive

10   relief, much of this audit oversight is left out.

11   Internal control is key to a company, and DFA has very

12   little of that.

13        I also noticed here down under (g)(iii), DFA board

14   members and senior executive management will continue to

15   execute annual conflict of interest certifications,

16   which are subject to review by DFA's own audit

17   committee.  Essentially, the fox is promising not to

18   raid the chicken coop again.

19        But the problem is not the conflict of the board

20   members and directors per se.  It's the conflict of the

21   organization which they are working for.  DFA both

22   processes and produces milk.  It's selling to itself and

23   creating -- that's where the conflict of interest is.

24   They waffle -- the material cost of their processors to

25   be lowest so that they can make as much profit as

1    possible upon that end.  That's the conflict of

2    interest.  It's not the individual members per se.

3        So with regard to cooperative change, to -- as I

4    said, but I really wanted to emphasize, to require DFA

5    to consider changing these practices, which it has

6    already considered, maintained, and adopted, is

7    pointless.

8        This has been demonstrated by a lack of change

9    following the Southeast settlement.  Now in the

10    Southeast, if you want to attend the Southeast area

11    council meeting, you need written permission, and you

12    may stay for only as long as required for you to speak.

13        We were speaking to a few of the Southeast farmers

14    about the organizational changes following their

15    settlement there, and one farmer was telling us about

16    this -- one of -- this change in the Southeast

17    farmer who ran for a Southeast area council seat and was

18    elected.  But after a little convincing by DFA, DMS, the

19    seat was filled not with the farmer who had won -- he

20    decided to drop out -- but the incumbent.  And then the

21    term changed from two years to three years.

22        This is -- this is not -- these release are not a

23    grant of significant economic relief going forward.

24    This -- this is nothing.  Our concessions are -- under

25    the release are legally binding.  DFA's are not.  This

1    is not equitable.

2         And worse, the lack of meaningful market relief

3    invalidates whatever monetary relief there is.  PI count

4    spikes, which our milk inspectors tell us are

5    unexplainable, and which are widely experienced unless

6    you are a delegate, are a prime example.

7         Over our objections, counsel negotiated away our

8    request for independent milk testing.  Consequently,

9    DFA, DMS can easily recover their monetary relief by

10   adjusting milk fees to reduce the amounts they pay out

11   in quality premiums.  In 2013, DFA alone, not DMS,

12   marketed 60.6 billion pounds of milk.  $50 million

13   amounts to 8 cents per hundredweight of that.

14        Now, over the past several months, us, Richard

15   Swantak and, to the best my knowledge, other DFA members

16   in the area have lost 50 cents of premium -- per

17   hundredweight of premiums, not 8, as a result of new

18   balancing fees which supposedly occurred because there

19   was too much milk in the order.

20        We have no -- we have no way of verifying that, as

21   farmers, especially since -- my father might just have

22   wanted to touch on this point, but we live five miles up

23   the road from the Chobani milk plant, and while there

24   was this oversurplus of milk, he couldn't -- he couldn't

25   get enough milk to keep his -- his plant at full

```
1    capacity.  It's -- it's not a good situation from our
2    point.
3         And because of this situation, Rick Smith was able
4    to state, in his July member update, that, speaking of
5    the settlement, this will not affect our operations in
6    the least.  Taken at their own words, defendants are
7    giving up nothing.
8         Now, what the class is giving up:  Any reasonable
9    settlement is by nature a compromise, plus the fact that
10   we must sacrifice some of our interests is a given.  The
11   reason this settlement stands out as unfair and
12   unreasonable is that it sacrifices all of our interests.
13        First, it sacrifices the class's case.  This is a
14   valuable asset to us because it has the potential to
15   recover some of what has been stolen from the class and
16   to bring an end to the illegal conduct which
17   countenances that.
18        We understand that the best-case potential monetary
19   recovery is a billion, 50 million dollars, treble
20   damages, and the -- the future nonmonetary value of
21   injunctive relief and fixing the industry problems which
22   caused this case is incalculable.
23        To surrender that at the eve of trial is a great
24   concession on our part.  To surrender it for, as we have
25   seen, nothing is hardly short of unconscionable
```

1    procedurally, because we have no bargaining power

2    against our class counsel, and substantively, because of

3    the one-sided terms.

4        In exchange for these terms, which include a

5    release which extends beyond both the time period and

6    the subject matter of the claim, this class is not

7    granted anything meaningful.  DFA can continue its

8    current full-supply agreements, patiently waiting until

9    the conclusion of the settlement period to punish any

10   farmers or cooperatives which dare to leave the fold,

11   and review its internal affairs to conclude that the

12   cooperative house already in perfect order.  Again, our

13   concessions are binding; defendants' are not.  That's

14   not equitable.

15       Second, it sacrifices our recovery.  This class was

16   ready to proceed to trial, seeking potential treble

17   damages, seeking over a billion dollars, best case.

18   Under the settlement, we are left with the value of one

19   tractor tire as compensation for 22-plus years of market

20   oppression.  True class action recovery on a class

21   member basis is typically somewhat small, but in this

22   case, we have a benchmark involving the same defendants

23   and the same conduct.

24       In the Southeast case, total recovery per farm,

25   before attorneys' fees, amounted to roughly $50,000.  In

1    the Northeast case, total recovery per farm, again,

2    before attorneys' fees, if the settlement goes through,

3    will be $6,666.

4         Applying this measure of counsel's effectiveness,

5    their percentage of recovery will be 4.4 percent, which

6    is actually strikingly similar to the result in

7    Goldberger versus Integrated Resources.  I don't know

8    how -- I'm the sure the Court must have worked with this

9    case before.  If I could provide the citation for that,

10   it would be appreciated.

11        Because I noticed two things in the Goldberger

12   opinion.  One thing which the court looked at was that a

13   lot of the work, which the attorneys were -- had

14   submitted in connection with the case, had already been

15   done for them.

16        In this case, the efforts of how they were in the

17   Southeast were benefited from by both Cohen Milstein and

18   BakerHostetler in the Northeast case, in addition to the

19   federal prosecutor work in 2004, with the investigation

20   back then.

21        And another thing was that the Goldberger court

22   found, because the likelihood of -- the likelihood of

23   nonpayment was slim, most of the defendants were

24   solvent, well-established individual entities, that did

25   not justify -- and, again, this is under -- upheld by

1    the Second Circuit Court of Appeals -- that did not

2    justify an increase in the attorneys' recovery.

3         But my point in this is that they would never

4    settle for a slap in the face of 4.4 percent, and

5    neither should the class be forced to.

6         Now, in addition to these facts, I would like to

7    bring the legal standard to bear.  In evaluating the

8    settlement, I understand that the complexity of the

9    expense and the likely duration of this case is

10   something the Court must consider.

11        I do not dispute this is a complex case.  The point

12   that I wish to emphasize is that much of this complexity

13   is in the past, not the future.  We are not facing the

14   hurdles of establishing a claim, dismissal, discovery,

15   summary judgment.  We are at the eve of trial.

16        It's not fair for us to give up our established

17   damage model, 341 million, for no injunctive relief, and

18   50 million, which, as I explained, DFA will recover that

19   at the drop of the hat.

20        And I'd also like to speak about -- as to the

21   reaction of the class.  There's two things I would like

22   to emphasize.

23        First of all, I would like to bring to the Court's

24   attention the fact that the more massive a farm is, the

25   more milk it ships with DFA or a co-conspirator plant,

1   the higher incentive it has to come down on DFA's side

2   of this settlement.

3        One of our neighbors milking 2500 cows told us that

4   he could not afford to risk opposing this because he

5   needed a market for his milk.  If a friend among the

6   higher-ups tells you you might want to send in a letter

7   in support, you have a very strong incentive to do so.

8   In fact, many of the letters in support, which I already

9   expressed, just -- that the writer was not familiar with

10  the particulars of the case, they just wanted it

11  settled.

12       The second thing I wanted to bring up is that many

13  of the farmers who express support for the settlement

14  express concerns which were very similar to ours at the

15  beginning of the case.  We wanted -- we don't want the

16  attorneys to take advantage of this process, and we

17  wanted fundamental market change.

18       People are under the impression that the settlement

19  will provide fundamental market change, are less likely

20  to support it for the right reasons.  But the fact is it

21  doesn't.  None of these provisions will change the

22  market conditions, which we complained about initially

23  and which claim has withstood the hurdles of dismissal,

24  discovery, and summary judgment.  My point is that if

25  many of these farmers were acquainted with the facts as

1   we are, they would be on our side of the room.

2       And I understand the risk going forward is a very

3   great consideration.  And after discovery, we were ready

4   to proceed with the -- seeking the $340 million in

5   damages.  The council claimed that 130 million of this

6   is most likely unrecoverable because it falls outside

7   the statute of limitations.  And our pleadings do not

8   include a fraudulent concealment claim to overcome that

9   statute.

10      And I may be a mere law student, but my immediate

11  thought when I heard that was Rule 15(b).  Pleadings

12  are -- a liberal amendment of pleadings is allowed to

13  aid in the decision on the merits.  But at any rate, the

14  Court specifically allowed the class to bring this

15  fraudulent concealment claim at trial in the motion for

16  summary judgment, and I'd like to point out that, in the

17  situation where one party acts as a fiduciary of

18  another, fraudulent concealment is most easy to

19  establish.

20      All that requires, under strict liability, is that

21  the -- the fiduciary acted other than in the best

22  interests of the party represented.  That's easy to

23  establish for us because DFA and DMS does that every day

24  by, number one, processing milk; number two, by owning

25  import licenses.  They're trying to sell our milk.  Why

1       would they have import licenses to bring other milk in?

2            So I would ask the Court to please question

3       counsel's hastiness to discount that portion of our

4       damages.  And the same applies to their hasty

5       consideration of the settlement in light of the best

6       possible recovery or, more accurately, in terms of the

7       darkness of the intended risk.  Only as an afterthought

8       do they mention the -- our best possible recovery in

9       terms of injunctive relief.  That starts with the money,

10      and that's where it stays.

11           I have brought up a couple things which, from

12      discussions with my parents and the class

13      representatives and other folks, I think this is our

14      best possible recovery.  Because DFA acts other than for

15      the best -- best possible -- best interests of its

16      fiduciaries, it doesn't count as a cooperative for

17      purposes of Capper-Volstead Act.  Therefore, it should

18      be held liable for nonsolicitation agreements and

19      sole-supply agreements.  As we can establish, the value

20      of that is a billion dollars in treble damages.

21           Aside from that, the injunctive relief of agreeing

22      under penalty to provide for third-party voting, vote

23      counting, and third-party milk testing will solve a lot

24      of the problems which we farmers face.  These things

25      which, if our counsel -- if our counsel had worked with

1  us and listened to us, these are the things which would

2  be on the table now, and we wouldn't be talking about

3  nonexistent injunctive relief.

4      The conspicuous absence of this, the entire

5  positive half of the spectrum -- you see, my

6  understanding is that we try to look at the best

7  possible recovery for the class and the worst possible

8  recovery, and then we have a spectrum upon which to

9  evaluate how reasonable the settlement is.  The

10  conspicuous absence of the entire half of that spectrum

11  casts a lot of doubt on counsel's assertion that they

12  exercised professional judgment.

13      It seems to me that rather than arguing this

14  settlement is fair, reasonable, and adequate, they

15  argued, "We need this settlement; therefore, it's fair,

16  reasonable, and adequate."  And a mixup like that is

17  something you lose major points for on law school exams,

18  and it's our prayer that this would not be rewarded in

19  practice.

20      I also want to speak about the fact that when the

21  notice initially went out in December regarding the

22  settlement, it had the wrong phone number.  Farmers were

23  sent through a runaround before they even started.

24      And given that fact, and the fact that we had

25  Christmas and New Year's right up there plus our full

1    daily schedule, the fact that 500 claims were still

2    filed is a testament not to the skill of the American

3    lawyer but to the perseverance of the American farmer.

4         You see, your Honor, I have to agree with my

5    brother that when it comes for knowing what's best for

6    the farmers, these attorneys are potatoes in a corn

7    crib.  It -- from the class perspective, we have no risk

8    going forward because this settlement leaves us with

9    nothing left to risk.

10        The monetary payment is -- as I said, it's a

11   tractor tire for 22 years of market oppression, and the

12   injunctive relief, the key thing which we were looking

13   to get out of this lawsuit, which -- farmers against

14   this settlement and for this settlement, that's what

15   they are looking for -- it's not going to result in any

16   change for us.

17        DFA has already clearly violated the law here, and

18   we need to hold them accountable for that.  In January

19   2000, there were 18,000 farms in this Northeast order.

20   Today there's 12.  I don't dispute that defendants and

21   those closest to them were quite literally making out

22   like bandits, but this industry and the lives and

23   communities it represents is in serious trouble.

24        Defendants and class counsel do not share these

25   risks and consequently have a joint interest opposed to

1    ours, yet this class could and still can get meaningful

2    relief, and we ask that our attorneys will not be

3    allowed to sell this out on us.

4         In order to discard the settlement and achieve

5    genuine fair, reasonable, and adequate relief for the

6    class, our only hope is your position as its guardian

7    and fiduciary.

8         And I want to thank you very much for the time and

9    the great honor of speaking on this issue.

10              THE COURT:  Thank you.

11        Who else would like to speak?

12        Okay.  Come on forward.

13        If you would please begin by stating and spelling

14   your name.

15              RALPH SITTS:  Your Honor, my name is Ralph

16   Sitts; R-a-l-p-h, S-i-t-t-s.

17              THE COURT:  Mr. Sitts is a class

18   representative.

19              RALPH SITTS:  Excuse me?

20              THE COURT:  You are a class representative.

21              RALPH SITTS:  Yes, I am.

22        Okay.  Thank you, your Honor, for this opportunity.

23        I have been a lead plaintiff from the beginning.  I

24   have six grandsons who we hope some of whom would carry

25   on the family farm to make five generations in dairying.

1    I take my responsibilities to my family and my dairy

2    farming seriously.  As you can see, I have a vested

3    interest.

4         A quick history, in my opinion, on how the dairy

5    farming industry got to where it is today:

6         At the very first, a few dairy neighbors got

7    together to form a bargaining co-op to market their

8    milk.  With the addition of other producers in this

9    co-op, it became more difficult for dairy farmers to

10   find a time to manage its everyday operations.  Hence,

11   managers were hired, ultimately a CEO.

12        Some co-ops moved into petroleum sales, building

13   material sales, insurance, baking, et cetera, all from

14   the revenues generated from milk sales.  This is where

15   dairymen, in my opinion, who were members of the co-op,

16   should have demanded this money, instead of being

17   invested in these ventures, be returned to the dairy

18   farmers.

19        The basic rule of thumb in retail is to buy cheap

20   and sell high.  In this case, hold down the price of the

21   raw material milk and this would increase profits at the

22   retail end.  These CEOs knew this, and where it failed

23   was that the co-ops did not return the profits back to

24   the dairymen.  The CEOs and the boards made profits for

25   the co-ops, but they did not return these profits in the

1    milk checks to the farmers.

2         In the Dean settlement which was consummated during

3    the holiday season, we were coerced into an agreement.

4    We were discouraged from interaction among plaintiffs.

5    The olds adage of divide and conquer applies.

6         In the Dean settlement, we were told the settlement

7    on the table is our only option, a one-time deal that

8    must be agreed to immediately.  If we consent to this

9    settlement, it will send a favorable precedent in the

10   DFA case, which will be for more injunctive reliefs and

11   for hundreds of millions of dollars.

12        To help with certification of the class, we must

13   sign now.  All this, despite the discovery process had

14   yet to be completed.  On a conference call, we were told

15   by our counsel that there were -- should be no

16   interaction between plaintiffs in regards to this case

17   without attorneys present, insinuating we could face

18   possible legal action.

19        In February, on Thursday, December -- or I'm sorry.

20        In fact, on Thursday, December 23rd, 2010, the day

21   the Dean settlement was filed, our counsel -- our

22   counsel contacted us individually, Ralph and Garret

23   Sitts on one line with one lawyer, and Alice Allen on

24   another line with another lawyer.  Prior to this, any

25   settlement discussions were handled as a group

1    conference call.  We were unable to hear what was being

2    said to or being said by Alice Allen, the other lead

3    plaintiff.

4        On this call, after a lengthy and heated discussion

5    with counsel, it became obvious to us that our counsel

6    was not going to honor our settlement points and the

7    settlement was a done deal.  This was totally unfair to

8    the class.  We felt that we, the class rep, should stand

9    our ground in the face of this coercion, but since

10   counsel had informed us earlier that we could not

11   discuss the case amongst ourselves without an attorney

12   present, we understood that we couldn't do anything

13   without unknown repercussions.  So under this

14   misrepresentation we agreed to the settlement.

15       Fast-forward to the DFA, DMS suit.  I learned to be

16   successful -- I learned in farming to be successful you

17   can't make the same mistake twice.  I soon became aware

18   that some of the tactics that were used in the Dean

19   settlement was being repeated in our counsel and used us

20   in this settlement.  It was like a page from today's

21   government:  Hurry up and sign this and read what's in

22   it later.

23       Maybe somewhere in law school there is a course in

24   Class Action Suit 101 with a guideline because we, the

25   plaintiffs, became aware of similar tactics by our

1     lawyers as in the Dean settlement.  My father told me

2     many years ago, Fool me once, shame on you; fool me

3     twice, shame on me.  The warning signs were there.

4          We, as plaintiffs, fully appreciate the time and

5     resources our counsel has dedicated to this case.  Our

6     counsel will undoubtedly move on to the next case with

7     no fear of their livelihoods or futures being

8     jeopardized.

9          The defendants in this case -- which was written by

10    our counsel and DFA without us, the plaintiffs, being

11    present at the table -- have these protective

12    provisions:

13         Section 1, paragraph 1.17, under Released Parties,

14    and I quote, means the settling defendants, their

15    predecessors, successors, parents, subsidiaries,

16    affiliates, representatives of any kind, all entities

17    which they have an ownership interest, shareholders,

18    partners, members, owners of any kind, attorneys, and

19    any and all past and present officers, directors,

20    employees, managing agents, and controlling persons of

21    such entities, including any past or present officers of

22    these parties originally -- originally named as a

23    defendant, but not any other defendant, end of quote.

24         Section 6, paragraph 6.1, line four, and I quote:

25    Release and Covenant Not to Sue:  Parties shall be

1    deemed to have, and by operation of the judgment shall

2    have, fully, finally, and forever released and

3    discharged all released claims against the released

4    party, shall have covenanted not to sue any of the

5    released parties with respect to all released claims,

6    and shall be permanently barred and enjoined from

7    instituting, commencing, prosecuting, or asserting any

8    released claims against any of the release parties, end

9    of quote.

10           This is totally unfair and unreasonable to the

11   class and the class members' ability for current or

12   future questions or actions to DFA.

13           As for the lead plaintiffs, under section 7.3,

14   letter (i), and I quote:  Settling defendants agree they

15   will not discriminate or retaliate, or cause

16   discrimination or retaliation, of any kind whatsoever in

17   response to the participation in support of the subclass

18   representatives or any other farmer in this action, end

19   of quote.

20           A very noble gesture.  But without any changes in

21   their control of our milk check and DFA owning the labs

22   that test our milk, how will we defend ourselves, and

23   who will be there to make sure we are treated fairly?

24   We have asked for independent lab testing but with no

25   results.  Again, DFA maintains complete control.

1            The lawyers have used our names, our reputations.
2    We have been vilified to our neighbors and fellow
3    co-ops, fellow producers.  The co-ops have threatened
4    our safety and livelihood.  The co-ops control our milk
5    checks, their laboratories that test our milk
6    for bacteria, drugs, protein, and butterfat.  In short,
7    they, DFA, could put us out of business tomorrow.

8            Yet collectively, what we may receive above the
9    class hardly seems equitable or fair given the facts
10   that our businesses and livelihoods could be ruined.  We
11   have spent many hours on this case, and we feel the
12   absence of similar guarantees and protections, as the
13   defendants, that the monetary compensation for the lead
14   plaintiffs is inadequate and should be more in line with
15   our risks.

16           Your Honor, I would just like to say, as an entire
17   class, we help feed the world and are stewards of the
18   land.  My son, Garret, and myself did not enter into
19   this lawsuit with a monetary award in mind.  The fact --
20   that fact was entered into the record for us by the lead
21   plaintiffs -- that fact was entered into the record for
22   us, the lead plaintiffs, by Attorney Kit Pierson, at the
23   Dean settlement fairness hearing.

24           We entered into this process as a fourth option.
25   The co-op, which myself was a member for several years,

1   was our first.  Questions to Clyde Rutherford and Rick

2   Smith at co-op meetings were handled with ridicule and

3   avoiding the issue.

4        Our next step, the executive branch, we were told

5   the enormity and perplexity of the case was beyond the

6   scope of their control.  In the legislative branch, our

7   representative gave us an ear, but anything that was

8   helpful failed to materialize -- materialize.

9        Our last hope is the judicial branch.  These

10  decisions made today may not be earth-shattering, but

11  they will affect all dairies -- all size dairy farms

12  severely.  The small- and mid-sized farms could be

13  devastated because of their limit to acquire capital and

14  the reality that they must market their milk through a

15  co-op.

16       The defendants, DFA, who control the milk price,

17  the cost of hauling, premiums paid on protein,

18  butterfat, et cetera, they also control marketing and

19  hauling costs and other deductions, for whatever the

20  co-op deems necessary, at the co-op's discretion.

21       The defendants also control the labs which test for

22  bacteria and drugs, which with a positive test could

23  result in an individual paying for a load of adulterated

24  milk, $20,000 plus, or a loss of market completely.

25       In conclusion, your Honor, I strongly urge that

1    this settlement be denied.  It is unfair to the class

2    because DFA admits to no wrongdoing and is forever

3    protected from any further actions.  It is unreasonable

4    because DMS still writes the checks -- Dairy Marketing

5    Service still writes the checks and controls the milk

6    for thousands of non-co-op members.  And it is

7    inadequate because the injunctive reliefs do very little

8    to change DFA's operations.

9        And the monetary award is one-third of the

10   Southeast/DFA lawsuit settlement.  In the Southeast,

11   there were only 6,000 producers, compared to 12,000 in

12   the Northeast.  Therefore, one-third of the money is

13   spread over twice as many producers.  Mathematically,

14   DFA has a sweetheart deal.

15       The cooperatives have been an integral part of the

16   dairy industry.  Through the years, cooperatives have

17   made many positive moves for the dairy farmers, but DFA

18   and DMS have stepped beyond the definition of a co-op.

19   We feel that with DFA and DMS's current monopolistic and

20   monopsonistic practices, this allows for egregious

21   controls over dairy farmers.

22       DFA and DMS have become judge and jury over our

23   livelihood.  Your Honor, there are many points, much of

24   which will be addressed by the other lead plaintiffs and

25   class members, as to what is unfair and what is

1    unreasonable with DFA and DMS.  Two issues that must be

2    resolved:  DMS, Dairy Marketing Services, must be

3    abolished.

4        Without DMS control of non-co-op members' milk,

5    DFA's full supply contracts will be very tough to meet,

6    thus allowing for more competition and, one would hope,

7    a better price for dairymen.

8        Dairy farmers who consciously made a choice not to

9    join DFA should not have their laboratory work or their

10   milk check controlled by DFA and DMS.  In conjunction

11   with this, there has to be independent lab testing for

12   all dairymen to remove any chance of or any suspicion of

13   improprieties by DFA and DMS.

14       Thank you, your Honor, for giving me a chance to

15   speak.

16            THE COURT:  Thank you.  Who would like to

17   speak next?

18            RICHARD SWANTAK:  I will.

19            THE COURT:  So, again, if you will just state

20   and spell your name first.

21            RICHARD SWANTAK:  My name is Richard

22   Swantak, S-w-a-n-t-a-k.

23            THE COURT:  And Mr. Swantak is also a class

24   representative.

25            RICHARD SWANTAK:  Good morning, your Honor,

1    and all present.

2        We are a fourth-generation dairy in Delaware

3    County, New York, that is geographically located in the

4    northern Catskills.  After graduating college in 1968,

5    receiving a B.S. in business administration with a major

6    in accounting and personnel, I returned to the farm and

7    worked with my parents until 1977 when I purchased the

8    farm.

9        I have watched dairy farm numbers dwindle in

10   Delaware County from 598 in 1982, producing 414 million

11   pounds, to 157 farms in 2007, producing 157 million

12   pounds.  Out of my three neighboring farms, two have

13   exited in 2014; and the third, in all likelihood, will

14   be gone this year as the three brothers and one sister's

15   average age is 70, and their health issues have become

16   insurmountable.

17       Also important to note that the average age of the

18   American dairy farmer is greater than 57.  Dairy farmers

19   are reluctant to advise their children, families, to

20   continue or to enter the dairy business as their

21   experience has proven the milk price over the decades

22   struggles to approach the cost of production.

23       I have watched neighboring farms, myself included,

24   look the other way, ignore their buildings' repair, keep

25   corn planters, choppers, tractors, and so many pieces of

1    equipment, 20, 30, 40, and 50 years, so as to hopefully

2    hang on.  At the same time, we observe inspectors'

3    vehicles that visit the farm are nearly brand-new

4    vehicles.

5         Also interesting for all here, I was not a

6    representative in the Northeast/Dean settlement but

7    found it notable to read that the DFA, DMS executives

8    state that, quote, A small, one-time cash payment is far

9    overshadowed by the long-term negative impact to

10   farmers' wallets.  Exhibit 1.

11        And to familiarize some of youse who may not

12   realize it, the Northeast/Dean settlement was 30 million

13   for 12,000-plus producers, where the Southeast

14   settlement was 140 million for 6,000 producers.

15        Also interesting was an article in the Wall Street

16   Journal in 2011 titled, "Farmers, Milk Buyers Settle

17   Antitrust Suit."  In the article, the last sentence

18   states:  Mr. -- in quotation marks -- excuse me.

19   Mr. Smith said the settlement would not hurt the

20   cooperative which has cash to pay the 158.6 million.

21        I am not impressed with our class counsel stating

22   the burdensome pioneer work they have done in this -- in

23   this suit as it appears that many of the same law firms

24   and attorneys were major players in the Southeast dairy

25   settlement, totaling 303.6 million with only half the

1    number of producers.

2         In 2014, I have watched my additional premium

3    dwindle from 44 cents in February to zero as of

4    November.  Also, my BST-free premium of 13 cents has

5    dropped to 6 cents.  Those 51 cents are -- needed by the

6    dairymen are likely to be a factor in the continuing

7    downward numbers of operating dairy farms in the

8    Northeast.

9         A friend from Columbus, Ohio, called me this past

10   fall asking if the growth hormone was still being used

11   in Grade A whole milk.  I replied, "I'm not sure."  So

12   without question, the public does have concern, if

13   growth hormones are being used, why -- why lowering the

14   premium?

15        On January 8th, I did call DMS 800 number in

16   Syracuse and got nothing but an answering machine.  I

17   left two questions:  One, why have premiums been dropped

18   or lowered; and, two, why hasn't hauling costs dropped.

19        The next day I received a call and was told that

20   there was too much milk, and they were considering

21   dropping 41 producers, and that hauling takes a few

22   months to show up on the milk jug.

23        I often listen to the NPR radio and heard a

24   trucking firm owner being interviewed this past

25   December, and he was asked about his thoughts on the

1    substantial drop in fuel prices.  He explained that he

2    was able to order 15 brand-new trucks, something he was

3    never able to consider before.

4        Many news media sources have interviewed citizens

5    around the United States asking how they have been

6    affected by the significant plummet in fuel prices over

7    the past six months.  It has been much of the same

8    opinion that they are thrilled to have the additional

9    money that was always spent on fuel now in the pots for

10   other needs.

11       I did have collective bargaining in my college

12   courses, however, I don't think one needs those credit

13   hours to recognize that here we go again as dairy

14   farmers being the last to reap the positive effects of

15   $45 oil compared to $100 oil.

16       Another concern of utmost importance is the need

17   for an independent laboratory to do the milk testing.

18   Over the years, I have had several farmers mention to me

19   that they were not happy with their butterfat test as it

20   often was two- to three-tenths lower than their DHI

21   records supported.

22       In addition, the last several years, most dairy

23   farmers have been upset by sudden spikes in a bacteria

24   test called PI, preliminary incubation.  This figure

25   seems to spike for no apparent reason on many farms, and

1    it takes away the average quality numbers that are

2    needed to receive a quality premium.  When asking our

3    inspectors what causes these sudden increases in PI

4    counts, or even what is the PI count, we are given an

5    answer that -- an answer that they themselves can't

6    really explain what the test consists of.

7         I would not feel I have represented my 12,000-plus

8    class producers fairly if I were to go along with this

9    fraction of the settlement that the Southeast Orders 5

10   and 7 received of 300.6 million for 6,000 producers.

11   Being beat up on the small Dean settlement of 30

12   million, I don't feel comfortable allowing DFA and DMS

13   to slap the Northeast dairymen harder and more abusively

14   than ever with a 40-million settlement that should be

15   more in line with a 250-million settlement minimum.

16        I also think the DF -- that -- excuse me.  I also

17   think that DFA and DMS executives will feel better of

18   their settlement if it is more in concert with the

19   Southeast settlement's monetary numbers in total.  The

20   Dean Foods managers will not be able to read on their

21   computers the small settlement that DFA and DMS gave

22   their Northeast producers.  With a fine comparable

23   settlement, I believe it should be a strong building

24   block of trust needed to help secure the existence and

25   good relationship that we, as producers, seek.

1          The United States citizen has been blessed with a

2     quality dairy product, as well as abundance.  Only the

3     seven-day hard work and responsibility of the dairy

4     producer has this been possible.  If we here in the

5     Northeast erode the fortitude and good will of the

6     American dairy farmer, we will have done an injustice to

7     all.

8          And then I just added this last note:  I am hoping

9     the sunshine I experienced walking in this courthouse

10    this morning will help shed light on this case.

11         Thank you, your Honor.

12              THE COURT:  All right.  Thank you.

13         Does anybody else want to speak?

14         Yes.

15              GARRET SITTS:  My name's Garret Sitts,

16    G-a-r-r-e-t, S-i-t-t-s.  I am a named class rep.

17         Hello, your Honor.  My name is Garret Sitts.  I

18    would like to make it very clear that I would be willing

19    to accept a settlement that offered real market relief

20    over going to trial.

21              THE COURT:  I am going to ask you to move a

22    little bit closer to the microphone, and -- you are soft

23    spoken like me, so really project your voice.  Okay?

24              GARRET SITTS:  Okay.  You want me to start

25    over?  I am not --

```
1                THE COURT:  No, I heard you.

2                GARRET SITTS:  I am not a public speaker.  I'm

3     sorry.

4                THE COURT:  You're doing fine.  Go ahead.

5                GARRET SITTS:  Sorry.  I will just start --

6     I -- I would like to make it very clear that I would be

7     willing to accept a settlement that offered real market

8     relief over going to trial.  I did not enter into this

9     litigation looking for a monetary award, and what I am

10    looking for is market relief, a market that is not

11    controlled and manipulated by the defendants.

12         Some issues I have with the proposed settlement,

13    the relief:  Section (a).  Settling defendants, during

14    terms of this agreement, will not enter into full-supply

15    agreements for the supply or sale of raw milk in

16    Order 1; however, settling defendants retain the right

17    to renew existing full-supply agreements.

18         The defendants currently have a monopoly on plant

19    access, and this provision allows the defendants to

20    maintain that monopoly by renewing existing full-supply

21    agreements.  No relief.

22         Paragraph -- or section (d) of the relief:

23    Settling defendants agree any cooperative member,

24    associate, affiliate of DFA, DMS, in Order 1 may, during

25    the times of this agreement, terminate its relationship
```

1    with DFA, DMS upon no more than 90 days' written notice
2    without penalty.
3         I believe this needs to include language that
4    allows processors to terminate their relationship
5    full-supply agreements with the defendants as well.  So
6    if the defendants are allowed to maintain their monopoly
7    on plant access, the farmer who chooses to terminate
8    their membership, relationship with the defendants will
9    have their access to plants blocked by full-supply
10   agreements.  The end result is the producer is not going
11   to be able to leave because they will not be able to
12   find a market for their milk.
13        Perhaps the most outrageous section of this
14   settlement to me is the release of claims.  The named
15   defendants are DFA and DMS.  Why did their employees,
16   subsidiaries, joint ventures, partners, et cetera, need
17   to be released from legal liabilities?  My question is,
18   what have they done?
19        I challenge the attorneys on both sides to produce
20   a class action settlement approved with a release of
21   claims as broad and encompassing as this one.  Where is
22   the precedence?
23        In paragraph (i), Settling defendants -- that they
24   will not discriminate or retaliate, or cause
25   discrimination or -- of any kind whatsoever in response

1    to the participation support of the subclass

2    representatives, and any -- or any other farm -- farmer

3    in this action.

4        My question is who bears the burden of proof?  Who

5    will enforce this?  The fact is the defendants own --

6    own Dairy One, a milk quality testing lab, which is used

7    to test producers' milk quality, which results affect

8    producers pay price via premiums.  I strongly believe

9    the defendants use their ownership and control of Dairy

10   One to control, intimidate, and eliminate troublemakers,

11   which this settlement fails to address.

12       An example:  Our farm was a member of DFA from 1998

13   through 2007.  In that time period, we were very

14   critical and outspoken of the defendants' business

15   practices.  In late 2007, we left DFA and began shipping

16   to Worcester Creameries.  At that time, Worcester

17   Creameries was the only processor in our geographical

18   area that was not affiliated with the defendants.

19       In the time that we were members of DFA, we had

20   three spoiled loads of milk, a minimum of 25 illegal

21   bacteria PI, somatic cell, et cetera, counts resulting

22   in tens of thousands of dollars in lost income.

23       We became members -- or started shipping with

24   Worcester Creameries in late 2007.  From 2007 to date,

25   we have had zero spoiled loads of milk, zero illegal

1    counts, and this is over seven years with zero milk

2    quality issues.  I have changed nothing, your Honor.  I

3    still do the same -- milk the cows and handle the milk

4    the same way.

5         One of the defendants' employees has even gone as

6    far as to tell my neighbor not to associate with me

7    because I really F'd things up and I may disappear one

8    day.

9         The Dean settlement:  We were unhappy with the Dean

10   settlement because the lawyers were willing to settle

11   before the discovery process was completed.  We were

12   told by our attorneys that Dean's market share was only

13   30 percent and we had a weak case, and that's why we

14   needed to settle.

15        We did not believe this.  We believed their market

16   share to be more like 70 to 90 percent.  We acquired

17   maps from the market administrators of plants,

18   locations, plants' IDs, compared them to the

19   spreadsheets that the attorneys had.  The maps from the

20   market administrator clearly pointed out that they had

21   left out a large number of plants.  We tried to point

22   this out to the attorneys.  They were unwilling to

23   accept it.

24        We were led to believe that it was illegal to

25   discuss the case without counsel present.  On the

1    conference call when the settlement was filed, the day

2    of the settlement was filed, one of the lawyers went on

3    a rant of profanity and threatened us.

4         We were discouraged from attending our fair -- the

5    fairness hearing.  I was later told by a man, John

6    Bunting, who is pretty instrumental in putting these

7    cases together -- in my opinion, he is an expert -- that

8    after preliminary approval of the Dean settlement and

9    before the fairness hearing, Cohen's expert that did the

10   market share on Dean contacted them and told them that

11   they grossly underestimated Dean's market share.  This

12   was never passed on to us.

13        In the last conference call with the DFA settlement

14   we had, we were informed that they -- they did not have

15   to have our support to file.  We demanded the reasons

16   for our objections be attached to the filing.  We were

17   told no, they would not.  I believe if that was done,

18   that would have saved us all a lot of time and

19   aggravation.  They did tell us that our objections would

20   be made more than clear to you.  Your order denying

21   preliminary approval was obvious those questions were

22   not made more than clear to you.

23        So on July 14th, Jonathan and Claudia Haar, Richard

24   Swantak, Ralph Sitts, Garret Sitts, and Alice Allen on a

25   speakerphone, met to draft opposition to the proposed

1    settlement in response to the questions raised in the

2    denial of preliminary approval.  At no time did Alice

3    Allen express opposition to this document.  In fact,

4    Alice had suggested things that -- things to be included

5    and they were.

6         Later that day, the final draft of that document

7    was e-mailed to Alice Allen for her review.  July 15th,

8    in the morning, I spoke with Alice, and at that time she

9    was okay with the contents of the document and was okay

10   with it being filed.  We sent it to the attorneys and

11   demanded it be filed.  We were told it would be

12   submitted.  It was submitted *in camera*.  We did not ask

13   for it to be submitted *in camera*.

14        Because it was submitted *in camera*, we had no way

15   of verifying that was our actual document, our actual

16   words.  We were told by the clerk that there was

17   something submitted *in camera*.

18        I have an e-mail here from one of the attorneys to

19   Ralph and Alice and Vera.  It says, As we previously

20   informed you, the statement regarding the settlement

21   prepared by some of you was delivered to the court on

22   July 23rd to be filed *in camera* to preserve the

23   confidentiality of attorney/client communications

24   referenced in the settlement -- or the statement,

25   rather.

```
 1          In subclass counsel's response, Yesterday the
 2    court's clerk contacted us and relayed that Judge Reese
 3    (sic) would rather not view attorney/client
 4    communications, and that subclass counsel providing a
 5    simple statement regarding the basis of class
 6    representatives' opposition to the proposed settlement
 7    would suffice for Judge Reese.
 8               THE COURT:  So it's "Judge Reiss," but that's
 9    okay.
10               GARRET SITTS:  Sorry, I'm -- I'm sorry.
11               THE COURT:  That's all right.
12               GARRET SITTS:  I'm nervous.
13               THE COURT:  That's all right.
14               GARRET SITTS:  Pursuant to the court's
15    request, sub counsel prepared the attached simple
16    statement to be filed in supplement to the July 23rd
17    submission:  Please feel free to call if you have any
18    questions.
19          According to the clerk's office, there's no record
20    of that communication.
21          And then I have one last thing that really blows my
22    behind.  It's a statement from DFA.  It was released
23    after the denial of preliminary approval.  It was
24    written by Brad Keating, K-e-a-t-i-n-g.  He is the chief
25    operating officer of DFA's Northeast dairy.
```

1          It says, Statement:  DFA explains objections filed

2     in Northeast lawsuit.  Dairy Farmers of America,

3     Incorporated, and Dairy Marketing Services, LLC, have

4     defended ourselves since this lawsuit was filed in 2009,

5     and we continue to do so.  This lawsuit has no merit.

6          The activities of DFA, DMS, and other affiliated

7     milk marketing cooperatives in the Northeast improve pay

8     price and stabilize the milk marketing for cooperative

9     members and independent producers alike.  As a

10    farmer-owned cooperative, we worked hard to ensure the

11    success, profitability of dairy farmers.  It is our

12    responsibility and obligation to act in their best

13    interests.  We take this very seriously.

14         The proposed settlement recently announced by the

15    plaintiffs' attorneys, who represent some of our

16    members, as well as dairy farmers who market milk

17    through DMS, cause us serious concern.  The proposed

18    settlement demonstrates the best interest of dairy

19    farmers are not being given full consideration.  The

20    settlement favors one segment of the class at the

21    expense of others, creating winners and losers by giving

22    market access to some and taking market access away from

23    others.  This is a clear conflict of interest by

24    plaintiffs' attorneys.

25         Additionally, despite reports that this settlement

1    is an economic windfall for dairy farmers, we believe

2    that, if approved, the settlement has the potential to

3    harm all producers in the Northeast effectively by

4    lowering market price for milk.

5        My question is, do we have a settlement,

6    your Honor?  It seems to me the defendants have

7    withdrawn and publicly trashed the settlement.  I would

8    like to know who ordered Mr. Keating to write this, to

9    disseminate it, and for what reason?

10                THE COURT:  Thank you.

11                GARRET SITTS:  Would you like --

12                THE COURT:  Yeah, if you would like -- we will

13   make sure that we have copies for everybody, and

14   we'll -- if you want to submit it, we will take it.  So

15   you can approach, and Miss Ruddy will take it from you,

16   and she will make copies on our break.

17       And this is about a good time for a break, so we

18   take one midmorning, 10 to 15 minutes, and then we will

19   come back and see if anybody else wants to be heard.

20       Anything further before we take our break?

21       Okay.  Thank you.

22   (Court was in recess at 10:38 a.m.)

23   (The following was held in open court at 10:52 a.m.)

24                THE COURT:  We are back on the record in Alice

25   Allen, et al., versus Dairy Farmers of America, et al.

1    And we are in our fairness hearing.

2         And let me ask if we have any members of the class

3    who also want to speak?

4         Yes.  And would you --

5              MIKE EBY:  Yes, my name is Mike Eby.

6              THE COURT:  And could you spell your last

7    name?

8              MIKE EBY:  E-b-y.

9         Dear United States District Court for the District

10   of Vermont:

11        I am the seventh-generation Lancaster County,

12   Pennsylvania, dairy farmer and member of Land O'Lakes

13   cooperative marketing Grade A in Federal 1 throughout

14   the entirety of the time period covered by the proposed

15   Northeast dairy settlement.

16        In the interests of the ability for future

17   generations to continue my family's dairy farming

18   tradition, I strongly object to the proposed settlement

19   of this case.  I have brought my eighth-generation son

20   along with me today to show the importance of this

21   matter.

22        My objection is based upon the following reasons:

23   First, the amount of the proposed settlement is

24   $50 million or approximately 16 cents per hundredweight.

25   This insignificant amount falls way short of the actual

1    alleged damages caused by DFA, DMS anticompetitive
2    behavior.
3         The damage amounts calculated by Dr. Kalt and
4    Rausser range from 41 cents to 69 cents.  And just as a
5    comparison, I brought my Land O'Lakes 2003 milk check
6    with me, which was one of the lowest years during the
7    time period of dairy farming for me, in the amount of
8    $10.80 for my mailbox price.
9         By the nature of the scrutiny expected, these
10   calculations of 41 to 69 cents are themselves very
11   conservative and would be considered a settlement.  The
12   same defendants in the recent Southeast case paid their
13   members approximately 300 million as compensation for
14   the same anticompetitive behavior.
15        Second, the -- more important than the dollar
16   amount is the accountability for the exoneration from
17   the behavior alleged in the suit that will only occur if
18   the case goes to trial.  As dairy farmers, we need to
19   have confidence that our farmer-owned cooperatives truly
20   act in our best interest.  The information that would
21   come out in a trial or be buried in a settlement is
22   vital to the confidence.  This should not be an option
23   for the defendants to pay a relatively small settlement
24   fee for the privilege of continuing business as usual.
25        And I'd like to read that last sentence again:  It

1    should not be an option for the defendants to pay a
2    relatively small fee settlement for the privilege of
3    continuing business as usual.
4         Thank you, your Honor.
5              THE COURT:   Thank you.
6         Somebody from that same row?
7         Yes.
8              ALICE ALLEN:   Thank you, your Honor.   My
9    name is Alice Allen.   And unfortunately, I need to read
10   so I don't draw a blank here.
11        My name is Alice Allen.   I began milking cows for
12   my neighbors in 1964.   Milking cows helped pay my
13   tuition through four years of college at the University
14   of New Hampshire.
15        In 1973, upon receiving my bachelor's degree in
16   dairy science from UNH, I began raising dairy heifers on
17   a rented farm to start my own herd.   I started shipping
18   milk in July of 1975 to HP Hood in Boston.
19        In 1983, as a member of a then-young dairy farmer
20   association, we began our first milk marketing study
21   group.   For the past 30 years, this group, in one form
22   or another, has succeeded in bringing nationally
23   respected speakers to our meetings to help dairy farmers
24   educate ourselves on marketing issues such as dangers of
25   massive consolidation, monopoly, monopsony, and possible

1   conspiracy.

2        With expressed interest from our legislators, I was

3   asked to go to Washington, D.C., in the late summer of

4   2001 to meet with staff of House and Senate Judiciary

5   Committee members to detail the market-related struggles

6   of Northeast dairy farmers.  We Northeast dairy farmers

7   had high hopes that the federal government would in some

8   way intervene and begin enforcing regulations such as --

9   Capper-Volstead and the historical portions of the

10  agriculture adjustment acts dating back to the 1930s.

11  There was much discussion but very little positive

12  action from our government.

13       The proposed settlement is not perfect and not all

14  I might have hoped for.  And I am not going to argue

15  with anything that the other named plaintiffs said, as I

16  am a named plaintiff in the non-DFA subclass.

17       The settlement is a compromise between both sides.

18  And there are risks to both sides in going to trial.

19  And the reason it seems that I had to disagree with my

20  co-class reps is, when we were going to have a unified

21  front and fight the settlement, I had great anxiety

22  about it, knowing that going to trial might not serve

23  our farmers any better.

24       I had such upset about it that I went to see my

25  regular lawyer, Bob Gensburg in St. Johnsbury, Vermont,

1   who has been following the case and also knows me

2   from -- from years of dairy farming.  And he said, "If

3   the court wanted only one opinion, there would only be

4   one named plaintiff.  You have to go with what you

5   believe and how you believe you can best represent your

6   farmer neighbors, to the best of your ability."

7       So at that point, I had to say that I was going to

8   support the settlement.  It was not a perfect settlement

9   by any stretch of anyone's imagination.  But I also have

10  to say that this is the first time in my career and

11  life, having been involved in dairy long before I was

12  old enough to milk cows -- this is the first time we

13  have made it this far.  And I think farmers need to

14  realize that we wouldn't be this far without the late

15  John Bunting having been a very articulate and dedicated

16  dairy farmer who understood these issues and had the

17  ability to bring these issues to the firm of Cohen

18  Milstein, who agreed to take the case.  John passed away

19  in November, and he is a loss to all of us.

20      But I do believe that the issues that are now

21  public record through this case are very, very important

22  for farmers to pay attention to.  I am disappointed that

23  there aren't more farmers in this room on either side.

24  I think -- I have seen more farmers at a machinery

25  auction than I am seeing here.  That may be partly due

```
1    to the fact that the dairy day of the Vermont Farm Show
2    is today.  I'm not sure.
3         But I believe that the really -- the only way for
4    farmers to have a say in this is to become very, very
5    educated and to know that the facts, that have been
6    brought out through this case need to be understood by
7    all farmers; that we can't just fight amongst ourselves,
8    that we have to create a better cooperative.  And I am
9    at a loss to say how to do that except by being
10   involved.
11        I have been involved as much as I could my entire
12   life.  And my farmers that I worked for in the early
13   days encouraged me to get involved and stay involved,
14   hence the milk marketing study group.
15        And I know that there needs to be more structural
16   relief, but I still do believe that this being the first
17   and only time that Northeast farmers have gotten this
18   far, it's a very important milestone that we should not
19   neglect, that we should not downplay.  It should be an
20   honor that we have gotten this far.
21        I have talked with several of the named plaintiffs
22   in the Southeast case.  That case, yes, it got more
23   money for those farmers, but the case had a lot of
24   different facts than our case.  It was a different --
25   different case altogether, as I understand it from those
```

1    named plaintiffs.  They're impressed that we have gotten

2    this far in the Northeast, knowing what they have

3    learned about our case.

4        While I would like a better settlement, I know

5    there is no guarantee that we would prevail at trial.

6    Having steadfastly remained committed to this case by

7    representing the best interests of Northeast dairy

8    farmers, I still -- in spite of everything I am hearing

9    today, I do not believe justice would be any better

10   served for Northeast dairy farmers by going to trial.

11   Not only is the outcome of the trial uncertain, but I do

12   not believe that the Court is in a position to take over

13   the management of milk marketing in the Northeast.

14       What I do believe, as I said before, is for any

15   positive changes to occur in dairy marketing in the

16   future, farmers themselves -- each and every dairy

17   farmer -- must become involved.  You are more

18   involved -- we are all more involved in our dairy

19   genetics, in our farm machinery, and growing crops, but

20   milk is what we survive on.  The income from selling our

21   milk is the most important thing.

22       We need to take a more active role and not just

23   leave it up to the few who have spoken here who are

24   trying their best to bring relief to the Northeast dairy

25   farmers.  We all have to pay attention, whether you are

1    DFA or non-DFA.  It doesn't matter.  We all -- every
2    single dairy farmer must pay attention.
3        And if you don't agree with what some of your
4    neighboring farmers are saying, read the documents.
5    Ask -- if you cannot understand some of the documents, I
6    will do my best and ask the attorneys to find people who
7    can help us understand what's in these documents.  Some
8    of them are very revealing.  But it, again, is up to the
9    dairy farmers.
10       And I know that seems like a very difficult request
11   for farmers because it's time consuming, it's difficult,
12   and I have to admit sometimes it's very boring to read
13   some of this.  But it is the only way -- and I repeat
14   the only way -- every farmer getting involved and
15   understanding the situation.
16       My uncles who were producer-dealers years ago --
17   they have all since passed away -- they said, "We always
18   thought it was going to get better but it never did."
19   This is our chance.  There are facts.  This case has
20   brought out many facts that were heretofore hidden from
21   our sight as dairy farmers.  But there's a lot of
22   information out there now, and it is up to us.  You
23   don't like what you see going on, you have got to go
24   after it, and you have got to pay attention.
25       Thank you very much for the privilege of speaking.

```
 1                    THE COURT:  All right.  Thank you.
 2               JONATHAN HAAR:  Good morning.
 3                    THE COURT:  Good morning.
 4               JONATHAN HAAR:  My name is Jonathan Haar.
 5     That's H-a-a-r.  I am a class representative for the
 6     DFA, DMS subclass.
 7          First, I want to thank you, your Honor, for the
 8     opportunity to address this Court on behalf of the dairy
 9     farmers I represent.  This has proven to be a daunting
10     project.  I learned over the last couple weeks that my
11     three youngest can handle barn chores on their own.
12          There is so much information to share relative to
13     this proposed relief that I believe is important for
14     you, your Honor, to have in order to make an informed
15     decision.  You will hear a lot from our esteemed counsel
16     making affirmative statements concerning the merits of
17     said settlement.
18          I have read, and no doubt you have, many of these
19     arguments already.  I want to be clear about this:
20     Every time they attempt to assert that this is a fair,
21     reasonable, or adequate settlement, they demonstrate
22     their ignorance of or contempt for this class and the
23     facts of the risk that we live under.
24          In order for a settlement to be fair, reasonable,
25     or adequate, it needs to be looked at in the light of
```

 1     the instant case.  Comparisons to irrelevant, unrelated
 2     settlements are useless to inform the decision-maker.
 3          If I may digress for just a moment, I believe it
 4     may be useful for the Court to provide a brief
 5     introduction to this class that is now dependent on your
 6     decision here as to whether we find any relief.
 7          Excuse me.
 8          This class feeds everyone in the courtroom.  Our
 9     routine consists of a minimum of six or seven hours of
10     daily work, what we call chores, mostly feeding and
11     milking cows.  That is seven days a week, 365 days a
12     year.  I have many neighbors who haven't missed chores
13     in years, some in decades.  That is around 40 hours a
14     week of difficult and dirty work, if everything goes
15     well, without equipment failure, flat tire, or animal
16     health issues.  This, of course, does not include a
17     single seed planted, crop harvested, bill paid, snow
18     shoveled, or board nailed back up.
19          As a result of this level of commitment, we are a
20     class ripe for abuse.  And we have been abused, first by
21     the defendants and now by those who purport to represent
22     us and our interest as counsel.  They're not only silent
23     in the face of evil, but they would happily sell us out
24     for the $16 million.
25          This is not like a Pella window case from the

1    Seventh Circuit decided this past June with respect to
2    getting paid or not for a defective product.  No, our
3    livelihoods are daily threatened by these defendants,
4    and our so-called counsel would leave us at their mercy.

5         Forgive me for my long-winded introduction.  I
6    would like to get to the substance of the proposed
7    settlement and, along procedural lines, confront some of
8    the issues surrounding negotiation and misleading
9    statements from both renewed motions and declarations of
10   Mr. Abrams and Mr. Brown.  It will be necessary for me
11   to briefly revisit the Dean settlement, as counsel has
12   used that as evidence against us.

13        With regards to procedure, I would like the Court
14   to consider our issues in light of 23(g)(4).  Concerning
15   the Dean settlement, my wife and I were informed there
16   is no reason to be at the fairness hearing.  The
17   courtroom is the domain of the attorneys, is what we
18   were told.  As such, we were actively discouraged from
19   attending.

20        You have heard about the push to get the Dean
21   settlement done and the divide-and-conquer tactics used
22   by Cohen Milstein.  Apparently the Sitts and Allens were
23   in opposition to the Dean settlement.  My wife and I,
24   who were in Washington for my deposition, were unaware
25   of the questions raised by our fellow class

1    representatives.

2        On the evening of December 23rd -- or -- 22rd or

3    23rd of 2010, while in the offices of Cohen Milstein,

4    Mr. Brown came into the room where we were.  He quietly

5    consulted with Mr. Pierson, who was with us at that

6    time.  Then he and Mr. Brown asked if we would accompany

7    him to his office to speak with Alice Allen, who was on

8    the phone.

9        When my wife and I spoke to Alice, using Ben's

10    arguments -- Mr. Brown -- we were able to sway her.

11    Mr. Brown explained the reasons for taking the Dean

12    settlement as primarily being, number one, it will

13    secure the class going forward.  Your Honor would be

14    hard-pressed not to grant us class certification for our

15    case having just approved the class for settlement.

16    This, of course, was proven to be a false statement.

17        His second reason we should approve is because it

18    would give us an impetus going forward after, and I

19    quote, the big fish, DFA, DMS, which is worth five times

20    as much.  This, too, has proven false, as evidenced by

21    the proposed settlement on the table.

22        How do I know the monetary amount is inadequate?

23    Well, it is because Mr. Benjamin Brown told me so.  He

24    said this settlement is worth $150 million.  And that

25    was on the -- at the onset of discovery, before class

1    certification, Daubert, et cetera.  I don't need to go

2    through it.  You were here for all of it.

3        In addition, Mr. Bob Abrams said in the Southeast

4    case, docket 1922-1, filed on the 21st of January 2013,

5    on page 13, in discussing monetary award in that case,

6    he cites Relafen, 231 F.R.D. 64, which I have no idea

7    what any of all that means, only to say, I quote, Noting

8    settlements obtaining 26 recovery -- 26 percent recovery

9    are reasonable.

10        Our recovery of $50 million represents just 14

11    percent of the DFA, DMS reduced damage model after

12    preliminary judgment of $350 million.  I suppose that

13    should mean that this recovery is unreasonable and

14    inadequate, according to Mr. Abrams.

15        It seems, since I am into the settlement already --

16    excuse me -- I will continue for just a moment looking

17    at the monetary aspect of it with regards to the

18    plaintiffs' incentives.  None of us got into this

19    lawsuit for money.  But for these attorneys to offer us

20    $20,000 to compensate for our risks against -- again

21    demonstrates their ignorance of or contempt for those

22    risks.

23        I received a call recently from a Mr. Joe Davitt.

24    He told me he would be sending a letter objecting to

25    this settlement.  He explained to me he used to be a DFA

1    delegate, but he said issues he raised, he questioned

2    the *status quo*:  How can we as delegates only vote on

3    nondairy policy issues?

4        Well, I guess he made too much noise and asked the

5    wrong questions.  He told Mr. Brad Keating, "I am just

6    asking the questions I am being asked by my farmers."

7    The field man, his field representative, stopped by the

8    farm one day and told him, "We don't have a market for

9    your milk," and they wouldn't be picking him up anymore.

10   So much for DFA being a farmer-run cooperative.  He was

11   a duly-elected representative.

12       Mr. Davitt called Arden Tewksbury.  Arden said he

13   could get the other local cooperative to pick him up.

14   That co-op sent out their representative.  He said, "It

15   should be no problem to pick up your milk.  I will call

16   you tomorrow to make arrangements."  Well, he did call.

17   He said, "Sorry, Joe.  We can't pick up your milk.  DFA

18   has threatened our access to the milk plant if we pick

19   you up."  Mr. Davitt was a third-generation farmer.  He

20   was forced to sell his cows three years ago.  He said,

21   "I doubt if I will ever milk a cow again."

22       With the exception of the Allens who sold their

23   cows several years ago, this is the risk that we, as

24   class representatives, live with every day.  This

25   falsely called agricultural co-op maintains all its

1    options with regards to crushing the businesses of

2    anyone who dares to oppose them.

3         Our counsel and this proposed settlement leaves

4    unscathed, in Rick Smith's own words, and they throw

5    $20,000 our way and have the unmitigated audacity to

6    suggest that this covers the risk we have taken.

7         With regards to settlement negotiations:  When you

8    go from hearing no talk of settlement, no talk of

9    settlement, not even close to settling, then settle, it

10   has a way of focusing our attention on areas of primary

11   concern.

12        Furthermore, our opinions have been informed by

13   over four years of experience on this case.  Mr. Pierson

14   insisted that injunctive relief would need to keep in

15   mind their business model, them being DFA.  We would

16   need to leave that unaffected.  Injunctive relief that

17   does not affect their business model is simply to

18   rearrange the chairs on the deck of the Titanic.  As

19   long as cooperatives make products and process milk,

20   they have a fundamental conflict of interest.

21        Having said that, we did propose injunctive relief

22   that would not affect their business model, unless:

23        Number one, divesting themselves of all testing

24   laboratory facilities should not affect their business

25   model, unless they have been shaving a little bit of

1    protein or fat off of the farmers' tests or using

2    testing as a club or a way to pilfer premiums.

3         Number two, requiring representation from the board

4    of directors to be present at all negotiations of

5    contracts for the supply of raw milk, that should not

6    affect their business model unless DFA, DMS is doing

7    something they don't want their directors to see.

8         Number three, third-party handling of delegate

9    elections shouldn't affect their business model unless

10   they are concerned about getting the wrong kind of

11   delegates.

12        Why Mr. Pierson, as an attorney allegedly

13   representing the farmers, should be concerned about

14   protecting the business model of DFA and DMS is only one

15   of the many questions we have asked concerning his

16   behavior.

17        One would think our prestigious negotiators could

18   have gotten us something.  What we have here is, in

19   absolute terms, zero.  Our esteemed counsel, to assert

20   otherwise, is, at best, delusional.  While I suspect the

21   language used by Mr. Abrams in his declaration and

22   renewed motion for preliminary approval is sufficiently

23   nuanced, that we couldn't accuse him of dishonesty, it's

24   a semantical stretch to say that some of our proposals

25   were accepted in hope or not at all or in part.  I don't

1    believe that any were accepted in whole.  As I said,

2    from when we went from no settlement, no settlement, to

3    settle, it sharpens your focus.

4        Garret and I both stated we had nonnegotiables.

5    Mr. Abrams explained there are no nonnegotiables, except

6    the money, the money which, of course, affects counsel.

7    As for our requests, well, we can't have nonnegotiables.

8    Garret talked about the divesting DFA, DMS of their milk

9    testing laboratories.  I guess that falls under the

10   category of "not at all."  My idea of third-party

11   handling of delegate elections, as we explained in our

12   document filed on the 23rd, was, shall we say,

13   emasculated.

14       With regards to negotiations, you may have gathered

15   things weren't going well in late June between our

16   counsel and ourselves.  We realized very quickly that

17   this proposed settlement was inadequate, unreasonable,

18   and unfair.  We dug in our heels on behalf of our class.

19       When your Honor denied preliminary approval

20   requesting the reasons for class representatives

21   unanimously opposing this proposed settlement -- excuse

22   me -- Mr. Brown contacted my wife to set up a conference

23   call for us to explain our issues.  We had just invested

24   so much of our precious early summertime in settlement

25   talks, which proved completely fruitless.

1          She said, "If the judge wants to know what our

2     objections are, we won't waste your time," referring to

3     counsel.  "We will give her," referring to your Honor,

4     "the purest document possible.  We will write it

5     ourselves."  We thought that would be the easiest way to

6     avoid the wordsmithing and editing that had been our

7     history with Mr. Pierson, who correctly states in his

8     declaration that Mr. Brown was our primary contact as

9     subclass representatives.  That was because we wanted to

10    fire Cohen Milstein if they didn't remove Mr. Pierson

11    who had -- up to that time, had been our primary

12    contact.

13         Anyway, Claudia told Ben, "We, the class reps" --

14    Mr. Brown, sorry -- "We, the class reps, will get

15    together and create a document.  We will send it to

16    Mr. Manitsky to file on our behalf."  Mr. Brown agreed

17    that that would be fine.  He assured us it would be

18    filed verbatim.

19         He also impressed upon Claudia that we need to get

20    this done right away.  I believe it was Friday he

21    called.  On Monday, July 14th, Richard Swantak, Ralph

22    and Garret Sitts, Claudia and I met at the Sitts' --

23    Sitts's farm.  Alice was present via speakerphone.  We

24    put together the document titled Class Representatives'

25    Opposition to Proposed Settlement.

1    Contrary to Mr. Brown's declaration, Miss Allen had
2    not wavered in her opposition to the settlement until
3    sometime after the 14th of July.  Fact is, Alice was an
4    active contributor.  She was particularly concerned that
5    we should share with the Court the following from our
6    document, and I quote:  Counsel apparently did not
7    inform the defendants either -- and this would be in
8    reference to the class representatives' unanimous
9    opposition.  And I go on with the quote:  Counsel
10   apparently did not inform the defendants either as DFA
11   remained confident enough about their agreement to
12   publish it as a finished matter to its membership on
13   Thursday, July 3rd, and on Farm Journal's ag website on
14   Tuesday, July 8th.
15       What happened to Alice Allen after July 15th is a
16   subject of speculation.  We overnight mailed our
17   document on the 15th.  It was received by Mr. Manitsky
18   at Gravel & Shea on the 16th.  It was filed with the
19   court on the 23rd *in camera*.  This was something we
20   strenuously objected to.
21       Our counsel claimed attorney work product and
22   attorney/client privilege.  Our understanding of
23   attorney/client privilege is that it is something the
24   client claims, not the attorney.  And in looking back,
25   or -- and there was some question at the time, even, if

1        contrary to our agreement, there was some attorney work

2        product, in the form of tampering with our document.

3              We, of course, despite our best efforts, were not

4        able to view the document that was submitted to the

5        court.  We were unable to confirm or dismiss our

6        suspicions.  I believe this is our filed copies of that

7        document.

8              Before diving into the nuts and bolts of the

9        proposed settlement, I note in the renewed motion for

10       preliminary approval a couple of items:  Number one,

11       counsel speaks of the proposed settlement being

12       beneficial in the light of timing.  We have discussed at

13       length how the financial compensation is -- is

14       functionally irrelevant.  I will explain how the same is

15       true for the alleged relief, although actually a lot of

16       that's already been covered -- excuse me -- as well.

17             Furthermore, I believe -- what I'd like to get at

18       is furthermore, I believe the threat of this legal

19       action hanging over the heads of DFA, DMS has a

20       beneficial effect on the farm.  Immediate closure of the

21       matter, especially in the form of a sellout to the

22       defendants, would remove the protection that the unknown

23       outcome of these proceedings provides to us.

24             Second point:  Also from the memorandum of law in

25       support of the renewed motion for preliminary approval,

1    it cites <u>Maywalt versus Parker & Parsley Petroleum</u>

2    <u>Company</u>.  In a pinnacle of arrogance, our esteemed

3    counsel quotes, "When a conflict arises between the

4    named plaintiffs and the rest of the class, the class

5    attorney must not allow decisions on behalf of the class

6    to rest exclusively with the named plaintiffs."

7         In the same motion they cite numerous cases and go

8    to great lengths to explain that they, as counsel, had a

9    right to negotiate for the class, a right we never

10   questioned.  Furthermore, there is no conflict between

11   the class and the class representatives.

12        All their arguments on these issues is the classic

13   case of complicating the obvious and trivializing the

14   momentous, the obvious being the conflict here is

15   between plaintiff counsel and the court they -- and the

16   class they purport to represent; the momentous being the

17   failure of said counsel to come up with anything

18   remotely resembling a fair, reasonable, or equitable

19   settlement.

20        Enough of the pleasantries.  Let's look at what the

21   settlement says, not what the lawyers say it says.  I

22   will try to summarize this fairly quickly, focusing on

23   the most salient points, and I will attempt to edit as

24   we go.  I hope that doesn't cause much hesitation.

25        The copy I am working with was apparently filed on

1    October 3rd, and the signature page is signed by

2    Mr. Pierson and Mr. Kuney on July 1st.

3         The first thing that I noticed was that on page

4    one, rather than defining the expansion of the complaint

5    in the definition section, it's tucked away right here.

6    We will revisit it when we get to the relief, but

7    they -- the definition of the complaint is not the

8    complaint, it's not the complaint and the amended

9    complaint, but it is the complaint and any other

10   pleading filed in this matter or any consolidated

11   matter.

12        And in the process of these declarations and

13   proceedings, I believe we have basically touched on

14   every -- every issue that is relevant to the dairy

15   industry.  So we are talking about all dairy industry

16   issues when we say "the complaint."

17        Section 1.5.  In this definition, section 1.5, it

18   refers here to the farmers who have not exercised a

19   right to be excluded by April 30th, 2013.  I will -- I

20   will revisit that.

21        Let me see if I will read -- some of these were

22   read, so I will try and spare -- but if I take as much

23   time to --

24             THE COURT:  Take as much time as you want.  We

25   have all day, and this is your opportunity.  So don't

1    worry about time.

2              JONATHAN HAAR:  Okay.  Well, thank you.  Thank

3    you.  I don't want to be overly redundant, is all.

4         Remember when reading the released claims we need

5    to keep in mind the expanded definition of the

6    complaint.  I basically went over that.

7         I notice it wasn't in the definition section.  I

8    thought that was a little unfair.  Released claims is

9    everything.  Release -- released parties is everybody,

10   their affiliates and their affiliates' affiliates.

11   Suffice to say -- we have been through these

12   definitions, so I guess I am comfortable with that.

13        Suffice to say, by the end of Section 1 we have set

14   up a scenario where everyone -- where anyone who has any

15   interest of any kind in the class members' farms --

16   including, obviously, the class members themselves -- is

17   absolving anyone who is in any way affiliated with the

18   defendants or affiliated, as I said, with the

19   defendants' affiliates.  Remembering the expanded

20   definition of the complaint, the issues at hand are

21   essentially any question that would have ever arisen in

22   the dairy industry.

23        So the defendants have requested eternal

24   absolution -- that's in Section 6.1 -- and -- all right.

25   I will move on there.

1          Section 3, notice to subclass.  I think Mrs. Haar
2     has that.
3          Section 4, I basically define the plaintiffs'
4     subclasses.
5          Section 4.2 just speaks about the fairness hearing.
6     Thank you.
7          The relative date of the agreement is ASAP.  I
8     apparently have some confusion here, and maybe you can
9     clear for me, are we talking about 30 months from the
10    date of this -- of, God forbid, the settlement, or are
11    we talking about the December 31st of 2016?
12               THE COURT:  The effective date?
13               JONATHAN HAAR:  No, the end of the settlement
14    period.
15               THE COURT:  I am going to allow the attorneys
16    to give their definition of it, because it's their
17    agreement, and I will note that is an issue that you
18    have and that needs to be decided as part of this
19    proceeding.
20               JONATHAN HAAR:  I was just a little confused
21    because this one, I believe, says the 31st of December,
22    2016.  But I have also heard said 30 months.  Whatever.
23    It's -- it's not of great consequence.
24         Release and covenant to sue (sic) is Section 6:
25    Upon the effective date, each of the releasing parties

1    shall have deemed -- shall deem to have and, by

2    operation of judgment, shall have fully, finally, and

3    forever released, relinquished, and discharged all

4    released claims -- Ralph actually read all of this, so I

5    will save it.

6        Section 6.1:  We, the class, are asked to forever

7    release -- we don't know exactly who, and we don't know

8    exactly from what.  I don't think this is reasonable.

9        Section 6.2 just drives the whole point home that

10   we -- we give it all up without even knowing exactly

11   what the "up" is.  With regards to the last sentence of

12   Section 6.2, Plaintiff subclasses acknowledge, and the

13   releasing parties deemed to have acknowledged, and by

14   operation of the judgment shall have acknowledged, that

15   the foregoing waiver was completely, separately --

16   was -- the foregoing waiver -- I'm sorry -- was

17   separately bargained for and a key element of the

18   settlement of which this release is a part.

19       Your Honor, with regards to what we mean as a

20   class, as this waiver is a key element of this

21   settlement, we are seeking denial of said settlement

22   with prejudice.

23       With regards to everyone but the attorneys, the

24   lawyers -- the money, rather, isn't really much worth

25   speaking about, and the reason being, it represents

1    approximately 1 percent of the average Order Farmer 1's
2    milk receipts.  I get this generous estimate by taking
3    the market administrator's daily average for the two
4    months -- I have -- I have two letters with me, and they
5    are from -- I think it's September, October, but they
6    are fall months, which milk production is typically
7    lower in the Northeast in the fall than in the summer,
8    but I will use that number.
9         I round that number down -- the market
10   administrator.  I round the number down to 5600 pounds
11   per day.  I divide that by a hundredweight to get a
12   hundred -- to get my hundredweights.  I divide it by a
13   hundred to get hundredweights, which is how we are paid.
14   I multiply that by $18.  Now, we have been averaging
15   well over $20 for the last two-plus years.  And I will
16   divide what the lawyers' very generous $4,000-per-farm
17   estimate.  And that gets me down to 1 percent of annual
18   gross milk receipts.  So we're talking about a one-time
19   payment equaling 1 percent of their milk receipts.
20        Now, this average farm, milk production averages a
21   little over 50 pounds per cow.  So if we take that
22   number, and we say 5600 pounds per day, we are looking
23   at basically a hundred-cow dairy.  That hundred-cow
24   dairy, in addition to milk receipts, has 50 bull cows
25   every year approximately, because your dairy herd is --

1   you are hoping to get your dairy to freshen on an annual

2   basis.  So there's some -- you know, obviously it's a

3   natural process, so there's some -- doesn't work like it

4   should in the textbook.

5        But, anyway, you have basically about a hundred

6   calves a year on a hundred-cow dairy.  And of those,

7   approximately half are usually bulls.  Sometimes that's

8   up or down.  But those are currently selling for over

9   $300 a head.  If you took $200 a head, you are looking

10  at, what, another -- I wrote -- I did the math --

11  another $10,000 to the bottom line.

12       Cows are also bringing in excess of a hundred

13  dollars -- a hundred pound -- I'm sorry.  Cows are also

14  bringing in excess of a thousand dollars a head.  So

15  let's say our dairy has a conservative cull rate of 25

16  percent, and let's say they only bring $800 a head.  My

17  last Holstein cull that I sent less than two weeks ago

18  brought $1200 a head, or she brought $1200.  So that

19  conservative estimate yields another $20,000.

20       This .1 percent does not take into account this

21  other $30,000, or the fact that if your cull rate's only

22  25 percent, you also have 25 heifer calves that you can

23  get rid of every year because you are replacing those 25

24  cows that you are pulling out.  It's a two-year time

25  span, but that's the way the math works.

1    So that's what we are looking at.  We are looking

2    at a one-time payment of 1 percent of your gross milk

3    receipts.

4        All right.  Now we are going to get into Section F,

5    which -- oh, no.  Monetary relief -- conduct elements,

6    I'm sorry.  Section -- it's Section 7.3, is the conduct

7    elements.

8        Now, over these conduct elements -- no, I will keep

9    going.  I'm sorry.  Conduct elements.  Monetary

10   relief -- I just went through the monetary relief.

11       Settling defendants, in terms of this agreement,

12   will not enter into any FSAs, new FSAs.  The younger

13   Mr. Haar established that it's not new FSAs that created

14   the problem.  So there's zero relief there.

15       Settling defendants agree, during the term of this

16   agreement, no new agreements for the supply of raw Grade

17   A milk or any renewal of existing agreements, not -- not

18   that there's none of them, but they shall be presented,

19   reviewed, and approved by the DFA board of directors

20   prior to DFA entering into, renewing such agreement,

21   presenting, reviewed, and approved by the DMS

22   board -- it's the same thing but DFA and DMS.  So it

23   repeats the comment that they will not enter into any of

24   those agreements.

25       This goes back to the negotiations.  I asked that

1   board members needed to participate in negotiations of

2   agreements.  In my third declaration, which was filed on

3   August 9th of 2013, I state in the DFA newsletters --

4   newsletter, member update that I received, I am

5   repeatedly told by the board of directors -- or told

6   that the board of directors has received, they have

7   reviewed, they have approved.

8       Never in my now-14-year tenure with DFA do I

9   remember the board initiating, recommending, requesting,

10  suggesting, or refusing any actions itself.  The board

11  of directors has not and will not direct the management.

12      Settling defendants -- Section (c).  Settling

13  defendants agree that they will, upon written request of

14  any of their respected members who are located in

15  Order 1, disclose a summary of the terms of agreements.

16  This disclosure shall state whether the agreement is a

17  full-supply agreement, the duration of the agreement, or

18  any other material provision, provided its disclosure is

19  permitted by the terms of said agreement.

20      Section (c) sounds like maybe we are going to get

21  something here.  But a little closer look reveals,

22  number one, the overcommitted farmer needs to write in,

23  and the boss knows you are writing to ask about the

24  boss.  Number two, he or she will get a summary, which,

25  of course, to summarize we need to edit.

1        Number three, said farmer can only do this for the
2    next 23 months if it's -- and I will just state this in
3    terms of the 31st of 2016 -- December 31st, 2016.  So I
4    will just use the -- that's what I was working with.  If
5    it's 30 months, then we need to adjust that, but -- for
6    the next 23 months, during which time whatever
7    information the farmer gets -- and Alice spoke to the
8    opportunity to get information -- we can't act upon.
9    It's unactionable.  We gave that away.
10       Fourth and finally, the last sentence provides the
11   combine-size loophole:  Provided its disclosure is
12   permitted in said agreement.  Section (c), no
13   transparency, no relief.
14       Section (d).  Settling defendants agree any
15   cooperative member, affiliate, associate in Order 1 may,
16   during the term of this agreement, terminate its
17   relationship upon no more than 90 days without written
18   notice.
19       I will use my 23 months, minus the three months,
20   the 90 days, if the market share and -- the market share
21   and FSS are not addressed, you have 20 months to find a
22   new career.  We haven't affected any of the key players
23   in any way, Rick Smith at his own word.
24       (e).  Settling defendants agree not to oppose a
25   request by subclass counsel to unseal and release

1    materials submitted to the court.  In connection with

2    the plaintiffs' motion for certification of

3    subclasses -- that's court docket number 388 -- and

4    defendants' motions for summary judgment, court docket

5    number 479 -- to the extent that the disclosure of such

6    documents is not prohibited by settling defendants'

7    obligations to third parties.

8         A couple things jump out with regards to (e).  Why

9    just stuff in connection with the two dockets?  How

10   about the whole record?  This looks patently unfair

11   compared to the exhaustive release.  The last sentence

12   effectively negates our efforts at disclosure anyway,

13   that being obligations to third parties.  It is very

14   easy to look for obligations to third parties.

15        Section (f).  Okay.  All of these next sections

16   need to be considered under the umbrella of fact that

17   most of these conduct -- that cover most of these

18   conduct elements, that being, number one, we are asking

19   them -- DFA, DMS -- to review and act -- I think Joshua

20   used this already -- that DFA, DMS to review and act on

21   policies they have already renewed and acted upon and

22   that they have already implemented these policies, and

23   the Northeast Dairy Council is under no obligation,

24   based on this settlement, to change anything.

25        So they are going to look at members' milk checks,

1    and if they feel in the mood -- Joshua had read the

2    Ernst & Young disclaimer.  I just wanted to mention to

3    the Court that that was from our DFA -- I think it's a

4    financial -- year-end financial statement they had

5    printed that disclosure in there.

6         It will disclose -- actually, Joshua covered this.

7    Disclosing the members, the identity of members of the

8    board of directors.  I guess -- I guess this will --

9    this would be a change if they -- if they talked about

10   their committees and checked their per diem rate.

11        Thanks.

12        DFA will post on its secure member website -- this

13   is Section (ii).  This is all under -- I think it's

14   conduct elements.

15        (ii).  DFA will post on its secure, members-only

16   website, myDFA, an annual disclosure of all material

17   related-party transactions, other than the sales or

18   purchases of raw milk to or from affiliates,

19   specifically broken out and identified per transaction,

20   not aggregated, with the definition of "material,"

21   "materiality" as involving an amount of $120,000 or

22   more.

23        (iii) also -- or Section (ii) here also equals no

24   transparency; three $100,000 transactions equals a

25   $300,000 transaction, but they're all still under

1    120,000.  They are not going to aggregate.  There's no
2    transparency here.  And if you did find something out,
3    you still can't act on it.
4        DFA board members and senior executive management
5    will continue to execute annual conflict of interest --
6    why is this in here?  This is something they do already.
7    How can we be selling our rights and our opportunity to
8    carry this to something reasonable, fair, whether it's
9    settlement or trial?  They just put in here things that
10   they already do and expect us to thank them for it.
11       In addition, it's all subject to their whim.
12       Okay.  Section (iv), (g):  DFA will disclose to
13   delegates at DFA's annual meeting financial information
14   which shall include materially party -- shall include
15   material related-party transactions as defined in 7(ii).
16       So that's the first loophole, that you can easily
17   negotiate your contracts to be below the material
18   number.
19       They are not going to aggregate.  That's the same.
20       With the definition of "material" -- oh, this is a
21   little different -- includes -- the definition including
22   a transaction of more than $5 million, excluding the
23   sales or purchases of raw milk from affiliates.
24       We're in the milk business.  This is what DFA and
25   DMS are doing.  This is the source of the -- this is the

1    source of the damages.  How -- we are not talking about

2    the milk business, why talk?  There's nothing there.

3        Number (v).  DFA auditors shall be selected from

4    one of the nationally recognized accounting --

5    accounting firms.  They already do that.  So again, it's

6    here, and they already do that.

7        DFA and senior management and audit committee of

8    DFA board will affirmatively represent that they are

9    responsible for the preparation, integrity, and accuracy

10   of DFA's annual financial report.

11       Again, we give away the right to do anything about

12   their behavior.

13       All right.  This is Section (j).  In my particular

14   copy, which I say apparently was filed, this (j) is

15   special because it comes before (h).  But -- DFA's

16   Northeast Area Council will undertake a careful review

17   as to whether changes are warranted in the election of

18   area council members and delegates -- I will share

19   something with regard to this a little further down --

20   if the Northeast Area Council so recommends such changes

21   will be implemented.

22       (h).  Compliance with the terms of the settlement

23   agreement will be monitored by the audit committee.

24   There will be two independent advisors.

25       Now, advisors don't know -- don't vote, and they

1    have no power.  And, in addition, I actually thought

2    this might have something to do with my -- with my

3    request for the board members to be present at

4    negotiations for contracts for the purchase and sale of

5    raw milk, but then I saw it was cut and pasted from the

6    Southeast.

7         On the advisors will have expertise -- oh, and they

8    are currently free from any other relationship with DFA.

9    Is that for the term of the settlement?  Are these

10   future players?  Are they former players?  And they are

11   going to report their views to the delegates at the DFA

12   annual meeting.  I was -- well, I already shared about

13   Mr. Davitt complaining about the annual meeting

14   delegates don't vote on milk policy issues.

15        Okay, (i) was the -- we discussed already about

16   the -- I guess Ralph read the -- the antidiscrimination

17   clause, that they are not going to discriminate against

18   us for standing here and telling our story.  Is this for

19   the term of the agreement, or is this forever, as the

20   release is, forever and ever, amen?  And how does it

21   work?

22        They take -- they take my milk.  They tested my

23   milk.  I say it was good; they say it was bad.  How do

24   I -- it's my word against theirs.  The milk's gone.

25   What's my recourse?  There's no -- there's nothing here

1    to protect me or defend me in any way from what -- I
2    mean, I am not a lawyer, but it seems to me that
3    there's -- there's nothing binding in any of this.
4    There's no punitive terms or anything.
5         (j).  This is the real (j):  Settling defendants
6    shall not enter or maintain any agreement or
7    understanding, written or unwritten, with any
8    cooperative that limits or restricts any form of
9    solicitation of milk supplies from dairy farmers,
10   including, but not limited to, any agreement that
11   restricts contacting or approaching dairy farmers to
12   offer more favorable financial terms, services, or other
13   terms or conditions.
14        Again, there's absolutely nothing binding here.
15   They have been doing this.  They knew they shouldn't be
16   doing it, as evidenced by the -- the Rick Smith comment
17   that has been shared with this Court before.  And is
18   this for the -- I assume this is only for the term of
19   the agreement.  This is not binding forever, like our
20   release is binding forever.
21        Settling defendants will have and maintain an
22   ongoing antitrust compliance program.
23        They violated this.  This was a subject that --
24   although unactionable by this Court, Mr. Pierson went to
25   great lengths to explain to the Court the defendants'

```
 1    violation of the consent decree in DFA antitrust
 2    compliance guidelines and their core policies.  This
 3    equals no change.  They do it already.
 4         And so we are on to the settlement fund.  I think
 5    we have -- I think I have got that.
 6         Okay.  Opt-outs.  I will -- I will look at
 7    opt-outs.
 8         I have spoken to several farmers who are engaged in
 9    legal proceedings or contemplating legal proceedings.
10    The original opt-out paperwork, I suppose, was sent
11    sometime prior to April 30th, 2013.  That's almost two
12    years ago.  When our distinguished counsel discussed
13    damages, they don't consider the damages these other
14    actions by class members may be seeking.
15         Some may have been started after the opt-out notice
16    was sent.  That was the case for Mr. Vaughn Sherman.  He
17    is out of -- out of Ithaca, New York.  He is the largest
18    organic producer east of the Mississippi, I am told.
19    Two years ago when he had the option to opt out, the
20    notice would have been an irrelevant piece of mail sent
21    to a member of this class who probably works 80 hours a
22    week.  Is this fair?  To steal away we don't know how --
23    how many legal actions from this class?
24         Remember, the expanded definition of the -- of the
25    complaint now covers every possible issue, essentially
```

1    every possible issue.  This is a sweetheart deal for the

2    defendants.  But it is patently unfair to these absent

3    class members, in particular.

4         Final point with regards to the settlement:  The

5    areas that are left to DFA's discretion need to be

6    considered in the light of who we are dealing with.

7    First, according to the Southeast area farmers I spoke

8    with, the recent settlement did not really solve any

9    problems and did not improve transparency.

10        One gentleman I spoke with was explaining -- he had

11   not actually been able to keep up with checking the

12   percentage of Order 1 milk, but he didn't think that

13   they made a fundamental change in that.  I don't know if

14   you are familiar with how in the Southeast they actually

15   took some money, and I believe it was $9 million, for a

16   couple of years and held it in escrow upon the fact that

17   if DFA did not follow through on their commitment to

18   redirect milk, to change the blending price -- because

19   the Southeast is traditionally a milk-deficient area,

20   and so typically the higher-value milk, the Order 1

21   milk, would be consumed locally.

22        But apparently -- and I really don't know a lot of

23   the ins and outs, but apparently the milk had been being

24   rediverted to change the Southeast-area blend price.

25   Well, this farmer's impression was -- and by the way,

1    most of these people asked me not to use their names.

2    Where I could, I did, but for the reasons that I trust

3    you are gathering, a lot of people are concerned.

4        He said that DFA is just going to take the

5    $9 million and distribute it to the class -- it's not

6    their money -- and then they can do what they have been

7    doing and it will just be easier for them to just make

8    their cost-of-doing-business payment.

9        I am not sure if this was the same gentleman or

10   another one, talked about recent upset victory,

11   Southeast Area Council.  DFA approached the farmer who

12   had won and explained that if he bumped the man who he

13   had beaten, that his area would lose its representation

14   on the corporate board.  Apparently the gentleman who

15   was the Southeast Area Council board member was also on

16   the corporate board.  And I am not that familiar with

17   the bylaws, but I am assuming, based on the comment,

18   that if you are not on a council, you can't be on the

19   board.

20       And so he was -- whatever -- whatever the case,

21   however that was explained, the bottom line was the

22   winner was convinced not to take his place on the

23   council.  DFA then removed one council seat in the area

24   to consolidate the power of this one person and then

25   voted to extend their terms from two years to three

1    years.  So much for grass roots representation.

2         This organization is not member-run.  And this

3    proposed settlement is inadequate to cause any change in

4    that.  DFA cheats.  I just explained that.

5         Another example:  Rick Smith was -- an agreement

6    was reached with Rick Smith, the -- Rick Smith -- I

7    assume you are familiar with Rick Smith -- with

8    scheduled meetings across the -- I don't know his title

9    at the moment -- across the Southeast.

10        Apparently Mr. Higgins and Mr. Foy were supposed to

11   be at the one that was scheduled for July 11th, 2013, at

12   the Best Western Hotel on Morland Drive in Statesville,

13   North Carolina.  They didn't make it, which is just as

14   well because the hotel was closed for renovations.

15        But if you went past the "closed" sign, you'd find

16   there was a meeting going on, two guest rooms with a

17   partition removed, to quote the farmer I spoke with,

18   without air conditioning, July in North Carolina.

19        A man was setting up video equipment.  Rick Smith

20   showed up late and complained about being videotaped.

21   He said, "Not that I really care, it's just unusual."

22   He gave his, to quote the farmer again, canned speech,

23   and left.  The farmer I spoke with then went and asked

24   the cameraman, who was packing up, "Who paid you?  Why

25   are you here?"  He said, "Oh" -- the cameraman said,

1    "The guy who spoke hired me.  It was a last-minute

2    thing.  His secretary called last night."

3         Another Southeast area farmer I spoke with was a

4    DFA delegate, explained -- he learned about the rule --

5    that was the one that, again, the younger Mr. Haar

6    shared about the -- they apparently had a rule change

7    where you can't just go to your council meeting, as an

8    owner.  You need to make an appointment, you can state

9    your case, and then, to quote this guy, you can leave.

10   You can vent and leave.  That's what he said.  And they

11   will close the door behind you and have their meeting,

12   close quotes.  The farmer told me, this is Rick Smith's

13   idea of transparency.  DFA lies.

14        A little closer to home, I have a letter dated --

15   and unfortunately I missed the tutorial about the -- how

16   to use the -- earlier, but I have a letter dated May

17   4th, 2012.  Originally I was just going to hit some high

18   marks, but I would like to read the whole thing, and

19   it's fairly short:

20        "Dear Producer:

21        "The United States has been showing significant

22   increases in milk production, particularly since

23   January.  The average production year to date has

24   grown" -- "has been in excess of 4 percent, which has

25   not occurred in many years.  U.S. can normally grow at a

1   rate of 1 and a half to 2 percent and see that rate of

2   increase absorbed through normal sales growth.  Growth

3   beyond these rates, which we are now experiencing, put

4   downward pressure on" -- "on our price.

5       "Unless there is extraordinary growth and demand,

6   the difference between 1 and a half and 2 percent and 4

7   percent, and the early" -- "and the early flush due to

8   the mild winter, have placed a significant burden on

9   milk for balancing."

10      The "flush" refers to the cows being turned out on

11  grass in the spring and actually even longer days

12  contribute to more milk.  Maybe they don't like this

13  weather.  I don't know.

14      "The stress on balancing is not unique to our area

15  but similar to other parts of the United States.  For

16  example, in California, some farms have produced milk

17  made over a certain base level are going to be charged

18  10 cents per hundredweight for balancing cost.

19  Other groups in the mideast, in Ohio, Michigan area, had

20  to dump milk because it had no place to go.  In

21  Michigan, Indiana area, farms paid 80 cents plus in

22  March for balancing and will probably do so again in

23  April.

24      "Three or four other cooperatives west of the

25  Mississippi have implemented base excess plans.  We

1   believe those plans are inappropriate for our geography

2   based on the fact that there's significant process plant

3   expansion underway.  We will need all the extra milk we

4   have plus some within 12 to 36 months."

5       We just said the area is different, and this is a

6   high-level, high-paid DFA -- or this is DMS -- I'm

7   sorry -- DMS officer.

8       And the next sentence starts, "Here in the

9   Northeast, it's no different."  I thought he just said

10  it was different, but anyway.  "Our plants are brimming

11  full of milk, which is higher than normal for this time

12  of year.  Normally extra milk will be balanced in

13  the range of 2.50 per hundredweight below our regular

14  pricing.  This year, that cost is approximating $6 per

15  hundredweight below our regular pricing.  These costs

16  are clearly way above the normal costs we handle

17  throughout the year.

18      "In light of where we are, we will be making

19  premium adjustments to address the costs associated with

20  balancing.  We will continue to seek all avenues to

21  reduce our balancing costs and keep marketing costs

22  down.

23      "Sincerely, Sharad Mathur."  He is the chief

24  operating officer of Dairy Marketing Services, LLC, and

25  that's May 4th, 2012.

1           This all sounds reasonable, and if you were an

2    Order 1 farmer from anywhere but central New York, you

3    might believe it.  But I live five miles up New York

4    State route from the Chobani plant.  I would actually

5    like to digress on that a little because, having reread

6    this -- and just last night I thought, it sounds a lot

7    to me like fear-driven extortion.

8           They're dumping milk in the Midwest, pouring your

9    product down the drain.  What if we can't find a home

10   for your milk?  Don't worry.  You just give us your 10

11   cents and be quiet -- it actually was 30 cents per

12   hundredweight.  They ended up charging us for about five

13   months -- it was for several months, at least, that

14   spring.

15          So, he's talking about how there's so much milk.  I

16   live five miles up New York's State Route 8 from the

17   Chobani plant, Chobani yogurt thing, in South Edmeston.

18   I know many people who work there.  At the time of this

19   letter, the Chobani plant was experiencing explosive

20   growth.  We work on both sides of Route 8.  We saw the

21   trucks coming and going incessantly.  Hamdi Ulukaya, the

22   founder of Chobani yogurt, was looking for 90 to a

23   hundred loads of milk per day.  DMS could not or would

24   not come up with enough milk for him.

25          Not finding enough milk in our area was one of his

1    primary reasons for moving much of his operation to

2    Idaho.   So I'm talking to my neighbors who work for

3    Hamdi Ulukaya, and they are saying, "Ah, we can't get

4    enough milk," and I am getting a letter from the chief

5    operating officer of LL -- of DMS telling me, "We gotta

6    charge you 30 cents to balance this month."   DFA lies.

7         A little more recently, little more recently:

8         I have here a letter from Mr. Brad Keating dated

9    October 25th, 2014, in which he states -- and I won't

10   read this whole one -- "Back in July we communicated to

11   you about the conditions and circumstances we're facing

12   in the marketing area:   the need to implement and make

13   the market adjustment on the check to help defray and

14   recover the costs of milk and the need to implement the

15   market adjustment on the check to help defray and

16   recover the costs of milk balancing."

17        It says, dealing with the same issues, "We are now

18   experiencing increased milk production in the region."

19   October 25th, 2014.

20        I have the milk marketing administrator's letter

21   here dated September 2014.   We received this after the

22   month.   It's reporting on the facts of September.   Milk

23   market administrator shows here pooled milk receipts

24   total 2.072 billion pounds, a decrease of 2.1 percent

25   from last month on an average daily basis.

1    Somebody is either wrong or lying.  Well, maybe

2    not.  Let's just say he is quicker than the market

3    administrator and give -- give him the benefit of the

4    doubt.  Maybe he is informed by more recent data.  Well,

5    the October newsletter, which came out in November,

6    states pooled milk receipts did increase .1 percent from

7    last month.

8    So after two months in which the -- in the middle

9    of which Mr. Keating said milk production is rising, we

10   are still at a net loss from August of 2 percent.  We

11   have been told all summer long that there's too much

12   milk; they are dumping milk.  There's too much milk;

13   they are dumping milk.  And we have also been paid

14   record high prices.

15   I am saying to everybody -- excuse me -- who tells

16   me there's too much milk and they're dumping it, if

17   there's too much milk and they are dumping it, how come

18   we are not getting $16 or $14 a hundredweight?  You are

19   getting record high prices, and we are being told that

20   there's too much milk.  Got that skeptical stripe --

21   strip, I guess.  I say, "Show me."  You know, "Show me."

22   I have a neighbor of mine whose cousin is a milk

23   truck driver, telling me, "Oh, Christmas they had to

24   dump the milk."  I said, "Your cousin, he drives a

25   truck, did he open the valve?"

1         "Well, no, they put it in the silo at the milk

2     plant."

3         And of course they stripped the value.  They -- I

4     don't know.  Perhaps they are dumping water after they

5     get out all the protein and fat.  But they're not

6     dumping milk, and it's illusionary to -- it's deceptive

7     to tell us, and they are our fiduciaries, and they are

8     telling us that they are dumping milk.  And in the

9     meantime, they have been hitting us up for 50 cents a

10    hundredweight.  Contrary to Mr. Keating's assertion, he

11    has been charging 50 cents a hundred pounds of milk

12    since October.  It was 15 cents a hundredweight since

13    July.

14        Assuming -- you can do a little math again.

15    Assuming 60 percent market share -- which is

16    conservative; in my neighborhood, it's, I'm sure, over

17    90, at least closer to 90 -- of approximately 2 billion

18    pounds in the order, one point -- that would be 1.2

19    billion pounds, forgetting the 15 cents from July

20    through -- through, I think it was October they

21    started -- this is ongoing right now.

22        So forgetting that, let's just look at the 50-cent

23    market adjustments, four months.  We have 1.2 billion

24    pounds divided by the hundredweight.  It's 12 million

25    hundredweights times -- is $6 million a month times four

1     months so far.  That's $24 million this fall, in this

2     order, because Mr. Keating says milk production is going

3     up.

4          All to say, these people who are claiming to

5     represent us as our co-op leaders and are assuring us

6     they will review and consider making changes?  Well,

7     they won't.  They will use every loophole, and there are

8     many in this inadequate, unfair, and unreasonable

9     proposed settlement.  The fact is, the arbitrary nature

10    of much of the relief combined with the vast loopholes

11    and brief period of opportunity to take action, coupled

12    with the expansive relief which moves our -- which

13    removes all our risk going forward -- oh, I'm sorry.

14    Let me start that over.

15         The fact is in the -- the arbitrary nature of much

16    of the relief, combined with the vast loopholes and

17    brief period of opportunity to take action, coupled with

18    the expansive release, removes all of our risk going

19    forward.  This proposed settlement gives away so much

20    and guts so little that we would be better off as a

21    class going to trial and losing, for at least the

22    defendants would not be able to get the release.  We

23    would lose 1 percent of one year's gross milk receipts,

24    but they would not get their release.

25         Contradict the proposed failure of relief with the

1    following:  Recognizing DFA is a farmer-financed

2    international milk-processing corporation.  Gone is

3    Capper-Volstead protection.  Gone is DMS.  Gone is

4    GNEMMA. But these become recognized as tools of the milk

5    mafia, which is, in fact, what they are.  That would

6    equal release.

7        My final subject:  There has been filed with this

8    court a letter opposing settlement.  I have the

9    unparalleled honor of speaking with the author, Maryanne

10    Miller.  She said she'd like this case to go to trial.

11        She also questioned the class definition of

12    Order 1.  She's always pooled in Order 1.  The market

13    administrator considers her an Order 1 producer.

14    Apparently, and I will put this in quotes, Professor

15    Rausser says it's possible that the unregulated areas

16    adjoining Order 1 are part of the relevant market, and

17    that's part of your opening comments from -- from the

18    class certification hearing on September 26th.

19        I had asked for and never received an answer from

20    my counsel, satisfactory or otherwise, as to why, after

21    the initial Dean settlement talks and after mediation,

22    the definition of the class was changed, excluding named

23    plaintiffs, Donna Hall and Vince Neville.  And I don't

24    know how many other farmers.

25        With regards to the primary reason, however, that I

1    speak of Maryanne Miller, her location is irrelevant.  I

2    speak of her because the actions and attitudes she

3    demonstrates are typical to this class.

4        What she did not mention in her letter is that she

5    and her sisters are the only ones working their

6    third-generation farm.  Maryanne is 65.  Her sister is

7    69.  Her sister should have had her knees replaced back

8    in 1999, but she won't do it, Maryanne says.  She has to

9    stand bending over in order to milk the cows.

10       The neighbors tell them they should switch to beef,

11   but she says, "We've always milked cows."  My

12   grandfather milked cows here until he died in his 90s.

13   Her father did the same.  He has been dead 11 years.

14   She says, "When my sister and I come in for supper,

15   about 10 o'clock," after she sets a while, takes a while

16   for her to get up.  But she says she just has to keep

17   moving, keep fighting.

18       Maryanne writes, "I strongly object to this

19   settlement, and I only wish I could attend this hearing.

20   Due to a full farm schedule which I have endured for the

21   past 45 years, it is not possible for me to attend."

22   When I consider these good women, in that old barn,

23   amongst their cows, bringing forth food to feed this

24   nation, and I think of the great honor I have to

25   represent them here, and I think of how these poor,

1    pathetic lawyers would sell their opportunity to

2    represent these good women and, worse, they would sell

3    these women out for a measly $800 an hour, your Honor,

4    we are fighting for more than $800 an hour here.  We are

5    fighting for the truth.

6        And at the end of the day, the truth matters.  The

7    truth is, this is a betrayal.  This is not a settlement.

8    My only question for my counsel is what more could you

9    have given away.

10       Your Honor, please do not join DFA and the

11   plaintiff counsel in our betrayal.  Thank you.

12            THE COURT:  Thank you.

13       We are going to take our lunch break at this time,

14   and we will come back at one, hear from anybody else who

15   wants to speak.  As I noted, I have some questions for

16   the attorneys, and we will hear from them.

17       Anything to bring to my attention before we take

18   our lunch break?

19            MR. PIERSON:  No, your Honor.

20            THE COURT:  All right.  Thank you.

21   (Court was in recess at 12:07 p.m.)

22   (The following was held in open court at 1:05 p.m.)

23            THE COURT:  We are back on the record in Alice

24   Allen, et al., versus Dairy Farmers of America, et al.,

25   and we are in our fairness hearing.

1           Did anybody else want to speak?

2                CLAUDIA HAAR:  My name is Claudia Haar.

3     That's H-a-a-r.  And I am also a class representative.

4     Thank you for your patience.

5           As I speak, I am going to be referring to Mr. Haar

6     as "Jonathan," just so that there's clarity between him

7     and my son Joshua, rather than saying Mr. Haar, Sr., and

8     Mr. Haar, Jr.

9           Also, I want to offer to the Court my deepest

10    apologies because I did not type Mr. Haar's speech.  So

11    it might be a little challenging for the reporter to be

12    able to decipher it.  After 30 years, I still have a

13    hard time, so I had to get --

14               THE COURT:  Well, I had an easy time hearing

15    him, so don't worry about it.

16               CLAUDIA HAAR:  Okay.  Good.  Well, because his

17    writing is the part that -- that I'm sorry to say I

18    didn't take care of.

19          It is a privilege to speak directly to the Court

20    today for several reasons.  First, it is a great

21    privilege to be the voice for fellow farmers who are

22    afraid to openly oppose this so-called settlement.

23          Second, as a class representative for the last four

24    and a half years, there have been times during these

25    proceedings when I have been exceedingly frustrated with

1    our lack of representation, and I believe a farmer's

2    perspective would have given clarity to our case and

3    answers your Honor's questions.

4         Third, my husband and I, as dairy farmers, have

5    personally experienced some of the illegal behaviors of

6    DFA, DMS.

7         Lastly, I have the perspective, as do the other

8    class representatives, of one having seen the unredacted

9    complaint and all of the allegations in its entirety.

10        Your Honor, I now direct your attention to

11   Exhibit A, which everyone has.  Please allow me to read

12   some portions of this e-mail Ralph and Garret Sitts,

13   Richard Swantak, and Jonathan and I sent to our

14   attorneys after this Court denied the initial

15   preliminary approval of this proposed settlement.

16        "In the unfortunate circumstance that your renewed

17   motion would succeed in bringing about a fairness

18   hearing, this would result in class counsel and

19   defendants arguing together against class

20   representatives in favor of a settlement which provides

21   absolution for defendants, millions for class counsel,

22   and pennies for the farmers you signed on to represent.

23   This would demonstrate to the Court the collusive nature

24   of this settlement.  Let's avoid that situation."

25        We then offer a suggestion, and closed with "Your

1    friends and fellow litigants."

2         Our suggestion was ignored.  When betrayal set in

3    and it was clear that the last thread of trust we placed

4    in counsel was met with disdain, we, as class

5    fiduciaries, knew we all had to speak on behalf of the

6    12,000 farming families we agreed to represent.  I know

7    we have heard that there are only 9,000 dairy farms in

8    Order 1, however the market administrator reports over

9    12,000.

10        Just because our dairy farmers in the Amish

11   community did not file claims in the Dean settlement

12   does not mean that they should not be counted.  They

13   suffer from the oppressive monopsony, as do we all.  I

14   am friends with many in our local Amish group.  They are

15   always interested in the status of this case and ask

16   about these proceedings.  They greatly appreciate your

17   diligence as guardian of this class.

18        Your Honor, with your permission, I would like to

19   first address farmers' concerns about the settlement

20   notification itself, the packet, and then I will get to

21   the settlement.

22        There are a variety of farmer experiences woven in

23   to help illustrate the points.  I am trying to keep it

24   brief, but there is a lot of material, and I think you

25   should be made aware of it.

1    With regard to the settlement notification, here is
2  what farmers have told us:  Some had not received a
3  packet, simply a notice that they would be receiving
4  one.  They were not aware that there was an opportunity
5  to oppose the settlement.
6    Those that did receive a settlement packet wanted
7  to know why the actual settlement itself was not
8  included in it for them to read.  I tried to explain
9  it's probably not usually procedural.  They were not
10  interested in that excuse.  Many farmers do not own a
11  computer or do not know how to operate one.  The average
12  age of dairy farmers -- I believe Mr. Swantak said
13  this -- is 57 years old.  That's not to say that you
14  can't learn things, but they don't need a computer in
15  their everyday work, so learning to use one has not been
16  a priority.  And with the immense implications with the
17  settlement, they just felt that it should have been
18  included right there in a hard copy for them to read.
19    Also, the Amish avoid this type of technology
20  altogether, so it's very difficult for them to be able
21  to get the settlement.  Even if they were not going to
22  claim, they still would have had an opportunity to read
23  it and perhaps send in letters, like some of the Amish
24  community did.
25    Being that the packet was sent out using -- using

1    our money through the proposed settlement fund, farmers

2    wanted a hard copy, which would be more useful to them,

3    especially to read the release of what they would be

4    giving up.

5        Number three.  Most farmers are fearful to openly

6    oppose this proposed settlement.  I spent a little time

7    on this, so I will try not to get too lost.  They told

8    us that to send a copy of a letter in opposition to this

9    proposed settlement to DFA, DMS defendants, which is

10   what was part of the process, would be to send a letter

11   of complaint about your boss to your boss.  They feared

12   possible repercussions, which some had already

13   experienced, just for questioning our so-called

14   cooperative.

15       Your Honor, please allow me to explain how dairy

16   farmers are compensated for their work, to better

17   illustrate our predicament.  I know we have heard a lot

18   about PI count of bacteria and all these different

19   things, but having a teaching background, I thought it

20   would be helpful to actually -- let's look at these

21   things, what is your milk analysis, and that's what I am

22   going to be doing.  Forgive me if you are already

23   familiar with these items.

24       So to do so, I would like to show you a copy of a

25   milk analysis sheet, which every dairy farmer receives

1    on a monthly basis, and then a corresponding paycheck

2    for the same period so that you would be able to see,

3    okay, this is what your -- the consistency of -- what

4    makes up your milk and then this is how you are being

5    compensated.

6         Okay.  So please refer to Exhibit B while I attempt

7    to use this machine.

8              THE COURT:  You say "this machine."  It's easy

9    enough for a judge to use, so --

10             CLAUDIA HAAR:  I love when you say that.  I

11   have used that phrase at home with my own children,

12   "Easy enough even Mom knows how to do it."

13             THE COURT:  Okay.

14             CLAUDIA HAAR:  Okay.

15             (Brief pause.)

16             CLAUDIA HAAR:  Technical difficulties.  Please

17   stand by.

18             (Brief pause.)

19             CLAUDIA HAAR:  As you can see, what you are

20   looking at is the front side of our butterfat protein

21   OS, which is other solids, results from December, but I

22   am jumping ahead.

23        At present time, DFA, DMS analyzes or -- we call it

24   tests our milk.  This, in itself, I would say, is a

25   questionable business practice.  Any other industry

1    dealing in weights and measures is externally regulated

2    by government agencies.  For example, it's not

3    appropriate for gas stations to calibrate their own gas

4    pumps being that their measure is used in the

5    calculation of the purchase of fuel.  This is why we see

6    a seal from the state on gas pumps verifying that they

7    have been inspected and that they are -- have integrity

8    with regards to what they are measuring.

9         So the fact that DFA, DMS measure -- measures the

10   quality of our milk and our components, that's why I am

11   trying to emphasize that this is a very serious matter,

12   and it's questionable because they are the ones who are

13   going to be compensating you.

14        So farmers are primarily interested in butterfat

15   and protein levels in their milk because these

16   components make up the largest portion of our

17   compensation, as we will see when we look at the milk

18   check.

19        So I am just going to point this out here.  Okay.

20   On the left here, I am pointing to the dates.  Actually,

21   you can see that date, all the way down.  This is for

22   December.

23        Your next column, moving to the right, it says

24   "Bfat" is butterfat.  So that's your percentages.  You

25   hear about two percent milk people buy?  And that sounds

1    like it's really low.  Well, probably the most is going

2    to be five percent, so it's not -- it's not too -- too

3    different.

4         The next one is your protein levels.  The next one

5    is your other solids that are in the milk.  And the

6    MUN -- I don't remember what that one is about, but they

7    don't -- oh, no, I'm sorry, the milk, urea and nitrogen.

8         Okay.  Now I am going to move this up, and you can

9    see the top chart -- it's a little bit confusing.  The

10   butterfat is, I believe, the solid bars, and the other

11   solids are on the top.  Mr. Haar didn't explain this to

12   me, but I am a little nervous.  Anyway, the main thing

13   that I want you to see is that farmers are concerned

14   with their butterfat and protein levels.

15        Okay.  So if a farmer starts feeding his cows extra

16   corn silage due to an overabundant harvest, then he

17   should see an increase in his butterfat because that

18   corn is going to be stored as energy, so the fat should

19   go up.

20        However, this was not the case with a fellow dairy

21   farmer who spoke to me.  He was suspect that DFA's milk

22   test was not accurate.  He called his field

23   representative to come out and test his milk under the

24   guise of checking the PI count, which I will explain the

25   PI count.

1          When the field rep arrived and took the sample, he

2    asked the farmer, "What test did you want me to run?"

3          "Why don't you just run 'em all," the farmer

4    replied.

5          When the test came back, the butterfat component

6    was 4.1 percent.  Later that day, the milk truck came to

7    pick up the farmer's milk, and like I said before, every

8    time the milk truck comes, an individual sample is taken

9    of that farmer's tank.  So of course he took the usual

10   sample.  That test showed up that the butterfat

11   component was only 3.5 percent.

12         Now I realize 3.5 percent, 4.1, doesn't seem like a

13   big difference, but when we look at the paycheck, that's

14   where the rubber meets the road.  The sample the truck

15   driver takes is the one that's used to determine the

16   farmer's pay price.  This farmer had to argue with our,

17   quote, cooperative to be reimbursed for some of his lost

18   revenue.

19         Okay.  So now I am going to put up Exhibit C.  This

20   is the other side of the milk quality test.  So the one

21   side you have your components of your fat protein, other

22   solids.  On the other side, you have your quality.

23   Okay.  So let's walk through this.

24              THE COURT:  So just a minute.

25              CLAUDIA HAAR:  Sure.

```
 1              THE COURT:  No emergency.  We are just fixing
 2     the monitors for people who can't see them.
 3              CLAUDIA HAAR:  Oh, okay.
 4              THE COURT:  Okay.  Keep going, please.
 5              CLAUDIA HAAR:  Sure.  Thank you.
 6         On this exhibit we see -- and I apologize.  I had
 7     to write at the top.  I didn't get to do fancy sheets,
 8     but we had baby lambs and they were in the house, which
 9     was distracting.
10         Okay, on the far left we have the date here, and
11     then our first column, this shows a supposed quality
12     test result.  The first column to the right of the date
13     column is titled "PLC/PAC/ML."  This shows your milk's
14     bacteria count, which is related to the cleanliness of
15     your facility and equipment.
16         The second column to the right, titled "Optical
17     Cell Count," measures your milk's somatic cell count,
18     which is related to the health inside your cow's udder.
19     Older cows tend to have a higher somatic cell count.
20         The third column to the right is titled
21     "Preliminary Incubation," which you have heard us refer
22     to as our milk's PI count.
23         DFA, DMS started using this test around 2005.  We
24     were told that consumers wanted to be able to leave milk
25     out for an extended period of time.  To this day, I have
```

1          not found one person that has this desire.  The nature

2          of milk is that it is perishable, and leaving it

3          unrefrigerated will hasten its spoiling.  These facts

4          have not escaped consumers.

5               The preliminary incubation test is conducted by

6          leaving a sample of milk unrefrigerated for 24 hours.

7          You can imagine the bacteria level of this sample, and

8          then they measure it.

9               The PI count is affected by environmental

10         conditions completely beyond the control of the farmer,

11         as our field representative explained to us.  Our field

12         representative said, you know, you try to keep things

13         clean and neat, which affects your bacteria, but

14         essentially, because it's exposed to environmental

15         conditions, you can have a high PI count and there is

16         nothing that you have done to contribute to that.

17              THE COURT:  I would assume if the testing

18         environment was warmer versus colder, that, in itself,

19         would have a --

20              CLAUDIA HAAR:  I am totally in agreement.

21              Our field representative still claims to this day

22         that the highest PI count for the month would be

23         dropped, as we were originally told.  But if you look at

24         the bottom of the PI column, to the December average,

25         which would be over here -- I don't know if you can see

1    that -- you will notice the highest PI count was

2    included to arrive in this calculation.

3         I would like to point out that none of our milking

4    practices were changed during this period.  In other

5    words, we didn't -- we milked our cows every day the

6    whole month of December exactly the same that we had,

7    and yet we have such an erratic range of data.

8         Because DFA, DMS have linked all three tests --

9    that would be the bacteria, the somatic cell, and the PI

10   count -- we did not qualify for any premium during this

11   month.  It used to be that if you kept your bacteria

12   within the range you can see -- let me point to the

13   bottom.  Let's see.  Let me move it up a little bit.

14        Okay.  On the bottom you see that there's a range

15   here of excellent, good, fair, poor, unsatisfactory.

16   And then they have the coinciding numbers for that

17   column to say how your milk ranks.

18        It used to be that the levels -- let's see where I

19   am.  Just a moment.  Okay.  No, that's pretty much the

20   point I was going to make about that.  Just that you

21   can -- oh, no, about the three columns.  Okay.

22        So it used to be that if you did well and your

23   bacteria -- let's say our bacteria was excellent,

24   between zero and 5,000.  Okay, then you would get a

25   price premium, let's say maybe 20 cents extra per

1    hundredweight for that month.  And then if you did more
2    poorly in the somatic cell, maybe you were only good or
3    fair, then you might not get that price premium, and so
4    they used to be done independently.
5        But now they are linked all together, which is
6    significant because if the preliminary incubation could
7    be tampered with, then that means that those farmers
8    would not receive any price premium over the top.
9    However, the co-op is still able to market that milk and
10   get the price premium that they want from the
11   marketplace.  So essentially they're skimming off the
12   top, not to be redundant.  Okay.
13       I would like to now turn to Exhibit D.  This is the
14   corresponding milk check that shows how Mr. Haar and I
15   were compensated for our milk.  At the top you can view
16   all of our milk analysis information.  So basically they
17   shrunk what we just were looking at in Exhibit B and C.
18   Exhibit B data is on the left, while Exhibit C data is
19   on the right.
20       Below this section is the pricing information.
21   Please follow the butterfat and protein lines all the
22   way to the right, while I try to point at the same
23   time -- here we go -- all the way to the right to see
24   that these two components contribute the largest
25   monetary compensation of our payment.

1        Your Honor, you may have been flooded by 10,000
2    letters and/or requests to speak in opposition to this
3    proposed settlement if farmers were not acutely aware
4    that DFA, DMS has the ability to directly affect their
5    paycheck by controlling their milk testing.
6        This point was reinforced when I met a perfect
7    stranger on January 3rd of this year.  We were on our
8    way to Jonathan's mother's 90th birthday celebration.
9    We stopped in Price Chopper to pick up some last-minute
10   items.  Jonathan and I split up in the store to be more
11   efficient, and he handed me a copy of our letter to
12   alert farmers of this proposed settlement and the
13   effects it might have on them.
14       This is Exhibit E.  So this is a letter that we had
15   put together jointly -- you can see on the second page
16   of it -- with Ralph and Garret Sitts and Richard
17   Swantak, because once the notification had gone out
18   about the settlement, we felt it was our responsibility
19   and duty to let farmers know, "Here's something you
20   really need to pay attention to," especially because it
21   was through the holiday season, which is challenging in
22   terms of time.
23       Okay.  So Jonathan hands me one of these letters
24   and says, "Just look for a farmer."  That's what he
25   said.  I was successful in picking out an older farmer

1   in his well-worn Carhartt overalls and jacket and his

2   well-worn hands too.  After patiently listening for a

3   minute, his immediate comment to me -- this is the first

4   thing he said -- "Aren't you worried about your somatic

5   cell count?"

6        Now, why would he say that if he didn't recognize

7   the significance of DFA, DMS being in control of our

8   testing?  As a retired, life-long dairyman who now

9   raises beef, this man knows the game all too well and

10  was concerned for us.

11       Farmers have also been reticent to openly oppose

12  this settlement because DFA, DMS controls the milk

13  testing of every tractor-trailer load of milk.  If they

14  say that your farm has contaminated a load, then you

15  have to pay for that load, approximately $20,000 at the

16  current milk price.

17       In other words, your sample that's taken from your

18  farm, they analyze that, and all of your milk gets

19  sucked out of the tank, goes into the big tanker, and

20  depending upon if it's a smaller truck or the full-sized

21  tanker -- I believe the full-sized tanker is 90,000 --

22  I'm not exactly sure, but it holds a tremendous amount

23  of milk, suffice to say.

24       And so if your milk -- like let's say you had to

25  treat a cow that had an infection, so you treated him

1    with some penicillin, you were supposed to withhold that

2    milk until that penicillin comes through the cow's

3    system.  If, by accident, the cow kicks the pail and

4    some of that milk goes into your milk and contaminates

5    it, or if you put that cow's milk in by accident because

6    you forgot, then that milk of your milk tank, when it

7    goes into the larger milk tank, it contaminates all of

8    that milk.  Okay.  So that's why you're responsible for

9    the full value.

10        Usually by the time the farmer is informed, the

11   milk has already supposedly been dumped, so you cannot

12   take an independent sample.  I say "supposedly" because

13   there's been many people that have had this experience

14   where they are told by DFA or DMS, "Your milk

15   contaminated a tanker load of milk, and so you need to

16   pay."  That milk is gone, so you cannot go and try to

17   get an independent sample.  It's their word against your

18   word.

19        And I think that's why -- I think it was Mr. Ralph

20   Sitts had mentioned about the $20,000 that we would be

21   getting as class representatives.  "Oh, you know, that's

22   a big amount of money."  That can be gone like that.  So

23   the money is not an issue.

24        Another reason that farmers are apprehensive to

25   openly oppose this proposed settlement is because of the

1    monopoly that DFA, DMS hold on the milk market.  I spoke

2    to a farmer who was a partner owner of a 2,000-cow

3    dairy.  He wasn't sure if he should speak out against

4    this settlement.  "Where would I sell my milk if they,"

5    meaning DFA, DMS, "take away my market?"

6        I assured him saying, "I don't condemn you.

7    Whatever you decide.  I know you have a lot of families

8    depending on you."  We can always eat venison and eggs.

9    We sell eggs also, so we have a lot of eggs.  The

10   farmer -- this farmer, along with so many, asked me to

11   please not name them.

12       Jonathan and I have experienced harassments by DFA

13   since we became involved with this lawsuit.  We started

14   having multiple inspections at -- when -- at times when

15   you normally wouldn't.  You would have one inspection,

16   and you passed; you go on.  But since we signed up as

17   class representatives, that hasn't been the case.

18       And we started having these multiple inspections

19   particularly before Jonathan's deposition and prior to

20   him speaking to the Court.  We never could figure out

21   exactly how defendants seemed to know about these

22   events.  It seemed like it was too much of a

23   coincidence.

24       For the first time ever, we were threatened to be

25   dropped by the cooperative when our milk inspector

1    complained about the excessive mud around our barnyard

2    just after Hurricane Irene.  At that time, we were

3    shipping good to excellent quality milk, so here all of

4    the scientific proof is that your milk is -- is

5    excellent quality, and yet he came to the farm and he

6    saw the mud, which I believe Rutland had quite a time

7    with that hurricane, you know, these -- these items are

8    beyond our control.

9         Fellow farmers were not able to get milk poundage

10   information -- okay, this is -- I am going on now.  That

11   was a long section having to do with why farmers would

12   be reticent to bring up objections.

13        Now I am going on to my next point, which is about

14   fellow farmers were not able to get milk poundage

15   information from the market administrator telephone

16   number that was given on the proposed settlement

17   notification.  I realize someone already covered this,

18   but I will go on.

19        They expressed frustration about trying the number

20   over and over, in between farm work, because the market

21   administrator's hours, I believe, only go till five

22   o'clock.

23        As a class representative, Jonathan called the

24   market administrator himself.  Eric F. Rasmussen, in the

25   Boston office, was not available.  Jonathan was directed

1      to Mr. Rasmussen's counterpart in the Albany office,

2      Peter Fredericks.  Mr. Fredericks explained, and I

3      quote, "We're not party to this.  We were dragged in."

4           When Jonathan asked if anyone had called to ask

5      permission to give the market administrator's number,

6      Mr. Fredericks said, "No.  If someone would have called,

7      I'm sure Eric would have let me know.  We talk all the

8      time."  Mr. Fredericks was told that Rust Consulting was

9      at fault.  Mr. Ben Brown had told Garret Sitts and

10     Jonathan that Cohen would not use Rust Consulting again

11     after a number of blunders with the Dean settlement,

12     which they handled.

13          Mr. Fredericks also commented about the boundary of

14     Order 1.  Remember, he works at the market

15     administrator's office.  He commented on the boundary of

16     Order 1 being used in this case, which leaves out

17     farmers who sell into Order 1 but do not reside in.  And

18     I quote, "If they," referring to plaintiff counsel,

19     "wanted to maximize the number of claims" -- in other

20     words, farmers relieved -- "they would never have

21     handled it like this."

22          Your Honor, before I go on with farmers' issues

23     dealing with the settlement itself, farmers insisted

24     that I ask you if you know what the protocol is or if

25     there is a protocol for farmers who have openly opposed

1   this proposed settlement, in the event that they

2   experience retaliation from DFA, DMS, either now or in

3   the future?  They were asking me, "Do we call the Court?

4   Are we supposed to call counsel?"

5        I said, "I have no idea if there even is any type

6   of protections in place."  So, I don't know if you know,

7   and maybe you can get back to us.

8             THE COURT:  So, you have the settlement

9   agreement, and it has a provision in it, and as your

10  fellow class representatives who talk about how is it

11  enforced, where's the protection, who has the burden of

12  proof, those are some of the questions I have for the

13  attorneys.

14       In the absence of that, you have the rights of a

15  citizen.  If you think a crime has been committed, you

16  call the police.  If you think your civil rights have

17  been affected, you file a lawsuit.

18       So there isn't any special protection that comes

19  out of being in a lawsuit, but I believe the courts take

20  a serious claim seriously.

21            CLAUDIA HAAR:  Okay.  Thank you.  I'm sorry.

22  I didn't mean to jump ahead.

23            THE COURT:  No.  That's fine.

24            CLAUDIA HAAR:  I didn't know that was going to

25  be one of your questions for counsel.

1    In trying to organize farmers' concerns about the
2    settlement, I was grateful to find and will now use the
3    nine-factor framework that this -- that the Second court
4    has identified in determining whether a settlement is
5    fair, adequate, and reasonable.
6    Number one, the complexity, expense and likely
7    duration of the litigation.  I deal with these issues
8    one at a time, and I deal with them in the most length.
9    So it's -- the rest -- I won't spend as much time on
10   each of the nine, just to spare you.
11   How complex is this case?  While there is a level
12   of complexity to our case with regards to figuring out
13   damages, which most of them have been figured out
14   already, the body of this case is so simple that even a
15   dairy farmer can figure it out.
16   DFA, DMS is not a cooperative at all, according to
17   the Capper-Volstead term that it must operate, and I
18   quote, for the members' benefit of its -- for the mutual
19   benefit of its members.
20   Our collective experiences have proven this.  DFA,
21   DMS should not be immune under any Capper-Volstead
22   protections, especially their consolidation of the milk
23   markets as is alleged in this case.
24   Okay.  Now I will direct your attention to
25   Exhibit F.

1                    THE COURT:  So, Jen, what happened to the
2      system?
3                    MS. JEN:  Did you want to show Exhibit F?
4                    CLAUDIA HAAR:  No, no, no.  It's an article.
5                    THE COURT:  Okay.
6                    CLAUDIA HAAR:  I figured you folks could look
7      at that.
8           I applaud Christine A. Varney.  She is the
9      Assistant Attorney General of the antitrust division at
10     the United States Department of Justice who so clearly
11     explains the intention of Capper-Volstead in her
12     thorough article I have included as Exhibit F.
13          I appreciated this because I was not fully
14     understanding what the implications of Capper-Volstead
15     was, and so it gave me quite an education.  That's why I
16     have included the entire article.  Also, with regards to
17     Ms. Varney's position, I think that it should be
18     considered seriously.
19          In fact, this article was so powerful in its
20     implications with regards to our case directly that five
21     months later Senator Charles E. Schumer from New York
22     wrote to Ms. Varney urging her to leave the antitrust
23     laws alone as they relate to dairy cooperatives.  So
24     obviously this must have struck a chord with someone in
25     the cooperatives, and they contacted Senator Schumer and

1    said, "You have gotta do something."  That's my opinion.

2         I have provided this article and another related to

3    this same topic as Exhibits G and H.  I won't read from

4    them right now, but it basically explains how Senator

5    Schumer is -- is asking Miss Varney, you know, "Please

6    don't touch this area of law because it's very important

7    that we keep it in place."  Of course, he has his

8    motivation.  And I do know that, as a cooperative, we do

9    donate money to various political causes.

10        And the second one, "Regulations May Hurt Dairy

11   Co-ops," this is Exhibit H.  They both have the same

12   author.  I should stop and explain that.  Mark Heller

13   wrote both of these articles.  They are both from the

14   Watertown Daily Times.  Interesting, Mark Heller's

15   mother grew up on a dairy farm down in Chenango County,

16   which is just 10 minutes from where we live.

17        Okay.  So this article, "Regulations May Hurt Dairy

18   Co-ops," Mark Heller interviewed Edward Gallagher, vice

19   president of economics and risk management at Dairylea

20   Cooperative.  To summarize it, what he says is that

21   regulations may hurt dairy cooperatives.  It might make

22   it difficult for them to operate and do the business

23   that they do on behalf of farmers.

24        Dairylea merged with DFA officially in April 2014.

25   So while he was not representing DFA, DMS per se, they

1    are now officially merged.  And I found out that
2    information from Mark Heller because I had called him to
3    get his permission to use his article.
4         Interesting also, two years after he had written
5    these articles, his job at the Watertown Daily Times was
6    ended.  They closed that position.  So he works
7    someplace else now.
8         Why our counsel did not clearly represent
9    simplicity of the body of our case to your Honor remains
10   a mystery.  At the class certification hearing,
11   September 26th, 2011, your Honor asked these questions
12   of Mr. Kit Pierson, and I quote:  "Who is doing what to
13   whom and why?"  This was almost two years into the
14   litigation.
15        Unfortunately, instead of answering your Honor's
16   questions, Mr. Pierson spent quite a bit of the Court's
17   time explaining the defendants' position.  Perhaps that
18   was because he was -- he has 24 years' experience as a
19   defense attorney, largely in antitrust and class action
20   suits.  After that time, Mr. Pierson was hired by Cohen
21   Milstein in 2009, when this case was filed.
22        After the class certification hearing, in September
23   2011, we asked our counsel to please answer your Honor's
24   basic questions.  We said, "She needs to understand the
25   fundamentals of the case."  But what do we know?  We're

1    only farmers.  They would not.

2        In October 2011, Jonathan handwrote a note to

3    address these issues and sent it to the Court.  We

4    didn't know that that wasn't protocol, and being

5    farmers, you run into problems; you're on your own.  So

6    you try to solve them as clearly and directly as you

7    can.

8        Okay.  So we learned that the proper protocol was

9    to sent the information via our counsel.  No problem, we

10   thought.  We then asked counsel to file Jonathan's

11   letter.  They would not.

12       Some months later, Terry Sullivan, who is a highly

13   regarded attorney with BakerHostetler, a woman who has a

14   lot of experience and is highly regarded, offered to

15   help Jonathan with the declaration to get this

16   information to the Court.  So the two of them worked on

17   it.  Mr. Haar was very -- felt very satisfied that the

18   product said what he wanted to say, but he was able to

19   take some help in terms of making it legible, at the

20   least.

21       Mr. Pierson insisted on critiquing the document.

22   Jonathan disagreed with all the neutering of his salient

23   points by Mr. Pierson.  There was no sense in continuing

24   to argue.  Mr. Pierson put his final version in double

25   envelopes.  Jonathan was instructed to sign the

1    declaration and send it to Andy Manitsky, who would then

2    file it with the Court.

3        The UPS lady came down our long driveway.  We live

4    on a dead-end road.  The kids all hollered, "She's here.

5    She's here."  When she presented the large envelope,

6    Jonathan ripped it open, he took out Mr. Pierson's

7    version and put his original document, signed, into the

8    smaller envelope, and sent it on its way.

9        Cohen only found out two weeks later when Jonathan

10    expressed his relief to Ms. Sullivan of finally having

11    answered your Honor's questions that are foundational to

12    our case.  We have included Jonathan's original

13    declaration, which is Exhibit I; the critiqued version,

14    which is Exhibit J; and I'm sorry, but I failed to -- I

15    have the third version, which was Mr. Pierson's version

16    that he had put in the envelope that we took out.

17        We realized that this was a little extreme to go

18    through this process, but we needed to make sure that

19    Mr. Haar's declaration was indeed the words that he

20    wanted to declare.

21        This experience contributed to us questioning

22    Mr. Pierson's loyalty and violations related to Rule

23    23(g)(4).  There are so many experiences that I could

24    share of how Mr. Pierson and Cohen and Milstein fought

25    against us and this case, making it much more complex,

1    but I will refrain.

2        What does all of this mean, what I have presented

3    you, articles about Capper-Volstead, issues we have

4    with -- with our counsel?  What does it all mean?

5        As we read through the papers of our case

6    proceedings and attended hearing after hearing, we

7    wondered, why is there so much confusion?  We know our

8    case, but what we're hearing and what we're reading is

9    not adding up.  Like your Honor asked, who is doing what

10   to whom and why?

11       It finally came to me, after a nightmare at 5:45

12   this morning.  It's a nightmare for several reasons.  I

13   will be honest.  We have worked with this counsel for

14   quite some time, and there's no pleasure in having to

15   share this information, but it's only because I love

16   them.  Like I tell my children, "I love you.  That's

17   why, if you are doing something wrong, I have gotta

18   correct it.  It's for your own good."

19       Your Honor, there are actually two nightmares of

20   injustice going on here simultaneously.  The first is

21   that DFA, DMS has taken a perfectly sound structure,

22   that being of the dairy cooperative, which literally was

23   meant for dairy farmers working cooperatively to market

24   their milk.  DFA, DMS has corrupted this system by

25   misusing Capper-Volstead in a two-fisted approach:   In

1    the one fist, oppressing the producers through

2    monopsony, while at the same time, in the other fist,

3    oppressing the processors through monopoly.

4        I'm sorry.  I said that wrong.

5        The first fist is oppressing the producers through

6    monopsony, while at the same time oppressing the

7    processors through a monopoly.  This is a brilliant

8    plan, but so was Hitler's.  Evil is evil.

9        Now, the second nightmare of injustice.  Our

10   counsel has taken a perfectly sound structure of

11   antitrust class litigation, whereby citizens of this

12   great nation are able to find justice against illegal

13   oppressive behaviors of giants, which we otherwise, on

14   our own, would not be able to do, or so we thought.

15       How does this work, you may ask?  Your Honor, it's

16   simply a game of cat and mouse.  Counsel gets

17   information from class representatives, and we are all

18   too happy to share this information because we're

19   thinking, This is going to lead to justice, and we are

20   going to have change, and there's going to be a brighter

21   day for dairy farming, the economy of -- the world

22   economy, our children.

23       But they get just enough information to hold

24   defendants' neck up against the wall, and then they say,

25   If you just give us the money, nobody will get hurt.

1    Our counsel has corrupted this system by
2    specifically addressing off-target issues designed
3    specifically not to affect any of the business practices
4    of the defendants, thereby not providing any relief
5    whatsoever for the dairy farmers or even for the
6    processors.
7    They have addressed these off-target issues
8    voluminously, as you know.  I have heard you say, and I
9    believe it, that you read every word that comes across
10   your desk.  So I'm going to refer to Exhibit K just for
11   a moment.  Page two of this -- this is an article from
12   Laws360, which is a law publication, and it deals
13   specifically with our case.
14   I would like the Court at a later time to be able
15   to read all of it.  They speak about your ability to
16   split the baby, which refers directly to King Solomon's
17   wisdom in trying to figure out justice.  It's quite an
18   honor.
19   So this article is titled, "Milk Processors Soured
20   After Rare Monopsony Ruling."  I am not going to deal
21   with the article right now -- I will in a few moments --
22   but I am going to direct your attention to page two,
23   right underneath the boldface title saying "Plaintiffs'
24   Sundry Antitrust Claims, Conspiracy, Monopsonization,
25   Attempted Monopsonization and Price Fixing Claims."

1          For the plaintiffs' remaining claims, the court
2     effectively split the baby.  And after exasperated
3     admonishment of both sides' extensive lists of
4     undisputed facts -- and then they list how many was in
5     each one -- the court ultimately -- and then it goes on,
6     and I will deal with that in a minute, that you were --
7     you were basically buried in all of this information
8     that was undisputed facts but were still able to bring
9     some semblance of understanding out of it.
10         Most recent time is the first page in the last
11    filing that the defendants and the plaintiff counsel had
12    given you, I believe it was supposed to be in seven days
13    before this hearing.  And the first page in this packet
14    is the request to exceed the page limit.  I know you
15    have said, and as a teacher I completely concur, that
16    you should be -- if you are intelligent, which these
17    gentlemen are, and ladies, you should be able to state
18    your points succinctly as possible.  So why the
19    exceeding of the page limit?  Why this big workload?
20    We'll get to that.
21         Joshua has done research and found that Cohen
22    employs this strategy often, the first page saying,
23    Could we please exceed -- of course you don't have a
24    chance to respond because then you have the whole
25    voluminous filing before you.  Did they think that they

1    would fool you, your Honor?  Or perhaps they would weary

2    you to just sign off on this settlement and make them go

3    away.  I won't ask you, but I'm sure that the thought

4    might have crossed your mind.

5        What they didn't account for in all of their

6    schemings was providence.  It is my belief that God

7    Almighty has put you in this position for such a time as

8    this.  That is why you, your Honor, who were looking for

9    truth, and we, who were looking for justice, were

10   thoroughly frustrated, until now.

11       This fairness hearing will prove fair in only one

12   way:  It is that we have had this opportunity, as

13   farmers, to deliver the truth directly to you about what

14   has been going on here.

15       Your Honor, that you may serve justice that we are

16   seeking, that is why we are delivering this truth to

17   you.

18       And I will make a side note that -- I think it only

19   came to me that -- early this morning, not that I slept

20   very well this whole week, because I realized that the

21   words that I am saying are very weighty and they have

22   strong implications, and this is not really a place that

23   I wanted to go to.  When I signed up to be a class

24   representative, I was looking relief for fellow farmers

25   and our farm and looking at the future of dairy farming.

1    I had no idea that we were going to be able -- we were

2    going to be realizing that there is this corruption

3    going on, not just with the defendants, but also with

4    our own counsel.

5         So that is why I use the term about it's a

6    cat-and-mouse game, you know.  We will beat you up a

7    little bit, but really not too hard.  Hand us the money,

8    and we will go away for a while.  It's also job security

9    because, being that they're not going to change anything

10   that they do if we agree to the settlement, then in 10

11   years we can be right back in here again and be able to

12   keep busy.

13        I would like the Court to know that we did search

14   for additional or potentially new counsel.  It's not

15   like we haven't tried.  We have called antitrust firms

16   all across the country.  We heard many excuses.  The

17   last firm was kind enough to be honest and explain that

18   the world of antitrust lawyers is rather small, and it

19   was doubtful if we would get anyone to step on the toes

20   of our current counsel.

21        My son Elijah, who is here today, recognized this

22   immediately as an unwritten nonsolicitation agreement.

23   Thank you all for the education.

24        One of Mr. Abrams' former colleagues offered to

25   help us add new counsel.  This proposed new counsel

1    informed us that if we added or procured new counsel

2    completely, we would run the risk of losing our position

3    as class representatives.  We left off our search for

4    now, recognizing that we may need a court order for new

5    appointment, as in the recent Pella case, from the

6    Second -- Seventh Circuit, which was decided June 2nd,

7    2014, where they dealt with appointing new counsel.

8         I will now address the expense of protracted

9    litigation.  If I may assume that Mr. Kuney and his

10   associates make the similar 600 to $800 an hour as our

11   attorneys, then they would be due -- that would be these

12   folks -- they would be due about $5 million a year for

13   their services.

14        We need to look at this number in relation to the

15   expense of the class for doing business as usual, which

16   would be the effect of taking this proposed settlement.

17   Having spoken to farmers in the Southeast, we know that

18   things have not only returned to business as usual, but

19   as we heard before, that they have become even worse.

20   If it is farmer owned and farmer driven, then why must

21   you give written permission to show up at a meeting and

22   only be allowed to say your piece and then you must

23   leave?

24        Dr. Rausser's damages models have ranged from a

25   billion dollars to the current figure of $350 million,

1    which we are -- were approved to go to trial with.

2    Taking -- excuse me.  Taking the lesser amount of

3    $350 million in damages, to be conservative, divided by

4    the 12-year period -- this would be from 2002 to 2014 --

5    the expense of the class doing business as usual with

6    DFA, DMS is costing us farmers roughly $29 million a

7    year.  So I don't mind paying Mr. Kuney 5 million.  I

8    mean, hey.

9         This is nearly six times the annual cost of

10   continuing this litigation.  So, if we project that this

11   case were to take, let's say, another four years, making

12   it 10 years all together -- I like 10 because it's a

13   good round number -- we farmers would have paid out

14   $50 million to defendant counsel.  If we don't sell

15   ourselves out or persevere for something fair,

16   reasonable, and adequate, we would be unencumbered from

17   this $29 million-per-year expense for milk market

18   suppression that we are already paying.

19        So in less than two years, that $29 million would

20   pay back Mr. Kuney and the firm of this litigation, and

21   we could start using that $29 million a year, which

22   would be kept by farmers, to reinvest into our farms,

23   feed distributors, seed companies, farm equipment

24   dealerships, agricultural supply stores, hardware

25   stores, mechanic shops, diners and other businesses,

1    thereby revitalizing our rural, local economies across

2    the Northeast.

3         Your Honor, if this case takes 20 years, then it

4    would take us four years to pay it back.  Dairy farmers

5    that I have spoken to said that they would pay this cost

6    for freedom from our oppressors.

7         We are not a class of people that are looking for a

8    handout because we know how to create wealth from the

9    land.  We enjoy that hard work.  So the idea of getting

10   $4,000, some money back, means nothing.  If we cannot

11   change the structure of how this corrupt model has

12   hijacked what dairy cooperatives were meant to be, then

13   we have no relief whatsoever.  If anything, it just

14   gives them more strength to just tighten the fist.

15        With regard to the duration of litigation,

16   considering our CEO was previously an attorney from

17   Brooklyn -- that's Rick Smith -- and his administration

18   has painstakingly attempted to conceal their illegal

19   behaviors, it's -- what I am trying to say is that

20   Mr. Smith is a smart man, and they have gone through

21   extensive measures in order to conceal their illegal

22   behavior.

23        Also, our senior vice president, Greg Wickham, is

24   brother-in-law to Lawrence Schwartz.  Who is Lawrence

25   Schwartz?  He holds the position of secretary to present

1   governor of New York Andrew Cuomo.  Like we have

2   recently seen with the current Sheldon Silver case,

3   misconduct at these levels takes time to unravel.  It is

4   interesting to note that Mr. Silver, who is a native to

5   lower Manhattan, took position as Speaker of the House

6   in 1994.

7        What on earth does that have to do with what we are

8   here for today?  I will tell you.  This is the same

9   requested time for the releases of the settlement to

10  begin.  Your Honor mentions this odd request that

11  extends roughly eight years prior to this case in your

12  denial of preliminary approval.  Suffice to say, this

13  case will take more time to litigate, but the outcomes

14  may have further-reaching and longer-lasting

15  implications than any of us had originally anticipated.

16       I will now address the next factor in the

17  framework.  I called it your framework because I

18  misunderstood.  I thought this was only Second Circuit.

19  My son Joshua educated me, so -- he says, "Ma, you can't

20  say that."  I am just mentioning that because when you

21  get the copy of it, you would be like, Whoa, what

22  happened?  That's what happened.  The mother was

23  ignorant.  Okay.  But at least I know how to learn from

24  my mistakes.

25       The reaction of the class to settlement.  This is

1    the second factor in our framework.  What is the

2    reaction of the class?

3        I noticed a common theme among most of my fellow

4    farmers who are in favor of this proposed settlement.

5    They were honest enough to admit a lack of knowledge

6    about this case in general or the proposed settlement in

7    particular.  I would hope that after today's hearing,

8    they would set aside time to research for themselves the

9    claims that we are making.  Since DFA, DMS have chosen

10   not to open the record of the case and to keep the

11   majority of the evidence confidential, I realize that

12   their research will be hampered.

13       I would also like to say that we respect these

14   farmers as fellow colleagues and recognize their effort

15   on their farms.

16       It has come to my attention, as a class

17   representative, that there are two other pending

18   litigations against DFA, DMS at this time.  Farmers

19   involved see the -- this broad release and the proposed

20   settlement as unfair and completely unreasonable with

21   regard to being able to pursue any further relief for

22   illegal behavior that has recently been discovered, not

23   to mention the future recovery for illegal behaviors yet

24   to be found out.  Farmers are wondering about the

25   legality of the broad release as well.  They're saying

1      to me, Can they even do that legally?

2           The letters you received in opposition sums up the

3      majority of what farmers think about this proposed

4      settlement.  I notice a common element in that many do

5      not want any settlement monetarily, not even injunctive

6      relief.  These people want this case to go to trial so

7      that evidence, which currently only rests with class

8      representatives, would be made public.  Farmers want

9      justice.  If we plant corn, then we reap corn.  If DFA,

10     DMS has sown corruptions, farmers want them to reap

11     judgment.

12          Some farmers have said that without any remedy for

13     DFA, DMS cooperative status, the milk market

14     suppression, DFA, DMS testing, and in-house elections,

15     the monetary relief is inconsequential.  Some farmers

16     have said that the lawyers could have all the money if

17     they would accomplish the above items of injunctive

18     relief, which would be meaningful and reasonable.

19          We are farmers -- I already said that.  Sorry.  I

20     jumped ahead of myself.

21          It seems to me that whether you are Donald Trump or

22     a homeless beggar on the street, nobody likes to be

23     stolen from.  To accept this unfair, unreasonable, and

24     inadequate relief would be like getting a dead calf back

25     from a crooked cattle dealer who has just stolen your

1     whole herd.

2         Some farmers are weary of this fight.  They want it

3     to be over and just go away.  This all sounds very nice

4     and appealing, but agreeing to this proposed settlement

5     actually ensures that it won't be over, and it will

6     never go away.

7         How can we give up?  I think of my father, Pasquale

8     Catalano, who is a 92-year-old World War II veteran and

9     a Purple Heart recipient.  He was a sergeant in B

10    Battery, 359th Field Artillery Battalion, 95th Infantry

11    Division.  These men earned the title of the Iron Men of

12    Metz for their notable accomplishment of liberating the

13    French city of Metz.  Each person in that generation did

14    their part.  Collectively, they triumphed, bringing

15    deliverance to those in concentration camps and an end

16    to the war.

17        I am grateful and proud of that generation, but I,

18    too, realize that the price of freedom is eternal

19    vigilance.  As Benjamin Franklin put it:  How can I

20    expect our six children to value freedom, stand up for

21    truth, and fight for liberty, if I am not willing to

22    sacrifice in the face of such a great injustice?  This

23    is how I, as a farmer, feel about this case in general

24    and this sellout of a proposed settlement in particular.

25        Counsel has attempted to devalue farmers'

1    opposition in this settlement.  They say that they know

2    what is in the best interests of the class.  I will just

3    address one letter that they commented on, which was

4    Mr. Eby's letter of -- in opposition to the settlement.

5    Counsel's argument against Mr. Eby's claim is that he

6    used the Southeast litigation case in comparison to this

7    Northeast litigation case, which I find is quite ironic

8    being that these attorneys completely rely on their own

9    ability to take similar cases and match them up to their

10   arguments -- or perhaps their paralegal's ability, to

11   match their own -- these similar cases to their

12   arguments in order to litigate them.  This is exactly

13   what Mr. Eby did, and he doesn't have a law license.

14       So in the words of my son Benjamin, who is not here

15   today -- he is taking 19 credits in animal science to be

16   a veterinarian, so he is looking to stay in the

17   agricultural community -- the relation -- this is what

18   Benjamin said:  The relation between a lawyer and

19   farmers is like that of a potato in a corn crib.

20       Your Honor, counsel's criticisms of farmers in

21   opposition are rendered irrelevant with their choice of

22   maintaining ignorance as to our concerns, risks, and

23   livelihood as farmers.  I received permission from

24   Anthony Bilinski to use the last portion of his letter

25   to sum up what the majority of the class thinks about

1    this settlement.  This is a gentleman who lives nearby,

2    and -- and he opposed the settlement.

3         And I quote -- you have a copy of it.  I quote,

4    "Yes, I know I will likely pay dearly for this letter if

5    you choose to ignore it, but there is a saying which I

6    believe applies here.  All it takes for evil to triumph

7    is for good men to do nothing."

8         Okay.  So now we get to move on to the third factor

9    in the framework in trying to determine whether or not

10   the settlement is fair, reasonable, and adequate:  the

11   stage of the proceedings and the amount of discovery

12   completed.

13        Despite the fact that this Court instructed

14   both defendants and subclass counsel at the August 1st,

15   2013, hearing that if they were going to settle, now is

16   the time.  I remember you specifically saying that.  You

17   explained about the -- you explained the effort and

18   resources involved in preparing for a jury and trial.

19        As the Court is aware, we were just 18 days from

20   trial when defendants and subclass agreed on a monetary

21   settlement and notified the Court, before any of us

22   class representatives, that only some injunctive relief

23   need be ironed out.  We are as far along as we can be to

24   trial, save the motions *in limine*, hearing and trial.

25   So we have an established case.  We have our damages

1    ready to go.

2        Number four:  the risks of establishing liability.

3    We were told by Mr. Ben Brown that he couldn't wait to

4    take this case to trial.  An attorney at Baker had told

5    us that they were sure we would win at trial.  Their

6    only concern was that they -- was what they would

7    receive in damages.  Because you remember, with the Dean

8    settlement, they did not receive all that they requested

9    from this Court.

10       I have provided a copy of the article, Exhibit K

11   from Law360, whose title says it all:  "Milk Processors

12   Soured After Rare Monopsony Ruling."  This article was

13   written about our case specifically and after your

14   summary judgment ruling.  To quote the article, "The

15   Court" -- this is where I left off before, saying that

16   after you had all this piles of undisputed facts to work

17   through, you ultimately found that genuine issues of

18   material fact persisted, and the conspiracy,

19   monopsonization, and attempted -- monopsonization claims

20   must be decided by a jury.

21       In this case, the macroeconomic impact doesn't

22   favor the monopsony with regard to the consumer because

23   they receive no benefit.  In other words, for all of the

24   suppress- -- oppressive behaviors of DFA, DMS, whether

25   they pay us more as farmers or less as farmers, when you

1   go to the store, the price remains the same.  So it's

2   not like, Well, we paid the farmers less, and then when

3   you go to the store it's a little bit cheaper, so

4   consumers are getting some benefit.  They are

5   essentially using their power on both ends of the

6   spectrum, as a middleman has the power to do.

7        Number five:  the risks of establishing damages.

8   Our case made it through summary judgment with

9   $350 million in damages to proceed to trial with.

10  That's all that I have about that.  That was pretty

11  quick.  So pretty much we are in good shape.

12        The risks of maintaining the class through the

13  trial.  Your Honor, I noticed in the defendants -- in

14  the defendants -- of the proposed settlement, filing of

15  memorandum of law in support of the dairy farmers'

16  subclass motion for final approval of the postsettlement

17  with defendants, that -- the last filing that they made

18  seven days ago, that although they have a heading which

19  includes maintaining a class action through trial, there

20  are no arguments listed in that section.

21        Your Honor went through a rigorous analysis before

22  certifying subclasses.  We have no reason to doubt that,

23  having been established, they would not be maintained

24  through trial.

25        The ability of the defendants to withstand a

1     greater judgment.  Do the defendants have the ability to

2     withstand greater judgment?  Yes.  We have attempted to

3     clearly explain how the defendants have unlimited access

4     to our capital.

5          Eight:  the range of reasonableness of the

6     settlement fund in light of the best possible recovery.

7     Our best possible recovery is that we win at trial with

8     our damage model of $350 million being trebled, to equal

9     1 billion, 50 million dollar recovery.  In light of

10    this, the settlement fund is completely unreasonable.

11         The range of reasonableness of the settlement fund

12    to a possible recovery in light of all the attendant

13    risks of litigation.  Mathematically, $50 million

14    represents about 4.4 or 4.8 percent recovery.  In order

15    for this to be reasonable, we would have to have a

16    greater than 95 percent chance of losing at trial.

17    Prior to the blurring influence of settlement, our own

18    counsel would never have assigned this case to that

19    level of risk.  The lack of injunctive relief, coupled

20    with the release, renders this proposed settlement worse

21    than if we had went to trial and lost.

22         In conclusion, your Honor, we farmers want to thank

23    you for seeking out truth to bring about genuine

24    justice.  You have not been willing to just play the

25    good old boys' game.  Thank you for your patience.

1          And in summary, your Honor, here is our position:

2     We have the mountains of Sinai on our right.  On our

3     left, Pharaoh and his armies who, for a moment, heard

4     our cry of "Let my people go."  But at the last, have

5     turned to pursue us, only to drag us back to Egypt and

6     the bondage we endured.

7          We beseech you, your Honor, as our guardian, with

8     the power to eviscerate the oppressors, to rend the

9     settlement asunder before us with prejudice, that we

10    might fight on into the promised land, a land flowing

11    with milk and honey.  Thank you.

12               THE COURT:  Thank you.

13         Does anybody else want to speak?

14               KENNETH DIBBELL:  Your Honor, I would like

15    to vehemently oppose this settlement.

16               THE COURT:  So, first things first, your name.

17               KENNETH DIBBELL:  Kenneth Dibbell.

18               THE COURT:  Kenneth Dibbell.

19               KENNETH DIBBELL:  You have it.

20               THE COURT:  And I do have it, and it's spelled

21    D-i-b-b-e-l, right?

22               KENNETH DIBBELL:  Two Ls.

23               THE COURT:  Two Ls.

24               KENNETH DIBBELL:  Going back, I would like to

25    vehemently oppose the settlement as proposed as being

1    totally unfair to the producers in Federal Order 1

2    versus those in the Southeast case.  There is no

3    comparison.

4        I'd like to do a little history on farm numbers.  I

5    was born just 17 miles from here -- correction, 26 miles

6    from here.  Grew up a lot in Stowe.  All during World

7    War I, boy -- World War II, 1940, we had 4.66 million

8    expected dairy producers in this country.  Today, we

9    have 1 percent of that number, 46,000, is all the

10   producers we have left in this country.  And a very

11   large portion of the milk is being made by a small -- 20

12   percent of the farms, the large farms.

13       It's been a total injustice how the dairy community

14   family farms have been treated by the federal

15   government, by their cooperatives, period.  When it

16   comes to cooperatives, on the milk-testing issue, my

17   cooperative shipped milk to Kraft Foods for 10 years

18   under two contracts, through -- we had an independent

19   lab do the butterfat, bacteria, et cetera.

20       Well, DFA, DMS convinced Kraft to buy their milk

21   from them instead of from the South New Berlin Co-op.

22   We had a choice.  We had no market for our milk other

23   than DMS, or we could have hauled it all the way to

24   Winchester, Virginia, and our trucker wasn't real

25   impressed with that.  So we signed up with DMS.  In the

1    first two months, everybody's butterfat went down two or

2    more points, their bacteria went up, and their somatic

3    cells went up.  The same milk had been testing good for

4    10 years.  That's just an illustration of the

5    hanky-panky that goes on with DFA, DMS.

6          The federal government is equally responsible for

7    this fiasco that has put 99 percent of the dairy

8    producers out of their business.  They have stolen

9    their -- their heritage and ruined their livelihood.

10   You have heard it -- farm families say here their kids

11   are not interested.  Well, it is hard work.  There's a

12   lot of reward monetarily, but those kids who grew up on

13   the farm and learned to work are still out there working

14   somewhere.  Those who grew up in town and didn't learn

15   to work are now living off the system.  Second and third

16   generation.  Outrageous.

17         Federal government has created several so-called

18   safety nets to protect dairy farmers, none of which

19   worked.  Price support system works better than most,

20   but it cost the taxpayers quite a lot of money because

21   they had to buy their surplus product and give it away.

22   Well, now we have got 46 million people on food stamps.

23   That's not a small bill.

24         I don't have that one with me.

25              THE COURT:  I did read your whole letter.

1          KENNETH DIBBELL:  I beg your pardon?

2          THE COURT:  I did read your whole letter and

3     the attachments.

4          KENNETH DIBBELL:  The part that I left back

5     there, you have it in your packet.  I'd appreciate it if

6     you study it.  I have got one in my hand, just one more.

7          THE COURT:  Sure.

8          KENNETH DIBBELL:  USDA Economic Research

9     Service calculates the cost of production on a U.S.

10    dairy farm, 50 cows or less, as $50.84 per

11    hundredweight.  Go to a hundred cows, it's $40 and

12    change.  It doesn't get down to $27 until it hits a

13    thousand cows.  This should be fixed, but we have been

14    trying for a long time to get a price hearing in

15    Washington.  Well, it hasn't happened.

16         And it's -- our Senator from New York, Kirsten

17    Gillibrand, had it in her farm bill proposal that, upon

18    request, the secretary would have to hold a price

19    hearing, if we could ever get a hearing, we could get

20    this thing on a fair pricing basis, at least.

21         Senate Bill 1645 from 2007, the Casey-Specter bill,

22    would have prevented this current disaster and a loss of

23    a lot of farms in between because it had supply

24    management function.  If it continued to grow

25    oversupply, those who were causing it were going to get

```
1    less for their milk, and they were going to maintain the
2    pay price for the lesser producers.  Their heritage.
3    But didn't happen.
4         One more, and I can't remember it.  Thank you for
5    listening.
6              THE COURT:  All right.
7              KENNETH DIBBELL:  And study your paperwork.
8              THE COURT:  I will.
9              KENNETH DIBBELL:  Thank you.
10             THE COURT:  We are going to take our
11   midafternoon break at this time, five to 10 minutes.  We
12   will come back and resume our hearing.
13        Anything to bring to my attention before we break?
14             MR. PIERSON:  No, your Honor.
15   (Court was in recess at 2:28 p.m.)
16   (The following was held in open court at 2:40 p.m.)
17             THE COURT:  We are back on the record in Alice
18   Allen, et al., versus Dairy Farmers of America.
19        And do we have somebody else who wants to speak?
20             LARRY BAILEY:  Yes, your Honor.
21             THE COURT:  Yes?
22             LARRY BAILEY:  Your Honor, my name's Larry
23   Bailey, B-a-i-l-e-y.  And I am going to come at this in
24   a little different light of where -- in favor of the
25   settlement agreement.
```

1          First, I'd like to give you a little intro that we
2    are a family farm.  I farm with my wife, my in-laws, and
3    my brother-in-law.  We milk 1100 cows in Fort Ann, New
4    York, which is in Washington County, New York.  And as
5    you well are aware, it borders Vermont and several other
6    large counties -- or counties in New York State, eastern
7    New York State.
8          And within our county there are several different
9    sizes of farm, from the Amish community now in
10   Whitehall, New York, of 10 cows, to farms that are quite
11   a bit larger than we are.  And as you know from our
12   letter, that we are a member of DFA for now.  We are in
13   our 15th year as a DFA member and very happy with that.
14   Currently, we are currently shipping between 2.3 and 2.4
15   million pounds of milk a month, and it is mainly going
16   to HP Hood in Agawam, Mass.
17         Previously to DFA, we were with an independent, and
18   we chose to go with DFA for the competitive price
19   advantage.  And we wanted to share that there are
20   choices today, and we do have choices today, and on a
21   regular basis, I do look for other options to market my
22   milk.  And so far, in 15 years, even though I do talk to
23   one company probably six times a year -- I am good
24   friends with one of the guys who runs it -- DFA has
25   always been able to give us a competitive price for the

1     hard work that we do on a daily basis.

2          And in addition, I'd also like to tell you that

3     we -- in addition to the farm, we also run a grain and

4     trucking company.  We -- we sell processed grain to

5     farmers, and we deliver for Cargill Animal Nutrition out

6     of Salem, New York.  And currently we have nine units on

7     the road and seven drivers, and we deliver those feeds

8     into New York, Vermont, Massachusetts, New Hampshire.

9     And it's been a very successful company, and we enjoy

10    what we do, and we get to visit with a lot of fellow

11    dairy farmers and become their friends.

12         Furthermore, we also own and operate two farm store

13    locations, one in Fort Ann, New York, and one here in

14    St. Albans, Vermont.  And, you know, in these stores, we

15    see different people, we meet people, and we sell things

16    from clothes to boots, fencing, garden supplies.  And

17    actually, I just got back from my convention in Denver

18    where we bought perfume and cologne, so that was a

19    little bit different and a little bit out of the

20    ordinary.

21         And we are a member of the class, and we'd like to

22    see this lawsuit come to an end, and we are in favor of

23    the settlement.  In business, as you are well aware, and

24    we have been in business for a lot of years, there

25    sometimes needs to be compromises made.  These

1    compromises sometimes move to further benefit everybody

2    involved.  And businesses need to do this sometimes to

3    move forward, get on to running and managing their

4    businesses.

5         Just like dairy farmers, we need to come together

6    with our fellow dairy farmers, move on, and go forward.

7    And visiting with fellow dairy farmers in my community

8    and customers and friends, you know, we are all feeling

9    that this needs to come to an end, move on, move

10   forward, turn over a new leaf, and continue forward.

11   And that also helps the relationship that we can have

12   with all our other dairy farmers and all our other

13   farmer families.

14        I'd like to show you that from our farm, and other

15   agribusinesses that we run, and fellow friends, dairy

16   farmers, and other things, our feelings are reflective,

17   as a member of this class, to go forward as a settlement

18   with this lawsuit.  Compromise made here would be a good

19   thing.  We need to allow our friends, our families,

20   other dairy farmers to move forward and get back to do

21   what they do best, running their business, to provide

22   the public with a great nutritional product called milk.

23        Thank you for your time.

24             THE COURT:  Thank you.

25        Anybody else who would like to speak?

1          PAUL BOURBEAU:  Good afternoon.  I'm Paul

2     Bourbeau, and I really appreciate the opportunity to be

3     able to speak -- that's spelled B-o-u-r-b-e-a-u -- from

4     St. Albans, Vermont, in Franklin County, not too far

5     away from the Canadian border.

6          I have a fairly unique experience to share with

7     you.  I am going to give you a little bit of bio and

8     just to let you know that we have continued to go back

9     to the DMS system and have made the conscious decision

10    to stay with DMS.

11         I'm born and raised on a dairy farm.  My father was

12    a director of St. Albans Co-op.  When we purchased our

13    own farm in 1982, at the ripe old age of 23, looked

14    around and felt very comfortable with what St. Albans

15    Co-op was offering to many of our neighbors.  And the

16    most competitive, successful farms in our area were

17    members of a co-op system.  Even though there were

18    independents there and other places for us to ship our

19    milk, we decided to go with St. Albans Co-op.

20         We stayed with St. Albans Co-op, but then in

21    February of 2000, we had a barn fire.  We lost all of

22    our milking facilities, lost about half the cows.  Make

23    a long story short, within a couple of hours, the

24    decision had been made for us we were out of the dairy

25    business.

1        We spent all of the year 2000 doing some soul

2   searching, wondering if that was really the business we

3   wanted to be in.  And the fact of the matter is I guess

4   it's something that gets into your blood, and we decided

5   we were going to build back.

6        We were offered that opportunity again, in the year

7   2001, when we built back, where are we going to ship our

8   milk.  By that time, we had the DMS system up in place.

9   We looked at what cooperation and working together was

10  allowing producers to do by being part of a larger

11  organization, and we made the decision to go back to

12  St. Albans Co-op and be part of that DMS system.

13       Fast-forward to 2008, the end of 2008, we were

14  looking at a downturn in the economy.  We were looking

15  at a rapid increase in the milk production, and there

16  were a lot of things that were pointing to a low milk

17  price in 2009.  As it turns out, milk prices crashed

18  terribly in 2009, much worse than I would have ever

19  imagined.

20       My wife and I made the difficult decision -- now,

21  keep in mind, I have been a farmer since I was able to

22  put my boots on by myself.  That's what I'd always,

23  always done, that's what I wanted to do, and that's what

24  we continued doing.

25       But still, at the end of 2008, we made the

1    difficult decision to put in a bid, which ended up being
2    accepted, to participate in the buyout program with CWT.
3    For one year, we didn't milk any cows.  We sent a letter
4    to our vendors, to our friends, saying that this was
5    strictly a business decision, and it was breaking our
6    hearts, but we truly believed the only way to be in
7    business long term -- as crazy as it sounds, to stay in
8    the dairy business long term -- was to have no cows
9    short term.
10        A lot of farmers went out of business in 2009.
11   It's been estimated that farmers lost an average of a
12   thousand dollars per cow in 2009.  I think we made the
13   right decision being out of business in 2009.  Obviously
14   it wasn't a profitable year, but we -- it allowed us to
15   get back in.
16        So here we were at the end of 2009.  We had
17   co-ops -- I had a co-op that was not part of the DMS
18   system wanted our milk really bad.  I am going to be
19   very honest with you, the last name Bourbeau, being
20   three miles away from the St. Albans Co-op plant, there
21   was -- and also we're only a few minutes away from the
22   Canadian border -- opportunities to sell our milk to
23   independents, and maybe our milk would have been
24   exported; we still made the decision to go back to DMS
25   system.  We shipped our milk to St. Albans Co-op.

1          A few years ago, we -- just three years ago, we
2     made the decision to switch to Dairylea.  We looked at
3     what was happening at St. Albans Co-op, looked at
4     different expenditures that were going to have to be
5     made for St. Albans Co-op to stay in business, et
6     cetera.  So without going into a whole lot of details,
7     we decided to switch to Dairylea.  Common theme there,
8     though:  We wanted to keep our milk in the DMS system.
9          Dairylea, as has been mentioned before, and you
10     have heard many times -- and I sincerely mean this.  I
11     am very, very impressed.  For five years all the
12     information has probably been duplicated, triplicated,
13     and so many times sent back to you, but still you're
14     listening, and I really appreciate it.
15          At the end of -- when Dairylea was no longer
16     Dairylea and became part of DFA, we had a choice again,
17     Bonnie and I.  Are we going to go with DFA?  We have a
18     choice here.  We can go to another co-op.  And we
19     decided to stay with DFA, again, to be part of that DMS
20     system.
21          Going back to my younger days, I was there when
22     St. Albans Co-op formed the Young Cooperators Program,
23     program for young farmers and members of farm families
24     to become part of an organization that's part of the
25     co-op in order to learn about our industry and see

1    what's happening.  My wife and I were part of that

2    St. Albans Co-op Young Cooperators Program.  We ended up

3    being national chair couple of the YCs.  Of all the

4    thousands of members in the YCs, we became national

5    chair couple.

6         I only explain that to you because in our travels,

7    in meeting with the other representatives of different

8    regions of the YCs, we came back home with a much

9    greater appreciation of what we had been taking for

10   granted, how much competition there was for our milk and

11   the choices that we had to market our milk.  Not

12   other -- not all other areas of the country had that

13   ability.  So we came back home with a much greater

14   appreciation of something that we might have taken for

15   granted for a long time.

16        In 2009, when the price of milk collapsed and there

17   was a lot of angst in the industry, I had been

18   involved -- as I said, starting with the YCs, I had been

19   involved for many, many years -- with the support of my

20   wife and my family, really paid attention to dairy

21   policy.  Senator Leahy, Congressman Welch nominated me

22   to serve on the newly formed dairy industry advisory

23   committee that Secretary Vilsack put together, an

24   emergency committee, two-year term, to look at new dairy

25   policy and what could we set up.

1          There were a few dairy farmers on that board.

2     There were industry representatives.  There were people

3     from academia; like I said, processors and purchasers;

4     consumer groups.  So -- and government officials.  This

5     was a very wide-ranging group of individuals with

6     different interests and different concerns when it

7     pertained to dairy.  I had always looked at it just from

8     a dairy farmer.  All of a sudden I was looking at it

9     from a completely different viewpoint.

10          Again, when we were looking at different ways to

11     come up with different programs to help dairy farmers,

12     one of the things that really stood out, one of the

13     programs -- and the government agencies came in and they

14     said to us, we're trying to figure out exactly what is

15     the market price for milk, what is the actual price for

16     milk in the United States.  And there were three dots

17     around the country, three areas where you could go and

18     there was enough competition for producers' milk that

19     you could actually understand what the true price was,

20     the true clearing price.  And one of those dots was

21     almost right over our farm up here in the Northeast.

22          So, again, I came back from that two years,

23     traveling to Washington, D.C., close to every three

24     weeks, with an even deeper appreciation.  Again, here is

25     a government agency, the national government, is saying

```
1    my area of the country, where I am in Franklin County,
2    Vermont, that's one of the areas they believe is the
3    truest competition and a lot of competition for my milk
4    where I have enough different choices.
5         So given all of that backdrop --
6              THE COURT:  How much of that --
7              PAUL BOURBEAU:  Go ahead.
8              THE COURT:  How much of that do you think is
9    because of the brand of Vermont milk, and the people,
10   for example, Ben & Jerry's, and we have a lot of cheese
11   producers who want to say, I'm getting my milk from
12   Vermont?
13             PAUL BOURBEAU:  Very, very honest -- excellent
14   question.  Excellent question.  But for individual
15   brands, like the Ben & Jerry's, that does make a
16   difference where the milk is coming from.  What they
17   were looking at, at that level, the USDA, of how many
18   people were looking to buy our milk, and very little of
19   it had to do with just the fact that it was from
20   Vermont.  We had the whole federal order.  And the
21   federal order had a lot more to do than just Vermont.
22   But excellent question.
23        But -- so I just give you that background just to
24   show you how many different organizations that was
25   involved in, and we still kept coming back -- even with
```

1    all that knowledge, kept coming back to the DMS system.

2          Why am I in favor of this agreement being accepted

3    and this lawsuit being settled?  I am going to be

4    perfectly honest with you.  The first thing that comes

5    to me is the stubborn Frenchman in me wants to fight

6    this right to the very end and prove we don't owe a

7    penny.  We didn't do anything wrong.

8          I have been a school board member for 30 years,

9    been lead negotiator for almost 25 years serving four

10   different school districts and a high school, lead

11   negotiator with -- for four schools right now, with

12   currently two associations support -- union -- support

13   staff union and a professional staff.

14         Over and over and over, the only way you come to

15   agreement is by compromise.  And there are times when we

16   have had to do things that we didn't really feel

17   comfortable with, but we knew that the best way to move

18   forward and what was the best for the children was to

19   accept an agreement that we didn't really feel

20   comfortable with.

21         I can't say that I truly feel comfortable with the

22   50 million.  I don't know that I really feel comfortable

23   with saying, Yes, we will do this.  We will pay this,

24   because, for me, there's a small part of me that says,

25   Well, even though we are saying we didn't do anything

1    wrong, there's a small part that's admitting guilt.  But

2    that's not the way I am viewing this agreement and why I

3    think it's time to settle.

4         This is casting such a long shadow over not only

5    DFA and DMS and St. Albans Co-op, formerly Dairylea,

6    it's all over this -- our industry.  It's all over all

7    the producers.  We have got this lawsuit.  We are such a

8    minority.  It was mentioned before only 46,000 dairy

9    farmers left in the United States.  Look at how few are

10   left here in the Northeast.  We need to work together.

11   We need to build coalitions.  We need to work with other

12   organizations.

13        I think having this lawsuit here, not knowing where

14   it's going to go, not knowing how many years this is

15   going to last, is really hampering our efforts in this

16   outreach program to get others to work with us as we

17   look forward to having a brighter future for us as dairy

18   farmers.  So this isn't just a DFA or DMS thing.  It's

19   for all farmers and the uncertainty of where this

20   lawsuit could bring us.

21        So, in closing, I thank you very much.  I am really

22   biting my tongue, resisting the urge to retry this case.

23   There's things that I have heard today that I definitely

24   don't agree with, but I think the point of today is what

25   do we feel about this agreement, and I strongly,

1   strongly believe that it's in the best interests of all

2   producers to -- to get this over with and move forward

3   with this.

4        And even though in my letter I said I did not know

5   all the intimate details -- I haven't been in court

6   every single session -- I've paid very close attention.

7   I didn't end up on a DIAC committee, I didn't end up

8   chair of the national YCs by not paying attention to

9   what is going on.  I have a fairly good knowledge of

10  what was going to occur, what has occurred, what's been

11  alleged, and I still believe that this is the right way

12  to go.

13       And there's a saying that I have used in the past,

14  and I will use it again.  There comes a point in time --

15  there comes a point in time when you are sitting here

16  wrestling over something and trying to win, the best way

17  out for you to win that tug-of-war is just to go to your

18  end of the rope and call it a day.

19                 THE COURT:  Thank you.

20                 PAUL BOURBEAU:  Thank you very much.

21                 THE COURT:  Anybody else who would like to

22  speak?

23       Yes.

24                 REG CHAPUT:  Thank you, your Honor.  My name

25  is Reg Chaput, C-h-a-p-u-t.  And I will try to be as

1    brief as I can possibly be.

2         So I farm in partnership with my brother Michael up

3    in North Troy, Vermont.  The name of the farm is Chaput

4    Family Farms, and we milk a thousand cows at 2500 acres,

5    and we employ 22 people.

6         I have been fortunate enough to have been born and

7    raised on the farm.  I'm 57 years old, so I guess that

8    makes me the average dairy farmer, from what I hear.

9    And other than a four-year stint in the Army, all my

10   time has been spent on farms.

11        The last 35 years on my own, I have had the

12   opportunity of being in three different co-ops and two

13   independent handlers, so I have got a real good flavor

14   of what options are available out there to market your

15   milk.

16        And I am not a cynical person by nature, but I am a

17   cautious person, so I -- it was important to me, when I

18   got involved with Dairylea in 1997, to start becoming

19   really involved with the co-op.  So I have attended a

20   lot of meetings, been on a lot of the committees.

21        And though I don't -- and I think I am the type of

22   person that I like to ask the tough questions and hold

23   people accountable, and I can say in all that time that

24   I don't feel that there has been any reason to suspect

25   that there has been any type of, you know, agreement to

1    harm in any way.  I think they're always trying to make
2    the best decisions in -- for all the co-op, even though
3    I may not agree with everything that they say or agree
4    to.  I step back from that, I realize; a lot of times
5    it's simply because it didn't impact me the way I wanted
6    it to.
7        But I really think it's important to start moving
8    away -- to settle this because it's been a real
9    distraction for the co-op leadership, and it's taken
10   them time away from, you know, putting programs in place
11   that could help dairy farmers from searching for other
12   milk marketing opportunities.  And so I really feel that
13   it's time to just put this to rest.  And so that's all I
14   have to say.
15       And thank you for your time.
16           THE COURT:  Thank you.
17       Anybody else?
18       Yes, sir.
19           BILL ROWELL:  My name is Bill Rowell,
20   R-o-w-e-l-l.  My brother and I milk 950 cows in Franklin
21   County, Vermont.  We produce 25 million pounds of milk a
22   year.  We are members of the St. Albans Dairy Co-op,
23   which is part of the DMS system.
24       If you look at our dairy production ending 2014,
25   you will see the United States produced 205.9 billion

1    pounds of milk.  If you look at our export market of

2    last year, you will see that we were exporting

3    17 percent of that annual production.  Today, that

4    export market is down around 13, perhaps down as low as

5    12 percent presently.  That additional milk has to go

6    somewhere.

7         I'm not a milk marketer.  DMS has done a good job

8    marketing milk, finding a home for it, for the best

9    possible price under volatile market conditions.  Food

10   processors are notorious, like any other consumer, of

11   trying to find the best possible price.  Milk is the

12   chief input for any dairy processor.  They are going to

13   buy it just as cheap as they can get it time and time

14   again.

15        We worked for seven and a half years to change

16   national dairy policy.  That was a long road.  We went

17   to Washington many times, many, many times, traveled

18   across the country many times, trying to get farmers to

19   work together.  That's a difficult project.  It's --

20   probably herding chickens would be easier.

21        We did get a safety net that the farmer can buy

22   into.  We did not get a management tool.  So now when

23   there's an oversupply of milk, which we're presently

24   facing -- because feed is cheap, everybody's producing

25   milk, grain is plentiful worldwide, and everybody in the

1   world is producing all the milk they can -- the market

2   will finally get to the point where it can't absorb all

3   of the milk.  Who is going to market it?

4          And in the Northeast, we lack -- particularly in

5   Vermont, we lack adequate infrastructure.  In other

6   words, we don't have an overabundance of processors.  So

7   who is going to market your milk under those conditions?

8          DFA built a plant in Nevada, last year or two, for,

9   I think, around a hundred million dollars, and they are

10  taking excess milk and making powder for export, trying

11  to find a home at the best possible price for the milk

12  in this country.

13         I'm apprehensive anytime that I do business with

14  someone.  You always question, is it the best deal?  Is

15  the integrity there?  How do I do better?  And I will

16  tell you this:  From my perspective, for the amount of

17  milk that we are making, I would hate to have to market

18  it, and I doubt that I could do better than what DMS is

19  doing for us.

20         So I will stand with them, and I would like to see

21  the lawsuit concluded because this lawsuit is casting an

22  image over the entire industry.

23         Now, on our farm over the last six and a half

24  years, we have had better than 20,000 people from 27

25  countries tour the farm.  And we often get comments

1     about the image of the dairy farmer and/or the dairy

2     industry.  It -- it brings into question the integrity,

3     and doing so brings into question the quality of the

4     product and into question animal care.  And if we go

5     down that road and stay in that rut for too long, you

6     are really painting us with a kind of a dark brush.

7          I'd appreciate seeing this settlement, and I'd like

8     to get moving forward on a more positive path.

9          Thank you, your Honor.

10              THE COURT:  All right.  Thank you.

11          Anybody else who wants to speak?

12          Yes.

13              MICHAEL SWANTAK:  Hello.  Michael Swantak,

14     S-w-a-n-t-a-k.

15          I just want to read a brief definition of

16     Capper-Volstead.  February 18th, 1922.

17          "The Capper-Volstead Act from 1922 allows

18     agricultural producers to form associations that allow

19     producers to compete together in the marketplace."

20          I guess I should say I am not in favor of going

21     through with this settlement for a lot of reasons, but I

22     am just going to keep this brief.  And if you look at

23     what DMS and DFA have done so far, after what I just

24     read, you would say no, they probably haven't broken any

25     laws.  Let me read further.

1        The act states that "persons engaged in the

2    production of agricultural products as farmers,

3    planters, ranchmen, dairymen, nut or fruit growers may

4    act together in associations, corporate or otherwise,

5    with or without capital staff, and collectively

6    processing, preparing for market, handling and marketing

7    in interstate and foreign commerce, such products of

8    persons so engaged.  Such associations may have

9    marketing agencies in common, and such associations and

10   their members may make the necessary contacts and

11   agreements to effect such purposes."

12        Still, it's up to you if they have broken that law.

13        Now, there's one more little piece:  "Provided,

14   however, that such associations are operated for the

15   mutual benefit of the members."  And that right there, I

16   have to say, yes, that's clear as it can be, but I think

17   the books need to be open there and just do a little

18   more digging into how they operate compared to what this

19   piece of paper says.

20        And that's all I have.

21             THE COURT:  Thank you.

22             MICHAEL SWANTAK:  You want this?

23             THE COURT:  If you give it to Jen, she will

24   make sure that I get it, so you can come forward.

25        Thank you.

1          MICHAEL SWANTAK:   Thank you.

2          THE COURT:   Anybody else who wants to speak?

3     All right.   I have some questions for the

4     attorneys, and we are going to hear from them.

5          I have, obviously, read your papers.   And I have a

6     couple subject matters, in particular, that I am

7     interested in your thoughts on.

8          When this came before the Court for preliminary

9     approval and it became clear to me that there was a

10    division between class counsel and class

11    representatives, I had a lot of questions for you about

12    what happens, how does the settlement occur without

13    authorization, can you settle over the class

14    representatives' objections, and you both provided legal

15    briefing on that.

16         But this is not at all the typical case.   I have

17    had settlement of class action suits, obviously, before,

18    and I am interested in your thoughts about what happens

19    when the division is this marked and the class

20    representatives are themselves fiduciaries and take a

21    very different view of the value of the settlement.

22         The release:   I have a problem with the release.

23    As a fiduciary to the class and having the

24    responsibility under the law to look out for their

25    interest, I just see this release as incredibly broad,

1    and it would even involve -- if the milk check was wrong
2    and you could prove it, that would be extinguished.  It
3    includes a release of all of DFA and DMS's members.
4        I would have a hard time -- I couldn't discern who
5    all is covered because I don't know who they have an
6    ownership interest in or who's their affiliates.  And
7    it's a lengthy period of time, and it just is not a
8    release that says all the claims that have been brought
9    in this lawsuit or could have been brought in this
10   lawsuit.  It's far vaster than that.  And I just don't
11   see how it squares off with the monetary settlement.
12       So I am very concerned about the release, and I
13   hadn't actually focused on the definition of the
14   complaint, so I am thankful for Mr. Haar for referencing
15   me back to the prelude to the settlement agreement that
16   defines the complaint to include any pleading filed in
17   this case.  And how does that affect the release?  Are
18   we really talking about any mention of any matter in any
19   of the papers filed in this court would be covered by
20   the release?  That would be astonishingly broad.
21       So I have a problem with the release, and sometimes
22   those problems can be fixed and sometimes they cannot.
23       Injunctive relief:  In ultimately granting
24   preliminary approval, I made the comment that the relief
25   in the settlement agreement is broader than what would

1    be ordered by the Court after a trial, and I only meant

2    that at this point the injunctive relief claims have

3    been narrowed to an injunction for anything either the

4    Court or the jury finds unlawful.  And you really don't

5    need an injunction to enjoin unlawful conduct.  It's

6    unlawful.

7        So that isn't really a lot of injunctive relief.

8    If a jury finds conduct is unlawful and somebody engages

9    it in -- the next day, they have got a problem with or

10   without a court injunction.  So I saw this as different

11   in kind as to what would happen at the end of the day.

12       But I am very concerned about the class

13   representatives' careful reading of the injunctive

14   relief and their representations that either they

15   already do it, this is already on the website, this

16   doesn't provide us with any benefit.  So that is

17   concerning.

18       I have been, obviously, your judge from the

19   beginning, and we have had many pointed discussions

20   about what is this case about.  And truthfully, this is

21   the first time I am hearing about the control of the

22   testing and how test results may or may not be

23   manipulated to produce certain results and cause

24   retaliation, and what happens if you terminate your

25   agreement but you have no place to go with your milk.

1          And certainly some of those points are raised, but

2     one of the challenges in presiding over this case is the

3     plaintiffs' kind of ever-evolving conspiracy, two

4     layers -- first it was this act or that act -- and me

5     trying to kind of corral it into something that was

6     manageable, and explaining to plaintiffs' counsel, you

7     know, you should be concerned if I don't understand your

8     theory of the case, that should be very concerning to

9     you, and having that conversation.

10         I just -- you know, one of the things that was

11    brought up in the summary judgment motion and other

12    times is this nonsolicitation agreement and co-ops

13    should not be discouraging other co-ops from soliciting

14    their members and there shouldn't be any spoken

15    agreements, and you know that in Silicon Valley that was

16    the focus of Judge Koh's decision and her rejecting

17    approval of the settlement, and there was very strong

18    proof in that case.

19         In this case, there has been strong proof, but I

20    remember Mr. Kuney directing my attention to:  Let's

21    say, for the sake of argument, that happened.  How does

22    it translate into damages?  How does it result in money?

23    And I just didn't feel like the plaintiffs' expert could

24    answer that question.  It was somehow included in there.

25         So I am concerned about when I am assessing the

1    likelihood of success on the merits and how this would

2    do at trial, that the class representatives have one

3    case in mind, and I was presented with a different and

4    much more wide-ranging and unwieldy case than they have

5    talked about today.  And how do I do that in evaluating

6    what would have happened in trial and what are the

7    likely ranges of recovery?

8        When the parties came to me and said, you know, we

9    won't want any further opt-outs, I looked at the case

10   law, and I said, yeah, this is -- we're pretty far along

11   in the lawsuit.  People have already had an opportunity

12   to jump in and out of the class, and at this point

13   there's no reason to let anybody opt out anymore.  We

14   have been here for years, and if they wanted to get out,

15   we had opportunities to do that.

16       It gives me pause when I see a release of this

17   magnitude and breadth to adhere to that position, to

18   say, you know what, you are in it, and you are going to

19   be releasing these claims, and you are going to have

20   this very expansive release because you didn't get out

21   when it was -- when the opportunity was there.  So I am

22   worried about that opt-out provision not being here in

23   the settlement.

24       I am interested in your thoughts, which some of the

25   parties -- or some of the speakers said, you know, we'd

1    be better off going to trial and losing because at least

2    we wouldn't be giving up anything by way of the release.

3    And in speaking to these issues, I am mindful of the

4    people who spoke in favor of the settlement, and it's

5    understood that settlements are the preferred way of

6    resolving lawsuits, if it can be done fairly,

7    reasonably, and adequately.  There's lots of case law on

8    that.

9        So I understand that's the backdrop, and we are not

10   really talking about are settlements, in general, a good

11   thing, but is this settlement a good thing.  And in

12   deciding this case, it's different because the

13   challenges are not just the money's not enough, the

14   injunctive relief is not broad enough, but many

15   arguments that, "I wanted this case to go to trial and

16   wanted the facts to be portrayed in front of a jury.  I

17   wanted this exposure, and that's why I was in it."  And

18   I haven't seen too many cases talking about that

19   particular factor.

20       So in analyzing the fair, reasonable, and adequacy

21   of the settlement, the courts don't talk about, but did

22   the plaintiffs really want to go to trial and have their

23   day in court, and did that get taken away from them.

24   But that's a theme here, so I am interested in how you

25   think I should be addressing that.

1    My comments are not intended to foreclose any of

2    your own.  Those are just some of the things that I am

3    thinking about.  And I am going to start with plaintiff

4    for their arguments in favor of approving the

5    settlement.

6         MR. PIERSON:  Thank you, your Honor.

7    Your Honor, Kit Pierson for the DFA, DMS subclass.

8    Your Honor, this case, was started five years and

9    three months ago.  I think you had only recently come on

10   to the federal bench.  It's been obvious from the outset

11   that the case evoked strong opinions and strong

12   emotions.  It evoked strong emotions and opinions by

13   caring, serious people and, frankly, by people on both

14   sides of the case.

15        Our job as counsel, your Honor, and as counsel for

16   the DFA, DMS subclass, has been to look at the facts,

17   look at the law, look at the probabilities and the

18   prospects in an objective way, in a dispassionate way,

19   in a sober way.  That is not always an easy job in this

20   context.  It involves telling people things that they

21   may not want to hear and making hard calls.

22        And what I'd like to do -- and I will try to answer

23   the Court's specific questions in the context of this --

24   is really walk through with you the Grinnell factors and

25   the thinking that led to our analysis of this

1   settlement, your Honor.  And I would start -- I would

2   start with two overriding principles that I think are

3   significant.

4        Number one is the notion, which your Honor

5   reflected in the Dean settlement, and it's clear from

6   the Second Circuit law, that there is a strong public

7   policy in favor of settlement, and that's sort of --

8   that's a starting point.  It's not dispositive.  It's a

9   starting point.

10        The second starting point that I think is

11   particularly applicable here is that there is a strong

12   presumption in favor of the fairness, adequacy, and

13   reasonableness of the settlement when three conditions

14   are present.

15        When the settlement is the result of arm's-length

16   negotiations, that's the first condition.  That is

17   clearly the case here.  These parties wrestled with each

18   other for five years.  They were as -- the Court -- as

19   we explained to the Court, there were sort of

20   false-start settlement discussions over that period, but

21   no one was quick to settle this case, your Honor.  This

22   was the epitome of arm's-length negotiations.

23        The second factor in applying the strong

24   presumption is the stage of the case.  Was there full

25   discovery so that people had an opportunity to evaluate

1      the situation?

2                    THE COURT:  So let me stop you on "arm's

3      length" because the argument that I am hearing is, yes,

4      until the money's on the table -- and the plaintiffs'

5      counsel is asking for $16.6 million -- that's when the

6      arm's length disappeared.  And the word "collusion" has

7      been used today.  I might define it differently than

8      that.  So I don't think at this point that that's

9      uncontested.

10                   MR. PIERSON:  Your Honor, it may be contested,

11     but it is not accurate.  You know, this case was hard

12     fought for five years, and I have been fighting cases

13     hard for 30 years from clients ranging from people in

14     Guantanamo to Microsoft and everyone in between, and

15     this case was no different in that respect, your Honor.

16           What happened in this case, and the reason there

17     was a settlement, is not unlike a number of other cases

18     that all the experienced counsel in this case have been

19     involved in.  You know, we did not have what we regarded

20     as a serious settlement offer, ever, or a settlement

21     offer that we were prepared to accept or recommend to

22     the Court, until we got to the eve of trial, which DFA,

23     DMS looked at their risk and their position changed

24     dramatically.  It happened, frankly, the Friday before

25     the final pretrial conference, which is why we wanted to

1    notify the Court right away.

2         And after that -- after that was really initiated

3    by DFA, DMS, you know, there were a series of lengthy,

4    lengthy phone calls with each of these subclass

5    representatives.  Now, they are free to disagree on the

6    merits of that, but there is not the slightest question

7    in my mind and Mr. Abrams', who is very involved and can

8    explain himself.  You know, this was hard fought, arm's

9    length, you know, in the very essence of that.

10        And I will also tell you, your Honor, that a fee

11   calculation was not a factor in my mind.  It was never a

12   factor in my mind.  It's never been a factor in my mind.

13   The Court will decide the appropriateness of the fee in

14   this case.  That's within the Court's discretion.  But I

15   make a decision in this case and other cases about

16   whether to settle without that as a consideration.  And

17   that was -- and that was what was done here.  So that

18   factor is present here, your Honor.

19        The second factor was there a full discovery, you

20   know, what we're really trying to get at there is has

21   counsel -- have you been at this long enough that -- and

22   have you had judicial rulings that gives you an

23   opportunity to assess the pros and the cons and the

24   risks, et cetera.

25        Your Honor ruled that that standard was met in

1    connection with the Dean settlement.  We're years past

2    the Dean settlement with a fuller discovery record, with

3    comprehensive judicial opinions on some of the key

4    issues in the case, and I am going to talk to you about

5    those and the significance of those to our calculation.

6        But -- but, you know, you know, both the Court and

7    our eyes were wide open in connection with this.   I

8    mean, it would be hard to find a case -- there are five

9    million pages of documents produced in this case, your

10   Honor.  It would be hard to find a case where that was

11   more easily satisfied.

12       The third criteria for the strong presumption is

13   whether experienced counsel were involved.  And,

14   your Honor, this is a point that I want to emphasize

15   because there were really five law firms involved in

16   this, and they're law firms -- these are not law firms

17   that are quick to settle cases.  Exactly the opposite.

18       Mr. Abrams, you know, is one of the finest lawyers

19   in the country, as is -- frankly, as is Mr. Kuney.  Very

20   experienced trial counsel.  His reputation is he takes

21   cases to trial.  He is a member of the American College

22   of Trial lawyers.  He is a lawyer that knows when to

23   take a case to trial and not.

24       The same is true of our firm, your Honor.  We have

25   taken -- I personally have taken a class action case to

1    verdict in the last two years.  Our firm has -- and I

2    supervise the antitrust group.  I am the co-lead of

3    at --

4              THE COURT:  So -- but let me ask you.  I

5    haven't seen the courts analyze whether a particular

6    attorney's the type to take it to trial or not take it

7    to trial.  And I view the Dean settlement very

8    differently in that at that point Dean said, Here's some

9    money.  We don't want to be involved, and we -- you

10   know, we aren't going to participate, and we are going

11   to have -- we are going to pay enough to get out of it

12   early.

13       And after the injunctive relief was dealt with,

14   there really wasn't any opposition, that I was told

15   about, to that settlement.  So I don't think it's a

16   question of will you take it to trial or not.

17              MR. PIERSON:  The question, your Honor, is

18   whether -- is whether you can have confidence in the

19   settlement because the judgment was made by experienced

20   counsel.  That's the question.  Was this made by

21   experienced counsel, or was it made by a bunch of

22   novices?

23       And the point I am making, your Honor, is that,

24   viewed from a variety of perspectives, you have, you

25   know, attorneys with a proven willingness to take cases

1    to trial.  You have attorneys that have litigated in the

2    Southeast for seven years, and Mr. Abrams can tell you

3    everything you need to know about the differences

4    between that case and this case, not the least of which

5    was the statute of limitations.

6        You have two very fine law firms in Vermont, and

7    you have David Balto, who has been in a senior position

8    at the FTC, and my partner, Ben Brown, who was in the

9    Department of Justice's antitrust division.  So you have

10   lawyers that have been on the defense side of cases, on

11   the plaintiffs' side of cases.  I have tried cases on

12   the defense side.  I have tried cases on the plaintiffs'

13   side.

14       You have lawyers looking at this from a variety of

15   perspectives, and those lawyers unanimously concluded

16   that this was in the best interests of the settlement.

17   And that's -- so I am not saying that the presumption is

18   irrebuttable.  What I am saying is that the Second

19   Circuit and this Court recognized in its earlier

20   opinion, I think citing one of those cases, that there

21   is a strong presumption when those conditions are met,

22   and they are clearly met here.

23            THE COURT:  So let me ask you about that

24   because I started off by saying this is unusual in that

25   I haven't had a settlement of a class action where class

1    representatives who know a lot about the case -- they

2    know a lot about the case.  They are not people who have

3    been kind of floating in and out and are on the caption

4    and don't know what the case is about, and they don't

5    share that level of confidence that you have, and that's

6    unusual, and what do I do about it?

7         So usually when I'm analyzing are counsel

8    experienced and otherwise competent and professional, I

9    am talking about what I see, and I have already found

10   that you are all capable of litigating this case.  But

11   we got a division here that doesn't exist in the

12   ordinary case.  And I assumed that your research was

13   exhaustive when I asked you about it.  Doesn't seem like

14   it's come up a lot in other cases.

15              MR. PIERSON:  Your Honor, there are numerous

16   cases in the Second Circuit and elsewhere in which class

17   representatives, sometimes unanimously -- which is not

18   the case here; you basically have three farms opposed,

19   one farm in favor -- but you have cases in the Second

20   Circuit and elsewhere where there is unanimous

21   opposition.  And courts say that, you know, counsel has

22   to make an independent judgment of the situation.

23        In all frankness, your Honor, I will tell you one

24   of the reasons that's true here is because the case

25   provokes such strong reactions because it involves

1    people's livelihood, and we understand that; that

2    some -- that there are some facts and -- or there are

3    some myths about the industry that just become

4    unchangeable in some people's minds.

5        And I will give you an example of that.  It was

6    alleged earlier today that Dean has 70 to 90 percent

7    market control in the Northeast.  Your Honor, there is

8    no evidence in the record -- not only is there no

9    evidence in the record supporting that conclusion, it's

10    simply not right.  It's simply incorrect.

11        Now, if I, as a subclass representative, believe

12    that there was 90 percent ownership by Dean here or 70

13    percent ownership, the case would be a very different

14    case, fundamentally different case, than the one you

15    have in front of you.  And, you know, it's a point that

16    we have made, you know, over and over that it's -- you

17    know, you -- it's not a mysterious -- certainly it was

18    in our interest and in Dr. Rau- -- you know, it would

19    have made sense for Dr. Rausser, if that face was even

20    close to correct, we would have claimed it.  It wasn't

21    in our interest to downplay the market share.

22        But you can go to the plants, you can see their

23    capacity, and both experts agreed on that.  And that's

24    why at the end of the day, your Honor, and I -- look, I

25    have the utmost respect for the integrity and the

1    motives of the subclass representatives.  You know, they

2    have done the job we have asked them to do, and I

3    applaud them for that.  But at the end of the day, you

4    know, there's a factual record here, and there's law,

5    and it has to be taken seriously, and it has to

6    inform -- it has to inform judgments.

7        And I will talk about that in a moment when I go to

8    risk, but an example of that is, you know, your -- the

9    Court has expressed some very serious concern in

10   these -- in this case about substantive issues.  And the

11   Court's made rulings that have legal consequences for

12   trial and for the risk to class members, and they have

13   to be taken into account.  And that's our job as

14   lawyers:  Even when people who care passionately about

15   this and who we like, you know, wish those facts don't

16   exist, we have to take that into account.

17       So let me turn to the 7 -- to the Grinnell factors,

18   and I will try to do it in a relatively succinct way.

19   The first factor is the complexity and expense and

20   duration of the litigation.  You know, I think that

21   factor is pretty -- it's pretty self-evident.  I have

22   been doing this 30 years.  It's about as complex a case

23   as it gets, and there --

24            THE COURT:  Well, let me ask about that

25   because I am not convinced it had to be that complex,

1    and I was interested in member of the public's

2    perception of my perception, and I hadn't read this

3    newspaper article, about what to do with your summary

4    judgment motion in opposition.

5         And it was such an overload of information and

6    document dump that it would have been impossible for me

7    to discuss each and every thing that was in that case.

8    It would have been a year-long writing exercise.  And so

9    I started looking at documents that I thought did not

10   match up with what you were telling me they said.

11        So you would say, This, you know, reflects their

12   agreement to conspire.  I'd look at the document; I'd

13   say, This doesn't say anything of the sort.  I don't

14   understand where it is.

15        So I'm not so sure that the complexity was built

16   into the case or it evolved.  And if you will remember,

17   we started out with one aspect of milk price, and I was

18   like, That doesn't seem right to me.  I am not a milk

19   expert.

20        Yeah, you are right; it's not right.  Here's a

21   new mix.  That doesn't seem right to me because really

22   what you are looking at is that uniformity that's part

23   of regulation.

24        Yeah, you're right, that's not -- and I told you

25   that's not a good thing.  That gives me a lot less

1   confidence because I can't -- I don't want to be

2   second-guessing a national expert in economics about his

3   theories.  And I kind of felt I was in that position

4   frequently.  So I am not convinced that the complexity

5   was inherent in the case as opposed to -- and may be an

6   effective litigation strategy because it certainly made

7   the defendants do a lot of work.

8           MR. PIERSON:  Your Honor, let me make a couple

9   comments about that, and it's a dialogue we have had

10  before.  One is, I can assure you if there was a single

11  document that sort of laid this all out and made the

12  simple case like some price-fixing cases that we're

13  involved in, I believe in litigating a case in a simple

14  fashion if, in fact, the evidence will allow you to do

15  that, if there is a single thing to point to.

16       So, for example, you know, you heard reference

17  today to milk testing or concern about milk testing.

18  Your Honor, there were -- and Mr. Abrams can comment

19  about the record in the Southeast, but,  you know, we

20  got voluminous discovery in this case, and there were 70

21  depositions in this case and probably another 50 in the

22  Southeast or 70 in the Southeast.

23       You know, if there had been -- putting aside

24  isolated, anecdotal and largely unproven assertions

25  about that, but limited assertions about that, if the

1    evidence was there, your Honor -- you know, the critique

2    your Honor has raised is that -- is that we threw too --

3    in too many things, not that we didn't, you know,

4    include things we should have included in.  If the

5    record had supported that, you know, we would have made

6    that claim.

7         But with extensive discovery in this case, you

8    know, it was, at best, a highly tangential issue in the

9    case.  That's the reality.  And as an officer of the

10   court, you know, I am not going to try to create

11   evidence that doesn't exist, that --

12        You know, but the point the Court raises was a

13   concern for us because we looked at the evidence --

14   there's no single document that sort of lays this thing

15   out, and we explained the evidence as fulsomely as we

16   could.  You know, here's our best evidence.  Here is all

17   our best evidence.  And the Court expressed concerns

18   about it.

19        And obviously, we have to make an independent

20   judgment about that.  And I remember one colloquy you

21   had with me, your Honor, is, you know, the jury's not

22   going to be able to understand this.  It's hard to

23   explain it.  I remember you commenting it was hard to

24   explain to the law clerk.  And, you know, I took those

25   comments really seriously.  You and I have had very

1    intelligent, I think, dialogues over the last five
2    years.
3        And when we present what we have found as the best
4    evidence in this voluminous record, and the Court says,
5    "It's confusing.  It's too far reaching.  I don't see.
6    It, I think -- I don't see the inferences you are
7    drawing from those documents," your Honor, I can agree
8    or disagree with that, but I am certainly going to
9    factor it in to the analysis of how a jury's likely to
10   react to this.
11       And we did, your Honor.  We took your comments and
12   concerns very seriously.  And if there was a simpler way
13   to present this case, if there was a single smoking gun
14   as opposed to sort of a broad conspiracy that involved
15   lots of actors that had to be brought into it, we would
16   have presented the simpler case.
17       But, your Honor, as much as, you know, particular
18   plaintiffs may wish the evidence was like this, or there
19   may be a lore in the Northeast that it's like this,
20   we've got to go where the facts -- where the facts and
21   the record led us, and that's what we evaluated it.  And
22   we evaluated it with your Court -- with the Court's
23   concerns in minds.
24       The only other point I'd make about complexity,
25   because it's raised by the Court's comments, there are a

1    couple aspects of this record that really do make it

2    more complex even than -- I mean, I basically have been

3    doing really complex antitrust cases my whole career.

4    One thing that is unusual about this case, the

5    regulatory structure is unusual.  The market definitions

6    are harder in this case, frankly, I think, than in a lot

7    of cases.

8         But the odd thing about this case is even

9    determining the price, which is an issue you reference,

10   you know, and where is it, what's it -- you know, even

11   when we sort of -- when everyone sort of got on board

12   with the notion that it was over-order premium, then we

13   had big fights with Rausser about whether he was

14   measuring it properly and there was the location

15   differential with Boston.

16        So it's not a case -- and I don't want to belabor

17   the point because it was only one of many factors, but

18   it's a really complex case.

19        The reaction of the class.  Your Honor, I think

20   this is -- this is significant, and I think it does

21   counsel in favor of the settlement.  You have heard very

22   impassioned and prepared and well-meaning statements by

23   several class representatives.  The fact is that 8,859

24   class members were notified about -- about the

25   settlement, and they were notified in a way that was

1    approved by the Court.  They received -- received the

2    Court's opinion.  They received direct mail notice.

3         And this is a case that, you know, people pay

4    attention to.  These are generally people that have

5    filed claims before under the Dean settlement.  People

6    pay attention to this case.  This is real money.  This

7    is not a coupon.  It's not $25 checks.  It's thousands

8    of dollars to people who -- you know, it matters.

9         And, you know, I respect anyone that objected to

10   the settlement, but the reality is that of those 8,850

11   people that got notified, you know, there were 10

12   objections by people that don't understand because they

13   are outside of Order 1, and that's a ruling the Court's

14   already made, was a correct ruling, and that left --

15   that left the three subclass representative farms and

16   their various members who objected, and it left 14 other

17   objections.

18        And, you know, we have commented on some of the

19   deficiencies in those objections.  Some were untimely.

20   But I don't really care about that.  Let's just take the

21   number at face value.

22             THE COURT:  So let's talk about that because,

23   as my judicial colleagues and I are grappling with class

24   action suits, and I have heard people say at conferences

25   they ought to be abolished because it's just not

1    achieving the benefit that was intended, silence of the

2    class is increasingly less used as that means everybody

3    thinks it's great.

4         And one of the things I was thinking about over the

5    lunch hour is, if you have a Pella window settlement,

6    and you don't get what you want for your defective Pella

7    window -- I have to go look at the case again, but I

8    can't remember the facts -- what's going to happen to

9    you?  You are going to -- you don't get your -- your

10   window fixed.  You don't buy windows there anymore.

11        And the point here is, "These people control our

12   livelihood.  They have our milk checks in their hands,

13   and they have the future of our ability to find a place

14   to sell our milk."  And you need to factor that in and

15   the amount of courage it would take to get up here and

16   talk about -- people use the phrase "complain about your

17   boss to your boss."

18        So I don't think that courts are saying, with

19   routine, like they may have previously, there's 5,000

20   people in the class and I haven't heard anybody in this

21   class action suit file an objection -- and I have had

22   those class actions -- and that must mean all 5,000

23   people are happy because you and I are getting class

24   action solicitations at home, and we're not answering

25   them either.  So what about that?

1              MR. PIERSON:  I think that's a fair

2    observation, your Honor, but I have a couple reactions

3    to it.

4              THE COURT:  All right.

5              MR. PIERSON:  So let's take, as a given, 99.8

6    percent, and I think that's basically the statistic.

7    99.8 percent of the people that were contacted about the

8    settlement with direct mail, with a court-approved

9    notice, in your opinion, did not object.  And that

10   argument might have some force if only -- if it was only

11   the DFA, DMS members that were not objecting.

12        But here, about half of those people -- it may be

13   more than half of those people -- do not sell their milk

14   through DFA, DMS.  So you have got thousands and

15   thousands of farmers who, at least as the class

16   representatives suggested, actually got a little less

17   relief out of equitable relief.  So if anyone had a

18   right to complain or if anyone would be expected to

19   complain, it would be those thousands and thousands of

20   people.

21             THE COURT:  So let me ask you about that.  I

22   don't -- let's assume, for the sake of argument, I have

23   the benefit -- I don't have to work with DFA and DMS,

24   they are not doing anything to me, and you want to give

25   me money, and I am going to say yes.  I am going to

1     release them.  I haven't had any kind of relationship to

2     them, so I am not giving up anything.

3          How is that a factor that would make them more

4     likely to object?

5               MR. PIERSON:  Because, your Honor, a part --

6     and Mr. Abrams can speak to this, but part of the whole

7     premise of this case has been that those farmers had

8     antitrust claims, and that, you know, under the

9     settlement they are releasing their claims, and they

10    have got to decide whether the benefits of the claim --

11    the benefits of the case financially and in terms of

12    equitably make it -- it's making sense for them to do

13    that.  And, you know, what you know is that 99.8 percent

14    of the people that were informed of that, you know, had

15    no objection to it at all.

16         And there are two other points I would like to make

17    in connection with that.  One is -- and this is

18    significant, your Honor.  You know, this notice was not

19    only sent -- you know, this information has not only

20    been sent to the -- to the class members.  It was also

21    sent to attorney generals in 10 states, including

22    Vermont; it was sent to the Department of Justice; it

23    was sent to the Attorney General for the District of

24    Columbia, none of whom have said that this is

25    unreasonable, that it's insufficient, that it's

1    wrong-handed.  None of them.

2         And you may remember, in connection with the Dean

3    settlement, the Vermont AG -- and we talked to the

4    Vermont AG's office about the case frequently over the

5    years and about the settlement.  You may recall that

6    they did come in, in connection with the Dean

7    settlement, and raise concerns about whether the money

8    was sufficient.  None of those entities have raised

9    objections.

10        The other indicia you have here, your Honor, is --

11   you know, the fact of the matter is, even though the

12   deadline for submitting claims is not till the end of

13   May, you know, 600 farmers have already basically voted

14   with their feet by filing -- I think the number's 576 --

15   by filing claims.  So you have got 576 people that are

16   already standing in line saying, I'd like the benefits

17   of the settlements, versus, you know, really, frankly, a

18   fairly *de minimis* -- I would say a *de minimis* level of

19   objections.

20        You know, give that factor whatever weight you want

21   to, your Honor, because I, frankly, think there are

22   other factors that may be more important, but I do think

23   that factor supports settlement here.

24        The third factor, the stage of proceedings, I don't

25   need to belabor it.  We are obviously -- that factor is

1    obviously satisfied.  We are late in the game here.

2         I do want to talk about the risk factors that went

3    into our analysis.  And there were several and they are

4    significant.

5              THE COURT:  Would you agree with Miss Haar

6    that there was really no risk that you would lose class

7    certification in the midst of trial?

8              MR. PIERSON:  You know, your Honor, I wouldn't

9    say -- I wouldn't say that that is not a risk, in all

10   honesty, and there's a couple reasons for that, because

11   we are fighting that issue in basically every court in

12   the country, including the courts of appeals.

13        There were two risks, your Honor.  Number one, DFA,

14   DMS had made it clear in their motions *in limine*, that

15   they were continuing to contest that, and, you know,

16   they -- as they have a right to, because the Court can

17   revisit the issue.  And what was going to happen at

18   trial, I think, we all know, is that they were -- I

19   mean, I think they had listed 30 or 40 farmers as

20   witnesses, if not more.  And they were going to get on

21   the stand and praise DFA and praise DMS, et cetera.  And

22   they clearly were going to raise that issue again,

23   your Honor.

24        And the second point is that if we got a jury

25   verdict, there is not any -- there's zero question in my

1    mind that it would have been raised on appeal because,

2    you know, your original ruling -- you know, the Court's

3    struggled with it.  The Court wrote two comprehensive

4    opinions, and I think pretty close issue in the Court's

5    mind was -- was my sense, maybe -- I am not trying to

6    read your mind, but it was an issue, and it was going to

7    be raised on appeal.

8        So I would not say it was the foremost risk we were

9    concerned about.  It was a risk.

10       Here are the foremost risks that I would -- that I

11   would say we focused on.  The first was one that

12   your Honor has raised, which is the statute of

13   limitations issue.  And you have raised it at every

14   juncture of the case.

15       As you know, you know, farmers, for years, didn't

16   pursue these claims until -- you know, until we agreed,

17   really in 1990 -- end of 2009, I guess, when the case

18   was filed or -- when we -- or 2011, whenever it was, a

19   long time ago.  You know, the conduct here goes back to

20   1998, and the concern that your Honor repeatedly

21   expressed was, you know, what about damages outside the

22   four-year limitations period?

23       And you expressed serious concerns about that from

24   two perspectives.  You know, one, legally do you guys

25   get over the bar?  And, two, even if legally you get

1   over the bar, I would say you expressed skepticism about

2   whether there really was a fraudulent concealment case

3   here.  And you allowed us to go forward on that at

4   summary judgment, and we understood that.

5        But we also understood that your Honor had

6   commented that we bore a heavy burden on that issue,

7   that the jury was likely to be instructed that we bore

8   the burden on all those issues, and that your Honor had

9   expressed skepticism at various points about whether,

10  given this record, we could really get over that bar.

11       So I am not saying that was dispositive, but we

12  understand that for the claims outside the four-year

13  period that was an issue that had -- that the Court had

14  taken very seriously and we would have to take very

15  seriously.

16       For claims within the four-year period, those

17  claims had statute of limitations issues, too, that we

18  had to grapple with.  We posited three theories for why

19  damages -- those damages were recoverable.  One was

20  Berkey Photo.  One was speculative damages, which were

21  actually the two theories that we pushed the hardest,

22  both of which the Court ruled against on summary

23  judgment.

24       The third theory was continuing violations, which

25  the Court allowed us to move forward on but with the

1   limitations that are applicable to that doctrine, and

2   some pretty strong language about that that's -- you

3   know, that the Second Circuit has taken a very narrow

4   view and restricted it to quite compelling

5   circumstances.

6        So the statute of limitation issues, which

7   essentially were not issues in the Southeast, were --

8   that's a risk factor we had to take very, very

9   seriously.

10       The second cluster of risk factors has to do with

11  other rulings by the Court, one of which -- and it's an

12  important one, and I will talk about it a little bit

13  when I talk about the amount -- the monetary amount of

14  the settlement -- was that -- that certain damages in

15  the case, which the defendants had estimated at

16  approximately a third of the claimed damages, were not

17  recoverable because they were umbrella damages.

18       And the Court, in fact, ruled on that issue and

19  ruled adversely to us.  So it was more than a risk.  It

20  could have been an appeal issue.  But it was a ruling we

21  had to grapple with, and it went directly to the

22  recoverability.

23       Secondly, you had expressed concerns, as we

24  discussed earlier, about the theory that

25  comprehensive -- whether it would be comprehended by the

1    jury and whether -- whether the inferences we were

2    asking for from the evidence -- they were not persuasive

3    to you.  And the fact that they -- that you had concerns

4    about it meant that there was a good chance some of

5    those jurors would have it.

6              THE COURT:  Let me ask you about the damages

7    again.  We had a couple numbers float by, and do you

8    agree that, when you were going into trial, you had

9    settled on a request for 340 million that could

10   potentially be trebled, or do you disagree with that?

11             MR. PIERSON:  Let me answer it in a -- in a

12   somewhat -- I agree with the 340 -- well, actually, I

13   need to modify that.  Let me walk you through my

14   analysis of the numbers.  Okay?

15        So starting principle is, in evaluating a

16   settlement, you have to start -- you have to analyze it

17   relative to single damages.  The Second Circuit has --

18   Second Circuit said that in Grinnell that it is improper

19   to view it in terms of treble damages, and that has been

20   repeatedly held.  So the starting number, your Honor, is

21   341 million.

22        The umbrella ruling issue, the umbrella ruling,

23   according to the defendants' perspect- -- from, you

24   know, the defendants said -- your Court -- the Court

25   accepted their position on umbrella damages.  They said

1    that knocked out a third of the claimed damages.  So

2    that gets you down to about $230 million in cognizable

3    damages, your Honor.  40 percent of those damages,

4    about -- which is about 90 --  I think it's 92, 93

5    million dollars, are outside the four-year limitations

6    period.  So those damages are only recoverable if you

7    win on fraudulent concealment.  The remaining damages

8    that are within the four-year period I think come out to

9    about 135 or 140 million dollars, your Honor.

10        So that's -- you know, you get all -- and then that

11   is subject to all the other risks in the case.  That's

12   subject to the risk that they put 25 farmers on the

13   stand and the jury is unconvinced that DFA's done

14   anything wrong here.  It's subject to their challenges

15   to Dr. Rausser's testimony.  It's subject to issues

16   about -- about the market definition.  It's subject to

17   all -- it's subject to their defenses about which

18   companies -- which conspirators were actually in the

19   case and is it a narrower conspirator that's been

20   alleged and does that mean other damages are umbrella

21   damages?

22        So, you know, if we win all the statute of

23   limitation issues, the damages are 231, you know, if

24   you -- if it gets limited to the four years, you are at

25   140.  And then you have all the risks below that.  And

1   we are talking about a settlement here, your Honor,

2   which is $50 million in addition to the $30 million

3   already recovered, so it's 80 million dol- -- and the

4   30 million would be an offset against any treble damage

5   award that comes out of the case.

6        So you are talking about a $80 million recovery

7   with that amount of damages in play.  You know, we are

8   not talking 4 percent, 5 percent.  We are talking about

9   the recovery of a very substantial percentage of damages

10   here in a case in which the risks of financial recovery

11   were very, very high.

12        The other risk factor that I want to mention,

13   your Honor, has to do with the risk of delay.  To be

14   frank with your Honor, your Honor's ruled on a lot of

15   tough issues in this case, and a lot of -- and probably

16   a lot of issues that could have gone either way,

17   reasonably could have gone either way.  And what it

18   inevitably meant, your Honor, was that whatever happened

19   at trial, whatever happened in post-trial motions, there

20   were going to be appeals regardless of -- regardless of

21   who won.  And certainly in the scenario in which the

22   plaintiffs win there were going to be appeals.

23        And my experience is that means -- in a case with

24   this much at stake, it means an appeal to the Second

25   Circuit.  If it's denied for the defendants, it means

1    request for *en banc* review followed by a cert position.

2    My experience, your Honor, is that is a two- or

3    three-year process, and that's if we win.  There's no --

4    if we win.  There's no relief and no payment for

5    probably a two-and-a-half-, three-year period.

6         If the case gets reversed and sent back for

7    retrial, which is not uncommon in an antitrust case of

8    this complexity, where your Honor has to make so many

9    hard calls -- if the case gets reversed for a new trial,

10   with the possibility of further appeals, we could be

11   talking five to ten years before there's any relief or

12   anyone gets paid.  And that -- that was another factor

13   that it would have been irresponsible -- irresponsible

14   not to weigh, your Honor.

15        The issue -- the next Grinnell factor is the

16   ability of the defendants to withstand judgment, and I

17   don't think -- I don't think that was a major factor in

18   our calculation, to be honest with you.  I don't think

19   it was -- not entirely clear that they could have

20   withstood the higher end, but I think the record -- we

21   proceeded on the assumption that they could pay a

22   judgment.

23        I talked about the reasonableness of the financial

24   amount -- the range of the financial amount.  I'd like

25   to talk about the equitable relief that was obtained in

1    the case, and there's several points I want to
2    highlight.
3        The first is that one component of the equitable
4    relief, your Honor -- and it was a really -- it was an
5    important component here, was that the
6    nonsolicitation -- the settlement agreement prohibits
7    nonsolicitation agreements going forward.  And it does
8    so without time limit; that the FSA provisions in the
9    agreement are limited to the term -- basically to the
10   term of agreement in time so that the FSA provisions
11   basically have a two-year period.
12       The nonsolicitation group -- the nonsolicitation
13   provision moves forward.  And frankly, your Honor, as I
14   reviewed -- as we reviewed the record in this case, you
15   know, nonsolicitation in the industry, this is -- it's
16   been a -- from our perspective -- the defendants
17   disagree and would have contested at trial, but, you
18   know, we emphasized that a lot.  We thought it was a
19   major part of the liability evidence.
20       And I know your Honor had questions about how it
21   linked up to the damages, but I know the Court had also
22   said, if I read your remarks correctly, that when you
23   looked at the record, this was the one part of the
24   record -- you had some questions about some other
25   inferences, but this was the one part of the record that

1    seemed problematic.  And I completely agree with that

2    assessment.  And, you know --

3              THE COURT:  So let me give you the devil's

4    advocate.  They know they are not supposed to be doing

5    that.  The judge has already said this looks like a

6    meritorious issue.  I don't know how it translates into

7    damages.

8         How much do you gain in a settlement agreement that

9    says, "Don't do that," when they're kind of already on

10   notice that that's probably something they need to

11   refrain from?  And then I'm -- one of the points raised

12   is, how is this enforced?  Who has the burden of proof?

13   Who's monitoring it?  How do we know whether it's

14   happening or not?

15             MR. PIERSON:  Well, you know, your Honor, it's

16   enforced like any other provision in the settlement.

17   The settlement provides, you know, the Court has

18   continuing jurisdiction.  So one of the early

19   allegations in the case, Mr. Haar learned -- correctly

20   learned -- of this unwritten agreement that existed, and

21   it was one of the facts that he brought to our

22   attention.

23        So, you know, it is a world in which there's an

24   exchange of information of -- you know, fairly

25   suspicious crowd up there.  I mean, people are looking

ugh

1    for things.  So -- but it's like any other provision in
2    a settlement.  If there's a -- it's -- a settlement is a
3    contract.  If they violate the Court keeps continuing
4    jurisdiction.  If there's a violation, they can raise it
5    with the Court, and the Court presumably will issue a
6    show cause to show why it hasn't been violated.
7        And, frankly, if someone came to us after the
8    settlement was put in place and said, "I think there's
9    been a violation of the settlement agreement," we would
10   assess it, and we would do something about it.  So
11   that's the short answer to your question.
12       I digress just for a second on that point.  You had
13   raised the issue about the case out in Silicon Valley in
14   which the settlement was originally not approved.  I
15   think the Shervi (phonetic) settlement, which I may be
16   -- may be approved.  But that -- the reason that
17   settlement wasn't approved -- there are two fundamental
18   differences.  Number one, the Department of Justice in
19   that case had already weighed in and said, I think the
20   way you are doing this in this industry is illegal.
21       I think the defendants here -- I don't think
22   they -- I think they were contesting whether they had a
23   nonsolicitation agreement.  It's not clear to me they
24   were conceding the illegality of it because there is law
25   that creates arguments both ways on that.  It was not

1    clear to me they were conceding the illegality, even

2    if -- even if it was proven.  So that's one difference

3    with the Silicon Valley case.

4         But the fundamental difference with the

5    Silicon Valley case is that the problem in the

6    settlement there was that the plaintiffs had settled at

7    a high number in terms of the percentage of the damages

8    early on in the case.  Let's just call it 20 percent.

9    That's not the exact number, but let's call it 20

10   percent of damages.  And then everything went well in

11   the case for them.

12        And the next defendant comes along two years ago,

13   and they say, Okay, we are going to settle with you for

14   10 percent.  And that's what bothered the judge was that

15   the -- it made no sense, given that everything had gone

16   well, that suddenly they were settling for substantially

17   less than they'd settled for earlier.

18        This case --

19             THE COURT:  But I recall last time we were

20   here, I said -- I was commenting on that, and somebody

21   told me, Well, there's a writ of mandamus, and she

22   shouldn't have done that, and she shouldn't have been

23   looking at the case in that way.

24        And you know what a writ of mandamus is, and I do,

25   and that's the circuit court saying you have overstepped

1      your power as a judge.

2            So did the Ninth Circuit issue a writ of mandamus?

3                  MR. PIERSON:  I don't think so, your Honor.

4      And, frankly, I mean, I don't think I said that because

5      I --

6                  THE COURT:  I am not saying you said it.

7      Somebody said, Don't rely on that.  There's a request

8      for a writ of mandamus.  You know, that's way beyond

9      what Judge Koh should have been doing.

10                 MR. PIERSON:  Yeah.  And, frankly, I don't --

11     the reason -- see, I don't have a problem with that

12     analysis.  So, for example, here, if we had settled with

13     Dean for $75 million, a hundred million dollars, and we

14     came in and said, You should accept the settlement, two

15     years later, even though, you know, we don't -- we

16     haven't walked the smooth path that Silicon Val- -- we,

17     you know, have walked an up-and-down path in which we

18     have taken some hits, had some rulings that helped us

19     and some rulings that hurt us significantly.

20            And -- but be that as it may, if we were coming in

21     here saying, you know, accept a $50 million settlement,

22     even though you accepted a hundred million dollar

23     settlement two years ago, you and I both would be

24     scratching our heads about this.

25            This situation is exactly the opposite.  Here, you

1    know, Dean settled for $30 million.  This settlement is
2    67 percent larger, it's $50 million, and that's the
3    case, notwithstanding the fact the umbrella ruling
4    potentially knocks a third of the damages out of the
5    case.  The statute of limitations issues are what they
6    are.  Rausser's -- Rausser's taken some hits.
7         So it's really -- it's really, I would say, almost
8    exactly the opposite of the situation out there.  So I
9    don't want to -- you know, I don't want to overemphasize
10   that.  I just think it's a fundamentally different
11   situation.
12        So point one about the equitable relief is that it
13   deals with a nonsolicitation problem in a way that is
14   enduring, is as enforceable as any settlement provision,
15   and if the case had gone to trial and there had been a
16   defense verdict, it would have been a validation -- the
17   notion that there was no risk in going to trial and
18   losing and that wouldn't have resulted in bad things,
19   it's just fundamentally wrong.
20        If this case had gone to trial and they had won,
21   farmers that wanted practices at DFA and DMS to change,
22   including nonsolicitation, they would have been nowhere.
23   And not only would they have been nowhere, it would have
24   been *res judicata*.
25        The second aspect of the settlement agreement is

1    the full-supply agreement.  And the important point I

2    want to make about the full-supply agreements is, you

3    know, there's this notion that was expressed that Dean

4    controlled 70 to 90 percent of the market.  That's just

5    wrong.

6         What the full-supply agreement provision does is

7    say, you know, for the next two years, you are limited

8    to the full-supply agreements in Schedule A.  And our

9    best calculation, your Honor, is that that's about 30

10   percent of the market.  It may be slightly less; it may

11   be slightly more, but it's about 30 percent of the

12   market, which leaves 70 percent of the market in play,

13   particularly with these nonsolicitation provisions gone.

14        And, you know, that was presented to all the -- to

15   all the state attorney generals and the Department of

16   Justice.  You know, no one has expressed concern about

17   that as sort of an appropriate way to deal with that

18   issue.

19             THE COURT:  So let me ask you about that

20   because the full-supply agreement provision says you can

21   keep what you have and renew it, and you can't have new

22   ones during this time period.  And I am hearing, Well,

23   that's exactly what we are worried about, what you have

24   in place and what you have the ability to renew.  And

25   that is the focus of this case.  It's not future

1    supply -- full-supply agreements.  It's what's on the

2    ground now and how it's affecting the market.  What

3    about that?

4              MR. PIERSON:  Your Honor, if the agreement

5    preserved more than 30 percent -- more than 30 percent,

6    that would -- that would raise a significant concern,

7    and it would have raised a significant concern to the

8    state attorney generals.  But when it's 30 percent and

9    when it's been presented to the Department of Justice

10   and attorney generals in every state that's been

11   affected, and no one has said that is an insufficient,

12   inadequate way -- unreasonable way to deal with this

13   problem, that's a -- that's a reasonable term of

14   settlement, your Honor.

15        The other provisions I wanted to comment on was

16   there are a number of the provisions that go to the

17   integrity of the financial information presented by DFA,

18   which has been an issue -- you know, it's not at all

19   clear that that's relief that could have been ordered.

20   Even if the case was successful, that requiring them to

21   do their statements in connection -- pursuant to GAAP,

22   et cetera, requiring --

23        I mean, one way to view this -- I guess a good way

24   to express it is, you know, look at this like a

25   Sarbanes -- Sarbanes-Oxley provision.  And, you know,

1    corporate America is not happy about the Sarbanes

2    requirements, people certified, et cetera, et cetera.

3    You really gotta look at those provisions about the

4    integrity of the financial information collectively.

5         They require, without time limit, the use of a

6    national accounting firm, which has independent -- you

7    know, which has its own liability risks, et cetera, et

8    cetera.  So they are required to do that.  They are

9    required to conform to GAAP, which is fundamental to

10   financial integrity and is -- and they're under no such

11   requirement right now.

12        And, thirdly, senior management and the

13   independent -- and the auditors committee are required

14   to certify, are required to affirmatively represent that

15   they are responsible for the preparation and integrity

16   of the financial state- -- of the financial statements.

17   So that's really where the Sarbanes-Oxley piece kicks

18   in.  That isn't required right now, and --

19                THE COURT:  So -- and I agree with you that I

20   would not be taking that kind of micromanaging effort in

21   injunctive relief after a trial in which you prevailed,

22   especially since you didn't ask for that, but the

23   argument on the other side is, yes, and if we find

24   something, we have released it.  So it's great to know

25   what's going on, but that release wouldn't allow us to

1    do anything about that.  What about that argument?

2             MR. PIERSON:  I'm sorry.  I am not --

3             THE COURT:  So you have got a financial

4    disclosure.  We are going to find out about this.  But

5    we are not going to be able to do anything about it.

6    And I know that the release is not for future claims,

7    but what about that argument?

8             MR. PIERSON:  That's the point, your Honor.

9    That is a provision -- injunctive relief, you know,

10   fundamental -- I mean, we dealt with anticompetitive

11   conditions, really, I think, about as well as we could,

12   and really the only compromise that could realistically

13   have been achieved here.  Those provisions are really

14   going-forward issues, to --

15        So we try to deal with a couple aspects of this.

16   Sort of there are issues about which Mr. Haar, in

17   particular, was quite concerned about, about corporate

18   democracy, financial integrity, transparency of the

19   records.  And, you know, as in any case where you are

20   dealing -- you know, injunctive relief is designed to

21   stop illegal behavior in the past, but it's also

22   designed to address issues going forward.  And none of

23   those provisions were time limited, your Honor.

24        They were real concerns that Mr. Haar expressed to

25   us.  They were things that could not have been achieved

1   at trial.  And they're a significant provision.  I mean,
2   corporate America is in an uproar about Sarbanes-Oxley.
3   So those are significant provisions.
4        The other provision, your Honor, that I wanted to
5   emphasize was -- was this disclosure of the factual
6   record here, which is substantial.  I mean, you know, we
7   don't want to release five million pages of documents to
8   the public.  I don't think the Court would have wanted
9   it, the third parties involved wouldn't want it, et
10  cetera.
11       But pretty much all the bad evidence in the case is
12  in the summary judgment pleadings, and if it wasn't
13  there, it was in the class certification proceedings.
14  And, you know, as a term of the settlement, we
15  negotiated the ability to release that information.  And
16  it will be -- I am confident it will be posted on the
17  Vermont Attorney General's website, just as they posted
18  earlier information.
19       And that has -- that has implications for farmers.
20  It has implications for the public.  And perhaps most
21  importantly, it has implications for law enforcement
22  agencies and legislatures.  And part of our view about
23  this case all along, your Honor, has been to get that
24  evidence out there; that at the end of the day -- you
25  know, it is not realistic for the Court to be managing

1    milk markets for the next five, 10, 15 years.  At the

2    end --

3        And I think there's probably agreement on that,

4    that a lot of the solutions here, at the end of the day,

5    need to come from antitrust law enforcement agencies,

6    need to come from state legislatures, need to come from

7    farmers making informed choices.  And that's -- that's

8    what that's designed to do.

9        Now, there are a couple of broad points I would

10   like to make about the equitable relief.  One is that

11   the equitable relief achieved here is somewhat greater,

12   from my perspective, than the equitable relief achieved

13   in the Southeast, which was approved as fair,

14   reasonable, and adequate on a -- frankly, on a stronger

15   record.  You know, this is broader relief in the sense

16   that it deals with nonsolicitation, which the Southeast

17   didn't deal with at all, which was a major part of the

18   evidentiary record here.

19       It is broader than anything that was done in the

20   Dean settlement.  You will remember that we tried to

21   take one step in that case, and it resulted in a lot of

22   divisions about how to handle FSAs.  And so the Dean

23   settlement, which was approved by the court as fair,

24   reasonable, and adequate, doesn't have -- doesn't have

25   any kind of injunctive provisions like that.  So this

1    settlement goes beyond both of those settlements, which

2    were -- which were approved.

3        It was sent to every relevant law enforcement

4    agency, state and federal, that regulate this order.

5    None of them said those provisions are insufficient.

6    There are other provisions you should be considering.

7    Nobody, including the Vermont Attorney General's Office,

8    raised any concerns --

9            THE COURT:  Well, I would think it would be an

10   overstatement that they got intimately involved in the

11   Dean settlement.

12           MR. PIERSON:  Excuse me?

13           THE COURT:  They did not get intimately

14   involved in the Dean settlement either, and I don't see

15   them popping up in other cases.  So I assume you didn't

16   get a lot of input in the Southeast milk case from them

17   either.

18           MR. PIERSON:  Yeah, I would say -- well, I

19   can't speak for the Southeast milk case, but what I

20   would say, your Honor, is that -- so, for example, when

21   Vermont intervened earlier in this case -- they do look

22   at the settlement, and they do discuss -- and they do

23   discuss these terms with us.

24       But I recall, because I looked at the letter the

25   other day, when they intervened in connection with the

1    Dean settlement, they specifically said that sometimes
2    they intervene, sometimes they don't.  They look at
3    these settlements, and, you know, for the state of
4    Vermont, the milk industry is central.  This is not --
5    this is not a window frames or whatever.  This is -- you
6    know, this is a highly political issue that people
7    are -- people are paying attention.
8         So, your Honor, you are going to have to make a
9    judgment about how much weight to give that.  But all I
10   am saying is that you had some very experienced,
11   hard-working antitrust counsel that made a judgment
12   about this, and you had -- it's sent to every law
13   enforcement agency, which, under CAFA, we are required
14   to send it.  We probably would have sent it to them
15   anyway.  But, you know, there's a framework set in place
16   for them to review it.
17        And I can't -- certainly outside of Vermont I can't
18   make represen- -- and even within Vermont I can't make
19   representations of how they do their job or whatever.
20   What I can tell you is there's a mechanism in the law,
21   in CAFA, to get them this information so they can review
22   it, so they can let a court know if they have -- they
23   have any concerns about its sufficiency, and none of
24   them, at the state or federal level, has raised any
25   concern about it.  No one's raised concerns to us.  No

1    one's filed any concerns with the court.

2         So the reality with this equitable relief,

3    your Honor, is that, you know, you can -- I guess there

4    is one other point I want to address, and then I'll -- I

5    want to make sure I have answered all the Court's

6    questions.  But here's the other point I wanted to make.

7         You know, you know, a colleague of mine told me

8    once -- and you've probably heard the same expression --

9    don't let the perfect be the enemy of the good.  And

10   there -- you -- one can always point to some provision

11   and say, well, this could have been a little better or

12   that could have been a little bit better.

13        But if you -- you know, one of the frustrations

14   that I have had is -- in sort of working through what I

15   think is a really good settlement, and -- I think it's

16   an excellent settlement.  It's not just a pretty good

17   settlement.  I think it's really -- it's an excellent

18   settlement.

19        One of the frustrations I have had is when you try

20   to sort of tie down, well, what is it you'd like to have

21   happen here, other than what's happening?  I kind of

22   made notes about a couple things that were mentioned

23   today, which seemed to be sort of the guts, other than

24   what I would describe as sort of, you know, minor points

25   about, well, they are already doing that, or they may

1    not be required to do in the future but they are kind of

2    doing it now, I would -- and I don't mean this

3    disrespectfully.  Some of those I kind of put -- I just

4    don't think those are really material criticisms, but

5    there were a couple things they mentioned.

6         They mentioned there should be controls on

7    nonsolicitation.  Well, there are controls on

8    nonsolicitation.  And I don't really know what more we

9    could have done with that than -- we have done it.  We

10   have got a blanket going-forward provision subject to

11   court enforcement.

12        There was a lot of talk about milk testing.  And,

13   your Honor, the reality is there just -- it hasn't been

14   a major part in the case because there just wasn't --

15   you know, we had five million pages of documents.  If

16   there was a strong evidentiary basis -- you know, to a

17   flaw, we included things in this case.

18             THE COURT:  Well, let me tell you the kind of

19   ballpark appeal of it.  DFA, DMS controls the testing.

20   The testing is done at the time the truck picks up the

21   milk.  The milk goes thereafter.  There's no retesting.

22   And you have to have confidence in the tester.  So why

23   not say, You know what?  A lot of other industries have

24   independent labs doing that, and why can't you divest

25   that part of your business and -- or outsource it or do

1    something so it's in independent hands?  And then when

2    we're told that we contaminated a truckful of milk and

3    we have to pay $20,000, it's on us.

4         So that's a lot to ask, but I didn't -- I have

5    never even heard that request before today.  I hadn't

6    heard that was something that was that important to the

7    people that were primarily the source of information to

8    you.

9              MR. PIERSON:  Your Honor, if -- if -- the case

10   has been going on for five years.  The class reps are --

11   are not shy.  You know, if they had -- you know, they

12   saw the summary judgment papers.  You know, they saw

13   their argument.  I mean, if there were, you know,

14   concerns that -- the only concern that was ever really

15   raised -- and it goes to a point Mrs. Haar raised --

16   was, Gee, why aren't you making more of DFA ownership of

17   processors in the Northeast?  I mean, I think from their

18   perspective -- and, again, there's a certain lore in

19   the issue.

20             THE COURT:  Let me say, they have asked to

21   speak directly to the Court, and I try my best to

22   respect the attorney/client relationship, because it

23   comes up, especially in criminal cases, where somebody

24   says, Can I just talk to you without my attorney?  And I

25   have to explain that that might not be in their best

1    interests.  But they did make efforts to have that

2    direct conduit.  So I don't know what they were going to

3    say.

4         But when we were talking about the Dean settlement

5    hearing and other instances, I do remember taking a

6    break and allowing you to talk to them about their

7    desire to talk to me.

8              MR. PIERSON:  Well, you know, your Honor,

9    what -- fair enough.  I don't disagree with anything you

10   just said.  The problem for us, as lawyers, your Honor,

11   is that, you know, we gotta go where the evidence takes

12   us.  And, you know, the evidentiary record did not

13   support making that a substantial part of the case.  I

14   mean, it's been raised as -- you know, there was one

15   person, I think the farmer in Upstate New York, who had

16   concerns about this, but even his testimony, his

17   deposition was, Well, I thought maybe that had happened,

18   but, you know, I didn't really have a way to prove it.

19   I'm --

20        So there are suspicions, and there are a lot of

21   suspicions in this industry.  But as lawyers,

22   your Honor, we can't make this stuff up.  And we

23   can't -- if it's not provable in some objective way,

24   someone -- someone saying, Gee, you know, my PI count

25   was high, and I don't really think it should have been

1    that high --

2              THE COURT:  I am not talking about in terms of

3    falsification of data or misrepresenting the milk test

4    results.  I am talking about in terms of control, which

5    was a theme in this case.  And you talked to me about

6    control of processors, and I pushed back and said, Well,

7    what about these independent processors?  And we talked

8    about milk leaving the order and when it could happen

9    and when it was not.

10         And I see this as an issue of control, is if the

11   person who is determining what's going on with your milk

12   is also the person who's paying you, they have got a lot

13   of control.

14             MR. PIERSON:  Your Honor, here's the problem,

15   though, is that there was minimal evidence -- in this

16   record of five million pages and probably a hundred -- a

17   hundred-plus depositions in the two cases, there was

18   minimal evidence -- and that may be overstating it --

19   that that authority had ever been abused in any way.

20         And, you know, we can't -- believe me,

21   your Honor -- and you see some of this in the various

22   objector statements.  There are so many suspicions and

23   concerns about what DFA is doing, et cetera, et cetera,

24   you know, we -- there's gotta be evidence to support

25   them.  There have gotta be facts to support them, or we

1   can't -- we can't tube a settlement because things that
2   have limited -- limited, if any, support in the record
3   aren't being addressed.
4        And, you know, ultimately, your Honor, you know,
5   that question just goes to -- you know, a settlement's a
6   compromise.  I mean, are there other things that
7   potentially could have been addressed?  Yeah.  I mean,
8   there's always more you could do.  There are always more
9   criticisms.  But there simply was not a factual basis in
10  the record to push that issue hard, particularly on a
11  class basis.
12       Your Honor, the other -- you know, when you asked
13  the other thing -- when they say, Okay, well, what could
14  you have done differently?  What would we like to have
15  seen you do differently?  The other things that were
16  mentioned was abolish DMS, which, you know, just as
17  counsel for the DFA, DMS subclass, I mean, that's
18  just -- was a non -- it was a nonstarter, relief we
19  would never get.  I don't think it was relief we could
20  advocate.
21       There was discussion -- what has probably been
22  maybe as important an issue as any to Mr. Haar is
23  changing the way votes are tabulated and having --
24  getting rid of block voting and doing voting by mail and
25  having an independent person counting it.  And, you

1    know, we tried to negotiate that issue.

2        We got what I would call modest relief on that

3    point, in the sense that they agreed to look at it and

4    implement changes if they concluded those were

5    warranted.  But there was no possibility that a jury

6    trial would have resulted in that -- in that relief.  So

7    even going forward to trial wouldn't have gotten them

8    that.

9        And the only other really specific thing that was

10   mentioned is that they like board members to attend --

11   to attend contract negotiations.  There are 53 board

12   members.  The settlement provides that they gotta

13   disclose -- they gotta disclose the contracts to the

14   boards, and that's -- that's really sort of the only --

15   I mean, I think it would -- A, it was not a material --

16   it's really not a material change they were suggesting,

17   and it was not a practical change, your Honor.

18       I do want to leave some time for Mr. Abrams to

19   address -- to address points that I haven't addressed.

20   I'm not sure I ticked off all the Court's questions.

21            THE COURT:  I had -- doesn't matter to me

22   which of you address it.  I had concerns about the

23   release.

24            MR. PIERSON:  Yeah, let me say a couple things

25   about the release too, and Mr. Abrams can make any other

1    comments he wants to about it.

2          Number one, this is the release that was used in

3    the Southeast.  It was approved by the court in the

4    Southeast as fair, reasonable, and adequate.  I

5    understand that's not binding on you, but it is the same

6    release that was used there.  Mr. Abrams can talk about

7    this.  But I -- I don't believe anyone was objecting to

8    it down there, nor do I believe that -- that anyone has

9    said, subsequent to the settlement, that that release

10   has caused problems for people.  Maybe Mr. Abrams will

11   know better than I too and he can tell you if I'm wrong.

12         Secondly, there were two -- the release language --

13   you know, general release and also a release of sort of

14   affiliated entities, that's pretty standard in

15   settlements from my experience, and Mr. Kuney can speak

16   to it directly, but, you know, the concern -- here's the

17   concern with not releasing the affiliates, et cetera, et

18   cetera, is that -- is that if we release the claims

19   against DFA, DMS, what's to stop us --

20         I was just involved in another settlement -- in a

21   mediation in which the defendant was raising exactly the

22   same issues.  What's to stop you the next day from going

23   in the back door and suing their affiliated entities or

24   their officers, et cetera, on exactly the same theory?

25   So --

```
1              THE COURT:  I agree that officers, employees,
2     agents may be covered.  I am concerned that I wouldn't
3     be able to tell you who's covered by this release.  I
4     would have some guesses on some of it, but I think -- I
5     see a lot of releases, and I think this is a broad
6     release.
7              MR. PIERSON:  Your Honor, what -- what I would
8     suggest -- and, again, Mr. Abrams and Mr. Kuney will
9     have their own -- their own perspectives on this, but it
10    did seem to me that if the Court has concerns about
11    particular provisions like that or particular language,
12    they are curable problems.  They are not a reason --
13    they may be a reason to say, I need to see a different
14    release from you.  Can you guys -- this is my concern.
15    Can you address this in language? but that's -- you
16    know, rather than starting over, after five years and
17    three months, I think that that would be the thing to
18    do.
19         So let me close with this comment, your Honor --
20    with a couple comments.  You know, one thing I have
21    tried to really stay away from is -- as you can imagine,
22    your Honor, it wasn't -- it wasn't easy to hear some of
23    the perspectives that were expressed today.  I have been
24    an attorney for 30 years, you know.  I came from a
25    family -- my father was a teacher, a professor; my
```

1    mother was a minister.  I came into this profession, and

2    I ultimately moved to the plaintiffs' side, and I have

3    been running the *pro bono* program at my firms for 10

4    years.  I came to it because of a really -- a really

5    deep commitment to justice.

6        And there are two things that have defined my

7    career, your Honor.  One is integrity, and one is an

8    intense dedication to the cases I worked on.  And

9    that -- that has not just been true of me.  That's been

10   true of all of my colleagues in this case.  You know, we

11   have fought like hell in this case for five years to do

12   the right thing.  And we brought exactly those --

13       I have no fear about going to trial.  I got the

14   biggest -- was part of the trial team that got the

15   biggest verdict in the country two years ago.  That was

16   not an issue here.  Fees were not an issue.  We did what

17   we thought was the right thing.  We got -- we have

18   gotten $80 million for farmers in a case in which the

19   damages -- the realistic damages, maximum, were not a

20   whole lot above that, and the defendants were saying

21   they were zero.

22       We dealt with a solicitation problem, which has

23   been a major problem in this industry.  We got equitable

24   relief that no law enforcement agency in the United

25   States has gotten in this industry, let alone in

1        Order 1, in the last decade.  This is not a pretty good
2        settlement.  It's not a good settlement.  It is an
3        excellent settlement, your Honor, and I would request
4        that you approve it.
5              THE COURT:  All right.  Thank you.
6           Mr. Abrams?
7              MR. ABRAMS:  Thank you, your Honor.
8           May it please the Court.  I am counsel for the
9        non-DFA, DMS subclass.  I would like -- I listened to
10       all -- the best I could, to all of the objections and
11       comments, positive comments made by the class members,
12       and I think I heard most of what Mr. Pierson said.
13          My effort was to take the comments of the class
14       members and try to categorize them to be helpful in
15       addressing them to your Honor.  Hopefully I will do
16       that.  I also intend to try to address all of the points
17       you raised earlier.
18          Mr. Pierson started off with risks.  I think that
19       was appropriate.  Any settlement has to take into
20       account risks.  Your Honor said in this case that the
21       case is, quote, laden with risks.  And your Honor was
22       absolutely right.  And we saw that.  Actually, we saw
23       that before we filed the case, and it's really cases.
24       And I will tell you that in a minute.  You heard me
25       connected with the Southeast.  Yes, I was the lead

1   counsel in the Southeast case.

2        The case -- the cases, because this is true for

3   both the Southeast case and the Northeast case -- they

4   were filed -- and when you file a plaintiff case, I

5   learned -- because my whole career was with -- on behalf

6   of defendants -- I learned when you file a plaintiff

7   case -- because I was asked to do this case and I was

8   asked to do one other case by my prior law firm, and I

9   will get to that in a minute -- you often find --

10   typically find that if you file a plaintiff class

11   action, you are going to find 30 to 50 other law firms

12   that file, and you end up in an MDL.

13        We filed these cases.  There were a couple of

14   firms, and I literally mean a couple of firms, that

15   filed copycat cases in the Southeast, not 30 to 50.  And

16   that tells you what the plaintiff bar thought the risks

17   were in proceeding with the case.  And as soon as I was

18   named lead counsel, they disappeared.  Cohen Milstein

19   was there.

20        And the same thing happened with the Northeast

21   case.  No copycat suits.  You heard Mr. Pierson saying,

22   and you probably heard at other times, that there were

23   no government suits.  Typically these class actions,

24   there are government suits.  You follow on the heels of

25   that.  There weren't any cases filed by any government

1   entity in connection with the milk business that we're

2   talking about here.

3       Now, you heard from one of the Haars earlier about

4   a whole record being created in the Southeast.  I'm very

5   familiar with what the government created in the

6   Southeast.  They took a lot of depositions.  I read most

7   of them.  They didn't file a lawsuit.  They did not

8   create a record that we could rely on.  We created the

9   record that we could rely on.

10      And that's the same thing with respect to the

11  Northeast.  There's no easy case here.  It's a very

12  difficult case, which is why I said your Honor was

13  right:  It was laden with risks.

14      And cases develop differently.  Your Honor has said

15  over time that -- and I hope you don't mind me referring

16  to your -- some prior orders because I --

17          THE COURT:  I would hope I didn't mind.  That

18  would be kind of strange.

19          MR. ABRAMS:  Your Honor said in your November

20  25, 2014, order, at 5 and 6, that, Considering the

21  strengths and weaknesses of the case, there's a, quote,

22  legitimate risk of a defense verdict at trial.

23      I don't quarrel with any -- I don't say this to

24  quarrel with what your Honor said.  I say it because we

25  have to take into account the risks.  I am not saying

1    you're right.  What I am saying is we have to take it

2    into account, and we did.

3        You noted that the documentary proof of antitrust

4    violations in some respects did not provide evidence of

5    conspiracy.  And you recognized the risks we have of

6    proving any damages at trial.

7        Now, Mr. Pierson went through a damage number.  I

8    actually end up at the same number he ends up.  I get

9    there a little differently.  And the difference is there

10   is overlapping -- there are overlapping sales between

11   the statute of limitations and the nonconspiring

12   producers.

13       So you take that into account, and I increased the

14   damages, but you get to somewhere between 130 and

15   150 million dollars because you take off the 35 percent

16   for the nonconspiring producers.  If you were to listen

17   to the defendants -- and in this instance I listened.  I

18   am not agreeing, but I am not listening -- and they say

19   the statute of limitations eliminates another 35

20   percent.  Well, that's where I say there's some overlap

21   there.  But you end up with something like 130 to

22   150 million dollars in single damages.

23       An $80 million damage number -- settlement number

24   that we get is more than half of that.  And if you look

25   at any of the cases, they would recognize that is an

1   excellent settlement.

2       I wanted to tell you a story, if I may -- it will

3   take three minutes -- of the -- the real -- it really

4   goes to the risk in this case and the risk we took.

5       I had a unique and unfortunate situation.  But for

6   a year clerking, I worked at the same law firm for 38

7   years.  That law firm was Howrey.  That law firm

8   dissolved in 2011.

9       I worked with a group of people at that firm.

10  There were about 17 people that were part of cases I

11  tried, the people I worked for for many, many years.  I

12  happened to be older than them, so I can't say -- but

13  their whole careers were spent with me, and we wanted to

14  go together to someplace.  17 people, it's a big group.

15      We talked to a lot of law firms in Washington, the

16  best law firms in Washington.  And I guess it's not so

17  humble to say that we were welcomed at every one of

18  those firms but one.  But any number of those firms

19  really questioned whether they wanted to take the milk

20  cases.  And we had two conditions -- I had two

21  conditions.  You take our group and you take the milk

22  case, and if you don't want to, we'll shake hands and

23  I'll go on.

24      That shows the risk -- it showed to me -- I knew it

25  anyway, but it showed to me, and I say it to you,

1    because of the risk that's involved in this case.  They

2    had no idea what would happen to the case in the

3    Southeast or the Northeast when we moved.  Got a very

4    good result in the Southeast.  The law firm I went with

5    is happy.  So is the trustee in bankruptcy for Howrey.

6    But firms were not just jumping on board to take on the

7    milk cases.  It's a risky case.  Your Honor recognized

8    it, and we recognized it, and we had to evaluate the

9    settlement in the context of risk.

10        Your Honor was told about my knowledge of the

11   Southeast case.  I have some knowledge of it.  I am sure

12   I don't have as much as it was touted to be, but I have

13   some knowledge of the Southeast case.

14            THE COURT:  But you were lead counsel, right?

15            MR. ABRAMS:  I was lead counsel.

16            THE COURT:  So you have a lot of knowledge of

17   that case.

18            MR. ABRAMS:  I hope I have retained some of

19   it.

20        I want to talk about the differences between the

21   Southeast case and the Northeast case, because some

22   people equate the two.  In the Southeast case, there was

23   a defendant called SMA.  It was the marketing entity.

24   It proclaimed its mission was to control all the milk

25   marketed in the Southeast.  And you know what?  They

1    nearly accomplished their mission in terms of

2    controlling the milk, because everything had to funnel

3    through SMA.  And that allowed defendants, by our

4    allegations, to enact, monitor, and enforce suppressed

5    prices.

6         There's no comparable entity in the Northeast.  The

7    Northeast is a different market than the Southeast.

8    It's a more fragmented market than the Southeast.  And

9    it will be more difficult to show the jury the effects

10   of the actions of the defendants in the Northeast versus

11   the Southeast.

12        There's a difference in the markets between the

13   Southeast and the Northeast, the markets themselves.  In

14   the Southeast, SMA had control over 88 percent of the

15   raw milk.  And in the Southeast, Dean and DFA had over

16   60 percent of the milk processed.  Here, defendants'

17   market share, per Dr. Rausser, was estimated to be much

18   less.  DMS has between -- according to our and

19   Dr. Rausser's analysis, between 40 and 58 percent of the

20   raw milk marketed, and Dean and DFA had between 20 and

21   25 percent of the milk processed.  Excuse me.  Those are

22   very different markets.

23        Oh, by the way, just to get -- you have been hit

24   with a lot of numbers today.  In the Southeast, there

25   were 6,086 claims that were made on the settlement in

1    the Southeast.  In the Northeast, I keep hearing about

2    12,000 or 12,800 or those numbers.  In the Northeast, in

3    the Dean settlement, there were 7200 claims.

4         Okay.  There are differences in the court orders

5    between the Northeast and the Southeast, and those

6    impact, obviously, any case.  In the Southeast,

7    defendants never even argued statute of limitations.

8    There's a two-page motion *in limine*.  There was never

9    really any serious issue in the Southeast.  Here, the

10   Court found statute of limitations to be a major issue

11   and a potential issue having significant impact on

12   damages.

13        In the Southeast, the court didn't exclude any of

14   Dr. Rausser's opinions.  Here, the Court excluded

15   aspects of opinions on relevant market and the damages

16   model Dr. Rausser had.

17        In the Southeast, the court ruled that plaintiffs

18   could admit damaging evidence of defendants' sweetheart

19   deals.  Here, the Court indicated evidence outside the

20   statute of limitations may not be admissible.  May not.

21   I emphasize my recognition of the "may not."

22        Okay.  I didn't mention the amount of damages

23   claimed in the Southeast.  We talked about it here, but

24   in the Southeast it was $415 million, if you want a

25   comparison to the 130 to the 150.

1          Okay.  The process for settlement has been raised

2     here.  What occurred?  I was -- I negotiated -- I was

3     the lead in negotiating the settlement in the Southeast,

4     and I think it's fair to say I was the lead in the

5     Northeast.  I will tell you that settlement negotiations

6     lasted in this case for years, literally years.

7          The Court ordered a mediation, you will remember,

8     with Michael Marks.  Indeed, the Haars attended that

9     mediation.  It got absolutely nowhere.  No negative on

10    Mr. Marks; it just didn't get anywhere.  There was no

11    offer of settlement.

12         In early 2013 -- and I am looking at my notes just

13    to remember the chronology -- counsel for DFA and DMS

14    and I talked some more.  I am going to tell you that the

15    class reps were absolutely informed of those

16    discussions.  They didn't go anywhere, and they were

17    informed that they didn't go anywhere, but they were

18    informed of those discussions and that they didn't go

19    anywhere.

20         They resumed -- discussions resumed in 2014, and,

21    again, there was no success.  And, again, I will tell

22    you, without any equivocation, the class reps were

23    informed of those discussions.

24         May 2014, settlement was discussed again.  We were

25    so far apart, there was nothing to discuss.  They ended.

```
 1        The class representatives were told that.
 2             Well, now it's June.  You may remember that the
 3        final pretrial was June 23rd.  I remember this clear- --
 4        one of the few things I remember clearly because I have
 5        a son who was getting married.  He lives in Los Angeles,
 6        and there was a weekend party where we were going to
 7        meet the parents of the bride.
 8             And I met with -- counsel for DFA, DMS called me,
 9        and I met with him on Wednesday.  And he said, Well,
10        it's really the end of the line.  You know, do you think
11        we could settle this case?  And I will tell you -- I
12        won't get into the specifics because I don't think
13        that's right.  If you ask me, I would answer you.
14             THE COURT:  No, because settlement
15        negotiations are not admissible.  I am much more
16        interested in what broke down between class counsel and
17        class representatives because this is a very unusual
18        situation.
19             MR. ABRAMS:  Yes, but I will mention --
20             THE COURT:  You can go through it your way.  I
21        don't need to know.
22             MR. ABRAMS:  No, no.  I am going to do it your
23        way.  I am going to try to.
24             I will tell you, because I think you asked this
25        question, in the Southeast we had an objector -- a class
```

1    rep who objected to the settlement as well.  I just tell

2    you that.

3        But to answer this question with the breakdown --

4    well, I can't tell you what's in the state of mind of

5    some of the class reps, but I can tell you the events.

6        I told you we met on that Wednesday before the

7    weekend.  The offer was nothing.  It was nothing.  There

8    was nothing to really say.

9        I got back -- I had to go to Greece for a client

10   after this event for my son.  I got back on Thursday.  I

11   had a text message from this person, Give me a call.  I

12   gave him a call.  He said -- I won't go into what he

13   said.  But a substantial number was discussed by him,

14   but never -- no commitment or anything.  And I said, I

15   can recommend to my clients a certain number.  He didn't

16   have that authority then.  I said, But, you know, this

17   is it because we are going to the final pretrial Monday.

18       On Friday I got a phone call agreeing to the number

19   I said.  And I had analyzed this case -- I mean, I had

20   in my mind.  I said that to him, but I also said, You

21   remember from day one there have to be nonmonetary terms

22   involved in this settlement, because I learned that in

23   the Southeast how important they were, and I said it

24   here.

25       So it ended up that I didn't negotiate with him on

1    the nonmonetary terms.  Mr. Kuney and I negotiated on

2    that.  And on the day -- that Friday, that day, the

3    class reps were called individually, because we couldn't

4    get a group call that quickly.  It was Friday that I

5    learned that they would offer this number.  And they

6    were told of the number and that we had nonmonetary

7    terms that had not been negotiated, and I was told that

8    people were pretty happy.

9         On Monday, people weren't happy anymore.  I don't

10   know why.  What I do know is that a statement was filed

11   with this court talking about all of the group

12   discussions -- and we reaffirm that in our affidavits --

13   that occurred, and there were a lot of group discussions

14   between us and the class reps.  And there were a lot of

15   issues raised.

16        And there were a lot of suggestions about

17   nonmonetary terms, and I will tell you every one of

18   those suggestions that we got was pursued -- I pursued

19   it and others with me pursued it -- with DFA, counsel

20   for DFA.  And we got a lot.  We didn't get everything.

21        Now, this is off track, but it's come up so often I

22   will say it:  I never heard about the milk testing being

23   a part of this case until today.  I understand

24   your Honor's point about control.  It makes sense.  It

25   was never an issue in this case.  We haven't seen any

1    evidence regarding it.

2         And what I will tell your Honor, which is what

3    every farmer has been told, "If there is any indication

4    of retaliation for your involvement in this suit, you

5    tell us because we wouldn't stand for it."  You'd be

6    told immediately -- well, you'd be told after I

7    discussed it with opposing counsel.  You'd be told.

8         And -- well, this is related to that.  It's not

9    exactly on point, although it gets there.  You asked

10   about certain provisions and what good is it if they're

11   in the settlement agreement if they're illegal anyway.

12   And I think you heard the response to that.

13        First of all, it's a whole lot easier coming to

14   you, because you will have jurisdiction, and saying

15   there's a violation, and you issue a show cause order,

16   rather than have it be part, a very small part, of a

17   major antitrust suit that you have to prove.  They will

18   have that as their right in the settlement agreement,

19   and that is very significant.

20        In the example that was brought up were the audit

21   documents in this context.  Well, you know what?  If --

22   there are rights with the audit document.  I don't

23   remember them all right now.  But there are rights there

24   for that and other things in these nonmonetary terms.

25        And if they're not satisfied -- I am not talking

1    retaliation now, but if they are not satisfied, there

2    are avenues to take.  You could go to the Vermont

3    Attorney General and talk about unfair trade practices.

4    You can pursue an unfair trade practice, if it rises to

5    that.  There are avenues for relief.

6        And I should tell you, in the Southeast, there's

7    some settlement provisions, and we don't think Dean

8    complied with a certain requirement, and we don't think

9    SMA complied with a certain requirement, and we have

10   filed motions before Judge Greer, and they're pending

11   before Judge Greer, to pursue those in that case.  And

12   the same thing would be done here.

13       Oh, public disclosure of the record and the request

14   that, you know, Why don't they just open up the whole

15   record?  Well, I sort of have learned this:  You know,

16   if you want to bury something, you bury it in five

17   million pages of documents.  I would much rather -- and

18   indeed what happens is you cull those documents, as I am

19   sure your Honor knows, to find the right documents.

20       We found the right documents for this case, like we

21   do for cases, and what is being opened and available in

22   conjunction with our -- our briefing -- there are 545

23   exhibits.  The plaintiffs' certification briefs include

24   153 exhibits.  And these exhibits mean deposition

25   experts, deposition exhibits, expert report examples,

1    the whole gamut of what is in the case.

2         Defendants' certification brief has 48 exhibits.

3    Our summary judgment brief has 282 exhibits.  And I know

4    there are problems with all this in another context, but

5    in this context, the availability of these records,

6    culled as they are, is significant.  And our summary

7    judgment -- or defendants' summary judgment brief has 62

8    exhibits.  Those are the key documents in a case.

9         And, you know, if you have a trial exhibit list,

10   and it's thousands of exhibits, well, you have them

11   there to make sure, but you know that you are really

12   talking 50 to a hundred documents that are the key

13   documents in a case.  These are the key documents.  They

14   are available.  And they're available, frankly, in a way

15   that makes more sense than opening up a

16   five-million-document case record.

17        Okay.  You asked a question about division between

18   the class reps and class counsel.  I was asked by --

19   Mr. Sitts opposes the settlement.  He and his son both

20   talked.  They oppose the settlement.  They're our

21   clients.  He asked me if I would be available to try

22   this case, if it had to be tried, and I said absolutely.

23        I am representing the class I represent zealously.

24   That is my job.  And I will do my job.  And if you say

25   we go to trial, we will go to trial.  I am here telling

1    you this is an excellent settlement, but whatever you

2    decide, I am here to do it.

3         You asked about the release, and I guess I -- I --

4    I don't -- I am not looking at it correctly, because

5    when I look at the release, it releases claims related

6    to the facts and circumstances alleged in the complaint.

7              THE COURT:  Well, it says, "includes any and

8    all claims, regardless of their nature, from January 1,

9    1994, through and including the effective date, arising

10   out of, associated with, related to the facts or

11   circumstances alleged in the complaint, including but

12   not limited to settling defendants' sale and marketing

13   of raw Grade A milk or their purchase of or failure or

14   refusal to purchase raw Grade A milk that was produced

15   in and pooled on Federal Milk Order 1.

16        "Release claims include all claims that were

17   asserted or could have been asserted, arising out of or

18   relating in any way to any conduct alleged in the

19   complaint" -- which is all the pleadings in this case --

20   "regardless of whether those claims arise from common

21   law theories, tort or contract, including without

22   limited" -- "limitation, breach of contract, breach of

23   fiduciary duty or theories under federal, state, or

24   other statutory law, rule, or regulation."

25        And then we have a very broad definition of the

1    people who benefit from the release.  So that looks very

2    broad to me.  And as I say, I see a lot of releases, and

3    I just had one in a wage-and-hour case in which the

4    persons were getting $50, a hundred dollars in their

5    settlement, and they were releasing all claims related

6    to their employment.  And actually that's not

7    permissible, so we sent it back, and they fixed the

8    release.

9        So I didn't need anybody to point to me concerns

10   about the release.  I raised them with you.  And I

11   raised it the first time I saw it, and I raised it in

12   the notice to the class members.  It's a lot broader

13   than that notice is saying.

14           MR. ABRAMS:  I -- I am not trying to quarrel

15   with you, but I will just tell you how I look at it.

16           THE COURT:  Okay.

17           MR. ABRAMS:  The "including but not limited

18   to" is a subset.  It's a defendant way of writing,

19   frankly.  But it's all related to the facts and

20   circumstances alleged in the complaint, in the amended

21   complaint.  That's where your -- what you are releasing.

22       And when I look at that, that's -- yes, is it

23   written in a broad way, but it's not different than --

24   you are always releasing what you allege in a complaint.

25   That's the nature of the settlement.  And that's how I

1    read this release provision.

2                   THE COURT:  How about "including but not

3    limited to anything" --

4                   MR. ABRAMS:  I'm sorry.

5                   THE COURT:  Sorry.  "Including but not limited

6    to anything about the sale of raw Grade A milk"?  What

7    wouldn't that cover that they are doing?

8                   MR. ABRAMS:  Like we didn't allege in the

9    complaint these tests regarding raw Grade A milk.

10   That's not what is -- it's not a fact or circumstance

11   alleged in the complaint.  I don't think it's part of

12   this case.

13                  THE COURT:  Well, what about "including but

14   not limited to settling defendants' sale and marketing

15   of raw Grade A milk or their purchase of or failure or

16   refusal to purchase" --

17                  MR. ABRAMS:  I'm sorry, Judge.  I can't hear

18   you.

19                  THE COURT:  I know.  I have a low-pitched

20   voice that's very hard to hear, and sometimes that's a

21   blessing.

22                  MR. ABRAMS:  It's me.  I --

23                  THE COURT:  That's okay.  So let's -- one

24   thing I want to do is -- it's 10 of 5:00, and I want to

25   make sure that we hear from the defendant.  So I say

1    it's broad; you think it's not broad.  Let's move on to

2    anything else you wanted to say to me before I turn to

3    defendants?

4              MR. ABRAMS:  When I heard that we were better

5    off going to trial and losing, I shook my head.  I don't

6    agree with that.  I don't agree with that from all the

7    positives you get from the settlement, and I do think

8    there are substantial positives, both monetary and

9    nonmonetary.  But I think there are substantial

10   negatives you get from going to trial and losing, which

11   is ratifying everything that the plaintiffs are talking

12   about here.  I am not interested in that.

13        I am interested -- if I go to trial, I want to win.

14   And so when I hear that, it's telling me that people

15   aren't looking at it the same way I am, in a very

16   significant way, which is what one, I think, should do

17   in analyzing whether a settlement makes sense.

18        I know you -- I should sit down.

19             THE COURT:  If you have a short thing you want

20   to say, that's fine, but I am going to turn to the

21   defendants.

22             MR. ABRAMS:  Yeah.  No.  And I -- I can't say

23   I want them to be heard, but I want this hearing to --

24   oh, can I just say one other thing?

25             THE COURT:  Sure.  Yes.

1          MR. ABRAMS:  Put this here.  I heard about

2     the -- I'm sorry?  I heard about the notice point, and

3     people didn't get -- you didn't hear all the objections

4     you would have heard if everybody got the notice, or

5     some comment like that from some people who were

6     objecting.

7          Well, the fact is that, in addition to the formal

8     notice that went out, there's a publication called

9     Farmshine which purports to go to 75 percent of the

10    farmers in the Order.  And there was an article on

11    producers urging opposition to DFA, DMS settlement,

12    which was the result of a letter from three of the class

13    reps who also reached out to GCR, GLOBAL Competition

14    Review, and provided the statement that had been

15    submitted to the Court *in camera*.

16         So I think that there was substantial word out

17    there about this settlement, and of course there's the

18    notice, which is that's the main point of the notice.

19    So I think what you heard today is -- you heard from

20    three class reps opposing the settlement.  You heard

21    from a class rep in favor of the settlement.  And you

22    heard from others in favor of the settlement.

23         I do believe all the issues were raised before

24    your Honor.  They were -- really covered the issues, but

25    I don't see that there's large opposition to this

1    settlement from the class.

2         With that, I will sit down.  Thank you.

3            THE COURT:  Thank you.

4         Let's hear from the defendants.

5            MR. KUNEY:  Thank you, your Honor.  This could

6    possibly be one of the briefest times I'm up here.

7            THE COURT:  I was thinking you usually get a

8    lot of time, so --

9            MR. KUNEY:  No, I know, and it's probably --

10   it's probably poetic justice of the sort that I don't

11   and probably suits the event that we are here for today

12   anyway, where --

13           THE COURT:  And this is Mr. Kuney.

14           MR. KUNEY:  I think we have a lot left to

15   say -- a lot less to say, frankly, than the people you

16   have already heard from.

17        Let me, with some trepidation, step into the issue

18   of the interpretation of the release.  I actually -- I

19   agree with Mr. Abrams that if one forced oneself to try

20   to diagram the sentence, the operative language

21   is "arising out of or related to the facts and

22   circumstances alleged in the complaint," and that

23   whatever follows has to be a piece of that.

24           THE COURT:  "Arising out of or relating to,

25   associated with" --

1              MR. KUNEY  Yeah.

2              THE COURT:  -- and you got a complaint

3      that's -- you know, what is it, a hundred or more

4      paragraphs?

5              MR. KUNEY:  The complaint is a long and

6      complicated complaint.  I don't deny that, but -- but

7      that's -- that's what's being released --

8              THE COURT:  All right.

9              MR. KUNEY:  -- is things that --

10             THE COURT:  And testing of milk is -- say we

11     will take that -- is associated with, related to the

12     allegations in the complaint.

13             MR. KUNEY:  There were -- there were, at some

14     point in the case -- and I confess I don't remember

15     whether it's in the language of the complaint -- one or

16     two -- my memory is it came up in the context of the

17     statute of limitations, what events had occurred within

18     four years of the filing of the complaint.

19         And what we heard in response was a couple of

20     anecdotes, not dissimilar from some of the things that

21     you heard in court today.

22             THE COURT:  So the way it came up was you were

23     challenging Dr. Rausser's motives of people to

24     participate in a conspiracy, and we started hearing

25     about threats and retaliation, and I heard just a tiny

```
1    sliver --
2              MR. KUNEY:  Right.
3              THE COURT:  -- of meddling with milk
4    results --
5              MR. KUNEY:  Right, and we --
6              THE COURT:  -- and that's it.
7              MR. KUNEY:  I think we addressed that in our
8    summary judgment and suggested that really none of those
9    episodes was there admissible evidence that could
10   corroborate the episode.  I don't think -- you didn't
11   reach that point in your summary judgment ruling, but we
12   felt comfortable that it was largely uncorroborated
13   hearsay, which in many cases the witnesses, during their
14   depositions, essentially undid at least half the story
15   on their own.
16        So when Mr. Pierson says there's really not an
17   evidentiary record to make that part of the settlement
18   process, I think that's absolutely right.  It's not that
19   it came up never.  It's that it did come up, and it
20   didn't have sufficient substance to warrant becoming a
21   significant piece of the case or, candidly, a part of
22   the settlement discussions.
23        But let me -- let me just say one thing about the
24   settlement --
25              THE COURT:  So let me just say that it caught
```

1   my attention today and not because you needed to have

2   Farmer 1 show that a split-second before the truck

3   arrived he had a chemist there analyzing and came up

4   with this butterfat and this protein, and then two

5   seconds later the truck driver's got a completely

6   different test.

7        I found it interesting in terms of control because,

8   frankly, prior to today -- and I am hearing Mr. Abrams

9   heard it for the first time today -- I didn't realize

10  that DFA and DMS did all the testing of the milk and

11  that there was no verification process from a third

12  party, and that's how they calculated the milk check.

13  And I could see a lot of control inherent in that.

14       I am not saying that would have been a different

15  case, but it's surprising to me to hear it for the first

16  time from the class representatives.

17            MR. KUNEY:  Well, I guess, I think the class

18  counsel have given their explanation, which, from what I

19  saw and the evidence that came through discovery, I

20  would have to agree with them, that there -- that there

21  was another side to that story, which is candid- --

22  frankly, when we explain what the cooperative does and

23  one of -- the services it brings to the members,

24  concentrating the testing was an enormous efficiency

25  that we thought saved people hundreds, thousands of

1    dollars across the scope of the region.

2        Rather than being -- rather than being an element

3    of coercion and control, we thought it was an important

4    efficiency that returned more money to dairy farmers.

5    And if testing had been more of an issue in the case,

6    that would have been what you would have heard from us,

7    that it's not abused and that, rather, it's a benefit.

8        But it appeared to us from where -- from the side

9    of the room we sit on that there were a few isolated

10   events that, frankly, didn't amount to a case that could

11   be pursued, particularly not on a class basis.  It

12   wouldn't be a -- a couple of anecdotes here and there.

13       So, yes, I understand the point that it sounds like

14   there's a gatekeeper and, gosh, they're testing your

15   milk, but someone has to test your milk.  The fact that

16   the samples are sort of -- the product is perishable,

17   and you can't necessarily argue about it, would be true

18   no matter who's doing it.

19       We -- your Honor, we totally get the idea that

20   there's some people there that don't trust us.  I mean,

21   we understand that.  Happily, we -- a few people came to

22   court today from a different perspective.  It's not

23   simply silence.  You heard some people that have made

24   multiple choices in their lifetime, in their careers,

25   to -- to operate through DFA and DMS.  Not everyone out

1    there thinks that this is some evil that, remarkably

2    enough, I thought was compared to things that had

3    happened during World War II, which took for sort of a

4    jarring comment, even in a long day of interesting and

5    important comments.

6         But, yes, I take your point.  It sounds like there

7    is a structure that, in the wrong hands, could be

8    abused.  I would say to you it's a structure that was

9    put in place to accomplish efficiencies and did so, and

10   there's no record of that abuse in the course of a case

11   where the discovery was exhaustive, the depositions were

12   endless, and the people who had those stories, they were

13   not corroborated through the deposition process.

14        THE COURT:  So I don't want to go -- and I

15   don't want to waste your time too much on this issue.

16   If you will recall, it came up in the issue of explain

17   your theory of the case to me in a way that I could

18   understand --

19        MR. KUNEY:  Right.

20        THE COURT:  -- relate to a law clerk, relate

21   to a jury.  And -- and that has actually been a theme

22   with which you have tried to persuade me to dismiss the

23   case or carve it up --

24        MR. KUNEY:  That's true.

25        THE COURT:  -- or not let it go to trial.

1              MR. KUNEY:  That's true.

2              THE COURT:  So that's how it came up.  It's

3    not we don't need to go down and investigate a new

4    claim, but it resonated with me.

5              MR. KUNEY:  I think it's clear -- I take that

6    point.  It may be clearer and simpler to explain than

7    some of the more complicated conspiracy theories that

8    you heard.  I think what you are hearing from both the

9    plaintiffs' side and my side of the case is that there

10   was not a factual record -- it's simpler to

11   articulate -- but that there's not a factual basis that

12   would have supported it, that made them feel comfortable

13   in pursuing it.

14        And, frankly, we weren't surprised at that, because

15   this was not an issue -- there's lots of -- lots of

16   complaints, lots of lore that resonates in the dairy

17   business, and this is not something that had been a

18   problem that was being brought to the cooperative's

19   attention as something that was some kind of systemic

20   situation that would require --

21             THE COURT:  So do you deny it was a request in

22   the injunctive relief?  Do you deny there was no issue

23   about independent testing, and people didn't say that

24   was really important to them?

25             MR. KUNEY:  Let me tell you what I remember.

1    And Mr. Abrams, I think, was clear about the fact that I

2    was only involved in the discussions about the conduct

3    remedies and not -- I was not -- I was occasionally a

4    participant but not the primary point of contact in the

5    discussion about the financial terms.

6        So that he and I made contact after I was informed,

7    much to my surprise, that there seemed to be a number

8    that the parties had agreed upon.  I thought I might

9    simplify the process by sending him a proposal for

10   injunctive relief that went to what I understood to be

11   the primary elements of the complaint, which was the

12   solicitation issue and the antitrust compliance, because

13   those topics had come up repeatedly, and I thought,

14   well, look, maybe we can do this quickly.

15       Mr. Abrams, early the following week, sent me a

16   very lengthy proposal, which he told me had come from

17   his consultations with the class representatives and

18   that -- and putting a whole list of new items on the

19   table, which I had not anticipated would be part of the

20   discussion, and I understood them, again, from his

21   representations, to be coming from his clients.

22       I have -- I have not checked my file, but I have no

23   recollection of our ever discussing this testing issue

24   as part of the conversation that included the proposals

25   that had come from the class members.  I didn't look.

1    It didn't occur to me to sort of go back and check and

2    see what I have.

3        I can -- I would have said what I said to you five

4    minutes ago, which is, that's not part of this case.  We

5    are here to resolve -- the resolution needs to be linked

6    to the case.  And that is -- that has been a nonissue

7    throughout the case, and I am not sure why we are

8    talking about it today.

9        What we -- frankly, that's the couple of

10   provisions in here which, instead of imposing relief,

11   suggest that the Northeast Area Council will take it up,

12   were other areas where we felt it was far afield, we'd

13   never heard complaints about it, it had not been an

14   issue in the case, we didn't think the dairy farmers

15   wanted it, so we said, We have got an idea.  Let them --

16   if you want us to guarantee that they will have a

17   process and think about it, we will do that.

18       But I have no -- I have no memory that this testing

19   was an item that we talked about at all.  And if it was,

20   it must have been 30 seconds or less.

21       And so we worked off of his paper, which had come

22   from his consultations with his class representatives.

23   We didn't agree to everything.  We had a negotiation.

24   And we came up with the injunctive relief that you see

25   here, which I also agree with Mr. Pierson's observation

1    that any question about the term of the agreement, the

2    length of the agreement, I think it is clear, goes to

3    December 31st of 2016, but some of the provisions,

4    including the nonsolicitation agreement, do not have a

5    sunset provision, do not have an end point.

6          And I was going to mention, but Mr. Abrams already

7    did, that since the wonders of ECF filing, I see these

8    motions being filed in the Southeast case for

9    enforcement of the settlement.  I am pleased to report

10   no such motion has been filed against DFA.  There's been

11   no criticism that we haven't adhered to the terms, and

12   the other settling parties they have pursued, where they

13   felt that they have not followed their obligations under

14   the settlement, and I have every reason to expect they

15   would vigorously do that here.  That's been their track

16   record, and that's how they have comported themselves.

17         So -- so we had -- I can't tell you more,

18   obviously, about the interactions between him and his

19   clients, Mr. Abrams and his clients.  I can only tell

20   you that what I was presented with, and was somewhat

21   taken aback by, was the lengthy list of proposals that

22   he explained as having come from his consultation with

23   them.  And then we proceeded to negotiate and to strike

24   a middle ground in terms of ones that we would accept

25   and ones that, frankly, seemed to us to be too far

```
1    afield and unrelated to the case or more intrusive in

2    ways that perhaps they didn't understand.

3        I don't -- I think -- I think that's it,

4    your Honor, unless there's something else that's come up

5    today that you think we can speak to, I'm happy to, but

6    otherwise, that's really all I was going to try to put

7    in front of the Court.

8                    THE COURT:  All right.

9                    MR. KUNEY:  Thank you very much.

10                   THE COURT:  All right.  It is past 5:00, and I

11   feel especially sorry for our court reporter.

12       Thank you.  You have given me lots to think about.

13   I will take the matter under advisement.  I will get you

14   a written order.

15       And anything further before we close for the day?

16                   MR. PIERSON:  No, your Honor.

17                   MR. KUNEY:  Not from us, your Honor.

18                   THE COURT:  Thank you.

19               (Court was in recess at 5:08 p.m.)

20                        *** ** ***

21               C E R T I F I C A T I O N

22       I certify that the foregoing is a correct
     transcript from the record of proceedings in the
23   above-entitled matte

24
     March 2, 2015                    _____
25   Date                             Anne Nichols Pierce
```