U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 MAR 31 PM 3: 35

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ALICE H. ALLEN, LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, GARRET SITTS, RALPH )
SITTS, JONATHAN HAAR, CLAUDIA HAAR, )
and RICHARD SWANTAK, on behalf of )
themselves and all others similarly situated, )
)
              Plaintiffs, )
)
    v. )    Case No. 5:09-cv-230
)
DAIRY FARMERS OF AMERICA, INC., and )
DAIRY MARKETING SERVICES, LLC, )
)
             Defendants. )

**OPINION AND ORDER DENYING WITHOUT PREJUDICE
MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT**
(Doc. 625)

Pending before the court is a motion for final approval of a proposed settlement between the DFA/DMS and non-DFA/DMS subclasses (collectively, the "Dairy Farmers Subclasses") and Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (the "Proposed Settlement"). (Doc. 625.)

The Proposed Settlement requires Defendants to make a payment of $50 million dollars to class members in two installments, authorizes certain injunctive relief, provides for incentive payments to Subclass Representatives, and seeks a proposed attorney's fees award of approximately $16.6 million, plus expenses, which Defendants have agreed not to oppose.

Based on the number of claims that may be filed, the average payment per class member dairy farm is estimated to be approximately $4,000. In exchange, class members must enter into a release (the "Proposed Release"), releasing, among other things, any claims they have in this action, any claims which may have been brought in this action,

and any claims which in certain respects are related to this action against Defendants and other entities with whom Defendants have or had a relationship.

I. **Factual and Procedural Background.**

Defendant DFA is a dairy cooperative that produces, processes, and distributes raw Grade A milk. Defendant DMS is a milk marketing agency which was formed in 1999 by DFA and Dairylea Cooperative, Inc. ("Dairylea") and is currently owned by DFA, Dairylea, and St. Albans Cooperative Creamery, Inc. Plaintiffs are dairy farmers who produced and sold raw Grade A milk in Federal Milk Market Order 1 ("Order 1") during the time period between January 1, 2002 to the present.

This class action arises out of Plaintiffs' allegations that Defendants and their alleged co-conspirators engaged in a wide-ranging conspiracy at the processor and cooperative levels to control the supply of raw Grade A milk in Order 1, which had the effect of suppressing certain premiums paid to dairy farmers for their milk. In their Revised Consolidated Amended Class Action Complaint (the "Amended Complaint"), (Doc. 117), Plaintiffs allege that Defendants engaged and are presently engaging in five violations of the Sherman Act, 15 U.S.C. §§ 1-2: (1) conspiracy to monopolize/monopsonize in violation of § 2 of the Sherman Act; (2) attempt to monopolize/monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopoly/monopsony in violation of § 2 of the Sherman Act; (4) price fixing in violation of § 1 of the Sherman Act; and (5) conspiracy to restrain trade in violation of § 1 of the Sherman Act. The court granted summary judgment in Defendants' favor on Plaintiffs' price fixing claim.

In late 2010, Plaintiffs and former Defendant Dean Foods Company ("Dean") reached a settlement agreement (the "Dean Settlement") that required Dean to make a one-time payment of $30 million. Plaintiffs agreed to release and discharge Dean from certain claims and potential claims. After granting preliminary approval of the Dean Settlement and holding a fairness hearing regarding final approval on July 18, 2011, the court granted final approval of the Dean Settlement and awarded attorney's fees of $4.5

million and costs and expenses of $1.5 million to Plaintiffs' counsel. (Doc. 341 at 14, 19.)[1]

On February 1, 2011, Plaintiffs filed a motion to certify the class and appoint class counsel and class representatives, (Doc. 206), which the court denied without prejudice. (Doc. 361.) Following a subsequent request for certification of two subclasses, (Doc. 388), this court granted on November 19, 2012, Plaintiffs' renewed motion for class certification and certified the following two subclasses:

1. All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who are members of DFA or otherwise sell milk through DMS ("DFA/DMS subclass"); and

2. All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who are not members of DFA and do not otherwise sell milk through DMS ("non-DFA/DMS subclass").

(Doc. 435 at 3-4). The court further granted Plaintiffs' request to appoint counsel for the Dairy Farmers Subclasses (collectively, the "Subclass Counsel"), as well as to name Jonathan and Claudia Haar and Richard Swantak the Subclass Representatives of the DFA/DMS subclass and to name Alice Allen and Laurance Allen and Ralph Sitts and Garret Sitts the Subclass Representatives of the non-DFA/DMS subclass (collectively, the "Subclass Representatives").

As the case approached trial, the court granted in part and denied in part the parties' motions to exclude certain expert opinions, (Docs. 470 & 473), and Defendants' motion for summary judgment. (Doc. 525.) A jury trial was scheduled to take place on July 7, 2014 through August 20, 2014. After Subclass Counsel notified the court that a settlement had been reached, an expedited motion for preliminary approval of the Proposed Settlement was filed on July 1, 2014 by Subclass Counsel. In seeking

---

[1] Subclass Representatives have raised issues concerning the Dean Settlement. With the exception of addressing their motion for new counsel, the court will not address challenges to the Dean Settlement at this time as the court held a fairness hearing at which those challenges could have been raised.

3

preliminary approval, Subclass Counsel advised the court that the Subclass Representatives unanimously opposed the Proposed Settlement. (Doc. 568; Doc. 568-1 at 4.) The court denied the motion for preliminary approval without prejudice, ruling "as a condition precedent to preliminary approval, [that] Subclass Counsel must disclose to the court the grounds for the Class Representatives' opposition to the Proposed Settlement." (Doc. 569 at 9.) Subclass Counsel submitted information to the court regarding why the Subclass Representatives opposed the Proposed Settlement, which included a letter to the court from the Subclass Representatives.

On October 3, 2014, Subclass Counsel filed a renewed motion for preliminary approval of the Proposed Settlement, (Doc. 580), which the court granted in part.[2] (Doc. 582.) The court authorized dissemination of notice to the class and ordered that requests to opt back in, claims forms, objections, and/or requests to be heard be filed fourteen days before the Fairness Hearing. A Fairness Hearing was scheduled for January 29, 2015.

Prior to the Fairness Hearing, Subclass Counsel filed a motion for attorney's fees of $16.6 million, reimbursement of expenses of $3,705,645.91, and incentive awards of $20,000 per farm for the Subclass Representatives. (Doc. 588.) Plaintiffs' motion for final approval of the Proposed Settlement, (Doc. 625), is now pending before the court.

## II. The Fairness Hearing.

On January 29, 2015, the court held a full day Fairness Hearing, which is briefly summarized below.[3]

### A. Support for the Proposed Settlement.

The court received five letters in support of the Proposed Settlement, (Docs. 593, 595, 605, 609 & 623), as well as a letter in support from Subclass Representative Alice Allen. (Doc. 592.) Four individuals spoke in favor of the Proposed Settlement at the Fairness Hearing. (Docs. 591, 602, 613 & 615.) Accordingly, a total of ten dairy farmers affirmatively expressed their support for the Proposed Settlement. In general, these

---

[2] The court declined to grant preliminary approval for Subclass Counsel's request for attorney's fees, costs, and expenses.

[3] *See also* Doc. 636 (transcript of Fairness Hearing on file with the court).

supporters either spoke in favor of the Proposed Settlement or expressed concerns that this lawsuit has been harmful to the dairy industry; interfered with practices by Defendants that were advantageous to dairy farmers; pitted dairy farmer against dairy farmer; and constituted a waste of resources.

Alice Allen, the only Subclass Representative who supports the Proposed Settlement, stated that she would prefer "a better settlement" but recognized that "there are risks to both sides in going to trial" and "no guarantee[s] that [the class] would prevail at trial." (Doc. 636 at 50, 53.) She further stated: "It was not a perfect settlement by any stretch of anyone's imagination. But I also have to say that this is the first time in my career and life, having been involved in dairy long before I was old enough to milk cows -- this is the first time we have made it this far. . . . I do not believe justice would be any better served for Northeast dairy farmers by going to trial." *Id.* at 51, 53.

### B. Objections to the Proposed Settlement.

The court received twenty-three letters objecting to the Proposed Settlement, (Docs. 589-90, 594, 596-601, 603-04, 606-08, 610, 612, 614, 616, 618, 627-29 & 632), as well as letters from two individuals who also spoke against the Proposed Settlement at the Fairness Hearing. (Docs. 611 & 630.) Subclass Representatives Richard Swantak, Garret Sitts, Ralph Sitts, Jonathan Haar, Claudia Haar, and their son Joshua Haar each provided a written and verbal statement, objecting to the Proposed Settlement. (Docs. 617 & 619-22.) Accordingly, a total of thirty-five dairy farmers representing twenty-eight farms affirmatively objected to the Proposed Settlement.

At the Fairness Hearing, the remaining Subclass Representatives opposed the Proposed Settlement, challenging both its procedural and substantive fairness. The remaining Subclass Representatives stated that they were advised of the Proposed Settlement only after a monetary settlement had been agreed to in principle by Subclass Counsel, which, in turn, impeded their ability to negotiate for the injunctive relief they contend is an essential component of any settlement.[4] They further contend that they

---

[4] During the Fairness Hearing, some of the Subclass Representatives informed the court of alleged problems regarding the Notice of the Proposed Settlement. The court, however, received

5

were discouraged from conferring with one another regarding the Proposed Settlement[5] and that their concerns about it and their desire to proceed to trial were given insufficient consideration by Subclass Counsel. In their motion seeking new counsel, (Doc. 637), filed after the Fairness Hearing, the remaining Subclass Representatives provided further details regarding what they claim was "collusive" conduct by Subclass Counsel, which they argue precludes the court from finding the Proposed Settlement was the product of good faith, arm's-length negotiations. *See id.* at 13-17; *see also Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) (observing that the district court must consider "the negotiating process . . . and the coercion or collusion that may have marred the negotiations themselves"); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 146 (E.D.N.Y. 2000) (recognizing that "the principal impediment to assuring an untainted settlement process is the financial interest of counsel, who may be improperly influenced to accept certain settlement terms, or to accept a settlement at all, thereby 'subordinat[ing] the interests of class members to the attorney's own economic self-interest'") (alterations in original) (quoting John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 371-72 (2000)).

The remaining Subclass Representatives also challenge the Proposed Settlement on substantive grounds, arguing that without certain injunctive relief, they may be

---

no direct complaints from any class members reporting a problem with the Notice or lack of receipt of or access to the Proposed Settlement, which was available from multiple sources including the court.

[5] One Subclass Representative stated that, as with the Dean Settlement, the Subclass Representatives "were discouraged from interaction among plaintiffs" and "were told by our counsel that there . . . should be no interaction between plaintiffs in regards to this case without attorneys present, insinuating we could face possible legal action." (Doc. 636 at 24.) Another Subclass Representative joined in this representation, stating that the Subclass Representatives "were led to believe that it was illegal to discuss the case without counsel present" and that "one of the lawyers went on a rant of profanity and threatened" the Subclass Representatives during settlement discussions. *Id.* at 41-42.

exposed to retaliation by DFA and DMS;[6] the Proposed Settlement's provision of estimated financial compensation of approximately $4,000 per dairy farm is "functionally irrelevant," (Doc. 636 at 66), as it reflects the cost of one "tractor tire," *id.* at 14; and the Proposed Settlement's injunctive relief is insufficient as it only requires Defendants to perform tasks they have already undertaken or to refrain from activity that is allegedly illegal.[7] For this reason, the remaining Subclass Representatives assert that the Proposed Settlement will allow Defendants to continue the practices that gave rise to this lawsuit.[8]

---

[6] As one Subclass Representative explained: "The lawyers have used our names, our reputations. We have been vilified to our neighbors and fellow co-ops, fellow producers. The co-ops have threatened our safety and livelihood. The co-ops control our milk checks, their laboratories that test our milk for bacteria, drugs, protein, and butterfat. In short, they, DFA, could put us out of business tomorrow." (Doc. 636 at 28.) Another Subclass Representative described dairy farmers as "a class ripe for abuse" that "ha[s] been abused, first by the [D]efendants and now by those who purport to represent us and our interest[s] as counsel." *Id.* at 56. The Proposed Settlement contains an anti-discrimination and anti-retaliation clause that Defendants "will not discriminate or retaliate, or cause discrimination or retaliation, of any kind whatsoever in response to the participation or support of the Subclass Representatives or any other farmer in this Action." (Doc. 625-3 at 19.) However, the remaining Subclass Representatives characterize this provision as inadequate because "without any changes in their control of our milk check and DFA owning the labs that test our milk, how will we defend ourselves, and who will be there to make sure we are treated fairly?" (Doc. 636 at 27.)

[7] For example, the Proposed Settlement prohibits DFA and DMS from entering into or maintaining "any agreement or understanding, written or unwritten, with any cooperative that limits or restricts any form of solicitation of milk supplies from dairy farmers." (Doc. 625-3 at 19.) Subclass Representatives contend that DFA and DMS entered into non-solicitation agreements, with knowledge that they were illegal, and thus any promise to refrain from this practice is only what the law requires. The Subclass Representatives also point out that the non-solicitation provision is effective only during the term of the Proposed Settlement, unlike the Proposed Release, which remains binding after the Proposed Settlement expires.

[8] In particular, the Proposed Settlement leaves the existing full-supply agreements ("FSAs"), which have been a focus of the litigation, "untouched." (Doc. 636 at 6.) It provides that Defendants "will not enter into any FSAs for the supply or sale of raw Grade A milk to customers in Order 1, provided, however, that Settling Defendants *retain the right to renew existing FSAs.*" (Doc. 625-3 at 15) (emphasis supplied). As one Subclass Representative explained: "This lawsuit was not brought on the basis of full-supply agreements which [D]efendants might bring into existence at some future date, but rather for the ones which are currently strangling the market. The fact that this term here does nothing to touch those means that it is not going to result in any market change." (Doc. 636 at 6.) Another Subclass Representative elaborated that, because Defendants "retain the right to renew existing full-supply

7

The remaining Subclass Representatives emphasize that they "did not enter into this lawsuit with a monetary award in mind," but rather sought "market relief, a market that is not controlled and manipulated by the [D]efendants," *id.* at 28, 38, and that "injunctive relief has been at the center of the issues that [the farmers] have sought," particularly "fundamental market change." *Id.* at 5-6, 17. The remaining Subclass Representatives also argued in favor of an expanded definition of the class to include all dairy farmers who pooled milk on Order 1 during the relevant time period, regardless of where they are physically located.

Finally, the remaining Subclass Representatives contend the Proposed Release is overbroad as it requires class members to release all claims that were or could have been asserted in the "Complaint," which is defined as the "complaints and amended complaints" and "any other pleading filed in this matter or any consolidated matter,"[9] and as the Proposed Release extends beyond a release of Defendants for their practices at issue in this case. (Doc. 625-3 at 2, 6.)

At the Fairness Hearing and in their written submissions, Subclass Counsel responded to Subclass Representatives' contentions, asserting they were ill-advised and unfounded. Subclass Counsel deny any procedural unfairness in how the Proposed Settlement was reached and represent that Subclass Representatives were involved in every stage of the negotiations and initially expressed support for the Proposed Settlement. They argue that the Proposed Settlement represents an excellent recovery for Subclass members and explain why it differed from the monetary relief obtained in the

---

agreements" and because they allegedly "currently have a monopoly on plant access," the Proposed Settlement "allows the [D]efendants to maintain that monopoly by renewing existing full-supply agreements. No relief." *Id.* at 38; *see also id.* at 74 ("Settling [D]efendants, in terms of this [A]greement, will not enter into any FSAs, new FSAs. [But] it's not new FSAs that created the problem. So there's zero relief there.").

[9] The Subclass Representatives contend that the definition of the "Complaint" in the Proposed Settlement includes voluminous information filed or generated in this case that has been sealed and that neither Subclass Representatives nor Subclass members have seen. In addition, although the Proposed Settlement requires disclosure of financial information by Defendants, if these disclosures are not actionable, they contend they will provide no material relief.

8

Southeastern Milk Antitrust case. *See In re Se. Milk Antitrust Litig.*, 2013 WL 2155379, at *7 (E.D. Tenn. May 17, 2013) (approving settlement).[10]

Subclass Counsel assert that the Proposed Settlement is fair, reasonable, and adequate in light of the risks of going forward at trial and the impact of the court's summary judgment decision on Plaintiffs' claims and liability and damages theories. They point out that the same Proposed Release had been used in the Southeastern Milk Antitrust case and characterized it as a standard release in an antitrust lawsuit.[11] They claim that many of the Subclass Representatives' requests for injunctive relief were either unrealistic or unobtainable in settlement negotiations, and they contend that the Proposed Settlement's injunctive relief requires fundamental and beneficial changes in the way Defendants conduct business and the disclosure of previously unavailable information that will benefit the class.

Regarding the Proposed Settlement's monetary relief, Subclass Counsel point out that the payment of $50 million "substantially exceeds" the Dean Settlement and that together this Settlement and the Dean Settlement is "the largest antitrust settlement in the history of this jurisdiction" and a "very significant achievement." (Doc. 625-1 at 8, 32, 34.) They explain that, although their claim for damages totaled $341,856,833, approximately $130,553,453 of those damages occurred outside the four-year limitations period and that the class would have to prove a theory of recovery for those damages. They also emphasize that the settlement fund must be considered in relation to the potential actual, rather than treble, damages. *See Cnty. of Suffolk v. Long Island Lighting*

---

[10] The court is not convinced that the cases are comparable in terms of the market power of the defendants, the evidence in support of the alleged antitrust violations, and the strength of a statute of limitations defense.

[11] While Subclass Counsel are correct that "[b]road class action settlements are common," the "authority" of plaintiffs in a class action to "release claims that were or could have been pled in exchange for settlement relief . . . is limited by the 'identical factual predicate' and 'adequacy of representation' doctrines." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005). "Together, these legal constructs allow plaintiffs to release claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement." *Id.*

*Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) (concluding the district court "correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure"). With these considerations in mind, Subclass Counsel ask the court to find the Proposed Settlement offers monetary and injunctive relief in the range of reasonableness based upon the factors and circumstances of this case. Defendants join in this request.

### III. Conclusions of Law and Analysis.

A district court "must carefully scrutinize the [proposed] settlement to ensure its fairness, adequacy and reasonableness, and that it was not a product of collusion." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted); *see also* Fed. R. Civ. P. 23(e)(2) (directing that a court "may" approve a class action settlement "only" after "finding that it is fair, reasonable, and adequate"). This entails a review of "the negotiating process leading up to the settlement [, *i.e.*, procedural fairness,] as well as the settlement's substantive terms [, *i.e.*, substantive fairness]." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009) (alterations in original) (internal quotation marks omitted).

#### A. Procedural Fairness.

"The court must review the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1941 (2014). The court "must pay close attention to" and "examine[] the negotiation process with appropriate scrutiny." *D'Amato*, 236 F.3d at 85. The court must also bear in mind its own "fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately." *In re Warner Commc'ns Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986).

In this case, there is no dispute that Subclass Counsel are experienced and able antitrust litigators who engaged in extensive discovery and motions practice necessary to the effective representation of the class. *See D'Amato*, 236 F.3d at 85 (directing a court

to ensure "that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests") (internal quotation marks omitted). They are also correct in asserting that the tactical decisions they have made in this case are ones that are controlled by counsel under well-established precedent.[12] Subclass Counsel thus had the authority to negotiate and enter into the Proposed Settlement, even if some or all of the class representatives opposed it, provided the settlement is in the best interest of the class. *See In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1365 (2d Cir. 1991) (noting the authority of lead counsel to negotiate for the class because "lead counsel are likely to be in the best position to conduct settlement discussions" and delineating the "responsibilities" of lead counsel, which include "to keep other counsel for subclasses or members of the classes informed about negotiations and to consult with them regarding appropriate settlement terms"); *see also Charron*, 731 F.3d at 254 (holding that "the assent of class representatives is not essential to the settlement, as long as the Rule 23 requirements are met" and further noting that "[c]lass counsel is supposed to represent the class, not the named parties") (internal quotation marks omitted).

The Subclass Representatives, however, also play an important role in this litigation and have a fiduciary obligation to represent the class's interests. *See Martens v. Thomann*, 273 F.3d 159, 173 n.10 (2d Cir. 2001) (noting that class representatives "have fiduciary duties towards the other members of the class") (citing, in part, *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 331 (1980) (recognizing "the responsibility of named

---

[12] *See C.I.R. v. Banks*, 543 U.S. 426, 436 (2005) (noting an "attorney can make tactical decisions without consulting the client," but remains "obligated to act solely on behalf of, and for the exclusive benefit of, the client-principal"); *Alaimo v. Cohen*, 2008 WL 4202267, at *6 n.6 (S.D.N.Y. Sept. 10, 2008) (noting that "the decision of what arguments to pursue are typically the domain of the attorney, not the client" and that "'[c]lients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters'") (quoting Model Rules of Prof'l Conduct R. 1.2 cmt. 2); *see also Deangelis v. Corzine*, 286 F.R.D. 220, 225 (S.D.N.Y. 2012) (ordering that class counsel had the "authority to render final determinations as to strategic decisions on behalf of the putative class"); *Malchman v. Davis*, 588 F. Supp. 1047, 1058 (S.D.N.Y. 1984) (noting "[i]t is almost always the attorneys [in class actions] who make the litigation decisions, determine strategy, and negotiate settlement terms").

plaintiffs to represent the collective interests of the putative class"); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995) ("Both class representatives and class counsel have responsibilities to absent members of the class.")); *see also McDowall v. Cogan*, 216 F.R.D. 46, 49 n.3 (E.D.N.Y. 2003) ("A named plaintiff acts as a fiduciary to the unnamed class members."). Their concerns therefore need to be afforded careful consideration in evaluating the Proposed Settlement.

Because the factual issues between Subclass Counsel and the remaining Subclass Representatives regarding the manner in which the Proposed Settlement was reached remain unresolved and are integral to a procedural fairness analysis, the court cannot make a finding of procedural fairness at this time. *See In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 104 (2d Cir. 2003) ("'The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court.'") (quoting *Maywalt*, 67 F.3d at 1078). The court thus turns to an examination of whether the Proposed Settlement is substantively fair, reasonable, and adequate.

### B. Substantive Fairness.

In deciding whether to approve a settlement of a class action suit, courts must also "examine the fairness, adequacy, and reasonableness of a class settlement according to the '*Grinnell* factors.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). The *Grinnell* factors require examination of:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart Stores, Inc.*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

Three of these factors warrant only a cursory discussion in the context of the Proposed Settlement. The complexity, expense, and likely duration of the litigation do not weigh in favor or against the substantive fairness of the Proposed Settlement because these factors are in equipoise. This case has been pending since 2009 and settled on the eve of trial. It has thus already presented costly, complex, and protracted litigation for both sides. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (noting that antitrust cases are "generally complex, expensive and lengthy" and that antitrust class actions in particular "have a well deserved reputation as being most complex") (internal quotation marks omitted). Because the case settled on the eve of trial, much of the necessary expense of the trial had been incurred, although substantial trial expenses could be expected. Subclass Counsel urge the court to find that these factors weigh in favor of approving the Proposed Settlement; however, the remaining Subclass Representatives urge the court to find that with trial preparation almost completed, an adjudication on the merits as opposed to a settlement was more advantageous to the class. Both of these arguments have merit.[13]

---

[13] The Subclass Counsel and Subclass Representatives appear to have a fundamental difference of opinion regarding what this case is about, what would be proved at trial, and what is a fair, reasonable, and adequate response to Defendants' alleged antitrust violations. The remaining Subclass Representatives seek to have the case and its settlement focus on Defendants' alleged "cradle to grave" grip on raw Grade A milk production in Order 1, including Defendants' sole ability to test Subclass members' milk and thereby determine Subclass members' milk checks. They contend that Defendants do not comport themselves as cooperatives and fiduciaries existing for the benefit of their members, but are more akin to for-profit corporations that benefit themselves at dairy farmers' expense. They also contend that Defendants are not entitled to immunity from the antitrust laws pursuant to the Capper-Volstead Act, 7 U.S.C. § 291.

In contrast, in the Amended Complaint and subsequent filings, Subclass Counsel have alleged an extensive, multi-member conspiracy acting to suppress a component of price which they have called "Farmer Premiums," controlling access to processing plants, and limiting the ability of dairy farmers to market their milk independently or outside Defendants' control. These allegations of antitrust violations extend far beyond the named Defendants. Subclass Counsel assert that they have not pursued claims regarding Defendants' milk testing because these

The stage of the proceedings and the amount of discovery completed weigh in favor of the substantive fairness of the Proposed Settlement because "[t]his factor requires the [c]ourt to consider whether the parties have adequate information about their claims." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 198 (S.D.N.Y. 2012) (noting that settlement was reached after pretrial negotiations, motion practice, and certification discovery), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013). In this case the parties have "a thorough understanding of their case." *Wal-Mart Stores, Inc.*, 396 F.3d at 118 (noting settlement was reached after "extensive discovery proceedings spanning over seven years" and thus "le[ft] relatively few unknowns prior to trial"); *see also Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998) ("First, there must be sufficient discovery of facts for the court intelligently to make such an appraisal as its fiduciary duty requires. Second, the pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . [, but] an aggressive effort to ferret out facts helpful to prosecution of the suit.") (alterations in original) (internal quotation marks and citations omitted).

The ability of Defendants to withstand a greater judgment appears uncontested as Subclass Counsel have represented that "DFA and DMS theoretically could withstand a greater judgment." (Doc. 625-1 at 31.) The Second Circuit has concluded that this factor "does not suggest that the settlement is unfair" when it "stand[s] alone" against the settlement and the remaining factors weigh in favor of the settlement. *D'Amato*, 236 F.3d at 86 (citing *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 178 n.9 (S.D.N.Y. 2000); and *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate."), *aff'd*, 117 F.3d 721 (2d Cir. 1997)).

The reaction of the class to the Proposed Settlement raises the greatest issue with regard to substantive fairness. Subclass Counsel points out that notices were sent to

---

allegations lack proof—a decision with which the remaining Subclass Representatives disagree.

8,859 dairy farmers by direct mail, as well as provided in certain publications, and that the objections filed with the court "constitute a very small fraction of the farmers notified of the" Proposed Settlement. (Doc. 625-1 at 18.) They contend that it is "significant" that, of the 8,859 farms directly notified, "approximately 1/8th of 1% have expressed any objection." *Id.* at 22. They also point out that more than 700 claims have already been submitted, which Subclass Counsel contends "is a strong indication that large numbers of Subclass intend to participate in the Settlement." *Id.* at 23; *see also* Doc. 633-1 at 9.

While some courts have considered the number of objections relative to the total number of potential class members in analyzing the class's reaction to the settlement,[14] other courts have found that a class's silence does not necessarily indicate approval and thus "a low level of vociferous objection is not necessarily synonymous with jubilant support." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981) (noting that class members often lack the resources to object or to opt out and litigate their claims); *accord Myers v. MedQuist, Inc.*, 2009 WL 900787, at *12 (D.N.J. Mar. 31, 2009); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (concluding that "[a]cquiescence to a bad deal is something quite different than affirmative support" and declining to "infer support from silence") (footnote omitted); *see also* Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 90-91 (2007) (concluding that "courts have systematically misinterpreted the silence of the class by ignoring more plausible explanations for class members' failure to object to a proposed settlement"). Courts have therefore been "unwilling to bootstrap a low response rate into class-wide enthusiasm for the settlement," *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001), and at least one district court in the Second Circuit has noted that the "silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement." *Cnty. of Suffolk v. Alcorn*, 710 F. Supp. 1428,

---

[14] *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (collecting district court cases in which the court concluded that a "small number of objections weighed in favor of the settlement" and noting the district court in that case "properly" considered that only eighteen objections were received of the 27,883 notices sent to potential class members).

1437 (E.D.N.Y. 1989), *aff'd in part, rev'd in part sub nom. Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1299 (2d Cir. 1990) (reversing district court's denial of attorney's fees).

Here, the silence of the class does not establish wide-spread acceptance of the Proposed Settlement among dairy farmers in Order 1, nor does that silence establish the "fairness" of the Proposed Settlement. *See Petruzzi's, Inc. v. Darling-Del. Co.*, 880 F. Supp. 292, 299-300 (M.D. Pa. 1995) (concluding that "'fairness' is not demonstrated by the silence of class members in response to the proposed settlement"); *see also In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 1995 WL 222177, at *6 (E.D. La. Apr. 12, 1995) ("The fact that a relatively small number of objections were lodged against the proposed settlement is insufficient to rebut the conclusion that the terms of the settlement are inadequate."). The nature of the objections to the Proposed Settlement underscore this conclusion. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. at 479 (explaining that "each objection must be evaluated on its merits"). Those objections are shared by the remaining Subclass Representatives who have actively participated in the litigation and are fully conversant with the Proposed Settlement's terms and conditions. *See Date v. Sony Elecs. Inc.*, 2009 WL 435289, at *10 (E.D. Mich. Feb. 20, 2009) (finding in a class action in which seventeen of 175,000 potential class members submitted "actual objections" that, "[a]lthough the objectors are few, the objections illuminate the inherent unreasonableness of the settlement"). The context in which the objections were made is also important. *See* Doc. 636 at 102, 111 ("Most farmers are fearful to openly oppose this proposed settlement [because] to send a copy of a letter in opposition to this [P]roposed [S]ettlement . . . would be to send a letter of complaint about your boss to your boss. . . . [F]armers [are] acutely aware that DFA, DMS has the ability to directly affect their paycheck by controlling their milk testing.").

Against this backdrop, the court cannot conclude that the reaction of the class has been positive. Instead, it appears that there is relatively strong opposition to the Proposed Settlement on the following grounds: (1) the monetary relief is inadequate if there are no significant changes to how Defendants do business (especially in light of the lack of

independent testing of milk which, in turn, determines the compensation due to dairy farmers); (2) the Proposed Release is overly broad in terms of its definition of what constitutes the Complaint, in its identity of the Released Parties, and in its duration in light of the expiration of other provisions of the Proposed Settlement; and (3) in light of the modest per farm relief, Subclass Counsel will be the primary beneficiaries of the Proposed Settlement if their requests for attorney's fees and costs are approved.

With regard to the risks to the class of establishing liability and damages and of maintaining the class action through the trial, Subclass Counsel contend that these factors weigh strongly in favor of the Proposed Settlement. With the exception of maintaining the class through trial, the court agrees. Plaintiffs' litigation risks were sizable in light of unresolved issues regarding the statute of limitations, market definition, the competing expert opinions, and Plaintiffs' damages calculation. A defense verdict therefore was and remains a distinct possibility.[15]

Analyzing the *Grinnell* factors collectively, the court cannot find that the Proposed Settlement's monetary relief of $50 million is on its face inadequate or unreasonable. However, when this amount is considered from the class's perspective, in light of the broad Proposed Release, and the absence of what the remaining Subclass Representatives contend is meaningful injunctive relief, the receipt of approximately $4,000 per dairy farm could reasonably be perceived as a modest recovery. *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 676 (S.D.N.Y. 2011) (noting that only two factors weighed against approval of a proposed class action settlement agreement—the reaction of the class and defendant's ability to withstand judgment—and that the reaction of the class was most "important" because "some of the concerns" of the objectors were "significant," including whether the settlement's release extended beyond claims with the identical factual predicate as the settled claims).

On balance, the *Grinnell* factors weigh against the Proposed Settlement primarily because of the reaction of the class. *See In re Am. Bank Note Holographics, Inc.*, 127 F.

---

[15] Contrary to the remaining Subclass Representatives' contentions, the court cannot conclude that a defense verdict would be more advantageous to the class than the Proposed Settlement.

Supp. 2d 418, 425 (S.D.N.Y. 2001) (noting that "[i]t is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy") (internal quotation marks omitted); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 119 (concluding that reaction of class members to the Settlement "is perhaps the most significant factor in [the] *Grinnell* inquiry"). When coupled with the procedural challenges to the Proposed Settlement, the court cannot conclude that the Proposed Settlement is substantively in the class's best interests. *See Weinberger v. Kendrick*, 698 F.2d 61, 69 n.10 (2d Cir. 1982) (directing that a district court "passing on settlements of class actions under [Rule 23]" is not "an umpire in [a] typical adversary litigation" but rather "a guardian for class members"); *see also Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 654 (2d Cir. 1999) (emphasizing that "the district court bears the ultimate responsibility for ensuring that the interests of vulnerable class members are vindicated") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the motion for final approval of the Proposed Settlement, (Doc. 625), is DENIED WITHOUT PREJUDICE.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 31st day of March, 2015.

Christina Reiss, Chief Judge
United States District Court