UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 17  AM 10: 42

CLERK
BY _____
DEPUTY CLERK

| | |
|---|---|
| ALICE H. ALLEN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 5:09-CV-00230-cr |
| | ) |
| DAIRY FARMERS OF AMERICA, INC., and | ) |
| DAIRY MARKETING SERVICES, LLC, | ) |
| | ) |
| Defendants. | ) |

**SIMILARLY-SITUATED SUBCLASS REPRESENTATIVES' RENEWED MOTION
FOR NEW COUNSEL AND MEMORANDUM IN SUPPORT**

After the Court's June 30th finding that it would not be in the subclasses' best

interest to remove our class counsel, we set to work things out with our counsel in order

to mutually achieve a good outcome of this case for our fellow dairy producers. On July

7th, Mr. Jonathan Haar asked Mr. Ben Brown via email for the hearing transcript, as

Mr. Brent Johnson had attached only the Opinion and Order in a curt email sent the day

of the Court's ruling and we had not heard from counsel since. Exhibits 1 and 2.

Mr. Ben Brown replied a week later by calling the Haars and speaking to Ms.

Claudia Haar. They had a nice conversation, and Claudia told Ben that she would relay

his request for a conference call to the other class reps. The next day, she emailed a

document we had thrown together to give counsel an idea of what we were thinking for

the case going forward. Exhibit 3-2. This email let them know that we were "making hay

while the sun shines," but that they should continue to share via email, and we would

"respond collectively as promptly as possible." Exhibit 3-1. Ben did not reply to this.

Instead, Kit emailed Claudia personally and told her that he, Ben, and Mr. Robert Abrams wanted to talk with her "directly." Exhibit 4.

Alternatively, Kit said, they would speak to all the class reps via conference call right at chore time that Friday, Saturday, or Monday. Exhibit 4. We responded that we had already shared what communication would be "most convenient" and it hadn't seemed to make any difference, but that if they still thought it would be helpful, "we can see about getting together on a conference call as soon as possible next week. However, any such call will be on a line of our choice so that we can record the call and verify for our fellow producers that counsel will not once again forget what was said in the event that this litigation reaches an impasse between the lawyers' pockets vs. the farmers' livelihood and our country's food supply. Best regards, and we look forward to hearing from you soon! Your friends and fellow litigants, Ralph and Garret Sitts, Jonathan and Claudia Haar, Richard Swantak." Exhibit 5. Both firms emailed us separately to tell us how "disappointed" they were, and showing that they had "forwarded" our information to defense counsel as something for Defendants to decide whether or not they could conveniently accommodate, thereby allowing class counsel to state for the record that they have listened to their class. Exhibits 6 and 7.

This and subsequent communications with both firms confirmed our realization that, if our subclasses of Northeast dairy producers are to secure any meaningful relief, these lawyers need to go. Defendants have their side of the case as well, but this only strengthens our need for counsel who will fight for meaningful relief rather than take the money and run. Now that we know what legal evidence is, we humbly request that the Court grant us a hearing so we may present evidence to prove the following:

2

I.   <u>The firms of Baker Hostetler and Cohen Milstein are guilty of collusive behavior</u>
     <u>which warrants their removal as class counsel.</u>

On July 15th, 2015, the five similarly-situated subclass representatives emailed
our counsel a list of three litigation objectives to be obtained through settlement or
sought at trial, and one addition to the Prayer for Relief (each discussed below).
Subclass counsel ignored the subclass representatives' attorney-client privilege by
directly sharing all these items – and misrepresenting the Prayer of Relief item as a
settlement demand – with defense counsel without even contacting these class
representatives beforehand. Exhibits 6 and 7.

On July 31st, counsel from Cohen Milstein and Baker Hostetler told class
representatives that their firms would not be pursuing these litigation objectives, on the
grounds that "DFA/DMS's view is...DFA/DMS believes...DFA/DMS will not agree
to...We would be happy to explain DFA/DMS's views...While we understand you
disagree with DFA/DMS's views..." Exhibits 13 and 14. Defense counsel could hardly
have done better had they emailed us directly.

On July 23rd, the Haars received an email originally from Mr. Jonathan Miesen,
Land O' Lakes Associate General Counsel, to Mr. William Neary, Land O' Lakes Director
of Business Development. Exhibit 18. As this email shows, our counsel shared their
litigation strategy with one of DFA's business partners. This meant that Land O' Lakes
would get as many farmers as possible to submit claims, which would allow our counsel
to show "support" for their settlement.

Class counsel's cooperation with defense counsel at the expense of the class is
reflected in their newly-renewed settlement. Lead counsel are selling a Release, minus

3

extra words, which could hardly be more beneficial to Defendants had they written it themselves. Regarding the concern raised by the Court that counsel's Release was broader than the notice to class members disclosed, Mr. Abrams explained "The "including but not limited to" is a subset. It's a defendant way of writing, frankly." 1/29/2015 Fairness Hearing Transcript, Doc. 636 at 240.

While the anti-retaliatory provisions may have been broadened, Defendants need not worry that they have been strengthened. Lead counsel, in assuring the Court that the settlement would protect subclass members, laid out the procedure in case of retaliatory measures: "You'd be told immediately -- well, you'd be told after I discussed it with opposing counsel. You'd be told." – Mr. Robert Abrams. 1/29/2015 Fairness Hearing Transcript, Doc. 636 at 236. We as class representatives have spoken with several farmers who have failed farm inspections, experienced erratic milk test results, and been personally visited by DFA representatives after speaking up. See, e.g., Exhibit 19. We cannot have counsel which places defense counsel's representations above those of their own class members.

Class counsel's collaboration with their purported adversaries was a problem for this class at another key juncture. The initial Dean Settlement, filed with the Court on Dec. 23, 2010, included a provision that Dean Foods would purchase between 10% and 20% of its milk supply from non-DFA/DMS sources. Preliminary Dean Settlement, Doc. 160-2 at 17-18. This settlement came under fire from several angles, and class counsel's response differed as follows.

When class representatives raised concerns about the Dean Settlement, counsel refused to consider them. See 1/29/2015 Fairness Hearing Transcript, Doc. 636 at 24-25

("On this call, after a lengthy and heated discussion with counsel, it became obvious to us that our counsel was not going to honor our settlement points and the [Dean] settlement was a done deal." – Mr. Ralph Sitts), 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 154:21-155:2 (We had maps from the market administrator, plant IDs, plant locations, compared them to the attorneys' documents, and it was clear they left out a large number of Dean plants in their analysis. We had argued to them that we had maps from the market administrator. They are the official document. They wouldn't budge. They wouldn't hear." – Mr. Garret Sitts). This refusal to allow class representatives' input was so blatant that even defendants picked up on it: "Based on discovery DMS and DFA have conducted to date, the Proposed Settlement was negotiated by Plaintiffs' counsel with little, or no, input from some of the named Plaintiffs. While some (but not all) of the class representatives claim to have evaluated the fairness of the settlement after-the-fact, their testimony reveals that they did so with materially incomplete understandings of the settlement agreement's key terms." DFA/DMS Memorandum in Opposition to Preliminary Approval of Dean Settlement, Doc. 188 at 5-6.

Yet when defense counsel raised concerns about the Dean Settlement, the response was very different. "Shortly after that" [mediation occurred December 2010], the lead attorney from Cohen Milstein met with defense counsel and CEO Rick Smith, of DFA. No other plaintiff attorneys were present. See 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 197. DFA/DMS's opposition to the Dean Settlement was based upon the injunctive relief set forth in §9.2, which they stated would disrupt their business relationships. DFA/DMS Memorandum in Opposition to Preliminary Approval of Dean Settlement, Doc. 188 at 23. That April, the same Cohen Milstein attorney

5

dropped §9.2 altogether. Amended Dean Settlement Agreement, Doc. 294. at 17-18. As a result of class counsel's deception of their class representatives, discussed below, the class representatives raised no objections to the Court. The Court was then left to discover exactly what DFA/DMS wanted it to discover: "Thus far, §9.2 [the injunctive relief] has been the sole source of objections to the Dean Settlement." Opinion and Order, Doc. 297 at 1. Thanks to Cohen Milstein's cooperation in removing this section, there was no remaining obstacle to approval, allowing DFA/DMS to maintain its influence on Dean and freeing Dean from having to search for milk not sold through DMS.

Ultimately, the class representatives did not object to the Dean Settlement. However, the Sittses were told by Mr. Ken Anderson, a co-worker of Mr. Bob Abrams and the others at Howrey, to go to the Fairness Hearing and "see that justice was done" (less politely, to keep Cohen Milstein from selling out the claim before Howrey could get there). See 4/20/2015 Hearing for New Counsel Transcript, at 30:12-15, 34:24-25. At this early date, the now-Baker Hostetler attorneys knew that Cohen Milstein was not to be trusted.

Much to Mr. Pierson's dismay, the Sittses did attend the Dean Fairness Hearing with Alice Allen. See 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 30-31. Mr. Pierson and his colleagues did their best to keep these class representatives quiet by representing that they would go after DFA next: "At that point, the attorneys proceeded – or directed our attention to a very large binder of evidence. That evidence contained a copy of a six-figure payment [actually a seven-figure payment] from the defendants to an independent co-op with a memo attached that, in short, thanked them for not competing. Apparently that binder had a lot of similar noncompeting payments and

letter agreements. We were told of ledgers -- two ledgers, one the membership was privy to and one that they were not. The ledger that was concealed from the members totaled over a billion dollars of assets acquired from members' money never to be repaid to the members. We were told -- I think we were told this stuff to persuade us at that time not to testify against the settlement" – Mr. Garret Sitts. 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 156-57.

We were perplexed to see Defendants' interests being better represented by our counsel than the interests of our fellow class members. Our dismay has only strengthened as we have continued to observe and learn of collusive behavior on the part of our counsel.

II.    Subclass Counsel, ignoring the input of the subclass members, has chosen objectives for this case in a manner which undermines the interests of the class.

While litigation strategy is the domain of Subclass counsel, the litigation objectives at which this strategy is aimed must be those of the class. The fact that "the client may rely on the attorney's expertise and special skills to achieve a result the client could not achieve alone...does not alter the fact that the client retains ultimate dominion and control over the underlying claim." *C.I.R. v. Banks*, 543 U.S. 426, 436 (2005). Our counsel has unlawfully taken advantage of the flexibility inherent in the class-action system by pursuing litigation objectives favorable to their interests while abandoning those desired by the class.

### Enforcement of DFA's Internal Antitrust Policy

This objective was initially preferred by counsel because it would not affect Defendants' business model. This requirement was already one of DFA's own policies,

7

so Defendants could readily agree to it, facilitating a settlement agreement. Class counsel spent the bulk of their class certification hearing in pursuit of this objective, despite the fact that "there isn't a cause of action for violating their antitrust policies or for violating consent decrees." Class Certification Transcript, Doc. 358 at 29:13-15.

### Financial Recovery

As each one of the class representatives, together with numerous class members, have sought to impress upon class counsel at various junctures, financial recovery is not our primary litigation objective. See 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 31:18-24 ("I will never forget Alice Allen... thumping six-foot-five Kit Pierson in the chest with her finger and admonishing him for making this about money..." – Mr. Ralph Sitts). Rather, what we dairy producers need to get, whether through settlement or at trial, is meaningful change to DFA/DMS's oppressive and illegal control over dairy farmers and domination of milk processors. It is certainly our litigation objective to recover what has been unlawfully taken from us. Yet it is more certainly our litigation objective to remedy the conditions which allowed for that taking in the first place. Accordingly, we and our fellow dairy producers encouraged our counsel to pursue the following litigation objectives.

### Milk Testing Reform

Early on, DFA/DMS's ability to use milk testing as a means of control was identified as a tool of monopoly/monopsony. Defendants' control of testing their members' milk and the milk marketed by DMS for supposedly-independent cooperatives "strengthens their position to restrain competition....Similarly, inspectors

have found higher bacteria counts…after those farmers publicly criticize DFA or DMS practices." Consolidated Amended Class Action Complaint, Doc. 117 at 5.

Then-class-representative Ms. Donna Hall maintained milk testing reform as an objective of the class. Ms. Hall provided class counsel with "boxes of evidence," among which were cooperative test results showing a mathematically-impossible identical low butterfat test result across herds and checks from Ms. Hall's cooperative compensating her for artificially-lowered premiums caused by manipulated milk test results.

In his deposition, class representative Garret Sitts discussed the problems with having Defendants test your milk and then write you a check based on their own test: "the preliminary incubation count was impossible based on the low levels of bacteria and the low somatic cell count that the same report indicated." 1/19/2011 Deposition of Garret Sitts, at 87:6-9. This discussion of milk testing went on for over thirty pages. 1/19/2011 Deposition of Garret Sitts, at 81-113.

That fall, class representative Jonathan Haar spoke of Defendants' control of milk testing as a tool of monopoly. "These people write your paycheck, they inspect your farm, they test your milk. What are you supposed to say?" 9/26/2011 Class Certification Hearing Transcript, Doc. 358 at 220.

The next spring, Mr. Haar explained via declaration (the one which counsel tried to reduce) about the "uproar from the membership" at a DFA meeting he had attended, but that, "despite the outcry and a brief reprieve of PI counts affecting our premiums, today PI counts *are* used to influence our premiums." 3/14/2012 Declaration of Jonathan Haar, at 3.

When milk testing came up in June 2014 during trial prep, Mr. Brent Johnson of Cohen Milstein specifically instructed prospective witness Mr. Douglas Ricker not to mention the issue. See 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 159.

During the June 2014 conference calls over settlement, Garret Sitts specifically stated that some form of milk testing reform had to be included, because without it, "we exist only because DFA allows us to." 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 158:22-159:5. Mr. Abrams told him no, because that would require a Board vote, which "we're not waiting for." When we discerned from a recent Order that, at that time, the Court had already been informed that the settlement was completed, class counsel's haste became understandable.

Milk testing was not included in the "terms of the Proposed Settlement." Entry Order Denying Preliminary Approval, Doc. 569 at 8. Nevertheless, when we drafted our Opposition to Proposed Settlement several days later, we still implicitly included the issue: "As for the organizational changes which we had requested early in the case, the collaborative efforts of class counsel and defendants have so neutered **_each of them_** as to render that portion of the settlement pointless. **_One_** example follows." Class Representatives' Opposition to Proposed Settlement, at 5 (emphasis added).

The fellow dairy producers we have spoken with bring up milk testing as a primary concern. See, e.g., 1/29/2015 Fairness Hearing Transcript, Doc. 636 at 143-44 ("In the first two months, everybody's butterfat went down two or more points, their bacteria went up, and their somatic cells went up. The same milk had been testing good for 10 years."), Exhibit 3-2 ("we have found multiple farmers who could share experiences and or documentation related to the subject"). In reply, counsel refused to

pursue even the simple solution of requiring two milk samples, one to be left on the farm.

Counsel has been helped in their efforts to avoid this objective by their change in class definition to exclude all producers located outside the Order. Initially, the definition read "produced raw grade A milk in Order 1 and pooled raw grade A milk in Order 1." Preliminary Dean Settlement, Doc. 160-2 at 7. It now reads "produced and pooled raw grade A milk in Order 1" Renewed Motion for Class Certification, Doc. 206 at 1. Was this was a litigation strategy to show a concentrated anti-competitive effect?

Several things indicate otherwise. First, DFA operates nationwide, as counsel knew because of the Southeast case. There is no "safe haven" from anticompetitive practices outside Order 1. As a result, class counsel knew that such a litigation strategy would be unsuccessful from the start. Second, if their strategy was truly to concentrate the anticompetitive effect of the alleged conduct, this would seem to require that producers who are able to sell into other Orders should be left out. Maine farmers do not sell milk into Canada. Because of their geographic location, they are the most likely to be forced to sell to co-conspirator Order 1 plants. As of September 2007, all but 13 Maine farms did just that. See http://www.maine.gov/dacf/milkcommission/established.shtml. However, counsel directly opposed including these farmers.

Perhaps one could conclude that the nation's "anti-trust titans" were merely clumsy. However, their choice of class definition just so happened to coincide with their decision to refrain from pursuing the class's objective of milk testing reform. At that point, much of the milk-testing evidence which had been brought to their attention rested with Ms. Donna Hall, a class representative located outside the Order. Milk

testing reform would reduce Defendants' control power and thereby significantly affect their business model. As a result, Defendants were not likely to agree to it, so if counsel avoided it altogether, they would be better able to reap a quick windfall through settlement. Thus, counsel used this "litigation strategy" as cover for a decision which advanced their own best interests while abandoning a litigation objective of the class.

<u>Third-Party Vote Counting in DFA Elections</u>

At least as early as Mr. Haar's deposition, class representatives identified DFA's lack of internal control over delegate selection. See 1/12/2011 Deposition of Jonathan Haar, at 175-184. DFA bosses' ability to choose who gets in allows them to run their cooperative and its market operations the way they see fit, regardless of the farmer-members. See 8/7/2013 Declaration of Jonathan Haar, at 2-3. This relief is an example of an issue which ***was*** explicitly stated in the Class Representatives' Opposition to Proposed Settlement last summer. Yet to date, counsel has accumulated no evidence to support relief. Rather, counsel avoided this objective as well, now sharing with us that DFA/DMS tells them that "there is no basis for making any changes in voting procedures." See Exhibits 13 and 14.

However, DFA in fact already employs third-party verification – when handling its members. "The FARM program sets ***industry-wide guidelines*** [now how exactly does DFA, allegedly just one company among many, set industry-wide guidelines?] for animal care and wellness best practices ***and uses third-party verification to ensure the validity and integrity of the program*** [in other words, to make sure that we are truly caring for our livestock] to our customers and consumers. We are

committed to 100% producer participation in this program by the end of 2015." Letter to the Members, July 16, 2015 (emphasis added, attached as Exhibit 16).

While the issue of DFA's control over internal elections may not find massive support in the record, failure to obtain evidence has not stopped our counsel from pursuing certain objectives before. See, e.g., Doc. 525 at 42 ("Plaintiffs have proffered no evidence that their damages prior to October 8, 2005 were neither specific nor calculable"). Had they not unquestioningly taken DFA/DMS's view at face value, our counsel could certainly have listened to their class members and required common-sense reform of this clear control issue as a term of settlement. Instead, they abandoned our litigation objective to pursue their own.

### A Stop to Full-Supply Agreements

As we explained at the January Fairness Hearing and in recent communications with our counsel, the full supply agreements documented in the record between DFA/DMS and processors are an anticompetitive stranglehold on the market and therefore represent a primary litigation objective of our class.

Counsel refused to pursue this objective because DFA/DMS's belief, again taken unquestioningly at face value, is that "(a) the record would not support a ban on FSA's; (b) the portion of the market supplied by DFA/DMS, or milk processed by Dean, is much smaller than some Subclass Representatives have contended; (c) full supply agreements are common in the milk industry and provide benefits to farmers selling milk through DFA/DMS because they guarantee an outlet for their milk; and (d) some DFA/DMS customers want full supply agreements, and other competitors provide them,

13

and DFA/DMS could not agree to forego a method of competition desired by some customers and used by competitors." Exhibits 13 and 14.

Counsel's readily-adopted belief is incorrect, as follows. (a) The record in this case is built upon the class's claim of anticompetitive arrangements between DFA/DMS and processors, of which full-supply agreements are a key element. More significantly, the Court found that this claim, while complex and as-yet unproven, had sufficient substance to bring before a jury. Counsel's choice to avoid this class objective is therefore poorly founded. (b) Mere market share is not conclusive evidence of actual market power. See Doc. 525 at 14. (c) If full-supply agreements are common in the milk industry, this indicates *more* support for finding anticompetitive practices, not less. (d) One reason DFA/DMS customers would want full-supply agreements is that the monopsony has been so successful that these customers cannot find an alternate milk supply. Counsel failed this class by disregarding our objective in order to secure their settlement, despite the scores of farmers who requested them via petition to pursue it. See Exhibit 15-2.

<u>Divesture of DFA's Milk Processing Interests</u>

The combination of DFA's agreements with milk processors and ownership interests in processing facilities form a central part of the antitrust violations which this case is built upon. DFA's processing activities create the conflict of interest which leads management to choose to increase milk processing interests and to suppress the milk price paid for raw material in order to boost revenue from finished product. We class representatives have shared this motive for antitrust violations with our counsel before. See 8/7/2013 Declaration of Jonathan Haar, at 1-2, see also Exhibit 15-2.

Given this conflict of interest between DFA management and members, and the fact that corporate divesture is a fairly common antitrust relief, it would seem that counsel would have pressed for at least a limiting of DFA's processing activities. Instead, they have avoided the issue, and did not even reply to us regarding our renewed request. See Exhibits 15-2 and Exhibits 13 and 14.

<u>Restructuring of DFA as a Publicly-Traded Corporation</u>

We requested to our counsel that this antitrust objective be specified in our Prayer for Relief. As we explained, "requiring DFA to restructure as a publicly-traded corporation would broadly and swiftly reform the industry by applying a preexisting legal structure, and is thus a trial relief which one would find hard to believe is "unavailable under the antitrust laws" or "unhelpful to the Court." It would seem that it would be much less work for the Court to enforce a decision which is based on preexisting corporate law than it would be for the Court to enforce a decision based on an ad hoc agreement interwoven with DFA's internal policies and procedures. Furthermore this would satisfy the subclasses' need for relief which is at least as long-term and binding as any Release." Exhibit 12.

DFA's cooperative status gives them great market power by freeing them from the disclosure requirements of ordinary milk processing corporations. Further, it grants them exemptions from antitrust compliance via the Capper-Volstead Act. Each is extremely valuable to DFA/DMS's business model.

However, DFA is not in fact a cooperative operated for the benefit of its members. See Genske Letter, attached as Exhibit 17 ("there are not enough physical assets to cover our members' equity investment"). This case is built around a network of DFA/DMS

arrangements and agreements which harm its members, disqualifying it from Capper-Volstead cooperative status. When we spoke to prospective counsel about the attainability of this litigation objective, they expressed disbelief that our counsel had passed up this "low-hanging fruit."

III.   <u>Subclass Counsel is guilty of actual misconduct as a result of misrepresentations of law and fact to both the subclass representatives and the Court.</u>

Early on, CohenMilstein adopted the practice of speaking with the Sittses and with Alice Allen on separate telephone calls. In conjunction, they made sure that the Sittses were led to believe that private communication among class representatives was not legally supported. This misrepresentation of law resulted in divided class representation. "As the case progressed, we had to educate ourselves because counsel has failed to inform us of our rights or the importance of our participating in the process." – Mr. Ralph Sitts. 4/20/15 Hearing for New Counsel Transcript, at 30:21-24.

In December 2010, Mr. Ben Brown told the Haars that a settlement with Dean would solidify the DFA class ("the Judge would have a hard time not certifying a class after having just done that for the Dean settlement"), and then used the Haars to convince a skeptical Alice Allen to agree. When the Sittses, who were not included in that call, remained unconvinced, Brent Johnson went on a rant of profanity directed at Mr. Garret Sitts, and then lied under oath about it at the June 1st Hearing. Mr. Brown's misrepresentation of law helped bring about revenue for his law firm, absolution for the Dean/DFA milk sales arrangement, and little for the dairy producers he signed on to represent. Mr. Johnson's dishonesty speaks for itself.

That July, Kit represented to the Court that counsel would be committed to meaningful injunctive relief. See Dean Final Fairness Hearing, Doc. 338 at 52 ("they really want changes in the industry that will improve the situation for everybody and help farmers get a fair deal and help farmers stay in business and help farmers get the benefit of fair competition....And we're committed to doing that"). Counsel's current settlement shows that this assertion was misleading. Their settlement specifically does not disturb existing full-supply agreements, or any other milk supply agreements approved by the Board. See Doc. 680-3, Section 7. It allows farmers to leave DFA/DMS, but overlooks the fact that, thanks to DFA/DMS's full-supply agreements, these farmers would then have nowhere to sell their milk. It allows for disclosure of Documents 388 and 479, but also provides that DFA/DMS is released from any claims which were or could have been asserted with respect to their subject matter. It provides that DFA's NEAC will "review" milk checks and election procedures, but does not provide any remedy for the control issues identified by class members as contributing to DFA/DMS's antitrust violations. The provisions which remain in force indefinitely are ones which do not affect DFA/DMS's market operations. Counsel represented one result and then brought about the opposite.

Later that summer, Mr. Kit Pierson told Mr. Jonathan Haar that, if Mr. Haar spoke at the upcoming class certification hearing, he could be cross-examined by Mr. Steven Kuney, who, "is no Carl Metz." Mr. Pierson's misrepresentation of law would have ensured that the only farmers which the Court would hear from that day would be on the defendants' side of the room – except that Mr. Haar was unmoved. As we now all know, only evidence is subject to cross-examination.

We as class representatives have long encouraged our counsel to pursue milk testing reform because of the monopolistic power it gives DFA, and worked to provide evidence of DMS's milk testing abuses when our counsel failed to do so. As shown by our efforts on milk testing described above, when Mr. Abrams told the Court that he had "never heard about the milk testing being a part of this case until today... It was never an issue in this case" he misrepresented the facts to the Court. January 29th Fairness Hearing Transcript, at 235-36. See also 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 104:8 ("It was not an issue").

Mr. Abrams also deceived the Court when he asserted "He [speaking of Mr.Sitts] asked me if I would be available to try this case, if it had to be tried, and I said absolutely." 1/29/2015 Fairness Hearing Transcript, Doc. 636 at 238:21-22. Mr. Sitts did not ask Mr. Abrams any such thing, as his testimony clearly shows. 4/20/2015 Hearing for New Counsel Transcript, Doc. 651 at 120:20-25.

Class counsel tell us that our litigation objectives are not in the best interests of our subclasses because these objectives include relief which could never be obtained at trial. See Exhibit 13 ¶ 7. Last summer, they told us that their settlement is in the best interests of our subclasses because it includes relief which could never be obtained at trial. This double standard has not contributed to a relationship of trust and confidence between the class's counsel and its representatives.

On June 20, 2014, counsel misled the Court that a settlement had been reached. A dollar amount had indeed been agreed to, but the injunctive relief remained unsettled. Opinion and Order, Doc. 667 at 5. Meanwhile, counsel was telling us that they had told the Court that the injunctive relief still needed to be "ironed out." When we spoke with

18

prospective new counsel, they explained that this method of negotiating was ill-advised: by agreeing to $50 million before negotiating injunctive relief, Mr. Abrams sacrificed our bargaining power at the outset. Class counsel's misrepresentation of fact helped cover this prejudicial step from the Court.

Two weeks later, following the Court's denial of preliminary approval, Ben Brown called the Haars and told them that if we wanted to submit our objections with the Court rather than just summarize them for counsel, we would need to send them in immediately. This was on a Friday, July 11th. That Tuesday the 15th, our Class Representatives' Opposition to Proposed Settlement was on its way to Andy Manitsky to be filed with the Court. Ben Brown called us again on Monday and Tuesday to speed things up. He called yet again on Wednesday, only to find that we had already sent it to them. To our surprise, counsel only filed with the Court on July 23rd, over a week later. There had not been any great urgency after all. Rather, class counsel's misrepresentation of fact allowed them to more thoroughly attack our objections and thereby present their settlement in a better light.

On July 29th, 2014, counsel filed their own summary of our objections, which represented that we were opposed because (a) we wanted more money, (b) we hadn't gotten what we wanted, and (3) counsel hadn't talked to us enough. Supplemental Document, Doc. 572 at 1. Mr. Dan Foix of Baker Hostetler asserted that "the Court's clerk contacted us and relayed that... "a simple statement" regarding the basis for the subclass representatives' objections to the proposed settlement would suffice..." Exhibit 21. When we contacted the Court to verify if any such communication had occurred, we were referred to the docket, where there was no record of any such request. Counsel's

misrepresentation covered their attempt to minimize the issues brought up by their class members.

On the evening of Tuesday, August 4th, 2015, Mr. Kit Pierson told us that "We anticipate submitting an executed agreement to the Court tomorrow for its consideration" but that they would still be available, "except while we are in transit to the pre-trial conference scheduled for 3 p.m. this Friday." Exhibit 20. The next evening, we received the letter to the Court from plaintiff and defense counsel mutually requesting that the conference be cancelled. Class counsel misled the class representatives (and the Court) for as long as possible regarding their plans to cancel the pre-trial conference. A few class members from Pennsylvania and southern New York were already en route to Vermont.

In support of their renewed settlement, subclass counsel assert that the injunctive relief reached in the Southeast Milk case has been "a significant goal of this litigation since at least January 2013 – with the support of the Subclass Representatives." Motion for Final Approval, Doc. 680 at 9. This assertion misleads the Court, as follows. We recently asked some of the Southeast farmers about the value of the Southeast relief. They explained that it had failed to stop DFA/DMS's market oppression or to make DFA more transparent to stakeholders. We shared the following concerns with our counsel: "We would have been better off not to take the money" "Conditions here are worse than ever" "In less than 24 months they'll have it all back." Exhibit 15-1. We did not feel that it would be helpful at that time to share with counsel that they also said that "Bob Abrams is a snake and a liar" and to "Hang him. Hang them all."

20

With this feedback, and in view of counsel's negotiation style, we realized that if our class were to get meaningful antitrust relief, its representatives would have to step up to the plate. Counsel turned down our proposals, explaining that DFA/DMS would never agree, which would spoil the whole settlement. We shared our concerns with Alice Allen. Exhibits 10 and 11. We also printed, circulated, and delivered a petition to counsel to somehow help them see that their class needs them to advocate our points to Defendants at least as well as they have advocated Defendants' points to us. This petition clearly stated "a cut-and-paste of the Southeast settlement will not be sufficient... "What would be more important would be to **change the corrupt system**." Exhibit 15-2. Thus, when counsel represented to the Court that Southeast relief "*has* been a significant goal of this litigation since at least January 2013 – with the support of the Subclass Representatives," they knew better. Were they being truthful, they would have said that Southeast relief *had* been a significant goal – until we learned more about it.

Additionally, subclass counsel represent that they have "reached out" to us regarding settlement negotiations, but that we "declined to participate." Renewed Motion for Final Approval, Doc. 680 at 11. In fact, we were the ones who contacted them, only to hear back almost a week later. See Exhibits 2 and 3. Additionally, we did not limit our conversations to email. Claudia Haar spoke with Ben Brown on the telephone that very week. We even made clear that we would work to schedule a recorded conference call if they thought it would be helpful. Our willingness to communicate with our counsel has remained even when things got a bit rough.

Unfortunately, they have used our continued communication as fodder for continued misrepresentations to the Court in favor of their settlement. "When class

21

counsel have demonstrated a lack of integrity, a court [and a subclass representative]
can have no confidence that they will act as conscientious fiduciaries of the class."
*Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014), citing *Creative Montessori
Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, 918 (7th Cir. 2011) [emphasis
added]. These firms have shown themselves unfit to represent the Dairy Farmer
subclasses.

## IV. Conclusion

These two firms have misled both the class representatives and the Court through
numerous misrepresentations of law and fact, most recently to advocate for final
approval of their renewed settlement without even a Fairness Hearing, and with no
meaningful antitrust relief for us and our fellow dairymen and women.

As a class, they have failed us legally by pursuing their own litigation objectives
while abandoning ours. Sadly, the worst part appears emblazoned on the Cohen Milstein
webpage: "Access to Justice." Rather than fight to free a class of hard-working farmers
oppressed under the thumb of a corporate giant, these class-action attorneys have
turned negotiators, colluding with their adversaries and undermining their class. We do
not believe that providing them opportunity for continued misconduct is in our best
interests as a class, thus we respectfully request a hearing to present evidence to remove
them from the case.

Respectfully submitted this August ___15___th, 2015,

*/s/Ralph Sitts*                                    */s/Garret Sitts*

Ralph Sitts                                          Garret Sitts

13501 Route 357

Franklin, NY 13775

(607) 829-2100

honeybee6582@gmail.com


*/s/Jonathan Haar*                                  */s/Claudia Haar*

Jonathan Haar                                        Claudia Haar

1495 Paddock Rd.

West Edmeston, NY 13485

(315) 855-4465

haarvest@frontier.com


*/s/Richard Swantak*

Richard Swantak

383 Swantak Rd.

South Kortright, NY 13842

(607) 538-1009

rjswantak@aol.com

I, Jonathan Haar, hereby certify that on August ___15th___, 2015, I served a copy of this motion and its exhibits to counsel of record by certified mail.

Jonathan Haar