UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ALICE H. ALLEN, et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>DAIRY FARMERS OF AMERICA, INC., and<br>DAIRY MARKETING SERVICES, LLC,<br><br>      Defendants. | **Civil Action No. 5:09-CV-00230** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DECERTIFY DFA/DMS SUBCLASS
DUE TO LACK OF ADEQUATE REPRESENTATION**

The questions of which individuals and which lawyers should represent the two

subclasses have been the subject of numerous recent filings in this case. *See, e.g.,* ECF #683

(Similarly-Situated Subclass Representatives Renewed Motion for New Counsel and

Memorandum in Support ("Renewed Motion for New Counsel")); ECF  #689 (Motion to

Reconsider Order Denying Motion for Appointment of Additional Subclass Counsel).  Whatever

the merits of the specific relief sought, however, these filings, particularly the Renewed Motion

for New Counsel, establish that the members of the "DFA/DMS subclass" are not represented by

fellow class members who share common interests in the conduct remedies sought to be

achieved through this litigation.

The appointed DFA/DMS subclass representatives—one Dairy Farmers of America, Inc.

("DFA") member farm, and one non-member farm—now seek the dissolution of DFA's ability

to function as a marketing cooperative by forcing its conversion to a stock corporation outside

the protections of the Capper-Volstead Act.  *See* ECF # 683-4.  These subclass representatives

recognize that what they call Defendants' "indefensible cooperative status" means "everything to

them," *id.*, and that Defendants would "lose everything" if they were forced to undergo such a

conversion.  ECF #683-11.[1]  Likewise, these representatives have committed to certain "non-

negotiable" elements of any settlement, including an absolute prohibition on any full supply

agreements by DFA or DMS, *see* ECF #683-4, which would fundamentally and materially alter

Defendants' operations.

Defendants remain committed to the Revised Settlement Agreement, and they continue to

believe that its final approval would be a reasonable end point to this litigation for all concerned,

given the entirety of the record built in this now nearly six-year old case.  Should the case

proceed on a different path, however, then there can be no ignoring the fact that the only existing

representatives of the DFA/DMS subclass have embraced an agenda that would not allow DFA

or Dairy Marketing Services ("DMS") to continue to exist as milk marketing entities.  However

sincerely these demands may reflect the subclass representatives' own views, they offer no

protection whatsoever to the DFA/DMS subclass members who belong to DFA or market

through DMS, who greatly value the continued existence and functioning of those organizations,

and who very much do not want to see them disbanded as a dairy marketing cooperative (DFA),

and a marketing agency in common (DMS), respectively.

This Court has already found that the injunctive relief requested in Plaintiffs' Amended

Complaint—relief that did not include the radical step of forcing DFA or DMS to discontinue

---

[1]  One of the subclass representatives' communications seeks to draw a distinction between a
settlement demand and a proposed amendment to the Prayer for Relief in this lawsuit, noting that
the suggested dissolution of DFA and DMS as cooperative, dairy marketing organizations is
"only" as a proposed amendment to the Prayer for Relief.  ECF # 683-11.  The Prayer for Relief
is what a plaintiff seeks in litigation.  However they label it, the subclass representatives have
embraced the end of DFA and DMS as dairy marketing organizations as a goal in this litigation.

their existence as dairy marketing organizations—"would fundamentally alter how [Defendants]

do business" and therefore created "a potential conflict between those who support and benefit

from the activities of DFA and DMS, and those who do not."  *Allen v. Dairy Farmers of Am.,*

*Inc.*, 279 F.R.D. 257, 273 (D. Vt. 2011).  The Court's solution to that conflict was two-fold:  (1)

Plaintiffs "amended and limited their request for injunctive relief to a request that the court

enjoin only that conduct which the court or a jury finds illegal," and (2) they created two

subclasses so that "class members have class representatives and class counsel that represent any

divergent interests."  *See* ECF # 435, Opinion Granting Class Certification, at 11.  That solution

required and still requires that there be adequate representation for both subclasses, and presently

there is not.  The sole designated representatives of DFA members and DMS-affiliated farmers

now seek injunctive relief that is far more "sweeping," *id.*, and far more injurious to their fellow

class members, than anything sought in the Amended Complaint.  With their only subclass

representatives being farmers who are committed to the effective destruction of DFA and DMS

as functioning dairy marketing organizations, the DFA/DMS Subclass lacks adequate

representation.  Under these circumstances and the prevailing law, the DFA/DMS class must be

decertified.

## ARGUMENT

A district judge has broad discretion to de-certify a class "whenever warranted."

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).  In

particular, decertification is appropriate when "a change in circumstances render[s] the plaintiffs

inadequate class representatives."  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502

F.3d 91, 104 (2d Cir. 2007).  "The duty to assay whether the named plaintiffs are adequately

representing the broader class does not end with the initial certification; as long as the court

retains jurisdiction over the case 'it must continue carefully to scrutinize the adequacy of representation and withdraw certification if such representation is not furnished.'"  *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1214 (6th Cir. 1997); *see also Lyons v. Georgia-Pacific Corp. Salaried Emps. Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000) (same).  Indeed, satisfaction of the adequacy requirement at all stages of the case is a "prerequisite [and] is essential to due process, because a final judgment in a class action is binding on all class members." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996); *see also Key v. Gillette Co.,* 782 F.2d 5, 7 (1st Cir. 1986) ("This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff.").

In *Barney*, the Sixth Circuit *sua sponte* decertified a class on appeal because it included class members whose interests the named Plaintiffs did not share, and thus "the named plaintiffs' claims are not typical of those of the enormous class certified and . . . they could not adequately represent such a class." 110 F.3d at 1214.  Likewise, in *Lyons*, the Eleventh Circuit decertified a class because the named Plaintiff did not have an incentive to protect important interests that many of the absent class members had at stake in the litigation.  221 F.3d at 1253.  As the Court explained: "We cannot expect Lyons to assert with 'forthrightness and vigor' those interests of other class members that he does not share and in which he has no stake." *Id.*  Decertification was thus required, because "[i]ndifference as well as antagonism can undermine the adequacy of representation." *Id.*

The same conditions require decertification in this case as well.  During the course of this litigation Defendants have submitted declarations from dozens of DFA and DMS farmers who testified to the significant value and benefits they receive from marketing their milk through

those organizations.  *See* ECF # 330-4 (Baldwin), 330-5 (Bikowsky), 330-6 (Crowl), 330-7

(Diebold), 330-8 (Grove), 330-9 (Handy), 330-10 (Hardie), 330-11 (Heatwole), 330-12 (King),

330-13 (Lovell), 330-14 (Magnan), 330-15 (Menard), 330-16 (Nop), 330-17 (Ormond), 330-18

(Stauffer), 330-19 (Sweet), 330-20 (Warburton), 330-21 (Wood), 330-22 (Beeman), 330-23

(Rutherford); ECF # 691-1 (Bailey),[2] 691-2 (Beeman II), 691-3 (Bikowsky II), 691-4 (Crowl II);

691-5 (Gasstrom), 691-6 (Gilbert), 691-7 (Handy II), 691-8 (Heatwole II), 691-9 (Hinsdale),

691-10 (Howrigan), 691- 11 (King II), 691-12 (McNall), 691-13 (Parent), 691-14 (Tracy), 691-

15 (Wood).  They explained in unequivocal terms the reasons why Plaintiffs' then more limited

injunctive demands would be harmful:

> I am particularly proud to have played a role, along with my fellow Board Members in the formation of DMS. . . .  The creation of DMS enabled producers to gain marketing strength.  This, in turn, meant the potential of higher prices for producers.  Interestingly, all producers in the marketplace ultimately gained because of the increased bargaining strength of DMS. . . .

King ¶ 9;

> DMS has helped streamline and improve efficiencies in milk marketing, thus providing farmers with a much higher return. . . .  I see first-hand how important DMS is to the Northeast, to DFA and to the other cooperatives that are part of DMS.  Without it, there would be no market stability. . . .  Both sides would suffer without an entity like DMS doing what it does today.

Handy ¶ 7;

> Mr. Haar and the other Plaintiffs want to see DFA and DMS fundamentally altered and hobbled going forward.  From their attack on DFA's investments, to their claim that DFA's supply agreement with Dean Foods is illegal, to their claim that GNEMMA is designed to suppress prices, *the Plaintiffs are challenging conduct that I am certain is beneficial to me*. . . .

---

[2] The entries at ECF # 691 were originally filed under Seal as part of ECF # 406, which contained confidential discovery material not implicated by this motion.  Defendants re-filed these declarations so that they would be publicly available.

Crowl II ¶ 9;

> [F]rom what I read in the Complaint, this case is about proving that DMS is a bad thing—that it has too many customers, that farmers have been forced to participate, that it controls the market, and that it is an illegal monopolist. ***That is not how I feel, and I don't understand how these two plaintiffs can say they are speaking for every farmer who markets through DMS when they make those claims.***

Gasstrom ¶ 8;

> These two dairy farmers may believe that signing supply contracts, and participating in common marketing agencies like GNEMMA, are harmful to them, but I certainly don't think that, nor do the farmers I know and represent. . . .

Heatwole ¶ 8;

> By marketing our milk more efficiently, negotiating for higher premiums and offering better services, DMS has been able to return more money back to the farmers than we used to get before we were part of DMS. . . . It would be a big blow to us and our members if these Plaintiffs succeeded in weakening DMS, as they clearly are trying to do.

Howrigan ¶ 4;

> I do not see how it would benefit me to have my cooperative's supply agreements with a major customer like Dean cancelled. Particularly given the current oversupply of milk in the Northeast, it is very important that we have stable, secure markets for our raw milk. I do not see how anyone representing my interests would want to see that stability and security threatened . . .

Bailey ¶ 8.

Those are only a sampling of the views that have been expressed throughout this litigation, up to and including at the recent Fairness Hearing in January. *See* 1.29.2015 Hrg. Tr. at 147:17 – 148:1 (Larry Bailey: "Previously to DFA, we were with an independent, and we chose to go with DFA for the competitive price advantage. And we wanted to share that there are choices today, and we do have choices today. . . . And so far, in 15 years, even though I do

talk to one company probably six times a year . . . DFA has always been able to give us a competitive price"); *id.* at 153:6 - 20 (Paul Bourbeau: "[In 2014] when Dairylea was no longer Dairylea and became part of DFA, we had a choice again. . . Are we going to go with DFA? We have a choice here. We can go to another co-op. And we decided to stay with DFA, again, to be part of that DMS system."); *id.* at 160:11 – 161:6 (Reg Chaput: "The last 35 years on my own, I have had the opportunity of being in three different co-ops and two independent handlers, so I have got a real good flavor of what options are available out there to market your milk. . . . I think they're [DMS] always trying to make the best decisions in – for all the co-op"); *id.* at 162:7 – 163:19 (Bill Rowell: "DMS has done a good job marketing milk, finding a home for it, for the best possible price under volatile market conditions. . . . I doubt that I could do better than what DMS is doing for us.").

These farmers are entitled to class representatives who understand and share their interest in maintaining their chosen milk marketing organizations, not ones who seek to weaken or even to destroy them. The current DFA/DMS subclass representatives do not share those interests. Instead, they believe—for whatever reason—that DFA and DMS do such a disservice to dairy farmers that they should not be allowed to continue as marketing organizations at all. *See* ECF # 683-11 (citing Defendants' "indefensible cooperative status"); 683-4 (requesting amendment of Complaint to demand: "[A]s DFA and DMS are outside the scope of Capper-Volstead Act's grant of antitrust immunity, they will restructure as a publicly traded corporation, converting farmer equity to marketable shares and opening the organization to the reasonable transparency required by law.").[3]

---

[3] Defendants explained in an earlier filing why conversion to a stock corporation would both violate the Kansas Cooperative Marketing Act (under which DFA was formed), and deprive DFA of the ability to collectively market its members milk under the protections of the Capper-

This demand also must be understood in the context of the subclass representatives' other demands for structural change that would fundamentally alter how DFA and DMS do business, by among other things eliminating every remaining full-supply contract with their customers. *See* ECF # 683-4, 683-11.  The subclass representatives say that those changes are "non-negotiable" elements of any settlement in this case, *id.*, but they are contrary to the Court's earlier holding that only a finding of illegality could eliminate the conflict in imposing such sweeping changes on subclass members who benefit from the existence of those contracts. *See Allen*, 279 F.R.D. at 273.  There is not adequate evidence to support a finding of illegality in these areas, and the subclass representatives continue to ignore or deny the basic market facts that demonstrate there is no need for any such relief in the first place.  *See* ECF # 678, at 6-18.

The subclass representatives are entitled to their views, of course.  But when the only subclass representatives on the DFA/DMS side are dairy farmers committed to the destruction of their current way of doing business, that leaves the rights and interests of the thousands of other subclass members inadequately represented.  That one of these subclass representative farms happens to be a member of DFA does not mean that the subclass representatives as a group are able to adequately protect the rights of ordinary DFA members who strongly believe that the continued functioning of their cooperative is important to their well-being.  And the Subclass's only other representative, Mr. Swantak, shares the Haars' views, *id.*, and testified that he considers himself an "independent" farmer who has never attempted to join a cooperative because he is "scared of coops."  ECF # 691-16 (Swantak Tr. 27:17-22, 122:17 – 123:2).  If Rule 23's adequacy of representation requirement means anything, it cannot be the case that one similarly situated representative, and one dissimilar representative, can decide that a class of

Volstead Act.  *See* ECF # 678, at 18-21.  Following such a conversion, the very act of negotiating **higher** prices for dairy farmers could be considered a *per se* antitrust violation.

thousands should pursue relief that would functionally destroy an entity that they have embraced as valuable to their livelihoods.

## **CONCLUSION**

Because adequate representation is currently so woefully lacking, the DFA/DMS Subclass must be decertified.   *Cordes & Co. Fin. Servs.*, 502 F.3d at 104; *Sumitomo Copper Litig.*, 262 F.3d at 139.

Dated:  September 3, 2015                         Respectfully submitted,


/s/ Steven R. Kuney
Steven R. Kuney
Kevin Hardy
Carl R. Metz
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
skuney@wc.com
khardy@wc.com
cmetz@wc.com


R. Jeffrey Behm
Ian Carleton
SHEEHEY FURLONG & BEHM P.C.
30 Main Street
P.O. Box 66
Burlington, VT  05402
Tel: (802) 864-9891
Fax: (802) 864-6815
jbehm@sheeheyvt.com
icarleton@sheeheyvt.com


W. Todd Miller
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, N.W.
Suite 300

Washington, DC  20037
Tel:  (202) 663-7820
Fax:  (202) 663-7849
tmiller@bakerandmiller.com

*Counsel for Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

   I certify that on September 3, 2015, the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY DFA/DMS-MEMBER SUBCLASS DUE TO LACK OF ADEQUATE REPRESENTATION was filed electronically. Copies of the foregoing document will be served on all counsel of record via the Court's CM/ECF filing system.


        /s/ Carl R. Metz_____
        Carl R. Metz