UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

ALICE H. ALLEN, et al.        *
                              *
           V                  *
                              *
DAIRY FARMERS OF AMERICA,     *
INC., et al.                  *   CIVIL FILE NO. 09-230

STATUS CONFERENCE
Tuesday, September 29, 2015
Burlington, Vermont

BEFORE:

     THE HONORABLE CHRISTINA R. REISS
        Chief District Judge

APPEARANCES:

     BRENT W. JOHNSON, ESQ., and KIT A. PIERSON, ESQ.,
        Cohen Milstein Sellers & Toll PLLC, 1100 New
        York Avenue, N.W., Washington, D.C.; Attorneys
        for the Plaintiffs

     ROBERT G. ABRAMS, ESQ. and DANYLL W. FOIX, ESQ.,
        BakerHostetler LLP, Washington Square, Suite
        1100, 1050 Connecticut Avenue, NW, Washington,
        D.C.; Attorneys for the Plaintiffs

                              Appearances Cont'd...

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

APPEARANCES CONTINUED:

    ANDREW D. MANITSKY, ESQ., Lynn, Lynn, Blackman & Manitsky, P.C., 76 St. Paul Street, Suite 400, Burlington, Vermont; Attorney for the Plaintiffs

    STEVEN R. KUNEY, ESQ. Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C.; Attorney for Defendant Dairy Farmers of America, Inc.

    CRAIG S. NOLAN, ESQ., Sheehey, Furlong & Behm, P.C., 30 Main Street, Burlington, Vermont; Attorney for the Defendant

    DANIEL J. SMITH, ESQ., Northeast Dairy Compact Commission Executive Director, 16 State Street, Montpelier, Vermont; Attorney for the Intervenors

    RICHARD T. CASSIDY, ESQ., Hoff Curtis, 100 Main Street, Burlington, Vermont; Attorney for the Intervenors

*** ** ***

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont   05402
(802) 860-2227

```
 1    TUESDAY, SEPTEMBER 29, 2015
 2    (The following was held in open court at 10:02 a.m.)
 3              COURTROOM DEPUTY:  Your Honor, the matter
 4    before the Court is civil case number 09-230, Alice
 5    Allen, et al., versus Dairy Farmers of America, et al.
 6    Representing the plaintiffs are attorneys Kit Pierson,
 7    Brent Johnson, Robert Abrams, Danyll Foix and Andrew
 8    Manitsky.  Representing the defendants are attorneys
 9    Steven Kuney and Craig Nolan.
10        And we are here for a status conference.
11              THE COURT:  Good morning.
12              MR. PIERSON:  Good morning, your Honor.
13              MR. ABRAMS:  Good morning, your Honor.
14              MR. KUNEY:  Good morning.
15              THE COURT:  We don't usually have this well
16    attended a status conference, but I am glad everybody is
17    here.
18        My goal is to set a course for going forward.  It
19    has been -- I am going to have a candid conversation
20    with you.  It's been my observation that there has been
21    chaos north of the V and that neither class counsel nor
22    subclass representatives are necessarily making
23    decisions that are benefiting the class.  So if there's
24    no evidentiary support for a removal of counsel, hearing
25    a day's testimony about attorney/client information and
```

1    strategies accepted and rejected isn't in the best

2    interests of the class.  Likewise, repeated efforts to

3    get rid of counsel or to suggest they're incompetent is

4    not in the best interests of the class.  Representations

5    that everybody who has filed a proof of claim isn't

6    supportive of the settlement is not in the best

7    interests of the class.  It's also not true.  So we are

8    going to set a path forward.

9         My thought was adding additional voices to the

10   class representatives, without necessarily getting rid

11   of the class representatives we have, would be an

12   appropriate way to interject some order in what's

13   happening.  And now I understand that there's no

14   objection to additional class representatives -- class

15   counsel, I should say, and so they have been added, and

16   my thought is, if you ask, I will give you some time to

17   see if you can make, as the new class representatives

18   suggested, a final go at settlement.

19        Otherwise, we are going to set it for trial.  We

20   are going to go forward, and we are going to resolve the

21   case.  And it's also my observation that it has not been

22   helpful for plaintiffs' counsel to vet ideas with

23   defendants' counsel and then explain to class

24   representatives why the defendants reject them.  That's

25   just not -- it's kind of the whole process has gotten

1    muddled.

2         This is a -- not -- it doesn't need to be

3    adversarial in tone, and the attorneys are working well

4    together, but I have never had a case where settlement

5    is based on the defendants persuading the class

6    representatives that what they're suggesting is not

7    appropriate and it's going through plaintiffs' counsel

8    at the time.  I understand you need to transmit that,

9    but that's not been particularly helpful.

10        On the same token, I agree that some of the class

11   representatives' requests for relief are just

12   unrealistic, and if they are set in stone and that's the

13   only thing you will accept and anything short of that

14   isn't going to work, you are not really understanding

15   the settlement process, which is often a compromise and

16   getting the best deal possible for the whole class as

17   opposed to the perfect deal that will satisfy each class

18   representative in its entirety.

19        So we are going to try to get things on track.  I

20   am happy to hear your -- your opinions in that regard.

21   I have pending -- the only motions pending now are the

22   renewed motion to appoint new counsel; the motion to

23   decertify the DFA, DMS subclass due to lack of adequate

24   representation; the motion to appoint Peter Southway,

25   Marilyn Southway, Reynard Hunt and Robert Fulper as DFA,

1   DMS subclass representatives; and there's a motion to

2   substitute them for current DFA, DMS subclass

3   representatives that was filed by Claudia Haar, Jonathan

4   Haar and Richard Swantak.

5        So I am going to start with plaintiffs, and then we

6   will work over to defendants.

7             MR. PIERSON:  Your Honor, this is Kit Pierson.

8   I guess there are a couple of things I would like to say

9   preliminarily and then happy to address these motions in

10  whatever sequence you want to.

11       I mean, in terms of where the case is and where

12  it's going, which is the most important question, I

13  think the Court is -- the Court is right.  The Court has

14  sort of set a process in motion with these new subclass

15  reps.  We think new subclass reps should be added on the

16  non- -- on the DFA, DMS side as well.  And the whole

17  rationale for them coming in was to let them evaluate

18  the settlement, participate in the settlement

19  discussions, and see where that goes.  And it seems to

20  me that's the right course to let -- and you can talk to

21  them about how long that process needs to run, but I

22  think that process should run its course, should be

23  presented to the Court, and if -- if that doesn't result

24  in a conclusion of the litigation, then we should be

25  going to trial.

1          THE COURT:  So you aren't asking that any of
2     the current subclass representatives be removed?
3          MR. PIERSON:  We are, your Honor.  We are
4     asking to be removed.
5          THE COURT:  Okay.
6          MR. PIERSON:  Your Honor, I do want to comment
7     on two of the comments the Court made about -- with
8     regard to the views about the settlement, which I think
9     are -- I think they're not fair, frankly, and let me
10    just give you my view on them.
11        You made the comment about the -- our point that
12    7500 class members have submitted claims.
13         THE COURT:  Not submitted claims.  Signed on
14    to the settlement is what I have seen.
15         MR. PIERSON:  They submitted claims,
16    your Honor.
17         THE COURT:  I know.
18         MR. PIERSON:  Yeah.
19         THE COURT:  And it's been framed as signed
20    on to the settlement.
21         MR. PIERSON:  Let me finish in --
22         THE COURT:  Okay.
23         MR. PIERSON:  -- how I would frame that.
24        Those class members were given -- were essentially
25    told they could do things, and they weren't mutually

1    exclusive.  They were told that they could submit

2    claims, and they were told that they could submit

3    objections and were told how to submit objections.

4         Now, those 7500 farmers made what I think would be

5    fairly described as a decision, because that choice was

6    clearly presented to them, and the decision they made

7    was to submit a claim, and the decision they made was

8    not to submit any objections to the settlement even

9    after having been told to do so.

10        Now, I think -- I think reasonable people can argue

11   about how much weight that is entitled to.

12             THE COURT:  Well, what about your notice to

13   the class?  I approved it, so I know what it says, and

14   it said just because you submit a proof claim does not

15   mean that you are agreeing with the settlement.

16        So you are right, they did not file objections.

17   You have equated filing a proof of claim with signing on

18   to the settlement, or that's how it's been represented.

19   I have a problem with that because I don't think those

20   are the same things.  You can have a different view.

21             MR. PIERSON:  They are not identical,

22   your Honor, but what we have said is these folks were

23   told not just you can submit a claim, but they were also

24   told, if you have objections, you can submit objections,

25   and here's how to.  And they all chose not to do that,

1    and what -- my main point is that's entitled to some

2    weight.  How much weight the Court gives it or how one

3    wants to characterize it, one could reasonably disagree

4    with, but that's a choice they made.  That's kind of

5    point one.

6         Point two, you made the comment about the

7    discussions with DFA, and I think that -- that may have

8    kind of been a misunderstanding of what happened here.

9    You know, what happened was we were presented by the

10   class repre- -- subclass representatives with -- with

11   terms that they wanted as part of a negotiated

12   settlement.  They were described by them as

13   nonnegotiables.

14        We presented them to the defendants, which is

15   exactly what we were really probably required to do, but

16   in any event, we did it.  The defendants then told us

17   why they would not agree to those -- they would not

18   agree to those terms, they were nonstarters, and the

19   reasons for that.

20        We communicated to the class representatives what

21   DFA had told us in the course of the settlement.  We had

22   communicated to the class representatives.  And I am

23   saying all this because it's in documents that they have

24   submitted.  We told them what DFA said.  We told them

25   the rationale for what DFA said.  That was -- I would do

1   that in any case where I am discussing with the

2   defendants.  That's the appropriate thing to do.

3       Now, that doesn't mean that we have to agree with

4   DFA, DMS.  We have to make an independent judgment about

5   whether that's realistic -- whether those are realistic

6   things to seek or not, but the point that had to be

7   communicated to the class reps was, you can decide

8   whether you want to pur- -- we can all decide whether

9   you want to proceed to trial on that basis but there

10  will be no settlement on this basis because this is

11  DFA's decision, this is why they feel strongly about it,

12  and it's nonnegotiable from their point of view.

13      So, your Honor, there was just absolutely nothing

14  wrong with communicating.  There really wasn't.  So

15  that's really -- that's really --

16              THE COURT:  Okay.

17              MR. PIERSON:  I don't want to quarrel with

18  you, but I --

19              THE COURT:  I agree with you on point two, not

20  on point one.  So you have got a partial victory.

21              MR. PIERSON:  I'll take that, your Honor.

22      I guess the one issue probably that I should --

23  that I should address is the -- is the motion for --

24  about -- regarding the class representatives, and

25  there're really two pieces of that.

1        One is that we have proffered four additional

2     subclass representatives:  Peter Southway,

3     Mrs. Southway, Reynard Hunt, and Robert Fulper.  We've

4     reviewed their qualifications.  They have all committed

5     to -- they understand their responsibilities.  They have

6     committed to consider the interest -- they understand

7     they have an obligation to consider the interests of the

8     entire subclass.  They're all highly qualified, and I

9     think the rationale the Court gave for adding subclass

10    representatives on the other side of the subclass, which

11    we, frankly, didn't take a position on -- we sort of

12    thought it was not our fight, but the rationale adopted

13    by the our -- by the Court really supports the same

14    conclusion on our side of the class.  So I --

15        THE COURT:  So let me ask you about that,

16    because I -- you know, and being stumped as to how we

17    are going to get this case to a resolution short of

18    forcing you to go to a trial, which is a possibility,

19    when it's obvious that both sides do think a settlement

20    is feasible, I don't understand why we would have to

21    replace the existing class representatives.

22        So one thing I am concerned about, I think that

23    they need to get with the program and represent the

24    whole class and be less obstructive, and I tried to make

25    that clear, that this is -- is not in the best interests

1     of the class.  You have to represent everybody.

2          But why replace the dissenting voices?  So it's one

3     thing to say new views from the class on both sides of

4     the subclasses, but why do our existing class

5     representatives have to go?

6               MR. PIERSON:  Well, it's a good question and I

7     agree they're distinct questions.  And, your Honor, as

8     you can imagine, having been accused of a variety of

9     things, you know, it's an issue I have wrestled with,

10    frankly, for years about how to deal with the subclass

11    rep situation, and one of the aspects of it that is

12    troubling to me -- it does go to your question -- is,

13    you know, if it was just me they were having problems

14    with, I'd get someone else to replace me.  I really

15    would.

16         The problem here is, you know, there're eight

17    attorneys from four different law firms.  You know,

18    Mr. Abrams has been described as a snake and a liar.

19    You know --

20              THE COURT:  Well, they don't have any problem

21    with the local counsel, and --

22              MR. PIERSON:  Well, your Honor --

23              THE COURT:  -- they have new attorneys.

24              MR. PIERSON:  -- that actually is not correct,

25    your Honor, because I have told them -- I have made very

1    clear to them that they can interact with Mr. Manitsky
2    whenever they want to, and Mr. Manitsky can tell you his
3    own experience, but what I would tell you, your Honor,
4    and it's quite truthful, is that if they get advice that
5    they don't like or disagrees with some preformed view of
6    what the law is or what they think the record ought to
7    be or whatever, they are not going to -- they are not
8    going to accept the words from any messenger.  They will
9    either just -- frankly, it includes the Court.  They
10   may -- they'll either dismiss it as irrelevant or they
11   will -- or they'll demonize the attorneys, and that's
12   what's happening.
13        Mr. Manitsky can talk about his own experience, but
14   what I will tell your Honor is -- is I have at multiple
15   points over the last six years encouraged them to reach
16   out to other counsel, whether it's Dave Balto, whether
17   it's Mr. Manitsky.  I have no problem with them talking
18   to the -- to Mr. Abrams and his team if that would help.
19   Made multiple attorneys -- and, your Honor, I have hit a
20   point in life where, frankly, you know, I look for
21   patterns, because there're always one-offs, and it's
22   hard to read into one-off, but what I can represent to
23   you as an officer of the court is it really hasn't
24   mattered, you know, which attorney is involved.  And so
25   that's a fundamental concern.

```
1              And the -- what finally led to our motion,
2     your Honor, which, for some, it may have been a
3     long time in the coming, was just an accumulation of
4     things and a conclusion that -- you know, I will tell
5     your Honor, I take -- you know, you heard me testify
6     about it at length.  I take a lot of pride in the
7     practice of law, and I take a lot of pride in my
8     integrity as a lawyer.  This is a new -- new problem for
9     me, and my own feeling is that it's become an enormous
10    distraction, an enormous waste of resources, and that --
11    and that we have got subclass representatives who
12    basically -- they have their own view of the world,
13    which they are entitled to, you know -- it's one of the
14    things I have always admired about them, that they have
15    their own view of the world, but the problem is,
16    your Honor, is that they either won't seek legal advice
17    or, if they get legal advice or even instructions from
18    the Court, which were quite clear about recording -- I
19    mean, could not have been clearer about recording
20    conversations, if they -- if they're getting something
21    they don't like, it's rejected, and that hurts the
22    class.  It hurts the class a lot.
23             So what it's meant over the course of this
24    litigation, it's meant that letters have been sent to
25    the court without running them by counsel or even -- not
```

1    only not running with -- them by counsel, without

2    counsel even knowing they were being sent to the

3    court --

4              THE COURT:  So -- but if we want to go -- and

5    I really don't think it's helpful to go down this

6    particular path for the class as a whole.  So I remember

7    when we had the motion for new counsel and Mr. Abrams

8    started telling me, As soon as this motion's done, we

9    are going to get rid of these class representatives, and

10   me saying to him, How is that helpful?  And then I get a

11   motion for approval of the settlement.  You don't need a

12   fairness hearing.  You don't need notice.  Just approve

13   it.  And how is that helpful?

14        So I understand that you need class representatives

15   that you can work with.  And I understand the presence

16   of dissenting class representatives may be problematic,

17   but it's a whole lot less problematic if there is a

18   group that you can work with, and if the dissenting

19   class representatives don't want to work with counsel,

20   at some point they will voice their objections to any

21   settlement.  We will take it into consideration.  When

22   we get to trial, you got a bigger problem because you

23   cannot have active --

24              MR. PIERSON:  Right.

25              THE COURT:  You can't have somebody tanking

1    the case from the witness stand.  But I don't see the

2    need to eradicate dissenting voices.

3         I agree that you are accused of many things that

4    were not proved up, and that we're kind of right back at

5    that "I expect you to rise above it," you know --

6              MR. PIERSON:  Yeah.

7              THE COURT:  -- that there was no evidence

8    presented, true evidence, and I made it very clear

9    you gotta testify from the witness stand.  You can't

10   just make arguments.  I could have decided that motion

11   on the first day.  And it was class counsels' decision

12   to testify in their honor.  Fine.  So I want -- I want

13   that stuff, if possible, to stop because it's not in the

14   best interests of the class.

15             MR. PIERSON:  I think that's fair, your Honor,

16   but let me -- I mean, this is a very candid conversation

17   we're having --

18             THE COURT:  We are.

19             MR. PIERSON:  -- and I want to be very candid

20   with you.  One of my frustrations with the judiciary is

21   often the easy course for judges when they see people

22   going at it -- usually it's attorneys, thankfully, but

23   is to sort of say a pox on both your houses.  It's sort

24   of like -- sort of like blaming Congress:  It's -- it's

25   everyone's fault.  And here's what I -- what I would

1    like to tell you, your Honor.

2         You have very dedicated attorneys with a lot of

3    integrity and a 30-year history to establish that.  You

4    have got subclass representatives who have made

5    communication very difficult in two respects.  One is by

6    this whole -- you know, the notion that calls had to be

7    recorded.  Recordings end up on the internet.  So -- and

8    the combination of that -- and at this point it's very

9    hard for us to have any confidence that -- that -- that

10   one of two things won't happen:  Either that statements

11   that are made in the course of confidential

12   communications will end up in the public domain,

13   including if we talk to them about the weaknesses of the

14   case or potential problems in the case -- I mean, that's

15   damaging to the class.

16        The other concern is them making public statements

17   or filing papers, saying things in public, without

18   running them by counsel that's been appointed by the

19   Court, so that we can evaluate what the potential

20   implications in the case are.  Those things are damaging

21   to the class, and what I would say, your Honor, is I'm a

22   big boy.  I have dealt with clients who are in shackles

23   when they are interacting with me, who were in shackles

24   for my safety.  I mean, I will do that.  I will work

25   with anyone.

1    What concerns me, your Honor, is conduct that I
2    think is detrimental to the subclass, and as an officer
3    of the court, I can't give you assurances or confidence
4    on my part that that conduct on their part is going to
5    stop because I have seen it year after year after year.

6    So if -- if the way your Honor wants to proceed, if
7    you are asking me can we work with them and try to plow
8    forward as effectively as we can, we can do that, and I
9    will do that.  But if you are asking me to tell you that
10   based on everything I have seen I have confidence that
11   these problems are going to end, that I can't represent
12   to you.  All I can represent is that as an officer of
13   the court and as a lawyer that has -- places great value
14   on my personal integrity and my commitment to the case,
15   I am certainly willing to do everything we can on our
16   part to make that work.

17           THE COURT:  All right.  So I am not going to
18   decide the motion today.  My perception is the problem
19   is bilateral.  It was not my perception that any of the
20   plaintiffs' counsel merited removal.  I decided no
21   removal.  The communication hasn't been the best.  I
22   made it very clear to existing class representatives
23   that if you aren't pulling for the class and you are
24   tanking the lawsuit and you are undermining the
25   plaintiffs' position in the eyes of the defense, that's

1   a nonstarter too.

2        So my interest, as the fiduciary to the class, is

3   what's happening to this class.  And that's my candid

4   observation.  It has been bilateral.  Right now you are

5   in a better position than the existing class

6   representatives, but I am wary of removing the

7   dissenting voice from the process.  And so my message to

8   class representatives is get with the program.  You

9   are -- your views will be respected.  They will be taken

10   up in the event there is a settlement.  We may talk

11   again if this case proceeds to trial because I don't

12   know how you can put on a witness who's not willing to

13   prep with you and not willing to adhere to your theory

14   of the case, but I am a little bit concerned at the

15   adversarial posture continuing.

16        I wasn't surprised that the defendants threw

17   gasoline on the fire with their motion to certify --

18   decertify the class, but I -- they're seeing the chaos,

19   and as good advocates, they are taking advantage of it.

20   And that's not in the best interests of the class.

21        MR. PIERSON:  If I could just make two

22   comments on that.  One is, you know, I do think it's

23   important the Court understand, I mean, I really try to

24   be kind of an umpire.  I mean, I really have tried

25   to stay objective about this.  I have talked to a lot of

1   people about the case, and -- experienced counsel, and

2   tried to get other perspectives, and one of the reasons

3   we filed the motion is, you know, we are officers of the

4   court, your Honor, and the issues we raised about the

5   subclass rep, they are serious issues, and, you know, it

6   would -- frankly, I think, it had gotten to a point

7   where it wouldn't have been consistent with our

8   responsibilities not to raise them.

9        Now, I understand what the Court's saying.  You

10  know, we will march on on whatever basis we are told to,

11  but I think it was important to raise them to the Court

12  on this, and I think it's the right thing to do.

13       I think the Court makes a second important point,

14  which is there's a distinction between where we are now,

15  at which a difference in views and dissenting voices,

16  it's all part of the process and a healthy thing.

17  That's very different than how do you proceed to trial,

18  and I think implicit in what the Court's saying, which I

19  completely agree with, is let's take this one step at a

20  time.  Let's everybody be grownups.  Let's everybody

21  stay focused on the interest, is how do we protect the

22  subclass, and let's march forward one step at a time,

23  and we will do that responsibly, your Honor.

24            THE COURT:  Okay.  Let me hear from any other

25  plaintiffs' counsel that is not duplicative of Mr.

1    Pierson, and that may be Mr. Abrams from his class or

2    our new counsel about what they need, what -- a time

3    frame they need, any plans for going forward.  So --

4              MR. ABRAMS:  Thank you, your Honor.

5         I have nothing to add to what Mr. Pierson said.  I

6    am happy to address any issues or questions of the

7    Court.

8              THE COURT:  All right.  That's fine.

9         How about our new counsel?  Mr. Cassidy or

10   Mr. Smith?

11             MR. SMITH:  Good morning.  I'm Daniel Smith.

12   Again, thank you for your decision over the summer to

13   include Mr. Taylor and Mr. Aubertine to begin with, and

14   Mr. Cassidy and myself by way of follow-up.

15        I think your summary of what we had intended

16   captures much of what I had intended to say, so I can be

17   relatively brief.

18        I would add that Steve Taylor and I basically

19   sketched this out to begin with as a team approach to

20   this, and it's taken a while but we have gotten there to

21   put the four of us together into this team.  I think the

22   motion practice really sharpened the role we were trying

23   to develop and it's been very helpful for that.

24        One consequence is I haven't yet had a chance to

25   speak with DFA's counsel.  I am in sort of an unusual

1     position.  I am quite familiar with Mr. Kuney's client

2     but I am not particularly familiar with him.  So we

3     haven't yet got to the point of becoming familiar with

4     the defendants' counsel.

5          As far as our road map, I think, as I said, we laid

6     it out in our motion.  What we'd like to do is become

7     more familiar with the case based on the additional

8     documents that are now available to us, and now that we

9     have the status of both additional representatives and

10    counsel, we would like to go back through and

11    communicate more formally with our fellow counsel as

12    well as the farmers.

13         I think your point to Mr. Pierson, the role of

14    dissenting voices in this type of dairy matter is very

15    important.  So we want to communicate with the Haars and

16    the Sitts and Mr. Swantak, get a better feel for their

17    concerns, but at the same time we speak with other

18    farmers from around the community in terms of their

19    feelings as well; at the same time educate ourselves in

20    the documents, sit down with Mr. Abrams and his

21    counterparts, and see where we are.

22         The goal --

23              THE COURT:  How much time do you think you are

24    going to need to do that?

25              MR. SMITH:  I think there are really two

1      points:  What is the time and what is the goal?  We

2      figure something on the order of six weeks to two months

3      for that process.  We have a benchmark, an immediate

4      benchmark in front of us to meet with Mr. Abrams down in

5      D.C. the end of next week, so I think we are all very

6      sanguine to the fact that this process has to move

7      forward and our role is not to slow it down but is to

8      move it forward.

9              So we want to get right to further discussions with

10     them next week, get through the record, talk with the

11     farmers.  We figure a six-week process for that.  The

12     goal is to develop some form of alternative proposed

13     settlement to sit down with the DFA side in that

14     six-weeks to two-month period.  Our objective is -- and,

15     again, where you started is kind of where we are.

16             I think what is unreasonable is to think that

17     Capper-Volstead is going to be done away with in this

18     case.  On the other hand, where the proposed settlement

19     is right now, from Mr. Aubertine and Mr. Taylor's

20     perspective, doesn't go far enough.  So what we are

21     looking for is somewhere in that range, in the middle of

22     what is realistic but what really is more responsive to

23     the concerns that Mr. Taylor and Mr. Aubertine have

24     heard.

25                     THE COURT:  All right.  And do you have a

1    position on any of the pending motions?  And should I

2    wait for your response?  Or -- I know you have just got

3    on board, so --

4                  MR. SMIHT:  I think we're basically new to

5    the -- new to the case.  Our primary focus is on the

6    issue of whether we can find some additional,

7    substantive provisions for a proposed settlement, see if

8    we can find a resolution to the case short of going to

9    trial, and that's our primary focus.  And I think the

10   issues that you are dealing with are teed up well by all

11   the other parties, and we are basically sitting those

12   out at this point.

13                  THE COURT:  Okay.  Mr. Kuney?

14                  MR. KUNEY:  Morning, your Honor.

15                  THE COURT:  Good morning.

16                  MR. KUNEY:  Steve Kuney for the defendants DFA

17   and DMS.  A couple of remarks.

18       We -- we believed and still believe that the

19   settlement that was submitted to the Court was a

20   reasonable resolution of this matter for all concerned.

21   We are --

22                  THE COURT:  Did you believe that the Court

23   could approve it without fairness hearing, class notice,

24   all that?

25                  MR. KUNEY:  I actually didn't understand that

1    the request was to not have a fairness hearing.  What

2    I -- what I thought, the way I read the motion, was that

3    they were suggesting that we didn't -- was not necessary

4    to have a new notice because the revised agreement was

5    more favorable to the class, but I had always expected

6    there would be a fairness hearing and there would be an

7    opportunity for people to come in and talk.  And then

8    your Honor would make the --

9          THE COURT:  How would they know where to --

10    without notice, how do you file an objection?  So that

11    kind of caught me by surprise, and since it was kind of

12    a joint proposal, I hadn't seen that.  And when we

13    looked at cases in which that had happened, it was

14    instead of getting 4,000, you got 4,500, and you didn't

15    complain about 4-, so you are not going to complain

16    about 4,500, or something like that.  I didn't see that

17    that's where we were.

18      So how would we -- I guess it's esoteric, but I

19    don't see that we would have a fairness hearing without

20    notice.

21          MR. KUNEY:  Well, I may have come up with my

22    own vision of how the process was going to play out.

23    Frankly, that was part of the reason that we thought it

24    made sense that the proposal was made in the alternative

25    so that if you thought the fuller process was necessary,

1     we could move forward in that direction.  I had not

2     anticipated -- obviously if we are going to have a

3     preliminary approval process, there would need to be

4     notice and all the steps would be required.  I had

5     anticipated that if your Honor thought that was the

6     appropriate direction, you would have sort of told the

7     parties to do that.  You didn't.  You simply denied the

8     motion based on the -- not having in front of you

9     enough, which I totally understood that.  But I did

10    think it wasn't that there wasn't going to be objection

11    to the new agreement; it was that the objectors had made

12    a very extensive record of their objections.  It was --

13    we weren't anticipating, candidly, that a lot of those

14    objections would be affected.  They would remain; they

15    would remain alive and well, and your Honor would be

16    once again put in a position to review the settlement.

17         The primary things that had changed from before

18    were -- and your not approving the original settlement,

19    you had expressed some concern about the process and

20    commented that you were unable to conclude that the

21    process weighed in favor of approving the settlement.

22         First --

23              THE COURT:  So I actually made two comments.

24    Process, which we took care of with the motion for new

25    counsel --

```
1              MR. KUNEY:  Right.

2              THE COURT:  -- and substantive, and that was

3    the objections.  But let's assume we are down the road.

4              MR. KUNEY:  Right.

5              THE COURT:  That's done.

6              MR. KUNEY:  All right.  Right.

7              THE COURT:  Right?  And it's an interesting

8    conversation because we haven't had it before.

9              MR. KUNEY:  I understand.

10             THE COURT:  Let's talk about the path going

11   forward.

12             MR. KUNEY:  Okay.  Understood and agree.

13   That's sort of spilt milk at this point, if you will

14   excuse the pun.

15        We appreciate that new people have been named.  We

16   have seen the motion to add even more new people.  We

17   are not unwilling -- we will listen.  We will

18   participate in the negotiating process in good faith.

19   We don't -- candidly, we don't see the settlement as

20   needing massive change to be fair.  New people who are

21   coming, who may have radically different perspectives

22   and may have ideas that we never heard about or thought

23   about, we're willing to entertain them, although, as we

24   have said before, we do tend to think that the

25   settlement ought to relate to the case, and so it would
```

1    be -- we are not sure what new ideas will fit to the

2    case, but we are open.  We are open to the process, and

3    we do think it makes sense, and we think everybody ought

4    to try very hard to see if we can kind of put Humpty

5    Dumpty back together again before we proceed down the

6    other path.

7         So we are, I will say, willing and anticipating

8    full participation in taking the best shot we can at

9    seeing whether it's possible to get this -- get -- to

10   come back to the Court with another settlement that has

11   broader approval among the class reps and that we can go

12   through whatever the full process, present it to the

13   class, and send out notice, and you can again evaluate

14   the people who are not in front of you and how they feel

15   about it.

16        So we are fine with that.  We will do it.  We

17   remain committed to it.  We wanted to settle the case

18   before.  We'd still like to see if we can work that out.

19        In terms of the pending motions -- I will be very

20   quick on that -- we don't take a position on the renewed

21   motion to replace class counsel.  We don't have a

22   position on the proposal to add new class reps on the

23   DFA, DMS side, or on the substitution.  We don't have a

24   position on either of those.

25        The motion to decertify, we said in the motion that

1    if we were in a settlement world, that would be a

2    different course, but we were looking ahead to the -- to

3    the prospect of another world.  And some of the comments

4    your Honor has made this morning about the unworkability

5    of the class reps' purposes of trial is precisely part

6    of what we were thinking about, but we were also

7    thinking about what you had said when the two subclasses

8    were first created, which is that you saw at least the

9    potential for a conflict between those who support and

10   benefit from DFA, DMS policies and those who do not.

11   And that when the two -- two subclasses were created,

12   what I at least had envisioned that would likely mean is

13   that the non-DFA class -- we wouldn't expect them to

14   necessarily be fans or supportive of DFA policies, but

15   that it -- but those farmers who are supportive of what

16   are ultimately determined to be the lawful policies of

17   DFA and DMS would have a voice on the DFA -- DFA, DMS

18   subclass sides.

19        What prompts the motion is that that seems to not

20   be happening right now.  That with the class

21   representatives for the DFA, DMS side, none of them --

22   not only didn't voice any support or -- or express the

23   view that the organizations were favorable, but they

24   literally sought the dissolution of them as dairy

25   marketing organizations, and we found it hard to see how

1    the many, many DFA farmers -- and we're not going to

2    debate with you this morning how many, but a lot of them

3    have come to court in various forms, through affidavit,

4    through support of the process.  I think it's -- I think

5    it's beyond question that there's some significant

6    number of people on the DFA, DMS side who want the

7    lawful activities of those organizations to continue and

8    find them very helpful and very beneficial to their

9    lives.  They seem to us right now to have no voice.

10        Whether the new proposed class reps provide that

11   voice, I will be honest with you, I can't tell at this

12   moment based on the limited record that we have so far,

13   and I have already discussed with Mr. Pierson whether he

14   would be willing to let us defer our reply brief on that

15   motion until we can get a better sense of whether we

16   think the problem that we raised has been solved or not,

17   but we are not -- we are not yet prepared this morning

18   to say we are withdrawing the motion to decertify

19   because it's all fine.  Because, from our perspective,

20   it's at best unclear whether the problem we raised has

21   been fixed, and surely if we are in litigation mode, the

22   problem's not been fixed.

23        THE COURT:  Was the class decertified in the

24   Southeastern milk case before trial?

25        MR. KUNEY:  The class was decertified -- yes,

1    there was a time when the DFA, DMS class was

2    decertified.  Then what happened is Dean raised the

3    issue of whether their settlement could still be valid

4    since they had now settled with the class that the court

5    had ruled could not be certified.  Then we went through

6    the process of creating subclasses, and then the DFA,

7    DMS class sought recertification for purposes of

8    continuing the litigation.

9                    THE COURT:  Okay.

10                   MR. KUNEY:  So we went through -- we went

11   through quite a -- maybe I should say similarly

12   protracted process of -- but there was a period of time

13   when the DFA, DMS class was out.

14                   THE COURT:  Okay.

15                   MR. KUNEY:  And so that's -- so we are not --

16   we are not necessarily seeking an early ruling on that,

17   but we are not in a position to withdraw it because we

18   think the problem is -- still is very real, that there

19   ought to be someone representing those I think

20   thousands, hundreds, dozens, whatever the number is, of

21   members of the DFA, DMS class who affirmatively think

22   these organizations are terribly important, positive

23   forces in their lives, and critical, and that voice

24   ought to be heard as part of this settlement process and

25   certainly any litigation process as well, and we don't

1    yet see that on the DFA side, but we are -- as part of

2    this process of moving forward, we are going to take a

3    hard look at that too.

4         We are not interested in -- we are not interested

5    in forcing decisions on issues that don't need to be

6    decided, but I do want the Court to understand that the

7    concern that prompted the decertification motion is

8    still this morning very much alive and well in our minds

9    because we don't yet see that kind of voice that we

10   think those dairy farmers deserve to have.

11              THE COURT:  Okay.

12              MR. KUNEY:  Okay?

13              THE COURT:  All right.

14              MR. KUNEY:  Thank you.

15              THE COURT:  Here's going to be our plan going

16   forward.  When we started the case, I told you it would

17   not -- I would not let it become the most expensive and

18   protracted case on the court's docket -- and of course

19   it has become one -- and that I would be involved

20   heavily until you could get along and manage the

21   discovery schedule yourselves.

22        And from that point forward, you did a very nice

23   job of moving the case forward.  There were no discovery

24   disputes that were not meaningful ones that required

25   judicial intervention.  They were very limited in

1    nature.  Lots of discovery was underway.  The summary

2    judgment process, although I think you must think I am

3    beyond human with the amount of stuff you gave me to

4    read, proceeded smoothly enough.  So you are capable of

5    moving the case forward in an efficient and reasonable

6    manner.

7         You have 90 days to see if you can settle the case,

8    and I don't care whether you settle it or not.  It's --

9    then we are going to go to trial because I do have an

10   obligation to get this case resolved.  It's my oldest

11   case, and it needs to be resolved.  So you will go to

12   trial, and we will have different issues at trial.

13        So one thing that the class representatives need to

14   understand is that dissenting voices in the settlement

15   process can be helpful and productive, but if you are

16   not pulling with the same oar at trial in front of a

17   jury, and you have open contempt for the attorney that's

18   doing your direct examination, that is not a good thing.

19   That's not in the best interests of the class.

20        And so dissension is not to be avoided.  That's

21   what makes full representation of the class important,

22   and Mr. Kuney has a good point:  If the class

23   representatives are doing their job, we are hearing from

24   people who love Mr. Kuney's clients.  And he is right,

25   there must be some members of the class who feel that

 1   way, and they need to be heard as well.

 2        So you are collecting all the information from the

 3   class.  You are making the best decision for the class

 4   at whole.  You have to give up some of your own

 5   hard-felt goals about the perfect settlement that will

 6   achieve happiness in the dairy industry for everyone

 7   from that point forward.  That is not a settlement, and

 8   it probably isn't going to be produced at trial, but

 9   that's our other way of resolving disputes.

10        So 90 days I am going to ask for a joint report.  I

11   will rule on all motions except for the motion to

12   decertify a class.  I am going to at least wait 90 days

13   because I don't see that's something that I need to do

14   now, but it's something to take up at trial.  It puts

15   significant risk on the plaintiffs going forward, so you

16   should factor that in to your negotiations as well.

17        I think in settlement it's very important to assume

18   that things are on the table until they come off.  Some

19   things are unrealistic, but I thought that there was a

20   substantive problem with the prior settlement in that

21   the injunctive relief is what people felt was

22   inadequate, and I made my opinion known that $50

23   million, while it was not unreasonable on its face, that

24   doesn't mean that it shouldn't be more, it shouldn't be

25   less.  That's, again, none of my business, and I don't

1    care, but it was the injunctive relief that caught my

2    attention because that was what the class told the

3    Court:  We want to go to trial.  We want to change the

4    way things are done.  This is how we want to alter

5    what's happening in the dairy industry.

6         So I will leave you to 90 days.  You will be

7    hearing from me if I don't hear from you, and you should

8    anticipate that when that 90 days is up, we are going to

9    be on a fast track to trial.  I have decided you can

10   just refile all your motions in *limine*.  I have decided

11   the summary judgment motions.  I know what the issues

12   are going to be.  We will be here in Burlington now, and

13   we aren't sharing courtrooms as of two weeks ago.  So

14   you will have plenty of time to try the case.

15        Anything further in this matter?

16             MR. PIERSON:  No, your Honor.  Thank you.

17             THE COURT:  Mr. Haar, did you want to say

18   something?

19             JONATHAN HAAR:  Yeah.  Can --

20             THE COURT:  You can say something briefly.

21             JONATHAN HAAR:  Yes.

22             THE COURT:  Sure.  Come on up.

23             JONATHAN HAAR:  I am just looking for

24   clarification on one issue.

25             THE COURT:  Sure.

1            JONATHAN HAAR:  With regards to communication

2    back and forth, we ran into a real glitch over the last

3    10 days or -- a week ago plus 10 days, and I was just

4    looking for clarification as to your ruling.

5         You said e-mails and recordings wouldn't work, and

6    we agreed with that, that, you know, you want to be able

7    to at least occasionally speak together, and I

8    appreciate your, number one, recognizing dissenting

9    voices equal justice and, number two, my blood type,

10   my wife likes to share with people, is B positive.  So,

11   you know, I am always willing to try to go forward and

12   hope for the best.

13           THE COURT:  So let me take this opportunity,

14   it is very important for the class as a whole, that I --

15   my job, according to the law, is to be the fiduciary to

16   the class as a whole.  I need you to represent that

17   class as a whole or you can't be a class representative.

18           JONATHAN HAAR:  I understand that -- that

19   completely.

20           THE COURT:  Okay.

21           JONATHAN HAAR:  And I believe I can speak for

22   the others that we all understand that completely.  You

23   understand we had some significant concern.

24           THE COURT:  Understood.  Okay, so you want

25   some guidance going forward, and go ahead and ask me a

1    question.

2         JONATHAN HAAR:   Well, what had happened was we

3    were looking to make recorded conference calls.  We felt

4    we'd have an electronic secretary at that juncture, and

5    that's where the impasse was.

6         So --

7         THE COURT:   So I think that's a bad idea

8    because it suggests you are making a record that is then

9    going to be used against your counsel in some later

10   proceeding.  It's not necessary.  If -- if you wanted to

11   get up and testify, if we came to that, you could

12   testify.  And it introduces an element into a free

13   discussion that's not appropriate.

14        So one of the things that I have tried to caution

15   everybody north of the V is, I don't want to know about

16   your attorney/client relationships, and I certainly

17   don't want these people privy to strategy and "I don't

18   like this" and "then we had this conversation and this

19   is what happened."  It's not good for the class.

20        So I think recording it is a bad idea.  It

21   introduces an element that people have to wonder where

22   those recordings are going to go for and how they are to

23   be used.  You should be having a candid conversation

24   that's respectful.  They shouldn't schedule the

25   conference calls at short time.  That did catch my

1      attention.  And let's see if you guys can work together

2      because there are solutions when people cannot work

3      together.  It happens all the time in cases.  And that

4      that's somebody has to go and you want it to be the

5      counsel and they want it to be you.  And let's see if we

6      can make sure that you are both still in the case

7      because you have information of value to share.  Okay?

8           So I don't want to --

9                JONATHAN HAAR:  Yes.  I appreciate that very

10     much.

11                THE COURT:  Okay.

12                JONATHAN HAAR:  And I hope that you got our

13     attempt to clarify our, quote, nonnegotiables.  We were

14     negotiating with our counsel.  We were looking for the

15     sun, the moon and the stars, we recognized fully, and we

16     shared that very quickly with them the following e-mail,

17     that we were looking for -- you know, we want goals.

18     How we get there, obviously their choice.

19                THE COURT:  Well, we will have new people in

20     the mix, and that's always -- it's like a chemistry

21     experiment.  I am hoping it's a good chemistry

22     experiment, and we'll see what happens.

23          I will wait to hear from you all in 90 days.  All

24     right?

25          Thank you.

1          JONATHAN HAAR:   And I will be looking forward

2     to speaking with all of them.

3              (Court was in recess at 10:47 a.m.)

4                    *** ** ***

5

6

7

8              C E R T I F I C A T I O N

9        I certify that the foregoing is a correct
      transcript from the record of proceedings in the
10    above-entitled matter.

11    _____
      October 9, 2015                    _____
12    Date                               Anne Nichols Pierce

13

14

15

16

17

18

19

20

21

22

23

24

25