# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **ALICE H. ALLEN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 5:09–CV–00230–cr** |
| ) | |
| **DAIRY FARMERS OF AMERICA, INC., and** ) | |
| **DAIRY MARKETING SERVICES, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DAIRY FARMER SUBCLASSES' MOTION FOR PRELIMINARY APPROVAL
## OF DECEMBER 2015 SETTLEMENT WITH DEFENDANTS DAIRY
## FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

RELEVANT BACKGROUND ............................................................................... 4

    I.      Relevant Procedural History Approaching the Parties' Trial Date........................ 4

    II.     The Initial DFA/DMS Settlement Negotiations and Terms. ................................ 5

    III.    Fairness Hearing on the Initial DFA/DMS Settlement and Related

          Motions. ............................................................................................................ 7

    IV.    The Settlement Before The Court. ..................................................................... 9

          A.      2015 Settlement Negotiations. ............................................................... 9

          B.      Important Terms in the Proposed Settlement............................................ 12

ARGUMENT ...................................................................................................... 16

    I.      The Settlement Satisfies the Criteria for Preliminary Approval. ......................... 17

          A.      The Settlement Resulted from Vigorous, Arm's Length

                Negotiations Between Experienced and Capable Counsel. ..................... 17

          B.      The Majority of the Subclass Representatives Support the

                Settlement Lending Additional Support for Preliminary Approval......... 18

          C.      The Settlement Provides Substantial Equitable Protections and

                Financial Remuneration Well Within the Range Deemed

                Acceptable by Courts. ........................................................................... 20

          D.      The Settlement Has No Obvious Deficiencies and Grants No

                Preferential Treatment. ......................................................................... 22

    II.     The Proposed Notices Satisfy Due Process and Should Be Approved................. 23

    III.    Proposed Relevant Deadlines. .......................................................................... 25

CONCLUSION.................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>C<small>ASES</small></small>

*In re Airline Ticket Comm'n Antitrust Litig.*,
  953 F. Supp. 280 (D. Minn. 1997).........................................................................23

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 5:09-CV-230, 2014 WL 6682436 (D. Vt. Nov. 25, 2014).....................................*passim*

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 5:09-cv-230, 2015 WL 1517400 (D. Vt. Mar. 31, 2015)............................................8, 18

*Banyai v. Mazur*,
  No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007).........................18

*Blessing v. Sirius XM Radio, Inc.*,
  507 F. App'x 1 (2d Cir. 2012) ....................................................................................17

*In re Cardizem CD Antitrust Litig*,
  218 F.R.D. 508 (E.D. Mich. 2003) .............................................................................23

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012)..........................................................................18

*Charron v. Wiener*,
  731 F.3d 241 (2d Cir. 2013)......................................................................................20

*Chatelain v. Prudential-Bache Sec., Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ............................................................................17

*Chin v. RCN Corp.*,
  No. 08 Civ. 7349, 2010 U.S. Dist. LEXIS 31272 (S.D.N.Y. Mar. 12, 2010).........................23

*Cty. of Suffolk v. Long Island Lighting Co.*,
  907 F.2d 1295 (2d Cir. 1990).....................................................................................21

*Flinn v. FMC Corp.*,
  528 F.2d 1169 (4th Cir. 1975) ...................................................................................20

*Handschu v. Special Services Division*,
  787 F.2d 828 (2d Cir. 1986)......................................................................................24

*Hayes v. Harmony Gold Min. Co.*,
  509 F. App'x 21 (2d Cir. 2013) ..................................................................................20

*Kincade v. General Tire and Rubber Co.*,
  635 F.2d 501 (5th Cir. 1981) .....................................................................................20

*Laskey v. UAW*,
    638 F.2d 954 (6th Cir. 1981) ............................................................................20

*Lizondro–Garcia v. Kefi LLC*,
    300 F.R.D. 169 (S.D.N.Y. 2014) .....................................................................16

*In re Luxottica Group S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) .....................................................................16

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010).........................................................................16

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) ..................................................................17, 24

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950).........................................................................................24

*In re Nasdaq Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) ..................................................................16, 23

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .....................................................................17

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972).............................................................................21

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................3, 23

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ...........................................................23

*In re Traffic Exec. Ass'n E. R.R.s*
    627 F.2d 631 (2d Cir. 1980)............................................................................16

*Thomas v. Albright*,
    139 F.3d 227 (D.C. Cir. 1998)........................................................................20

*Vazquez v. Lamont Fruit Farm, Inc.*,
    No. 06-CV-582S, 2011 U.S. Dist. LEXIS 144167 (W.D.N.Y. Dec. 12, 2011).....................23

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................22

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)..............................................................................17

*Weseley v. Spear, Leeds & Kellogg,*
    711 F. Supp. 713 (E.D.N.Y. 1989) ...................................................................22

*White v. National Football League,*
    836 F. Supp. 1458 (D. Minn. 1993)...............................................................22

**STATUTES**

15 U.S.C. § 1 ...........................................................................................................4

15 U.S.C. § 2 ...........................................................................................................4

**OTHER AUTHORITIES**

Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.53 (4th ed.
    2002) .................................................................................................................24

David F. Herr, *Annotated Manual for Complex Litig.* § 13.14 (4th ed. 2014) ............................21

Fed. R. Civ. P. 23 .........................................................................................9, 17, 20, 24

*Manual for Complex Litigation, Third* § 30.42 (1995)................................................17

## INTRODUCTION

The Dairy Farmer Subclasses move for preliminary approval of a Settlement that provides significant financial remuneration and equitable relief for dairy farmers in the Northeast.   The Settlement serves as the culmination of more than six years of hard-fought litigation between dairy farmers and defendants DFA and DMS.  As explained below, settlement negotiations over the past several months have made significant progress and added important new protections for Subclass members.  Both the financial and equitable terms of the Settlement represent substantial achievements in this litigation and enjoy the support of six of the nine Subclass Representative farms.  To the extent opposition exists, however, the Settlement now expressly provides that any farmer who does not wish to be bound by its terms has the opportunity to opt out.  The Dairy Farmer Subclasses respectfully submit that the Settlement should now be preliminarily approved, so that all farmers will have an opportunity to review its terms and, if they wish, realize the benefits offered by the Settlement.

The purpose of preliminary approval is not to determine the ultimate fairness of the Settlement but rather to perform an initial review to decide whether any apparent facial defects preclude presenting it to the Subclasses.  This Court has already found that the monetary component of the Settlement – the payment of $50 million – "falls within a reasonable range of potential outcomes when considered in the context of the legitimate risk of a defense verdict,"[1] and thus warrants preliminary approval.  The Court's conclusion holds true today.  This sum amounts to an average payment of $4,000 for Subclass Members and is wholly fair and reasonable given the risks of continued litigation.

---

[1] *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 6682436, at *4 (D. Vt. Nov. 25, 2014) (Order Granting Preliminary Approval of Initial Settlement with DFA and DMS, hereinafter 11/25/2014 Order)

Similarly, this Court evaluated a portion of the equitable relief provided by the Settlement and deemed it "broader than the scope of the equitable relief that may have been ordered by the court" should the case have proceeded to trial and sufficiently fair and reasonable to warrant an evaluation by the Subclasses.[2]  The significant equitable components preliminarily approved by the Court last year – including a prohibition on all non-solicitation agreements, limitations on full supply agreements; auditing, certification and disclosure requirements designed to address concerns relating to the use of farmer equity in DFA and the financial integrity of DFA's operations; relief enhancing the ability of farmers to terminate their relationship with DFA/DMS; non-retaliation protections; and significant disclosure of relevant factual materials – remain important components of the proposed Settlement.

In addition to these provisions, however, the proposed Settlement includes significant additional provisions that have been negotiated over the past three months.  These include:

- Extending the prohibition on the formation or renewal of full supply agreements except in limited circumstances (Agreement ¶ 7.2(a)(i), Ex. A);

- Creating and funding the position for an independent Advisory Council Member to review financial records and serve as an advocate within DFA for higher pay prices and farmer equity, and establishing a Farmer Ombudsperson to investigate and facilitate resolution of any complaints, including complaints relating to testing, voting rights, or termination from DFA (*id.* ¶ 7.2(d));

- Safeguards to address any concerns regarding the integrity of milk testing, including a mechanism that allows farmers to obtain "split samples" and secure testing at independent labs if they have concerns about the results of particular milk tests, and also annual receipt by the Ombudsperson of a report from the Market Administrator regarding discrepancies disclosed, or the lack thereof, from its independent testing of the Dairy One laboratory (*id.* ¶¶ 7.2(f), (g));

- Prohibiting DFA/DMS from obtaining a controlling interest in the Dairy One milk testing organization (*id.* ¶ 7.2(e));

- Imposing procedural requirements on DFA's use of block voting in connection with voting on Federal Milk Marketing Order 1 amendments and ensuring that any farmer has the right to vote individually (*id.* ¶ 7.2(h));

---

[2] *Id.*

2

- Limitations on the power of DFA/DMS to terminate farmer contracts (*id.* ¶ 7.2(c)); and

- A provision affording any member of the Subclasses that does not wish to participate in the Settlement, or be bound by its terms, the right to opt out (*id.* ¶ 9.1).

Not only will these conduct provisions result in real industry change, the Settlement provides that DFA/DMS will bear the cost of these provisions, further enhancing the financial value of the Settlement. Additionally, the Settlement retains the previously narrowed release of claims.

This Settlement is the product of protracted and serious, arm's length negotiations among experienced counsel, represents a substantial step forward for dairy farmers in the Northeast, and reflects the extensive involvement and input of all of the Subclass Representatives, including two former state agricultural commissioners. Indeed, very significant efforts have been made to consider and evaluate all ideas and issues raised by the Subclass Representatives and many of the new conduct provisions reflect their proposals and concerns, including those raised by the Representatives who opposed the original settlement (and continue to oppose settlement). But to the extent these Subclass Representatives or any members of the Subclasses prefer the risks of litigation to the relief and certainty of settlement, the Settlement provides an opportunity to opt out of the Subclasses and pursue their own claims against DFA/DMS. They should not, however, have the ability to block meaningful – indeed, unprecedented – financial and equitable relief for nearly 9,000 farmers.

This Court has recognized that "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."[3] This interest is particularly strong where, as here, where the Settlement provides not only significant financial relief, but also important equitable relief (much of which could not realistically be achieved at trial, even if

---

[3] Op. and Order Granting in Part and Den. in Part Final Approval of Dean Settlement 8, ECF No. 341 (hereafter "8/3/2011 Op. & Order") (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995)).

successful), while avoiding the risks and delay that would attend any trial and subsequent appeal. Accordingly, the Dairy Farmer Subclasses respectfully request that the Court preliminarily approve the Settlement and order Notice.  A proposed Notice informing the Subclass members of their rights and the substantive provisions of the Settlement is attached to this memorandum, and a plan for effectuating notice is explained in Section II of the Argument, *infra*.

## RELEVANT BACKGROUND

The Court is familiar with the history of this litigation.  For convenience, the Subclasses provide below a brief recitation of the events that gave rise to the instant motion.

## I.   Relevant Procedural History Approaching the Parties' Trial Date.

This case commenced more than six years ago and has been vigorously contested at every stage.  The heart of the case alleges DFA/DMS conspired with various co-conspirators to restrict competition for raw Grade A milk produced, marketed, and processed in the Northeast; monopsonized raw Grade A milk and milk marketing services in the Northeast; and engaged in other unlawful activities that suppressed the prices received by Northeast dairy farmers for their raw Grade A milk in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[4]

Following the Court's partial grant of Defendants' motions to dismiss,[5] the Dairy Farmer Subclasses settled with former Defendant Dean Foods Company for $30 million.  That Settlement was finally approved in August 2011,[6] and the case proceeded against the remaining defendants, DFA and DMS.

---

[4] Revised Consolidated Am. Class Action Compl. ("Am. CAC"), Nov. 12, 2010, ECF No. 117.

[5] Op. and Order Granting in Part and Den. in Part Defs.' Mots. to Dismiss, Aug. 30, 2010, ECF No. 81.

[6] Order and Final J. Approving Class Action Settlement and Dismissing Claims as to Def. Dean Foods Company, Aug. 15, 2011, ECF No. 345.

During discovery, the Dairy Farmer Subclasses secured and analyzed millions of pages of documents, participated in more than seventy depositions, and filed and/or responded to many hundreds of pages of expert reports.  As a result of this extensive discovery and both sides' substantial experience with the *Southeastern Milk Antitrust Litigation*, counsel for the Subclasses and Defendants approached trial with a deep understanding of the complex factual, economic, and legal issues presented by the case.

As the Dairy Farmer Subclasses prepared for trial, however, two important decisions from the Court impacted both sides' assessment of the case.  First, the Court's *Daubert* rulings – both regarding market analysis and damages – materially impacted the nature and scope of expert testimony in this case.[7]  Second, the summary judgment rulings had significant implications for the case that would be presented to a jury.  Although the Subclasses prevailed on many of the summary judgment issues, Defendants were successful in limiting aspects of the Subclasses' case, including the claims for relief and recoverable damages.[8]  Following these rulings, both sides proceeded vigorously to prepare for trial in the summer of 2014.

## II.     The Initial DFA/DMS Settlement Negotiations and Terms.

As the trial drew near, the parties finally began making progress toward a potential settlement.  Though the parties had engaged in sporadic settlement negotiations throughout the course of the litigation – including participating in a Court-ordered mediation with Michael Marks, a highly respected mediator – the parties had remained intractably far apart in their positions.  After settlement was later reached in the *Southeastern Milk Antitrust Litigation*, the

---

[7] Op. and Order Granting in Part and Deny. in Part Defs.' Mot. to Exclude Various Ops. of Pls.' Merits Expert Dr. Gordon Rausser, Dec. 31, 2013, ECF No. 470; *see also* Mot. to Strike Untimely Revision of Expert Op., Ex. 1, Mar. 18, 2014, ECF No. 486-1.

[8] Op. and Order Granting in Part and Den. in Part Defs.' Mot. for Summ. J., June 11, 2014, ECF No. 525.

parties resumed settlement discussions in the Northeast with the full support of the Subclass Representatives (who encouraged counsel to proceed with negotiations in the Northeast in the hopes of securing a meaningful, but smaller, financial settlement and equitable terms similar to those negotiated in the Southeast).

Although the parties had periodic discussions, no material progress was made until, on June 19, 2014, DFA/DMS indicated – for the first time – that it was prepared to agree to financial terms that counsel for both Subclasses believed constituted an excellent result for the Subclasses provided acceptable, equitable relief could also be obtained.  The next day, Counsel for the Subclasses and Defendants notified the Court's clerk of the situation and, consistent with the instructions received, continued to explore settlement negotiations with DFA/DMS.  In conjunction with those negotiations, Subclass Counsel and the Subclass Representatives engaged in multiple discussions regarding the advisability of settlement and potential equitable terms.  Throughout the discussions between Subclass Representatives and Subclass Counsel, Subclass Counsel continued to negotiate with DFA/DMS.

On July 1, 2014, days before trial was scheduled to commence, the parties executed a final settlement agreement (hereinafter the "Initial DFA/DMS Settlement").[9]  That Settlement provided that DFA/DMS would pay the Dairy Farmer Subclasses $50 million for the Dairy Farmer Subclasses as well as provide substantial equitable relief.[10]    The Court preliminarily approved the Initial DFA/DMS Settlement[11] and notice was disseminated to the Subclasses.

---

[9] *See* Ex. 2 to Mem. of Law in Supp. of the Dairy Farmer Subclasses' Mot. for Final Approval of Proposed Settlement with Defs. DFA and DMS, Jan. 22, 2015, ECF No. 625-1.
[10] *Id*.
[11] 11/25/2014 Order.

III.     **Fairness Hearing on the Initial DFA/DMS Settlement and Related Motions.**

After notice of the Initial Settlement issued to the Dairy Farmer Subclasses, 30 objections, 10 letters of support, and 7,550 claims were submitted.[12]  On January 29, 2015 the Court held an Initial Fairness Hearing.[13]  At that hearing, some farmers came forward to provide their views of the Initial DFA/DMS Settlement including the Subclass Representatives at that time.[14]  Subclass representative Alice Allen, supported the Settlement, while Representatives for three other farms (the Haars, the Sitts and Richard Swantak) (collectively "Opposing Subclass Representatives" or "Opposing Representatives") opposed it.[15]  Though not raised in their initial objections to the injunctive portion of the Settlement, a main theme at the initial fairness hearing was the Opposing Representatives' argument "that independent milk testing was essential to meaningful injunctive relief as, in its absence, Defendants had the ability to control their livelihoods and retaliate against them."[16]

Following the Initial Fairness Hearing, the Opposing Subclass Representatives moved to remove Subclass Counsel,[17] asserting without evidence that Subclass Counsel had engaged in "collusion" with attorneys representing DFA/DMS.[18]

---

[12] *See* Objections, ECF Nos. 589-90, 594, 596-601, 603-04, 606-08, 610-12, 614, 616-22, 627-30, 632; Letters of Support, ECF Nos. 591-93, 595, 602, 605, 609, 613, 615, 623.  *See also* Mem. of Law in Supp. of the Dairy Farmer Subclasses' Mot. for Final Approval of Proposed Settlement with Defs. DFA and DMS, Jan. 22, 2015, ECF No. 625-1.

[13] Tr. of Fairness Hr'g held on Jan. 29, 2015 ("Fairness Hr'g Tr."), Mar. 3, 2015, ECF No. 636.

[14] Fairness Hr'g Tr. 5:9-142:11.

[15] Fairness Hr'g Tr. 5:9-46:9, 55:4-142:11.

[16] Op. and Order Den. Subclass Reps.' Mot. for New Counsel at 3, June 30, 2015, ECF No. 667.

[17] Class Reps.' Mot. to Appoint Counsel, Mar. 11, 2015, ECF No. 637.

[18] Class Reps.' Memo. in Supp. of Mot. for New Counsel at 13-17, Mar. 11, 2015, ECF No. 637-1.

While that motion was pending, the Court denied without prejudice the Dairy Farmer Subclasses' Motion for Final Approval of the Initial DFA/DMS Settlement.[19] In reaching this conclusion, the Court noted that, "there is no dispute that Subclass Counsel are experienced and able antitrust litigators who engaged in extensive discovery and motions practice necessary to the effective representation of the class."[20]  However, in the face of some Subclass Representatives' objections and related, pending assertions of misconduct, the Court ruled that it could not determine the procedural fairness of the Settlement.  The Court also cited the opposition of some other Subclass members to the proposed settlement.[21]

The Court then held an evidentiary hearing to address the allegations raised in Opposing Subclass Representatives' motion and to address the procedural fairness issue.  The hearing lasted two days and the Court allowed Opposing Subclass Representatives as well as Subclass Counsel to testify or otherwise submit relevant evidence.[22] After the hearing closed, the Court denied Opposing Representatives' motion.[23]  The Court found that disagreement about tactical decisions did not constitute misconduct and the Court had "no reason to doubt" that Subclass Counsel were acting in the Subclasses' best interests.[24]  Opposing Representatives later filed a second motion to disqualify counsel which was denied, and the Haars later filed a motion

---

[19] *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2015 WL 1517400, at *5 (D. Vt. Mar. 31, 2015) (Opinion and Order Denying Without Prejudice Motion for Final Approval of Proposed Settlement, hereinafter 3/31/2015 Order).

[20] *Id.*

[21] *Id.* at *7.

[22] Tr. of Class Reps.' Mot. for New Counsel Hr'g held on Apr. 20, 2015, May 22, 2015, ECF No. 651; Tr. of Class Reps.' Mot. for New Counsel Hr'g held on June 1, 2015, June 8, 2015, ECF No. 658.

[23] Op. and Order Denying Subclass Reps.' Mot. for New Counsel at 3, June 30, 2015, ECF No. 667.

[24] *Id.* at 7.

seeking an extension of time to request reconsideration, which was also denied.[25] In the wake of the tactics and arguments pursued by the Opposing Representatives, DFA/DMS moved to decertify the SDA/DMS Subclass based on their inadequacy to be representatives under Rule 23.

## IV. The Settlement Before The Court.

### A. 2015 Settlement Negotiations.

Following submission of a revised settlement for final approval in August of 2015, the Court denied final approval and ruled that pursuant to Rule 23, it was necessary under the circumstances of this case that any revised settlement undergo the preliminary approval, notice, and final approval process. In an effort to include fresh perspectives, in the late summer and fall of 2015 the Court also (a) appointed Stephen Taylor and Darrel Aubertine as additional Subclass Representatives for the non-DFA/DMS Subclass (alongside existing Subclass Representatives Alice and Lawrence Allen and Garret and Ralph Sitts)[26] and added their counsel, Daniel Smith and Richard Cassidy, as additional Counsel for the non-DFA/DMS Subclass; and (b) later added Peter Southway, Marion Southway, Robert Fulper and Reynard Hunt as additional Subclass Representatives for the DFA/DMS Subclass.[27]

At the September 29, 2015 status conference, the Court indicated that the parties would be given additional time to reach a settlement and stated that if they were unable to do so by

---

[25] Renewed Mot. to Appoint New Counsel, Aug. 16, 2015, ECF No. 683; Entry Order Den. Renewed Mot. for New Counsel and Granting in Part and Den. in Part Subclass Counsel's Mot. for Appointment of Additional Subclass Reps. and Removal of Current Subclass Reps. (hereinafter "Order Den. New Counsel and Adding Subclass Reps."), Oct. 23, 2015, ECF No. 707; Mot. for Leave to File Mot. for Deferral of Deadline, Dec. 7, 2015, ECF No. 708; Entry Order Den. Mot. to Defer Deadline for Mot. for Reconsideration, Jan. 4, 2016, ECF No. 711.

[26] Op. and Order Granting Mot. for Appointment of Additional Rep. Party, Den. Mot. for Appointment of Additional Subclass Counsel, and Granting in Part and Den. in part Mot. to Intervene, Aug. 11, 2015, ECF No. 682.

[27] Order Den. New Counsel and Adding Subclass Reps.

December 28, 2015, the case would be set for trial.[28]  The Court also postponed its decision on

DFA/DMS's motion to decertify the DFA/DMS Subclass, but counseled the parties to take that

motion into account in settlement negotiations. *See* Stipulation to Defer Deadline for Defs.'

Reply in Supp. of Mot. to Decertify, Oct. 13, 2015, ECF No. 706.

Since that time, existing and newly appointed Subclass Counsel have worked diligently

with existing and newly appointed Subclass Representatives to negotiate a settlement with

DFA/DMS that would be most beneficial to farmers.  As set forth below in a non-exhaustive list,

this has included numerous meetings and discussions involving all Subclass Counsel, the

Subclass Representatives, and, during negotiations, DFA/DMS counsel and DFA's CEO:

| Date | Event |
|---|---|
| September 29, 2015 | In person meeting between Subclass Counsel and Subclass Representatives in Burlington, Vt. |
| October 8, 2015 | Meeting between Subclass Counsel, and counsel for DFA/DMS regarding potential settlement in Washington, D.C. |
| October 13, 2015 | In-person meeting between Subclass Counsel and Subclass Representatives in Albany, NY. |
| October 26, 2015 | DFA/DMS Subclass Counsel confers telephonically with the newly appointed Subclass Representatives- Peter and Marion Southway, Robert Fulper, and Reynard Hunt |
| October 28, 2015 | Meeting between Subclass Counsel regarding potential settlement in Washington, D.C. |
| November 3, 2015 | Telephonic conference with Subclass Representatives and Subclass Counsel. |
| November 6, 2015 | Telephonic conference with Subclass Representatives and Subclass Counsel. |
| November 16, 2015 | In person meeting lasting more than two hours between Subclass Counsel, counsel for DFA/DMS, and Rick Smith. |
| November 20, 2015 | Telephonic conference between Subclass |

---

[28] Min. Entry, Sept. 29, 2015, ECF No. 703.  See also Renewed Mot. for Final Approval, or in the Alternative, Prelim. Approval of Am. Settlement, Aug. 5, 2015, ECF No. 674-1; Entry Order Den. Renewed Mot. for Final Approval, or the in Alternative, Prelim. Approval of Am. Settlement, Sept. 1, 2015, ECF No. 690.

| | Counsel and counsel for DFA/DMS regarding settlement. |
|---|---|
| November 23, 2015 | In-person meeting between Subclass Representatives and Subclass Counsel in Albany, NY. |
| November 30, 2015 through December 8, 2015 | Subclass Counsel and counsel for DFA/DMS exchange drafts of potential settlement agreement and revisions. |
| December 9, 2015 | Meeting between Subclass Counsel and counsel for DFA/DMS in Washington, D.C. |
| December 14, 2015 | One and a half hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 15, 2015 | Two hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 17, 2015 | Two hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 18, 2015 | Telephonic conference between Subclass Counsel and counsel for DFA/DMS. |
| December 21, 2015 | Four and a half hour telephonic conference with Subclass Representatives and Subclass Counsel. Telephonic conference between Subclass Counsel and counsel for DFA/DMS. |
| December 22, 2015 | Subclass Counsel and counsel for DFA/DMS execute the pending Settlement. |
| December 23, 2015 | Parties inform the Court that they have reached a settlement.[29] |

As the table reflects, the instant Settlement was reached following three months' extensive negotiations that built upon over one year of prior settlement negotiations.[30] The Subclass Representatives were involved and provided input throughout the process. Subclass Counsel not only apprised them of the settlement negotiations as they occurred but solicited feedback from the Representatives regarding the negotiations and revised proposals to DFA/DMS based on that feedback.

---

[29] Status Report Regarding Settlement, Dec. 23, 2015, ECF No. 710.

[30] If anything, the table is an under inclusive representation of the communications between Subclass Counsel and the Subclass Representatives over the last quarter of 2015 as it excludes calls between individual Subclass Representatives and counsel as well as relevant email correspondence.

**B.  Important Terms in the Proposed Settlement.**

These efforts paid off.  Pursuant to the terms of the instant Settlement, DFA/DMS agree to pay a total of $50 million to the Dairy Farmer Subclasses in addition imposing significant and unprecedented changes to their business practices in the Northeast.  Notably, the Settlement provides that DFA/DMS will be financially responsible for the million dollar-plus cost of these conduct provisions, further enhancing the financial value of the Settlement.  Agreement ¶ 7.2(p).  For the Court's convenience, these conduct terms are summarized in the attached Exhibit B, which denotes those provisions that are new, revised, or unchanged from the Initial DFA/DMS Settlement.[31]  In evaluating the terms of the Settlement, one substantial change is that those Subclass members who do not wish to be bound by the Settlement may opt out and will not be bound by the terms of the Settlement.  *Id*. ¶ 9.1.  Other important additions include the following:

First, the Settlement establishes and funds two farmer representative positions – the Advisory Council Member and Farmer Ombudsperson – to allow greater transparency into DFA/DMS and its finances (the Advisory Council Member), and provide a mechanism for farmers to raise concerns and seek their resolution through investigation, access to relevant records and non-binding mediation by the Ombudsperson.  *Id*. ¶ 7.2(d).  The Advisory Council Member shall be charged with, among other things, advocating for the enhancement of producer pay prices and improving dairy farmers' margins.  *Id*. ¶ 7.2(d)(iv)(1).  To effectuate this duty, the Advisory Council Member can commission a third-party review of DFA and DMS financial statements and consolidation accounting.  He or she shall have access to all books and financial records of DFA's Northeast Area Council and DMS, be permitted to attend and participate in

---

[31] Additionally, a Redline Comparison of this Settlement with the 2014 Initial DFA/DMS Settlement is attached as Ex. C.  This document reflects the changes made in the new Settlement as well as those changes retained from the Settlement proposed to the Court on August 6, 2015.

Northeast Area Council Meetings as well as other critical meetings, meet quarterly with an individual from DFA/DMS's management team to review activities in the Northeast, and consult with outside experts. *Id*. ¶ 7.2(d)(vi).

The Farmer Ombudsperson shall focus on promoting fairness for DFA/DMS farmers by hearing and investigating their complaints and concerns and attempting to resolve them with DFA/DMS. *Id*. ¶ 7.2(d)(v)(2). To achieve this goal, the Farmer Ombudsperson shall have access to relevant records, meet quarterly with a representative from the DFA/DMS management team, and attend and participate in Northeast Area Council Meetings. *Id*. ¶ 7.2(d)(vii).

Second, the Settlement creates significant protections to address concerns about potential manipulation of milk testing results. Although DFA/DMS continues to dispute allegations about milk testing that were raised during the settlement approval process – and does not believe any relief relating to this could be secured at trial – the parties worked diligently to agree on mechanisms and safeguards that would reasonably address the concerns expressed by some farmers. Accordingly, for the next decade, the Settlement prohibits DFA/DMS from acquiring a controlling ownership interest in the milk testing company its farmers use, Dairy One. *Id*. ¶ 7.2(e). During this period, DFA farmers shall not comprise a majority of the DairyOne Board and DFA/DMS shall be required to engage in arm's length negotiations with DairyOne. Moreover, for the next five years, any dairy farmer in Order 1 whose milk is tested by DairyOne and who disputes the accuracy of the test result may require a split sample procedure in which the dairy farmer observes the collection and sealing of a sample that will be tested at two independent, certified labs in addition to DairyOne. *Id*. ¶ 7.2(f). If the split sample fails to confirm the original test result within a reasonable level of error, the appropriate adjustments to the farmer's milk check will be made and information regarding the labs' differing results

submitted to the Market Administrator. *Id.* ¶ 7.2(f)(i). Additional farmer concerns regarding milk testing accuracy may be raised with the Farmer Ombudsperson who shall be empowered to mediate such disputes. *Id.* ¶ 7.2(f)(iii). Similar procedures are provided for adulterated milk results. *Id.* ¶ 7.2(g).

Third, the Settlement includes important provisions that protect dairy farmers from having their milk marketing arrangements terminated. *Id.* ¶ 7.2(c). Should DFA/DMS decide not to renew a Subclass Member's milk marketing arrangement due to lack of demand, DFA/DMS shall provide the Subclass Member 30 days' advanced notice of the termination decision along with a copy of the instant Settlement. *Id.* ¶ 7.2(c)(i). DFA/DMS shall also be required, at the terminated Subclass member's request, to continue to market their milk for a grace period of six months. *Id.* In the event DFA/DMS terminates a Subclass member's marketing arrangement for cause, DFA/DMS shall again provide at least 30 days' advanced written notice of the decision along with a reasonable opportunity to cure the reason for termination. *Id.* ¶ 7.2(c)(ii). Should the terminated Subclass member wish to dispute the provided basis for termination, the Northeast Area Council or DMS Board of Directors shall review the decision and, at the farmer's discretion, the Farmer Ombudsperson may be asked to mediate the dispute. *Id.* At the same time, the Settlement still allows DFA and DMS farmers the opportunity to terminate the marketing agreements with DFA and DMS on 90 days' notice instead of having only an opportunity once a year upon the agreement's renewal. *Id.* ¶ 7.2(b).

Fourth, the Settlement provides an alternative to DFA's block voting procedure so that should DFA decides to vote its cooperative as a block, it shall first be required to inform its members about that decision and provide individual ballots to allow every farmer an opportunity to vote against the block. *Id.* ¶ 7.2(h).

Fifth, some of the conduct elements from the Initial DFA/DMS Settlement have been supplemented to provide even greater protection to Subclass Members. The period during which DFA/DMS is restricted to certain specified full supply agreements (and can enter new agreements only in limited circumstances) is extended to four years following final approval of the proposed settlement. *Id.* ¶ 7.2(a). Also, the provision protecting Subclass members and Representatives from retaliation as a result of this suit has been supplemented. *Id.* ¶ 7.2(m).

Other key conduct elements from the Initial DFA/DMS Settlement remain unchanged: DFA is permanently prohibited from entertaining or maintaining any form of non-solicitation agreement, *id.* ¶ 7.2(n); DFA/DMS has still agreed not to oppose the unsealing of the material evidence in the record specified in the agreement, *id.* ¶ 7.2(i), which means that those records will be available to farmers, law enforcement officials, the media, and the general public; DFA is subject to requirements relating to the disclosure, audit and certification of financial transactions and other financial information, *id.* ¶ 7.2(j); an Audit Committee to include at least two independent advisors with expertise in accounting, financial reporting, and auditing, will be established to monitor DFA/DMS's compliance with the Settlement, *id.* ¶ 7.2(l); and the DFA Northeast Area Council must conduct a review of members' milk checks and its election procedures, *id.* ¶ 7.2(k).

In exchange for the above consideration, Subclass Members who do not opt out of the Settlement agree to give up the right to continue this lawsuit against DFA or DMS. *Id.* ¶ 1.16. To address concerns discussed by the Court and others, the release of claims has been revised as compared with the Initial DFA/DMS Settlement to make clear that the release is limited to claims that were or could have been asserted "arising out of the conduct" alleged in the complaint. *Id.* Similarly, the definition of "Released Parties" has been narrowed to exclude, for

example, Defendants' affiliates, partners, certain representatives, and those entities in which they have an ownership interest. *Id.* ¶ 1.17.

## ARGUMENT

This Court has explained that, "preliminary approval is only 'the first step in the settlement of a class action' to 'preliminarily determine' whether to authorize notice and schedule a hearing . . . ." 11/25/2014 Order, 2014 WL 6682436, at *5 (quoting *Lizondro–Garcia v. Kefi LLC*, 300 F.R.D. 169, 179 (S.D.N.Y. 2014)).  Preliminary approval of a class action settlement, in contrast to final approval, "'is at most a determination that there is what might be termed "probable cause" to submit the proposal to class members and hold a full-scale hearing as to its fairness.'"  *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (quoting *In re Traffic Exec. Ass'n E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980)).

Accordingly, on preliminary approval, courts evaluate whether the Settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval . . . ."  *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  If it does, "preliminary approval is granted." *Id*.

In deciding whether to approve a settlement, the Second Circuit recognizes a strong public interest in favor of settling class action suits.[32]  As this standard is satisfied here, the Settlement should be preliminarily approved and notice of the Settlement disseminated to the Subclasses so that they can determine whether the settlement serves their interests.

---

[32] *See* 8/3/2011 Op. & Order at 8 (granting final approval of Dean settlement); *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

I.      **The Settlement Satisfies the Criteria for Preliminary Approval.**

   A.     **The Settlement Resulted from Vigorous, Arm's Length Negotiations Between Experienced and Capable Counsel.**

Vigorous arm's-length negotiations between seasoned counsel protect against collusion and advance the fairness considerations of Rule 23(e), and the recommendation to settle resulting from such negotiations is entitled to deference from the Court.[33]   Such deference is especially appropriate after the parties have engaged in thorough fact-finding and discovery.[34]   As more fully described in Section IV.A of the Relevant Background, *supra*, the Settlement was achieved following intensive, arm's-length negotiations.  Nothing in the course of the negotiations, or in the substance of the proposed Settlement, presents any reason to doubt its fairness.

Moreover, experienced counsel recommend the proposed Settlement which favors preliminary approval.[35]   Specifically, Subclass Counsel, who are experienced in litigating and settling antitrust actions, determined that the proposed Settlement was in the best interest of the Subclasses because it provides immediate, significant financial benefits along with substantial structural relief, while avoiding the inherent risks of trial and the possibility of years of ensuing appeals.  This endorsement weighs heavily in favor of the Court's preliminary approval. Subclass Counsel included two attorneys, added much later in the proceedings, to provide a fresh

---

[33] *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (quoting *Manual for Complex Litigation, Third* § 30.42 (1995)); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) ("view of experienced counsel favoring the settlement is 'entitled to great weight'") (citation omitted).

[34] *See Blessing v. Sirius XM Radio, Inc.*, 507 F. App'x 1, 1 (2d Cir. 2012) (settlement was presumptively fair when "settled on the eve of trial, after nearly three years of litigation, including extensive fact and expert discovery").

[35] *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (quoting *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992)).

perspective and voice in the negotiations.  Their significant role in the negotiations over the last

several months, and subsequent support of the instant Settlement, lends even further support to

the inherent fairness of the Settlement.[36]  In preliminarily approving the Initial Settlement, the

Court recognized that,

> Proposed Settlement resulted from arms-length, non-collusive negotiations on the eve of trial between experienced and fully-informed counsel. The Proposed Settlement was preceded by years of discovery and motion practice, including motions that addressed the merits of the parties' claims and defenses and the admissibility of evidence at trial. Accordingly, the negotiations between Subclass Counsel and Defendants' counsel satisfy the standards for preliminary approval with regard to the procedure by which the Proposed Settlement was reached.

11/25/2014 Order, 2014 WL 6682436, at *3.[37]  This conclusion is even more true today given

that the negotiations were more extensive, followed two extensive evidentiary hearings to

address the procedural fairness of the settlement process, and included additional Subclass

Counsel and Subclass Representatives.

## B.   The Majority of the Subclass Representatives Support the Settlement Lending Additional Support for Preliminary Approval.

As discussed more fully above, the Settlement Representatives were active participants in

the discussion and evaluation of this Settlement and they were regularly informed regarding the

status of the negotiations and litigation considerations should this case go to trial.  A significant

majority of the Subclass Representatives – six of the nine farms involved – actively support the

---

[36] *See Banyai v. Mazur*, No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342, at *22-24 (S.D.N.Y. Mar. 27, 2007) (settlement reached by "experienced, capable counsel after meaningful discovery" was presumptively fair, adequate and reasonable) (citation omitted).

[37] *See also Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2015 WL 1517400, at *7 (D. Vt. Mar. 31, 2015) (Order Denying Without Prejudice Motion for Final Approval of Proposed Settlement) (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 198 (S.D.N.Y. 2012)) ("[t]he stage of the proceedings and the amount of discovery completed weigh in favor of the substantive fairness of the Proposed Settlement because '[t]his factor requires the [c]ourt to consider whether the parties have adequate information about their claims.'").

Settlement.  One of these six, the Allens, has participated in this litigation since its start.   The five other Subclass Representatives supporting the Settlement stepped up to represent the interests of the Subclasses after the Initial Settlement was denied.  Based on extensive discussions of the strengths and weaknesses of the case, the prospects at trial, and the pros and cons of possible settlement terms, these new Representatives (including individuals not only with many decades of experience as farmers, but also significant experience in government as former state agricultural commissioners and in business) uniformly support the Settlement.[38]  As the terms of the Settlement suffer no facial defects and the Settlement is supported by a majority of the current Subclass Representatives, the criteria for preliminary approval are readily satisfied.[39]

Despite having obtained substantial additional conduct relief since the Initial DFA/DMS Settlement – specifically relief noted by the Opposing Subclass Representatives to be critical to reforming the industry including protocols to protect farmers from milk testing abuses – Subclass Representatives for three of the nine farms have again indicated their intent to oppose the Settlement.  They are the Haars, the Sitts, and Mr. Swantak.

While the Opposing Representatives will have an opportunity to convey their own views, the Court has previously requested some explanation regarding the bases for the Opposing Representatives objection to the Settlement.[40]  Though Subclass Counsel do not wish to speak for the Opposing Representatives regarding their objections, Counsel will attempt to summarize their asserted reasons for objecting.  In short, the Opposing Representatives have indicated their

---

[38] 7,550 farms, nearly 85% of the Subclasses, submitted claims for relief in connection with the Initial Settlement.

[39] *See, e.g.*, 11/25/2014 Order, 2014 WL 6682436, at *2 (noting "the reaction of the class to the Proposed Settlement remains an important consideration in determining whether the Proposed Settlement should be approved").

[40] Entry Order Deny. Without Prejudice Expedited Mot. for Prelim. Approval of Settlement Between Dairy Farmers of Am., Inc., Dairy Mktg. Servs., LLC, and Dairy Farmer Subclasses, July 9, 2014, ECF No. 569.

desire to obtain additional terms by going to trial – including the restructuring of DFA as a publicly-traded company, the elimination of any Capper-Volstead protection provided by the U.S. Congress, and other terms.  Subclass Counsel considered these terms but believe they are not in the best interest of the Subclasses, would never be agreed to by DFA/DMS as terms of a settlement, and are not realistically achievable at trial or sustainable on appeal.  If the Opposing Representatives maintain their objections, the Settlement now provides them an opportunity to opt out of the Settlement, but all Subclass farmers should have the opportunity to secure the substantial financial and equitable relief afforded by the Settlement without jeopardizing such relief to pursue these additional terms at trial and in a subsequent appeal.

It bears repeating that "the assent of class representatives is not essential to the settlement, as long as the Rule 23 requirements are met."  *Charron v. Wiener*, 731 F.3d 241, 254 (2d Cir. 2013) (affirming settlement approval over unanimous objections of named plaintiffs"), *cert. denied*, 134 S. Ct. 1941 (2014).[41]  Rather, class settlements are judged on whether they are in the best interests of the class as a whole.  *Charron*, 731 F.3d at 254.  Because Subclass Counsel and a two-thirds majority of the Subclass Representatives believe the Settlement to be in the Subclasses' best interests, we urge the Court to preliminarily approve it so that Subclass members may evaluate the Settlement's terms for themselves.

**C.    The Settlement Provides Substantial Equitable Protections and Financial Remuneration Well Within the Range Deemed Acceptable by Courts.**

In deciding whether to grant preliminary approval, the Court also considers whether the settlement falls into the range of what might be found fair, reasonable and adequate, so that notice of the proposed settlement should be given to class members and a hearing scheduled to

---

[41] *See also Hayes v. Harmony Gold Min. Co.*, 509 F. App'x 21, 22-24 (2d Cir. 2013); *Thomas v. Albright*, 139 F.3d 227, 232 (D.C. Cir. 1998); *Kincade v. General Tire and Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981); *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 n.19 (4th Cir. 1975), *cert. denied*, 96 S. Ct. 1462 (1976).

consider final settlement approval.  *See* David F. Herr, *Annotated Manual for Complex Litig.* § 13.14 (4th ed. 2014).  The Second Circuit recognizes that, "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

This Court has already found that the monetary component of the Settlement – the payment of $50 million – "falls within a reasonable range of potential outcomes when considered in the context of the legitimate risk of a defense verdict,"[42] and thus warrants preliminary approval.  This prior ruling rings all the more true considering that defendants have since moved to decertify the DFA/DMS Subclass.  Indeed, even if compared to the maximum single damages[43] available in this case, $50 million stands out as a truly excellent result for the Subclasses.  The maximum single damages calculated by Subclass Plaintiffs' expert in this case was $341 million.  The Court's summary judgment opinion excludes recovery of damages on milk sales to non-conspirators, which removes approximately one-third of single damages, and reduces the overall amount to about $228 million.  Only 60% of those damages – approximately $136.8 million – fall within the four-year limitations period and are potentially achievable without establishing fraudulent concealment.  Thus, if the Settlement is approved, the total recovery from the DFA/DMS and Dean settlements will be $80 million, almost 60% of the maximum single damages under this analysis.  This is a stellar result for the Subclasses and easily satisfies the standard for preliminary approval.

---

[42] 11/25/2015 Order, 2014 WL 6682436, at *4.

[43] *See Cty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) (holding that in deciding final approval "it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure").

This Court has also deemed a subset of the equitable relief provided by the Settlement "broader than the scope of the equitable relief that may have been ordered by the court" and sufficiently fair and reasonable to warrant an evaluation by the Subclasses.[44]  As described more fully previously, the Settlement includes significant provisions *in addition* to those already deemed worthy of submission to the Subclasses.  The conduct elements provided herein go far beyond anything achieved by governmental antitrust authorities or realistically available to the Subclasses at trial and strongly support preliminary approval here.[45]

### D.     The Settlement Has No Obvious Deficiencies and Grants No Preferential Treatment.

Antitrust class actions are "notoriously complex, protracted, and bitterly fought." 8/3/2011 Op. & Order at 12 (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).  This case would be no less complex or risky to try, especially given that the Subclasses had already endured some significant setbacks in their preparation for trial particularly with regard their expert analysis which this Court recognized the Subclasses were "heavily dependent upon" in proving their case. *Id*.

Even if Plaintiffs were to prevail against DFA/DMS at trial – and such a verdict was upheld after extended appeals – there is no guarantee the Subclasses would be awarded more than what has been obtained in this Settlement.  Indeed, there is no reasonable prospect the

---

[44] 11/25/2015 Order, 2014 WL 6682436, at *4.

[45] *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511-512 (E.D.N.Y. 2003) (approving settlement, in part, based on injunctive relief regarding credit card issuers' practices); *White v. National Football League*, 836 F. Supp. 1458, 1479 (D. Minn. 1993) (approving antitrust settlement with changes to NFL rules which benefitted players).

Subclasses would have received the substantial equitable relief achieved here. Given these risks, balanced against the valuable benefits, the proposed Settlement is not obviously deficient.[46]

The proposed Settlement also should be preliminarily approved because it grants no preferential treatment to class representatives or segments of the class.[47] Its compensatory damages would be distributed to all Subclass members according to each member's volume of milk production and sales. This *pro rata* treatment is "fundamentally fair."[48]

Likewise, the proposed Settlement grants no preferential treatment to the DFA/DMS or the non-DFA/DMS Subclasses. The proposed Settlement's compensatory damages would be distributed to all members of the Subclasses according to the same *pro rata* formula. This distribution of funds on the same basis is consistent with Dr. Rausser's opinion that members of both Subclasses were equally harmed (Rausser Decl. ¶ 32, Mar. 19, 2012), which further confirms there is no preferential treatment.[49] Lacking any obvious deficiencies, the Settlement should be preliminarily approved. *See In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995).

## II.   The Proposed Notices Satisfy Due Process and Should Be Approved.

At preliminary approval, the "court must direct notice in a reasonable manner to all class

---

[46] *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) ("Based on this risk and the anticipated expense and complexity of further litigation, the court cannot say that the proposed settlement is obviously deficient . . . .").

[47] *See In re NASDAQ*, 176 F.R.D. at 102; *see also Vazquez v. Lamont Fruit Farm, Inc.*, No. 06-CV-582S, 2011 U.S. Dist. LEXIS 144167, at *6-7 (W.D.N.Y. Dec. 12, 2011) (preliminarily approving proposed settlement in part because "this Court finds no 'obvious deficiencies' with respect to the agreement's treatment of the class members, named Plaintiffs, or class counsel") (quoting *Chin v. RCN Corp.*, No. 08 Civ. 7349, 2010 U.S. Dist. LEXIS 31272, at *2 (S.D.N.Y. Mar. 12, 2010)).

[48] *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (approving *pro rata* distribution of settlement fund based on number of alleged fixed-price product as "cost-effective, simple and fundamentally fair").

[49] *See, e.g.*, *In re Cardizem CD Antitrust Litig*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving allocation of settlement funds consistent with expert damages calculation).

members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Notice must be

"reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections," *Mullane v. Central*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and "express no opinion on the merits of

the settlement," *Handschu v. Special Services Division*, 787 F.2d 828, 833 (2d Cir. 1986).

The Court should approve the proposed Notice and Summary Notice substantially in the

form of Exs. D and E.   Subclass Counsel propose to disseminate notices in a similar fashion as

previously approved by this Court.[50]  The proposed Notice and Summary Notice inform Subclass

members of: (1) the nature of the pending litigation, (2) the settlement's general terms and

effects upon class members, (3) where additional information may be obtained, (4) their right to

opt out of the Settlement and the process for doing so, and (5) their right to appear and be heard

at the Fairness Hearing.  The Notice further explains that Subclass members need not re-submit a

claim if they did so last year and wish to receive their share of the Settlement.[51]  Accordingly,

the Notices are more than sufficient under the governing legal standards.[52]

The notice plan provides that Notice be (1) directly issued by U.S. Mail to addresses of

Subclass members as maintained by the Federal Milk Market Administrator; (2) published the

Summary Notice in publications whose circulation is likely to reach Subclass members;[53] and (3)

posted the notices on www.NortheastDairyClass.com.  A nearly identical plan was approved in

---

[50] *See, e.g.*, Op. and Order Granting Prelim. Approval of Revised Dean Settlement at 16-17, May 4, 2011, ECF No. 297; 11/25/2014 Order, 2014 WL 6682436, at *6.

[51] The necessary information from farmers has not changed and requiring Subclass members to re-submit claims would result in confusion and wasted resources.

[52] *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. at 66; *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.53 (4th ed. 2002).

[53] Previously, publication notice was provided in the following publications: *American Agriculturalist*, *Country Folks* (Eastern edition), *Farming: The Journal of Northeast Agriculture*, and *Progressive Dairyman* (Northeast edition).  Provided the timing of publication of the Notices works with their publication schedules, these publications would likely be used again.

the prior settlements and has proven effective in providing Subclass Members with notice.

## III.   Proposed Relevant Deadlines.

Subclass Counsel propose that the Court set the following deadlines:

| Event | Date |
|-------|------|
| Notice to Subclasses by U.S. Mail; Summary Notice published. | As soon as practicable after entry of the Order granting preliminary approval. |
| Motion for attorneys' fees, reimbursement of expenses, or Subclass Representatives' incentive awards due to the Court. | 30 days following the entry of an Order granting preliminary approval of the Settlement. |
| Deadline for Subclass Members to:<br>• Request permission to opt back into the class if they previously opted out;<br>• Opt out of the Settlement if they do not wish to be bound by its terms;<br>• Submit claim forms if they have not already done so but wish to be included in this Settlement;<br>• Submit letters in support or objections to the Settlement;<br>• Indicate their intent to appear at the Fairness Hearing. | 14 days before the Fairness Hearing. |
| Motion for final approval and response to any letters in support or objections to the Settlement. | 7 days before the Fairness Hearing. |
| Fairness Hearing. | Not less than 90 days following entry of an Order granting preliminary approval so that Notice can be issued and Subclass members allowed at least 60 days to exercise their rights. |

## CONCLUSION

The Dairy Farmer Subclasses respectfully request that the Court grant their Motion for Preliminary Approval of Settlement, approve the proposed Notices substantially in the form of those attached and set the deadlines above.

Dated: January 15, 2016

/s/ Robert G. Abrams
Robert G. Abrams, Esq.
Robert J. Brookhiser, Esq.
Gregory J. Commins, Jr., Esq.
Terry L. Sullivan, Esq.
Danyll W. Foix, Esq.
Baker & Hostetler LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
Tel:  (202) 862-1500
rabrams@bakerlaw.com
rbrookhiser@bakerlaw.com
gcommins@bakerlaw.com
tsullivan@bakerlaw.com
dfoix@bakerlaw.com

/s/ Daniel Smith
Daniel Smith, Esq.
16 State St.
PO Box 801
Montpelier, VT 05601
Tel:  (802) 229-6661
dmsith@gmavt.com

/s/ Richard T. Cassidy
Richard T. Cassidy, Esq.,
Hoff Curtis, P.C.
100 Main St,
Burlington, VT 05401
Tel:  (802) 316-4962
rcassidy@hoffcurtis.com

Emily J. Joselson, Esq.
Lisa B. Shelkrot, Esq.
Langrock Sperry & Wool, LLP
210 College St.
P.O. Box 721
Burlington, VT 05402
Tel:  (802) 864-0217
ejoselson@langrock.com
lshelkrot@langrock.com

*Counsel for the non-DFA/DMS Subclass*

Respectfully submitted,

/s/ Kit A. Pierson
Kit A. Pierson, Esq.
Benjamin D. Brown, Esq.
Brent W. Johnson, Esq.
Emmy L. Levens, Esq.
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave., N.W.
Ste. 500, West Tower
Washington, DC 20005
Tel:  (202) 408-4600
kpierson@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
elevens@cohenmilstein.com

David A. Balto, Esq.
The Law Offices of David A. Balto
1350 I St,, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
david.balto@yahoo.com

Andrew D. Manitsky, Esq.
Lynn, Lynn, Blackman & Manitsky, P.C.,
76 St. Paul St., Suite 400
Burlington, VT 05402
Tel:  (802) 860-1500
amanitsky@lynnlawvt.com

*Counsel for the DFA/DMS Subclass*