# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **ALICE H. ALLEN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Action No. 5:09-CV-00230-cr** |
| ) | |
| **DAIRY FARMERS OF AMERICA, INC., and** ) | |
| **DAIRY MARKETING SERVICES, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

### SECOND AMENDED SETTLEMENT AGREEMENT

This Second Amended Settlement Agreement ("Agreement") is made and entered into as of this ~~1st~~___ day of ~~July, 2014~~_____ by and between Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC (collectively, "Settling Defendants" as defined in Paragraph 1.21~~, "Settling Defendants"~~)) and the Plaintiff Subclasses (hereinafter "Plaintiff Subclasses"~~),"~~ as defined in Paragraph 1. 14), through Subclass Counsel.

WHEREAS, the Plaintiff Subclasses are prosecuting the above-captioned action on their own behalf and on behalf of their respective Subclasses against the Settling Defendants;

WHEREAS, the Plaintiff Subclasses have alleged in their Revised Consolidated Amended Class Action Complaint, Court Dkt. No. ~~complaints and amended complaints (collectively, and with any other pleading filed in this matter or any consolidated matter, the "Complaint")~~117 (hereinafter "Complaint"), that the Settling Defendants during the Class Period (defined below) engaged in certain conduct in violation of, among other things, the Sherman Act, 15 U.S.C. §§ 1 and 2, which caused the Plaintiff Subclasses to incur damages as a result of such conduct, for which the Plaintiff Subclasses seek an award of money damages and injunctive

1

relief;

WHEREAS, the Settling Defendants deny each and every one of the Plaintiff Subclasses' allegations of unlawful conduct, have not conceded or admitted any liability, and have asserted a number of defenses to Plaintiff Subclasses' claims;

WHEREAS, Subclass Counsel have conducted an investigation into the facts and the law regarding the Complaint and have concluded, after carefully considering the facts and circumstances of the Complaint, the risks associated with continued litigation, and the applicable law, that a settlement with the Settling Defendants according to the terms and conditions set forth below (the "Settlement") is in the best interest of the Plaintiff Subclasses;

WHEREAS, the Settling Defendants, despite their belief that they are not liable for the claims asserted and that they have meritorious defenses to the claims alleged, have nevertheless concluded that they will enter into this Agreement solely to avoid the further expense, inconvenience, and burden of protracted litigation, and the distraction and diversion of its personnel and resources, and thereby to put to rest this controversy, and to avoid the risks inherent in uncertain, complex litigation;

WHEREAS, Subclass Counsel on behalf of the Plaintiff Subclasses and the Settling Defendants agree that neither this Agreement nor the terms hereof shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Settling Defendants or of the truth of any of the claims or allegations in the Complaint;

WHEREAS, arms-length settlement negotiations have taken place between Subclass Counsel and counsel for the Settling Defendants;

WHEREAS, Subclass Counsel and Settling Defendants have each had the full

opportunity to examine the facts and circumstances surrounding their respective decisions to accept the terms of this Agreement and have not relied upon any representations (or the lack thereof) not set forth in this Agreement itself concerning the circumstances leading to this Agreement; and

WHEREAS, this Agreement, which is subject to the preliminary and final approval of the Court, sets forth all of the terms and conditions of the agreement between the Settling Defendants and Subclass Counsel on behalf of the Plaintiff Subclasses;

NOW, THEREFORE, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, it is agreed by and among the undersigned, on behalf of the Settling Defendants and on behalf of the Plaintiff Subclasses, that the Action (defined below) and all claims of the Plaintiff Subclasses against the Settling Defendants be settled, compromised, and dismissed on the merits and with prejudice, without costs as to the Plaintiff Subclasses, or the Settling Defendants, subject to the approval of the Court, on the following terms and conditions.

1. **Definitions**

1.1.1.1 "Actions" means the class action captioned as *Allen, et al. v. Dairy Farmers of America, et al.*, No. 5:09-cv-00230-cr (D. Vt.).

1.2.1.2 "Claims Administrator" means the entity selected by Class Counsel to administer the Settlement and, in particular, the claims process in this matter.

1.3.1.1 "Subclasses" means the DFA/DMS Subclass and the non DFA/DMS Subclass certified by the Court in its Memorandum Opinion and Order dated November 19, 2012 (Court Docket No. 435).

1.4. "Subclass Counsel" means the law firms of Baker Hostetler LLP, 1050

~~Connecticut Avenue, N.W., Suite 1100, Washington, D.C. 20036, as counsel for the non-DFA/DMS Subclass, and Cohen Milstein Sellers & Toll, PLLC, 1100 New York Ave., N.W., Suite 500, West Tower, Washington, D.C. 20005 and The Law Offices of David Balto, 1350 I Street N.W., Suite 850, Washington, D.C. 20005, as counsel for the DFA/DMS Subclass.~~

~~1.5.   "Subclass Member" means a Person who falls within a Subclass definition and has not exercised a right to be excluded from the DFA/DMS Subclass or non-DFA/DMS Subclass as of April 30, 2013 (the "Exclusion Dates").  "Subclass Member" also means a Person who falls within the Subclass definition and who exercised a right to be excluded from his or her Subclass as of the Exclusion Dates but is permitted by Order of the Court to opt back into a Subclass. "Plaintiff Subclasses" include all of the Subclass Members.~~

~~1.6.~~1.3 "Class Period" means the period from January 1, 2002 through the present.

1.4     "Conduct Period" shall mean the period of time beginning thirty (30) days after final approval of the settlement by the Court and extending for four (4) years from that date.

~~1.7.~~1.5 "Court" means the United States District Court for the District of Vermont.

~~1.8.~~1.6 "Distribution Plan" shall have the meaning set forth in Paragraph 8.4 hereto.

~~1.9.~~1.7 "Effective Date" means the earliest date on which all of the events and conditions specified in Paragraph 5.1 herein have occurred or have been met.

~~1.10.~~1.8      "Fairness Hearing" ~~shall have~~means the ~~meaning set forth~~hearing described in Paragraph 2.1 ~~hereto.~~(d).

4

1.11.1.9 "FSA" refers to a full-supply agreement and means an agreement to assume the rights and/or responsibility for supplying all of a buyer's requirements for raw Grade A milk at a buyer's processing plant.

1.12.1.10 "Judgment" means final order of judgment, dismissal, and approval of the Settlement.

1.11 "Subclass Representatives" means the named Plaintiffs Alice H. "Market Administrator" means the United States Department of Agriculture's administrator for Federal Milk Marketing Order 1.

1.12 NEAC means Defendant Dairy Farmer of America's Northeast Area Council.

1.13. Allen and Laurence E. Allen doing business as Al lens Farm, Garret Sitts and Ralph Sitts, Jonathan and Claudia Haar, and Richard Swantak, and any other plaintiffs designated by the Court as Subclass Representatives, individually and on behalf of a Plaintiff Subclass.

1.14.1.13 "Person" means an individual or an entity.

1.14 "Plaintiff Subclasses" means all of the Members of the Subclasses.

1.15.1.15 "Preliminary Approval Order" means an order to be entered by the Court preliminarily approving the Settlement.

1.16.1.16 "Released Claims" means all claims that were asserted or that could have been asserted in the Complaint as to the Released Parties, as defined in Paragraph 1.18 below. Released Claims includes any and all claims regardless of their nature from January 1, 1994 through and including the Effective Date arising out of, associated with, or related to the facts or circumstances alleged in the Complaint, including but not limited to Settling Defendants' sale and marketing

of raw Grade A milk, or their purchase of, or failure or refusal to purchase, raw Grade A milk that was produced in and pooled on Federal Milk Marketing Order 1 ("Order 1"). Released Claims includes all claims that were asserted or that could have been asserted arising out of or relating in any way to any conduct alleged in the Complaint from January 1, 1998 through the date that this Amended Settlement is submitted to the Court for Final Approval, that were asserted or that could have been asserted arising out of the conduct alleged in the Complaint as to the Released Parties, as defined in Paragraph 1.17 below, regardless of whether those claims arise from common law theories of tort or contract, including without limitation breach of contract and breach of fiduciary duty, or theories under federal, state, or other statute, law, rule, or regulation.

1.17.1.17   "Released Parties" means the Settling Defendants, their predecessors, successors, parents, subsidiaries and affiliates, representatives of any kind, insurers, all entities in which they have an ownership interest, shareholders, partners, members, owners of any kind, attorneys, and any and all past and present officers, directors, employees, managing agents, and controlling persons of such entities, including any past or present officers of these entities originally named as a Defendant, but not any other Defendant.

1.18.1.18   "Releasing Parties" means, individually and collectively, the Plaintiff Subclasses and all Subclass Members on behalf of themselves and any Person claiming by or through them as an heir, administrator, devisee, predecessor, successor, parent, subsidiary, representative of any kind, all entities in which they have an ownership interest, shareholder, partner, director, member, owner of any

kind, affiliate, assignee, agent, employee, contractor, attorney, or insurer. Releasing Parties shall not include any Person who is excluded from the Subclasses pursuant to Paragraph 9.1.

1.19. 1.19      "Settlement Amount" shall have the meaning set forth in Paragraph 7.1 hereto.

1.20. 1.20      "Settlement Fund" shall have the meaning set forth in Paragraph 7.1 hereto.

1.21. 1.21      "Settling Defendants" means Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC, or their predecessors, successors, parents, subsidiaries and affiliates, representatives of any kind, heirs, administrators and devisees, all entities in which they have an ownership interest, shareholders, partners, members, owners of any kindsubsidiaries, members, owners, attorneys, and any and all past and present officers, directors, employees, managing agents, and controlling persons of such entities, but not any other Defendant.

1.22      "Term of this Agreement" shall meanSubclasses" means the DFA/DMS Subclass and the non-DFA/DMS Subclass certified by the Court in its Memorandum Opinion and Order dated November 19, 2012 (Court Dkt. No. 435).

1.23      period"Subclass Counsel" means the law firms of Baker & Hostetler LLP, 1050 Connecticut Avenue, N.W., Suite 1100, Washington, D.C. 20036, Langrock Sperry & Wool, LLP, 210 College Street, P.O. Box 721, Burlington, VT 05402, Hoff Curtis, P.C., 100 Main Street, Burlington, VT 05401, and Daniel Smith, Esq., 16 State Street, Montpelier, VT 05601, as counsel for the non-DFA/DMS Subclass; and Cohen Milstein Sellers & Toll, PLLC, 1100 New York Avenue,

N.W., Suite 500, West Tower, Washington, D.C. 20005, Lynn, Lynn, Blackman & Manitsky, P.C., 76 St. Paul Street, Suite 400, Burlington, VT 05401, and The Law Offices of David Balto, 1350 I Street N.W., Suite 850, Washington, D.C. 20005, as counsel for the DFA/DMS Subclass.

1.24    "Subclass Member" means a Person who falls within a Subclass definition and has not exercised a right to be excluded from the EffectiveDFA/DMS Subclass or non-DFA/DMS Subclass as of April 30, 2013 (the "Exclusion Date, as defined in ") or has submitted a request for exclusion pursuant to Paragraph 9.1.  "Subclass Member" also means a Person who falls within the Subclass definition and who exercised a right to be excluded from his or her Subclass as of the Exclusion Date but is permitted by Order of the Court to opt back into a Subclass as provided in Paragraph 9.2.

1.22.1.25    "Subclass Representatives" means the named Plaintiffs and Court-appointed Subclass Representatives, namely Alice H. Allen and Laurence E. 9 above, through and including December 31, 2016Allen doing business as Al-lens Farm, Stephen H. Taylor, Darrel J. Aubertine, Garret Sitts and Ralph Sitts, Jonathan and Claudia Haar, Peter Southway, Marilyn Southway, Reynard Hunt, Robert Fulper, and Richard Swantak, and any other Persons designated by the Court, as Subclass Representatives, individually and on behalf of a Plaintiff Subclasses.

**2.    Motion for Preliminary Approval**

2.1.2.1 Within one week afterFollowing the complete execution of this Agreement, but not later than January 15, 2016, Subclass Counsel shall file with the Court a

motion, which shall not be opposed by the Settling Defendants, requesting entry of a Preliminary Approval Order, providing for, *inter alia*:

(a).(a)  Preliminary approval of this Agreement as fair, reasonable, and adequate and in the best interests of the Class, considering all relevant risks and factors of litigation;

(b).(b)  Approval of the form and manner of notice described in Section 3 ~~hereto~~;

(c).(c)  Appointment of a Claims Administrator;

(d).(d)  A determination that ~~no~~an additional ~~opt out period~~opportunity to request exclusion from the Subclasses is ~~warranted or required by~~permitted pursuant to Rule 23(e)(4) of the Federal Rules of Civil Procedure;

(e).(e)  The scheduling of a hearing (the "Fairness Hearing") to consider (i) whether this Agreement should be approved as fair, reasonable, and adequate to, and in the best interests of, the Subclasses, and whether Judgment should be entered dismissing the Released Claims on the merits and with prejudice; (ii) whether to approve any application by Subclass Counsel for an award of attorneys' fees and payment of costs and expenses; and (iii) whether to approve any application for payment of incentive awards to the Subclass Representatives;

(f).(f)  The date by which any Subclass Member may serve written objections to this Agreement or to any application by Subclass Counsel for attorneys' fees and expenses, which date shall, subject to the Court's approval, be fourteen (14) days prior to the Fairness Hearing;

(g).(g) A stay of all further pretrial and trial proceedings against the Settling Defendants; and

(h).(h) An injunction against the initiation, commencement, or prosecution of any Released Claim by any of the Releasing Parties.

2.2. Upon the filing of the motion requesting entry of a Preliminary Approval Order, the Settling Defendants will not participate in further briefing in connection with the approval of this Agreement or as otherwise specified herein.

## 3.   Notice to Subclass Members

3.1.3.1 The Plaintiff Subclasses shall develop, after consultation with the Settling Defendants and the Claims Administrator, a proposed plan by which to notify the Subclasses of the Settlement.  The proposed notice program shall include a proposed form of notice, which shall be agreed upon by the Settling Defendants and Plaintiff Subclasses, and which shall be subject to Court approval.  Plaintiff Subclasses shall submit their proposed notice program to the Court for approval at the same time Plaintiff Subclasses file their motion requesting entry of a Preliminary Approval Order as described above in Paragraph 2.1.

3.2.3.2 In accordance with the requirements of Rule 23 of the Federal Rules of Civil Procedure and Due Process, the notice program shall identify and individually notify, to the extent practicable, each member of the Subclasses reasonably ascertainable from records producedprovided by the Settling DefendantsMarket Administrator for Order 1 or otherwise reasonably available.

3.3   In order to provide notice of the Settlement to those individuals who may not be capable of being identified for purposes of providing individual notice,

publication notice, to the extent recommended by the Claims Administrator and ordered by the Court shall also be provided.

**4.      Fairness Hearing**

4.1.4.1 At the Fairness Hearing, Plaintiff Subclasses shall seek entry of a Judgment, which shall not be opposed by the Settling Defendants, *inter alia*:

(a).(a)  Finally approving this Agreement and its terms as being fair, reasonable, and adequate, and in the best interest of the Subclasses, within the meaning of Rule 23 of the Federal rules of Civil Procedure, and directing its consummation according to its terms;

(b).(b)  Determining that the notices to the Subclasses constituted, under the circumstances, the most effective and practicable notice of this Agreement and the Fairness Hearing, and constituted due and sufficient notice for all other purposes to all Persons entitled to receive notice;

(c).(c)  Ordering dismissal of the Action with prejudice and without payment of fees or costs by the Settling Defendants;

(d).(d)  Permanently barring and enjoining institution, commencement, or prosecution, by any of the Releasing Parties, of any action asserting any Released Claim against the Released Parties, in any local, state, federal, or other court or tribunal of any nation, or in any agency or other authority or arbitral or other forum wherever located;

(e).(e)  Providing that any Subclass Member who fails to object in the manner prescribed in this Agreement shall be deemed to have waived any

objections to the Settlement or this Agreement and will forever be barred from making any such objections to this Agreement;

(f)     Providing that any Person who timely submits a Request for Exclusion shall be excluded from the Subclasses, shall have no rights with respect to this Agreement, and shall receive no payments as provided in this Agreement;

(g)     Providing that any Person who previously requested exclusion from the Subclasses but who timely submits a Request for Reinstatement shall be reinstated to the Subclasses, as if they had not been excluded, for purpose of participating in this Settlement;

(f).(h) Retaining exclusive jurisdiction over this Agreement, including the administration and consummation of this Agreement; and

(g).(i) Determining pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no just reason for delay and directing that the judgment of dismissal shall be final and entered forthwith.

4.2.4.2 Any Subclass Member who objects to the Settlement may appear at the Fairness Hearing in person or through counsel, at its own expense, to present any evidence or argument with respect to the Settlement, to the extent permitted by the Court. However, no such Subclass Member shall be heard, and no papers, briefs, pleadings, or other documents shall be received and considered by the Court, unless such Subclass Member properly submits a written objection that includes (a) notice of intention to appear, (b) proof of membership in thea Subclass, and (c) the specific grounds for the objection.  The Plaintiff Subclasses will request that

the Court order that any written objection must be filed with the Court no later than fourteen (14) days prior to the date set for the Fairness Hearing, and mailed to Subclass Counsel and counsel for the Settling Defendants, received and postmarked (or mailed by overnight delivery) no later than fourteen (14) days prior to the date of the Fairness Hearing.  Any Subclass Member who fails to object in the manner prescribed herein shall be deemed to have waived any objections to the Settlement and this Agreement and will forever be barred from making any such objections to the Settlement or this Agreement.

4.3.   Any Person who timely requested exclusion from the Subclass, and who has not in his individual capacity sued in a separate lawsuit one or more of the Settling Defendants for the same conduct alleged in the Actions, may apply to the Court to be reinstated to the Subclass provided such application sets forth the reasons for seeking reinstatement and is received by the Claims Administrator at least fourteen (14) days prior to the date of the Fairness Hearing.

4.4.4.3 If this Agreement is finally approved by the Court in its current form, or in a form not materially different therefrom, the Plaintiff Subclasses and Settling Defendants agree not to take any appeal from entry of judgment.   Final approvalApproval of this Agreement shall not be contingent upon the Court making any particular award of attorney's fees, costs or expenses or any incentive award to Subclass Representatives, and any order of the Court making or relating to such award shall not affect the approval or finality of this Agreement or the validity, effectiveness or enforceability of the releases set forth herein.

**5.      Effective Date of Agreement**

5.1.5.1 This Agreement shall become final and effective on the earliest date on which all of the following events and conditions have occurred or have been met:

(a).(a)  No party has timely availed itself of any right to terminate this Agreement pursuant to Paragraph 11.1 herein;

(b).(b)  The Court has entered the Judgment, following notice to the Subclasses and the Fairness Hearing, finally approving this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and dismissing the Actions with prejudice as to all Subclass Members, and without costs; and

(c).(c)  The time for appeal or to seek permission to appeal from the Judgment has expired or, if appealed, approval of this Agreement and the Judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

5.2     This Section shall not limit or otherwise apply to any obligations set out in Section 7.2.

6.    **Release and Covenant Not To Sue**

6.1.6.1 Upon the Effective Date, and in consideration of the Settlement Consideration specified in Section 7 herein and for other good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, each of the Releasing Parties shall be deemed to have, and by operation of the Judgment shall have,

fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, shall have covenanted not to sue any of the Released Parties with respect to all Released Claims, and shall be permanently barred and enjoined from instituting, commencing, prosecuting or asserting any Released Claims against any of the Released Parties.

6.2.6.2 Upon the Effective Date, each member of the Plaintiff Subclassesshall Subclasses shall have expressly waived, and each of the Releasing Parties shall be deemed to have waived, and by operation of the Judgment shall have waived, any and all provisions, rights, and operation of the Judgment shall have waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or any principle of common law or foreign law, that is similar, comparable, or equivalent in effect to California Civil Code § 1542 and § 20-7-11 of the South Dakota Codified Laws or that would otherwise act to limit the effectiveness or scope of the releases.  Plaintiff Subclasses and the Releasing Parties expressly acknowledge that they may hereafter discover facts in addition to or different from those that any of them or their counsel now knows or believes to be true with respect to the subject matter of the Released Claims or otherwise, but upon the Effective Date each Plaintiff shall expressly have, and, upon the Effective Date, each Releasing Party shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non contingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into

existence in the future, including, but not limited to, conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts as set forth in Paragraph 1.16 above, that could have been asserted with respect to the subject matter of the Released Claims.  Plaintiff Subclasses acknowledge, and the Releasing Parties shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement of which this release is a part.

7.    **Settlement Consideration**

**Monetary Payment**

7.1. 7.1 .  Settling Defendants will pay have paid an aggregate sum of fifty million United States dollars ($50,000,000) (the "Settlement Amount") into an escrow account (the "Settlement Fund"), with fifty per cent (50%) allocated to DFA, and fifty percent (50%) allocated to DMS.  The Settlement Amount shall be paid in two installments, with the first installment of twenty five million United States dollars ($25,000,000) paid into the Settlement Fund within 15 days of entry of the Preliminary Approval Order, and the second installment of twenty five million United States dollars ($25,000,000) paid into the Settlement Fund prior to April 15, 2015. percent (50%) allocated to DFA, and fifty percent (50%) allocated to DMS.  JPMorgan Chase Bank, National Association shall serve as the escrow agent (unless the Plaintiff Subclasses and Defendants agree upon another escrow agent), and the escrow account shall be established and administered in accordance with Section 8 hereof.

7.2.(a)  The monetary relief described in Paragraph 7.1 shall be the sole monetary relief afforded to the Plaintiff Subclasses.  Settling Defendants will have no responsibility to make any payment other than the payments described in Paragraph 7.1. or payments for any costs referenced in Paragraph 7.2(p).

7.3.    Conduct elements.

7.2    Settling Defendants, during the Term of this Agreement, **Conduct Elements**. Unless otherwise provided, the conduct elements in Section 7.2 shall commence thirty (30) days after final approval of the settlement by the Court and extend for four (4) years from that date ("Conduct Period").  Any conduct element in the following Subparagraphs as to which no time period is specified shall continue to be enforceable against Settling Defendants without time limitation.

(a)    Supply Agreements.

(i)    During the Conduct Period, DFA/DMS will not enter into any new FSAs for the supply or sale of raw Grade A milk to customers in Order 1.; provided, however, that Settling Defendants retain the right to it may renew existing FSAs (as set forth inthe agreements identified on the attached Schedule A), for the supply or sale of raw Grade A milk in Order 1 subject to the provisions; and further provided that it may enter into a new FSAs for the sale of raw Grade A milk to customers in Order 1 in any situation in which the customer is the operator of a newly constructed plant or the

17

customer is the new owner or operator of an existing plant and the customer requires a FSA in order to construct or operate that plant.

(a).(ii)  The schedule of FSAs appended to this Agreement as Schedule A shall include any expiration and renewal dates of each such agreement.  If any new FSAs are reached during the Conduct Period per the proviso of the forgoing Section applicable to new plants or new plant owners, then an Amended Schedule A with any expiration or renewal dates of that agreement shall be provided to the Farmer Ombudsperson, whose duties are described further in Paragraph 7.2(d) below, to be posted publicly on the website maintained in connection with this Settlement.

(b).(iii) Settling Defendants During the Conduct Period, DFA and DMS agree that, during the Term of this Agreement, any new agreements for the supply of raw Grade A milk to customers in Order 1, and the renewal of any existing agreement for the supply or sale of raw Grade A milk to customers in Order 1, or any renewal of existing agreements for the supply or sale of raw Grade A milk customers in Order 1, shall shall be presented, reviewed, and approved by the DFA Board of Directors, prior to DFA entering into or renewing any such an agreement, or presented, reviewed, and approved byto the DMS Board of Directors, prior to DMS entering into or renewing any such an agreement.

(c).(iv) Settling Defendants agree that they will, upon written request by any of their respective members who are located in Order 1, disclose to that member a summary of the terms of any DFA or DMS agreement for the supply or sale of raw Grade A milk customers in Order 1.  This disclosure shall state whether the agreement is a ~~full supply agreement~~FSA, the duration of the agreement, and any other material provision, provided its disclosure is permitted by the terms of said agreement.

(d).(b) Marketing Agreements.   Settling Defendants agree that any cooperative member, affiliate, or associate of DFA or DMS in Order 1 may, during the ~~Term of this Agreement~~Conduct Period, terminate its relationship with DFA or DMS upon no more than ninety (90) days written notice without penalty, and Settling Defendants shall not seek any remedies in law or equity based on the timing of any such termination.

(c)        Termination of Individual Producer Milk Marketing Arrangements.

(i)        During the Conduct Period, in the event DFA or DMS determines not to renew any milk marketing arrangement for a dairy farmer who was a member of the DFA/DMS Subclass solely because of lack of demand for the farmer's milk, DFA and/or DMS, whichever is involved, will provide the farmer notice of the substance of this Subparagraph along with any notice of the intended non-renewal 30 days before the end of the term of the farmer's marketing arrangement and, upon the farmer's request,

19

continue to market that farmer's milk for a grace period of up to six (6) months beyond the end of the arrangement, provided, however, that this provision shall not apply in any case of the termination of a farmer's milk marketing arrangement for cause.

(ii)     In the case of a proposed termination for cause of any dairy farmer who was a member of the DFA/DMS Subclass, DFA or DMS will provide the farmer notice of the substance of this Subparagraph along with at least 30 days' written notice to the farm detailing the reasons for the proposed termination and providing a reasonable opportunity to cure before the termination becomes effective.  In the event the farmer disputes the basis for the termination for cause, such dispute shall be brought to the attention of the Northeast Area Council ("NEAC") or the DMS Board of Directors, which shall review whether the termination is justified and also, at the farmer's discretion, to the attention of the Farmer Ombudsperson, whose duties are described further in Paragraph 7.2(d) below, who shall facilitate and attempt to mediate the dispute on the farmer's behalf.

(d)     Establishment of Two Farmer Representative Positions:  Advisory Council Member and Farmer Ombudsperson.

(i)     Term.  The term of the Advisory Council Member shall begin upon his or her appointment and shall extend for four years from the beginning of the Conduct Period, as defined above.  The term of

the Farmer Ombudsperson shall begin upon his or her appointment and extend for five years from the beginning of the Conduct Period, as defined above.

(ii)     Responsibilities.   The Advisory Council Member and the Farmer Ombudsperson shall have the following responsibilities:

(1)     *Advisory Council Member*.  The Advisory Council Member shall advocate for the enhancement of producer pay prices and improvement of the net income (margin) of dairy farmers who produce and pool milk in Order 1 and who are members of DFA or who otherwise market their milk through DMS, and for the enhancement of the equity of DFA member dairy farmers who produce and pool milk in Order 1.

(2)     *Farmer Ombudsperson.*   The Famer Ombudsperson is authorized to investigate and facilitate the resolution of individual complaints by dairy farmers who produce and pool milk in Order 1 and who are members of DFA or who otherwise market their milk through DMS, regarding the activities of DFA/DMS that affect the operations of their individual farms.  Such complaints may include, but are not limited to, matters relating to proposed termination, elections, voting procedures, and milk testing.

(iii)    Appointment.   The Advisory Council Member and the Farmer Ombudsperson shall be selected by Subclass Counsel after consultation with the Subclass Representatives in this Action and with the concurrence of the Defendants, provided, however, that in no case shall any individual selected for either of these positions have been either (i) a class representative of either of the Subclasses in this Action, or own, operate or share a farm with such a class representative, or (ii) an attorney from any of the law firms that served as counsel for either of the Subclasses.   The appointments shall be made not later than 120 days after Final Approval of the Settlement by the Court.   In the event the Settling Parties cannot agree on the individuals to fill either or both of these positions, Settling Defendants and Subclass Counsel after consultation with the Subclass Representatives each will propose a candidate to the Court, and the Court will select the Advisory Council Member or the Farmer Ombudsperson, as required.

(iv)    In the event an Advisory Council Member or a Farmer Ombudsperson originally appointed is unable to serve in that position through his or her term as described above, then a successor shall be appointed by the recommendation of the majority of the class representatives of the two Subclasses in this Action and with the concurrence of the Defendants.   The appointments shall be made not later than 60 days after the

Advisory Council Member or Farmer Ombudsperson ceases to fill their position.  In the event the Settling Parties cannot agree on a successor, each Party will propose a candidate to the Court, and the Court will select a successor who will serve the remainder the term.

(v)     Statement of Goals.  In the performance of their duties, the Advisory Council Member and the Farmer Ombudsperson shall be guided by the following respective Statement of Goals:

(1)     *Advisory Council Member.* To improve producer pay prices and the net income (margin) of dairy farmers who produce and pool milk in Order 1 and who are members of DFA or otherwise market their milk through DMS, and for the enhancement of the equity of DFA member dairy farmers who produce and pool milk in Order 1, in both the near term and the long term, through the marketing of the raw milk of DFA's members and DMS shippers in Order 1, and the prudent investment of a portion of the proceeds from raw milk marketing in a manner that advances the interests of those DFA members and DMS shippers.

(2)     *Farmer Ombudsperson.*  To promote fairness for dairy farmers who produce and pool milk in Order 1 and who are members of DFA or otherwise market their milk through DMS, consistent with the needs and interests of all dairy

farmers who produce and pool milk in Order 1 and who are members of DFA or otherwise market their milk through DMS, and with protecting the privacy of those dairy farmers who seek the Farmer Ombudsperson's assistance

(3) For both the Advisory Council Member and the Farmer Ombudsman, to recognize the cooperative organization of DFA and DMS, to pursue their duties in good faith and in a collaborative manner intended to improve the effective operation of DFA and DMS on behalf all DFA Members and DMS shippers who produce and pool milk in Order 1, and to protect the confidentiality of the information they have gained through participation in NEAC meetings, DFA member meetings in Order 1, or otherwise in the course of performing their duties.

(vi) Rights and Duties of Advisory Council Member:

(1) Access to books and records; financial review authority. The Advisory Council Member shall have access to all books and financial records of or used by the NEAC, and DMS. In addition, the Advisory Council Member may on one occasion during the course of his or her term, commission a third-party review of DFA and DMS individual company financial statements and consolidation accounting, provided, however, that any such review shall

not include a new or additional audit of DFA's or DMS's financial books and records, and further provided that the expert or consultant retained to perform such review shall be selected by the Advisory Council Member subject to the provisions of Paragraph 7.2(d)(vi)(5), in consultation with Subclass counsel and with the concurrence of Defendants. The Advisory Council Member shall be bound by the confidentiality provisions of Section (i) below with regard to the exercise of this authority and all other duties under this Subsection.

(2) NEAC Meeting attendance and participation. The Advisory Council Member shall be a non-voting, advisory member of the NEAC and in that capacity shall have the right to attend and participate in all NEAC meetings, receive all information provided to other NEAC members, request additional information as appropriate, and make suggestions and proposals, consistent with the duties and responsibilities established under this Settlement Agreement. The Advisory Council Member's reports prepared under Paragraph 7.2(d)(viii) below shall be included on the NEAC meeting agenda semi-annually.

(3) Attendance and participation at DFA Member meetings and DFA Annual Meeting. The Advisory Council Member

shall also have the right to attend and be introduced at DFA member meetings in Order 1, as well as the DFA Annual Meeting, and may, if the Advisory Council Member so chooses, solicit input from individual members at these meetings.

(4)     Designated management contact.   DFA/DMS shall designate an individual from the management team responsible for DFA's and DMS's activities in Order 1 to serve as the designated point of contact for the Advisory Council Member.   This designated contact person shall meet with the Advisory Council Member at least quarterly.

(5)     Consultation with outside experts.   The Advisory Council Member may, from time to time, as the need arises, confer with outside experts and consultants to assist in the performance of his or her duties, including but not limited to the review of the financial or other records to which the Advisory Council Member has access pursuant to Paragraph 7.2(d)(vi)(1); provided that any such consultants and experts who are to review financial or other records agree in advance in writing that they have no conflicts of interest with respect to any of the Parties to this Action; provided further that all experts and consultants retained under this Subsection shall agree in writing that they will

be bound by the confidentiality provisions established in Subsection (i) below.

(vii)    Rights and Duties of the *Farmer Ombudsperson:*

(1)    Access to records and documents.  The Farmer Ombudsperson shall have access to all relevant records as required for investigation and mediation in an effort to resolve any received complaint.  The Farmer Ombudsperson may take all reasonable actions to advocate for the farmer and facilitate or mediate the dispute at his discretion.

(2)    Designated point of contact.  DFA/DMS shall designate an individual from the management team responsible for DFA's and DMS's activities in Order 1 to serve as the designated point of contact for the Farmer Ombudsperson. This designated contact person shall meet with the Farmer Ombudsperson at least quarterly.

(3)    Attendance and participation at NEAC and DFA Member Meetings.  The Farmer Ombudsperson shall have the right to attend the NEAC meetings semi-annually and shall be on the agenda at least annually.  The Farmer Ombudsperson shall also have the right to attend and be introduced at DFA member meetings in Order 1, and may, if the Farmer

Ombudsperson so chooses, solicit input from individual members at these meetings.

(viii)   Reports.   The Advisory Council Member and the Farmer Ombudsperson shall individually report on their activities to dairy farmers who produce and pool milk in Order 1 and who are DFA members or who otherwise market their milk through DMS.  They shall report every six months throughout their term of service.  The reports shall be by a mailing accompanying producer milk checks, posted on the myDFA website or by some other similar mode of communication, at the discretion of the Advisory Council Member and the Farmer Ombudsperson.  The reports shall also be provided to the NEAC, DMS, and all appropriate DFA and DMS management personnel.  The Advisory Council Member may also recommend to DFA and/or DMS, as he or she deems appropriate, that such reports be provided to the auditing firm(s) for DFA and DMS.

(ix)   Compensation and Budget.

(1)   Advisory Council Member.

a.   Year 1.  Compensation will not exceed $150,000, at a per hour rate of up to $375 plus itemized expenses.  Consultancy fees and itemized expenses will not exceed $75,000, and shall include

reasonable fees and expenses incurred in establishing the position.

b.      Years 2-4.  Compensation will not to exceed $75,000, annually, at a per hour rate of up to $375 plus itemized expenses.   Consultancy fees and itemized expenses will not exceed $25,000.

(2)      *Farmer Ombudsperson.* Years 1-5. Compensation will not exceed $40,000 annually, at a per hour rate of up to $100, plus itemized expenses not to exceed $10,000, and shall include reasonable fees and expenses incurred in establishing the position.

(3)      Disbursement.  Upon the submittal of a monthly time and expense report that shows (1) the number of hours spent by an Advisory Council Member or the Farmer Ombudsperson on his duties and responsibilities, (2) a brief narrative description of the same, and (3) the total amount due at the rate above for the total of the hours spent, DFA shall pay the total amount due within two weeks of the submission of the monthly time and expense report.

(x)      Confidentiality.   The Advisory Council Member, the Farmer Ombudsperson, and any consultants and experts they retain shall be bound by the same confidentiality provisions as apply to all members of the NEAC and shall agree in writing that they will be

bound by the terms set forth in Schedule C.   The Farmer Ombudsperson shall ensure to protect the privacy of individual farmers who have brought issues to his or her attention.

(xi)   Notice of Farmer Representatives to Producers.  Not later than 30 days after the appointment of the Advisory Council Member and the Farmer Ombudsperson, DFA and DMS shall provide notice of their appointments to dairy farmers who produce and pool milk in Order 1 and who are DFA members or who otherwise market their milk through DMS, and advise them generally of the duties and responsibilities of these individuals as detailed above.  The manner of notice shall be by a mailing accompanying milk checks.  In the case of the Farmer Ombudsperson, the notice shall include the address, telephone number, and email address of the Farmer Ombudsperson and shall briefly note that the Farmer Ombudsperson is available to advocate for individual farmers and investigate and mediate complaints with DFA and DMS.  Notice shall be provided in the same manner, every six months from the date of appointment of the Farmer Representatives.

(e)   Relationship to Dairy One Cooperative.  For a period of time extending ten years from the beginning of the Conduct Period, as defined above, DFA/DMS shall not acquire a controlling ownership interest in Dairy One or permit farmers who are members of DFA to hold a majority of the Board seats on the Board of Dairy One, and DFA and Dairy One shall

engage only in arms'-length business transactions; provided, however, that nothing in this provision shall prohibit DFA/DMS from providing support from time to time as they deem appropriate to facilitate Dairy One continuing to provide its testing services to DFA members, farmers whose milk is marketed by DMS, and other dairy farmers in the Northeast who choose to use Dairy One's laboratory, as well as the information services Dairy One provides.

(f)     Milk Check Testing.  For a period of time extending five years from the beginning of the Conduct Period, as defined above, any dairy farmer in Order 1 whose milk is tested at the Dairy One laboratory for purposes of determining any portion of that farmer's milk check and who disputes the accuracy of the test results for his or her milk may require that a split sample procedure be initiated according to the specified protocol for such sampling (copy attached as Schedule B).  According to the protocol, the dairy farmer may observe the process of collecting and sealing the samples, and that sample will be tested at two independent, certified testing laboratories in addition to Dairy One.  The farmer may select the two independent laboratories located within Order 1 that are certified by the Market Administrator.

(i)     The results from those split samples will be provided to both the dairy farmer and to Dairy One.  If the results are confirmed within a reasonable level of statistical tolerance, as per the standards established by the Market Administrator, then the test values used

for pay check determination on that farm shall stand as originally reported. If the split samples fail to confirm the original test results, within a reasonable level of statistical tolerance, then appropriate adjustments shall be made in any milk check determination that was based upon the original results, and information about the differing results between the Dairy One lab and the other labs testing the split samples shall be sent to the personnel at the Market Administrator's office responsible for the oversight and certification of testing laboratories.

(ii)     Any farmer may invoke this split sampling procedure up to three times per year at no cost to the farmer. If the farmer's test results are confirmed by the split sample procedure on all three occasions, within a reasonable level of statistical tolerance, then any further split sampling that the farmer requests will be at the expense of the farmer, which expense shall be deducted from the farm's next milk check; provided that, should a subsequent test disclose a discrepancy, the farmer shall not bear the cost of such test.

(iii)    Any issues relating to the accuracy of testing for purposes of milk check determinations, including with the split sampling procedure described herein, may, by the election of either the farmer or of DFA or DMS, be brought to attention of the Farmer Ombudsperson, who shall attempt to facilitate or mediate a mutually agreeable solution on the farmer's behalf and who may, if

the Farmer Ombudsperson determines that good cause exists, order one or more additional split samples be taken at no expense to the farmer.   In response to any such request from the Farmer Ombudsperson, DFA/DMS shall request any relevant records from Dairy One or other laboratories.

(iv)     DFA shall annually provide the Farmer Ombudsperson with a report that (i) identifies any discrepancies found between test results obtained at the Dairy One laboratory and the test results obtained from any other certified laboratories, pursuant to the verification sampling program conducted by the Order 1 Market Administrator, or (ii) states that no such discrepancies have been reported in the past twelve months.

(g)     Adulterated Milk.  DFA and DMS are required to undertake the provisions of this section for a period of time extending five (5) years from the beginning of the Conduct Period, as defined above.  Testing to determine whether milk is adulterated, such as by antibiotics, high bacteria count or otherwise, and to determine which farm's milk caused the adulteration, shall continue to occur in the first instance in a manner consistent with all applicable state and federal regulations that govern such testing, and at a certified laboratory at the processing plant receiving the milk, in order for the plant to determine whether to accept or reject milk.  If milk is found to be adulterated per such testing, DFA/DMS shall within three (3) hours

notify the dairy farmer whose milk the receiving processing plant contends was the cause of milk being rejected by that plant.

(i)     Upon notification of the farmer, DFA/DMS shall take steps to promptly request that any remaining sample of the milk be maintained at the receiving plant and, if the farmer so requests, have the remaining sample sent to another laboratory certified to perform the test at issue for confirmation testing.  If the results of the original test are confirmed at the second laboratory, then the dairy farmer shall be responsible for covering the costs of the loss of the adulterated milk.  If the results of the original test are not confirmed, then the farmer shall not bear the liability for the costs of the loss of the adulterated milk.

(ii)     Any issues relating to the adulterated milk may, by the election of either the farmer or of DFA or DMS, be brought to attention to the Farmer Ombudsperson, who shall attempt to facilitate or mediate a mutually agreeable solution on the farmer's behalf.  In response to any such request from the Farmer Ombudsperson, DFA/DMS shall request any relevant records from processing plants, Dairy One, or other laboratories.

(h)     Block Voting.  In the event there is voting on any Federal Milk Marketing Order 1 amendment during Conduct Period, and DFA determines as a cooperative to vote its members as block, then DFA shall:

(i)      Provide an information statement to its members in Order 1 of the cooperative position that is to be block voted setting forth the rationale for such vote, and

(ii)      Provide individual ballots to all, with a statement that any member in Order 1who so desires may vote against the block if they wish and setting forth the procedures for doing so.

(e).(i)  Release of Information.  Settling Defendants agree not to oppose a request by Subclass Counsel to unseal and release materials submitted to the Court, including briefs and the documents that provided the source for supporting exhibits, filed with the Court in connection with Plaintiffs' motion for certification of subclasses (Court ~~Docket~~Dt. No. 388) and Defendants' motion for summary judgment (Court ~~Docket~~Dt. No. 479), to the extent the disclosure of such documents is not prohibited by Settling Defendants' obligations to third parties.

~~7.3(f).  DFA's Northeast Area Council ("NEAC") will undertake a careful review of members' milk checks, with respect to clarity, transparency, and any other matters, including an opportunity for members' input, in order to determine whether changes in the milk checks are warranted, and if the NEAC so recommends, such changes will be implemented.~~

(g).(j)  DFA Financial Information.   DFA financial reports are and will be prepared in accordance with generally accepted accounting principles as promulgated by the Financial Accounting Standards Board, and DFA further undertakes as follows.

(i).(i)   DFA will disclose the identity of members of the Board of Directors and of the Committees of the Board and the generally applicable per diem payment rate compensation for Board members.

(ii).(ii) DFA will post on its secure, members-only website, myDFA, an annual disclosure of all material related-party transactions, other than the sales or purchases of raw milk to or from affiliates, specifically broken out and identified per transaction (not aggregated), with the definition of "material" to be consistent with the SEC's Item 404 promulgated at 17 C.F.R. 229.404 (defining materiality as involving an amount of $120,000 or more).

(iii).(iii)        DFA Board members and senior executive management will continue to execute annual conflict of interest certifications, which shall be subject to review by the Audit Committee, with a report by the Audit Committee of any issues to the delegates at the Annual Meeting.

(iv).(iv)        DFA will disclose to delegates at DFA's annual meeting financial information which shall include –material related-party transactions as defined in Paragraph 7.3(i2(j)(ii), and DFA's financial results from its participation in joint ventures and off-balance sheet transactions, specifically broken out and identified per transaction (not aggregated), with the definition of "material"

to include any transaction involving more than $5 million, excluding the sales or purchases of raw milk to or from affiliates.

(v).(v) DFA auditors shall be selected from one of the nationally recognized accounting firms.

(vi).(vi)        DFA senior management and the Audit Committee of the DFA Board will affirmatively represent that they are responsible for the preparation, integrity and accuracy of DFA's Annual Financial Report.

(k)      (j.)    DFA'sNEAC Review.    In consultation with the Farmer Ombudsperson, the NEAC will undertake a careful review, including an opportunity for members' input, as to-:

(i)      members' milk checks, with respect to clarity, transparency, and any other matters, including an opportunity for members' input, in order to determine whether changes in the milk checks are warranted, and if the NEAC so recommends, such changes will be implemented; and

(ii)     whether changes are warranted in the election procedure by which Area Council members and delegates are chosen, including specifically whether the membership should be able to cast ballots by mail, in addition to casting votes in person at meetings, and if the NEAC so recommends, such changes will be implemented..,.

(h).(l) Monitoring Compliance.    Compliance with the Termsterms of this Settlement Agreement will be monitored by the Audit Committee of the

37

DFA Board, whose membership has a total of seven (7) members plus two (2) independent advisors with expertise in accounting, financial reporting and auditing matters.  Other than serving as advisors to the Audit Committee, the two (2) advisors are currently free of any other relationship with DFA.  The Audit Committee shall report its views to the delegates at DFA's annual meeting.

(i).(m) Retaliation.  Settling Defendants agree that they will not discriminate or retaliate, or cause discrimination or retaliation, of any kind whatsoever in response to (a) the participation or support of the Subclass Representatives or any other farmerSubclass Member in this Action, including the expression of views by any Subclass Representative or other Subclass Member in support of or opposition to any proposed resolution of the Complaint, or to the proposed continued pursuit of this litigation through trial, or to the opting out of either Subclass, or (b) any Subclass Member's decision to cease (or to consider ceasing) to market their milk with Settling Defendants or otherwise cease their affiliation with Settling Defendants .

(j).(n) Solicitation.   Settling Defendants shall not enter or maintain any agreement or understanding, written or unwritten, with any cooperative that limits or restricts any form of solicitation of milk supplies from dairy farmers, including but not limited to any agreement that restricts contacting or approaching dairy farms to offer more favorable financial terms, services or other terms or conditions.

(k).(o)  Antitrust Compliance.  Settling Defendants will have and maintain an on-going antitrust compliance program.

(p)      Cost for Conduct Provisions.  To the extent not expressly provided in the conduct provisions set forth in Paragraph 7.2, the Settling Parties agree and understand that the costs of implementing these proposals shall be borne by Settling Defendants, without recourse to the Settlement Fund or any other monetary contribution expected or required by the Subclass members or Subclass counsel.

## 8.    The Settlement Fund

8.1.8.1 The Plaintiff Subclasses and Defendants, their counsel, and the Court shall treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1 for all periods after the date of initial funding of the Settlement Fund.  The Plaintiff Subclasses and Defendants, their counsel, and the Court agree to take no action inconsistent with the treatment of the Settlement Fund in such manner, and all provisions of this Agreement shall be interpreted in a manner, that is consistent with such treatment.  As required, the Plaintiff Subclasses and Defendants shall timely make such elections as are necessary or advisable to carry out the provisions of this Paragraph, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1(j)) back to the earliest permitted.   Such elections shall be made in compliance with the procedures and requirements contained in such regulations.

8.2.8.2 For the purpose of § 468B of the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, the "administrators" of the Settlement Fund

shall be the Claims Administrator designated by Class Counsel and approved by the Court.  The Class Counsel's designee shall timely and properly file or cause to be filed on a timely basis all tax returns necessary or advisable with respect to the Settlement Fund (including without limitation all income tax returns, all informational returns, and all returns described in Treas. Reg. § 1.468B-2(1)).

8.3.8.3  The Settlement Fund shall be invested, at the sole discretion of Subclass Counsel, and in accordance with the escrow agreement described in Paragraph 7.1 hereof, in a United States treasury money market fund subject to the regulations of the United States Securities Exchange Commission or United States Government Treasury Bills or Notes of no more than six (6) months' duration, provided however that when disbursement of some or all of the Settlement Fund is approved by the Court, the necessary funds may be transferred into and paid out of a federally insured bank account.  All interest earned on the Settlement Fund shall become and remain part of the Settlement Fund.

8.4.8.4  After the Effective Date, the Settlement Fund shall be distributed in accordance with a plan that Subclass Counsel shall submit at the appropriate time for approval by the Court ("Distribution Plan").  In no event shall the Settling Defendants bear any risk or have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such distribution and administration or any losses associated therewith.

8.5.8.5  Subclass Representatives and Subclass Counsel shall be reimbursed, indemnified, and paid solely out of the Settlement Fund for all expenses, including, but not

limited to, attorneys' fees, costs, and expenses.  The Settling Defendants shall not be liable for any costs, fees, or expenses of any of Plaintiff Subclasses' or Subclass Representatives' respective attorneys, experts, advisors, agents, or representatives, and all such costs, fees, and expenses as approved by the Court shall be paid out of the Settlement Fund.  In no event shall Settling Defendants be obligated to pay anything in addition to the Settlement Amount described in Paragraph 7.1 hereto, including without limitation Subclass notice costs, attorneys' fees, payments to named Plaintiffs for their efforts on behalf of the Subclasses, settlement administration costs, escrow costs, taxes, or any other cost or expense arising from or to be paid as part of this Agreement.

8.6.8.6  Prior to the Effective Date, (i) up to $100250,000 of the Settlement Fund may be used to give notice of the Settlement to Subclass members and for settlement administration costs, (ii) up to $10,000 of the Settlement Fund may be used for escrow agent costs, and (iii) any amount of the Settlement Fund may be used to pay required taxes on income earned on the Settlement Fund.  Except as otherwise provided in this Paragraph, any disbursement from the Settlement Fund, including disbursements for attorneys' fees, costs and expenses, and incentive fees to named Subclass Representatives, shall be made only upon approval and order of the Court, and only after the Effective Date.

**9.**     Opt Outs

**9.**     Subclass Members who timely and validly requested exclusion from the Subclasses as of the applicable **Exclusion** Date or such other deadline as the Court may set for opting out, and**and Reinstatement**

9.1.9.1 Requesting exclusion from the Subclasses.  Any Person who wishes to seek exclusion from either of the Subclasses for purposes of this Settlement must timely submit a written request for exclusion as provided in this Paragraph (a "Request for Exclusion").  Any Person who have not opted back in as permitted by Court order (collectively "Opt Outs"),timely submits a Request for Exclusion shall be excluded from the Subclasses, shall have no rights with respect to this Agreement, and shall receive no payments as provided in this Agreement.  A Request for Exclusion must be in writing and state the name, address, and telephone number of the Person(s) seeking exclusion.  The parties shall request that the Court order that the Request for Exclusion must be mailed to the Claims Administrator at the address provided in the notices to Settlement Subclass Members and postmarked (or mailed by overnight delivery) no later than twenty-one (21) days prior to the date set for the Fairness Hearing or any other date set by the Court.

9.2    Requesting reinstatement to Subclasses.  Subclass Members who previously requested exclusion from the Subclasses may be reinstated to the Subclasses as permitted by the Court (a "Request for Reinstatement").  Any Person who timely submits a Request for Reinstatement shall be reinstated to the Subclasses, as if they had not been excluded, for purpose of participating in this Settlement.  A Request for Reinstatement must be in writing and state the name, address, and telephone number of the Person(s) seeking reinstatement.  The parties shall request that the Court order that the Requests for Reinstatement must be mailed to the Claims Administrator at the address provided in the notices to the Subclass

Members and postmarked (or mailed by overnight delivery) no later than twenty-one (21) days prior to the date set for the Fairness Hearing or any other date set by the Court.

9.3     The Claims Administrator shall forward each Request for Exclusion and Request for Reinstatement to Subclass Counsel and counsel for the Settling Defendants within three (3) business days of receipt.

## 10.   Attorneys' Fees

10.1.10.1     Settling Defendants will have no responsibility to pay Subclass Counsel's attorneys' fees, costs, or expenses.  Subclass Counsel may apply to the Court for payment of attorneys' fees, costs, and expenses from the Settlement Fund. Attorneys' fees and expenses will be determined and awarded from the Settlement Fund in a manner consistent with Second Circuit law following the application for such fees and expenses by Subclass Counsel.  Settling Defendants will have no responsibility to pay Subclass Counsel's attorneys' fees, costs, or expenses. Under no condition will Subclass Counsel seek an amount of attorneys' fees in excess of 33 1/3% of the Settlement Consideration in ParagraphsParagraph 7.1 through 7.3 plus reimbursement for reasonable litigation and administrative expenses.

10.2.10.2     Settling Defendants will not oppose an application for attorneys' fees or expenses submitted by Subclass Counsel consistent with the limitation described in Paragraph 10.1 hereto.

10.3.10.3      In the event the Court disapproves of, or reduces the amount sought in, any such application, such disapproval or reduction shall have no effect on the terms of the Agreement.

**11.     Withdrawal From or Modification of the Settlement**

11.1.11.1      If the Court declines to approve this Agreement or any material part hereof, or if such approval is materially modified or set aside on appeal, or if the Court does not enter the Judgment, or if the Court enters the Judgment and appellate review is sought and, on such review, such Judgment is not affirmed or is materially modified, then the Settling Defendants and Plaintiff Subclasses shall each, in their respective sole discretion, have the option to rescind this Agreement in its entirety.  Any Defendant or Plaintiff Subclass wishing to rescind pursuant to this Paragraph 11.1 must provide written notice of rescission within thirty (30) calendar days of the event giving rise to the option to rescind.

11.2.11.2      A modification or reversal on appeal of any amount of Subclass Counsel's fees and expenses awarded by the Court from the Settlement Fund or any Distribution Plan shall not be deemed a modification of all or a part of the terms of this Agreement or such final judgment.

11.3.11.3      If the Agreement is not approved by the Court in all material parts or is otherwise rescinded, the Settling Defendants shall promptly be reimbursed the Settlement Fund, including interest thereon, if any, less any funds actually disbursed pursuant to Paragraph 8.6 hereto; in addition, Subclass Counsel shall promptly reimburse Settling Defendants for any funds actually disbursed pursuant to Paragraph 8.6(i) and 8.6 (ii).

11.4.11.4      In the event that this Agreement is rescinded pursuant to Paragraph 11.1, or for any reason the Effective Date does not occur in accordance with the terms of Paragraph 5.1 herein, then:

(a).(a)  The terms and provisions of this Agreement, with the exception of this Paragraph 11.4 (which shall continue in full force and effect), shall be null and void and shall have no force or effect;

(b).(b)  Neither the existence nor the terms of this Agreement, nor any negotiations preceding this Agreement, nor any acts performed pursuant to, or in furtherance of, this Agreement, shall be used or offered in evidence in the Actions or in any other action or proceeding for any purpose (other than to enforce the terms remaining in effect); and

(c).(c)  The Settling Defendants may oppose and assert all objections to the continued certification of the Subclasses or such other class as the Court may certify.

## 12.   Taxes

12.1.12.1      Subclass Counsel shall be solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid, when due, from the

Settlement Fund; Subclass Counsel shall direct the escrow agent to do so in writing. The Settling Defendants shall have no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or pay any taxes on the Settlement Fund, unless the settlement is not consummated and the Settlement Fund is returned to the Settling Defendants. In the event the settlement is not consummated, the Settling Defendants shall be responsible for the payment of any taxes (including any interest or penalties) on said income.

13. **Miscellaneous**

13.1.13.1     Subclass Counsel and the Settling Defendants shall use their best efforts to effectuate this Agreement, including cooperating in promptly seeking the Court's approval of procedures (including the giving of class notice under Rule 23(e) of the Federal Rules of Civil Procedure) to secure the prompt, complete, and final dismissal with prejudice of the Actions as to the Settling Defendants.

13.2.13.2     The United States District Court for the District of Vermont shall retain jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Subclass Counsel and Settling Defendants.

13.3.13.3     This Agreement constitutes the entire agreement among Subclass Counsel on behalf of the Plaintiff Subclasses and the Settling Defendants pertaining to the settlement of the Actions against the Settling Defendants only and supersedes any

46

and all prior and contemporaneous undertakings of Plaintiff Subclasses and the Settling Defendants in connection therewith.  This Agreement may be modified or amended only by a writing executed by Subclass Counsel and Settling Defendants.

13.4.13.4      This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Releasing Parties and the Released Parties.  Without limiting the generality of the foregoing and subject to the Effective Date occurring:  (a) each and every covenant and agreement made herein by Subclass Counsel shall be binding upon all Subclass Members and Releasing Parties, and (b) each and every covenant and agreement made herein by the Settling Defendants shall be binding upon all Released Parties.

13.5.13.5      This Agreement may be executed in counterparts by Subclass Counsel and the Settling Defendants (or their counsel), and an emailed signature shall be deemed an original signature for purposes of executing this Agreement.

13.6.13.6      Neither the Settling Defendants nor Plaintiff Subclasses, nor any of them, shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.

13.7.13.7      Nothing expressed or implied in this Agreement is intended to or shall be construed to confer upon or give any person or entity other than Subclass Members, Releasing Parties, and Released Parties any right or remedy under or by reason of this Agreement.

13.8.13.8      Other than in a proceeding to enforce its terms, this Agreement shall not be used or admitted in any other action or proceeding for any purpose and shall not be deemed an admission of any fact in any proceeding.

13.9.13.9      Where this Agreement requires any party to provide notice or any other communication or document to any other party, such notice, communication, or document shall be provided by electronic mail, or letter by overnight delivery, to counsel for that party, and in the case of notice to members of the Subclass, notice to Subclass Counsel shall be sufficient.

13.10.13.10    Each of the undersigned attorneys represents that he or she is fully authorized by their respective clients and/or the Court's November 19, 2012 Orderand September 23, 2015 Orders certifying the Subclasses and appointing Subclass Counsel to enter into the terms and conditions of, and to execute, this Agreement on behalf of their respective clients and/or the Subclass each Subclass counsel represents, subject to Court approval.

13.11.13.11    The recitals set forth above are incorporated herein and thereby made a part hereof.

13.12.13.12    New York law shall apply to any dispute arising from or relating to this Agreement.

Dated:  July 1, 2014

Dated: _____

_____                    _____
Robert G. Abrams, Esq.                         Steven R. Kuney, Esq.
Robert J. Brookhiser, Esq.                     Kevin Hardy, Esq.
Gregory J. Commins, Jr., Esq.                  Carl R. Metz, Esq.
Terry L. Sullivan, Esq.                        WILLIAMS & CONNOLLY LLP
Danyll W. Foix, Esq.                           725 Twelfth Street, N.W.

Baker & Hostetler LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
Tel:  (202) 862-1500
rabrams@bakerlaw.com
rbrookhiser@bakerlaw.com
gcommins@bakerlaw.com
tsullivan@bakerlaw.com
dfoix@bakerlaw.com

Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
skuney@wc.com
khardy@wc.com
cmetz@wc.com

Daniel Smith, Esq.
16 State St.
PO Box 801
Montpelier, VT 05601
Tel:  (802) 229-6661
dmsith@gmavt.com

R. Jeffrey Behm, Esq.
Ian Carleton, Esq.
SHEEHEY FURLONG & BEHM P.C.
30 Main Street
P.O. Box 66
Burlington, VT 05402
Tel: (802) 864-9891
Fax: (802) 864-6815
jbehm@sheeheyvt.com
icarleton@sheeheyvt.com

Richard T. Cassidy, Esq.,
Hoff Curtis, P.C.
100 Main St,
Burlington, VT 05401
Tel:  (802) 316-4962
rcassidy@hoffcurtis.com

W. Todd Miller, Esq.
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20037
Tel: (202) 663-7820
Fax: (202) 663-7849
tmiller@bakerandmiller.com

Emily J. Joselson, Esq.
Lisa B. Shelkrot, Esq.
Langrock Sperry & Wool, LLP
210 College St.
P.O. Box 721
Burlington, VT 05402
Tel:  (802) 864-0217
ejoselson@langrock.com
lshelkrot@langrock.com

*Counsel for Defendants Dairy Farmers of
America, Inc. and Dairy Marketing Services,
LLC*

*Counsel for the non-DFA/DMS Subclass*

Kit A. Pierson, Esq.
Benjamin D. Brown, Esq.
Brent W. Johnson, Esq.
Emmy L. Levens, Esq.
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave., N.W.
Ste. 500, West Tower
Washington, DC 20005
Tel:  (202) 408-4600
kpierson@cohenmilstein.com
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
elevens@cohenmilstein.com

David A. Balto, Esq.
The Law Offices of David A. Balto
1350 I St,, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
david.balto@yahoo.com

Andrew D. Manitsky, Esq.
~~Gravel and Shea PC~~
Lynn, Lynn, Blackman & Manitsky, P.C.,
76 St. Paul St., ~~7th Floor,~~Suite 400
~~P.O. Box 369~~
Burlington, VT 05402
Tel:  (802) ~~658-0220~~860-1500
amanitsky@~~gravelshea~~lynnlawvt.com

*Counsel for the DFA/DMS Subclass*

# SCHEDULE A

| Plant Name | Parent Group | City | State | Expiration Date | Renewal Date |
|---|---|---|---|---|---|
| Crowley Foods, LLC | H.P. Hood, Inc. | Concord | NH | April 4, 2016 | April 3, 2016 |
| Crowley Foods, LLC | H.P. Hood, Inc. | Arkport | NY | April 4, 2016 | April 3, 2016 |
| Crowley Foods, LLC | H.P. Hood, Inc. | Lafargeville | NY | April 4, 2016 | April 3, 2016 |
| Crowley Foods, LLC/Penn Maid | H.P. Hood, Inc. | Philadelphia | PA | April 4, 2016 | April 3, 2016 |
| Garelick Farms, Inc | Dean Dairy Group | Florence | NJ | December 31, 2016 | January 1, 2016 |
| Leprino Foods Co | Leprino Foods Co. | Waverly | NY | October 31, 2016 | November 1, 2016 |
| Maplebrook Farm | | Bennington | VT | March 31, 2016 | April 1, 2016 |
| Rosenberger's Dairies, Inc | H. P. Hood, Inc. | Hatfield | PA | April 4, 2016 | April 3, 2016 |
| Tuscan/Lehigh Valley Dairies, L. P. | Dean Dairy Group | Schuylkill Haven | PA | December 31, 2016 | January 1, 2016 |
| Swan Valley | Swan Valley | Swanton | VT | February 28, 2016 | March 1, 2016 |

# SCHEDULE B

## PROTOCOL FOR SPLITTING BULK MILK TANK SAMPLES

All milk samples are to be collected by a Licensed Sampler.

## 1.  Inspect the milk.

Visually inspect the milk following the directions in the current Pasteurized Milk Ordinance (PMO).

If the milk shows any abnormalities, do not sample it.

> *a. Examine the milk by sight and smell for any off odor or any other abnormalities that would class the milk as not being acceptable. Reject if necessary.*
>
> *b. Wash hands thoroughly and dry with a clean individual sanitary towel or other approved hand-drying device immediately prior to measuring and/or sampling the milk.*
>
> *c. Record milk temperature, collection time (optionally, in military time (24 hour clock)), date of pick-up and bulk milk hauler/sampler's name and license or permit number on the farm weight ticket; monthly the hauler/sampler shall check the accuracy of the thermometer on each bulk tank and record results when used as a test thermometer. Accuracy of required recording thermometers shall be checked monthly against a standardized thermometer and recorded. Pocket thermometer shall be sanitized before use.*

## 2.  Verify the temperature of the milk.

Use a calibrated thermometer to take the temperature of the milk.

Only sample milk between 35 and 40 degrees F.

## 3.  Sample the milk following the Universal Sampling System in the current Pasteurized Milk Ordinance.

*Universal Sampling System: When bulk milk hauler/samplers collect raw milk samples, the "universal sampling system" shall be employed, whereby samples are collected every time milk is picked up at the farm. This system permits the Regulatory Agency, at its discretion, at any given time and without notification to the industry, to analyze samples collected by the bulk msilk hauler/sampler. The use of the "universal sample" puts more validity and faith in samples collected by industry personnel. The following are sampling procedures:*

*a. Pick-up and handling practices are conducted to prevent contamination of milk contact surfaces.*

*b. The milk shall be agitated a sufficient time to obtain a homogeneous blend. Follow the Regulatory Agency's and/or manufacturer's guidelines or when using an approved aseptic sampling device, follow the specified protocol and Standard Operating Procedure (SOP) for that device.  Ensure correct agitation time using a clock or stopwatch.*

*c. While the farm bulk milk tank and/or silo is being agitated, bring the sample container, dipper, dipper container and sanitizing agent for the outlet valve, or single-service sampling tubes into the milkhouse aseptically. Remove the cap from the farm bulk milk tank and/or silo outlet valve and examine for milk deposits or foreign matter and then sanitize if necessary. Protect the hose cap from contamination when removing it from the transfer hose and during storage.*

*d. The sample may only be collected after the milk has been properly agitated or when using an approved aseptic sampling device, follow the specified protocol and SOP for that device. Remove the dipper or sampling device from the sanitizing solution or sterile container and rinse at least twice in the milk.*

*e. Collect a representative sample or samples from the farm bulk milk tank and/or silo by using a sample dipper or other approved aseptic sampling device. When transferring milk from the sampling equipment, caution should be used to assure that milk is not spilled back into the farm bulk milk tank and/or silo. Do not fill the sampling container more than ¾ full. Close the cover on the sample container.*

*f. The sample dipper shall be rinsed free of milk and placed in its carrying container.*

*g. Close the cover or lid of the farm bulk milk tank.*

*h. The sample shall be identified with the producer's number at the point of collection.*

*i. A temperature control sample shall be taken at the first stop of each load. This sample shall be labeled with collection time (optionally, in military time (24 hour clock)), date, temperature and producer and bulk milk hauler/sampler identification.*

*j. Place the sample or samples immediately into the sample storage case.*

## **4.  Additional Requirements.**

For split samples, a representative master sample will be collected in a sterile master container large enough to provide the number and size of final samples needed.  The master container should be filled no more than ¾ full to permit proper mixing.

Prior to collection of the master sample, label the final sample vials with the date and time of sample collection, the temperature of the milk, the sampler's initials and the name and number of

the farm sampled.

After collection, agitate the milk in the master container by inverting it from top to bottom twenty five times as quickly as possible without pausing.
Within 3 minutes of inverting the master sample, split it into the pre-labeled vials. Once pouring has commenced, do not stop until all vials are full.

Do not fill vials more than ¾ full, to permit proper mixing of the samples.

**5.  Handling and Transportation.**

Immediately after splitting, place the samples in a float in a cooler with an ice/water mixture. Samples are to be maintained in an upright position with the tops of the vials above the water line.

Samples must travel with a temperature control and be maintained between 32-40 degrees F at all times.

Samples are to be transported with appropriate Chain of Custody paperwork by licensed samplers or in a sealed case.

All samples must arrive at the testing laboratories before the sample is too old for the test being performed.

**6.  Laboratory Testing**

Samples used to verify test results will be sent to independent, certified labs using calibrated testing equipment.

The labs to be used will be identified prior to the collection of samples.

Steps should be taken to ensure that all laboratories being used are performing the same testing methods and procedures.

# SCHEDULE C

**DAIRY FARMERS OF AMERICA, INC.**
**COUNCILPERSON CONFIDENTIALITY OBLIGATIONS**

1..  All information disclosed, and discussions which occur, at Area Council meetings are understood to be confidential unless specifically noted otherwise or if in the public domain.

2.  The Councilperson shall maintain the strict confidentiality of all nonpublic information concerning DFA, its members, business, personnel, regulatory affairs, intellectual property rights, finances, and/or operations. Any such nonpublic information shall be used by the Councilperson solely in his/her capacity as a Councilperson and only for the specific purpose for which it was provided, and shall not be disclosed or provided, directly or indirectly, by the Councilperson to any third parties. The Councilperson shall immediately notify the Chairman of the Area Council in the event of any unauthorized use of disclosure of such nonpublic information.  The Councilperson shall not engage in any commodity trading or trading in the shares of publicly traded companies using information that was obtained through DFA that is not otherwise in the public domain.

/s/ _____

Position: _____

Date: _____