## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **ALICE H. ALLEN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 5:09–CV–00230–cr** |
| ) | |
| **DAIRY FARMERS OF AMERICA, INC., and** ) | |
| **DAIRY MARKETING SERVICES, LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DAIRY FARMER SUBCLASSES' MOTION FOR FINAL APPROVAL OF
## DECEMBER 2015 SETTLEMENT WITH DEFENDANTS DAIRY
## FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC

# TABLE OF CONTENTS

RELEVANT BACKGROUND .................................................................................. 4

I.    RELEVANT PROCEDURAL HISTORY APPROACHING THE
PARTIES' TRIAL DATE. ............................................................................... 4

II.    THE INITIAL DFA/DMS SETTLEMENT NEGOTIATIONS AND
TERMS. .......................................................................................................... 6

III.    FAIRNESS HEARING ON THE INITIAL DFA/DMS
SETTLEMENT AND RELATED MOTIONS. ............................................... 7

IV.    THE SETTLEMENT BEFORE THE COURT. .............................................. 9

        A.    Settlement Negotiations. .................................................................... 9

        B.    Important Terms in the Proposed Settlement. ................................ 12

V.    PRELIMINARY APPROVAL AND NOTICE. ............................................ 16

ARGUMENT ....................................................................................................... 17

I.    THE DFA/DMS SETTLEMENT SATISFIES THE SECOND
CIRCUIT'S STANDARDS FOR FINAL APPROVAL. .............................. 17

        A.    The Settlement Resulted from "Arm's Length, Good Faith
Negotiations Between Experienced and Skilled Litigators" and
Was Procedurally Fair. ................................................................. 18

        B.    The Settlement is Entitled to a Presumption of Fairness,
Reasonableness and Adequacy. .................................................... 19

        C.    The Settlement Satisfies the *Grinnell* Factors and Should be
Approved. ...................................................................................... 21

                1.    The complexity expense and likely duration of the
litigation. ........................................................................... 21

                2.    The Reaction of the Subclasses to the Settlement. .............. 22

                3.    The stage of the proceedings and the amount of
discovery completed. .......................................................... 27

                4.    The risks of establishing liability. ....................................... 28

      5.      **The Risks of Establishing Damages.**............................................ 31

      6.      **The risk the Subclasses could be decertified.** ........................... 32

      7.      **The ability of the Defendants to withstand a greater judgment.** ................................................................................... 32

      8.      **The range of reasonableness of the settlement fund in light of (a) the best possible recovery and (b) all of the attendant risks of the litigation.** .................................................. 33

II.      **THE PLAN OF ALLOCATION WARRANTS APPROVAL.** ....................... 39

III.      **THE COURT SHOULD ALLOCATE FUNDS TO PAY THE CASE SETTLEMENT ADMINISTRATOR.** ................................................................. 40

**CONCLUSION** ............................................................................................................... 43

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re "Agent Orange" Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984) ...........................................................26, 33, 35

*Am. Med. Ass'n v. United Healthcare Corp.*,
    No. 00 Civ. 2800(LMM), 2009 WL 4403185 (S.D.N.Y. Dec. 1, 2009) ................................18

*In re Bear Stearns Cos. Secs., Derivative, & ERISA Litig.*,
    No. 08 MDL 1963, 2014 U.S. Dist. LEXIS 94696 (S.D.N.Y. July 8, 2014) ...................42, 43

*In re Beef Indus. Antitrust Litig.*,
    600 F.2d 1148 (5th Cir. 1979) ...........................................................29

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 264 (2d Cir. 1979).............................................................29

*Blessing v. Sirius XM Radio, Inc.*,
    No. 09 CV 10035(HB), 2011 WL 3739024 (S.D.N.Y. Aug. 24, 2011) ................................34

*Bryan v. Pittsburgh Plate Glass Co.*,
    494 F.2d 799 (3d Cir. 1974)..............................................................26

*Charron v. Pinnacle Grp. N.Y. LLC*,
    974 F. Supp. 2d 179 (S.D.N.Y. 2012).....................................................27

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013).............................................................26

*Chatelain v. Prudential-Bache Sec., Inc.*,
    805 F. Supp. 209 (S.D.N.Y. 1992)........................................................20

*City of Detroit v. Grinnell Corp.*,
    356 F.Supp. 1380 (S.D.N.Y. 1972), *aff'd in part, rev'd on other grounds*, 495
    F.2d 448 (2d Cir. 1974).................................................................35

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)........................................................ *passim*

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ..........................................................26

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) .......................................................22

*Cty. of Suffolk v. Long Island Lighting Co.*,
    907 F.2d 1295 (2d Cir. 1990) ........................................................................26, 34

*D.S. v. N.Y.C. Dep't of Educ.*,
    255 F.R.D. 59 (E.D.N.Y. 2008) ...............................................................................18

*EEOC v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ...................................................................................25

*In re Elec. Books Antitrust Litig.*,
    No. 14-4649(L), 2016 WL 624505 (2d Cir. Feb. 17, 2016) ....................................27

*Ersler v. Toshiba Am., Inc.*,
    No. CV-07-2304 (SMG), 2009 U.S. Dist. LEXIS 14374 (E.D.N.Y. Feb. 24,
    2009) .........................................................................................................................23

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
    No. 05 Civ. 10240 (CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007).........19, 22

*In re Excess Value Ins. Coverage Litig.*,
    No. M-21-84RMB, 2004 WL 1724980 (S.D.N.Y. June 30, 2004) ...........................18

*Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    741 F. Supp. 84 (S.D.N.Y. 1990) .............................................................................43

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510 (CPG)(SMG), 2009 U.S. Dist. LEXIS 25109 (E.D.N.Y.
    Mar. 25, 2009) ..........................................................................................................41

*In re Global Cross Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................................18

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987).................................................................................25, 26

*Hall v. ProSource Techs., LLC*,
    No. 14-CV-2502 (SIL), 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016)...................19

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    No. 12-Civ-8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ..................20

*Hicks v. Morgan Stanley & Co.*,
    01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005) ...................39

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009).................................................................26, 35

*Johansson-Dohrmann v. CBR Sys., Inc.*,
   No. 12-cv-1115-MMA (BGS), 2013 U.S. Dist. LEXIS 103863 (S.D. Cal. July
   24, 2013) ...........................................................................................................................23

*In re Joint E. & S. Dist. Asbestos Litig.*,
   129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991) ........................................................................26

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011).................................................................................................18

*In re Lloyd's Am. Tr. Fund Litig.*,
   No. 96 Civ. 1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)........................26, 40

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) .........................................................................................23

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)..................................................................................39

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ...........................................................................20, 22, 31

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*,
   838 F. Supp. 729 (S.D.N.Y. 1993)........................................................................................20

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009).........................................................................................17, 19

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) .........................................................................................35

*In re Metlife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...........................................................18, 19, 22, 33

*In re Michael Miliken & Assocs. Sec. Litig.*,
   150 F.R.D. 46 (S.D.N.Y. 1993) ...........................................................................................20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................20, 32

*In re PaineWebber Ltd. P'ships Litig.*,
   147 F.3d 132 (2d Cir. 1998)..................................................................................................17

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd* 117 F.3d 721 (2d Cir. 1997)...................................20

*Park v. Thomson Corp.*,
   No. 05 Civ. 2931(WHP), 2008 WL 4684232 (S.D.N.Y. Oct. 22, 2008)................................26

*Parker v. Time Warner Entm't Co., L.P.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ...................................................................41

*Pettway v. Am. Cast Iron Pipe Co.*,
    576 F.2d 1157 (5th Cir. 1978) .......................................................................26

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................5

*In re Prudential Sec. P'ships Litig.*,
    MDL No. 1005, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) ...........................35

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) .......................................................................26

*In re Salomon Inc. Sec. Litig.*,
    No. 91 Civ. 5442 (RPP), 1994 U.S. Dist. LEXIS 8038 (S.D.N.Y. June 15,
    1994) ...................................................................................................27

*Spann v. AOL Time Warner, Inc.*,
    No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848 (S.D.N.Y. June 7,
    2005) ..............................................................................................41, 43

*Stouter v. Smithtown Cent. Sch. Dist.*,
    687 F. Supp. 2d 224 (E.D.N.Y. 2010) ..............................................................29

*Taft v. Ackermans*,
    No. 02-cv-7951, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan 31, 2007) ...............................39

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982)....................................................................25, 26

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................................19

*Thompson v. Metro Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ....................................................................18

*In re Top Tankers, Inc. Sec. Litig.*,
    No. 06 Civ. 13761 (CM), 2008 U.S. Dist. LEXIS 58106 (S.D.N.Y. July 31,
    2008) ...................................................................................................39

*In re Traffic Exec. Ass'n E. R.Rs v. Long Island R.R. Co.*, 627 F.2d 631 (2d Cir.
    1980). ...................................................................................................18

*Trief v. Dun & Bradstreet Corp.*,
    840 F. Supp. 277 (S.D.N.Y. 1993)..................................................................20

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989)..............................................................20

*In re Urethanes Antitrust Litigation*,
No. 04-md-01616 (D. Kan.)............................................................................22

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695(CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ................19

*In re Vitamins Antitrust Litig.*,
No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000)..............................40

*In re W. Union Money Transfer Litig.*,
No. CV-01-0335 (CPS), 2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004)..................34

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005).................................................................... *passim*

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982).............................................................................17

*West Virginia v. Chas. Pfizer & Co.*,
440 F.2d 1079 (2d Cir. 1971)...............................................................18, 25, 28

**STATUTES**

15 U.S.C. §§ 1-2 .................................................................................................4

**OTHER AUTHORITIES**

1 Alba Conte, *Attorney Fee Awards* (3d ed. 2010)...........................................41

Federal Rules of Civil Procedure Rule 23(e) ...........................................5, 17

*Manual for Complex Litigation*, (4th ed. 2014) ..............................................41

*Manual for Complex Litigation* (3d ed. 2003) ................................................40

Newberg & Conte, *Newberg on Class Actions* (3d ed. 1992) ........................40

William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2011)................41

The Dairy Farmer Subclasses respectfully request that the Court approve the December 2015 Settlement with Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (collectively "Defendants").[1]  This settlement recovers a substantial percentage of the damages claimed in this case and achieves equitable relief that is unprecedented in this industry, furthers the Second Circuit's strong policy favoring settlement of complex litigation (and, in particular, class actions), and provides significant relief while avoiding the very substantial risks and inevitable delays that would attend a trial of this matter and subsequent appeals.

In addition to the unanimous views of Subclass Counsel that this settlement is in the best interest of the Subclasses – views that are afforded a strong presumption under Second Circuit law – the settlement is supported by the antitrust enforcement authority for the State of Vermont (the Vermont Attorney General);[2] the Chairs of the Vermont Senate Committee on Agriculture and the Vermont Senate Committee on Appropriations;[3] and the bi-partisan leadership of the New Hampshire Environment & Agriculture Committee.[4]  The settlement is also supported by a substantial majority of the Subclass Representatives appointed by the Court,[5] including the new

---

[1] *See* Ex. A, December 2015 Settlement Agreement.

[2] Letter at 1, Apr. 1, 2016, ECF No. 832 ("The Attorney General's Office for the State of Vermont writes in support of the proposed settlement between Plaintiffs and Defendants [DFA and DMS]. . . .").

[3] Letter at 1-2, Apr. 26, 2016, ECF No. 1510 (writing "in support of the proposed settlement" and indicating that "it provides a significant, worthwhile advance for the region's dairy industry," and that the disclosure requirements and appointment of ombudsperson and DFA producer price advocate will also benefit legislative efforts "to update and modernize our dairy cooperative law").

[4] Letter at 1, May 3, 2016, ECF No. 2023 (writing "in strong support of the proposed settlement").

[5] Two of the previously appointed Subclass Representative Farms – Ralph and Garrett Sitts and Richard Swantak – have elected to exclude themselves from the Settlement.  As a result, only seven Court-appointed Subclass Representatives remain.  Of those, six Subclass

1

Subclass Representatives appointed by the Court to provide "a fresh perspective and new expertise that is likely to assist the court."[6]  Similarly, the great majority of Subclass farms that have communicated with the Court, support the settlement.  *See* Exhibit B (chart summarizing letters filed regarding the settlement).   Indeed, 91.4% of the subclass farms that have made submissions to the Court have indicated they support the settlement.

As the product of multiple years of arm's-length negotiations among experienced counsel with a deep understanding of the factual and legal issues in this case, informed by more than 70 depositions and millions of pages of discovery, the settlement is entitled to a presumption of fairness.  An examination of the settlement's substantive terms confirms the correctness of that presumption. The settlement provides the Subclasses with significant and certain financial remuneration while simultaneously achieving significant equitable relief.  In addition to the broad and meaningful conduct terms achieved in the initial settlement with DFA/DMS, the revised agreement now includes relief to address milk testing, the primary concern that was raised by the dissenting Subclass Representatives at the last final approval hearing.  If this matter proceeded to trial and the case was unsuccessful, *all* of this financial and equitable relief would be lost.  Even if the case was successful, it is highly unlikely that any of the non-monetary relief could be accomplished (in other words, even if a trial were successful, even the relief most recently identified by the dissenting Subclass Representatives as a primary concern would almost certainly be sacrificed), and it is highly likely that several years of appellate delay would result before there was *any* relief.  The settlement will also result in recovery of a substantial portion of the claimed single damages in this case – an amount well within the reasonable range upheld in

---

Representatives support the Settlement.

[6] Op. & Order Granting Mot. for Appointment of Additional Representative Party at 13, Aug. 11, 2015, ECF No. 682.  Six of the seven farms operated by the Subclass Representatives support the settlement.

numerous cases in the Second Circuit.  Moreover, in addition to the equitable relief referenced

above, the settlement achieves a significant amount of additional relief (much of which would be

unavailable even if trial were successful), which the Vermont Attorney General's office has

described as "on par with the sort of relief that our office would seek in a matter like this."  ECF

No. 832 at 2; *see also id.* at 1 (Vermont Attorney General's office is "impressed by the extensive

injunctive relief that the settlement obtains for the class members.").

A vocal minority of Subclass members remain opposed to settlement.  As discussed

below, much of this opposition reflects a year-long effort by one of the dissenting Subclass

Representative farms and the National Dairy Producers Organization to enlist opposition to the

settlement.  While only a small percentage of the Subclasses has endorsed that view, it should be

emphasized that *it is highly unlikely* that the additional relief they seek – specifically, a court-

imposed "pricing provision" regulating all prices in future supply agreements, a provision

eliminating all "block voting" and requiring that "all [D]efendant voting should be achieved only

by three-quarter approval by individual [D]efendant membership voting" and other unspecified

relief[7] – could ever be achieved in an antitrust class action trial, let alone upheld on appeal.

Indeed, in the recorded discussion of its own calls made publicly available on NDPO's website –

NDPO's Chairman characterized its pricing proposal as "somewhat of a far-fetched concept . . .

for the judge to actually enact."[8]  That understates the matter:  there is no possibility such relief

could be achieved at trial or upheld on appeal.  To the extent some farmers prefer to opt out from

the settlement (as NDPO has actively encouraged), the settlement terms allow them to do so.

Given this option, however, the continued dissent of a minority of farmers should not prevent

many thousands of dairy farmers from benefitting from the financial and equitable relief afforded

---

[7] *See* Ex. C at 8 (transcript of cited discussion by Mr. Eby on Feb. 16, 2016 call).

[8] *Id.* at 6.

by the settlement.

In short, the settlement reflects a careful and balanced evaluation of the evidence and potential relief available in this litigation.  It is supported by experienced counsel, the Vermont Attorney General's office, and legislative authorities in the States of Vermont and New Hampshire, and represents a fair and reasonable resolution of this litigation that will now provide significant and immediate relief to the Subclasses.  As set forth below, the settlement should be approved under the legal standards set forth by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), and subsequent cases.

**RELEVANT BACKGROUND**

The Court is familiar with the history of this litigation.  For convenience, the Subclasses provide below a brief recitation of the events that gave rise to the instant motion.

## I.     RELEVANT PROCEDURAL HISTORY APPROACHING THE PARTIES' TRIAL DATE.

This case commenced more than six years ago and has been vigorously contested at every stage of the proceedings.  The heart of the case alleges DFA/DMS colluded with various co-conspirators to restrict competition for raw Grade A milk produced, marketed, and processed in the Northeast; monopsonized raw Grade A milk and milk marketing services in the Northeast; and engaged in other unlawful activities that suppressed the prices received by Northeast dairy farmers for their raw Grade A milk in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.[9]

Following the Court's partial grant of Defendants' motions to dismiss,[10] a $30 million settlement with former Defendant Dean Foods Company was reached.  In its review of the

---

[9] Consolidated Am. Class Action Compl., Nov. 12, 2010, ECF No. 117.

[10] Op. & Order Granting in Part & Den. in Part Defs.' Mots. to Dismiss, Aug. 30, 2010, ECF No. 81.

settlement the Court explained that "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."[11]  Applying the factors set forth by the Second Circuit in *Grinnell*, ECF No. 341 at 8-14, the Court found that the settlement "was the result of arm's length negotiations between competent, experienced counsel, fully familiar with an extensive factual record, who have litigated the case in a vigorous and professional manner," and that the terms of the settlement were "fair, reasonable and adequate." *Id.* at 14 (quoting in part Fed. R. Civ. P. 23(e)).  After final approval of the settlement in August 2011,[12] the case proceeded against the remaining Defendants, DFA and DMS.

During discovery, the Dairy Farmer Subclasses secured and analyzed millions of pages of documents; participated in more than 70 depositions; and filed and/or responded to many hundreds of pages of expert reports.  As a result of this extensive discovery and both side's substantial experience with the *Southeastern Milk Antitrust Litigation*, counsel for the Subclasses and Defendants approached trial with a deep understanding of the complex factual, economic, and legal issues presented by the case.

As the Dairy Farmer Subclasses prepared for trial, however, two important decisions from the Court materially impacted their case.  First, the Court's *Daubert* rulings – both regarding market analysis and damages, restricted the nature and scope of expert testimony in this case.[13]  Second, the summary judgment rulings had significant implications for the case that would be presented to a jury.  Although the Subclasses prevailed on many of the summary

---

[11] Op. & Order Granting in Part & Den. in Part Final Approval of Dean Settlement at 8, Aug. 3, 2011, ECF No. 341 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995)).

[12] Order and Final J. Granting Mot. for Approval of Proposed Plan, Aug. 15, 2011, ECF No. 345.

[13] Op. & Order Granting in Part and Den. in Part Defs.' Mot. to Exclude Pls.' Merits Expert at 23, Dec. 31, 2013, ECF No. 470; *see also* Defs.' Mot. to Strike at Ex. 1, Mar. 18, 2014, ECF No. 486.

judgment issues, Defendants were successful in limiting aspects of the Subclasses' case, including the claims for relief and recoverable damages.[14]   Following these rulings, both sides proceeded vigorously to prepare for trial in the Summer of 2014.

## II.   THE INITIAL DFA/DMS SETTLEMENT NEGOTIATIONS AND TERMS.

As the trial drew near, the parties began making progress toward a potential settlement. Though the parties had engaged in sporadic settlement negotiations throughout the course of the litigation – including participating in a Court-Ordered mediation with Michael Marks, a highly respected mediator – the parties had remained intractably far apart in their positions.  After settlement was later reached in the *Southeastern Milk*, the Subclass Representatives encouraged Counsel to proceed with negotiations in the Northeast in the hopes of securing a meaningful, but smaller, financial settlement and equitable terms similar to those negotiated in the Southeast.[15]

Although the parties continued discussions during the ensuing period, no material progress was made until June 19, 2014. Then, with scheduled trial only a few weeks away,

---

[14] Op. & Order Granting in Part and Den. in Part Defs.' Mot. for Summ. J. at 33, June 11, 2014, ECF No. 525.

[15] After learning of developments in the *Southeastern Milk* litigation, counsel for the DFA/DMS Subclass (Mr. Brown) spoke with the Haars for an hour on January 22, 2013 regarding potential implications for settlement in the Northeast.  Mr. Brown was informed that the Haars "were very happy with the news about the Southeast settlement," "had a couple of additional thoughts on injunctive relief that they would like to see," and recognized that any monetary settlement in the Northeast would be substantially smaller because of differences in the case.  Hr'g Tr. 70:12-22, June 1, 2015, ECF No. 658 ("6/1/15 Hr'g Tr.") (testimony of Ben Brown).  *See also* Hr'g Ex. 17, Apr. 20, 2015, ECF No. 651 ("4/20/15 Hr'g") (Jan. 23, 2013 email re: conferring with clients) (indicating that Haars "were impressed with the terms of the SE settlement offer and are hopeful that DFA/DMS will be interested in a similar approach with us," would like to "do better than the Dean number [$30 million], but understand that we can't get in the same ballpark as the SE settlement with DFA," and "[t]here were one or two tweaks to the injunctive relief they would like to see that may or may not be possible"); 6/1/15 Hr'g Tr. 71:25-72:1 (Mr. Swantak was "very impressed with the terms of the Southeast settlement injunctive relief"); 4/20/15 H'rg Ex. 18 (Jan. 24, 2013 e-mail noting that Mr. Swantak "would like to see this all resolve though settlement, especially if we can get injunctive relief along the lines of the SE settlement.").

DFA/DMS indicated – for the first time – that it was prepared to agree to financial terms that Counsel for both Subclasses believed constituted an excellent result for the Subclasses, provided acceptable equitable relief could also be obtained.  Counsel for the Subclasses and Defendants notified the Court's clerk of the situation and, consistent with the instructions received, continued to explore settlement negotiations with DFA/DMS.  In conjunction with those negotiations, Subclass Counsel and the Subclass Representatives engaged in multiple discussions regarding the advisability of settlement and potential equitable terms.  Throughout the discussions between Subclass Representatives and Subclass Counsel, Subclass Counsel continued to negotiate with DFA/DMS.

On July 1, 2014, days before trial was scheduled to commence, the parties executed a settlement agreement (hereinafter the "Initial DFA/DMS Settlement").  That settlement provided that DFA/DMS would pay $50 million and imposed severeal forms of equitable relief similar to that achieved in the Southeast (and also included prohibition on non-solicitation agreements, which had not been at issue in the Southeast).  In exchange for this relief, the Subclass members would end the litigation and execute a release.  The Court preliminarily approved the Initial DFA/DMS Settlement[16] and notice was disseminated to the Subclasses.

## III.   FAIRNESS HEARING ON THE INITIAL DFA/DMS SETTLEMENT AND RELATED MOTIONS.

On January 29, 2015 the Court held an Initial Fairness Hearing.[17]  At that hearing, some farmers came forward to provide their views of the Initial DFA/DMS Settlement including all four Subclass Representative farms.[18]  Subclass Representative Alice Allen, supported the Settlement, while Representatives for three other farms (the Haars, the Sitts, and Richard

---

[16] Op. & Order Granting in Part Renewed Mot. for Prelim. Approval of Settlement, Nov. 25, 2014, ECF No. 582.

[17] Hr'g Tr., Jan. 29, 2015, ECF No. 636 ("1/29/15 Hr'g Tr.").

[18] 1/29/15 Hr'g Tr. 22:15-46:6, 49:8-142:13.

Swantak) (collectively "Opposing Subclass Representatives" or "Opposing Representatives"),
opposed it.[19]  Though not raised in the Opposing Representatives' initial objections to the
injunctive portion of the settlement, the objections at the hearings focused to a significant degree
on their concerns about milk testing.  *See e.g.*, 1/29/15 Hr'g Tr. at 19:21-24 (aside from financial
damages, "the injunctive relief of agreeing under penalty to provide for third party voting, vote
counting, and third-party milk testing will solve a lot of the problems which we farmers face")
(statement of Joshua Haar); *see also* Renewed Mot. to Appoint New Counsel at 11, Aug. 17,
2015, ECF No. 683 (subsequent pleading by Opposing Representatives criticizing counsel for
not pursuing "even the simple solution of requiring two milk samples, one to be left on the
farm.").

Following the Initial Fairness Hearing, the Opposing Subclass Representatives moved to
remove Subclass Counsel,[20] asserting without evidence that Subclass Counsel had "colluded"
with attorneys representing DFA/DMS.[21]  While that motion was pending, the Court denied
without prejudice the Motion for Final Approval of the Initial DFA/DMS Settlement.[22]  In
reaching this conclusion, the Court noted that, "there is no dispute that Subclass Counsel are
experienced and able antitrust litigators who engaged in extensive discovery and motions
practice necessary to the effective representation of the class."[23]  Because of the pending (and at
that time unresolved) allegations challenging negotiation of the Settlement, the Court ruled that it
could not determine the procedural fairness of the Settlement.  The Court also cited the

---

[19] *Id.*
[20] Class Reps.' Mot. to Appoint Counsel, Mar. 11, 2015, ECF No. 637.
[21] *Id.* at 13-17.
[22] Op. & Order Den. without Prejudice Mot. for Final Approval, Mar. 31, 2015, ECF No.
642.
[23] *Id.* at 10.

opposition of some other Subclass members to the proposed settlement.[24]

The Court then held an evidentiary hearing to address the allegations raised in Opposing Subclass Representatives' motion and to address the procedural fairness issue.  The hearing lasted two days and the Court allowed Opposing Subclass Representatives as well as Subclass Counsel to testify or otherwise submit relevant evidence.[25]  After the hearing closed, the Court denied Opposing Representatives' Motion.[26]  The Court found that disagreement about tactical decisions did not constitute misconduct and the Court had "no reason to doubt" that Subclass Counsel were acting in the best interests of the Subclasses.[27]  Opposing Representatives later filed a second motion to disqualify counsel, which was denied, and the Haars later filed a motion seeking an extension of time to request reconsideration, which was also denied.[28]

## IV.    THE SETTLEMENT BEFORE THE COURT.

### A.    Settlement Negotiations.

In the fall of 2015, in an effort to include fresh perspectives, the Court (a) appointed Stephen Taylor and Darrel Aubertine as additional Subclass Representatives for the non-DFA/DMS[29] and (b) subsequently added Peter Southway, Marion Southway, Robert Fulper and Reynard Hunt as additional Subclass Representatives for the DFA/DMS Subclass.[30]  While adding these Representatives, the Court held a September 29, 2015 status conference, at which

---

[24] *Id*. at 17.

[25] *See* 4/20/15 and 6/1/15 Hr'g Transcripts.

[26] Op. & Order Den. Mot. for New Counsel, June 30, 2015, ECF No. 667.

[27] *Id*. at 7.

[28] *See* Renewed Mot. to Appoint New Counsel, Aug. 17, 2015, ECF No. 683; Entry Order Den. Subclass Representatives' Renewed Mot. for New Counsel, Oct. 23, 2015, ECF No. 707; Mot. for Leave to File Mot. for Deferral of Deadline, Dec. 7, 2015, ECF No. 708; Entry Order Den. Subclass Representatives' Mot. to Defer Deadline for Mot. for Reconsideration, Jan. 4, 2015, ECF No. 711.

[29] *See* ECF No. 682.  The Court subsequently added their counsel, Daniel Smith and Richard Cassidy, as additional Counsel for the DFA/DMS Subclass.

[30] Order Granting Mot. for Reconsideration re Op. & Order Den. Mot. for Appointment of Additional Subclass Counsel, Sept. 23, 2015, ECF No. 700.

the Court "set a course for going forward," observed that "some of the class representatives' requests for relief are just unrealistic," told the parties to undertake a "final go" at settlement, allowed the parties 90 days (until December 28, 2015) to reach a settlement, and advised the parties that, absent settlement by that deadline, the case would be set for trial.[31]  The Court also postponed its decision on DFA/DMS's motion to decertify the DFA/DMS Subclass, but counseled the parties to take that motion into account in settlement negotiations.

Following the course set by the Court, Subclass Counsel worked diligently and engaged collaboratively with existing and newly appointed Subclass Representatives to revise the settlement with DFA/DMS.  Those efforts included numerous group meetings and discussions involving Subclass Counsel, the Subclass Representatives, and, during negotiations, DFA/DMS counsel and DFA's CEO.  A non-exhaustive list of these meetings and communications include the following:

| Date | Event |
|---|---|
| September 29, 2015 | In person meeting between Subclass Counsel and Subclass Representatives in Burlington, Vt. |
| October 8, 2015 | Meeting between Subclass Counsel, and counsel for DFA/DMS regarding potential settlement in Washington, D.C. |
| October 13, 2015 | In-person meeting between Subclass Counsel and Subclass Representatives in Albany, NY. |
| October 26, 2015 | DFA/DMS Subclass Counsel confers telephonically with the newly appointed Subclass Representatives- Peter and Marion Southway, Robert Fulper, and Reynard Hunt |
| October 28, 2015 | Meeting between Subclass Counsel regarding potential settlement in Washington, D.C. |
| November 3, 2015 | Telephonic conference with Subclass Representatives and Subclass Counsel. |
| November 6, 2015 | Telephonic conference with Subclass Representatives and Subclass Counsel. |
| November 16, 2015 | In person meeting lasting more than two hours |

---

[31] 9/29/15 Transcript at 3:18, 4:13-21, 5:10-12, and 33:7-12.

| | between Subclass Counsel, counsel for DFA/DMS, and Rick Smith. |
|---|---|
| November 20, 2015 | Telephonic conference between Subclass Counsel and counsel for DFA/DMS regarding settlement. |
| November 23, 2015 | In-person meeting between Subclass Representatives and Subclass Counsel in Albany, NY. |
| November 30, 2015 through December 8, 2015 | Subclass Counsel and counsel for DFA/DMS exchange drafts of potential settlement agreement and revisions. |
| December 9, 2015 | Meeting between Subclass Counsel and counsel for DFA/DMS in Washington, D.C. |
| December 14, 2015 | 1.5 hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 15, 2015 | 2 hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 17, 2015 | 2 hour telephonic conference with Subclass Representatives and Subclass Counsel. |
| December 18, 2015 | Telephonic conference between Subclass Counsel and counsel for DFA/DMS. |
| December 21, 2015 | Four and a half hour telephonic conference with Subclass Representatives and Subclass Counsel. Telephonic conference between Subclass Counsel and counsel for DFA/DMS. |
| December 22, 2015 | Subclass Counsel and counsel for DFA/DMS execute the pending Settlement. |
| December 23, 2015 | The parties inform the Court that they have reached a settlement.[32] |

As the table reflects, the revised Settlement was reached following three months of extensive negotiations that built on more than one year of prior settlement negotiations and the years of litigation prior to any settlement negotiations. The Subclass Representatives were involved throughout the process. Subclass Counsel both apprised them of the settlement negotiations as they occurred, and solicited feedback from the Representatives regarding the negotiations and revised proposals to DFA/DMS based on that feedback.

---

[32] Status Report, Dec. 23, 2015, ECF No. 710.

## B.    Important Terms in the Proposed Settlement.

These efforts of multiple years of negotiations paid off.  Pursuant to the terms of the instant settlement, DFA/DMS agree to pay a total of $50 million to the Dairy Farmer Subclasses in addition imposing significant and unprecedented changes to their business practices in the Northeast.  Notably, the settlement provides that DFA/DMS will be financially responsible for the cost of these conduct provisions, further enhancing the financial value of the settlement.  Second Am. Settlement Agreement ¶ 7.2(p), Jan. 15, 2016, ECF No. 712 ("Agreement.").  For the Court's convenience, these conduct terms are summarized in the attached Exhibit D, which denotes those provisions that are new, revised, or unchanged from the Initial DFA/DMS Settlement.  In evaluating the terms of the settlement, one substantial change is that those Subclass members who do not wish to be bound by the settlement may opt out and pursue their own litigation against DFA/DMS.  Agreement ¶ 9.1.

The key conduct elements from the Initial DFA/DMS Settlement remain unchanged and they provide significant relief for the Subclasses, including, for example:  DFA is permanently prohibited from entertaining or maintaining any form of non-solicitation agreement, *id.* ¶ 7.2(n); DFA/DMS has still agreed not to oppose the unsealing of the material evidence in the record specified in the agreement, *id.* ¶ 7.2(i), which means that those records will be available to farmers, law enforcement officials, the media, and the general public; DFA is subject to requirements relating to the disclosure, audit and certification of financial transactions and other financial information, *id.* ¶ 7.2(j)); an Audit Committee to include at least two independent advisors with expertise in accounting, financial reporting, and auditing, established to monitor DFA/DMS's compliance with the Settlement, *id.* ¶ 7.2(l); and the DFA Northeast Area Council must conduct a review of members' milk checks and its election procedures, *id.* ¶ 7.2(k)).

With the strong encouragement of the Court, substantial additional time in which to

continue to negotiate the terms of a settlement, as well as the pressure of a December 28 deadline or trial, the parties were able to reach agreement on important additions to the conduct relief, including the following:

First, the settlement establishes and funds two farmer representative positions – the Advisory Council Member and Farmer Ombudsperson – to allow greater transparency into DFA/DMS and its finances (the Advisory Council Member), and provide a mechanism for farmers to raise concerns and seek their resolution through investigation, access to relevant records and non-binding mediation by the Ombudsperson.  Agreement ¶ 7.2(d).  The Advisory Council Member shall be charged with, among other things, advocating for the enhancement of producer pay prices and improving dairy farmers' margins.  *Id.* ¶ 7.2(d)(iv)(1).  To effectuate this duty, the Advisory Council Member commission a third-party review of DFA and DMS individual company financial statements and consolidation accounting, shall have access to all books and financial records of DFA's Northeast Area Council and DMS, be permitted to attend and participate in Northeast Area Council Meetings as well as other critical meetings, meet quarterly with an individual from DFA/DMS's management team to review activities in the Northeast, and consult with outside experts.  *Id.* ¶ 7.2(d)(vi).

The Farmer Ombudsperson shall focus on promoting fairness for DFA/DMS dairy farmers by hearing and investigating their complaints and concerns and attempting to resolve them with DFA/DMS.  *Id.* ¶ 7.2(d)(v)(2).  To achieve this goal, the Farmer Ombudsperson shall have access to relevant records, meet quarterly with a representative from the DFA/DMS management team, and attend and participate in Northeast Area Council Meetings.  *Id.* ¶ 7.2(d)(vii).

Second, the settlement creates significant protections to address concerns about potential

manipulation of milk testing results.  Although DFA/DMS disputed the claims about milk testing that were raised during the settlement approval process[33] – and expressed the view that no relief relating to this could be secured at trial – the parties worked diligently to agree on mechanisms and safeguards that would reasonably address the concerns that were raised first during the approval process of the Initial Settlement and then again during the recent settlement period. Accordingly, for the next decade, the settlement prohibits DFA/DMS from acquiring a controlling ownership interest in the milk testing company its members use, Dairy One.  *Id.* ¶ 7.2(e).  During this period, DFA farmers shall not comprise a majority of the DairyOne Board and DFA/DMS shall be required to engage in arm's length negotiations with DairyOne. Moreover, for the next five years, any dairy farmer in Order 1 whose milk is tested by DairyOne and who disputes the accuracy of the test result may require a split sample procedure in which the dairy farmer observes the collection and sealing of a sample that will be tested at two independent, certified labs in addition to DairyOne.  *Id.* ¶ 7.2(f).  If the split sample fails to confirm the original test result within a reasonable level of error, the appropriate adjustments to the farmer's milk check will be made and information regarding the labs' differing results submitted to the Market Administrator.  *Id.* ¶ 7.2(f)(i).  Additional farmer concerns regarding milk testing accuracy may be raised with the Farmer Ombudsperson who shall be empowered to mediate such disputes.  *Id.* ¶ 7.2(f)(iii).  Similar procedures are provided for adulterated milk results.  *Id.* ¶ 7.2(g).

Third, the settlement expands existing provisions regarding milk marketing agreements to include important provisions that protect dairy farmers from having their milk marketing

---

[33] DFA/DMS's views regarding milk testing – and the defenses it would raise at a trial – are described by DFA/DMS in their Response in Support of the Renewed Motion for Final Approval, Aug. 6, 2015, ECF No. 678, and the declarations by James R. Zimmerman, Russell Beck and Kent Widrick. *See also* Decls., Aug. 6, 2015, ECF Nos. 678-1 to 678-3.

14

arrangements terminated.  *Id*. ¶ 7.2(c).  Should DFA/DMS decide not to renew a Subclass

Member's milk marketing arrangement due to lack of demand, DFA/DMS shall provide the

Subclass Member 30 days' advanced notice of the termination decision along with a copy of the

instant Settlement.  *Id*. ¶ 7.2(c)(i).   DFA/DMS shall also be required, at the terminated Subclass

member's request, to continue to market their milk for a grace period of six months.  *Id*.  In the

event DFA/DMS terminates a Subclass member's marketing arrangement for cause, DFA/DMS

shall again provide at least 30 days' advanced written notice of the decision along with a

reasonable opportunity to cure the reason for termination.  *Id*. ¶ 7.2(c)(ii).  Should the terminated

Subclass member wish to dispute the provided basis for termination, the Northeast Area Council

or DMS Board of Directors shall review the decision and, at the farmer's discretion, the Farmer

Ombudsperson may be asked to mediate the dispute.  *Id*.  At the same time, the settlement

conversely still allows DFA and DMS farmers the opportunity to terminate the marketing

agreements with DFA and DMS on 90 days' notice instead of having only an opportunity once a

year upon the agreement's renewal.  *Id*.  ¶ 7.2(b).

Fourth, the settlement expands the prior provision on block voting to provide an

alternative to DFA's block voting procedure so that should DFA decides to vote its cooperative

as a block, it shall first be required to inform its members about that decision and provide

individual ballots to allow every farmer an opportunity to vote against the block.  *Id*. ¶ 7.2(h).

Fifth, some of the key conduct elements from the Initial DFA/DMS Settlement have been

supplemented to provide even greater protection to Subclass Members.  The period during which

DFA/DMS is restricted to certain specified full supply agreements (and can enter new

agreements only in limited circumstances) is extended to four years following final approval of

the proposed settlement.  *Id*. ¶ 7.2(a).[34]  Also, the provision protecting Subclass members and the

Subclass Representatives from retaliation as a result of this suit has been supplemented.  *Id*. ¶

7.2(m).  The non-retaliation provision expressly prohibits any form of discrimination or

retaliation against any

In exchange for the above consideration, Subclass Members who do not opt out of the

settlement agree to give up the right to continue this lawsuit against DFA or DMS.  *Id*. ¶ 1.16.

To address concerns discussed by the Court and others, the release of claims has been revised as

compared the Initial DFA/DMS Settlement to make clear that the release is limited to claims that

were or could have been asserted "arising out of the conduct" alleged in the complaint.  *Id*.

Similarly, the definition of "Released Parties" has been narrowed to exclude, for example,

Defendants' affiliates, partners, certain representatives, and those entities in which they have an

ownership interest.  *Id*. ¶ 1.17.

## V.    PRELIMINARY APPROVAL AND NOTICE.

On February 8, 2016, the Court preliminarily approved the Settlement and ordered that

notice be disseminated to the Subclasses.  Order Granting Mot. for Prelim. Approval, Feb. 8,

2016, ECF No. 718.  In accordance with the Court's Order, Subclass Counsel caused Notice to

be disseminated to the Subclasses on or about February 19, 2016.  Ex. F, Decl. of Matthew B.

---

[34] The settlement permits DFA/DMS to maintain and renew a limited number of full supply
agreements specified in Schedule A to the settlement.  Those agreements account for a relatively
small portion of the Class 1 plant capacity in the Northeast.  The settlement also provides, in ¶
7.2(a)(iii), that during the conduct period any new agreements for the supply of raw Grade A
milk in Order 1, and renewal of any existing agreement, "shall be presented, reviewed and
approved by the DFA Board of Directors, prior to DFA entering into or renewing any such
agreement, or to the DMS Board of Directors, prior to DMS entering into or renewing any such
agreement." This is consistent with the proposal by one Subclass Representative, Mr. Haar, that
board members participate in this process.  *See* 1/29/15 Hr'g Tr. at 81:2-5.  Although it is not
practical to have Board members present at each of these negotiations, this provision ensures
Board review and approval before any agreement is executed and thus is substantially in accord
with this proposal.

Potter at ¶¶ 21-22.  Additionally, Subclass Counsel caused notice of the Settlement to be published in the periodicals approved by the Court and directed the Claims Administrator to create and maintain a website and call center that provides information to the Subclasses regarding the Settlement.  Ex. F, Decl. of Matthew B. Potter at ¶¶ 22-23.

## ARGUMENT

## I. THE DFA/DMS SETTLEMENT SATISFIES THE SECOND CIRCUIT'S STANDARDS FOR FINAL APPROVAL.

The Second Circuit has instructed that "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."  *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982).[35]  These apply with special force in class actions.  Pursuant to Federal of Civil Procedure Rule 23(e)(2), courts will approve settlements if they are "fair, reasonable and adequate."  *Id.*  In making that determination, courts review "the negotiating process leading up to the settlement [, *i.e.*, procedural fairness,] as well as the settlement's substantive terms [, *i.e.*, substantive fairness]."[36]  The Second Circuit has identified nine factors to be considered in making this determination:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

---

[35] *Accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.' *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998). 'The compromise of complex litigation is encouraged by the courts and favored by public policy.'") (quoting in second part *Newberg on Class Actions* § 11:41 (4th ed.)); ECF No. 341 at 8; ECF No. 718 at 2.

[36] ECF No. 642 at 10 (quoting *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009)); *see, e.g., Wal-Mart*, 396 F.3d at 116.

ECF No. 341 at 8-9 (quoting *Grinnell*, 495 F.2d at 463).  "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"[37]

In *Grinnell* and subsequent cases, the Second Circuit has indicated that "[t]he most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."  *Grinnell*, 495 F.2d at 455 (quoting *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir. 1971)).[38]

### A.   The Settlement Resulted from "Arm's Length, Good Faith Negotiations Between Experienced and Skilled Litigators" and Was Procedurally Fair.

The multiple years of negotiations that led to the Settlement are described above.  This process was extensive, involved experienced counsel who have been litigating this matter for more than six years, and included extensive discussion with the Subclass Representatives. In granting preliminary approval of the Settlement, the Court found that, "the 2015 Settlement

---

[37] *In re Global Cross Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).

[38] *See, e.g.*, *In re Traffic Exec. Ass'n E. R.R.s v. Long Island R.R. Co.*, 627 F.2d 631, 633 (2d Cir. 1980) (In exercising discretion, "the most significant factor for the district judge is the strength of plaintiffs' case balanced against the settlement offer."); *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir. 1971) ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.  This factor is sometimes referred to as the likelihood of success."); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 333-34 (E.D.N.Y. 2010) (most important factor is strength of case on merits versus amount of settlement); *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800(LMM), 2009 WL 4403185, at *4 (S.D.N.Y. Dec. 1, 2009) (same); *D.S. v. N.Y.C. Dep't of Educ.*, 255 F.R.D. 59, 78 (E.D.N.Y. 2008) (same); *In re Excess Value Ins. Coverage Litig.*, No. M-21-84RMB, 2004 WL 1724980, at *12 (S.D.N.Y. June 30, 2004) (same); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 262 (2d Cir. 2011) (citing *Grinnell* as establishing this principle).  In *Wal-mart*, 396 F.3d at 119, the court cited the fact that there were only 18 objections to the settlement as "perhaps the most significant factor" in its analysis of the *Grinnell* factors and approval of the settlement in that case, but did not suggest that it was modifying the standard established in *West Virginia*, *Grinnell*, and many subsequent cases.

Agreement was reached as a result of non-collusive, arms-length negotiations that involved experienced attorneys and thirteen Subclass Representatives, all of whom are familiar with the facts and legal theories at issue in this complex litigation."  ECF No. 718 at 3.  Where, as here, "the settlement was reached as a result of arm's-length negotiations between experienced, capable counsel after the meaningful exchange of information and discovery, the Court concludes that the Settlement Agreement is procedurally fair, and is therefore entitled to a presumption of reasonableness."  *Hall v. ProSource Techs., LLC*, No. 14-CV-2502 (SIL), 2016 WL 1555128, at *5 (E.D.N.Y. Apr. 11, 2016).  That conclusion is well-supported by the record and satisfies the procedural fairness requirement here.

### B.   The Settlement is Entitled to a Presumption of Fairness, Reasonableness and Adequacy.

Under Second Circuit law, a settlement that results from arm's length, good faith negotiations between experienced counsel following meaningful discovery is entitled to "a presumption" of fairness, reasonableness, and adequacy.[39]  Because of their familiarity with the factual record, legal issues and risks presented at both the trial and appellate stage, the views

---

[39] *See, e.g., Wal-Mart*, 396 F.3d at 116 ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'") (quoting *Manual for Complex Litigation* § 30.42 (3d ed. 1995)); *McReynolds*, 588 F.3d at 803 (There is "a presumption of fairness, reasonableness, and adequacy as to the settlement where 'a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'") (quoting *Wal-Mart*, 396 F.3d at 116)); *Hall*, 2016 WL 1555128, at *5 (same); *In re MetLife*, 689 F. Supp. 2d at 329 (citing *McReynolds*, 588 F.3d at 803); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) (proposed class action settlement "enjoys a strong presumption that it is fair, reasonable and adequate" when it results from arm's length negotiations by experienced counsel); *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *1 (S.D.N.Y. May 14, 2004) ("strong presumption" of fairness, reasonableness and adequacy); *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (same).

"expressed by counsel experienced in this genre of litigation [i.e., class action litigation][] weigh heavily in favor of approval" of a settlement.[40]  "This is particularly true in complex class actions, where 'the courts have long recognized that such litigation "is notably difficult and notoriously uncertain," and that compromise is particularly appropriate.'"[41]  That presumption applied with particular force here for the following reasons:

First, the fairness, reasonableness and adequacy of the settlement reflects the unanimous judgment of each of the law firms representing the Subclasses, with diverse backgrounds and expertise.[42]  Second, as in *Marsh ERISA*, the settlement was reached after review of millions of pages of documents, more than 70 depositions in the Northeast (and even more in the Southeast), voluminous expert reports and extensive briefing of the issues presented.  *See* note 41, *supra.*

---

[40] *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 282 (S.D.N.Y. 1993); *see, e.g.*, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (quoting *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992)); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd* 117 F.3d 721 (2d Cir. 1997) (class counsel's opinion that settlement is in the best interests of the class is entitled to "great weight") (quoting *Chatelain*, 805 F. Supp. at 212); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 740 (S.D.N.Y. 1993) (same); *In re Michael Miliken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 56 (S.D.N.Y. 1993) (same).

[41] *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 WL 7323417, at *3 (S.D.N.Y. Dec. 19, 2014) (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989)).  *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 139 (S.D.N.Y. 2010) ("At the time of the Settlement, Plaintiffs' Counsel had reviewed millions of pages of documents, participated in 100 depositions, exchanged expert reports and rebuttal reports, and fully briefed the issue of class certification.  The advanced stage of the litigation and extensive amount of discovery completed weigh heavily in favor of approval.  The parties' counsel were clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of the proposed Settlement.").

[42] For example, the attorneys involved in this matter include counsel with many years of experience in the prosecution and defense of class actions, including extensive trials of class action matters; attorneys who have served at the Department of Justice and the Federal Trade Commission on antitrust enforcement matters; attorneys with extensive experience trying matters before juries in Vermont; and counsel with significant prior experience in the dairy industry.

Thus, counsel is well-positioned to evaluate the factual record, legal issues, economic issues, and relative benefits and risks of settlement and trial. Based on the evidentiary record and Second Circuit law, the settlement is entitled to the presumption of fairness, reasonableness and adequacy.

### C.    The Settlement Satisfies the *Grinnell* Factors and Should be Approved.

### 1.    The complexity expense and likely duration of the litigation.

Antitrust cases, by their nature, are highly complex, and this is particularly true of antitrust class actions.[43] Absent settlement, there would be significant additional resources and costs expenses to prosecute the claims not only through trial, but also through several years of appeals that would almost inevitably follow.

During the prior Fairness Hearing, some Subclass members questioned whether trial would materially increase the time and expenses required for this case. Given the complexity of antitrust class action litigation, the resources required – for both the parties and the judiciary – to complete both trial and subsequent appeals are enormous. A six-week antitrust trial would require resolution of more than a dozen motions *in limine*, a much larger number of evidentiary issues presented by the parties' voluminous deposition designations, cross-designations and objections, presentation of weeks of factual and expert testimony by witnesses traveling to Vermont, and numerous motions both during the course of trial and after the completion of trial.

Moreover, regardless of the outcome of trial, extensive appellate proceedings would be virtually inevitable. There are countless examples of antitrust cases with lengthy and expensive appeals following trial, a process that requires several years to complete. If the plaintiffs succeeded at trial, it is highly likely that extended appeals would have resulted – a process that

---

[43] *See, e.g.*, *Wal-Mart*, 396 F.3d at 118 (approving settlement where antitrust case would have taken "three months to try and several years for appellate review").

would be expected to last several years.[44]  Moreover, because a case of this complexity has required resolution of many vigorously contested legal issues – including issues relating to class certification, substantive antitrust law and damages – there is an inherent risk that a favorable jury verdict would be reversed on appeal, resulting in many additional years of delay before the Dairy Farmer Subclasses obtained any relief.  In short, the complexity, expense and duration of this litigation would not end with a trial, but would almost certainly extend many years into the future.  This is a factor that must be taken into account and weighs in favor of the proposed settlement.[45]

### 2.    The Reaction of the Subclasses to the Settlement.

The second *Grinnell* factor – reaction of the Subclass – also favors Settlement.  The following considerations are relevant to application of this factor.

---

[44] For example, in *In re Urethanes Antitrust Litigation*, No. 04-md-01616 (D. Kan.), a jury verdict in favor of the class in February 2013 resulted in lengthy post-trial motions, an appeal to the Tenth Circuit, a request for *en banc* review, and then a petition for *certiorari* to the Supreme Court.  While the matter was pending before the Supreme Court, a proposed settlement was finally reached and will now be reviewed by the District Court pursuant to Rule 23.  This process is not likely to be completed until late 2016, almost four years after the jury reached a verdict.  Had the appellate process resulted in a reversal, the case would have taken many more years to complete.

[45] *See, e.g.*, *Wal-Mart*, 396 F.3d at 118 (explaining that appellate review would take "several years"); *In re Metlife*, 689 F. Supp. 2d at 331-32 (holding that "complexity, expense, and likely duration of the litigation favor the proposed Settlement" because "[r]egardless of the outcome at trial, post-trial motions and an appeal by the losing party were likely, possibly followed by a new trial in the event of a reversal. . . . Delay at the trial stage and through post-trial motions and the appellate process might have forced class members to wait years longer for any recovery."); *Marsh ERISA*, 265 F.R.D. at 138 ("even if the Class were to win a judgment at trial, the additional delay of trial, post-trial motions and appeals could deny the Class any actual recovery for years"); *EVCI Career Colls.*, 2007 WL 2230177, at *5 (finding that complexity, expense and likely duration of litigation supported settlement where "there would have been significant additional resources and costs expended to prosecute the claims through trial and the inevitable appeals"); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (explaining that after a trial, defendants would "undoubtedly appeal" to the Court of Appeals and perhaps the Supreme Court; "[g]iven the recent minting of some of the applicable law, the parties risked the possibility of a reversal and second trial").

*First,* the Court should be apprised of the following facts (*see also* Exhibit B):

- A total of 8,859 farms were given Court-approved notice.

- 7,551 farms (approximately 85% of the farms notified) have submitted claims.[46]

- 1,048 subclass farms have submitted letters to the Court indicating their support for the settlement. 98 subclass farms have made submissions opposing the settlement. Thus, 91.4% of the subclass farms that have made submissions to the Court, have indicated they support the settlement.[47]

- After the Court allowed Subclass members a second opportunity to opt out of the settlement, only 172 farms (1.9% of those notified) elected to do so.[48]

---

[46] This is an extremely high claim submission rate. This is particularly striking because a significant number of Subclass members are Amish or Mennonite farmers who often do not participate in litigation for personal reasons. The Court has previously indicated that a subclass member's decision to submit a claim form (but not object or otherwise weigh in on a settlement) should be given limited weight. In some other cases, courts have found this to be a factor favoring approval, particularly where class members (as the settlement now provides) have the opportunity to opt out and instead elect to submit a claim. *See, e.g., Ersler v. Toshiba Am., Inc.,* No. CV-07-2304 (SMG), 2009 U.S. Dist. LEXIS 14374, at *5 (E.D.N.Y. Feb. 24, 2009); *In re Luxottica Grp. S.p.A. Sec. Litig.,* 233 F.R.D. 306, 312 (E.D.N.Y. 2006) (finding reaction of class favored approval where "claims have been submitted on behalf of 80 percent of the affected shares," even though class members were permitted to opt out); *Johansson-Dohrmann v. CBR Sys., Inc.,* No. 12-cv-1115-MMA (BGS), 2013 U.S. Dist. LEXIS 103863, at *17-18 (S.D. Cal. July 24, 2013).

As discussed above, however, there are two other considerations of much greater significance here. First, the Second Circuit has made clear that where a settlement is fair and reasonable, it should be approved even where there is much more significant opposition. *See* discussion *infra.* Second, in addition, the settlement presented here is supported by the great majority of farms that have filed submissions, as well as a substantial majority of the subclass representatives appointed by the Court.

[47] *See* Exhibit B. Additional letters were received from some farms that are not members of the Subclasses, because they are not in Order 1 or opted out of the Subclasses, and have no standing to object to (or support) the settlement. There were also some farms that submitted duplicate submissions. These submissions – an additional 109 letters in support of the settlement and 61 in opposition – have been excluded from the totals above.

[48] During the first opportunity to opt-out of the Subclasses, 936 timely requested to exclude themselves. We note that farmers can and do elect to opt out of the litigation for many reasons. They may not want involvement with the legal process, they may wish to pursue relief separately, or they may have a different view of DFA/DMS than alleged in the lawsuit (and therefore may prefer not to be part of litigation or a settlement against DFA/DMS).

Thus, the great majority (more than 90%) of subclass members that have expressed views about the settlement to the Court, have indicated that they favor settlement.

*Second,* as we have previously advised, there has been an aggressive, year-long effort to urge opposition and (more recently) opt-outs to the settlement.[49]  Subclass Counsel previously expressed concern that this effort has included significant misinformation (which it has).  Even aside from that concern, the inherent difficulties of understanding the complex factual and legal issues presented (particularly where much of the relevant evidence is under seal), is a significant reason that the Second Circuit gives significant weight of experienced counsel, and has emphasized the importance of the courts' own assessment of the fairness of a settlement.  Here, it is striking that after more than a year of vigorous efforts to persuade farmers that they have been "sold out" by lawyers colluding with DFA/DMS, this campaign has persuaded only a small fraction of the Subclasses to oppose the settlement (or elect not to secure its benefits and be subject to its terms).

*Third*, as noted above, approximately 90% of the submissions to the Court *support* approval of the settlement.[50]

---

[49] This effort has been coordinated by Mr. Haar and Mr. Eby (of the National Dairy Producers Organization) and is described in conference calls that were recorded and then made publicly-available on the NDPO website.  Mr. Eby hoped to persuade more than 1,000 farmers to oppose the settlement – and there have been mailings, multiple calls to individual farmers, and efforts to encourage opposition at farm events – but the actual opposition that resulted from this year-long effort is substantially smaller.  *See* Ex. C (transcript of NDPO Feb. 16, 2016 call) (statement by Mr. Eby "thinking out loud" that "if we were to get 1,000 petitions, and they were to go across her desk, and they were to then show up on the court docket" that is " a statement" and is "going to make it very difficult for her."). To be clear, Subclass Plaintiffs have no objection to anyone expressing their views or trying to persuade others to share those views with accurate information.  It is also worth noting that Mr. Eby has elected to exclude himself from the Settlement and, accordingly, does not have standing to oppose or support the Settlement.

[50] Mr. Haar has apparently requested *in camera* submission of materials alleging that some farmers made those submissions because of concern they could face retaliation if they did not. Subclass Counsel requested those materials (and indicated they could be treated as subject to the

Although these numbers, as well as the support of a substantial majority of the Subclass Representatives (including the new Representatives added to provide "a fresh perspective and new expertise that is likely to assist the court"), reflect significant support for the settlement, it has become obvious that *no settlement* will ever overcome some level of opposition.  Indeed, that is clear from the letters submitted by NDPO which urge relief that cannot possibly be provided in an antitrust trial, even if successful.  As revised – and consistent with comments by the Court – the settlement allows any Subclass member the ability to opt out of the settlement – but they should not be able to prevent the many thousands of Subclass members who will immediately benefit from this settlement from securing those benefits.  The Second Circuit has been clear that the courts' responsibility in these circumstances is to evaluate the adequacy of the settlement, bearing in mind that "[t]he most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."  *Grinnell*, 495 F.2d at 455 (quoting *West Virginia*, 440 F.2d at 1085); *see also* note 38 *supra*.

Thus, in *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987), the Second Circuit affirmed approval of a settlement even though *all* 46 of the 126 class members who responded to the notice were opposed to the settlement and those objectors constituted 36% of the total class.  In affirming, the Second Circuit explained:

> [I]t is well established that a settlement can be fair notwithstanding a large number of objectors.  *See, e.g.*, *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982) (approving settlement despite objections of approximately 56% of class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) (approving consent decree over objections of 15% of class); *Reed v. Gen. Motors*

---

protective order for attorneys eyes only), but the materials have not been provided.  The settlement includes an explicit provision prohibiting any such retaliation and the Court retains jurisdiction if there is a violation of this term, or any other term, in the settlement.  In essence, opponents of the settlement seem to be taking the position that their submissions should be counted, and the much larger number of supporting submissions should be disregarded.  That is not a tenable position.

> *Corp.*, 703 F.2d 170 (5th Cir. 1983) (approving settlement despite opposition of
> 40% of class); *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) (approving
> settlement despite objections of counsel purporting to represent almost 50% of
> class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974)
> (approving settlement over objections of more than 20% of class); *cf. Pettway v.
> Am. Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978) (disapproving settlement
> opposed by 70% of subclass).

823 F.2d at 23 (citations for certiorari denials omitted).  In upholding the settlement –

even though 36% of the class (and all the submitters) had objected – the Second Circuit

indicated that "despite the fact that there was such minority opposition to the settlement,

*the fairness and reasonableness of th[e] settlement must be the cornerstone of our*

*analysis*."  *Id.* at 24 (emphasis added).  This approach has been reiterated by the Second

Circuit and other courts in subsequent opinions.[51]

    Here, almost ninety percent of the submissions to the Court, as well as a substantial

---

[51] *See, e.g.*, *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013) (settlement approved where 118 class members had objected, 58 had submitted supporting letters, 141 had opted out, and the named class representatives all opposed settlement); *Cty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1325 (2d Cir. 1990) (affirming approval of settlement over objections of "a majority" of the class); *TBK Partners*, 675 F.2d at 462 (holding that settlement that was fair should be approved even though holders of a majority of class shares opposed settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 485 (S.D.N.Y. 2009) ("The Second Circuit has also previously provided guidance as to what percentage of the class must object before a settlement would be rendered unfair, indicating that an otherwise fair settlement should not be deemed unfair because of opposition by thirty-six percent of the total class."); *Park v. Thomson Corp.*, No. 05 Civ. 2931(WHP), 2008 WL 4684232, at *3 (S.D.N.Y. Oct. 22, 2008) (approving settlement where 134 class members opted out and citing *Grant's* holding that an "otherwise fair settlement should not be deemed unfair because of opposition by 36% of the total class"); *In re Lloyd's Am. Tr. Fund Litig.*, No. 96 Civ. 1262 RWS, 2002 WL 31663577, at *23 (S.D.N.Y. Nov. 26, 2002) (approving settlement where 239 of 1,350 class members submitted objections); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 854 (E.D.N.Y. & S.D.N.Y. 1991) (explaining that "settlements may be approved in the face of substantial objections from class members" and indicating that "opposition may reflect a lack of full appreciation of the legal and factual complexities present" and "[a] truly democratic vote by informed members of the class would be virtually impossible"); *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 761-63 (E.D.N.Y. 1984) (approving settlement where more than one thousand class members communicated to court and a *majority* opposed settlement; court ruled that "strong opposition of a considerable number of sincere and well-motivated members of the class" did not preclude approval).

majority of the Subclass Representatives, *support* settlement.  Accordingly, the second *Grinnell* factor also favors approval of the Settlement.

### 3.   The stage of the proceedings and the amount of discovery completed.

This *Grinnell* factor is designed to assure the Court "that the counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them and the risks of maintaining the class action through trial."  *In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442 (RPP), 1994 U.S. Dist. LEXIS 8038, at *40 (S.D.N.Y. June 15, 1994).  The Second Circuit recently reaffirmed that a settlement reached on the "eve of trial" after "[f]ull discovery, both fact and expert discovery, had taken place" rendered the Court well-positioned to determine the settlement's adequacy.  *In re Elec. Books Antitrust Litig.*, No. 14-4649(L), 2016 WL 624505, at *3 (2d Cir. Feb. 17, 2016) (internal quotations omitted); *see also Wal-Mart*, 396 F.3d at 118 ("If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement.") (quoting *Newberg on Class Actions* § 11.45 (4th ed.)).

The Court has previously determined that the "stage of the proceedings and the amount of discovery completed weight in favor of the substantive fairness of the Proposed Settlement because '[t]his factor requires the [c]ourt to consider whether the parties have adequate information about their claims.'"  ECF No. 362 at 14 (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 974 F. Supp. 2d 179, 298 (S.D.N.Y. 2012)).  The Court found that "[i]n this case the parties have 'a thorough understanding of their case.'"  *Id.*  (quoting *Wal-Mart*, 396 F.3d at 118).  That conclusion is supported by the record, including discovery that involved millions of pages of documents and more than seventy depositions, as well as counsels' understanding of the factual record in *Southeastern Milk*.  Under Second Circuit law, this finding and the arm's-length nature of the negotiations mean that the presumption of fairness, reasonableness and adequacy is

applicable and the conclusions of counsel that the settlement is in the best interest of the

Subclasses and are entitled to heavy weight.

### 4.    The risks of establishing liability.

As discussed *supra,* the Second Circuit has instructed that "[t]he most important factor"

in evaluating settlement is "the strength of the case for [the] plaintiffs on the merits," balanced

against the settlement terms.  *Grinnell,* 495 F.2d at 455 (quoting *West Virginia*, 440 F.2d at

1085).  Evaluating the plaintiffs' "risks of establishing liability" is obviously of central

importance to this analysis.  In the Court's prior opinion denying approval without prejudice, the

Court found that:

> With regard to the risks to the class of establishing liability and damages and of
> maintaining the class action through the trial, Subclass Counsel contend that these
> factors weigh *strongly in favor* of the Proposed Settlement.  *With the exception of
> maintaining the class through trial, the court agrees.*  Plaintiffs' litigation risks
> were sizable in light of unresolved issues regarding the statute of limitations,
> market definition, the competing expert opinions, and Plaintiffs' damages
> calculation.  *A defense verdict therefore was and remains a distinct possibility*.

ECF No. 642 at 17 (emphasis added).

This Court is very familiar with the factual and legal issues presented by the case.

In evaluating the settlement, all counsel involved had to consider both the Court's prior

rulings and comments, as well as numerous defenses that would be presented at trial by

DFA/DMS.  Although these defenses are disputed, all of the following factors and risks

had to be considered:

- The concerns expressed by the Court on a number of occasions about the complexity
  of the case, the risk the jury would not understand the liability theories, and the
  inferences that could be drawn from the evidence.[52]

---

[52] *See, e.g.*, ECF No. 525 at 17-22 (discussing issues about inferences that can be drawn
from evidence); Hr'g Tr. at 8:20-9:7, May 8, 2014, ECF No. 497 ("5/8/14 Hr'g Tr.") (discussing
complexity of theory and problem of presenting theory to jury that "they can't figure out"); Hr'g
Tr. at 23:16-24, Aug. 1, 2013, ECF No. 466 ("8/1/13 Hr'g Tr.") (raising concerns about

- The Court's ruling relating to market definition and the potential implications of that ruling for rule of reason analysis, damages, and other issues in the case.[53]

- The summary judgment rulings created significant uncertainties regarding the nature and scope of evidence the Subclasses would be permitted to show the jury.[54]

- The "heavy" burden the Subclasses would face to prove fraudulent concealment and recovery damages outside the four-year limitations period.[55]

- For damages within the statute of limitations period, the Court's summary judgment ruling rejected two of the three theories proffered by the Subclasses (the speculative damages rule and the *Berkey Photo* rule). *See* ECF No. 525 at 41-43; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 264 (2d Cir. 1979). The summary judgment ruling and earlier ruling on Defendants' motion to dismiss also raised issues about the conduct subject to the remaining doctrine (the continuing violation rule), explaining that it is "heavily disfavored in the Second Circuit" and applied only on "a showing of compelling circumstances." ECF No. 81 at 34-38 (quoting *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010)); ECF No. 525 at 38 (same). This created material risks even for damages incurred within the four-year period.

- DFA/DMS's contention that their combined market share is in the range of 50-53% and their related argument that this is insufficient for monopolization or market

---

[53] ECF No. 525 at 6-12; *see also* ECF No. 470 at 8 ("[A] difference in opinion regarding the relevant geographic market may have a chain effect because the definition of geographic market assists in defining the market participants, which, in turn, may be critical to determining anticompetitive effects.").

complexity and ability of a wide range of jurors to understand to under proffered theories).

[54] ECF No. 525 at 6, 24-25, 28, 40-41, 42 & 44; *see also* 5/8/14 Hr'g Tr. at 8:24-9:10 (raising issues about evidence that could be presented to the jury).

[55] ECF No. 81 at 29-31 (stating that Plaintiffs' burden of establishing fraudulent concealment is a "heavy one" and it was "somewhat unlikely that Plaintiffs" could satisfy burden because of the "public nature of the information upon which they base their claims" and ruling that "[a]s currently pled, the Amended Complaint fails to set forth a fraudulent concealment claim that would toll the applicable statute of limitations") (quoting in part *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979)); ECF No. 341 at 11-12 (explaining the Plaintiffs' "challenges with regard to Dean's statute of limitations defense"); ECF No. 525 at 33, 36 (denying summary judgment but stating that Plaintiffs' burden to establish fraudulent concealment at trial was a "heavy one") (quoting *In re Beef Indus.*, 600 F.2d at 1171); 5/8/14 Hr'g Tr. at 12:2-9 ("So I don't understand the fraudulent concealment argument, when it starts, when it stops, where is the due diligence part of it, why couldn't you have brought the lawsuit sooner, got the discovery you claim shows all the bad acts and brought those claims. It's not as if people were not complaining about some of these activities well before the class period and well before the statute of limitations.").

power.[56]

- DFA/DMS's contention that full supply agreements are common in the milk industry, provide significant benefits to DFA/DMS farmers, and such agreements with Dean are not anticompetitive or unlawful because Dean has only approximately a 16% share of all milk processing in Order 1 (and 33-35% of pool distributing capacity).

- DFA/DMS's contention that the alleged conspiracy would not succeed without the involvement of many other cooperatives, including Agri-Mark, St. Albans, Land-o-Lakes, Maryland-Virginia and others, and its related contention that the Subclasses could not establish their involvement in the conspiracy;

- DFA/DMS's contention that these farmer-owned cooperatives have no motive to participate in a conspiracy that suppresses milk prices for their owner-members.

- DFA/DMS's contention that the alleged conspiracy would not succeed without the involvement of Hood (the largest processor other than Dean), which was previously dismissed from the case after filing a motion to dismiss;[57]

- DFA/DMS's related contention that the alleged conspiracy could not succeed without the participation of other processors, such as Kraft and Farmland, and its contention that their participation could not be established.

- DFA/DMS's contention that the challenged practices provide significant efficiencies and are pro-competitive,[58] its prior submission of declarations from many farmers, and the potential impact of many farmers testifying in support of DFA/DMS at trial.

The factual and legal issues raised by these defenses are complex and, as noted, would be vigorously contested.  But in evaluating the settlement, counsel had to give careful consideration to these risks individually and collectively, and the consequences for the Subclasses if:  (a) a jury returned a defense verdict based on some or many of these defenses; (b) DFA/DMS received favorable court rulings on these issues either at trial or in post-trial motions; or (c) if there was a

---

[56] Mem. of P.&A. in Supp. of Mot. by Defs. DFA & DMS for Summ. J. at 17-18, Jan. 30, 2014, ECF No. 479-1.

[57] ECF No. 81 at 41 (holding that allegations in complaint were insufficient to state an antitrust conspiracy claim against Hood and dismissing Hood from the case).

[58] *See, e.g.*, Defs.' Resp. to Pls.' Mot. *In Limine* to Preclude Arg. or Implication at Trial that Pls. are "Suing Themselves" at 2, June 13, 2014, ECF No. 533 (indicating that Defendants will introduce evidence that "the formation of DMS" and "Defendants' entry into supply and outsourcing contracts with processors" were "*beneficial* to dairy farmers" and "[s]uch evidence goes to the heart of Defendants' case.").

successful plaintiff verdict, the risks and delays presented by appeals would very likely continue

for years (and could result in a reversal of any favorable verdict).

In *Grinnell* and other cases, the Second Circuit has emphasized the overriding importance

of this consideration.  For the reasons set forth above, the risks of establishing liability (and

sustaining a liability finding) strongly support approval of the settlement.

### 5.     The Risks of Establishing Damages.

The Court's March 31, 2015 opinion found that the risk of establishing damages also

supported the settlement.  ECF No. 642 at 17.  Although damage issues would be significantly

disputed at trial, these are all risks that had to be carefully considered:

- The recovery of damages in the case was significantly impacted by the Court's summary judgment ruling excluding certain damages as umbrella damages, and also depends significantly on the jury's resolution of the statute of limitations issues described above.

- DFA/DMS has submitted expert reports challenging the damage methodologies and conclusions reached by the Dairy Farmer Subclasses' expert, Dr. Rausser, on numerous grounds.[59]

- DFA/DMS would rely on their expert, Dr. Kalt, to argue that "[d]uring the class period, premiums for farmers supplying Order 1 plants increased in absolute terms by an average of $0.04/cwt per year, or $0.30/cwt over the class period," and contend that premiums in Order 1 are generally higher than in other Orders.[60]  DFA/DMS would rely on Dr. Kalt's analysis to contend that damages in this case are zero.

In addition to these issues, counsel had to consider the fact that no jury in this District has

awarded damages in any case in the past 15 years that approach the magnitude of the damages

requested here (or, for that matter, the amount of the settlement).  In approving the settlement at

issue in *Wal-Mart*, the Second Circuit cautioned that "the history of antitrust litigation is replete

---

[59] *See, e.g., Marsh ERISA,* 265 F.R.D. at 140 (approving settlement and explaining that "[t]he presentation of expert testimony on complex damages issues inevitably creates significant risks that Plaintiffs avoid with [] settlement.").

[60] Defs.' Concise Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ¶¶ 107, 127-30, Jan. 31, 2014, ECF No. 479-2.

with cases in which antitrust plaintiffs succeeded at trial on laility, but recovered no damages, or only negligible damages, at trial, or on appeal."[61]

### 6. The risk the Subclasses could be decertified.

Although the Court's March 31, 2014 Opinion dismissed the risk of decertification, DFA/DMS have made clear that they would re-litigate this issue at trial, presumably by reasserting their defenses based on alleged conflicts and challenges to Dr. Rausser's ability to show impact and damages by common proof.  In pre-trial submissions, DFA/DMS indicated it would present testimony on these matters both to seek decertification at trial or to make this the basis "*of a subsequent appeal*."[62]  More recently, DFA/DMS filed a motion for decertification. With DFA/DMS's agreement, that motion remained pending while the parties resumed the negotiations that culminated in this Settlement.  Because of the complexity of the issues and still evolving standards relating to class certification, these are risks Subclass Counsel had to take seriously not only at trial, but in a subsequent appeal.[63]

### 7. The ability of the Defendants to withstand a greater judgment.

Although the seventh *Grinnell* factor may be relevant where the defendant's ability to pay a greater judgment is in doubt, in most cases (including this one) it is not a significant factor favoring or disfavoring settlement.[64]

---

[61] *Wal-Mart*, 396 F.3d at 118 (quoting *NASDAQ Mkt.-Makers*, 187 F.R.D. at 476).

[62] ECF No. 533 at 3 (emphasis added).

[63]  Indeed, the Court recognized this risk when it stated: "So 90 days I am going to ask for a joint report. I will rule on all motions except for the motion to decertify a class. I am going to at least wait 90 days because I don't see that's something that I need to do now, but it's something to take up at trial. It puts significant risk on the plaintiffs going forward, so you should factor that in to your negotiations as well."  Status Conference Tr. at 34:10-16, Sept. 29, 2015, ECF No. 705.

[64] *See* ECF No. 642 at 14; *In re Metlife*, 689 F. Supp. 2d at 339-40 (explaining that this factor "is much less important than other factors" and "does not weigh either for or against

8.  **The range of reasonableness of the settlement fund in light of (a) the best possible recovery and (b) all of the attendant risks of the litigation.**

**The Financial Relief**.  As previously advised, the $50 million payment agreed to by DFA/DMS is the largest antitrust settlement or judgment in the history of this jurisdiction and exceeds by a factor of almost 20 the largest jury verdict reported in the past 15 years.  In determining that $50 million was a fair and reasonable settlement amount, Subclass Counsel had to evaluate this in light of the risks of establishing liability, proving damages, maintaining the Subclasses, and the risks and delays that would attend subsequent appeals.[65]

The amount of a settlement must be "judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *Agent Orange*, 597 F. Supp. at 762.  In *Grinnell*, the Second Circuit made clear that a proposed settlement "cannot be judged without reference to the strength of plaintiffs' claims." 495 F.2d at 455.  The Second Circuit noted that "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id.* at 455 n.2.  While that obviously is not the situation presented here, the salient point is that the reasonableness of any settlement amount must carefully consider the risks and delays that would be entailed by a trial and subsequent appeals.

Here, by any measure, the amount of the settlement is an outstanding result.  The Second Circuit has established that "it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."  ECF No. 642 at 8-9 (quoting *Long*

approval").

[65] Although some objectors have argued that a larger payment was secured in *Southeastern Milk*, the Court has previously explained that the factual record in this case presents significantly greater challenges than the *Southeastern Milk* case.  ECF No. 341 at 6-8.

*Island Lighting*, 907 F.2d at 1324).[66]  Thus, the appropriate calculation is:

- The maximum single damages calculated by Subclass Plaintiffs' expert in this case was $341 million.  (Defendants' expert believes there are no provable damages).

- The Court's summary judgment opinion excludes recover of damages on milk sales to non-conspirators, an amount Defendants estimate as one-third of the claimed damages. This means that the maximum single damages following the Court's ruling are approximately $228 million.

- Assuming no overlap, only 60% of those damages – approximately $136.8 million – fall within the four-year limitations period (even for those damages, Plaintiffs confront the challenges relating to the continuing violation doctrine discussed above).  Any recovery of additional damages would require the Subclasses to establish fraudulent concealment.

Thus, if the proposed settlement is approved, the total recovery from the

DFA/DMS and Dean settlements will be $80 million, almost *60%* of the maximum single

damagers calculated by Subclasses' expert during the four-year period (after applying he

Court's summary judgment ruling), and a substantial percentage of the amount claimed if

the total period is considered.[67]

In light of the "distinct possibility" of a defense verdict, ECF No. 642 at 17, the risks and

uncertainties in establishing damages, and applicable Second Circuit law,[68] the settlement

---

[66] *Accord Grinnell*, 495 F.2d at 452; *Blessing v. Sirius XM Radio, Inc.*, No. 09 CV 10035(HB), 2011 WL 3739024, at *3 n.4 (S.D.N.Y. Aug. 24, 2011); *In re W. Union Money Transfer Litig.*, No. CV-01-0335 (CPS), 2004 WL 3709932, at *11 n.11 (E.D.N.Y. Oct. 19, 2004).

It would be equally inappropriate to compare the settlement amount to some benchmark other than the single damages that are realistically recoverable in the case (such as some other measure of damages that has not been posited by plaintiffs' experts or a comparison with the total volume of milk sold in Order 1 or the total price that include significant components other than the over-order premiums as issue here).

[67] If the Subclasses proceeded to trial and were successful, the prior settlement of the Dean litigation would be an offset against the trebled award.

[68] *See, e.g.*, *In re Initial Pub. Offering*, 671 F. Supp. 2d at 483-85 (approving settlement which provided two percent of defendants' maximum possible liability, observing that "the Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate"); *In re Merrill Lynch Tyco Research Sec. Litig.*,

amount is clearly reasonable and well within the range approved by the Second Circuit.  *See* ECF No. 582 at 7 ("On balance, a total monetary payment of $50 million falls within a reasonable range of potential outcomes when considered in the context of the legitimate risk of a defense verdict.").

**The Injunctive Relief.**  Like the financial terms, the injunctive terms must be "judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *Agent Orange*, 597 F. Supp. at 762.  As in *Grinnell*, all settlement terms have to be evaluated by considering "the strength of the case for plaintiffs on the merits" balanced against the terms available in settlement.  *Grinnell*, 495 F.2d at 455.  And in considering those terms, Subclass Plaintiffs had to evaluate:  (a) the conduct that could be demonstrated based on the voluminous discovery record; (b) whether that conduct is illegal under the antitrust laws; (c) the relief that could be supported on a class basis; (d) the relief realistically achievable at trial; (e) the risks that Subclass Plaintiffs would not prevail at trial and would, as a result, eliminate all financial and non-monetary relief; and (f) the likelihood of several years of appellate delay before any relief would be entered (and substantially more delay if a verdict was reversed on appeal).

As the Court is aware, the injunctive relief that could be secured at a trial is limited to conduct found to be illegal.[69]  The Court previously approved the Dean settlement, which did not

---

249 F.R.D. 124, 135 (S.D.N.Y. 2008) ("estimated recovery of three percent of the total damages estimated by the plaintiffs, does not meaningfully diverge from the range of reasonableness"); *In re Prudential Sec. P'ships Litig.*, MDL No. 1005, 1995 U.S. Dist. LEXIS 22103, at *51-57 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6% and 5% of claimed damages); *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y. 1972) (3.2% to 3.7% of the potential recovery "well within the ball park"), *aff'd in part, rev'd on other grounds*, 495 F.2d 448 (2d Cir. 1974).

[69] After the initial ruling denying class certification, the Court certified Subclasses in this matter in part because injunctive relief at trial would be limited to conduct determined to be

include any injunctive relief at the time of approval, as fair and reasonable.  The proposed

settlement with DFA/DMS goes far beyond the monetary relief set forth in the Dean settlement.

On the evidentiary record now before the Court, there are numerous indicia of the reasonableness

of this relief:

First, as discussed above, from the onset of the extended negotiations with DFA/DMS the

Subclass Representatives indicated a strong interest in substantially achieving the injunctive

relief secured in *Southeastern Milk*.  That relief has, to a very large extent, been secured.  The

settlement also goes well beyond *Southeastern Milk* by imposing strict limitations on agreements

not to solicit farmers (a significant restraint that was confirmed by discovery), providing relief

relating to testing that was not included in the *Southeastern Milk* settlement, creating both an

Ombudsperson and an Advisory Council member that respectively will serve to investigate

issues, mediate disputes, advocate greater pay and report as appropriate.

Second, after milk testing was raised as an overriding concern at the prior fairness

hearing, there was extensive negotiation to address this issue in the revised settlement.   On one

of the publicly available NDPO's calls, one of the participants commented that "the precedent

this would set is what has me very interested in this case" because "if this could set the precedent

of validating split-sample results from independent labs, then we might have something to use

here."[70]  As described *supra,* the settlement includes significant relief in this area.  This is

particularly significant because the opposition at the last fairness hearing argued at length that

this was one of their primary objectives, and yet this class relief can *only* be achieved through

---

illegal.  Op. & Order Granting Pls.' Renewed Mot. for Class Certification at 3, Nov. 19, 2012,
ECF No. 435.

[70] *See* Ex. E at 18 (transcript of NDPO Jan. 19, 2016 call).  Although participants then
questioned whether this was in the settlement, this, in fact, is exactly what the revised settlement
does.

Settlement.  If the matter instead proceeded to trial, there is no realistic prospect that this relief would be achieved.

Third, as explained *supra*, the submissions by the Vermont Attorney General's office and senior legislators in both Vermont and New Hampshire:

- The Vermont Attorney General's Office has stated that it is "impressed by the extensive injunctive relief that the settlement obtains for the class members.  The behavioral remedies go directly to the conduct alleged in the matter …. The injunctive relief appears to be on part with the sort of relief that our office would seek in a matter like this.  In light of these considerations, we hope that the Court will approve this settlement."  ECF No. 832.

- Senator Starr, Chair of Vermont's Senate Committee on Agriculture and Senator Kitchel, Chair of the Committee on Appropriations, have urged approval of the Settlement and discussed the benefits of increased transparency relating to DFA's operations, milk testing and new member solicitation.  "Appointment of the ombudsperson would also be a significant advance in this regard."  The legislature will also "benefit from hearing a report by the DFA producer price advocate as to key legal changes, once he or she has had the chance to pursue the designated mission."  ECF No. 1510.

- Similarly, the Chair, Vice Chair and Ranking Member of the New Hampshire House Committee on Environment and Agriculture have written to the Court and expressed their "strong support of the proposed settlement" in this matter.  ECF No. 2023.[71]

Fourth, in addition to the equitable provisions described *supra*, the settlement also provides very substantial disclosure of the discovery materials that were filed under seal in connection with both summary judgment and class certification.  Given the nature and scope of briefing on summary judgment, those materials include the key materials learned during discovery in this litigation.[72]  As the submissions by legislators in both

---

[71] Notice was also provided to officials at the Justice Department and the other State Attorney Generals offices encompassing Order 1, so that they could review the Settlement pursuant to the Class Action Fairness Act ("CAFA") and advise the Court if they had any concerns about its sufficiency or terms.  None have raised any objections.

[72] Notably, during the settlement negotiations, all of the Subclass Representatives were invited to identify any other pleadings they wished to have unsealed.  There were no requests for

Vermont and New Hampshire make clear, the disclosure of these materials will be important not only to farmers, but also to the legislatures as they consider whether any other actions to regulate cooperatives are appropriate.[73]

Finally, it bears emphasis that much of the relief achieved in the settlement goes significantly beyond what could realistically be achieved even if a jury trial was successful (and the verdict and any injunctive relief was ultimately upheld following appeals).  Indeed, in criticizing that relief (and compromises that are an inherent feature of any settlement), the objections to the settlement instead urge additional actions that simply are not realistic on this record or in a class action antitrust trial.  Indeed, as noted above, the Chair of NDPO has himself characterized the proposal (set forth in the NDPO's letter) relating to DFA-pricing going forward as "far fetched."  It simply is not in the best interest of the Subclasses to forego very significant and immediate equitable relief, in an effort to pursue additional items that are not realistically achievable at trial, would be unlikely to survive an appeal, and – even in the highly unlikely event those obstacles could be overcome – would not be secured for many years.

* * * * *

In short, based on the record before the Court, not only is there a presumption favoring final approval under Second Circuit law, the *Grinnell* factors – including a careful evaluation of

---

additional unsealing (other than a comment about documents relating to payments not to compete – but significant information relating to that is included with the summary judgment pleadings and will be subject to unsealing).

[73] ECF No. 1510 at 2 ("From the legislative standpoint, we will benefit from access to the key documents in the case's extended record.  We have considered more than once the need to update and modernize our dairy cooperative law.  We have been hampered in this effort by lack of access to significant data.  The availability of the case's record should fill this void and substantially assist with this effort.  We would also benefit from hearing a report by the DFA producer price advocate as to key legal changes, once he or she has had the chance to pursue the designated mission.").

"the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement" – strongly support approval.  This is also consistent with the Second Circuit's strong policy favoring settlement of litigation and, in particular, class action litigation.

## II.     THE PLAN OF ALLOCATION WARRANTS APPROVAL.

The Dairy Farmer Subclasses respectfully submit for the Court's approval this Proposed Plan of Allocation of the Settlement Funds.   The standard for "approval of a plan of allocation is the same as the standard for approving a settlement: 'namely, it must be fair and adequate.'"  *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761 (CM), 2008 U.S. Dist. LEXIS 58106, at *34 (S.D.N.Y. July 31, 2008) (quoting *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002)).  Further, if the plan of allocation is "formulated by 'competent and experienced class counsel, an allocation plan need only have a "reasonable, rational basis."'" *Taft v. Ackermans*, No. 02-cv-7951, 2007 U.S. Dist. LEXIS 9144, at *27 (S.D.N.Y. Jan 31, 2007) (quoting *Hicks v. Morgan Stanley & Co.*, 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *19-20 (S.D.N.Y. Oct. 24, 2005)).

The Settlement Funds and the interest earned thereon will be distributed to approved Claimants, less any amounts approved by the Court for payment of attorneys' fees, reimbursement of litigation expenses, and incentive awards to class representatives ("Net Settlement Funds").   The Net Settlement Funds will be distributed on a pro rata basis to approved Claimants.  An approved Claimant's pro rata share of the settlement will be determined by dividing (a) the dollar value of the Claimant's total amount of raw Grade A milk produced and pooled from January 1, 2002 to December 31, 2014 by (b) the total dollar value of all Claims made by members of that Class.  The Claims Administrator will review all Claim Forms received and is authorized to investigate any claims and require additional documentation or proof as the Claims Administrator deems necessary to verify the claims.

The Dairy Farmer Subclasses propose that the Net Settlement Funds be distributed, according to the Plan of Allocation, as soon as practicable after all of the following have occurred: a) the Court has granted final approval to the proposed settlement; b) the Court has ruled on Subclass Counsel's requests for an award of attorneys' fees, for reimbursement of litigation expenses, and for incentive awards to class representatives; c) the Claims Administrator has reviewed all Claim Forms and determined the amounts recommended to be paid to Claimants; and d) the time for appeal of the final approval has passed or the approval is affirmed on appeal.

Settlement distributions, such as this one, that apportion available settlements funds on a pro rata basis to approved Claimants, without favoring any class member over another, have consistently been deemed fair, reasonable, and adequate by numerous courts.[74]  Accordingly, for all the foregoing reasons, the Dairy Farmer Subclasses respectfully request that this Court grant approval of this Plan of Allocation.

### III.    THE COURT SHOULD ALLOCATE FUNDS TO PAY THE CASE SETTLEMENT ADMINISTRATOR.

The DFA/DMS and Non-DFA/DMS Farmer Subclasses respectfully request that the Court enter an Order allocating up to $250,000 of the Settlement Fund, as provided by the 2015 Settlement Agreement, for payment of Rust Consulting's settlement notice and administration fees and expenses.  It is common practice for parties to a class action settlement to agree to an

---

[74] *See, e.g.*, *In re Lloyd's Am. Tr. Fund*, 2002 WL 31663577, at *19 ("pro rata allocations . . . are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits."); *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.").  *See also* Newberg & Conte, *Newberg on Class Actions* § 12.10 (3d ed. 1992) (noting that settlement agreements may provide for pro rata distributions based on the fraction of a claimant's loss to the total aggregate recognized loss); *Manual for Complex Litigation* § 30.47 (3d ed. 2003).

amount that will be set aside for notice and administration costs and to assess that amount against the common fund created by the settlement.[75]

Accordingly, the parties agreed in the 2015 Settlement Agreement that up to $250,000 of the Settlement Fund may be used for settlement notice and administration expenses. *See* Settlement Agreement ¶ 8.6. The Proposed Order submitted by the Subclasses with their Motion for Preliminary Approval (and as approved by the Court), however, inadvertently requested $100,000 for settlement notice and administrative expenses. *See* ECF No. 718 at 10 n.3. The Subclasses respectfully request that the Court increase the allocation for settlement notice and administration costs up to $250,000 so as to conform with the terms of the 2015 Settlement Agreement.

The requested allocation would reimburse Rust Consulting for fees and expenses from both the notice and administration of the 2015 Settlement Agreement as well as the 2014 Settlement Agreement that was preliminarily approved by the Count. It is appropriate to do so since the vast majority of the work to process claims for the 2014 Settlement is being utilized again now. The notice for the 2015 settlement instructed class members that they need *not* submit a claim if they already had done so in connection with the 2014 settlement.

---

[75] *See, e.g.*, *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 273 (E.D.N.Y. 2009) (explaining that settlement administration expenses ordinarily are paid from the common fund); *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPG)(SMG), 2009 U.S. Dist. LEXIS 25109, at *20-21 (E.D.N.Y. Mar. 25, 2009) (authorizing payment from settlement fund to claims administrator); *Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848, at *27 (S.D.N.Y. June 7, 2005) (approving settlement agreement allocating money from common fund for settlement administration expenses); *Manual for Complex Litigation* (4th ed. 2014) § 21.312 ("parties generally use the settlement agreement to allocate the cost of settlement notices"); William B. Rubenstein, *Newberg on Class Actions* § 8:34 (5th ed. 2011) (citing cases and observing that "district courts in every circuit, in approving settlements, routinely defer to the parties' determination of who should pay for dissemination of notice"); 1 Alba Conte, *Attorney Fee Awards* § 2.19 (3d ed. 2010) (explaining that settlement administrative costs are awarded out of the common fund).

As described in greater detail in the Declaration of Matthew B. Potter attached as Exhibit F, these collective fees and expenses for both settlements include Rust Consulting preparing three sets of settlement notices disseminated to the Subclasses; preparing and placing additional settlement notices in several dairy-related publications; preparing and maintaining a website for the Subclasses (www.northeastdairyclass.com); receiving, reviewing, confirming, and compiling settlement claims information for nearly 8,000 claimants; following up with claimants to cure deficient submissions; identifying and resolving duplication or discrepancies with claims submitted in response to the 2014 and 2015 settlement notices; auditing and investigating claims; responding to thousands of telephone calls, emails, and letters received from dairy farmers; and providing overall project management for the claims administration processes.  These activities are routine and reasonable for providing notice and administration of a class action settlement. *See, e.g.*, *In re Bear Stearns Cos. Secs., Derivative, & ERISA Litig.*, No. 08 MDL 1963, 2014 U.S. Dist. LEXIS 94696, at *38-40 (S.D.N.Y. July 8, 2014) (noting that administrator services include processing claims and administering settlement payments).

The Subclasses submit that the requested allocation should be approved.  Importantly, the Court already preliminarily approved the 2015 Settlement Agreement that provides for up to $250,000 for notice and administration costs.  Additionally, Subclass members received a copy of the Agreement which included the $250,000 allocation.[76]  The requested allocation is consistent with Rust Consulting's actual fees and expenses.  Through April 30, 2016, Rust Consulting had expended approximately 1,000 hours and incurred a total of $223,157.34 in fees and expenses for notice and administration in connection with both DFA/DMS settlements.  *See* Ex. F, Decl. of Matthew B. Potter at ¶ 42.  This amount of fees and expense for handling two

---

[76] The Court-approved Notice does not contain any reference to the amount of funds to be set aside for claims administration costs so the Subclasses have received consistent information.

settlements in a case of this nature is reasonable in the experience of Subclass Counsel, and is consistent with reported cases.[77]

The Subclasses, therefore, respectfully request that the Court enter an Order allocating up to $250,000 of the Settlement Fund for payment of Rust Consulting's settlement notice and administration fees and expenses.  The Subclasses conferred with counsel for Defendants DFA/DMS and they do not oppose this requested Order.

## **CONCLUSION**

For the foregoing reasons, the Dairy Farmer Subclasses respectfully request that the Court grant the Motion for Final Approval of the December 2015 Settlement and enter the proposed Judgment and Final Order appended to this motion.

Dated:  May 9, 2016                                    Respectfully Submitted,


/s/ Robert G. Abrams                              /s/ Kit A. Pierson
Robert G. Abrams, Esq.                           Kit A. Pierson, Esq.
Robert J. Brookhiser, Esq.                       Benjamin D. Brown, Esq.
Gregory J. Commins, Jr., Esq.                    Brent W. Johnson, Esq.
Terry L. Sullivan, Esq.                          Emmy L. Levens, Esq.
Danyll W. Foix, Esq.                             Cohen Milstein Sellers & Toll, PLLC
Baker & Hostetler LLP                            1100 New York Ave., N.W.
Washington Square, Suite 1100                    Suite 500, West Tower
1050 Connecticut Ave., N.W.                      Washington, DC  20005
Washington, DC  20036                            (202) 408-4600
202-862-1500                                     kpierson@cohenmilstein.com
rabrams@bakerlaw.com                             bbrown@cohenmilstein.com

---

[77] *See, e.g.*, *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 741 F. Supp. 84, 88 (S.D.N.Y. 1990) (approving a total of $507,684.45 to be disbursed from common fund to cover settlement administration costs, which amounted to $30.69 per claim); *Bear Stearns ERISA Litig.*, 2014 U.S. Dist. LEXIS 94696, at *38-40 (granting request for $421,261.49 to be disbursed from common fund to cover settlement administration expenses); *Spann*, 2005 U.S. Dist. LEXIS 10848, at *26 (approving settlement agreement allocating up to $300,000 from common fund for settlement administration expenses).

rbrookhiser@bakerlaw.com
gcommins@bakerlaw.com
tsullivan@bakerlaw.com
dfoix@bakerlaw.com

Emily J. Joselson, Esq.
Lisa B. Shelkrot, Esq.
Langrock Sperry & Wool, LLP
210 College St.
P.O. Box 721
Burlington, VT 05402-0721
(802) 864-0217
ejoselson@langrock.com
lshelkrot@langrock.com

*Counsel for the non-DFA/DMS
Subclass*

bjohnson@cohenmilstein.com
elevens@cohenmilstein.com


David A. Balto, Esq.
The Law Offices of David A. Balto
1350 I St,, N.W., Suite 850
Washington, DC 20005
(202) 789-5424
david.balto@yahoo.com

Andrew D. Manitsky, Esq.
Gravel and Shea PC
76 St. Paul St., 7th Floor,
P.O. Box 369
Burlington, VT  05402
(802) 658-0220
amanitsky@gravelshea.com

*Counsel for the DFA/DMS Subclass*