# EXHIBIT E

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**MIKE EBY:**  Well, I would like to welcome everybody here this evening to the National Dairy Producers Organization weekly call.  Once again, we have these calls every Tuesday evening, 8 p.m. Eastern Time and specifically for dairy producers as well as Ag vendors and anyone else that can contribute to the conversation as to the industry, as to the dairy industry.

And we have a board of directors.  Of course, for those of you that have been participating for a long time, we have board of directors.  Bob Krucker in Idaho.  Paul Rozwadowski, Wisconsin.  Pete DeHaan, Oregon.  Gary Genske in California.  He has a CPA firm and then he has a dairy-producing farm in the state of New Mexico, so he represents two states.  John King and myself here in Pennsylvania.  So we have weekly board calls.  And we had one such board call today discussing topics -- multiple topics, one of those being DairyLine. I plan on having another interview here soon with Bill Baker, so listen for that for those of you that have access to radio and can listen to that.  For those of you that don't, we do have those recordings aired on the telephone system.  In fact I think it's been a while since I've given that number out.  So for those of you that do not have access to radio, but you would like to hear it or maybe you don't even hear it on the radio because it doesn't air within your region, of course with the telephone you could call and listen to it at any time regardless where you are in the country. So if you have a pencil, you can grab a piece of paper and write this number down.  Telephone number 717-284-2200 and it will ask you to press a number, and the number you want to press is three.  And that will take you to the DairyLine, which is the syndicated program that airs nationally on 80 radio stations.  And the radio station -- or actually the telephone that you're accessing is here in Lancaster County, Pennsylvania.  What we do is we re-air all of the broadcasts that air on our radio station here within Lancaster County, and that airs.  And then of course we have National Dairy spots that we air in front of that.

So for those of you who do not have access to radio and would like to hear DairyLine, you can then also hear the reports of the National Dairy Producers Organization.  And that report typically is done -- it's the interview that we have with Bill Baker.  And what I do is we cut up the -- it's probably like an eight-minute interview depending upon how much time Bill Baker gives us, but what I do is I cut them up into 60-second spots.  And then we can re-air those across the nation on multiple different radio stations that sell 60-second time slots.  And it also allows us to then air this on the radio -- or the telephone, I'm sorry -- on the telephone system just prior to the DairyLine.  So, I'll give that number one more time, area code (717) 284-2200 and just press number three.  Some of the other issues that we discussed today -- we had discussed opportunities to continue to promote our agenda with the National Dairy Producers Organization.  We have multiple different publications that we're in.  And we have a new opportunity, which is not confirmed yet, so I don't want to disclose that information yet, but look for something very unique to come here in the next couple of months if everything works out the way we have planned.

We need to finalize some things yet, but it's exciting to be involved in this process and be able to utilize our dollars that we generate as dairy producers and to use those dollars to reach and teach the dairy producers as to really what we need as an industry, and that is a profitable price for our product, which obviously is what will allow us to be sustainable.  So it's really about profitability for sustainability.  We all know that the dairy industry has their own version of what that is.  And

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

we at the National Dairy Producers Organization a lot of time butt heads with the dairy industry simply because we are not status quo.  We call it as it is, and we know that the supply-demand will not be denied.  And when the dairy industry would assume that it can be, it's our responsibility to call them out for that.

[00:05:05]

So you will notice multiple different publications that we are in.  We are not afraid to stay to the truth as we see it as dairy producers.  And we're hoping that other dairy producers will eventually stand up and say, you know what, that's true.  I'm glad somebody has the guts to call it for what it is.  And that's what we are, that's what we're doing.  And if you believe in our cause and you would like to help our mission, the dollars that you would help to pay do not go to pay the board members.  We do not receive funds as board members.  So therefore, you can be assured that the money that you pay goes directly to the general fund, which really is utilized to promote the message so that more dairy producers can hear and understand.

Let's see, we also discussed today our newsletter.  You'll soon see a new newsletter coming out.  So we finalized some of the details in that.  Gary was unable to be on the call this afternoon.  He has the flu.  So we were unable to do some finalizations of the newsletter, but we did discuss some of the things that we would like to see in it.  And one of those, if not in this next newsletter it would be in the following newsletter, you will see something in regards to the Northeast class action lawsuit.  And what we're looking to do is to help you as a dairy producer and especially for those of you that live within the Northeast to understand more fully of what the settlement is suggesting and requesting that you accept. So we will be printing something along those lines.  We've been actively working to generate more addresses.  We have pretty much, if I'm understanding correctly -- that has been -- we've received a lot of help from some dairy producers.  And I think we have pretty much the states that we need minus New York and Vermont.  Those are going to be the two that require the most effort.  Obviously, the most dairy farmers live within those states here in the Northeast.  So the good news is we will have access to dairy producers who milked within the year of 2010.  It will not be a complete list, but it gives us a lot more addresses than what we once had.  So that is the good news, and you will be -- if you are not receiving our newsletter currently, and you live within the Northeast and you've produced milk in the year 2010, you will receive our newsletter more than likely.  And if you do not receive our newsletter and you would like that, you can feel free to give us a call.  In fact I don't have the number right here in front of me, so later on in the call I'll give that number out so you can reach our office in California, and we'd be more than happy to put you on the mailing list and see to it that you receive a newsletter.

So while I'm talking about the Northeast case, I've invited Jonathan Haar.  I have had a nice conversation with him today.  For those of you that do not know Jonathan or maybe have not heard of the name before or maybe heard of the name but yet question where you've heard it, the reason you've heard his name because he would be one of the plaintiffs on the Northeast case here in Vermont.  Actually, he lives within the state of New York, and he and his wife, Claudia, are active in this whole process.  So is Jonathan on the phone here this evening?  Well,

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

if he's not on yet, I told him probably 8:15 we'll get to this, so I will look to hear from him once he does come on.

So while we're waiting, are there any questions that anyone may have regarding this organization?  Any questions that you may have that you would like to ask that would be not just for the benefit of yourself, but I'm sure for the benefit of all listeners?  Well, feel free at any time to chime in and to be able to ask any questions that you may have.  I will continue with some other things that we have discussed today.  We, of course, let me think.  Going down through the agenda, I'm trying to go through the top of the things that we've discussed.

**[00:10:00]**

Of course we discussed advertising in the "Progressive Dairyman."  For those of you that have seen those ads, we've been in that pretty much I would say consistently in the last couple years.  And that has been pretty much a good way to reach dairy producers.  I think for those that are within the industry that look to do some promotion of their agenda or maybe even just their business, they look to utilize that magazine.  And I believe it is a pretty well heavily utilized and heavily read magazine.  Have any of you seen the ads that we've placed within the "Progressive"?  No?

**TOM:**  Well --

**MIKE EBY:**  We had one just recently.  Typically, they give us a nice three-quarter page towards the front of the magazine.  So it is a nice placement for that.  And also the "Hoard's" we had done in the past.  In fact, I was reading the "Hoard's" this past week, and I saw that Tom -- I hear that you're on the phone here this evening.  It was a nice piece that you had in there Tom.  Would you like to speak a little bit to that?

**TOM:**  Oh, not really.  The piece speaks for itself basically.

**MIKE EBY:**  Maybe for those that --

**TOM:**  And --

**MIKE EBY:**  Maybe for those that do not receive the "Hoard's," can you give a recap of what you've said in that piece?

**TOM:**  Well, basically, it was a response to [INDISCERNIBLE ] article about reinventing the co-operatives.  In that article, he had laid out quite a few good ideas, but he didn't really put any input on the producers regaining control of their co-operatives.  And I basically addressed that to the fact that the management of the cooperatives are not doing what they could to promote the benefits of the co-op to the dairy farmer.  I also hit on the fact that the [PH] FMOO is not a dairy farmer-friendly tool.  And it has been crafted over the years by processes in a few other organizations for their benefit, not for the benefit of the dairy farmer.  And if that was to be challenged in court -- the FMOO was to be challenged, it would more than likely be found to be

3

criminally destructive to the dairy farmer, the dairy infrastructure, and the region where the milk is being produced.  And I also challenged the dairy farmer -- Mr. and Mrs. Dairy Farmer, what kind of action are you going to take on this?  Are you going to stay with the status quo and be part of the distrust for property and bankruptcy or are you going to join your fellow dairymen and unify and demand a better price for your milk, ways to improve your economic position?  So that's basically the gist of it.

**MIKE EBY:**  That's right.  Well, and then you called out National Milk Producers Federation as well.

**TOM:**  I believe I did, yes.

**MIKE EBY:**  And that's a --

**TOM:**  They don't do what they claim they can do for us.  And to highlight a little bit more the National Milk Producers Federation that has put through this farm program that they -- was originally a voluntary thing, but now is a mandatory thing.

And just recently, their Michigan Milk Producers' Organization out there has demanded that their members join up with that 100% or they would lose their market access to sell their milk.  And I feel that is very [PH] dictoriatative of any co-op to do that -- that you either do it our way or we don't take your milk.

**[00:15:00]**

That is not what co-ops are supposed to be doing.  They could and should do a better job for their members.  Their members are the ones that give them the money to support themselves.  And now they are promoting this Nutrient LLC, which is going to be another thing shoved down our throat.  And I could go into more details about that.  But the other program was voluntary, then it became mandatory, and they are going to do the same thing with this nutrient management bit.  They're working hand-in-hand with the EPA, and they're going to insist that most of us put in electric digesters, methane digesters to make electricity.

We have a pilot program here in Mass. that has those -- originally there were supposed to be five to seven digesters put in.  And then Massachusetts also passed a law on the books that no longer can any food waste be incorporated into the landfills.  So, bingo, the digester is supposed to take that.  And we have one [INDISCERNIBLE] dairy that has taken two trailer loads a week of 18,000 gallons, and he has to incorporate that with his manure. And then that is a pretty hefty price.  And as Gary said a while back that six of his farms that he does the books for have digesters, and they don't make money on the digesters.  And that's what National Milk is promoting, that it is another source of income for the dairy farmers.

**MIKE EBY:**  Right.  So we do have some digesters here locally within Lancaster County.  I can't say I'm very familiar with how they work, but I'm assuming that they need to be cleaned out on a regular basis or at least maybe not cleaned out, but at least topped off, because you can't

continue to put manure in.  So that product then eventually makes it out into the field I'm assuming, and I'm talking food waste, which obviously would create more work for the dairy producer to haul that stuff out into the field.  I mean, am I reading this correctly?

**TOM:**  More work and more expense.  And then that --

**DEREK:**  So they're forcing this food waste you're saying because they're getting federal funding or something on them and now they're requiring they got to take outside waste, huh?

**TOM:**  Well, that's the way it is here in Massachusetts.  I know of one operation that is obligated to take two trailer loads a week, that amounts to 18,000 gallons a job, a dump.  And they had to add another slurry store to store the excess during the winter months.  They already had one slurry store, so it's an additional expense.  And here in Mass. you can't spread on frozen ground anymore.  That's probably coming that way in the rest of the country too.  It is in Vermont and some upper states.  So you got to store that stuff, and it's not cheap to store.

**MIKE EBY:**  So how much does that break down, Tom, in a pit situation like that.  Obviously, the methane gas can be utilized but does it break down to the point where it would be less product to be then taken out versus what was put in?  Do you sense some of that happening?

**TOM:**  It depends on the content of the food waste as to how much actual methane they could generate out of it.  In Europe, these digesters, they actually add regular foliage products that are high in nitrogen to make more methane.  But we're not in that kind of a position to be adding [PH 0:19:37] our foliage products in to the methane digester to make more methane.  And the digesters are basically -- most of them are all plug flow.  They have some others that are different, but the travel time for the input to the output is roughly two weeks.

**[00:20:00]**

**MIKE EBY:**  Yes, well, thank you, Tom, for that.   It's always good to hear from specific involvement with area producers.  And I think it inspires others to get involved and others to write articles.  When we see our fellow dairy farmers write these articles in magazines, it makes us realize that it can be done.  And I just encourage more of that, because quite honestly that's what will make a difference. It's nice to have it from organizational leaders, but it's I think even more powerful when it comes specifically from dairy farmers.  And then once those dairy farmers start to unite under an organizational structure, it becomes that much more powerful.

So is Jonathan Haar on the call here yet this evening?  I invited Jonathan to join us here, so I'll keep asking throughout the call and hopefully he'll be able to give us a little bit of an update of what's been happening up in Vermont.  Like I said earlier, I had a nice conversation with Jonathan today and Claudia.  And of course, now this information is public.  It is on the court docket, and we can then speak and he can then speak to us.  Up until this point it was -- we could speak of it, but it would not have been proper for class reps to be openly involved in speaking of conversations, private conversations with lawyers.  But now that it is on the court docket, it is open for discussion.  So are there questions that maybe prior to Jonathan coming on the call here

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

this evening?  Are there questions that we would like to ask of Jonathan?  It might be a good time to start to think of some of those things.

**MALE 1:**  Mike?

**MIKE EBY:**  Yes?

**MALE 1:**  What gave with the Vermont?  I just got on here.  What actually --

**MIKE EBY:**  There is a settlement that is sitting there in front of the judge, and they are asking our lawyers and, of course, DFA are looking at preliminary approval.  And the judge then at this point will look at it, and I'm assuming within a few weeks -- we don't know the exact timeline. The only thing that we have to go on is based upon how she acted last time when this was put forth.  So we basically have a blueprint of how she handled this a year ago.  And we pretty much expect to see the same thing unless she really wants to run this through -- ram it through, I guess she could pick up the pace.

But, we pretty much expect to see within a couple weeks her approval or disapproval.  And based upon what we feel is her desire to get this out of her hands and maybe that's not a fair way of saying it, but that's the way it feels, we sense that she will approve it as far as preliminary approve it, set a hearing date, and then give us an opportunity to come either speak for or against the hearing -- or for or against the settlement that's been proposed.  So all of this will potentially happen based upon, like I said with the blueprint that we've had to look at before, you know, we're looking at once she gives the date, she'll probably set it 60 days from the date that she approves it, preliminarily.  So we're looking at probably, what did we say last night, Derek, probably May for a hearing?

**DEREK:**  That's what we were thinking, yes.

**MIKE EBY:**  Yes.  So something like that.  Sometime in May we're thinking that a hearing would take place.  And then it takes -- let's see, if we had the hearing in January 28th last time, she gave her opinion and denied the motion or the settlement on March 31st.  So we're looking at 60 days beyond the hearing.

So if we kind of want to look to see what this might happen or where we may be at this point in a few months, we're looking at probably May, June, July we would have an answer.  And then if it is approved and you had signed to receive the funds, that's when I believe you would start to then see money.  And I don't know if it comes all at once or if it comes in separate checks, but probably July sometime.

**JONATHAN HAAR:**  Actually, Mike, this is Jonathan Haar.

**[00:24:58]**

TNC-January19_2016
Cohen Milstein Sellers & Toll PLLC
March 11, 2016
Transcript by TransPerfect

**MIKE EBY:**  Yes?  Oh, you're on, Jonathan, great.  Okay, so for everybody, like I said, we have invited Jonathan to be on here this evening.  So Jonathan is a class rep with the Northeast case, so go ahead, fill us in, Jonathan.

**JONATHAN HAAR:**   I was just going to say that with regards to the funds -- I'm going to actually shout out.  Claudia, do you remember when Dean was approved?  When it was approved -- when she approved it, it took quite a while from the approval of the settlement to the disbursement of funds.

**CLAUDIA HAAR:**  Yes, it almost a year.  We received the money just before Christmas of [PH] this year.

**MIKE EBY:**  So --

**CLAUDIA HAAR:**  [INDISCERNIBLE] sent it in --

**JONATHAN HAAR:**  They had their fairness hearing though was -- I don't know when she actually approved it.  It took quite a while from the time that she approved until the time that anybody actually saw money.

**MIKE EBY:**  Okay.  And when you say a while, are you talking months or --

**JONATHAN HAAR:**  Months, months.

**MIKE EBY:**  Okay.

**JONATHAN HAAR:**  Yes, yes.  I don't recall exactly when she granted final approvement of the Dean settlement, but checks weren't issued until December.  We signed off on the Dean settlement unfortunately just prior to Christmas of whatever year that was, and it was a full year until we saw money.  And there was functionally no opposition.  Dan Smith tried to represent the main farmers with regards to that they felt that they should have in on the settlement on out of order farmers that we've heard quite a bit about.  But that was like the only -- you know, because Mr. Pierson removed the injunctive relief that DFA was opposed to.  Then it was a smooth sailing because we really didn't know, I mean.  I'm just actually looking over an email that I had sent on the 22nd to the other class representatives.  And we say we were -- our questions regarding settlement were crushed by Cohen attorneys, who deceived or coerced their class representatives in order to get their way.

And we've been criticized by [PH] Darryl -- that would be [PH] Darryl Obrtein, Steve of the -- oh, I can't remember his last name.

**MIKE EBY:**  Taylor.

**JONATHAN HAAR:**  Yes, Steve Taylor, thank you, and Dan Smith for accepting the Dean settlement, but Claudia and I convinced Alice to sign off and that left Ralph and Garrett alone.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

And they went along to "keep the peace." So anyway it was, it took a while. So don't start writing checks against [INDISCERNIBLE].

**MIKE EBY:** So was the funding, when it did come through, was it all in one check or did they space those checks out as well?

**JONATHAN HAAR:** In that case, it was all in one check, but there were some glitches. I know there was one -- I think he may have actually -- no, I don't who the guy was, but some guy who was supposed to get like $1,000 dollars got a million dollars. And thankfully he was --

**TOM:** He was happy.

**JONATHAN HAAR:** Well, thankfully he had the scruples to actually notify somebody and say I think there's a mistake. And so there were a couple -- in fact Cohen swore to us -- Ben Brown said that they would never use Russ Consulting again, because there was actually quite a bit of issues. However, apparently that didn't pan out either, because that's who they're dealing with or hoping to deal with.

**MIKE EBY:** So you mentioned Russ Consulting. Is there a reason of such delay for things to be posted with Russ Consulting? Is that a class counsel issue or is that a Russ Consulting issue?

**JONATHAN HAAR:** I have no idea. I know like I say, Mr. Brown tried to pass the buck to Russ Consulting and said that they had never used them before and they would never them again. But that would be his side of the story, and apparently it's not particularly meaningful seeing as they're using Russ again, so I don't know if that's something that DFA arranges or how that works.

**MALE 2:** So what do think, Jonathan? We're hoping the judge don't approve this.

**JONATHAN HAAR:** I think if we can muster enough support from the class, she may well deny it.

**[00:30:00]**

She's a fiduciary of the class, and she needs to act in our best interest. But she also needs to be responsive to our wishes. But that's a little bit of a quagmire there, because they could say -- the argument would be that we don't know what's good for us. But it's interesting. Mike was sharing with me earlier the reason they gave for our objections. And I am just looking over an email that I had sent on the 22nd to the other class representatives. That's when they had come up with their final document. And basically we say the settlement does nothing to address the monopoly/monopsony. We're a little sarcastic in there. My son helped me with it, and he tends to be a little -- just a little fires from the hip. But basically we say that we're in court because DFA has broken federal antitrust law. At the turn of the century, there were over 18,000 dairy producers in our order, today there are barely 12,000.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

These people did not give up because they didn't have their milk checks reviewed.  They gave up because of the monopoly/monopsony successfully suppressed the price to the point where they had little choice.  We say that -- this is actually his language.  He said, "Unfortunately the settlement now before us is hardly a remarkable legal document.  It is little different from all too many legal 'solutions,' which completely miss the problems they were supposed to solve."  He says, "We're not in court because we don't have an ombudsman or because DFA hasn't promised to review member's milk checks.  We're in court because they've broken federal antitrust law."

So we just basically are concerned that the settlement does nothing to address any of the issues that brought the lawsuit to begin with.  And I suppose counsel would argue that they're dealing with the full supply issue, but they don't.  I mean if you read the settlement, you can see that there's quite a number of loopholes that will enable them to continue as they have been.  I guess there's fewer of them than there formerly were, but I think that's probably because, mostly because they've been so successful that they're not actually necessary anymore.  If you need a large volume of milk, where are you going to go besides DMS?

**DEREK:**  So the other thing is the DFA is starting to own the plants so the full supply agreements kind of get irrelevant then.

**JONATHAN HAAR:**  Well, they have provisions written into the settlement that they're allowed to do a full supply agreement for a new plant if that's a contingency of the plant opening.  So I mean it's very easy.

**CLAUDIA HAAR:**  Or an old plant.

**JONATHAN HAAR:**  Or an old plant if it's a contingency of the plant staying in business.  So it's very easy for an attorney to write up a document that says, oh, we need a full supply agreement in order to build this plant or in order to continue running this plant.  So like I say, there -- and Darryl Obertein he said at one of the meetings we were having, they had some ideas and we were like, okay, well they sound like good ideas.  Let's see what you can get.  But he says that the devil's in the details and that's the story here.

So I'm hoping people take a close look at what's actually there, because at first blush, some of the things sound like a good idea.  Oh gee, that might be a good idea.  Oh, let's see.  But when you take a better look, it really isn't as it might be.  Like, for example, they have the ombudsperson, which is a -- they word it in the settlement agreement as somebody who's going to listen to farmer's interests and pursue relief solutions.  But I was sharing with Mike earlier, this guy -- they've laid out the funding and everything, and this guy basically will work one day a week in the Northeast order, which goes from Maryland to Maine and encompasses some, I don't know, somewhere between 9,000 and 12,000 farmers.

**[00:35:00]**

And so he's going to -- I don't know how effective he'll be.  They have him checking up on testing issues and other stuff.  But then the other thing is, the main thing from my way of

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

thinking is that ultimately he has no authority. So he's simply -- he can go like I shared -- I've shared this example with a few people, where I've been concerned about the delegate election process. And so I say, okay, Mr. ombudsperson, I think there's a problem here. So this person then looks into this situation. And he says, wow, yes there is a problem here. You're absolutely right. So he goes to his contact person at DFA and says, look this is a big problem. This is over here and this is a problem, and it's just no good. You have to change it. And the DFA person then simply according to the settlement can just say, well, thank you for sharing. They're under no obligation to actually change anything.

**MALE 2:**   And the guy would have no authority.

**JONATHAN HAAR:** Right. He has no authority at all, so. And he's also bound by confidentiality agreement, so he can't share even the things that he learns. He's very restricted on who and where and when he can share. He's got the same confidentiality agreement that the board members have.

**MALE 2:**   So that's no good at all.

**JONATHAN HAAR:** No, no. And like I say at first blush somebody may think, oh that seems like a good plan. It stemmed from an idea they had in the Southeast where they had advocate committee made up of a plaintiff, academic people they selected like -- because the milk marketing story down there. And their big issue was -- well their biggest issue was reblending. And so they set up this committee, and the committee was binding. The committee had authority. And the committee was one academic person that the plaintiff would appoint, one that the defendants would appoint and one that those two would pick. And so then if a farmer had a question, he calls these guys up and they look into it, and if they find a problem or they suggest a change, it's not a suggestion. If they say this change needs to happen according to the settlement, DFA was bound to make that change. It was binding.

But the problem in the Southeast, because then we said, wow that sounds like that could have been a good solution, but we looked into it. We called some Southeast farmers, and they were completely unaware that this committee existed. And basically, I talked to one of the committee members, and he said, well we were wondering -- we assumed that they would send us whatever notification they sent to the farmers, but we never got any notification. And so basically what it was is they never made a provision to notify anybody. So the three years actually pretty much went by [INDISCERNIBLE]. We notified a couple of farmers. The one guy was like, "Oh I got a couple issues. Let me have the guy's number." So I mean I haven't looked in to find out what happened. But, yes, so that was the way they beat that.

I mean, so we were thinking, well gee, if they had something like that where they actually notified people, and if you had an issue, you could bring it to somebody who could objectively look at it. And if they recommend a change, DFA would be bound to that. Well gee, that might be something to talk about or at least think about in terms of does this settlement justify doing away with the risk of trial. But when you have what we have, which is functionally nothing, it's -- to me anyway, it's -- people need to read the settlement obviously themselves. But --

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**TOM:**  Will they be sending copies out to all the farmers again?

**JONATHAN HAAR:**  Actually that was something my wife pushed for, which Mr. Johnson said that they would.  Now whether they do or not, he said that they would, so.  Because I think that would be -- it's a fairly lengthy document, but it's not -- and it's legalese.  So it's a little complicated, but it's not -- it's also pretty understandable on the other hand.  It says what it says and if you read it and you're like hmm.   If you --

**TOM:**  Yes.  If they want to strangle the farmer, they might as well send out what they use to strangle the farmer with, right?

**[00:40:00]**

**MIKE EBY:**  Well, and Jonathan what about them with them misrepresenting what you had suggested.  In fact, they just basically claimed or put in -- kind of paraphrased what you felt as plaintiffs were in opposition to the settlement.  You want to touch on that a little bit?

**JONATHAN HAAR:**  Yes, that was kind of amazing that I was glad Mike was able to share with me what we said in terms of why we were opposed, because I -- just I like I say, I'm looking over this email of my last communication with them, and you'll note that there is nothing in there about wanting to restructure them or anything.   We basically say, this settlement does not address the issues, and the issue being the monopoly/monopsony and the antitrust violations.  So they just completely misrepresent what we feel, what we've actually said and what we've actually written to them.  So it's -- and we haven't received a copy yet from our attorneys.  I tried to contact them today, not even aware that they had filed the settlement because they sent us a draft of the memorandum of law in support of the settlement with a cover letter on Friday and -- on Thursday, and they said that this is with Brent's email that he sent.  But [INDISCERNIBLE] explained to them that the email thing is a little challenging.  I like hard copies of what they send.  And, yes I still haven't seen what it is I'm thinking with regards to -- and what they're telling the court.  So we're actually -- I haven't spoken to the Sitz' or Mr. Swantak.  But we will talk to them and determine if it's something we should deal with in terms of addressing it before the court at this juncture even.  You know that there -- in the first settlement, she denied preliminary approval because she had no idea why we objected.  And we had sent in a one-page thing that said we objected.

And then, so the attorneys said, well we need to know.  And we thought, well gee, if they get a fairness hearing, we don't want to give them all our information right up front.  So we said, we'll help -- and plus we didn't want to waste the time, because these guys takes so much time.  I mean, we got together and we crafted a document in a couple of hours, whereas these guys it would have taken -- we would have said what we wanted, they would have written it the way they wanted.  We would have had to get back to them and say no that's not the right way.  That's not what we want to say.  And it would have just been another week of summer weather that we weren't doing what we need to do on the farm.  And so we just did it ourselves and then had them send it to the court.  But, yes, so we may do something along those lines again, so.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**MIKE EBY:**  Jonathan, maybe you want to explain how they got the concept of publicly traded. It would have been on that petition where we would have had 88 farmers sign at the bottom as one of those things that would be sought at trial if the [INDISCERNIBLE].

**JONATHAN HAAR:**  Yes, correct.  And in fact, the judge is aware of that and so it's out there, but we recognize all along that this is not something that is attainable through settlement.  We never represented that it was or that we were seeking it through settlement.  At that point in time, we were trying to communicate with our counsel and say, look, we want you to represent us and this is -- we want you to represent this information.  And we were saying that if you throw this on the table in terms of amending the prayer of relief, which is the part of the complaint that explains what it is that you would like.  And, of course, the judge is at liberty at that -- if you had a win at trial, which is a big if, but if you won at trial, the judge has the liberty then to come up with her own stuff or use the stuff you have or use some of it, use all of it, use none of it.  But the judge is going to look to craft a solution.  And this is a very logical solution because it would move them from

[00:45:00]

having no oversight to being overseen by the FTC and various agencies and government bodies that oversee these type of large publicly traded corporations.  And then with the information they came up with in the West Coast there, to me this would be usable in this case.  It's the same people, it's the same accusations, and it's basically a smoking gun, is how they describe it, how the attorneys describe it in the case out West.

And it would speak -- I think it speaks very clearly to the fact that DFA, as well as Land O'Lakes and I don't know how many of these other large co-ops are not functioning as dairy co-operatives.  They just don't.  They're not looking for more money for their members.  They're looking for -- and in fact quite the opposite, they're looking to buy milk cheap.

**MALE 3:**   They're looking for low milk prices.

**JONATHAN HAAR:**  Exactly right.

**MALE 3:**   And they work accordingly too.

**JONATHAN HAAR:**  Yes, absolutely.  I mean the evidence to support the accusation is everywhere.  And so in terms of pursuing that -- and it seems to me to segue very nicely with an antitrust lawsuit, a solution to an antitrust problem.  Again, that would be -- it would have to be at a win at trial.  And they would never even consider a settlement pursuing that.  Like we said, we never represented that.  However, they misrepresented what we said to the defendants and to the court. And so this has been an ongoing challenge with these particular attorneys.   And I don't know how prevalent it is in class action, but --

**MIKE EBY:**  Maybe you want to touch --

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**DEREK:**  Talking about the information being everywhere, I think that's why a lot of farmers probably got excited about proposing the settlement before was the fact that a lot of this confidential information would be buried in a settlement.  Is there anything different in this settlement with it?  There is a provision in there I see for release of information that the defendants agree not to oppose a request by subclass counsel.  And I guess, what does that all really mean, I guess, as far as the availability of this information?  Is it going to be buried or --

**JONATHAN HAAR:**  Well apparently it will be made available, the information with regards to summary judgment.  There are some stipulations as to what would be released.  And I've asked questions and not gotten answers with regards to, in particular, they say except stuff that third party obligations would prevent them from releasing.  Now if you're talking about antitrust behavior, it's all going to involve third parties.  The deal is with the antitrust is we've gotten together illegally, and we are fixing prices or suppressing prices.  So I don't know at the end of the day exactly how much of that information would be eliminated by that stipulation. The fact that the third parties -- I don't know if they need to be in agreement or what exactly -- and again, they're not clear on some of these details.  And so I'm forced at this point to assume the worst.  Maybe it wouldn't be that bad, I don't know.  But, yes, so they're talking about summary judgment.  And there was one other ruling --

**DEREK:**  Plaintiff's motion for certification of subclasses.

**JONATHAN HAAR:**  Okay.

**DEREK:**  And defendant motion for summary judgment.  That's as you say to the extent the disclosure of such documents in not prohibited by settling defendant's obligations to third parties, so.

**[00:50:04]**

Yes, I guess probably any third party could just at will prohibit it is what it looks like.

**JONATHAN HAAR:**  I would assume and then also do these -- these third parties are not going to be -- they're beholden, they do business with DFA.  So they are going -- obviously they're working together, so they're going to have an interest in keeping each other happy.  So I'm not sure exactly how much of that information would be.  They say they'll release this and they'll release that.  Class certification was the other one.  That's interesting subclass certification.  I wonder why.  And then Mr. Sitz, Garret, was interested in some specific documents.  But they basically talked in circles and didn't come up with those documents at all.  He was talking about agreements not to compete.  Apparently Cohen -- because what happened was that the Dean settlement, the Sitz' and Alice Allen had gone to the fairness hearing.  Of course, we had no idea what a fairness hearing is or how it's supposed to work.  Our attorneys told us nothing.  In fact, they told us the courtroom is the domain of the attorneys, and we don't need to be there, which if you look into what a fairness hearing is all about, it's actually just the opposite.  The fairness hearing is the opportunity for the class to address the court.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

So they went there and at that point in time they didn't tell counsel they were showing up. And when, I guess they all stood up when the judge entered the chamber, and then when they all sat down, Garret remained standing. And the judge asked, can I help you or something, and he said I would like an opportunity to address the court. And she said, "That'll be fine. I'll make a provision for that." And so they sat down and then Mr. Pierson got hold of them. Before the judge was going to ask him to speak, Mr. Pierson asked for a recess. They went out in the hall. I guess they had a pretty heated conversation. And at that point in time, Cohen showed him a bunch of documents, agreements not to compete. And so he was saying, I want to see those, because there were payments of -- I forget if it was millions or hundreds of thousands of dollars or whatever it was, it was a payment for agreeing not to compete. And so Garret wanted those to be unsealed. And they basically didn't remember seeing those and weren't sure if they existed and basically like I say talked in circles, and apparently there'll be no release of those specific documents. So that's as far as we were able to get with them.

**DEREK:** They have a provision in there about block voting, that I guess the members could -- an individual member could excuse themselves from being included within the block vote. And I guess my question -- it doesn't say it everywhere now. In the one document, it says that's only in regards to federal milk marketing order votes. Is that your understanding of that?

**JONATHAN HAAR:** Apparently, the way the block voting works is -- and I was completely ignorant of this, but Mr. Smith, Dan Smith, the attorney for Taylor -- he explained that the way the block voting -- it's on federal milk marketing order issues that they employ this block vote. And what they've done is I guess in theory, we can always oppose the block vote. You could request a ballot yourself, and as a DFA or Land O'Lakes or whatever Agri-Mark member if they want to vote yea and you want to vote nay, you can request a ballot and go ahead and do that. But nobody tells you that. So all they do is tell you we block voted this. And so you're sitting there saying, gee, I don't agree with that, I wouldn't have done that, but what can I do?

**[00:55:00]**

So what they're planning on doing is if an issue comes up -- now I actually don't know if this thing has a time frame on it or not, because the ones that don't have time frames, they're allegedly going to stand. So if a block vote issue comes up, what they would do is include ballots in the notification or in the check letter or somehow they would get a ballot to every member so that you would then have the opportunity to cast a different ballot. Now I don't know, again, who's collecting these ballots. Do you send it directly to the market administrator or do you send it to them? Them being the co-op in question? And apparently they said there hasn't been a block vote in 10 years or something.

**DEREK:** So if that's the case if it's having to do with the federal milk marketing order. The reason I ask is that co-ops also block vote on our behalf when it comes to National Milk Producers Federation. And I didn't know if that would be included in that provision or not. And it kind of sounds like --

**JONATHAN HAAR:** Apparently not.

14

**TNC-January19_2016**
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**DEREK:**  Okay, okay.

**JONATHAN HAAR:**  Yes, no.  I would say no that that's not --

**DEREK:**  Okay, sorry.

**JONATHAN HAAR:**  Yes, I wasn't aware of that.  National Milk Producers.

**DEREK:**  Well, yes a lot of these votes are made on the co-operative level like for CWT recently whether to increase funding for that, you know, making the farm program mandatory as Tom mentioned earlier, things like that.

**JONATHAN HAAR:**  Right.

**DEREK:**  And these co-ops are voting with their full vote that we're voting this way without asking the individual members of those co-ops.  So that's why I kind of got excited when I saw that provision in the settlement.

**JONATHAN HAAR:**  Oh, right, okay.  Yes, no, apparently this is -- the discussion was concerning milk marketing order.

**DEREK:**  Okay.

**JONATHAN HAAR:**  So I would assume that they will not touch the National Milk Producers.  That's a good point.

**MALE 3:**   So any co-op issues still would not be -- they still wouldn't let the members know that they're even voting for it.  They'd just block vote like usual.

**DEREK:**  Right.

**JONATHAN HAAR:**  Right.  Yes, like the CWT for example.

**MALE 3:**   So we don't have anything there either.

**JONATHAN HAAR:**  Well, yes [INDISCERNIBLE] marketing --

**DEREK:**  What's your take on [INDISCERNIBLE].  Go ahead.

**JONATHAN HAAR:**  No, go on.  I was just saying --

**DEREK:**  Oh, I was just going to -- I was kind of moving to the next thing of what your take was on the lab testing provisions they've got in this.

15

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:**  Let me see if I can dig it up, the lab testing.  The big thing of course we were saying, we're interested in the divesture, and they said, oh well, we can't sell it because we don't own it.  It's an independent co-op.  So they weren't going there, so they were going to change their influence on the board, but they were dealing with the DFA.  They can have only so many DFA board members.  So that to me, if it's DMS instead of DFA that means nothing.  And then the other things were -- I would have to look at that, actually reread that or if you have it right in front of you what your question is about, I can try and field that for you.

**DEREK:**  Well, let's see here.  Check testing.  "For a period of time extending five years from the beginning of the conduct period as defined above, any dairy farmer [PH 0:59:19] in order one whose milk is tested at the Dairy One laboratory for purposes of determining any portion of that farmer's milk check and who disputes the accuracy of the test results for his or her milk may require that a split sample procedure be initiated according to the specified protocol" that they've attached.  And then it talks about the protocol a little bit here.  "Sample will be tested at two independent certified testing laboratories in addition to Dairy One."  And it's saying a farmer could do that three times within a year at no cost.  I guess the problem is knowing ahead of time which ones you want it done on, but --

**[01:00:00]**

**JONATHAN HAAR:**  Yes.  Yes. I'm just looking.

**DEREK:**  problem is knowing ahead of time which ones you want it done with

**JONATHAN HAAR:**  Yes.

**DEREK:**  Excuse me.

**JONATHAN HAAR:**  Yes, I'm just looking at this section here now.  And now I have a signed copy of this settlement agreement.  But it was signed on the 22nd of December and it's the last I had heard from them.  So I don't know, like for example, you mentioned the protocol.  And I don't have anything --

**DEREK:**  And that would be a -- Schedule B is what that copy attached is OVERLAY].

**JONATHAN HAAR:**  Right.  Okay, I don't think I have that Schedule B.

**DEREK:**  Okay, yes, this is the one they would have filed the 15th, I guess.

**JONATHAN HAAR:**  Oh, yes, no, I do have the protocol, inspect the milk, yes.

**DEREK:**  Which is pretty standard, I guess but --

**JONATHAN HAAR:**  Yes.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**DEREK:**  You [INDISCERNIBLE] What I was looking for on here -- if these two other labs disagree with what Dairy One's lab says, they are bound to take the new results then, I guess that's correct, isn't it?  I'm looking in here where that would be.

**JONATHAN HAAR:**  Yes, that's a good question.  I think they are saying that you can bring it to the attention of the farmer ombudsperson.  So, no.

**DEREK:**  Oh, okay.  [OVERLAY].

**JONATHAN HAAR:**  All right?  They're saying if there's a problem, okay, now you go to this ombudsperson.  Like I explained, he's got a day a week and however many farmers. [INDISCERNIBLE].

**DEREK:**  Yes, and he's got no authority to do anything.

**JONATHAN HAAR:**  And no authority to do anything.  Who shall attempt to facilitate or mediate a mutual agreement on the farmer's behalf.

**DEREK:**  Yes, shoot.  [INDISCERNIBLE].

**JONATHAN HAAR:**  So if good cause exists order one or more additional split samples to be taken at no expense to the farmer.

**DEREK:**  Yes.

**JONATHAN HAAR:**  Okay, great.  So now you got a whole lot of samples that prove that they are wrong.

**DEREK:**  You've got a lot of samples that -- all work, no action, yes.

**JONATHAN HAAR:**  That's another good point.  Yes, see, the thing is when you look at it -- because I was actually thinking that they had something there.  Because I --

**DEREK:**  That's what I thought [INDISCERNIBLE].

**JONATHAN HAAR:**  -- Because you really make the assumption that they are going to, oh, so if there's a problem then they are going to make it right.

**DEREK:**  Yes.

**JONATHAN HAAR:**  But actually no.  They say if there's a problem, any issues related to the accuracy of testing for purposes of milk checks including with split-sample procedure described herein, may by the election of either farmer or DFA/DMF be brought to the attention of the ombudsperson.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**DEREK:**  See, I'm not even in the Northeast but this issue right here and the precedent this would set is what has me very interested in this case because we've got this going on around the country and yes, I thought boy if this could set the precedent of validating split-sample results from independent labs, then we might have something to use here.  But, yes, it's not like we have that, I guess, do we?

**JONATHAN HAAR:**  I guess not.  I guess not.  I mean, you know, I try and be objective and fair-minded in dealing with the settlement and dealing with counsel but when you read it, it says what it says and you need to take it for what it says.  It's not --

**DEREK:**  Yes.

**MIKE EBY:**  Well and too, Jonathan, like you had mentioned to me earlier today, anything that is proposed as a solution, they have predetermined ways around --

**DEREK:**  [INDISCERNIBLE].

**MIKE EBY:**  -- not having to come through with what you feel may be the solution or may be basically what you have just suggested right there.  They just make sure that they cover their bases to not have to be accountable.

**JONATHAN HAAR:**  Well, yes.  So, my concern with  I'm hoping, like I say, that folks reading it will pay attention enough.  Because like you say, you read that thing and you think oh, this not a bad deal.  This is okay.  This might actually help somebody until you get down to what -- in my copy it's called [PH] three little I's.

**[01:05:00]**

I don't know if they change any of that stuff too in the final --

**MIKE EBY:**  Yes.  So when I find out --

**DEREK:**  I did find something here under the one little "I" on this one here -- be on Page 33 of 56.  I'll read this here.  It says if the split samples fail to confirm the original test results within a reasonable level of statistical tolerance, then appropriate adjustments shall be made in any milk check determination that was based upon the original results and information about the differing results between Dairy One lab and the other labs testing the split samples shall be sent to the personnel at the market administrator's office.  So there it says that appropriate adjustments shall be made to the milk check.  So, I don't know --

**JONATHAN HAAR:**  Okay.  So then that could conceivably be setting the precedent.

**DEREK:**  Yes.  That's kind of what I was looking for here, yes.  But I don't know what that other section is talking about the ombudsman now, what that's all about.  But --

18

**TNC-January19_2016**
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:**  I'm looking for that.

**DEREK:**  That's what the three little I's -- yes, I see that.

**JONATHAN HAAR:**  Then appropriate adjustments -- yes -- shall be made in any milk check determination that was based on the original results and information about the differing results between Dairy One and the other labs testing the split sample shall be sent to the personnel -- yes, so that's not a bad thing.  And it's five years.

**DEREK:**  Right.  Temporary solution to a permanent problem.

**JONATHAN HAAR:**  Yes.  And again, the problem obviously being that you don't know -- I mean, if you have a systemic issue, then you can utilize this.  But if you don't know that you want to test this particular sample that went today.

**DEREK:**  Right.

**JONATHAN HAAR:**  So you're not going to necessarily have the split sample for -- so it could be helpful.  It could be helpful for people with certain issues.  There's no doubt, I guess.

**MIKE EBY:**  Had you had any time --

**JONATHAN HAAR:**  Who?

**MIKE EBY:**  -- Jonathan, to go through and look at the copy that I had sent to you versus what you have signed?  Are you noticing any discrepancies?

**JONATHAN HAAR:**  Well, the little "I" that the gentleman was saying Page 33 out of 35 or something, is on Page 28 in the copy that I have.  So apparently there must be some -- at least been some maneuvering of things.  I don't know that this -- hopefully -- I mean, I don't know if there's been any changes.  No, I haven't had a chance to really look at it.  I'm just wondering too as I'm reading this a couple of times, how does that work that there is appropriate adjustment shall be made in any milk check determination that was based upon the original results.  That information sent to Dairy One.  Okay.  And then issues relating to the accuracy of testing for purposes of milk-check determinations can be brought to the attention of the ombudsperson who shall attempt to facilitate an immediate and mutual agreement, so a mutually agreeable solution on the farmer's behalf.  So, how does that work?

**DEREK:**  So that's [INDISCERNIBLE] discrepancy in samples then, maybe.  Any issues relating to the accuracy.  So, yes-- trying to think of an example of what that would be.

**TOM:**  How does that work when you receive your paycheck and you discover that you're not getting paid for what you thought you were.  Those samples are long gone aren't they by that time, so how can you actually refer back to the sample that's in question?

19

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:** The short answer is you can't. You would need to say gee, are they going to do the same thing this next month? Maybe I ought to get my split samples done. But it doesn't help you for historical things.

**[01:10:05]**

**DEREK:** Yes. I've got a guy here that's just running split samples at his own expense on every pickup. Just keeping a running record and he's got some interesting information in it. But --

**JONATHAN HAAR:** Does he? And I [INDISCERNIBLE]

**DEREK:** Yes. That's really the only way that -- you're not going to -- like you say -- you're not going to know ahead of time when to check, so --

**JONATHAN HAAR:** Yes, I've started doing the same -- taking a second sample every single time I tell them I want a second sample, leave it. But, which I think is a good idea for anybody. But I haven't been able to do anything with it. I have a lab about 35 miles away that I could -- an independent lab -- that I could run my samples to. And I would like to do it but it's just a matter of getting that done. Just something else to do.

**DEREK:** [INDISCERNIBLE] yes.

**TOM:** Is it -- that would never work either. [INDISCERNIBLE]

**MIKE EBY:** Even just to pull the sample and keep it in the refrigerator and to have it until everything clears. I mean, obviously you would just throw your samples away on a regular basis but you would at least have a sample to back up any claim. So, therefore, there was a time I think that you were concerned about being accused of penicillin in the milk or -- you know how some of those stories were out there. But that would be a perfect example as to why it would be necessary or why it would be beneficial to keep a sample of your own.

**JONATHAN HAAR:** Yes, I would encourage people to do that just like you say. If there's a question and you say, oh, hold on a minute, I'm going to run this up to wherever.

**MIKE EBY:** Right. And then you are only testing the samples that are in question. You are not testing every single one.

**JONATHAN HAAR:** Right.

**DEREK:** But if it's for something like bacteria or like that, I mean, that's -- time is of the essence there. Like Tom is saying, it's [INDISCERNIBLE].

**MIKE EBY:** Right.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**DEREK:**  After the fact, you're not going to be able to go back**.**  Yes, something like penicillin, yes, that's a good idea.

**JONATHAN HAAR:**  The challenge, of course, is obviously if you had a lab that had no incentive to make money for its owners by tweaking tests, it would be a better situation.  But, of course, I think somebody -- I forget who it was -- was talking about that.  It's at the data entry point too, is another challenge that they -- your independent lab says your milk is 4.6% fat and your co-op writes it down as 4.5%.  You realize of course that it's only a tenth of a percent, but when you add that up over an order or over a few hundred farms, a few thousand farms, it becomes a big pile of cash.  So [INDISCERNIBLE] some of the things are -- there are not too many real easy answers.

**MIKE EBY:**  I guess at this point, we've discussed a lot of the settlement.  What would it be that you would suggest of dairy producers.  Now I know that it's up to each one individually to read it and to come to a conclusion and maybe you're not even in the position where you want to say what you would suggest to do.  But at the same time, we as dairy farmers are looking at this and saying, well, for those that have been investing most of their time into this in the last couple of years, you would be the best one to kind of give direction.  So would there be any sort of direction at all, Jonathan that you would suggest?

**JONATHAN HAAR:**  Well, like you say, it's up to individuals.  I just throw out there that the issue is an anti-trust issue and I don't see any relief along those lines.  There is absolutely nothing here with regards to that.  Now there -- the split sample for a few years, well, that may be helpful.  Now, is that worth surrendering our position in this lawsuit.

**[01:15:01]**

The attorneys have represented to us that we can't win.  Oh, you can't win, you can't win.  It's -- there's not -- the record, the evidence, the da-da-da-da-da.  Now, of course, they have a $16 million incentive to tell us that we can't win.  And the court is designed to weed out cases that can't win before they get to trial.  That's what summary judgment is all about.  That's what motion to strike is all about.  So if there was no hope, we would not have gotten this far.  Now, Miss Allen -- Alice has frequently talked about how far we've come and we've never come this far before.  So I think that's an important consideration when we weigh is this settlement worth it or not.  And obviously for the Sitz's and myself and Mr. Swantek, we believe it's not.  We really believe that there's not enough here to justify -- and you do have to win at trial.  It's not a foregone conclusion but by the same token, it's not a foregone conclusion you're losing either.

And if you did win, we could conceivably win very big.  We -- that's not outside of the realm of possibility, that our original damage model stood at $1 billion.  Well, the attorneys tell us the Court approved this to go forward seeking $350 million in damages, which is trebled in an anti-trust case.  In other words, multiplied by three.  So that's $1,050,000,000 if they were able to just keep it at the 350.  Now they represent that would be difficult and there's issues of fraudulent concealment and statute of limitations.  And so, we don't think we can be able to keep this whole 350.  It might get whittled down to -- I forget what the numbers that they whittle it down to -- it's

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

$150 million or something like that, which is still monetarily quite a bit different, which the money obviously, we need relief.  A one-time payment of -- the farmers in the Southeast who have gotten lots of money per farm have shared with us.  The ones I have spoken to have shared with us that they felt there was a mistake.

So in this email, which I'll send this email to  Mike and he's welcome to share it to whoever, that I wrote to the other class members.  I used a lot of Patrick Henry and I said look, experience is my only teacher.  I can't -- I have nothing to judge the future by but the past.  And so I have no choice but to say that we would not be -- at the end of the day, we would not be doing anything for our industry by taking this settlement.  We will not be affecting the way DFA does business at all. If we were able to help some people out over the next five years with regards to some of these test deals, well that would be nice.  Is that worth giving up the potential of actually fixing the problem?  So, I also share when I say I agree with Alice and Peter, we have never gotten so far as dairy farmers.  I disagree with them that this fact means we should settle under these terms. It would be irresponsible for me to support a settlement that provides no long-term solutions just so that we can have quote, "peace in our time."  And then I quote Patrick Henry.  I say, they tell us that we are weak, unable to cope with so formidable an adversary.  But when shall we be strong?  Will it be next week or next year?  Shall we gather strength by irresolution and inaction?  Shall we acquire the means of effectual resistance by lying supinely on our backs and hugging the delusive phantom of hope until our enemies shall have us bound hand and foot?  Sir, we are not weak if we make proper use of those means which the God of nature has placed in our power.

**[01:20:00]**

Besides, sir, we shall not fight our battles alone.  There is a just God who presides over the destinies of nations and will raise up friends to fight our battles for us.  The battle is not to the strong alone, it's to the vigilant, the active, the brave.  Besides sir, we have no election if we be base enough to desire it.  There is no retreat but in submission or slavery.  Our chains are forged. Their clanking can be heard on the plains.

I had to quote Patrick Henry there, I say if DFA headquarters in Kansas City, "What is it that the gentlemen wish?  What would they have?  Is life so dear or peace so sweet to be purchased at the price of chains and slavery?  God forbid it.  I know not what course others may take, but as for me, we oppose."  And that's Garrett and Ralph and Claudia and I.  And that's obviously Patrick Henry's quote from 1775.  But, I think there's a lot of truth in that.  That we've been told we don't -- we should -- we've come so far but now we should seek favorable terms.  And if there were favorable terms here, it might be something to consider.  But the fact that there is so little of consequence to the farmers and to the future of the farmers.  For me, I can't in good conscience endorse it.  So at the end of the day, I'm like Garrett said to his dad.  He said, "Look I've got to oppose this," because he has a couple of little boys .  And he says if someday they want to get into the business and they can't because of the way that the marketing has been set up and the way that the prices are run by the cooperatives, I want to have done everything I can do.  And so that's why we're opposing it and we have gotten a long way.  We are on the eve of trial in the federal court.  I mean, it's kind of a big deal.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

It's interesting that it's now evolved into the fact that we're in the courthouse and we have Bernie Sanders sitting in opposition to us represented by Alice's, -- the woman who drives Alice is Bernie Sanders' AG.  I don't know the title of a congress person's AG person.  But this is the person -- and now his personal attorney, Cassidy is representing Mr. Taylor.  So it's interesting that -- I don't know what DFA donates to Mr. Sanders.  I don't know if there is any connection there at all.  It's a politically-charged environment obviously and we've got a battle on our hands.  But I don't think it's appropriate to surrender at this point.  So, I hope I didn't ramble on too much but that's where I'm coming from.

**TOM:**  All right, thank you for doing what's right there Jonathan.

**MIKE EBY:**  I [INDISCERNIBLE].

**TOM:**  I think most of the farmers would agree with that.

**DEREK:**  That's for sure.

**MIKE EBY:**  [INDISCERNIBLE] and that's what I was looking for.  I wanted your feeling, your gut feeling on this and your heart and I thank you for sharing that.  It was good this evening to be able to go and kind of go line-by-line on some of the specifics of the settlement.  And then also get the feel for how you are feeling.  Anything you want to add Jonathan, or any questions?  I know we're over our time here that we commit on these evenings but I think this was a great call this evening.  But anything more specific that anybody has any --

**TOM:**  Well, I've got to say I appreciate his input and his thoughts on the deal.  And that explains a lot more to the rest of us that are listening.  It gives us a better grasp on it.

**MIKE EBY:**  That's right.

**TOM:**  And we all need to get a copy of this so-called settlement and study it ourselves and be willing to ask the questions and then to formulate a response to it.

**MIKE EBY:**  That's right.  And Jonathan, you mentioned the fact that, Claudia had requested that everyone receive a copy.  And at this point, you are not certain whether or not that will happen?

**JONATHAN HAAR:**  Yes, correct.  I mean, hopefully they will do that.  Mr. Johnson is adamant that yes, we're going to do that, so hopefully everyone will get a copy of the settlement and then they can go through it.

[01:25:04]

And I appreciate people's specific questions.  That's very helpful even in terms of informing like the block voting National Milk.  I should have been aware of that but I hadn't really thought of that aspect of it.  So it's very helpful to hear people's specific questions, because obviously

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

different people look at things differently and they have different insight.  And I am happy to represent the strengths, if we can find some with regards to the settlement.  But I think we do need to weigh it against what we're giving up.  And, yes, so that's where we're at.  And I do appreciate, like I say, everybody's input and we're going to need involvement if we're going to convince this judge to deny this settlement, it's going to take a lot of support in terms of letters and hopefully even speakers in opposition at the fairness hearing, so --

**MIKE EBY:**  I plan to be there and offer transportation to those that would like to go.  So I don't know what that looks like yet, but we at least need to start thinking what that might look like and put that out there.  And like you said, letters --if they can't go and speak, they can at least write a letter.

**JONATHAN HAAR:**  That's right.  You know if we can get our friends and neighbors to write letters -- I had the situation last time -- I had a lot of people who were willing but just didn't nail it down.  Whatever we can do to facilitate them actually getting that done is going to be critical. It's going to be quite critical, so -- [OVERLAY]

**DEREK:**  Yes, there's quite a procedure to it, I guess isn't there?  I mean, you've got to make four different copies or something and I think that's why Mike is going to collect and make sure you all -- everything gets done right.

**JONATHAN HAAR:**  I was planning on doing the same with some of my neighbors.  Just hand them a piece of paper, ask them to write their thoughts and then just deal with getting copies out to the various people.  I don't know but that I think that the judge posted stuff that she got that people did not follow all that protocol.  Obviously, it's better if we do, but if people just fire off letters to the court, it's -- I think that -- whether -- we would want to wait until she granted preliminary approval because she won't receive anything prior to that.  And there is the chance that she might not do that because she knows that we will be in opposition and she knows that we have some significant issues with regards to professional conduct of our attorneys.  And she has made some very questionable maneuvers herself, which under investigation would not look very good.  And so, she may determine that it might be in everyone's best interest to forego a fairness hearing and just deny the settlement.  That is a possibility, so that would be an answer to prayer though.  That's a lot.  I think that may be a long shot but boy that would be nice.

**TOM:**  Is there any we can encourage her to do that?

**JONATHAN HAAR:**  I don't know.  I don't know if she starts to hear from people already, if that would influence her.  It's a possibility.  I don't think there's anything to lose by doing that other than the postage.  I just don't -- yes.  I don't know.

**TOM:**  So that would be fine if we would want to do that.

**JONATHAN HAAR:**  Yes, I guess.  I mean, I -- [PH] Mr. Belinski had sent a letter to the court that they did not receive.  He had issues because he said he had written at the last fairness hearing and he felt he would pay for having done it.  And then he felt that he was having some

24

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

issues and he brought them to the court's attention but I think because she didn't really -- she stated we can't just receive mail on subjects from people.

**[01:30:06]**

But it may have an impact, whether or not she, you know, dockets it or takes a serious look at it. If she's getting -- if she's getting mail it might -- I mean I know last time, when they sent the settlement, we set up a phone chain and we tried to get people to -- because this was like right on the eve of trial. This was like -- I forget the exact dates but it was right before Independence Day, so the holiday weekend was in there and this was the second of July or something that they said we have a settlement. And the trial jury section was supposed to be the 8th of July, the following Monday. And this was like a Tuesday, what's like I say, Independence Day being the Thursday of that week or something, and but we got people to call the court house. I said, just call the court house and say, you know, I'm interested in attending the trial.

I'm interested in finding out what's going on with the trial. We're looking forward to the trial, whatever. Whatever you want to say, just call up and talk about the trial and -- and I was certain that we had a significant number of calls. I mean I don't really know for sure. I know the younger Mr. Swantak was very helpful in getting people to -- to follow through with that and she denied the preliminary approval at that juncture for that first settlement because she said she needed to hear from us. And so that was that -- but it was dead at that point. So I really don't know. I mean, I'm not going to tell you to do it. I'm not going to tell you not to do it. So.

**MIKE EBY**: I have a feeling -- I mean, we can do obviously whatever we want but I have a feeling that she will return it. Ken Dabell has put something in. I had actually submitted a letter from National Dairy Producers Organization, if you remember Jonathan, when we were accused by the -- by the class counsel for -- I don't know what they're -- basically trying to manipulate the outcome. And being probably more like a nuisance to the case is what they viewed us. And then we, with the National Dairy Producers Organization had written a letter to the judge, stating the fact that we've done nothing wrong. She responded back -- or I don't know if it was her or if it was the court clerk, making the statement that if we were to submit anything to the judge or to the court, it would need to come through an Amicus Brief at this point. So my question to you would be, at what point it would not need to be an Amicus Brief, and my guess would be it would have to be after she would grant preliminary approval to anything. So my assumption would be true. I believe that she won't look at anything until she gets preliminary approval.

**JONATHAN HAAR:** Probably -- I'm certain that she would send things back and she would not docket them.

**MIKE EBY**: Right.

**JONATHAN HAAR:** But I -- I'm also certainly that they'll open and read what comes to the court.

**MIKE EBY**: Okay.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:**  And whether or not that would have an impact, that I can't -- you know, I really can't speak to.  I don't know if it would.

**MIKE EBY**:  Right.

**JONATHAN HAAR:**  You know, something about the case that people need to keep in mind, including the judge, is that it's -- we are the class.  This is our case.

**MIKE EBY**:  That's right.

**JONATHAN HAAR:**  We're not here to -- you know, I've spoken as class representative, I say, I'm not here to represent the attorneys -- what the attorneys want or what the attorneys think.  I'm not even here to represent the judge.  I'm here to represent the class.  And so as class members, this is -- this is, you know, your lawsuit.  And this is the juncture we're at.  And so, you know, yes, I know that the letters would definitely -- I can almost -- you know, I shouldn't say definitely but, you know, I'd agree with you Mike that, that she would not put things up and she would not -- you know, she would not docket them.

**[01:35:03]**

She would send them back.  The indication would be that, you know, you know, we can't hear from you now.  It's irrelevant.  It doesn't mean anything.  Whether or not that would be completely true, that I don't know.  So.

**MIKE EBY:**  Right.  Well, we know that they will docket them after the --

**JONATHAN HAAR:**  Correct.

**MIKE EBY:**  -- after the preliminary.  So, if we're going to make the effort, I would say we might as well make it so -- and do it at such a time where it will get credit and it will be docketed and the lawyers will see it as well.  Because otherwise the lawyers would never see it.  If we would just simply send it straight to the court now, she doesn't put it on the docket and the lawyers do not get to hear our response.

I think it's good for the lawyers to truly hear from dairy producers, as well.

**JONATHAN HAAR:**  Yes.  Yes, well, I don't know, actually because, quite frankly, they don't care.

**MIKE EBY:**  Well --

**JONATHAN HAAR:**  You know, all it will do is -- they'll be like, oh boy, we've got a fight on our hands.

**MIKE EBY:**  Yes.  Yes, I agree.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:**  You know --

**MIKE EBY:**  I don't -- and when I said that, I don't anticipate them really doing anything or thinking any differently other than just to know that we're still here.

**JONATHAN HAAR:**  You know, like I say, you know, I don' t -- I don't know if it would be -- you know, obviously, if you're going to send one letter, I would encourage folks like you say, to do it after -- should she grant preliminary approval.  But I don't know if she started getting stuff and hearing stuff at this juncture, what kind of -- if that -- if that could have any impact or not.  I really don't know.  Because like I say, she's -- she knows she's got an interesting hearing coming, if she does, you know -- and she will do a fairness hearing.  So if she grants preliminary approval, there is a fairness hearing.  And if there is a fairness hearing, she's got a big day.  So, so that is what it is.  I don't know, you know, if she would be blanch at that.  I don't really -- I can't figure her at this point.

You know, I don't know --

**MIKE EBY:**  Right.

**JONATHAN HAAR:**  You know, we've discussed, is she being pressured.  I have no idea.

**MIKE EBY:**  Well, being that I was rejected once, with that letter that I had sent in from National Dairy without an Amicus Brief attached, you know, I have a feeling that my best position would not to irritate her anyway.  I have a feeling that if dairy producers would want to do it now, they could but I believe from my standpoint, I'm going to just simply wait.

**JONATHAN HAAR:**  I agree.

**MIKE EBY:**  Until it's preliminary approved.  Because I've been warned once.  I don't need to be slapped again.

**JONATHAN HAAR:**  Yes, no, I feel personally, we're in a similar position and we're not sure if we should bother even dealing with the fact that they've misrepresented us at this juncture to the court.

**MIKE EBY:**  Right.

**JONATHAN HAAR:**  You know, should we even bother or should we just save it all and, you know, and wait for the -- wait for the hearing and then be heard.  I'm not -- you know --

**TOM**:  Well, we definitely got to -- we definitely got to follow the rules laid out there.  It's a matter of understanding what the rules are.

**MIKE EBY:**  Right.

TNC-January19_2016
**Cohen Milstein Sellers & Toll PLLC**
**March 11, 2016**
**Transcript by TransPerfect**

**JONATHAN HAAR:**  Correct.  Correct.  Yes.  Which is -- which is a challenge.  You know, the system is set up, you know, by attorneys for attorneys, so it's an uphill climb.  But I'm an optimist.  I believe justice can happen.  I know justice does happen ultimately but hopefully sooner than later, so.

**MIKE EBY:**  Well that is a -- that would be a great way to end the call here this evening.  Jonathan, thank you for your optimism.  Thank you for representing the class, and you do a class act job on that, so thank you too for Claudia and all the support that she's been as your wife, and also as a class rep.  And we also are very thankful -- for the Sitz' and the Swantak, as well.  So, you're welcome to come to these calls.  We have them every Tuesday.

So feel free to jump in at any time.  Jonathan, you have the information now so in the next few weeks, these issue will continue to pop up and if you would like to come on and brief us on some of these calls, that would be awesome.

**[01:40:10]**

**JONATHAN HAAR:**  Thank you very much.

**MIKE EBY:**  Yes.

**JONATHAN HAAR:**  If I did I would try and keep brief.

**DEREK**:  We enjoy hearing from you.

**MIKE EBY:**  Yes, very much.  Thank you, too Derek, for coming up with good questions here this evening, and I think it was a great call for people to call in and listen to throughout the week.  This call will be available so for those of you that know that a neighbor would benefit from hearing this, don't forget that this call is recorded and they can dial in -- the last numbers 7039.  Tonight you dialed in at 7035.  But 7039, and the PIN number's the same.  So with that I will conclude the call here this evening.  Thank you very much for everybody for participating and we will catch you next week.  That's Jonathan for coming on.  Appreciate it.  Thank you.

**JONATHAN HAAR:**  Have a good night.  Thank you.