UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

ALICE H. ALLEN, et al.        *
                              *
            V                 *
                              *
DAIRY FARMERS OF AMERICA,     *
INC., et al.                  *   CIVIL FILE NO. 09-230

FAIRNESS HEARING
Friday, May 13, 2016
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA R. REISS
        Chief District Judge

APPEARANCES:

    BRENT W. JOHNSON, ESQ., and KIT A. PIERSON, ESQ.,
        Cohen Milstein Sellers & Toll PLLC, 1100 New
        York Avenue, N.W., Washington, D.C.; Attorneys
        for the Plaintiffs

    ROBERT G. ABRAMS, ESQ., BakerHostetler LLP,
        Washington Square, Suite 1100, 1050 Connecticut
        Avenue, NW, Washington, D.C.; Attorney for the
        Plaintiffs

                            Appearances Cont'd...

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

APPEARANCES CONTINUED:

      STEVEN R. KUNEY, ESQ. Williams & Connolly LLP,
         725 Twelfth Street, N.W., Washington, D.C.;
         Attorney for Defendant Dairy Farmers of America,
         Inc.

      IAN P. CARLETON, ESQ., Sheehey, Furlong & Behm,
         P.C., 30 Main Street, Burlington, Vermont;
         Attorney for the Defendant

      DANIEL J. SMITH, ESQ., Northeast Dairy Compact
         Commission Executive Director, 16 State Street,
         Montpelier, Vermont; Attorney for the
         Intervenors

      RICHARD T. CASSIDY, ESQ., Hoff Curtis, 100 Main
         Street, Burlington, Vermont; Attorney for the
         Intervenors

                *** ** ***

ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont   05402
(802) 860-2227

# I N D E X

| STATEMENT BY CLASS MEMBER | PAGE | LINE |
|---|---|---|
| KENNETH DIBBELL | 9 | 17 |
| STEPHEN H. TAYLOR | 12 | 16 |
| DARREL AUBERTINE | 16 | 8 |
| LYLE WOOD | 20 | 19 |
| GARY GENSKE - on behalf of John J. King | 23 | 22 |
| DOUGLAS RICKER | 29 | 21 |
| PETER SOUTHWAY | 35 | 15 |
| WILLIAM OLIN | 42 | 2 |
| JONATHAN HAAR | 46 | 8 |
| DAVID GALLEY | 54 | 20 |
| LARRY BURGIN | 59 | 15 |
| PATTY BIKOWSKY | 63 | 22 |
| WILLIAM MOODY | 67 | 10 |
| LISA KNAPTON | 70 | 12 |
| REYNARD HUNT | 71 | 8 |
| TIMOTHY MAXHAM | 72 | 25 |
| PATRICK HOWRIGAN | 79 | 15 |
| BILL ROWELL | 82 | 16 |
| WAYNE HURTUBISE | 85 | 24 |
| CLEMENT GERVAIS | 87 | 22 |
| PAUL STANLEY | 90 | 21 |
| BRYAN DAVIS | 93 | 6 |
| CONNIE MENARD | 96 | 15 |

# I N D E X

| STATEMENT BY CLASS MEMBER | PAGE | LINE |
|---|---|---|
| MARK MAGNAN | 100 | 25 |
| TIMOTHY MAGNANT | 102 | 24 |
| HAROLD HOWRIGAN, JR. | 105 | 7 |
| ALICE H. ALLEN | 109 | 17 |
| ROBIN SWEET | 115 | 13 |
| HEIDI DOLLOFF | 117 | 2 |
| EDGAR KING | 119 | 18 |
| DARLENE REYNOLDS | 124 | 18 |
| ROB MORRILL | 127 | 2 |
| JOSHUA HAAR - on behalf of Claudia Haar, Dave Ward and Rod Jennison | 130 | 18 |

| STATEMENT BY ATTORNEY | PAGE | LINE |
|---|---|---|
| KIT PIERSON, ESQ. | 138 | 12 |
| ROBERT ABRAMS, ESQ. | 141 | 4 |
| DANIEL SMITH, ESQ. | 142 | 7 |

1   FRIDAY, MAY 13, 2016

2   (The following was held in open court at 10:05 a.m.)

3        COURTROOM DEPUTY:  Your Honor, the matter

4   before the Court is civil case number 90-CV-230, Alice

5   Allen, et al., versus the Dairy Farmers of America,

6   Incorporated, et al.  Representing the plaintiff are

7   attorneys Kit Pierson, Brent Johnson and Robert Abrams.

8   Representing the defendant are attorneys Steven Kuney

9   and Ian Carleton.  And we are here for a fairness

10  hearing.

11       THE COURT:  Good morning.  I am going to kind

12  of tell you how we are going to proceed today and give

13  you some ideas of things that you might want to talk

14  about and hopefully answer any questions you will have

15  before you appear.

16       The Court received approximately 1400 letters.  I

17  have read those letters whether or not they were timely,

18  so don't worry about that.  A few were not from class

19  members.  If you are not a class member, you can't

20  actually object or approve of the settlement.  A few

21  were from people who had opted out of the class and so

22  they're no longer class members.  But most of them were

23  from people who had closely followed this litigation,

24  that were aware of the claims, that had some very

25  important insights into the dairy industry, this case

1    and the proposed settlement, and I read them with

2    interest.

3         So if for any reason you don't get to speak, don't

4    worry.  I have read your written comments.

5         We are going to try to get to everybody today who

6    filed in accordance with the Court's rules about an

7    opportunity to speak.  In order to do this, I am going

8    to have to set some ground rules.  So I am planning on

9    each of you presenting for about five to seven minutes.

10   I am going to be watching the clock, but I want to focus

11   on what you are saying.  Please be careful yourself in

12   that respect, and then I won't have to be rude and

13   interrupt you.

14        It sometimes helps to collect your thoughts in

15   bullet points:  "These are the five things that I want

16   the judge to take away from my remarks."  It's fine to

17   repeat other things that -- things that other people

18   have said, but you might want to offer new information.

19        You can talk about the attorneys' fees if you would

20   like.  That's going to be decided in a separate motion.

21   We are going to try to get through everybody who has

22   notified us of their intent to appear in a timely

23   fashion.  We will call out the names.  You can come

24   forward.  You are not going to be under oath.  If you,

25   for some reason, wanted to be under oath, that's fine.

1    It's not required for a fairness hearing.  So that -- I

2    will leave that up to you, but I don't expect people

3    will be under oath, and they will not be subject to

4    class -- to cross examination.  So nobody will be

5    questioning you about the remarks that you offer.

6         Please remember that we are in a courtroom, so make

7    sure that your remarks are courteous.  I know that

8    people have some strongly held opinions.  That's fine.

9    I want to hear them, but I want you to choose language

10   that's appropriate for a courtroom.

11        Some of the things that I am going to be deciding

12   today may be helpful in framing your remarks.  One of

13   the things that I am going to have to look at in terms

14   of approving this settlement is whether it was

15   procedurally fair.  Who was involved in the

16   negotiations?  How did the negotiations occur?  Were

17   they fair and at arm's length?  Were opposing viewpoints

18   considered?  And, is this a procedurally fair

19   settlement?

20        The next thing I am going to have to determine is

21   whether this is a substantively fair settlement, and the

22   Court is directed to look at a number of factors to make

23   this determination.  These are factors that are set

24   forth in the law:

25        The complexity, expense and likely duration of the

1    litigation; the reaction of the class to the settlement;
2    the stage of the proceedings and the amount of discovery
3    completed prior to the settlement; the risks of
4    establishing liability.  So how likely was it that the
5    plaintiffs would win at trial or the defendants win at
6    trial?  Would there be appeals thereafter?  How long
7    would it take to reach a different resolution through a
8    trial?

9        The risks of establishing damages.  The risks of
10   maintaining the class through the trial.  So in the
11   event that the class got decertified, we would have a
12   trial for individuals but we would not have a
13   class-action suit.  That would be a very different case.

14       The ability of the defendants to withstand a
15   greater judgment.  Could they pay more?  Should they pay
16   more?  Why should they pay more?

17       The range of reasonableness of the settlement fund
18   in light of the best possible recovery.  So how does
19   this match up to what would happen at trial in the best
20   possible circumstances, but again, factoring in the
21   appeals period, evidentiary rulings, other factors?

22       And so those are the things I am going to be
23   looking at and you may want to consider as well.  And
24   what we are going to do is we are going to get started
25   right away with people, and I know some of you have to

1    leave, and the attorneys will speak at the end of the

2    hearing.

3         So it's much more important that I hear from class

4    members than attorneys at this fairness hearing, and the

5    goal is to determine whether this proposed settlement,

6    which I will call the December 2015 settlement, is fair,

7    reasonable and adequate.

8         The first person is Kenneth Dibbell, and if he

9    would come forward.  We are doing this in the order in

10   which we received your notice of intention to speak.  I

11   will hear from him.

12        And I will ask you, when you come forward, if you

13   will just state and spell your name for the record.

14             KENNETH DIBBELL:  And that is Kenneth Dibbell,

15   not Dibbell (pronunciation).

16             THE COURT:  Sorry, sir.

17             KENNETH DIBBELL:  I am only going to give

18   you people today a brief history lesson on the dairy

19   industry.

20        In 1940, we had 4.66 million licensed and inspected

21   dairy producers.  97 percent of those farms were from

22   one to 29 cows.  Over the years, we suffered

23   considerable attrition for various reasons.

24        We will go fast-forward to 1980, more or less

25   modern times.  In 1980, we still had 350,000 dairy

1   producers in this nation.  Today, we're down to 43,000

2   and falling.  That's less than one percent of the farms

3   we had in 1940 producing milk.  It's an outrage.

4       We have taken the hardest-working people in this

5   nation, 14 hours a day, seven days a week, and we have

6   put them out of business due the economic strangulation,

7   failure to pay them what it costs to make the product.

8   There's a few people responsible for this.

9       It starts in Washington with our government.  USDA,

10  economic research, calculates to current cost of

11  production for 23 states, average 27.66 per

12  hundredweight, but AMS is currently administering a pay

13  price under $13 per hundredweight.  While it's pretty

14  difficult to pay 25, $27 of the cost with 13 or $14,

15  Houdini, that's the only one I know of, that could do

16  it.

17      It's an outrage what we have done to the

18  dairy-producing community, and it's not just the

19  government's fault; the dairy cooperatives' are equally

20  irresponsible for their farmer/owner, quote, members not

21  to come up with a supply management system and quit

22  flooding the market.  That's why our price is in the

23  toilet.

24      Global market kept us going for a couple of years

25  with 15, 17 percent exports.  Well, my position on the

```
1    global market is we need to get out of the global
2    market.  We need to cancel NAFTA, GATT and WTO, which
3    was responsible for doing away with the COOL labeling,
4    and our consumers have a right to know where their food
5    comes from, and that COOL labeling, country-of-origin,
6    labeling, was a good item.  And our people deserve to
7    have that, and the good state of Vermont probably does
8    still have it.
9        Currently -- I am going to leave this with the
10   Court.  It's an explanation of the bill that could have
11   solved this problem way back in 2007.  The Casey-Specter
12   bill, Senate 1640, had a supply management system, a
13   proper pay price to keep farmers farming, and the
14   surplus, if there was one, was going to be manufactured
15   at the cost of the producers and given to the food
16   banks, a very common-sense principle.  Taxpayer money
17   wasn't going to be involved.
18       I mean, we used to have a system where the
19   government bought the product and gave it away.  This
20   was designed with total common sense.
21       Those who continued to grow and overproduce beyond
22   the market needs were going to pay for the
23   manufacturing, and it was going to be donated to the
24   food banks.
25       It is my hope that this Court will see the light,
```

1    put this thing before a jury.  In the Southeast case, a

2    parallel situation, Dean Foods and DFA coughed up $300

3    million, and here we have the same situation where Dean

4    Foods got away for 30 mill and DFA is still trying to

5    get away with 50 mill and no fault.

6         It's an outrage.  I'm finished.  And that if I got

7    time left, and I should have, I'll yield it to Joshua

8    Car -- Haar.  Thank you.

9              THE COURT:  Thank you.

10        Next person --

11             KENNETH DIBBELL:  This is for the Court.

12             THE COURT:  Okay.  And if you give it to Jen,

13   she will take it.

14             THE COURT:  Stephen Taylor.

15             KENNETH DIBBELL:  Thanks, Jen.

16             STEPHEN TAYLOR:  Thank you, your Honor.  My

17   name is Stephen H. Taylor; S-t-e-p-h-e-n H. Taylor,

18   T-a-y-l-o-r.

19        I am a dairy farmer of some 40 years.  I farm with

20   my sons in the village of Meriden, New Hampshire.  I

21   served from 1982 until 2007 as the commissioner of

22   agriculture for the State of New Hampshire.  Throughout

23   my lifetime, my adult lifetime, and involvement in dairy

24   farming, I have had an enormous interest in dairy policy

25   issues, and in retirement I continue to hold that

1    interest.

2        I am one of the new named representatives who was

3    admitted to this case by the Court, and I am here today

4    to appear to support the proposed settlement that has

5    been placed before the Court, and I also wish to support

6    the alternative fee motion that has been offered.

7        The letter that I submitted to the Court on April

8    27th goes into considerable detail about my position on

9    this matter.  I will try at this point just to hit some

10   of the highlights.

11       I petitioned the Court to enter the case because I

12   was extremely troubled by the apparent heavy focus on

13   monetary relief and the inadequacy of the nonmonetary

14   provisions that were proposed in the initial settlement.

15   I was also deeply concerned about the breakdown in the

16   relationship between the named representatives and the

17   plaintiffs' counsel, and I was further concerned deeply

18   about the fee that was proposed as being excessive.

19       This proposed settlement represents a significant

20   improvement, in my view, over the first proposal in

21   several respects.  Provision for an audit, for an

22   ombudsman, for a clarification on full-supply contracts

23   and testing protocols are all very, very important, but

24   it's important, I think, that this Court recognize that

25   the log jam that was represented in the first proposed

1   settlement has been broken through a great deal of

2   effort on the part of counsel, on the part of named

3   representatives.

4        The negotiations that I have been involved with

5   have been very respectful.  They have recognized that

6   there are considerable variances in viewpoints.  I think

7   everybody who wished had a chance to be heard, and we

8   worked very, very diligently to get to the point we're

9   at today.

10       The most important provision of this proposed

11   settlement, your Honor, is the provision for an audit,

12   and I think that that is a breakthrough and of extreme

13   importance.  Also essential that the audit have adequate

14   resources to be conducted fully and thoroughly.

15       The new and strengthened provisions of the proposed

16   settlement, I feel, and the Court's power to make them

17   work, can alter the defendants' practices that left us

18   at this -- resulted in the bringing of this action.

19       Your Honor, I believe the alternative of going to

20   trial is not rational at this point.  My feeling is that

21   all could be lost in the long shot of attempting to win

22   at trial.

23       The majority of the messages the Court has

24   appeared -- has received appear to favor the settlement.

25   There are some very strongly held views in opposition,

1    and I recognize 'em and I respect them, but there are

2    also thousands of people who have not been heard who are

3    within the class.  And I think the attitude of those

4    people can be summed up in this way:  They trust the

5    Court in a fiduciary role to manage this matter in their

6    best interests, and I think -- I urge the Court to take

7    that as my view.

8        Some people look at this as a glass half empty;

9    others look at it as a glass half full.  However it is

10   viewed, I think it is worthwhile pursuing the settlement

11   as it is presented today.

12       Speaking to the fee, the combined DFA, Dean

13   monetary settlement would amount to about $80 million.

14   I believe a 20-percent allocation for fee, placing that

15   at 16 million, would be proper.  In the scale of the

16   business activities that these entities represent,

17   billions and billions of dollars, this recovery is quite

18   small.

19       Division of the fee.  The case is where we are

20   because of the efforts of the new named representatives,

21   and the previously named representatives as well, and

22   also the counsel, and I wish the Court to take note of

23   the hard work and dedication, diligence and talent that

24   was brought to bear by my counsel, Mr. Smith, and

25   Mr. Cassidy.  They brought knowledge of the intricacies

1  of the northeastern dairy industry to bear in a very

2  productive and important way, and they also made certain

3  that the process by which we continued the negotiations

4  were very open and respectful.

5       Thank you, your Honor.

6           THE COURT:   Thank you.

7       Darrel Aubertine.

8           DARREL AUBERTINE:   Morning, your Honor.

9           THE COURT:   Good morning.

10           DARREL AUBERTINE:   And thank you for the

11  opportunity.   Again, my name is Darrel.   I am former

12  commissioner of ag and markets in New York State.   My

13  name is D-a-r-r-e-l A-u-b-e-r-t-i-n-e.

14       I'd like to speak on essentially three issues.   I

15  would first like to speak on the issue of the settlement

16  itself in support of the settlement.   I would also like

17  to give my thoughts with regard to the comments that you

18  spoke of earlier, these letters from the farm community.

19  I would also like to emphasize my support for my former

20  colleague, Steve Taylor, with regard to the attorneys'

21  fees.

22       I am a former dairy farmer, some people call

23  recovering dairy farmer, from northern New York State.

24  And northern New York State, not unlike other places in

25  the nation, faces a lot of issues with regard to outlets

1   for the milk -- the dairy community does.  Like many

2   others, I have been concerned with the apparent

3   manipulation in the marketplace that seems to work to

4   the detriment of the dairy community.  I joined the suit

5   to see if something better could be made of the proposed

6   settlement that the Court rejected earlier.

7        As the Court decided, there was obviously too much

8   focus on money and not enough on an attempt to do more

9   to change the conduct of DFA and DMS in the marketplace,

10  and we were appreciative of the window that we were

11  given last fall to do what we could to improve upon the

12  settlement.

13       Mr. Smith and myself were instrumental in

14  organizing several meetings in Albany, New York, as well

15  as numerous phone calls, e-mails and the like, to try to

16  put together as best we could an alternative, an

17  enhanced -- the settlement that was rejected.

18       Now I can't say that we ended up with sweeping

19  reform.  We didn't.  And from the first meeting with the

20  original class counsel, it was very apparent that the

21  case wouldn't allow for this anyway.  But I still

22  strongly believe the settlement is an important,

23  positive first step toward a more open marketplace.

24       The attorneys have identified the many new

25  proposals and parts thereof and how they would work with

1      the original provisions.  The net result should --

2      should be that the defendants are going to have to

3      operate in a more transparent fashion both as a business

4      enterprise and now as they relate to their own members.

5          Even if I'm not a DFA member, I, for one, plan to

6      keep a close eye on the position of advisory council

7      member.  The time and resources are there now for that

8      position to make a real change.  The net change should

9      come in the form of higher farm gate prices.

10         I will also be very interested to observe the

11     ombudsperson's work.  This is an innovation that should

12     prove to be a real change in the cooperative's operating

13     culture.  I expect the other cooperatives will be

14     observing to see how this works as well.

15         Now, with regard to the many letters you have

16     received, I would like to provide a few thoughts of my

17     own as a former commissioner but that as a

18     multigenerational farmer as well.

19         First, I think it's very meaningful that you have

20     received well over a thousand letters.  I believe it's

21     rare that the farm community in general would respond in

22     such a manner.  I also think you have gotten a

23     representative response.  The relative number of

24     supporters versus the opponents indicate by -- indicate

25     by their letters the overwhelming support which is

1    strongly in favor of the new provisions for the reasons

2    stated.  And I -- also bringing this case to conclusion

3    was a major factor in farmers that I had the opportunity

4    to talk to.

5         Now, as far as the fee, I would like to associate

6    myself with the comments of my former colleague, Steve

7    Taylor.  The legal fee of over $22 million, roughly 25

8    percent of the settlement, exceeds -- it would seem to

9    me, is excessive and based on the criteria used in the

10   Southeast case and in the Dean Food case here in the

11   Northeast.

12        While I do not believe, as I said, that the

13   settlement is an important first step toward a more open

14   marketplace, it still won't accomplish as much as was

15   done down south.  Of course the monetary recovery, even

16   combined with the prior settlement, isn't nearly the

17   same.

18        I am not doubting that substantial -- a substantial

19   fee has been earned.  Again, as a policymaker, I

20   understand that we need to provide an incentive for

21   attorneys to pursue these difficult cases, but Steve and

22   myself believe that a proposed 20-percent, roughly,

23   combined fee, amounting to $16 million -- and again, I

24   pretend to be no expert -- would seem to be more in

25   line.

1          I also believe, as Mr. Taylor just -- just said,

2     that Mr. Smith and Mr. Cassidy deserve more than a

3     straight-line share of the fee.  Mr. Smith, in

4     particular, really did come in at a time and use his

5     expertise for the -- from a dairy perspective on dairy

6     issues to get us to the point where we are today.

7               THE COURT:  So we're coming up on your time.

8     Go ahead.  Just a couple --

9               DARREL AUBERTINE:  In closing, I believe the

10    overwhelming majority of the dairy farm community do

11    want to establish clear guidelines as to what is and is

12    not acceptable in the marketplace.  And as I said

13    earlier, the settlement should not be looked at as

14    sweeping reform but rather a positive step in an effort

15    to bring fairness and equity to the marketplace;

16    therefore, I do support settling of the case.

17               THE COURT:  Thank you.

18        The next person is Lyle Wood.

19               LYLE WOOD:  Good morning, your Honor.

20               THE COURT:  Good morning.

21               LYLE WOOD:  My name is Lyle J. Wood, L-y-l-e

22    J. W-o-o-d.

23        I own and operate Wood Farms, LLC, in Clayton, New

24    York, with my cousin, Scott Bourcy.  I'm a

25    third-generation dairy farmer.  I have worked at the

1      farm since I was nine years old.

2          The farm was started in 1945 by my grandfather,

3      Henry Wood, with 16 cows.  We currently milk over 1200

4      cows on two dairies and ship our milk through the home

5      dairy independently and through our other dairy through

6      Agri-Mark.  We have been with DMS since they have been

7      incorporated and started, and at the other dairy we have

8      been at Agri-Mark for four years.

9          Additionally, I am a state director for DairyOne,

10     and I am in favor of settling this lawsuit.  I have a

11     wife, Jennifer, who is here with me today, and I have

12     three children:  Hannah, Henry and Harrison.

13         At DairyOne, the core of DairyOne is the belief in

14     agriculture's integrity; integrity, professionalism,

15     commitment and innovation.  That's the key to our

16     long-term success at DairyOne.

17         The DairyOne milk lab is one of the largest of its

18     kind in North America.  Our staff excels at testing milk

19     accurately.  DairyOne has invested in top-of-the-line

20     equipment.

21         Every day the lab receives 2500 to 3,000 bulk tank

22     milk samples tested for food safety and farmer payment

23     purposes.  DFA makes up only half of our bulk tank

24     business.  Each day the lab also tests an average 20,000

25     individual cow milk samples.  Farmers use these results

1    to better manage their herds.  The large number of

2    samples the lab receives every day requires a system

3    that is designed to provide accurate results for

4    samples, but not making --

5              THE COURT:  So let me just stop you.  This

6    happens to anybody who reads, you speed up.  I do it to

7    her all the time.  So she is having a hard time keeping

8    up with you.

9              LYLE WOOD:  Oh.  My wife told me when I came

10   up to slow down, so --

11             THE COURT:  That's okay.  Whenever -- when you

12   read, you speed up.  Go ahead.  You are doing fine.

13             LYLE WOOD:  Sorry.  I had it written down.

14        So the lab has approximately 20,000 samples a day

15   that they receive in the lab.  And at DairyOne, our

16   board is made up of 17 directors, 14 which are elected

17   at large and then three DFA board members, to make a

18   total of 17.

19        The milk analyzers are checked every week by the

20   USDA at our lab.  There are 12 people involved in doing

21   the samples on a daily basis.  Every sample is handled

22   by at least three employees during every test.  The lab

23   is regulated by numerous state and federal agencies.

24   For example, this winter three different agencies

25   visited over three weeks to inspect the laboratory.

1           I am in favor of settling this lawsuit because DMS
2      has been good to us since we have been with DMS.  We
3      have been independent.  We have never been threatened
4      or felt threatened, neither way.  Any time we've had a
5      problem or anything going on with DMS, they have been
6      very helpful in solving any of our problems, from a test
7      sample or anything else that we have done with them.
8      And they have always -- they have never, you know,
9      wanted us to be in DFA, be in anything else, and being
10     Agri-Mark at the other dairy, they still could care
11     less, you know, what we do, and I don't know how we
12     would market our milk if we didn't have DMS to go
13     through.
14          And with DMS, we have had -- DFA also helps us out
15     with certain problems even though we don't -- we are not
16     a member of the co-op for DFA.
17          So that's all I got to say.
18              THE COURT:  Okay.  Thank you.
19              LYLE WOOD:  Thank you.
20              THE COURT:  Gary Genske on behalf of John J.
21     King.  I should say Gary Genske.
22              GARY GENSKE:  Good morning, your Honor.
23              THE COURT:  Good morning.
24              GARY GENSKE:  Can the clerk hand you -- I have
25     a typed --

```
 1                    THE COURT:  Sure.
 2                    GARY GENSKE:  I'm a dairy farmer from New
 3      Mexico.
 4                    THE COURT:  So make sure she can take -- the
 5      court reporter can take down your -- the spelling of
 6      your name.
 7                    GARY GENSKE:  Okay.  Might as well be sworn in
 8      too.
 9                    THE COURT:  Okay, if you want to.
10                    (Gary Genske was duly sworn.)
11                    GARY GENSKE:  I'm a dairy farmer from New
12      Mexico.  We milk about 2,000 cows.  I'm a C --
13                    THE COURT:  So you are -- you are not part of
14      the class, but you are speaking on behalf of somebody
15      who is?
16                    GARY GENSKE:  Yes.
17                    THE COURT:  Okay.
18                    GARY GENSKE:  I'm -- a brief introduction of
19      myself.
20                    THE COURT:  Okay.
21                    GARY GENSKE:  I qualify myself first as a
22      dairy farmer.  I produce for Dairy Farmers of America.
23      They owe my dairy $2 million every day of the week.  And
24      I am a CPA.  Our dairy clients produce about 12 percent
25      of the milk in the country in 31 states.  So nobody's
```

1    more addicted to this industry than probably I am.

2          However -- good morning, your Honor -- I am here

3    with resumé attached at the request of dairy farmer and

4    subclass member John J. King from -- I am going to say

5    it wrong -- Pequea, Pennsylvania, to speak on his behalf

6    and to object to the proposed second amended settlement

7    agreement.

8          In the proposed settlement agreement, defendants

9    DFA/DMS offer, aside from the $50 million, other

10   concessions that give the illusion that the defendants

11   will become more transparent to their co-op membership.

12         The agreement was written -- or as written, in my

13   opinion, will do very little to change the DFA/DMS

14   management behavior.  Various provisions of the

15   agreement are a form over any real substance.

16         First of all -- this is a total of five minutes.  I

17   timed it several times.  All right.

18         First of all, DFA is a cooperative organized under

19   the laws of the state of Kansas, Chapter 7.  I do have

20   it attached, the state law.  And the state law states:

21         Associations organized under this act shall be

22   deemed nonprofit as they are not organized to make a

23   profit for themselves as such or for their members as

24   such but only for their members as producers.

25         Second, DFA is a cooperative whose farmer net

1    equity has diminished over the last 10 years from 722

2    million in 2006 -- that's page 13 attached -- to 470

3    million in 2015 -- page three attached.

4         Third, it is a cooperative that has not made any

5    net profit from its own operations and has made profits

6    only from joint ventures in all of the last 10 years --

7    pages -- even numbered pages 4 through 14 --

8    illustrating that only milk-buying customers are making

9    money.  The co-op and its member producers are not.

10        Fourth, it is a cooperative offering an

11   out-of-court settlement in this and other antitrust

12   cases.  The proposed settlement agreement with the

13   stated goals -- on page 20 of the agreement -- to

14   improve producer pay prices and net income margin for

15   dairy farmers, and it also provides the prudent

16   investment of some proceeds from milk sales that

17   advances the interests of DFA/DMS shippers.  The

18   proposed advisory council will be severely limited in

19   achieving any meaningful results.  Only granting the

20   advisory council access to the information already

21   presented to DFA's Northeast Area Council, as the

22   agreement calls for, is not sufficient for the advisory

23   council to achieve the above stated goals.

24        The allegations contained in the original complaint

25   occurred under the watchful eye of the Northeast Area

1    Council, therefore, the information DFA provides to the

2    council obviously falls short of full disclosure of

3    information, so restricting the advisory council to only

4    the information the Northeast Area Council receives from

5    DFA will severely limit the effectiveness of the

6    advisory council's purpose.

7         The purpose of the settlement agreement does not

8    make clear how the findings and recommendations of the

9    proposed advisory council get communicated to other than

10   DFA's point of contact or how the council's findings and

11   recommendations will get presented to the Northeast Area

12   Council or, more importantly, to the corporate board in

13   Kansas City.  Additionally, the advisory council will

14   severely be bound by confidentially -- confidentiality

15   provisions -- page 26 of the agreement.

16        One more page.  The proposed agreement, on page 32

17   and -3, indicates that DFA's financial information is

18   prepared in accordance with generally accepted

19   accounting principles.  It may be true, but providing

20   the advisory council with only the published accounting

21   reports will not satisfy the goals of the advisory

22   council.  Published financial information did not

23   prevent the alleged clandestine antitrust activities of

24   DFA and DMS.

25        As a CPA and a DFA dairy farmer, I resent the

1    insinuation that generally accepted accounting principle

2    financial statements would disclose illegal business

3    practices.  And for DFA management and any legal

4    representative in this matter to hide illegal business

5    activities behind accounting information published by

6    accountants is a misrepresentation.

7        These apparent rights for DFA to censor or suppress

8    the advisory council's findings or recommendations, and

9    the restriction of all of DFA's records, essentially

10   makes the advisory council's effort no more than a

11   rubber stamp of approval of DFA's Northeast Dairy

12   Council actions.  So why have an advisory council and

13   make the settlement -- this settlement provision appear

14   to be a material concession on the part of defendant

15   DFA?  Do these provisions provide transparency for DFA

16   and DMS for farmers?  I think not.

17       The proposed settlement agreement as written, in my

18   opinion, will have very little impact on how DFA and DMS

19   will do business in the future.  If the Court cannot

20   grant the proposed advisory council access to all of DFA

21   and DMS records and reasonable dissemination of the

22   council's findings, I would urge the Court to allow this

23   case to go to trial.  Our co-op's behavior must change.

24       With continual decline, as Ken mentioned earlier,

25   of dairy farmers in the country and continued lack of

```
 1    enough profitability for sustainability, we dairy
 2    farmers feel we are in the center of a DFA circular
 3    firing squad picking off dairymen and eventually killing
 4    itself in the process.
 5              THE COURT:  So you are right at your time.  A
 6    little bit more?
 7              GARY GENSKE:  Just my proposal.
 8              THE COURT:  Okay.  Go ahead.
 9              GARY GENSKE:  So I ask the Court:  Reject the
10    second amended agreement and let this matter go to
11    trial, or the proposed settlement -- order the proposed
12    settlement agreement to provide the proposed advisory
13    council full access to all requested records wherever
14    located, to have all findings of the advisory council
15    published without limitation, that the advisory council
16    to be held harmless without retaliation in the same way
17    all attorneys in this case wish to be held harmless, and
18    to appoint myself as the chair of the advisory council.
19              THE COURT:  All right.  Thank you.
20         Douglas Ricker.
21              DOUGLAS RICKER:  Good morning.
22              THE COURT:  Good morning.
23              DOUGLAS RICKER:  I would like to -- first
24    thing I do is second what the guy just had to say.
25              THE COURT:  So we -- I know your name.  Would
```

1     you just spell it for the record.

2              DOUGLAS RICKER:  Okay.  Douglas Ricker,

3     R-i-c-k-e-r, from Sussex, New Jersey.  I hope I don't

4     tear up.

5          I been coming here the last three times with my

6     wife.  She's unable to be here today.  She has blood

7     clots in both lungs and in her legs, so I'm here

8     representing her and myself.  I'd like to give a little

9     history not only of the dairy business since 1937 when I

10    was born, and to the present, which sadly comes to 78

11    years.

12         I started out as a young kid not only milking cows

13    but belonging to one of the largest co-ops in New

14    Jersey, and I started coming to the meetings, and I'm a

15    person don't listen to what you say but I listen to what

16    you don't say, and it's very obvious.

17         So I was going to this co-op meeting, I seen what

18    was going wrong, and no one else could see it, so I

19    brought it up before the board, and then within a

20    month's time they filed bankruptcy.

21         The vice president of the organization came to me.

22    He said, "I been here every meeting, every executive

23    meeting.  How do you find out?"  And I said, "Don't

24    listen to what they say.  You listen to what they

25    don't -- what they don't say."

1          I've been at farm bureau membership.  I'm just not

2     some guy down the road.  I was the one that made the

3     motion back in the '70s, to start a Northeast dairy

4     committee and farm bureau, and I was a member of that

5     structure for several years, and when this problems

6     what's going on now started, I called my neighbor over

7     my back fence, Lou Dobbs, and I asked him to do a story

8     on the problems with DMS/DFA and what the problems were

9     happening, and he did a very good job.

10         A couple years after that, we had a large tornado

11    in our farm that put us out of business, so -- a few

12    months after that Kit Pierson gave me a call, and we

13    welcomed to -- him to our house, and we spent half the

14    day with him and giving him all the stuff that I knew

15    about what was going on, and a lot of this stuff that I

16    was talking to him about was the founder of the person

17    who started this lawsuit, Mr. Bunting.  He's no longer

18    with us.  But when Kit got -- and I got done speaking,

19    he says, "You know anyone that can help us out with this

20    case?"  And I said yes, I have a good friend.  I always

21    don't agree with him, but times to have a best friend,

22    it's best that you always don't agree.  So you had some

23    lively discussions.

24         And this guy sits back here to my left,

25    Mr. Southway.  We go battles here and there, and I have

1    disagreed with him and have agreed.  We had our

2    depositions taken, and we were advised by Mr. Johnson

3    that we don't talk to each other, and I could

4    understand, we're getting ready for a lawsuit, don't

5    talk to each other.

6        So finally, I don't know, it was a year now, in

7    July, when decided to -- not to go to court, and I got a

8    call from Mr. Johnson telling us that we're not going to

9    court, we're going to try to settle the case, and so I

10   felt like I could call Mr. Southway.

11       I gave him a call, and he and I both agreed that,

12   hey, we want this going to court and not be settled.  So

13   my thought was all on the same page.  That was July.

14   And by December, Mr. Southway and I were talking, and he

15   said, "Well, I been sending some letters to your Honor

16   in the supporting of the settlement," and I said, "No,

17   no, no, no.  We agreed we don't want to do this."

18       So -- and as time proceeded, I heard Mr. Southway

19   said he was going to replace someone on one of the

20   committees, and I come up here and try to make that not

21   happen.  He's not only my friends, we disagree once in a

22   while.

23       So as this went on, we prevented that from

24   happening.  Your Honor was very wise and agreed to leave

25   the Haars on the case, and I saw right.  Then I come

1    back, and I got a slap across my face.  Not only did
2    Mr. Southway got on the committee, his wife, one of
3    their partners got on the committee, from New Jersey.
4    And I have had 60 years of experience in this, problems
5    in the dairy business, and working with Mr. Bunting on
6    this case to get it started, and, your Honor, you --
7    respectful to you, you appointed this committee of
8    those -- those four people from New Jersey, and that
9    turned the tide on the vote, and that was a mistake,
10   your Honor.
11        I don't want to -- but you don't make it
12   unbalanced.  You come in and get four people that I
13   considered didn't know anything about the case.
14   Mr. Southway knew some of the problems, but the other
15   ones, I never seen 'em to a meeting anywheres, whether
16   it's in Albany or it's in Texas or wherever we were, was
17   farm bureau and other things getting things done.
18   So let's leave that alone right there, but --
19             THE COURT:  So we are coming --
20             DOUGLAS RICKER:  Two other things I want to
21   make a short comment on.
22        I got a phone call one day.  They said, "Why don't
23   you call Minnesota and see if you're in or out on this
24   case."  So I called out to Minnesota.  They have no
25   record of me being involved with this case.  I never get

1    any letters involved with this case.  I have been

2    through all this stuff of being ready for trial, and

3    that's what happened.  But the thing about this case, it

4    ain't worth the paper it's written on.  I mean true,

5    honest.  I have been on our state board of agriculture

6    in New Jersey, and I don't know if you know Mr. Phil

7    Alampi, one of the most popular secretary of

8    agriculture, goes way back, and he -- I been on bonding

9    committees with him to get co-ops and independent

10   dealers in New Jersey bonded.  We got statutes set up

11   that you just can't throw someone out; you have to give

12   'em so many days before they can do that, but it's not

13   fair.

14       So I don't know whether, on this case, I'm in or

15   I'm out, but Mr. Eby -- if you don't resolve this and

16   let it go to court, Mr. Eby, which I have great respect

17   for, is going to -- they have opt out.  They were in on

18   the start, the whole thing, all over again, but the

19   thing that caused it to happen this way, when you go and

20   have a imbalance voting on the thing, that is --

21   your Honor, that is unfair.  All the years I put in, I

22   deserve more respect than that.

23       So Mr. Southway is still my friend.  My wife now

24   will be able tomorrow to take Mr. and Mrs. Southway's

25   daughter to a dairy princess seminar in New Jersey.

```
 1        We're still going to be friends.  I am not going to hit
 2     him.  He is not going to hit me.  Right, Mr. Southway?
 3              THE COURT:  Well, that's good, and we are
 4     coming up on Mr. Southway's time, so this is a good
 5     segue.
 6              DOUGLAS RICKER:  Oh, God.
 7              THE COURT:  All right.
 8              DOUGLAS RIKCER:  I have 10 more minutes to
 9     speak, please?
10              THE COURT:  No.  No, thank you.  Thank you
11     very much.
12              DOUGLAS RICKER:  You're welcome.
13              THE COURT:  Let's have Mr. Southway come
14     forward.
15              PETER SOUTHWAY:  Good morning, your Honor.
16              THE COURT:  Good morning.
17              PETER SOUTHWAY:  Peter Southway,
18     S-o-u-t-h-w-a-y.
19        I wasn't quite prepared to have such an
20     introduction to your court today, but I got one.
21     However, I think what Doug says is actually very, very
22     important, and let me explain why it's important.
23        I'm here today on behalf of my wife and I, who were
24     appointed as additional class representatives.  She is a
25     little more comfortable on the farm with the grandkids,
```

1    so I am going to do the speaking.

2        This hearing is really about equity for all of the

3    class members.  I am an independent producer.  I was

4    willing to testify against DFA and DMS in this case from

5    the very beginning because of the antitrust issues that

6    were in the case.  This case has morphed over time.

7        My experience as 25-year commercial banker, I spent

8    a lot of time with antitrust litigation in the

9    MasterCard, Visa, American Express world, spent a lot of

10   time in federal court in Newark and New York City, so I

11   look at the case a lot differently, and what I have done

12   is try to take this case apart from the very beginning

13   to today as a class representative, what is provable,

14   what is winnable, and what is not.

15       And that's the important part for this case to be

16   analyzed, because if we can't prove it and win it at

17   trial, we really don't have anything.  So what I would

18   like to deal with is what are the known factors and what

19   are the unknown factors.

20       You know, we hear a lot about the monetary award in

21   this case.  At 50 million, farmers may get $4,000.

22   Well, if it was a hundred million, they'd get eight.  If

23   it was $150 million, maybe they'd get 12.  Because of

24   the large class, there's no big pot of gold for any

25   individual class member here.

1          So I think as when you analyze the monetary data of

2     the settlement of this thing, it really does -- becomes

3     not important, but it is an $80 million achievement.  I

4     dare find anybody else who has brought a case in the

5     Northeast that put $80 million back into the farmers'

6     pool.  It's not a $10 coupon like a lot of typical

7     class-action cases ended up to be.

8          The second thing that's known and unknown is we

9     look at the injunctive relief.  What's written in the

10     agreement, we know and we can read it.  And we need to

11     read it carefully.  For example, we just heard testimony

12     from an accountant who said that the advisory council

13     member doesn't have records of DMS.  It says right in

14     the agreement they have all the records of DMS and NEAC.

15     So you need to read carefully what the "and" means and

16     not make statements that really are not correct.

17          I also believe the advisory council and the farmer

18     ombudsperson are going to be under your authority

19     because you are going to sign this agreement if it goes

20     forward and it's settled.  I have asked our attorneys,

21     if we reach a point six months down the road, that we

22     can have an agreed discussion and find out if the

23     advisory council and ombudsperson are fulfilling their

24     obligations.  If they are not, they have agreed with me

25     that they will come back and we'll file a motion if we

1    have to because we believe that those positions are

2    important.  We believe they can have far-reaching

3    effects.  And I think it's important that the Court

4    recognizes that and will also push forward the

5    settlement.

6         So I think the injunctive relief is substantial,

7    it's brought coverage, it's court ordered.  The class

8    representatives who are involved, the initial ones and

9    the additional ones, have spent a lot of time, a lot of

10   phone calls, a lot of e-mails, a lot of discussions,

11   meetings in person to try to arrive to the product we

12   are at.  And I understand we don't come to an agreement.

13        What I have tried to do is say what are the

14   emotional issues and what are the factual issues in this

15   case.  And I can agree with -- Mr. Dilbert, is it?  The

16   first speaker today?

17             THE COURT:  Dibbell.

18             PETER SOUTHWAY:  It's a shame to see the dairy

19   industry go away, but you know what?  That's part of

20   America.  We have seen a lot industries go away.

21   Consolidation is here today.  I don't believe that this

22   case is going to resolve the consolidation issues of the

23   dairy industry.

24        When you look at proposals put up against DFA --

25   let's put 'em into receivership.  Well, I think their

1    creditors and their commercial paper people are going to

2    be first in line in receivership and, wait a minute,

3    we'll run the company.  And if their creditors are going

4    to run the company, I don't think us dairy farmers are

5    going to work out too well.

6        Make 'em a for-profit company.  Let's think about

7    that.  For-profit.  I was shareholder-driven

8    organization, did it for 25 years, did all the SEC work.

9    I know what shareholder-driven companies do.  We are

10   after shareholder profits.  Shareholder profits are

11   going to conflict with co-op profits.

12       Capper-Volstead was put in place so that dairy

13   farmers, farmers across this country, can enjoy the

14   immunity, and destroying that would be devastating not

15   only for dairy -- DFA in the Northeast -- and again, it

16   sounds like I am a DFA apologist, and I hate to say I am

17   not, but we have DFA members across this United States

18   of America that we would impact in this case if this

19   Court would say, boom, they no longer have co-op

20   exemption.  That would be horrible.  That would be a

21   wrong decision for us to even ask for, never mind for

22   the Court to do.

23       Back to the certainty issues:  milk testing,

24   adulterated milk, block-voting changes.  These are all

25   covered in this agreement in detail.  We have never had

1    that protection before, and I think that's important to

2    recognize.  And by the way, a farmer does not have to

3    know in advance what milk he wants to get tested.  The

4    agreement says he can do it at any time if he thinks he

5    is having a problem.  That's what the agreement says.

6        I also think that, in closing, the organized

7    opposition in this case was intent on trying to drive

8    emotional issues, and emotional issues don't typically

9    get solved well in a court of equity.  We need to focus

10   on what's fair for every member across the board.  And I

11   believe that the settlement we have brought forth here

12   is a fair settlement.  Is it a perfect settlement?  No.

13   Would we love to see more?  Yes.  But that's what

14   happens when you settle.  You get as much as you

15   possibly think you can against the risk of not accepting

16   it.  The risk of a trial, the risk of value limitations,

17   the risk of class decertification, the risk of appeals.

18   Long time before any money, if won, could ever be put

19   into a dairy farmer's pocket.  So I think it's time to

20   settle, and I believe that our role is to try to be as a

21   peacemaker.

22       I also would like to throw one other little thing

23   out there for people to think about.  You know, we have

24   had very experienced attorneys in this case.  I am

25   amazed at their resumés from a professional point of

1     view and what they have accomplished in other
2     class-action cases, some of them incredibly well.  And I
3     believe class-action lawyers are the answer to all prior
4     abuse in the United States because they ultimately bear
5     the burden of bringing abuse and settling it and stating
6     the class is going forward.
7         If these attorneys thought that they could win a
8     3-, 4-, $500 million settlement, you think they are
9     going to stand here and accept 20 percent, 30 percent of
10    the fees today?  So I bow a little bit to the expertise
11    that they represent at the table and say:  You know
12    what?  If they think this is where we ought to be, this
13    is where we ought to be because the evidence isn't there
14    to bring us further.  If it was there, I think they'd
15    like to be talking today about 30 percent of a $500
16    million settlement --
17        Sorry, Mr. Kuney.
18        -- rather than 20 percent of a $50 million
19    settlement.  So I think we just -- as dairy farmers, we
20    need to keep that in the back of our mind, that if our
21    attorneys are saying this is as far as we can go,
22    they're telling us that for a reason, not just because
23    they don't want to make money today.
24                THE COURT:  Thank you.
25                PETER SOUTHWAY:  Thank you.

```
1              THE COURT:  William Olin.
2              WILLIAM OLIN:  Good morning, and thank you
3      for the opportunity to speak.
4          My name is William Olin, W-i-l-l-i-a-m O-l-i-n.
5          I'm a dairy farmer in Nineveh, New York, a little
6      bit east of Binghamton.  I have been since 1980.  My
7      wife and I milk 57 cows at the present time.  During the
8      time frame of the lawsuit we were between 125 and 155,
9      but we downsized a year ago when I got too old.  Older.
10         I have been involved with Dairylea for my entire
11     life.  My dad was a Dairylea member.  We started our own
12     farm.  We were Dairylea members.  I am active in other
13     farm organizations and in our church.  Dairy farming is
14     the only job I ever wanted, and it's the only job I am
15     lucky to have ever had.  And I think it's time to settle
16     this lawsuit, and I'd like to address a few of the
17     things that are involved.
18         My observation of DMS:  Before DMS was formed, I
19     had three milk trucks going by my farm.  We had
20     Dairylea, we had one from DFA for a neighbor, and
21     another neighbor that was Crowley's.  And after DMS was
22     formed, one milk truck picked up all the milk, but the
23     three farms still got their milk check from their
24     original vendor that they were doing business with.  So
25     it has lowered the cost of assembling the milk, and I
```

 1    think that's a benefit to us farmers.

 2         As far as block voting goes, I think that's

 3    absolutely necessary to marketing orders.  There's a lot

 4    of issues that need to have a decision made that are

 5    just administrative stuff, and you are not going to get

 6    farmers to take the time to go and cast their vote on

 7    mundane stuff, but they still had the opportunity, if

 8    they wish, to abstain or to oppose the cooperative's

 9    vote in the block vote.

10         As far as conspiring to lower prices, I think that

11    DFA has done the opposite.  They've paid a competitive

12    price to what my neighbors have gotten.  They have also

13    got premiums from processors for things like quality,

14    for things like rBST-free, some help on hauling.  So

15    there are -- that's extra money that comes into our pool

16    of money.

17         And in addition, Dairylea and DFA have programs to

18    help reduce the cost of producing the milk through sort

19    of a buying group kind of thing, so it doesn't matter

20    what your price of milk is, how high it is, if your cost

21    of producing milk is higher yet, you're not going to

22    make money.  We have ups and downs in milk prices.  Two

23    years ago, when we were getting $27 for milk, I didn't

24    hear anybody say, "Good job, DFA."

25         The cost of production of milk is not -- meeting

1    the production of milk is not DFA's job.  Their job is

2    to market my milk, reliably and competitively, and I

3    think they have done that.

4        It is up to the members of DFA to choose the

5    management and direction of our cooperative, not the

6    court or not the outsiders, and I have been active all

7    my life in cooperatives, and I have never been turned

8    down in an effort to take part and express my opinion.

9    There are some that won't be satisfied with any

10   settlement without doing maximum damage do DFA and, in a

11   good day, put them out of business, and I think that

12   would be a real shame.

13       There is no coercion here in getting me here.  I

14   much rather be home planting corn, but I feel strongly

15   that it's time to settle this lawsuit.  I am proud to be

16   a member of DFA.  Thank you.

17            THE COURT:  All right.  Thank you.

18       Robert B. Jennison.  Roderick, sorry.

19       So, Roderick Jennison?

20            JOSHUA HAAR:  Roderick Jennison happens to be

21   a neighbor of ours.  He was unable to attend today,

22   but --

23            THE COURT:  Okay.  So I am going to have to go

24   to the next person, but you are coming up --

25            JOSHUA HAAR:  I have here his signed witness

1    and attested proxy.

2              THE COURT:  Okay.  Well, he needs -- this is

3    for appearing in person.  So how about we take you --

4    you are going to be next.  We have 12 and 13 are Claudia

5    and Jonathan Haar, and the next person will be David

6    Ward then.

7              JOSHUA HAAR:  All right.

8              THE COURT:  Is David Ward here?

9              JONATHAN HAAR:  We have Dave Ward's proxy

10   also.

11             THE COURT:  Okay.  So that will move us

12   through.

13        Do you have anybody else's so we will cross them

14   off the list?

15             CLAUDIO HAAR:  Yes.  He has my proxy as well.

16             THE COURT:  Okay.  And -- okay.  So let's have

17   Jonathan Haar.

18             JONATHAN HAAR:  We will go with me first.

19             CLAUDIA HAAR:  I'm sorry, what did you say?

20             THE COURT:  Well, you told me he had your

21   proxy, David Ward's proxy and Roderick Jennison's proxy.

22             CLAUDIA HAAR:  Yes, ma'am.

23             THE COURT:  So that leads us to Jonathan Haar.

24             CLAUDIA HAAR:  Okay.

25             THE COURT:  If you want to speak yourself, you

1    can, but if he has got your proxy, that's the purpose of

2    having him speak.  Okay.

3             CLAUDIA HAAR:  Absolutely.  The proxies are in

4    this notebook, so just for functional -- functionality,

5    Jonathan also has his exhibits in here as well.  So may

6    I approach the bench?

7             THE COURT:  Sure.

8             JONATHAN HAAR:  Good morning, your Honor.

9             THE COURT:  Good morning.

10            JONATHAN HAAR:  This is Jonathan Haar.  That's

11   H-a-a-r.

12        I want to apologize concerning the supplemental

13   briefs.  They're a little disheveled, our exhibits, I

14   guess we would call them.  If -- if it would be helpful

15   to the Court, we would request that we could rebrief

16   them.  We were planning on presenting oral explanation

17   of all of them, but obviously we can't do that in five

18   minutes, so we would make that request.

19        So let me just -- I will start with by way of

20   clarity with regards to the people who are my fellow DFA

21   members.  I am in no way disparaging them or my fellow

22   class representatives with whom I am standing in

23   opposition to them as well as the settlement.  I respect

24   their positions in their --

25            As I said in my second declaration, which is on the

1    docket -- my copy is not docketed, so I don't have the

2    docket reference for that.

3        I'd like to get sworn.

4            THE COURT:  Okay.  You may do so.

5            (Jonathan P. Haar was sworn.)

6            THE COURT:  Go ahead.

7            JONATHAN HAAR:  Okay.  I would like to speak

8    to -- with regards to procedure.  I am going to state

9    that Mr. Brent Johnson engaged in professional

10   misconduct in misrepresenting the facts of the law on --

11   toward the end of the negotiation process on a phone

12   call.  It was the Friday before Christmas, on or about

13   the Friday before Christmas.  He basically went on a

14   rant explaining to the -- all the class representatives

15   were on the phone at that point in time.  I'm not sure

16   if Mr. Taylor was there or not.  But to the best of my

17   knowledge, everyone was there.  And he explained the

18   relative merits of settlement over trial, and he said,

19   "If you go to trial, you will get no injunctive relief.

20   You will get nothing on full-supply agreements.  You'll

21   get nothing -- you won't get an ombudsperson.  You will

22   get nothing on milk testing.  You will get no relief.

23   You will get absolutely no relief.  You might get a

24   little more money, which all of you said you are not

25   interested in more money."

1        So I confronted him.  I said, "Excuse me.  You're
2   wrong.  That's factually incorrect."
3        He said, "No, you're wrong, but I am not going to
4   convince you by arguing with you."
5        So I said, "No, if I'm wrong, please explain to me
6   how I'm wrong.  You have a responsibility there."  I
7   said, "You have a prayer of relief in the complaint that
8   clearly lays out and includes the caveat that the judge"
9   -- your Honor in this case -- "could issue injunctive
10  relief as you see -- deem appropriate.  Furthermore,
11  injunctive relief issued at trial, they don't deal
12  with -- you would not deal with Mr. Kuney.  You would
13  look for remedy and that would be that."
14       So after representing that the -- we would lose at
15  trial -- and you have 150 opt-outs and -- led by Mike
16  Eby, that are pursuing the same claims with attorneys
17  that we have brought to this Court previously, so
18  there's apparently some merit to our antitrust claim.
19  So --
20       Yes, so -- after that call -- and this is all
21  documented in our e-mails, exhibits.
22       Oh, in addition, Mr. Foix and Mr. Dan Smith engaged
23  in the same misconduct.  I have shared with this Court
24  how I have been called to Madison County, my home
25  county, to serve jury duty, and the judge explained the

1    case before us and explained how all the evidence works

2    and everything, and he said -- he -- the case was -- it

3    was a burglary, but the person who had done the burglary

4    was not the person on trial.  The person on trial never

5    entered the building.  The person on trial simply drove

6    the getaway car.

7        Mr. Foix and Mr. Smith did not utter a word the

8    whole time Mr. Brent Johnson ranted and raved about how

9    there's nothing in -- in trial, and then this lie was

10   repeated by class representatives Southway, Aubertine,

11   those in support of the settlement, you know, there's

12   really -- this is the very best we can do because we

13   can't get anything at trial, or we'll only get very

14   little, or -- I feel misrepresenting, obviously

15   misrepresenting the prospects, you know, laying aside

16   whether you win or lose.  Obviously you could lose, and,

17   you know, that's a reality.  So.

18       See what else did I have.

19       Mr. Taylor references he wanted an audit.

20   Mr. Aubertine referenced the same thing, the ACM

21   specifically.  I was dealing mostly with the substance

22   of the settlement, but I felt that extremely important

23   to get that in.

24       So Mr. Taylor and Mr. Aubertine both represented

25   they wanted additional audits.  Mr. Genske spoke to the

1     item of the audit and the advisory committee person

2     specifically denied the right to get an audit, no matter

3     what the budget item or, you know, he couldn't use his

4     limited budget to do a limited audit of a particular

5     aspect of the business.  No audits, because an auditor

6     would have a responsibility to report wrongdoing is what

7     I realized later.

8          In summary, there were a few things -- the reason

9     the ombudsperson and the -- I don't mean to talk fast

10    but I have five minutes.

11         The reason the ombudsperson and the advisory

12    committee person came into being was because in the

13    Southeast, Mr. Foix, on a conversation, represented

14    that -- represented that there had been a committee

15    formed, an academic committee, a -- an academic chosen

16    by the defendants, an academic chosen by the plaintiffs

17    and an academic chosen by them, and that farmers could

18    bring information to that person, and -- and I asked,

19    "Is this a binding committee?"  Mr. Foix represented to

20    me that indeed it was binding because the defendants had

21    signed the agreement so they had agreed to abide by the

22    recommendation of the committee.

23         The way the defendants got out of any commitment

24    there is the money ran out with regards to notifying the

25    farmers, because I called one of the committee members.

1    He told me, "We never heard anything.  We never saw what

2    they sent to the farmers.  I think they left the fox in

3    charge of the hen house," was the quote.

4         So -- so from that, I said, you know, this idea

5    might have merit.  This might be a way that we can

6    bring -- that we might be able to bring about change.

7    That idea does not represent change as this settlement

8    does not represent change, and you will hear and you

9    have heard how this settlement is a step, a first step,

10   a beginning, a -- no, it's a settlement.  It closes the

11   door.

12        The caveat that they used in the Southeast to keep

13   information under file is the same one that's in this

14   existing settlement.  That's why the information in the

15   Southeast is -- to the best of my knowledge, that record

16   is mostly sealed because of the provision that

17   third-party members who are involved in these agreements

18   could represent that they don't want these agreements

19   disclosed.  So functionally, you're not going to get

20   disclosure.  And then --

21        Oh, the other thing was the milk testing.  I

22   represented -- you know, you had -- we had talked about

23   divesture.  I brought to you, and you will see in your

24   exhibit, the two little milk tubes.  Now, if they had

25   gone with the idea I represented, which is extremely

1    easy -- and it's Donna Hall's.  I'll give Donna Hall the

2    credit.  It's extremely simple.  Send two sample tubes.

3    You leave one at every farm, take that one label, run it

4    over the top of the sample tube, and you -- you left

5    that there.

6         Now every farm every time I could create my own

7    record of alleged wrongdoing or I could check it out and

8    find out that, indeed, everything is fine.  If there's a

9    spoiled load, I immediately have recourse.  You will

10   notice in the adulterated loads, the first caveat is,

11   well, if there's any sample remaining --

12        Now, bear in mind, this is a milk plant that's run

13   by milk supplied by the defendants.  They have a

14   compelling reason to make sure that there's no sample

15   left.  This whole settlement is based on we're relying

16   on the complete integrity of the defendants, and one of

17   my e-mails I really liked, I quoted Patrick Henry, that

18   "I have no teacher but history."

19        And they're in federal court coast to coast,

20   multiple cases.  Apparently there's some integrity issue

21   somewhere.

22             THE COURT:  So you're almost out of time.

23   Just a couple more points.

24             JONATHAN HAAR:  Yes.

25        So I mentioned milk testing, that to leave those

1    tubes in would destroy a lot of the control because, you

2    know, then --

3         So my summary of substance.

4         This stuff is all in.

5         I wrote -- toward the end of that binder there's 43

6    pages.  They're handwritten.  Sorry about that.  And

7    they are double-spaced, so it's not really that much

8    writing, but --

9         I am just trying to think if there's anything --

10         I represented about the important first step.

11    Professional misconduct.  Sorry to think out loud.

12              THE COURT:  That's all right.

13              JONATHAN HAAR:  And, again, my -- my second

14    declaration, which basically states, "In my declaration

15    I did not mean to -- I did not inform my fellow

16    DFA farmers or farmers that market their milk through

17    DMS are in collusion with regards to the antitrust

18    violations described in the complaint.  I respect these

19    farmers as colleagues and recognize their efforts on

20    their farms and for their organization.  I do not

21    question their honesty or the genuineness of their views

22    as expressed in their declarations; however, since DFA

23    and DMS have chosen not to open the record of the case

24    and keep the vast majority of the evidence confidential,

25    the declarants' opinions are uninformed by this

1    evidence.  I remain convinced that the declarants'

2    position, in addition to the bias and incomplete

3    information they have received from the management of

4    DFA and DMS, taints their objectivity."

5         You will note, your Honor, that actually in -- with

6    regards to the opposition, the vast majority of farmers

7    are actually the defendants.  They're members of the

8    board of DMS we have heard from and, in addition,

9    politicians.

10        You have in front of you today the classic dairy

11   problem.  You have bankers, lawyers and politicians and

12   processors, which I touch on all that in my -- in my

13   writing, standing before you telling you what dairy

14   farmers need.  And I'm encouraging you to listen to the

15   actual dairy farmers that are not delegates of the

16   organization.  As far as I know, these --

17        I will leave it there.  Thank you.

18             THE COURT:  Okay.  Thank you.

19        David Galley.

20             DAVID GALLEY:  Good morning, your Honor.

21             THE COURT:  Good morning.

22             DAVID GALLEY:  Thank you for the opportunity

23   to speak.

24             THE COURT:  Would you just spell your last

25   name.  Yes, good.

```
1                    DAVID GALLEY:  My name is David Galley,
2        G-a-l-l-e-y.
3             Along with my wife, Kathy, and my daughter, Sonya,
4        we comprise Silver Spoon Dairy, LLC, of Garrattsville,
5        New York.  We formed an LLC with our daughter three
6        years ago, three years after she graduated from Virginia
7        Tech and worked elsewhere.  She has a keen interest in
8        dairy cattle and has demonstrated a commitment to the
9        future of our home farm.
10            We milk about 70 cows, ship roughly two million
11       pounds of milk a year.  Registered holstein herd, 26,000
12       pound herd average.  We raise all our own forage,
13       high-moisture corn as well as all replacement animals.
14       Through a comprehensive nutrient management plans and
15       precision feeding, we strive to employ the best
16       management practices available.
17            In addition to our farm business, my family and I
18       are very active in our community.  I serve as an elder
19       in our church, vice chairman of the town planning board
20       in addition to serving as the secretary of South New
21       Berlin Cooperative in South New Berlin, New York.
22            My wife is also active in church, 4-H county, the
23       state holstein groups, and our daughter is music
24       director of the church and very active in 4-H, Holstein
25       Association and dog agility training and competition.
```

1          To demonstrate my perspective, I would like to give
2     you some background on how I have grown through the
3     dairy industry.
4          I began shipping milk in 1967, nearly 50 years ago,
5     through a small local co-op called Rock Royal Co-op,
6     which was affiliated with Net-co.  1972 I moved to my
7     current location and joined Dairylea.
8          In the early '80s, there were independent handlers
9     aggressively canvassing for milk, and so I left Dairylea
10    and became an independent for a number of years.
11         1986, myself and a group of four others organized
12    the group co-op of 35 producers.  Our goal was to offer
13    a buyer consistent supply of quality milk located in a
14    geographic close and easily accessible area.  We were
15    very successful in obtaining over-order pricing and a
16    secure market for our milk.
17         We became affiliated with Allied Federated
18    Cooperatives in Canton, and as president of Butternut
19    Milk Group I served on the Allied board of directors.
20         In early 2001, our group, along with South New
21    Berlin and some others, lost confidence in Allied
22    management.  When our concerns were not addressed,
23    Butter Milk Group and South New Berlin both left Allied.
24    At the time, we dissolved the Butternut Milk Group, and
25    most of us joined the South New Berlin group.  I was

1    appointed to the board of directors, elected to serve as
2    secretary, which I still am today.
3         During my time in both groups, I have been involved
4    in contract negotiations with handlers, and when we left
5    Allied, that is the South New Berlin group, we were able
6    to negotiate a successful three-year contract with a
7    large handler.  We were not able to renew that contract
8    at the end of three years, but we were able to, through
9    DMS, market the milk through them with the same terms
10   with a five-year contract.  That was the beginning of
11   our marketing agreement with DMS, and the co-op has
12   remained with them today.
13        South New Berlin is an independent group that hires
14   its own fieldmen, general manager and hauler, with
15   contracts with DMS for a producer payroll.
16        During my tenure on the executive committee of
17   South New Berlin, I have been involved in all
18   negotiations and matters with DFA.  We meet with the DFA
19   representatives at least annually, or more often if
20   either party feels there's a need.  All matters have
21   always been settled in a way that have been equitable
22   and in the best interests of both parties.  We are very
23   concerned about having a stable market for our milk, and
24   DFA's been able to provide that stability.  Milk
25   marketing is much more complex than it was 30 years ago

1    when we organized our first small group.  South New

2    Berlin is an example of successfully working together

3    with DMS/DFA, and in today's milk-marketing climate, we

4    don't feel that we are in a position to negotiate with

5    large processing facilities nor to be on top of

6    day-to-day handling of loads of milk.  We need the

7    expertise and strength of a group like DMS/DFA to

8    provide our marketing arm.

9         Much has been brought to light through the

10   Northeast settlement, and February 15th, 2016, our board

11   of directors sent a letter to the U.S. District Court

12   supporting the settlement and asking to expedite the

13   decision.  The letter was sent clearly to indicate our

14   position of South New Berlin Cooperative, and that

15   letter, as well as our attendance today, is our

16   initiative and demonstrate our support.

17        My cost of being here today is expensive.  Getting

18   our corn planted and beginning hay crop harvest

19   determines the blueprint of our success the next 12

20   months.  Right now today would be a good time to be

21   planting corn.  Eric Lindberg, our cooperative

22   president, is here with me today, I think indicates how

23   valuable we feel the settlement is and that it should be

24   completed.  And we are here with full board support.

25        As an industry, dairymen and DFA need to move past

1   this, settle and strengthen our position to survive the

2   current milk crisis.  Our South New Berlin Coop

3   president, Eric Lindberg, and I have met with each of

4   the board members and have their documented unanimous

5   support in this position.

6       We think the people that have been appointed by the

7   Court to be involved with DFA and the settlement can

8   only bring good things to light:  more people, more

9   ideas, more integrity.

10      I thank you for the opportunity to speak again, and

11  I hope this brings a different perspective than many

12  others have.  Thank you.

13          THE COURT:  Thank you.

14      Larry Burgin.

15          LARRY BURGIN:  Good morning, your Honor.

16          THE COURT:  Good morning.

17          LARRY BURGIN:  And thank you for the

18  opportunity to speak today.

19      My name is Larry Burgin.  That's L-a-r-r-y

20  B-u-r-g-i-n.  I am a dairy farmer from Delhi, New York.

21  Our farm, Mushkoday Farm, is a family business with my

22  sons Jacob and John being the fifth generation to be

23  part of the farm.  It started in 1908 by my

24  great-grandparents, John and Jessie Burgin.  They milked

25  about a dozen cows.

1     Since that time our dairy has seen tremendous

2     change.  Today we are currently milking around 160 cows,

3     producing well over three million pounds of raw milk

4     annually.  We also utilize some of the latest dairy

5     production technology utilizing robotics.  It is

6     inspiring for me to work on a farm and a family business

7     with three generations working together as my father of

8     80 years of age is still integrally involved with the

9     daily activities of the farm.

10     It has been a privilege for me to be involved in

11     the dairy industry here in the Northeast for the last 36

12     years.  It has given my wife and myself the opportunity

13     to raise our five children in a rural, agricultural

14     environment in which they had daily activity -- or daily

15     responsibilities and activities.  This, I believe, is

16     something that has benefited them greatly as they have

17     grown into adulthood.

18     My wife, Ann, after our children have grown, is

19     currently a full-time substitute teacher at South

20     Kortright Central School.  I serve on the New York City

21     Water Shed Agricultural Council board of directors.  We

22     are also parishioners at St. Ann's Roman Catholic Church

23     in Andes, New York.

24     I wholeheartedly believe in the value of

25     cooperatives.  My family has belonged to a cooperative

1    for almost a hundred years.  My great-grandfather joined

2    Dairylea as a member in 1929.  I also credit our farm's

3    relative success to the united practices of a

4    cooperative, and I believe that DFA and DMS are

5    committed to marketing our milk every day of the year.

6        Becoming a Dairylea member myself in 1980, I

7    quickly realized the value of being part of a

8    cooperative as a great way to become informed and

9    educated on the milk industry here in the Northeast.

10   That being said, I always made it a point to develop a

11   relationship with my director and asked them lots of

12   questions.

13       In these last 36 years, I have never asked any

14   questions that I did not have answered to -- to my

15   satisfaction.  I can unequivocally say that as a member

16   and a delegate, being part of the -- part of Dairylea,

17   and now DFA, I was privy many times to the decisions

18   that the board of directors and the management team

19   made, and I can also unequivocally say that those

20   members' interests and those of the entire industry here

21   in the Northeast were always at the forefront of all

22   their business dealings.

23       I firmly believe there was no wrongdoing by DFA and

24   DMS at all.  The management of the cooperative always

25   has the best interests of the members as well as the

1    entire Northeast dairy industry in the front of their

2    mind.  As such, I believe that by this settlement, it

3    will allow DFA to put this lawsuit behind them and move

4    forward to seek new business opportunities that will

5    provide better returns for the members as well as

6    strengthening the milk-marketing environment here in the

7    Northeast for all of us.

8         In my opinion, we face some very difficult

9    marketing and pricing issues here in the Northeast, and

10   we need to, as farmers, utilize our cooperatives and

11   work closely with them now at all times to improve

12   returns back to the farm.  There is an acronym that we

13   have all heard before and that is TEAM -- together

14   everyone achieves more.

15        A good friend of mine worked tirelessly his whole

16   adult life to build bridges between people.  He always

17   told me that it was better for everyone involved to

18   build bridges rather than to tear one down.  In my

19   experience in this industry, when we all work together

20   as dairy farmers, members of a cooperative, we can do a

21   better job marketing our milk, hauling it more

22   efficiently, and obtaining greater returns back to the

23   farm.  This is one of the reasons why I support the

24   proposed settlement of this case.

25        I am very aware that some farmers oppose this

1    settlement and believe that having a trial will solve

2    all of their problems.  To me, a trial is pointless when

3    you consider all of the intricate details of milk

4    marketing that would have to be discussed in court.

5    Going to trial will not create new markets.  It will not

6    obtain better pricing, and it will not reduce our

7    hauling costs.  If this lawsuit continues, it will only

8    breed more animosity amongst dairy farmers here in the

9    Northeast and deny farmers the benefit of this

10   settlement.

11       A while ago I heard someone say that when one

12   segment of agriculture says something derogatory about

13   another segment of agriculture, nobody wins.  Everybody

14   loses.  If we as farmers continue to argue amongst

15   ourselves, we will continue to receive less than

16   potential that is available.  I support the proposed

17   settlement and recommend that the dairy industry work

18   together as a team to bring about real and positive

19   changes.  Thank you.

20           THE COURT:  Thank you.

21       Patty Bikowsky.

22           PATTY BIKOWSKY:  It's Patty Bikowsky,

23   P-a-t-t-y B-i-k-o-w-s-k-y.

24       My husband and I are dairy farmers on a farm in

25   Madison, New York.  We milk about 80 cows.  We have

1    raised our family there.  They have chosen to do other

2    professions but still love to come back to the farm.

3        I currently serve as a council member for the

4    Northeast Dairy -- DFA -- Area Council.  I have been in

5    that role for about 10 years.  Additionally, I serve on

6    the New York Beef Council, the National Cattleman's Beef

7    Board, and also the American Dairy Association and Dairy

8    Council Promotion Board.

9        I feel very strongly that the co-op is the way to

10   go for farmers to work together.  25 years ago I was an

11   independent.  Farmers like to be known as independent

12   themselves.  They like to run their own business.  They

13   like to be their own boss.  And here I was handing my

14   milk to an independent person who could do whatever he

15   wanted, make the profits he wanted, and the more I

16   thought about a co-op, the more I thought this is the

17   way I want to go because then I can have control.  I can

18   have a say in how the business is run.

19       So I joined the co-op, became a member.  Soon

20   realized I wanted to take a more active role, so I

21   became part of the resolutions committee.  That's the

22   part that farmers -- any farmers can bring any issues,

23   any problems, any changes that they want to a

24   resolutions member.  The resolutions committee gets

25   together, discusses it, decides what -- what they want

1    for their co-op, and that is passed and becomes part of

2    the resolutions book.  So it is definitely a grass-roots

3    effort.  I love that part of it.

4        When I had the opportunity to become -- to run as a

5    director, I jumped right at it.  I kind of like to have

6    a say in things, and I like to speak my peace, but I

7    like to also understand how things are run.

8        I'm unique as I stand here because I'm the council

9    member that represents the district that Jonathan and

10   Claudia Haar reside in.  I take my role seriously, and

11   the first time I met them was at -- we have summer

12   picnics and fall district meetings, and I met them

13   there.  They seemed to be very interested in the co-op.

14   We had a long discussion.  They said that they would

15   like to run as delegates, and I said, "Well, I can get

16   the information for you how to do it."

17       So in a return phone call I talked to them about

18   how to become a delegate.  You can nominate yourself.

19   You can nominate somebody else.  And then you -- as long

20   as the person that you nominated accepts it, you

21   become -- you are on the ballot and you can run for any

22   of the elected positions.

23       I expected that the Haars would do that at the next

24   election which was the next year, but they chose not to,

25   which surprised me.

1          So I have made sure that any member I speak to has

2     that opportunity to become a representative, and if they

3     don't want to, if they want to call me and get

4     information -- there are newsletters sent out.  We try

5     to be transparent in everything.  We -- there's no

6     hidden secrets at our board meetings.  Some things are

7     in executive session, but anything that pertains to the

8     members that will help them out, we go out of our way to

9     give that information.

10         I think this settlement will do an even better job,

11    though, with the two representatives that are -- you

12    were talking about.  Perhaps somebody doesn't get along

13    with their council member and they feel more comfortable

14    talking to someone else.  This will give them another

15    outlet, but it is all about transparency and

16    representation.  Frankly, sometimes I don't even get

17    enough people to fill my delegates' positions, and I

18    have to beg people to do this, but farmers are busy.

19    Like they say, we should all be planting corn, but we

20    felt it was important to come here and to speak and

21    encourage you to do the settlement as it stands.

22         I think that this has gone on for so long, it has

23    hindered DFA's ability to work on behalf of the members

24    effectively.  It's taken management time and energy away

25    from productive business that could actually help all

1    farmers.  It's made it harder for farmers to work

2    together, and in today's milk-marketing environment, we

3    need to all work together instead of against each other.

4    So I urge you to please settle the lawsuit.  It needs to

5    end, and we all need to get back to focusing on the

6    things that matter:  working together to improve the

7    livelihood of all dairy farmers.  Thank you.

8              THE COURT:  Thank you.

9         William S. Moody.

10             WILLIAM MOODY:  Good morning, your Honor.

11   I am William S. Moody, W-i-l-l-i-a-m S. M-o-o-d-y.

12        My family and I live in Delaware County, New York.

13   I am here to support the settlement of the case of Allen

14   versus the Dairy Farmers of America.

15        Our family has used cooperatives for many years,

16   ever since my grandfather joined Dairymen's League in

17   the mid 1920s, and we felt that's the best way to market

18   our milk.  We are currently members of Dairy Farmers of

19   America and have been since our former cooperative

20   joined with DFA.

21        We milk 60 cows on a grass-based system and it

22   works very well for us.  Our family of three children

23   grew up on our dairy and are still involved in the dairy

24   industry.  My daughter currently owns part of our dairy

25   farm and has cows in it, and we hope to continue the

1    fourth generation on our farm.

2         Because of the small size of our dairy, we depend

3    very heavily on DFA to provide us with services such as

4    marketing our milk, getting us a fair price for our

5    milk, guaranteeing payment for our milk, and providing

6    us with many extra support services to lower the cost

7    for our farm.

8         DFA is a dairy farmer-owned cooperative.  All

9    members have equity in DFA, and to continue this lawsuit

10   has the chance of costing the farmer members millions of

11   dollars against the equity in DFA.  This is one of the

12   reasons that I am supporting this current settlement.

13        I feel that DFA has always worked in my best

14   interests.  I have attended many local meetings to get

15   information and also to vote for DFA delegates and

16   directors at our local meetings.  The ballots are passed

17   out at our local meetings and counted by dairy farmer

18   members in a fair manner so that everybody that has

19   wanted to be a delegate or run for director of DFA has

20   gotten to do so.

21        I have actually been a participant in the process

22   of counting these ballots for different districts so

23   that I really don't know any of the members that were

24   running, and I can say that the directors and delegates

25   are all fairly elected by their farmer members.

1          I attended expanded Northeast board meetings where

2     fairly large groups of farmers can get together and

3     discuss any matter that -- of interest and actually

4     interact with the directors and the staff of Northeast

5     DHI -- or Northeast Dairy Farmers of America.

6          I have been a national delegate and attended 13 of

7     our 17 annual meetings and voted for corporate

8     directors.  I am also a large user of DairyOne services

9     for the technology they offer and believe they have a

10    great deal of integrity.  I have used DairyOne and the

11    former Northeast DHI for over 40 years to test my milk

12    and to provide me with management advice for my dairy.

13         I believe their milk-testing services are the best

14    in the dairy business and work with a great deal of

15    integrity.  My milk check has always been very clear to

16    me, and all of the deductions and premiums that I

17    received are broken down and explained on every milk

18    check.  And as to that point, for the last several

19    years, I have received an over-order premium based on

20    the quality of my milk, on not using rSBT {sic} on my

21    cows, and this has been a substantial -- on a small

22    dairy like ours, this has been a substantial extra

23    income for us.

24         I believe that this settlement is good and it will

25    provide extra oversight.  Our board and our council have

1   fairly large numbers of farms and another person will

2   only add to the benefit of having an extra person take a

3   look at the business we do and offer up advice.

4        I believe the ombudsman will be a positive thing

5   for many of the people that really don't understand all

6   of the things that are going on in our dairy

7   cooperative.

8        For all these reasons, I believe this settlement

9   should be finalized now.   Thank you.

10            THE COURT:   Thank you.

11       Lisa Knapton.   Lisa Knapton.   No?

12            LISA KNAPTON.   Lisa Knapton, K-n-a-p-t-o-n.

13       I am a first-generation dairy farmer from New

14   Hampshire.   I've raised my family -- excuse my voice.

15   I'm nervous -- raised my family on the farm there.

16       I wrote a letter in support of the settlement.

17   Although I understand the arguments of the other side

18   and the frustration, and -- I think from a

19   first-generation farmer perspective, we -- we're

20   planting genetically modified plants.   We are using

21   genomics to breed our animals.   We are milking our cows

22   with robotics.   But we aren't looking at our market

23   price, which is driven in part by policies which were

24   written in the '30s.   And I see this case as a

25   beginning.

```
 1              Instead of looking back, I think we should be
 2     looking forward at reform, and I see this as a step in
 3     the right direction.  And that's all I have to say.
 4              THE COURT:  All right.  Thank you.
 5         Reynard Hunt.
 6              REYNARD HUNT:  Good morning.
 7              THE COURT:  Good morning.
 8              REYNARD HUNT:  It's Reynard, R-e-y-n-a-r-d
 9     H-u-n-t.
10              AUDIENCE MEMBER:  Please speak into the mic.
11              REYNARD HUNT:  And I am a subclass
12     representative for DFA and DMS subclass.  I support the
13     proposed settlement in this case.
14         I grew up on a dairy farm in New Jersey that had
15     been in the family since before the American Revolution.
16         From the time we sold our herd early -- in the
17     early '70s, I have raised dairy replacement heifers and
18     still do so today, and I do some crop farming.
19         I was a physical education teacher for 35 years,
20     and then I co-founded Spring House Dairy with Peter
21     Southway in 2003.  During that time, we kept
22     approximately 95 head of dairy cattle, and beginning in
23     around 2005, we started selling most of the milk through
24     DMS.
25         After selling my interest in the Spring House Dairy
```

1    in 2011, I operated my own dairy herd until August 2013,

2    milked approximately 50 cows, and sold the milk through

3    DMS.

4        I -- as a class representative, I took my role very

5    seriously, evaluated the litigation and settlement to

6    the best of my abilities.  I had quite a few discussions

7    with local farmers and some farmers out of the area, and

8    as most everybody agreed, it's not a perfect settlement

9    but most were in agreement that it was a good settlement

10    and it was necessary to make this settlement.

11        Weighing the risks of trial and appeals versus what

12    farmers are certainly receiving from this settlement,

13    concluded that the settlement was the best choice.  The

14    main decision was between continuing to fight the

15    defendants and head to trial or whether negotiate a

16    settlement, and I think the latter is the best course.

17    The settlement disregards -- resulted from these

18    negotiations is I think a good one, in my estimation,

19    and it's a good compromise for both sides.

20        THE COURT:  Thank you.  We'll have one more

21    before the morning, and that -- I mean before our lunch

22    break, and that will be Tim Maxham.

23        TIMOTHY MAXHAM:  Good morning, your Honor.

24        THE COURT:  Good morning.

25        TIMOTHY MAXHAM:   I guess we're about

1    halfway through, and there's some other members from St.

2    Albans Co-op that are going to be after me, but luckily

3    they get a chance to have a break before they come up.

4                THE COURT:  So let's just have your spelling

5    of your last name for the record.

6                TIMOTHY MAXHAM:  Yes.  Timothy Maxham,

7    M-a-x-h-a-m.

8                THE COURT:  Thank you.

9                TIMOTHY MAXHAM:  I am going to briefly go back

10   roughly a hundred years just to say St. Albans Co-op, up

11   in St. Albans, Vermont, was created back in 1919.  In

12   the year 1920, my mother was born, and it was stated

13   earlier this morning, you know, number of farms.  There

14   are roughly 25,000 farms in the state of Vermont.  By

15   the year 1950, we were down to 15,000 farms, and today,

16   in the year 2016, Vermont farmers are -- roughly

17   approximately 850 of us.  And so, you know, we all know

18   what's happening, but yet we are still producing food

19   and fiber around the country for expanded population.

20   We have our trials and tribulations, and we're

21   addressing one of those here today.

22        It's been a long process, and I'm here to speak in

23   favor of the settlement.  I think it's gone on long

24   enough.  It wasn't settled completely the first time

25   around, and there has been stated earlier there have

1    been updates to that to make more protection for some of

2    the people that were looking and considered some

3    inequities in the market system and how we operate.

4         I have seen a lot of changes since I was born in

5    1953, and I was born on a small dairy farm in

6    Morrisville, Vermont, and I think I had milk in my blood

7    veins because it's all I ever wanted to do was be a

8    dairy farmer.

9         In the late '50s, you know, a lot of changes that

10   we have seen progress, and it started, you know, it -- I

11   can still remember my mother and father milking into the

12   milk cans.  And about the late 1950s there was a push,

13   United Farmers Co-op, I believe at the time we were

14   involved with, you know, bulk tanks and updating.  We

15   did put in a bulk tank at that time.  I remember, you

16   know, remodeling the farm, probably a couple old horse

17   stalls that we took out and put in a bulk tank.

18        Unfortunately, two or three years later, cows were

19   sold.  I didn't have anything to say about it.  But

20   that's the way it goes.  We seen that attrition, and we

21   can't say the marketplace has always driven it, you

22   know.  It's been other things that made the economics

23   unviable for farmers to continue or they reached an age

24   and they couldn't pass it on, as some people have stated

25   here, that they have -- the farm has gone, come down in

1   the family in generations.

2       So I lost my opportunity to farm the family farm.

3   My parents and I, and my other siblings, moved to South

4   Hero, which is in Grand Isle County, on beautiful Lake

5   Champlain, just 25 miles away from here, in 1966.

6       In 1967, at the age of 13, I started working for a

7   neighbor farm and worked there for 10 years through high

8   school, put myself through two years of tech college at

9   Vermont -- VTC in Randolph, went back to the farm and

10  continued working there until 1977, and I decided it was

11  time to stretch out and operate it myself.

12      There was a neighbor farm that had gone out earlier

13  and barn was vacant.  I asked him if I could rent the

14  place, and so I'm coming up on the anniversary Memorial

15  Day weekend 1977.  I was a member of the St. Albans

16  Co-op.  I paid my dollar to buy a share, and I became an

17  operating member of St. Albans Co-op.

18      Over the years, we have seen things continually

19  change.  Shortly previous to that, Grand Isle -- several

20  towns, Grand Isle Creamery, they decided to disband or

21  join with St. Albans Co-op.  They did so.  Shortly after

22  that, there were some other smaller co-ops that decided

23  that they needed to make a change, and they changed and

24  joined with St. Albans Co-op.

25      Over the years we saw some membership grow.  St.

1    Albans Co-op basically was just Franklin County.  Now we

2    have members in New Hampshire, all of northern Vermont,

3    and some over in New York.  We have had to expand to

4    stay viable and offer the services for the farmers to

5    compete and market their milk.

6         One of the reasons that I think it's time for the

7    settlement to be made and continue on, as has been

8    expressed earlier here, you know, I kind of get up in

9    the morning and there's only so much I can do in a

10   24-hour period.  Sometimes it's kind of cut and dried;

11   other times we have issues that we want to take care of

12   and certain circumstances that come about that it just

13   doesn't allow it.  You're out making hay and it rains,

14   you're all done.  We talked about planting corn.  We

15   don't usually get it done in a day, but we usually get

16   it done.  But when something like this has taken this

17   long -- and we all know that the wheels of justice

18   sometimes turn slow, and we need to continue and move on

19   and look forward, and one of the things -- a couple of

20   things:  Why am I a co-op member?

21        I guess at the time it probably -- there weren't

22   too many alternatives, but I have been a strong

23   supporter of the co-op ever since I joined.  I know my

24   board of directors.  I know management.  I am only 30

25   miles away from the plant.  I don't have to worry about

1      marketing my milk.  It's taken care of.  I receive a

2      milk check.  As talked about, we receive premiums on

3      qualities and that type of thing.  And I just want to

4      relate that balancing milk and taking care of it, you

5      know, 365 days a years, individually I can't do that,

6      and I know the runnings of co-op and marketing milk and

7      taking care of a perishable product.  When a lot of

8      times our customer, the co-op customer, is closed for

9      the weekend or long holidays, the use of milk goes down,

10     somehow that product is taken care of.

11         And we have a co-op member in Lamoille County, in

12     the town of Morrisville where I was born.  They

13     operate a -- probably a small, medium-sized farm, but

14     they have personally gotten into value-added product.

15     They produce cheese on the farm.  And talking with a

16     fellow there one day, he says, "Well, we probably

17     produce cheese two or three days a week.  We probably

18     take 600 pounds of milk."  I don't know how much milk

19     they are milking, but -- or making, but they have to

20     have an avenue for the rest of that product.  They don't

21     have to worry about it because the milk truck is picking

22     up their milk every day.  They're able to do what they

23     want to do in trying to create a market for small amount

24     of it, make a value-added product and make some extra

25     income.

1          THE COURT:  So we are right about at your

2    time.  A couple last thoughts?

3          TIMOTHY MAXHAM:  Okay.  The other thing is

4    that I have been involved in town government for a long

5    time.  Your Honor, you're familiar with Vermont so, you

6    know, town meeting.  I have been town moderator for 30

7    years in the town of South Hero, and there's only so

8    much business we can take care of in a day.  We have an

9    agenda, and we take care of things.  And also, we

10   operate on Roberts Rules of Order, and, you know, some

11   questions, they require larger percentage to move on to

12   certain things, and some of those, you know, require

13   two-thirds vote consideration.

14         As I understand it, we had six plaintiffs.  It was

15   increased to nine.  We have six of those that are in

16   favor of the settlement.  We are at that magic number of

17   two-thirds.  Let's settle the question and move on to

18   greater things and look forward to the future.  Thank

19   you.

20         THE COURT:  All right.  Thank you.

21         We will take our noon break at this time, and we'll

22   come back at one o'clock.  You shouldn't leave things in

23   the courtroom when you exit, and I understand Clement

24   Gervais might have to leave early, so you are actually

25   number four when we come back, so I think we should be

```
 1    able to get to you, but you might want to talk to the
 2    people ahead of you if that isn't going to work for you.
 3          And anything from counsel before we take our break?
 4                MR. PIERSON:  No, your Honor.  Thank you.
 5                MR. KUNEY:  Not here, your Honor.
 6    (Court was in recess at 12:00 p.m.)
 7    (The following was held in open court at 1:10 p.m.)
 8                THE COURT:  We are back on the record in Alice
 9    Allen versus Dairy Farmers of America, and we are in our
10    fairness hearing.  And the next speaker is Patrick
11    Howrigan.
12                PATRICK HOWRIGAN:  You want the spelling on
13    the name?
14                THE COURT:  Yes, please.
15                PATRICK HOWRIGAN:  H-o-w-r-i-g-a-n.
16          Good afternoon.
17                THE COURT:  Good afternoon.
18                PATRICK HOWRIGAN:  My name is Patrick
19    Howrigan.  My wife, Paula, and I have been proud members
20    of the St. Albans Co-op since 1977.  My two sons
21    represent seventh-generation dairymen in Franklin
22    County, Vermont.
23          I believe that myself and my fellow dairymen can
24    accomplish more when we work together than we can
25    working alone.  Our board of directors, management and
```

1    staff are open, accessible and helpful to explain if we

2    have any concerns.  I am confident that when our

3    directors put their boots on in the morning, they face

4    the same concerns for their families and farm management

5    as we do.

6        St. Albans Co-op has a long tradition of helping

7    membership with financial programs to assist with

8    purchasing supplies like fertilizer, seed, feed, and

9    storage supplies.  These programs are available to all

10   members and we can all benefit.

11       When St. Albans Co-op became members of Dairy

12   Farmers of America and DMS, it was a good move for our

13   patrons.  We now have the benefit of financial strength

14   that we can deal with larger customers.  We can work

15   together to service markets that would have been beyond

16   our reach.  We now have hauling advantages that can help

17   produce premiums for our membership.  DMS has the

18   ability to send the closest milk available to the

19   nearest market.  Instead of competing relationships for

20   market share, we now work together to benefit us, the

21   farmer owners.

22       We at St. Albans have made a major financial

23   investment in our production facilities.  We now have

24   the capacity to service milk in the Northeast while also

25   contributing as team players.  Our relationship with DFA

1    and DMS requires major trust of all involved.  The
2    settlement in Allen versus Dairy Farmers of America is
3    good for all.  This settlement provides a structure to
4    protect and guard this trust.  It will protect and
5    provide a solid voice for our member dairy farmers.  The
6    settlement will provide the legal outline to solve
7    problems and build trust as we move forward.  I support
8    the settlement.  I would believe it will be good for our
9    family and good for my fellow dairymen.
10        I feel the Court did a good job of explaining the
11   new aspects of the settlement which includes significant
12   elements that could really benefit the dairy industry.
13   The concept of having a farmer ombudsman is very
14   compelling to me.  It could go a long way in giving
15   dairy farmers a new type of mediation mechanism as well
16   as additional peace of mind that DFA and DMS are
17   conducting business in the best interests of the dairy
18   farmer members.
19        The advisory council member will also provide
20   benefit.  There will be an additional advocate for
21   farmers and through this role could suggest new ideas to
22   DFA and DMS to improve dairy farmers' bottom line.
23   Overall, these new positions will go a long way in
24   demonstrating and verifying transparency and respect
25   within DFA and DMS.

1          In addition to the new positions listed above there
2     and other benefits to the settlement agreement, the
3     financial-disclosure and milk-testing provisions should
4     provide additional assurance to dairy farmers.
5          Finally, I believe the theme of this settlement is
6     to continue to grow trust and respect between DFA/DMS
7     and the dairy farmer members.  All the protections
8     included in the settlement go a long way towards
9     achieving that goal.  I feel it is time to enforce the
10    settlement and allow it to be the voice of trust and
11    protection for our dairy farmers.  This settlement gives
12    us the tool box to protect and enhance that trust.
13    Thank you.
14               THE COURT:  Thank you.
15          Bill Rowell.
16               BILL ROWELL:  Good afternoon, your Honor.
17               THE COURT:  Afternoon.
18               BILL ROWELL:  My name is Bill Rowell,
19    R-o-w-e-l-l.
20          My brother, Ryan, and I operate Green Mountain
21    Dairy Farm in Franklin County, Vermont.  We are members
22    of the St. Albans Cooperative Creamery.  We milk 950
23    cows and receive quality awards for the milk we produce.
24    Last year our production exceeded 27 million pounds.
25          In an effort to raise the bar for agriculture, we

1    have hosted tours of our farm and digesture operation

2    for more than 22,000 visitors over the past several

3    years.  Our objective is to educate the consumer, show

4    them where their food comes from, let them observe the

5    routine practices on today's farm, and see firsthand how

6    cattle are housed, fed and cared for.  It's been a big

7    success.

8         This August we will host Vermont Breakfast on the

9    Farm, an event sponsored by the Agency of Agriculture

10   and the University Extension Service.  I have been on

11   the state board of advisers for University Extension for

12   the past six years.  We are told to expect a crowd of

13   more than 1,000 people.  Yet here today I can see those

14   efforts being overshadowed by negative press.  This

15   disturbs me.  It comes as a detriment to the image of

16   the dairy industry that we are trying to improve and to

17   our livelihood and every farmer here.

18        I believe that settling this matter would be in

19   everyone's better interests.  I did attend the previous

20   two hearings.  I would note that your seating in here is

21   much more comfortable with the cushions.

22        One of the two key words here today is cooperation.

23   The milk market is highly sensitive to pricing, product

24   quality, consumer confidence and/or public trust.

25   Presently U.S. agriculture finds itself at a real

1    disadvantage in the global marketplace.  The strength of

2    the U.S. dollar alone creates an obstacle for

3    competitive sales.

4        In addition, the supply of milk currently exceeds

5    market demand.  As a result, milk is being dumped for

6    land application, another negative image for our

7    industry.

8        The proposed requirement of introducing new

9    positions, ombudsman and advisory council member as part

10   of DFA's counsel, I find that to be highly positive and

11   it does several things of import.  First, it serves to

12   improve clarity by offering a direct link to

13   information.  Second, it creates a means of mediation to

14   resolve issues before they become a tumultuous problem.

15   Third, and key to the entire process, serves to increase

16   transparency.

17       I would also note that transparency lays bare the

18   responsibility of all parties involved, not just that of

19   the cooperative itself.  St. Albans and DFA have

20   achieved a good working relationship over the years,

21   something which has increased benefits to both

22   cooperatives and their producer members.  I would like

23   to see this relationship continue.

24       As members, we currently enjoy programs which

25   otherwise might not exist.  There are a number of

1    examples.   One is that of collaborating for market milk
2    and maximize premiums rather than compete with each
3    other for the markets.   Another recognizes
4    transportation efficiencies.
5        Since the revised settlement was served to promote
6    a good working relationship between the cooperative and
7    its producer members, I am hopeful that a settlement
8    agreement can be reached today.   While some may think it
9    fitting for the big corporation to pay, and by doing so
10   find that it serves justice, they would be failing to
11   recognize this as a burden shouldered by farmers, the
12   producer members of the cooperative.
13       $50 million settlement, there's no doubt that it
14   will take time for the industry to get beyond the
15   negative press resulting from this action.   Therefore, I
16   ask that you end it today and allow that work to begin.
17       My family has been in agriculture in this country
18   since 1637, and we have had to cooperate to get here
19   today.   We're going to have to cooperate to move forward
20   tomorrow.   Let's get started.
21               THE COURT:   Thank you.
22               BILL ROWELL:   Thank you.
23               THE COURT:   Wayne Hurtubise.
24               WAYNE HURTUBISE:   Thank you, your Honor,
25   for allowing me to speak.   My name is Wayne Hurtubise,

1    H-u-r-t-u-b-i-s-e.

2         I own and operate a dairy farm in Richford,

3    Vermont, which is in Franklin County, with my two

4    brothers, a son, and nephews, which are the fourth

5    generation on this farm.  We milk 800 cows.  We market

6    24 million pounds of milk a year.  We have been a member

7    of St. Albans Co-op since 1982, which is a

8    member-governed cooperative committed to providing

9    service, stable markets, and the greatest return in

10   profits to our members.

11        I am here today on my own accord to explain why I

12   am in support of the Northeast Dairy lawsuit settlement.

13   Working with DFA/DMS gives the St. Albans Co-op members

14   security -- security, excuse me, with large milk

15   customers in maximizing premiums versus competing for

16   markets against them.

17        The key aspects about this settlement are:

18        The farmer ombudsperson who will listen and

19   investigate any farmer's disputes between DFA and DMS.

20        An advisory council member, which will allow --

21   which will -- excuse me, advocate for farmers with DFA

22   and DMS and promote better pay prices, net income, and

23   enhance equity for them.

24        Milk tested.  For the next 10 years, DFA and DMS

25   will not acquire a controlling interest in the

1    milk-testing company its farmers use, which is DairyOne.

2    In addition, any concerns regarding milk-testing

3    accuracy will be brought forth to the farmer

4    ombudsperson who will attempt to mediate any disputes.

5        Adulterated milk, which is farmer's milk found

6    unacceptable for milk processing plants.  DFA and DMS

7    will notify the affected farmer within three hours.  At

8    farmer's request, testing will be done at an independent

9    laboratory.

10       These provisions are all changes from the original

11   settlement which will provide added assurance that DFA

12   and DMS are serving in the best interests of their

13   members.

14       In closing, it would take a considerable amount of

15   time for me to explain all the benefits and member

16   programs that has helped our farm in the 36 years we

17   have been with the St. Albans Co-op.  I believe that

18   this settlement is fair and see no need to go to trial.

19   Thank you.

20           THE COURT:  Thank you.

21       Clement Gervais.

22           CLEMENT GERVAIS:  Thank you.  My name is

23   Clement Gervais, G-e-r-v-a-i-s, and I am in support of

24   the settlement.

25       I farm in Bakersfield, Vermont, with three

1   brothers, one niece, and my parents.  My family milks
2   around 1800 cows which produce approximately 50 million
3   pounds of milk a year.  My father started farming in
4   Bakersfield in 1960, and in 2013 we had the honor of
5   being named Vermont Dairy Farm of the Year.
6       I am a member of the -- I am a member of the
7   independent St. Albans Cooperative Creamery and have
8   been for over 30 years.  There are a few reasons I
9   choose to ship my milk to St. Albans Co-op.  I have
10  always enjoyed the transparency of our co-op.  My family
11  has always been able to talk to the staff, the CEO, or
12  any of the farmer directors whenever we need to.  One
13  example of this is any time our farm has had questions
14  about a quality test or solids test that could affect
15  our pay price, staff has always listened to our concerns
16  and retested to ensure accuracy.
17      Oftentimes my busy schedule does not allow me or
18  many other farmers to be involved or kept up to date on
19  important issues.  The St. Albans Co-op has always been
20  a consistent and fair voice for its farmers.  Whether it
21  is for rule or policy changes in our industry or any
22  potential concerns for its farmers, I have always
23  appreciated this fair representation.
24      The St. Albans Co-op is absolutely essential to my
25  family's success at producing and selling milk.  I rely

1   on my co-op to market my milk and to do so profitably.

2   Milk co-ops are farmer owned so if we do not find a

3   profitable home to our milk, then all of its farmers

4   lose money.

5        St. Albans has worked with DFA and DMS to gain

6   efficiencies in the collection, handling and balancing

7   of our milk.  This relationship is a positive one to

8   gain trucking efficiencies as well as improving the

9   balancing of our milk.  At times such as now, when our

10  milk shed has extra milk, we do not undercut each other

11  to find a home.  That would only lower the sell price

12  more hurting what the dairy farmers actually get paid.

13       I would like to mention a few of the reasons I

14  support this settlement.  I really like the idea of

15  adding a farmer ombudsperson.  This will give more

16  trust, transparency, as well as a way to improve

17  communications.  The advisory council member will also

18  create a valuable mechanism to mediate any concerns.

19       I feel the settlement is not an end; it is the

20  beginning of better communication that will benefit all

21  the farmers.  I also like the new milk-testing

22  provisions.  All farmers get paid according to the fat

23  and protein tests of our milk.  Additional testing will

24  help ensure that our farmers are getting paid fairly.

25       Another reason for supporting this settlement is to

1    secure my co-op's financial responsibilities.  In the

2    last couple of years, I have been part of the St. Albans

3    Co-op equity committee.  Part of this committee's

4    responsibility is to make sure the co-op has a strong

5    equity position.  This will enable us to grow or

6    diversify when it's profitable for its farmers.

7        St. Albans' financial responsibility for paying

8    forth this settlement is an unknown amount unless the

9    settlement is approved.

10        The last reason for supporting this settlement is

11    to avoid additional attorneys' fees.  If not settled,

12    the extra costs for attorneys will only hurt all

13    farmers.  It's time to settle this lawsuit so we can

14    concentrate on the many important financial needs to

15    ensure a strong co-op and successful farmers in it.

16        I want to thank you for your time and the

17    opportunity to speak today and hope you consider my

18    views to approve this settlement.

19            THE COURT:  Thank you.

20        Paul Stanley.

21            PAUL STANLEY:  Good afternoon.

22            THE COURT:  Good afternoon.

23            PAUL STANLEY:  My name is Paul Stanley,

24    P-a-u-l S-t-a-n-l-e-y.

25        And, your Honor, I know that I cannot wear a hat in

1    this courtroom, but I would like to use this as a prop

2    because any good farmer, dairy farmer, cannot go out of

3    the barn without his hat.  And I'd also like to add and

4    point out that there's a Jersey cow on this hat.  She is

5    one of the nine million plus cows that we have in this

6    country, and I believe, and my colleagues know what I'm

7    going to say, with St. Albans Co-op, that what she

8    produces represents what we need to be producing to sell

9    our product and get out of the bind that we're in with

10   our surplus, and that is high components in our dairy

11   products.

12        And getting to the reason that we're here today:

13   I, like Clement, live in Bakersfield, Vermont, with my

14   wife, who runs a 30-cow dairy farm with my daughter, who

15   works off the farm; and our 60 registered Jersey and

16   heifers produce a high-component milk that is shipped to

17   St. Albans Cooperative Creamery, which we have done

18   since our dairy was established in 1985.

19        Paulin Dairy was designed to operate with an

20   off-farm income, which dairies of this size typically

21   must rely on.  One of my off-farm incomes was acting as

22   a dairy inspector with the State of Massachusetts,

23   giving me much insight into the fluid milk marketing in

24   the Northeast Federal Market Order.

25        The lawsuit of Allen versus Dairy Farmers of

1    America, Dairy Marketing Service, needs to be settled,

2    period.  And I repeat, it needs to be settled.  And,

3    your Honor, in listening to the comments, we always have

4    a take-home message, and I hope that the take-home

5    message that you are hearing today from the folks that

6    are testifying is the settlement of this suit.

7         As the suit drags on, it is also dragging our

8    milk-marketing abilities down with it.  It is

9    essentially a fight among dairy farmers for a fluid

10   market we no longer have in the Northeast Order.  This

11   has pushed more of the milk produced into this order, to

12   the Class IV milk powder market, which is very low

13   return to the dairy industry and is only a place to

14   dispose of milk we do not have a market for in the

15   Northeast or the U.S.  This pushes the milk plant

16   capacity to the point where milk has to be disposed of

17   in our on-farm nutrient cycling systems.

18        The settlement of this lawsuit would allow St.

19   Albans Cooperative and the rest of the Northeast, the

20   national milk market, to move forward with some

21   innovative, out-of-the-box ways to market our milk.

22        If only half the time and money that has been spent

23   on this lawsuit were put toward marketing and promoting

24   our dairy products, we would not have the oversupply of

25   milk that we have in the marketplace today.  Instead, we

1   would have healthier people living on a healthier

2   planet.

3        Thank you for your time and consideration.

4            THE COURT:  Thank you.

5        Bryan Davis.

6            BRYAN DAVIS:  Good afternoon, your Honor.

7            THE COURT:  Good afternoon.

8            BRYAN DAVIS:  My name is Bryan Davis,

9   B-r-y-a-n D-a-v-i-s.

10       I want to start off by thanking you for giving me

11  the opportunity to testify in your courtroom today.  I

12  have never testified in court before, or anywhere else,

13  as a matter of fact, so please bear with me.

14       Our farm is located in Derby, Vermont, which is

15  located directly on the Canadian border in northern

16  Vermont.  That part of the state is also referred to as

17  the Northeast Kingdom.  I farm with my wife, a son,

18  daughter-in-law, and I just had my first grandson born

19  five months ago.  He will be the fourth generation on

20  our farm.

21       We milk 135 cows and produce about three million

22  pounds of milk a year.  We also raise the same number of

23  replacement stock.  We also tap 4500 maple trees, and

24  we're just coming off the best season we have ever had

25  in the 60-year history of our maple business.

1     I have read the proposed settlement, and I want to

2     thank all the parties involved.  You can tell they put a

3     tremendous amount of faith, effort and thought into it.

4     Almost 40 years ago my father and mother helped me

5     buy the neighbor's farm.  My dad was always a member of

6     a co-op.  He was even a director for Cabot Creamery for

7     15 years before Agri-Mark bought the co-op.  I have been

8     a co-op member myself for my entire farming career,

9     first at Cabot and now at St. Albans.  I switched to

10    St. Albans because I thought they were very transparent

11    and that the CEO and management team were only a phone

12    call away.

13    I was very fortunate 20 years ago.  I was elected a

14    director of St. Albans Co-op.  It's a position I still

15    hold.  I believe co-ops are a very important part of our

16    industry.  I belong to a co-op because it allows me to

17    sleep better at night knowing my milk is going to be

18    picked up in the morning and that I'm going to receive a

19    fair price for it.  I feel if I was an independent

20    producer and shipped directly to Dean Foods or Hood, I

21    would wonder and worry that I might receive a phone call

22    saying that they wouldn't need my milk this coming

23    weekend or over an upcoming holiday.

24    Back in the '80s, St. Albans Co-op was very

25    instrumental, along with others in the industry, in

1    establishing the Northeast Dairy Compact.  It was a

2    pricing formula to help us with low prices that we were

3    receiving back then.  It worked, and it was the envy of

4    many other parts of the country.

5        My question was, did Dean Foods or Hood help us get

6    that pricing formula?  They did not.  It was co-ops made

7    of dairy farmers, and that's what helped us get that

8    Northeast Dairy Compact.

9        Quick comment regarding the component the

10   milk-testing sampling in the settlement.  I have been on

11   the quality committee at the co-op, you know, St. Albans

12   Co-op, since I was elected, and I'm now chairman of the

13   quality committee, and all of those years I can only

14   remember two or three times where a member had a

15   complaint about milk testing, and once we brought those

16   producers to the table to meet with our quality

17   committee and the lab technicians, we didn't hear

18   another peep out of 'em.  We just needed to get them in

19   to the office, and we needed to educate 'em; just needed

20   to get 'em off the farm and educate them about the

21   process.

22       St. Albans Co-op has been a partner with DFA and

23   DMS for many years now.  I believe the partnership has

24   worked very well and has benefited the membership of

25   both organizations.  I think this lawsuit has been a sad

1   chapter in the lives of dairy farmers.  It has pitted

2   dairy farmers against dairy farmers.  Every farmer --

3   every dairy farmer across the U.S. is suffering right

4   now due to our low milk prices.  I believe it is more

5   important now than ever for dairy farmers to unite and

6   work together, whether it's through our co-ops, National

7   Milk, farm bureau or any other organization.  The time

8   is upon us that we need to speak as one.

9        I am very much in favor of this proposed

10  settlement, and I would like to ask the Court to support

11  it as well.

12             THE COURT:  Thank you.

13             BRYAN DAVIS:  Thank you.

14             THE COURT:  Connie Menard.

15             CONNIE MENARD:  Good afternoon,

16  your Honor.

17       I, like Bryan, have never testified before so

18  please bear with me also.  And I really want to thank

19  you for the opportunity to speak today.  I was very

20  excited to know that -- that I was allowed to do so.

21             THE COURT:  If you just would spell your last

22  name.

23             CONNIE MENARD:  Yes.  My name is Connie

24  Menard, M-e-n-a-r-d.

25             THE COURT:  And I should just say for the

1    record, testimony is usually when you are under oath, so

2    you are making comments.

3              CONNIE MENARD:  Okay.

4              THE COURT:  So anybody who is worried about

5    testifying, don't -- doesn't need to worry about that

6    because you are making comments, but you won't be

7    considered testifying unless you are under oath.  Okay?

8              CONNIE MENARD:  Okay, thank you, your Honor.

9    I have learned something today.

10        My family has a dairy farm in Moores, New York, and

11   we are members of St. Albans Cooperative Creamery, and

12   we have been just since 2006.  Before that, we belonged

13   to a cooperative that had decided to dissolve, and when

14   we began our search for a new cooperative, we had many

15   options available.  As a matter of fact, we were courted

16   quite heavily by several of the co-ops.  We chose

17   St. Albans because of the smaller side of the co-op, the

18   transparency of the management and the finances, and

19   also the equitable treatment of all of its members.

20        Your Honor, my husband and I began our farm in

21   1986.  Last year we hit a milestone as we became a

22   limited liability company, and we brought our son and

23   his wife into the business legally through lawyers and

24   everything.  Their children are -- my grandchildren are

25   the third generation on our family farm.  We have 85

1    milking cows and 75 young stock.  In today's standards,
2    we would be considered a fairly small farm.
3         Seven miles away, my brothers have a fairly large
4    farm.  We work together occasionally for the good of
5    both farms, and it helps us both to be more profitable.
6    The size of their operation allows them to realize cost
7    efficiencies and timeliness with field work that they
8    pass on to us.
9         I believe that the relationship between St. Albans
10   Cooperative, DFA and DMS are a lot like the relationship
11   our small farm has with the large farm.  Each remains
12   autonomous in their finances and leadership.  DFA opens
13   up marketing opportunities for us, and by working
14   together, we can serve our customers more efficiently,
15   therefore adding to our margins.  We are able to use our
16   new powder plant to its best capacity, and we
17   collaborate on milk hauling both from the farm and to
18   the customers.
19        There are benefits for their producers that they
20   make available to our producers as well.  Dairy
21   cooperatives are a great asset to producers, and when
22   cooperatives work together, everybody wins.
23        Your Honor, there are dairy producers that know
24   nothing about their co-op.  They do not ask questions.
25   They do not understand how a cooperative works or about

```
1    how their milk is marketed, and some farmers are okay
2    with that.  They just want to farm and get a check and
3    it is what it is.  I'll be honest with you.  I was in
4    that position at one time.  When we purchased our farm
5    we had a big fat debt and a young family, and I just had
6    to farm, but it came a point in time when I realized
7    there was part of the business that I needed to learn
8    more.
9         Some farmers feel that their cooperative is out of
10   reach.  Perhaps the only contact they have with their
11   cooperative is the man or person who picks up their
12   milk.  They may want to know more but they don't know to
13   ask or where to go for answers.  They may be afraid to
14   ask questions for fear of sounding ignorant or
15   accusatory.  They may be too shy to speak up at
16   meetings, or maybe they have asked questions at some
17   point but never really got a clear answer.
18        If these farmers had had someone to go to that was
19   easily accessible, an outside person whom they could
20   trust, maybe they would understand more how the co-op is
21   structured, how it is managed, feel more like it is a
22   part -- like they are a part of it, and get more
23   involved.
24        The suggested appointment of an ombudsperson as
25   proposed in this settlement would be a perfect fit for
```

1     farmers in this scenario.  They could go to this person

2     to confirm or deny rumors that they heard and would

3     hopefully realize that those who say the co-op is

4     against them are wrong.  As their questions get answered

5     and they become more comfortable within their

6     organization, they will realize that the co-op is

7     actually an extension of their own business.

8          Another piece of this settlement that I appreciate

9     is the addition of the advisory council member.  On our

10    farm is always a positive experience to have someone new

11    look at our operation, a fresh set of eyes and new ideas

12    to bring better plans and practices that could possibly

13    lead to more profit.  This position will bring value for

14    sure.

15         Our farm family believes in our cooperative.  We

16    have a deep trust and faith in the leadership and are

17    aware of how much it enhances our business.  I truly

18    believe that every dairy farmer should be able to

19    experience the same peace of mind.  Putting this

20    settlement behind us, along with the changes proposed,

21    will help to make this happen.  Thank you again,

22    your Honor.

23              THE COURT:  Thank you.

24         Mark Magnan.

25              MARK MAGNAN:  Good afternoon, your Honor.

1              THE COURT:  Good afternoon.

2              MARK MAGNAN:   Thank you for the opportunity to

3     be here.  My name is Mark Magnan, M-a-g-n-a-n.

4         I farm in Fairfield and St. Albans, with three

5     brothers and my parents.  I farm on a farm in Fairfield

6     where my grandfather emigrated from Canada and my father

7     was born in the farmhouse that we have today almost 90

8     years ago.

9         In talking to my father this morning, we were

10    talking about things that was going on today and what we

11    had to do.  Amongst planting corn and fixing fence, I

12    also stated I was coming to this hearing, to which he

13    almost interrupted me saying anything else, and he said,

14    "That should be front and center."  He said from what he

15    knows about it, people need to go to these and put this

16    behind us.

17        My father told me a couple of stories about when he

18    started farming.  He could relate back to the '30s, '40s

19    and '50s, and he said there was no communication with

20    their milk handler back then.  Today, as he knows, we

21    get production information from our co-op daily on our

22    iPhones, lab results, and many other programs that we as

23    dairy farmers can take part of.  My father was also one

24    of the driving forces behind me to becoming a director

25    of St. Albans Co-op.

1          As director of St. Albans Co-op, I am very proud of

2     the work that we at St. Albans and DFA collaborate

3     together with.  When we work together, such as getting

4     market premiums out of the marketplace, it makes much

5     more sense to go to milk buyers as one unified voice

6     rather than two or multiple.  We can garner more

7     premiums from the marketplace, and that is what --

8     exactly what DMS does.

9          We also gain efficiencies in transportation.  For

10    instance, if you have a DFA farm and a St. Albans farm

11    on the same road, we have come up with programs where

12    one truck will pick up both farms, even though they're

13    not a member of the same co-op, to save and garner

14    trucking efficiencies.  That means real returns for

15    dairy farmers.  This gives the independence to the

16    farmers.  They can still remain with whomever they are

17    loyal to, but yet we can gain efficiencies.

18         Building strengths helps build good relationships

19    with our customers as well.  They know -- farmers know

20    they can rely upon the co-op, and today that is exactly

21    what farmers need.  Thank you.

22              THE COURT:  Thank you.

23         Tim Magnant.

24              TIMOTHY MAGNANT:  Good afternoon,

25    your Honor.

1              THE COURT:  Good afternoon.

2              TIMOTHY MAGNANT:  Thank you for the

3     opportunity to speak.

4          My name is Timothy Magnant, M-a-g-n-a-n-t.  I own a

5     farm in the beautiful area up in northern Vermont,

6     Franklin.  I border on the southwest side of the village

7     which provides its challenges with -- I have to have a

8     lot of community action to keep -- make my farm work

9     with keeping the neighbors happy, and farming's

10    something I have enjoyed all my life.

11         I farm there with my wife, Martha, and my two

12    now-grown and moved-on daughters, Danielle and Desiree,

13    who grew up with the farm values which are very

14    important.

15         The one who told me -- taught me most of my farming

16    experience was my father who took Mark Magnan, the

17    previous speaker's -- he took my father's place on the

18    board of directors for the St. Albans Co-op.  And I

19    learned a lot about my co-op through my father.

20         They speak for us nationally.  They speak for us in

21    the state on policies, and they provide a lot of support

22    for our farmers other than milk marketing.  Whether it

23    be water quality issues or other issues, our co-op is

24    very important to us for being our voice and a big

25    voice.

1          One of the things that I've really appreciated is

2     our co-op just put in a new dryer, redid the plant.  We

3     haven't had a lot of investment in Franklin County or

4     even Vermont for our industry.  Our board of directors,

5     wise businessmen, were able to put us there, put the

6     dryer in, make us -- for these times when they talk

7     about the weekend milk, they can dry and powder it.

8     They can move that milk.  Like they say, we have a safe

9     market.

10         As far as our board of directors, whether it's the

11    co-op store, whether I meet Harold John or I meet Bryan

12    Davis or whoever, I can ask 'em  a question; they're

13    always front and center and allow me to speak to 'em and

14    give me advice or let me know what -- you know, what the

15    milk industry looks like or what's going on with our

16    co-op.  They will talk to us.

17         Our CEO, Leon Berthiaume, same way.  If you see

18    him, he's always open to you.  I think our -- I have had

19    good luck at being able to talk to 'em as farmers, as

20    co-op members.  They are always available to me.  I have

21    had an excellent experience.

22         I would be in favor of us settling this today.  I

23    think the ombudsperson is a good idea.  I think the

24    person on the advisory council could provide new ideas.

25    I think if we settle this, I think we can move forward.

1    I agree with the previous speakers that this is kind of

2    a black eye for us.  We need to move on.  We need to do

3    better PR and band together and work together.  Thank

4    you for your time.

5              THE COURT:  Thank you.

6         Harold Howrigan, Jr.

7              HAROLD HOWRIGAN, JR.:  Good afternoon,

8    your Honor.  I'm Harold Howrigan, H-a-r-o-l-d

9    H-o-w-r-i-g-a-n.  Thank you for allowing me the time to

10   provide comments today on this important issue.

11        I am a member of St. Albans Co-op Creamery.  Our

12   family has shipped milk to the St. Albans Co-op for over

13   40 years.  I farm with my brothers, Michael and

14   Lawrence, our wives, and my mom is still involved; and

15   my brothers and I have six sons that work with us on the

16   farm, and we have some girls too but they are not on the

17   farm.  We currently milk around 1200 cows, have an

18   additional 800 young stock.

19        While growing up on our family farm in the '60s and

20   '70s, our formative years, cooperative was a very

21   household word, one that we all realized the importance

22   and value of.  We sold our milk to the St. Albans Co-op,

23   and we sold our syrup to the Franklin County Maple

24   Co-op.  And in the 1980s, when our farm needed to grow

25   to accommodate our growing family, we turned to Yankee

1    Farm Credit, a financial institution with cooperative

2    government and values.

3        As diverse as these entities all were in the

4    services they provided to our farm, their core

5    principles that they operate on were all virtually

6    identical.  They have boards of directors elected from

7    their farmer member owners.  Their governance and

8    oversight was provided by these farmers.  All the

9    profits were either reinvested in their business or paid

10   out to their members in dividends.

11       In the early 1900s, it became imperative that dairy

12   farmers worked collectively to market their milk to

13   ensure that they had a fair price and that their milk

14   got picked up, period.  The dairy cooperative is an

15   extension of the farm or the farm's an extension of the

16   co-op, whichever way you look at it.  But at the end of

17   the day, the co-op puts all farmers on a level playing

18   field, large and small.  For one dollar, you can

19   purchase a voting common stock in St. Albans Co-op, and

20   with that dollar you can milk all the cows that your

21   heart desires.  And it also gives you access to milk

22   testing, hauling programs, seed and grain purchasing and

23   fertilizer financing, access to risk management advice.

24   And it goes on.

25       As the dairy industry transitioned into the 21st

1    century, milk production increased, the number of

2    dairies decreased.  The milk market changed

3    significantly also with the consolidation of markets and

4    customer mergers.  Dairy co-ops' marketing options

5    became fewer with more demands.  DMS was formed by

6    farmer-owned co-ops to create some more efficiencies in

7    the movement and marketing of milk and to help deal with

8    these multinational corporations that were buying our

9    milk markets, to commingle milk, to create efficiencies

10   in hauling, field personnel to name a few.

11       At this time we became affiliated with DFA at our

12   co-op, and I think it's probably one of the best things

13   we have ever done.  Instead of competing with them for

14   markets when milk was long, we're working with them in

15   markets to gain premiums and efficiencies wherever we

16   could.

17       As we gather here today at this fairness hearing

18   after seven years of litigation, I really think it's

19   time to approve this settlement and let the farmers and

20   their cooperatives and the industry move on to focus on

21   some positive and productive things that we need so

22   badly.

23       The new language in the proposal, along with the

24   advisory council member and the farmer ombudsperson,

25   will sufficiently address all the concerns that the

1    plaintiffs have raised over the course of this process.

2    These new positions, in addition to all the current

3    staff, should provide dairy farmers the assurance that

4    DFA/DMS are serving the best interests of their dairy

5    farmer member owners.

6        It would be important for these new representatives

7    to become versed on how milk is priced, the challenges

8    and fluctuations of the markets, co-op margins, and

9    their member milk components.  They all fluctuate

10   seasonal.  However, the most important part moving

11   forward would be in the communication, will still be on

12   the responsibility of the members to attend the

13   meetings, to read the newsletters, to build a

14   relationship with the co-op staff, the CEO or directors,

15   so that when they do have an issue, they'd feel

16   comfortable picking up the phone and calling, or if they

17   see 'em on the street or at church.  Just --

18   conversation is easy if you know somebody.  And if you

19   don't go there, you're always afraid just to ask a

20   simple question.

21       All this new language, access to financial

22   information, third-party testing, it will still take two

23   willing people to communicate efficiently and

24   effectively.  Our co-ops have always gone above and

25   beyond to help our members, whether it's split samples,

1    sample rechecks.  At our farm, we have 34 years running

2    of top-quality milk, and we have had sample requests

3    over the years, and most of the time when we thought our

4    components were off, it was something to do with our

5    feed efficiencies and the co-op was glad to help.

6         Judge Reiss, I thank you again for this opportunity

7    to speak, and after seven years, it's comforting to me

8    to see that there is some positive things coming out of

9    this hearing.  With an additional advisory person on the

10   board and a new set of eyes looking at things for a

11   different way and somebody to mediate the questions that

12   the members have, this has all gotta be good, and the

13   transparency that the whole process has brought forward.

14   Thank you.

15             THE COURT:  Thank you.

16        Alice Allen.

17             ALICE ALLEN:  Good afternoon, your Honor.

18             THE COURT:  Good afternoon.

19             ALICE ALLEN:  I'm Alice H. Allen, A-l-i-c-e H.

20   Allen, A-l-l-e-n.  It's a privilege to speak before you

21   today.

22        And my history of the dairy business is a long one.

23   I am not a second-generation farmer.  I am actually

24   first-generation.  My ancestors in Finland were dairy

25   farmers and my ancestors in Canada were dairy farmers.

1    I'm really the first one in this country, but my history

2    of involvement with the dairy business goes back to my

3    mentors.  I call them my uncles although they weren't my

4    blood uncles.  They were the Watt Brothers, DM Watt and

5    Sons, and they were producer dealers, and I milked cows

6    for them while I was in college, and one of the first

7    things they taught me was, "If you are going to go in

8    the business, Alice, you can't just milk cows.  You have

9    gotta market your milk.  You have gotta pay attention to

10   your market."  They really had to because they were

11   producer dealers.  They -- every bit of milk they made,

12   they bottled and sold.  And if they made too much milk

13   and it went into the pool, they lost a lot of money.

14        So they taught me very well, and when I went out on

15   my own, I bought heifers from them.  I milked cows for

16   them and they paid me in heifer calves.  And when I

17   started out on my own on a rented farm, I took their

18   advise seriously and I joined a co-op.  It was a small

19   marketing co-op, and I became very involved and was

20   later admitted to the board of directors, and once I was

21   on the board, they asked me to write their newsletter.

22   They never had a newsletter before.  So I started

23   writing their newsletter, and that was back in the '70s.

24        And early in the 1980s, there were a group of us

25   young farmers -- we were young then, not so young now --

1    and we formed a milk-marketing study group.  We were

2    called the Young Farmers Milk Marketing Study Group, and

3    that has evolved into the New Hampshire-Vermont Milk

4    Marketing Study Group.  But we held meetings, and one of

5    the things that we -- we noticed over the years, that we

6    had really good participation when milk prices were low,

7    but the participation sort of dwindled when prices got

8    high.

9        And, again, looking back to my uncles, my so-called

10   uncles, it was important that we advocate for farmers to

11   get involved, because we're all really good at making

12   milk and growing crops, but the biggest part of our

13   business should be in marketing, and that actually is

14   probably the essence of the problems here, that farmers

15   didn't get as involved as they should.

16       So here I am, being the named plaintiff in this

17   case, and my husband, Larry, is also a named plaintiff.

18   He's the brains behind the outfit.  I am the mouth.  And

19   I have to confess to your Honor that early in the game

20   of this case, I also was one of the angry class

21   representatives, and I was thinking that our attorneys

22   weren't doing what they should.  They weren't listening

23   to us.  And we knew all there was to know of the milk

24   business, and they weren't -- they weren't fighting for

25   us.

```
 1              Then my husband, the smart one, said after a
 2    particularly angry phone call with other class reps, he
 3    said, "You guys know what is achievable through an
 4    antitrust class action litigation?"  Wow.  So we started
 5    the investigation, I guess you could call it, and I
 6    contacted my own personal lawyer in St. Johnsbury and
 7    asked him questions, and then I have a very good friend
 8    who is a retired lawyer from Washington, D.C., and asked
 9    him.  We started to learn that, gosh, what our attorneys
10    were doing was what they were supposed to be doing.
11    They were antitrust lawyers, and they knew their stuff.
12              Another thing that my lawyer in Vermont told me is
13    you couldn't find law firms in the state of Vermont or
14    New Hampshire that could do what these attorneys are
15    doing for you farmers.  So that was, I guess you could
16    call it, my epiphany.
17              So when we learned that our attorneys really were
18    working for us, instead of being angry with them and
19    arguing with them, Larry and I decided, well, we're
20    going to work with them, and we are going to ask
21    questions.  And I have to say that I pestered the
22    daylights out of them.  And they have been very kind all
23    the way along, answered my questions and then some.
24              And I feel that we owe a great debt to them, and I
25    will not say a word against the fees that they need to
```

1    get because they have earned it.  There's no other firm

2    that I have been aware of that could take on the load

3    that they took and be responsive to the criticism that

4    they received and still do their job.

5         And there was an interesting thing that I will add

6    from the end of Vermont's legislative session this year.

7    House Speaker Shap Smith made a comment that really

8    struck me.  He said, "Criticism is vital to a

9    functioning democracy."  Then he went on to say that

10   discussion and disagreement is a good thing, but there

11   comes a time when constant criticism and disagreement

12   becomes counterproductive.  And I think that may have

13   happened in this case.  And I agree that not all of us

14   will agree that this settlement is a good settlement,

15   but in my opinion, after having been involved in this

16   case from the beginning, and under the advice of my

17   long-dead uncles, I believe that what we have gained

18   through this settlement -- the farmers have talked about

19   the ombudsperson, and that to me personally is a very,

20   very important part of this injunctive relief, because

21   some of the Shire farmers or the farmers who maybe

22   aren't sure that they should ask a question, now there's

23   someone they can go to and they can get answers.

24        The advisory council person is also an extremely

25   person important.  These are things that we haven't had

1    before, and to just throw them out and say -- and

2    marginalize them and say this isn't going do any good is

3    really a shame because we worked very hard, and I think

4    this is a new beginning.

5         And the other thing that is very important to me

6    is, when you look around the room and you see all the

7    farmers that have taken time from their farms in a

8    really busy crop season right now, to come and express

9    their support or their opposition, it's important.  We

10   have engaged farmers.  They have become involved, and

11   that's a good thing because that is, in the future, the

12   only way we are going to have a positive impact, and

13   working together, it's difficult, it's very difficult,

14   and, again, functioning democracy needs criticism, but

15   we also need to work together.  And I think that this

16   settlement gives us an opportunity to move forward and

17   work together.  And there's a glut of milk all over the

18   world.  It's not just in this country.  And my husband

19   was also a milk hauler, so I got to see as a dairy

20   farmer and a milk hauler's wife what goes on when trying

21   to balance milk, and it's not -- it's not easy.

22        And I think some of these co-ops do a good job,

23   some do better than others, but I think it's something

24   farmers need to be made aware of that you need to have a

25   co-op board and co-op management that understands these

1    issues, and I am not saying that DFA has been saintly in
2    all of this.  They have work to do, but this settlement
3    would keep their feet to the fire.  There are now a lot
4    more farmers that are paying attention, and that's what
5    we need.
6        And I thank you very much for the privilege and the
7    honor of speaking to you today, your Honor.  Thank you
8    very much.
9            THE COURT:  Thank you.
10       Robin Sweet.
11           ROBIN SWEET:  Afternoon.
12           THE COURT:  Good afternoon.
13           ROBIN SWEET:  Robin, R O B I N; Sweet,
14   S-w-e-e-t, Senior.
15       I wanted to express my views about this settlement.
16   I have been -- I am on my fifth generation on the farm.
17   I farm with my wife and my son.  And I'm probably one of
18   the smallest farms speaking today, so.
19       I have served on the DFA Northeast Council for the
20   last nine years.  Before that I was a delegate.  And I
21   was kind of disappointed and upset with the plaintiffs
22   that think that we would sit there on the council and
23   look the other way while the co-op would take advantage
24   of the farmers and lower the base price.  I thought we
25   was all together on this, and I am in favor of settling

1    the lawsuit.

2        I feel the money spent on the lawsuit could have

3    been put to better use for product development and

4    marketing to get a better price for the milk.  And it's

5    dragged on for a long time, and it really should come to

6    a close.

7        Many of the provisions with the -- with the

8    advisory council member and -- it would all be taken

9    very seriously.  Being a small farmer, I was treated

10   just as good on the board as the large farms, and they

11   listened to me, and it could be a good way to get back

12   to the farms for information, more information, and it's

13   a lot more than it used to be.

14       Years ago, when I was farming with my father, we

15   have been through two or three different co-ops, and DFA

16   has been a lot more transparent than a lot of them have

17   been.  They just -- they're bigger.

18       And the ombudsman, it's a very important part.

19   Like I say, there's a lot of farmers that won't speak

20   up, don't come to the meetings, but if they feel they

21   have somebody they can talk to, it would be beneficial

22   and it would help 'em get along a little better, so.

23       With that, it's getting close to chore time, so I

24   will be short.  So thank you.

25              THE COURT:  Thank you.

```
1              Heidi Dolloff.
2                   HEIDI DOLLOFF:  Good afternoon, your Honor.
3      I'm Heidi, H-e-i-d-i, Dolloff, D-o-l-l-o-f-f.
4              Thank you for the opportunity to participate in
5      this hearing today.  My name is Heidi Dolloff, and with
6      my husband, Michael, and our two children -- Hannah
7      who's 12 and Matthew who is 6 -- I operate a 75-cow
8      dairy farm in Springfield, Vermont.
9              Both my husband and I grew up on our family dairy
10     farms in New Hampshire, but due to circumstances beyond
11     our control, we did not have the opportunity to continue
12     farming them.  So due to our desire to continue farming,
13     we bought an empty farm in Springfield where we began
14     our dairy.
15             I am a 4-H club leader.  I serve as vice chair of
16     our state and regional promotion organization.  I have
17     been a past president of our county farm bureau, and I
18     have been a past board of trustee on the state farm
19     bureau.  I also serve on our county FSA committee, and I
20     am a DFA delegate.
21             In 2014, we received the honor of being named
22     Vermont's Dairy Farm of the Year.  I am here in support
23     of this settlement.  We produce about 1.8 million pounds
24     of raw milk annually that has been marketed through
25     Dairy Farmers of America since 2003 when we joined the
```

1      cooperative.

2           From 1997, when we began farming in Springfield, to

3      joining DFA in 2003, we were an independent farm.  As a

4      small dairy, we faced many challenges dealing directly

5      with the processors.  We found significant value in the

6      DMS system, and because of the secure milk market and

7      the stability we found in the DMS system, we chose to

8      join DFA in 2003.  Not only did I like the equity

9      structure of DFA, I felt that the cooperative had its

10     members' best interests in mind, and by taking the

11     business of marketing my milk off my plate, I am able to

12     focus on what I love to do:  ensuring good health of my

13     cows and producing high-quality milk.

14          I have never once worried about the business side

15     of things within DFA.  And since joining DFA, I am

16     confident of the abilities and appreciate the

17     transparent nature of the organization.  Multiple times

18     throughout the year I attend leadership conferences that

19     I have direct access to the top management and the top

20     dairy farmer leaders within DFA, and they will give me

21     honest answers to my questions.

22          DFA is a strong farmer-like grass roots cooperative

23     that I know is looking out for the best of their members

24     and the industry as a whole.

25          In the settlement DFA has admitted no wrongdoing,

1    and I personally believe they have not -- they have

2    done -- they have not done anything wrong.  I am for the

3    provision in the settlement that will allow all members

4    to feel as confident about the cooperative as I do.

5         The installation of the advisory member and the

6    ombudsman's roles on the council may be valuable for

7    some members by providing access to a third party for

8    questions and grievances.  I think whenever there is

9    more transparency involved, it is a good thing.

10        Dairy farming to Mike and I is more than a milk

11   check.  It is a way of life.  And our cooperative is our

12   biggest partner in helping us protect our right to farm.

13   So we need to continue to work together, to support the

14   settlement, and put this lawsuit behind us once and for

15   all.  Thank you.

16             THE COURT:  Thank you.

17        Ed King?

18             EDGAR KING:  Good afternoon, your Honor.

19             THE COURT:  Good afternoon.

20             EDGAR KING:  It's a privilege to be here to

21   represent my friends and my neighbors and my co-op

22   members.

23        I am a third-generation dairy farmer --

24             THE COURT:  So we probably can guess at the

25   spelling of your name, but I need to make sure --

1          EDGAR KING:  Oh, King, K-i-n-g.  First name

2     Edgar, E-d-g-a-r.  I apologize.  I had that written

3     right in front of me and I totally overlooked it.

4          I am a third-generation dairy farmer.  I farm with

5     my wife and two of our four sons on a farm that's been

6     in the family for about 110 years.  We're excited that

7     we have high school-age grandchildren who want to farm.

8     As you can see, that would make the fifth generation.

9     Together, we milk about a thousand cows near

10    Schuylerville, New York.  Now that's in eastern edge of

11    New York, north of Albany about 40 miles.

12         I have had the privilege of representing my

13    neighbors and friends for 20 years on the Dairylea board

14    of directors and for a couple years recently, and then I

15    decided it was time to pass the baton.

16         I grew up on my family's dairy farm.  I graduated

17    from Cornell in 1963, and I had the foresight to be

18    married before I graduated so my wife and I came back

19    home and began dairying with 32 cows.

20         In 1972 we expanded by constructing a 110-cow barn.

21    And as our sons came home to the business, and in one

22    case one left for another pursuit, we have grown the

23    business to the present size today.  It's been sort of

24    static for a few years.

25         We love our cows.  We're fortunate to have

1    developed the kind of cattle that others appreciate.

2    And marketing them has proven to be both satisfying and

3    profitable.  Our family's always marketed our milk

4    through a cooperative because we recognize that their --

5    that the cooperative's professional marketers are best

6    qualified to represent us in the marketplace.

7         I have been active in a number of farm

8    organizations, and I currently or I have served as an

9    elder in my church for, I don't know, more than 40

10   years.  I didn't really look back, but it's more than

11   40.

12        And my interest and issues facing farmers resulted

13   in me becoming a bit of an industry activist that led to

14   leadership positions in numerous organizations, and I

15   have had some experience that not a lot of other farmers

16   have had.  I -- among other things, I spent 11 years as

17   a deputy commissioner of agriculture in New York where I

18   had all of the milk program responsibilities, both

19   economic and sanitary.  After that I spent some time in

20   our Assembly with the Assembly agriculture committee.

21   That relates to your House here in Vermont.  And I was

22   the dairy industry guru for the Assembly ag committee

23   and for a joint legislative commission on dairy industry

24   development.

25        That was followed by three years as manager of

1    government and customer relations with the Regional

2    Cooperative Marketing Agency known in the trade as --

3    the acronym was RCMA, and that was a super co-op.  It

4    priced fluid milk for all the co-ops and for independent

5    farmers in the marketplace in the Northeast.

6        All during that time, I -- by the good graces of my

7    wife and my family, we continued with our dairy farm

8    operation, but I have had some unique experiences, and I

9    have had the chance to sort of look at things from

10   different perspectives, and the knowledge that I gained

11   while serving in all these various capacities is that

12   the business of marketing milk to processors is very

13   demanding.  In short, it's a tough business, a business

14   that's not for the faint hearted and therefore best left

15   to professionals, like cooperative.

16       I just can't seem to give up this public work so I

17   serve today as -- and I think my sons enjoy it that I am

18   away from the farm, and -- but I enjoy working with

19   them.  I serve as a *pro bono* commissioner representing

20   agricultural issues, interests, on our New York State

21   board of real property services.  And for the last seven

22   years I have chaired the New York State Farm Service

23   Agency state committee.  So why am I here today?

24       I am here because I strongly support the proposed

25   settlement.  I have attended a number of these hearings,

1    and I have reviewed the proposal, and I am completely in

2    favor of it.  We can accomplish what we need to best by

3    working through, I believe, the structure of DFA/DMS and

4    others in order to receive the highest possible returns

5    for our members.

6        I have watched all of the machinations in the

7    marketplace, from seeing producers lose markets, people

8    who thought they had a guaranteed market forever with a

9    processor only to be dumped because the processor had

10   too much milk.  And DFA's never -- never terminated a

11   member because we had too much milk.  We have marketed

12   that milk for our members.  And I think that's to our

13   credit.  We didn't seek to get away from the

14   responsibility of marketing all the milk that we had.

15       Never before has bringing resolution to this issue

16   been more critical than it is now, especially given the

17   excess supply of milk in our region.  As I see it, the

18   farmers opposing the settlement -- and I will be kind of

19   blunt here -- most likely are probably seeking to

20   destroy DFA.  That's my opinion.

21       My experience in the marketplace tells me that

22   given today's market conditions, if DFA no longer

23   existed, given today's present market conditions, prices

24   would -- to the farm, would plummet.  That's my

25   observation, my estimation.

1          The settlement provides -- it gives provisions

2    which would add a new voice to the area council -- I am

3    in support of that -- and a new person for others to

4    approach to resolve the issues of distrust about DFA and

5    DMS.   There's nothing we can't solve if we talk to each

6    other.   Therefore, I see it a benefit to the portion of

7    the settlement entitled Farmers', Affiliates' and

8    Cooperatives' Right to Terminate.   This provision would

9    enable an unsatisfied member to terminate their

10   membership upon their request.   That wouldn't be

11   constrained.

12         So in summary, I just wish to see this lawsuit end,

13   period.   That's why I'm here today.   I thank you for

14   your attention and allowing me for the opportunity to

15   express my thoughts.

16              THE COURT:   Thank you.

17         Darlene Reynolds.

18              DARLENE REYNOLDS:   Hello.   My name is

19   Darlene Reynolds, D-a-r-l-e-n-e R-e-y-n-o-l-d-s.   And I

20   am here in support of settling this.

21         I am a first-generation farmer.   My husband had a

22   farm with his family but they divorced, and so we were

23   out to start on our own in 1991, and during that time,

24   we leased cows and we leased a farm, and it was a rough

25   start, you know, when you try and take and start on your

1    own and get everything started.  And then we were able

2    to move from Highgate to Alburg, Vermont, where we are

3    now, in 1994, and began our journey of becoming the

4    farmers that we are today.

5          We currently milk about 685 cows, and we have about

6    450 young stock.  And I also have four daughters, and

7    we're a very feminine farm.  About 50 percent of the

8    people that we have employed for us are female, and I

9    take a lot of pride in that.  And our current name is

10   Crosswinds Dairy and Daughters.  And I am a member of

11   DFA, and I was not a member of DFA in the beginning.  I

12   had a previous cooperative but chose, in 2002, to become

13   a DFA person.

14         The first immediate thing that I got when I came to

15   DFA is how much involvement they wanted me to become

16   into, which excited me, because as a first generation,

17   and me not from a dairy farm -- I actually have a degree

18   in social work -- I really wanted to find out how things

19   worked, and the first thing they said is, Well, why

20   don't you become a delegate.  So it was -- it took me

21   probably three or four years.  I made the decision why,

22   why not.  So I became a delegate and I feel like my

23   educational journey had began where I was able to do

24   some traveling to annual meetings.  I was able to go to

25   Syracuse for other meetings.  And it allowed me to find

1    out how milk marketing worked.  It allowed me how to

2    figure out that the Northeast was not the sole place for

3    milk, and it wasn't just in Vermont that things

4    happened, that it was on a national level.  It really

5    gave me a good objective of what we were doing back at

6    home, you know, of what was going on nationally as well.

7         So I think that in settling this, with the people

8    that you have on the advisory committee, the council, as

9    well as the ombudsperson to help with mediation, it only

10   pushed forward on the educational piece.

11        And I want to say -- I want to thank Miss Allen for

12   coming up here in support of this settlement.  I think

13   it's the first step in us as a family, because I

14   believe -- even being a first-generation, I gotta say

15   that everybody that's behind me, they're a part of my

16   family now.  They say that they're third-, fourth-.  I

17   have always been impressed on how much they have allowed

18   me, being kind of an outsider, to come in and be a part

19   of it and treat me as an equal and become a part of that

20   family.

21        So with this being settled, I believe it can start

22   the process of healing and pushing our industry forward,

23   which it desperately needs right now with the fact of

24   what's going on in our milk markets.  Thank you.

25             THE COURT:  Thank you.

1          Rob Morrill.

2               ROB MORRILL:  Thank you, your Honor, for

3     the privilege of speaking today.  My name is Rob

4     Morrill, M-o-r-r-i-l-l.  And our family resides in

5     Concord -- Pennycook, New Hampshire, which is a village

6     within the city of Concord.  Geography is we are an hour

7     north of Boston, an hour west of the Atlantic Ocean, and

8     an hour south of the White Mountains.

9          We are very fortunate to farm within the city of

10    the capitol of New Hampshire where I actually live.  We

11    farm approximately a hundred acres of field land right

12    there that goes back to the first minister of the city

13    of Concord that our farm currently owns, my wife and I.

14    And when we're working out in the fields, in the

15    background is the capitol dome of the city, so -- of the

16    whole state.  Excuse me.

17         But we farm in the village of Pennycook.  My

18    grandfather purchased that farm in 1925.  I'm the third

19    generation myself, and three of our sons is involved in

20    the business.  There's a fourth generation.  They

21    officially came in and we became an LLC in 2012, where

22    we expanded and leased a second location 60 miles

23    away in Acworth, New Hampshire, which is on the

24    Connecticut River Valley.  So we've learned what farming

25    two operations 60 miles apart is like, but their future

1    is they hope to build a new facility.

2         My wife and I were very blessed with four children.

3    The three boys have come back to the farm.  And our

4    daughter currently is on staff at Cornell as a dairy

5    extension specialist, and she married a dairy farmer in

6    upstate, near Potsdam, New York.  So to think that they

7    all wanted to be part of the dairy industry, we were

8    very fortunate because I can remember taking -- going

9    with my grandfather with canned milk to the plant on

10   North State Street in Concord when I was a very, very

11   young boy.  They were a member of Concord Dairy, which

12   was a farmer-owned co-op back then, of which today it is

13   owned by HP Hood company, and the milk from our farm

14   still goes to that exact same plant.  Every year of my

15   life that is where our milk has gone, and I drive past

16   that plant every day going to and from my house to the

17   farm.  So that's kind of a unique thing within our

18   industry because so many people don't have an awareness.

19        However, in approximately 2003, we had been through

20   Concord Co-op.  They merged with Weeks Dairy.  It was

21   sold to Crowley Foods, then to NDS.  Then the plant was

22   sold to HP Hood.  During the Crowley time was when DMS

23   was formed.  We were independent producers at that point

24   and it didn't take too long to realize we needed to

25   become members of this co-op because, yes, we felt we

1    had a very strong market because it was right there, the

2    fluid market, but the market -- milk-marketing industry

3    has changed today considerable.  It's not a local

4    market.  It is a world market, and milk marketing, you

5    need to be looking at the world market all the time

6    today for this industry.  And so this settlement allows

7    DMS and DFA to pursue those interests.  They don't need

8    to be tying up energy, you know, to take care of this

9    litigation.  They can be pursuing the avenues to help us

10   as farmers back on the farm, to procure our milk

11   markets, because if we let things go the way they are

12   today, unfortunately, I am afraid, that it could be

13   worse than it is.  And, you know, I am looking at --

14   really enjoyable to looking forward to watching the

15   future generations of our farm continue, and, you know,

16   we need this settlement to settle so we can move

17   forward.  So we are continually in support of this

18   litigation to be settled.  Thank you.

19             THE COURT:  Thank you.

20        That's the end of the people who gave us notice,

21   timely notice of their intent to appear and who are

22   actually class members and haven't opted out.

23        So we are going to take our midafternoon break.  It

24   will be approximately 10 minutes.  When we come back, if

25   the attorneys want to make any further arguments, they

1    may do so.

2         Anything to bring to my attention before we break?

3              MR. PIERSON:  No, your Honor.

4              THE COURT:  Let me ask, what would you like to

5    bring to my attention?

6              CLAUDIA HAAR:  Just that I had wanted Joshua

7    Haar to speak as my proxy, and Dave Ward and Rod

8    Jennison had also wanted him to speak on their behalf,

9    and we weren't sure if you were going to save that to

10   before the counsel or after.

11             THE COURT:  Why don't we do that right now and

12   we will take our break afterwards.

13             CLAUDIA HAAR:  Thank you.

14             THE COURT:  So come on forward.  And I thought

15   that you had given the proxy to Jonathan Haar, but I

16   understand that it's now been given to you.  So go ahead

17   and say your name for the record.

18             JOSHUA HAAR:  Thank you very much.  Joshua

19   Haar.  That's H-a-a-r.

20       All right, yes.  A couple quick remarks to begin

21   here.

22       First of all, I wish to thank the Court for hearing

23   from as many people as it has today, and I wish to thank

24   everyone who has showed up.

25       As quite a few of us have heard today, it is very

1      difficult to get farmer input.  And even so, I wish to
2      direct the attention to the Court that very few of those
3      who spoke today are not personally affiliated with
4      either a named defendant or a co-conspirator.  The
5      reason the law provides that the Court must consider the
6      reaction of the class, not the defendants, is that
7      defendants and those affiliated with them have a clear
8      incentive to settle.
9          Of course these individuals think it's time for
10     this case to be settled.  In the case of DFA members,
11     Northeast Area Council members, and DairyOne, these
12     people are members of organizations which are personally
13     called to task for their violations of federal antitrust
14     law.  In the case of members of St. Albans Cooperative,
15     their cooperative participated with DFA in creating DMS,
16     which is a named defendant also being brought to task
17     for its violations of federal law.
18         Now, regarding the response of the class, there
19     are, I understand, approximately 1200 letters in support
20     of this proposed settlement whereas last time there was
21     barely a dozen.  It's pretty clear what happened.
22     There's only one party to this case that has the ability
23     to reach that many farmers, together with the power to
24     make sure these farmers actually sign and deliver
25     letters in support.

1    I would like to refer the Court to, in our list of

2    exhibits, the -- I believe it is the plastic page where

3    you have there the Oneida-Madison Milk Cooperative

4    annual meeting agenda, and if you turn to page -- the

5    second page of that agenda, you will note that two DFA

6    members appear on the agenda.

7    Now, my understanding is that the law states that

8    it is improper for defendants to contact class members

9    in regard to settling a case.  Not only were these

10   people contacted, they presented at the meeting, and if

11   you turn to the next page, you will see on the

12   Oneida-Madison Milk Co-op settlement update this co-op

13   put out a request for support of the settlement.

14   We heard from several members of the South New

15   Berlin Co-op today.  I would refer the Court to the

16   declaration of Mr. Kenneth Dibbell, document 722, filed

17   March 11, 2016, in which case Mr. Dibbell was personally

18   threatened by Mr. Ed King, general manager of the South

19   New Berlin Co-op, because, quote, If I -- this is

20   Mr. Dibbell speaking.  Quote:  If I encouraged farmer

21   members to oppose this settlement through my petition --

22   DFA markets a hundred percent of South New Berlin

23   milk -- these people are on the line for their entire

24   cooperative.

25   I would also like to refer the Court to the letter

1    All South New Berlin Co-op Milk Producers.  This was

2    delivered to my proxy provider, I guess, Mr. Dave Ward:

3    These co-ops are tightening the noose around the necks

4    of farmers as DMS realizes that if it does not get

5    enough support for this settlement, it is going down.

6         I would also like to refer the Court to the

7    letter -- just a moment, please.  Okay, Cortland Bulk

8    Milk Producers Corporation.  This is document number

9    724, filed March 16, 2016.  Mr. Stuart Young, the CEO of

10   East River Dairy and president of Cortland Bulk Milk

11   Producers Corporation, says, I quote:  DFA and DMS are

12   responsible for marketing most of our members' milk.

13        Now, we were surprised to see this letter on the

14   docket because we had seen that name recently too.  If

15   you turn to the next page, you will see the Dairy

16   Farmers of America.  This is our milk production slip

17   from October 16, 2015, for the milk for the period

18   ending November 30 last year.  At the bottom of the page

19   you will see a $16 deduction going to Cortland Bulk Milk

20   Producers Corporation.  That shows very clearly how we

21   obtained the support:  We purchased it.

22            THE COURT:  Okay.  A couple more minutes.

23            JOSHUA HAAR:  Yes.

24        One other question I would have for the Court.  I

25   understand I started roughly four, five minutes ago.

1    Mr. Dave Ward and Mr. Rod Jennison both requested to

2    speak, so I would like to know if I am permitted five to

3    seven minutes or --

4              THE COURT:   That wouldn't be fair to other

5    people.

6              JOSHUA HAAR:   -- the ten to 14?

7              THE COURT:   So if you can finish up in the

8    next three, four minutes, that would be fine.

9              JOSHUA HAAR:   Okay.   Will do so.

10        One other procedural issue with this settlement is,

11   because -- Mr. Doug Ricker testified earlier -- excuse

12   me, spoke earlier regarding the efforts of class counsel

13   to secure new class representatives.   It was clearly in

14   their incentive to do so.   But a look at the docket will

15   explain that the action in response to that motive did

16   not come from subclass counsel.   It came from

17   defendants; note the motion to decertify.   This is what

18   provided Mr. Pierson the opportunity to bring up these

19   replacement class representatives.   But that was not the

20   only motive on the table.

21        You see, if you look a little further back to the

22   filing from the Eastern District of Tennessee, you will

23   see that Mr. Kuney did exactly the same thing,

24   successfully decertifying the DFA subclass in the

25   Southeast litigation.   His signature appears at the top

1    of the filing.  The primary -- or the first reason he

2    listed for decertification was that the class members

3    were -- or the class representatives, excuse me, were

4    not DFA members and they were not typical of the DFA

5    subclass.

6        None of the four people who Mr. -- the class

7    counsel put forward as class representatives are DF- --

8    are or have ever been DFA members.  Mr. Kuney knew that

9    this would be a clear way to get the class undermined.

10       Now, Mr. Pierson also knew this because we told him

11   when -- if you remember from proceedings a while back,

12   the class certification hearing, when he had flown up to

13   the farm to argue my father out of speaking, and that

14   was one of the issues which we discussed at length.  So

15   Mr. Pierson knew that that would undermine his class,

16   but he did it anyway so that he could get those class

17   members on to tip the scales in favor of settlement.

18       Now, the presumption of fairness which applies in

19   class actions is designed to safeguard settlements which

20   are truly fair.  Where the collusion has been such an

21   issue in this case that this Court has felt compelled to

22   reference it at multiple proceedings, and wherever

23   evidence at this fairness hearing appears of

24   professional misconduct on the part of the attorneys in

25   trying to trick the class representatives into thinking

1    there was no relief available at trial, the presumption

2    of fairness no longer applies.

3         So for -- for that reason, there are procedural

4    issues with this settlement in addition to the

5    substantive ones touched upon earlier.  And on the

6    whole, the coercion of so many of the class members --

7         Actually, one more note on that and then I will

8    conclude.

9              THE COURT:  Okay.

10             JOSHUA HAAR:  Is that the -- we had submitted

11   the declarations of -- I don't remember the exact

12   number, but the farmers whose milk inspectors showed up

13   and told them to sign this or they might not have a milk

14   market, and I understand those for reasons were not

15   received, but the fact of the matter is, there are 1200

16   letters --

17             THE COURT:  Well, let me just -- let me just

18   say.

19             JOSHUA HAAR:  Okay.

20             THE COURT:  If -- I can't look at things in

21   private.  So that's what I have tried to make clear.

22   It's against the ethical rules for me to receive things.

23   So if you want things docketed, that's fine, but I can't

24   look at things without showing them to the parties and

25   the attorneys without violating my rules.

1           JOSHUA HAAR:  Okay, I understand.

2           THE COURT:  So that's how that happened.

3           JOSHUA HAAR:  So --

4           THE COURT:  So let's have you finish up --

5           JOSHUA HAAR:  Yep.

6           THE COURT:   -- and then we will take our

7    break.

8           JOSHUA HAAR:  So -- but the evidence appears

9    clearly on the docket where these letters came from.

10   You have the three opt-outs, docket numbers 2027, 2028,

11   and 2025, which state, "When my milk inspector brought

12   me a form to sign" -- you have document number 1281 --

13   "my DFA/DMS inspector asked me to fill this out and sign

14   it.  I think it should be illegal for him to do this."

15        In fact, it is illegal.  It's federal extortion.

16   So the procedural problems with this settlement, coupled

17   with its substantive inadequacies, require, in my humble

18   opinion, that it be denied.  The fact of the matter is,

19   it's -- it's simply not just to allow the conduct which

20   has been going on to continue, which is why the factors

21   provided under Grinnell provide plenty of discretion for

22   this settlement to be thrown out the way it deserves and

23   for our case to be brought forward.  Thank you very

24   much.

25           THE COURT:  Thank you.

```
1              All right.  We will take our midafternoon break.
2     As I said, it's approximately 10 minutes or so, and we
3     will come back for any arguments the attorneys want to
4     present.  Thank you.
5     (Court was in recess at 2:39 p.m.)
6     (The following was held in open court at 2:57 p.m.)
7              THE COURT:  We are back on the record in Alice
8     Allen versus Dairy Farmers of America, and now we will
9     hear from the attorneys if they want to offer any
10    further argument in favor or against the settlement.  I
11    will start with the plaintiffs' counsel.
12             MR. PIERSON:  Thank you, your Honor.  Kit
13    Pierson for the DFA/DMS subclass.  And, your Honor, I
14    will be very brief.  I will not use my five minutes, but
15    there were a couple comments I did want to make.
16             First, I --
17             THE COURT:  I wasn't planning on leaving the
18    attorneys with five minutes.
19             MR. PIERSON:  No, I understand.
20             THE COURT:  Okay.
21             MR. PIERSON:  I am just kidding, your Honor,
22    but I will, in fact, be brief because I think -- I think
23    the Grinnell factors here -- and we will largely stand
24    on our briefs.  I think the Grinnell factors very
25    clearly and decisively point in favor of settlement
```

1    here.

2         I did want to --

3              AUDIENCE MEMBER:  Can't hear  him.

4              AUDIENCE MEMBER:  Can't hear.

5              THE COURT:  Can't hear him.  Okay.

6              MR. PIERSON:  Okay.

7         All right.  I did want to add that I think the

8    Court can get additional confidence here from the fact

9    that the Vermont Attorney General's Office has weighed

10   in, the Vermont Agricultural Committee, the Vermont

11   Senate Appropriations Committee and the New Hampshire

12   Agricultural and Environmental Committee -- were all, I

13   think, additional indicia of reasonableness.

14        Your Honor, one of the -- one of the challenges in

15   this case -- and we're both painfully aware of it -- has

16   been -- has been the distrust and, in some instances,

17   hostility that characterizes aspects of this industry,

18   and at some level I feel like, you know, we got caught

19   in the middle of that a little bit.

20        It's very, very difficult, but I think it's an

21   important aspect of the settlement that others have

22   emphasized and that I wanted to emphasize that the

23   settlement does a variety of things and a variety of

24   things that haven't been accomplished by anyone in this

25   industry in 20 years.  But among those are -- are

1    disclosure of a very voluminous record so people can see

2    what the real facts are as opposed to rumor.

3         Another thing is transparency in the management

4    going forward.  And the other is what a number of people

5    talked about today, the role of the ombudsperson in

6    particular in creating a better mechanism for dialogue

7    so the industry can move forward based on facts and

8    reality and an ability to have a dialogue, and I think

9    those things are important.

10        The last two comments I wanted to make, your Honor,

11   are these:  So it's been seven years, and I do want to

12   thank the Court for -- it's been a very challenging

13   case, as you know.  I want to thank you for your hard

14   work, for your patience, and for -- and for your

15   fairness, and it's recognized and appreciated.

16        I also want to give one other thank you,

17   your Honor, which is to my colleagues, Brent Johnson

18   and Emmy Levens.  It's been a tough case for the

19   attorneys.  You know that.  But I watched -- I hired

20   these attorneys, and I have watched them grow up on this

21   case for seven years.  They have been incredibly

22   dedicated to the subclass and to this litigation and to

23   professionalism for seven years, and as their boss, as

24   their friend, as their colleague, I want to thank them

25   for their dedication.

1          THE COURT:  All right.  Thank you.

2      Anybody else from the plaintiffs' counsel that

3  wants to speak?

4          MR. ABRAMS:  Thank you, your Honor.  Bob

5  Abrams on behalf of the non-DFA/DMS subclass.

6      And I too want to thank the Court.  I particularly

7  want to -- I will make this point.  When we came to you

8  with the initial settlement agreement, I thought it was

9  a very good settlement agreement.  You suggested that we

10  focus on some nonmonetary concepts.  We did that, and we

11  did it again.  And I'm going to stand here and say I can

12  tell you, at least from perspective, and I know the

13  perspective of virtually everybody that I have

14  interacted with, believes it is now an excellent

15  settlement agreement.

16      I don't know that the history is particularly

17  important, but a lot of these provisions, particularly

18  the ombudsman provision -- for example, there was a

19  provision in the Southeast SMA settlement provisions

20  that was akin to that, but it isn't nearly as good as

21  that.  And we did go back and we, together with all the

22  lead counsel on the plaintiffs' side and with DFA,

23  forged what is truly, I think, an excellent nonmonetary

24  provision in that respect and in many others that

25  your Honor now sees.

1      So I think -- I thank you.  I thank you on behalf

2  of the class we represent, and hopefully the Court will

3  approve the settlement.

4          THE COURT:   Thank you.

5      Anybody else from the plaintiffs' counsel

6  perspective?

7          MR. SMITH:   Thank you, your Honor.   Daniel

8  Smith for the non-DFA subclass.  Also would be very

9  brief.

10     I think when we came into the case we made it very

11 clear that we had heard all of the directives that the

12 Court had provided for the path forward and tried to

13 follow that.  I think you have heard from -- as to the

14 substantive provisions on the substantive side.  The one

15 thing I would add there is that the -- the new council

16 members specifically tasked with dealing with higher

17 milk prices, which is ultimately the substance of this

18 case, over-order premiums, that's the specific charge

19 that the advisory council was giving.

20     On the procedural side, I think the one --

21          (Disruption from sound interference in

22 courtroom.)

23          MR. SMITH:   On the procedural side, I

24 think the one thing to accentuate there is your clear

25 directive, was the need to hear from the class, and I

1    think what you have heard today is from the class, and

2    you have received the letters that we received.  I think

3    both Commissioners Taylor and Aubertine gave their

4    opinion that this is representative of the opinion of

5    the class of what's been expressed to you.  So those

6    would be the two points that I would accentuate.

7         And I obviously don't have the history with the

8    case to extend appreciation, but I would just end where

9    I started, which is that the guidance you provided

10   really did lay out the path for -- for reaching a

11   settlement two days before Christmas.  You gave us a

12   pretty tight window, but we did manage to meet your

13   path.  Thank you.

14             THE COURT:  All right, thank you.

15        Any further comments on behalf of plaintiffs'

16   counsel before I turn to the defendants?

17        Mr. Kuney.

18             MR. KUNEY:   Thank you, your Honor.  Steve

19   Kuney on behalf of DFA and DMS.  I'll try to keep to the

20   brevity that my colleagues have demonstrated so far.

21        I do appreciate the Court's attitude today in

22   providing opportunity for all of the class members who

23   had expressed an intention to speak to have the

24   opportunity notwithstanding the issue about the timing

25   of the postmarks.  I'm glad those people had a chance to

1    speak, and I think they feel the way we would like
2    people to feel about having had a chance to participate
3    in a process and having their voices heard so that kind
4    of as citizens and as class members I think they feel
5    very good about the opportunity they had here this
6    afternoon.
7        I want to do something that I almost never do
8    anymore which is express surprise at this point in my
9    career.  I try not to say I am surprised by things.  But
10   as the -- typically in the class cases, being on the
11   defense side, the settlement process is usually a bit of
12   tug-of-war for all you are trying to do is not let the
13   other side pull very far on the rope.
14       The way the negotiation process played out here, it
15   actually became an opportunity to try to do something
16   positive.  And the many -- the praiseworthy comments you
17   heard this afternoon about the new positions that have
18   been created and about the new transparency that has
19   been created, about the new, positive framework it may
20   bring to bear on the co-op, the people on the DFA side
21   actually endorse that wholeheartedly, and I can, as
22   their counsel, endorse it as well, that it was a rare
23   opportunity as a defendant in a class case to feel as if
24   the settlement process gave me and us a chance to do
25   something better notwithstanding our views about the

```
 1    allegations that had led to the case in the first place.
 2         So appreciate that, and appreciate the Court's
 3    patience and attention to the case throughout, and
 4    again, thank you on behalf of the class members here
 5    today.
 6              THE COURT:  All right.  At this point I am
 7    going to take the matter under advisement.  I am going
 8    to get you a prompt written decision.  I have to do it
 9    in writing.  It's just not something that the Court can
10    reel off on the record without giving careful
11    consideration to the laws and the facts.
12         I have read everything that you filed.  That was
13    quite an expedition of its own.  And when I say prompt,
14    I do it in the Court's quotation marks, so what you
15    think is prompt might be different from what I think is
16    prompt, but certainly within the next 60 days.
17         Thank you.
18              MR. PIERSON:  Thank you, your Honor.
19              MR. ABRAMS:  Thank you, your Honor.
20              (Court was in recess at 3:08 p.m.)
21                        *** ** ***
22              C E R T I F I C A T I O N
          I certify that the foregoing is a correct
23    transcript from the record of proceedings in the
      above-entitled matter.
24
25    June 1, 2016                _____
      Date                       Anne Nichols Pierce
```