UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUN -7 AM 11: 09

CLERK

BY _____
DEPUTY CLERK

ALICE H. ALLEN, LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, GARRET SITTS, RALPH )
SITTS, JONATHAN HAAR, CLAUDIA HAAR, )
RICHARD SWANTAK, PETER SOUTHWAY, )
MARILYN SOUTHWAY, REYNARD HUNT, )
ROBERT FULPER, STEPHEN H. TAYLOR, )
and DARREL J. AUBERTINE, on behalf of )
themselves and all others similarly situated, )
)
Plaintiffs, )
)
v. ) Case No. 5:09-cv-230
)
DAIRY FARMERS OF AMERICA, INC. and )
DAIRY MARKETING SERVICES, LLC, )
)
Defendants. )

## OPINION AND ORDER GRANTING
## MOTION FOR FINAL APPROVAL OF
## DECEMBER 2015 PROPOSED SETTLEMENT
(Doc. 2076)

Pending before the court is a motion for final approval of a proposed settlement (the "December 2015 Proposed Settlement") between Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") and the DFA/DMS and non-DFA/DMS subclasses (collectively, "Plaintiffs" or the "Dairy Farmers Class"). (Doc. 2076.)[1] The Dairy Farmers Class is comprised of dairy farmers who produced and sold raw Grade A milk in Federal Milk Market Order 1 ("Order 1") between January 1, 2002 to the present. Defendant DFA is a dairy cooperative that produces, processes, and distributes raw Grade A milk. Defendant DMS is a milk-marketing agency that was

---

[1] The pending motion also requests that the court allocate a portion of the settlement fund for distribution to Rust Consulting for administrative costs. *See* Doc. 2076-1 at 48-51. The court will address this issue in a separate Order.

formed in 1999 by DFA and Dairylea Cooperative, Inc. ("Dairylea") and is currently owned by DFA, Dairylea, and St. Albans Cooperative Creamery, Inc. ("St. Albans Co-op").

On May 13, 2016, the court held a Fairness Hearing, at which thirty-five class members or their designees appeared and addressed the court regarding whether the December 2015 Proposed Settlement is fair, reasonable, and adequate as required by Fed. R. Civ. P. 23(e)(2). The court also heard oral argument from the parties' attorneys, all of whom support the settlement.

A total of 8,859 farms were provided court-approved notice of the December 2015 Proposed Settlement. Approximately 7,551 farms (85% of those notified) submitted claims.

Prior to the Fairness Hearing, the court received and reviewed approximately 1,400 letters regarding the December 2015 Proposed Settlement. Approximately 90% of those letters were in favor of the settlement and approximately 10% opposed it. Members of the Dairy Farmers Class were permitted to opt out of the December 2015 Proposed Settlement to initiate or continue litigation against DFA and DMS, and approximately 172 farms (1.9% of the Dairy Farmers Class) did so. The ability to opt out was not offered in any of the parties' previous settlement proposals.

Dairy Farmers Class Representatives Alice H. Allen, Laurance E. Allen, Peter Southway, Marilyn Southway, Reynard Hunt, Robert Fulper, Stephen H. Taylor, and Darrel J. Aubertine support the December 2015 Proposed Settlement ("Supporting Class Representatives"). Class Representatives Jonathan and Claudia Haar oppose it ("Opposing Class Representatives"). Class Representatives Garrett Sitts, Ralph Sitts, and Richard Swantak have opted out of the December 2015 Proposed Settlement ("Opting Out Class Representatives").

I. **The December 2015 Proposed Settlement.**

  A. **Terms of the December 2015 Proposed Settlement.**

Pursuant to the December 2015 Proposed Settlement, without an admission of wrongdoing, Defendants have agreed to pay $50 million dollars to the Dairy Farmers

2

Class in exchange for a release of the claims asserted in this action as well as claims "arising out of the conduct alleged in the Complaint" as to specified released parties.[2] (Doc. 2076-2 at 5, ¶ 1.16.) Defendants have agreed to non-retaliation safeguards for the Dairy Farmers Class; specific protocols to increase class members' ability to leave DFA/DMS without penalty; the provision of a milk marketing grace period in the event a dairy farm is terminated from DFA/DMS; disclosure of certain financial information; and a prohibition of non-solicitation agreements, which allegedly prevented class members from freely leaving their cooperatives and joining competing cooperatives.

In addition to the injunctive relief set forth in previous proposed settlements, the December 2015 Proposed Settlement includes the following:

> The extension of the prohibition on the formation or renewal of full supply agreements, except in certain circumstances, for a four-year period following final approval of the December 2015 Proposed Settlement by the court;
>
> The establishment and funding of an independent Advisory Council Member for four years to review DFA/DMS financial records, serve as an advocate within DFA for higher pay prices and farmer equity, and attend and participate in DFA Northeast Area Council Meetings as a non-voting member;
>
> The establishment and funding of a Farmer Ombudsperson for five years to investigate and facilitate resolution of any complaints—including complaints related to testing, voting rights, or termination from DFA/DMS—and attend and participate in DFA Northeast Area Council Meetings;
>
> The imposition of certain protocols regarding milk testing for five years, including a mechanism that allows farmers to obtain "split samples" and secure testing at independent labs up to three times per year at no cost to the farmer, the annual receipt by the Farmer Ombudsperson of a report from the Market Administrator regarding the results of its independent testing of the Dairy One laboratory, and standards regarding the reporting of adulterated milk testing results for five years;

---

[2] In late 2010, Plaintiffs and former Defendant Dean Foods Company ("Dean") reached a settlement agreement (the "Dean Settlement") that required Dean to make a one-time payment of $30 million. Plaintiffs agreed to release and discharge Dean from certain claims and potential claims. The court approved the Dean Settlement and the certified settlement class received the proceeds of the settlement, minus attorneys' fees and expenses of $6 million.

The prohibition on DFA/DMS from obtaining a controlling interest in the Dairy One milk testing organization for ten years and the prohibition on DFA members from holding a majority of seats on Dairy One's board;

The imposition of limitations on DFA's use of block voting in connection with voting on Federal Milk Market Order 1 amendments, as well as the preservation of the right to vote individually; and

The formation of an Audit Committee consisting of seven DFA members plus two independent advisors with expertise in accounting, financial reporting, and auditing to monitor compliance with the December 2015 Proposed Settlement and to report to the delegates at the DFA annual meeting.

### B. Reaction of Governmental Agencies and Others.

Consistent with the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), notice of the December 2015 Proposed Settlement was provided to officials at the Justice Department and each Attorneys General office located in Order 1. Only the Vermont Attorney General's Office responded to the notice. In its written submission to the court, the Vermont Attorney General's Office stated that it supported the settlement, noting that it was:

> impressed by the extensive injunctive relief that the settlement obtains for the class members. The behavioral remedies go directly to the conduct alleged in the matter[.] . . . The injunctive relief appears to be on par with the sort of relief that our office would seek in a matter like this. In light of these considerations, we hope that the Court will approve this settlement.

(Doc. 832 at 1-2.)

Two groups of legislators in Order 1 also provided written support for the December 2015 Proposed Settlement. Vermont Senators Robert Starr, Chair of the Committee on Agriculture, and Jane Kitchel, Chair of the Committee on Appropriations, support approval of the settlement, emphasizing the increased transparency it affords with regard to DFA/DMS's operations and the benefits dairy farmers will derive from independent milk testing and the appointment of an ombudsperson. Robert Haefner, John O'Connor, and Tara Sad, the Chairman, Vice Chairman, and ranking member, respectively, of the New Hampshire House of Representatives Environment and Agriculture Committee, also expressed their "strong support of the proposed

4

settlement[.]" (Doc. 2023 at 1.)

## II. Conclusions of Law and Analysis.

Under Rule 23, a court may approve a settlement in a class action only after finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). This entails a review of "the negotiating process leading up to the settlement[, *i.e.*, procedural fairness,] as well as the settlement's substantive terms[, *i.e.*, substantive fairness]." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009) (alterations in original and internal quotation marks omitted).

### A. Procedural Fairness.

"The court must review the negotiating process leading up to the settlement for procedural fairness, to ensure that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1941 (2014). The court "must pay close attention to" and "examine[] the negotiation process with appropriate scrutiny." *D'Amato*, 236 F.3d at 85. The court must also bear in mind its own "fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately." *In re Warner Commc'ns Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986).

In this case, counsel for both parties and Supporting Class Representatives assert that the negotiation process took place in an arms-length manner and in good faith. They further assert that the class representatives participated in in-person, telephonic, and email discussions as part of these negotiations, as detailed in Subclass Counsel's submissions.

Although they acknowledge that Supporting Class Representatives have engaged in no wrongdoing and have participated in the negotiation of the December 2015 Settlement Proposal in good faith, Opposing Class Representatives nonetheless contend that the December 2015 Proposed Settlement is the product of collusion, coercion, and bad faith. They claim certain members of Subclass Counsel have engaged with

5

Defendants in a sham settlement, are guilty of professional misconduct, and have coerced support from the class. Counsel for both parties and Supporting Class Representatives disavow this characterization of the settlement process.

On April 20, 2015 and June 1, 2015, the court held a two-day evidentiary hearing at which Opposing Class Representatives and Opting Out Class Representatives were permitted to present their evidence of collusion, coercion, and bad faith. No such evidence was presented. Rather, it became clear that there were differences of opinion between Subclass Counsel and certain class representatives regarding how the case should be litigated, whether it should be settled or proceed to trial, and, if settled, the appropriate nature and extent of injunctive relief. It further became clear that communication had broken down between certain class representatives and certain Subclass Counsel to such an extent that no meaningful settlement or trial preparation discussions were possible. These circumstances were contrary to the interests of the class as a whole. *See* Doc. 682 at 8 (noting that because of a breakdown in communications, "the opposing Subclass Representatives and Subclass Counsel [were] failing to present a united front on behalf of the Dairy Farmer[s] [Class] and, in this respect, [were] undermining the interests of absent class members[,]" and that, "[a]s the case progresses towards either trial or to a final settlement, the stalemate and the lack of communication between Subclass Counsel and all but two of the Subclass Representatives [was] and will continue to be unacceptable").[3]

On September 3, 2015, Defendants moved to decertify the class for lack of adequate representation. *See* Fed. R. Civ. P. 23(a)(4), 23(c)(1)(C). Defendants argued that the appointed class representatives were "committed to the effective destruction of

---

[3] *See Martens v. Thomann*, 273 F.3d 159, 173 n.10 (2d Cir. 2001) (noting that class representatives "have fiduciary duties towards the other members of the class"); *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 331 (1980) (recognizing "the responsibility of named plaintiffs to represent the collective interests of the putative class"); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995) ("Both class representatives and class counsel have responsibilities to absent members of the class."); *see also McDowall v. Cogan*, 216 F.R.D. 46, 49 n.3 (E.D.N.Y. 2003) ("A named plaintiff acts as a fiduciary to the unnamed class members.").

6

DFA and DMS as functioning dairy marketing organizations," which was antithetical to the interests of other class members "who belong to DFA or market through DMS, who greatly value the continued existence and functioning of those organizations, and who very much do not want to see them disbanded[.]" (Doc. 692-1 at 2-3.)

On September 24, 2015, Subclass Counsel sought to remove certain class representatives, asserting they were unable to communicate and work with their counsel; failed to objectively evaluate the case; refused to abide by the court's rulings; and were "prepared to take actions that [would] prejudice the interests of the Subclass . . . without any meaningful consultation about the implications under prevailing antitrust and class action law." (Doc. 701-1 at 4.) In turn, Opposing Class Representatives and Opting Out Class Representatives renewed their motion to remove Subclass Counsel. Neither Subclass Counsel nor Opposing and Opting Out Class Representatives proffered any resolution to their stalemate other than the other group's removal.

The court denied Defendants' motion to decertify as moot, and denied on the merits Subclass Counsel's motion to remove certain class representatives and the motion to remove Subclass Counsel. In so ruling, the court noted that as long as the breakdown in communication on Plaintiffs' side of the case persisted, no meaningful settlement negotiations or trial preparation could take place. In an attempt to remedy this stagnation and to ensure adequate representation of the class, the court appointed additional class representatives and additional class counsel. *See In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 104 (2d Cir. 2003) ("'The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court.'") (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995)). Thereafter, the parties negotiated during a 90-day period that culminated in the December 2015 Proposed Settlement.

There is no credible evidence that the process by which the December 2015 Proposed Settlement was reached was tainted by collusion, coercion, or bad faith. Instead, the negotiations took place at arms-length and in good faith between experienced

antitrust litigators who were knowledgeable about the facts and the law, the realities of the marketplace, and the risks and challenges of a trial. The evidence thus establishes that the December 2015 Proposed Settlement is procedurally fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2).

### B. Substantive Fairness.

In the Second Circuit, a court is directed to "examine the fairness, adequacy, and reasonableness of a class settlement according to the '*Grinnell* factors.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). The *Grinnell* factors require examination of:

(1) the complexity, expense and likely duration of the litigation;
(2) the reaction of the class to the settlement;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart Stores, Inc.*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

The complexity, expense, and likely duration of the litigation weigh heavily in favor of approving the December 2015 Proposed Settlement. This case has been pending since 2009 and has presented costly, complex, and protracted litigation for both sides. Any trial would be a substantial additional expense and a time consuming process, which would be exacerbated by the fact that neither party is presently engaged in trial preparations. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (noting that antitrust cases are "generally complex, expensive and lengthy" and that antitrust class actions in particular "have a well deserved reputation as

being most complex") (internal quotation marks omitted).[4] Regardless of the outcome at trial, this court's rulings and the jury's verdict would almost inevitably be the subject of one or more lengthy appeals.[5]

Participation of the class in the December 2015 Proposed Settlement has been robust and far exceeds the participation in previous proposed settlements in this case. The reaction of the class has been overwhelmingly positive. *See Wal-Mart Stores, Inc.*, 396 F.3d at 119 (concluding that the reaction of class members to the settlement "is perhaps the most significant factor in [the] *Grinnell* inquiry"); *see also In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (noting that "[i]t is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy") (internal quotation marks omitted).

The stage of the proceedings and the amount of discovery completed also weigh in favor of approval. There is an ample factual record in this case which permits the parties to have "a thorough understanding of their case." *Wal-Mart Stores, Inc.*, 396 F.3d at 118 (also noting settlement was reached after "extensive discovery proceedings spanning over seven years[,] . . . leaving relatively few unknowns prior to trial"). No additional discovery is contemplated, nor would it likely alter the risks and benefits of going to trial. The court has already ruled on Defendants' motion for summary judgment, winnowing the claims for trial and identifying those issues that hinge on witness testimony. This is

---

[4] To the extent objecting class members insist that only a trial will vindicate their claims against DFA/DMS, they may opt out of the settlement.

[5] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (observing that the appellate process could take "several years"); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 331-32 (E.D.N.Y. 2010) (noting that the "complexity, expense, and likely duration of the litigation favor the proposed Settlement" because "[r]egardless of the outcome at trial, post-trial motions and an appeal by the losing party were likely, possibly followed by a new trial in the event of a reversal[,] . . . [and] [d]elay at the trial stage and through post-trial motions and the appellate process might have forced class members to wait years longer for any recovery"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (explaining that "even if the Class were to win a judgment at trial, the additional delay of trial, post-trial motions and appeals could deny the Class any actual recovery for years"); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *5 (S.D.N.Y. July 27, 2007) (approving settlement where "there would have been significant additional resources and costs expended to prosecute the claims through trial and the inevitable appeals").

thus not a case that has been settled prematurely or without an adequate understanding of the value of Plaintiffs' claims and the extent of Defendants' litigation risk.

The risks to the class of establishing liability and damages also weigh in favor of approving the December 2015 Proposed Settlement. If this matter proceeded to trial, Plaintiffs would face substantial challenges in establishing a factually and legally sustainable market definition, Defendants' market power, the economic motive for the alleged conspiracy, and the participation of a wide array of co-conspirators at the cooperative and processor levels. Defendants' statute of limitations defenses, alone, may have precluded many of Plaintiffs' claims and a significant portion of Plaintiffs' claimed damages.

As the numerous written responses to the settlement make clear, Plaintiffs would face the additional challenge of persuading a Vermont jury that this case involves dairy farmers against wealthy corporate entities, as opposed to dairy farmers against dairy farmers. At trial, Plaintiffs may have to confront evidence from the many dairy farmers who spoke at the Fairness Hearing and who view DFA/DMS as transparent and helpful partners that assist them in finding the most advantageous market and best price for their fluid Grade A milk.

In addition, if this case proceeded to trial, Defendants would likely renew their motion to decertify the class, arguing that the interests of dairy farmers who supported DFA/DMS were unrepresented by Subclass Counsel and the Dairy Farmers Class representatives. In opposing this motion, there is a distinct likelihood that Plaintiffs would either not present a united front, or would have difficulty demonstrating that they are adequately representing pro-DFA/DMS dairy farmers' interests. The risks of maintaining the class through trial thus support a negotiated resolution.

The ability of Defendants to withstand a greater judgment appears uncontested. This factor, however, "does not suggest that the settlement is unfair" when it "stand[s] alone" against the settlement and the remaining factors weigh in favor of the settlement. *D'Amato*, 236 F.3d at 86; *see also In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[T]he fact that a defendant is able to pay more than it offers in

10

settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate."), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

The reasonableness of the settlement fund, in light of the best possible recovery and the attendant risks of litigation, also weighs in favor of approving the December 2015 Proposed Settlement. The settlement's $50 million in monetary relief will offer class members a modest recovery, predominantly because of the size of the class.[6] However, a total recovery against DFA/DMS and Dean of $80 million is not insubstantial when viewed against the backdrop of the risks of continued litigation. The injunctive relief offered by the December 2015 Proposed Settlement is more extensive than Plaintiffs request in the Second Amended Complaint, and thus more extensive than the court would likely order if Plaintiffs prevailed at trial.

Collectively, the *Grinnell* factors weigh in favor of approving the December 2015 Proposed Settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 69 n.10 (2d Cir. 1982) (directing that a district court "passing on settlements of class actions under [Rule 23]" is not "an umpire in [a] typical adversary litigation" but rather "a guardian for class members"); *see also Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 654 (2d Cir. 1999) (emphasizing that "the district court bears the ultimate responsibility for ensuring that the interests of vulnerable class members are vindicated") (internal quotation marks omitted). The court thus finds that the December 2015 Proposed Settlement is substantively fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). To ensure the parties' compliance with the terms of the December 2015 Proposed Settlement, the court retains jurisdiction over its enforcement.

---

[6] It is estimated that the average recovery will be $4,000 per dairy farm class member, however, the court's determination of Subclass Counsel's motions for attorneys' fees, reimbursement of expenses, and incentive awards (Docs. 728 & 729) will affect this amount.

11

## CONCLUSION

For the foregoing reasons, the motion for final approval of the December 2015 Proposed Settlement is GRANTED. (Doc. 2076.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 7th day of June, 2016.

Christina Reiss, Chief Judge
United States District Court