U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUN 14 PM 4:28

CLERK
BY  LAW
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ALICE H. ALLEN, LAURANCE E. ALLEN, )
d/b/a Al-lens Farm, GARRET SITTS, RALPH )
SITTS, JONATHAN HAAR, CLAUDIA HAAR, )
RICHARD SWANTAK, PETER SOUTHWAY, )
MARILYN SOUTHWAY, REYNARD HUNT, )
ROBERT FULPER, STEPHEN H. TAYLOR, )
and DARREL J. AUBERTINE, on behalf of )
themselves and all others similarly situated, )
)
              Plaintiffs, )
)
v. ) Case No. 5:09-cv-230
)
DAIRY FARMERS OF AMERICA, INC. and )
DAIRY MARKETING SERVICES, LLC, )
)
             Defendants. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR ATTORNEYS' FEES AND COSTS, AND INCENTIVE AWARDS
(Docs. 728 & 729)

Pending before the court are Dairy Farmer Subclasses' Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Subclass Representatives in Connection with the DFA/DMS 2015 Settlement (Doc. 728) ("Lead Counsel" proposal), and Additional Named Representatives Stephen H. Taylor and Darrel J. Aubertine's Alternative Motion for Award of Overall Attorneys' Fees, for Incentive Award and Division of Such Fees Among Class Counsel (Doc. 729) ("Intervenor Counsel" proposal).

Lead Counsel seeks attorneys' fees in the amount of $16,666,666, reimbursement of $3,804,337.68 in expenses, and an incentive award of $130,000 for distribution to the nine Subclass Representative farms.[1] Intervenor Counsel seeks an attorneys' fees award

---

[1] Lead Counsel proposes that the initially appointed Subclass Representative farms (Allen, Haar,

totaling $11,500,000, with $500,000 designated for payment to Intervenor Counsel. Intervenor Counsel also seeks reimbursement of their expenses in the amount of $6,294.18 and incentive awards for Subclass Representatives Aubertine and Taylor of $20,000 each. On May 13, 2016, the court held a Fairness Hearing to consider whether to approve the December 2015 Settlement, at which time the court took the pending motions under advisement.

The attorneys participating in Lead Counsel's motion are Robert G. Abrams, Esq., Robert J. Brookhiser, Esq., Gregory J. Commins, Jr., Esq., Terry L. Sullivan, Esq., Danyll W. Foix, Esq., Emily J. Joselson, Esq., Lisa B. Shelkrot, Esq., Kit A. Pierson, Esq., Benjamin D. Brown, Esq., Brent W. Johnson, Esq., Emmy L. Levens, Esq., David A. Balto, Esq., and Andrew D. Manitsky, Esq. The attorneys participating in Intervenor Counsel's motion are Daniel Smith, Esq., and Richard T. Cassidy, Esq.

I.      **Factual and Procedural Background.**

This class action arises out of Plaintiffs' allegations that Defendants Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), Dean Foods Company ("Dean"), and other named and unnamed co-conspirators conspired to control the supply of raw Grade A milk in Order 1, which had the effect of suppressing certain premiums paid to dairy farmers for their milk.

On August 3, 2011, the court granted final approval of a settlement between Plaintiffs and Dean, requiring Dean to make a one-time payment of $30,000,000 (the "Dean Settlement"). The court awarded attorneys' fees of $4,500,000, reflecting fifteen percent of the Dean Settlement, and reimbursement of $1,500,000 in expenses. The total award to Plaintiffs' attorneys was therefore twenty percent of the Dean Settlement. The court declined to grant any incentive payments to class representatives at that time, explaining that the notice sent to class members did not disclose these proposed payments and thus "[a]dditional compensation for their efforts must await further developments in this case, and must be accompanied by full and accurate notice of any deduction from the

---

Sitts, and Swantak) receive $20,000 each, and the farms added as Subclass Representatives within the past year (Aubertine, Fulper, Hunt, Southway, and Taylor) receive $10,000 each.

class's recovery." (Doc. 341 at 19.)

On November 19, 2012, the court certified a class consisting of all dairy farmers, whether individuals, entities, or members of cooperatives, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present (the "Dairy Farmers Class"). This class is comprised of two Subclasses.[2] At the time of class certification, the court approved Plaintiffs' request that Claudia and Jonathan Haar and Richard Swantak be named representatives of the DFA/DMS Subclass, and that Alice H. and Laurance E. Allen and Garrett and Ralph Sitts be named representatives of the non-DFA/DMS Subclass.

After an adjudication of Defendants' motion for summary judgment, which the court granted in part and denied in part, the parties reached a settlement agreement on July 1, 2014 (the "2014 Settlement"). The court subsequently denied without prejudice the motion for final approval of the 2014 Settlement.

During communications regarding the 2014 Settlement, the relationship between Lead Counsel and certain Subclass Representatives eroded. Those Subclass Representatives subsequently moved to remove Lead Counsel. The court denied the motion, concluding "removal of class counsel at this late stage in the proceedings and in this complicated case would constitute an extraordinary remedy reserved for actual misconduct for which no alternative remedy is either feasible or prudent." (Doc. 667 at 8.)

While the motion to remove Lead Counsel was pending, Stephen H. Taylor and

---

[2] The certified Subclasses are as follows:

1. All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who are members of DFA or otherwise sell milk through DMS ("DFA/DMS [S]ubclass"); and

2. All dairy farmers, whether individuals or entities, who produced and pooled raw Grade A milk in Order 1 during any time from January 1, 2002 to the present, who are not members of DFA and do not otherwise sell milk through DMS ("non-DFA/DMS [S]ubclass").

(Doc. 435 at 3-4).

3

Darrel J. Aubertine moved to intervene and be joined as additional Subclass Representatives for the non-DFA/DMS Subclass. They also sought the addition of their attorneys, Daniel Smith, Esq., and Richard T. Cassidy, Esq., as Subclass Counsel for the non-DFA/DMS Subclass. On August 11, 2015, the court granted the motion to intervene, noting that:

> At this juncture, the opposing Subclass Representatives and Subclass Counsel are failing to present a united front on behalf of the Dairy Farmer Subclasses and, in this respect, are undermining the interests of absent class members. As the case progresses towards either trial or to a final settlement, the stalemate and the lack of communication between Subclass Counsel and all but two of the Subclass Representatives is and will continue to be unacceptable. Without a significant change in circumstances, removal of either Subclass Representatives or Subclass Counsel or both may be warranted.

(Doc. 682 at 8.) The court initially denied the request to add additional attorneys because their addition would increase the attorneys' fees and costs and "would effectively force Subclass Counsel to work with new attorneys at the court's direction." *Id.* at 14. When the stalemate between opposing Subclass Representatives and Lead Counsel persisted, the court granted the appointment of Attorneys Smith and Cassidy as additional counsel ("Intervenor Counsel").[3]

On September 24, 2015, Lead Counsel moved to add Marilyn and Peter Southway, Reynard Hunt, and Robert Fulper as DFA/DMS Subclass Representatives, and to remove the previously appointed DFA/DMS Subclass Representatives. On October 23, 2015, the

---

[3] The court explained:

> The non-DFA/DMS Farmer Subclass has withdrawn its opposition to the appointment of Daniel Smith, Esq. and Richard T. Cassidy, Esq. as additional Subclass Counsel as long as they are appointed as full-time, ordinary Subclass Counsel and not simply limited to the role of settlement counsel[.] In their reply, Attorneys Smith and Cassidy acknowledge that they will shar[e] the same responsibilities and obligations as existing Subclass Counsel. For the same reasons that the court appointed additional Subclass Representatives, the court concludes that the appointment of additional Subclass Counsel is in the best interests of the class.

(Doc. 700) (citation omitted).

4

court granted the motion to add Subclass Representatives, but denied the motion to remove the previously appointed Subclass Representatives. The court explained that the existing Subclass Representatives "adequately represent the DFA/DMS Subclass and remain committed to vigorously pursuing its interests" and their removal would eliminate dissenting opinions that may be important to the adequate representation of the class. (Doc. 707 at 7.)

The parties thereafter continued negotiations that resulted in the December 2015 Settlement. On May 13, 2016, the court held a Fairness Hearing at which members of the Dairy Farmers Class overwhelmingly supported the settlement. On June 7, 2016, the court granted final approval of the December 2015 Settlement.[4]

Lead Counsel and Intervenor Counsel (collectively, "Plaintiffs' counsel") now seek attorneys' fees and expenses. In support of their pending motions, Plaintiffs' counsel submit affidavits identifying the amount of hours that attorneys and other legal professionals devoted to this case, as well as the hourly rates those individuals typically charge for their services. In total, Plaintiffs' counsel expended approximately 64,000

---

[4] The December 2015 Settlement addresses attorneys' fees and expenses as follows:

> [1.] Subclass Counsel may apply to the Court for payment of attorneys' fees, costs, and expenses from the Settlement Fund. Attorneys' fees and expenses will be determined and awarded from the Settlement Fund in a manner consistent with Second Circuit law following the application for such fees and expenses by Subclass Counsel. Settling Defendants will have no responsibility to pay Subclass Counsel's attorneys' fees, costs, or expenses. Under no condition will Subclass Counsel seek an amount of attorneys' fees in excess of 33 1/3% of the Settlement Consideration [of $50,000,000] plus reimbursement for reasonable litigation and administrative expenses.
>
> [2.] Settling Defendants will not oppose an application for attorneys' fees or expenses submitted by Subclass Counsel consistent with the limitation described in [the preceding paragraph].
>
> [3.] In the event the Court disapproves of, or reduces the amount sought in, any such application, such disapproval or reduction shall have no effect on the terms of the Agreement.

(Doc. 2076-2 at 40-41.)

hours, reflecting more than $28.7 million in fees, exclusive of costs, on this case.[5] The records they submit in support of their request identify general categories of tasks, such as "Investigations, Factual & Legal Research[,]" "Discovery, Document Management and Depositions[,]" and "Case Management and Administration[.]" *See* Doc. 728-2 at 2. These general categories do not reveal how much time was expended on discrete tasks, such as filing an opposition to a motion for summary judgment or filing a motion to replace certain Subclass Representatives.

Plaintiffs' counsel have also incurred unreimbursed costs in the amount of $3,810,631.86. Lead Counsel summarizes their expenses as follows:

> Obtaining, reviewing, and hosting documents; preparing, taking, and defending depositions; hiring stenographers and videographers for depositions; performing computerized legal research; making copies and deliveries; preparing pleadings (motions, memoranda, etc.) filed with the Court; preparing for hearings; expert witness fees and costs[;] . . . preparing for trial (reviewing and organizing video deposition testimony, preparing witness examinations, selecting exhibits, preparing demonstratives, etc.); and traveling to depositions, hearings, and meetings with clients, experts, and potential witnesses.

(Doc. 728 at 27-28.) Intervenor Counsel's expenses arise solely from travel and lodging related to this case.

## II. Conclusions of Law and Analysis.

### A. Whether to Grant Lead Counsel's Proposal for Attorneys' Fees or Intervenor Counsel's Proposal for Attorneys' Fees.

Lead Counsel seeks attorneys' fees in the amount of $16,666,666, or 33.3% of the monetary recovery under the December 2015 Settlement. Intervenor Counsel proposes an alternative award of $11,500,000, which reflects 23% of the monetary recovery. For the reasons set forth below, the court determines that an attorneys' fees award comprising 14% of the December 2015 Settlement ($7,000,000), without accrued interest, is reasonable.

"In a certified class action, the court may award reasonable attorney's fees[.]"

---

[5] $28,790,531 reflects Lead Counsel's fees of $28,575,341, and Intervenor Counsel's fees of $215,190.

6

Fed. R. Civ. P. 23(h). It is "well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund" and that "[c]lass action lawsuits are the prototypical example of instances where the common fund doctrine can apply." *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010). Approval of a reasonable fee in common fund cases is "often challenging . . . especially because—since the attorneys' fees are drawn from a common fund rather than being paid separately by the defendants—there is little incentive for the defendants to contest the size of the fee. To the contrary, plaintiffs' and defendants' lawyers share an interest in the approval of an agreed upon settlement." *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010). For this reason, the district court has a "duty to act as a fiduciary who must serve as a guardian of the rights of absent class members, and [to] reaffirm the requirement of a searching assessment regarding attorneys' fees that should properly be performed in each case." *Id.* at 419 (citations and internal quotation marks omitted).

"[E]ither the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases[.]" *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 45 (2d Cir. 2000). "[T]he trend in [the Second] Circuit is toward the percentage method[.]" *McDaniel*, 595 F.3d at 417 (internal quotation marks omitted). Pursuant to the percentage method, the court "sets some percentage of the recovery as a fee." *Goldberger*, 209 F.3d at 47. That "fee award should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." *Id.* at 53 (internal quotation marks omitted).

Although courts in the Second Circuit most often use the percentage method, the lodestar may nonetheless serve "as a 'cross check' on the reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 50. The lodestar method "scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies

that figure by an appropriate hourly rate." *Id.* at 47.[6]

"[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances[.]" *Goldberger*, 209 F.3d at 47. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court[.]" *Id.* District courts must consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50 (alterations and internal quotation marks omitted).

### 1. Time and Labor Expended by Counsel.

Plaintiffs' counsel estimate they expended approximately 64,000 hours on this case, amounting to $28,790,531 in fees.[7] The problem with this estimate is threefold. First, some of the 64,000 hours gave rise to the Dean Settlement. At the time of the Dean Settlement, Lead Counsel represented that it had completed "over 31,000 hours of legal work." (Doc. 310-1 at 17.) The court has already awarded attorneys' fees to compensate

---

[6] As to the appropriate hourly rate to apply, the Second Circuit has held:

> [W]hen faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule. In order to overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result.

*Simmons v. New York City Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009).

[7] Out-of-district hourly rates apply in this instance because Plaintiffs' out-of-district counsel possess significant antitrust expertise not readily available in this district, and it was reasonable for Plaintiffs to believe they would achieve a "substantially better net result" with their services. *See Simmons*, 575 F.3d at 175. Nonetheless, some rates claimed by Lead Counsel are excessive. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 2016 WL 3163073, at *7 (6th Cir. June 7, 2016) (concluding that the district court's reliance on the lodestar method was erroneous and noting that "[o]ne problem is that the rates claimed by class counsel are exceedingly high: some 20 lawyers billed the class more than $700 per hour, and some billed more than $900 per hour; and over 40 paralegals charged an average of $228 per hour, which is more than $10 per hour higher than the rates charged by the top 1% of paralegals nationwide"). Ten Lead Counsel attorneys billed the class more than $700 per hour, fourteen current and former paralegals charged between $220 and $279 per hour, and legal assistants charged as much as $300 per hour. *See* Doc. 728-8 at 2, Doc. 728-14 at 2, Doc. 728-17 at 2.

the time expended in pursuing the Dean Settlement.

Second, the estimate includes time that Lead Counsel spent addressing the communication breakdown with Subclass Representatives. Intervenor Counsel ask the court to consider Lead Counsel's "responsibility for the breakdown in communications[,]" and "propose that the majority of the time spent on this issue be accounted for, and removed, as part of the lodestar cross-check." (Doc. 729-1 at 8) (internal quotation marks omitted). The court agrees that the attorneys' fees award should reflect that some of the fees expended on this issue could have been avoided by a more cooperative relationship between Lead Counsel and Subclass Representatives.

Third, Plaintiffs' counsel aggregate their hours expended into broad categories of tasks. Consequently, the court cannot "scrutinize[] the fee petition to ascertain the number of hours reasonably billed to the class[.]" *See Goldberger*, 209 F.3d at 47; *see also Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 2016 WL 3163073, at *8 (6th Cir. June 7, 2016) (holding that the district court erroneously approved class counsel's request for $10 million in fees, and observing that "class counsel provided no backup whatsoever—no time records, no descriptions of work done—in support of their hours spent working on this case . . . class counsel [instead] provided the district court with a single page of documentation for each firm, listing only the employee names, titles, rates, hours, and—by multiplying the rates and hours—the total lodestar for that firm").

For the foregoing reasons, Plaintiffs' lodestar does not provide a reliable cross check for a reasonable attorneys' fees award. It nonetheless provides factual support for Plaintiffs' counsel's claim that they expended substantial time and effort on this class action case.

### 2. Magnitude and Complexities of the Litigation.

Lead Counsel argues that the complexity of this antitrust case is heightened because counsel did not benefit from a simultaneous or preceding government action. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (affirming attorneys' fees award and observing that "antitrust cases, by their nature, are highly complex"); *In re Visa Check/Mastermoney Antitrust*

9

*Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003) (noting that the case was more challenging to litigate because counsel "did not benefit from any previous or simultaneous government litigation"). To some extent, however, the *Southeastern Milk Antitrust Litigation* afforded Plaintiffs' counsel substantive and strategic benefits because "[a]s a result of . . . extensive discovery and both side's substantial experience with the *Southeastern Milk Antitrust Litigation*, counsel for the Subclasses and Defendants approached trial with a deep understanding of the complex factual, economic, and legal issues presented by the case." (Doc. 2076-1 at 13.)

### 3. Risk of the Litigation.

Lead Counsel argues that it encountered significant contingency and litigation risks, and should be rewarded for those risks.[8] Lead counsel further argues that "[t]he risk of litigation is 'perhaps the foremost factor' when considering fees[.]" (Doc. 728 at 22) (quoting *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005)). The Second Circuit has held that "[a] court, . . . in adjudging whether to award a risk multiplier, should examine closely the nature of the action in order to determine whether, as a matter of public policy, it is the type of case worthy of judicial encouragement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987).

Although Lead Counsel is correct that the pursuit of this class action was a substantial burden that involved many complex factual and legal issues, the risk in this case arises primarily from Plaintiffs' difficulty in establishing liability and damages. Moreover, while class action litigation may assist in ensuring compliance with federal antitrust laws, the December 2015 Settlement advances those goals indirectly. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."). Defendants have neither admitted any wrongdoing, nor been found to have committed any antitrust

---

[8] Intervenor Counsel, in contrast, did not assume a substantial risk for purposes of the *Goldberger* analysis when it joined the lawsuit during the last year. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 55 (2d Cir. 2000) ("It is well-established that litigation risk must be measured as of when the case is filed.").

10

violations. Whether "as a matter of public policy, [this case] is the type of case worthy of judicial encouragement" therefore remains unclear. *See In re Agent Orange*, 818 F.2d at 236.

### 4. Quality of Representation.

Despite Intervenor Counsel's identification of certain concerns with the quality of Lead Counsel's representation,[9] "the quality of representation is best measured by results, and . . . such results may be calculated by comparing the extent of possible recovery with the amount of actual verdict or settlement." *Goldberger*, 209 F.3d at 55 (internal quotation marks omitted). Intervenor Counsel characterizes the net monetary settlement of $80,000,000 as a "small" recovery in comparison to the damages alleged in the initial Complaint. (Doc. 729-1 at 11.) Lead Counsel counters that "[t]he total $80 million represents almost 60% of the maximum single damages within the statute of limitations period and accounting for the [c]ourt's exclusion of certain damages." (Doc. 728 at 16.)

As any damages calculation in this case is subject to significant statute of limitations and other challenges, it provides an unreliable benchmark.[10] In comparison to the settlement in *Southeastern Milk Antitrust Litigation*, in which the evidence of alleged antitrust violations was arguably stronger and the statute of limitations issues were less daunting, the monetary recovery in the instant case is modest, but the injunctive relief is significantly broader. On balance, this case represents a fair, reasonable, and adequate recovery for the class, even when compared to the settlement in *Southeastern Milk Antitrust Litigation*.

---

[9] *See* Doc. 729-1 at 7-8 ("These problematic [case] characteristics are the over-emphasis on monetary relief, the breakdown in communications between counsel and almost all Named Representatives, the flawed geographic market definition, the failure to develop Defendant DMS' role, the early if not outright premature settlement with Dean Foods, and the fact that one of the subclasses will be funding the settlement fund from which their recovery as well as the attorneys' fees will be drawn.").

[10] *See, e.g., Goldberger*, 209 F.3d at 55-56 (where counsel asserted a 90% recovery of class damages based on an expert report they commissioned, the Second Circuit was "hesitant to accept that report unquestioningly . . . because it ha[d] not been tested through the adversarial process[,] . . . the valuation of damages in securities class actions is not a 'hard science,' and all such reports are singularly susceptible to attack").

### 5.     Requested Fee in Relation to the Settlement.

Lead Counsel seeks attorneys' fees of $16,666,666, amounting to one-third of the monetary recovery in the December 2015 Settlement.[11] With the $4,500,000 in attorneys' fees awarded in the Dean Settlement, attorneys' fees would represent twenty-six percent of the overall monetary recovery. Intervenor Counsel proposes attorneys' fees in the amount of $11,500,000, which is twenty-three percent of the current settlement.[12] When combined with the attorneys' fees obtained in the Dean Settlement, attorneys' fees would represent twenty percent of the overall monetary recovery.

The Second Circuit has held that, rather than a "'benchmark[,]'" courts must engage in a "searching assessment" to determine whether the requested fee is reasonable in relation to the settlement. *Goldberger*, 209 F.3d at 52. "While public policy favors the award of reasonable attorney's fees, courts must also guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class." *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 130 (S.D.N.Y. 2009) (internal quotation marks omitted). To avoid windfalls in multi-million dollar settlements, the Second Circuit has observed that courts often reduce fees awards. *See Goldberger*, 209 F.3d at 52 ("[E]mpirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%."); *Wal-Mart Stores, Inc.*, 396 F.3d at 122 (affirming an attorneys' fees award of 6.5% of the settlement fund and noting that because "economies of scale could cause windfalls in common fund cases, courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable").[13]

---

[11] When Lead Counsel's proposed attorneys' fees is combined with Plaintiffs' counsel's request for reimbursement of expenses, the attorney payment from the current settlement would amount to 41%.

[12] When Intervenor Counsel's proposed attorneys' fees is combined with Plaintiffs' counsel's request for reimbursement of expenses, the attorney payment from the current settlement would amount to 30.6%.

[13] *See also In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 373 (S.D.N.Y. 2005) (awarding 12% of

12

Lead Counsel cites *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) in support of its position that a one-third recovery of the settlement fund is authorized in the Second Circuit. In that case, the court granted an attorneys' fees award of $170 million, which was below the lodestar and reflected one-third of the net settlement fund.[14] The court emphasized that reducing attorneys' fees would result in only "trivial" benefits to each class member while penalizing counsel and "chill[ing] other class actions." *Id.* at 515.

In contrast, in this case, numerous class members supporting the December 2015 Settlement emphasize that because of low milk prices, even a modest additional payment would afford relief.[15] They also ask the court to ensure that the attorneys are not the primary beneficiaries of the settlement.[16] As a result, awarding a 14% fee in lieu of the

---

the $75 million settlement in attorneys' fees, rather than the 20% requested by counsel); *In re Twinlab Corp. Sec. Litig.*, 187 F. Supp. 2d 80, 87 (E.D.N.Y. 2002) (denying counsel's request for attorneys' fees amounting to one-third of the $26.5 million settlement, and instead granting a 12% award).

[14] In *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 514 (S.D.N.Y. 2009), the court reasoned that "there is simply no reason why plaintiffs' counsel should be awarded a percentage of their expenses in addition to being reimbursed for those reasonable expenses[,]" and it therefore deducted the administrator's fee, PSLRA payments, and attorneys' expenses to calculate the "net" settlement fund from which the attorneys' fees award was drawn.

[15] *See, e.g.*, Doc. 1803 at 1 ("In 2016 dairy farmers in the Northeast are once again selling milk for less than the costs of producing it. Dairy farm families will be grateful for the modest payments this settlement will deliver."); Doc. 1842 at 1 ("As a dairy farmer who at this time is receiving a low milk price because of our overproduction to the marketplace, the money would be greatly appreciated, and used for seed, fertilizer and supplies for me to continue another year."); Doc. 1846 at 2 ("We hope [the court] will make it possible for the quick disbursement of settlement funds to each farm family in the North East. The funds are needed with milk prices dropping."); Doc. 2018 at 1 ("Low milk prices are making it very difficult to continue farming. The settlement money would be a help."); Doc. 2051 at 1 ("[The settlement] is fair and financially beneficial to our farm at a time when milk prices are very low.").

[16] *See, e.g.*, Doc. 1627 at 2 ("If we were to state an objection to anything in the settlement, it would be to the outrageous lawyer fees that are proposed. . . . I think we speak for many farmers when we say that we don't need another +/-$4000 pittance.") (emphasis omitted); Doc. 2030 at 1 ("I would ask that you minimize the percentage that the lawyers retain. This was designed to help us financially strapped dairy farmers, not the rich lawyers."); Doc. 2060 at 2 ("It is time that the Allen [v.] Dairy Farmers of America lawsuit is settled. The money should be returned to the members. After all, the settlement money is their money anyway.").

one-third fee requested by Lead Counsel will result in a more meaningful recovery per farm.[17]

### 6. Public Policy Considerations.

In addressing the attorneys' fees award in the Dean Settlement, the court observed that "[p]ublic policy weighs in favor of awarding substantial attorney's fees for incurring the risks of meritorious litigation that redresses antitrust violations. At this juncture, no antitrust violations have been found." (Doc. 341 at 18 n.8.) This continues to be true and, as Intervenor Counsel points out, "redress of antitrust violations remains limited as compared with the original [C]omplaint." (Doc. 729-1 at 14.) It, however, remains equally true that the December 2015 Settlement affords relief that would not have been obtained without the efforts of Plaintiffs' counsel. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (concluding that public policy supports the requested attorneys' fee, and noting that the Department of Labor "took no action against [d]efendants[,]" and that "[w]ithout the efforts of [p]laintiffs' [c]ounsel, the participants in [the defendants'] [p]lan would not have obtained any relief at all").

In support of the December 2015 Settlement, the Vermont Attorney General stated:

> Our office is . . . impressed by the extensive injunctive relief that the settlement obtains for the class members. The behavioral remedies go directly to the conduct alleged in the matter, and will hopefully benefit the dairy farmers impacted by this case and help rectify past wrongs. The injunctive relief appears to be on par with the sort of relief that our office would seek in a matter like this.

(Doc. 832 at 1-2.) Two members of the Vermont Senate Chamber praised the positive political byproducts of the injunctive relief, explaining:

> From the legislative standpoint, we will benefit from access to the key documents in the case's extended record. We have considered more than once the need to update and modernize our dairy cooperative law. We have been hampered in this effort by lack of access to significant data. The

---

[17] The per-farm estimates are based on the prediction that 7,600 farms will assert settlement claims, that Plaintiffs' counsel will be reimbursed for all of their expenses, and that the incentive payments will total $155,000.

> availability of the case's record should fill this void and substantially assist with this effort. We would also benefit from a hearing report by the DFA producer price advocate as to legal changes, once he or she has had the chance to pursue the designated mission.

(Doc. 1510 at 2.) The bi-partisan leadership of the New Hampshire House of Representatives Environment and Agriculture Committee similarly expressed their support for the settlement, noting also that the increased access to data will benefit dairy farmers. These statements of support underscore that the public will benefit from the December 2015 Settlement in increased transparency and accountability by key stakeholders in the market for raw Grade A milk.

Examining the totality of the circumstances, the court concludes that an attorneys' fees award of $7 million, or 14% of the December 2015 Settlement fund, without accrued interest, is reasonable.

### B. Whether to Set Aside a Certain Portion of Attorneys' Fees for Payment to Intervenor Counsel.

Intervenor Counsel requests that the court set aside $500,000 of the attorneys' fees award to compensate them for "the value they have provided in resolving the prior procedural infirmity of the case and their leadership in providing the material enhancement of the proposed settlement's substantive relief." (Doc. 729-1 at 25-26.) They claim that leaving the allocation of the award to the attorneys involved in the case will inevitably result in a disagreement that will require the court's intervention. Lead Counsel opposes Intervenor Counsel's request, arguing that Intervenor Counsel has failed to provide a sufficient reason to warrant a higher award than the rest of the attorneys involved in this case, and that Plaintiffs' counsel should fully address this matter among themselves before the court considers whether to designate a certain portion of the attorneys' fees for Intervenor Counsel.[18]

---

[18] Lead Counsel additionally argues that the request for a division of attorneys' fees is a non-dispositive motion that requires a party to certify that it conferred in good faith with the opposing party before seeking relief from the court, which Intervenor Counsel failed to do. *See* D. Vt. L.R. 7(a)(7) ("A party filing a non-dispositive motion must certify that the party has made a good faith attempt to obtain the opposing party's agreement to the requested relief."). Other courts

15

An allocation of the attorneys' fees award among the several lawyers representing Plaintiffs has not yet been proposed, and could not have been proposed prior to the court's instant award of $7,000,000 in attorneys' fees. A total distribution plan is necessary before the court can determine whether Intervenor Counsel's request for $500,000 is reasonable. If Plaintiffs' counsel are unable to achieve a mutually agreeable resolution, they will have the opportunity to raise that issue with the court. The court therefore DENIES Intervenor Counsel's motion for $500,000 of the attorneys' fees award without prejudice.

### C. Whether to Grant Lead Counsel's Proposal for Reimbursement of Expenses and Intervenor Counsel's Proposal for Reimbursement of Expenses.

Lead Counsel seeks reimbursement of their expenses, which amounts to $3,804,337.68. Intervenor Counsel seeks reimbursement of $6,294.18 in expenses. In total, Plaintiffs' counsel thus request $3,810,631.86 in unreimbursed expenses.[19]

"In a certified class action, the court may award reasonable . . . nontaxable costs that are authorized by law[.]" Fed. R. Civ. P. 23(h). The Second Circuit has held that expenses "that are incidental and necessary to the representation" are recoverable, provided they are reasonable. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987) (internal quotation marks omitted); *see also In re Fid./Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) ("[L]awyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax.").

---

have found motions for attorneys' fees to be dispositive motions. *See Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 698 F. Supp. 2d 168, 173 (D.D.C. 2010) ("The [c]ourt concludes that an EAJA fee petition is a dispositive motion, thereby rendering [Local Rule 7(m), which requires parties to confer in good faith,] inapplicable."); *Rajaratnam v. Moyer*, 47 F.3d 922, 924 (7th Cir. 1995) ("The application for fees cannot be characterized as nondispositive.") (footnote omitted). This court need not decide the issue because it agrees that the court's intervention in this dispute would be premature.

[19] The December 2015 Settlement permits counsel to seek "reimbursement for reasonable litigation and administrative expenses." (Doc. 2076-2 at 41.)

Counsel for the law firms involved in representing Plaintiffs have submitted affidavits attesting to their unreimbursed expenses, which are consistent with costs typically incurred in a class action case of this magnitude. *See, e.g.*, *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 364 (E.D.N.Y. 2010) (in a class action common fund case, observing that "expert fees, electronic research charges, . . . postage and delivery expenses, discovery costs, filing fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and out-of-town travel expenses" are the type "that are necessarily incurred in litigation and routinely charged to clients"). Although these expenses are substantial, they were "incidental and necessary" to providing adequate representation, are not artificially inflated or otherwise in bad faith, and are therefore reasonable. *See Reichman*, 818 F.2d at 283 (internal quotation marks omitted); *In re Marsh ERISA Litig.*, 265 F.R.D. at 150 (granting reimbursement of expenses that were "largely attributable to ordinary and necessary costs such as court reporters, expert fees, computer-assisted document organization, travel and copying"). The court therefore GRANTS Lead Counsel's and Intervenor Counsel's requests for the reimbursement of expenses.

### D. Whether to Grant Lead Counsel's Proposal for Incentive Payments or Intervenor Counsel's Proposal for Incentive Payments.

Lead Counsel seeks incentive payments amounting to $130,000, which would award $20,000 to each farm that has been a Subclass Representative since the class was certified (Allen, Haar, Sitts, and Swantak), and $10,000 to each farm that has been added as a Subclass Representative during the past year (Aubertine, Fulper, Hunt, Southway, and Taylor). Intervenor Counsel seeks to increase the incentive payments to $20,000 for Subclass Representatives Aubertine and Taylor to reward their expertise and assistance in reaching a settlement.

"In [the Second] Circuit, the [c]ourts have, with some frequency, held that a successful [c]lass action plaintiff, may, in addition to his or her allocable share of the ultimately recovery, apply for and, in the discretion of the [c]ourt, receive an additional award, termed an incentive award." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200

(S.D.N.Y. 1997). Incentive awards are "fairly typical in class action cases[,]" are "discretionary," and are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009); *see also Roberts*, 979 F. Supp. at 200 ("The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery.").

The four farms that were initially appointed as Subclass Representatives have maintained significant involvement in this case for approximately six years without any guarantee that their efforts would result in a successful outcome. They have fulfilled their responsibilities as Subclass Representatives and have expressed the divergent views of class members, which contributed to the parties reaching a just settlement. To compensate these Subclass Representative farms for their efforts, the Allen, Haar, Sitts, and Swantak farms are awarded incentive payments of $20,000 per dairy farm.[20]

Subclass Representatives Aubertine and Taylor invested less time and bore less

---

[20] Subclass Representatives Garrett Sitts, Ralph Sitts, and Richard Swantak opted out of the December 2015 Settlement. Neither the notice provided to class members, nor the December 2015 Settlement limits eligibility for incentive payments to those Subclass Representatives who participate in the settlement. *Cf. Tavares v. S-L Distribution Co.*, 2016 WL 1743268, at *9 (M.D. Pa. May 2, 2016) (awarding incentive payments to "each of the two [] class representatives who have not opted to exclude themselves from the class" where the settlement agreement provided that incentive payments would be awarded only to participating class representatives). The Second Circuit has not addressed whether class representatives opting out of a settlement shall be eligible for incentive payments. In this case, it would be unfair to deprive the Sitts and Swantak farms of compensation for their considerable efforts as Subclass Representatives in the years preceding the December 2015 Settlement, which included their appearance at numerous court hearings and settlement negotiations, and their fulfillment of discovery obligations.

risk than that borne by the initial Subclass Representatives. In terms of their investment in this case, they are more similarly situated to the other Subclass Representative farms appointed during the past year, which entered the case at a contentious point and contributed substantially to the settlement negotiation process. Although they invested less time and bore less risk, they nonetheless deserve a substantial award for their contributions. It is therefore appropriate for the Aubertine, Fulper, Hunt, Southway, and Taylor dairy farms to receive an incentive payment of $15,000 each.

In sum, the court GRANTS IN PART Lead Counsel's proposal for incentive payments and GRANTS IN PART Intervenor Counsel's request to supplement the incentive payments for Subclass Representatives Aubertine and Taylor.

## CONCLUSION

For the foregoing reasons, the court:

1. AWARDS compensation of Plaintiffs' attorneys' fees in the amount of $7 million;

2. DENIES Intervenor Counsel's request for a division of attorneys' fees;

3. AWARDS compensation of Plaintiffs' counsel's unreimbursed costs and expenses in the amount of $3,810,631.86, with $3,804,337.68 designated for Lead Counsel and $6,294.18 designated for Intervenor Counsel; and

4. AWARDS $155,000 in incentive payments to Subclass Representative farms, with the Allen, Haar, Sitts, and Swantak farms receiving $20,000 per farm, and the Aubertine, Fulper, Hunt, Southway, and Taylor farms receiving $15,000 per farm.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 14th day of June, 2016.

Christina Reiss, Chief Judge
United States District Court